E-FILED
Friday, 17 June, 2022  10:54:56 AM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION**

| | | |
|---|---|---|
| PAUL BERGE and TIMOTHY KREISSLER, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 20 cv 2310 |
| CITY OF KANKAKEE, POLICE AND FIRE | ) | |
| COMMISSION OF THE CITY OF KANKAKEE, | ) | |
| CHIEF FRANK KOSMAN, MAYOR CHASTITY | ) | |
| WELLS-ARMSTRONG, WILLIE HUNT, | ) | |
| NICKEY F. YATES, Individually and in their | ) | |
| official capacities, | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants City of Kankakee, Police and Fire Commission of the City of Kankakee, Chief Frank Kosman, Mayor Chastity Wells-Armstrong (hereinafter "Wells"), Willie Hunt and Nickey F. Yates, by their attorneys, Odelson, Sterk, Murphey, Frazier & McGrath, Ltd., hereby move this Honorable Court to enter summary judgment in their favor pursuant to Federal Rule of Civil Procedure 56, stating in support thereof as follows:

### I.      INTRODUCTION

Plaintiff Paul Berge, former City of Kankakee police officer, and Plaintiff Timothy Kreissler, current City of Kankakee police lieutenant, both Caucasian, brought this lawsuit against the City of Kankakee, its Police and Fire Commission, former Police Chief Kosman, former Mayor Wells-Armstrong, former Deputy Chief Hunt and Police and Fire Commissioner Yates complaining (1) that an African American who scored lower than the two Plaintiffs on the lieutenant promotional examination was selected for promotion to lieutenant instead of the Plaintiffs; and (2) Berge was improperly terminated from the police department. Plaintiffs allege

four counts against the Defendants: (I) racial discrimination in violation of Title VII of the Civil Rights Act concerning the lieutenant promotion; (II) retaliation against the Plaintiffs for engaging in activities protected by Title VII; (III) a *Monell* claim pursuant to 42 U.S.C. §1983 alleging racial discrimination; and (IV) violation of Plaintiffs' constitutional right to Equal Protection by the individual Defendants pursuant to §1983.

Defendants seek summary judgment in their favor on all counts. The evidence produced during the course of discovery clearly demonstrates that, pursuant to Illinois law governing police department promotional examinations, Chief Kosman and the Police and Fire Commission lawfully selected the third-ranked candidate based upon merit, and not upon the candidates' race. Furthermore, it was clearly proven that Berge's termination from the police department was based upon Berge's two incidents of serious misconduct in July 2020, coupled with a significant disciplinary history, and not because of any discriminatory or retaliatory basis or motive.  Plaintiffs fail in their attempts to point to other African Americans' promotions and appointments as evidence of a basis to discriminate against Caucasian individuals or that a policy, custom or widespread practice of discrimination against Caucasian individuals existed. Plaintiffs merely complained of every time an African American was promoted or appointed, ignored the instances of Caucasian individuals being promoted or appointed, and failed to introduce any evidence that the promotions or appointments were not based upon the qualifications or experience of the candidates, but rather upon race. Also, Plaintiffs failed to introduce evidence of the existence of any similarly situated, non-Caucasian individuals who were treated more favorably than the Plaintiffs. Plaintiffs further failed to introduce sufficient evidence that the failure to promote the Plaintiffs or the termination of Berge was in retaliation for any activities protected by Title VII.

Finally, Plaintiffs failed to produce sufficient evidence that any of the individual defendants committed any culpable acts for which they could be held liable.

## II.    UNDISPUTED MATERIAL FACTS

### The Parties

1.    Plaintiff Paul Berge, Caucasian, is a resident of Kankakee County Illinois and was formerly employed by the City of Kankakee as a police officer. (Dkt. #1, Complaint, ¶8).

2.    Plaintiff Timothy Kreissler, Caucasian, is a resident of Kankakee County and is currently a lieutenant with the Kankakee Police Department. (Dkt. #1, ¶10; Ex. A, Kreissler dep. tr. p. 125).

3.    Defendant City of Kankakee is a municipal corporation incorporated under the laws of the State of Illinois.

4.    Defendant Frank Kosman, Caucasian, was the Police Chief of the City of Kankakee from May 2019 to May 2021. (Ex. B, Kosman dep. tr. pp. 5, 11, 101).

5.    Defendant Chastity Wells-Armstrong (hereinafter "Wells"), African American, was elected to the Kankakee City Council in 2015, elected as Mayor of the City of Kankakee in 2017, and served as Mayor of Kankakee until April 2021. (Ex. C, Wells dep. tr. pp. 9, 201).

6.    Defendant Willie Hunt, African American, was employed by the Kankakee City Police Department for 24 years and retired from the department in May 2021. (Ex. D, Hunt dep. tr., pp. 14-15).

7.    Defendant Nickey Yates, African American, has served as a member of the Fire and Police Commission since 2017. (Ex. E, Yates dep. tr., pp. 21-22).

**Jurisdiction and Venue**

8.      This matter is brought pursuant to 42 U.S.C. §2000e-2(a) and 42 U.S.C. §1983. (Dkt. #1).

9.      Plaintiffs filed a charge of discrimination with the EEOC in Chicago, Illinois on February 3, 2020, and Notices of a Right to Sue correspondences were issued on August 7, 2020. (Dkt. #s 1-1, 1-2).

10.     This Court has jurisdiction of this action pursuant to 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. §§ 1331 and 1343.

11.     Venue is proper pursuant to 28 U.S.C. §1391(b) because the alleged acts giving rise to Plaintiff's claims occurred in this judicial district.

**Kreissler's Employment with the Kankakee Police Department**

12.     Plaintiff Kreissler was hired by the Kankakee Police Department March 6, 2002 and promoted to Sergeant July 1, 2009. (Ex. A, p. 24; Ex. F, R. 0291).

13.     In 2010 Kreissler received a 10-day suspension concerning inappropriate sexual conversations during a ride-along with a 19- or 20-year-old girl. (Ex. A, pp. 137-38; Ex. G, R. 0449-50).

14.     Kreissler was promoted to lieutenant in March 2021. (Ex. A, pp. 123-25).

**Berge's Employment with the Kankakee Police Department**

15.     Berge was hired as a Kankakee police officer on February 11, 2006. (Ex. H, R. 0146). He was promoted to sergeant in January 2016. (Ex. I, R. 0195).

16.     Berge was previously arrested three times (Ex. J, Plaintiff Berge's dep. tr., p. 50). The first time was for criminal trespass at a concert when he was young. (Ex. J, p. 50). He was arrested in Elk Grove for possession of cannabis and paraphernalia in 1998 and pled guilty. (Ex. J, pp. 51-52, 77; Ex. K, R. 0028). He also had a DUI in 1998. (Ex. J, pp. 77-78; Ex. K, R. 0027).

17.     While employed as a Kankakee police officer, on November 4, 2007 Berge consumed alcohol for a number of hours with a sergeant, which resulted in Berge physically fighting the sergeant and seriously injuring him. (Ex. J, pp. 95-96). The sergeant was hospitalized and suffered a punctured lung, broken ribs, a ruptured eardrum and a broken orbital socket; Berge, however, did not receive any substantial injury. (Ex. J, pp. 96-97).

18.     This incident caused Chief Kinkade to question Berge's readiness for duty as a police officer. (Ex. J, p. 97). Berge was placed on administrative leave, ordered to contact the employee assistance program to seek evaluation and assistance for possible alcohol abuse and to participate in anger management counseling. (Ex. J, p. 98). He ultimately received a two-day suspension. (Ex. J, pp. 99-100).

19.     In 2014 Berge was investigated in response to a report that he was abusing steroids, and then tested positive for steroids. (Ex. J, pp. 104-05, 107). This resulted in Berge being removed from KAMEG (a specialized drug enforcement task force), entering a last-chance agreement with the City and receiving a 30-day suspension. (Ex. J, pp. 106-08; Ex. L, R. 1270-71).

