Frank Kosman Backwrite - 3/23/2022
2:20-cv-02310-CSB-EIL # 17-2 Page 1 of 90
Paul Berge, et al. vs. City of Kankakee, et al.

E-FILED
Friday, 17 June, 2022 10:54:57 AM
Clerk, U.S. District Court, ILCD

1          IN THE UNITED STATES DISTRICT COURT
           FOR THE CENTRAL DISTRICT OF ILLINOIS
2                    URBANA DIVISION

3

    PAUL BERGE and TIMOTHY      )
4   KREISSLER,                  )
                                )
5        Plaintiffs,            )
                                )
6        vs.                    ) No. 20-cv-2310
                                )
7   CITY OF KANKAKEE, POLICE    )
    AND FIRE COMMISSION OF      )
8   THE CITY OF KANKAKEE,       )
    CHIEF FRANK KOSMAN,         )
9   MAYOR CHASTITY              )
    WELLS-ARMSTRONG, WILLIE     )
10  HUNT, NICKEY F. YATES,      )
    Individually and in         )
11  their Official Capacity,    )
                                )
12       Defendants.            )

13

14          The discovery deposition of FRANK KOSMAN,

15  taken in the above-entitled cause, before

16  Brenda S. Hall, Certified Shorthand Reporter of the

17  State of Illinois, CSR License No. 084-003359, on

18  Wednesday, March 23, 2022, at 12:00 p.m., 206 South

19  Jefferson Street, Suite 100, Chicago, Illinois,

20  pursuant to notice.

21

22

23

24



Frank Kosman Backwrite  -  3/23/2022
Paul Berge, et al. vs. City of Kankakee, et al.
2:20-cv-02210-CSB-EIL  #173  Page 2 of 90

```
 1    PRESENT:

 2
               HERBERT LAW FIRM
               BY:  MR. DANIEL Q. HERBERT
 3             206 South Jefferson Street
               Suite 100
 4             Chicago, Illinois  60661
               (312) 655-7660
 5             dan.herbert@danherbertlaw.com

 6                  Appeared on behalf of Plaintiffs;

 7             ODELSEN, STERK, MURPHEY, FRAZIER, MCGRATH
               BY:  MR. MICHAEL MCGRATH
 8             3318 W. 95th Street
               Evergreen Park, Illinois  60805
 9             (708) 424-5678
               mmcgrath@osmfm.com
10

11                  Appeared on behalf of Defendants.

12

13

14

15                       *     *     *

16

17

18

19

20

21

22

23

24
```



Frank Kosman Backwrite  -  3/23/2022
Paul Berge, et al. vs. City of Kankakee, et al.
2:20-cv-02310-CSB-EIL   #172   Page 3 of 90

```
1                    I N D E X
     WITNESS                              EXAMINATION
2
     FRANK KOSMAN
3
        By Mr. Herbert                         5
4                                            229

5       By Mr. McGrath                      209

6

7

8

9

10

11
                   E X H I B I T S
12   NUMBER                            MARKED FOR ID

13   Kosman Deposition Exhibit

14      No. 1       Policy 1040            192

15      No. 2       E-mail                 198

16

17

18

19

20

21

22

23

24
```



Frank Kosman Backwrite  -  3/23/2022
2:20-cv-02310-CSB-EIL   # 17-1   Page 4 of 90
Paul Berge, et al. vs. City of Kankakee, et al.

**Page 4**

1    (Whereupon, the witness was

2    duly sworn.)

3    MR. HERBERT:  Good morning, Mr. Kosman.  How

4  are you?

5    THE WITNESS:  Good.

6    MR. HERBERT:  Good.  And we've met before in

7  a previous proceeding, but again my name is Dan

8  Herbert and I represent the Plaintiffs Paul Berge and

9  Tim Kreissler in the Case No. 20-cv-2310.

10    And this is the discovery deposition

11  of one of the individual Defendants, Chief Frank

12  Kosman, who is no longer chief with Kankakee,

13  correct?

14    THE WITNESS:  Correct.

15    MR. HERBERT:  All right.  And I don't know if

16  you've given a deposition before.

17    THE WITNESS:  Yes.

18    MR. HERBERT:  Okay.  So just some of the

19  ground rules that we go over, and I can tell you kind

20  of -- you get them already, but just obviously allow

21  me to finish my question before you give an answer,

22  and then you provide verbal answers as opposed to

23  just a shake of the head, okay?

24    THE WITNESS:  Yes.

**Page 5**

1    MR. HERBERT:  And then if there's any breaks

2  that you want to take, feel free.  I just ask that if

3  there's a question pending that you answer the

4  question before you take a break, all right?

5    THE WITNESS:  Correct.  Okay.

6    MR. HERBERT:  Okay.  And again, I might ask

7  some questions that are confusing.  I probably will.

8  Feel free to ask me to restate them if you need me

9  to, okay?

10    THE WITNESS:  Okay.

11    FRANK KOSMAN,

12  called as a witness herein, was examined and

13  testified as follows:

14    EXAMINATION

15  BY MR. HERBERT:

16    Q.  Mr. Kosman, you are no longer chief with

17  Kankakee.  Is that correct?

18    **A.  Correct.**

19    Q.  And when did your employment end with

20  them?

21    **A.  May of 2021.**

22    Q.  Okay.  And what were the circumstances

23  behind your -- or strike that.

24    What was the status of you leaving?

**Page 6**

1  Were you terminated?  Were you -- resigned?

2    **A.  My contract was not renewed.**

3    Q.  Okay.  And do you know why it was not

4  renewed?

5    **A.  No.**

6    Q.  Okay.  Was there a change in any

7  circumstances that led to you, your contract not

8  being renewed as far as you know?

9    **A.  Yes.  There was a new mayor.**

10    Q.  Okay.  And who became mayor?  That's

11  okay.  I know.  I can't think of his name either.

12    MR. MCGRATH:  Curtis.

13    THE WITNESS:  Yeah, Chris Curtis C-u-r-t-i-s.

14  BY MR. HERBERT:

15    Q.  And how were you informed that your

16  contract was not being renewed?

17    **A.  He came to my office or the office of the**

18  **chief of police and told me that he wasn't going to**

19  **renew the contract.**

20    Q.  Okay.  Anything else during that

21  conversation?

22    **A.  No.**

23    Q.  Did it surprise you?

24    **A.  No.**

**Page 7**

1    Q.  Why not?

2    **A.  I think during the campaign they said --**

3  **he had said that he was looking for a new chief, and**

4  **I know the union supported him in the election.**

5    Q.  Okay.  And what is the relevance of the

6  union supporting him in the election with respect to

7  your contract not being renewed?

8    **A.  I think they had their own person they**

9  **wanted to have as the chief.**

10    Q.  The union did?

11    **A.  I believe so.  I didn't get that verbatim**

12  **from anybody, but that's what I assumed.**

13    Q.  And who is the chief now?

14    **A.  Robin Passwater P-a-s-s-w-a-t-e-r, to the**

15  **best of my knowledge.**

16    Q.  And do you know if that was the union's

17  preference?

18    **A.  I believe so.**

19    Q.  Why do you believe the union preferred

20  Mr. Passwater?

21    **A.  He gave a talk at the union meeting when**

22  **they were deciding whether to support one of the**

23  **mayors.**

24    Q.  I'm sorry.  Who gave a talk at the union



Frank Kosman Backwrite - 3/23/2022
2:20-cv-02310-CSB-EIL # 17-1 Page 5 of 90
Paul Berge, et al. vs. City of Kankakee, et al.

meeting?

A. Robin Passwater. There were a number of people talking, but he was one of the people that were talking.

Q. And you were at the union meeting?

A. Yes.

Q. And were you the chief then?

A. Yes.

Q. And why were you at the union meeting?

A. Well, it was an FOP meeting, so I was in the FOP.

Q. Okay. And then what happened during the talk with Robin Passwater?

A. He thought that they should support Chris Curtis over the current mayor for -- for the election, in the election, mayoral election.

Q. Okay. Was the purpose of this meeting, was it to decide on the endorsement of a particular candidate?

A. Yes, I believe so.

Q. And was it the endorsement for the mayoral race?

A. Yes.

Q. And who was in that race aside from Chris

Curtis? I imagine he ran against the incumbent, correct?

A. Yes. At that point it was just him and Chasity Wells-Armstrong.

Q. And Chasity Wells-Armstrong hired you, correct?

A. Correct.

Q. Did anyone else speak at this meeting other than Robin Passwater?

A. I know I spoke -- there were other people there. It was kind of an open discussion.

Q. Okay. And what did you speak about?

A. I spoke about thinking that it would be unprofessional. We should not be supporting any particular mayoral candidate.

Q. Okay. Who did you support as a mayoral candidate?

A. I voted for Mayor Chasity Wells-Armstrong.

Q. And why is it --

A. But I didn't say that we should support her at the meeting. I said we should stay out of it.

Q. Okay. And why is it that you believed that the union shouldn't endorse a particular

candidate?

A. I don't think that the politics -- as a police officer, you have to work for whoever becomes the mayor and that is -- you shouldn't be taking sides in that situation. I don't think it's professional.

Q. Okay. The union disagreed with your assessment?

A. Yeah. Yes, they voted otherwise. It wasn't unanimous, but it was a decision to go, and I don't remember the exact count.

Q. And the vote was to endorse Chris Curtis over Mayor Chasity Wells, correct?

A. Correct.

Q. Okay. Do you know approximately how many were at this meeting?

A. You know, just -- I don't remember exactly, but it had to be around 25.

Q. Okay. And how was the vote taken? Was it a show of hands, or was it a verbal vote?

A. I believe it was written on a piece of paper that was passed out.

Q. Okay. Do you remember when this took place?

A. Probably March or April of 2019. I guess the election is in April, so I think in March.

Q. So March 2019. April 2019 was the election?

A. Did I say 2019?

Q. You did.

A. No, that's when I got hired, so it was two years. In 2021. I'm sorry.

Q. Okay. And when you were at this meeting, were you on duty or off duty? And I know it's a difficult question being the chief.

A. I mean, I worked my 9:00 to 5:00, but this was like 7:00 o'clock in the evening.

Q. Okay. Were you in uniform?

A. No, I do not believe so. No, because they held it at a bar upstairs, so I didn't wear a uniform.

Q. Where was it at, what bar?

A. I think it's called City Tap.

Q. Okay. And was it --

A. Village Tap. It's got to be City Tap, yeah.

Q. And was the meeting made up of Kankakee police officers, City of Kankakee police officers?

**Frank Kosman Backwrite - 3/23/2022**
2:20-cv-02310-CSB-EIL   # 17-2   Page 6 of 90
Paul Berge, et al. vs. City of Kankakee, et al.

1   A.   Yes.

2   Q.   Anyone else that wasn't a police officer
3   there?

4   A.   Not that I remember, no.

5   Q.   So all the people that were there, they
6   worked under your command at that point?

7   A.   Yeah.  If they were police officers, yes.

8   Q.   Okay.

9   A.   I didn't call the meeting.  It was called
10  by the union representatives, but I was invited.

11  Q.   Did Mayor Chasity Wells know that you
12  were going to that meeting?

13  A.   I don't remember if we discussed it or
14  not.

15  Q.   Do you know if you discussed it at any
16  point with her, anything about the vote with the
17  union?

18  A.   It probably was mentioned, but I don't
19  think it was like discussed in any detail.

20  Q.   Tell me what you remember about how it
21  was mentioned.

22  A.   I might have brought up that there was a
23  meeting and the union decided to support Chris
24  Curtis, and I think she said like she knew, or what

1   do you expect or, you know, what do you know, but
2   that was it.

3   Q.   And do you remember where that
4   conversation took place?

5   A.   I don't know if that was on the phone or
6   if it was in person.

7   Q.   Would it have been the same day that the
8   vote took place?

9   A.   Maybe the next day.

10  Q.   Okay.  Was there any discussion at this
11  meeting about who the chief of police should be?

12  A.   No.

13  Q.   Was there any discussion about you being
14  replaced as chief of police?

15  A.   No.

16  Q.   Was there any opinions being expressed by
17  any of the members at this meeting about you as a
18  chief of police, either positive or negative?

19  A.   No, I don't remember anything particular
20  to me.

21  Q.   Do you know what the union's -- the
22  memberships' general opinion was of you as a chief?

23  A.   Well, early in my tenure there, I know
24  there was a vote of no confidence, but I think we had

1   a good working relationship after that.

2   Q.   There was a vote of no confidence taken
3   against you?

4   A.   Yes.

5   Q.   By the union members?  By the membership
6   of the -- what union represented the police officers?

7   A.   The FOP.

8   Q.   Okay.  So the FOP.  What lodge, do you
9   know?

10  A.   Not off the top of my head, no.

11  Q.   So the FOP that represented Kankakee City
12  police officers, there was a vote of no confidence
13  that was taken by these members with respect to you?

14  A.   Yes, and I think other people too, like
15  the mayor.

16  Q.   Okay.

17  A.   I think it was --

18  Q.   There was a vote of no confidence against
19  the mayor?

20  A.   I believe she was named on it, but I'm
21  not a hundred percent sure on that.

22  Q.   Okay.

23  A.   I just know about myself.  But I know
24  there was other people.  It was like more

1   administration, kind of against the administration.

2   Q.   Okay.  And that was in the paper, right?

3   A.   Yes.

4   Q.   And that was a vote that was taken by the
5   membership of FOP that represented Kankakee Police,
6   right?

7   A.   Right, and they came to a board meeting
8   and said.

9   Q.   Right.  And they talked about it was a
10  vote of no confidence for you, correct?

11  A.   Correct.

12  Q.   A vote for the mayor no confidence,
13  correct?

14  A.   I believe so.

15  Q.   A vote for Deputy Chief Hunt, correct?

16  A.   I think so, yes.

17  Q.   A vote of no confidence for Commander
18  Donell Austin as well, correct?

19  A.   I remember that for sure, yeah.

20  Q.   Okay.  Why do you remember that one for
21  sure?

22  A.   I don't know.  Because he was a
23  commander.  He was not on the -- he was a higher
24  echelon of the personnel, but he wasn't the top, so I



Frank Kosman Backwrite - 3/23/2022
2:20-cv-02310-CSB-EIL #17-1 Page 7 of 90
Paul Berge, et al. vs. City of Kankakee, et al.

1 don't know.

2 Q. Okay.

3 A. I don't know why they put him in there,

4 but he was the patrol commander at the time.

5 Q. Okay. Well, do you know what the -- what

6 reasons did they express for the vote of no

7 confidence against you and -- you would agree that

8 would be the top command staff of the police

9 department at the time, correct, Deputy Chief Hunt

10 and Donell Austin?

11 MR. MCGRATH: Objection. The form of the

12 question.

13 BY MR. HERBERT:

14 Q. You can answer. And your lawyer is going

15 to make objections obviously. You can answer unless

16 your lawyer instructs you not to answer the question.

17 A. Okay. He was part of the, I guess,

18 command structure, but there was also -- well, I

19 don't know. Well, there was -- I don't think there

20 was a permanent detective commander at the time, so.

21 I guess he would have been.

22 Q. So the vote of no confidence was taken

23 against -- it was all individuals that were African

24 American aside from you, correct?

Page 16

1 A. Yes.

2 Q. And you were appointed by an African

3 American mayor, correct?

4 A. Yes.

5 Q. And was part of the basis for the vote of

6 no confidence, was it because the members believed

7 that they were not being treated fairly within that

8 administration?

9 MR. MCGRATH: Objection. It calls for

10 speculation.

11 If you know.

12 THE WITNESS: I believe so, yes.

13 BY MR. HERBERT:

14 Q. Okay. And, I mean, they spoke in front

15 of the -- various members spoke in front of the city

16 council, correct?

17 A. Correct.

18 Q. And they believed that they were being

19 discriminated against by the new command staff,

20 correct?

21 A. Yes.

22 Q. And it was white police officers that

23 were complaining about being discriminated against,

24 right?

Page 17

1 A. I believe so.

2 Q. Okay. And in fact, the people that spoke

3 and aired their complaints on behalf of the

4 membership of the FOP at the city council meeting,

5 those were white males, correct?

6 A. I'm trying to think of that group there,

7 and I think it was.

8 Q. Okay. And there was specific complaints

9 that they believed the supervisors were -- they

10 believed Deputy Chief Hunt was discriminatory towards

11 white police officers, correct?

12 A. I don't know if that was mentioned

13 specifically, but I assume, yes.

14 MR. MCGRATH: Don't assume.

15 THE WITNESS: Okay.

16 MR. MCGRATH: Just whatever you remember

17 testify to.

18 BY MR. HERBERT:

19 Q. You knew that there was complaints about

20 Deputy Chief Hunt discriminating against white police

21 officers, correct?

22 A. In that -- at that time, like when they

23 spoke?

24 Q. Yeah.

Page 18

1 A. I don't remember exactly what they were

2 saying. I remember that it was in reference to

3 being -- in response to Sergeant Sneed being promoted

4 to lieutenant.

5 Q. And what were the complaints about that?

6 It was based upon Sergeant Sneed being promoted

7 over -- out of rank order, correct?

8 A. Right. He was third on the list, and so

9 two other officers were passed over for the

10 promotion.

11 Q. Right. And the two other officers

12 were -- are you talking about the sergeants or the

13 lieutenants?

14 A. I'm talking about the lieutenants.

15 Q. Okay. And that's the subject of our

16 complaint here.

17 A. Yes.

18 Q. Obviously the two individuals that were

19 passed over were the Plaintiffs here, Paul Berge and

20 Tim Kreissler, correct?

21 A. Correct.

22 Q. And they were ranked respectively one and

23 two on that list, correct?

24 A. Correct.

Page 19



Frank Kosman Backwrite  -  3/23/2022
2:20-cv-02310-CSB-EIL  #17-21  Page 8 of 90
Paul Berge, et al. vs. City of Kankakee, et al.

Q.  And so the complaints were that the promotion was made out of rank order, correct?

MR. MCGRATH:  Objection.  Form of the question.  Are you talking about the federal complaint or at the meeting?

BY MR. HERBERT:

Q.  At the meeting.  At the union meeting, those were complaints?

A.  Yes.

Q.  That the promotion was out of rank order, correct?

A.  Yes.

Q.  And the belief as to why Sneed was promoted over the other two guys was in part because they believed that there was favoritism shown to the black candidate, correct?

MR. MCGRATH:  Objection.  Form of the question, calls for speculation.

Whatever you know.

THE WITNESS:  Yes.

BY MR. HERBERT:

Q.  Okay.  And they thought that -- part of the frustration was that this was another example of white police officers being discriminated against by

Page 20

the black administration, correct?

MR. MCGRATH:  Objection.  Form of the question, foundation, incomplete hypothetical.

THE WITNESS:  Yes.

BY MR. HERBERT:

Q.  Okay.  And you said, when I talked about your knowledge of there being concerns by the members about Deputy Chief Hunt being discriminatory towards white police officers, you said you weren't sure at the time of the meeting, but you certainly -- during your career as the chief, you were aware that there was tension regarding the -- some white police officers and Deputy Chief Hunt, correct?

MR. MCGRATH:  Objection.  It calls for speculation, foundation, form.

THE WITNESS:  Yes.

BY MR. HERBERT:

Q.  And tell me about those.  Tell me what you were aware of about the complaints about Deputy Chief Hunt with respect to these white police officers.

A.  It was brought to me about in the past some Facebook messages.

Q.  And those were the Facebook messages that

Page 21

Hunt was eventually disciplined for by a different chief, right?

A.  Yes.

Q.  And those were Facebook posts that had derogatory messages about white people on his personal Facebook, correct?

A.  Yes.

Q.  So the concerns were, as far as you were aware, was that Hunt was essentially a racist towards white people?

MR. MCGRATH:  Objection.  Form of the question, vague, incomplete hypothetical, it calls for speculation.

BY MR. HERBERT:

Q.  You can answer.

A.  The concern was because he had posted those, made those Facebook posts, that there was concern about that.

Q.  And the concern was that the deputy chief had a negative attitude towards white people, correct?

MR. MCGRATH:  Objection.  Form of the question, foundation.

THE WITNESS:  The concern was about his

Page 22

negative Facebook posts.

BY MR. HERBERT:

Q.  About white people?

A.  About white -- I guess -- yes.  I don't --

Q.  And it was more -- go ahead.

A.  I forgot exactly what the posts were because it happened before my tenure there, but it was, you know, it was not -- I don't know for sure if it was against white people or that black people were discriminated against.  I know it was -- I guess just a different side of a coin there.

BY MR. HERBERT:

Q.  Yeah.

A.  But there were some kind of postings that were questionable.

Q.  And questionable, they were racial postings, correct?

A.  Yes.

Q.  And they were questionable because they could certainly be construed as being discriminatory towards a particular race, correct?

A.  Yes.

Q.  And that race would be white, correct?

Page 23



Frank Kosman Backwrite - 3/23/2022
2:20-cv-02310-CSB-EIL # 17-1 Page 9 of 90
Paul Berge, et al. vs. City of Kankakee, et al.

1    A.  Yes.

2    Q.  And some of those posts were -- included

3  a picture of a white person with a tail saying that a

4  certain percentage of white people are born with

5  tails.  Do you remember that one?

6    A.  I think someone mentioned that.

7    Q.  And then there was talk about -- numerous

8  posts about white supremacy.  Do you remember that?

9    A.  I don't remember that, but I remember

10  about the tail.

11    Q.  But many of the posts were about white

12  police officers mistreating black people.  You

13  remember that, correct?

14    A.  Broadly.  I remember it being

15  discriminatory against black people, but I don't

16  remember if it was specific of a police officer or --

17  being discriminatory against white people.

18    Q.  Okay.  And aside from those Facebook

19  posts, there was concerns that you were aware of by

20  white police officers about Deputy Chief Hunt other

21  than just that single instance of Facebook posts,

22  correct?

23    A.  I don't remember right now as we sit here

24  anything else being said about him other than that.

1    Q.  Well, did you have any concerns about

2  Deputy Chief Hunt being discriminatory towards white

3  people in general?

4    A.  I didn't see it during my time there.

5    Q.  Did you have any concerns about Deputy

6  Chief Hunt being discriminatory towards white police

7  officers?

8    A.  No, I did not see that.

9    Q.  Okay.  But you were aware, certainly you

10  were aware of rumors that people believed that Hunt

11  was essentially anti-white?

12    MR. MCGRATH:  Objection.  Form of the

13  question.

14  BY MR. HERBERT:

15    Q.  That's a bad question.

16    Certainly you're aware of rumors

17  that the white police officers believed that Deputy

18  Chief Hunt had some negative feelings toward white

19  people in general, correct?

20    MR. MCGRATH:  Objection.  Form of the

21  question, it calls for speculation, hearsay, and

22  foundation.

23    THE WITNESS:  It was just in reference -- I

24  took it from that Facebook post that that would --

1  that emanated from.

2  BY MR. HERBERT:

3    Q.  Certainly you had complaints made to you

4  about -- did you have any complaints made to you by

5  any white police officers that felt that there was

6  discrimination occurring within the Kankakee Police

7  Department?

8    A.  None other than the promotion.

9    Q.  Okay.  And that's a promotion of Michael

10  Sneed?

11    A.  Yes.

12    Q.  Is it Michael Sneed?

13    A.  Yes.

14    Q.  Michael Sneed.  So those complaints were

15  that they believed -- the complaints were that it was

16  a promotion based on race, fair to say?

17    A.  Yes.

18    Q.  And let me ask you, was it a promotion

19  based on race?

20    A.  No.

21    Q.  Okay.  I understand as a police chief

22  there's -- complaint has a -- is subject to a couple

23  of definitions, and I think you know what I'm talking

24  about.  Like if somebody makes a formal complaint,

1  then that triggers a required response on your

2  behalf, correct?

3    A.  Correct.

4    Q.  So if somebody made a complaint about a

5  specific racial discriminatory act done by a

6  supervisor, you would be required to take specific

7  investigatory steps based on that complaint, correct?

8    A.  Yes.

9    Q.  Okay.  And fair to say, as you sit here

10  today, at the time you were chief, that you never

11  took any investigatory steps towards investigating

12  complaints of racial discrimination?

13    A.  Correct.  I don't remember any.

14    Q.  Okay.  Were you aware of any complaints

15  or concerns being raised by any police officers,

16  maybe of a more general nature about concerns about

17  racial discrimination occurring within the police

18  department?

19    A.  No.

20    Q.  I mean, part of your job is to make sure

21  that the police officers that work under you are --

22  work in a hostile-free work zone, correct?

23    A.  Correct.

24    Q.  That they are allowed to work without



**Frank Kosman Backwrite  -  3/23/2022**
2:20-cv-02310-CSB-EIL # 17-3   Page 10 of 90
**Paul Berge, et al. vs. City of Kankakee, et al.**

1  being discriminated against, correct?
2      **A.  Correct.**
3      Q.  Did you take any steps to make sure that
4  there was no hostile work environment going on?
5      **A.  I know we had anti-harassment training I**
6  **believe through human resources, and we also went**
7  **through the State-mandated anti-discrimination kind**
8  **of training.**
9      Q.  Okay.  And that training and
10  certification talked about how individuals couldn't
11  be discriminated against based upon their race for
12  any reason, right?
13      **A.  Right, or harassed.**
14      Q.  Discriminated or harassed by a supervisor
15  or anyone else, correct?
16      **A.  Correct.**
17      Q.  Okay.  And that would include in the area
18  of promotion, correct?  Somebody couldn't be
19  discriminated against in the area of promotion,
20  correct?
21      **A.  Correct.**
22      Q.  Certainly couldn't be discriminated
23  against because of their race for a particular
24  promotion, correct?

1      **A.  Correct.**
2      Q.  And you would agree that having
3  somebody -- having somebody be promoted that was
4  ranked lower than you, that could be a form of
5  discrimination, correct?
6      MR. MCGRATH:  Objection.  Form of the
7  question, it calls for speculation, a legal
8  conclusion.
9      THE WITNESS:  It could be.
10  BY MR. HERBERT:
11      Q.  And it could be a form of racial
12  discrimination if a black individual was lower ranked
13  and promoted over two other higher ranked white
14  police officers, correct?
15      MR. MCGRATH:  Objection.  Form of the
16  question, foundation, incomplete hypothetical, and
17  it's vague.
18      THE WITNESS:  It could be.
19  BY MR. HERBERT:
20      Q.  And in fact, you would agree that if a
21  black police officer was promoted over two higher
22  ranked white police officers and the reason was
23  either because the higher ranked individuals were
24  white or the lower ranked individual was black, that

1  could be a form of -- or that could be the basis for
2  discrimination, correct?
3      MR. MCGRATH:  Could you repeat that question?
4      MR. HERBERT:  Probably not.
5          You know what, can you try reading
6  that one?
7          (Whereupon, the record was
8          read as requested.)
9  BY MR. HERBERT:
10      Q.  Yeah, racial discrimination is what I
11  meant to ask.  Do you understand?
12      MR. MCGRATH:  Objection.  Foundation, an
13  incomplete hypothetical, it calls for a legal
14  conclusion, it's vague, it's compound.
15      THE WITNESS:  Again, it could be.
16  BY MR. HERBERT:
17      Q.  And it could be because race is not
18  supposed to be factored into promotion decisions,
19  correct?
20      **A.  Correct.**
21      Q.  And race is not supposed to be factored
22  into any conditions that affect police officers'
23  rights within the workplace, correct?
24      **A.  Correct.**

1      Q.  And you were hired by Mayor Chasity
2  Wells, correct?
3      **A.  Correct.**
4      Q.  And you were hired after her chosen
5  candidate resigned.  Is that correct?
6      **A.  I don't know the exact mechanics of what**
7  **happened, if he was only temporarily appointed or he**
8  **resigned.  I don't know exactly how that worked out.**
9      Q.  And that was Price Dumas?
10      **A.  Correct.**
11      Q.  Did you know Price Dumas prior to you
12  going to work for Kankakee?
13      **A.  No.**
14      Q.  And what's your understanding today as to
15  how you replaced Price Dumas?
16      **A.  My understanding of it, his appointment**
17  **wasn't approved by the city council, and so that**
18  **his -- either he resigned like you said or the mayor**
19  **withdrew him as a candidate for that position and**
20  **they went on to -- then there became a search for a**
21  **chief.  I applied.  After the process, I was hired as**
22  **the police chief.**
23      Q.  Okay.  And after you were hired, you
24  certainly became aware of more reasons -- or I



Frank Kosman Backwrite - 3/23/2022
2:20-cv-02310-CSB-EIL # 17-3 Page 11 of 90
Paul Berge, et al. vs. City of Kankakee, et al.

**Page 32**

1 shouldn't say that. After you were hired, you
2 certainly heard about the process where Chief Dumas
3 was brought forth to be the chief of police but was
4 eventually not given the approval by the board. You
5 heard about that?
6     MR. MCGRATH: Objection. Foundation, it
7 calls for hearsay, form of the question, vague.
8     THE WITNESS: I heard that was what happened.
9 BY MR. HERBERT:
10    Q. Yeah. And did you ever hear any reasons
11 as to why the board didn't certify Chief Dumas?
12    **A. You know, I don't recall exactly why,**
13 **what the reasoning was for the city council to not**
14 **approve the appointment.**
15    Q. Certainly there was racial components
16 involved in the lack of approval for Dumas. You
17 became aware of that?
18    MR. MCGRATH: Objection. Form of the
19 question, foundation, it calls for hearsay. He's
20 testified he didn't have any firsthand knowledge.
21       But if somebody told you anything.
22    THE WITNESS: Yeah, I'm not sure why the
23 council didn't approve him. You know, I -- I'll
24 leave it there.

**Page 33**

1 BY MR. HERBERT:
2    Q. Did you ever talk to the mayor about the
3 council's decision not to approve Dumas?
4    **A. I think just -- it was stated that they**
5 **didn't approve him, but I don't know what the**
6 **individual -- I -- my -- and I'm trying to think why**
7 **I came to that conclusion, but my conclusion was**
8 **because he didn't have -- and it was probably because**
9 **of the council making a point about me having the**
10 **credentials or having the management, being an**
11 **executive in different departments, or in Bensenville**
12 **anyway, that I had the experience as a chief**
13 **executive of a police department, and there was a**
14 **reason why they hired me or approved my appointment.**
15 **I don't think that Price Dumas had that.**
16    Q. Okay. But in your conversations with the
17 mayor, she certainly expressed to you that she
18 believed that Dumas was never given the approval by
19 the city council because he was black, right?
20    MR. MCGRATH: Objection. Form of the
21 question, leading, it calls for hearsay, foundation.
22    THE WITNESS: I don't think she ever said
23 that.
24

**Page 34**

1 BY MR. HERBERT:
2    Q. Well, you heard about the city council's
3 votes on the approval for Dumas and how they were
4 strictly based across racial lines. The black
5 council member voted to have Dumas as the chief, and
6 then the white council members voted not to have
7 Dumas as the chief. You became aware of that,
8 correct?
9     MR. MCGRATH: Objection. Foundation, it
10 calls for hearsay, and leading.
11    THE WITNESS: I don't know if it was black
12 and white or it might have been the Republican,
13 Democratic sides, the political parties. Sometimes
14 those fall in line, but I'm not sure exactly if there
15 was any crossover.
16 BY MR. HERBERT:
17    Q. Right. But you became aware of the fact
18 that part of the reason was racial, that that was one
19 of the rumors being expressed was that Dumas wasn't
20 selected because he was black?
21    **A. I wouldn't make that assumption.**
22    Q. Okay. And I'm not saying you made that
23 assumption. Certainly that was something that was --
24 that were part of the rumors that were being -- that

**Page 35**

1 you became aware of after you became chief, correct?
2    **A. You know, I didn't -- no one told me that**
3 **specifically.**
4    Q. Well, you talked to Deputy Chief Hunt
5 about Dumas not being approved as the chief at some
6 point, did you not?
7    **A. Yeah. I mean, we -- right. We talked**
8 **about -- he gave me background in reference.**
9    Q. And Hunt believed that Dumas wasn't
10 chosen and given the approval by city council because
11 he was black, right?
12    MR. MCGRATH: Objection. Leading, it calls
13 for speculation, hearsay, foundation.
14    THE WITNESS: I don't know if he believed
15 that, but he didn't tell me that.
16 BY MR. HERBERT:
17    Q. Okay. But are you saying that he
18 never told -- he never mentioned anything about Dumas
19 being black as being part of any reason why he wasn't
20 certified by the board?
21    **A. I don't remember him saying it as plain**
22 **as you're saying or -- because I'm a white person,**
23 **and I was appointed chief, so I don't understand it.**
24    Q. Got it. So maybe he -- perhaps maybe he



**Frank Kosman Backwrite  -  3/23/2022**
2:20-cv-02310-CSB-EIL  #17.3  Page 12 of 90
Paul Berge, et al. vs. City of Kankakee, et al.

1 didn't say exactly those words, but is it fair to say
2 you clearly got the impression that Hunt believed
3 that because Dumas was black that somehow resulted in
4 him not getting the job, fair to say?
5     MR. MCGRATH: Objection. Form of the
6 question, it's an incomplete hypothetical, calls for
7 speculation.
8     THE WITNESS: I don't remember him saying
9 that.
10 BY MR. HERBERT:
11     Q.  Not saying that, but did you get the
12 impression that Hunt believed that race was one of
13 the reasons why Dumas did not get the approval by the
14 city council?
15     MR. MCGRATH: The same objection. It calls
16 for speculation.
17 BY MR. HERBERT:
18     Q.  You can answer.
19     **A.  We had a professional relationship, and I**
20 **would not get into that kind of speculation.**
21     Q.  And you had numerous conversations with
22 the mayor during your time as a chief, correct?
23     **A.  Correct.**
24     Q.  And you dealt with the city council when

1 you were the chief, correct?
2     **A.  Correct.**
3     Q.  You went in front of them for votes on
4 various matters, correct?
5     **A.  Yes.**
6     Q.  And you were with the mayor for various
7 meetings with the city council, correct?
8     **A.  Correct.**
9     Q.  And the mayor certainly was frustrated by
10 some members of the city council, correct?
11     MR. MCGRATH: Objection. Form of the
12 question, foundation, calls for speculation.
13     THE WITNESS: Yes.
14 BY MR. HERBERT:
15     Q.  Okay.  And one of those reasons was she
16 believed that there was certain members of the city
17 council that were being discriminatory towards
18 blacks?
19     **A.  I know she spoke from -- as the mayor on**
20 **the board, and she talked about discrimination, but I**
21 **don't remember -- and I know she was upset about some**
22 **votes or, you know, not getting approval, but I don't**
23 **know if she made that correlation saying that any**
24 **specific alderman or anything was racist.**

1     Q.  I get that.  But she certainly expressed
2 beliefs that she believed that there was -- that
3 Kankakee was historically discriminating against
4 blacks?
5     **A.  Right, and I think some of that as an**
6 **example came up when they were talking in reference**
7 **to having marijuana or cannabis, the cannabis thing**
8 **and they needed to put money in the historically**
9 **black areas because they were not provided with the**
10 **resources or -- you know, in the past.**
11     Q.  Okay.  And that wasn't the only issue
12 that she expressed frustration towards Kankakee's
13 administration regarding treatments of black,
14 correct?  That's just one example?
15     **A.  Yes.**
16     Q.  Okay.  She was pretty open about her
17 beliefs that she thought that Kankakee, the city
18 historically had been discriminating against blacks
19 as a race, correct?
20     **A.  I think she made statements like that,**
21 **like in this cannabis situation.**
22     Q.  Yeah.  And she also made numerous
23 statements that she believed that the police
24 department was too white, correct?

1     MR. MCGRATH: Objection. Foundation.
2     THE WITNESS: I don't think she put it that
3 way, but she wanted the community to more reflect the
4 community -- or the police department to reflect the
5 community.
6 BY MR. HERBERT:
7     Q.  Okay.  And reflect the community by
8 having more blacks in the police department to
9 reflect the black community, correct?
10     **A.  I believe that would be her preference,**
11 **yes.**
12     Q.  Yeah.  And not only do you believe
13 that --
14     **A.  She said things.**
15     Q.  It was made very clear to you that she
16 wanted to have more blacks in the police department,
17 correct?
18     **A.  She wanted it to reflect the community**
19 **more.  She was -- I mean, that was national talk and**
20 **that, and she supported that position.**
21     Q.  And part of that position was having more
22 blacks in the Kankakee Police Department, correct?
23     MR. MCGRATH: Objection. Form of the
24 question, incomplete hypothetical, form.



**Frank Kosman Backwrite** - 3/23/2022
2:20-cv-02310-CSB-EIL #17-3 Page 13 of 90
Paul Berge, et al. vs. City of Kankakee, et al.

| |
|---|

1  You can answer.

2  THE WITNESS: Yes.

3  BY MR. HERBERT:

4  Q.  And she started a campaign effort, a

5  recruitment effort I should say, recruiting more

6  African Americans for the police department, correct?

7  **A.  I don't know if that was before my time.**

8  **I don't remember her having a recruitment to hire**

9  **more black officers in my tenure, during the two**

10  **years I was there.**

11  Q.  Well, Deputy Chief Hunt when he worked

12  under you, he was in charge of recruitment for police

13  officers, correct?

14  **A.  Right.**

15  Q.  Correct?

16  **A.  But we didn't have much recruiting**

17  **actually because COVID hit soon after I became chief.**

18  Q.  Right, but he was in charge of that

19  recruitment division, correct?

20  **A.  He was in charge of, yeah, recruitment.**

21  Q.  And he put Donell Austin in charge of

22  that unit, correct?

23  **A.  Correct.**

24  Q.  And that was under your command, correct?

Page 40

1  **A.  Yes.**

2  Q.  And the mission was to go into the black

3  neighborhoods and seek to hire more black candidates

4  for the police department, correct?

5  **A.  I would -- we were trying to recruit and**

6  **have more people for the test.  We didn't have a lot**

7  **of people on the test and everything, it was going**

8  **into all kinds of neighborhoods, job fairs at**

9  **colleges, community colleges, going into different**

10  **areas to recruit people, but I don't think it was**

11  **limited in any way to just the black community.**

12  Q.  Well, certainly there was an emphasis on

13  going into the black communities, correct?

14  MR. MCGRATH:  Objection.  The form of the

15  question, it calls for speculation, foundation.

16  THE WITNESS:  We wanted to be inclusive in

17  all of the communities, so there would have been some

18  in the black communities, but the problem is I don't

19  think we actually had any because of COVID.  During

20  the time we weren't able to go into any communities.

21  They canceled the job fairs at the colleges and the

22  situations we went to, I don't think that recruitment

23  process ever amounted to much.

24  BY MR. HERBERT:

Page 41

1  Q.  Whether it amounted to much, there was a

2  plan to increase the participation in the black

3  community for the recruitment of African Americans in

4  the police department, fair to say?

5  **A.  As part of a whole, yes.**

6  Q.  Okay.  And, I mean, the mayor, she was --

7  she was not a wilting flower.  Do you understand what

8  I mean by that?  She made her expressions pretty

9  clear, correct?

10  **A.  Correct.**

11  Q.  And she firmly believed that there was a

12  bad relationship between the police department in

13  Kankakee and the community, right?

14  **A.  She thought it should be improved.**

15  Q.  Improved?

16  **A.  Yeah, improved.**

17  Q.  Okay.  And she thought --

18  **A.  There's room for improvement, yeah.**

19  Q.  And she thought that -- and specifically

20  that the white police officers were mistreating the

21  black community, correct?

22  MR. MCGRATH:  Objection.  The form of the

23  question, foundation, incomplete hypothetical.

24  THE WITNESS:  I think it was more in general

Page 42

1  policing, having negative issues and relationships

2  with the black community.  So I don't know if it was

3  just Kankakee.  I think she was looking at it as a

4  whole, through the nation kind of a thing, but then

5  she was in charge of Kankakee, so that would be where

6  she would think that -- you know, her attention was

7  there.

8  BY MR. HERBERT:

9  Q.  So her concerns were on a national level

10  that police were mistreating the black community and

11  also that the Kankakee Police Department was

12  mistreating the black community, those were her

13  concerns?

14  **A.  She wanted to make sure that the Kankakee**

15  **Police Department wasn't mistreating the black**

16  **community and her concerns were nationwide.**

17  Q.  Right, but she had concerns that the

18  black community was being mistreated by the Kankakee

19  Police Department, correct?

20  **A.  I believe that to be true.**

21  Q.  And you believe that because she

22  mentioned that?

23  **A.  Right.  She thought there was a problem**

24  **there, not having a good relationship between the**

Page 43

**Frank Kosman Backwrite - 3/23/2022**
2:20-cv-02310-CSB-EIL  # 172-3  Page 14 of 90
Paul Berge, et al. vs. City of Kankakee, et al.

1 police and the black community, and that that would
2 go hand in hand with that.
3    Q.  Right.  And specifically she talked about
4 white police officers mistreating individuals in the
5 black community within the Kankakee Police
6 Department, correct?
7    MR. MCGRATH:  Objection.  Form of the
8 question, it misstates his prior testimony.
9       You can answer.
10    THE WITNESS:  I'm trying to think of an
11 example of her specifically talking about...  I don't
12 remember any specific cases as we sit here today in
13 reference to her saying that policeman is not
14 treating that person correctly.
15 BY MR. HERBERT:
16    Q.  Yeah, and I get that.
17    A.  Oh, you know.
18    Q.  Go ahead.
19    A.  People would call her to complain about
20 the police, and she would forward that to me, but
21 that wouldn't be her.  It would, you know.
22    Q.  Got it.
23    A.  In those kind of situations.
24    Q.  She believed that the Kankakee Police

1 A.  Yes.
2    Q.  And he replaced a white police officer,
3 correct?
4    A.  Yes.  I think that was that Robin
5 Passwater.
6    Q.  Right.  And you're aware of the fact that
7 she made Donell Austin a commander, correct?
8    MR. MCGRATH:  Objection.  Form of the
9 question, foundation, incomplete hypothetical,
10 misstates the prior testimony.
11    THE WITNESS:  No, I would assume that was
12 through the command structure of the police
13 department before -- I know he was the patrol
14 commander but I'm -- yeah, the contract would have
15 been signed by the mayor, I believe so.  I guess you
16 could say it that way then, yes.
17 BY MR. HERBERT:
18    Q.  And he became commander when Chasity
19 Wells was mayor, correct?
20    A.  Yes.  I believe so, yeah.
21    Q.  And Price Dumas was the chief, correct?
22    A.  Yes.
23    Q.  And Donell Austin, when he became
24 commander, the white commander that was there was

1 Department was predominately white and that it did
2 not accurately reflect the makeup of the Kankakee
3 city, correct?
4    MR. MCGRATH:  Objection.  Form of the
5 question, it calls for speculation, foundation, and
6 vague, incomplete hypothetical.
7    THE WITNESS:  It wasn't -- I don't know if
8 you used the word predominant, but it was -- there
9 were -- the blacks were represented in the Kankakee
10 Police Department.  She believed it should be more
11 so.  Like if black is around 40 percent of the police
12 department, she would probably, and she didn't give
13 me these numbers, but she wanted to have more black
14 police officers to reflect that number more.
15 BY MR. HERBERT:
16    Q.  Okay.  And she promoted Deputy Hunt,
17 correct?
18    MR. MCGRATH:  Objection.  Form of the
19 question.
20    THE WITNESS:  No, he was a deputy chief when
21 I got there.
22 BY MR. HERBERT:
23    Q.  Okay.  You're aware of the fact that she
24 made him deputy chief, correct?

1 demoted, correct?
2    A.  That was before I was there, but I would
3 assume, yes.
4    Q.  Yeah.  It was Commander Kidwell, correct?
5 You're aware of that?
6    A.  Well, I know he went to -- he was a
7 deputy commander at the KAMEG when I was there.
8    Q.  Okay.  But you're aware of the fact that
9 commander --
10    A.  Yeah, now that you mention it, I think,
11 yeah, I heard that he was the patrol commander
12 before.
13    Q.  Yeah.  So Austin replaced Kidwell,
14 correct?
15    A.  I believe so, yes.
16    Q.  So the top under Mayor Chasity Wells, the
17 head of the police department, she put a black male
18 in there, correct?
19    A.  Correct.
20    Q.  And then the No. 2 in command, the deputy
21 chief, she put a black male in there, correct?
22    A.  Correct.
23    Q.  And then the commander of the patrol
24 division, she put a black male in there, correct?



**Frank Kosman Backwrite  -  3/23/2022**
2:20-cv-02310-CSB-EIL   #17-3   Page 15 of 90
**Paul Berge, et al. vs. City of Kankakee, et al.**

1    MR. MCGRATH:  Objection.  Form of the
2  question, it calls for speculation, it's vague, an
3  incomplete hypothetical.
4  BY MR. HERBERT:
5    Q.  You can answer.
6    **A.  Yes.**
7    MR. MCGRATH:  Can we just take a quick break?
8    MR. HERBERT:  Yeah.
9                (Whereupon, a short break
10                was taken.)
11    MR. HERBERT:  Back on the record.
12  BY MR. HERBERT:
13    Q.  Did you become familiar with a lawsuit
14  that was filed by numerous black police officers in
15  the --
16    MR. HERBERT:  What year was that, do you
17  know?  The one by Hunt.
18    MR. MCGRATH:  It was early two thousands.
19  2003, '04.
20    MR. HERBERT:  Thank you.
21  BY MR. HERBERT:
22    Q.  Did you become aware of the fact that --
23    **A.  Before we get into that, I should**
24  **clarify.  As the --**

1    Q.  Well, hold on.  There's no question
2  pending on this.
3    **A.  Okay.**
4    Q.  Are you saying --
5    **A.  Before about who -- like I said in**
6  **reference to the mayor, that she approved the**
7  **contract, but that would be myself as a police chief**
8  **who would say that I wanted this as my deputy chief**
9  **or this as -- him as my commander or a thing like**
10  **that, and then that's what would happen.  But the**
11  **contract -- so I make sure that -- the semantics**
12  **aren't there.**
13        **The police chief is the one that's**
14  **instrumental in appointing, in telling the people,**
15  **but the contract itself is actually approved by the**
16  **mayor.  I think the city council too.**
17    Q.  So your answer that you gave me earlier,
18  you're saying that that answer is incorrect?
19    **A.  Well, like I prefaced it before, that**
20  **it's when the contract is actually signed, but the**
21  **word you used was they appointed.  I guess I just**
22  **want to make sure that we understand each other in**
23  **reference to what appointed -- or, you know, what**
24  **actually it means.**

1    Q.  Got it.  But you're not saying the answer
2  you gave was factually incorrect.  You're just
3  clarifying it?
4    **A.  Correct.  Like in the situations -- after**
5  **I became chief, the mayor after a while -- "Do you**
6  **still want to keep that -- Deputy Chief Hunt as the**
7  **deputy chief," and I said yes.**
8    Q.  And this is after you just had a
9  conversation with your lawyer, correct?
10    **A.  Yes.**
11    Q.  Okay.  So going back to that lawsuit, you
12  became aware of the fact that now Deputy Chief Hunt,
13  or I guess under your command Deputy Chief Hunt filed
14  a lawsuit against the City of Kankakee alleging
15  discrimination in the promotional process, correct?
16    **A.  When did I become aware of this, or what**
17  **is the question?**
18    Q.  Well, I just said you became aware of it
19  at some point, correct?
20    **A.  At some point I became aware of it.**
21    Q.  Okay.  And you became aware of the fact
22  that Hunt along with numerous other black Kankakee
23  police officers filed a discrimination lawsuit about
24  a promotion, correct?

1    **A.  Correct.**
2    Q.  Okay.  And did you ever talk to Hunt
3  about that lawsuit?
4    **A.  Yes.**
5    Q.  Okay.  And what were his feelings about
6  it?
7    **A.  He thought that the -- someone had given**
8  **someone the test -- helped them with test preparation**
9  **which he didn't think it was fair.**
10    Q.  He thought white guys were given the
11  answers, white police officers, right?
12    **A.  Yes.**
13    Q.  And he was upset about that, correct?
14    **A.  Correct.**
15    Q.  And he believed that there was
16  discrimination in the Kankakee Police Department
17  against blacks, correct?
18    **A.  In that instance, yes.**
19    Q.  Okay.  And how about in other instances?
20  Did he ever express to you any other instances where
21  he thought that blacks were discriminated against in
22  the Kankakee Police Department?
23    **A.  No.**
24    Q.  But he certainly felt that blacks were

Frank Kosman Backwrite - 3/23/2022
Paul Berge, et al. vs. City of Kankakee, et al.
2:20-cv-02310-CSB-EIL  #17-3   Page 16 of 90

1 discriminated against by whites on a general level,
2 correct?
3     MR. MCGRATH:  Objection.  Form of the
4 question, foundation, calls for speculation, asked
5 and answered.
6     THE WITNESS:  I'm sorry?
7     MR. MCGRATH:  And asked and answered.
8     THE WITNESS:  Answer?
9 BY MR. HERBERT:
10     Q.   Yeah.
11     **A.   I think he thought there was historical**
12 **discrimination.**
13     Q.   Against blacks?
14     **A.   Against blacks.**
15     Q.   By whites?
16     **A.   Yes.**
17     Q.   And he thought there was historical
18 discrimination against blacks by white police
19 officers, correct?
20     MR. MCGRATH:  Objection.  Foundation, calls
21 for speculation.
22     THE WITNESS:  I don't remember any specific
23 like example of when a police officer discriminated
24 against a black in Kankakee.

Page 52

1 BY MR. HERBERT:
2     Q.   Okay.  But you -- when you were the
3 chief, you had probably hundreds of conversations
4 with Deputy Chief Hunt?
5     **A.   Daily, yes.**
6     Q.   And probably hundreds of conversations
7 with Commander Austin?
8     **A.   Yes.**
9     Q.   Okay.  And you would agree with me
10 that -- well, Deputy Chief Hunt freely put out some
11 negative posts about white people on his Facebook
12 account.  You're aware of that, correct?
13     MR. MCGRATH:  Objection.  Foundation, form of
14 the question.
15     THE WITNESS:  Yes.
16 BY MR. HERBERT:
17     Q.   Were you Facebook friends with him at any
18 point?
19     **A.   I think I am now.**
20     Q.   Okay.  Have you seen any posts on his
21 account that are discriminatory or potentially
22 discriminatory towards whites?
23     **A.   No.**
24     Q.   Anything that shows any animosity towards

Page 53

1 whites?
2     **A.   No.**
3     Q.   Okay.  But certainly during those
4 conversations, hundreds of conversations you've had,
5 did you ever get the impression from speaking with
6 Deputy Chief Hunt that he believed that white people
7 were mistreating black people?
8     **A.   I think he made it -- made some comments**
9 **on that George Floyd situation, that it was improper**
10 **policing what they did.**
11     Q.   Okay.  And part of those hundreds of
12 conversations that you had with Deputy Chief Hunt,
13 you would talk about personnel within the Kankakee
14 Police Department, correct?
15     **A.   Correct.**
16     Q.   Okay.  And it's fair to say that Hunt, he
17 had some problems with some police officers within
18 the Kankakee Police Department?
19     **A.   I guess I would have to -- what problems**
20 **are.  I don't know, you know.**
21     Q.   Well, some issues.  He had some concerns
22 about some members of the Kankakee Police Department?
23     MR. MCGRATH:  Objection.  Form of the
24 question, speculation.

Page 54

1     THE WITNESS:  I don't -- just normal
2 personnel issues, you know, like overtime, you know,
3 but I don't think of him having any special problems
4 with anybody.
5 BY MR. HERBERT:
6     Q.   Well, he complained to you about white
7 police officers, correct, certain white police
8 officers?
9     MR. MCGRATH:  Objection.  Foundation.
10     THE WITNESS:  I don't remember him saying,
11 like there's anything that he pointed to saying this
12 white police officer, this officer is racist.  He
13 could be lazy, he could be something, other
14 situations or something like that, but I don't know
15 about...
16 BY MR. HERBERT:
17     Q.   But he raised concerns about various
18 white police officers, correct?
19     MR. MCGRATH:  Objection.  Foundation, vague.
20     THE WITNESS:  I mean, there could have been
21 white officers.  There was black officers too.  You
22 know, the same kind of, you know, personnel issues,
23 but.
24 BY MR. HERBERT:

Page 55



**Frank Kosman Backwrite - 3/23/2022**
2:20-cv-02310-CSB-EIL # 173 Page 17 of 90
**Paul Berge, et al. vs. City of Kankakee, et al.**

1  Q.  Can you think of any black police
2  officers, that Hunt expressed problems that he was
3  having with any black police officers?
4     MR. MCGRATH:  Object to the form of the
5  question.  Are we just talking like performance
6  issues?
7  BY MR. HERBERT:
8     Q.  Any issues.
9     **A.  I mean, I know that overtime, that one of**
10 **the officers, it happened to be a black officer,**
11 **worked a lot of overtime, and the union would**
12 **complain in reference to him working overtime, and he**
13 **had to talk to him a few times about you can't work**
14 **so many hours.**
15    Q.  Okay.  Let me get a little more specific.
16       Hunt, you had conversations with
17 Hunt where he thought that some of the white police
18 officers were trying to undermine his authority
19 within the ranks?
20    **A.  I don't remember him saying he's trying**
21 **to undermine my authority.**
22    Q.  Well, he thought that the white police
23 officers were not treating him fairly, fair to say?
24    MR. MCGRATH:  Objection.  Foundation, it

Page 56

1  calls for speculation, it's incomplete, and vague.
2     THE WITNESS:  I don't remember any instance
3  of that.
4  BY MR. HERBERT:
5     Q.  Okay.
6     **A.  Because if someone was fair -- fairly**
7  (sic), you would have to investigate it or whatever,
8  so I don't remember anything that would have been
9  said like that.
10 BY MR. HERBERT:
11    Q.  Well, you became aware of the fact that
12 there was a bunch of negative posts on social media
13 that were going throughout the community about
14 Commander Hunt, correct -- or I'm sorry, Deputy Chief
15 Hunt?
16    MR. MCGRATH:  Objection.  Foundation, it
17 calls for speculation.
18    THE WITNESS:  I know there was past ones.  I
19 don't remember anything during the two years I was
20 there.
21 BY MR. HERBERT:
22    Q.  You became aware of the fact through
23 conversations with Hunt that he believed white police
24 officers were posting negative things about him on

Page 57

1  social media accounts, correct?  You had
2  conversations to that extent?
3     **A.  I think it had to do with those posts**
4  **that you were talking about before and another**
5  **officer may have posted, and I don't know if it was**
6  **anyone there.  I think it was a past officer or**
7  **something that shared that post.**
8     MR. MCGRATH:  Can you clarify which post
9  you're talking about?
10    THE WITNESS:  The ones before that you
11 brought up in reference to the tail, that kind.
12 BY MR. HERBERT:
13    Q.  Okay.  Are you aware of any posts being
14 made on a Facebook group that was referred to as
15 You're Probably from Kankakee, and those posts were
16 negative about Deputy Chief Hunt?
17    **A.  It wouldn't surprise me from that site,**
18 **but I don't remember anything.  I didn't listen to**
19 **that.  I didn't look at that site.  After I first got**
20 **there, I soon realized that it was just all negative.**
21 **I didn't pay attention to it.**
22    Q.  So you're familiar with that site?
23    **A.  Yes.**
24    Q.  And you know that it was negative towards

Page 58

1  one person, Deputy Chief Hunt, correct?
2     MR. MCGRATH:  Objection.  Form of the
3  question, it calls for speculation, foundation, and
4  it's vague.
5     THE WITNESS:  It was negative a lot, so I
6  don't know, but specifically if it was in reference
7  to him, but.
8  BY MR. HERBERT:
9     Q.  Well, you knew that --
10    **A.  It probably was political.**
11    Q.  It was negative against the mayor,
12 correct, Chasity Wells?
13    MR. MCGRATH:  Again, testify to what you
14 know.
15    THE WITNESS:  The only thing that I ever
16 remember about that site, and I believe it was that
17 site, it posted some picture of one of our patrol
18 officers and saying something, that she sold adult
19 toys or something, and that's the only thing that I
20 remember from that site.
21 BY MR. HERBERT:
22    Q.  Okay.  And I'm not necessarily asking you
23 what you saw on the site.
24       You're aware of the fact that the

Page 59



**Frank Kosman Backwrite**  -  3/23/2022
2:20-cv-02310-CSB-EIL # 117-3   Page 18 of 90
**Paul Berge, et al. vs. City of Kankakee, et al.**

1 site, there was various negative information being

2 posted about the mayor, correct?

3      MR. MCGRATH: Objection. It's hearsay,

4 foundation, vague, calls for speculation.

5      THE WITNESS: You know, I don't know.

6 BY MR. HERBERT:

7      Q. Did you ever talk to the mayor about that

8 site?

9      **A. I don't recall a conversation, I mean,**

10 **anything about that site. I don't know.**

11      Q. Did you ever hear the mayor complain

12 about what was going on that site?

13      **A. I don't know what site -- I don't know**

14 **what came specifically from that site or not. I know**

15 **there was one complaint she made that somebody posted**

16 **something. I don't know if it was on that site,**

17 **Facebook site or whatever about having a picture of**

18 **her or started talking about doing target practice**

19 **with her because she made a complaint in regards to**

20 **that.**

21      Q. Let's make it more general. Certainly

22 you were aware of the fact that the mayor was upset

23 that there was information, negative information

24 being posted about her on social media accounts. You

1      THE WITNESS: I don't know. I don't know.

2 BY MR. HERBERT:

3      Q. Is it your testimony that you never heard

4 the mayor mention anything about negative information

5 being posted about her and/or her administration on

6 social media accounts?

7      **A. On any social media account?**

8      Q. Yes.

9      **A. Well, yes.**

10      Q. Okay.

11      **A. No, I mean, she said -- she complained.**

12 **She made a specific complaint about one person**

13 **posting on a social media site about her having --**

14 **talking about target practice.**

15      Q. And that's the only -- the only instance

16 that you can think of where the mayor ever expressed

17 any statement or opinion about negative information

18 being posted about her or her administration?

19      **A. I mean, she might have mentioned at that**

20 **point that this guy is always posting negative stuff**

21 **about her or something, you know, but I don't know.**

22      Q. It was all over the community, correct?

23      MR. MCGRATH: Objection. Speculation,

24 foundation.

1 would agree with me on that?

2      MR. MCGRATH: Objection. Leading, calls for

3 hearsay, speculation, foundation.

4      THE WITNESS: I think it's just an assumed

5 thing. I don't really know -- got too much involved

6 in that.

7 BY MR. HERBERT:

8      Q. You assumed that the mayor was mad

9 about --

10      **A. No, I assumed that there was people that**

11 **posted things negative about political people.**

12      Q. I'm not asking about that.

13      **A. Well, that's what I'm answering.**

14      Q. Okay. Well, let me ask the question

15 again. You certainly became aware of the fact that

16 the mayor believed that there was negative

17 information being posted about her and her

18 administration, and she wasn't happy about that,

19 correct?

20      MR. MCGRATH: Objection. Foundation, it

21 calls for speculation.

22      THE WITNESS: I can't recall any specific

23 incident. I would assume that --

24      MR. MCGRATH: No, don't assume.

1 BY MR. HERBERT:

2      Q. You can answer.

3      **A. Yes.**

4      Q. Okay. And you were the police chief when

5 all this stuff was being spread all over the

6 community, correct?

7      MR. MCGRATH: Objection. Foundation, an

8 incomplete hypothetical, vague.

9        Do you know what information?

10      THE WITNESS: I was police chief, and there's

11 going to be negative stuff on social media, yes.

12 BY MR. HERBERT:

13      Q. And in fact, there was negative stuff on

14 social media. That's what I'm talking about.

15      **A. Okay.**

16      Q. And you were aware of that, correct?

17      **A. Yes.**

18      Q. And you were aware of that because the

19 mayor was upset about the negative information being

20 posted on social media, correct?

21      MR. MCGRATH: Objection. Foundation.

22      THE WITNESS: I don't know how upset she was.

23 I mean, it would be common human nature that she

24 wouldn't be happy about it.

# Frank Kosman Backwrite - 3/23/2022
## 2:20-cv-02310-CSB-EIL #17-3 Page 19 of 90
## Paul Berge, et al. vs. City of Kankakee, et al.

BY MR. HERBERT:

Q. Okay. And you certainly heard her express her common human nature about not being happy about it, correct?

A. I don't recall that.

Q. Okay. Well, you knew that Deputy Hunt wasn't happy about this information that was being spread all over the community while you were the deputy -- or while you were the chief, correct?

MR. MCGRATH: Objection. Form of the question, speculation, it's hearsay.

THE WITNESS: I know he was upset or -- you know, I don't know upset, concerned. He was concerned when that post about that officer selling adult toys or whatever was on that.

BY MR. HERBERT:

Q. I get that, and you keep going back to one specific example. My question is, you were the chief of police?

A. Correct.

Q. And you were aware of negative posts about the administration while you were the chief of police, correct?

A. You know, I don't really follow those

Page 64

because it doesn't really matter what somebody says.

Q. I'm not asking you if you followed it. You were aware of the fact that there was posts going all throughout the Kankakee community, that it was critical of the mayor and her command staff?

MR. MCGRATH: Objection. Form of the question, it's vague, calls for speculation.

THE WITNESS: I don't know how widespread it was but it was -- you know, there would be -- when you say general, going across the whole community, I don't know that. I know that there were some statements or whatever put out there, but that's in everything.

BY MR. HERBERT:

Q. All right. I don't know if I understood anything that you just answered.

A. Yeah, I'm just saying I don't know about any specifics.

Q. And I'm not trying to trick you on this.

A. It seems like it.

Q. You were the police chief?

A. Correct.

Q. There was negative information being spread throughout the Kankakee community, and it was

Page 65

critical of the mayor and your police department, correct?

MR. MCGRATH: Objection. Form of the question, it calls for speculation, foundation, vague.

BY MR. HERBERT:

Q. You can answer.

A. Okay. I agree that there was social media that was negative. I don't know general going across the whole community. You know, I don't know about all of that.

Q. And I'm not asking you for like specifics, who it went to or what particular post. I'm asking in general. You were aware of the fact that there was these widespread posts that were critical of the mayor and the police department, correct?

MR. MCGRATH: Objection. Asked and answer, foundation, calls for speculation.

You can answer.

THE WITNESS: There were posts. I don't know how widespread.

BY MR. HERBERT:

Q. Okay. And they were negative posts about

Page 66

the mayor and the police department, correct?

MR. MCGRATH: Objection. Asked and answered, form of the question.

MR. HERBERT: I haven't gotten an answer yet.

THE WITNESS: Yes.

BY MR. HERBERT:

Q. And the criticism was about the way the police department was being run, correct?

MR. MCGRATH: Objection. Form of the question.

MR. HERBERT: Strike the question.

BY MR. HERBERT:

Q. There was criticism related to the way the police department was being run, correct?

MR. MCGRATH: Objection. Form of the question, it calls for speculation, hearsay, foundation.

BY MR. HERBERT:

Q. You can answer.

A. Yes.

Q. And the criticism was that the leadership in the police department, specifically the black leadership was discriminating against the white police officers, correct?

Page 67



**Frank Kosman Backwrite** - 3/23/2022
2:20-cv-02310-CSB-EIL # 17-3 Page 20 of 90
Paul Berge, et al. vs. City of Kankakee, et al.

**Page 68**

1    A.   No, I don't recall that.  I recall about
2  shots being fired and being -- you know, the police
3  aren't doing anything about shootings and the kind of
4  situations like that, but I don't know -- I don't
5  remember anything specific like what you just said.
6    Q.   You're aware of the fact that people were
7  complaining that the police department was being run
8  by individuals that were not running the department
9  properly, correct?
10    A.   I think it was frustration in reference
11  to not stopping the shootings or the violence.
12    Q.   And that's it?  That's all you can think
13  of?
14    A.   That's all that would matter to me.
15    Q.   You can't think of any complaints about
16  the racial makeup of the Kankakee Police Department
17  being made?
18    A.   Not on social media.
19    Q.   You can't think of any complaints about
20  the mayor demoting white police officers and
21  replacing them with all black command staff?  You
22  can't think of any complaints related to that?
23    A.   No.
24    Q.   You can't think of any complaints related

**Page 69**

1  where white police officers were claiming that they
2  were being discriminated against by the black
3  administration in Kankakee?
4    A.   No.
5    Q.   Okay.  Well, I can say you're probably
6  the only one that was in Kankakee that wasn't aware
7  of that.
8    MR. MCGRATH:  I object to that.  It's
9  argumentative and it misstates the prior testimony,
10  and there's nothing in the record to support that.
11  BY MR. HERBERT:
12    Q.   How many conversations did you have with
13  Deputy Chief Hunt about his filing that lawsuit
14  concerning discrimination in the police department?
15    A.   I don't know.  Just one or two.
16    Q.   Okay.  And during those conversations
17  Hunt expressed to you that he thought he was being
18  discriminated against because the answers were given
19  to white police officers and not black police
20  officers, correct?
21    MR. MCGRATH:  Objection.  Asked and answered.
22    THE WITNESS:  Well, he thought he was being
23  discriminated against because somebody else got the
24  answers and he didn't, so yes.  And he's white -- or

**Page 70**

1  I think the -- I don't know who.  I forgot who it was
2  that supposedly got the help, and he didn't get the
3  help and he was black.
4  BY MR. HERBERT:
5    Q.   Right, but let's go straight to the
6  issue.  He was upset because he thought that the
7  whites were being given advantages that the blacks
8  weren't being given, correct?
9    A.   Yes.
10    Q.   And he thought that the Kankakee Police
11  Department generally gave preference to white police
12  officers over black police officers, correct?
13    MR. MCGRATH:  Objection.  Foundation, it
14  calls for speculation, incomplete hypothetical, and
15  vague.
16    THE WITNESS:  I know he was upset about that
17  specific, but it wasn't current.  That was, you know,
18  in the past.
19  BY MR. HERBERT:
20    Q.   You were aware of the fact that Hunt was
21  upset that throughout his career in the Kankakee
22  Police Department he witnessed what he believed to be
23  many forms of discrimination by white police officers
24  against black police officers?

**Page 71**

1    MR. MCGRATH:  Objection.  Foundation,
2  incomplete hypothetical, it calls for speculation.
3    THE WITNESS:  No.
4  BY MR. HERBERT:
5    Q.   Did you prepare by reviewing any
6  documents in preparation for your deposition today?
7    A.   Yes.
8    Q.   What did you look at?
9    A.   I looked at my memo explaining my
10  recommendation for promotion.
11    Q.   Anything else?
12    A.   No.
13    Q.   Did you have any conversations with
14  anyone other than your lawyer?
15    A.   No.
16    Q.   When was the last time you spoke with
17  Mayor Chasity Wells-Armstrong?
18    A.   I saw her a couple months ago at a
19  riverfront ceremony.  We're starting a river walk.
20    Q.   Okay.  And before that?
21    A.   Probably a phone call maybe a month
22  before that just to catch up.
23    Q.   Okay.  Have you spoken to Price Dumas in
24  the last year?



Frank Kosman Backwrite - 3/23/2022
Paul Berge, et al. vs. City of Kankakee, et al.
2:20-cv-02310-CSB-EIL # 17-3 Page 21 of 90

**Page 72**

1    A.  No.  I've never spoken to him.

2    Q.  Okay.  How about Deputy Chief Hunt, have

3 you spoken with him in the last year?

4    A.  Yes.

5    Q.  And when was the last time you spoke with

6 him?

7    A.  About two months ago, a phone

8 conversation.

9    Q.  Have you communicated with him other than

10 speaking with him during that two-month period

11 leading up to today?

12    A.  No.

13    Q.  Okay.  What was the conversation about

14 between the two of you?

15    A.  I was wondering what he knew about the

16 substitute teacher since he works at the school

17 district.

18    Q.  Okay.  And just going back to those

19 Facebook -- the negative information that was being

20 put forth about the command stuff.  After you became

21 chief, did you become aware of the fact that Price

22 Dumas was conducting an investigation into negative

23 information being posted on social media about the

24 command staff?

**Page 73**

1    A.  I think there was some previous

2 investigation in reference to somebody posting some

3 internal document or something on social media or

4 something like that, so I don't know if that's what

5 you're referring to.

6    Q.  I asked you about investigations

7 conducted.

8    A.  Right.  Him having to investigate --

9 Price having an investigation in reference to

10 somebody posting some document or some information

11 that was from an internal --

12    Q.  Right.  And when you became the chief of

13 the police department in Kankakee, you wanted to know

14 everything about the police department as best as you

15 could, correct?

16    A.  Correct.

17    Q.  You wanted to know about all the

18 personnel, correct?

19    A.  Yes.

20    Q.  You wanted to know about any problems

21 that were occurring within the Kankakee Police

22 Department, correct?

23    A.  Correct.

24    Q.  You wanted to know about any potential

**Page 74**

1 criminal behavior that was being conducted by any of

2 the members within the Kankakee Police Department,

3 correct?

4    A.  Correct.

5    Q.  And so you dug into the history of the

6 Kankakee Police Department after you became the

7 chief, correct?

8    A.  Well, I became aware of situations, yeah.

9 Digging into, I didn't re-investigate things that

10 were investigated before.

11    Q.  Well, certainly you became aware of the

12 fact that the Illinois State Police was conducting a

13 criminal investigation into the chief of police that

14 you replaced, didn't you?

15    A.  I was aware of it.  I mean, there was

16 newspaper articles when I was looking for a job.

17    Q.  But you didn't look into it at all as

18 your role as the chief of police?

19    A.  It was already over.

20    Q.  You weren't concerned about potential

21 criminal conduct going on within the police

22 department that might have included other police

23 officers within the Kankakee Police Department?

24    A.  Of course I would be concerned if I

**Page 75**

1 thought there was something that was still going on.

2    Q.  But you didn't do anything to

3 investigate, did you?

4    A.  There was nothing to investigate.

5    Q.  You would agree with me that a criminal

6 investigation into a chief of police is a pretty

7 sensational matter, correct?

8    MR. MCGRATH:  Objection.  Form of the

9 question, foundation, incomplete hypothetical.

10 BY MR. HERBERT:

11    Q.  You can answer.

12    A.  Yes.

13    Q.  And did you become aware of the fact that

14 the criminal investigation into Price Dumas was him

15 using police department resources to conduct an

16 investigation on a non-police related matter?  Did

17 you become aware of that?

18    A.  I was aware because the newspaper

19 articles, the Illinois State Police investigated the

20 incident of him running a couple plates on some cars.

21    Q.  Right.  And Deputy Chief Hunt, he was

22 investigated for the same type of conduct, correct?

23    A.  No.

24    Q.  You're not aware of any investigation



**Frank Kosman Backwrite - 3/23/2022**
2:20-cv-02310-CSB-EIL #17.3 Page 22 of 90
Paul Berge, et al. vs. City of Kankakee, et al.

1 into Deputy Chief Hunt, about him using police
2 department equipment for a non-police related
3 instance?
4    **A. No.**
5    Q. You're not aware of the fact that Deputy
6 Chief Hunt was conducting investigations that were --
7 that he was being told to conduct by the mayor, the
8 mayor that hired you, Chasity Wells? You're not
9 aware of that fact?
10    MR. MCGRATH: Objection. Foundation, it
11 calls for speculation, incomplete hypothetical, it's
12 vague, and no prior testimony to that.
13    THE WITNESS: No.
14 BY MR. HERBERT:
15    Q. You're not aware of the fact that Chasity
16 Wells-Armstrong told Deputy Hunt that he needed to
17 conduct an investigation to find out who was making
18 all these negative posts about her and her command
19 staff? You're not aware of that fact?
20    **A. No.**
21    Q. And you're not aware of the fact that
22 deputy -- or I'm sorry, Mayor Chasity Wells directed
23 Price Dumas to conduct investigations into who was
24 making negative posts about her administration, and

Page 76

1 that investigation led to a criminal investigation by
2 the Illinois State Police? You're not aware of the
3 fact that the mayor was involved in that?
4    MR. MCGRATH: Objection. Form of the
5 question, it's compound, incomplete hypothetical, not
6 supported by the record in this case.
7    THE WITNESS: No.
8 BY MR. HERBERT:
9    Q. They never talked to you about that, the
10 mayor, Dumas, Hunt, correct?
11    **A. No. Correct.**
12    Q. Would you have taken the job had you
13 known that there was all of these allegations of
14 misconduct concerning the mayor and her top police
15 command staff?
16    MR. MCGRATH: Objection. Form of the
17 question, foundation, it's vague, incomplete
18 hypothetical, it's not supported by the -- there's
19 nothing in the record about the mayor being
20 investigated.
21 BY MR. HERBERT:
22    Q. You can answer.
23    **A. Yes.**
24    Q. Would you have looked into the issue with

Page 77

1 Deputy Chief Hunt considering you kept him as your
2 deputy chief when you were the chief?
3    MR. MCGRATH: Objection. Form of the
4 question, foundation, speculation.
5    Can you read that question back,
6 please?
7 BY MR. HERBERT:
8    Q. Well, do you understand the question?
9    MR. MCGRATH: No, I may have another
10 objection.
11    (Whereupon, the record was
12    read as requested.)
13    THE WITNESS: If you're asking me a
14 hypothetical, if I knew that he would -- done
15 something wrong. I don't understand.
16 BY MR. HERBERT:
17    Q. I'll ask another question.
18    Had you known that there was
19 allegations against Deputy Chief Hunt about improper
20 investigative techniques done at the behest of the
21 mayor, would you have looked into that situation
22 after you became the chief?
23    MR. MCGRATH: Objection. An incomplete
24 hypothetical, foundation, unsupported by the record

Page 78

1 in this case, it's vague, improper.
2    THE WITNESS: If I was -- if I thought there
3 was some improper conduct that wasn't investigated
4 already, then I would have investigated it.
5 BY MR. HERBERT:
6    Q. So were you aware of an investigation of
7 Deputy Chief Hunt that exonerated somehow, exonerated
8 him somehow concerning this investigation?
9    **A. Exonerated him of what?**
10    Q. You just testified that you're not aware
11 of the allegations against Hunt regarding his
12 investigation at the behest of the mayor. Is that
13 what you testified to earlier?
14    **A. Correct.**
15    Q. This is the first time you're hearing
16 about that today, correct?
17    **A. I'm not sure exactly what you're talking**
18 **about but, yes, an allegation of him doing something**
19 **improper.**
20    Q. Are you aware of any allegations against
21 Lieutenant Hunt regarding his performance on the job?
22    **A. No.**
23    Q. Okay. When you were appointed the chief,
24 were you allowed to select who you wanted to have as

Page 79



**Frank Kosman Backwrite** - 3/23/2022
2:20-cv-02310-CSB-EIL #17-3 Page 23 of 90
**Paul Berge, et al. vs. City of Kankakee, et al.**

1 your command staff?

2  A. Yes.

3  Q. And when you first became chief, Deputy

4 Chief Hunt was there, correct?

5  A. Correct.

6  Q. And Commander Austin was there, correct?

7  A. Yes.

8  Q. And did you remove either one of them?

9  A. No.

10  Q. And did you do any research to determine

11 whether or not you needed to make any changes to the

12 command staff?

13  A. Yes.

14  Q. What did you do?

15  A. I interviewed almost all the members of

16 the police department, and I reviewed the personnel

17 files.

18  Q. Did you interview the candidates -- well,

19 strike that.

20     Did you interview Deputy Chief Hunt?

21  A. Yes.

22  Q. Did you interview Commander Austin?

23  A. Yes.

24  Q. And you said that you interviewed all the

Page 80

1 members of the police department?

2  A. I tried to. I don't know if there were a

3 couple that I didn't -- I might not have made it to,

4 but the vast majority I talked to.

5  Q. And you would agree with me that during

6 your interviews of the police officers, there was

7 complaints about Deputy Chief Hunt, correct?

8  A. Yes.

9  Q. And there was complaints that he

10 mistreated white police officers, correct?

11  A. No.

12  Q. What were the complaints about Deputy

13 Chief Hunt?

14  A. The complaint about the Facebook posting.

15  Q. And that was made by numerous people,

16 correct?

17  A. I remember one. I don't know if there's

18 -- if someone else mentioned it too, but there was

19 one that made a point of it.

20  Q. There was complaints about Deputy Chief

21 Hunt where people believed he was -- he had negative

22 feelings towards white people, correct?

23     MR. MCGRATH: Objection. Asked and answered,

24 it calls for speculation, foundation.

Page 81

1     THE WITNESS: The only one I remember is the

2 one in reference to the Facebook posting.

3 BY MR. HERBERT:

4  Q. How many people did you interview in the

5 police department?

6  A. Probably 60.

7  Q. 60 police officers?

8  A. Somewhere in there, between 50 and 60.

9  Q. How many police officers were there at

10 the time you interviewed these individuals?

11  A. Mid 60s.

12  Q. And did you document these interviews?

13  A. I took notes.

14  Q. Do you still have those notes?

15  A. I don't have them, no.

16  Q. Did you give those notes to somebody?

17  A. I don't think so. I don't know. I don't

18 remember what happened to them. That was like when I

19 first came to take notes, but I didn't keep them. I

20 don't know if they're still in a file in the drawer

21 in the chief's office or not.

22  Q. Where would they be?

23  A. In the file drawer in the chief's office

24 I would think if they're still there, in a desk.

Page 82

1  Q. Is there a particular file drawer that

2 they would be in?

3  A. I don't remember.

4  Q. Do you know of any file or drawer that

5 you would have put them in?

6  A. They were in -- I put them in a binder

7 and I don't know what I would have done with that or

8 I had it in the -- I think it was -- it was in the

9 chief's office. I don't know if it was a desk drawer

10 or if it was in a file cabinet because I didn't use

11 it too much after I -- but I did it because it helped

12 me remember names and everything of the officers.

13 You know, I used their general kind of questions.

14  Q. And when you left the police department,

15 you took all of your personal belongings with you,

16 correct?

17  A. My personal belongings, yes.

18  Q. But you're saying you left that binder in

19 there?

20  A. I don't remember if I still did or I got

21 rid of it. I don't know.

22  Q. Okay. And it's your testimony that these

23 interviews of the 60 police officers, approximately,

24 that the only complaint about Deputy Chief Hunt was

Page 83



Frank Kosman Backwrite  -  3/23/2022
2:20-cv-02310-CSB-EIL  #172-3  Page 24 of 90
Paul Berge, et al. vs. City of Kankakee, et al.

1 that he posted things on his Facebook that were
2 inappropriate?
3    **A.  Yes.**
4    Q.  There was not a single complaint -- or
5 strike that.
6         There was not -- nothing was raised
7 about people's belief that Hunt was not fair in any
8 way?
9    **A.  No.**
10   Q.  How about Commander Austin, were there
11 any complaints about Commander Austin not treating
12 people fairly?
13   **A.  There might have been some complaints in**
14 **reference to Commander Austin being -- I don't know**
15 **what is the right word, stern or not understanding**
16 **enough or not being a good communicator.**
17   Q.  Okay.  Were there any complaints made by
18 white officers about Commander Austin?
19   **A.  You know, I don't --**
20   MR. MCGRATH:  Are you still talking about
21 when he was interviewing the 50 to 60?
22   MR. HERBERT:  Why not?
23   THE WITNESS:  I don't remember who actually
24 made those -- that kind of a comment.

Page 84

1 BY MR. HERBERT:
2    Q.  And the complaints about deputy -- or I'm
3 sorry, yeah, Deputy Chief Hunt about his Facebook
4 posts, were those complaints made by white police
5 officers?
6    **A.  The one subject that did I remember was a**
7 **white officer.**
8    Q.  And as you sit here today, you think only
9 one of the 50 to 60 people that you interviewed about
10 Deputy Chief Hunt brought that issue up about his
11 Facebook posts?
12   MR. MCGRATH:  Objection.  Form of the
13 question, he interviewed about Deputy Chief Hunt.
14 Misstates prior testimony.
15        You can answer.
16   THE WITNESS:  That's all I remember.
17 BY MR. HERBERT:
18   Q.  There could have been more?
19   **A.  I don't remember anybody else.**
20   MR. MCGRATH:  Objection.
21 BY MR. HERBERT:
22   Q.  There could have been more that you just
23 don't remember, correct?
24   MR. MCGRATH:  Objection.  It calls for

Page 85

1 speculation, asked and answered.
2    THE WITNESS:  It's possible, I guess.
3 BY MR. HERBERT:
4    Q.  Well, you're aware of the fact that this
5 was a -- Hunt's Facebook posts, that was a very big
6 topic of concern within the police department.  You
7 knew that when you were the chief, correct?
8    **A.  I don't know if it still was.**
9    Q.  You certainly, more than this one person
10 that you remember, you heard other people talk about
11 Hunt's Facebook posts, correct, people within the
12 police department?
13   **A.  I don't remember having other**
14 **conversations with other people about it.**
15   Q.  You're aware of the fact that it was a
16 very well known topic of discussion amongst the
17 police officers that Hunt had made these racially
18 derogatory posts on his Facebook.  You would agree
19 with me on that?
20   MR. MCGRATH:  Objection.  It calls for
21 speculation, foundation, hearsay.
22   THE WITNESS:  I know that it happened and I
23 know that it was a while before then and it had
24 been -- there was a discipline matter raised, so it

Page 86

1 was probably well known within the department, but I
2 don't know.  It was old news.
3 BY MR. HERBERT:
4    Q.  Well, certainly when the union came and
5 expressed their vote of no confidence, they gave the
6 reasons why they voted no confidence for you and the
7 mayor and Wells -- I'm sorry, and Austin and Hunt.
8 They gave reasons, correct?
9    **A.  Reasons.  I just remember the reason**
10 **being the promotion.**
11   Q.  They believed that the administration was
12 racist towards white police officers?
13   MR. MCGRATH:  Objection.  Form of the
14 question, calls for speculation, hearsay, it's vague,
15 and form.
16   THE WITNESS:  Yes.
17 BY MR. HERBERT:
18   Q.  And part of the reason for that, for
19 their belief that Hunt was a racist, part of that was
20 because of his racist posts on Facebook, correct?
21   MR. MCGRATH:  We're just talking about the
22 vote of no confidence at the meeting?  Objection to
23 hearsay, speculation, vague, form of the question.
24   THE WITNESS:  Yeah, I don't recall if they

Page 87



**Frank Kosman Backwrite   -   3/23/2022**
Paul Berge, et al. vs. City of Kankakee, et al.
2:20-cv-02310-CSB-EIL  # 17-3   Page 25 of 90

1 mentioned that in their complaint.
2 BY MR. HERBERT:
3     Q.  Did you talk to the mayor about the
4 command staff at any point after you were appointed
5 chief?
6     A.  Yes.
7     Q.  And tell me about that.
8     A.  She asked if I wanted to make any
9 changes, and I remember her specifically asking me
10 about Deputy Chief Hunt, and I told her that I
11 thought he was doing a good job and I haven't had any
12 complaints and I wanted to keep him there.
13     Q.  When did this conversation take place?
14     A.  Six months to a year after I was there.
15     Q.  When did you interview the 50 to 60
16 police officers in relation to when you started?
17     A.  I try to do it within the first two
18 months.
19     Q.  And is it your testimony that the first
20 conversation you had with the mayor about Deputy
21 Chief Hunt was six months to a year after you took
22 over?
23     A.  I don't remember.  I mean, we might have
24 mentioned this, stuff in reference to just regular

1 conversations, but I remember her asking me about if
2 I wanted to keep -- how I thought Deputy Chief Hunt
3 was doing and if I wanted to keep him as deputy chief
4 or select somebody else.
5 BY MR. HERBERT:
6     Q.  After you were appointed chief -- or
7 strike that.
8         Prior to your being appointed chief,
9 did you have any conversations with deputy -- I'm
10 sorry, Mayor Chasity Wells?
11     A.  Before I became?
12     Q.  Yes.
13     A.  Yes.
14     Q.  Tell me about those.
15     A.  We met in her office.
16     Q.  When?
17     A.  Probably in April sometime of 2019.
18     Q.  Okay.
19     A.  And I don't know if we talked -- I went
20 through the process -- I don't remember meeting her
21 at first when they had the regular interviews with
22 the -- the selecting contract or the process, but
23 when she was making her final decisions, I met her in
24 her office.

1     Q.  And that would be in April of 2019?
2     A.  Yeah.  It could be March, but I think
3 April, somewhere in there.
4     Q.  Okay.
5     A.  And she explained to me -- I mean, the
6 things that stuck to me was that she thought that the
7 police department wasn't and the officers in the
8 police department weren't being held accountable for
9 their activity, and she wanted to make sure that I
10 made sure that everyone was accountable for what they
11 did.
12     Q.  Okay.  Anything else?
13     A.  I did ask her if she planned on running
14 again for election, and she told me that she did.
15     Q.  Okay.  And anything else?
16     A.  That's the two major things I remember.
17 The two things I remember.
18     Q.  Do you remember anything else?
19     A.  No.
20     Q.  How long did this meeting last?
21     A.  15 minutes.
22     Q.  And the only things you remember is she
23 expressed her concern that officers were not being
24 held accountable, correct?

1     A.  Yeah.  Now that we're talking more, I
2 remember she made it clear that I was going to have
3 to move into town.  She wanted me to be part of the
4 community.
5     Q.  Okay.  Anything else?
6     A.  And that was it basically.
7     Q.  Okay.  So the three topics that you
8 remember being discussed in your meeting with the
9 mayor prior to being hired were police not being held
10 accountable, you moving into town, and whether or not
11 she was going to run for a second term?
12     A.  Yes.
13     Q.  Did she say -- do you know if she
14 mentioned anything about -- I'm sorry.  She said that
15 she believed police were not being held accountable
16 within the Kankakee Police Department?
17     A.  Yes.  Plus, she wanted to make sure that
18 everyone was held accountable.
19     Q.  Well, tell me what you remember about
20 that portion of the conversation.
21     A.  I just remember her -- I remember that
22 being a big thing, to make sure that you keep
23 everyone -- keep a person held accountable, so if
24 they're doing something wrong that they're held

Frank Kosman Backwrite - 3/23/2022
2:20-cv-02310-CSB-EIL #17-3 Page 26 of 90
Paul Berge, et al. vs. City of Kankakee, et al.

1 accountable for doing it.

2 Q. Do you remember anything else other than
3 those words being said, not being held accountable?

4 A. No, just to make sure that you keep
5 everybody at the police department accountable.

6 Q. Did she give you any examples of why she
7 believed the police were not being held accountable?

8 A. I don't remember any specific thing that
9 she provided me.

10 Q. Did she mention anything about the
11 command staff at the police department that she put
12 in place?

13 A. I don't remember.

14 Q. Take your time.

15 A. I don't remember anything. I mean, in
16 passing that, you know, after you're there for a
17 while, you might -- you know, whatever you decide to
18 do with your command staff, if you have any
19 recommendations to let me know, or I might have
20 brought it up that I have to be -- you know, try to
21 get acquainted with the department, the processes and
22 the personnel and get back to her on that, but that
23 would have been just in a normal conversation. It
24 wasn't anything that I remember.

1 Q. So there was discussions about how after
2 you were there for a while, if you wanted to make
3 changes to the command staff?

4 A. You know, being personnel, the personnel
5 issues, just, you know, that I would have to -- that
6 probably would have been something I would have
7 brought up in reference to becoming the chief there.

8 Q. Did she tell you that you could bring in
9 whoever you wanted to if you were hired on the first
10 day?

11 A. We didn't talk about bringing anybody in
12 from the outside.

13 Q. How about from the inside?

14 A. She did not. We didn't talk anybody. I
15 didn't know anybody really from the inside, so I
16 wouldn't.

17 Q. Was there any discussion about your
18 ability to change personnel -- or strike that.

19 Was there any discussion about your
20 ability to change the deputy chief?

21 A. I don't remember any specifics on that.

22 Q. Do you remember if Deputy Chief Hunt's
23 name was mentioned during the meeting?

24 A. I don't remember.

1 Q. Do you remember if the mayor said
2 anything about if you were hired that Deputy Chief
3 Hunt would remain the deputy chief?

4 A. I don't think we discussed that. It was
5 more centered on me.

6 Q. So there was no discussion about who
7 would be the deputy chief after you were hired
8 between you and the mayor in that first meeting?

9 A. Other than he was the deputy chief, you
10 know, at the time.

11 Q. Did she give you any -- did she say
12 anything that -- to you that it was her desire to
13 have Deputy Chief Hunt remain in the position whoever
14 was hired as a chief?

15 A. No.

16 Q. Did you meet with her any time after
17 that?

18 A. Probably like on at least a weekly basis.

19 Q. So that would be the only meeting that
20 you had with her prior to you being hired?

21 A. Yes.

22 Q. Was there an interview process?

23 A. Yes.

24 Q. And how many -- tell me about the

1 process.

2 A. There was applications in there. That
3 was handled by -- now I forget the name of the
4 outfit, of the firm that had it, and then they had
5 panel interviews from -- a group of people
6 interviewing us. I can't remember if we did it all
7 -- we were all there, but I don't know if we actually
8 did it individually or we did it as a group once and
9 then individually later that day or it was -- so
10 there was an interview process that we went through.

11 Q. Who do you remember interviewing you?

12 A. Yeah, I know it wasn't the mayor, but I
13 don't remember who it was. It might have been some
14 committee, but I didn't know who were there at the
15 time, so I don't remember who it was.

16 I know there was -- it could have
17 been the firm and then it might have been like some
18 members of the board possibly. I don't remember
19 exactly who the personnel. I just remember it was an
20 interview. I remember going to the city hall in a
21 board -- in a conference outside the board room and
22 being interviewed by the personnel. And then there
23 was a big lag between then and when I got the -- I
24 applied probably in the summer of 2018, and I got



Frank Kosman Backwrite   -   3/23/2022
Paul Berge, et al. vs. City of Kankakee, et al.
2:20-cv-02310-CSB-EIL   #17-3   Page 27 of 90

**Page 96**

1  hired in March of 2019.

2      Q.   And I understand at the time you might

3  not have known who you were interviewing with.

4      A.   Right.

5      Q.   But after you worked as the chief, you

6  got to know the various members of the command staff,

7  correct?

8      A.   Yes.

9      Q.   Okay.  So as you sit here now, do you

10  know the names of anyone that interviewed you?

11      A.   I don't think it was members of the

12  internal police force because I remember Donell was

13  there.

14      Q.   We'll say in the Kankakee government

15  then?

16      A.   I don't remember, and I don't want to

17  speculate.  I don't want to guess.  I don't remember

18  exactly, no.  I don't know if it was some city

19  councilmen or not.  I don't remember.

20      Q.   Is it your testimony you don't remember

21  the name of anyone that interviewed you during the

22  interview process other than the mayor during the

23  April meeting?

24      A.   And that was near the end, so I was

**Page 97**

1  already -- I'm sorry, but I don't.  I interviewed a

2  lot of times for a lot of different positions.

3      Q.   You said you interviewed with possibly

4  people from the board?

5      A.   I remember there was a group of people

6  that interviewed me and so I -- I think that it was.

7      Q.   Do you remember if you were ever

8  interviewed by Nickey Yates?

9      A.   You know, I don't remember.

10      Q.   You know who Nickey Yates is, correct?

11      A.   Yeah, I know he's on the board of the

12  Police and Fire Commission, but I don't think they

13  would have been involved in hiring a chief, so I

14  don't think so, but I don't know.

15      Q.   Did you ever have a conversation with

16  Nickey Yates before you were hired?

17      A.   Not that I remember, no.  If he was on

18  that board maybe I did, but I don't remember having a

19  conversation with him.

20      Q.   Other than being on the board, did you

21  ever have any conversations with Nickey Yates prior

22  to you being hired as the chief?

23      A.   No.

24      Q.   During any of those interviews by these

**Page 98**

1  unknown people, did Deputy Chief Hunt's name ever

2  come up?

3      A.   Not that I recall, no.

4      Q.   Was there ever any discussion about you

5  and the command staff, the current command staff?

6      A.   I know Donell Austin was one of the other

7  candidates, so we talked.  If that's what...

8      Q.   I'm not talking about conversations with

9  other candidates.  I'm talking about the interviews.

10      A.   I don't remember who was on that

11  interview panel, so I don't know.

12      Q.   We've already established that point.

13  You have to listen to my question, otherwise we'll be

14  here all day long.

15      A.   Okay.  I've got it.  No, no.  I've got a

16  lot of time.

17      Q.   Was there ever any discussions during

18  those interviews about the current command staff?

19      A.   I don't remember those questions.

20      Q.   Was there ever any discussion about your

21  ability to choose individuals for the command staff?

22      A.   You know, I don't remember the interview.

23      Q.   So you don't remember anything about the

24  contents of the interviews?

**Page 99**

1      A.   No, not in that specific one, no.

2  They're all pretty similar and they blend together.

3      Q.   Well, tell me about the others one

4  because I don't know.

5      A.   I don't know.  Well, when you go for a

6  police chief thing, they ask you, you know, what --

7      Q.   I'm not saying general.  I'm talking

8  about your process.

9      A.   That's what I'm talking about.

10      Q.   I'm talking your process with the

11  Kankakee Police Department.  Tell me about all the

12  interviews that you had?

13      A.   I think I only had the one when I came

14  over to the city hall where it was like -- I don't

15  think it was a panel interview.  I think it was where

16  we walked in.  Maybe they had interviews of, you

17  know, the four, five applicants and we came in there

18  and were interviewed, but I know there were other

19  applicants that were sitting outside with me there.

20          So I went in to be interviewed

21  and the guy asked -- probably around a conference

22  table in there, and we were asked specific questions

23  in reference to, you know, give some advice -- not

24  advice, but give us some information about yourself.



Frank Kosman Backwrite  -  3/23/2022
2:20-cv-02310-CSB-EIL  #17-3  Page 28 of 90
Paul Berge, et al. vs. City of Kankakee, et al.

1 What's your leadership style, all that, the general
2 kind of questions that they ask.
3     Q.  Was that the only interview that you had,
4 other than that and the one that you had with Mayor
5 Chasity Wells before you were hired?
6     A.  That's all I remember.
7     Q.  Okay.  When you were hired -- or strike
8 that.
9          So the next conversation you would
10 have had with the mayor would have been after you
11 were hired?
12     A.  Yes.
13     Q.  Okay.  And when did that take place?  I'm
14 not trying to trick you.  Was it the same day, was it
15 the next day?
16     A.  You know, I don't remember.  I'm not
17 trying to say -- you know, I don't remember.  It
18 would have been after I was hired.  You know, we
19 didn't have a set time.  We'd always -- every
20 Wednesday or whatever they have a meeting in general
21 with the mayor and -- like a leadership meeting, and
22 you would bring up points that you wanted to be
23 brought up either at the board level or issues that
24 you were having.  Those were general ones.
Page 100

1     Q.  I'm not talking about general meetings.
2     A.  I know, but you were asking me about
3 meetings.  That's when I would meet on a regular
4 basis, and then once if -- every so often some issue
5 would come up or something that I needed to talk to
6 her about, then I would make an appointment and meet
7 her.
8     Q.  I'm not asking you about that.  The first
9 day you were chief, do you remember what day that
10 was?
11     A.  I got sworn in May 4th, and I started
12 like the week after that.
13     Q.  Okay.  And so you would have started
14 roughly around May 11th, correct?
15     A.  Somewhere in there, yeah.
16     Q.  Did you have any conversations with the
17 mayor from that April meeting until the day that you
18 started on or around May 11th?
19     A.  None that I remember.
20     Q.  Okay.  So the first day that you were --
21 that you came to work, did you have any discussions
22 with the mayor?
23     A.  I don't remember.  I don't know if she
24 was available or not.
Page 101

1     MR. MCGRATH:  No, just -- if you don't
2 remember, you don't remember.
3 BY MR. HERBERT:
4     Q.  Do you remember the first conversation
5 you had with the mayor after you were the police
6 chief?
7     A.  I don't remember.
8     Q.  Do you know approximately when it would
9 have been?
10     A.  You know, I'm sure I would have met with
11 her soon after I started or, you know, that week,
12 during that week depending on her schedule.
13     Q.  Did you make any changes to the police
14 department the first day that you were in office
15 personnel-wise?
16     A.  No.
17     Q.  Did you make any changes to the personnel
18 in the police department your first month in office?
19     A.  No.
20     Q.  Did you ever make any changes to
21 personnel of the police department while you were
22 chief?
23     A.  Yes.
24     Q.  When was the first change that you made?
Page 102

1     A.  That would have been I think in that
2 August.
3     Q.  And tell me about that.
4     A.  Well, that's when I had to -- made the
5 recommendation to promote Michael Sneed.
6     Q.  So the first personnel move that you made
7 after being hired was to promote Michael Sneed to
8 lieutenant, correct?  Isn't that what you just
9 testified to?
10     A.  Yeah.  I'm trying to remember if there
11 was anybody else that was promoted to sergeant, but I
12 don't remember anybody else.
13     Q.  Okay.  So the first personnel move that
14 you made upon being chief was promoting Michael Sneed
15 to lieutenant, correct?
16     A.  Yes.
17     Q.  And Michael Sneed was ranked third on
18 that list, correct?
19     A.  Correct.
20     Q.  And that was after the entire assessment
21 had been done, correct?
22     A.  Correct.
23     Q.  After the Stanard & Associates did their
24 assessment, correct?
Page 103



Frank Kosman Backwrite - 3/23/2022
2:20-cv-02310-CSB-EIL # 17-3 Page 29 of 90
Paul Berge, et al. vs. City of Kankakee, et al.

1  A.  Correct.

2  Q.  And then after you were allowed to add

3 various points to the process, correct?

4  A.  Not me.  You mean like -- there was a set

5 list when I started.

6  Q.  Okay.  And you made the decision to

7 promote Michael Sneed over the two higher ranked

8 candidates, correct?

9  A.  Correct.

10  Q.  And you knew that Michael Sneed was

11 black, correct?

12  A.  Yes.

13  Q.  And you knew that the other two

14 candidates were white, correct?

15  A.  Yes.

16  Q.  And prior to you making this first

17 personnel change, you kept deputy chief -- or Deputy

18 Chief Hunt in his position, correct?

19  A.  Correct.

20  Q.  And you kept Commander Austin in his

21 position, correct?

22  A.  Correct.

23  Q.  And in fact, you never changed Deputy

24 Chief Hunt, his position in any way, correct?

Page 104

1  A.  No.

2  Q.  You never changed Commander Austin's

3 position in any way, correct?

4  A.  Correct.

5  Q.  Did you ever interview anyone for Deputy

6 Chief Hunt's position?

7  A.  No.

8  Q.  Did you ever interview anyone for

9 Commander Austin's position?

10  A.  No.

11  Q.  Did you ever seek to replace Hunt or

12 Austin?

13  A.  Well, Hunt left in March, but no.

14  Q.  Did you ever have a conversation with the

15 mayor after you were hired as chief about your

16 command staff?

17  A.  Yes.

18  Q.  Tell me about that.

19  A.  Well, I talked to her and told her that I

20 was going to recommend Michael Sneed to be promoted

21 to lieutenant and that I wanted to move Jay Etzel to

22 be the permanent commander of the detective division.

23  Q.  Okay.

24  A.  And then we talked in reference to

Page 105

1 sergeants too being promoted from the list.

2  Q.  Okay.  So you talked to her about the

3 promotion of Michael Sneed, correct?

4  A.  Correct.

5  Q.  And when did that conversation take

6 place?

7  A.  Probably early August.

8  Q.  Okay.  And you had been there for three

9 months, approximately?

10  A.  Yes.  Yes.

11  Q.  Okay.  And do you remember what the

12 conversation was that you had with the mayor about

13 the promotion of Michael Sneed?

14  A.  I told her that I wanted to recommend the

15 promotion of Michael Sneed.  I thought he was the

16 most qualified, and talked about the rule of three

17 where I could appoint either one of the top three

18 candidates off of a list.

19  Q.  And what's your understanding -- did you

20 bring up the rule of three or did the mayor bring it

21 up?

22  A.  I brought it up.

23  Q.  And what was your understanding of what

24 the rule of three was at that point?

Page 106

1  A.  My understanding of the rule of three was

2 I was able to appoint the top three -- the promotion

3 made from the top three candidates on a promotion

4 list.

5  Q.  Okay.  And anything else about your

6 understanding of that?

7  A.  I found out later you could pass up one

8 one time, the second person two times, and the third,

9 but at the time, to be honest, I thought it was the

10 top three that you were able to pick from.

11  Q.  Did you have any conversations with the

12 mayor about Sneed's promotion other than this

13 conversation that you're talking about?

14  A.  Yeah, I explained that I thought, you

15 know, for the basic reasons that he was -- he had

16 22 years' seniority in the department.

17  Q.  Hold on.  I'm asking -- is this during

18 the same conversation?

19  A.  Yes.

20  Q.  Okay.  My question was different though.

21 My question was, aside from that conversation, had

22 you had any conversations with the mayor about

23 Sneed's promotion?

24  A.  No.

Page 107

**Frank Kosman Backwrite  -  3/23/2022**
2:20-cv-02310-CSB-EIL  # 17-3  Page 30 of 90
**Paul Berge, et al. vs. City of Kankakee, et al.**

1    Q.   Prior to Sneed being promoted, did you
2  have any conversations with Deputy Hunt about Sneed's
3  promotion?
4      A.   I told him what I thought.
5      Q.   When did you tell him what you thought?
6      A.   Probably late July, early August.
7      Q.   Okay.  Where did that conversation take
8  place?
9      A.   He had a list of -- a chart, an
10 organizational chart in his office, so we usually
11 talked in reference to where -- any personnel moves,
12 it would be in front of that chart.  My recollection
13 is it was in front, in his office.
14     Q.   Hunt had an organizational chart of all
15 the personnel of the Kankakee Police Department in
16 his office?
17     A.   Yes.
18     Q.   And you had a conversation with him about
19 promoting Sneed, correct?
20     A.   Yes and Jay Etzel.
21     Q.   And that would have been in late July or
22 early August?
23     A.   Yes.
24     Q.   Did you have any other conversations with

Page 108

1  Deputy Chief Hunt about Sneed's promotion prior to
2  that?
3      A.   Not that I recall, no.
4      Q.   Did you have any conversations with
5  anyone about Sneed's promotion other than the mayor
6  and Deputy Hunt that you just spoke about?
7      A.   No.
8      Q.   When did you become involved in the
9  promotional process of Deputy Chief Hunt -- or I'm
10 sorry, of Michael Sneed?
11     A.   When I became chief.
12     Q.   So right after you became deputy chief,
13 you were involved in the promotional process of
14 Michael Sneed?
15     A.   When I became chief, I was involved in
16 the promotional process.
17     Q.   I'm sorry.  I misspoke.
18          And tell me what your involvement
19 was.  Let me ask another question.  The list had
20 already been compiled by the time you were chief
21 where Berge, Kreissler, and Sneed were ranked one,
22 two, and three?
23     A.   Correct.
24     Q.   And I'm not sure if it was Kreissler or

Page 109

1  Berge that was No. 1 or 2, but Sneed was ranked
2  third, correct?
3      A.   Kreissler, then Berge, then Sneed.
4      Q.   Okay.  And that list was already in
5  place, correct?
6      A.   Correct.
7      Q.   Okay.  And so tell me what the first step
8  you did in that promotional process was that you can
9  recall.
10     A.   Well, as part of the contract, I had like
11 60 or 90 days in order to make a promotion, and I
12 guess there was an opening position as a detective
13 commander because of Dave Skelly leaving or retiring
14 around the time that I got hired.
15     Q.   And I'm not talking about --
16     A.   No, I'm saying there was an opening, so
17 there was a process in place where you had to promote
18 somebody.
19     Q.   Right.  I'm just asking what your first
20 step was that you took.
21     A.   Review the personnel files.
22     Q.   Okay.  You reviewed the personnel files
23 of whom?
24     A.   The three candidates.

Page 110

1      Q.   Kreissler, Berge, and Sneed?
2      A.   Correct.
3      Q.   And what was contained within those
4  personnel files?
5      A.   The usual that's contained in personnel
6  files.  The information in reference to their hiring,
7  their -- you know, the positions that they held at
8  the department, the different -- any commendations,
9  any disciplinary matters, any evaluations, letters
10 from the public are in the personnel files.
11     Q.   Okay.  And how long after you had been
12 chief did you review the personnel files?
13     A.   Two months in.
14     Q.   And what was your next step after
15 reviewing the personnel files?
16     A.   Just observing and seeing what their work
17 product was.
18     Q.   How did you observe and see what their
19 work product was?
20     A.   Well, I reviewed their reports.  I -- you
21 know, saw how they interacted with the personnel --
22     Q.   Anything else?
23     A.   -- with their positions, and I had
24 conversations -- spoke work-wise with them.  I don't

Page 111



Frank Kosman Backwrite - 3/23/2022
Paul Berge, et al. vs. City of Kankakee, et al.
2:20-cv-02310-CSB-EIL  #17-3  Page 31 of 90

1 know if I spoke much to Berge because he was on the
2 midnight shift I think at the time.
3    Q.   Okay.
4    A.   But I met him a couple times.  Kreissler
5 was the acting detective commander, so every major
6 case I'd go and talk to him, and Sneed was in charge
7 of the gang crimes unit, and so I would be working
8 with them too.
9    Q.   Okay.
10    A.   So my interactions with them.
11    Q.   Other than what you just testified to,
12 was there any other steps that you took in the
13 promotional process where Sneed became the
14 lieutenant?
15    A.   No.
16    Q.   And when did you make the decision for
17 Sneed to be the lieutenant?
18    A.   The beginning of August.
19    Q.   And was it based on any criteria other
20 than what you have just mentioned involving your
21 process in the promotional --
22    A.   No.
23    Q.   You were a relatively new chief, correct?
24    A.   Correct.  Well, new in Kankakee, but I

Page 112

1    A.   I must have made four or five.
2    Q.   Okay.  And all of those four or five of
3 people that were promoted, they were on a rank order
4 list, correct?
5    A.   Right.  And we're talking about civil
6 service rank, and then I also made deputy chief
7 appointments.
8    Q.   Right.  Those are exempt rank positions,
9 correct?
10    A.   Yes.
11    Q.   Where there's not a list compiled,
12 correct?
13    A.   Correct.
14    Q.   So, yes, I'm talking about civil service
15 ranks.  In those four or five promotions, all of
16 those individuals that were promoted, they were
17 eventually part of a rank order list, correct?
18    A.   Correct.
19    Q.   Okay.  And do you know if any one of
20 those four or five individuals that were promoted
21 were promoted out of rank order?
22    A.   I don't remember.  There were some, but I
23 don't know if I was the chief then or a deputy chief.
24 I don't remember exactly how.

Page 114

1 had 16 years prior chief in Bensenville.
2    Q.   Got it.  And had you ever promoted anyone
3 in Bensenville before?
4    A.   Oh, yes.
5    Q.   And had you ever promoted an African
6 American in Bensenville?
7    A.   I don't believe so, no.
8    Q.   And the promotional process in
9 Bensenville, did Stanard & Associates conduct the
10 interview process -- or I'm sorry, were they involved
11 in the promotional process for Bensenville?
12    A.   I don't think so, no.
13    Q.   Was the process for Bensenville, was it
14 similar to the process for Kankakee in that there was
15 various tests that were conducted and a rank order
16 list compiled at the conclusion of those tests?
17    A.   Yes.
18    Q.   Okay.  And how many promotions do you
19 think you made to the rank of lieutenant while you
20 were the chief in Bensenville?
21    A.   We didn't have lieutenants.  We had
22 sergeants.
23    Q.   How many promotions did you make,
24 approximately?

Page 113

1    Q.   I'm talking about you as the chief on
2 these four --
3    A.   I know.  I have 16 years, and I don't
4 remember.
5    Q.   Okay.  So you don't remember if you ever
6 promoted somebody out of rank order other than
7 Lieutenant Sneed?
8    A.   Correct.
9    Q.   So as far as you know, as you sit here
10 today, Lieutenant Sneed is the only -- or is the
11 first individual that you can recall where you
12 promoted somebody out of rank order, correct?
13    A.   As I sit here today, that's the only one
14 I know of.
15    Q.   Okay.  Was anyone else involved in the
16 decision to promote Lieutenant Sneed other than you?
17    A.   No.  Well, I mean, I went to the board
18 and made a recommendation to the Board of Police and
19 Fire Commissioners to certify that decision.
20    Q.   Okay.  And tell me about that.  When did
21 you do that?
22    A.   I sent a memo at the beginning of August
23 in reference to their next board meeting which was --
24 I forgot.  The second Monday in August or Tuesday

Page 115



**Frank Kosman Backwrite - 3/23/2022**
2:20-cv-02316-CSB-EIL # 17-3 Page 32 of 90
**Paul Berge, et al. vs. City of Kankakee, et al.**

1 maybe, the board meeting in reference to them.
2 Q. Did you go to the board meeting?
3 A. I went to the board meeting too, yes.
4 Q. Okay. So you sent a letter before you
5 went to the board meeting?
6 A. Yeah, so they would have it in their
7 packet.
8 Q. Okay. And then tell me about when you
9 went to the board meeting. What happened?
10 A. I just went to the board meeting and I
11 basically went over the memo in reference to the
12 recommendation I had, I gave my reasons, and they
13 certified it.
14 Q. Did you give any reasons other than what
15 was contained within the memo?
16 A. No. I kept it to what was in the memo.
17 Q. Were there any questions asked by anyone
18 from the board?
19 A. Not that I remember.
20 Q. Did you inform the board that you were
21 taking Lieutenant Sneed or Michael Sneed out of rank
22 order when you made the promotion?
23 A. Right. Yes.
24 Q. Did you tell the board you were bypassing

1 Q. Did you ever talk to the two white
2 candidates that you passed over?
3 A. I don't think so.
4 Q. Did you ever explain to them why you
5 passed them over?
6 A. I think afterwards.
7 Q. That's what I'm asking about. Tell me
8 about that.
9 A. I thought you meant before. The day
10 after or the next time they worked. So I'm pretty
11 sure Tim Kreissler would have been the day after, and
12 then Berge, I don't know exactly when that was, and I
13 told them that I -- basically what was in my memo and
14 the reasoning that I had and why I passed them over
15 in favor of Sneed for the promotion.
16 Q. And tell me everything that you remember
17 about that conversation.
18 MR. MCGRATH: I think there's multiple, two
19 separate conversations.
20 THE WITNESS: Right.
21 BY MR. HERBERT:
22 Q. Okay. Who did you meet with first?
23 A. I don't remember, but I'm assuming it was
24 Kreissler since he would be there the next day in the

1 two higher ranked white candidates to promote Michael
2 Sneed?
3 A. I told them the three candidates, which
4 they were familiar with, and then I also told them
5 about the rule of three and I recommend they pick the
6 third candidate.
7 Q. Was this a public meeting, or was this --
8 A. It was a public meeting.
9 Q. Okay. Was there anyone else there from
10 the public?
11 A. I don't remember.
12 Q. Was there any discussion on the matter
13 other than them certifying your recommendation?
14 A. I don't remember.
15 Q. And prior to you making that decision,
16 you didn't have any conversations with anyone other
17 than Mayor Chasity Wells and Deputy Chief Hunt. Is
18 that your testimony?
19 A. That's all I remember.
20 Q. Take your time.
21 A. That's all I remember.
22 Q. Can you think of anyone else?
23 A. No, I don't know why I would talk to
24 anybody else.

1 morning.
2 Q. Tell me about everything that you
3 remember about that conversation.
4 A. Well, I remember he was upset in
5 reference to it, and I tried to encourage him that
6 this is just one promotion, there will be more in the
7 future. I've been passed over for promotions and,
8 you know, it's part of the reason, but I thought that
9 Sneed was more proactive in reference to his being in
10 charge of that gang unit, and I thought that's what
11 we needed for our department.
12 Q. Do you remember anything else about the
13 conversation?
14 A. No.
15 Q. How about the conversation with Berge,
16 when did that take place?
17 A. Like I said, I don't know if that was the
18 day of it or the next day, but it was in my office
19 again and that was a shorter conversation. He was
20 upset and I explained the same, the same reasoning
21 for why I thought Sneed would be the better candidate
22 for the position.
23 Q. And when Kreissler came in, he asked you
24 why he was passed over and Sneed was promoted over



**Frank Kosman Backwrite - 3/23/2022**
2:20-cv-02310-CSB-EIL # 17-3 Page 33 of 90
**Paul Berge, et al. vs. City of Kankakee, et al.**

1 him, correct?

2     **A. Correct.**

3     Q. And he asked you -- you knew that

4 Kreissler had scored higher than Sneed, correct?

5     **A. Correct.**

6     Q. And you knew that he scored significantly

7 higher. Would you agree?

8     **A. Yes.**

9     MR. MCGRATH: Objection. Form of the

10 question.

11 BY MR. HERBERT:

12     Q. And did you make any comments to him that

13 Sneed was chosen because the command staff needed to

14 look more like the community?

15     **A. No.**

16     Q. Did you make any comments about Sneed's

17 promotion being related to the makeup of the

18 community in any way?

19     **A. No.**

20     Q. Did you make any comments that the

21 leadership in the police department didn't look like

22 the community in any way?

23     **A. No.**

24     Q. Did you make any comments similar to any

Page 120

---

1 terminated or this one where he was passed over for a

2 promotion.

3     Q. Okay. It's your understanding he filed

4 two EEOC complaints?

5     **A. Some kind of lawsuits for discrimination.**

6     Q. And both of those were related to him

7 being discriminated against for what he believed was

8 based on his race, correct?

9     **A. I think that was part of it, yes.**

10     Q. Okay. And Berge made a complaint about

11 being sexually harassed by Commander Donell Austin.

12 Do you remember that?

13     **A. That came up in his interrogation.**

14     Q. What do you remember him saying?

15     **A. I didn't -- from the hearings and**

16 **everything that we were at, he said that Officer -- I**

17 **mean, Commander Austin, I don't know, stood in front**

18 **of him and pushed his groin towards him while he was**

19 **sitting at a desk.**

20     Q. Stuck his crotch in his face, correct?

21     **A. I don't know if those are the exact**

22 **words. Whatever that type of thing, yes.**

23     Q. Okay. And when did you become aware of

24 that complaint?

Page 122

---

1 of those?

2     **A. No.**

3     MR. MCGRATH: Can we just -- I have to go

4 feed the meter.

5     MR. HERBERT: Yeah. Sorry. How long do you

6 want to take?

7         (Whereupon, a short break

8         was taken.)

9     MR. HERBERT: All right. So going back on

10 the record here.

11 BY MR. HERBERT:

12     Q. You became aware of the fact that Paul

13 Berge filed a discrimination charge with the EEOC in

14 February 2020?

15     MR. MCGRATH: Objection. Form of the

16 question.

17 BY MR. HERBERT:

18     Q. You became aware of the fact that he had

19 filed an EEOC complaint, correct?

20     **A. Was that involved with the -- with this,**

21 **in this, because of this situation or the other**

22 **situation? This situation?**

23     Q. What situations are you talking about.

24     **A. I'm talking about the one where he was**

Page 121

---

1     **A. After the interrogation.**

2     Q. How long after the interrogation? Would

3 it have been within the same day?

4     **A. Not the same day I don't think. Maybe**

5 **the same week.**

6     Q. Okay. And how did you become aware of

7 that complaint?

8     **A. I don't remember for sure. It could have**

9 **been our attorney that told me about the allegation.**

10     Q. Deputy Chief Hunt was involved -- was in

11 that interrogation, correct?

12     **A. Yeah. It might have been him or it might**

13 **have been both of them told me, so.**

14     Q. And Berge was the complainant, correct?

15     **A. Yes.**

16     Q. And Austin was the person being

17 complained against, correct?

18     **A. Yes.**

19     Q. And the Kankakee Police Department had a

20 policy with respect to complaints of discrimination,

21 correct?

22     **A. Correct.**

23     Q. And that policy was that an investigation

24 needed to be conducted, correct? I'll ask another

Page 123

**Frank Kosman Backwrite** - 3/23/2022
2:20-cv-02310-CSB-EIL # 17-3 Page 34 of 90
**Paul Berge, et al. vs. City of Kankakee, et al.**

1 question.
2        For complaints of harassment or
3 discrimination, the Kankakee Police Department has a
4 policy, correct?
5    A.  Correct.
6    Q.  And complaints for harassment or
7 discrimination, the policy is that there needs to be
8 an investigation, correct?
9    A.  Correct.
10    Q.  And obviously part of the policy is that
11 the person being complained of, the harasser, they
12 are not to be made aware of the allegations that were
13 made against them, correct?  That's the policy?
14    A.  Yes.
15    Q.  And in fact, you told Commander Austin
16 about the complaint made against him by Paul Berge,
17 correct?
18    A.  Yes.
19    Q.  And you did not conduct any investigation
20 into the sexual harassment complaint made by Paul
21 Berge, correct?
22    A.  Wrong.
23    Q.  Tell me all the steps you took to
24 investigate the sexual harassment complaint made by

1 Paul Berge.
2    A.  When I became aware of the statement by
3 Officer Berge during his interrogation, I interviewed
4 Commander Austin about it.
5    Q.  When did you interview Commander Austin?
6    A.  Probably within a week of hearing about
7 it.
8    Q.  Where did that interview take place?
9    A.  In my office.
10    Q.  Is there paperwork from that interview?
11    A.  No.  I think it was more of an informal
12 interview.
13    Q.  Okay.  Was it part of a formal
14 investigation?
15    A.  No, I just -- I asked him in reference to
16 it, in reference to whether -- I wanted to know
17 whether there was anything to it.
18    Q.  What is the policy, Kankakee Police
19 Department policy when you were the chief, what are
20 the first steps required upon receiving a complaint
21 of sexual harassment?
22    A.  It comes through -- after a supervisor
23 is -- someone complains, makes a complaint about it
24 to his supervisor, they open an investigation into

1 it.
2    Q.  What's the first step in that open
3 investigation?
4    A.  Well, they probably do an informal
5 interview first to see the merits of it.
6    Q.  Okay.  Is it assigned to a particular
7 investigator?
8    A.  If it goes up from -- it would probably
9 be a deputy chief.
10    Q.  Is it documented?
11    A.  If it's -- yes, if it's found to be a
12 bona fide kind of investigation.
13    Q.  So you're saying a complaint --
14    A.  I did not take it.
15    Q.  Hold on.  Hold on.  You've got to let me
16 finish, sir.  When somebody makes a complaint about
17 sexual harassment, there is no formal
18 investigation -- or I'm sorry, it's not documented
19 until it's determined whether or not it's bona fide?
20    A.  No, this was a rather peculiar situation
21 because it came up in interrogation and it wasn't
22 like a normal way it would come through, so it is
23 different.
24    Q.  Right.  Because an interrogation --

1    A.  It's all documented there.
2    Q.  So there was never any -- never any
3 investigative number assigned to that case, correct?
4    A.  Correct.
5    Q.  And that's normally done.  If there's a
6 complaint, it's assigned a particular police
7 department number that's specific to that complaint,
8 correct?
9    A.  Right.  This was all included in that
10 whole investigation.
11    Q.  You have to answer my question though.
12    A.  Right.
13    Q.  When a complaint is made, there is a
14 specific police department number that is associated
15 with that case, correct?
16    A.  When an individual complaint is made,
17 yes.
18    Q.  Okay.  And that is documented on a
19 report, correct?
20    A.  Correct.
21    Q.  And that's contained within the computer
22 system of the Kankakee Police Department, correct?
23    A.  Yes.
24    Q.  Okay.  And from there there is a formal



**Frank Kosman Backwrite  -   3/23/2022**
2:20-cv-02310-CSB-EIL   # 17-3   Page 35 of 90
**Paul Berge, et al. vs. City of Kankakee, et al.**

1 investigation, correct, after this report number is
2 generated?
3    **A.  No, there's an investigation.**
4    Q.  Okay.  And all the steps of the
5 investigation are documented, correct?
6    **A.  Yes.**
7    Q.  And at the conclusion of the
8 investigation, there is a finding that is made with
9 respect to the allegations?
10    **A.  Yes.**
11    Q.  And that's documented in the file,
12 correct?
13    **A.  Correct.**
14    Q.  And it's either found credible or not
15 credible, correct?
16    **A.  Yes.**
17    Q.  And then and only then after all those
18 steps are taken can an investigation be closed,
19 correct?
20    **A.  Yes.**
21    Q.  And part of that investigation would be
22 to interview anyone with knowledge, correct?
23    **A.  Correct.**
24    Q.  And that would include any witnesses,

1    Q.  So you're saying the Kankakee Police
2 Department policy was followed with every respect
3 concerning complaints of sexual harassment --
4    **A.  Yes.**
5    Q.  -- with the case of Paul Berge?
6    **A.  Yes.**
7    Q.  Okay.  So there was a thorough
8 investigation?
9    **A.  Yes.**
10    Q.  There was a finding that was made in the
11 report?
12    **A.  Yes.**
13    Q.  And that was documented?
14    **A.  Yes.**
15    Q.  And the case was closed out?
16    **A.  Yes.**
17    Q.  And that was done in the investigation of
18 the sexual harassment complaint, correct?
19    **A.  It was in -- it was part of**
20 **the insubordination complaint that was already being**
21 **investigated.**
22    Q.  The policy is that a complaint made of
23 sexual harassment, there has to be a file associated
24 specifically with that complaint, correct?

1 correct?
2    **A.  Correct.**
3    Q.  And that would include certainly the
4 victim, correct?
5    **A.  Correct.**
6    Q.  And you would agree with me that you
7 never interviewed Paul Berge with respect to his
8 complaint of sexual harassment, correct?
9    **A.  Correct.  Not personally, no.**
10    Q.  And you never -- well, no report number
11 was ever generated as a result of Paul Berge's
12 complaint, specific to the complaint?
13    **A.  I would argue that it's all included in**
14 **the whole complaint in reference to Berge.**
15    Q.  Right.  I understand that, but the
16 process that we just talked about --
17    **A.  Right.**
18    Q.  -- the Kankakee policy that you just
19 spoke of, that wasn't followed in this case, correct?
20    **A.  Because it came through the interrogation**
21 **process already.  We had a number.  It was his --**
22 **based on that number that we were doing the**
23 **disciplinary investigation in reference to the whole**
24 **incident.  That was part of that incident.**

1    **A.  And there was one, and it was the**
2 **insubordination complaint.  It was the same thing.**
3 **The reason for the insubordination, it was included**
4 **-- it was his comeback from the insubordination**
5 **complaint.**
6    Q.  So there was no separate case made for
7 Paul Berge's complaint about the sexual harassment?
8    **A.  He never made a complaint other than in**
9 **interrogation in reference to this situation, so the**
10 **interrogation was there.**
11    Q.  There was no file that was --
12    **A.  No separate file was made.**
13    Q.  For Paul Berge's sexual harassment
14 complaint?
15    **A.  Correct.**
16    Q.  And you never interviewed Paul Berge in
17 this case, correct?
18    **A.  No.  There was an interrogation.  He gave**
19 **his side.**
20    Q.  Other than your informal conversation
21 with Commander Austin, what steps did you take in the
22 investigation of the sexual harassment complaint?
23    **A.  I didn't personally take any.**
24    Q.  And at the time that you were the chief,



**Frank Kosman Backwrite - 3/23/2022**
2:20-cv-02310-CSB-EIL #17-3 Page 36 of 90
**Paul Berge, et al. vs. City of Kankakee, et al.**

1 had anyone ever made a complaint of sexual harassment

2 other than Paul Berge?

3    **A.  No.**

4    Q.  In the time that you were the chief, had

5 anyone made any complaint against a supervisor?

6    **A.  Not that I remember.**

7    Q.  You filed charges against Paul Berge on

8 August 13, 2020, correct?

9    **A.  Correct.**

10    Q.  And you sought his termination, correct?

11    **A.  Correct.**

12    Q.  And in fact, he was terminated, correct?

13    **A.  Correct.**

14    Q.  The decision that you made to promote

15 Sneed over Berge and Kreissler, was any part of that

16 decision made based upon Kreissler's job performance?

17    **A.  Yes.**

18    Q.  Tell me about that.

19    **A.  Well, he was the acting chief and I was**

20 **-- or acting detective commander.  I spoke with him.**

21 **He was satisfactory in his position, but I didn't see**

22 **him being proactive and going above and beyond which**

23 **would be just the satisfactory level of performance.**

24    Q.  Did you ever document your observations?

1    **A.  No.  He didn't do nothing wrong.**

2    Q.  You said he didn't do anything wrong?

3    **A.  Not that I remember.**

4    Q.  But you thought he was not proactive

5 enough?

6    **A.  Right.**

7    Q.  Proactive with whom?

8    **A.  Being out making more arrests, being more**

9 **involved with the investigations.**

10    Q.  Had any of his supervisors complained

11 about his work performance to you?

12    **A.  No.**

13    Q.  Did you ever talk to any of his

14 supervisors about his work performance?

15    **A.  Not that I remember.**

16    Q.  If you did, it would have been

17 documented, correct?

18    **A.  Yes.**

19    Q.  Well, you would agree with me that

20 promoting somebody, that's a very important step,

21 correct?

22    **A.  Yes.**

23    Q.  It's important to the police department?

24    **A.  Yes.**

1    Q.  It's important to the community?

2    **A.  Correct.**

3    Q.  It's important to the individual police

4 officer and their families, correct?

5    **A.  Yes.**

6    Q.  It results in more money, more prestige,

7 correct?

8    **A.  More money.**

9    Q.  And certainly this is a very important

10 decision for a chief to make, correct?

11    **A.  Correct.**

12    Q.  And especially when we're talking about

13 the rank of lieutenant because now they are

14 supervising -- they have a much wider pool of people

15 that they're supervising, correct?

16    **A.  Correct.**

17    Q.  They have a bigger role in the police

18 department, correct?

19    **A.  Correct.**

20    Q.  They have more of a command role in the

21 police department?

22    **A.  Correct.**

23    Q.  So you wanted to make sure that the

24 decision you made to promote somebody to lieutenant

1 was done with all due care, correct?

2    **A.  Correct.**

3    Q.  And done after reviewing every relevant

4 detail that could go into your decision, correct?

5    **A.  Correct.**

6    Q.  And it's your testimony that you did not

7 interview a single supervisor of Kreissler, Berge,

8 and Sneed prior to you making the decision?

9    **A.  Yes.**

10    Q.  And you did not speak with anyone that

11 worked with any of the three of them prior to you

12 making that decision?

13    **A.  Yes.**

14    Q.  In all the other promotions that you did

15 as the chief in Bensenville, had you ever made a

16 decision to promote somebody -- or strike that.

17       We've established -- tell me if I'm

18 correct unless your answer has changed, that the

19 promotions you made at Bensenville, those were made

20 based upon the rank order of the list, correct?

21    **A.  My answer still stands.  I don't**

22 **remember.**

23    Q.  Okay.  But you can't think of a single

24 situation where it was not done in rank order,

Frank Kosman Backwrite  -  3/23/2022
2:20-cv-02310-CSB-EIL  # 117-3  Page 37 of 90
Paul Berge, et al. vs. City of Kankakee, et al.

1 correct?

2 **A. I don't remember.**

3 Q. Can you think of a single situation in

4 which it was not done in rank order?

5 **A. Not at this time.**

6 Q. Okay. So your analysis and your decision

7 to promote was based upon reviewing the personnel

8 files of the three candidates, correct?

9 **A. Yes. That's part of it, yeah.**

10 Q. And observing them for a short period of

11 time, correct?

12 **A. For three months, yes.**

13 Q. And that's it, correct?

14 **A. Correct.**

15 Q. Do you think that you did a thorough

16 analysis -- or strike that.

17 Do you think there's anything else

18 that you could have done to have a more informed

19 decision?

20 **A. No.**

21 Q. You don't think that speaking to the

22 police officers that worked for them for decades

23 could provide any information relative to your

24 analysis?

Page 136

1 **A. No.**

2 Q. You don't think that speaking to the

3 individuals under your command that supervised them

4 for decades could provide any information relative to

5 your analysis?

6 **A. No.**

7 Q. Why not?

8 **A. Because as a chief, I've got to make a**

9 **decision. It's going to be based on mine. Everyone**

10 **has an opinion on the situation. I went with what I**

11 **thought was the best decision, and that's based on my**

12 **opinion.**

13 Q. And the opinion of the mayor, Chasity

14 Wells, was that Sneed should be promoted, correct?

15 **A. We never discussed that.**

16 Q. That was her opinion though?

17 MR. MCGRATH: Objection. It calls for

18 speculation.

19 THE WITNESS: I didn't discuss that with her.

20 BY MR. HERBERT:

21 Q. You knew that she wanted Sneed to be

22 promoted, correct?

23 **A. I never discussed that with her.**

24 Q. You knew that she wanted more blacks in

Page 137

1 the command staff of the police department, correct?

2 **A. But like you just pointed out, we already**

3 **had two blacks in the command staff.**

4 Q. You knew that she wanted more blacks

5 included in the command staff of the police

6 department prior to you making a decision to promote

7 Sneed, correct?

8 MR. MCGRATH: Objection. Foundation, it

9 calls for speculation, misstates the prior testimony.

10 THE WITNESS: I think we already had blacks

11 represented in the command staff.

12 BY MR. HERBERT:

13 Q. You knew that -- I'll keep asking the

14 question.

15 **A. And I'll keep telling you the same.**

16 Q. So your answer is that it was your belief

17 that since there was black people in the command

18 staff that the mayor was indifferent into who you

19 promoted to lieutenant?

20 MR. MCGRATH: Objection. It calls for

21 speculation, it misstates the prior testimony,

22 foundation.

23 THE WITNESS: I didn't talk to her about it.

24 I know that she wanted to have a -- reflect the

Page 138

1 population. It already had reflected the population,

2 so I didn't think it was an issue.

3 BY MR. HERBERT:

4 Q. You knew that she wanted a police

5 department that was reflective of the population of

6 Kankakee, correct?

7 **A. Correct.**

8 Q. And we spoke about this earlier, but she

9 wanted to -- and part of that was that there would be

10 more African Americans involved in the Kankakee

11 Police Department, correct?

12 **A. Yes.**

13 Q. And you knew that she wanted more African

14 Americans involved in the higher ranks of the police

15 department, correct?

16 MR. MCGRATH: Objection. It misstates the

17 prior testimony, foundation, calls for speculation.

18 THE WITNESS: I think that was already there,

19 so I don't know if she -- when you're saying more, I

20 don't know. I didn't talk to her about it, but in my

21 mind it already reflected that.

22 BY MR. HERBERT:

23 Q. So you thought prior to promoting Sneed

24 that the command staff of the police department was

Page 139

Frank Kosman Backwrite - 3/23/2022
2:20-cv-02310-CSB-EIL # 17-3 Page 38 of 90
Paul Berge, et al. vs. City of Kankakee, et al.

1 black enough?

2     **A. Out of four it would be two that were**
3 **black and two that were white, so I thought that -- I**
4 **didn't know why that would be an issue.**

5     Q. Okay. So you thought it was black
6 enough?

7     **A. I didn't think -- I didn't consider it**
8 **because I didn't think it was an issue.**

9     Q. Okay. And you knew that Deputy Chief
10 Hunt wanted Sneed to be promoted, correct?

11     MR. MCGRATH: I'm going to object.
12 Foundation, calls for speculation.

13 BY MR. HERBERT:

14     Q. You can answer. You can answer, Chief.

15     **A. I think he was happy. They're friends.**

16     Q. How did you know that Sneed and Hunt were
17 friends?

18     **A. Well, I know they -- he had mentioned**
19 **before how they got hired together and they were --**
20 **they both worked together out in Hopkins Park.**

21     Q. And you were aware of that fact when you
22 made the decision to promote Sneed?

23     **A. Yes.**

24     Q. And that was part of the reason why you

Page 140

---

1 promoted Sneed?

2     **A. No.**

3     Q. Did Hunt ever tell you that he was
4 friends with Sneed?

5     **A. I don't know if they were like friends**
6 **socially outside of work, but they were -- they got**
7 **hired together. They were friendly. I've seen them.**
8 **They appeared friendly talking to each other, so I**
9 **don't think -- but I don't know if they actually**
10 **associate much outside of work. I don't know.**

11     Q. How do you know they got hired together?

12     **A. Talking with both of them about when they**
13 **came over to the police department and how they got**
14 **hired. That's when they got hired at the same time.**

15     Q. So Hunt told you that he started the
16 police academy with Sneed, correct?

17     **A. Yeah. I mean, if they got hired at the**
18 **same time, I assume they went to the academy**
19 **together.**

20     Q. And he told you he was friends with
21 Sneed, correct?

22     **A. Yes. I think because they worked**
23 **together in Hopkins Park.**

24     Q. And he told you that he grew up with

Page 141

---

1 Sneed, correct?

2     **A. Right, I think in Hopkins Park. Yeah.**

3     Q. And you knew all this prior to you
4 promoting Sneed over the two white candidates,
5 correct?

6     **A. I knew that, yes.**

7     Q. You said you reviewed the personnel file
8 of all the candidates, correct?

9     **A. Yes.**

10     Q. And in the personnel file would have been
11 all the disciplinary reports of the candidates,
12 correct?

13     **A. Yes.**

14     Q. And what -- is it any discipline that
15 somebody gets as a police officer?

16     **A. No, it's like -- there's a personnel file**
17 **and a discipline file, and they're next to each other**
18 **in the same cabinet.**

19     Q. Okay. The discipline file, that includes
20 any misconduct alleged against a police officer while
21 they're working, correct?

22     **A. Right.**

23     Q. Okay. And do you remember what -- as you
24 sit here today, if there was any discipline in the

Page 142

---

1 file of Michael Sneed when you reviewed it?

2     **A. I think he accidentally shot a -- had a**
3 **misfire or something in the office when he was at**
4 **KAMEG.**

5     Q. And if I remember correctly, it was
6 somebody else's gun too, wasn't it?

7     **A. I don't remember that.**

8     Q. Okay. So he fired a weapon in a building
9 filled with people accidentally, correct?

10     MR. MCGRATH: Objection. It calls for
11 speculation, foundation.

12     THE WITNESS: It was an accidental discharge.
13 I don't remember if there was other people there or
14 whatever. I know it was in the office at KAMEG. He
15 could have been alone, he could have been with other
16 guys. I don't really know.

17 BY MR. HERBERT:

18     Q. Did you talk to him about it?

19     **A. I don't think so.**

20     Q. Did you talk to anyone that was involved
21 in the investigation?

22     **A. No.**

23     Q. Did you talk to anyone that was -- that

Page 143



**Frank Kosman Backwrite - 3/23/2022**
2:20-cv-02310-CSB-EIL  #17-3  Page 39 of 90
**Paul Berge, et al. vs. City of Kankakee, et al.**

1 had any knowledge about the investigation?

2 **A. No.**

3 Q. So just reviewing the report -- and it

4 was found that he did it, correct? It was found that

5 his actions were inappropriate, correct?

6 **A. Yeah, the discharge of a firearm**

7 **accidentally would be inappropriate, yes.**

8 Q. And that occurred shortly before he was

9 promoted to lieutenant, correct?

10 **A. No, I think that was years before. I'm**

11 **not sure exactly. It was before I got there.**

12 Q. Anything else in his disciplinary file --

13 well, let me ask you this. Did that cause you

14 concern?

15 **A. Yes.**

16 Q. But not enough to prevent you from

17 bypassing two higher ranked candidates to promote

18 him?

19 **A. Correct.**

20 Q. Okay. And anything else in his file

21 cause you concern regarding his discipline?

22 **A. No. I don't remember anything else.**

23 Q. Okay. Well, he had various traffic

24 accidents. Do you remember that?

Page 144

1 **A. Possibly. No, I don't. I don't really**

2 **remember. I don't.**

3 Q. Okay. But nothing in his personnel file

4 caused you concern to the point that you didn't think

5 you could promote him?

6 **A. Correct.**

7 Q. Okay. Do you have any knowledge about

8 the testing process that was conducted by Stanard &

9 Associates that resulted in the rank list of

10 Kreissler, Berge, and Sneed for lieutenant?

11 **A. I believe it had an assessment center,**

12 **but I'm not sure.**

13 Q. All right. So you were concerned about

14 something in the assessment center?

15 **A. No.**

16 Q. Oh.

17 **A. Well, no.**

18 Q. Okay. I forget the question I asked you,

19 but you're saying that's your knowledge of the

20 testing process?

21 **A. I know that Stanard gives the written**

22 **test and they have usually an assessment center, but**

23 **I don't know specifically about the Kankakee one.**

24 **I'm assuming it's that way.**

Page 145

1 Q. When you were the chief of police, if you

2 had allegations of misconduct that were made about an

3 officer, there needed to be a report generated,

4 correct?

5 **A. Yes.**

6 Q. And there needed to be like an

7 investigatory number, a CR number, a complaint

8 register number, correct?

9 **A. Well, a disciplinary number,**

10 **investigative. It's...**

11 Q. Okay. And there needs to be a thorough

12 investigation into that, correct?

13 **A. Yes.**

14 Q. And that would -- the investigative file

15 would be part of the individual's personnel records,

16 correct?

17 **A. Right, or it would be indexed to it.**

18 Q. Okay. Did anyone ever report misconduct

19 to you about Michael Sneed prior to him being

20 promoted?

21 **A. Prior, no.**

22 Q. Did anyone ever report misconduct to you

23 about Michael Sneed after he was promoted to

24 lieutenant?

Page 146

1 **A. Not specifically him but after in**

2 **reference to the use of video equipment during their**

3 **search warrants.**

4 Q. Tell me about that.

5 **A. They were doing overhear taping.**

6 MR. MCGRATH: Can you identify who they is?

7 THE WITNESS: The gang crimes unit.

8 BY MR. HERBERT:

9 Q. The gang crime unit was doing overhear

10 recordings?

11 **A. Overhear, and they're supposed to have it**

12 **-- and I forgot exactly how that was supposed to be,**

13 **if it's supposed to be video and audio or just video.**

14 **And they were doing it wrong in reference to having**

15 **the video and the audio or just video instead of**

16 **doing what they were supposed to have.**

17 Q. Who was doing it wrong?

18 **A. The members of the gang crime unit.**

19 Q. Who were the members of the gang crime

20 unit?

21 **A. It was Sneed was the sergeant at the time**

22 **in front, and then there was two officers and now I**

23 **can't...**

24 Q. Villagomez one of them?

Page 147



Frank Kosman Backwrite - 3/23/2022
2:20-cv-02310-CSB-EIL # 17-3 Page 40 of 90
Paul Berge, et al. vs. City of Kankakee, et al.

1    A.  Villagomez was one of them.

2    Q.  Lonnie Sturkey?

3    A.  I think he was already in patrol when

4 this was happening.

5    Q.  Thomas Martin?

6    A.  Yes, Thomas Martin.

7    Q.  And you said that you became aware that

8 there was something -- hold on.  You became aware

9 that there was something improper being done by these

10 officers with respect to recording individuals, fair

11 to say?

12    A.  Fair to say.

13    Q.  Okay.  And how did you become aware of

14 that?

15    A.  I forgot how it came forward.  It could

16 have came through the State's Attorney's office.  I

17 think it did.  In court someone made an issue in

18 reference to it on some case because there was

19 supposed to be, like I said, it was either audio

20 or -- it was supposed to be no audio with the video

21 when they do an overhear, and they were doing the --

22 they were borrowing KAMEG equipment which they

23 weren't familiar with and they didn't do it right, so

24 they were copying -- they had the voice on it too

Page 148

1 rather than doing just the video.

2    Q.  So it was a confidential overhear,

3 correct?

4    A.  I believe that's what it's considered.

5 It wasn't when I was a detective.  It was some kind

6 of a new thing that the courts have allowed, but they

7 only would let the video overhear or -- come in when

8 they're doing a drug transaction but not the audio.

9    Q.  Got it.  And that's a formal procedure

10 that's put in place by the State's Attorney's office,

11 correct?

12    A.  If you want the audio, then you're

13 supposed to go get the overhear from the State's

14 Attorney's office.

15    Q.  Right.  So you can do video without an

16 overhear, but you can't do audio without an overhear,

17 correct?

18    A.  Correct.

19    Q.  And you found out that this team was

20 doing audio without a confidential overhear, correct?

21    A.  Correct.

22    Q.  And they were doing that without the

23 knowledge of the State's Attorney's office, correct?

24    A.  Correct.

Page 149

1    Q.  And that's a constitutional violation,

2 correct?

3    A.  Yes.

4    MR. MCGRATH:  Objection.  It calls for a

5 legal conclusion.

6 BY MR. HERBERT:

7    Q.  And was there any impact related to the

8 misconduct of these officers?

9    A.  The way it worked out because of

10 personnel issues and everything too, I disbanded that

11 gang unit in that form.

12    Q.  You said that this issue came to you from

13 the State's Attorney, correct?

14    A.  I believe.  I'm not sure exactly, but I

15 think that that makes sense where it came from.

16    Q.  Okay.  And it came from the State's

17 Attorney because the issue was raised in court,

18 correct?

19    A.  Right.  Correct.

20    Q.  And the issue was raised in court for

21 particular defendants that were arrested, correct?

22    A.  Correct.

23    Q.  And they were -- their constitutional

24 rights were violated by having their audio recorded,

Page 150

1 correct?

2    A.  Correct.

3    Q.  And that's how it came to you, correct?

4    A.  Correct.

5    Q.  And there was numerous individuals,

6 correct?

7    A.  I don't know how many.

8    Q.  And when this happened, Sneed was a

9 sergeant, correct?

10    A.  Wrong.  He was already a lieutenant.

11    Q.  Is it your testimony that -- I thought

12 you said he was the sergeant in the gang enforcement

13 tactical unit.

14    A.  He was, but then he became lieutenant and

15 the unit was still there.

16    Q.  Right, but that wasn't my question.  When

17 these constitutional violations took place, Sneed was

18 a sergeant, correct?

19    A.  Yes.

20    Q.  And he was --

21    A.  When I became aware of it, he was already

22 a lieutenant.

23    Q.  I understand that.

24    A.  Okay.

Page 151

Frank Kosman Backwrite  -  3/23/2022
2:20-cv-02310-CSB-EIL  #117-3   Page 41 of 90
Paul Berge, et al. vs. City of Kankakee, et al.

| | |
|---|---|
| 1 Q. And he was the sergeant of the team of | 1 warrants an investigation by the police department? |
| 2 police officers that committed these constitutional | 2 A. No. |
| 3 violations, correct? | 3 Q. So it did warrant an investigation, |
| 4 A. Yes. | 4 correct? |
| 5 Q. And as a result of these constitutional | 5 A. Yes. |
| 6 violations, the State's Attorney brought it to your | 6 Q. You did not conduct an investigation? |
| 7 attention, correct? | 7 A. I don't know if it had to go through the |
| 8 A. Correct. | 8 Internal Affairs investigation part. I investigated |
| 9 Q. Did you open an investigation on the | 9 it to find out what happened and fixed that problem. |
| 10 matter? | 10 Q. You never generated a complaint number, |
| 11 A. Yes, I checked into it, made sure that | 11 correct? |
| 12 they -- that it didn't -- how that happened in the | 12 A. Correct. |
| 13 first place, and made sure they didn't do it again. | 13 Q. And that was required per policy, |
| 14 Q. We talked about the policy of the | 14 correct? |
| 15 Kankakee Police Department and that is that there is | 15 A. I don't think so. |
| 16 a complaint number generated. Do you remember | 16 Q. Was there ever an investigation done by |
| 17 talking about that? | 17 the police department concerning the allegations made |
| 18 A. Yes. | 18 against Sneed and his team members? |
| 19 Q. Did you generate a complaint number in | 19 A. I looked into it. |
| 20 this case? | 20 Q. Other than you looking into it, was there |
| 21 A. We were talking about sexual harassment | 21 an investigation done by the police department? |
| 22 we talked about before. | 22 A. No. |
| 23 Q. No, just a few moments ago we talked | 23 Q. So you made the decision not to get the |
| 24 about misconduct being reported to you by a police | 24 police department involved, and you made the decision |
| Page 152 | Page 154 |
| 1 officer. There is a formal process with respect to | 1 to simply look into it, correct? |
| 2 that vis-a-vis Kankakee Police Department policy, | 2 A. I was part of the police department. |
| 3 correct? | 3 Q. Okay. Did you document this complaint |
| 4 A. Yes, with citizen complaints and their | 4 made by the State's Attorney in any complaint file? |
| 5 things, yes. | 5 A. I don't believe so. |
| 6 Q. Not just citizen complaints -- | 6 Q. And there was never a complaint file made |
| 7 A. Internal Affairs, okay. | 7 against Sneed with respect to the allegations made in |
| 8 Q. Did you follow the policy with respect to | 8 this case, correct? |
| 9 the complaint made by the State's Attorney's office | 9 A. Correct. |
| 10 concerning the complaint made in this case? | 10 Q. And in fact, individuals whose |
| 11 A. I don't think I pulled a number, no. | 11 constitutional rights were violated because of Sneed |
| 12 Q. And that would have been contrary to | 12 and the people that work for him, their cases were |
| 13 department policy, correct? | 13 dismissed by the State's Attorney's office, correct? |
| 14 A. I'd have to review that policy again in | 14 A. Yes. |
| 15 that situation where it came in. It's a little bit | 15 Q. And they were dismissed because Sneed and |
| 16 different kind of situation because it has nothing to | 16 his team members committed constitutional violations |
| 17 do with like an intentional wrongdoing or anything | 17 that required dismissal of cases, correct? |
| 18 like that. It was a procedure that they did wrong. | 18 A. Yes. |
| 19 And I don't think we had procedure written on that | 19 Q. So these individuals had charges put |
| 20 overhear thing, so it was more of a problem with the | 20 against them unlawfully, correct? |
| 21 way that -- our process. | 21 A. Well, I don't think there was any |
| 22 Q. Is it your testimony that a police | 22 contention that they didn't commit the crime. It was |
| 23 officer accused of committing constitutional | 23 how the police followed their technical |
| 24 violations against arrestees is not something that | 24 responsibilities on doing it. |
| Page 153 | Page 155 |



Frank Kosman Backwrite - 3/23/2022
2:20-cv-02310-CSB-EIL # 173-3 Page 42 of 90
Paul Berge, et al. vs. City of Kankakee, et al.

1  Q.  And these individuals were arrested,
2  correct?
3      A.  Correct.
4      Q.  They were put in jail, correct?
5      A.  I don't know if they posted bond, but I
6  assume so, yes.
7      Q.  And you never documented the
8  misconduct -- and in fact, you agree that the
9  misconduct was sustained.  You agree that Sneed
10  violated what he was accused of violating?
11      A.  Well, I don't know if Sneed did it.  His
12  officers that were with him.
13      Q.  He was a sergeant.  He's responsible for
14  the actions of his under-links, correct?
15      A.  Well, that would be like saying every
16  officer that does something wrong, you know, the
17  sergeants would be -- in one sense they're
18  responsible, but they're not -- you know, if an
19  officer punches somebody, takes aggressive force and
20  that sergeant wasn't even there, then it wouldn't be
21  that sergeant -- you know, he'd have a different
22  level of responsibility.
23      Q.  Did your informal investigation determine
24  that Sneed was not liable for the constitutional

Page 156

1      A.  That and personnel issues.  We were
2  shorthanded on the street and I said because of this
3  and that, we're not going to have that unit anymore.
4      Q.  Did you put anything in Sneed's personnel
5  file regarding the misconduct --
6      A.  No.
7      Q.  -- that was sustained against him?
8      A.  No.
9      Q.  Why not?
10      A.  Because I thought I handled it the way it
11  should have been handled.  We disbanded the unit
12  and -- it was more -- there's two different kinds of
13  mistakes in my mind, mistakes of the heart and
14  mistakes of the mind.  This was a mistake of the
15  mind.  They did a technical mistake.  There was no
16  intent of wrongdoing or evil -- nothing evil that
17  they intended to do, and so I did just a procedural
18  kind of correction to it by disbanding the unit and
19  putting them -- and not having it there anymore, and
20  they weren't going to be doing any of that kind of
21  work anymore, so I didn't have to worry about it.
22      Q.  Was the City of Kankakee, were they sued
23  in this case?
24      A.  No.

Page 158

1  violations in any way?
2      A.  I know he didn't mechanically handle that
3  part of the deal.
4      Q.  So is it your testimony that Sneed did
5  nothing wrong with respect -- hold on.  Let me
6  finish, that Sneed did not violate any department
7  policies when these individuals were -- their
8  constitutional rights were violated during these
9  arrests and incarceration?
10      A.  Well, in the sense that he's their
11  supervisor, yes, he should have made -- I mean, he's
12  responsible to that level, but I don't -- my
13  recollection is he didn't actually do the recording.
14      Q.  Why doesn't --
15      A.  So they were supposed to turn off
16  something on the recorder and they didn't.
17      Q.  I get it.  Was Sneed ever disciplined for
18  that?
19      A.  No.
20      Q.  Was there ever an investigative finding
21  made on that case?
22      A.  No.  I just disbanded the unit.
23      Q.  You disbanded it because of the
24  constitutional violations?

Page 157

1      Q.  And when you received this complaint from
2  the State's Attorney's office, how long had Sneed
3  been a lieutenant?
4      A.  I don't know.  It was probably sometime
5  in the fall, just a few months.
6      Q.  Well, he was made lieutenant in August,
7  correct?
8      A.  Right.
9      Q.  So it would have been in the fall,
10  meaning what?
11      A.  October.
12      Q.  Okay.  So a couple months after he was
13  made lieutenant, these allegations were made,
14  correct?
15      A.  Yes.
16      Q.  And these allegations were made
17  concerning work that was done by Sneed while he was a
18  sergeant, correct?
19      A.  By his unit.
20      Q.  And you already talked about how there
21  was -- there had been a lot of people that were upset
22  about Sneed being promoted over the two higher ranked
23  white candidates, correct?
24      A.  Yes.

Page 159



**Frank Kosman Backwrite** - 3/23/2022
2:20-cv-02310-CSB-EIL #172-3 Page 43 of 90
**Paul Berge, et al. vs. City of Kankakee, et al.**

1  Q.  And did that fact that people were upset
2  about that, did that play any role into your decision
3  not to put this information in Sneed's personnel
4  file?
5  **A.  No, I didn't even think about that part.**
6  Q.  Well, you knew that if you put that
7  information in Sneed's personnel file that people
8  could find out about it, correct?
9  **A.  Yeah, eventually you could, I guess.**
10  Q.  Did you tell the mayor about the
11  allegations against Sneed?
12  **A.  I don't think so.**
13  Q.  Did you talk to any of your -- the deputy
14  chief about the constitutional violations made by
15  police officers under your command?
16  **A.  I probably did.  I talked to them about**
17  **it because I wasn't familiar with the procedure, so**
18  **I'm sure we talked about it.**
19  Q.  You talked to Deputy Chief Hunt?
20  **A.  I don't remember specifically, but I**
21  **think -- we met every day in reference to different**
22  **things, so it's probably something I would have**
23  **brought up.**
24  Q.  And it's probably something you would

Page 160

1  have brought up with the deputy chief, correct?
2  **A.  He probably would have been there and the**
3  **two commanders.**
4  Q.  Okay.  And you said you weren't familiar
5  with the process, and that's why you talked to Deputy
6  Hunt about it, correct?
7  **A.  Well, to the two commanders and the**
8  **deputy chief.**
9  Q.  And the deputy chief was Hunt, correct?
10  **A.  Yes.**
11  Q.  And did Hunt tell you what the procedure
12  should be?
13  **A.  I don't remember who was more familiar**
14  **with the mechanics and how exactly that worked, but**
15  **then I -- you know, someone was able to say how**
16  **overhear is supposed to work.**
17  Q.  Okay.  But regardless of who advised you
18  of what, the decision was made in your consultation
19  with the command staff that there was not going to be
20  anything put in Sneed's personnel file?
21  **A.  That wasn't even discussed.**
22  Q.  Did you review a -- you said you reviewed
23  the personnel file of all the candidates for
24  lieutenant, correct?

Page 161

1  **A.  Say that again.  I'm sorry.**
2  Q.  You reviewed the personnel files of all
3  the candidates for lieutenant?
4  **A.  Yes.**
5  MR. MCGRATH:  Objection.  Form of the
6  question.  The top three.
7  BY MR. HERBERT:
8  Q.  The top three, yes?
9  **A.  Yes.**
10  Q.  And in there do you remember seeing a
11  letter of recommendation for Michael Sneed?
12  **A.  Yes.**
13  Q.  Tell me about that.
14  **A.  There was one letter of recommendation**
15  **from I think a professor at Olivet Nazarene who was a**
16  **former commander for the Kankakee Police Department.**
17  Q.  Okay.  And do you remember the name of
18  that individual?
19  **A.  No, I don't.**
20  Q.  Is it Matt Adamson?
21  **A.  It sounds right.**
22  Q.  Were there any other letters of
23  recommendation for Michael Sneed in his personnel
24  file?

Page 162

1  **A.  Yeah, I don't remember because I**
2  **think that Matt -- I received that letter somehow.**
3  **That's probably why it got into the personnel file.**
4  Q.  Okay.  So you put the letter of
5  recommendation that you received into Michael Sneed's
6  personnel file?
7  **A.  Yes.**
8  Q.  Okay.  Did you put any letters of
9  recommendation into the personnel file for any
10  other -- for Officer Berge?
11  **A.  I didn't receive any.**
12  Q.  Did you put any letters of recommendation
13  into the personnel file for Tim Kreissler?
14  **A.  No.  I didn't receive any.**
15  Q.  How is it that this individual sent a
16  letter of recommendation to you for the promotion of
17  Sneed to lieutenant?
18  **A.  I don't know.  I know that Sneed would**
19  **teach at classes or be a spokes -- or somebody at the**
20  **classes at Olivet Nazarene, so I'm assuming it came**
21  **from because of his contacts over there.**
22  Q.  Okay.  So you talked about all the
23  reasons that you considered when you chose Sneed to
24  be the lieutenant.  You did not talk about this

Page 163



**Frank Kosman Backwrite - 3/23/2022**
2:20-cv-02310-CSB-EIL  # 173  Page 44 of 90
Paul Berge, et al. vs. City of Kankakee, et al.

1 letter of recommendation that you put in his file.

2 So based upon that, was that part of your

3 consideration for Sneed to be lieutenant?

4     A.  It wasn't -- I didn't think it was that

5 important.

6     Q.  Then why did you put it in his personnel

7 file?

8     A.  That's always been my thing.  Someone

9 gets a that-a-boy kind of letter, you put it in their

10 file.

11     Q.  But you put it in the file as part of the

12 selection process for lieutenant, correct?

13     A.  I don't remember.  I got it -- if there

14 was a recommendation for a promotion or whatever, if

15 that was the title of the letter, maybe I did put it

16 on there.  I don't know.

17     Q.  Did you tell the Police and Fire

18 Commission that there was a letter of recommendation?

19     A.  I don't remember.

20     Q.  Did you provide them the personnel file?

21     A.  They had the personnel file, yeah.

22     Q.  So the Police and Fire Commission had the

23 personnel file with the letter of recommendation that

24 you put in there, correct?

Page 164

---

1     A.  I'm not a hundred percent that they had

2 the personnel file.  I think they do, but I'm not a

3 hundred percent sure on that, but if it was the

4 personnel -- that letter would have probably been in

5 the personnel file.

6     Q.  And don't you think that gave Sneed an

7 unfair advantage, the fact that he was allowed to

8 have a letter of recommendation put into his file and

9 the other two officers were not allowed to have a

10 letter of recommendation put into their file?

11     A.  No one was denied to have a reference

12 letter.  If someone else would have got a reference

13 letter, it would have went into the file too.

14     Q.  Did you tell Kreissler that, "Hey, I'm

15 going to have to make that decision, go out and get

16 some letters"?

17     A.  No.  I don't think that would be fair.

18     Q.  Did you tell Berge that?

19     A.  No.  I didn't tell Sneed that either.

20     Q.  You don't know if somebody else told

21 Sneed to get a letter, right?

22     A.  I don't know.

23     Q.  You don't know if his good friend Willie

24 Hunt told him, "Hey, go get a letter," correct?

Page 165

---

1     A.  No, I don't know.

2     Q.  You don't know if Willie Hunt called up

3 Matt Adamson -- you knew that Willie Hunt knew Matt

4 Adamson, right?

5     A.  You know I -- yeah, because he was a past

6 commander at the police report.

7     Q.  And you don't know if Willie Hunt called

8 up Matt Adamson and said, "Hey, get a letter in there

9 for my guy Sneed because we need to get him

10 promoted."  You don't know if that happened either,

11 do you?

12     A.  No, I don't know.

13     Q.  Whatever happened to Officer Villagomez?

14     A.  He resigned.

15     Q.  Was he pending an investigation at the

16 point in which he resigned?

17     A.  Yes.

18     Q.  Had you filed charges against him at the

19 time in which he resigned?

20     A.  I think I was notified of charges, but I

21 think it was before the interrogation.

22     Q.  Were you seeking his termination at any

23 point?

24     A.  I think that would have happened after

Page 166

---

1 the interrogation, but that would -- he was looking

2 at discipline up to and including termination.

3     Q.  What were the allegations against Officer

4 Villagomez?

5     A.  He had used narcotics.

6     Q.  And had he used -- was the allegation

7 that he used narcotics related to his performance?

8     A.  It was off-duty.

9     Q.  Okay.  A one time incident?

10     A.  That's all we had evidence on.

11     Q.  And what time frame did you have evidence

12 that he used narcotics?

13     A.  Explain the time frame.

14     Q.  What unit was he assigned to at the time

15 in which you had evidence that he used narcotics?

16     A.  He was in patrol.

17     Q.  Okay.  Would this have been before or

18 after he was on the gang enforcement tactical unit?

19     A.  This would have been after.

20     Q.  Okay.  Did you know that Sneed and Hunt

21 were roommates while in the police academy?

22     A.  No.

23     Q.  We took the deposition of Deputy Chief

24 Hunt the other day and he said that you wanted to

Page 167



Frank Kosman Backwrite - 3/23/2022
2:20-cv-02310-CSB-EIL #17-3 Page 45 of 90
Paul Berge, et al. vs. City of Kankakee, et al.

1 make sure or prevent any appearance that Hunt was
2 being involved in the promotion of Sneed.
3        Did you want to make sure that there
4 was no appearance that Hunt was involved in the
5 promotion of Sneed?
6    A.  I just wanted to make it that it was my
7 decision for the promotion, so, I mean, it was nobody
8 else's.
9    Q.  Okay.  Did you tell Hunt that you wanted
10 to make sure that nobody could allege that he was
11 involved in the promotion of Sneed?
12   A.  No, I don't remember that specific thing.
13 I just know that it would be my decision.
14   Q.  Did you talk to Hunt in any way about any
15 perception about him being involved in the promotion
16 process?
17   A.  I don't know if he made a comment that
18 he -- you know, that he was worried about that or
19 anything, but I don't remember that being a concern
20 of mine.
21   Q.  And when he made that comment, would that
22 have been before or after you made the decision to
23 promote Michael Sneed?
24   A.  Well, I would be considering that before,

1 so that would be -- I mean, it was my decision to do
2 that because I couldn't do that afterwards.  It would
3 have to be before.
4    Q.  So when he made the comment about Sneed,
5 about not wanting to have any appearance of being
6 involved in the promotion, that was before you had
7 made the selection to Sneed?
8    A.  I don't remember that conversation
9 referenced to him not being -- I just knew that I
10 wanted to be it, so that as a chief, it was my
11 decision on who I promoted.  It might have the same
12 effect saying it's mine and not his, but it could be
13 a misunderstanding or the way it sounded, but it
14 wasn't like I said, I want to make sure that you're
15 not included in the -- looked down -- you know, that
16 you're the one who made the decision.  It's my
17 decision.  It's up to me.
18   Q.  Okay.  And that was the understanding
19 that you had with Hunt?
20   A.  That's my understanding that I had with
21 everybody.
22   Q.  Okay.  Well, anyone else other than
23 Hunt -- well, strike that.
24        Are you saying that Hunt was

1 incorrect that you stated to him something along the
2 lines of, you wanted to make sure that there was no
3 appearance that Hunt was involved in the
4 investigation?
5    A.  Investigation?
6    Q.  I'm sorry.  Promotion?
7    A.  I don't remember having it from that
8 aspect of it.  I mean, I remember it being that I
9 just wanted it to be my decision for it.
10   Q.  I understand.  That's not what I'm
11 asking.
12   A.  I know, but that's -- I don't remember.
13 I can't say he's lied at it, or it could be a
14 misunderstanding the way he's speaking and the way
15 I'm speaking.  You know, I could see where he could
16 take that I'm -- make sure he's not involved in it by
17 my saying that I'm the one, it's my decision to be
18 doing it.
19   Q.  And certainly if there was an appearance
20 that Hunt was involved in the promotion and Sneed was
21 promoted, that would cause concern with people in the
22 police department, correct?
23        MR. MCGRATH:  Objection.  It calls for
24 speculation, foundation, an incomplete hypothetical.

1        THE WITNESS:  I don't know.  I guess it
2 would, but it would be -- I don't know, I mean,
3 because if you're a police chief and if you're not
4 the one making -- if someone's pulling your strings
5 and you're a puppet and then it would be -- it would
6 look -- it would be bad.
7 BY MR. HERBERT:
8    Q.  Right, and it would be bad if Sneed were
9 promoted because everyone knew he was friends with
10 Hunt, right?
11   A.  Yes.
12        MR. MCGRATH:  Objection.  The form of the
13 question, foundation.
14 BY MR. HERBERT:
15   Q.  And it would be bad because everyone knew
16 that Hunt had this animosity towards white people and
17 Sneed was being promoted over two white people?
18        MR. MCGRATH:  Objection.  Asked and answered,
19 calls for speculation, hearsay, incomplete
20 hypothetical, and form.
21        THE WITNESS:  That wouldn't help with a past
22 posting in reference to it, them being friends with
23 the subject.  That could be a problem.
24



Frank Kosman Backwrite - 3/23/2022
Paul Berge, et al. vs. City of Kankakee, et al.
2:20-cv-02310-CSB-EIL #17-3 Page 46 of 90

BY MR. HERBERT:

Q. You're saying the past posting of Hunt?

A. The Facebook, right.

Q. So there was concern about Hunt being involved in the promotion that resulted in Sneed being promoted over two white candidates, correct?

MR. MCGRATH: Objection. It misstates the prior testimony, foundation, it's leading, form.

BY MR. HERBERT:

Q. You can answer.

A. I mean, I could see where someone might think that and I just wanted to make sure that it was on my decision and not that, so why go with somebody helping their friend when it's actually my decision.

Q. Because you knew it was an unusual situation for an individual to skip over two higher ranked individuals on the promotion list, correct?

MR. MCGRATH: Objection. Form of the question, compound, incomplete hypothetical foundation.

THE WITNESS: I think the rule of three is well established and I understood that from -- for a long time. So, I mean, I've seen it happen before.

Page 172

BY MR. HERBERT:

Q. Is it your understanding that the rule of three, that any one of the three can be chosen for whatever reason the chief wants to choose that individual?

A. Right. So if you go -- you can pass once for the first, pass twice for the second one.

Q. That's not my question.

A. If you're following the process, yes.

Q. Okay. So you could have chose Sneed for any reason you wanted, correct?

A. Correct. Well, not any reason. You couldn't say, you know -- you'd have to have a good -- you know, some -- any legal reason, I guess, it would be good.

Q. Okay. And how about a reason that the promotion would be more accurately reflective of the community, would be a justifiable reason for a chief to utilize in the rule of three?

MR. MCGRATH: Objection. Form of the question, it calls for a legal conclusion, foundation, an incomplete hypothetical and form.

BY MR. HERBERT:

Q. Take your time.

Page 173

A. Do I think that you could do it for that reason? I guess there's a lot of legal precedence for it even though I think it causes a lot of issues within the department or in a situation, but there's consent decrees and everything out there that would probably support that decision.

BY MR. HERBERT:

Q. Support the decision to promote somebody in part because of the race of somebody?

A. Probably better reflect the community someone could argue.

Q. The race of the community?

MR. MCGRATH: Objection. The form of the question, incomplete hypothetical, form.

THE WITNESS: If that's what the consent decree is saying, that you have some kind of racial bias, I guess it would.

BY MR. HERBERT:

Q. Well, what else could it reflect when you say reflective of the community other than race, what else could it be?

MR. MCGRATH: Form, an incomplete hypothetical, it calls for speculation.

THE WITNESS: Nowadays a lot of things.

Page 174

Gender, you know, the sexual identity, all kinds of things.

BY MR. HERBERT:

Q. Okay. Including race?

A. Yeah. Handicapped. There's a whole list.

Q. Including race?

A. Yes.

Q. In your role as a police chief, you dealt with various vendors for the police department. Do you know what I'm referring to when I say that?

A. Yes.

Q. Okay. And what is the process for somebody that is doing business with the city when it relates to the police department?

A. I guess it's -- if it's over a certain amount of money, you've got to go through their actual purchasing bid and everything. If it's lesser amounts of money it's -- you don't have to go through a bidding process, and then you just pick -- choose which vendor you want to, that provides the best for the best price. It's up to the department head.

Q. Okay. But you'd agree with me that it has to be a transparent process, correct?

Page 175



Frank Kosman Backwrite  -  3/23/2022
2:20-cv-02310-CSB-EIL  #172-3  Page 47 of 90
Paul Berge, et al. vs. City of Kankakee, et al.

1    A.  Yes.  I mean, the bills are shown every
2  month at the different meetings, and it's all public
3  meetings.
4    Q.  Done at -- shown at the city council,
5  correct?
6    A.  And at the, like for me, the Public
7  Safety Committee.
8    Q.  Okay.  And when somebody becomes a
9  vendor, there has to be a documented process of that
10  vendor, such as their owners, correct, people
11  affiliated with the business?
12    A.  I mean, I don't think Kankakee has as
13  tight a system as that.
14    Q.  All right.  Well, let me ask you a
15  question.  Could you -- if there is a company that
16  does mechanic work for the entire village of Cook
17  County -- or I'm sorry, the City of Kankakee and it
18  generates a million dollars a year in business, could
19  you as the police chief hire your brother without
20  seeking approval from anyone?
21    MR. MCGRATH:  Objection.  Form of the
22  question, incomplete hypothetical, foundation.
23    THE WITNESS:  I think that would put it over
24  the threshold amount.

Page 176

1  BY MR. HERBERT:
2    Q.  And assuming that it's over the threshold
3  amount, what needs to be done?
4    A.  If it's over the threshold amount, then
5  you would have to go do the bidding process for it.
6    Q.  It has to be opened up for bidding,
7  correct?
8    A.  Yes.
9    Q.  It has to be competitive bids, correct?
10    A.  Right.  Correct.
11    MR. MCGRATH:  Do you mean to say that his
12  brother, brother-in-law, whoever it was works for the
13  mechanical company and then he would hire him?
14  BY MR. HERBERT:
15    Q.  Did you do that?  No, I'm kidding.
16    MR. MCGRATH:  No, because --
17    MR. HERBERT:  I'm moving on.  That was just
18  to get a broad answer from him.
19    MR. MCGRATH:  Okay.
20  BY MR. HERBERT:
21    Q.  The vendors that are given city
22  contracts, you would agree with me that the process
23  needs to be transparent with the city council and for
24  the public as well, correct?

Page 177

1    A.  Right.
2    Q.  Okay.
3    A.  Just to digress a little bit too.
4  There's also things called sole source and contracts
5  with the State that you could jump on and kind of
6  things like that where you don't have to do the
7  actual bidding.
8    Q.  Got it.  And that transparency is, it's
9  part of Kankakee Police Department policies, correct?
10    A.  I think it's a city policy more than.
11    Q.  A city policy, and then some of it is
12  governed by State law as well?
13    A.  Yes.
14    Q.  Okay.  And you would agree with me that
15  part of the State law and the policy is to -- is to
16  ensure that people affiliated with the police
17  department are not also affiliated with vendors that
18  are doing business with the city in the event that
19  there's a conflict of interest?
20    A.  Sorry.  Could you say that again?  I'm
21  sorry.
22    Q.  Sure.  You would agree with me that the
23  laws and the policy, that part of them are put into
24  place to avoid any conflict of interest between, say,

Page 178

1  somebody on the police department and a vendor that's
2  doing business with the police department, correct?
3    A.  Correct.  There's probably ethics issues.
4    Q.  Right.  So in the scenario that I gave
5  earlier about your brother owning this car repair
6  company, if you were to recommend him as a vendor,
7  you would certainly need to disclose the fact that
8  this was your brother, right?
9    A.  Yeah.  Well, if you didn't do it, someone
10  else would for sure.
11    Q.  Right.  Or if you owned the business, and
12  let's assume it's not your brother's business, it's,
13  you know, Joe's Cadillac business and you had a
14  partial ownership in there, and if you were seeking
15  them to do business with the city, you would need to
16  disclose that fact, correct?
17    A.  Correct.
18    Q.  And that's because the transparency is
19  needed to make sure that there is no conflict of
20  interest between any individuals and any vendors that
21  are billing the citizens of Kankakee?
22    A.  Yes.
23    Q.  Okay.  And you're familiar with Stanard &
24  Associates, correct?

Page 179



Frank Kosman Backwrite - 3/23/2022
2:20-cv-02310-CSB-EIL #17-3 Page 48 of 90
Paul Berge, et al. vs. City of Kankakee, et al.

1 A. Yes.

2 Q. And you're aware of the fact that they

3 have conducted promotional tests, the process for

4 those for Kankakee since approximately 2005?

5 A. I know they did them in the past. I

6 don't know the extent of that because they didn't do

7 them for me when I did it.

8 Q. Okay. And the promotional process that

9 resulted in Michael Sneed being promoted to

10 lieutenant, Stanard & Associates conducted that

11 promotional process, correct?

12 A. That's my understanding.

13 Q. Okay. And are you -- do you know if

14 anyone from the Kankakee Police Department played any

15 role in the process in which Michael Sneed was ranked

16 No. 3? That's a bad question.

17 You played a role in the promotion

18 of Michael Sneed by promoting him, correct?

19 A. Correct.

20 Q. So I guess the better question is, do you

21 know of anyone else in the Kankakee Police Department

22 that played any role in the promotional process?

23 A. You know, I don't know all their process

24 that they used, like in the assessment center, so I

Page 180

1 don't know if they had an officer or anybody sit in

2 as part of the judges in the assessment process or

3 not.

4 Q. You received a complaint of

5 discrimination with respect to this promotional

6 process, correct?

7 A. Yes.

8 Q. Did you conduct any investigation to

9 determine whether or not any of the allegations were

10 true or false?

11 A. Are you talking in reference to like the

12 civil suit that I received a complaint for, or are

13 you talking about a complaint, like written

14 complaint?

15 Q. I don't know. You said you received a

16 complaint.

17 A. I was thinking the civil, the EEOC kind

18 of complaint of that thing.

19 Q. Okay. So did you conduct any

20 investigation after you being made aware of the

21 complaint by the EEOC concerning discrimination with

22 respect to that promotional process?

23 A. No.

24 Q. Are you aware of any investigation

Page 181

1 conducted by anyone from the City of Kankakee

2 regarding the allegations of discrimination in that

3 promotional process?

4 A. No.

5 Q. And when you received that complaint

6 about discrimination of the promotional process, you

7 in fact were the chief, correct?

8 A. Yes.

9 Q. And you in fact had promoted Michael

10 Sneed, correct?

11 A. Correct.

12 Q. Did you ever look -- did you ever

13 determine if Deputy Chief Willie Hunt played any role

14 in the promotional process of Michael Sneed?

15 A. No.

16 Q. No, you didn't investigate that?

17 A. No.

18 Q. So you don't know whether or not he did?

19 A. I did not investigate it, no, so I don't

20 know.

21 Q. You don't know if he played any role in

22 it?

23 MR. MCGRATH: Hold on. Objection. Form of

24 the question.

Page 182

1 Are you talking about the EEOC

2 complaint regarding this promotional examination that

3 he's been testifying to all afternoon that he's

4 stated he's the sole person responsible for making

5 that promotional selection or a different EEOC

6 complaint from a prior promotion?

7 BY MR. HERBERT:

8 Q. I'm talking about the EEOC complaint

9 related to this lawsuit, related to the allegations

10 in this lawsuit.

11 MR. HERBERT: Would you mind repeating the

12 question I asked, not that one, but. I'm sorry.

13 (Whereupon, the record was

14 read as requested.)

15 BY MR. HERBERT:

16 Q. Okay. You don't know if Willie Hunt

17 played any role in the process conducted by Stanard &

18 Associates that resulted in Sneed being ranked third?

19 A. Correct.

20 Q. And you don't know of any department

21 reason why Hunt would have been involved in any

22 process associated with Stanard & Associates'

23 compilation of the final list where Sneed ranked

24 third?

Page 183



**Frank Kosman Backwrite - 3/23/2022**
2:20-cv-02310-CSB-EIL # 17-3 Page 49 of 90
Paul Berge, et al. vs. City of Kankakee, et al.

1    A.  I don't know if they used -- I never used
2  Stanard.  I don't know if they used somebody from the
3  department as part of their -- one of the judges in
4  the multiple judge interview process.  I don't know
5  their process.
6    Q.  Okay.  So you don't know whether or not
7  Willie Hunt played any role in the process that
8  resulted in Michael Sneed being ranked third on the
9  promotional list?
10    A.  Correct.
11    Q.  Okay.  Are you aware of the fact that
12  Michael -- I'm sorry, that Willie Hunt is employed by
13  Stanard & Associates?
14    A.  You know, I don't know if he did.  He may
15  have done some assessment centers.  I don't know.  I
16  don't remember.  I don't know if he did that or not.
17    Q.  All right.  My question was are you --
18  hold on.  You're aware of the fact that Willie Hunt
19  is employed by Stanard & Associates regardless of
20  what his role was, correct?
21    A.  Yes.
22    Q.  Okay.  When did you become aware of that
23  fact?
24    A.  I don't know.

Page 184

1    Q.  Would it have been before or after you --
2    A.  It had to be after I was hired, but I
3  don't know when.
4    Q.  You were hired in May '19?
5    A.  Yes.
6    Q.  The promotion was in August '19?
7    A.  Correct.
8    Q.  Did you become aware of the fact -- you
9  obviously became aware of the fact after you were
10  hired in May 2019, correct?
11    A.  Uh-huh.
12    Q.  You have to say yes.
13    A.  Oh, I'm sorry.
14    Q.  That's all right.
15    A.  Yes.
16    Q.  Did you become aware of that fact prior
17  to August 2019?
18    A.  I don't remember if I knew before or
19  after he worked for Stanard.  I didn't -- working as
20  an assessor, that goes with the profession and I
21  don't really -- I don't remember.  It didn't make a
22  mark to me.  It didn't -- I didn't -- I don't
23  remember.  I don't remember the exact -- I don't know
24  when I found out that he was an assessor.

Page 185

1    Q.  As you sit here today, you don't know
2  whether or not you found out Willie Sneed was
3  employed by Stanard & Associates --
4    A.  Willie Hunt.
5    MR. MCGRATH:  Willie Hunt.
6  BY MR. HERBERT:
7    Q.  Thank you.  You don't know whether or not
8  Willie Hunt was employed by Stanard & Associates
9  prior to you making -- selecting Sneed as lieutenant?
10    A.  Yes.
11    Q.  It could have been before that, correct?
12    A.  It could have been.
13    Q.  And it could have been after that,
14  correct?
15    A.  Correct.
16    Q.  Okay.  And you said that -- how did you
17  become aware of this fact?
18    A.  I think Willie Hunt mentioned it or
19  whatever, that he works as an assessor sometimes for
20  -- and I might not have even caught on that it was
21  Stanard, that he works as an assessor for some police
22  testing services.
23    Q.  Well, you said you became aware he worked
24  for Stanard, yes?

Page 186

1    A.  I might have misspoke.  He worked as an
2  assessor for some testing services.  I didn't realize
3  it was Stanard or not or whatever.  I don't know.
4  It's very -- it's unclear to me about exactly -- I
5  have a vague idea that he did work there.  I don't
6  remember him actually going, working or saying, I'm
7  going this week to an assessment or something.  I
8  don't remember.
9    Q.  You became aware that he was employed by
10  Stanard at some point while you were the chief,
11  correct, or are you telling me that you're becoming
12  aware of that fact just now?
13    A.  Not just now, but somewhere down the --
14  it's --
15    Q.  That's what I'm asking you.
16    A.  It's reminding me that he did, but
17  I didn't -- he probably -- he mentioned it to me
18  sometime, but I don't remember exactly when or the
19  context of it.
20    Q.  At the point in which he mentioned it to
21  you, did you know that Stanard had conducted the
22  promotional process in which Sneed was promoted?
23    A.  I probably knew from just looking at the
24  files or whatever it was Stanard that had ran

Page 187

Frank Kosman Backwrite - 3/23/2022
2:20-cv-02310-CSB-EIL #17-3 Page 50 of 90
Paul Berge, et al. vs. City of Kankakee, et al.

1 the testing process or had been told that Stanard had
2 run the testing process. It didn't really matter to
3 me because it was already done. It was just a list
4 there.
5  Q. Other than that conversation you had with
6 Willie Hunt about him working for Stanard, did you
7 have any other conversations with him about that?
8  A. No.
9  Q. Did you have any conversations with
10 anyone about Willie Hunt working for Stanard?
11  A. No.
12  Q. And the fact that Stanard conducted the
13 examination in which you promoted Michael Sneed and
14 you found out that Willie Hunt, Sneed's good,
15 life-long friend worked for Stanard, that didn't
16 cause you any concern?
17  A. No.
18  Q. And at the point in which you found out,
19 people were already complaining about the promotion
20 of Sneed, right?
21  MR. MCGRATH: Objection. Found out about
22 what?
23 BY MR. HERBERT:
24  Q. At the point in which you found out Hunt

Page 188

1 worked for Stanard, people were complaining about the
2 selection of Sneed, correct?
3  MR. MCGRATH: Objection. Misstates the prior
4 testimony, foundation.
5  THE WITNESS: I recollect the complaints in
6 reference to when Sneed -- when I chose Sneed over
7 the other two, but I don't remember hearing any
8 issues in reference to the testing process before
9 they came up with the list.
10 BY MR. HERBERT:
11  Q. That's not the question I asked you. You
12 have to listen to me, okay, otherwise we're going to
13 be here all day long.
14  A. Okay.
15  Q. At the point in which you found out that
16 Hunt worked for Stanard, there had already been
17 complaints about Sneed being promoted over the two
18 higher ranked candidates?
19  MR. MCGRATH: Objection. Foundation, calls
20 for speculation, misstates testimony.
21  THE WITNESS: I don't remember when we had
22 that conversation in reference to him working as an
23 assessor.
24

Page 189

1 BY MR. HERBERT:
2  Q. Okay. And you had one conversation with
3 Hunt about that, correct?
4  A. I believe so, yes.
5  Q. Did you have any conversations with
6 anyone else about Hunt's employment with Stanard &
7 Associates?
8  A. I don't recall any.
9  Q. Did you have a conversation with the
10 mayor about Hunt working for Stanard & Associates?
11  A. No, I don't think so.
12  Q. Did you document that Hunt was working
13 for Stanard & Associates?
14  A. No.
15  Q. Why not?
16  A. I didn't think it was important.
17  Q. Okay. For the record, you paused about
18 30 seconds before you gave that answer.
19  MR. MCGRATH: There's no question pending.
20 BY MR. HERBERT:
21  Q. You didn't think it was important to
22 document that Willie Hunt worked for Stanard &
23 Associates. Is that your testimony?
24  A. Correct.

Page 190

1  Q. There is a policy with respect to
2 secondary employment with the Kankakee Police
3 department, correct?
4  A. Correct.
5  Q. And what does that policy require
6 concerning someone's employment with secondary
7 agencies?
8  A. Approval by the chief.
9  Q. Anything else?
10  A. I don't know.
11  Q. And is that a written approval?
12  A. I don't know if it says it specifically
13 in the thing it's written approval. It probably does
14 I would think, but I don't know.
15  Q. Is the secondary employment of an
16 individual, is that documented in their personnel
17 file?
18  A. I think usually, yes.
19  Q. But it wasn't done with Willie Hunt,
20 correct?
21  A. I don't know when he started working
22 there, so I don't know. I didn't like check in his
23 personnel file if he had it done or not.
24  Q. But it should be in his personnel file.

Page 191



**Frank Kosman Backwrite - 3/23/2022**
2:20-cv-02310-CSB-EIL # 17-3 Page 51 of 90
Paul Berge, et al. vs. City of Kankakee, et al.

1  You'd agree with me on that?

2      A.   That would be your best policy, yeah.

3      Q.   Okay.  But you didn't put it in his

4  personnel file, correct?

5      A.   No.

6      Q.   Why not?

7      A.   Well, I think it was an ongoing kind of a

8  thing.  You know, every so often he'd do an

9  assessment and he would be doing -- you know,

10  working.  I don't know.  It's not like a full-time

11  job.

12      Q.   Were you trying to keep that fact about

13  the relationship with Hunt and Stanard & Associates,

14  were you trying to keep that information from getting

15  out in the public?

16      A.   No.

17      Q.   Were you trying to keep that information

18  a secret?

19      A.   No.

20      Q.   If can I mark as Kosman 1.

21          (Whereupon, Kosman

22           Deposition Exhibit No. 1

23           was marked for

24           identification.)

Page 192

1  BY MR. HERBERT:

2      Q.   If can you take a look at that.  And for

3  the record, it is Policy 1040, and it is a six-page

4  document.  And my question is going to be --

5  obviously, take as much time as you want, but do you

6  recognize that policy, and was that policy in place

7  when you were the chief of police?

8      MR. MCGRATH:  Can you just review it?

9          Give me one minute.

10      MR. HERBERT:  Yeah.  Take your time, Mike.  I

11  won't ask any questions.

12          (Whereupon, a short break

13           was taken.)

14  BY MR. HERBERT:

15      Q.   Let me just -- when you're done.  Take

16  your time.

17      A.   Okay.

18      Q.   Okay.  So my question is, do you

19  recognize that document?

20      A.   Yes.

21      Q.   And that's the policy that was in place

22  when you were the chief?

23      A.   It looks like there was -- this one's

24  copyrighted 4/27/21, so I was chief of police for the

Page 193

1  last five or six days.

2      Q.   Okay.  Was there a policy in place

3  regarding outside employment that is different from

4  this document when you were the chief?

5      A.   I think we added this part about outside

6  employment while on disability kind of a thing.

7      Q.   Okay.  But other than that, it's

8  essentially the same?

9      A.   I think so.

10      Q.   Okay.  So the policy in there talks about

11  how there needs to be written approval from the

12  chief, correct?

13      A.   Okay.

14      Q.   Yes, that's in the document?

15      A.   Yes.

16      Q.   And there was no written approval by you

17  for Hunt working for Stanard & Associates, correct?

18      A.   Not by me, no.

19      Q.   And there was no written approval from

20  anyone that you saw regarding Hunt's working for

21  Stanard & Associates, was there?

22      A.   You know, I never checked, so I don't

23  know.

24      Q.   Okay.  Well, you would agree that there

Page 194

1  needed to be written approval by somebody regarding

2  Hunt's employment with Stanard & Associates, correct?

3      A.   Yes.

4      Q.   And the purpose and scope of this policy,

5  the first sentence, "To avoid actual or perceived

6  conflicts of interest."  Do you see that?

7      A.   Yes.

8      Q.   And then the last page -- I'm sorry, the

9  second to the last page, the last section, Section

10  1040.7 talks about "Contractual Agreements for Law

11  Enforcement Services."

12          You would agree with me that based

13  upon your understanding of Hunt's employment

14  conducting assessments with Stanard & Associates,

15  that would be considered a law enforcement service

16  per the definitions of this policy, correct?

17      A.   I think this has to do with more off-duty

18  employment for like when we like would work at the --

19  a contract for like being security, you know, at a

20  business having, you know, like an outdoor event or

21  something like that.

22      Q.   Okay.  Well, we don't have to speculate.

23  It's defined in here --

24      A.   And that's what it's talking about.

Page 195



**Frank Kosman Backwrite - 3/23/2022**
2:20-cv-02310-CSB-EIL #17-3 Page 52 of 90
Paul Berge, et al. vs. City of Kankakee, et al.

Q. Hold on. It's defined in here. Oh, page 1. You're going to the last page. Page 1 defines what off-duty employment is, right, and it's "Any secondary employment that is not conditioned on the actual or potential use of law enforcement powers by any off-duty employee," correct? Did I read that correctly?

A. You read that correctly.

Q. Okay. So is it your testimony that Deputy Chief Hunt's work with Stanard & Associates is not considered outside employment that would be relevant to this?

A. Well, this section here that you're talking about is contractual agreements for law enforcement services, so that would be enforcing the law. That section doesn't apply to what you're talking about on the front.

Q. And that's your opinion, correct?

A. In my opinion.

Q. Why is it included in this document then if it doesn't apply?

A. Because they're talking about working -- and the Kankakee Police Department has a lot of contractual agreements for providing law enforcement

Page 196

services, and that's not off-duty employment, secondary employment that is not conditioned on the actual potential use of law enforcement powers. So that it says right there, that doesn't apply to that one.

Q. To that one being -- hold on, hold on, being 1040.7. You're saying that 1040.7 does not refer to off-duty employment as referenced in this policy?

A. Right, because it's actually using -- doing law enforcement powers.

Q. It's a policy that's documented -- the headline is Outside Employment. You're saying that it was erroneously included on the policy for outside employment because it doesn't pertain to outside employment? Is that your testimony?

A. No.

Q. So it does apply to the policy on outside employment?

A. No, it doesn't. It spells it out right there it doesn't.

Q. Okay. Real quick. We'll make this Kosman 2.

Page 197

(Whereupon, Kosman Deposition Exhibit No. 2 was marked for identification.)

BY MR. HERBERT:

Q. Have you seen this document before?

A. I have to read it first. Yes.

Q. Yes, you've seen that document?

A. Yes.

Q. Okay. Do you remember when you first saw that document? Was it during the time period that you were chief?

A. Yes, and it was probably the last year, so not the first year. I saw it later.

Oh, wait, sometime in there. I guess I'll just have to say sometime in there because I don't remember.

Q. Sometime in where?

A. Sometime within two years I was chief there.

Q. Okay. But you don't remember at any point within those two years that you saw this document?

A. I don't remember when that was.

Page 198

Q. Okay. Well, the document is alleging criminal conduct by one of your commanders, correct?

A. Correct.

Q. And it's alleging criminal conduct against your deputy chief, correct?

A. Well, he's saying that they're discussing becoming involved with the -- but he ends by saying he thinks there is illegal activity going on.

Q. Yeah. And I'm not going to quibble with you, but are you telling me that looking at that document as chief of police and someone who's been in law enforcement for 25 years that those are not allegations of illegal conduct by your Deputy Chief Willie Hunt?

A. Well, he says in there it's his belief there's illegal activity going on.

Q. I know what it says.

A. But he also doesn't mention any illegal activity in there, but you're asking me if he did something wrong. Having negotiations with using Auto-Lab wouldn't make it illegal.

Q. Okay. So it's your testimony that reading that letter you don't believe that there is any allegations made against Willie Hunt of a

Page 199



**Frank Kosman Backwrite** - 3/23/2022
2:20-cv-02310-CSB-EIL #172-3 Page 53 of 90
Paul Berge, et al. vs. City of Kankakee, et al.

1 criminal nature?

2     **A. I don't understand any kind of**

3 **allegations. I mean, he says at the end there's an**

4 **allegation or a belief, but he doesn't say anything**

5 **in there that it is.**

6     Q. Okay. So based upon reading that, you

7 don't take that as an allegation against Willie Hunt

8 as far as illegal conduct?

9     **A. Correct.**

10     Q. As far as anything improper?

11     **A. Correct.**

12     Q. Okay. The same thing with Mayor Wells.

13 That letter alleges criminal conduct against Mayor

14 Chasity Wells.

15     **A. The same thing.**

16     Q. The same thing, no, it does not?

17     **A. Right. It doesn't spell out anything**

18 **that they did. It just says he believes it. In the**

19 **content, the body of it, it doesn't say what would be**

20 **illegal.**

21     Q. So you would need to do more

22 investigation to determine if illegal activity -- if

23 these allegations were in fact true?

24     **A. True.**

1     Q. Tell us what investigative steps you took

2 to determine if your deputy chief was involved in

3 criminal activity.

4     MR. MCGRATH: Objection. Form of the

5 question, incomplete hypothetical.

6     THE WITNESS: I don't think there was any

7 criminal activity.

8 BY MR. HERBERT:

9     Q. Tell me what investigative --

10     **A. None.**

11     Q. You didn't take one investigative step to

12 determine whether or not there's criminal activity?

13     **A. Correct.**

14     Q. Well, then how in the world would you

15 know if the allegations are true or false?

16     **A. There's nothing in there to be -- if it**

17 **was true, they were negotiating with them about doing**

18 **the work for the -- mechanical work for the squad**

19 **cars. It wouldn't be illegal to talk about that.**

20     Q. So based upon your reading of this

21 document, it's your belief that there is no need to

22 conduct any investigation because it is patently

23 false by looking at just the face of the document.

24 Is that your testimony?

1     **A. The facts might be true, but it doesn't**

2 **rise to a crime. I think negotiations would be good**

3 **to find out what they -- if a company could do a**

4 **better job or do it for less. You would negotiate**

5 **with any company.**

6     Q. Did you ever talk to Austin about, why

7 did you think this was criminal?

8     **A. I don't think so.**

9     Q. Well, he worked under your command,

10 right?

11     **A. This was from 2018.**

12     Q. He worked under your command at the point

13 that you found out --

14     **A. He wrote this a year and a half before.**

15     Q. He worked under your command at the point

16 in which you found out that Austin made a criminal

17 allegation, correct?

18     **A. I don't consider that a criminal**

19 **allegation. I consider this more of a -- somebody**

20 **doing something to cover themselves so they're not**

21 **going to get involved in case something does go**

22 **wrong, bad in the future.**

23     Q. Okay. When Austin made this allegation,

24 whether or not you believe it's criminal, Austin,

1 when you found out about it, Austin worked for you,

2 correct?

3     MR. MCGRATH: Objection. Form of the

4 question, incomplete hypothetical. It's an e-mail he

5 also wrote to himself, so I'm not sure if it's a

6 notation for an investigation or a criminal act to

7 anyone within the department.

8     But you can answer.

9     THE WITNESS: Austin, he was the patrol

10 commander.

11 BY MR. HERBERT:

12     Q. Under you?

13     **A. Yes.**

14     Q. And when you found out about this

15 allegation, and part of the allegation is against

16 Willie Hunt, whether it be a criminal allegation or

17 not, Willie Hunt was your deputy chief, correct?

18     **A. Correct.**

19     Q. And you didn't conduct any

20 investigation -- you never talked to Austin about

21 these allegations, correct?

22     **A. I don't believe so.**

23     Q. You never talked to Hunt about these

24 allegations, correct?

Frank Kosman Backwrite - 3/23/2022
2:20-cv-02316-CSB-EIL #17-3 Page 54 of 90
Paul Berge, et al. vs. City of Kankakee, et al.

Page 204

1    A.  I don't remember.
2    Q.  You don't remember if you talked to Hunt
3 about --
4    A.  I don't remember how I got -- I remember
5 seeing this, but I don't remember where I seen this
6 at.
7    Q.  I'm not asking you how you got it.
8    A.  I don't remember.
9    Q.  I'm asking you if you ever talked to
10 Hunt?
11    A.  And I answered I don't remember.
12    Q.  You don't remember?
13    A.  I don't remember.
14    Q.  Don't you think that would be something
15 you'd remember --
16    A.  No.
17    Q.  -- talking to your deputy chief --
18    A.  I talked to him every day.
19    Q.  You've got to let me finish.
20    MR. MCGRATH:  Objection.  Argumentative.
21 BY MR. HERBERT:
22    Q.  Don't you think that would be something
23 you would remember, talking to your deputy chief,
24 your No. 2 about allegations made by your commander?

Page 205

1    MR. MCGRATH:  Objection.  Asked and answered,
2 argumentative.
3    THE WITNESS:  I don't remember.
4 BY MR. HERBERT:
5    Q.  Did you ever talk to the mayor about
6 these allegations when you found out about them when
7 you were the chief under her?
8    A.  No.
9    Q.  Were you afraid that you would upset the
10 mayor if you talked to her about these allegations
11 when you found out about them?
12    A.  No.
13    Q.  Then why didn't you talk to her about it?
14    A.  I didn't take it seriously.  It didn't
15 make sense.  It sounded like a little bit -- it
16 sounded to me just a guy writing something to protect
17 himself in case something goes wrong in the future,
18 and so that's why I think it was -- nothing went
19 wrong in the future, so this was like old news and it
20 didn't have any -- it wasn't important.
21    Q.  So you believe that Austin
22 mischaracterized this behavior when he called it
23 criminal behavior, correct?
24    A.  I think he probably had limited

Page 206

1 information, and I think he mischaracterized it.
2    Q.  Do you think he made a false complaint?
3    A.  I don't think he made a complaint.  He
4 never made it -- I don't think so.
5    Q.  Do you think he made false allegations
6 about criminal conduct against Hunt and the mayor?
7    MR. MCGRATH:  Objection.  Form of the
8 question, an incomplete hypothetical, it calls for
9 speculation.  It's an e-mail to the same person.
10    THE WITNESS:  I think he did it just because
11 he wanted to protect himself.
12 BY MR. HERBERT:
13    Q.  Do you think he made false allegations
14 contained within this document about Hunt and the
15 mayor?
16    A.  I don't think the allegations are wrong
17 in reference to the talking to another mechanic shop
18 in town about handling the department's oil changes
19 and maintenance.  I would think they probably did
20 that, but I don't think that rises to a criminal
21 matter.
22    Q.  I'm not asking about your opinion here.
23 I'm talking Hunt made what he believed were criminal
24 allegations.  Do you agree with me on that?

Page 207

1    A.  No, because you're talking about Austin.
2    Q.  Austin.  I apologize.  Austin made what
3 he characterized as criminal allegations, correct?
4    A.  Well, he says "appears to have elements
5 of corruption," and then he comes in here, "It is my
6 belief illegal activity going on in relation to this
7 business."  So I'll go with his words, whatever --
8 what he says.
9    Q.  Well, what do those words mean to you?
10 You've taken complaints from individuals.  Do you
11 believe that Hunt made a criminal complaint, that he
12 alleged criminal misconduct?
13    MR. MCGRATH:  Objection.  Form of the
14 question, compound, it calls for speculation.
15    THE WITNESS:  I think he's alleging that
16 there may be criminal conduct that happened in 2018,
17 but you'd have to ask him about -- more in reference
18 to the basis on that.  I don't think that there was
19 because it didn't happen.
20 BY MR. HERBERT:
21    Q.  You didn't do that, did you?  You didn't
22 ask him?
23    A.  No, because there was -- the problem
24 with -- in Kankakee is they have a very loose process



Frank Kosman Backwrite - 3/23/2022
Paul Berge, et al. vs. City of Kankakee, et al.
2:20-cv-02310-CSB-EIL # 17-3 Page 55 of 90

1 for repairing the squad cars. I tried to get it in a
2 bidding -- when this kind of thing came up, I tried
3 to get it into a regular bidding process for it and
4 the board of the Public Safety Committee turned it
5 down. They said just share it --
6   Q. I'm not concerned about that.
7   A. That's why I didn't do an investigation
8 on it. The board just wanted us to share the
9 mechanical work on the squad cars throughout the
10 city.
11   Q. Did you order anyone in the Kankakee
12 Police Department to look into the allegations raised
13 in Kosman 2?
14   A. No.
15   Q. Do you know if anyone in the Kankakee
16 Police Department did look into the allegations
17 raised in that letter?
18   A. No, I don't.
19   Q. It would be fair to say you didn't have a
20 lot of control in that police department?
21   A. No, I had a lot of control. I decided
22 not to follow up on something that was two years old.
23   Q. You didn't make a lot of the decisions
24 though, did you?

Page 208

1   A. I'm sorry?
2   Q. You didn't make a lot of the decisions
3 within the police department, did you?
4   A. I think I made a lot of decisions within
5 the police department.
6   Q. Just not the big ones that involved the
7 mayor and your deputy chief, right?
8   MR. MCGRATH: Objection. Form of the
9 question, argumentative.
10   THE WITNESS: Wrong.
11   MR. HERBERT: All right. I don't think I
12 have anything further.
13   MR. MCGRATH: I have a few follow-ups.
14       EXAMINATION
15 BY MR. MCGRATH:
16   Q. And let's start with the last topic with
17 Lieutenant Austin's April 13, 2018 e-mail to himself
18 regarding what he believed illegal activity going on
19 in relation to the AutoZone or Auto-Lab, correct?
20   A. Correct.
21   Q. Do you know if Donell Austin who was a
22 lieutenant in April of 2018, if he initiated any
23 investigation based upon his belief that there was
24 criminal activity?

Page 209

1   MR. HERBERT: I'm going to object,
2 foundation. This chief didn't do a thing to look
3 into this allegations.
4   MR. MCGRATH: I'm not talking about the
5 chief.
6 BY MR. MCGRATH:
7   Q. I'm talking about Lieutenant Austin in
8 2018, other than writing an e-mail to himself --
9   MR. HERBERT: Right, objection. Just finish
10 your question, sorry.
11 BY MR. MCGRATH:
12   Q. Other than writing an e-mail to himself
13 in April of 2018 wherein he states to himself, I
14 believe that there's illegal activity going on in
15 relation to this business, that being the Auto-Lab,
16 do you know whether or not Lieutenant Austin ever
17 opened up an investigation regarding the Auto-Lab in
18 April 2018 or on any date after?
19   MR. HERBERT: Objection. It's putting in
20 facts that are not in evidence. There's no testimony
21 that this chief is aware that Austin was writing this
22 to himself other than the from/to box, but that could
23 have gone to anyone, I mean.
24

Page 210

1 BY MR. MCGRATH:
2   Q. It's addressed to himself, correct? Do
3 you still have the exhibit in front?
4   MR. HERBERT: And foundation because the
5 chief has already testified to his lack of any
6 investigation into this complaint.
7 BY MR. MCGRATH:
8   Q. Right, we went through that. It's clear
9 you didn't open up an investigation or look into it
10 any further, correct?
11   A. Correct.
12   Q. All right. After reviewing documents and
13 becoming the chief, did you see anything that
14 indicated that Lieutenant Austin, based upon his
15 belief that there was illegal activity, that he
16 conducted or had an investigation opened up from the
17 date of April 13, 2018 until the date you became
18 chief the next year?
19   MR. HERBERT: I'm going to object. Other
20 than him looking at this letter because that's all
21 he's identified that he's done in relation to this,
22 so if the question is based upon -- based upon
23 reading this paragraph, then I think it's a proper
24 question. So that's my objection.

Page 211



**Frank Kosman Backwrite  -  3/23/2022**
2:20-cv-02310-CSB-EIL  #172-3  Page 56 of 90
Paul Berge, et al. vs. City of Kankakee, et al.

1    Obviously, you can answer.

2    BY MR. MCGRATH:

3    Q.  You understand the question, right?

4    **A.  Do I know if he did -- took any further?**

5    Q.  Right.  Did he open up an investigation?

6    Did he look into it?

7    **A.  I didn't.**

8    Q.  I'm not asking about you.  I'm asking

9    about Lieutenant Austin, that he takes it upon

10   himself to write an e-mail that, boy, I think there's

11   illegal activity going on and I'm a lieutenant in the

12   department.  Do you know whether or not Lieutenant

13   Austin, and this is all prior to you becoming chief,

14   if he opened up an investigation or went to anyone

15   within the department and said, "We have to look into

16   this"?

17       MR. HERBERT:  Objection.  Foundation.  He

18   would have no way of knowing because he didn't do

19   anything.

20       Go ahead.

21   BY MR. MCGRATH:

22   Q.  Did you see anything like that from the

23   time of this e-mail, April 2018, until the time that

24   you became chief, that anything was done within the

Page 212

1    Kankakee Police Department at the request of

2    Lieutenant Austin?

3    MR. HERBERT:  Objection.  Foundation.

4       You can answer.  You can answer.

5    THE WITNESS:  No, I don't know.

6    BY MR. MCGRATH:

7    Q.  Okay.  Are you aware that Lieutenant

8    Austin referred this matter to the FBI?

9    **A.  I don't know.**

10   Q.  All right.  Would you agree that the

11   investigative resources of the FBI are greater than

12   the Kankakee Police Department?

13   MR. HERBERT:  Objection.  Relevance.

14   BY MR. MCGRATH:

15   Q.  Would you agree?

16   **A.  Yes.**

17   Q.  All right.  Just on the size, the budget?

18   **A.  I hate to do that.**

19   Q.  But they have greater resources?

20   **A.  Yeah.**

21   Q.  Were you ever contacted while you were

22   the chief by the FBI in regards to any correspondence

23   that Lieutenant Austin sent to the FBI in regards to

24   his belief that there was illegal activity concerning

Page 213

1    the Auto-Lab in the City of Kankakee?

2       MR. HERBERT:  I'm going to object to the form

3    of the question.  It's not illegal activity with the

4    Auto-Lab.  It's the illegal activity of the mayor,

5    deputy chief, and the former chief.

6    BY MR. MCGRATH:

7    Q.  Right.  It says, "Illegal activity going

8    on in relation to this business."

9       So did you ever hear from the FBI

10   that they looked into any allegations made by

11   Lieutenant Austin in relation to Willie Hunt, the

12   mayor, Auto-Lab, former Chief Price Dumas?  Were you

13   ever contacted by the FBI while you were the chief?

14   **A.  No.**

15   Q.  As far as the EEOC complaints by Berge

16   and Kreissler, do you recall that issue being brought

17   up during the Berge hearing, that Berge had filed an

18   EEOC complaint?

19   **A.  Yes.**

20   Q.  All right.  Was that the first time you

21   ever heard that Berge ever filed an EEOC complaint

22   against the city or the department based upon

23   discrimination for being skipped over on the

24   promotional list?

Page 214

1    **A.  Yes.**

2       MR. HERBERT:  Objection.  It misstates the

3    evidence.  He already said that -- oh, I'm sorry.

4    I'll withdraw my objection.

5    THE WITNESS:  Yes.

6    BY MR. MCGRATH:

7    Q.  Okay.  And at the time of the hearing,

8    did you testify that you had not received any EEOC

9    complaint?

10   **A.  Yes.**

11   Q.  All right.  Do you know if you ever

12   received the EEOC complaint after the day of the

13   hearing when Berge was ultimately terminated from the

14   police department?

15   **A.  Yes.**

16   Q.  You received that complaint?

17   **A.  I think so.**

18   Q.  Okay.  Did you receive that at the police

19   department, or did you receive it from human

20   resources, or did you receive it from the city's

21   legal department, if you remember?

22   **A.  I don't remember.  I think it would have**

23   **gone through the city.  I don't know exactly how**

24   **that...**

Page 215

Frank Kosman Backwrite - 3/23/2022
Paul Berge, et al. vs. City of Kankakee, et al.
2:20-cv-02310-CSB-EIL #17-3 Page 57 of 90

1  Q.  The issue with Sneed, when he was a
2  sergeant in the gang unit and the question regarding
3  the overhears.  Do you remember that line of
4  questioning?
5     A.  Yes.
6     Q.  So correct me if I'm wrong, but he was
7  the sergeant of the gang unit and they were using
8  equipment from KAMEG they weren't familiar with,
9  correct?
10    A.  Obviously, yes.
11    Q.  All right.  And as a result of not being
12 familiar with the equipment, they made audio and
13 video recordings of these control --
14    MR. HERBERT:  I'm going to object.
15 Foundation for him to say what the reason was why
16 they did it.  He didn't conduct an investigation into
17 it.
18 BY MR. MCGRATH:
19    Q.  Were you told by the State's Attorney or
20 any officers within the department of how the
21 overhears included audio and video?
22    A.  Ask me that again.  I'm sorry.
23    Q.  You were contacted by the State's
24 Attorney's office --

Page 216

1     A.  Right.
2     Q.  -- that there was a number of cases that
3  had to be thrown out because there was a violation of
4  the rules, correct?
5     A.  Right.  They dismissed them because there
6  was audio and it should only have been video.
7     Q.  Right.  And did you talk to anyone from
8  either the State's Attorney's office or within your
9  department on how that happened?
10    A.  Yes.
11    Q.  All right.  Who did you talk to?
12    A.  I talked to Sneed.
13    Q.  Who else did you talk to?
14    A.  I probably talked to Martin.
15    Q.  Who else did you talk to?
16    A.  I think those were the guys that were
17 most involved in that.
18    Q.  All right.  Did you learn that they are
19 borrowing or using KAMEG equipment that they weren't
20 familiar with?
21    A.  Yes.
22    Q.  Was that the cause of why there was audio
23 and video in violation of the rules?
24    MR. HERBERT:  Objection.  Foundation.  If

Page 217

1  anything it's based upon a self-serving statement of
2  somebody, if in fact they said that.
3  BY MR. MCGRATH:
4     Q.  You can answer.
5     A.  They misused it.  It was only supposed to
6  be video and it had the audio in there.  They thought
7  it was not covering it or they -- the video wouldn't
8  be there or the audio wouldn't be there, and it was
9  audio and video.
10    Q.  Did it appear to you to be a mistake or
11 was it an intentional act of the three members of
12 your gang unit to audio and videotape these
13 control --
14    MR. HERBERT:  Objection.  Foundation.  He
15 didn't conduct a formal investigation as was required
16 per department policy.
17 BY MR. MCGRATH:
18    Q.  You can go ahead and answer.
19    A.  I think it was a mistake.
20    Q.  Okay.  Do you know how many cases had to
21 be dismissed by the State's Attorney's office as a
22 result of the mistake in using the KAMEG equipment?
23    MR. HERBERT:  Objection.  Form of the
24 question.

Page 218

1     You can answer.
2     THE WITNESS:  I don't know exactly, but I
3  know it wasn't that -- it wasn't -- my understanding,
4  it wasn't a lot.
5  BY MR. MCGRATH:
6     Q.  By a lot, was it a handful?
7     A.  And I don't have a number.
8     Q.  Okay.  Did any of those individuals that
9  were arrested and charged and their cases ultimately
10 dismissed based on the misuse of the KAMEG recording
11 equipment, did any of them file a lawsuit against the
12 City of Kankakee that you know of?
13    A.  No.
14    Q.  And you were asked a lot of questions
15 about whether or not that violated their
16 constitutional rights.  In your experience in law
17 enforcement, you're familiar with motions that are
18 filed by criminal defense attorneys on behalf of
19 their clients, a motion to quash, a motion to
20 suppress evidence, correct?
21    A.  Correct.
22    Q.  And if those motions are granted by a
23 court, is the court finding that the rules or the
24 constitutional provisions aren't followed and that's

Page 219



**Frank Kosman Backwrite - 3/23/2022**
2:20-cv-02310-CSB-EIL # 117-3 Page 58 of 90
**Paul Berge, et al. vs. City of Kankakee, et al.**

1  why the evidence is suppressed?

2  MR. HERBERT: Objection. Relevance. These

3  cases were not dismissed on a motion. They were

4  dismissed upon the State's Attorney discovering

5  illegal activity and it was dismissed on behalf of

6  the People of the State of Illinois and the County of

7  Kankakee.

8  BY MR. MCGRATH:

9  Q. Okay. You can answer.

10  **A. Yes.**

11  Q. Sneed's personnel file, you reviewed that

12  obviously a couple of years ago when you made the

13  decision to promote him. As you sit here today, do

14  you remember what was in his file as it relates to

15  discipline?

16  **A. The only one I remember was the one that**

17  **we spoke about, the accidental discharge.**

18  Q. All right. Was there a discharge or was

19  there an improper brandishing of a weapon? Are you

20  sure that there was a misfire?

21  MR. HERBERT: I'm going to object. I don't

22  think there's any dispute there was a misfire,

23  certainly based on his testimony and based upon the

24  evidence given to me by the chief.

Page 220

1  THE WITNESS: I thought there was a misfire.

2  BY MR. MCGRATH:

3  Q. Okay. Do you know, did that happen prior

4  to you becoming chief?

5  **A. Yes.**

6  Q. Do you know if that occurred years before

7  you becoming chief?

8  **A. I don't recall right now.**

9  Q. Are you aware that Sneed was promoted

10  over two non-blacks when he was promoted to sergeant

11  by a prior administration?

12  **A. You know, I didn't remember that, but I**

13  **don't know if that's -- I don't know if that's true**

14  **or not. It may have -- I don't know.**

15  Q. I can represent to you that that did

16  occur. Do you have any opinion on Lieutenant Sneed's

17  performance as a police officer given the fact that

18  he has been chosen by you over two white officers to

19  become lieutenant, and under a prior chief and

20  administration he was chosen over two non-blacks to

21  become sergeant? Would that reflect Officer Sneed

22  now Lieutenant Sneed as being a well-established

23  veteran, hard working officer of the Kankakee Police

24  Department?

Page 221

1  MR. HERBERT: Objection. Form of the

2  question, foundation for this witness, speculation.

3  THE WITNESS: Yes.

4  MR. HERBERT: Relevance. He didn't consider

5  that fact.

6  BY MR. MCGRATH:

7  Q. When you came on-board and were appointed

8  as the police chief, were you confirmed by the city

9  council?

10  **A. Yes.**

11  Q. And at the time Willie Hunt was the

12  deputy chief, correct?

13  **A. Yes.**

14  Q. And Donell Austin was one of the

15  commanders?

16  **A. Yes, patrol commander.**

17  Q. And you did not demote or change Donell

18  Austin from that position, correct?

19  **A. Correct.**

20  Q. You heard the name of Jay Etzel. How do

21  you spell his last name?

22  **A. E-t-z-e-l.**

23  Q. All right. And what was Jay Etzel's

24  position when you became police chief?

Page 222

1  **A. He was lieutenant in patrol.**

2  Q. Who was the other commander along with

3  Donell Austin when you were appointed as police

4  chief?

5  **A. There was none, and Tim Kreissler was the**

6  **acting commander as Dave Skelly retired some time in**

7  **May. I think he may have been still on the books in**

8  **May, but he was like on vacation or whatever and he**

9  **was going to be leaving.**

10  Q. Did you ever promote or make any officer

11  a second commander alongside of Donell Austin?

12  **A. Yes, Jay Etzel was the detective**

13  **commander.**

14  Q. And Jay Etzel is white, correct?

15  **A. Yes.**

16  Q. And you promoted Jay Etzel from

17  lieutenant to commander, correct?

18  **A. Correct.**

19  Q. During the time you were chief of the

20  Kankakee Police Department, did you ever promote any

21  other individuals off of any promotional list other

22  than Michael Sneed?

23  **A. Yes.**

24  Q. Did you promote any white officers to

Page 223



**Frank Kosman Backwrite - 3/23/2022**
2:20-cv-02310-CSB-EIL  #173-3  Page 59 of 90
**Paul Berge, et al. vs. City of Kankakee, et al.**

1  sergeant or any white sergeants to lieutenant?

2  **A.  Yes.**

3  Q.  And can you tell me the names and who you

4  promoted to what rank?

5  **A.  Coash.**

6  MR. HERBERT:  How do you spell it?  I'm

7  sorry.

8  THE WITNESS:  C-o-a-s-h was promoted to

9  sergeant.

10 BY MR. MCGRATH:

11 Q.  What's his race?

12 **A.  Male white.  And then -- I'm getting old**

13 **now.  A female white officer.**

14 Q.  To what rank?

15 **A.  Sergeant.**

16 Q.  Do you remember her name?

17 **A.  I'm trying to think of it.  I forgot.**

18 **Terrible.**

19 Q.  Any other officers to sergeant or

20 sergeants to lieutenant other than Michael Sneed,

21 Coash and the female white that you can't remember

22 her name?

23 MR. HERBERT:  I'm sorry.  Are you asking just

24 white people that he promoted or any promotions?

1  MR. MCGRATH:  Any promotions.

2  THE WITNESS:  Any promotions.  And then there

3  was Jose Hernandez promoted to sergeant.  Joseph

4  Hernandez.

5  BY MR. MCGRATH:

6  Q.  Joseph?

7  MR. HERBERT:  That's a different guy?

8  THE WITNESS:  Yes.

9  BY MR. MCGRATH:

10 Q.  So Jose and?

11 **A.  There's a Jose Hernandez and then -- or**

12 **is it Hernandez?  Yeah.  I'm sorry.  It's Martinez.**

13 **It's Jose Martinez and Jose -- it's not Hernandez,**

14 **it's Martinez.**

15 Q.  Any others that you promoted?

16 **A.  I think I was still there when Kreissler**

17 **was promoted.  Yeah, I may have still been there when**

18 **Kreissler was promoted.**

19 Q.  To what position was he promoted?

20 **A.  From sergeant to lieutenant.  I think I**

21 **was there.  It was near the end of my tenure there,**

22 **but I think he was promoted.**

23 Q.  And Jay Etzel, is he still with the

24 department?

1  **A.  Well, I think -- he had retired in**

2  **January of '21, but I think he's back as their CALEA**

3  **manager part time.**

4  Q.  So he retired while you were still chief?

5  **A.  Yes.**

6  Q.  You talked a little bit about when you

7  became chief, you interviewed 50 to 60 officers.  Was

8  that your intent to get to know members of the police

9  department that you were in charge of?

10 **A.  Yes.**

11 Q.  Because you came from the outside.  You

12 had no contacts with the City of Kankakee until you

13 were hired.  Is that fair to say?

14 **A.  Correct.**

15 Q.  And when you met with the 50 to 60

16 officers within the department, how long would you

17 meet with them typically?

18 **A.  Ten minutes.**

19 Q.  Would that occur one-on-one in your

20 office?

21 **A.  Yes.**

22 Q.  Was that set by schedule, or did you have

23 an open door policy, or how was it that you had --

24 **A.  Some was scheduled, some was just -- they**

1  were there at roll call and say, "Come on and see

2  me."

3  Q.  And you believe you took some notes when

4  you interviewed these officers or met with these

5  officers, correct?

6  **A.  Yes.**

7  Q.  And I believe you stated you did so to

8  help you remember the names of some of these

9  officers?

10 **A.  Yes, and their -- you know, which one**

11 **went to college.  You know, just background on them.**

12 Q.  There was a lot of questions about

13 Facebook posts and whether or not you investigated

14 Facebook posts or the groups that made Facebook

15 posts.  While you were chief, did you ever print out

16 any Facebook posts?

17 **A.  I'm thinking I probably did for the one**

18 **about the target that they -- somebody made a report.**

19 Q.  Was that a target directed at then Mayor

20 Chasity Wells-Armstrong?

21 **A.  Yes.**

22 Q.  And then you opened up an investigation

23 into that Facebook post?

24 **A.  Yes.**

**Frank Kosman Backwrite - 3/23/2022**
Paul Berge, et al. vs. City of Kankakee, et al.
2:20-cv-02310-CSB-EIL # 17-3 Page 60 of 90

1    Q.   And what was the purpose of that
2  investigation?
3       A.   To see if there was a criminal
4  investigation, and because of a conflict of interest,
5  I requested the State Police look into it.
6       Q.   And did you ask them to look into who was
7  behind the post on Facebook?
8       A.   Well, I think it was -- that was easy.
9  That was already known.
10      Q.   Do you remember the name of the person or
11 persons who made that post?
12      A.   No, I don't.
13      Q.   Did the State Police conduct their
14 investigation?
15      A.   Yes.
16      Q.   Were there any criminal charges lodged
17 against anyone based upon that State Police
18 investigation?
19      A.   No.
20      Q.   It was at the end of that investigation?
21      A.   Yes.
22      Q.   Did your department look into that
23 particular person or the Facebook post or site any
24 further after the State Police conducted their

Page 228

1  investigation?
2       A.   No.
3       MR. MCGRATH:  All right.  That's all I have.
4       MR. HERBERT:  Real briefly, I promise.
5            FURTHER EXAMINATION
6  BY MR. HERBERT:
7       Q.   You talked about how Kreissler was made
8  the acting commander at some point?
9       A.   When I took over, he was the acting
10 commander.
11      Q.   Okay.  The acting commander of what unit?
12      A.   Detectives.
13      Q.   Okay.  And his career service rank was
14 that of a sergeant, correct?
15      A.   Correct.
16      Q.   And a commander, that would be an exempt
17 rank position, correct?
18      A.   Correct.
19      Q.   And it would be -- on the hierarchy it
20 would be above lieutenant, correct?
21      A.   Correct.
22      Q.   So Kreissler was made acting commander
23 over anyone of his rank, correct?
24      A.   Correct.

Page 229

1    Q.   And he was made acting commander of any
2  other lieutenants, correct?
3       A.   Correct.
4       Q.   And have you ever made acting commanders?
5       A.   In Bensenville we had acting shift
6  commanders which was basically just patrol, but not
7  commander.  We didn't have a commander level.
8       Q.   But making somebody in a position two
9  ranks above their rank, that's somewhat unusual,
10 isn't it?
11      A.   Yes.
12      Q.   Okay.  And do you know why Kreissler was
13 made acting commander in this case?
14      A.   I think because he was there.  He was a
15 sergeant in detectives, and everyone else was
16 assigned other places, so they just made him the
17 acting.  He probably handled stuff while Commander
18 Skelly was gone, on vacation and everything, so they
19 just kept him there for the time being.
20      Q.   Do you know why, or are you just
21 speculating?
22      A.   I'm speculating.  I wasn't there when
23 they made him.
24      Q.   Okay.  Would you agree with me part of

Page 230

1  the reason he was made is because he was considered
2  competent in his job?
3       A.   Yes.
4       Q.   Considered the most competent person to
5  fill that position of active commander, correct?
6       A.   In detectives, yes.
7       Q.   Well, in any rank?
8       A.   You know, I don't know there's -- no.  I
9  mean, there was lieutenants like Kidwell that could
10 have went in there and done it, other people that
11 could have done it, but he just decided to stay, to
12 do it -- with that.  I wouldn't say he was most
13 competent.  He was competent to do it.
14      Q.   But out of anyone that was eligible for
15 that position, he was chosen, correct, Kreissler?
16      A.   Like I said, it was before my time but,
17 yes, he was chosen.
18      Q.   Did you consider that factor -- or I'm
19 sorry.  Strike that.
20            And while he was acting commander,
21 he was the commander of the entire unit, correct?
22      A.   Correct.
23      Q.   He was the commander in charge of the
24 detective division, in charge of all the detectives,

Page 231

Frank Kosman Backwrite - 3/23/2022
Paul Berge, et al. vs. City of Kankakee, et al.
2:20-cv-02310-CSB-EIL #17-3 Page 61 of 90

1 correct?

2 **A. Correct.**

3 Q. And the detectives investigate the most

4 serious crimes within Kankakee, correct?

5 **A. Correct.**

6 Q. And did you consider the fact that

7 Kreissler had served as an acting commander at the

8 point in which you decided to bypass him with Michael

9 Sneed?

10 **A. Yes.**

11 Q. And you talked about the various

12 promotions that you made, Coash, the female sergeant,

13 Hernandez, and Martinez. Do you remember that?

14 **A. Yes.**

15 Q. Were those individuals promoted based off

16 of rank order?

17 **A. Yes.**

18 Q. Were there any black individuals within

19 the top three for any of those promotions?

20 **A. No.**

21 MR. HERBERT: I have nothing else.

22 MR. MCGRATH: Okay. We'll waive signature.

23    (Deposition concluded at 4:58 p.m.)

24

Page 232



Frank Kosman Backwrite - 3/23/2022
2:20-cv-02310-CSB-EIL # 17-3 Page 62 of 90
Paul Berge, et al. vs. City of Kankakee, et al.

```
 1                REPORTER'S CERTIFICATE

 2

 3          I, Brenda S. Hall, CSR No. 084-003359,

 4  Certified Shorthand Reporter of said state, do hereby

 5  certify:

 6          That previous to the commencement of the

 7  examination of the witness, the witness was duly

 8  sworn to testify the whole truth concerning the

 9  matters herein;

10          That the foregoing deposition transcript was

11  reported stenographically by me, was thereafter

12  reduced to typewriting under my personal direction

13  and constitutes a true record of the testimony given

14  and the proceedings had;

15          That the said deposition was taken before me

16  at the time and place specified;

17          That I am not a relative or employee or

18  attorney or counsel, nor a relative or employee of

19  such attorney or counsel for any of the parties

20  hereto, nor interested directly or indirectly in the

21  outcome of this action.

22

23

24
```



Frank Kosman Backwrite - 3/23/2022
2:20-cv-02310-CSB-EIL # 17-3 Page 63 of 90
Paul Berge, et al. vs. City of Kankakee, et al.

1          IN WITNESS WHEREOF, I do hereunto set my hand

2     at Chicago, Illinois, this 12th day of April, 2022.

3

4

5                    _____

6                    Certified Shorthand Reporter

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24



**Frank Kosman Backwrite - 3/23/2022**
2:20-cv-02310-CSB-EIL # 17-3 Page 64 of 90
Paul Berge, et al. vs. City of Kankakee, et al.

## WORD INDEX

**< 0 >**
**04** 48:*19*
**084-003359** 1:*17*
*233:3*

**< 1 >**
**1** 3:*14* 110:*1*
192:*20, 22* 196:2
**100** 1:*19* 2:3
**1040** 3:*14* 193:*3*
**1040.7** 195:*10*
*197:7*
**11th** 101:*14, 18*
**12:00** 1:*18*
**12th** 234:2
**13** 132:*8* 209:*17*
211:*17*
**15** 90:*21*
**16** 113:*1* 115:*3*
**19** 185:*4, 6*
**192** 3:*14*
**198** 3:*15*

**< 2 >**
**2** 3:*15* 47:*20*
110:*1* 197:*23*
198:2 204:*24*
208:*13*
**2003** 48:*19*
**2005** 180:4
**2018** 95:*24* 202:*11*
207:*16* 209:*17, 22*
210:8, *13, 18*
211:*17* 212:*23*
**2019** 11:*1, 3, 5*
89:*17* 90:*1* 96:*1*
185:*10, 17*
**2020** 121:*14* 132:8
**2021** 5:*21* 11:8
**2022** 1:*18* 234:2
**206** 1:*18* 2:*3*
**209** 3:*5*
**20-cv-2310** 1:*6* 4:*9*
**21** 226:2
**22** 107:*16*
**229** 3:*4*
**23** 1:*18*
**25** 10:*18* 199:*12*

**< 3 >**
**3** 180:*16*
**30** 190:*18*
**312** 2:*4*
**3318** 2:*8*

**< 4 >**
**4/27/21** 193:*24*
**4:58** 232:*23*
**40** 45:*11*
**424-5678** 2:*9*
**4th** 101:*11*

**< 5 >**
**5** 3:*1*
**5:00** 11:*12*
**50** 82:8 84:*21*
85:*9* 88:*15* 226:7,
*15*

**< 6 >**
**60** 82:6, *7, 8* 83:*23*
84:*21* 85:*9* 88:*15*
110:*11* 226:7, *15*
**60661** 2:*4*
**60805** 2:*8*
**60s** 82:*11*
**655-7660** 2:*4*

**< 7 >**
**7:00** 11:*13*
**708** 2:*9*

**< 9 >**
**9:00** 11:*12*
**90** 110:*11*
**95th** 2:*8*

**< A >**
**ability** 93:*18, 20*
98:*21*
**able** 41:*20* 107:2,
*10* 161:*15*
**above-entitled** 1:*15*
**academy** 141:*16, 18*
167:*21*
**accidental** 143:*13*
220:*17*
**accidentally** 143:2,

**9** 144:*7*
**accidents** 144:*24*
**account** 53:*12, 21*
62:*7*
**accountable** 90:*8,*
*10, 24* 91:*10, 15, 18,*
*23* 92:*1, 3, 5, 7*
**accounts** 58:*1*
60:*24* 62:6
**accurately** 45:*2*
173:*17*
**accused** 153:*23*
156:*10*
**acquainted** 92:*21*
**act** 27:*5* 203:*6*
218:*11*
**acting** 112:*5*
132:*19, 20* 223:*6*
229:8, *9, 11, 22*
230:*1, 4, 5, 13, 17*
231:*20* 232:*7*
**action** 233:*21*
**actions** 144:*5*
156:*14*
**active** 231:*5*
**activity** 90:*9* 199:*8,*
*16, 19* 200:*22*
201:*3, 7, 12* 207:*6*
209:*18, 24* 210:*14*
211:*15* 212:*11*
213:*24* 214:*3, 4, 7*
220:*5*
**actual** 175:*18*
178:*7* 195:*5* 196:*5*
197:*3*
**Adamson** 162:*20*
166:*3, 4, 8*
**add** 104:*2*
**added** 194:*5*
**addressed** 211:*2*
**administration** 15:*1*
17:*8* 21:*1* 38:*13*
61:*18* 62:*5, 18*
64:22 69:*3* 76:*24*
87:*11* 221:*11, 20*
**adult** 59:*18* 64:*15*
**advantage** 165:*7*
**advantages** 70:*7*
**advice** 99:*23, 24*
**advised** 161:*17*

**Affairs** 153:*7* 154:*8*
**affect** 30:*22*
**affiliated** 176:*11*
178:*16, 17*
**afraid** 205:*9*
**African** 16:*23* 17:*2*
40:*6* 42:*3* 113:*5*
139:*10, 13*
**afternoon** 183:*3*
**agencies** 191:*7*
**aggressive** 156:*19*
**ago** 71:*18* 72:*7*
152:*23* 220:*12*
**agree** 16:*7* 29:*2, 20*
53:*9* 61:*1* 66:*8*
75:*5* 81:*5* 86:*18*
120:*7* 129:*6*
133:*19* 156:*8, 9*
175:*23* 177:*22*
178:*14, 22* 192:*1*
194:*24* 195:*12*
206:*24* 213:*10, 15*
230:*24*
**Agreements** 195:*10*
196:*14, 24*
**ahead** 23:*6* 44:*18*
212:*20* 218:*18*
**aired** 18:*3*
**alderman** 37:*24*
**allegation** 79:*18*
123:*9* 167:*6* 200:*4,*
*7* 202:*17, 19, 23*
203:*15, 16*
**allegations** 77:*13*
78:*19* 79:*11, 20*
124:*12* 128:*9*
146:2 154:*17*
155:*7* 159:*13, 16*
160:*11* 167:*3*
181:*9* 182:*2* 183:*9*
199:*13, 24* 200:*3,*
*23* 201:*15* 203:*21,*
*24* 204:*24* 205:*6,*
*10* 206:*5, 13, 16, 24*
207:*3* 208:*12, 16*
210:*3* 214:*10*
**allege** 168:*10*
**alleged** 142:*20*
207:*12*
**alleges** 200:*13*



**Frank Kosman Backwrite - 3/23/2022**
Paul Berge, et al. vs. City of Kankakee, et al.
2:20-cv-02310-CSB-EIL # 17-3 Page 65 of 90

alleging 50:*14*
199:*1*, *4* 207:*15*
allow 4:*20*
allowed 27:*24*
79:*24* 104:2 149:6
165:7, 9
alongside 223:*11*
American 16:*24*
17:*3* 113:6
Americans 40:6
42:3 139:*10*, *14*
amount 175:*17*
176:*24* 177:*3*, *4*
amounted 41:*23*
42:*1*
amounts 175:*19*
analysis 136:6, *16*,
*24* 137:5
and/or 62:5
animosity 53:*24*
171:*16*
answer 4:*21* 5:*3*
16:*14*, *15*, *16* 22:*15*
36:*18* 40:*1* 44:9
48:*5* 49:*17*, *18*
50:*1* 52:8 63:2
66:7, *18*, 20 67:4,
*19* 75:*11* 77:22
85:*15* 127:*11*
135:*18*, *21* 138:*16*
140:*14* 143:*12*
172:*10* 177:*18*
190:*18* 203:8
212:*1* 213:4 218:*4*,
*18* 219:*1* 220:9
answered 52:5, 7
65:*16* 67:2 69:*21*
81:*23* 86:*1* 171:*18*
204:*11* 205:*1*
answering 61:*13*
answers 4:*22*
51:*11* 69:*18*, *24*
anti-discrimination
28:7
anti-harassment
28:5
anti-white 25:*11*
anybody 7:*12* 55:*4*
85:*19* 93:*11*, *14*, *15*
103:*11*, *12* 117:*24*
181:*1*

anymore 158:*3*, *19*,
*21*
anyway 33:*12*
apologize 207:2
appear 218:*10*
appearance 168:*1*,
*4* 169:5 170:*3*, *19*
Appeared 2:6, *11*
141:8
appears 207:*4*
applicants 99:*17*, *19*
applications 95:2
applied 31:*21*
95:*24*
apply 196:*16*, *21*
197:*4*, *18*
appoint 106:*17*
107:2
appointed 17:2
31:7 35:*23* 49:*21*,
*23* 79:*23* 88:4
89:6, *8* 222:7 223:*3*
appointing 49:*14*
appointment 31:*16*
32:*14* 33:*14* 101:6
appointments 114:7
approval 32:*4*, *16*
33:*18* 34:*3* 35:*10*
36:*13* 37:22
176:*20* 191:*8*, *11*,
*13* 194:*11*, *16*, *19*
195:*1*
approve 32:*14*, *23*
33:*3*, 5
approved 31:*17*
33:*14* 35:5 49:6, *15*
approximately
10:*15* 83:*23* 102:*8*
106:9 113:*24* 180:*4*
April 11:*1*, 2, *3*
89:*17* 90:*1*, *3*
96:*23* 101:*17*
209:*17*, *22* 210:*13*,
*18* 211:*17* 212:*23*
234:2
area 28:*17*, *19*
areas 38:9 41:*10*
argue 129:*13*
174:*11*
argumentative 69:9
204:*20* 205:2 209:9

arrested 150:*21*
156:*1* 219:9
arrestees 153:*24*
arrests 133:8 157:9
articles 74:*16* 75:*19*
aside 8:*24* 16:*24*
24:*18* 107:*21*
asked 52:*4*, 7
66:*18* 67:2 69:*21*
73:6 81:*23* 86:*1*
88:8 99:*21*, *22*
116:*17* 119:*23*
120:*3* 125:*15*
145:*18* 171:*18*
183:*12* 189:*11*
205:*1* 219:*14*
asking 59:22 61:*12*
65:2 66:*12*, *14*
78:*13* 88:9 89:*1*
101:2, *8* 107:*17*
110:*19* 118:7
138:*13* 170:*11*
187:*15* 199:*19*
204:7, 9 206:22
212:8 224:*23*
aspect 170:8
assessment 10:8
103:*20*, *24* 145:*11*,
*14*, *22* 180:*24*
181:2 184:*15*
187:7 192:9
assessments 195:*14*
assessor 185:*20*, *24*
186:*19*, *21* 187:2
189:*23*
assigned 126:6
127:*3*, 6 167:*14*
230:*16*
associate 141:*10*
associated 127:*14*
130:*23* 183:22
Associates 103:*23*
113:9 145:9
179:*24* 180:*10*
183:*18*, *22* 184:*13*,
*19* 186:*3*, 8 190:7,
*10*, *13*, *23* 192:*13*
194:*17*, *21* 195:2,
*14* 196:*10*
assume 18:*13*, *14*
46:*11* 47:*3* 61:*23*,

*24* 141:*18* 156:6
179:*12*
assumed 7:*12* 61:*4*,
*8*, *10*
assuming 118:*23*
145:*24* 163:*20*
177:2
assumption 34:*21*,
*23*
attention 43:6
58:*21* 152:7
attitude 22:*20*
attorney 123:9
150:*13*, *17* 152:6
155:*4* 216:*19*
220:*4* 233:*18*, *19*
attorneys 219:*18*
Attorney's 148:*16*
149:*10*, *14*, *23*
153:9 155:*13*
159:2 216:*24*
217:8 218:*21*
audio 147:*13*, *15*
148:*19*, *20* 149:*8*,
*12*, *16*, 20 150:*24*
216:*12*, *21* 217:6,
*22* 218:6, *8*, 9, *12*
August 103:2
106:7 108:6, 22
112:*18* 115:22, *24*
132:8 159:6 185:6,
*17*
Austin 15:*18* 16:*10*
40:*21* 46:7, *23*
47:*13* 53:7 80:6,
*22* 84:*10*, *11*, *14*, *18*
87:7 98:6 104:*20*
105:*12* 122:*11*, *17*
123:*16* 124:*15*
125:*4*, 5 131:*21*
202:6, *16*, *23*, *24*
203:*1*, 9, 20 205:*21*
207:*1*, 2 209:*21*
210:7, *16*, *21*
211:*14* 212:9, *13*
213:2, *8*, *23* 214:*11*
222:*14*, *18* 223:*3*, *11*
Austin's 105:2, 9
209:*17*
authority 56:*18*, *21*



**Frank Kosman Backwrite - 3/23/2022**
2:20-cv-02310-CSB-EIL # 17-3 Page 66 of 90
Paul Berge, et al. vs. City of Kankakee, et al.

**Auto-Lab** 199:*21* 209:*19* 210:*15, 17* 214:*1, 4, 12*
**AutoZone** 209:*19*
**available** 101:*24*
**avoid** 178:*24* 195:*5*
**aware** 21:*11, 19* 22:*9* 24:*19* 25:*9, 10, 16* 27:*14* 31:*24* 32:*17* 34:*7, 17* 35:*1* 45:*23* 46:*6* 47:*5, 8* 48:*22* 50:*12, 16, 18, 20, 21* 53:*12* 57:*11, 22* 58:*13* 59:*24* 60:*22* 61:*15* 63:*16, 18* 64:*21* 65:*3* 66:*14* 68:*6* 69:*6* 70:*20* 72:*21* 74:*8, 11, 15* 75:*13, 17, 18, 24* 76:*5, 9, 15, 19, 21* 77:*2* 79:*6, 10, 20* 86:*4, 15* 121:*12, 18* 122:*23* 123:*6* 124:*12* 125:*2* 140:*21* 148:*7, 8, 13* 151:*21* 180:*2* 181:*20, 24* 184:*11, 18, 22* 185:*8, 9, 16* 186:*17, 23* 187:*9, 12* 210:*21* 213:*7* 221:*9*

**< B >**
**Back** 48:*11* 50:*11* 64:*17* 72:*18* 78:*5* 92:*22* 121:*9* 226:*2*
**background** 35:*8* 227:*11*
**bad** 25:*15* 42:*12* 171:*6, 8, 15* 180:*16* 202:*22*
**bar** 11:*16, 18*
**based** 19:*6* 26:*16, 19* 27:*7* 28:*11* 34:*4* 112:*19* 122:*8* 129:*22* 132:*16* 135:*20* 136:*7* 137:*9, 11* 164:*2* 195:*12* 200:*6* 201:*20* 209:*23*

211:*14, 22* 214:*22* 218:*1* 219:*10* 220:*23* 228:*17* 232:*15*
**basic** 107:*15*
**basically** 91:*6* 116:*11* 118:*13* 230:*6*
**basis** 17:*5* 30:*1* 94:*18* 101:*4* 207:*18*
**becoming** 93:*7* 187:*11* 199:*7* 211:*13* 212:*13* 221:*4, 7*
**beginning** 112:*18* 115:*22*
**behalf** 2:*6, 11* 18:*3* 27:*2* 219:*18* 220:*5*
**behavior** 74:*1* 205:*22, 23*
**behest** 78:*20* 79:*12*
**belief** 20:*13* 84:*7* 87:*19* 138:*16* 199:*15* 200:*4* 201:*21* 207:*6* 209:*23* 211:*15* 213:*24*
**beliefs** 38:*2, 17*
**believe** 7:*11, 18, 19* 8:*20* 10:*21* 11:*15* 14:*20* 15:*14* 17:*12* 18:*1* 28:*6* 39:*10, 12* 43:*20, 21* 46:*15, 20* 47:*15* 59:*16* 113:*7* 145:*11* 149:*4* 150:*14* 155:*5* 190:*4* 199:*23* 202:*24* 203:*22* 205:*21* 207:*11* 210:*14* 227:*3, 7*
**believed** 9:*23* 17:*6, 18* 18:*9, 10* 20:*15* 25:*10, 17* 26:*15* 33:*18* 35:*9, 14* 36:*2, 12* 37:*16* 38:*2, 23* 42:*11* 44:*24* 45:*10* 51:*15* 54:*6* 57:*23* 61:*16* 70:*22* 81:*21* 87:*11*

91:*15* 92:*7* 122:*7* 206:*23* 209:*18*
**believes** 200:*18*
**belongings** 83:*15, 17*
**Bensenville** 33:*11* 113:*1, 3, 6, 9, 11, 13, 20* 135:*15, 19* 230:*5*
**BERGE** 1:*2* 4:*8* 19:*19* 109:*21* 110:*1, 3* 111:*1* 112:*1* 118:*12* 119:*15* 121:*13* 122:*10* 123:*14* 124:*16, 21* 125:*1, 3* 129:*7, 14* 130:*5* 131:*16* 132:*2, 7, 15* 135:*7* 145:*10* 163:*10* 165:*18* 214:*15, 17, 21* 215:*13*
**Berge's** 129:*11* 131:*7, 13*
**best** 7:*15* 73:*14* 137:*11* 175:*21, 22* 192:*2*
**better** 119:*21* 174:*10* 180:*20* 202:*4*
**beyond** 132:*22*
**bias** 174:*17*
**bid** 175:*18*
**bidding** 175:*20* 177:*5, 6* 178:*7* 208:*2, 3*
**bids** 177:*9*
**big** 86:*5* 91:*22* 95:*23* 209:*6*
**bigger** 134:*17*
**billing** 179:*21*
**bills** 176:*1*
**binder** 83:*6, 18*
**bit** 153:*15* 178:*3* 205:*15* 226:*6*
**black** 20:*16* 21:*1* 23:*10* 24:*12, 15* 29:*12, 21, 24* 33:*19* 34:*4, 11, 20* 35:*11, 19* 36:*3* 38:*9, 13* 39:*9* 40:*9* 41:*2, 3, 11, 13, 18* 42:*2, 21* 43:*2, 10, 12, 15, 18*

44:*1, 5* 45:*11, 13* 47:*17, 21, 24* 48:*14* 50:*22* 52:*24* 54:*7* 55:*21* 56:*1, 3, 10* 67:*22* 68:*21* 69:*2, 19* 70:*3, 12, 24* 104:*11* 138:*17* 140:*1, 3, 5* 232:*18*
**blacks** 37:*18* 38:*4, 18* 39:*8, 16, 22* 45:*9* 51:*17, 21, 24* 52:*13, 14, 18* 70:*7* 137:*24* 138:*3, 4, 10*
**blend** 99:*2*
**board** 15:*7* 32:*4, 11* 35:*20* 37:*20* 95:*18, 21* 97:*4, 11, 18, 20* 100:*23* 115:*17, 18, 23* 116:*1, 2, 3, 5, 9, 10, 18, 20, 24* 208:*4, 8*
**body** 200:*19*
**bona** 126:*12, 19*
**bond** 156:*5*
**books** 223:*7*
**born** 24:*4*
**borrowing** 148:*22* 217:*19*
**box** 210:*22*
**boy** 212:*10*
**brandishing** 220:*19*
**break** 5:*4* 48:*7, 9* 121:*7* 193:*12*
**breaks** 5:*1*
**Brenda** 1:*16* 233:*3*
**briefly** 229:*4*
**bring** 93:*8* 100:*22* 106:*20*
**bringing** 93:*11*
**broad** 177:*18*
**Broadly** 24:*14*
**brother** 176:*19* 177:*12* 179:*5, 8*
**brother-in-law** 177:*12*
**brother's** 179:*12*
**brought** 12:*22* 21:*22* 32:*3* 58:*11* 85:*10* 92:*20* 93:*7* 100:*23* 106:*22*



**Frank Kosman Backwrite  -  3/23/2022**
2:20-cv-02310-CSB-EIL   # 17-3   Page 67 of 90
Paul Berge, et al. vs. City of Kankakee, et al.

152:*6*  160:*23*
161:*1*  214:*16*
**budget** 213:*17*
**building** 143:*8*
**bunch** 57:*12*
**business** 175:*14*
176:*11, 18*  178:*18*
179:*2, 11, 12, 13, 15*
195:*20*  207:*7*
210:*15*  214:*8*
**bypass** 232:*8*
**bypassing** 116:*24*
144:*17*

**< C >**
**cabinet** 83:*10*
142:*18*
**Cadillac** 179:*13*
**CALEA** 226:2
**call** 12:*9*  44:*19*
71:*21*  227:*1*
**called** 5:*12*  11:*19*
12:*9*  166:2, *7*
178:*4*  205:22
**calls** 17:*9*  20:*18*
21:*14*  22:*12*  25:21
29:*7*  30:*13*  32:7,
*19*  33:21  34:*10*
35:*12*  36:*6, 15*
37:*12*  41:*15*  45:5
48:2  52:*4, 20*  57:*1,
17*  59:*3*  60:*4*  61:2,
*21*  65:*7*  66:*4, 19*
67:*16*  70:*14*  71:2
76:*11*  81:24  85:24
86:*20*  87:*14*
137:*17*  138:*9, 20*
139:*17*  140:*12*
143:*10*  150:*4*
170:*23*  171:*19*
173:*21*  174:*23*
189:*19*  206:*8*
207:*14*
**campaign** 7:2  40:*4*
**canceled** 41:*21*
**candidate** 8:*19*
9:*15, 17*  10:*1*
20:*16*  31:5, *19*
117:*6*  119:*21*
**candidates** 41:*3*
80:*18*  98:*7, 9*

104:*8, 14*  106:*18*
107:*3*  110:*24*
117:*1, 3*  118:*2*
136:*8*  142:*4, 8, 11*
144:*17*  159:*23*
161:*23*  162:*3*
172:6  189:*18*
**cannabis** 38:*7, 21*
**Capacity** 1:*11*
**car** 179:*5*
**care** 135:*1*
**career** 21:*11*  70:*21*
229:*13*
**cars** 75:*20*  201:*19*
208:*1, 9*
**Case** 4:*9*  77:*6*
79:*1*  112:6  127:*3,
15*  129:*19*  130:*5,
15*  131:*6, 17*
148:*18*  152:*20*
153:*10*  155:*8*
157:*21*  158:*23*
202:*21*  205:*17*
230:*13*
**cases** 44:*12*  155:*12,
17*  217:2  218:*20*
219:*9*  220:*3*
**catch** 71:22
**caught** 186:*20*
**cause** 1:*15*  144:*13,
21*  170:*21*  188:*16*
217:22
**caused** 145:*4*
**causes** 174:*3*
**center** 145:*11, 14,
22*  180:*24*
**centered** 94:*5*
**centers** 184:*15*
**CENTRAL** 1:*1*
**ceremony** 71:*19*
**certain** 24:*4*  37:*16*
55:*7*  175:*16*
**certainly** 21:*10*
23:*21*  25:*9, 16*
26:*3*  28:22  31:24
32:*2, 15*  33:*17*
34:*23*  37:*9*  38:*1*
41:*12*  51:24  54:*3*
60:*21*  61:*15*  64:2
74:*11*  86:*9*  87:*4*
129:*3*  134:*9*

170:*19*  179:*7*
220:*23*
**CERTIFICATE**
233:*1*
**certification** 28:*10*
**Certified** 1:*16*
35:*20*  116:*13*
233:*4*  234:6
**certify** 32:*11*
115:*19*  233:*5*
**certifying** 117:*13*
**change** 6:6  93:*18,
20*  102:*24*  104:*17*
222:*17*
**changed** 104:*23*
105:2  135:*18*
**changes** 80:*11*
88:*9*  93:*3*  102:*13,
17, 20*  206:*18*
**characterized** 207:*3*
**charge** 40:*12, 18, 20,
21*  43:*5*  112:6
119:*10*  121:*13*
226:*9*  231:*23, 24*
**charged** 219:*9*
**charges** 132:*7*
155:*19*  166:*18, 20*
228:*16*
**chart** 108:*9, 10, 12,
14*
**Chasity** 9:*4, 5, 18*
10:*13*  12:*11*  31:*1*
46:*18*  47:*16*  59:*12*
71:*17*  76:*8, 15, 22*
89:*10*  100:*5*
117:*17*  137:*13*
200:*14*  227:*20*
**CHASTITY** 1:*9*
**check** 191:22
**checked** 152:*11*
194:22
**Chicago** 1:*19*  2:*4*
234:*2*
**CHIEF** 1:*8*  4:*11,
12*  5:*16*  6:*18*  7:*3,
9, 13*  8:*7*  11:*11*
13:*11, 14, 18, 22*
15:*15*  16:*9*  18:*10,
20*  21:*8, 11, 13, 20*
22:*2, 19*  24:*20*
25:*2, 6, 18*  26:*21*

27:*10*  31:*21, 22*
32:2, *3, 11*  33:*12*
34:*5, 7*  35:*1, 4, 5,
23*  36:22  37:*1*
40:*11, 17*  45:*20, 24*
46:*21*  47:*21*  49:*7,
8, 13*  50:*5, 6, 7, 12,
13*  53:*3, 4, 10*  54:*6,
12*  57:*14*  58:*16*
59:*1*  63:*4, 10*  64:*9,
19, 22*  65:*21*  69:*13*
72:*2, 21*  73:*12*
74:*7, 13, 18*  75:*6,
21*  76:*1, 6*  78:*1, 2,
19, 22*  79:*7, 23*
80:*3, 4, 20*  81:*7, 13,
20*  83:*24*  85:*3, 10,
13*  86:*7*  88:*5, 10,
21*  89:*2, 3, 6, 8*
93:*7, 20, 22*  94:*2, 3,
7, 9, 13, 14*  96:*5*
97:*13, 22*  98:*1*
99:*6*  101:*9*  102:*6,
22*  103:*14*  104:*17,
18, 24*  105:*6, 15*
109:*1, 9, 11, 12, 15,
20*  111:*12*  112:*23*
113:*1, 20*  114:*6, 23*
115:*1*  117:*17*
123:*10*  125:*19*
126:*9*  131:*24*
132:*4, 19*  134:*10*
135:*15*  137:*8*
140:*9, 14*  146:*1*
160:*14, 19*  161:*1, 8,
9*  167:*23*  169:*10*
171:*3*  173:*4, 19*
175:*9*  176:*19*
182:*7, 13*  187:*10*
191:*8*  193:*7, 22, 24*
194:*4, 12*  196:*10*
198:*12, 19*  199:*5,
11, 13*  201:*2*
203:*17*  204:*17, 23*
205:*7*  209:*7*  210:*2,
5, 21*  211:*5, 13, 18*
212:*13, 24*  213:22
214:*5, 12, 13*
220:*24*  221:*4, 7, 19*
222:*8, 12, 24*  223:*4,
19*  226:*4, 7*  227:*15*



**Frank Kosman Backwrite - 3/23/2022**
**Paul Berge, et al. vs. City of Kankakee, et al.**
2:20-cv-02310-CSB-EIL # 17-3 Page 68 of 90

**chief's** 82:*21, 23*
83:*9*
**choose** 98:*21* 173:*4*
175:*20*
**chose** 163:*23*
173:*10* 189:*6*
**chosen** 31:*4* 35:*10*
120:*13* 173:*3*
221:*18, 20* 231:*15,*
*17*
**Chris** 6:*13* 8:*14,*
*24* 10:*12* 12:*23*
**circumstances** 5:*22*
6:*7*
**citizen** 153:*4, 6*
**citizens** 179:*21*
**CITY** 1:*7, 8* 11:*19,*
*21, 24* 14:*11* 17:*15*
18:*4* 31:*17* 32:*13*
33:*19* 34:*2* 35:*10*
36:*14, 24* 37:*7, 10,*
*16* 38:*17* 45:*3*
49:*16* 50:*14* 95:*20*
96:*18* 99:*14*
158:*22* 175:*14*
176:*4, 17* 177:*21,*
*23* 178:*10, 11, 18*
179:*15* 182:*1*
208:*10* 214:*1, 22*
215:*23* 219:*12*
222:*8* 226:*12*
**city's** 215:*20*
**civil** 114:*5, 14*
181:*12, 17*
**claiming** 69:*1*
**clarify** 48:*24* 58:*8*
**clarifying** 50:*3*
**classes** 163:*19, 20*
**clear** 39:*15* 42:*9*
91:*2* 211:*8*
**clearly** 36:*2*
**clients** 219:*19*
**closed** 128:*18*
130:*15*
**Coash** 224:*5, 21*
232:*12*
**C-o-a-s-h** 224:*8*
**coin** 23:*12*
**college** 227:*11*
**colleges** 41:*9, 21*

**come** 98:*2* 101:*5*
126:*22* 149:*7* 227:*1*
**comeback** 131:*4*
**comes** 125:*22* 207:*5*
**command** 12:*6*
16:*8, 18* 17:*19*
40:*24* 46:*12* 47:*20*
50:*13* 65:*5* 68:*21*
72:*20, 24* 76:*18*
77:*15* 80:*1, 12*
88:*4* 92:*11, 18*
93:*3* 96:*6* 98:*5, 18,*
*21* 105:*16* 120:*13*
134:*20* 137:*3*
138:*1, 3, 5, 11, 17*
139:*24* 160:*15*
161:*19* 202:*9, 12, 15*
**Commander** 15:*17,*
*23* 16:*4, 20* 46:*7,*
*14, 18, 24* 47:*4, 7, 9,*
*11, 23* 49:*9* 53:*7*
57:*14* 80:*6, 22*
84:*10, 11, 14, 18*
104:*20* 105:*2, 9, 22*
110:*13* 112:*5*
122:*11, 17* 124:*15*
125:*4, 5* 131:*21*
132:*20* 162:*16*
166:*6* 203:*10*
204:*24* 222:*16*
223:*2, 6, 11, 13, 17*
229:*8, 10, 11, 16, 22*
230:*1, 7, 13, 17*
231:*5, 20, 21, 23*
232:*7*
**commanders** 161:*3,*
*7* 199:*2* 222:*15*
230:*4, 6*
**commencement**
233:*6*
**commendations**
111:*8*
**comment** 84:*24*
168:*17, 21* 169:*4*
**comments** 54:*8*
120:*12, 16, 20, 24*
**COMMISSION** 1:*7*
97:*12* 164:*18, 22*
**Commissioners**
115:*19*
**commit** 155:*22*

**committed** 152:*2*
155:*16*
**committee** 95:*14*
176:*7* 208:*4*
**committing** 153:*23*
**common** 63:*23*
64:*3*
**communicated** 72:*9*
**communicator**
84:*16*
**communities** 41:*13,*
*17, 18, 20*
**community** 39:*3, 4,*
*5, 7, 9, 18* 41:*9, 11*
42:*3, 13, 21* 43:*2,*
*10, 12, 16, 18* 44:*1,*
*5* 57:*13* 62:*22*
63:*6* 64:*8* 65:*4, 10,*
*24* 66:*10* 91:*4*
120:*14, 18, 22*
134:*1* 173:*18*
174:*10, 12, 20*
**company** 176:*15*
177:*13* 179:*6*
202:*3, 5*
**competent** 231:*2, 4,*
*13*
**competitive** 177:*9*
**compilation** 183:*23*
**compiled** 109:*20*
113:*16* 114:*11*
**complain** 44:*19*
56:*12* 60:*11*
**complainant** 123:*14*
**complained** 55:*6*
62:*11* 123:*17*
124:*11* 133:*10*
**complaining** 17:*23*
68:*7* 188:*19* 189:*1*
**complains** 125:*23*
**complaint** 19:*16*
20:*5* 26:*22, 24*
27:*4, 7* 60:*15, 19*
62:*12* 81:*14* 83:*24*
84:*4* 88:*1* 121:*19*
122:*10, 24* 123:*7*
124:*16, 20, 24*
125:*20, 23* 126:*13,*
*16* 127:*6, 7, 13, 16*
129:*8, 12, 14*
130:*18, 20, 22, 24*

131:*2, 5, 7, 8, 14, 22*
132:*1, 5* 146:*7*
152:*16, 19* 153:*9,*
*10* 154:*10* 155:*3, 4,*
*6* 159:*1* 181:*4, 12,*
*13, 14, 16, 18, 21*
182:*5* 183:*2, 6, 8*
206:*2, 3* 207:*11*
211:*6* 214:*18, 21*
215:*9, 12, 16*
**complaints** 18:*3, 8,*
*19* 19:*5* 20:*1, 8*
21:*19* 26:*3, 4, 14,*
*15* 27:*12, 14* 68:*15,*
*19, 22, 24* 81:*7, 9,*
*12, 20* 84:*11, 13, 17*
85:*2, 4* 88:*12*
122:*4* 123:*20*
124:*2, 6* 130:*3*
153:*4, 6* 189:*5, 17*
207:*10* 214:*15*
**components** 32:*15*
**compound** 30:*14*
77:*5* 172:*19* 207:*14*
**computer** 127:*21*
**concern** 22:*16, 18,*
*19, 24* 86:*6* 90:*23*
144:*14, 21* 145:*4*
168:*19* 170:*21*
172:*4* 188:*16*
**concerned** 64:*13, 14*
74:*20, 24* 145:*13*
208:*6*
**concerning** 69:*14*
77:*14* 79:*8* 130:*3*
153:*10* 154:*17*
159:*17* 181:*21*
191:*6* 213:*24* 233:*8*
**concerns** 21:*7* 22:*8*
24:*19* 25:*1, 5*
27:*15, 16* 43:*9, 13,*
*16, 17* 54:*21* 55:*17*
**concluded** 232:*23*
**conclusion** 29:*8*
30:*14* 33:*7* 113:*16*
128:*7* 150:*5* 173:*21*
**conditioned** 196:*4*
197:*2*
**conditions** 30:*22*
**conduct** 74:*21*
75:*15, 22* 76:*7, 17,*



**Frank Kosman Backwrite - 3/23/2022**
2:20-cv-02310-CSB-EIL # 17-3 Page 69 of 90
**Paul Berge, et al. vs. City of Kankakee, et al.**

23 79:3 113:9
124:19 154:6
181:8, 19 199:2, 4,
13 200:8, 13
201:22 203:19
206:6 207:16
216:16 218:15
228:13
**conducted** 73:7
74:1 113:15
123:24 145:8
180:3, 10 182:1
183:17 187:21
188:12 211:16
228:24
**conducting** 72:22
74:12 76:6 195:14
**conference** 95:21
99:21
**confidence** 13:24
14:2, 12, 18 15:10,
12, 17 16:7, 22
17:6 87:5, 6, 22
**confidential** 149:2,
20
**confirmed** 222:8
**conflict** 178:19, 24
179:19 228:4
**conflicts** 195:6
**confusing** 5:7
**consent** 174:5, 15
**consider** 140:7
202:18, 19 222:4
231:18 232:6
**consideration** 164:3
**considered** 149:4
163:23 195:15
196:11 231:1, 4
**considering** 78:1
168:24
**constitutes** 233:13
**constitutional** 150:1,
23 151:17 152:2, 5
153:23 155:11, 16
156:24 157:8, 24
160:14 219:16, 24
**construed** 23:21
**consultation** 161:18
**contacted** 213:21
214:13 216:23

**contacts** 163:21
226:12
**contained** 111:3, 5
116:15 127:21
206:14
**content** 200:19
**contention** 155:22
**contents** 98:24
**context** 187:19
**contract** 6:2, 7, 16,
19 7:7 46:14 49:7,
11, 15, 20 89:22
110:10 195:19
**contracts** 177:22
178:4
**Contractual** 195:10
196:14, 24
**contrary** 153:12
**control** 208:20, 21
216:13 218:13
**conversation** 6:21
13:4 50:9 60:9
72:8, 13 88:13, 20
91:20 92:23 97:15,
19 100:9 102:4
105:14 106:5, 12
107:13, 18, 21
108:7, 18 118:17
119:3, 13, 15, 19
131:20 169:8
188:5 189:22
190:2, 9
**conversations** 33:16
36:21 53:3, 6 54:4,
12 56:16 57:23
58:2 69:12, 16
71:13 86:14 89:1,
9 97:21 98:8
101:16 107:11, 22
108:2, 24 109:4
111:24 117:16
118:19 188:7, 9
190:5
**Cook** 176:16
**copying** 148:24
**copyrighted** 193:24
**correct** 4:13, 14
5:5, 17, 18 9:2, 6, 7
10:13, 14 15:10, 11,
13, 15, 18 16:9, 24
17:3, 16, 17, 20

18:5, 11, 21 19:7,
20, 21, 23, 24 20:2,
11, 16 21:1, 13
22:6, 21 23:18, 22,
24 24:13, 22 25:19
27:2, 3, 7, 13, 22, 23
28:1, 2, 15, 16, 18,
20, 21, 24 29:1, 5,
14 30:2, 19, 20, 23,
24 31:2, 3, 5, 10
34:8 35:1 36:22,
23 37:1, 2, 4, 7, 8,
10 38:14, 19, 24
39:9, 17, 22 40:6,
13, 15, 19, 22, 23, 24
41:4, 13 42:9, 10,
21 43:19 44:6
45:3, 17, 24 46:3, 7,
19, 21 47:1, 4, 14,
18, 19, 21, 22, 24
50:4, 9, 15, 19, 24
51:1, 13, 14, 17
52:2, 19 53:12
54:14, 15 55:7, 18
57:14 58:1 59:1,
12 60:2 61:19
62:22 63:6, 16, 20
64:4, 9, 20, 23
65:22 66:2, 17
67:1, 8, 14, 24 68:9
69:20 70:8, 12
73:15, 16, 18, 22, 23
74:3, 4, 7 75:7, 22
77:10, 11 79:14, 16
80:4, 5, 6 81:7, 10,
16, 22 83:16 85:23
86:7, 11 87:8, 20
90:24 96:7 97:10
101:14 103:8, 15,
18, 19, 21, 22, 24
104:1, 3, 8, 9, 11, 14,
18, 19, 21, 22, 24
105:3, 4 106:3, 4
108:19 109:23
110:2, 5, 6 111:2
112:23, 24 114:4, 9,
12, 13, 17, 18 115:8,
12 120:1, 2, 4, 5
121:19 122:8, 20
123:11, 14, 17, 21,
22, 24 124:4, 5, 8, 9,

13, 17, 21 127:3, 4,
8, 15, 19, 20, 22
128:1, 5, 12, 13, 15,
19, 22, 23 129:1, 2,
4, 5, 8, 9, 19 130:18,
24 131:15, 17
132:8, 9, 10, 11, 12,
13 133:17, 21
134:2, 4, 7, 10, 11,
15, 16, 18, 19, 22
135:1, 2, 4, 5, 18, 20
136:1, 8, 11, 13, 14
137:14, 22 138:1, 7
139:6, 7, 11, 15
140:10 141:16, 21
142:1, 5, 8, 12, 21
143:9 144:4, 5, 9,
19 145:6 146:4, 8,
12, 16 149:3, 11, 17,
18, 20, 21, 23, 24
150:2, 13, 18, 19, 21,
22 151:1, 2, 3, 4, 6,
9, 18 152:3, 7, 8
153:3, 13 154:4, 11,
12, 14 155:1, 8, 9,
13, 17, 20 156:2, 3,
4, 14 159:7, 14, 18,
23 160:8 161:1, 6,
9, 24 164:12, 24
165:24 170:22
172:6, 17 173:11,
12 175:24 176:5,
10 177:7, 9, 10, 24
178:9 179:2, 3, 16,
17, 24 180:11, 18,
19 181:6 182:7, 10,
11 183:19 184:10,
20 185:7, 10
186:11, 14, 15
187:11 189:2
190:3, 24 191:3, 4,
20 192:4 194:12,
17 195:2, 16 196:6,
18 199:2, 3, 5
200:9, 11 201:13
202:17 203:2, 17,
18, 21, 24 205:23
207:3 209:19, 20
211:2, 10, 11 216:6,
9 217:4 219:20, 21
222:12, 18, 19



**Frank Kosman Backwrite  -  3/23/2022**
Paul Berge, et al. vs. City of Kankakee, et al.

2:20-cv-02310-CSB-EIL  # 17-3   Page 70 of 90

223:*14*, *17*, *18*
226:*14*  227:*5*
229:*14*, *15*, *17*, *18*,
*20*, *21*, *23*, *24*  230:*2*,
*3*  231:*5*, *15*, *21*, *22*
232:*1*, *2*, *4*, *5*
**correction**  158:*18*
**correctly**  44:*14*
143:*5*  196:*7*, *8*
**correlation**  37:*23*
**correspondence**
213:*22*
**corruption**  207:*5*
**council**  17:*16*  18:*4*
31:*17*  32:*13*, *23*
33:*9*, *19*  34:*5*, *6*
35:*10*  36:*14*, *24*
37:*7*, *10*, *17*  49:*16*
176:*4*  177:*23*  222:*9*
**councilmen**  96:*19*
**council's**  33:*3*  34:*2*
**counsel**  233:*18*, *19*
**count**  10:*11*
**County**  176:*17*
220:*6*
**couple**  26:*22*  71:*18*
75:*20*  81:*3*  112:*4*
159:*12*  220:*12*
**course**  74:*24*
**COURT**  1:*1*
148:*17*  150:*17*, *20*
219:*23*
**courts**  149:*6*
**cover**  202:*20*
**covering**  218:*7*
**COVID**  40:*17*
41:*19*
**CR**  146:*7*
**credentials**  33:*10*
**credible**  128:*14*, *15*
**crime**  147:*9*, *18*, *19*
155:*22*  202:*2*
**crimes**  112:*7*  147:*7*
232:*4*
**criminal**  74:*1*, *13*,
*21*  75:*5*, *14*  77:*1*
199:*2*, *4*  200:*1*, *13*
201:*3*, *7*, *12*  202:*7*,
*16*, *18*, *24*  203:*6*, *16*
205:*23*  206:*6*, *20*,
*23*  207:*3*, *11*, *12*, *16*

**criteria**  112:*19*
**critical**  65:*5*  66:*1*,
*16*
**criticism**  67:*7*, *13*,
*21*
**crossover**  34:*15*
**crotch**  122:*20*
**CSR**  1:*17*  233:*3*
**current**  8:*15*  70:*17*
98:*5*, *18*
**Curtis**  6:*12*, *13*
8:*15*  9:*1*  10:*12*
12:*24*
**C-u-r-t-i-s**  6:*13*

**< D >**
**Daily**  53:*5*
**Dan**  4:*7*
**dan.herbert@danher**
**bertlaw.com**  2:*5*
**DANIEL**  2:*2*
**date**  210:*18*  211:*17*
**Dave**  110:*13*  223:*6*
**day**  13:*7*, *9*  93:*10*
95:*9*  98:*14*  100:*14*,
*15*  101:*9*, *17*, *20*
102:*14*  118:*9*, *11*,
*24*  119:*18*  123:*3*, *4*
160:*21*  167:*24*
189:*13*  204:*18*
215:*12*  234:*2*
**days**  110:*11*  194:*1*
**deal**  157:*3*
**dealt**  36:*24*  175:*9*
**decades**  136:*22*
137:*4*
**decide**  8:*18*  92:*17*
**decided**  12:*23*
208:*21*  231:*11*
232:*8*
**deciding**  7:*22*
**decision**  10:*10*
33:*3*  104:*6*  112:*16*
115:*16*, *19*  117:*15*
132:*14*, *16*  134:*10*,
*24*  135:*4*, *8*, *12*, *16*
136:*6*, *19*  137:*9*, *11*
138:*6*  140:*22*
154:*23*, *24*  160:*2*

161:*18*  165:*15*
168:*7*, *13*, *22*  169:*1*,
*11*, *16*, *17*  170:*9*, *17*
172:*13*, *14*  174:*6*, *8*
220:*13*
**decisions**  30:*18*
89:*23*  208:*23*
209:*2*, *4*
**decree**  174:*16*
**decrees**  174:*5*
**Defendants**  1:*12*
2:*11*  4:*11*  150:*21*
**defense**  219:*18*
**defined**  195:*23*
196:*1*
**defines**  196:*3*
**definitions**  26:*23*
195:*16*
**Democratic**  34:*13*
**demote**  222:*17*
**demoted**  47:*1*
**demoting**  68:*20*
**denied**  165:*11*
**department**  16:*9*
26:*7*  27:*18*  33:*13*
38:*24*  39:*4*, *8*, *16*,
*22*  40:*6*  41:*4*  42:*4*,
*12*  43:*11*, *15*, *19*
44:*6*  45:*1*, *10*, *12*
46:*13*  47:*17*  51:*16*,
*22*  54:*14*, *18*, *22*
66:*1*, *16*  67:*1*, *8*, *14*,
*22*  68:*7*, *8*, *16*
69:*14*  70:*11*, *22*
73:*13*, *14*, *22*  74:*2*,
*6*, *22*, *23*  75:*15*
76:*2*  80:*16*  81:*1*
82:*5*  83:*14*  86:*6*,
*12*  87:*1*  90:*7*, *8*
91:*16*  92:*5*, *11*, *21*
99:*11*  102:*14*, *18*,
*21*  107:*16*  108:*15*
111:*8*  119:*11*
120:*21*  123:*19*
124:*3*  125:*19*
127:*7*, *14*, *22*  130:*2*
133:*23*  134:*18*, *21*
138:*1*, *6*  139:*5*, *11*,
*15*, *24*  141:*13*
152:*15*  153:*2*, *13*
154:*1*, *17*, *21*, *24*

155:*2*  157:*6*
162:*16*  170:*22*
174:*4*  175:*10*, *15*,
*22*  178:*9*, *17*  179:*1*,
*2*  180:*14*, *21*
183:*20*  184:*3*
191:*3*  196:*23*
203:*7*  208:*12*, *16*,
*20*  209:*3*, *5*  212:*12*,
*15*  213:*1*, *12*
214:*22*  215:*14*, *19*,
*21*  216:*20*  217:*9*
218:*16*  221:*24*
223:*20*  225:*24*
226:*9*, *16*  228:*22*
**departments**  33:*11*
**department's**
206:*18*
**depending**  102:*12*
**deposition**  1:*14*
3:*13*  4:*10*, *16*  71:*6*
167:*23*  192:*22*
198:*2*  232:*23*
233:*10*, *15*
**Deputy**  15:*15*  16:*9*
18:*10*, *20*  21:*8*, *13*,
*19*  22:*19*  24:*20*
25:*2*, *5*, *17*  35:*4*
40:*11*  45:*16*, *20*, *24*
47:*7*, *20*  49:*8*  50:*6*,
*7*, *12*, *13*  53:*4*, *10*
54:*6*, *12*  57:*14*
58:*16*  59:*1*  64:*6*, *9*
69:*13*  72:*2*  75:*21*
76:*1*, *5*, *16*, *22*  78:*1*,
*2*, *19*  79:*7*  80:*3*, *20*
81:*7*, *12*, *20*  83:*24*
85:*2*, *3*, *10*, *13*
88:*10*, *20*  89:*2*, *3*, *9*
93:*20*, *22*  94:*2*, *3*, *7*,
*9*, *13*  98:*1*  104:*17*,
*23*  105:*5*  108:*2*
109:*1*, *6*, *9*, *12*
114:*6*, *23*  117:*17*
123:*10*  126:*9*
140:*9*  160:*13*, *19*
161:*1*, *5*, *8*, *9*
167:*23*  182:*13*
196:*10*  199:*5*, *13*
201:*2*  203:*17*



**Frank Kosman Backwrite - 3/23/2022**
**Paul Berge, et al. vs. City of Kankakee, et al.**

2:20-cv-02310-CSB-EIL # 17-3 Page 71 of 90

204:*17, 23* 209:*7*
214:*5* 222:*12*
**derogatory** 22:*5*
86:*18*
**desire** 94:*12*
**desk** 82:*24* 83:*9*
122:*19*
**detail** 12:*19* 135:*4*
**detective** 16:*20*
105:*22* 110:*12*
112:*5* 132:*20*
149:*5* 223:*12*
231:*24*
**Detectives** 229:*12*
230:*15* 231:*6, 24*
232:*3*
**determine** 80:*10*
156:*23* 181:*9*
182:*13* 200:*22*
201:*2, 12*
**determined** 126:*19*
**different** 22:*1*
23:*12* 33:*11* 41:*9*
97:*2* 107:*20* 111:*8*
126:*23* 153:*16*
156:*21* 158:*12*
160:*21* 176:*2*
183:*5* 194:*3* 225:*7*
**difficult** 11:*11*
**Digging** 74:*9*
**digress** 178:*3*
**directed** 76:*22*
227:*19*
**direction** 233:*12*
**directly** 233:*20*
**disability** 194:*6*
**disagreed** 10:*7*
**disbanded** 150:*10*
157:*22, 23* 158:*11*
**disbanding** 158:*18*
**discharge** 143:*13*
144:*6* 220:*17, 18*
**disciplinary** 111:*9*
129:*23* 142:*11*
144:*12* 146:*9*
**discipline** 86:*24*
142:*14, 17, 19, 24*
144:*21* 167:*2*
220:*15*
**disciplined** 22:*1*

157:*17*
**disclose** 179:*7, 16*
**discovering** 220:*4*
**discovery** 1:*14* 4:*10*
**discriminated**
17:*19, 23* 20:*24*
23:*11* 28:*1, 11, 14,
19, 22* 51:*21* 52:*1,
23* 69:*2, 18, 23*
122:*7*
**discriminating**
18:*20* 38:*3, 18*
67:*23*
**discrimination** 26:*6*
27:*12, 17* 29:*5, 12*
30:*2, 10* 37:*20*
50:*15, 23* 51:*16*
52:*12, 18* 69:*14*
70:*23* 121:*13*
122:*5* 123:*20*
124:*3, 7* 181:*5, 21*
182:*2, 6* 214:*23*
**discriminatory**
18:*10* 21:*8* 23:*21*
24:*15, 17* 25:*2, 6*
27:*5* 37:*17* 53:*21,
22*
**discuss** 137:*19*
**discussed** 12:*13, 15,
19* 91:*8* 94:*4*
137:*15, 23* 161:*21*
**discussing** 199:*6*
**discussion** 9:*11*
13:*10, 13* 86:*16*
93:*17, 19* 94:*6*
98:*4, 20* 117:*12*
**discussions** 93:*1*
98:*17* 101:*21*
**dismissal** 155:*17*
**dismissed** 155:*13,
15* 217:*5* 218:*21*
219:*10* 220:*3, 4, 5*
**dispute** 220:*22*
**DISTRICT** 1:*1*
72:*17*
**DIVISION** 1:*2*
40:*19* 47:*24*
105:*22* 231:*24*
**document** 73:*3, 10*
82:*12* 132:*24*
155:*3* 190:*12, 22*

193:*4, 19* 194:*4, 14*
196:*20* 198:*6, 8, 11,
23* 199:*1, 11*
201:*21, 23* 206:*14*
**documented** 126:*10,
18* 127:*1, 18* 128:*5,
11* 130:*13* 133:*17*
156:*7* 176:*9*
191:*16* 197:*12*
**documents** 71:*6*
211:*12*
**doing** 60:*18* 68:*3*
79:*18* 88:*11* 89:*3*
91:*24* 92:*1* 129:*22*
147:*5, 9, 14, 16, 17*
148:*21* 149:*1, 8, 20,
22* 155:*24* 158:*20*
170:*18* 175:*14*
178:*18* 179:*2*
192:*9* 197:*11*
201:*17* 202:*20*
**dollars** 176:*18*
**Donell** 15:*18* 16:*10*
40:*21* 46:*7, 23*
96:*12* 98:*6* 122:*11*
209:*21* 222:*14, 17*
223:*3, 11*
**door** 226:*23*
**drawer** 82:*20, 23*
83:*1, 4, 9*
**drug** 149:*8*
**due** 135:*1*
**dug** 74:*5*
**duly** 4:*2* 233:*7*
**Dumas** 31:*9, 11, 15*
32:*2, 11, 16* 33:*3,
15, 18* 34:*3, 5, 7, 19*
35:*5, 9, 18* 36:*3, 13*
46:*21* 71:*23* 72:*22*
75:*14* 76:*23* 77:*10*
214:*12*
**duty** 11:*10*

**< E >**
**earlier** 49:*17* 79:*13*
139:*8* 179:*5*
**early** 13:*23* 48:*18*
106:*7* 108:*6, 22*
**easy** 228:*8*
**echelon** 15:*24*

**EEOC** 121:*13, 19*
122:*4* 181:*17, 21*
183:*1, 5, 8* 214:*15,
18, 21* 215:*8, 12*
**effect** 169:*12*
**effort** 40:*4, 5*
**either** 6:*11* 13:*18*
29:*23* 31:*18* 80:*8*
100:*23* 106:*17*
128:*14* 148:*19*
165:*19* 166:*10*
217:*8*
**election** 7:*4, 6* 8:*16*
11:*2, 4* 90:*14*
**elements** 207:*4*
**eligible** 231:*14*
**else's** 143:*6* 168:*8*
**E-mail** 3:*15* 203:*4*
206:*9* 209:*17*
210:*8, 12* 212:*10, 23*
**emanated** 26:*1*
**emphasis** 41:*12*
**employed** 184:*12,
19* 186:*3, 8* 187:*9*
**employee** 196:*6*
233:*17, 18*
**employment** 5:*19*
190:*6* 191:*2, 6, 15*
194:*3, 6* 195:*2, 13,
18* 196:*3, 4, 11*
197:*1, 2, 8, 13, 15,
16, 19*
**encourage** 119:*5*
**endorse** 9:*24* 10:*12*
**endorsement** 8:*18,
21*
**ends** 199:*7*
**enforcement** 151:*12*
167:*18* 195:*11, 15*
196:*5, 15, 24* 197:*3,
11* 199:*12* 219:*17*
**enforcing** 196:*15*
**ensure** 178:*16*
**entire** 103:*20*
176:*16* 231:*21*
**environment** 28:*4*
**equipment** 76:*2*
147:*2* 148:*22*
216:*8, 12* 217:*19*
218:*22* 219:*11*



**Frank Kosman Backwrite - 3/23/2022**
2:20-cv-02310-CSB-EIL #17-3 Page 72 of 90
Paul Berge, et al. vs. City of Kankakee, et al.

erroneously 197:*14*

especially 134:*12*

essentially 22:*9*
25:*11* 194:*8*

established 98:*12*
135:*17* 172:22

ethics 179:*3*

Etzel 105:*21*
108:*20* 222:*20*
223:*12*, *14*, *16*
225:*23*

E-t-z-e-l 222:*22*

Etzel's 222:*23*

evaluations 111:*9*

evening 11:*13*

event 178:*18*
195:*20*

eventually 22:*1*
32:*4* 114:*17* 160:*9*

Evergreen 2:*8*

everybody 92:*5*
169:*21*

evidence 167:*10*, *11*,
*15* 210:*20* 215:*3*
219:*20* 220:*1*, *24*

evil 158:*16*

exact 10:*11* 31:*6*
122:*21* 185:*23*

exactly 10:*18* 19:*1*
23:*7* 31:*8* 32:*12*
34:*14* 36:*1* 79:*17*
95:*19* 96:*18*
114:*24* 118:*12*
144:*11* 147:*12*
150:*14* 161:*14*
187:*4*, *18* 215:*23*
219:*2*

**EXAMINATION**
3:*1* 5:*14* 183:*2*
188:*13* 209:*14*
229:*5* 233:*7*

examined 5:*12*

example 20:*23*
38:*6*, *14* 44:*11*
52:*23* 64:*18*

examples 92:*6*

executive 33:*11*, *13*

exempt 114:*8*
229:*16*

Exhibit 3:*13*

192:22 198:*2* 211:*3*

exonerated 79:*7*, *9*

expect 13:*1*

experience 33:*12*
219:*16*

explain 118:*4*
167:*13*

explained 90:*5*
107:*14* 119:*20*

explaining 71:*9*

express 16:*6* 51:*20*
64:*3*

expressed 13:*16*
33:*17* 34:*19* 38:*1*,
*12* 56:*2* 62:*16*
69:*17* 87:*5* 90:*23*

expressions 42:*8*

extent 58:*2* 180:*6*

**< F >**
face 122:*20* 201:*23*

Facebook 21:*23*, *24*
22:*4*, *6*, *17* 23:*1*
24:*18*, *21* 25:*24*
53:*11*, *17* 58:*14*
60:*17* 72:*19* 81:*14*
82:*2* 84:*1* 85:*3*, *11*
86:*5*, *11*, *18* 87:*20*
172:*3* 227:*13*, *14*,
*16*, *23* 228:*7*, *23*

fact 18:*2* 29:*20*
34:*17* 45:*23* 46:*6*
47:*8* 48:*22* 50:*12*,
*21* 57:*11*, *22* 59:*24*
60:*22* 61:*15* 63:*13*
65:*3* 66:*14* 68:*6*
70:*20* 72:*21* 74:*12*
75:*13* 76:*5*, *9*, *15*,
*19*, *21* 77:*3* 86:*4*,
*15* 104:*23* 121:*12*,
*18* 124:*15* 132:*12*
140:*21* 155:*10*
156:*8* 160:*1* 165:*7*
179:*7*, *16* 180:*2*
182:*7*, *9* 184:*11*, *18*,
*23* 185:*8*, *9*, *16*
186:*17* 187:*12*
188:*12* 192:*12*
200:*23* 218:*2*
221:*17* 222:*5* 232:*6*

factor 231:*18*

factored 30:*18*, *21*

facts 202:*1* 210:*20*

factually 50:*2*

fair 26:*16* 27:*9*
36:*1*, *4* 42:*4* 51:*9*
54:*16* 56:*23* 57:*6*
84:*7* 148:*10*, *12*
165:*17* 208:*19*
226:*13*

fairly 17:*7* 56:*23*
57:*6* 84:*12*

fairs 41:*8*, *21*

fall 34:*14* 159:*5*, *9*

false 181:*10*
201:*15*, *23* 206:*2*, *5*,
*13*

familiar 48:*13*
58:*22* 117:*4*
148:*23* 160:*17*
161:*4*, *13* 179:*23*
216:*8*, *12* 217:*20*
219:*17*

families 134:*4*

far 6:*8* 22:*8* 115:*9*
200:*8*, *10* 214:*15*

favor 118:*15*

favoritism 20:*15*

FBI 213:*8*, *11*, *22*,
*23* 214:*9*, *13*

February 121:*14*

federal 20:*4*

feed 121:*4*

feel 5:*2*, *8*

feelings 25:*18* 51:*5*
81:*22*

felt 26:*5* 51:*24*

female 224:*13*, *21*
232:*12*

fide 126:*12*, *19*

file 82:*20*, *23* 83:*1*,
*4*, *10* 128:*11*
130:*23* 131:*11*, *12*
142:*7*, *10*, *16*, *17*, *19*
143:*1* 144:*12*, *20*
145:*3* 146:*14*
155:*4*, *6* 158:*5*
160:*4*, *7* 161:*20*, *23*
162:*24* 163:*3*, *6*, *9*,
*13* 164:*1*, *7*, *10*, *11*,
*20*, *21*, *23* 165:*2*, *5*,

8, *10*, *13* 191:*17*, *23*,
*24* 192:*4* 219:*11*
220:*11*, *14*

filed 48:*14* 50:*13*,
*23* 121:*13*, *19*
122:*3* 132:*7*
166:*18* 214:*17*, *21*
219:*18*

files 80:*17* 110:*21*,
*22* 111:*4*, *6*, *10*, *12*,
*15* 136:*8* 162:*2*
187:*24*

filing 69:*13*

fill 231:*5*

filled 143:*9*

final 89:*23* 183:*23*

find 76:*17* 154:*9*
160:*8* 202:*3*

finding 128:*8*
130:*10* 157:*20*
219:*23*

finish 4:*21* 126:*16*
157:*6* 204:*19* 210:*9*

**FIRE** 1:*7* 97:*12*
115:*19* 164:*17*, *22*

firearm 144:*6*

fired 68:*2* 143:*8*

**FIRM** 2:*2* 95:*4*, *17*

firmly 42:*11*

first 58:*19* 79:*15*
80:*3* 82:*19* 88:*17*,
*19* 89:*21* 93:*9*
94:*8* 101:*8*, *20*
102:*4*, *14*, *18*, *24*
103:*6*, *13* 104:*16*
110:*7*, *19* 115:*11*
118:*22* 125:*20*
126:*2*, *5* 152:*13*
173:*7* 195:*5* 198:*7*,
*10*, *14* 214:*20*

firsthand 32:*20*

five 99:*17* 114:*1*, *2*,
*15*, *20* 194:*1*

fixed 154:*9*

flower 42:*7*

Floyd 54:*9*

follow 64:*24* 153:*8*
208:*22*

followed 65:*2*
129:*19* 130:*2*

**Frank Kosman Backwrite - 3/23/2022**
2:20-cv-02310-CSB-EIL # 17-3 Page 73 of 90
Paul Berge, et al. vs. City of Kankakee, et al.

155:*23* 219:*24*
**following** 173:*9*
**follows** 5:*13*
**follow-ups** 209:*13*
**FOP** 8:*10, 11* 14:*7, 8, 11* 15:5 18:*4*
**force** 96:*12* 156:*19*
**foregoing** 233:*10*
**forget** 95:*3* 145:*18*
**forgot** 23:7 70:*1* 115:*24* 147:*12* 148:*15* 224:*17*
**form** 16:*11* 20:*3, 17* 21:2, *15* 22:*11, 22* 25:*12, 20* 29:*4, 6, 11, 15* 30:*1* 32:*7, 18* 33:*20* 36:*5* 37:*11* 39:*23, 24* 41:*14* 42:*22* 44:7 45:*4, 18* 46:8 48:*1* 52:*3* 53:*13* 54:*23* 56:*4* 59:2 64:*10* 65:6 66:*3* 67:*3, 9, 15* 75:8 77:*4, 16* 78:*3* 85:*12* 87:*13, 15, 23* 120:*9* 121:*15* 150:*11* 162:5 171:*12, 20* 172:*8, 18* 173:*20, 22* 174:*13, 14, 22* 176:*21* 182:*23* 201:*4* 203:*3* 206:7 207:*13* 209:*8* 214:*2* 218:*23* 222:*1*
**formal** 26:*24* 125:*13* 126:*17* 127:*24* 149:*9* 153:*1* 218:*15*
**former** 162:*16* 214:5, *12*
**forms** 70:*23*
**forth** 32:*3* 72:*20*
**forward** 44:*20* 148:*15*
**found** 107:7 126:*11* 128:*14* 144:*4* 149:*19* 185:*24* 186:2 188:*14, 18, 21, 24* 189:*15* 202:*13, 16* 203:*1, 14* 205:6, *11*

**foundation** 21:*3, 15* 22:*23* 25:*22* 29:*16* 30:*12* 32:6, *19* 33:*21* 34:*9* 35:*13* 37:*12* 39:*1* 41:*15* 42:*23* 45:5 46:*9* 52:*4, 20* 53:*13* 55:*9, 19* 56:*24* 57:*16* 59:*3* 60:*4* 61:*3, 20* 62:*24* 63:*7, 21* 66:*4, 19* 67:*17* 70:*13* 71:*1* 75:*9* 76:*10* 77:*17* 78:*4, 24* 81:*24* 86:*21* 138:*8, 22* 139:*17* 140:*12* 143:*11* 170:*24* 171:*13* 172:*8, 20* 173:*22* 176:*22* 189:*4, 19* 210:2 211:*4* 212:*17* 213:*3* 216:*15* 217:*24* 218:*14* 222:*2*
**four** 99:*17* 114:*1, 2, 15, 20* 115:2 140:2
**frame** 167:*11, 13*
**FRANK** 1:*8, 14* 3:*1* 4:*11* 5:*11*
**FRAZIER** 2:7
**free** 5:2, *8*
**freely** 53:*10*
**friend** 165:*23* 172:*14* 188:*15*
**friendly** 141:*7, 8*
**friends** 53:*17* 140:*15, 17* 141:*4, 5, 20* 171:*9, 22*
**from/to** 210:*22*
**front** 17:*14, 15* 37:*3* 108:*12, 13* 122:*17* 147:*22* 196:*17* 211:*3*
**frustrated** 37:*9*
**frustration** 20:*23* 38:*12* 68:*10*
**full-time** 192:*10*
**further** 209:*12* 211:*10* 212:*4* 228:*24* 229:*5*

**future** 119:7 202:*22* 205:*17, 19*

**< G >**
**gang** 112:7 119:*10* 147:7, *9, 18, 19* 150:*11* 151:*12* 167:*18* 216:2, 7 218:*12*
**Gender** 175:*1*
**general** 13:22 25:*3, 19* 27:*16* 42:*24* 52:*1* 60:*21* 65:*10* 66:*9, 14* 83:*13* 99:7 100:*1, 20, 24* 101:*1*
**generally** 70:*11*
**generate** 152:*19*
**generated** 128:2 129:*11* 146:*3* 152:*16* 154:*10*
**generates** 176:*18*
**George** 54:*9*
**getting** 36:*4* 37:22 192:*14* 224:*12*
**give** 4:*21* 45:*12* 82:*16* 92:6 94:*11* 99:*23, 24* 116:*14* 193:*9*
**given** 4:*16* 32:*4* 33:*18* 35:*10* 51:7, *10* 69:*18* 70:7, *8* 177:*21* 220:*24* 221:*17* 233:*13*
**gives** 145:*21*
**go** 4:*19* 10:*10* 23:6 41:2, *20* 44:2, *18* 70:5 99:5 112:6 116:2 121:*3* 135:*4* 149:*13* 154:7 165:*15, 24* 172:*13* 173:6 175:*17, 19* 177:5 202:*21* 207:7 212:*20* 218:*18*
**goes** 126:*8* 185:*20* 205:*17*
**going** 6:*18* 12:*12* 16:*14* 28:*4* 31:*12* 41:7, *9, 13* 50:*11* 57:*13* 60:*12* 63:*11*

64:*17* 65:*3, 10* 66:9 72:*18* 74:*21* 75:*1* 91:2, *11* 95:*20* 105:*20* 121:*9* 132:*22* 137:*9* 140:*11* 158:*3, 20* 161:*19* 165:*15* 187:6, 7 189:*12* 193:*4* 196:2 199:*8, 9, 16* 202:*21* 207:6 209:*18* 210:*1, 14* 211:*19* 212:*11* 214:2, 7 216:*14* 220:*21* 223:9
**Good** 4:*3*, 5, 6 14:*1* 43:*24* 84:*16* 88:*11* 165:*23* 173:*14, 15* 188:*14* 202:2
**gotten** 67:*4*
**governed** 178:*12*
**government** 96:*14*
**granted** 219:22
**greater** 213:*11, 19*
**grew** 141:*24*
**groin** 122:*18*
**ground** 4:*19*
**group** 18:6 58:*14* 95:5, *8* 97:5
**groups** 227:*14*
**guess** 11:*1* 16:*17, 21* 23:*4, 11* 46:*15* 49:*21* 50:*13* 54:*19* 86:2 96:*17* 110:*12* 160:*9* 171:*1* 173:*14* 174:2, *17* 175:*16* 180:*20* 198:*16*
**gun** 143:6
**guy** 62:*20* 99:*21* 166:*9* 205:*16* 225:7
**guys** 20:*14* 51:*10* 143:*17* 217:*16*

**< H >**
**half** 202:*14*
**Hall** 1:*16* 95:*20* 99:*14* 233:*3*
**hand** 44:2 234:*1*
**handful** 219:*6*



**Frank Kosman Backwrite - 3/23/2022**
Paul Berge, et al. vs. City of Kankakee, et al.
2:20-cv-02310-CSB-EIL # 17-3 Page 74 of 90

**Handicapped** 175:*5*
**handle** 157:*2*
**handled** 95:*3*
158:*10, 11* 230:*17*
**handling** 206:*18*
**hands** 10:*20*
**happen** 49:*10*
172:*23* 207:*19*
221:*3*
**happened** 8:*12*
23:*8* 31:7 32:*8*
56:*10* 82:*18* 86:22
116:*9* 151:*8*
152:*12* 154:*9*
166:*10, 13, 24*
207:*16* 217:*9*
**happening** 148:*4*
**happy** 61:*18* 63:*24*
64:*3, 7* 140:*15*
**harassed** 28:*13, 14*
122:*11*
**harasser** 124:*11*
**harassment** 124:*2,
6, 20, 24* 125:*21*
126:*17* 129:*8*
130:*3, 18, 23* 131:*7,
13, 22* 132:*1* 152:*21*
**hard** 221:*23*
**hate** 213:*18*
**head** 4:*23* 14:*10*
47:*17* 175:22
**headline** 197:*13*
**hear** 32:*10* 60:*11*
214:*9*
**heard** 32:2, *5, 8*
34:2 47:*11* 62:*3*
64:2 86:*10* 214:*21*
222:*20*
**hearing** 79:*15*
125:6 189:7
214:*17* 215:*7, 13*
**hearings** 122:*15*
**hearsay** 25:2*1* 32:7,
*19* 33:21 34:*10*
35:*13* 60:*3* 61:*3*
64:*11* 67:*16* 86:*21*
87:*14, 23* 171:*19*
**heart** 158:*13*
**he'd** 156:2*1* 192:*8*

**held** 11:*16* 90:*8, 24*
91:*9, 15, 18, 23, 24*
92:*3, 7* 111:7
**help** 70:2, *3* 171:2*1*
227:*8*
**helped** 51:*8* 83:*11*
**helping** 172:*14*
**HERBERT** 2:2
3:*1* 4:*3, 6, 8, 15, 18*
5:*1, 6, 15* 6:*14*
16:*13* 17:*13* 18:*18*
20:*6, 21* 21:*5, 17*
22:*14* 23:2, *13*
25:*14* 26:2 29:*10,
19* 30:*4, 9, 16* 32:9
33:*1* 34:*1, 16*
35:*16* 36:*10, 17*
37:*14* 39:6 40:*3*
41:*24* 43:8 44:*15*
45:*15, 22* 46:*17*
48:*4, 8, 11, 12, 16,
20, 21* 52:9 53:*1,
16* 55:*5, 16, 24*
56:7 57:*4, 10, 21*
58:*12* 59:*8, 21*
60:6 61:7 62:2
63:*1, 12* 64:*1, 16*
65:*14* 66:*6, 23*
67:*4, 6, 11, 12, 18*
69:*11* 70:*4, 19*
71:*4* 75:*10* 76:*14*
77:*8, 21* 78:*7, 16*
79:*5* 82:*3* 84:*22*
85:*1, 17, 21* 86:*3*
87:*3, 17* 88:2 89:*5*
102:*3* 118:2*1*
120:*11* 121:*5, 9, 11,
17* 137:*20* 138:*12*
139:*3, 22* 140:*13*
143:*18* 147:*8*
150:6 162:7 171:*7,
14* 172:*1, 9* 173:*1,
23* 174:*7, 18* 175:*3*
177:*1, 14, 17, 20*
183:*7, 11, 15* 186:6
188:*23* 189:*10*
190:*1, 20* 193:*1, 10,
14* 198:*5* 201:*8*
203:*11* 204:2*1*
205:*4* 206:*12*
207:*20* 209:*11*

210:*1, 9, 19* 211:*4,
19* 212:*17* 213:*3,
13* 214:2 215:2
216:*14* 217:*24*
218:*14, 23* 220:2,
21* 222:*1, 4* 224:6,
23* 225:7 229:*4, 6*
232:2*1*
**hereto** 233:*20*
**hereunto** 234:*1*
**Hernandez** 225:*3, 4,
11, 12, 13* 232:*13*
**Hey** 165:*14, 24*
166:*8*
**hierarchy** 229:*19*
**higher** 15:*23* 29:*13,
21, 23* 104:7 117:*1*
120:*4, 7* 139:*14*
144:*17* 159:22
172:*16* 189:*18*
**hire** 40:*8* 41:*3*
176:*19* 177:*13*
**hired** 9:*5* 11:7
31:*1, 4, 21, 23* 32:*1*
33:*14* 76:*8* 91:*9*
93:*9* 94:2, *7, 14, 20*
96:*1* 97:*16, 22*
100:*5, 7, 11, 18*
103:7 105:*15*
110:*14* 140:*19*
141:*7, 11, 14, 17*
185:*2, 4, 10* 226:*13*
**hiring** 97:*13* 111:6
**historical** 52:*11, 17*
**historically** 38:*3, 8,
18*
**history** 74:*5*
**hit** 40:*17*
**hold** 49:*1* 107:*17*
126:*15* 148:*8*
157:*5* 182:*23*
184:*18* 196:*1* 197:*6*
**honest** 107:*9*
**Hopkins** 140:2*0*
141:*23* 142:2
**hostile** 28:*4*
**hostile-free** 27:*22*
**hours** 56:*14*
**human** 28:*6* 63:*23*
64:*3* 215:*19*

**hundred** 14:*21*
165:*1, 3*
**hundreds** 53:*3, 6*
54:*4, 11*
**HUNT** 1:*10* 15:*15*
16:9 18:*10, 20*
21:*8, 13, 20* 22:*1, 9*
24:*20* 25:*2, 6, 10,
18* 35:*4, 9* 36:*2, 12*
40:*11* 45:*16* 48:*17*
50:*6, 12, 13, 22*
51:*2* 53:*4, 10* 54:*6,
12, 16* 56:*2, 16, 17*
57:*14, 15, 23* 58:*16*
59:*1* 64:6 69:*13,
17* 70:*20* 72:*2*
75:2*1* 76:*1, 6, 16*
77:*10* 78:*1, 19*
79:*7, 11, 21* 80:*4,
20* 81:*7, 13, 21*
83:2*4* 84:7 85:*3,
10, 13* 86:*17* 87:*7,
19* 88:*10, 21* 89:*2*
94:*3, 13* 104:*18, 24*
105:*11, 13* 108:*2,
14* 109:*1, 6, 9*
117:*17* 123:*10*
140:*10, 16* 141:*3,
15* 160:*19* 161:*6, 9,
11* 165:*24* 166:*2, 3,
7* 167:*20, 24* 168:*1,
4, 9, 14* 169:*19, 23,
24* 170:*3, 20*
171:*10, 16* 172:*2, 4*
182:*13* 183:*16, 21*
184:*7, 12, 18* 186:*4,
5, 8, 18* 188:*6, 10,
14, 24* 189:*16*
190:*3, 10, 12, 22*
191:*19* 192:*13*
194:*17* 199:*14, 24*
200:*7* 203:*16, 17,
23* 204:*2, 10* 206:*6,
14, 23* 207:*11*
214:*11* 222:*11*
**Hunt's** 86:*5, 11*
93:22 98:*1* 105:*6*
190:6 194:*20*
195:*2, 13* 196:*10*
**hypothetical** 21:*3*
22:*12* 29:*16* 30:*13*



**Frank Kosman Backwrite - 3/23/2022**
2:20-cv-02310-CSB-EIL # 17-3 Page 75 of 90
Paul Berge, et al. vs. City of Kankakee, et al.

36:6  39:24  42:23
45:6  46:9  48:3
63:8  70:14  71:2
75:9  76:11  77:5,
18  78:14, 24
170:24  171:20
172:19  173:22
174:14, 23  176:22
201:5  203:4  206:8

**< I >**
**ID**  3:12
**idea**  187:5
**identification**
192:24  198:4
**identified**  211:21
**identify**  147:6
**identity**  175:1
**illegal**  199:8, 13, 16,
18, 21  200:8, 20, 22
201:19  207:6
209:18  210:14
211:15  212:11
213:24  214:3, 4, 7
220:5
**ILLINOIS**  1:1, 17,
19  2:4, 8  74:12
75:19  77:2  220:6
234:2
**imagine**  9:1
**impact**  150:7
**important**  133:20,
23  134:1, 3, 9
164:5  190:16, 21
205:20
**impression**  36:2, 12
54:5
**improper**  54:9
78:19  79:1, 3, 19
148:9  200:10
220:19
**improved**  42:14, 15,
16
**improvement**  42:18
**inappropriate**  84:2
144:5, 7
**incarceration**  157:9
**incident**  61:23
75:20  129:24  167:9
**include**  28:17
128:24  129:3

**included**  24:2
74:22  127:9
129:13  131:3
138:5  169:15
196:20  197:14
216:21
**includes**  142:19
**including**  167:2
175:4, 7
**inclusive**  41:16
**incomplete**  21:3
22:12  29:16  30:13
36:6  39:24  42:23
45:6  46:9  48:3
57:1  63:8  70:14
71:2  75:9  76:11
77:5, 17  78:23
170:24  171:19
172:19  173:22
174:14, 22  176:22
201:5  203:4  206:8
**incorrect**  49:18
50:2  170:1
**increase**  42:2
**incumbent**  9:1
**indexed**  146:17
**indicated**  211:14
**indifferent**  138:18
**indirectly**  233:20
**individual**  4:11
29:12, 24  33:6
115:11  127:16
134:3  162:18
163:15  172:16
173:5  191:16
**Individually**  1:10
95:8, 9
**individuals**  16:23
19:18  28:10  29:23
44:4  68:8  82:10
98:21  114:16, 20
137:3  148:10
151:5  155:10, 19
156:1  157:7
172:17  179:20
207:10  219:8
223:21  232:15, 18
**individual's**  146:15
**inform**  116:20

**informal**  125:11
126:4  131:20
156:23
**information**  60:1,
23  61:17  62:4, 17
63:9, 19  64:7
65:23  72:19, 23
73:10  99:24  111:6
136:23  137:4
160:3, 7  192:14, 17
206:1
**informed**  6:15
136:18
**initiated**  209:22
**inside**  93:13, 15
**instance**  24:21
51:18  57:2  62:15
76:3
**instances**  51:19, 20
**instructs**  16:16
**instrumental**  49:14
**insubordination**
130:20  131:2, 3, 4
**intended**  158:17
**intent**  158:16  226:8
**intentional**  153:17
218:11
**interacted**  111:21
**interactions**  112:10
**interest**  178:19, 24
179:20  195:6  228:4
**interested**  233:20
**internal**  73:3, 11
96:12  153:7  154:8
**interrogation**
122:13  123:1, 2, 11
125:3  126:21, 24
129:20  131:9, 10,
18  166:21  167:1
**interview**  80:18, 20,
22  82:4  88:15
94:22  95:10, 20
96:22  98:11, 22
99:15  100:3  105:5,
8  113:10  125:5, 8,
10, 12  126:5
128:22  135:7  184:4
**interviewed**  80:15,
24  82:10  85:9, 13
95:22  96:10, 21
97:1, 3, 6, 8  99:18,

20  125:3  129:7
131:16  226:7  227:4
**interviewing**  84:21
95:6, 11  96:3
**interviews**  81:6
82:12  83:23  89:21
95:5  97:24  98:9,
18, 24  99:12, 16
**investigate**  57:7
73:8  75:3, 4
124:24  182:16, 19
232:3
**investigated**  74:10
75:19, 22  77:20
79:3, 4  130:21
154:8  227:13
**investigating**  27:11
**investigation**  72:22
73:2, 9  74:13  75:6,
14, 16, 24  76:17
77:1  79:6, 8, 12
123:23  124:8, 19
125:14, 24  126:3,
12, 18  127:10
128:1, 3, 5, 8, 18, 21
129:23  130:8, 17
131:22  143:22
144:1  146:12
152:9  154:1, 3, 6, 8,
16, 21  156:23
166:15  170:4, 5
181:8, 20, 24
200:22  201:22
203:6, 20  208:7
209:23  210:17
211:6, 9, 16  212:5,
14  216:16  218:15
227:22  228:2, 4, 14,
18, 20  229:1
**investigations**  73:6
76:6, 23  133:9
**investigative**  78:20
127:3  146:10, 14
157:20  201:1, 9, 11
213:11
**investigator**  126:7
**investigatory**  27:7,
11  146:7
**invited**  12:10
**involved**  32:16
61:5  77:3  97:13



Frank Kosman Backwrite - 3/23/2022
Paul Berge, et al. vs. City of Kankakee, et al.
2:20-cv-02310-CSB-EIL # 17-3 Page 76 of 90

109:*8*, *13*, *15*
113:*10*  115:*15*
121:*20*  123:*10*
133:*9*  139:*10*, *14*
143:*21*  154:*24*
168:*2*, *4*, *11*, *15*
169:*6*  170:*3*, *16*, *20*
172:*5*  183:*21*
199:*7*  201:*2*
202:*21*  209:*6*
217:*17*
**involvement**  109:*18*
**involving**  112:*20*
**issue**  38:*11*  70:*6*
77:*24*  85:*10*  101:*4*
139:*2*  140:*4*, *8*
148:*17*  150:*12*, *17*,
*20*  214:*16*  216:*1*
**issues**  43:*1*  54:*21*
55:*2*, *22*  56:*6*, *8*
93:*5*  100:*23*
150:*10*  158:*1*
174:*3*  179:*3*  189:*8*

**< J >**
**jail**  156:*4*
**January**  226:*2*
**Jay**  105:*21*  108:*20*
222:*20*, *23*  223:*12*,
*14*, *16*  225:*23*
**Jefferson**  1:*19*  2:*3*
**job**  27:*20*  36:*4*
41:*8*, *21*  74:*16*
77:*12*  79:*21*  88:*11*
132:*16*  192:*11*
202:*4*  231:*2*
**Joe's**  179:*13*
**Jose**  225:*3*, *10*, *11*,
*13*
**Joseph**  225:*3*, *6*
**judge**  184:*4*
**judges**  181:*2*  184:*3*
**July**  108:*6*, *21*
**jump**  178:*5*
**justifiable**  173:*18*

**< K >**
**KAMEG**  47:*7*
143:*4*, *15*  148:*22*
216:*8*  217:*19*
218:*22*  219:*10*

**KANKAKEE**  1:*7*, *8*
4:*12*  5:*17*  11:*23*,
*24*  14:*11*  15:*5*
26:*6*  31:*12*  38:*3*,
*17*  39:*22*  42:*13*
43:*3*, *5*, *11*, *14*, *18*
44:*5*, *24*  45:*2*, *9*
50:*14*, *22*  51:*16*, *22*
52:*24*  54:*13*, *18*, *22*
58:*15*  65:*4*, *24*
68:*16*  69:*3*, *6*
70:*10*, *21*  73:*13*, *21*
74:*2*, *6*, *23*  91:*16*
96:*14*  99:*11*
108:*15*  112:*24*
113:*14*  123:*19*
124:*3*  125:*18*
127:*22*  129:*18*
130:*1*  139:*6*, *10*
145:*23*  152:*15*
153:*2*  158:*22*
162:*16*  176:*12*, *17*
178:*9*  179:*21*
180:*4*, *14*, *21*  182:*1*
191:*2*  196:*23*
207:*24*  208:*11*, *15*
213:*1*, *12*  214:*1*
219:*12*  220:*7*
221:*23*  223:*20*
226:*12*  232:*4*
**Kankakee's**  38:*12*
**keep**  50:*6*  64:*17*
82:*19*  88:*12*  89:*2*,
*3*  91:*22*, *23*  92:*4*
138:*13*, *15*  192:*12*,
*14*, *17*
**kept**  78:*1*  104:*17*,
*20*  116:*16*  230:*19*
**kidding**  177:*15*
**Kidwell**  47:*4*, *13*
231:*9*
**kind**  4:*19*  9:*11*
15:*1*  23:*15*  28:*7*
36:*20*  43:*4*  44:*23*
55:*22*  58:*11*  68:*3*
83:*13*  84:*24*  100:*2*
122:*5*  126:*12*
149:*5*  153:*16*
158:*18*, *20*  164:*9*
174:*16*  178:*5*

181:*17*, *18*  192:*7*
194:*6*  200:*2*  208:*2*
**kinds**  41:*8*  158:*12*
175:*1*
**knew**  12:*24*  18:*19*
59:*9*  64:*6*  72:*15*
78:*14*  86:*7*  104:*10*,
*13*  120:*3*, *6*  137:*21*,
*24*  138:*4*, *13*  139:*4*,
*13*  140:*9*  142:*3*, *6*
160:*6*  166:*3*  169:*9*
171:*9*, *15*  172:*15*
185:*18*  187:*23*
**know**  4:*15*  6:*3*, *8*,
*11*  7:*4*, *16*  9:*10*
10:*15*, *17*  11:*10*
12:*11*, *15*  13:*1*, *5*,
*21*, *23*  14:*9*, *23*
15:*22*  16:*1*, *3*, *5*, *19*
17:*11*  18:*12*  20:*19*
23:*9*, *11*  26:*23*
28:*5*  30:*5*  31:*6*, *8*,
*11*  32:*12*, *23*  33:*5*
34:*11*  35:*2*, *14*
37:*19*, *21*, *22*, *23*
38:*10*  40:*7*  43:*2*, *6*
44:*17*, *21*  45:*7*
46:*13*  47:*6*  48:*17*
49:*23*  54:*20*  55:*2*,
*14*, *22*  56:*9*  57:*18*
58:*5*, *24*  59:*6*, *14*
60:*5*, *10*, *13*, *14*, *16*
61:*5*  62:*1*, *21*  63:*9*,
*22*  64:*12*, *13*, *24*
65:*8*, *9*, *11*, *15*, *17*
66:*9*, *10*, *21*  68:*2*, *4*
69:*15*  70:*1*, *16*, *17*
73:*4*, *13*, *17*, *20*, *24*
81:*2*, *17*  82:*17*, *20*
83:*4*, *7*, *9*, *13*, *21*
84:*14*, *19*  86:*8*, *22*,
*23*  87:*2*  89:*19*
91:*13*  92:*16*, *17*, *19*,
*20*  93:*4*, *5*, *15*
94:*10*  95:*7*, *12*, *14*,
*16*  96:*6*, *10*, *18*
97:*9*, *10*, *11*, *14*
98:*6*, *11*, *22*  99:*4*, *5*,
*6*, *17*, *18*, *23*  100:*16*,
*17*, *18*  101:*2*, *23*
102:*8*, *10*, *11*

107:*15*  111:*7*, *21*
112:*1*  114:*19*, *23*
115:*3*, *9*, *14*  117:*23*
118:*12*  119:*8*, *17*
122:*17*, *21*  125:*16*
138:*24*  139:*19*, *20*
140:*4*, *16*, *18*  141:*5*,
*9*, *10*, *11*  143:*15*, *17*
145:*21*, *23*  151:*7*
154:*7*  156:*5*, *11*, *16*,
*18*, *21*  157:*2*  159:*4*
161:*15*  163:*18*
164:*16*  165:*20*, *22*,
*23*  166:*1*, *2*, *5*, *7*, *10*,
*12*  167:*20*  168:*13*,
*17*, *18*  169:*15*
170:*12*, *15*  171:*1*, *2*
173:*13*, *14*  175:*1*,
*11*  179:*13*  180:*5*, *6*,
*13*, *21*, *23*  181:*1*, *15*
182:*18*, *20*, *21*
183:*16*, *20*  184:*1*, *2*,
*4*, *6*, *14*, *15*, *16*, *24*
185:*3*, *23*  186:*1*, *7*
187:*3*, *21*  191:*10*,
*12*, *14*, *21*, *22*  192:*8*,
*9*, *10*  194:*22*, *23*
195:*19*, *20*  199:*17*
201:*15*  208:*15*
209:*21*  210:*16*
212:*4*, *12*  213:*5*, *9*
215:*11*, *23*  218:*20*
219:*2*, *3*, *12*  221:*3*,
*6*, *12*, *13*, *14*  226:*8*
227:*10*, *11*  230:*12*,
*20*  231:*8*
**knowing**  212:*18*
**knowledge**  7:*15*
21:*7*  32:*20*  128:*22*
144:*1*  145:*7*, *19*
149:*23*
**known**  77:*13*
78:*18*  86:*16*  87:*1*
96:*3*  228:*9*
**KOSMAN**  1:*8*, *14*
3:*1*, *13*  4:*3*, *12*
5:*11*, *16*  192:*20*, *21*
197:*23*  198:*1*
208:*13*
**KREISSLER**  1:*4*
4:*9*  19:*20*  109:*21*,



**Frank Kosman Backwrite - 3/23/2022**
2:20-cv-02310-CSB-EIL # 17-3 Page 77 of 90
**Paul Berge, et al. vs. City of Kankakee, et al.**

*24* 110:*3* 111:*1*
112:*4* 118:*11, 24*
119:*23* 120:*4*
132:*15* 135:*7*
145:*10* 163:*13*
165:*14* 214:*16*
223:5 225:*16, 18*
229:*7, 22* 230:*12*
231:*15* 232:7
**Kreissler's** 132:*16*

**< L >**
**lack** 32:*16* 211:5
**lag** 95:*23*
**late** 108:*6, 21*
**LAW** 2:2 178:*12,*
*15* 195:*10, 15*
196:5, *14, 16, 24*
197:*3, 11* 199:*12*
219:*16*
**laws** 178:*23*
**lawsuit** 48:*13*
50:*11, 14, 23* 51:*3*
69:*13* 183:9, *10*
219:*11*
**lawsuits** 122:5
**lawyer** 16:*14, 16*
50:*9* 71:*14*
**lazy** 55:*13*
**leadership** 67:*21,*
*23* 100:*1, 21* 120:*21*
**leading** 33:*21*
34:*10* 35:*12* 61:2
72:*11* 172:8
**learn** 217:*18*
**leave** 32:*24*
**leaving** 5:*24*
110:*13* 223:9
**led** 6:7 77:*1*
**left** 83:*14, 18*
105:*13*
**legal** 29:7 30:*13*
150:5 173:*14, 21*
174:2 215:*21*
**lesser** 175:*18*
**letter** 116:4 162:*11,*
*14* 163:2, *4, 16*
164:*1, 9, 15, 18, 23*
165:*4, 8, 10, 12, 13,*
*21, 24* 166:8

**199:*23* 200:*13*
208:*17* 211:*20*
**letters** 111:9
162:*22* 163:8, *12*
165:*16*
**level** 43:*9* 52:*1*
100:*23* 132:*23*
156:*22* 157:*12*
230:7
**liable** 156:*24*
**License** 1:*17*
**lied** 170:*13*
**lieutenant** 19:*4*
79:*21* 103:8, *15*
105:*21* 112:*14, 17*
113:*19* 115:*7, 10,*
*16* 116:*21* 134:*13,*
*24* 138:*19* 144:9
145:*10* 146:*24*
151:*10, 14, 22*
159:*3, 6, 13* 161:*24*
162:*3* 163:*17, 24*
164:*3, 12* 180:*10*
186:9 209:*17, 22*
210:7, *16* 211:*14*
212:9, *11, 12* 213:2,
*7, 23* 214:*11*
221:*16, 19, 22*
223:*1, 17* 224:*1, 20*
225:*20* 229:*20*
**lieutenants** 19:*13,*
*14* 113:*21* 230:2
231:9
**life-long** 188:*15*
**limited** 41:*11*
205:*24*
**line** 34:*14* 216:*3*
**lines** 34:*4* 170:2
**list** 19:*8, 23* 103:*18*
104:5 106:*1, 18*
107:*4* 108:9
109:*19* 110:*4*
113:*16* 114:*4, 11,*
*17* 135:*20* 145:9
172:*17* 175:6
183:*23* 184:9
188:*3* 189:9
214:*24* 223:*21*
**listen** 58:*18* 98:*13*
189:*12*

**little** 56:*15* 153:*15*
178:*3* 205:*15* 226:6
**lodge** 14:8
**lodged** 228:*16*
**long** 90:*20* 98:*14*
111:*11* 121:5
123:2 159:2
172:*23* 189:*13*
226:*16*
**longer** 4:*12* 5:*16*
**Lonnie** 148:2
**look** 58:*19* 71:8
74:*17* 120:*14, 21*
155:*1* 171:6
182:*12* 193:2
208:*12, 16* 210:2
211:9 212:6, *15*
228:5, *6, 22*
**looked** 71:9 77:*24*
78:*21* 154:*19*
169:*15* 214:*10*
**looking** 7:*3* 43:*3*
74:*16* 154:*20*
167:*1* 187:*23*
199:*10* 201:*23*
211:*20*
**looks** 193:*23*
**loose** 207:*24*
**lot** 41:6 56:*11*
59:5 97:2 98:*16*
159:*21* 174:2, *3, 24*
196:*23* 208:*20, 21,*
*23* 209:2, *4* 219:*4,*
*6, 14* 227:*12*
**lower** 29:*4, 12, 24*

**< M >**
**mad** 61:8
**maintenance** 206:*19*
**major** 90:*16* 112:5
**majority** 81:*4*
**makeup** 45:2
68:*16* 120:*17*
**making** 33:9 76:*17,*
*24* 89:*23* 104:*16*
117:*15* 133:8
135:8, *12* 138:6
171:*4* 183:*4* 186:9
230:8
**male** 47:*17, 21, 24*

224:*12*
**males** 18:5
**management** 33:*10*
**manager** 226:*3*
**March** 1:*18* 11:*1,*
*2, 3* 90:2 96:*1*
105:*13*
**marijuana** 38:7
**mark** 185:22
192:*20*
**MARKED** 3:*12*
192:*23* 198:*3*
**Martin** 148:5, *6*
217:*14*
**Martinez** 225:*12,*
*13, 14* 232:*13*
**Matt** 162:*20* 163:2
166:*3, 8*
**matter** 65:*1* 68:*14*
75:7, *16* 86:*24*
117:*12* 152:*10*
188:2 206:*21* 213:8
**matters** 37:*4* 111:9
233:9
**MAYOR** 1:9 6:*9,*
*10* 8:*15* 9:*18* 10:*4,*
*13* 12:*11* 14:*15, 19*
15:*12* 17:*3* 31:*1,*
*18* 33:2, *17* 36:22
37:6, *9, 19* 42:6
46:*15, 19* 47:*16*
49:6, *16* 50:5
59:*11* 60:2, *7, 11,*
*22* 61:8, *16* 62:*4,*
*16* 63:*19* 65:5
66:*1, 16* 67:*1*
68:*20* 71:*17* 76:7,
*8, 22* 77:*3, 10, 14,*
*19* 78:*21* 79:*12*
87:7 88:*3, 20*
89:*10* 91:9 94:*1, 8*
95:*12* 96:*22* 100:*4,*
*10, 21* 101:*17, 22*
102:5 105:*15*
106:*12, 20* 107:*12,*
*22* 109:5 117:*17*
137:*13* 138:*18*
160:*10* 190:*10*
200:*12, 13* 205:5,
*10* 206:6, *15* 209:7
214:*4, 12* 227:*19*



**Frank Kosman Backwrite - 3/23/2022**
Paul Berge, et al. vs. City of Kankakee, et al.
2:20-cv-02310-CSB-EIL # 17-3 Page 78 of 90

mayoral 8:*16*, *22*
9:*15*, *16*
mayors 7:*23*
**MCGRATH** 2:7
3:5 6:*12* 16:*11*
17:9 18:*14*, *16*
20:*3*, *17* 21:2, *14*
22:*11*, 22 25:*12*, *20*
29:6, *15* 30:*3*, *12*
32:6, *18* 33:*20*
34:9 35:*12* 36:5,
*15* 37:*11* 39:*1*, *23*
41:*14* 42:22 44:7
45:*4*, *18* 46:8 48:*1*,
7, *18* 52:*3*, 7, *20*
53:*13* 54:*23* 55:9,
*19* 56:4, *24* 57:*16*
58:8 59:2, *13* 60:*3*
61:2, *20*, *24* 62:*23*
63:7, *21* 64:*10*
65:6 66:*3*, *18* 67:2,
*9*, *15* 69:8, *21*
70:*13* 71:*1* 75:8
76:*10* 77:4, *16*
78:*3*, *9*, *23* 81:*23*
84:*20* 85:*12*, *20*, *24*
86:*20* 87:*13*, *21*
102:*1* 118:*18*
120:9 121:*3*, *15*
137:*17* 138:8, *20*
139:*16* 140:*11*
143:*10* 147:6
150:*4* 162:*5*
170:*23* 171:*12*, *18*
172:7, *18* 173:*20*
174:*13*, *22* 176:*21*
177:*11*, *16*, *19*
182:*23* 186:*5*
188:*21* 189:*3*, *19*
190:*19* 193:8
201:*4* 203:*3*
204:*20* 205:*1*
206:7 207:*13*
209:8, *13*, *15* 210:*4*,
6, *11* 211:*1*, 7
212:2, *21* 213:6, *14*
214:6 215:6
216:*18* 218:*3*, *17*
219:5 220:8 221:2
222:6 224:*10*

225:*1*, 5, 9 229:*3*
232:22
mean 11:*12* 17:*14*
27:*20* 35:7 39:*19*
42:6, 8 55:*20* 56:9
60:9 62:*11*, *19*
63:*23* 74:*15* 88:*23*
90:5 92:*15* 104:*4*
115:*17* 122:*17*
141:*17* 157:*11*
168:7 169:*1* 170:8
171:2 172:*11*, *23*
176:*1*, *12* 177:*11*
200:*3* 207:9
210:*23* 231:9
meaning 159:*10*
means 49:*24*
meant 30:*11* 118:9
mechanic 176:*16*
206:*17*
mechanical 177:*13*
201:*18* 208:9
mechanically 157:*2*
mechanics 31:6
161:*14*
media 57:*12* 58:*1*
60:*24* 62:6, 7, *13*
63:*11*, *14*, *20* 66:9
68:*18* 72:*23* 73:*3*
meet 94:*16* 101:*3*,
6 118:22 226:*17*
meeting 7:*21* 8:*1*,
5, 9, *10*, *17* 9:8, 22
10:*16* 11:9, *23*
12:9, *12*, *23* 13:*11*,
*17* 15:7 18:4 20:5,
7 21:*10* 87:22
89:*20* 90:*20* 91:8
93:*23* 94:8, *19*
96:*23* 100:*20*, *21*
101:*17* 115:*23*
116:*1*, 2, *3*, 5, 9, *10*
117:7, 8
meetings 37:7
101:*1*, *3* 176:2, *3*
member 34:*5*
members 13:*17*
14:*5*, *13* 17:6, *15*
21:7 34:6 37:*10*,
*16* 54:22 74:2
80:*15* 81:*1* 95:*18*

96:6, *11* 147:*18*, *19*
154:*18* 155:*16*
218:*11* 226:8
membership 14:*5*
15:5 18:*4*
memberships 13:*22*
memo 71:9 115:22
116:*11*, *15*, *16*
118:*13*
mention 47:*10*
62:4 92:*10* 199:*18*
mentioned 12:*18*,
*21* 18:*12* 24:6
35:*18* 43:22 62:*19*
81:*18* 88:*1*, *24*
91:*14* 93:*23*
112:*20* 140:*18*
186:*18* 187:*17*, *20*
merits 126:*5*
messages 21:*23*, *24*
22:5
met 4:6 89:*15*, *23*
102:*10* 112:*4*
160:*21* 226:*15*
227:*4*
meter 121:*4*
**MICHAEL** 2:7
26:9, *12*, *14* 103:*5*,
7, *14*, *17* 104:*7*, *10*
105:*20* 106:*3*, *13*,
*15* 109:*10*, *14*
116:*21* 117:*1*
143:*1* 146:*19*, *23*
162:*11*, *23* 163:*5*
168:*23* 180:9, *15*,
*18* 182:9, *14* 184:*8*,
*12* 188:*13* 223:22
224:*20* 232:8
**Mid** 82:*11*
midnight 112:*2*
**Mike** 193:*10*
million 176:*18*
mind 139:*21*
158:*13*, *14*, *15*
183:*11*
mine 137:9 168:*20*
169:*12*
minute 193:9
minutes 90:*21*
226:*18*

mischaracterized
205:22 206:*1*
misconduct 77:*14*
142:*20* 146:2, *18*,
22 150:8 152:*24*
156:8, *9* 158:*5*
207:*12*
misfire 143:*3*
220:*20*, 22 221:*1*
mission 41:2
misspoke 109:*17*
187:*1*
misstates 44:8
46:*10* 69:9 85:*14*
138:9, *21* 139:*16*
172:7 189:*3*, *20*
215:2
mistake 158:*14*, *15*
218:*10*, *19*, *22*
mistakes 158:*13*, *14*
mistreated 43:*18*
81:*10*
mistreating 24:*12*
42:*20* 43:*10*, *12*, *15*
44:*4* 54:7
misunderstanding
169:*13* 170:*14*
misuse 219:*10*
misused 218:*5*
mmcgrath@osmfm.c
om 2:9
moments 152:*23*
**Monday** 115:*24*
money 38:8 134:6,
8 175:*17*, *19*
month 71:*21*
102:*18* 176:2
months 71:*18* 72:7
88:*14*, *18*, *21* 106:9
111:*13* 136:*12*
159:5, *12*
morning 4:*3* 119:*1*
motion 219:*19*
220:*3*
motions 219:*17*, 22
move 91:*3* 103:6,
*13* 105:*21*
moves 108:*11*
moving 91:*10*
177:*17*



Frank Kosman Backwrite - 3/23/2022
Paul Berge, et al. vs. City of Kankakee, et al.
2:20-cv-02310-CSB-EIL # 17-3 Page 79 of 90

**multiple** 118:*18*
184:*4*
**MURPHEY** 2:7

**< N >**
**name** 4:7 6:*11*
93:*23* 95:*3* 96:*21*
98:*1* 162:*17*
222:*20, 21* 224:*16,*
*22* 228:*10*
**named** 14:*20*
**names** 83:*12* 96:*10*
224:*3* 227:8
**narcotics** 167:*5, 7,*
*12, 15*
**nation** 43:*4*
**national** 39:*19* 43:*9*
**nationwide** 43:*16*
**nature** 27:*16* 63:*23*
64:*3* 200:*1*
**Nazarene** 162:*15*
163:*20*
**near** 96:*24* 225:*21*
**necessarily** 59:*22*
**need** 5:8 166:*9*
179:*7, 15* 200:*21*
201:*21*
**needed** 38:8 76:*16*
80:*11* 101:*5*
119:*11* 120:*13*
123:*24* 146:*3, 6*
179:*19* 195:*1*
**needs** 124:7
146:*11* 177:*3, 23*
194:*11*
**negative** 13:*18*
22:*20* 23:*1* 25:*18*
43:*1* 53:*11* 57:*12,*
*24* 58:*16, 20, 24*
59:*5, 11* 60:*1, 23*
61:*11, 16* 62:*4, 17,*
*20* 63:*11, 13, 19*
64:*21* 65:*23* 66:*9,*
*24* 72:*19, 22* 76:*18,*
*24* 81:*21*
**negotiate** 202:*4*
**negotiating** 201:*17*
**negotiations** 199:*20*
202:*2*
**neighborhoods** 41:*3,*
*8*

**never** 27:*10* 33:*18*
35:*18* 62:*3* 72:*1*
77:*9* 104:*23* 105:*2*
127:*2* 129:*7, 10*
131:*8, 16* 137:*15,*
*23* 154:*10* 155:*6*
156:*7* 184:*1*
194:*22* 203:*20, 23*
206:*4*
**new** 6:*9* 7:*3* 17:*19*
112:*23, 24* 149:*6*
**news** 87:2 205:*19*
**newspaper** 74:*16*
75:*18*
**NICKEY** 1:*10*
97:*8, 10, 16, 21*
**non-blacks** 221:*10,*
*20*
**non-police** 75:*16*
76:*2*
**normal** 55:*1* 92:*23*
126:*22*
**normally** 127:*5*
**notation** 203:*6*
**notes** 82:*13, 14, 16,*
*19* 227:*3*
**notice** 1:*20*
**notified** 166:*20*
**Nowadays** 174:*24*
**NUMBER** 3:*12*
8:2 45:*14* 127:*3, 7,*
*14* 128:*1* 129:*10,*
*21, 22* 146:*7, 8, 9*
152:*16, 19* 153:*11*
154:*10* 217:*2* 219:*7*
**numbers** 45:*13*
**numerous** 24:7
36:*21* 38:*22* 48:*14*
50:*22* 81:*15* 151:*5*

**< O >**
**Object** 56:*4* 69:*8*
140:*11* 210:*1*
211:*19* 214:*2*
216:*14* 220:*21*
**Objection** 16:*11*
17:*9* 20:*3, 17* 21:*2,*
*14* 22:*11, 22* 25:*12,*
*20* 29:*6, 15* 30:*12*
32:*6, 18* 33:*20*
34:*9* 35:*12* 36:*5,*

*15* 37:*11* 39:*1, 23*
41:*14* 42:*22* 44:*7*
45:*4, 18* 46:*8* 48:*1*
52:*3, 20* 53:*13*
54:*23* 55:*9, 19*
56:*24* 57:*16* 59:*2*
60:*3* 61:*2, 20*
62:*23* 63:*7, 21*
64:*10* 65:*6* 66:*3,*
*18* 67:*2, 9, 15*
69:*21* 70:*13* 71:*1*
75:8 76:*10* 77:*4,*
*16* 78:*3, 10, 23*
81:*23* 85:*12, 20, 24*
86:*20* 87:*13, 22*
120:*9* 121:*15*
137:*17* 138:*8, 20*
139:*16* 143:*10*
150:*4* 162:*5*
170:*23* 171:*12, 18*
172:*7, 18* 173:*20*
174:*13* 176:*21*
182:*23* 188:*21*
189:*3, 19* 201:*4*
203:*3* 204:*20*
205:*1* 206:*7*
207:*13* 209:*8*
210:*9, 19* 211:*24*
212:*17* 213:*3, 13*
215:*2, 4* 217:*24*
218:*14, 23* 220:*2*
222:*1*
**objections** 16:*15*
**observations** 132:*24*
**observe** 111:*18*
**observing** 111:*16*
136:*10*
**obviously** 4:*20*
16:*15* 19:*18*
124:*10* 185:*9*
193:*5* 212:*1*
216:*10* 220:*12*
**occur** 221:*16*
226:*19*
**occurred** 144:*8*
221:*6*
**occurring** 26:*6*
27:*17* 73:*21*
**o'clock** 11:*13*
**October** 159:*11*
**ODELSEN** 2:7

**off-duty** 167:8
195:*17* 196:*3, 6*
197:*1, 8*
**office** 6:*17* 82:*21,*
*23* 83:*9* 89:*15, 24*
102:*14, 18* 108:*10,*
*13, 16* 119:*18*
125:*9* 143:*3, 15*
148:*16* 149:*10, 14,*
*23* 153:*9* 155:*13*
159:2 216:*24*
217:8 218:*21*
226:*20*
**officer** 10:*3* 12:2
24:*16* 29:*21* 46:2
52:*23* 55:*12* 56:*10*
58:*5, 6* 64:*14* 85:7
122:*16* 125:*3*
134:*4* 142:*15, 20*
146:*3* 153:*1, 23*
156:*16, 19* 163:*10*
166:*13* 167:*3*
181:*1* 221:*17, 21,*
*23* 223:*10* 224:*13*
**officers** 11:*24* 12:7
14:*6, 12* 17:*22*
18:*11, 21* 19:*9, 11*
20:*24* 21:*9, 13, 21*
24:*12, 20* 25:*7, 17*
26:*5* 27:*15, 21*
29:*14, 22* 30:*22*
40:*9, 13* 42:*20*
44:*4* 45:*14* 48:*14*
50:*23* 51:*11* 52:*19*
54:*17* 55:*7, 8, 18,*
*21* 56:*2, 3, 10, 18,*
*23* 57:*24* 59:*18*
67:*24* 68:*20* 69:*1,*
*19, 20* 70:*12, 23, 24*
74:*23* 81:*6, 10*
82:*7, 9* 83:*12, 23*
84:*18* 85:*5* 86:*17*
87:*12* 88:*16* 90:*7,*
*23* 136:*22* 147:*22*
148:*10* 150:8
152:2 156:*12*
160:*15* 165:*9*
216:*20* 221:*18*
223:*24* 224:*19*
226:*7, 16* 227:*4, 5, 9*
**Official** 1:*11*



**Frank Kosman Backwrite - 3/23/2022**
2:20-cv-02310-CSB-EIL #17-3 Page 80 of 90
**Paul Berge, et al. vs. City of Kankakee, et al.**

**Oh** 44:*17* 113:*4*
145:*16* 185:*13*
196:*1* 198:*15* 215:*3*
**oil** 206:*18*
**Okay** 4:*18*, *23* 5:*5*,
*6*, *9*, *10*, *22* 6:*3*, *6*,
*10*, *11*, *20* 7:*5* 8:*12*,
*17* 9:*12*, *16*, *23*
10:*7*, *15*, *19*, *23*
11:*9*, *14*, *20* 12:*8*
13:*10* 14:*8*, *16*, *22*
15:*2*, *20* 16:*2*, *5*, *17*
17:*14* 18:*2*, *8*, *15*
19:*15* 20:*22* 21:*6*
24:*18* 25:*9* 26:*9*,
*21* 27:*9*, *14* 28:*9*,
*17* 31:*23* 33:*16*
34:*22* 35:*17* 37:*15*
38:*11*, *16* 39:*7*
42:*6*, *17* 45:*16*, *23*
47:*8* 49:*3* 50:*11*,
*21* 51:*2*, *5*, *19* 53:*2*,
*9*, *20* 54:*3*, *11*, *16*
56:*15* 57:*5* 58:*13*
59:*22* 61:*14* 62:*10*
63:*4*, *15* 64:*2*, *6*
66:*8*, *24* 69:*5*, *16*
71:*20*, *23* 72:*2*, *13*,
*18* 79:*23* 83:*22*
84:*17* 89:*18* 90:*4*,
*12*, *15* 91:*5*, *7* 96:*9*
98:*15* 100:*7*, *13*
101:*13*, *20* 103:*13*
104:*6* 105:*23*
106:*2*, *8*, *11* 107:*5*,
*20* 108:*7* 110:*4*, *7*,
*22* 111:*11* 112:*3*, *9*
113:*18* 114:*2*, *19*
115:*5*, *15*, *20* 116:*4*,
*8* 117:*9* 118:*22*
122:*3*, *10*, *23* 123:*6*
125:*13* 126:*6*
127:*18*, *24* 128:*4*
130:*7* 135:*23*
136:*6* 140:*5*, *9*
142:*19*, *23* 143:*8*
144:*20*, *23* 145:*3*, *7*,
*18* 146:*11*, *18*
148:*13* 150:*16*
151:*24* 153:*7*
155:*3* 159:*12*

161:*4*, *17* 162:*17*
163:*4*, *8*, *22* 167:*9*,
*17*, *20* 168:*9*
169:*18*, *22* 173:*10*,
*16* 175:*4*, *13*, *23*
176:*8* 177:*19*
178:*2*, *14* 179:*23*
180:*8*, *13* 181:*19*
183:*16* 184:*6*, *11*,
*22* 186:*16* 189:*12*,
*14* 190:*2*, *17* 192:*3*
193:*17*, *18* 194:*2*, *7*,
*10*, *13*, *24* 195:*22*
196:*9* 197:*22*
198:*10*, *21* 199:*1*,
*22* 200:*6*, *12*
202:*23* 213:*7*
215:*7*, *18* 218:*20*
219:*8* 220:*9* 221:*3*
229:*11*, *13* 230:*12*,
*24* 232:*22*
**old** 87:*2* 205:*19*
208:*22* 224:*12*
**Olivet** 162:*15*
163:*20*
**on-board** 222:*7*
**once** 95:*8* 101:*4*
173:*6*
**one-on-one** 226:*19*
**ones** 57:*18* 58:*10*
100:*24* 209:*6*
**one's** 193:*23*
**ongoing** 192:*7*
**open** 9:*11* 38:*16*
125:*24* 126:*2*
152:*9* 211:*9* 212:*5*
226:*23*
**opened** 177:*6*
210:*17* 211:*16*
212:*14* 227:*22*
**opening** 110:*12*, *16*
**opinion** 13:*22*
62:*17* 137:*10*, *12*,
*13*, *16* 196:*18*, *19*
206:*22* 221:*16*
**opinions** 13:*16*
**opposed** 4:*22*
**order** 19:*7* 20:*2*,
*10* 110:*11* 113:*15*
114:*3*, *17*, *21* 115:*6*,
*12* 116:*22* 135:*20*,

*24* 136:*4* 208:*11*
232:*16*
**organizational**
108:*10*, *14*
**outcome** 233:*21*
**outdoor** 195:*20*
**outfit** 95:*4*
**outside** 93:*12*
95:*21* 99:*19* 141:*6*,
*10* 194:*3*, *5* 196:*11*
197:*13*, *14*, *15*, *18*
226:*11*
**overhear** 147:*5*, *9*,
*11* 148:*21* 149:*2*, *7*,
*13*, *16*, *20* 153:*20*
161:*16*
**overhears** 216:*3*, *21*
**overtime** 55:*2* 56:*9*,
*11*, *12*
**owned** 179:*11*
**owners** 176:*10*
**ownership** 179:*14*
**owning** 179:*5*

**< P >**
**p.m** 1:*18* 232:*23*
**packet** 116:*7*
**page** 195:*8*, *9* 196:*2*
**panel** 95:*5* 98:*11*
99:*15*
**paper** 10:*22* 15:*2*
**paperwork** 125:*10*
**paragraph** 211:*23*
**parcel** 130:*19*
**Park** 2:*8* 140:*20*
141:*23* 142:*2*
**part** 16:*17* 17:*5*
20:*14*, *22* 27:*20*
34:*18*, *24* 35:*19*
39:*21* 42:*5* 54:*11*
87:*18*, *19* 91:*3*
110:*10* 114:*17*
119:*8* 122:*9*
124:*10* 125:*13*
128:*21* 129:*24*
136:*9* 139:*9*
140:*24* 146:*15*
154:*8* 155:*2* 157:*3*
160:*5* 164:*2*, *11*
174:*9* 178:*9*, *15*, *23*

181:*2* 184:*3* 194:*5*
203:*15* 226:*3*
230:*24*
**partial** 179:*14*
**participation** 42:*2*
**particular** 8:*18*
9:*15*, *24* 13:*19*
23:*22* 28:*23* 66:*13*
83:*1* 126:*6* 127:*6*
150:*21* 228:*23*
**parties** 34:*13*
233:*19*
**pass** 107:*7* 173:*6*, *7*
**passed** 10:*22* 19:*9*,
*19* 118:*2*, *5*, *14*
119:*7*, *24* 122:*1*
**passing** 92:*16*
**Passwater** 7:*14*, *20*
8:*2*, *13* 9:*9* 46:*5*
**P-a-s-s-w-a-t-e-r**
7:*14*
**patently** 201:*22*
**patrol** 16:*4* 46:*13*
47:*11*, *23* 59:*17*
148:*3* 167:*16*
203:*9* 222:*16*
223:*1* 230:*6*
**PAUL** 1:*2* 4:*8*
19:*19* 121:*12*
124:*16*, *20* 125:*1*
129:*7*, *11* 130:*5*
131:*7*, *13*, *16* 132:*2*,
*7*
**paused** 190:*17*
**pay** 58:*21*
**peculiar** 126:*20*
**pending** 5:*3* 49:*2*
166:*15* 190:*19*
**people** 8:*3* 9:*10*
12:*5* 14:*14*, *24*
18:*2* 22:*5*, *10*, *20*
23:*3*, *10* 24:*4*, *12*,
*15*, *17* 25:*3*, *10*, *19*
41:*6*, *7*, *10* 44:*19*
49:*14* 53:*11* 54:*6*,
*7* 61:*10*, *11* 68:*6*
81:*15*, *21*, *22* 82:*4*
84:*12* 85:*9* 86:*10*,
*11*, *14* 95:*5* 97:*4*, *5*
98:*1* 114:*3* 134:*14*
138:*17* 143:*9*, *14*



**Frank Kosman Backwrite - 3/23/2022**
2:20-cv-02310-CSB-EIL # 17-3 Page 81 of 90
Paul Berge, et al. vs. City of Kankakee, et al.

155:*12* 159:*21*
160:*1, 7* 170:*21*
171:*16, 17* 176:*10*
178:*16* 188:*19*
189:*1* 220:*6*
224:*24* 231:*10*
**people's** 84:7
**perceived** 195:*5*
**percent** 14:*21*
45:*11* 165:*1, 3*
**percentage** 24:*4*
**perception** 168:*15*
**performance** 56:*5*
79:*21* 132:*16, 23*
133:*11, 14* 167:7
221:*17*
**period** 72:*10*
136:*10* 198:*11*
**permanent** 16:*20*
105:22
**person** 7:8 13:6
24:*3* 35:22 44:*14*
59:*1* 62:*12* 86:9
91:23 107:8
123:*16* 124:*11*
183:*4* 206:9
228:*10, 23* 231:*4*
**personal** 22:*6*
83:*15, 17* 233:*12*
**personally** 129:*9*
131:*23*
**personnel** 15:*24*
54:*13* 55:2, *22*
73:*18* 80:*16* 92:22
93:*4, 18* 95:*19, 22*
102:*17, 21* 103:6,
*13* 104:*17* 108:*11,
15* 110:*21, 22*
111:*4, 5, 10, 12, 15,
21* 136:7 142:7, *10,
16* 145:*3* 146:*15*
150:*10* 158:*1, 4*
160:*3, 7* 161:*20, 23*
162:2, *23* 163:*3, 6,
9, 13* 164:6, *20, 21,
23* 165:*2, 4, 5*
191:*16, 23, 24*
192:*4* 220:*11*
**personnel-wise**
102:*15*

**persons** 228:*11*
**pertain** 197:*15*
**phone** 13:*5* 71:*21*
72:7
**pick** 107:*10* 117:*5*
175:*20*
**picture** 24:*3* 59:*17*
60:*17*
**piece** 10:*21*
**place** 10:*24* 13:*4, 8*
88:*13* 92:*12*
100:*13* 106:6
108:*8* 110:*5, 17*
119:*16* 125:8
149:*10* 151:*17*
152:*13* 178:*24*
193:*6, 21* 194:2
233:*16*
**places** 230:*16*
**plain** 35:*21*
**Plaintiffs** 1:*5* 2:*6*
4:*8* 19:*19*
**plan** 42:2
**planned** 90:*13*
**plates** 75:*20*
**play** 160:2
**played** 180:*14, 17,
22* 182:*13, 21*
183:*17* 184:7
**please** 78:6
**Plus** 91:*17*
**point** 9:*3* 12:6, *16*
33:9 35:6 50:*19,
20* 53:*18* 62:*20*
81:*19* 88:*4* 98:*12*
106:*24* 145:*4*
166:*16, 23* 187:*10,
20* 188:*18, 24*
189:*15* 198:*22*
202:*12, 15* 229:*8*
232:*8*
**pointed** 55:*11*
138:*2*
**points** 100:*22*
104:*3*
**POLICE** 1:7 6:*18*
10:*3* 11:*24* 12:*2, 7*
13:*11, 14, 18* 14:6,
*12* 15:*5* 16:*8*
17:*22* 18:*11, 20*
20:*24* 21:*9, 12, 20*

24:*12, 16, 20* 25:6,
*17* 26:*5, 6, 21*
27:*15, 17, 21* 29:*14,
21, 22* 30:*22* 31:*22*
32:*3* 33:*13* 38:*23*
39:*4, 8, 16, 22* 40:6,
*12* 41:*4* 42:*4, 12,
20* 43:*10, 11, 15, 19*
44:*1, 4, 5, 20, 24*
45:*10, 11, 14* 46:2,
*12* 47:*17* 48:*14*
49:7, *13* 50:*23*
51:*11, 16, 22* 52:*18,
23* 54:*14, 17, 18, 22*
55:7, *12, 18* 56:*1, 3,
17, 22* 57:*23* 63:*4,
10* 64:*19, 23* 65:*21*
66:*1, 16* 67:*1, 8, 14,
22, 24* 68:2, 7, *16,
20* 69:*1, 14, 19*
70:*10, 11, 12, 22, 23,
24* 73:*13, 14, 21*
74:2, 6, *12, 13, 18,
21, 22, 23* 75:6, *15,
19* 76:*1* 77:2, *14*
80:*16* 81:*1, 6, 10*
82:*5, 7, 9* 83:*14, 23*
85:*4* 86:6, *12, 17*
87:*12* 88:*16* 90:7,
*8* 91:*9, 15, 16* 92:*5,
7, 11* 96:*12* 97:*12*
99:6, *11* 102:*5, 13,
18, 21* 108:*15*
115:*18* 120:*21*
123:*19* 124:*3*
125:*18* 127:6, *14,
22* 130:*1* 133:*23*
134:*3, 17, 21*
136:*22* 138:*1, 5*
139:*4, 11, 14, 24*
141:*13, 16* 142:*15,
20* 146:*1* 152:*2, 15,
24* 153:*2, 22* 154:*1,
17, 21, 24* 155:*2, 23*
160:*15* 162:*16*
164:*17, 22* 166:6
167:*21* 170:*22*
171:*3* 175:*9, 10, 15*
176:*19* 178:*9, 16*
179:*1, 2* 180:*14, 21*
186:*21* 191:2

193:7, *24* 196:*23*
199:*11* 208:*12, 16,
20* 209:*3, 5* 213:*1,
12* 215:*14, 18*
221:*17, 23* 222:*8,
24* 223:*3, 20* 226:*8*
228:*5, 13, 17, 24*
**policeman** 44:*13*
**policies** 157:7
178:*9*
**policing** 43:*1* 54:*10*
**Policy** 3:*14* 123:*20,
23* 124:*4, 7, 10, 13*
125:*18, 19* 129:*18*
130:2, *22* 152:*14*
153:*2, 8, 13, 14*
154:*13* 178:*10, 11,
15, 23* 191:*1, 5*
192:2 193:*3, 6, 21*
194:2, *10* 195:*4, 16*
197:*9, 12, 14, 18*
218:*16* 226:*23*
**political** 34:*13*
59:*10* 61:*11*
**politics** 10:2
**pool** 134:*14*
**population** 139:*1, 5*
**portion** 91:*20*
**position** 31:*19*
39:*20, 21* 94:*13*
104:*18, 21, 24*
105:*3, 6, 9* 110:*12*
119:*22* 132:*21*
222:*18, 24* 225:*19*
229:*17* 230:*8*
231:*5, 15*
**positions** 97:2
111:7, *23* 114:*8*
**positive** 13:*18*
**possible** 86:2
**possibly** 95:*18*
97:*3* 145:*1*
**post** 25:*24* 58:7, *8*
64:*14* 66:*13*
227:*23* 228:7, *11, 23*
**posted** 22:*16* 58:*5*
59:*17* 60:*2, 15, 24*
61:*11, 17* 62:*5, 18*
63:*20* 72:*23* 84:*1*
156:*5*



**Frank Kosman Backwrite - 3/23/2022**
**Paul Berge, et al. vs. City of Kankakee, et al.**
2:20-cv-02310-CSB-EIL # 17-3 Page 82 of 90

**posting** 57:*24*
62:*13, 20* 73:2, *10*
81:*14* 82:2 171:22
172:2
**postings** 23:*15, 18*
**posts** 22:4, *17* 23:*1,*
*7* 24:2, 8, *11, 19, 21*
53:*11, 20* 57:*12*
58:*3, 13, 15* 64:*21*
65:*3* 66:*15, 21, 24*
76:*18, 24* 85:4, *11*
86:*5, 11, 18* 87:20
227:*13, 14, 15, 16*
**potential** 73:*24*
74:20 196:*5* 197:*3*
**potentially** 53:*21*
**powers** 196:*5*
197:*3, 11*
**practice** 60:*18*
62:*14*
**precedence** 174:2
**predominant** 45:*8*
**predominately** 45:*1*
**prefaced** 49:*19*
**preference** 7:*17*
39:*10* 70:*11*
**preferred** 7:*19*
**preparation** 51:*8*
71:*6*
**prepare** 71:*5*
**PRESENT** 2:*1*
**prestige** 134:*6*
**pretty** 38:*16* 42:*8*
75:*6* 99:2 118:*10*
**prevent** 144:*16*
168:*1*
**previous** 4:*7* 73:*1*
233:*6*
**Price** 31:9, *11, 15*
33:*15* 46:*21* 71:*23*
72:*21* 73:9 75:*14*
76:23 175:22
214:*12*
**print** 227:*15*
**prior** 31:*11* 44:*8*
46:*10* 69:9 76:*12*
85:*14* 89:8 91:9
94:20 97:*21*
104:*16* 108:*1*
109:*1* 113:*1*
117:*15* 135:8, *11*

138:*6, 9, 21* 139:*17,*
*23* 142:3 146:*19,*
*21* 172:8 183:*6*
185:*16* 186:9
189:*3* 212:*13*
221:*3, 11, 19*
**proactive** 119:9
132:22 133:4, *7*
**probably** 5:*7* 11:*1*
12:*18* 30:4 33:8
45:*12* 53:*3, 6*
58:*15* 59:*10* 69:*5*
71:*21* 82:6 87:*1*
89:*17* 93:6 94:*18*
95:*24* 99:*21* 106:*7*
108:*6* 125:*6* 126:*4,*
*8* 159:*4* 160:*16, 22,*
*24* 161:2 163:*3*
165:*4* 174:*6, 10*
179:*3* 187:*17, 23*
191:*13* 198:*13*
205:*24* 206:*19*
217:*14* 227:*17*
230:*17*
**problem** 41:*18*
43:*23* 153:*20*
154:*9* 171:*23*
207:*23*
**problems** 54:*17, 19*
55:*3* 56:2 73:*20*
**procedural** 158:*17*
**procedure** 149:9
153:*18, 19* 160:*17*
161:*11*
**proceeding** 4:*7*
**proceedings** 233:*14*
**process** 31:*21* 32:2
41:*23* 50:*15* 89:*20,*
*22* 94:22 95:*1, 10*
96:22 99:*8, 10*
104:*3* 109:9, *13, 16*
110:8, *17* 112:*13,*
*21* 113:8, *10, 11, 13,*
*14* 129:*16, 21*
145:8, *20* 153:*1, 21*
161:*5* 164:*12*
168:*16* 173:9
175:*13, 20, 24*
176:9 177:*5, 22*
180:*3, 8, 11, 15, 22,*
*23* 181:2, *6, 22*

182:*3, 6, 14* 183:*17,*
*22* 184:*4, 5, 7*
187:22 188:*1, 2*
189:8 207:*24* 208:*3*
**processes** 92:*21*
**product** 111:*17, 19*
**profession** 185:*20*
**professional** 10:*6*
36:*19*
**professor** 162:*15*
**promise** 229:*4*
**promote** 103:*5, 7*
104:*7* 110:*17*
115:*16* 117:*1*
132:*14* 134:24
135:*16* 136:*7*
138:*6* 140:22
144:*17* 145:*5*
168:*23* 174:*8*
220:*13* 223:*10, 20,*
*24*
**promoted** 19:*3, 6*
20:*14* 29:*3, 13, 21*
45:*16* 103:*11*
105:*20* 106:*1*
108:*1* 113:2, *5*
114:*3, 16, 20, 21*
115:*6, 12* 119:*24*
137:*14, 22* 138:*19*
140:*10* 141:*1*
144:*9* 146:*20, 23*
159:22 166:*10*
169:*11* 170:*21*
171:*9, 17* 172:*6*
180:9 182:9
187:22 188:*13*
189:*17* 221:9, *10*
223:*16* 224:*4, 8, 24*
225:*3, 15, 17, 18, 19,*
*22* 232:*15*
**promoting** 103:*14*
108:*19* 133:*20*
139:23 142:*4*
180:*18*
**promotion** 19:*10*
20:*2, 10* 26:8, *9, 16,*
*18* 28:*18, 19, 24*
30:*18* 50:*24* 71:*10*
87:*10* 106:*3, 13, 15*
107:*2, 3, 12, 23*
108:*3* 109:*1, 5*

110:*11* 116:22
118:*15* 119:*6*
120:*17* 122:2
163:*16* 164:*14*
168:*2, 5, 7, 11, 15*
169:*6* 170:*6, 20*
172:*5, 17* 173:*17*
180:*17* 183:*6*
185:*6* 188:*19*
**promotional** 50:*15*
109:9, *13, 16* 110:*8*
112:*13, 21* 113:*8,*
*11* 180:*3, 8, 11, 22*
181:*5, 22* 182:*3, 6,*
*14* 183:*2, 5* 184:*9*
187:22 214:*24*
223:*21*
**promotions** 113:*18,*
*23* 114:*15* 119:*7*
135:*14, 19* 224:*24*
225:*1, 2* 232:*12, 19*
**proper** 211:*23*
**properly** 68:*9*
**protect** 205:*16*
206:*11*
**provide** 4:*22*
136:*23* 137:*4*
164:*20*
**provided** 38:9 92:9
**provides** 175:*21*
**providing** 196:*24*
**provisions** 219:*24*
**public** 111:*10*
117:*7, 8, 10* 176:*2,*
*6* 177:*24* 192:*15*
208:*4*
**pulled** 153:*11*
**pulling** 171:*4*
**punches** 156:*19*
**puppet** 171:*5*
**purchasing** 175:*18*
**purpose** 8:*17*
195:*4* 228:*1*
**pursuant** 1:*20*
**pushed** 122:*18*
**put** 16:*3* 38:*8*
39:2 40:*21* 47:*17,*
*21, 24* 53:*10* 65:*12*
72:20 83:*5, 6*
92:*11* 149:*10*
155:*19* 156:*4*



**Frank Kosman Backwrite - 3/23/2022**
**Paul Berge, et al. vs. City of Kankakee, et al.**
2:20-cv-02310-CSB-EIL # 17-3 Page 83 of 90

158:*4* 160:*3, 6*
161:*20* 163:*4, 8, 12*
164:*1, 6, 9, 11, 15,*
*24* 165:*8, 10*
176:*23* 178:*23*
192:*3*
**putting** 158:*19*
210:*19*

**< Q >**
**qualified** 106:*16*
**quash** 219:*19*
**question** 4:*21* 5:*3,*
*4* 11:*11* 16:*12, 16*
20:*4, 18* 21:*3*
22:*12, 23* 25:*13, 15,*
*21* 29:*7, 16* 30:*3*
32:*7, 19* 33:*21*
36:*6* 37:*12* 39:*24*
41:*15* 42:*23* 44:*8*
45:*5, 19* 46:*9* 48:*2*
49:*1* 50:*17* 52:*4*
53:*14* 54:*24* 56:*5*
59:*3* 61:*14* 64:*11,*
*18* 65:*7* 66:*4* 67:*3,*
*10, 11, 16* 75:*9*
77:*5, 17* 78:*4, 5, 8,*
*17* 85:*13* 87:*14, 23*
98:*13* 107:*20, 21*
109:*19* 120:*10*
121:*16* 124:*1*
127:*11* 138:*14*
145:*18* 151:*16*
162:*6* 171:*13*
172:*19* 173:*8, 21*
174:*14* 176:*15, 22*
180:*16, 20* 182:*24*
183:*12* 184:*17*
189:*11* 190:*19*
193:*4, 18* 201:*5*
203:*4* 206:*8*
207:*14* 209:*9*
210:*10* 211:*22, 24*
212:*3* 214:*3* 216:*2*
218:*24* 222:*2*
**questionable** 23:*16,*
*17, 20*
**questioning** 216:*4*
**questions** 5:*7*
83:*13* 98:*19* 99:*22*
100:*2* 116:*17*

193:*11* 219:*14*
227:*12*
**quibble** 199:*9*
**quick** 48:*7* 197:*22*

**< R >**
**race** 8:*22, 24* 23:*22,*
*24* 26:*16, 19* 28:*11,*
*23* 30:*17, 21* 36:*12*
38:*19* 122:*8* 174:*9,*
*12, 20* 175:*4, 7*
224:*11*
**racial** 23:*17* 27:*5,*
*12, 17* 29:*11* 30:*10*
32:*15* 34:*4, 18*
68:*16* 174:*16*
**racially** 86:*17*
**racist** 22:*9* 37:*24*
55:*12* 87:*12, 19, 20*
**raised** 27:*15* 55:*17*
84:*6* 86:*24* 150:*17,*
*20* 208:*12, 17*
**ran** 9:*1* 187:*24*
**rank** 19:*7* 20:*2, 10*
113:*15, 19* 114:*3, 6,*
*8, 17, 21* 115:*6, 12*
116:*21* 134:*13*
135:*20, 24* 136:*4*
145:*9* 224:*4, 14*
229:*13, 17, 23*
230:*9* 231:*7* 232:*16*
**ranked** 19:*22* 29:*4,*
*12, 13, 22, 23, 24*
103:*17* 104:*7*
109:*21* 110:*1*
117:*1* 144:*17*
159:*22* 172:*17*
180:*15* 183:*18, 23*
184:*8* 189:*18*
**ranks** 56:*19*
114:*15* 139:*14*
230:*9*
**read** 30:*8* 78:*5, 12*
183:*14* 196:*6, 8*
198:*7*
**reading** 30:*5*
199:*23* 200:*6*
201:*20* 211:*23*
**Real** 197:*22* 229:*4*
**realize** 187:*2*
**realized** 58:*20*

**really** 61:*5* 64:*24*
65:*1* 93:*15* 143:*17*
145:*1* 185:*21* 188:*2*
**reason** 28:*12* 29:*22*
33:*14* 34:*18* 35:*19*
87:*9, 18* 119:*8*
131:*3* 140:*24*
173:*4, 11, 12, 14, 16,*
*18* 174:*2* 183:*21*
216:*15* 231:*1*
**reasoning** 32:*13*
118:*14* 119:*20*
**reasons** 16:*6* 31:*24*
32:*10* 36:*13* 37:*15*
87:*6, 8, 9* 107:*15*
116:*12, 14* 163:*23*
**recall** 32:*12* 60:*9*
61:*22* 64:*5* 68:*1*
87:*24* 98:*3* 109:*3*
110:*9* 115:*11*
190:*8* 214:*16* 221:*8*
**receive** 163:*11, 14*
215:*18, 19, 20*
**received** 159:*1*
163:*2, 5* 181:*4, 12,*
*15* 182:*5* 215:*8, 12,*
*16*
**receiving** 125:*20*
**recognize** 193:*6, 19*
**recollect** 189:*5*
**recollection** 108:*12*
157:*13*
**recommend** 105:*20*
106:*14* 117:*5* 179:*6*
**recommendation**
71:*10* 103:*5*
115:*18* 116:*12*
117:*13* 162:*11, 14,*
*23* 163:*5, 9, 12, 16*
164:*1, 14, 18, 23*
165:*8, 10*
**recommendations**
92:*19*
**record** 30:*7* 48:*11*
69:*10* 77:*6, 19*
78:*11, 24* 121:*10*
183:*13* 190:*17*
193:*3* 233:*13*
**recorded** 150:*24*
**recorder** 157:*16*

**recording** 148:*10*
157:*13* 219:*10*
**recordings** 147:*10*
216:*13*
**records** 146:*15*
**recruit** 41:*5, 10*
**recruiting** 40:*5, 16*
**recruitment** 40:*5, 8,*
*12, 19, 20* 41:*22*
42:*3*
**reduced** 233:*12*
**refer** 197:*8*
**reference** 19:*2*
25:*23* 35:*8* 38:*6*
44:*13* 49:*6, 23*
56:*12* 58:*11* 59:*6*
68:*10* 73:*2, 9* 82:*2*
84:*14* 88:*24* 93:*7*
99:*23* 105:*24*
108:*11* 111:*6*
115:*23* 116:*1, 11*
119:*5, 9* 125:*15, 16*
129:*14, 23* 131:*9*
147:*2, 14* 148:*18*
160:*21* 165:*11, 12*
171:*22* 181:*11*
189:*6, 8, 22* 206:*17*
207:*17*
**referenced** 169:*9*
197:*8*
**referred** 58:*14*
213:*8*
**referring** 73:*5*
175:*11*
**reflect** 39:*3, 4, 7, 9,*
*18* 45:*2, 14* 138:*24*
174:*10, 19* 221:*21*
**reflected** 139:*1, 21*
**reflective** 139:*5*
173:*17* 174:*20*
**regarding** 21:*12*
38:*13* 79:*11, 21*
144:*21* 158:*5*
182:*2* 183:*2* 194:*3,*
*20* 195:*1* 209:*18*
210:*17* 216:*2*
**regardless** 161:*17*
184:*19*
**regards** 60:*19*
213:*22, 23*
**register** 146:*8*



**Frank Kosman Backwrite  -  3/23/2022**
2:20-cv-02310-CSB-EIL  # 17-3   Page 84 of 90
**Paul Berge, et al. vs. City of Kankakee, et al.**

**regular** 88:*24*
89:*21* 101:*3* 208:*3*
**re-investigate** 74:*9*
**related** 67:*13*
68:22, *24* 75:*16*
76:2 120:*17* 122:6
150:7 167:7 183:9
**relates** 175:*15*
220:*14*
**relation** 88:*16*
207:6 209:*19*
210:*15* 211:*21*
214:*8, 11*
**relationship** 14:*1*
36:*19* 42:*12* 43:*24*
192:*13*
**relationships** 43:*1*
**relative** 136:*23*
137:*4* 233:*17, 18*
**relatively** 112:*23*
**relevance** 7:5
213:*13* 220:2 222:*4*
**relevant** 135:*3*
196:*12*
**remain** 94:*3, 13*
**remember** 10:*11,*
*17, 23* 12:4, *13, 20*
13:*3, 19* 15:*19, 20*
18:*16* 19:*1, 2* 24:*5,*
*8, 9, 13, 14, 16, 23*
27:*13* 35:*21* 36:*8*
37:*21* 40:*8* 44:*12*
52:22 55:*10* 56:*20*
57:*2, 8, 19* 58:*18*
59:*16, 20* 68:*5*
81:*17* 82:*1, 18*
83:*3, 12, 20* 84:*23*
85:*6, 16, 19, 23*
86:*10, 13* 87:*9*
88:*9, 23* 89:*1, 20*
90:*16, 17, 18, 22*
91:*2, 8, 19, 21* 92:*2,*
*8, 13, 15, 24* 93:*21,*
*22, 24* 94:*1* 95:*6,*
*11, 13, 15, 18, 19, 20*
96:*12, 16, 17, 19, 20*
97:*5, 7, 9, 17, 18*
98:*10, 19, 22, 23*
100:6, *16, 17* 101:*9,*
*19, 23* 102:*2, 4, 7*
103:*10, 12* 106:*11*

114:*22, 24* 115:*4, 5*
116:*19* 117:*11, 14,*
*19, 21* 118:*16, 23*
119:*3, 4, 12* 122:*12,*
*14* 123:*8* 132:*6*
133:*3, 15* 135:*22*
136:2 142:*23*
143:*5, 7, 14* 144:*22,*
*24* 145:2 152:*16*
160:*20* 161:*13*
162:*10, 17* 163:*1*
164:*13, 19* 168:*12,*
*19* 169:*8* 170:*7, 8,*
*12* 184:*16* 185:*18,*
*21, 23* 187:*6, 8, 18*
189:*7, 21* 198:*10,*
*17, 21, 24* 204:*1, 2,*
*4, 5, 8, 11, 12, 13, 15,*
*23* 205:*3* 215:*21,*
*22* 216:*3* 220:*14,*
*16* 221:*12* 224:*16,*
*21* 227:*8* 228:*10*
232:*13*
**reminding** 187:*16*
**remove** 80:*8*
**renew** 6:*19*
**renewed** 6:2, *4, 8,*
*16* 7:7
**repair** 179:*5*
**repairing** 208:*1*
**repeat** 30:*3*
**repeating** 183:*11*
**replace** 105:*11*
**replaced** 13:*14*
31:*15* 46:2 47:*13*
74:*14*
**replacing** 68:*21*
**report** 127:*19*
128:*1* 129:*10*
130:*11* 144:*3*
146:*3, 18, 22* 166:6
227:*18*
**reported** 152:*24*
233:*11*
**Reporter** 1:*16*
233:*4* 234:*6*
**REPORTER'S**
233:*1*
**reports** 111:*20*
142:*11*

**represent** 4:*8*
221:*15*
**representatives**
12:*10*
**represented** 14:*6,*
*11* 15:5 45:*9*
138:*11*
**Republican** 34:*12*
**request** 213:*1*
**requested** 30:*8*
78:*12* 183:*14* 228:5
**require** 191:*5*
**required** 27:*1, 6*
125:*20* 154:*13*
155:*17* 218:*15*
**research** 80:*10*
**resigned** 6:*1* 31:*5,*
*8, 18* 166:*14, 16, 19*
**resources** 28:*6*
38:*10* 75:*15*
213:*11, 19* 215:*20*
**respect** 7:6 14:*13*
21:*20* 123:*20*
128:*9* 129:*7* 130:*2*
148:*10* 153:*1, 8*
155:*7* 157:*5* 181:*5,*
*22* 191:*1*
**respectively** 19:*22*
**response** 19:*3* 27:*1*
**responsibilities**
155:*24*
**responsibility**
156:*22*
**responsible** 156:*13,*
*18* 157:*12* 183:*4*
**restate** 5:*8*
**result** 129:*11*
152:*5* 216:*11*
218:22
**resulted** 36:*3*
145:*9* 172:*5* 180:*9*
183:*18* 184:*8*
**results** 134:*6*
**retired** 223:*6*
226:*1, 4*
**retiring** 110:*13*
**Review** 110:*21*
111:*12* 153:*14*
161:*22* 193:*8*
**reviewed** 80:*16*
110:*22* 111:*20*

142:*7* 143:*1*
161:*22* 162:*2*
220:*11*
**reviewing** 71:*5*
111:*15* 135:*3*
136:*7* 144:*3* 211:*12*
**rid** 83:*21*
**right** 4:*15* 5:*4*
15:*2, 6, 7, 9* 17:*24*
19:*8, 11* 22:*2*
24:*23* 28:*12, 13*
33:*19* 34:*17* 35:*7,*
*11* 38:*5* 40:*14, 18*
42:*13* 43:*17, 23*
44:*3* 46:*6* 51:*11*
65:*15* 70:*5* 73:*8,*
*12* 75:*21* 84:*15*
96:*4* 109:*12*
110:*19* 114:*5, 8*
116:*23* 118:*20*
121:*9* 126:*24*
127:*9, 12* 129:*15,*
*17* 133:*6* 142:*2, 22*
145:*13* 146:*17*
148:*23* 149:*15*
150:*19* 151:*16*
159:*8* 162:*21*
165:*21* 166:*4*
171:*8, 10* 172:*3*
173:*6* 176:*14*
177:*10* 178:*1*
179:*4, 8, 11* 184:*17*
185:*14* 188:*20*
196:*3* 197:*4, 10, 20*
200:*17* 202:*10*
209:*7, 11* 210:*9*
211:*8, 12* 212:*3, 5*
213:*10, 17* 214:*7,*
*20* 215:*11* 216:*11*
217:*1, 5, 7, 11, 18*
220:*18* 221:*8*
222:*23* 229:*3*
**rights** 30:*23*
150:*24* 155:*11*
157:*8* 219:*16*
**rise** 202:*2*
**rises** 206:*20*
**river** 71:*19*
**riverfront** 71:*19*
**Robin** 7:*14* 8:*2, 13*
9:*9* 46:*4*



**Frank Kosman Backwrite  -  3/23/2022**
2:20-cv-02310-CSB-EIL  # 17-3   Page 85 of 90
**Paul Berge, et al. vs. City of Kankakee, et al.**

**role** 74:*18* 134:*17, 20* 160:2 175:9 180:*15, 17, 22* 182:*13, 21* 183:*17* 184:*7, 20*
**roll** 227:*1*
**room** 42:*18* 95:21
**roommates** 167:*21*
**roughly** 101:*14*
**rule** 106:*16, 20, 24* 107:*1* 117:5 172:*21* 173:2, *19*
**rules** 4:*19* 217:*4, 23* 219:*23*
**rumors** 25:*10, 16* 34:*19, 24*
**run** 67:8, *14* 68:7 91:*11* 188:2
**running** 68:*8* 75:20 90:*13*

**< S >**
**Safety** 176:7 208:*4*
**satisfactory** 132:2*1, 23*
**saw** 59:*23* 71:*18* 111:2*1* 194:*20* 198:*10, 14, 22*
**saying** 19:2 24:*3* 34:22 35:*17, 21, 22* 36:8, *11* 37:*23* 44:*13* 49:*4, 18* 50:*1* 55:*10, 11* 56:20 59:*18* 65:*17* 83:*18* 99:7 110:*16* 122:*14* 126:*13* 130:*1* 139:*19* 145:*19* 156:*15* 169:*12, 24* 170:*17* 172:2 174:*16* 187:6 197:*7, 13* 199:6, *7*
**says** 65:*1* 191:*12* 197:*4* 199:*15, 17* 200:*3, 18* 207:*4, 8* 214:*7*
**scenario** 179:*4*
**schedule** 102:*12* 226:22
**scheduled** 226:*24*

**school** 72:*16*
**scope** 195:*4*
**scored** 120:*4, 6*
**search** 31:20 147:*3*
**second** 91:*11* 107:8 115:*24* 173:7 195:9 223:*11*
**secondary** 191:2, *6, 15* 196:*4* 197:2
**seconds** 190:*18*
**secret** 192:*18*
**section** 195:9 196:*13, 16*
**security** 195:*19*
**see** 25:*4, 8* 111:*18* 126:5 132:2*1* 170:*15* 172:*11* 195:6 211:*13* 212:22 227:*1* 228:*3*
**seeing** 111:*16* 162:*10* 204:*5*
**seek** 41:*3* 105:*11*
**seeking** 166:22 176:20 179:*14*
**seen** 53:20 141:7 172:*23* 198:6, *8* 204:*5*
**select** 79:*24* 89:*4*
**selected** 34:20
**selecting** 89:22 186:*9*
**selection** 164:*12* 169:7 183:*5* 189:2
**self-serving** 218:*1*
**selling** 64:*14*
**semantics** 49:*11*
**seniority** 107:*16*
**sensational** 75:7
**sense** 150:*15* 156:*17* 157:*10* 205:*15*
**sent** 115:22 116:*4* 163:*15* 213:*23*
**sentence** 195:*5*
**separate** 118:*19* 131:6, *12*
**Sergeant** 19:*3, 6* 103:*11* 147:2*1* 151:9, *12, 18* 152:*1* 156:*13, 20, 21* 159:*18* 216:2, *7*

221:*10, 21* 224:*1, 9, 15, 19* 225:*3, 20* 229:*14* 230:*15* 232:*12*
**sergeants** 19:*12* 106:*1* 113:22 156:*17* 224:*1, 20*
**serious** 232:*4*
**seriously** 205:*14*
**served** 232:7
**service** 114:*6, 14* 195:*15* 229:*13*
**services** 186:22 187:2 195:*11* 196:*15* 197:*1*
**set** 100:*19* 104:*4* 226:22 234:*1*
**sexual** 124:*20, 24* 125:2*1* 126:*17* 129:*8* 130:*3, 18, 23* 131:7, *13, 22* 132:*1* 152:2*1* 175:*1*
**sexually** 122:*11*
**shake** 4:*23*
**share** 208:5, *8*
**shared** 58:7
**shift** 112:2 230:5
**shootings** 68:*3, 11*
**shop** 206:*17*
**short** 48:9 121:7 136:*10* 193:*12*
**shorter** 119:*19*
**Shorthand** 1:*16* 233:*4* 234:6
**shorthanded** 158:2
**shortly** 144:*8*
**shot** 143:2
**shots** 68:2
**show** 10:20
**shown** 20:*15* 176:*1, 4*
**shows** 53:*24*
**sic** 57:7
**side** 23:*12* 131:*19*
**sides** 10:5 34:*13*
**signature** 232:22
**signed** 46:*15* 49:20
**significantly** 120:6
**similar** 99:2 113:*14* 120:*24*
**simply** 155:*1*

**single** 24:2*1* 84:*4* 135:7, *23* 136:*3*
**sir** 126:*16*
**sit** 24:2*3* 27:9 44:*12* 85:8 96:9 115:9, *13* 142:*24* 181:*1* 186:*1* 220:*13*
**site** 58:*17, 19, 22* 59:*16, 17, 20, 23* 60:*1, 8, 10, 12, 13, 14, 16, 17* 62:*13* 228:*23*
**sitting** 99:*19* 122:*19*
**situation** 10:5 38:2*1* 54:9 78:2*1* 121:2*1, 22* 126:20 131:9 135:*24* 136:*3* 137:*10* 153:*15, 16* 172:*16* 174:*4*
**situations** 41:22 44:*23* 50:*4* 55:*14* 68:*4* 74:*8* 121:*23*
**Six** 88:*14, 21* 194:*1*
**six-page** 193:*3*
**size** 213:*17*
**Skelly** 110:*13* 223:6 230:*18*
**skip** 172:*16*
**skipped** 214:*23*
**Sneed** 19:*3, 6* 20:*13* 26:*10, 12, 14* 103:5, *7, 14, 17* 104:7, *10* 105:20 106:*3, 13, 15* 108:*1, 19* 109:*10, 14, 21* 110:*1, 3* 111:*1* 112:6, *13, 17* 115:7, *10, 16* 116:2*1* 117:2 118:*15* 119:9, *21, 24* 120:*4, 13* 132:*15* 135:8 137:*14, 21* 138:7 139:*23* 140:*10, 16, 22* 141:*1, 4, 16, 21* 142:*1, 4* 143:*1* 145:*10* 146:*19, 23* 147:2*1* 151:8, *17* 154:*18* 155:7, *11, 15* 156:9, *11, 24*



**Frank Kosman Backwrite - 3/23/2022**
**Paul Berge, et al. vs. City of Kankakee, et al.**

2:20-cv-02310-CSB-EIL  # 17-3   Page 86 of 90

157:*4, 6, 17*  159:*2, 17, 22*  160:*11*  162:*11, 23*  163:*17, 18, 23*  164:*3*  165:*6, 19, 21*  166:*9*  167:*20*  168:2, *5, 11, 23*  169:*4, 7*  170:*20*  171:*8, 17*  172:*5*  173:*10*  180:*9, 15, 18*  182:*10, 14*  183:*18, 23*  184:*8*  186:*2, 9*  187:*22*  188:*13, 20*  189:*2, 6, 17*  216:*1*  217:*12*  221:*9, 21, 22*  223:*22*  224:*20*  232:*9*

**Sneed's**  107:*12, 23*  108:*2*  109:*1, 5*  120:*16*  158:*4*  160:*3, 7*  161:*20*  163:*5*  188:*14*  220:*11*  221:*16*

**social**  57:*12*  58:*1*  60:*24*  62:*6, 7, 13*  63:*11, 14, 20*  66:*8*  68:*18*  72:*23*  73:*3*

**socially**  141:*6*

**sold**  59:*18*

**sole**  178:*4*  183:*4*

**somebody**  26:*24*  27:*4*  28:*18*  29:*3*  32:*21*  60:*15*  65:*1*  69:*23*  73:*2, 10*  82:*16*  89:*4*  110:*18*  115:*6, 12*  126:*16*  133:*20*  134:*24*  135:*16*  142:*15*  143:*6*  156:*19*  163:*19*  165:*20*  172:*13*  174:*8, 9*  175:*14*  176:*8*  179:*1*  184:*2*  195:*1*  202:*19*  218:*2*  227:*18*  230:*8*

**someone's**  171:*4*  191:*6*

**somewhat**  230:*9*

**soon**  40:*17*  58:*20*  102:*11*

**sorry**  7:*24*  11:*8*  52:*6*  57:*14*  76:*22*  85:*3*  87:*7*  89:*10*  91:*14*  97:*1*  109:*10, 17*  113:*10*  121:*5*  126:*18*  162:*1*  170:*6*  176:*17*  178:*20, 21*  183:*12*  184:*12*  185:*13*  195:*8*  209:*1*  210:*10*  215:*3*  216:*22*  224:*7, 23*  225:*12*  231:*19*

**sought**  132:*10*

**sounded**  169:*13*  205:*15, 16*

**sounds**  162:*21*

**source**  178:*4*

**South**  1:*18*  2:*3*

**speak**  9:*8, 12*  135:*10*

**speaking**  54:*5*  72:*10*  136:*21*  137:*2*  170:*14, 15*

**special**  55:*3*

**specific**  18:*8*  24:*16*  27:*5, 6*  37:*24*  44:*12*  52:*22*  56:*15*  61:*22*  62:*12*  64:*18*  68:*5*  70:*17*  92:*8*  99:*1, 22*  127:*7, 14*  129:*12*  168:*12*

**specifically**  18:*13*  35:*3*  42:*19*  44:*3, 11*  59:*6*  60:*14*  67:*22*  88:*9*  130:*24*  145:*23*  147:*1*  160:*20*  191:*12*

**specifics**  65:*18*  66:*13*  93:*21*

**specified**  233:*16*

**speculate**  96:*17*  195:*22*

**speculating**  230:*21, 22*

**speculation**  17:*10*  20:*18*  21:*15*  22:*13*  25:*21*  29:*7*  35:*13*  36:*7, 16, 20*  37:*12*  41:*15*  45:*5*  48:*2*  52:*4, 21*  54:*24*

57:*1, 17*  59:*3*  60:*4*  61:*3, 21*  62:*23*  64:*11*  65:*7*  66:*4, 19*  67:*16*  70:*14*  71:*2*  76:*11*  78:*4*  81:*24*  86:*1, 21*  87:*14, 23*  137:*18*  138:*9, 21*  139:*17*  140:*12*  143:*11*  170:*24*  171:*19*  174:*23*  189:*20*  206:*9*  207:*14*  222:*2*

**spell**  200:*17*  222:*21*  224:*6*

**spells**  197:*20*

**spoke**  9:*10, 13*  17:*14, 15*  18:*2, 23*  37:*19*  71:*16*  72:*5*  109:*6*  111:*24*  112:*1*  129:*19*  132:*20*  139:*8*  220:*17*

**spoken**  71:*23*  72:*1, 3*

**spokes**  163:*19*

**spread**  63:*5*  64:*8*  65:*24*

**squad**  201:*18*  208:*1, 9*

**staff**  16:*8*  17:*19*  65:*5*  68:*21*  72:*24*  76:*19*  77:*15*  80:*1, 12*  88:*4*  92:*11, 18*  93:*3*  96:*6*  98:*5, 18, 21*  105:*16*  120:*13*  138:*1, 3, 5, 11, 18*  139:*24*  161:*19*

**Stanard**  103:*23*  113:*9*  145:*8, 21*  179:*23*  180:*10*  183:*17, 22*  184:*2, 13, 19*  185:*19*  186:*3, 8, 21, 24*  187:*3, 10, 21, 24*  188:*1, 6, 10, 12, 15*  189:*1, 16*  190:*6, 10, 13, 22*  192:*13*  194:*17, 21*  195:*2, 14*  196:*10*

**stands**  135:*21*

**start**  209:*16*

**started**  40:*4*  60:*18*  88:*16*  101:*11, 13, 18*  102:*11*  104:*5*  141:*15*  191:*21*

**starting**  71:*19*

**State**  1:*17*  74:*12*  75:*19*  77:*2*  178:*5, 12, 15*  220:*6*  228:*5, 13, 17, 24*  233:*4*

**stated**  33:*4*  170:*1*  183:*4*  227:*7*

**State-mandated**  28:*7*

**statement**  62:*17*  125:*2*  218:*1*

**statements**  38:*20, 23*  65:*12*

**STATES**  1:*1*  210:*13*

**State's**  148:*16*  149:*10, 13, 23*  150:*13, 16*  152:*6*  153:*9*  155:*4, 13*  159:*2*  216:*19, 23*  217:*8*  218:*21*  220:*4*

**status**  5:*24*

**stay**  9:*22*  231:*11*

**stenographically**  233:*11*

**step**  110:*7, 20*  111:*14*  126:*2*  133:*20*  201:*11*

**steps**  27:*7, 11*  28:*3*  112:*12*  124:*23*  125:*20*  128:*4, 18*  131:*21*  201:*1*

**STERK**  2:*7*

**stern**  84:*15*

**stood**  122:*17*

**stopping**  68:*11*

**straight**  70:*5*

**Street**  1:*19*  2:*3, 8*  158:*2*

**strictly**  34:*4*

**strike**  5:*23*  67:*11*  80:*19*  84:*5*  89:*7*  93:*18*  100:*7*  135:*16*  136:*16*  169:*23*  231:*19*

**strings**  171:*4*



**Frank Kosman Backwrite  -  3/23/2022**
**Paul Berge, et al. vs. City of Kankakee, et al.**
2:20-cv-02310-CSB-EIL   # 17-3   Page 87 of 90

**structure** 16:*18*
46:*12*
**stuck** 90:*6* 122:*20*
**stuff** 62:*20* 63:*5*,
*11*, *13* 72:*20* 88:*24*
230:*17*
**Sturkey** 148:*2*
**style** 100:*1*
**subject** 19:*15*
26:*22* 85:*6* 171:*23*
**substitute** 72:*16*
**sued** 158:*22*
**suit** 181:*12*
**Suite** 1:*19* 2:*3*
**summer** 95:*24*
**supervised** 137:*3*
**supervising** 134:*14*,
*15*
**supervisor** 27:*6*
28:*14* 125:22, 24
132:*5* 135:*7* 157:*11*
**supervisors** 18:*9*
133:*10*, *14*
**support** 7:*22* 8:*14*
9:*16*, *21* 12:*23*
69:*10* 174:*6*, *8*
**supported** 7:*4*
39:*20* 77:6, *18*
**supporting** 7:*6*
9:*14*
**supposed** 30:*18*, *21*
147:*11*, *12*, *13*, *16*
148:*19*, *20* 149:*13*
157:*15* 161:*16*
218:*5*
**supposedly** 70:*2*
**suppress** 219:*20*
**suppressed** 220:*1*
**supremacy** 24:*8*
**sure** 14:*21* 15:*19*,
*21* 21:*9* 23:*9*
27:*20* 28:*3* 32:22
34:*14* 43:*14* 49:*11*,
*22* 79:*17* 90:*9*, *10*
91:*17*, *22* 92:*4*
102:*10* 109:*24*
118:*11* 123:*8*
134:*23* 144:*11*
145:*12* 150:*14*
152:*11*, *13* 160:*18*
165:*3* 168:*1*, *3*, *10*

169:*14* 170:*2*, *16*
172:*12* 178:22
179:*10*, *19* 203:*5*
220:*20*
**surprise** 6:*23* 58:*17*
**sustained** 156:*9*
158:*7*
**sworn** 4:*2* 101:*11*
233:*8*
**system** 127:22
176:*13*

**< T >**
**table** 99:22
**tactical** 151:*13*
167:*18*
**tail** 24:*3*, *10* 58:*11*
**tails** 24:*5*
**take** 5:2, *4* 27:*6*
28:*3* 48:*7* 82:*19*
88:*13* 92:*14*
100:*13* 106:*5*
108:*7* 117:*20*
119:*16* 121:*6*
125:*8* 126:*14*
131:*21*, *23* 170:*16*
173:*24* 193:2, *5*, *10*,
*15* 200:*7* 201:*11*
205:*14*
**taken** 1:*15* 10:*19*
14:*2*, *13* 15:*4*
16:22 48:*10* 77:*12*
121:*8* 128:*18*
193:*13* 207:*10*
233:*15*
**takes** 156:*19* 212:*9*
**talk** 7:*21*, *24* 8:*13*
24:*7* 33:*2* 39:*19*
51:*2* 54:*13* 56:*13*
60:*7* 86:*10* 88:*3*
93:*11*, *14* 101:*5*
112:*6* 117:*23*
118:*1* 133:*13*
138:*23* 139:*20*
143:*19*, *21*, *24*
160:*13* 163:*24*
168:*14* 201:*19*
202:*6* 205:*5*, *13*
217:7, *11*, *13*, *15*
**talked** 15:*9* 21:*6*
28:*10* 35:*4*, *7*

37:*20* 44:*3* 77:*9*
81:*4* 89:*19* 98:*7*
105:*19*, *24* 106:2,
*16* 108:*11* 129:*16*
152:*14*, *22*, *23*
159:*20* 160:*16*, *18*,
*19* 161:*5* 163:22
203:*20*, *23* 204:2, *9*,
*18* 205:*10* 217:*12*,
*14* 226:*6* 229:*7*
232:*11*
**talking** 8:*3*, *4*
19:*12*, *14* 20:*4*
26:*23* 38:*6* 44:*11*
56:*5* 58:*4*, *9* 60:*18*
62:*14* 63:*14* 79:*17*
84:*20* 87:*21* 91:*1*
98:*8*, *9* 99:*7*, *9*, *10*
101:*1* 107:*13*
110:*15* 114:*5*, *14*
115:*1* 121:*23*, *24*
134:*12* 141:*8*, *12*
152:*17*, *21* 181:*11*,
*13* 183:*1*, *8* 195:*24*
196:*14*, *17*, *22*
204:*17*, *23* 206:*17*,
*23* 207:*1* 210:*4*, *7*
**talks** 194:*10* 195:*10*
**Tap** 11:*19*, *21*
**taping** 147:*5*
**target** 60:*18* 62:*14*
227:*18*, *19*
**teach** 163:*19*
**teacher** 72:*16*
**team** 149:*19* 152:*1*
154:*18* 155:*16*
**technical** 155:*23*
158:*15*
**techniques** 78:*20*
**tell** 4:*19* 12:*20*
21:*18* 35:*15* 88:*7*
89:*14* 91:*19* 93:*8*
94:*24* 99:*3*, *11*
103:*3* 105:*18*
108:*5* 109:*18*
110:*7* 115:*20*
116:*8*, *24* 118:*7*, *16*
119:*2* 124:*23*
132:*18* 135:*17*
141:*3* 147:*4*
160:*10* 161:*11*

162:*13* 164:*17*
165:*14*, *18*, *19*
168:*9* 201:*1*, *9*
224:*3*
**telling** 49:*14*
138:*15* 187:*11*
199:*10*
**temporarily** 31:*7*
**Ten** 226:*18*
**tension** 21:*12*
**tenure** 13:*23* 23:*8*
40:*9* 225:*21*
**term** 91:*11*
**terminated** 6:*1*
122:*1* 132:*12*
215:*13*
**termination** 132:*10*
166:22 167:*2*
**Terrible** 224:*18*
**test** 41:6, *7* 51:*8*
145:22
**testified** 5:*13*
32:*20* 79:*10*, *13*
103:*9* 112:*11* 211:*5*
**testify** 18:*17* 59:*13*
215:*8* 233:*8*
**testifying** 183:*3*
**testimony** 44:*8*
46:*10* 62:*3* 69:*9*
76:*12* 83:22 85:*14*
88:*19* 96:*20*
117:*18* 135:*6*
138:*9*, *21* 139:*17*
151:*11* 153:22
157:*4* 172:*8* 189:*4*,
*20* 190:*23* 196:*9*
197:*16* 199:22
201:*24* 210:*20*
220:*23* 233:*13*
**testing** 145:*8*, *20*
186:22 187:*2*
188:*1*, *2* 189:*8*
**tests** 113:*15*, *16*
180:*3*
**Thank** 48:*20* 186:*7*
**that-a-boy** 164:*9*
**thing** 38:*7* 43:*4*
49:*9* 59:*15*, *19*
61:*5* 91:22 92:*8*
99:*6* 122:22 131:2
149:*6* 153:*20*

**Frank Kosman Backwrite  -  3/23/2022**
**Paul Berge, et al. vs. City of Kankakee, et al.**

2:20-cv-02310-CSB-EIL   # 17-3   Page 88 of 90

164:8  168:12
181:18  191:13
192:8  194:6
200:12, 15, 16
208:2  210:2
**things**  39:14  57:24
61:11  74:9  84:1
90:6, 16, 17, 22
153:5  160:22
174:24  175:2
178:4, 6
**think**  6:11  7:2, 8
10:2, 5  11:2, 19
12:19, 24  13:24
14:14, 17  15:16
16:19  18:6, 7  24:6
26:23  33:4, 6, 15,
22  38:5, 20  39:2
41:10, 19, 22  42:24
43:3, 6  44:10  46:4
47:10  49:16  51:9
52:11  53:19  54:8
55:3  56:1  58:3, 6
61:4  62:16  68:10,
12, 15, 19, 22, 24
70:1  73:1  82:17,
24  83:8  85:8  90:2
94:4  96:11  97:6,
12, 14  99:13, 15
103:1  112:2
113:12, 19  117:22
118:3, 6, 18  122:9
123:4  125:11
135:23  136:3, 15,
17, 21  137:2
138:10  139:2, 18
140:7, 8, 15  141:9,
22  142:2  143:2, 20
144:10  145:4
148:3, 17  150:15
153:11, 19  154:15
155:21  160:5, 12,
21  162:15  163:2
164:4  165:2, 6, 17
166:20, 21, 24
172:12, 21  174:1, 3
176:12, 23  178:10
186:18  190:11, 16,
21  191:14, 18
192:7  194:5, 9
195:17  201:6

202:2, 7, 8  204:14,
22  205:18, 24
206:1, 2, 3, 4, 5, 10,
13, 16, 19, 20
207:15, 18  209:4,
11  211:23  212:10
215:17, 22  217:16
218:19  220:22
223:7  224:17
225:16, 20, 22
226:1, 2  228:8
230:14
**thinking**  9:13
181:17  227:17
**thinks**  199:8
**third**  19:8  103:17
107:8  110:2  117:6
183:18, 24  184:8
**Thomas**  148:5, 6
**thorough**  130:7
136:15  146:11
**thought**  8:14  20:22
38:17  42:14, 17, 19
43:23  51:7, 10, 21
52:11, 17  56:17, 22
69:17, 22  70:6, 10
75:1  79:2  88:11
89:2  90:6  106:15
107:9, 14  108:4, 5
118:9  119:8, 10, 21
133:4  137:11
139:23  140:3, 5
151:11  158:10
218:6  221:1
**thousands**  48:18
**three**  91:7  106:8,
16, 17, 20, 24  107:1,
2, 3, 10  109:22
110:24  117:3, 5
135:11  136:8, 12
162:6, 8  172:21
173:3, 19  218:11
232:19
**threshold**  176:24
177:2, 4
**thrown**  217:3
**tight**  176:13
**Tim**  4:9  19:20
118:11  163:13
223:5

**time**  16:4, 9, 20
18:22  21:10  25:4
27:10  36:22  40:7
41:20  71:16  72:5
79:15  82:10  92:14
94:10, 16  95:15
96:2  98:16  100:19
107:8, 9  109:20
110:14  112:2
117:20  118:10
131:24  132:4
136:5, 11  141:14,
18  147:21  166:19
167:9, 11, 13, 14
172:23  173:24
193:5, 10, 16
198:11  212:23
214:20  215:7
222:11  223:6, 19
226:3  230:19
231:16  233:16
**times**  56:13  97:2
107:8  112:4
**TIMOTHY**  1:2
**title**  164:15
**today**  27:10  31:14
44:12  71:6  72:11
79:16  85:8  115:10,
13  142:24  186:1
220:13
**told**  6:18  32:21
35:2, 18  76:7, 16
88:10  90:14
105:19  106:14
108:4  117:3, 4
118:13  123:9, 13
124:15  141:15, 20,
24  165:20, 24
188:1  216:19
**top**  14:10  15:24
16:8  47:16  77:14
106:17  107:2, 3, 10
162:6, 8  232:19
**topic**  86:6, 16
209:16
**topics**  91:7
**town**  91:3, 10
206:18
**toys**  59:19  64:15
**traffic**  144:23

**training**  28:5, 8, 9
**transaction**  149:8
**transcript**  233:10
**transparency**  178:8
179:18
**transparent**  175:24
177:23
**treated**  17:7
**treating**  44:14
56:23  84:11
**treatments**  38:13
**trick**  65:19  100:14
**tried**  81:2  119:5
208:1, 2
**triggers**  27:1
**true**  43:20  181:10
200:23, 24  201:15,
17  202:1  221:13
233:13
**truth**  233:8
**try**  30:5  88:17
92:20
**trying**  18:6  33:6
41:5  44:10  56:18,
20  65:19  100:14,
17  103:10  192:12,
14, 17  224:17
**Tuesday**  115:24
**turn**  157:15
**turned**  208:4
**twice**  173:7
**two**  11:8  19:9, 11,
18, 23  20:14  29:13,
21  40:9  48:18
57:19  69:15  72:7,
14  88:17  90:16, 17
104:7, 13  107:8
109:22  111:13
117:1  118:1, 18
122:4  138:3  140:2,
3  142:4  144:17
147:22  158:12
159:22  161:3, 7
165:9  171:17
172:6, 16  189:7, 17
198:19, 22  208:22
221:10, 18, 20  230:8
**two-month**  72:10
**type**  75:22  122:22
**typewriting**  233:12



typically 226:*17*

**< U >**
**Uh-huh** 185:*11*
**ultimately** 215:*13*
219:*9*
**unanimous** 10:*10*
**unclear** 187:*4*
**under-links** 156:*14*
**undermine** 56:*18*,
*21*
**understand** 26:*21*
30:*11* 35:*23* 42:7
49:22 78:8, *15*
96:2 129:*15*
151:*23* 170:*10*
200:2 212:*3*
**understanding**
31:*14*, *16* 84:*15*
106:*19*, *23* 107:*1*, *6*
122:*3* 169:*18*, *20*
173:2 180:*12*
195:*13* 219:*3*
**understood** 65:*15*
172:22
**unfair** 165:*7*
**uniform** 11:*14*, *17*
**union** 7:*4*, *6*, *10*, *19*,
*21*, *24* 8:*5*, *9* 9:*24*
10:*7* 12:*10*, *17*, *23*
14:*5*, *6* 20:*7* 56:*11*
87:*4*
**union's** 7:*16* 13:*21*
**unit** 40:*22* 112:*7*
119:*10* 147:*7*, *9*, *18*,
*20* 150:*11* 151:*13*,
*15* 157:22 158:*3*,
*11*, *18* 159:*19*
167:*14*, *18* 216:2, *7*
218:*12* 229:*11*
231:*21*
**UNITED** 1:*1*
**unknown** 98:*1*
**unlawfully** 155:*20*
**unprofessional** 9:*14*
**unsupported** 78:*24*
**unusual** 172:*15*
230:*9*
**upset** 37:*21* 51:*13*
60:22 63:*19*, *22*
64:*12*, *13* 70:6, *16*,

*21* 119:*4*, *20*
159:*21* 160:*1* 205:*9*
**upstairs** 11:*16*
**URBANA** 1:*2*
**use** 83:*10* 147:2
196:*5* 197:*3*
**usual** 111:*5*
**usually** 108:*10*
145:22 191:*18*
**utilize** 173:*19*

**< V >**
**vacation** 223:*8*
230:*18*
**vague** 22:*12* 29:*17*
30:*14* 32:*7* 45:*6*
48:*2* 55:*19* 57:*1*
59:*4* 60:*4* 63:*8*
65:*7* 66:*5* 70:*15*
76:*12* 77:*17* 79:*1*
87:*14*, *23* 187:*5*
**various** 17:*15* 37:*4*,
*6* 55:*17* 60:*1* 96:*6*
104:*3* 113:*15*
144:*23* 175:*10*
232:*11*
**vast** 81:*4*
**vendor** 175:*21*
176:*9*, *10* 179:*1*, *6*
**vendors** 175:*10*
177:*21* 178:*17*
179:*20*
**verbal** 4:*22* 10:*20*
**verbatim** 7:*11*
**veteran** 221:*23*
**victim** 129:*4*
**video** 147:2, *13*, *15*
148:*20* 149:*1*, *7*, *15*
216:*13*, *21* 217:*6*,
*23* 218:6, *7*, *9*
**videotape** 218:*12*
**Village** 11:*21*
176:*16*
**Villagomez** 147:*24*
148:*1* 166:*13* 167:*4*
**violate** 157:*6*
**violated** 150:*24*
155:*11* 156:*10*
157:*8* 219:*15*
**violating** 156:*10*

**violation** 150:*1*
217:*3*, *23*
**violations** 151:*17*
152:*3*, *6* 153:*24*
155:*16* 157:*1*, *24*
160:*14*
**violence** 68:*11*
**vis-a-vis** 153:*2*
**voice** 148:*24*
**vote** 10:*12*, *19*, *20*
12:*16* 13:*8*, *24*
14:*2*, *12*, *18* 15:*4*,
*10*, *12*, *15*, *17* 16:*6*,
*22* 17:*5* 87:*5*, *22*
**voted** 9:*18* 10:*9*
34:*5*, *6* 87:*6*
**votes** 34:*3* 37:*3*, *22*
**vs** 1:*6*

**< W >**
**wait** 198:*15*
**waive** 232:*22*
**walk** 71:*19*
**walked** 99:*16*
**want** 5:*2* 49:*22*
50:*6* 96:*16*, *17*
121:*6* 149:*12*
168:*3* 169:*14*
175:*21* 193:*5*
**wanted** 7:*9* 39:*3*,
*16*, *18* 41:*16* 43:*14*
45:*13* 49:*8* 73:*13*,
*17*, *20*, *24* 79:*24*
88:*8*, *12* 89:*2*, *3*
90:*9* 91:*3*, *17* 93:*2*,
*9* 100:*22* 105:*21*
106:*14* 125:*16*
134:*23* 137:*21*, *24*
138:*4*, *24* 139:*4*, *9*,
*13* 140:*10* 167:*24*
168:6, *9* 169:*10*
170:2, *9* 172:*12*
173:*11* 206:*11*
208:*8*
**wanting** 169:*5*
**wants** 173:*4*
**warrant** 154:*3*
**warrants** 147:*3*
154:*1*
**way** 39:*3* 41:*11*
46:*16* 67:*7*, *13*

84:*8* 104:*24* 105:*3*
120:*18*, *22* 126:22
145:*24* 150:*9*
153:*21* 157:*1*
158:*10* 168:*14*
169:*13* 170:*14*
212:*18*
**weapon** 143:*8*
220:*19*
**wear** 11:*16*
**Wednesday** 1:*18*
100:*20*
**week** 101:*12*
102:*11*, *12* 123:*5*
125:*6* 187:*7*
**weekly** 94:*18*
**Well** 8:*10* 13:*23*
15:*18* 16:*5*, *18*, *19*
25:*1* 34:*2* 35:*4*
40:*11* 41:*12* 47:*6*
49:*1*, *19* 50:*18*
53:*10* 54:*21* 55:*6*
56:22 57:*11* 59:*9*
61:*13*, *14* 62:*9*
64:*6* 69:*5*, *22* 74:*8*,
*11* 78:*8* 80:*18*
86:*4*, *16* 87:*1*, *4*
91:*19* 99:*3*, *5*
103:*4* 105:*13*, *19*
110:*10* 111:*20*
112:*24* 115:*17*
119:*4* 126:*4*
129:*10* 132:*19*
133:*19* 140:*18*
144:*13*, *23* 145:*17*
146:*9* 155:*21*
156:*11*, *15* 157:*10*
159:*6* 160:*6* 161:*7*
168:*24* 169:22, *23*
172:22 173:*12*
174:*19* 176:*14*
177:*24* 178:*12*
179:*9* 186:*23*
192:*7* 194:*24*
195:22 196:*13*
199:*1*, *6*, *15* 201:*14*
202:*9* 207:*4*, *9*
226:*1* 228:*8* 231:*7*
**well-established**
221:22



**Frank Kosman Backwrite - 3/23/2022**
**Paul Berge, et al. vs. City of Kankakee, et al.**
2:20-cv-02310-CSB-EIL # 17-3 Page 90 of 90

**Wells** 10:*13* 12:*11*
31:2 46:*19* 47:*16*
59:*12* 76:*8, 22*
87:7 89:*10* 100:*5*
117:*17* 137:*14*
200:*12, 14*
**WELLS-**
**ARMSTRONG** 1:*9*
9:*4, 5, 19* 71:*17*
76:*16* 227:*20*
**went** 28:6 31:*20*
37:*3* 41:22 47:6
66:*13* 89:*19* 95:*10*
99:*20* 115:*17*
116:*3, 5, 9, 10, 11*
137:*10* 141:*18*
165:*13* 205:*18*
211:*8* 212:*14*
227:*11* 231:*10*
**We're** 71:*19* 87:*21*
91:*1* 114:*5* 134:*12*
158:*3* 189:*12*
**we've** 4:6 98:*12*
135:*17*
**WHEREOF** 234:*1*
**white** 17:22 18:*5,*
*11, 20* 20:24 21:*9,*
*12, 20* 22:5, *10, 20*
23:*3, 4, 10, 24* 24:*3,*
*4, 8, 11, 17, 20* 25:*2,*
*6, 17, 18* 26:5
29:*13, 22, 24* 34:*6,*
*12* 35:22 38:24
42:*20* 44:4 45:*1*
46:2, *24* 51:*10, 11*
52:*18* 53:*11* 54:6
55:6, *7, 12, 18, 21*
56:*17, 22* 57:*23*
67:23 68:20 69:*1,*
*19, 24* 70:*11, 23*
81:*10, 22* 84:*18*
85:*4, 7* 87:*12*
104:*14* 117:*1*
118:*1* 140:*3* 142:*4*
159:*23* 171:*16, 17*
172:*6* 221:*18*
223:*14, 24* 224:*1,*
*12, 13, 21, 24*
**whites** 52:*1, 15*
53:22 54:*1* 70:7
**wider** 134:*14*

**widespread** 65:*8*
66:*15, 22*
**WILLIE** 1:*9*
165:*23* 166:2, *3, 7*
182:*13* 183:*16*
184:7, *12, 18* 186:2,
*4, 5, 8, 18* 188:6, *10,*
*14* 190:22 191:*19*
199:*14, 24* 200:7
203:*16, 17* 214:*11*
222:*11*
**wilting** 42:7
**withdraw** 215:*4*
**withdrew** 31:*19*
**WITNESS** 3:*1* 4:*1,*
*5, 14, 17, 24* 5:5, *10,*
*12* 6:*13* 17:*12*
18:*15* 20:20 21:*4,*
*16* 22:24 25:*23*
29:*9, 18* 30:*15*
32:*8, 22* 33:22
34:*11* 35:*14* 36:8
37:*13* 39:2 40:2
41:*16* 42:24 44:*10*
45:*7, 20* 46:*11*
52:6, *8, 22* 53:*15*
55:*1, 10, 20* 57:2,
*18* 58:*10* 59:5, *15*
60:5 61:4, 22 62:*1*
63:*10, 22* 64:*12*
65:8 66:*21* 67:5
69:22 70:*16* 71:*3*
76:*13* 77:7 78:*13*
79:2 82:*1* 84:*23*
85:*16* 86:2, 22
87:*16, 24* 118:*20*
137:*19* 138:*10, 23*
139:*18* 143:*13*
147:7 171:*1, 21*
172:*21* 174:*15, 24*
176:*23* 189:*5, 21*
201:6 203:*9* 205:*3*
206:*10* 207:*15*
209:*10* 213:5
215:*5* 219:2 221:*1*
222:*2, 3* 224:*8*
225:*2, 8* 233:7
234:*1*
**witnessed** 70:22
**witnesses** 128:*24*
**wondering** 72:*15*

**word** 45:*8* 49:*21*
84:*15*
**words** 36:*1* 92:*3*
122:22 207:*7, 9*
**work** 10:*3* 27:*21,*
*22, 24* 28:*4* 31:*12*
56:*13* 101:*21*
111:*16, 19* 133:*11,*
*14* 141:*6, 10*
155:*12* 158:*21*
159:*17* 161:*16*
176:*16* 187:*5*
195:*18* 196:*10*
201:*18* 208:*9*
**worked** 11:*12* 12:6
31:*8* 40:*11* 56:*11*
96:*5* 118:*10*
135:*11* 136:*22*
140:*20* 141:22
150:*9* 161:*14*
185:*19* 186:*23*
187:*1* 188:*15*
189:*1, 16* 190:*22*
202:9, *12, 15* 203:*1*
**working** 14:*1*
56:*12* 112:*7*
142:*21* 185:*19*
187:6 188:6, *10*
189:22 190:*10, 12*
191:*21* 192:*10*
194:*17, 20* 196:22
221:*23*
**workplace** 30:*23*
**works** 72:*16*
177:*12* 186:*19, 21*
**work-wise** 111:*24*
**world** 201:*14*
**worried** 168:*18*
**worry** 158:*21*
**write** 212:*10*
**writing** 205:*16*
210:*8, 12, 21*
**written** 10:*21*
145:*21* 153:*19*
181:*13* 191:*11, 13*
194:*11, 16, 19* 195:*1*
**wrong** 78:*15* 91:24
124:22 133:*1, 2*
147:*14, 17* 151:*10*
153:*18* 156:*16*
157:5 199:*20*

202:22 205:*17, 19*
206:*16* 209:*10*
216:*6*
**wrongdoing** 153:*17*
158:*16*
**wrote** 202:*14* 203:*5*

**< Y >**
**YATES** 1:*10* 97:*8,*
*10, 16, 21*
**Yeah** 6:*13* 10:*9*
11:22 12:7 15:*19*
18:24 23:*14* 30:*10*
32:*10, 22* 35:7
38:22 39:*12* 40:*20*
42:*16, 18* 44:*16*
46:*14, 20* 47:*4, 10,*
*11, 13* 48:*8* 52:*10*
65:*17* 74:*8* 85:*3*
87:*24* 90:*2* 91:*1*
95:*12* 97:*11*
101:*15* 103:*10*
107:*14* 116:*6*
121:*5* 123:*12*
136:*9* 141:*17*
142:*2* 144:*6* 160:*9*
163:*1* 164:*21*
166:*5* 175:*5* 179:*9*
192:*2* 193:*10*
199:9 213:*20*
225:*12, 17*
**year** 48:*16* 71:24
72:*3* 88:*14, 21*
176:*18* 198:*13, 14*
202:*14* 211:*18*
**years** 11:*8* 40:*10*
57:*19* 107:*16*
113:*1* 115:*3*
144:*10* 198:*19, 22*
199:*12* 208:22
220:*12* 221:*6*

**< Z >**
**zone** 27:22