20.     In 2014 Berge backed a squad car into a street pole, damaging the vehicle. (Ex. J, pp. 109-10). This was determined to be a chargeable offense and he received a written reprimand. (Ex. J, pp. 109-10).

21.     On April 14, 2012, Kankakee police responded to a call concerning a one-vehicle accident involving Berge's personal vehicle. (Ex. J, pp. 111-12). Berge reported to the responding officer that an unknown vehicle hit his vehicle while it was parked and then fled the area. (Ex. J, pp. 115-16). In fact, there was no hit-and-run; instead, Berge was driving when he damaged his own vehicle. (Ex. J, p. 117).

22.     Berge was ultimately given an unpaid 30-day suspension and another last-chance agreement for making a false police report. (Ex. J, pp. 116-17, 131-32). Berge signed the agreement that stated he admitted that he was under the influence of alcohol and unprescribed steroids at the time of the accident. (Ex. J, p. 130). The last-chance agreement was in effect for a five-year period until April 1, 2020, and per that agreement Berge agreed that if he committed another infraction, he would be terminated from the police department. (Ex. J, p. 131; Ex. M, R. 1303-04).

**Berge's incidents of misconduct in July 2020 and resulting termination**

23.     Berge was placed on administrative leave on July 20, 2020, for committing acts of insubordination by refusing to obey lawful orders from his superiors. (Ex. J, p. 133; Ex. N, R. 1706-07).

**July 15, 2020 incident:**

24.     There was a parking lot in Kankakee that had frequent and ongoing issues involving criminal damage, public intoxication, suspicious individuals, drug activity, drinking and shots fired in the summer of 2020. (Ex. N., R. 1719-20 tr. 43-45; Ex. O, R. 2057, ¶13). In response to concerns raised by City Aldermen, on July 15, 2020 Commander Austin told Berge to go to that location

and issue citations for any ordinance violations. (Ex. N, R. 1721-22, tr. 52-53; Ex. O, 2057, ¶s14-16).

25.     That afternoon Commander Austin went to the sergeant's office to find out if any citations had been issued at that location. (Ex. N, R. 1723, tr. 58; Ex. O, R. 2058, ¶17). Berge had his feet on the desk and his eyes closed. (D 1724, tr. 63-64; D2058, ¶18). Austin had to call Berge's name several times, waived his hand in front of Berge's face and tapped on the desk to get Berge to get his attention. (Ex. N, R. 1724, tr. 64; Ex. O, R. 2058, ¶s 19, 21).

26.     In response to Austin's question about if anything was done at the subject location, Berge didn't answer Austin and instead stood up and asked questions about what citizens were complaining and which aldermen were asking for something to be done, and was rude and dismissive of Austin. (Ex. N, R. 1724-25, tr. 64-65; Ex. O, R. 2058, ¶s 21-22).

27.     Berge came around the desk, got chest to chest and face to face with Austin, and berated Austin, asking what Austin has done for the three years he has been patrol commander, stating it was not Austin's department anymore, it was their department, and they were going to take it back, and that Austin didn't know how to do his job. (Ex. N, R. 1725, tr. 67-68; Ex. O, R. 2058-59, ¶ 23). Austin considered this to be insubordination. (Ex. N, R. 1725-26 tr. 68-69; Ex. O, 2059, ¶24).

28.     When Berge answered the phone during his conversation with Austin, Austin ordered Berge to hang up four times, which Berge ignored. (Ex. N, R. 1726, tr 69-70; Ex. O, R. 2059, ¶25). Austin pushed down the receiver and told Berge he was relieved of duty and to leave the department, but Berge did not immediately comply.  (Ex. N, R. 1726, tr. 70-72; Ex. O, R. 2059, ¶26).

29.     Austin informed the chief of the incident that day and wrote a report about the incident. (Ex. P, R. 1383-84; Ex. N, R. 1797, tr. 70-71, R. 1727 tr. 74; Ex. O, R. 2059, ¶28, R. 2060, ¶38). Austin considered Berge to be insubordinate, discourteous, disrespectful, dismissive, rude and elusive during the incident. (Ex. N, R. 1725, tr 65, R. 1727, p. 74).

**July 18, 2020 incident:**

30.     On July 18, 2020, there was a planned peaceful protest march taking place in Kankakee in response to the occurrence in Minneapolis involving George Floyd. (Ex. N, R. 1790, tr. 44; Ex. O, R. 2065, ¶75). Chief Kosman determined it was sufficient to have himself and two other officers present, and Berge was not assigned a detail for the march. (Ex. N, R. 1791, tr. 45-47, R. 1792, tr. 50; Ex. O, R. 2065-66, ¶s 75, 77).

31.     When the marchers proceeded to the courthouse, Berge started walking towards the front of the courthouse. (Ex. N, R. 1793, tr. 53-54; Ex. O, R. 2066, ¶79). Chief Kosman did not want Berge intermingling with the protestors and gave him an order to leave and go back to his car. (Ex. N, R. 1793, tr. 55; Ex. O, R. 2066, ¶79). Chief Kosman had to repeat the order several times, the last time stating it was a direct order to go back to his car and leave. (Ex. N, R. 1793, tr. 55-56; Ex. O, R. 2066, ¶80).

32.     Berge turned away from Chief Kosman, waived him off and proceeded to head towards the courthouse. (Ex. N, R. 1793-94, tr. 55-58; Ex. O, R. 2066, ¶80, R. 2067, ¶82).

33.     Chief Kosman told Sergeant Miller what happened, and Miller went to talk to Berge. (Ex. N, R. 1794, tr. 57-58; Ex. O, R. 2066-67, ¶s 81-82). As Berge walked away from the courthouse, the Chief approached Berge and told him to go back to his car, leave the area, he was done for the day, and to report to the Chief's office his next workday. (Ex. N, R. 1794, tr. 59; Ex. O, R. 2067, ¶s 82-84). Berge told Chief Kosman he didn't have to follow unlawful orders and that

the Chief's order was unlawful. (Ex. N, R. 1794, tr. 60; Ex. O, R. 2067, ¶83). Chief Kosman ordered him to leave, but he did not. (Ex. N, R. 1794, tr. 60; Ex. O, R. 2067, ¶s 83-84). Berge told Chief Kosman he was a poor leader and maybe it was time for the chief to retire. (Ex. N, R. 1795, p. 61; Ex. O, R. 2067, ¶84).

34.     Lieutenant Passwater arrived, and the Chief again told Berge to go to the station, put away his gear, and come to his office his next workday. (Ex. N, R. 1795, tr. 62-63; Ex. O, R. 2067, ¶85). Berge again did not comply with the order. (Ex. N, R. 1795 tr. 63; Ex. O, R. 2067, ¶86). Instead, he asked Passwater what he should do, and Passwater told Berge to listen to the Chief, and Berge finally complied. (Ex. N, R. 1795, tr. 63; Ex. O, R. 2067, ¶86).

35.     Passwater has been a member of the police department for 31 years and a lieutenant for 20 years, and was not aware of any other occasion in which a subordinate officer refused to follow the order of the Chief of Police. (Ex. N, R. 1752, tr 175, R. 1756, tr. 190-91; Ex. O, R. 2062, ¶50, R. 2063, ¶60).

36.     On July 20th Chief Kosman advised Berge orally and in writing he was being placed on administrative leave based upon his conduct on July 15th and July 18th and indicated the policies Berge violated. (Ex. N, R. 1706-07, R. 1798, tr 73-74; Ex. O, R. 2068, ¶88).

37.     Chief Kosman reviewed video footage from the July 18th incident and received memos concerning both incidents, and then set up a formal interrogation of Berge advising him that any admissions made during the course of the interrogation could be used in charges seeking his dismissal, with notice of the interrogation being served upon Berge on July 24, 2020. (Ex. N, R. 1703-1705, R. D1798, tr. 75-76; Ex. O, R. 2059, ¶28, R 2068, ¶s 89-90).

9

38.     Chief Kosman then reviewed the interrogation transcript, determined that Berge made false statements, and filed charges seeking Berge's termination on August 13, 2020. (Ex. N, R. 1639-42; D 1802-04 tr 90-97; D2069, ¶96-97).

39.     Incidents of Berge's past misconduct were also introduced at the termination hearing in aggravation. (Ex. N, R. 1882, tr. 5). Chief Kosman introduced evidence of the November 2007 incident in which Berge was involved in a physical altercation with a superior officer and received a three-day suspension for conduct unbecoming of an officer, and was directed to refrain from consuming intoxicating beverages to the extent that it results in intoxication or offensive behavior that discredits him or the department. (Ex. N, R. 1882, tr. 6).

40.     The Board also was made aware that in 2014 Berge received a 30-day suspension for using steroids without a prescription, and that as a result of this incident, Berge was also removed from KAMEG. (Ex. N, R. 1882, tr. 6-7).

41.     Also introduced was the 2012 incident wherein Berge wrecked his personal vehicle by crashing into a building while under the influence of alcohol and un-prescribed steroids, and then subsequently filed a false police report claiming it was a result of a hit-and-run incident. (Ex. N, R. 1882, tr. 8).

42.     When the Commissioners were given the opportunity to ask questions of Berge, Commissioners Bessant, Landwehr and Flores asked Berge about whether he had discretion to ignore the order of his supervisors, whether he gives orders to his subordinates, and whether his supervisors expected orders to be followed immediately. (Ex. N, R. 1847-48, tr. 269-73, R. 1849, tr. 278, 280). Berge then testified that in his fifteen years of experience he never encountered supervisors that wanted orders to be followed immediately. (Ex. N, R. 1849, tr. 280). Commissioner Yates then asked if Berge participated in the vote of no confidence against his

police supervisors, which was related to Berge's testimony concerning receiving and following direct orders given by supervisors. (Ex. N, R. 1849-50, tr. 280-81). Ultimately the question was determined to be outside the scope of the hearing and not answered. (Ex. N, R. 1850, tr. 281).

43.     The Board of Fire and Police Commissioners then voted to terminate Berge on December 1, 2020 and issued its written findings of fact and decision. (Ex. N, R. 1897, tr. 65-66; Ex. O, R. 2056-78).

44.     The Board of Fire and Police Commissioners that made the decision to terminate Berge was comprised of five members: Dr. Willie Davis, Mr. Nickey Yates, Ms. Dawn Landwehr, Ms. Cortney Bessant, and Mr. Mario Flores. All five members signed the order terminating Berge, and four out of five of the members voted in favor of terminating Berge, with Commissioner Flores being absent from the proceedings that evening. (Ex. N, R. 1897; tr. 65-66; Ex. O, R. 2077-78). Only Mr. Yates, however, was named as a defendant in this matter.

**Promotion of Sneed to Lieutenant instead of Plaintiffs:**

45.     It was Chief Kosman's decision to promote Sneed to lieutenant and not Mayor Well's or Deputy Chief Hunt's. (Ex. A, pp. 98, 118, 122-23; Ex. C, p. 194; Ex. B, p. 103). Mayor Wells was not involved in Sneed's promotion to lieutenant and Kosman never discussed whether Mayor Wells wanted Sneed to be promoted. (Ex. B, p. 137).

46.     Chief Kosman reviewed the personnel files of the three candidates, Kreissler, Berge and Sneed, which contained their discipline. (Ex. B, pp. 110-11). Chief Kosman also observed them for three months, reviewed their reports, observed how they interacted with other personnel and spoke with them. (Ex. B, pp. 111-12, 136).

47.     On August 8, 2019, Chief Kosman sent a memorandum to the Board of Fire and Police Commissioners listing Kreissler, Berge and Sneed as the three candidates eligible for promotion to lieutenant. (Ex. Q, R. 2267-68). The memorandum provided a summary of the

experience of the three candidates, with Kreissler having 17 years of experience and being the acting detective commander, Berge having 13 years of experience and a being sergeant on the midnight shift, and Sneed having 22 years of experience and being the supervisor of the Gang Enforcement Tactical unit. (Ex. Q, R. 2267).

48.    The memorandum further explained why Chief Kosman was recommending Sneed for promotion to lieutenant, stating "All three candidates are capable sergeants who can be expected to perform the duties of lieutenant successfully. However, Sergeant Sneed has distinguished himself by serving meritoriously for 12 years in KAMEG including the last 6 months of his tenure there as the deputy director of the task force. Since leaving KAMEG, he has successfully commanded the newly formed tactical unit which so far in 2019 is responsible for 30 drug arrests, 8 guns seized, 20 new gang contacts and 38 warrant arrests. Based on his exhibited skills, knowledge and experience, I recommend him for promotion to lieutenant." (Ex. Q, R. 2267).

49.    Chief Kosman thought Sneed was more pro-active in that he was in charge of the gang unit, and Chief Kosman thought that is what the department needed. (Ex. B, p. 119). Chief Kosman thought Kreissler was satisfactory in his position in acting detective commander, but he did not see Kreissler being proactive with arrests and investigations or going above and beyond satisfactory performance. (Ex. B, pp. 132-33). Chief Kosman did consider that Kreissler had served as acting commander. (Ex. B, p. 232). Sneed's promotion was not based upon race. (Ex. B, p. 26)

50.    Chief Kosman then went to the Board of Fire and Police Commissioner's meeting to discuss his recommendation for Sneed's promotion. (Ex. B, pp. 115-16). Chief Kosman informed the board members he was recommending promoting Sneed out of rank order. (Ex. B, p. 116).

51.     The Board voted to approve Chief Kosman's recommendation. (Ex. B, p. 115; Ex. E, p. 65-66). The Board looked at more than test scores, and wanted to look at the entire person, including time in uniform, and Sneed had the most. (Ex. E, p. 68). The Board additionally looked at leadership capacity, and Sneed had served in a leadership capacity in the drug unit (Ex. E, pp. 71, 109). The Board considered that Kreissler had military experience, but it was not a determining factor. (Ex. E, p. 162). The Board further considered the Chief's recommendation (Ex. E, p. 72). The fact that Sneed was African American and the other two candidates were Caucasian was not a factor in the Board's determination. (Ex. E, pp. 69-70, 72). The Board did not see any letters of recommendation for any candidate. (Ex. E, pp. 76, 112).

52.     Kreissler had no firsthand knowledge that Mayor Wells, Deputy Chief Hunt, Commissioner Yates or the Kankakee City Council were involved with selection of Sneed for promotion. (Ex. A, pp. 98, 192-93). Further, Kreissler never had any conversations concerning promotions with Mayor Wells, Commissioner Yates or Deputy Chief Hunt. (Ex. A, pp. 139-40).

53.     At the time the subject lieutenant's promotional list was in place with Kreissler and Berge ranked first and second, Chief Kosman was Caucasian; Deputy Chief Hunt was African American; Commander Austin was African American, and the other Commander was either Skelly or Etzel, both of whom were Caucasian. The Lieutenants were Etzel, Passwater, Skelly and Lowman, all of whom were Caucasian. Sergeants Raimondo, Malendine, Kreissler, Hunter, Nicholas were Caucasian, except Hunter who is African American. (Ex. J, pp. 186-92).

**Other promotions referenced by Plaintiffs:**

54.     Sneed was third on the sergeant promotional list in 2014 or 2015 when he was promoted over officers Berge and Halper. (Ex. J, p. 146) This occurred, however, right after Berger was suspended for the steroid use. (Ex. J, pp. 146-47).

55.     Four out of the five chiefs Deputy Chief Hunt has worked under have skipped orders for promotions. (Ex. D, p. 33). Former Chief Dumas promoted Gary Tyson, a Caucasian, who skipped over others on the promotional list. (Ex. D, p. 137).

56.     Following Wells taking office as mayor, non-African American individuals were promoted, including Gary Tyson (Caucasian), Jose Martinez (Latino), Lacy (Caucasian), Jay Etzel (Caucasian), Coash (Caucasian), and eventually Kreissler to lieutenant in 2021. (Ex. C, p. 190; Ex. B, pp. 223-25; Ex. A, pp. 123-25).

57.     Plaintiffs' complaint states that in February 2018, Steve Hunter, an African American, was promoted to sergeant as the third-ranked candidate on the sergeant's promotional list, skipping over two Caucasian male candidates. (Dkt. 1, #33-34). Hunter was selected because he's very good at his job. (Ex. C, p. 193). The union supported the promotion of Hunter and said he was the most qualified on the list. (Ex. D, p. 144).

58.     The commanders are selected by the police chief. (Ex. C, p. 105). Former Chief Dumas removed Kidwell from Commander and replaced him with Donell Austin and made Kidwell director of KAMEG. (Ex. C, pp. 123-25, 132). This was done to give someone else in the department a chance to do it. (Ex. A, p. 184).

**Berge's Sexual Harassment claim:**

59.     Kankakee Police Department Policy 328 requires any incident of sexual harassment to be timely documented and reported to the appropriate supervisor. (Ex. R, pp. 650-54); Ex. J, pp. 93-94). A copy of this policy was signed by Berge on June 5, 2017. (Ex. J, pp. 93-94). Berge did not make any complaint of sexual harassment until he was in the middle of his interrogation on July 30th concerning his incidents of misconduct that occurred on July 15th and July 18th. (Ex. N, R. 1639-42, R. 1658, tr. 48-49).

60.     Berge claimed that on July 15th when Commander Austin was attempting to speak with him about Berge's failure to follow the order to issue citations and Berge had his eyes closed and feet up on the desk, Austin put his foot on a chair near him and allegedly was trying to put his crotch in Berge's face. (Ex. N, R. 1658, tr. 48-49). Contrary to the City's policy requirements, Berge never made any complaint of sexual harassment in writing to his supervisor, and did not make any kind of report in a timely manner. (Ex. J, pp. 94-95)

61.     Chief Kosman interviewed Commander Austin about Berge's sexual harassment complaint about a week after hearing about it. (Ex. B, pp. 125). Berge's complaint was made part of the file concerning Berge's insubordination and no separate report number was assigned to it because it had already gone through the interrogation process as part of the investigation into Berge's insubordination. (Ex. A, pp. 129-30). Chief Kosman did not interview Berge personally because Berge made his statement during his interrogation. (Ex. B, p. 131).

**Plaintiffs' EEOC Charges:**

62.     Plaintiffs Kreissler and Berge filed charges of discrimination with the EEOC on February 3, 2020. (Dkt. # 1-01).

63.     Chief Kosman was not aware of Berge's EEOC charge concerning discrimination at the time he testified at Berge's termination hearing on September 30, 2020. (Ex. B, p. 122; Ex. N, R. 1818, tr. 154).

64.     Berge had no knowledge of anyone at the City knowing of his filing the EEOC charge (Ex. J, pp. 21-22, 159). Berge did not have any communications with Chief Kosman, Mayor Wells, Deputy Chief Hunt, Commissioner Yates or anyone at City Hall concerning his EEOC charges, and did not advise anyone in administration of the charge. (Ex. J, pp. 159-60, 173-74).

**Mayor Wells:**

65.     Mayor Wells wanted to improve diversity on the department, which included improving gender, ethnicity and sexual orientation diversity (Ex. C, p. 129). She also wanted to develop better relationships with the community, and to address gun violence. (Ex. C, p. 138).

66.     The mayor appoints the village attorney, the village engineer, and the department heads. (Ex. C, p. 43). She appointed Pat Power (Caucasian) as City attorney; Tomora Nelson as Code official (African American); Damon Schuldt (Caucasian) as fire chief; Elizabeth Kubal (Caucasian) as comptroller; Mike Hoffman (Caucasian) as Village planner; Neil Piggush (Caucasian) to village engineer; and Pete Schiel (Caucasian) to Utility Supervisor. (Ex. 43-52)

67.     The first police chief Mayor Wells appointed was Robin Passwater, Caucasian. (Ex. C, p. 46). After he quit the position, she appointed Price Dumas as acting chief and requested the City Council to approve Dumas as Chief, but they did not.  (Ex. C, pp. 53, 112). She did not reach out to Dumas to be the Chief because he was African American. (Ex. C, p. 116). Following the counsel's rejection of Dumas, the position was posted, and internal and external applications were submitted. (Ex. C, pp. 107-08). Frank Kosman, Caucasian, was then appointed as chief. (Ex. C, pp. 108, 163).

68.     The police chief had full autonomy to run the police department. (Ex. C, p. 135). Mayor Wells was not involved in any decisions affecting the police department, including having no involvement in police department promotions, other than appointing the chief. (Ex, C, pp. 135, 172).

69.     Berge had no knowledge or information that Mayor Wells participating in the day-to-day operations of the police department, and never saw any memos from hir directing personnel on what to investigate, time off, scheduling, instituting or changing policies, hiring or the day-to-

day operations of the police department. (Ex. J, pp. 199-200, 204-05). Berge only saw her one time at the police department when she said hello and brought donuts. (Ex. J, p. 205).

### Deputy Hunt

70.    Berge had no knowledge that Deputy Chief Hunt was involved with hiring in the police department. (Ex. J, p. 201). Deputy Chief Hunt had no involvement with Sneed's promotion either time Sneed was promoted. (Ex. D, p. 46). Kreissler asked Chief Kosman if the decision to promote Sneed to lieutenant was Hunt's decision and the Chief said "no, this is my decision." (Ex. A, p. 122-23).

### Commissioner Yates

71.    Commissioner Yates voted to terminate Berge, but it was not based upon Berge casting a 'no confidence' vote in the leadership or making comments about taking back the Department. (Ex. E. pp. 98-99). Yates never made any attempt to get more black people in the department (Ex. E, p. 135).

72.    Yates believes blacks have been treated unfairly in the county and the city. (Ex. E, p. 52).

### Chief Kosman

73.    Chief Kosman promoted and recommended for promotion Caucasian individuals, including promoting Jay Etzel to commander, Coash to sergeant, a female officer to sergeant, and Plaintiff Kreissler to lieutenant. (Ex. B, pp. 222-25). He also recommended Martinez, Hispanic, to sergeant. (Ex. B, p. 225).

74.    Chief Kosman had no knowledge of Berge filing a discrimination charge during Berge's termination hearing, but was aware of it at the time his deposition was taken. (Ex. B. p. 122; Ex. N, R. 1818, tr. 154).

### III.    ARGUMENT

**A.    Summary Judgment Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether there is any material dispute of fact that requires a trial, the court is to construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994); *Singer v. Raemisch*, 593 F.3d 529, 533 (7th Cir. 2010). A court's favor toward the nonmoving party, however, does not extend to drawing inferences which are only supported by speculation or conjecture. See *Singer*, 593 F.3d at 533. In addition, this court "need not accept as true a plaintiff's *characterization* of the facts or a plaintiff's legal conclusion." *Nuzzi v. St. George Cmty. Consol. Sch. Dist. No. 258*, 688 F. Supp. 2d 815, 835 (C.D. Ill. 2010) (emphasis in original). Moreover, the party opposing summary judgment may not rely on the allegations contained in the pleadings. *Waldridge*, 24 F.3d at 920. "[I]nstead, the nonmovant must present definite, competent evidence in rebuttal." *Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 924 (7th Cir. 2004). Summary judgment "is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Koszola v. Bd. of Educ. of City of Chicago*, 385 F.3d 1104, 1111 (7th Cir. 2004), quoting *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003). Specifically, to survive summary judgment, the nonmoving party "must make a sufficient showing of evidence for each essential element of its case on which it bears the burden at trial." *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 936 (7th Cir. 2007), citing *Celotex Corp.*, 477 U.S. at 322-23.

**B.     The official capacity claims brought against the individual defendants are redundant to claims brought against the City.**

The official capacity claims against the individual defendants should be dismissed because they are duplicative of the claims against the Defendant City of Kankakee. "[A]n official capacity suit is another way of pleading an action against an entity of which the officer is an agent." *Sow v. Fortville Police Department*, 636 F.3d 293, 300 (7th Cir. 2011). See also *Lugg v. Sutton*, 368 F.Supp.3d 1257, 1264 (C.D. Ill. 2019) (claims against individuals in their official capacities are redundant and immaterial when governmental entity also named as a defendant). Thus, Plaintiff's official capacity claims against Defendants Kosman, Wells, Hunt and Yates should be dismissed.

**C.     Any claims and facts concerning alleged violations of Michael Shreffler should be disregarded for purposes of ruling upon this motion.**

Plaintiff's allegations concerning the termination of Michael Shreffler are irrelevant to these proceedings. (Complaint, ¶s 38-41). The attorneys representing Plaintiffs Berge and Kreissler also filed a lawsuit on behalf of Michael Shreffler against the City of Kankakee, (No. 19-cv-20170, C.D. Ill.), alleging violations of Shreffler's constitutional rights and Title VII stemming from his termination from the Kankakee police department. On September 28, 2021, the Court granted the defendants' motion for summary judgment in its entirety. (19-cv-2170, Dkt. # 35). Thus, if the Court has already determined that Shreffler's rights have not been violated, such allegations should not be used as a basis in this litigation to demonstrate discrimination or retaliation in this case.

**D.     Defendants should be granted summary judgment on Counts I and III of the Complaint because Plaintiffs failed to produce sufficient evidence to demonstrate that they were discriminated against in the promotional process because of their race, or that the City had a policy, custom or widespread practice of discriminating against Caucasians.**

Count I of Plaintiffs' Complaint alleges the Plaintiffs were denied promotion to lieutenant based upon their race in violation of Title VII.  Count III sets forth a §1983 *Monell* Claim, alleging

19

Plaintiffs were denied equal protection by being discriminated against in the promotional process because of their race. These claims can be analyzed together. See *Cole v. Bd. of Trustees*, 838 F.3d 888, 899 (7th Cir. 2016) ("The same requirements for proving race discrimination apply to claims under Title VII and the Equal Protection Clause, so we consider them together." See also *Lavalais v. Vill. of Melrose Park,* 734 F.3d 629, 635 (7th Cir. 2013) (Title VII and §1983 race discrimination employment claims are analyzed under the same standards). "[*A*]*ll* discrimination cases present the same basic legal inquiry: At the summary-judgment stage, the proper question to ask is 'whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the [plaintiff's] discharge or other adverse employment action.'" *Ferrill v. Oak Creek-Franklin Joint Sch. Dist.*, 860 F.3d 494, 499 (7th Cir. 2017). The burden-shifting analysis established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) is still a viable option for analyzing employment discrimination claims. *Barbera v. Pearson Educ., Inc.,* 906 F.3d 621, 629 (7th Cir. 2018).

In this case, Plaintiffs are pursuing a reverse-discrimination claim, as they are white plaintiffs.  See *Hosick v. Chicago State University Board of Trustees*, 924 F.Supp.2d 956, 966 (N.D. Ill. 2013), citing *Mills v. Health Care Service Corp.*, 171 F.3d 450, 455-57 (7th Cir. 1999). To survive summary judgment under the burden-shifting approach in a reverse discrimination case, a plaintiff must show: (1) background circumstances exist to show an inference that the employer has reason or inclination to discriminate invidiously against whites or evidence that there is something "fishy" about the facts at hand; (2) he was meeting his employer's legitimate performance expectations; (3) he suffered an adverse employment action; and (4) he was treated less favorably than similarly situated individuals who are not members of his protected class. *Formella v. Brennan*, 817 F.3d 503, 511 (7th Cir. 2016); *Bless*, 9 F.4th at 574. If the plaintiff

makes this prima facie showing, then the burden would shift to the defendant to present a legitimate, non-discriminatory reason for the challenged employment action. *Formella*, 817 F.3d at 511. If the defendant carries this burden, then the burden would shift back to the plaintiff to show pretext, or at least to produce evidence establishing a genuine factual dispute about pretext to defeat summary judgment. *Formella*, 817 F.3d at 511.

In this case, Plaintiffs failed to establish 'background circumstances' that the Defendants had reason or intent to discriminate against white individuals, or that they were treated less favorably than similarly situated individuals. Defendants have also presented legitimate, non-discriminatory reasons for the promotion of Sneed over the Plaintiffs.

1. Plaintiff failed to show any background circumstances existed that would support an inference that the Defendants had reason to discriminate against the Plaintiffs because of their race or that the City had a policy, custom or widespread practice of discriminating against Caucasians.

The Plaintiffs' complaint, as well as many of the questions posed to the Defendants at their depositions, concerned topics that are unrelated to the Plaintiffs' claimed injuries of both failing to be promoted and Berge being terminated. Nevertheless, the evidence produced during discovery showed that the Defendants appointed and promoted both African American and Caucasian people, and Plaintiff did not produce any evidence that when African American people were promoted, those promotions were based upon discrimination against Caucasian people. Thus, there was no policy, custom or widespread practice of discriminating against Caucasian people.

First, the appointments made by Mayor Wells to the City's administration were overwhelmingly made to Caucasian individuals.  (SOF #66). Also, two of the three police chiefs she appointed were Caucasian. (SOF #67). Further, following Wells taking office as mayor, non-African American individuals were promoted in the police department. (SOF #56).

21

Moreover, at the time the lieutenant's promotional list from which Plaintiffs' claim they should have been promoted was in place, the command staff of the police department was composed of both African Americans and Caucasians. (SOF # 53).

Further, this was not the first time that the top-ranked candidate on a promotional list was skipped over for promotion. Deputy Chief Hunt testified that four out of the five chiefs Hunt has worked under have skipped orders for promotions. (SOF # 55). Chief Dumas promoted Gary Tyson, Caucasian, who skipped over others on the promotional list. (SOF #55).

Plaintiffs' Complaint states that in February 2018, Steve Hunter, an African American, was promoted to sergeant as the third-ranked candidate on the sergeant's promotional list, skipping over two Caucasian male candidates. (Dkt. 1, #33-34). The only evidence produced during discovery concerning the basis for this promotion was that Hunter was selected because he's very good at his job. ((SOF #57). The union supported the promotion of Hunter and said he was the most qualified on the list. ((SOF #57). No evidence was produced that this was because Hunter was African American or that the other two candidates were Caucasian.

Berge also complains that in 2014 or 2015 he and Officer Halper were skipped over for promotion to sergeant and Sneed promoted instead. (SOF #54). This, however, occurred right after Berger was suspended for the steroid use. ((SOF #54). No evidence was introduced concerning Officer Halper's disciplinary history or other qualifications in comparison to those of Sneed or Berge.

Former Chief Dumas removed Kidwell from Commander and replaced him with Donell Austin, and made Kidwell director of KAMEG. (SOF #58). The changes in command were done to give someone else in the dept. a chance to do it. (SOF #58).

Such occurrences do not demonstrate any basis for discrimination against the Plaintiffs based upon being Caucasian. Plaintiffs pointing to every time an African American was selected for a promotion or appointment -- without providing any evidence as to the number of Caucasian people were promoted or appointed, or any evidence concerning the experience and qualifications of those selected versus those who were not – does not amount to showing that the employer has an inclination to discriminate invidiously against white people.

Moreover, while the Mayor did have a goal of improving diversity in the department, this goal encompassed increasing gender, ethnicity and sexual orientation diversity. (SOF # 65). She also had goals of improving relationships with the community and to address gun violence. (SOF #65). However, none of this constitutes evidence of discrimination against Caucasians or Plaintiffs.

In the lawsuit filed by Shreffler (C.D. Ill. No. 19-cv-20170), Plaintiff Shreffler pointed to the same basis of evidence set forth in this case to attempt to demonstrate that background circumstances existed for the employer to discriminate against the white plaintiffs, which the Court did not find sufficient:

> Plaintiff cites to Mayor Wells-Armstrong's' statements about the lack of diversity on the KPD and the demotion of several white officers and promotion of black officers in their place as evidence of "background circumstances" necessary to show an inference that the City had reason or inclination to discriminate against him, as a white officer. However, the Mayor's statements on diversity are of little value in assessing Plaintiff's discrimination claim, because the comments were not made around the time of Plaintiff's termination and were not made in reference to Plaintiff's termination or other disciplinary actions taken against Plaintiff. See *Teruggi v. CIT Group/Capital Finance, Inc.*, 709 F.3d 654, 661 (7th Cir. 2013). (*Shreffler* MSJ decision, Dkt. #35, p. 35).

Likewise, in this case Mayor Wells-Armstrong's statements about wanting to improve diversity are also of little value to Plaintiffs Kressler's and Berge's discrimination claims because no evidence was introduced as to when these statements were made, and they were not made in reference to the Plaintiffs. Furthermore, wanting to improve diversity standing alone is not

actionable misconduct. See *Rudin v. Lincoln Land Cmty. College*, 03-3079, 2004 U.S. Dist. Lexis 33786, *23 (C.D. Ill. Oct. 1, 2004) ("it is not illegal for the LLCC administration to desire a more diverse faculty.").

Therefore, Plaintiffs have failed to show background circumstances existed that the Defendants had reason or an intent to discriminate against Caucasian individuals, or that there was a policy, custom or widespread practice of discriminating against Caucasians.

2.  <u>Plaintiffs failed to show they were treated less favorably than similarly-situated individuals outside of their protected class.</u>

Plaintiffs Berge and Kreissler also cannot demonstrate that they were treated less favorably than similarly situated individuals who are not members of his protected class. As stated in the *Shreffler* decision:

> To determine whether employees are similarly situated, courts ask "whether the other employees' situations were similar enough to the plaintiff's that it is reasonable to infer, in the absence of some other explanation, that the different treatment was a result of race or some other unlawful basis." *de Lima Silva*, 917 F.3d at 559, quoting *Luster v. Illinois Department of Corrections*, 652 F.3d 726, 730 (7th Cir. 2011). To be "similarly situated," co-workers must be directly comparable to the plaintiff in all material aspects, but they need not be identical in every conceivable way. *Langenbach v. Wal-Mart Stores, Inc.*, 761 F.3d 792, 802 (7th Cir. 2014). There must be enough common factors to allow for a meaningful comparison in order to divine whether intentional discrimination was at play, which, in the usual case, means a plaintiff must at least show that the comparators (1) dealt with the same supervisor; (2) were subject to the same standards; and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them. *Coleman v. Donahoe*, 667 F.3d 835, 847 (7th Cir. 2012). (*Shreffler* MSJ decision, Dkt. #35, p. 36).

65 ILCS 5/10-2.1-15 provides that promotions shall be made of any of the three individuals who scored the highest rating on the promotional examinations. "[T]his provision grants to a police or fire commission the discretion to promote any candidate from among the highest candidates that appear on a certified promotional list." *Brunke v. Bd. of Fire & Police Comm'rs*, 99 Ill.App.3d

24

25, 28 (1ˢᵗ Dist. 1981) (plaintiff had no vested right to promotion just because he was ranked higher on promotional examination list than person who was ultimately selected). See also *McCoy v. Bd. of Fire & Police Comm'rs,* 79 Ill.App.3d 742, 743-44 (1ˢᵗ Dist. 1979) (promotion is a matter of discretion, and a plaintiff did not have a right to promotion solely because his name appeared on the promotion list).

In this case, while Sneed took the same promotional examination as the two Plaintiffs, he was not a similarly situated individual because he had different experience and qualifications that distinguished him from the Plaintiffs as the most qualified to be promoted to Lieutenant, and evidence that the decision to promote Sneed was not based upon the race of Plaintiffs or Sneed. First, Sneed had five more years of experience than Kreissler, and 9 more years of experience than Berge. (SOF #47). Additionally, Sneed had distinguishing experience serving as a member of KAMEG for 12 years, including the last 6 months of his tenure serving as the deputy director of the task force. (SOF #48). Moreover, since leaving KAMEG, Sneed successfully commanded the newly formed tactical unit which, at the time of the Chief's recommendation, was responsible for 30 drug arrests, 8 guns seized, 20 new gang contacts and 38 warrant arrests in 2019. (SOF #48).

Plaintiffs do not actually identify any other similarly situated comparators who were not members of his class who received more favorable treatment than they did. Plaintiffs attempt to compare the promotion of Hunter (African American) over two other white candidates for promotion to sergeant in February 2018 (Dkt. #1, ¶34). This, however, is not a directly comparable situation because the three individuals eligible for promotion were different individuals with different qualifications, experience and other factors that may have been considered during the promotional decision, and the sergeant position may require different qualifications from the lieutenant position. Plaintiffs did not produce any evidence as to the individual qualifications,

experience, disciplinary history, or any other information concerning Hunter or the two individuals who were passed over by Hunter in order to demonstrate that those two individuals were similarly situated to the Plaintiffs. Moreover, the only evidence presented concerning the reasons for the promotion was that Hunter was very good at his job, the union supported the promotion, and the union said he was the most qualified candidate. (SOF #58).

Other claims concerning the promotion of individuals to administrative positions within the police department are even less comparable. (Dkt. #1, ¶36). Plaintiffs did not apply and were not considered for promotion to commander, deputy chief or chief. Moreover, there is no promotional examination for these positions. Thus, any complaints about such individuals being promoted are irrelevant.

Counts I and III do not allege that Berge was terminated as a result of racial discrimination. Even if this were considered, however, Berge has not provided any evidence of another similarly situated employee who engaged in the type of misconduct in which he engaged, nor with the history of previous misconduct that was contained in his personnel record. "It is well established that a plaintiff must provide specific evidence and specific examples of employees who have been treated more favorably in order to establish this element." *Dority v. city of Chicago*, 2001 WL 1155286, *14 (N.D. Ill. Sept. 28, 2001). "Blanket arguments that Plaintiff is similarly situated to every other officer in the KPD who may have committed similar infractions will not suffice." (*Shreffler* MSJ decision, Dkt. #35, p. 37). Like Sheffler, Plaintiff has not provided any names of any similarly situated individuals who may have been terminated because of their race, nor any evidence of their job performance or specific misconduct they committed in order to demonstrate there existed any similarly situated individuals who were terminated because of their race.

3.   The Defendants had legitimate, non-discriminatory reasons for Defendants' actions concerning Plaintiffs

26

a)      Promotion of Sneed over Plaintiffs:

Defendants had legitimate, non-discriminatory reasons for promoting Sneed over Plaintiffs. As stated above, Sneed had more years on the force and had served on the KAMEG task force for 12 years, including serving as the deputy director. (SOF #47, 48). The Chief also believed Sneed was more proactive than Kreissler, and had reviewed the personnel files of the three candidates, observed them, reviewed their reports, observed their interactions with other personnel, and spoke with them when determining who he would recommend for promotion. (SOF #46, 49). In affirming the Chief's recommendation, the Board wanted to look at more than promotional test scores and at the person as a whole, and considered Sneed's time in uniform, leadership experience and the Chief's recommendation. (SOF #51). Race of the candidates was not a consideration. (SOF #51).

b)      Termination of Plaintiff Berge:

Further, Defendants demonstrated a legitimate, non-discriminatory reason for Berge's termination – in this case, Plaintiff's repeated insubordination to his superiors, coupled with his prior disciplinary infractions.

As set forth in Defendants' statement of facts, Berge had two incidents of insubordination in close proximity of time, coupled with a history of prior severe disciplinary infractions. On July 15, 2020, Berge ignored Commander Austin's order to write citations for ordinance violations, was nonresponsive to Austin's attempts to get his attention when Austin attempted to speak with Berge about the citations, was rude and dismissive towards Austin, berated Austin, made multiple derogatory statements about Austin's job performance, and ignored Austin's orders to end a phone call. (SOF #24-28). Austin wrote a report of the incident and considered Berge to

27

be insubordinate, discourteous, disrespectful, dismissive, rude and elusive during the incident. (SOF #29).

On July 18, 2020, Berge ignored multiple orders from the Chief of Police to leave an area, instead waiving off the Chief and heading towards where he was not supposed to leave. (SOF #30-32). Additionally, Berge told the Chief he didn't have to follow his orders, he was a poor leader, and maybe it was time for the Chief to retire. (SOF #33). The Chief reviewed video and reports concerning the incidents, then placed Berge on administrative leave two days later, and set up a formal interrogation of Berge. (SOF #36-37). Following the interrogation, Chief Kosman filed charges seeking Berge's termination. (SOF #38).

Incidents of Berge's past misconduct were also introduced at the termination hearing in aggravation. (SOF #39). The Chief introduced evidence of the November, 2007 incident in which Berge was involved in a physical altercation with a superior officer and received a three-day suspension for conduct unbecoming of an officer. (SOF #37). The Board also was made aware that in 2014 Berge received a 30-day suspension for using steroids without a prescription, and that as a result of this incident, Berge was also removed from KAMEG. (SOF #40). Also introduced was the 2012 incident wherein Berge wrecked his personal vehicle by crashing into a building while under the influence of alcohol and un-prescribed steroids, and then subsequently filed a false police report claiming it was a result of a hit-and-run incident. (SOF #41).

Finally, it is not the court's function to second-guess whether Plaintiff should have been terminated for his misconduct. In adjudicating claims under federal employment discrimination statutes, a court does not sit as a 'super-personnel department,' second-guessing an employer's 'business decision as to whether someone should be fired or disciplined because of a work-rule violation.'" *Coleman v. Donahoe*, 667 F.3d 835, 862 (7th Cir. 2012). Defendants have shown that

the decision to terminate Berge was not disproportionate to his misconduct, and Plaintiff has failed to show that the purported reason for his termination was to cover up a racially discriminatory motive. *Lord v. High Voltage Software, Inc.,* 839 F.3d 556, 564 (7th Cir. 2016).

**E.     Defendants should be granted summary judgment on Count II of Plaintiffs' Complaint because Plaintiffs cannot establish that they were retaliated against for engaging in protected activities.**

Count II of Plaintiffs' complaint alleges the Defendants retaliated against the Plaintiffs because they engaged in activities protected by Title VII. "Title VII prohibits an employer from retaliating against an employee for opposing or participating in an investigation of an unlawful employment practice." *Lewis v. Wilkie*, 909 F.3d 858, 866 (7th Cir. 2018), citing 42 U.S.C. § 2000e-3(a). "To prevail on a Title VII retaliation claim, the plaintiff must prove that (1) he engaged in an activity protected by the statute; (2) he suffered an adverse employment action; and (3) there is a causal link between the protected activity and the adverse action." *Lewis*, 909 F.3d at 866.

1.     <u>Kreissler:</u>

The only activity in which Kreissler claims to have engaged that is protected by Title VII is that he filed a charge of discrimination with the EEOC on February 3, 2020. (Dkt. #1, ¶4; Dkt. #1-1). The only alleged reprisal against Kreissler, however, was that he was not promoted to Lieutenant in August 2019 (Dkt. #1, ¶45). Kreissler was subsequently promoted to lieutenant in March, 2021. (SOF #14). Thus, the City cannot be held liable for retaliation against Kreissler if Kreissler did not engage in any protected activity prior to the alleged harm.

2.     <u>Berge:</u>

Berge filed a claim of discrimination with the EEOC on February 3, 2020. (Dkt. #1, ¶4; Dkt. #1-1). He also states that he orally reported a claim of sexual harassment in the workplace

during his interrogation on July 30, 2020. (Dkt. #1, ¶62). Further, the Complaint states Berge filed a worker's compensation claim in July 2018. (Dkt. 1, ¶60).

a) EEOC filing

First, as to Berge's filing of the EEOC charges, for the same reasons set forth above for Kreissler, the EEOC charge cannot be considered a basis for retaliation against Berge by not promoting him when the promotion of Sneed to lieutenant occurred prior to the filing of the EEOC charges. (Dkt. #1, ¶4; Dkt. #1-1).

Further, Chief Kosman testified on September 30, 2020, that he was unaware that Berge filed a claim of discrimination, well after charges were filed against Berge seeking his termination. (SOF #63). No evidence was introduced of the City, its administration or the other Defendants having knowledge of the charge prior to this date. Berge did not speak to the individual Defendants or any City administrator of the Charges, and had no knowledge of anyone at the city knowing of the charges he filed. (SOF #64). Thus, because the hearing seeking Berge's termination was well underway prior to anyone at the City knowing of the EEOC complaint, it cannot be construed as the basis for Berge's dismissal.

b) sexual harassment claim:

Secondly, as to Berge's claim of sexual harassment, it is clear that Berge never made a report of the alleged harassment until the proceedings resulting in his termination were well underway.  Berge's insubordination that resulted in his termination occurred on July 15 and 18, 2020. (SOF #23). On July 24th, Berge received notice of a formal interrogation concerning his alleged misconduct on July 15th and 18th, which informed him that termination was a possible consequence. (SOF #37). Despite the alleged harassment occurring on July 15th, Berge did not make any claim of sexual harassment until he was in the middle of his interrogation on July 30,

2020, well after the disciplinary proceedings against him had begun and contrary to the City's policy requiring prompt reporting and documentation of any claim of sexual harassment. (SOF #59-60). Thus, it is clear that the City was already in the process of investigating and potentially terminating Berge prior to his oral report of alleged sexual harassment made during his interrogation, and therefore no causal link existed between claim of sexual harassment and his termination.

c) worker's compensation claim

The fact that Berge previously filed for worker's compensation is wholly irrelevant to these proceedings. First, Berge's previously filing worker's compensation claims cannot support a Title VII claim of retaliation, as Title VII only prohibits retaliation against an employee based upon sex, race, national origin, or some other protected class. *Fonseca v. Spraying Sys. Co.,* 466 F.Supp.3d 834, 850 (N.D. Ill. 2020). Secondly, Filing an EEOC charge is a prerequisite to suit under Title VII. *Hayes v. Decatur Pub. Sch. Dist. 61,* 20 cv 2001, 2021 U.S. Dist. Lexis 248579 at *7 (C.D. Ill.). Only those claims that are fairly encompassed within an EEOC charge can be the subject of a resulting lawsuit. *Chambers v. American Trans Air, Inc.,* 17 F.3d 998, 1003 (7th Cir. 1994). Berge's charge of Discrimination does not mention any worker's compensation filing or claim he was discriminated against based upon any disability. (Dkt. # 1-01). Finally, Berge's workers' compensation claim filed in July 2018 was too remote in time to his termination on December 1, 2020, to establish a causal connection.  See *Shreffler* MSJ decision, Dkt. #35, pp. 43-44; *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 665 (7th Cir. 2008); (Complaint, ¶60).

Thus, clearly, there was no causal link between the Plaintiffs' protected activities and the Defendants choosing a more-qualified candidate to promote to lieutenant. Further, as set forth in detail above, the evidence produced in this case demonstrates that Berge engaged in serious and

multiple instances of misconduct that provided a sufficient basis for his termination, and no causal connection existed between the Berge's claimed protected activities and his termination.

**F.      The individual defendants should be granted summary judgment on Count IV of Plaintiff's Complaint because Plaintiff has not established that any individual Defendant violated Plaintiffs' rights to equal protection based upon Plaintiffs' race.**

Count IV alleges liability against the individual defendants for violation of the Plaintiffs' right to equal protection based upon the Plaintiffs' race. Liability on a §1983 equal protection claim is decided one person at a time. *Taylor v. Ways,* 999 F.3d 478, 493 (7th Cir. 2021). For constitutional violations under §1983, a government official is only liable for his or her own misconduct. *Id.* "Personal involvement in a subordinate's constitutional violation requires supervisors to 'know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see.' Put another way, personal involvement in the equal protection context requires specific intent to discriminate." *Id.* at 494 (internal citations omitted).  In addition to failing to show any violation of their rights as set forth above, Plaintiffs failed to show that the individual defendants had the requisite individual involvement necessary to prevail against them.

1.      Commissioner Yates

Yates is the only member of the five-person Board of Fire and Police Commissioners to be named as a defendant in these proceedings, despite the Board as a whole voted upon the promotion of Sneed to Lieutenant over the Plaintiffs and the termination of Berge from the Department. (SOF # 43-44, 51). For the reasons set forth above, Sneed's promotion over Plaintiffs and Berge's termination were not based upon racial discrimination or in retaliation for engaging in protected conduct.

The Board of Fire and Police Commissioners as a whole voted to accept the recommendation of the Police Chief to promote Sneed. (SOF #51). Yates testified that Sneed's

promotion was based upon more than just test scores; rather, the entire person, the Chief's recommendation, the candidates' time in uniform, and the candidate's leadership capacity were all considered. (SOF #51). Yates also specifically testified that the fact that Sneed was African American and the other two were Caucasian was not a factor in the determination. (SOF #51).

The Board of Fire and Police Commissioners also voted as a whole to terminate Berge. (SOF #43-44). Yates voted to terminate Berge, but this was not based upon his race. (SOF #71). Additionally, Plaintiffs failed to show that Yates discriminated against the Plaintiffs or had any intention to do so. While Yates made comments about black people not being treated well by white people in the county and the city, that does not demonstrate that Yates himself had any intent to discriminate against the Plaintiffs specifically, or against anyone at all. (SOF #72). Plaintiffs also complain that Yates asked Berge a question at his termination proceedings concerning a vote of no confidence taken by a group of Kankakee officers against the command staff. (Dkt. #1, ¶70). When reviewed in the context of the proceedings, however, it is clear it was not related to any discriminatory intent or retaliation. Following other Commissioners' questions concerning whether Berge had discretion to ignore supervisor's orders, and Berge's testimony that in his fifteen years of experience he never encountered supervisors that wanted orders to be followed immediately, Yates then asked if Berge participated in the vote of no confidence against police supervisors, which was directly related to Berge's testimony concerning receiving and following direct orders given by supervisors. (SOF #42). Ultimately the question was determined to be outside the scope of the hearing and not answered, so no prejudice to Berge resulted. (SOF #42). During this exchange concerning following orders, there was no discussion of the racial makeup of the command staff, or anything related to race. Thus, the question related to Berge's belief that he had leeway to ignore the orders of supervisors with whom he disagreed rather than somehow

evidencing any personal involvement by Yates in violating the Plaintiffs' rights. Consequently, Plaintiffs have failed to show Yates can be held personally liable to the Plaintiffs for violation of their constitutional rights.

2.   Deputy Chief <u>Hunt</u>

Plaintiffs failed to produce any evidence whatsoever that Hunt was involved in the promotion of Sneed to lieutenant or the termination of Berge. Hunt specifically testified had no involvement with Sneed's promotion. (SOF #70).  Moreover, Kreissler testified that he specifically asked Chief Kosman if the decision to promote Sneed to Lieutenant was Willie Hunt's decision and the Chief said "no, this is my decision." (SOF #70). Kreissler had no firsthand knowledge that Hunt was involved with the selection of Sneed for promotion. (SOF #52). Berge also had no knowledge of Hunt being involved in hiring. (SOF #70). Consequently, there is no basis for finding Hunt liable to Plaintiffs.

3.   <u>Mayor Wells</u>

Mayor Wells was not involved in the promotion of Sneed or termination of Berge. Wells was not involved in any decisions affecting the police department other than appointing the Chief. (SOF #68). Berge testified he had no knowledge of Wells being involved in any aspect of running the police department. (SOF #69). Kreissler testified he had no firsthand knowledge that the mayor was involved with the selection of Sneed for promotion. (SOF #52). Instead, as set forth above, the Chief made the decision to recommend Sneed to be promoted to lieutenant, and the Board of Fire and Police Commissioners voted to affirm that recommendation. The Chief did not discuss that he was recommending Sneed for promotion with Wells. (SOF #45). Thus, no evidence was set forth demonstrating that Wells had any individual involvement with the promotion.

Furthermore, it was Chief Kosman who had first-hand knowledge of Berge's misconduct on July 18, 2020, reviewed reports about both the July 15th and July 18th incidents of Berge's misconduct and set up Berge's formal interrogation, and then filed charges against Berge seeking his termination. (SOF #31-32, 37-38). The Board of Fire and Police Commissioners then voted to terminate Berge. (SOF #43). Again, no evidence was set forth demonstrating that Wells had any individual involvement with Berge's termination. Therefore, Wells cannot be held individually liable in this lawsuit.

4.     Chief Kosman

Chief Kosman is Caucasian. As set forth above, pursuant to the Illinois statute governing promotions, Kosman lawfully recommended Sneed for promotion based upon Sneed's superior experience and qualifications. (SOF #46-49). Furthermore, the record shows that Kosman also recommended Caucasian officers for promotion. (SOF #73).

Additionally, Chief Kosman had more than sufficient justification for bringing charges against Berge seeking his termination following Berge repeatedly disobeyed Kosman's direct orders given as the Chief of the police department, and which also shortly followed another incident of Berge engaging in insubordination of another supervisor. (SOF #24-28, 30-34). Moreover, these were not the first incidents of Berge engaging in unacceptable behavior as a Kankakee police officer, as his disciplinary record reflected. (SOF #39-41). Berge did not introduce any evidence that any other officer of another race committed similar infractions and received lesser discipline. Consequently, Kosman cannot be held individually liable to Plaintiffs. Thus, there is no basis to impose individual liability upon Chief Kosman.

WHEREFORE, Defendants City of Kankakee, Police and Fire Commission of the City of Kankakee, Chief Frank Kosman, Mayor Chastity Wells-Armstrong, Willie Hunt and Nickey F. Yates respectfully request this Honorable Court to enter summary judgment in their favor, and for such further relief as the Court deems appropriate.

Respectfully submitted,

**CITY OF KANKAKEE, POLICE AND FIRE COMMISSION, KOSMAN, WELLS-ARMSTRONG, HUNT and YATES**

By:     _/s/ Michael J. McGrath_
            One of their attorneys

Michael J. McGrath
Amy E. Zale
**ODELSON, STERK, MURPHEY,
FRAZIER & McGRATH, LTD.**
3318 West 95th Street
Evergreen Park, Illinois 60805
Ph: (708) 424-5678; Fax: (708) 741-5070
mmcgrath@osmfm.com
azale@osmfm.com

## **CERTIFICATE OF COMPLIANCE**

I certify that this brief conforms to the requirements of Rule 7.1(c). The length of this

memorandum, excluding the pages containing the Undisputed Material Facts is <u>6,480</u> words.

By:       <u>/s/ Michael J. McGrath</u>

Michael J. McGrath
Amy E. Zale
**ODELSON, STERK, MURPHEY, FRAZIER & McGRATH, LTD.**
3318 West 95th Street
Evergreen Park, Illinois 60805
Ph.(708) 424-5678; Fax (708) 741-5070
azale@osmfm.com
mmcgrath@osmfm.com

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, a non-attorney, hereby certifies that on **June 17, 2022,** she caused the **Defendants' Motion for Summary Judgment** to be electronically filed with the Clerk of the Court using the CM/ECF system which will send notification using the CM/ECF system to the CM/ECF participants list.

*/s/ Kathleen M. Carey*