Willie Hunt   -   3/21/2022
2:20-cv-02310-CSB-EIL   # 17-5   Page 1 of 100
Paul Berge, et al. vs. City of Kankakee, et al.

E-FILED
Friday, 17 June, 2022  10:54:57 AM
Clerk, U.S. District Court, ILCD

1        IN THE UNITED STATES DISTRICT COURT
         FOR THE CENTRAL DISTRICT OF ILLINOIS
2                  URBANA DIVISION

3

    PAUL BERGE and TIMOTHY      )
4   KREISSLER,                  )
                                )
5        Plaintiffs,            )
                                )
6        vs.                    ) No. 20-cv-2310
                                )
7   CITY OF KANKAKEE, POLICE    )
    AND FIRE COMMISSION OF      )
8   THE CITY OF KANKAKEE,       )
    CHIEF FRANK KOSMAN,         )
9   MAYOR CHASTITY              )
    WELLS-ARMSTRONG, WILLIE     )
10  HUNT, NICKEY F. YATES,      )
    Individually and in         )
11  their Official Capacity,    )
                                )
12       Defendants.            )

13

14        The discovery deposition of WILLIE HUNT,

15  taken in the above-entitled cause, before

16  Brenda S. Hall, Certified Shorthand Reporter of the

17  State of Illinois, CSR License No. 084-003359, on

18  Monday, March 21, 2022, at 11:00 a.m., 206 South

19  Jefferson Street, Suite 100, Chicago, Illinois,

20  pursuant to notice.

21

22

23

24

Willie Hunt - 3/21/2022
2:20-cv-02310-CSB-EIL #17-5 Page 2 of 100
Paul Berge, et al. vs. City of Kankakee, et al.

```
 1    PRESENT:

 2              HERBERT LAW FIRM
                BY:  MR. DANIEL Q. HERBERT
 3              206 South Jefferson Street
                Suite 100
 4              Chicago, Illinois  60661
                (312) 655-7660
 5              dan.herbert@danherbertlaw.com

 6                    Appeared on behalf of Plaintiffs;

 7              ODELSEN, STERK, MURPHEY, FRAZIER, MCGRATH
                BY:  MR. MICHAEL MCGRATH
 8              3318 W. 95th Street
                Evergreen Park, Illinois  60805
 9              (708) 424-5678
                mmcgrath@osmfm.com
10
                     Appeared on behalf of Defendants.
11

12

13

14

15                        *     *     *

16

17

18

19

20

21

22

23

24
```



Willie Hunt - 3/21/2022
Paul Berge, et al. vs. City of Kankakee, et al.
2:20-cv-02310-CSB-EIL   # 17-5   Page 3 of 100

```
1                    I N D E X
    WITNESS                         EXAMINATION
2
    WILLIE HUNT
3
        By Mr. Herbert                    4
4                                       243

5       By Mr. McGrath                 205

6

7

8

9

10                  E X H I B I T S
    NUMBER                          MARKED FOR ID
11
    Hunt Deposition Exhibit
12
        No. 1      Defendants' Answers      108
13
        No. 2      Facebook posts          171
14
15      No. 3      Policy 328              172

16
        No. 4      Recruitment and         173
17                 selection

18      No. 5      Answer                  176

19

20

21

22

23

24
```



Willie Hunt   -   3/21/2022
2:20-cv-02310-CSB-EIL   # 173-5   Page 4 of 100
Paul Berge, et al. vs. City of Kankakee, et al.

1     (Whereupon, the witness was
2 duly sworn.)
3     WILLIE HUNT,
4 called as a witness herein, was examined and
5 testified as follows:
6     EXAMINATION
7 BY MR. HERBERT:
8     Q.  Good morning, Mr. Hunt.  How are you?
9     A.  I'm fine.  And you?
10     Q.  Good.
11         This is the discovery deposition
12 taken of one of the individual Defendants, Mr. Willie
13 Hunt, in case number 20-cv-2310.
14 BY MR. HERBERT:
15     Q.  Mr. Hunt, I've taken your deposition
16 before, correct?
17     A.  I believe so.
18     Q.  Okay.  And I don't know if you remember
19 some of the ground rules that we talked about with
20 regards to giving a deposition, but we want to make
21 sure that you give verbal answers, no shaking of the
22 head, you wait until my question is asked before you
23 give your answer, and obviously if you need to take a
24 break at any point, feel free to.  I just ask that

Page 4

1 you finish -- or answer the question if there's one
2 pending, okay?
3     A.  Okay.
4     Q.  Are you clear on all those ground rules?
5     A.  Yes.
6     Q.  Okay.  Did you prepare -- or did you
7 review any documents in preparation for today's
8 deposition?
9     A.  Just my personal -- personnel file.
10     Q.  Okay.  And your personnel file, the one
11 from Kankakee?
12     A.  Yes.
13     Q.  And what was in that personnel file, do
14 you remember?
15     A.  Training, discipline and personal,
16 personal information.
17     Q.  Okay.  You gave a deposition in a case of
18 Michael Shreffler S-h-r-e-f-f-l-e-r.  Is that
19 correct?
20     A.  I believe so.
21     Q.  Okay.  And did you review that
22 deposition?
23     A.  No.
24     Q.  Okay.  Any reason to believe that any of

Page 5

1 your answers that you gave in that deposition were
2 incorrect?
3     A.  No.
4     Q.  And when you say no, to the best of your
5 knowledge, all those answers were correct?
6     A.  To the best of my knowledge, yes.
7     Q.  Okay.  And I went through your dep and
8 you talked about how you believed, at the time of the
9 deposition you believed that discrimination was still
10 occurring at the Kankakee Police Department.  Do you
11 remember making a statement to that effect?
12     A.  Yes.
13     Q.  And you said that the discrimination was
14 being conducted by white supervisors against minority
15 officers.  Do you remember making that statement or
16 something to that effect?
17     A.  Something to that effect, but I believe I
18 made a correction on that too.
19     Q.  Okay.  What is your belief --
20     A.  If I can see the deposition, I can tell
21 you what I corrected.
22     Q.  Okay.  And you know what, we're having
23 that printed, so I can do that for you.  But let me
24 ask you, do you believe that while you were employed

Page 6

1 with the Kankakee Police Department that there was
2 discrimination being done against minority officers?
3     A.  Without looking at the deposition and
4 what answer I gave in a deposition.
5     Q.  Well --
6     A.  I don't want to say something that I
7 corrected in a previous deposition.
8     Q.  Okay.  No, and I understand that.  I
9 guess I'm asking a new question.
10         During your time at the Kankakee
11 Police Department, as you sit here for today's
12 deposition, do you believe that there was
13 discrimination that was done towards minority
14 officers?
15     A.  Like I said before --
16     Q.  You want to look at the dep?
17     A.  I need to look at the dep.
18     Q.  That's fine.
19         Okay.  How are you currently
20 employed?
21     A.  I work for Kankakee School District 111.
22     Q.  And what is Kankakee School District 111?
23 Does that encompass grammar schools, high schools,
24 colleges?

Page 7



**Willie Hunt - 3/21/2022**

2:20-cv-02310-CSB-EIL # 173 Page 5 of 100

Paul Berge, et al. vs. City of Kankakee, et al.

**Page 8**

1　A.　Just elementary school, preschool and
2　high school.

3　Q.　Okay.  And what schools are those?

4　A.　You mean you want me to name the schools?

5　Q.　Yes, please.  Or is there a whole bunch?

6　A.　It's about nine schools.

7　Q.　Okay.  What's the high school?

8　A.　Kankakee High School.

9　Q.　Okay.  Any other high schools?

10　A.　No, just one high school.

11　Q.　And the grammar schools, the ones that
12　you remember?

13　A.　We have a junior high, Kankakee Junior
14　High.

15　Q.　Okay.

16　A.　And the elementary schools would be
17　Edison, Mark Twain, Steuben, Kennedy, Lincoln,
18　Proegler.

19　Q.　How do you spell that?

20　A.　P-r-o-e-g-l-e-r.

21　Q.　Okay.

22　A.　And I believe that's it.

23　Q.　Okay.  What's your position there?

24　A.　Director of Safety and Security.

**Page 9**

1　Q.　And how long have you held that position?

2　A.　Since June of twenty -- when did I
3　retire?  2021.

4　Q.　And do you have a staff that reports to
5　you?

6　A.　Yes.

7　Q.　Approximately how many people report to
8　you?

9　A.　Approximately 13.

10　Q.　Okay.  And do you report to anyone?

11　A.　Yes.

12　Q.　Tell me who is in your chain of command?

13　A.　The superintendent.

14　Q.　Okay.  And who is the superintendent?

15　A.　Genevar Walters.

16　Q.　How do you spell the first name?

17　A.　It's funny.  I have to look it up.

18　Q.　That's okay.  Just for the record, you're
19　looking at your phone which is cool.

20　A.　Yeah.

21　Q.　And is that a male or female?

22　A.　It's a female.  The V is silent in her
23　name, so I always mess that up.  It's G-e-n-e-v-a-r
24　Walters.

**Page 10**

1　Q.　And has your address changed since the
2　last time we took your deposition?

3　A.　No.

4　Q.　Okay.  Your phone number?  Do you have a
5　new phone?

6　A.　My personal phone.

7　Q.　Okay.  What's your phone number?

8　A.　(815) 405-7011.

9　Q.　Okay.  And who hired you for this
10　position?

11　A.　Sissy O'Connor.

12　Q.　S-i-s-s-y?

13　A.　Yes, O'Connor.

14　Q.　And who is Sissy O'Connor?

15　A.　At the time she was superintendent of HR,
16　human resource.

17　Q.　Okay.  So Sissy O'Connor was
18　superintendent of human resources for School
19　District 111?

20　A.　Yes.

21　Q.　Okay.  And then who was her supervisor?

22　A.　Dr. Walters.

23　Q.　Okay.  And Dr. Walters is Genevar, right?

24　A.　Genevar.

**Page 11**

1　Q.　Genevar.  Excuse me.  And then does
2　Dr. Walters, does she report to anyone in her
3　position?

4　A.　Yes.

5　Q.　Who is that?

6　A.　The board.

7　Q.　The board?

8　A.　Uh-huh.  The school board members.  The
9　school board.

10　Q.　Okay.  And is that an elected school
11　board or is it appointed?

12　A.　Elected.

13　Q.　And elected by the community?

14　A.　Yes.

15　Q.　And how many members are on the school
16　board now currently?

17　A.　Seven.

18　Q.　And how many were on when you were hired
19　in June of 2021?

20　A.　I believe seven.

21　Q.　Okay.  And is there different titles
22　within the board members?

23　A.　Yes.

24　Q.　And tell me about those.



Willie Hunt - 3/21/2022
2:20-cv-02310-CSB-EIL   # 17-5   Page 6 of 100
Paul Berge, et al. vs. City of Kankakee, et al.

| | |
|---|---|
| 1    A.  You have a president. | 1    A.  One more. |
| 2    Q.  Okay.  Who is the president currently? | 2    Q.  One more.  And if you can't think of |
| 3    A.  Barbara Wells. | 3  it -- |
| 4    Q.  Okay.  And who was the president of the | 4    A.  Mary Archie. |
| 5  board in 2021, do you know? | 5    Q.  A-r-c-h-y? |
| 6    A.  Barbara Wells. | 6    A.  A-r-c-h-e-i (sic). |
| 7    Q.  Okay.  What other positions are there | 7    Q.  Okay.  And were those the same board |
| 8  aside from president? | 8  members that were on when you were hired in |
| 9    A.  Vice president. | 9  June 2021? |
| 10    Q.  And who was that? | 10    A.  No. |
| 11    A.  Can I look in my phone? | 11    Q.  Were all of them different? |
| 12    Q.  Sure.  Sure. | 12    A.  No. |
| 13    A.  I'm just going to the district website. | 13    Q.  Do you know who was on the board in 2021 |
| 14  They have all that information. | 14  that's not on the board currently? |
| 15    Q.  Oh.  That's okay.  I can do that too. | 15    A.  I can't recall. |
| 16    A.  Okay. | 16    Q.  That's okay.  And tell me how it is that |
| 17    Q.  You don't know as you sit here today who | 17  you were given this assignment. |
| 18  the vice president is? | 18    A.  I applied for the position online. |
| 19    A.  No. | 19    Q.  Okay.  When did you apply for the |
| 20    Q.  Do you know the members that are on the | 20  position online? |
| 21  board? | 21    A.  Maybe a month after I retired. |
| 22    A.  Yes. | 22    Q.  And when did you retire? |
| 23    Q.  Okay.  Barbara? | 23    A.  I retired May 5, 2021. |
| 24    A.  Barbara Wells. | 24    Q.  And you retired from the -- |
| Page 12 | Page 14 |
| 1    Q.  Who else that you can think of? | 1    A.  Kankakee City Police Department. |
| 2    A.  Jess Gathing. | 2    Q.  Okay.  And why is it that you retired in |
| 3    Q.  Jess? | 3  May of 2021? |
| 4    A.  Jesse. | 4    A.  I've reached the age of retirement. |
| 5    THE COURT REPORTER:  What was the last name? | 5    Q.  And -- |
| 6    THE WITNESS:  Gathing G-a-t-h-i-n-g. | 6    A.  50. |
| 7  BY MR. HERBERT: | 7    Q.  Okay. |
| 8    Q.  Okay.  Who else? | 8    A.  With 24 years of service. |
| 9    A.  Tracy Verrett. | 9    Q.  And are those the only reasons why you |
| 10    Q.  V-e-r-a-t? | 10  retired? |
| 11    A.  V-e-r-r-e-t-t. | 11    A.  Yes. |
| 12    Q.  Okay. | 12    Q.  Okay.  When did you turn 50? |
| 13    A.  Darrell Williams. | 13    A.  December 18th. |
| 14    Q.  Okay. | 14    Q.  Of '20? |
| 15    A.  Chris Bohlen. | 15    A.  '20.  (Nodding head.) |
| 16    Q.  C-h-r-i-s? | 16    Q.  Okay.  And who was the mayor at the time |
| 17    A.  Yes. | 17  that you retired? |
| 18    Q.  Bohlen B-o-l-e-n, a-n? | 18    A.  Mayor Chasity Wells-Armstrong. |
| 19    A.  I think it's spelled B-o-h-l-e-n. | 19    Q.  Okay.  And she was eventually voted out |
| 20    Q.  Okay. | 20  of election? |
| 21    A.  Deb Johnston. | 21    A.  That is correct. |
| 22    Q.  Okay. | 22    Q.  Or voted out by election, correct? |
| 23    A.  How many is that? | 23    A.  Correct. |
| 24    Q.  Five, six. | 24    Q.  And when did that election take place? |
| Page 13 | Page 15 |

Willie Hunt   -   3/21/2022
Paul Berge, et al. vs. City of Kankakee, et al.
2:20-cv-02310-CSB-EIL  # 17-5  Page 7 of 100

1    A.  Let's see.  The election, I believe, was
2  in April.
3    Q.  April of 2021?
4    A.  Yes.
5    Q.  And you retired a month later?
6    A.  No, a month before.
7    Q.  Oh, okay.  I thought you said you retired
8  in May?
9    A.  No, March.
10    Q.  Oh, March.
11    A.  March 5th.
12    Q.  March 5th.  Okay.  Did you put in
13  retirement papers?
14    A.  Yes, sir.
15    Q.  When did you do that?
16    A.  February 23rd.
17    Q.  Okay.  And was that an official police
18  department document that you put in or --
19    A.  Yes.
20    Q.  Okay.  What's that document called?
21    A.  Oh, it's just a memo.
22    Q.  A memo?
23    A.  A memo to the chief and the mayor.
24    Q.  Okay.  So is it just like a to/from that

1  you write, or is there a specific police department
2  form that you fill out?
3    A.  Just a to/from.
4    Q.  Okay.  And do you remember what you said
5  in that to/from?
6    A.  It's in my personnel file if I can look
7  at my phone.
8    Q.  That's okay.  And you sent this to the
9  mayor?
10    A.  To the mayor, yes.
11    Q.  And anyone else?
12    A.  Chief of police.
13    Q.  Which was whom?
14    A.  Frank Kosman.
15    Q.  Okay.  Anyone else?
16    A.  And HR.
17    Q.  And who was the individual from HR?
18    A.  James Ellexson.
19    Q.  Okay.  And when you retired, did you
20  receive all the benefits that you were entitled to
21  upon retiring?
22    A.  Yes.
23    Q.  Okay.  And those include a retirement
24  star I'm assuming?

1    A.  Yes.
2    Q.  Okay.  Retirement credentials?
3    A.  Yes.
4    Q.  Okay.  An ID, things like that?
5    A.  Yes.
6    Q.  Okay.  And at the time you retired, were
7  you under any investigation by the department?
8    A.  No.
9    Q.  At the time that you retired, were you
10  under investigation by anyone that you know of?
11    A.  No.
12    Q.  Did anyone ask you to resign?
13    A.  No.
14    Q.  Did anyone encourage you to resign?
15    A.  Yes.
16    Q.  Who?
17    A.  My wife.
18    Q.  Okay.  And when you resigned, what rank
19  were you?
20    A.  Deputy chief.
21    Q.  Okay.  And deputy chief, that would be
22  second highest in command at the police department?
23    A.  Yes.
24    Q.  And was that an exempt rank position or a

1  career service position if you understand that
2  question?
3    A.  Can you be more specific?
4    Q.  You were appointed to your position as
5  deputy chief, correct?
6    A.  Correct.
7    Q.  And the mayor appointed you, correct?
8    A.  Yes.
9    Q.  So you didn't test for that position,
10  correct?
11    A.  Correct.
12    Q.  So you would agree it's not a career
13  service position in that regard, correct?
14    A.  Correct.
15    Q.  Okay.  And when you retired, did you --
16  are you receiving a pension?
17    A.  Yes.
18    Q.  And are you receiving a pension based
19  upon your pay as a deputy chief or as -- strike that.
20        Your highest career service is
21  lieutenant, correct?
22    A.  That is correct.
23    Q.  And your pension you're currently
24  receiving, correct?



Willie Hunt - 3/21/2022
2:20-cv-02310-CSB-EIL #17-5 Page 8 of 100
Paul Berge, et al. vs. City of Kankakee, et al.

1    A.  Yes.
2    Q.  And is that based upon your pay as a
3 lieutenant or as a deputy chief?
4    A.  The downstate pension states that your
5 pension is based on your last base pay.
6    Q.  Okay.
7    A.  So it would be as deputy chief.
8    Q.  All right.  Do you have to work in that
9 rank for a certain amount of time to receive a
10 pension benefit based upon the position of deputy
11 chief?
12    A.  Unlike Chicago, no.
13    Q.  No.  Just one day and you can --
14    A.  One day.
15    Q.  Okay.  How long had you been the deputy
16 chief?
17    A.  Since July 3, 2017.  All right.  And then you said that
18    Q.  Okay.  All right.  And then you said that
19 you applied to Kankakee to be the Director of Safety
20 and Security for the School District 111, correct?
21    A.  That is correct.
22    Q.  And you became or you were awarded that
23 position in May of 2021, correct?
24    A.  June.

1    Q.  June.  I'm sorry.  I have June written
2 here.
3          When did you apply?  And I apologize
4 if I asked this before.
5    A.  I think I stated about a month --
6    Q.  Prior?
7    A.  After I retired.
8    Q.  Okay.  And was this position, was it
9 opened up to the public?  How is it that you became
10 aware of it I guess is my question?
11    A.  Yes, it was posted.
12    Q.  Posted where?
13    A.  On the school website.
14    Q.  Okay.  Did you apply for this position
15 prior to resigning from the Kankakee Police
16 Department?
17    A.  No.
18    Q.  Did you apply for this position prior to
19 giving -- sending that memo indicating that you were
20 going to retire?
21    A.  No.
22    Q.  Okay.  Did you work anywhere after you
23 retired from Kankakee and before you started work
24 with the Kankakee School District?

1    A.  Yes.
2    Q.  Where did you work?
3    A.  I worked for Stanard & Associates.
4    Q.  Okay.  And how long did you work for
5 Stanard & Associates?
6    A.  Probably a couple years.
7    Q.  Okay.  A couple years meaning two years?
8    A.  Yes.
9    Q.  When did you work for Stanard &
10 Associates?
11    A.  2018, 2019, 2020.
12    Q.  And what position did you hold with
13 Stanard & Associates?
14    A.  Evaluator.
15    Q.  Evaluator?
16    A.  Yes.
17    Q.  And who hired you?
18    A.  The company.
19    Q.  Tell me about -- well, first of all, let
20 me ask you this.  Do you remember what month you
21 started in 2018?
22    A.  No, I don't.
23    Q.  Do you know if it would have been early
24 in the year, middle of the year, later in the year?

1    A.  Maybe the fall.
2    Q.  The fall of 2018, yes?
3    A.  Yes.
4    Q.  Okay.  And had you worked for Stanard &
5 Associates at all prior to the fall of 2018?
6    A.  No.
7    Q.  Had you been affiliated with Stanard &
8 Associates at any point prior to you going to work
9 for them?
10    A.  No.
11    Q.  Who hired you?  Did I ask this question,
12 who hired you, and your answer was?
13    A.  The company.
14    Q.  Okay.  And tell me about how it is that
15 you came to be employed by Stanard & Associates?
16    A.  We used Stanard & Associates for our
17 testing company.
18    Q.  Okay.  When you say we used it, you're
19 saying --
20    A.  The city.
21    Q.  Okay.  The City of Kankakee?
22    A.  Yes.
23    Q.  The police department, correct?
24    A.  Police and fire department.



Willie Hunt   -   3/21/2022
2:20-cv-02310-CSB-EIL   #175   Page 9 of 100
Paul Berge, et al. vs. City of Kankakee, et al.

| | |
|---|---|
| 1    Q.   Okay. Used Stanard & Associates for? | 1    **A. No.** |
| 2    **A. Testing.** | 2    Q.   Okay. Do you have any guesses as to why |
| 3    Q.   For testing. For promotional testing? | 3 you were replaced with -- Stanard & Associates with |
| 4    **A. Yes, and hiring.** | 4 Police Consultants? |
| 5    Q.   And how long had you and the city used | 5    MR. MCGRATH: Objection to the question. It |
| 6 Stanard & Associates for testing? | 6 calls for speculation. |
| 7    **A. Since probably 2005.** | 7 BY MR. HERBERT: |
| 8    Q.   And did Stanard & Associates conduct all | 8    Q.   Yeah, if you know. If you have any |
| 9 the testing for the Kankakee Police Department from | 9 reasons to believe. |
| 10 2005 until you retired? | 10    **A. I believe it was budgetary.** |
| 11    **A. No.** | 11    Q.   Okay. And why do you believe that? |
| 12    Q.   Did another company come in to conduct | 12    **A. Because Stanard & Associates was more** |
| 13 the testing? | 13 **expensive.** |
| 14    **A. Yes.** | 14    Q.   Okay. What type of work -- or tell me |
| 15    Q.   What company was that? | 15 how it is that -- you said that you were employed by |
| 16    **A. I believe it was Police Consultants.** | 16 the company, with Stanard & Associates, correct? |
| 17    Q.   And when did Police Consultants come in | 17    **A. Correct.** |
| 18 and take over the testing phase? | 18    Q.   And they had been involved with the |
| 19    **A. Under Frank Kosman.** | 19 testing since 2005, correct? |
| 20    Q.   Okay. When you say under Frank Kosman, | 20    **A. That's correct.** |
| 21 what do you mean by that? | 21    Q.   And did you play -- as part of your |
| 22    **A. When he became chief.** | 22 duties on the police department, at any point did |
| 23    Q.   And when was that? | 23 you -- were you involved in any procedures that |
| 24    **A. He only did two years, so it had to be** | 24 Stanard & Associates were involved with on the |
| Page 24 | Page 26 |
| 1 **2019.** | 1 Kankakee Police Department? |
| 2    Q.   Well, Frank Kosman was there before 2019, | 2    MR. MCGRATH: Objection to the form of the |
| 3 wasn't he? | 3 question. |
| 4    **A. I think Frank Kosman came May 2019.** | 4 BY MR. HERBERT: |
| 5    Q.   Okay. And why is it that Police | 5    Q.   Do you understand the question? |
| 6 Consultants took over the testing for Stanard & | 6    **A. No. Repeat it again.** |
| 7 Associates? | 7    Q.   It wasn't a very good one. |
| 8    **A. You have to ask Frank Kosman.** | 8      During your time as a police officer |
| 9    Q.   Tell me all the reasons that you know of | 9 with the Kankakee Police Department, did you ever |
| 10 why Police Consultants took over. | 10 work with Stanard & Associates on any projects prior |
| 11    **A. That's just who he chose.** | 11 to you going to work for them in 2018? |
| 12    Q.   At the time in which you worked for | 12    **A. Can you repeat the question again?** |
| 13 Stanard & Associates, you were employed with the | 13    Q.   Yeah. Stanard & Associates conducted the |
| 14 Kankakee Police Department, correct? | 14 testing procedures for the City of Kankakee from 2005 |
| 15    **A. That is correct.** | 15 until 2019, correct? |
| 16    Q.   And at the time in which Police | 16    **A. Correct.** |
| 17 Consultants replaced Stanard & Associates for the | 17    Q.   At any point during that time period, did |
| 18 testing administration for the Kankakee Police | 18 any of your duties involve the testing process in any |
| 19 Department, you also were employed by the Kankakee | 19 way? |
| 20 Police Department, correct? | 20    **A. No.** |
| 21    **A. That is correct.** | 21    Q.   Did any of your duties involve working |
| 22    Q.   And you don't know any reasons as you sit | 22 with Stanard & Associates in any of those -- on any |
| 23 here today why Stanard & Associates was replaced with | 23 of the work that was being done by Stanard & |
| 24 Police Consultants? | 24 Associates? |
| Page 25 | Page 27 |

Willie Hunt - 3/21/2022
2:20-cv-02310-CSB-EIL # 41-5 Page 10 of 100
Paul Berge, et al. vs. City of Kankakee, et al.

1    A.  Not for -- the work that I did with
2  Stanard & Associates was not for the city.  It was
3  for other police departments.
4    Q.  Got it.  I guess I'm asking more specific
5  though.  When Stanard & Associates was administering
6  the testing process, would you ever have any
7  communications with any of the Stanard & Associates'
8  individuals when it related to the Kankakee Police
9  Department?
10   A.  Yes.
11   Q.  Tell me about that.
12   A.  Just we knew who was administering the
13 exam.  That was it.  As far as any other thing
14 dealing with the test, Stanard & Associates handled
15 all of that.  That way the police department would
16 have a third party handling all the information,
17 handling the test and would be left out of it.
18   Q.  Okay.  Stanard & Associates, they would
19 have handled promotional tests during that time
20 period, correct?
21   A.  That is correct.
22   Q.  And did any of those roles -- or strike
23 that.
24        Any of those tests that they

<div style="text-align:right">Page 28</div>

1  administered, were you a candidate on any of those
2  promotional tests?
3    A.  Yes.
4    Q.  Tell me about them.
5    A.  I was promoted twice within the City of
6  Kankakee through testing.
7    Q.  Okay.  And tell me about those.
8    A.  Sergeant and lieutenant.
9    Q.  And when were you promoted to sergeant?
10   A.  Oh, my goodness.  Man.  It was before I
11 had ten years on, so it was like 2017 -- it had to
12 have been like twenty -- 2016.
13   Q.  Okay.
14   A.  And lieutenant was -- I had turned 40, so
15 it would have been 2011.
16   Q.  Do you have that reversed?  You said
17 sergeant 2016, lieutenant 2011.  You were promoted to
18 sergeant before you were promoted to lieutenant,
19 right?
20   A.  Yes.  You know what, it was two thousand
21 -- not 2016.  It will be '06.  '06.
22   Q.  2006?
23   A.  2006.  That sounds better.  That sounds
24 better.  And lieutenant was 2011.

<div style="text-align:right">Page 29</div>

1    Q.  Okay.  And when you were promoted to
2  sergeant, Stanard & Associates administered that
3  test.  Is that correct?
4    A.  That is correct.
5    Q.  And did Stanard & Associates come out
6  with a final list of candidates?
7    A.  Yes.
8    Q.  And where were you ranked when you --
9  when that final list came out?
10   A.  No. 3.  The final list for Stanard or the
11 final list for the department?  There's two different
12 lists.
13   Q.  Okay.
14   A.  Stanard gives a list and then they wait
15 for military points, then the department do a final
16 list.
17   Q.  Okay.  So Stanard's final list in 2006,
18 you were ranked No. 3?
19   A.  Yes.
20   Q.  And then the department's final list,
21 what were you ranked?
22   A.  No. 1.
23   Q.  Okay.  And when you were ranked No. 3,
24 there was two white candidates that were ahead of

<div style="text-align:right">Page 30</div>

1  you, correct?
2    A.  Yes.
3    Q.  And the two white candidates were ranked
4  Nos. 1 and 2 by the Stanard & Associates' list,
5  correct?
6    A.  Yes.
7    Q.  Okay.  And you were promoted over those
8  two white candidates, correct?
9    A.  Yes.
10   Q.  Okay.  And in 2011 --
11   A.  Excuse me.  Can you go back to...
12   Q.  Is there something you would like to
13 clarify?  Feel free.
14   A.  Yeah, I'd like to clarify.
15   Q.  Go ahead.
16   A.  On the department list I was No. 1
17 because of military points.
18   Q.  Got it.  And in 2011 where were you
19 ranked on the final Stanard & Associates list?
20   A.  No. 3.
21   Q.  Okay.  And were you ranked at a different
22 number after the department --
23   A.  No.
24   Q.  Okay.  And were you promoted to

<div style="text-align:right">Page 31</div>

Willie Hunt  -  3/21/2022
2:20-cv-02310-CSB-EIL   # 47-5   Page 11 of 100
Paul Berge, et al. vs. City of Kankakee, et al.

1 lieutenant in 2011?

2 **A. Yes.**

3 Q. And were you promoted to lieutenant over

4 the individuals that were ranked Nos. 1 and 2?

5 MR. MCGRATH: Objection. Foundation, form of

6 the question.

7 BY MR. HERBERT:

8 Q. Do you understand the question?

9 **A. Repeat it again.**

10 Q. Sure. You were ranked third, so there

11 was a candidate ranked No. 1 and No. 2 that were

12 ahead of you, correct?

13 **A. That is correct.**

14 Q. And were those two white males?

15 **A. Yes.**

16 Q. And were you promoted to lieutenant

17 before either of those two individuals that were No.

18 1 and 2 were promoted to lieutenant?

19 **A. No.**

20 Q. Okay. Were you promoted to lieutenant

21 after those individuals were promoted to lieutenant?

22 **A. Yes.**

23 Q. Okay. And so fair to say that the --

24 that in 2011 the Kankakee Police Department followed

1 rank order when making the selections, correct?

2 **A. Correct.**

3 Q. And also in 2006 the Kankakee Police

4 Department followed rank order as well after they had

5 done their adjustments to the Stanard & Associates

6 list, correct?

7 **A. Correct.**

8 Q. And are you aware of the Kankakee Police

9 Department ever making promotions out of rank order?

10 **A. Yes.**

11 Q. Okay. Tell me about those.

12 **A. I've worked for five different chiefs,**

13 **and four out of five have skipped orders doing**

14 **promotions.**

15 Q. Okay. Tell me about the chiefs that have

16 skipped orders during promotions.

17 **A. William Doster.**

18 Q. How do you spell that?

19 **A. William.**

20 Q. I've got that.

21 **A. Doster D-o-s-t-e-r.**

22 Q. And how long was that individual chief?

23 **A. He was chief before I got there, so I**

24 **think, I believe the early '90s. He came when**

1 we lead the nation per capita in homicides, so.

2 Q. But you weren't working there at that

3 point?

4 **A. I wasn't working there, but I was hired**

5 **under Chief Doster.**

6 Q. Okay. While you were working there, tell

7 me about all the situations that you're aware of

8 where a chief has gone out of rank order in making

9 promotions.

10 **A. Doster skipped Brian Coash who was**

11 **No. 1.**

12 Q. Were you working there --

13 **A. Yes.**

14 Q. -- at the point in which he made that

15 skip?

16 **A. Yes.**

17 Q. Okay. Skipped who? I'm sorry.

18 **A. Brian B --**

19 Q. I've got that.

20 **A. Coash C-o-a-s-h.**

21 Q. Okay. And he skipped Mr. Coash in favor

22 of whom?

23 **A. John Raimondo.**

24 Q. Okay. Do you know why he skipped Coash

1 for Raimondo?

2 **A. You would have to ask.**

3 Q. Do you know any reasons why?

4 **A. I can only speculate.**

5 Q. And tell me what your belief is.

6 MR. MCGRATH: Objection. It calls for

7 speculation.

8 BY MR. HERBERT:

9 Q. Well, you have a reason to think that

10 there was -- that that was behind the going out of rank

11 order, so I'm asking you what your reason to believe

12 is?

13 **A. Like I said, I'm only speculating because**

14 **there's no foundation, no truth to it, so.**

15 Q. No truth to what? Have you heard rumors

16 about it?

17 **A. I'll be speculating.**

18 Q. You've heard rumors about why Coash was

19 skipped for Raimondo, correct?

20 MR. MCGRATH: The same objection, an ongoing

21 objection. It calls for speculation, foundation.

22 BY MR. HERBERT:

23 Q. I'm not asking you to speculate. I'm

24 asking you --



Willie Hunt - 3/21/2022
2:20-cv-02310-CSB-EIL # 41-5 Page 12 of 100
Paul Berge, et al. vs. City of Kankakee, et al.

1  A. That's what I will be doing. I'll be
2 speculating.
3  Q. You're speculating if you heard rumors?
4  A. I didn't hear any rumors.
5  Q. You never heard any rumors as to why
6 Raimondo skipped Coash?
7  MR. MCGRATH: Objection. You said Raimondo
8 skipped. I think you meant the chief.
9  THE WITNESS: The chief skipped.
10 BY MR. HERBERT:
11  Q. The chief skipped using Raimondo over
12 Coash. You never heard one single rumor about a
13 reason behind that?
14  A. I've had a conversation.
15  Q. Tell me about that.
16  A. With Raimondo's stepdad.
17  Q. Okay.
18  A. And he said he wasn't leaving the
19 department until his boy got promoted.
20  Q. Okay. What else about that conversation?
21  A. That was it.
22  Q. Did his dad tell you why he wasn't
23 leaving the department until his son got promoted?
24  A. No. That was just the conversation we
Page 36

1 had.
2  Q. What did his dad do for Kankakee?
3  A. He was a lieutenant.
4  Q. Okay. And what race was Raimondo?
5  A. White.
6  Q. What about Coash?
7  A. White.
8  Q. Okay. And you said Raimondo -- I'm
9 sorry. I want to make sure I'm correct. Was Coash
10 higher ranked than Raimondo on the promotional list?
11  A. Yes.
12  Q. And Raimondo skipped Coash?
13  A. The chief skipped Coash and promoted
14 Raimondo.
15  Q. Okay. To what rank?
16  A. Sergeant.
17  Q. And you said that you had a conversation
18 with Raimondo's dad?
19  A. Stepfather.
20  Q. Where he said he's not leaving the
21 department until his son is promoted?
22  A. Yes.
23  Q. Wasn't his son promoted to sergeant?
24  A. Not when he had the conversation.
Page 37

1  Q. Okay. Well, tell me about that because I
2 don't understand. I don't understand when this
3 conversation took place.
4  A. I was training with Lieutenant Nolte.
5  Q. And who was that? How do you spell that?
6  A. Nolte?
7  Q. Yes.
8  A. Charles Nolte. Just like the movie actor
9 Nolte N-o-l-t-e.
10  Q. Okay. And tell me about that. When were
11 you training with him?
12  A. When I was a rookie.
13  Q. What year?
14  A. '97.
15  Q. All right. And what about that?
16  A. He just said he wasn't retiring until his
17 son got promoted.
18  Q. Okay. So was somebody promoted over
19 Raimondo at first?
20  A. I don't understand the question.
21  Q. Well, here. You're saying that
22 Rinardo --
23  A. Raimondo.
24  Q. Raimondo?
Page 38

1  A. Raimondo.
2  Q. Thank you. The chief took Raimondo and
3 skipped over the higher ranked officer and promoted
4 him, correct?
5  A. Correct.
6  Q. So my question is, when did that happen
7 in relation to his stepfather and you hearing these
8 rumors about people not leaving until Raimondo was
9 promoted?
10  A. That was before Raimondo was promoted.
11  Q. Do you know why Raimondo was promoted?
12  A. You have to ask Chief Doster.
13  Q. But you don't know any reason why?
14  A. No.
15  Q. Okay. Who else? What other chiefs
16 promoted somebody out of rank order?
17  A. Chief Regnier.
18  Q. Was there any African Americans on that
19 list that you spoke of where there was Coash and
20 Raimondo?
21  A. I believe so.
22  Q. Okay. Who was on there?
23  A. I believe Lamont Upton.
24  Q. Do you know where Mr. Upton was ranked on
Page 39



Willie Hunt - 3/21/2022
2:20-cv-02310-CSB-EIL # 47-5 Page 13 of 100
Paul Berge, et al. vs. City of Kankakee, et al.

1 that list?

2    **A. No, I do not.**

3    Q. Do you know if he was ranked behind

4 Raimondo?

5    **A. I think they were before Raimondo.**

6    Q. Meaning higher ranked?

7    **A. Yes.**

8    Q. And you say they. Who are you referring

9 to?

10    **A. Paul Miller. You asked me if there were**

11 **any minorities on that list.**

12    Q. Okay. So Upton and Miller?

13    **A. Paul Miller.**

14    Q. Okay. And those individuals are African

15 American?

16    **A. Yes.**

17    Q. And those individuals were ranked higher

18 than Raimondo?

19    **A. No.**

20    Q. And Coash was ranked No. 1?

21    **A. No. After those were promoted, he was**

22 **remaining. He was No. 1 on the list, and I believe**

23 **Raimondo was No. 2 or No. 3. Raimondo was No. 3.**

24    Q. Hold on. After who was promoted?

1    **A. After a group of sergeants were promoted.**

2 **I think it was seven or eight were promoted.**

3    Q. Off of one list?

4    **A. Yeah, off of one list, and the remainders**

5 **on that list was Coash, Monferdini, and Raimondo.**

6    Q. Okay. So that the black individuals that

7 you talked about, they were already promoted,

8 correct?

9    **A. Yes.**

10    Q. And they were promoted based in rank

11 order, correct?

12    **A. Yes.**

13    Q. Okay. They didn't skip over any white

14 supervisors -- or I'm sorry, white candidates when

15 they were promoted, correct?

16    **A. Correct.**

17    Q. Okay. And then you said Chief Regnier

18 which is R-e-g-n-i-e-r?

19    **A. Yes.**

20    Q. He went out of rank order when he did his

21 promotions?

22    **A. Yes.**

23    Q. And when did that happen?

24    **A. I don't know the exact year.**

1    Q. That's okay.

2    **A. Okay.**

3    Q. What was the promotion for?

4    **A. Sergeant.**

5    Q. From patrolman to sergeant?

6    **A. That is correct.**

7    Q. Okay. And do you remember approximately

8 what year that was?

9    **A. No, I don't.**

10    Q. You were employed by the Kankakee Police

11 Department at the point?

12    **A. Yes.**

13    Q. Were you a patrolman at the point?

14    **A. No.**

15    Q. Were you a sergeant at the point?

16    **A. I was a sergeant.**

17    Q. Okay. So it would have been sometime

18 after 2006, correct?

19    **A. After 2006, yes.**

20    Q. And before you were a lieutenant,

21 correct?

22    **A. I was a lieutenant.**

23    Q. You were a lieutenant when Chief

24 Regnier --

1    **A. He promoted me to lieutenant, yes, during**

2 **his administration.**

3    Q. In 2011?

4    **A. Yes.**

5    Q. And that was out of rank order?

6    **A. No.**

7    Q. Okay. So when you said Chief Regnier

8 promoted people out of rank order, were you a

9 lieutenant at the time?

10    **A. I was a lieutenant. It was the**

11 **sergeants.**

12    Q. Okay. Tell me about that. So it would

13 have been sometime between 2011 until the point that

14 Chief Regnier left the department?

15    **A. Yes.**

16    Q. Which would have been?

17    **A. 2017.**

18    Q. Okay. But you don't remember where it

19 was within that year -- within those years?

20    **A. No.**

21    Q. It could have been any one of those years

22 that you're referring to?

23    **A. After 2011, yes.**

24    Q. Okay. Tell me about what you know about



Willie Hunt  -  3/21/2022
Paul Berge, et al. vs. City of Kankakee, et al.
2:20-cv-02310-CSB-EIL   # 47-5   Page 14 of 100

Page 44

```
1   that sergeants promotion where the chief went out of
2   rank order.
3        A.  I think Berge was No. 1, Paul Berge was
4   No. 1.  I can't remember who was No. 2 exactly.  It
5   might have been -- oh, it was Scott, what's his name?
6   I can't remember the kid's name, but it was Scott,
7   and then it was Michael Sneed.
8        Q.  Okay.  And this was the list after the
9   department made the adjustments?
10       A.  Yes.
11       Q.  Do you know what the list was when
12  Stanard & Associates ranked that list?
13       A.  Pretty much the same because none of them
14  had military experience.
15       Q.  Okay.  And who was promoted first to
16  sergeant off of that list that you just spoke of?
17       A.  Sneed.
18       Q.  And Sneed is black, correct?
19       A.  Yes.
20       Q.  And Berge and the second individual, are
21  they white?
22       A.  The second one is Asian, and Berge is
23  white.
24       Q.  Okay.  And do you know why Sneed was
```

Page 45

```
1   promoted over those individuals?
2        A.  You would have to ask the chief.
3        Q.  Do you know any reasons why?
4        A.  No.
5        Q.  Okay.  And do you know if Sneed's -- you
6   don't know any reasons why Sneed was promoted over
7   Berge?
8        A.  You would have to ask the chief.
9        Q.  Okay.  And at the time, at that point was
10  that the first time that you had ever seen an African
11  American candidate promoted ahead of a white
12  candidate that was ranked ahead of them on the list
13  within the Kankakee Police Department?
14       A.  Yes.
15       Q.  And since that promotion of Sneed over
16  the individuals that were ranked higher than them,
17  have you ever seen the situation where an African
18  American candidate was promoted over non-African
19  American candidates that were ranked ahead of them?
20       A.  No.
21       Q.  Well, Sneed was promoted over two
22  Caucasian individuals a second time, correct?
23       A.  Correct.
24       Q.  Okay.  So your answer would have been
```

Page 46

```
1   yes.  Maybe you didn't understand my question.
2        A.  I didn't understand the question.
3        Q.  Okay.  And we'll get to that.
4        A.  Okay.  I thought we were talking about
5   the sergeant, that sergeant list right there.
6        Q.  Got it.  All right.  Sneed was promoted
7   over Berge and this Scott individual who -- and then
8   Berge was -- or I'm sorry.  And then that was for
9   sergeant.  And then Sneed also was promoted over
10  Kreissler and Berge, two Caucasians for the rank of
11  lieutenant, correct?
12       A.  That is correct.
13       Q.  And other than Sneed being promoted over
14  white candidates, can you think of anyone else other
15  than Sneed that has been promoted over white
16  candidates that were ranked higher than them?
17       A.  No.
18       Q.  Did you have anything to do with Sneed's
19  promotion to sergeant?
20       A.  No.
21       Q.  Did you have anything to do with Sneed's
22  promotion to lieutenant?
23       A.  No.
24       Q.  When Sneed was promoted to lieutenant,
```

Page 47

```
1   were you working for Stanard & Associates?
2        A.  Yes.
3        Q.  And tell me about what your duties
4   were -- or strike that.
5             You said that you were hired by the
6   owners of Stanard & Associates, correct?
7        A.  Yes.
8        Q.  And who are the owners of Stanard &
9   Associates?
10       A.  I said I was hired by the company.  I
11  don't know the owners.
12       Q.  Well, tell me, did you apply for that
13  position?
14       A.  No, they kind of like recruited.
15       Q.  Okay.  Who kind of like recruited?
16       A.  The testing administrator, Lory.
17       Q.  And this is the testing administrator for
18  Stanard & Associates?
19       A.  Yes.
20       Q.  And her name is Lory?
21       A.  Yes.
22       Q.  L-a-u-r-i-e?
23       A.  L-o-r-i.
24       Q.  Okay.  And what is Lory's last name?
```

Willie Hunt  -  3/21/2022
2:20-cv-02310-CSB-EIL  # 47-5  Page 15 of 100
Paul Berge, et al. vs. City of Kankakee, et al.

**Page 48**

1    A.  Can I look at my phone?

2    Q.  Sure.

3    A.  Newcomb N-e-w-c-o-m-b.

4    Q.  And do you know if Lory Newcomb is still

5  working for Stanard?

6    A.  Yes.

7    Q.  Okay.  What's her position now?

8    A.  She's still the administrator.  She's a

9  senior -- well, she's still an administrator.

10    Q.  Do you have her phone number while you

11  have her --

12    A.  I have her e-mail.

13    Q.  Can you give me that, please?

14    A.  And it's Y.  It's L-o-r-y newcomb@stanard

15  s-t-a-n-d-a-r-d dot com.

16    Q.  S-t-a-n-a-r-d?

17    A.  Yes.

18    Q.  Dot com?

19    A.  Dot com.

20    Q.  Where are they located?

21    A.  I think they're originally based out of

22  Colorado.

23    Q.  Okay.  Do you have an office -- or did

24  you have an office with them?

**Page 49**

1    A.  No.

2    Q.  Did you ever report to any facilities for

3  Stanard when you worked with them?

4    A.  Yes.

5    Q.  Where at?

6    A.  Whatever police department they were

7  doing an assessment.

8    Q.  Okay.  And you said that Lory recruited

9  you?

10    A.  Yes.

11    Q.  How did she recruit you?

12    A.  I believe after one of the testing

13  process she just asked if I was interested in doing

14  assessments for other departments.

15    Q.  Okay.  After one of the testing process,

16  what does that mean?

17    A.  They administer the testing process for

18  the city and after one of the testing process -- it

19  was after I became deputy chief.

20    Q.  Okay.

21    A.  She asked if I was interested in doing

22  assessments for the departments.

23    Q.  Do you remember what year that was?

24    A.  I believe 2018.

**Page 50**

1    Q.  And you said it was after one of the

2  testing processes she asked you to be --

3    A.  Would I consider be an assessor.

4    Q.  Do you know what testing process this was

5  after that she made this request?

6    A.  Probably after one of the city, the city

7  testing process.

8    Q.  Okay.  Which one?

9    A.  Whichever one -- it had to be 2017 going

10  into 2018.

11    Q.  Was it after the testing process for

12  sergeant to lieutenant?

13    A.  I believe so.

14    Q.  Okay.  And that was the testing process

15  where Sneed was promoted over Kreissler and Berge,

16  correct?

17    A.  No.

18    Q.  What test was that then?

19    A.  2018 Frank wasn't there.  Frank promoted

20  Sneed, so I know it wasn't 2017.

21    Q.  Okay.  What test are you referring to

22  then?

23    A.  I think a test was given.

24    Q.  You said it was a test to lieutenant in

**Page 51**

1  2017, and it was after that testing process that you

2  were recruited and hired by Stanard & Associates.  Is

3  that fair to say?

4    A.  Yes.

5    Q.  Okay.  And as you sit here today, do you

6  know who was awarded that position?

7    A.  What position?

8    Q.  Lieutenant on that test.

9    A.  Sneed.

10    Q.  Okay.  So after the promotional test from

11  sergeant to lieutenant in which Sneed was promoted

12  over the two higher ranked white candidates, you were

13  recruited by Stanard & Associates to work for them,

14  correct?

15    A.  Yes.

16    Q.  And this was after Stanard & Associates

17  had conducted the test where Berge and Kreissler

18  scored higher than Sneed, correct?

19    A.  Correct.

20    Q.  And this is where after the city did

21  their final evaluations, Berge and Kreissler were

22  still ranked ahead of Officer Sneed, correct?

23    A.  Correct.

24    Q.  And despite that, Sneed was promoted over

Willie Hunt - 3/21/2022

2:20-cv-02310-CSB-EIL # 47-5 Page 16 of 100

Paul Berge, et al. vs. City of Kankakee, et al.

1 those two white candidates, correct?

2    A.  Yes, because of the rule of three.

3    Q.  Had you ever seen in your time at the

4 police department -- you talked about how Sneed had

5 been promoted over two higher ranked white candidates

6 when he went for sergeant.  My question is:  Have you

7 ever seen a situation where -- or strike that.

8        During the testing process where

9 Sneed was promoted over Berge and Kreissler to

10 lieutenant, you would agree with me that that was the

11 first time that you had ever seen where somebody was

12 promoted over two higher ranked candidates after the

13 city had done their final rank order?

14    MR. MCGRATH:  Objection.  Foundation.

15    MR. HERBERT:  I'm going to withdraw the

16 question.

17 BY MR. HERBERT:

18    Q.  Okay.  Did you work -- did you know Lory

19 Newcomb prior to her recruiting you?

20    A.  No.

21    Q.  Did you know anyone that was employed by

22 Stanard & Associates prior to Lory Newcomb recruiting

23 you?

24    A.  No.

                                        Page 52

1    Q.  How is it that Lory Newcomb recruited

2 you?

3    A.  Like I said before, it was after a

4 **testing process and they looked for ranked**

5 **individuals to assess other police departments.**

6    Q.  I'm asking you specifically though.  You

7 said that she recruited you, correct?

8    A.  She asked if I would be interested in

9 **being an assessor.**

10    Q.  Okay.  And you said it was after the

11 testing process in which Sneed was promoted over

12 Berge and Kreissler, correct?

13    A.  It was after the testing process.

14    Q.  Okay.  How long after?

15    A.  I don't know the exact time.

16    Q.  Do you know if it would have been -- you

17 said after the testing process.  Would that have been

18 before Sneed was actually promoted to the rank of

19 lieutenant?

20    A.  Yes.

21    Q.  Okay.  So during the time period after

22 Stanard conducted the testing process and the point

23 in which Sneed was promoted to lieutenant, at some

24 point therein you were recruited to work for Stanard

                                        Page 53

1 & Associates?

2    A.  Repeat that again.

3    Q.  Sure.

4    A.  Because you confused me when you just

5 **said that.**

6    Q.  That's okay.  I just want to make sure I

7 understand what you said.  You said you were

8 recruited by Lory Newcomb to work for Stanard &

9 Associates at some point after Stanard & Associates

10 conducted the examination -- or the testing

11 process -- strike that, not the testing process, the

12 promotional process from sergeant to lieutenant,

13 correct?

14    A.  The testing process.

15    Q.  Okay.  And it would have been -- she had

16 recruited you after Stanard conducted the testing

17 process for that promotion but prior to Sneed being

18 promoted to lieutenant, correct?

19    A.  Yes.  The process was complete.  This was

20 **me.  She asked me if I would be an assessor.**

21    Q.  Okay.  Do you know how much time elapsed

22 from the time that the process was complete until the

23 time that Sneed was promoted to lieutenant?

24    A.  I do not know the exact time.

                                        Page 54

1    Q.  Tell me how much time you think.  Would

2 it be a year?

3    A.  I do not -- I don't want to say a year

4 **and it's less than a year or more than a year.  I**

5 **don't know the exact time.  But the only thing you**

6 **have to do is if you pull the test results, that**

7 **would have the exact date when the test was given,**

8 **when the list was promoted.**

9    Q.  As you sit here today, do you know if it

10 was more than a year from the time in which the

11 testing process was finished until Sneed was promoted

12 to lieutenant?

13    A.  That would be fair to say because Frank

14 **Kosman came May of 2019, and I'm sure the list was**

15 **already up before then.**

16    Q.  Okay.  And tell me all of the steps.  How

17 did Lory Newcomb contact you?

18    A.  I think I gave her my phone number maybe.

19    Q.  When would you have given her your phone

20 number?

21    A.  After we talked after the testing

22 **process.**

23    Q.  How is it that you talked after the

24 testing process?  Did you call her?

                                        Page 55



Willie Hunt  -  3/21/2022
2:20-cv-02310-CSB-EIL  # 41-5  Page 17 of 100
Paul Berge, et al. vs. City of Kankakee, et al.

**Page 56**

1    A.  No, just in conversation when she's
2  gathering all the stuff and I think just small talk
3  and asked have I ever thought about being an assessor
4  for the promotion process.  I told her I hadn't given
5  it any thought but I will, and she told me that I
6  would never assess my home department of course, but
7  I would do other departments, particularly, probably
8  not in the area, Chicago, Evanston, and different
9  things like that.
10    Q.  This conversation, you said she was
11  gathering up her stuff is when you had the
12  conversation with her about this, correct?
13    A.  Yes.
14    Q.  Was she gathering up her stuff related to
15  the testing process that she was administering for
16  the Kankakee Police Department in which Sneed was
17  eventually promoted off?
18    A.  Yes.  She was gathering her material
19  after the testing process.
20    Q.  Okay.  And this was at the Kankakee
21  Police Department?
22    A.  No.
23    Q.  Where was it at?
24    A.  I believe the test was probably given at

**Page 57**

1  KCC.
2    Q.  Okay.  So when you had this conversation
3  with her, that was at KCC?
4    A.  I don't know if she came back to the
5  department or -- I know the test was probably
6  administered at KCC because I'm thinking about we
7  always use a big facility.  It was either KCC or the
8  Kankakee High School.  I can't remember exactly where
9  the testing was given.  We usually don't give it at
10  the department, I know that.
11    Q.  Was this the first conversation that you
12  had with Lory Newcomb?
13    A.  Yes.
14    Q.  Was this the first conversation you had
15  with anyone from Stanard & Associates?
16    A.  Yes.
17    Q.  Okay.  And you said -- who initiated the
18  conversation, you or her?
19    A.  I believe she might have initiated it.
20    Q.  Okay.
21    A.  Just asking whether or not I thought
22  about being an assessor.
23    Q.  Okay.  Were you in uniform?
24    A.  No, I didn't wear a uniform when I was

**Page 58**

1  deputy chief.
2    Q.  Okay.  And this would have been at the
3  testing facility, whether it would be Kankakee High
4  School or KCC?
5    A.  Or it might have been at the department.
6  I'm not sure.
7    Q.  Okay.  Who else was present when you had
8  this conversation with her?
9    A.  I can't recall.
10    Q.  And you said that she was gathering
11  materials when you had this conversation with her,
12  correct?
13    A.  I believe so.
14    Q.  And those were materials for the testing
15  process for sergeant to lieutenant at that time?
16    A.  Yes.
17    Q.  Okay.  And --
18    A.  From sergeant to lieutenant and patrolman
19  to sergeant.  She did both tests.
20    Q.  And what was your role in that testing
21  process?
22    A.  None.
23    Q.  Why were you in the room with Lory
24  Newcomb while she was collecting materials for that

**Page 59**

1  testing process if you had no role in that?
2    A.  It was after the testing process.
3    Q.  Was there anyone else present?
4    A.  I can't recall.
5    Q.  And the materials that she had, those
6  were the test materials, correct?
7    A.  Correct.
8    Q.  And those were the test materials for
9  Michael Sneed, correct?
10    A.  It would have been the testing material
11  for who all took the test.
12    Q.  Right.  And Michael Sneed took the test,
13  right?
14    A.  Yes.
15    Q.  And Paul Berge took the test, right?
16    A.  Paul Berge, Tim Kreissler, Monferdini,
17  Jose Martinez, Joe Martinez.
18    Q.  And so you were in a room with Lory
19  Newcomb and the testing material, and as you sit here
20  today, you can't think of any reason why you were in
21  that room with Lory Newcomb and the testing material?
22    A.  I don't recall where it took place, where
23  the conversation took place.  I don't know if it was
24  at the department or if it was at -- it couldn't have

Willie Hunt  -  3/21/2022
2:20-cv-02310-CSB-EIL  # 41-5  Page 18 of 100
Paul Berge, et al. vs. City of Kankakee, et al.

1 been at KCC. It might have been at the department.
2     Q. But why were you in a room, regardless of
3 where it was, if you had no role in the testing
4 process with the Kankakee Police Department, why were
5 you in a room with an individual that had physically
6 the testing materials for this test?
7     A. I can't recall where we had the
8 conversation at.
9     Q. I'm asking a more specific one.
10 Regardless of where you had that conversation, why
11 were you in a room with somebody from Stanard &
12 Associates that you did not work for at the time and
13 that person had the testing material including the
14 test of Sneed, Berge, and Kreissler, why were you in
15 that room if you had no role in the testing process?
16     A. I didn't have any role in the testing
17 process.
18     Q. Why were you there then?
19     A. Just making sure she had everything she
20 need or... It was the end of the testing process.
21     Q. Was anyone else there from the Kankakee
22 Police Department to make sure she had everything she
23 needed?
24     A. I can't recall who else was there.
                                                Page 60

1     Q. Were you on duty when you were there?
2     A. I was working, yes.
3     Q. So that's on duty?
4     A. Yes.
5     Q. Did you tell the chief that you were
6 going to go into this room with -- hold on. You've
7 got to let me finish the question.
8        Did you tell the chief that you were
9 going to go into this room with Lory Newcomb from
10 Stanard & Associates who had the testing material?
11     A. The chief might have been there. I can't
12 recall who was there.
13     Q. Do you know if you told the chief that
14 you were going to do this?
15     A. The chief -- it might have been in the
16 chief's office. I don't know. Like I said, I can't
17 recall where we had the conversation. I just know it
18 was at the end of the testing process.
19     Q. And you said it might have been in the
20 chief's office?
21     A. It might have been.
22     Q. And who was the chief? Price Dumas,
23 correct?
24     A. At the time probably Price Dumas.
                                                Page 61

1     Q. So if it took place in the chief's
2 office, it would have been you, the chief, and this
3 individual from Stanard & Associates, correct?
4     A. Yes.
5     Q. And if it took place in the chief's
6 office, it would have been the three of you and
7 Ms. Newcomb would have had the testing material with
8 her?
9     A. But she would have had it in a briefcase
10 or something. I mean, you're making it seem like the
11 test material is all out and open.
12     Q. Well, when you said that you were in the
13 room with her, you said she was gathering up the
14 testing materials?
15     A. Her briefcase and all that stuff, yes.
16     Q. Oh, oh.
17     A. Yes, not the physical test because the
18 test probably was given at KCC -- like I said, the
19 test was probably given at KCC or the school, at a
20 bigger facility, not the department. We usually
21 don't give the test at the department. So when I
22 said she was gathering her material, I'm talking
23 about her laptop, her briefcase and all that stuff,
24 not the individual test material.
                                                Page 62

1     Q. I've got you. And this would have been
2 at the conclusion of the written test, correct?
3     A. Yes.
4     Q. Okay. And it would have been prior to
5 Stanard & Associates creating a ranked list for the
6 rank of lieutenant, correct?
7     A. Correct.
8     Q. So prior -- after the test was done
9 and prior to Stanard & Associates coming up with
10 their rank list, you had a meeting with Lory Newcomb
11 from Stanard & Associates, correct?
12     A. No. I had a conversation, not a meeting,
13 just a conversation.
14     Q. But it would have been during that time
15 period that I just said?
16     A. After the testing process.
17     Q. And before the Stanard & Associates had
18 come out with the list, correct?
19     A. Yes.
20     Q. And before the chief had come out with
21 the list, correct?
22     A. Correct.
23     Q. And you asked about being employed by --
24 hold on. You asked -- during that time period, you
                                                Page 63



Willie Hunt - 3/21/2022
2:20-cv-02310-CSB-EIL  # 41-5  Page 19 of 100
Paul Berge, et al. vs. City of Kankakee, et al.

1 asked about being employed by Stanard & Associates to
2 work on testing procedures?
3     MR. MCGRATH:  Objection.  Misstates the prior
4 testimony.
5        You can answer.
6 THE WITNESS:  No.  As I said before, she
7 approached me and asked have I thought about being an
8 assessor for promotional tests and hiring.
9 BY MR. HERBERT:
10    Q.  And what did you tell her?
11    A.  I'll think about it.
12    Q.  Okay.  And then what happened?
13    A.  She might have contacted me by e-mail to
14 see if I wanted to be an assessor, and I tried it
15 out.
16    Q.  When did she contact you by e-mail?
17    A.  Afterward.
18    Q.  Did she contact you at your department
19 e-mail?
20    A.  No.
21    Q.  Did she contact you at your personal
22 e-mail?
23    A.  Yes.
24    Q.  What is your personal e-mail?  What

Page 64

1 e-mail did she contact you at?
2    A.  Willie.j.hunt@gmail.com.
3    Q.  Is that your current e-mail?
4    A.  Yes.
5    Q.  Was that your e-mail back when she
6 contacted you?
7    A.  Yes.
8    Q.  Do you still have the e-mail that she
9 sent you when she contacted you?
10    A.  I don't think so.
11    Q.  Where would that e-mail be?
12    A.  I delete my e-mails or they recycle every
13 so often.
14    Q.  How many times did you communicate via
15 e-mail with Lory Newcomb?
16    A.  I've done probably about six assessments.
17    Q.  How many times did you communicate with
18 Lory Newcomb via e-mail?
19    A.  About maybe six to seven times responding
20 to a, "Hey, do you want to do this assessment, yes or
21 no?"
22    Q.  Well, I'm going to ask that you produce
23 any e-mails that you have with Lory Newcomb and give
24 those to your attorney.  I'll follow those up with a

Page 65

1 request to produce, okay?
2    A.  Okay.
3    Q.  Okay.  And do you know how long it was
4 she contacted you -- why is it that you gave her your
5 personal e-mail and not your -- strike that.
6        Did you give her your e-mail
7 address?
8    A.  Yes.
9    Q.  Okay.  And why is it that you gave her
10 your personal e-mail address?
11    A.  Because it wasn't work related.
12    Q.  Okay.  And from the time in which you had
13 this conversation with her at the conclusion of the
14 test, how long was it before she contacted you?
15    A.  I can't recall.
16    Q.  Would it have been more than a year?
17    A.  No, it was less than a year.
18    Q.  Would it have been within a week?
19    A.  I don't think it was that short.  I think
20 maybe a few months.
21    Q.  Okay.  And what was the next
22 communication when she contacted you?  Tell me how
23 long were you hired after she communicated with you
24 the second time?

Page 66

1    A.  Like I said, I did probably about six
2 assessments for her.
3    Q.  That wasn't my question though.  When
4 were you hired?
5    A.  2018.
6    Q.  Okay.  When would that have been in
7 relation to when you had this conversation with
8 Ms. Newcomb about being employed by Stanard &
9 Associates?
10    A.  About two months after that.
11    Q.  Okay.  So about two months after the
12 conversation, you were hired by Stanard & Associates.
13 Is that correct?
14    A.  Yes.
15    Q.  Okay.  And do you know what month that
16 would have been?
17    A.  I don't know.
18    Q.  Okay.  Do you know if Stanard &
19 Associates had already -- do you know if Stanard &
20 Associates was involved -- was still involved in the
21 lieutenant promotional process in which Sneed was
22 promoted over Kreissler and Berge at the time in
23 which you were hired by them?
24    A.  I do not know.

Page 67



Willie Hunt - 3/21/2022
2:20-cv-02310-CSB-EIL # 41-5 Page 20 of 100
Paul Berge, et al. vs. City of Kankakee, et al.

1  Q.  Okay.  So at the time in which you were
2  hired by Stanard & Associates, Stanard & Associates
3  may have still been working on the promotional test
4  regarding Sneed, Berge, and Kreissler to lieutenant,
5  correct?
6      A.  I do not know.
7      Q.  I'm saying it could have been during that
8  time period, right?
9      A.  I don't know.
10     MR. MCGRATH:  Objection.  Foundation, it
11  calls for speculation.
12  BY MR. HERBERT:
13     Q.  And tell me how it is that you were
14  hired.  Did you fill out any paperwork?
15     A.  No.
16     Q.  Did you speak with --
17     A.  Just a W-4, 1099 form, whatever.
18     Q.  Okay.  And did you fill that out upon
19  being employed by them?
20     A.  Yes.
21     Q.  Okay.  Would it have been the same day?
22     A.  Whenever I did my first assessment, I
23  think I filled out the paperwork.
24     Q.  Okay.  When did you do your first
                                          Page 68

1  assessment?
2      A.  In 2018, I believe.
3      Q.  Okay.  And for what department did you do
4  your first assessment?
5      A.  I know I -- I can't recall exactly which
6  one is the first department, but I can tell you the
7  departments that I did.
8      Q.  Well, do you remember what month it was
9  in 2018 that you began working on your first
10  assessment?
11     A.  No, I don't.
12     Q.  As you sit here today, you don't remember
13  what department you conducted your first assessment
14  on?
15     A.  No, I don't.
16     Q.  The work that you did with Stanard &
17  Associates, was it the same type of work from the
18  time in which you were hired until the time in which
19  you were not employed by them?
20     A.  Yes.
21     Q.  Okay.  And had you ever done any of that
22  work in the past?
23     A.  No.
24     Q.  So they hired you to conduct assessments
                                          Page 69

1  for examinations, and that was something that you had
2  zero experience in?
3      A.  We were trained.  They trained us.  We
4  went through a training with the company.
5      Q.  Oh.  Tell me about the training.
6      A.  It was just evaluation training.
7      Q.  Where was that at?
8      A.  At the testing site.
9      Q.  Where is the testing site?
10     A.  Whatever department it was.  We would
11  meet like maybe two to three hours early and go over
12  the standards and evaluation process.
13     Q.  Okay.  Other than this 1099 form, did you
14  fill out any paperwork with Stanard & Associates?
15     A.  No.
16     Q.  Were you given any identification card?
17     A.  No.
18     Q.  Were you given -- how were you paid?
19     A.  Check.
20     Q.  Was it a check -- was it a monthly check?
21     A.  No, just for whatever assessment that was
22  done.
23     Q.  Okay.  And how much were you -- were you
24  paid per assessment?
                                          Page 70

1      A.  Yes.
2      Q.  So from the start of the project to the
3  completion of the project?
4      A.  Yes.
5      Q.  Were you paid hourly, or was it a flat
6  fee?
7      A.  A flat fee.
8      Q.  And how much were you paid for the
9  assessments?
10     A.  I believe it was $300 a day if it took
11  three days.
12     Q.  Okay.  And do you know how much you've
13  been paid in total by Stanard & Associates?
14     A.  Not without looking at my tax document.
15     Q.  And I get that.  It's probably hard to
16  come up with an exact number, but do you have a
17  general idea how much you've been paid by Stanard &
18  Associates since you've been employed by them?
19     A.  About 3500.
20     Q.  Total?
21     A.  Yes.
22     Q.  And the training, did you have one
23  training session?
24     A.  No, we have -- every assessment there was
                                          Page 71

Willie Hunt - 3/21/2022
2:20-cv-02310-CSB-EIL # 41-5 Page 21 of 100
Paul Berge, et al. vs. City of Kankakee, et al.

Page 72

1 a training session.

2    Q.  Okay.  When you say we, who's involved in

3 we in your training sessions?

4    A.  Whatever other officers, state troopers.

5 Whatever other officers that were there doing the

6 assessment.

7    Q.  Okay.  So your first training assessment

8 -- or strike that.

9         After you were hired, filled out a

10 1099, had you ever spoken with anyone from Stanard &

11 Associates other than Lory Newcomb?

12    A.  No.

13    Q.  Had you ever met with anyone from Stanard

14 & Associates other than Lory Newcomb?

15    A.  I think on one assessment, I think I met

16 somebody else that took Lory's place.

17    Q.  Who was that?

18    A.  I can't recall the name.

19    Q.  Do you know who it was that hired you?

20    A.  The company.

21    Q.  Do you know anyone in the company that

22 hired you?

23    A.  No.

24    Q.  Do you know anyone -- did you know anyone

Page 73

1 at that company at the time in which you were hired?

2    A.  Besides Lory, no.

3    Q.  Okay.  How about now, do you know anyone

4 at the company now?

5    A.  Lory.

6    Q.  Okay.  And how did you know Lory?

7    A.  She was the assessor at the -- the

8 facilitator for the testing process.

9    Q.  So when did you first meet Lory?

10    MR. MCGRATH:  Objection.  Asked and answered.

11    THE WITNESS:  Whatever I told you before

12 because you're repeating the same questions.

13 BY MR. HERBERT:

14    Q.  And I get it.  I'm not trying to trick

15 you up.

16    A.  Yeah, you're repeating the same question,

17 so whatever date you wrote down.

18    Q.  But Lory had been with Stanard &

19 Associates since Stanard & Associates started doing

20 work with the Kankakee Police Department, correct?

21    A.  I believe so.

22    Q.  So did you ever meet her during those

23 time periods that she was working for Stanard

24 conducting the promotional testing processes prior to

Page 74

1 the time you met her regarding the 2017, 2018

2 promotion to lieutenant?

3    A.  No.

4    Q.  Okay.  And anyone from Stanard &

5 Associates, did you meet anyone prior to you meeting

6 Lory during that test?

7    A.  No.

8    Q.  Okay.  So out of all the promotional

9 tests that were conducted by Stanard & Associates

10 prior to this test, the 2017 test from sergeant to

11 lieutenant in which Sneed was promoted, you had never

12 had a conversation with anyone from the testing

13 process, Stanard & Associates, correct?

14    A.  Correct.

15    Q.  So this was the first time that you had a

16 conversation with somebody from Stanard & Associates

17 during the entire period in which Stanard &

18 Associates was conducting all the previous

19 promotional examinations?

20    A.  That is correct.

21    Q.  And as you sit here today, you can't

22 think of one reason why you were in a room with --

23 one department authorized reason why you were in a

24 room with Lory Newcomb during this test?  I know I

Page 75

1 asked you before, and you didn't have an answer.  I'm

2 just giving you a chance to come up with an answer.

3    A.  The thing is at the end of the testing

4 process, she was gathering her stuff.  I think she

5 might have stopped by the office and said that she

6 was done or whatever and asked had I ever thought

7 about being an assessor.  I told her I would think

8 about it.

9         A few months later she might have

10 contacted me and asked if I wanted to do an

11 assessment, and I did an assessment, it was good, and

12 then she might have called me for a few more.

13    Q.  Okay.  But that answer is different than

14 what you said earlier.  You said she may have come by

15 your office and talked to you about it.

16    MR. MCGRATH:  Objection.  Misstates the

17 evidence -- or misstate the testimony.

18 BY MR. HERBERT:

19    Q.  Didn't you just say that?  You said she

20 may have come by your office to have this

21 conversation?

22    MR. MCGRATH:  Objection.  Misstates the --

23 BY MR. HERBERT:

24    Q.  Well, tell me what you --



Willie Hunt - 3/21/2022
2:20-cv-02310-CSB-EIL    # 47-5   Page 22 of 100
Paul Berge, et al. vs. City of Kankakee, et al.

1    A.  I said she was gathering her stuff,
2 getting ready to leave after she had completed the
3 testing process.  The testing material was not out in
4 the open.  When I say she was gathering her stuff,
5 her briefcase, whatever she had brought, getting
6 ready to leave.  And the conversation might have went
7 have I ever thought about being an assessor because
8 they needed assessors.  Usually they try to get
9 people ranked from lieutenant, master sergeant on up,
10 ranked people to do their assessments.
11      So I told her I'd think about it,
12 gave her my address.  She contacted me a few months
13 afterwards.  I did an assessment.  We went through
14 training.  We do training before the assessment to
15 make sure that everybody is on the same page, make
16 sure that your scores are within one or two points of
17 each other.
18    Q.  Right, and I get that.
19    A.  Okay.
20    Q.  But what I'm asking though is, can you
21 think of any police-related business why you would be
22 in a position where you had a conversation with Lory
23 Newcomb as you sit here today?
24    MR. MCGRATH:  Object to the form of the
                                                    Page 76

1 question, police-related business.
2 BY MR. HERBERT:
3    Q.  Do you understand the question?
4    A.  I'm just saying...
5    Q.  Let me ask it a different way.
6    A.  Yeah, please.
7    Q.  You weren't involved in the testing
8 process at all, correct?
9    A.  No.
10    Q.  The testing process is run by Stanard &
11 Associates completely, correct?
12    A.  Correct.
13    Q.  And it's done without any influence by
14 anyone from the department, correct?
15    A.  Correct.
16    Q.  And Stanard & Associates was hired to
17 conduct this testing examination so that nobody from
18 the department can tamper with the examination
19 results, correct?
20    A.  Correct.
21    Q.  Okay.  And so you would agree with me
22 that you had no role in that examination process,
23 correct?
24    A.  Correct.
                                                    Page 77

1    Q.  And you had not been working with Stanard
2 & Associates at any point, correct?
3    MR. MCGRATH:  Up until that --
4 BY MR. HERBERT:
5    Q.  Up until that point?
6    A.  Up until that point.
7    Q.  Yes, correct?
8    A.  Correct.
9    Q.  Okay.  And you had -- those tests that
10 Lory Newcomb had, those weren't stored in the
11 Kankakee Police Department, were they?
12    A.  No.
13    Q.  Okay.  And those were the property of
14 Stanard & Associates, correct?
15    A.  Correct.
16    Q.  And nobody from the Kankakee Police
17 Department would have access to those documents,
18 correct?
19    A.  Correct.
20    Q.  And nobody from the Kankakee Police
21 Department could review those documents, correct?
22    A.  Correct.
23    Q.  Okay.  Do you know of anyone else that
24 was ever employed by the Kankakee Police Department
                                                    Page 78

1 that did any work for Stanard & Associates?
2    A.  I'm not sure.
3    Q.  Okay.  You're not sure if anyone --
4    A.  I'm not sure if Robin Passwater done
5 evaluations, Regnier done evaluations.  I wouldn't
6 know.  I didn't do it with them.
7    Q.  Right.  You don't know anyone that has
8 ever been employed by the Kankakee Police Department,
9 you're not aware of anyone ever doing --
10    A.  Assessments.
11    Q.  -- any work for Stanard & Associates in
12 any manner, correct?
13    A.  Correct.
14    Q.  Okay.  Are you aware of anyone within the
15 Kankakee administration that has worked for Stanard &
16 Associates?
17    A.  Like I said before, I'm not -- I'm not
18 aware.
19    Q.  And now I'm making it broader, not just
20 the police department, so I'm saying anyone within --
21 do you know if the mayor ever worked for Stanard &
22 Associates, Chasity Wells?
23    A.  No.
24    Q.  Do you know if anyone in the -- within
                                                    Page 79



Willie Hunt - 3/21/2022
2:20-cv-02310-CSB-EIL  # 47-5  Page 23 of 100
Paul Berge, et al. vs. City of Kankakee, et al.

1 the -- any of the -- you know the members of city
2 council I'm assuming?
3    **A.  Pretty much.**
4    Q.   Okay.  Do you know of any of the members
5 of city council that were affiliated with Stanard &
6 Associates in any way?
7    **A.  No.**
8    Q.   Do you know anyone other than Lory
9 Newcomb that are affiliated with Stanard &
10 Associates?
11    **A.  You've asked that before.  No, the only**
12 **person I know from Stanard & Associates is Lory.**
13    Q.   Okay.  And you have copies of all the
14 paychecks that you've received from Stanard &
15 Associates?
16    **A.  No.**
17    Q.   What happened to those?
18    **A.  I usually destroy them.**
19    Q.   Okay.  And your last paycheck would have
20 been in 2020?
21    **A.  Yes.**
22    Q.   And it's your testimony that you
23 destroyed those documents?
24    **A.  The paycheck, the stubs, yes.**

Page 80

1    Q.   Okay.  Do you have any documents from
2 your employment with Stanard & Associates, do you
3 have that in your possession?  When I say possession,
4 not here but at your house, where?
5    **A.  1099.**
6    Q.   One 1099 or for every year that you
7 worked?
8    **A.  For every year that I worked.**
9    Q.   Okay.  And I'm going to ask that you
10 produce that if I didn't do that already, but I'm
11 going to ask that you produce any documentation that
12 you have with Stanard & Associates, okay?
13    **A.  Okay.**
14    Q.   What other documents do you think that
15 you would have other than e-mails with Nicki?
16    **A.  Who?**
17    Q.   Oh, I'm sorry.  I already got her name
18 wrong.
19    MR. MCGRATH:  Lory.
20 BY MR. HERBERT:
21    Q.   Lory, e-mails with Lory and 1099s.  Would
22 there be any other documents related to Stanard &
23 Associates?
24    **A.  No.**

Page 81

1    Q.   How is it that your employment ended with
2 Stanard & Associates?
3    **A.  It didn't.  I just stopped doing**
4 **assessments because I got another job.**
5    Q.   Okay.  So you continued to work for
6 Stanard & Associates after you had resigned from the
7 police department?
8    **A.  Yes.**
9    Q.   Okay.  When was the last time you had a
10 conversation with anyone from Stanard & Associates,
11 or when I say conversation, any communication
12 whatsoever?
13    **A.  I think she e-mailed me last week for an**
14 **assignment.**
15    Q.   Okay.  And when you say she, you're
16 talking about Lory?
17    **A.  Yeah.  Can I look at my phone?**
18    Q.   Go ahead.  And you're looking at your
19 e-mail on your phone?
20    **A.  I'm looking at my e-mail on my phone so I**
21 **can give you the exact date.**
22    Q.   That's great.  And if you can tell me, if
23 you can click on that and see how many e-mails you
24 have from her, that would be great.

Page 82

1    **A.  This was February 22nd.**
2    Q.   And when was the last one prior to that?
3 Can you click on it and see all the communications
4 that you've had with her?  And if you can't do it
5 now.
6    **A.  Yeah.  Yeah, it goes back to 2017.**
7    Q.   And for the record, you're looking at
8 your phone.
9    **A.  Yes.**
10    Q.   Which I certainly told you is okay.
11        Can you tell how many --
12    **A.  How many e-mails?**
13    Q.   Yeah.
14    **A.  47.**
15    Q.   And the date of that first e-mail, can
16 you tell me when that is in 2017?
17    **A.  July 19th.**
18    Q.   July 19th, 2017?
19    **A.  Yeah.**
20    Q.   Okay.  And do you think that would have
21 been the -- or can you pull up that e-mail and see if
22 that's the e-mail where she's asking you to work for
23 Stanard & Associates?
24    **A.  No.**

Page 83

Willie Hunt  -  3/21/2022
2:20-cv-02310-CSB-EIL  # 41-5  Page 24 of 100
Paul Berge, et al. vs. City of Kankakee, et al.

1  Q.  No, you can't pull it up, or no --

2  A.  No, that's not the e-mail.

3  Q.  Okay.

4  A.  And as a matter of fact, those were sent

5  to my city e-mail address.

6  Q.  Okay.  So the 47 e-mails that you just

7  talked about were e-mails sent from Lory at Stanard &

8  Associates to your city e-mail?

9  A.  Yep, until I...

10  Q.  Is that yes?

11  A.  Yes.  Until -- let's see, until -- yeah.

12  Q.  Okay.  Can you pull up on your phone

13  e-mails that you've had with Lory or anyone else from

14  Stanard & Associates other than those 47 e-mails with

15  your department account to your personal account?

16  A.  No, this would be it.  I don't have

17  access to my department account anymore.  These were

18  just e-mails that were forwarded to my personal

19  account.

20  Q.  Okay.  So those 47 e-mails, those were

21  sent to your personal account or your department

22  account?

23  A.  They were sent to my department account.

24  Q.  Okay.  So I'm asking for the other

Page 84

1  account, your personal account.  Do you have e-mails

2  with anyone from Stanard & Associates concerning your

3  personal account?

4  A.  Yeah, the last from --

5  Q.  Okay.  For the record, he's still looking

6  at his phone.

7  A.  I'm still looking at my phone.  That

8  would be from -- that would be from, it looked like

9  March 1st of 2021 --

10  Q.  I'm sorry?

11  A.  From March 1st till 2/22/22.

12  Q.  Okay.  And those were to your -- how many

13  e-mails are in there?

14  A.  14.

15  Q.  Okay.  And did your e-mail change?  Your

16  personal e-mail, was it different prior to the

17  personal e-mail that you had March 1st, 2021?

18  A.  No.

19  Q.  Do you know what happened to the e-mails

20  that were -- or strike that.

21       There were e-mails between you and

22  Lory or somebody from Stanard & Associates to your

23  personal account prior to March 1, 2021, correct?

24  A.  No.  No, when I looked at it, it was

Page 85

1  forwarded from my work e-mail address.

2  Q.  Okay.

3  MR. MCGRATH:  Did your work e-mails also go

4  to your personal e-mail when you were working within

5  the department?

6  THE WITNESS:  I had a deputy chief Gmail.

7  BY MR. HERBERT:

8  Q.  What was that e-mail address?

9  A.  Deputy chief?

10  Q.  Yes.

11  A.  Deputy Chief Hunt.

12  Q.  Spelled out?

13  A.  All one word.

14  D-e-p-u-t-y-c-h-i-e-f-h-u-n-t?

15  A.  Uh-huh.

16  Q.  Yes?

17  A.  Yes.  I'm sorry.

18  Q.  That's okay.  No, you're doing great.

19  And what is it at?

20  A.  @gmail.

21  Q.  So deputychiefhunt@gmail.com?

22  A.  Yes.

23  Q.  Are you saying that is your department,

24  that was your department e-mail?

Page 86

1  A.  No, that was my e-mail for Gmail because

2  the department didn't have Gmail, so I would forward

3  my...

4  Q.  So that e-mail that you just gave us,

5  Deputy Chief Hunt was your personal e-mail?

6  A.  Yes.

7  Q.  What was your department e-mail address?

8  A.  Wjhunt@citykankakee-il.gov.

9  Q.  All right.  So you said that there was 14

10  e-mails from March 1, 2021 until 2/20/2022.  What

11  e-mail were those communications on for you?

12  A.  Willie.j.hunt because it was after I

13  retired.

14  Q.  Okay.  Well, give me that e-mail, please.

15  Willie W-i-l-l-i-e?

16  A.  You wrote it down earlier.

17  Q.  Did I?

18  A.  Yes, you did.

19  Q.  I'm sorry.  I didn't see it.  Willie, I'm

20  sorry.

21  A.  .j.hunt@gmail.com.

22  Q.  And I'm sorry.  Just the 47 e-mails --

23  A.  That included the 14.

24  Q.  Okay.  So is it your testimony -- I'm

Page 87

Willie Hunt  -  3/21/2022
2:20-cv-02310-CSB-EIL  # 41-5  Page 25 of 100
Paul Berge, et al. vs. City of Kankakee, et al.

1 just confused.  What e-mails did you have
2 communications with Stanard & Associates on?  Would
3 it have been all three of those e-mails that you
4 talked about, deputychiefhunt, wjhunt, and
5 willie.jhunt?
6     **A.  Willie.jhunt after I retired.  That was**
7 **my personal.  That was from March 1st up until**
8 **2/22/22.**
9     Q.  So prior to that?
10    **A.  Prior to that it would have been**
11 **deputychief or whunt, my city e-mail address and**
12 **deputychief.**
13    Q.  So it would have been either
14 deputychiefhunt@gmail.com or
15 wjhunt@citykankakee-il.gov?
16    **A.  Yes.  Yes.**
17    Q.  No other e-mails?
18    **A.  No.**
19    Q.  Okay.  And I'm going to ask that you
20 produce those e-mails to your attorney, okay?
21    **A.  Okay.**
22    MR. HERBERT:  I think this might be a good
23 time for a -- as long a break as you guys want.  Five
24 minutes, ten minutes, a half hour.  I don't really

1 care.  Five minutes good?
2     MR. MCGRATH:  Yeah, five minutes.  That's
3 good.
4     MR. HERBERT:  Okay.
5             (Whereupon, a short break
6             was taken.)
7     MR. HERBERT:  All right.  Back on the record.
8 BY MR. HERBERT:
9     Q.  All right.  Mr. Hunt, going back to
10 Stanard & Associates, I didn't know that you had
11 worked for them at any point.  Fair to say that you
12 filled out some documents in this case such as
13 Answers to the Request to Produce and Answers to
14 Interrogatories, correct?
15    **A.  Correct.**
16    Q.  Okay.  And you knew that the lawsuit in
17 which you were a defendant was challenging the
18 promotion regarding Sneed bypassing two white
19 candidates higher ranked than him on the 2017, 2018
20 lieutenant promotion, correct?
21    **A.  Correct.**
22    Q.  And you knew that Stanard & Associates
23 had conducted the testing process for that
24 promotional process, correct?

1     **A.  Correct.**
2     Q.  And you knew that you had worked for
3 Stanard & Associates during that process, correct?
4     **A.  Correct.**
5     Q.  And you knew that --
6     MR. MCGRATH:  Objection to the form of the
7 question.
8 BY MR. HERBERT:
9     Q.  And you knew that you had been in a room
10 with the tests that involved at the very least
11 Kreissler, Berge, and Sneed during that process,
12 correct?
13    **A.  No.  As I stated before, I was never in a**
14 **room with the physical test like you're trying to**
15 **make it seem.**
16    Q.  Don't you think it's relevant that you
17 were hired by Stanard & Associates during the process
18 from conducting the testing process until the point
19 in which the promotion was made, the very subject of
20 the lawsuit here, don't you think that that was
21 relevant information that we would want to know as
22 the Plaintiffs?
23    **A.  No.**
24    MR. MCGRATH:  Objection.  Form of the

1 question.
2         But you can answer.
3 BY MR. HERBERT:
4     Q.  Okay.  Did you ever tell anyone from the
5 Kankakee Police Department that you had been employed
6 by Stanard & Associates?
7     **A.  The chief knew.**
8     Q.  Which chief?
9     **A.  Price knew.**
10    Q.  Price Dumas?
11    **A.  Price Dumas, Frank Kosman, yes.**
12    Q.  Okay.  How did the chief know that you
13 were employed by Stanard & Associates?
14    **A.  I told him.**
15    Q.  When did you tell him?  And when you say
16 him, are you talking about --
17    **A.  Price.**
18    Q.  -- Chief Dumas?
19    **A.  Yes.**
20    Q.  Okay.  When did you tell Chief Dumas that
21 you were employed by Stanard & Associates?
22    **A.  Shortly after she offered me the first**
23 **assignment.**
24    Q.  Okay.  Which would have been sometime

Willie Hunt - 3/21/2022
2:20-cv-02310-CSB-EIL # 47-5 Page 26 of 100
Paul Berge, et al. vs. City of Kankakee, et al.

1 prior to the final list coming out on the 2018
2 lieutenant promotion in which Sneed bypassed the
3 other two candidates, correct?
4    **A. State that again.**
5    Q. It would have been before the final list
6 came out where Sneed was promoted over the other two
7 candidates, correct?
8    MR. MCGRATH: Objection to the form of the
9 question.
10    THE WITNESS: You're confusing me. Say it
11 again.
12 BY MR. HERBERT:
13    Q. Okay. You testified earlier that you
14 were hired by Stanard & Associates at some point
15 prior to Sneed being promoted over Berge and
16 Kreissler. Do you remember saying that earlier?
17    **A. I was hired by Stanard & Associates**
18 **before Sneed was promoted. That is correct.**
19    Q. Okay. And that's promoted to lieutenant,
20 correct?
21    **A. Correct.**
22    Q. Okay. And did you tell Price Dumas that
23 you were employed by Stanard & Associates prior to
24 Sneed being promoted to lieutenant?

Page 92

1    **A. Yes.**
2    Q. Did you tell Dumas that you were employed
3 by Stanard & Associates prior to Stanard & Associates
4 coming out with their rank list of candidates?
5    **A. Repeat the question.**
6    Q. Did you tell Price Dumas that you were
7 employed by Stanard & Associates prior to Stanard &
8 Associates producing their rank order list?
9    **A. I can't recall whether or not the list**
10 **was finished or not.**
11    Q. How did you inform Price Dumas of this
12 information?
13    **A. In a conversation I told him that I would**
14 **be doing assessments for other departments with**
15 **Stanard & Associates.**
16    Q. Where did the conversation take place?
17    **A. Probably in his office.**
18    Q. Do you know if anyone else was present?
19    **A. No.**
20    Q. No, you don't know or --
21    **A. I don't recall anyone else being present.**
22    Q. Okay. Other than Price Dumas, did you
23 have a conversation with anyone or a communication
24 with anyone about your employment with Stanard &

Page 93

1 Associates, communications with somebody from the
2 Kankakee Police Department?
3    **A. Yes, Chief Kosman.**
4    Q. Tell me about that.
5    **A. I told him I was doing assessments for**
6 **Stanard & Associates and he thought it was a good**
7 **thing career-wise to be able to evaluate other**
8 **departments and see what other departments were**
9 **doing. He didn't have a problem with that.**
10    Q. When did you tell Chief Kosman that?
11    **A. I don't exactly recall, but I had to let**
12 **him know that I was doing something outside of the**
13 **department, so.**
14    Q. Okay. You said you had to let him know?
15    **A. Yeah.**
16    Q. Is it the Kankakee Police Department
17 policy that you have to inform your supervisors of
18 any other outside employment?
19    **A. Yes.**
20    Q. And how is it that you're supposed to
21 inform them, just a conversation?
22    **A. Just a conversation or if we have a**
23 **contract, you can do secondary employment, but this**
24 **wasn't constant. It was a situation where I can say**

Page 94

1 no, I don't want to do anything, so it wasn't
2 consistent employment.
3    Q. Well, you would agree with me that while
4 you were employed by the City of Kankakee that
5 employees had to produce a document informing their
6 supervisors that they were performing outside
7 employment, correct?
8    **A. Uh-huh. Correct.**
9    Q. Okay. And you never documented this on
10 paper that you were employed by Stanard & Associates,
11 did you?
12    **A. I don't believe so.**
13    Q. Okay. Just in a conversation, correct?
14    **A. Correct.**
15    Q. Do you know if anyone else knew that you
16 were employed by Stanard & Associates that was
17 affiliated with the Kankakee Police Department?
18    **A. No.**
19    Q. No, you don't know, or nobody did?
20    **A. Nobody.**
21    Q. Okay. How about Mayor Chasity
22 Wells-Armstrong, did you ever tell her that you were
23 employed by Stanard & Associates?
24    **A. No.**

Page 95



Willie Hunt  -  3/21/2022
2:20-cv-02310-CSB-EIL  # 41-5  Page 27 of 100
Paul Berge, et al. vs. City of Kankakee, et al.

Q.  How about anyone on the Police and Fire
Commission, did you ever tell them that you were
employed by Stanard & Associates?

A.  No.

Q.  How about anyone on city council, did you
ever inform any of them that you were employed by
Stanard & Associates?

A.  No.

Q.  At the time in which you were employed by
Stanard & Associates, were you aware of the fact that
Stanard & Associates had a contract with the City of
Kankakee?

A.  No.

Q.  Are you aware now that they had a
contract with the City of Kankakee?

A.  Now that you're telling me.

Q.  Well, I don't know because I haven't seen
any documents.

A.  I haven't seen any either.

Q.  But you've been involved in the -- the
police department pays Stanard & Associates to
conduct those tests, correct?

A.  Yes.

Q.  And that payment process, it has to be

approved, correct?

A.  Correct.

Q.  It has to be raised at a city council
meeting, correct?

A.  That is correct.

Q.  And the city council has to vote on that,
correct?

A.  That is correct.

Q.  Just like they do with any vendor that is
receiving payment and work from Kankakee, correct?

A.  Correct.

Q.  And so you knew that Stanard & Associates
was a vendor for Kankakee at the time in which you
were working for Stanard & Associates, correct?

A.  After the testing process, yes.

Q.  Okay.  Well, at the time in which you
became employed by Stanard & Associates, you knew
that they had been conducting testing processes for
the City of Kankakee for some 10, 12 years at that
point, correct?

A.  Correct.

Q.  So you knew that they were a vendor for
the City of Kankakee, right?

A.  They were a vendor for the City of

Kankakee prior to that, yes.

Q.  Okay.  And you knew that they had a
financial relationship with the City of Kankakee,
correct?

A.  Based on which administration hired them,
yes.

Q.  Okay.  And you knew that that was a
contract that had to be renewed every year by city
council, correct?

A.  No.

MR. MCGRATH:  Objection.  It misstates
testimony.

BY MR. HERBERT:

Q.  You would agree with me that while you
were employed by the City of Kankakee, you had a duty
to disclose any potential conflicts of interest,
correct?

A.  Correct.

Q.  And you had a duty to disclose any
relationships with any businesses that are doing
business with the City of Kankakee, correct?

A.  Correct.

Q.  And you never informed anyone other than
the chiefs that you had a business relationship, an

employment relationship with a vendor for the City of
Kankakee, correct?

A.  Correct.

Q.  And you should have made that information
known -- hold on.  You should have disclosed -- well,
strike that.

Not you should have.  You were
required to disclose the business relationship that
you had with Stanard & Associates at the point in
which you worked for them when you were a Kankakee
police officer, correct?

MR. MCGRATH:  Objection.  The form of the
question, it calls for speculation, foundation.
Other than his testimony that he disclosed it to the
chiefs.

You can answer.

THE WITNESS:  Yes, that was after the testing
process, so the dealing with Stanard at that point
was done.  We didn't have to renew the contract with
Stanard.  It was just if the chief at the time chose
the testing process with Stanard, he has that right
to do that.

BY MR. HERBERT:

Q.  Was that the last examination testing



Willie Hunt - 3/21/2022
2:20-cv-02310-CSB-EIL  # 41-5  Page 28 of 100
Paul Berge, et al. vs. City of Kankakee, et al.

1 process that Stanard & Associates worked on for the
2 City of Kankakee, the promotional test that resulted
3 in Sneed being promoted to lieutenant?
4     A.  That was the last testing process, yes.
5     Q.  You're sure of that?
6     A.  To the best of my knowledge, yes, because
7 after that Frank Kosman brought in his own testing
8 company.
9     Q.  Okay.  Did you ever get disciplined by
10 anyone for not documenting in any way that you had
11 been employed by Stanard & Associates?
12     A.  No.
13     Q.  When you did work for Stanard &
14 Associates, did you have access to any Stanard &
15 Associates' material in any way?
16     A.  Yes.
17     Q.  Tell me about that.
18     A.  Whatever tests that the department was
19 giving or whatever scenario they were giving, I had
20 access to that.
21     Q.  And how would you gain access to that?
22     A.  It would be brought in by the
23 facilitator.
24     Q.  Okay.  And those are paper copies of the

1 test?
2     A.  Not of the test, of the scenarios.
3     Q.  Okay.  And the scenarios are scenarios
4 that are used in the testing process, correct?
5     A.  Correct.
6     Q.  And the scenarios are used as one
7 component of the testing process, correct?
8     A.  That is correct.
9     Q.  So there's a written test in which
10 somebody -- in which there's a list of the scores of
11 the individuals, correct?
12     A.  Correct.
13     Q.  And then the scenario component, that's a
14 separate category in which the individuals are ranked
15 based upon their performance and evaluation in those
16 scenarios, correct?
17     A.  That is correct.
18     Q.  And do you know if any of the scenarios
19 that you had access to at any point for Stanard &
20 Associates, were any of those scenarios ever used on
21 any tests that involved the Kankakee Police
22 Department?
23     A.  I wouldn't know.
24     Q.  Did you have access to any equipment from

1 Stanard & Associates?
2     A.  No.
3     Q.  Did you have access to any Stanard &
4 Associates via a computer?
5     A.  No.
6     Q.  Okay.  Aside from the access to the --
7 well, your role with Stanard & Associates, you talked
8 about how you would have access to the training
9 scenarios, correct -- I'm sorry, the scenarios for
10 the testing component, correct?
11     A.  For that specific department, yes.
12     Q.  Okay.  Any other areas other than the
13 scenario portion that you worked on with Stanard &
14 Associates?
15     A.  No.
16     Q.  And what was your role with respect to
17 the work you performed for the scenarios of the
18 assessments that you conducted?
19     A.  Just an assessor would read -- we all
20 have different parts to read.  It was just scenario
21 based to see how the officer will respond in
22 different situations.
23     Q.  Right, but would you come up with a score
24 for the individual responses for any particular

1 officer?
2     A.  Yes, we had a rubric and they would have
3 to hit certain key points in their answers to get
4 certain points.
5     Q.  Okay.  And you would determine whether or
6 not they hit key answers based upon the rubric that
7 was set forth from Stanard & Associates?
8     A.  Based on their answers and the rubric,
9 yes.
10     Q.  Okay.  Fair to say the assessments are a
11 little bit more subjective, the scoring compared to,
12 say, a written examination?
13     MR. MCGRATH:  Objection.  Form of the
14 question.
15         If you know.
16     THE WITNESS:  The way we were trained, you
17 would have to hit certain words, certain -- for
18 example, if you had a scenario that involved a
19 domestic, if the officer said he would separate the
20 couple, get an individual statement from each -- it
21 listed almost everything that the officer would do
22 because it's coming from the department.  The
23 scenarios are based on the department's rules and
24 regs, so they would have to pretty much follow the

Willie Hunt - 3/21/2022
2:20-cv-02310-CSB-EIL #47-5 Page 29 of 100
Paul Berge, et al. vs. City of Kankakee, et al.

1  rules and regs of the department as they handle the
2  call.
3  BY MR. HERBERT:
4      Q.  Right.
5      A.  So I would say that would be very
6  objective because you had to hit those certain key
7  points.
8      Q.  And you talked about how you would
9  receive training prior to each assessment.  Do you
10  remember talking about that?
11     A.  Yes.
12     Q.  And the training would take place a
13  couple hours before --
14     A.  Yes.
15     Q.  -- before the training or before you
16  conducted the assessment?
17     A.  Yes.
18     Q.  And you said that there was a bunch of
19  people involved in this training.  Is that fair to
20  say?
21     A.  Yes.
22     Q.  Okay.  And those were all people that
23  were working on the testing process for Stanard?
24     A.  Yes.

1      Q.  Okay.  And how many people would be
2  involved in that training?
3      A.  Assessors?
4      Q.  Yeah.
5      A.  It would be Lory Newcomb.  She would be
6  the facilitator, and it would be anywhere, depending
7  on the size of the department.  Sometimes it can just
8  be three assessors, or sometimes it can be, if we
9  were doing a department, let's say for example like
10  Joliet, there probably would be ten assessors.
11     Q.  Do you know the names of any assessors
12  that you work with or that were working for Stanard &
13  Associates and you worked on a project with?
14     A.  I can only like remember first names.
15     Q.  Okay.  If you can give me first names and
16  maybe the department they were with.
17     A.  Amir, State Police retired, a commander
18  for the State Police.  Robert, a retired commander
19  for Joliet.  I worked with the chief of police from
20  Bourbonnais.
21     Q.  Was that the current chief of police or
22  retired chief of police?
23     A.  Retired chief.
24     Q.  Okay.

1      A.  It was quite a few.  I think I worked
2  with like three state troopers.
3      Q.  All right.  You gave me three individuals
4  that you knew of and all three of those individuals
5  were retired from their department?
6      A.  Yes.
7      Q.  Do you know of any individuals that you
8  worked with that were currently employed by a
9  department?
10     A.  Yes, a lieutenant from Joliet.
11     Q.  Okay.  And did you receive any documents
12  during this training?
13     A.  Whatever we received, we returned back to
14  Stanard & Associates.
15     Q.  What would you receive?
16     A.  Just the rubric on how to evaluate.  It
17  was the same training every time pretty much, that we
18  make sure that the assessors were within one or
19  two points from each other, and if you were -- the
20  spread was further apart, you would sit and discuss
21  why you felt that you gave that score and either you
22  would come up or somebody would come down within the
23  point range.
24     Q.  Okay.  So it sounds to me like the

1  assessment was -- the scores were negotiated more so
2  than a written test, correct?
3      MR. MCGRATH:  Objection.  Form of the
4  question, it calls for speculation.
5          You can answer.
6      THE WITNESS:  What was the question?
7  BY MR. HERBERT:
8      Q.  You as the assessors, you guys had the
9  ability to negotiate the final score for somebody
10  based upon an individual question, fair to say?
11     A.  What was the question?
12     Q.  You would agree that the assessment
13  phase, because you guys would talk about whether or
14  not somebody should get five points or four points
15  based upon their answer, it would be more subjective
16  as opposed to like a written examination portion?
17     MR. MCGRATH:  The same objection.  Form of
18  the question.
19     THE WITNESS:  I'm going to say what was the
20  question?
21  BY MR. HERBERT:
22     Q.  You don't understand what I just asked
23  you?
24     A.  I didn't understand the question that you



Willie Hunt - 3/21/2022
2:20-cv-02310-CSB-EIL # 47-5 Page 30 of 100
Paul Berge, et al. vs. City of Kankakee, et al.

1 asked.

2 Q. Okay. What about the question that I

3 asked that you didn't --

4 A. There was no question.

5 Q. Would you agree that the testing process

6 for the assessment is more subjective when coming to

7 a final grade as opposed to other components of the

8 testing process?

9 A. Yes, there was some subjectivity.

10 Q. Okay. All right. If I can show you what

11 I will mark as Hunt 1 which is -- I will make note

12 that it is the Defendants' Answer and Affirmative

13 Defenses to the Complaint. Take a look at that.

14 MR. HERBERT: Mike, let me see if I have a

15 copy for you.

16 (Whereupon, Hunt Deposition

17 Exhibit No. 1 was marked

18 for identification.)

19 MR. HERBERT: Do you need a copy, Mike?

20 MR. MCGRATH: No.

21 BY MR. HERBERT:

22 Q. All right. If you can turn to page 4,

23 question 16. Okay. It says, "Hunt operated in his

24 official capacity as the Deputy Chief of Police and

Page 108

1 was responsible for hiring, training and supervision

2 of all personnel necessary to operate and maintain

3 the City of Kankakee Police Department." Do you see

4 that?

5 A. Yes.

6 Q. Okay. I read that correctly, yes?

7 A. Yes, that's what that states.

8 Q. Okay. And then the answer, the first

9 portion, "The Defendants admit that Hunt was

10 operating in his official capacity as the Deputy

11 Chief of Police during the acts to which he admits

12 committing as stated in this answer, that he has

13 powers and responsibilities granted and imposed upon

14 him concerning the training and supervision of

15 Kankakee Police Department personnel by the City of

16 Kankakee code."

17 Did you have any role in the

18 promotion process or final decision for Lieutenant

19 Sneed being promoted to lieutenant?

20 A. No.

21 Q. If you could turn to page 6. Chasity

22 Wells-Armstrong, she was elected mayor in April 2017,

23 correct?

24 A. That is correct.

Page 109

1 Q. And prior to her being elected to mayor,

2 you donated money to her campaign?

3 A. Yes.

4 Q. And you went to her fundraisers, correct?

5 A. Yes.

6 Q. And you supported her candidacy, correct?

7 A. Yes.

8 Q. Okay. And you're aware of the fact that

9 she ran -- one of her campaign issues was that there

10 needed to be diversity within the Kankakee Police

11 Department, correct?

12 A. Correct.

13 Q. You were aware of that, correct?

14 A. Correct.

15 Q. And you agreed with her, correct?

16 A. Yes.

17 Q. And she talked about increasing the

18 minority makeup of the police command staff within

19 the Kankakee Police Department, correct?

20 A. Correct.

21 Q. And you agreed with her that there needed

22 to be an increase of minorities within the police

23 command staff, correct?

24 A. That is correct.

Page 110

1 Q. And you believed that when she was a

2 candidate for mayor, correct?

3 A. Yes.

4 Q. And you believed that after she was

5 elected mayor, correct?

6 A. Yes.

7 Q. And you believed that because you thought

8 blacks were discriminated against by white

9 supervisors within the Kankakee Police Department,

10 correct?

11 A. No. When I say I agreed with her about

12 the diversifying the department and having more

13 minorities, I'm talking about white females also,

14 Hispanics, Asians.

15 Q. Right, I get that.

16 A. Yes.

17 Q. That wasn't my question. You would agree

18 with me that you believed that during your time in

19 the Kankakee Police Department that white supervisors

20 had discriminated against minority officers, correct?

21 A. I think I clarified that in my

22 deposition. I corrected it in my deposition. If you

23 can give me a copy of my deposition that we

24 previously took.

Page 111



Willie Hunt - 3/21/2022
2:20-cv-02310-CSB-EIL # 47-5 Page 31 of 100
Paul Berge, et al. vs. City of Kankakee, et al.

1  Q.  I'm asking though what your opinion is
2  right now.
3      A.  Yeah, and what was the question?
4      Q.  Do you believe that the Kankakee Police
5  Department white supervisors had discriminated
6  against minority officers during the time in which
7  you were employed by the Kankakee Police Department?
8      MR. MCGRATH:  I'm just going to object to the
9  foundation, based on the time that he worked at the
10 department.
11 BY MR. HERBERT:
12     Q.  You can answer.  And it's not in that
13 document that you're looking at.
14     A.  Oh, no, I know it's not here.  That's why
15 I said if I had my document.  I believe there was
16 some issues within the department.
17     Q.  What type of issues?
18     A.  You can say misunderstandings or
19 insensitivities amongst the races.
20     Q.  Okay.  Do you believe that whites, white
21 officers were given a priority during the promotional
22 process at any point when you were a Kankakee police
23 officer?
24     A.  No.
                                        Page 112

1      Q.  You sued as a member of the Kankakee
2  Police Department alleging that you were
3  discriminated against by white supervisors during the
4  promotional process, correct?
5      A.  I sued for the changing of the testing
6  process.
7      Q.  Okay.  And part of your allegations is
8  that the testing process was not fair, correct?
9      A.  That is correct.
10     Q.  And the testing process discriminated
11 against you as an African American, correct?
12     A.  Discriminated against minorities as a
13 whole, yes.
14     Q.  And you were part of a group of
15 plaintiffs that sued, correct?
16     A.  Yes.  That wasn't the original group that
17 started out, but that was the group that was left
18 standing, yes.
19     Q.  And the group that was left standing,
20 those were all African American --
21     A.  Males.
22     Q.  Male African Americans, correct?
23     A.  Correct.
24     Q.  And you all alleged that you were
                                        Page 113

1  discriminated against during the testing process
2  because of your race, correct?
3      A.  My major complaint was that the testing
4  process was not -- it was outdated and it needed to
5  reflect more up-to-date standards, yes.
6      Q.  Okay.  But there was other components to
7  your lawsuit?
8      A.  There was other components to that
9  complaint, yes.
10     Q.  And there was other allegations that were
11 being made, correct?
12     A.  Yes.
13     Q.  And there were other allegations that you
14 were making, correct?
15     A.  Mine was based on the testing process.
16     Q.  Okay.  And the testing process
17 discriminating against you as an African American,
18 correct?
19     A.  And other minorities, yes.
20     Q.  Okay.  And you believed that you were
21 being discriminated against because you were an
22 African American, correct?
23     A.  I believe I was being discriminated
24 against because of the testing process was outdated
                                        Page 114

1  and it didn't reflect current standards that need to
2  be included in a testing process.  That was my
3  initial complaint, but the complaint was broadened by
4  the other officers who were in the complaint that
5  also had some racial issues with the department, yes.
6      Q.  Is it your testimony that you were not --
7  you were not complaining that race was being utilized
8  in the promotional process when you filed your
9  lawsuit?
10     A.  Like I said, that was part of the
11 complaint, race was part of the complaint.
12     Q.  Part of your complaint?
13     A.  Yes.
14     Q.  Okay.  So that's what I'm asking.  You
15 believe that you were discriminated against because
16 of your race, correct?
17     A.  Correct.
18     Q.  And you believe that these people that
19 were getting the promotions were getting it partly
20 because of their race, correct?
21     A.  Correct.  And the way the testing process
22 was set up, yes.
23     Q.  And the ones that were getting promoted
24 were white people, correct?
                                        Page 115



Willie Hunt  -  3/21/2022
2:20-cv-02310-CSB-EIL  #14-5  Page 32 of 100
Paul Berge, et al. vs. City of Kankakee, et al.

**Page 116**

1    A.   White males, yes.

2    Q.   Okay.  And you believed that that

3 discriminatory process continued in the Kankakee

4 Police Department, correct?

5    A.   **Until it was changed, yes.**

6    Q.   Okay.  And when do you believe it was

7 changed?

8    A.   **It was changed in 2003.**

9    Q.   Okay.  When did you file your lawsuit?

10    A.   **Two thousand -- it went to court in 2005.**

11    Q.   Okay.

12    A.   **In 2003 they developed a Blue Ribbon**

13 **Committee made up of CEOs and leaders in the**

14 **community who suggested to the city that they need to**

15 **change their testing process to reflect the current**

16 **standards and update their testing process, so that's**

17 **when Stanard & Associates was brought in and the**

18 **police department changed their testing process to**

19 **include education, military experience, and longevity**

20 **and different things like that.**

21    Q.   All right.  You're not saying that there

22 was never any discrimination against a minority

23 officer after 2003 within the Kankakee Police

24 Department, are you?

**Page 117**

1    A.   **Repeat the question again, please.**

2    Q.   Yeah.  You said that the process changed

3 in 2003?

4    A.   **The testing process changed, yes.**

5    Q.   Okay.  You're not saying that minority

6 officers weren't discriminated against at any point

7 in the police department after 2003.  That's

8 certainly not your belief, is it?

9    MR. MCGRATH:  Object to the form of the

10 question, foundation, it's complete.

11        But you can answer.

12    THE WITNESS:  I think we still had some

13 issues within the police department, yes.

14 BY MR. HERBERT:

15    Q.   And when you say issues, you're talking

16 about racial issues, correct?

17    A.   **Yes.**

18    Q.   You're talking about white supervisors

19 still discriminating against minority officers,

20 correct?

21    A.   **I would say not understanding or being**

22 **sensitive to the other races, yes.**

23    Q.   Okay.  And that discrimination continued

24 throughout your tenure on the Kankakee Police

**Page 118**

1 Department, correct?

2    A.   **We've had issues with that.**

3    Q.   When you say we've had issues?

4    A.   **The department has had issues with that,**

5 **yes.**

6    Q.   With discrimination within the police

7 department, the department's had issues with that?

8    A.   **I think at first you said supervisors.  I**

9 **just think in general we had situations that lacked**

10 **sensitivity to other cultures and other races.**

11    Q.   Okay.  You're part of that group NOBLE,

12 and it's an acronym, NOBLE, correct?

13    A.   **I was.**

14    Q.   And how long were you part of that?

15    A.   **Probably three, four years.**

16    Q.   Okay.  What years?

17    A.   **2017 to probably 2019.**

18    Q.   Okay.  And that is an organization

19 that's --

20    A.   **National Organization for Black Leaders**

21 **and Executives.**

22    Q.   Okay.  And it's about -- one of the

23 causes with NOBLE is the -- is creating diversity

24 within police departments, correct?

**Page 119**

1    A.   **That is correct.**

2    Q.   And also specifically diversity within

3 the command staff of police departments, correct?

4    A.   **That is correct.**

5    Q.   And you joined that organization because

6 you believed that there needed to be diversity within

7 the command staffs of police departments, correct?

8    A.   **No, I joined the organization because it**

9 **was recommended to me by Chief Kinkade.**

10    Q.   Okay.  But you agreed when you joined

11 that organization with the -- one of their -- one of

12 their goals, to increase the diversity within the

13 command staffs of police departments, you agreed that

14 that needed to be done, correct?

15    A.   **Yes.  I believe the police department**

16 **should reflect the community, yes.**

17    Q.   And you believe that prior to Mayor

18 Chasity Wells being elected mayor, you don't believe

19 that African Americans were accurately represented in

20 the command staff of the Kankakee Police Department,

21 fair to say?

22    A.   **It's fair to say that I didn't think that**

23 **the command staff reflected the makeup component of**

24 **the city.  That is correct.**

Willie Hunt  -  3/21/2022
2:20-cv-02310-CSB-EIL  # 47-5  Page 33 of 100
Paul Berge, et al. vs. City of Kankakee, et al.

1    Q.   Okay.  The command staff, it changed
2 after Mayor Wells was elected as mayor, correct?
3    **A.   Correct.**
4    Q.   And it changed in that there was numerous
5 blacks that were promoted and put within the command
6 staff ranks of the police department, correct?
7    **A.   If I was appointed, yes.**
8    Q.   Well, not just you.  You were appointed,
9 correct?
10   **A.   Yes.**
11   Q.   And you were appointed, the position that
12 -- you took the position of a white male police
13 officer, correct?
14   **A.   Yes, I took his appointment.**
15   Q.   And whose appointment was that?
16   **A.   Robin Passwater.**
17   Q.   So you were appointed to the No. 2 spot
18 within the police command staff by Mayor Chasity
19 Wells, correct?
20   **A.   Correct.**
21   Q.   And you weren't the only African American
22 that was promoted to the top ranks of the command
23 staff, correct?
24   **A.   Correct.**

1    Q.   Donell Austin was promoted, correct?
2    **A.   Correct.**
3    Q.   He's black, right?
4    **A.   Yes.**
5    Q.   And he was promoted to the rank of
6 commander, correct?
7    **A.   Correct.**
8    Q.   And demoted from the commander position
9 was a white male, correct?
10   **A.   Correct.**
11   Q.   And that white male was Mr. Kidwell
12 K-i-d-w-e-l-l, correct?
13   **A.   Correct.**
14   Q.   And the police chief that Mayor Chasity
15 Wells hired, that was a black male, correct?
16   **A.   Correct.**
17   Q.   That was Price Dumas, correct?
18   **A.   Correct.**
19   Q.   So the top three positions within the
20 Kankakee Police Department were changed from white to
21 black after Mayor Chasity Wells was elected, correct?
22   **A.   No.**
23   Q.   Tell me how I'm not correct.
24   **A.   I think when she first got into office, I**

1 **think Robin Passwater was the acting chief.**
2    Q.   Right.  But I'm saying after she got
3 elected, at some point it was changed.  The top three
4 positions within the police command staff went from
5 white males to black males, correct?
6    **A.   After Robin Passwater quit, yes.**
7    Q.   Okay.  And that was part of Mayor Chasity
8 Wells's campaign promise, correct?
9    **A.   I don't think that -- she wanted to**
10 **diversify the police department, whatever.**
11   Q.   She wanted to increase the minority
12 makeup of the police command staff, correct?
13   **A.   Yes.**
14   Q.   And she did that, correct?
15   **A.   Correct.**
16   Q.   And she did that by demoting white people
17 for black people, correct?
18   MR. MCGRATH:  Objection.  Form of the
19 question, incomplete hypothetical, foundation, it
20 misstates the prior testimony.
21 BY MR. HERBERT:
22   Q.   You can answer.
23   **A.   She appointed who she felt was qualified.**
24   Q.   Okay.  And you would agree with me that

1 part of the reason that you were promoted was
2 because -- you were promoted and a white male was
3 demoted was because of the fact you were black?
4    **A.   I would like to think that I was**
5 **qualified.**
6    Q.   I understand that, but you would agree
7 with me that that was one of the reasons, right, the
8 fact that you were black and this individual was
9 white?
10   **A.   You would have to ask the mayor.**
11   Q.   Well, I'm asking you though.
12   **A.   I would like to think I was qualified.**
13   Q.   And I'm not saying you weren't qualified.
14   **A.   Okay.**
15   Q.   But you would agree with me that your
16 race, you being black and that being a campaign
17 promise of the mayor, you would agree with me that
18 you being black was part of the reason that you were
19 promoted to deputy chief?
20   MR. MCGRATH:  Objection.  Form of the
21 question, it calls for speculation, foundation.
22   THE WITNESS:  I believe you would have to ask
23 the mayor.  I'd like to stand on my own credentials
24 being that I had served 20 years with the police



Willie Hunt  -  3/21/2022
2:20-cv-02310-CSB-EIL  # 47-5  Page 34 of 100
Paul Berge, et al. vs. City of Kankakee, et al.

1 department, got my master's degree, was working on my
2 doctoral degree.  And furthermore, when Kidwell and
3 Passwater thought that I had a chance to be chief,
4 they came to me and said they will support me in any
5 way they could.
6 BY MR. HERBERT:
7     Q.  But Kidwell, you relied on him for help
8 after you were promoted to deputy chief, right?
9     A.  No.
10    Q.  Well, you didn't know of any reason why
11 Kidwell's work performance would have resulted in him
12 being demoted, right?
13    A.  Not to my knowledge.
14    Q.  He was a very good deputy chief as far as
15 you knew?
16    A.  Kidwell wasn't deputy chief.
17    Q.  What position was he?
18    A.  He was commander.
19    Q.  Okay.  And you were promoted to the rank
20 of deputy chief?
21    A.  Yes.
22    Q.  So there had not been a rank of deputy
23 chief at the point in which you were promoted?
24    A.  Yes.

Page 124

1     Q.  There was?
2     A.  Yes.
3     Q.  Okay.
4     A.  You said Kidwell.
5     Q.  That's okay.  I'm sorry.  You're right.
6 But Passwater --
7     A.  Yes.
8     Q.  You took his position, correct?
9     A.  That is correct.
10    Q.  And then Austin was promoted to
11 commander, right?
12    A.  Correct.
13    Q.  And that was after you were deputy chief,
14 correct?
15    A.  Correct.
16    Q.  And did you play any role in the
17 promotion of Austin to commander?
18    A.  No.
19    Q.  Did you play any role in the demotion of
20 Kidwell from commander to lieutenant?
21    A.  No.
22    Q.  Who made that decision, do you know?
23    A.  The chief and the mayor.
24    Q.  Chief Dumas and the mayor?

Page 125

1     A.  Yes.
2     Q.  Were you involved in any of those
3 conversations?
4     A.  No.
5     Q.  As you sit here today, do you know
6 whether or not the fact that Donell Austin was black,
7 if that factored into the decision to promote him to
8 commander?
9     A.  You would have to ask those two
10 individuals.  I know that Donell is a veteran,
11 12-year veteran, he got his master's degree, served
12 as sergeant, staff sergeant in the military, so I
13 would like to think that he had credentials to be in
14 the position, so.
15    Q.  The mayor, after she promoted Dumas or
16 appointed Dumas, you, and Austin, the mayor talked
17 about this in the media, how she had changed the
18 command staff to look more like the community, right?
19    A.  If you're saying that --
20    MR. MCGRATH:  No, just whatever you know or
21 remember.
22    THE WITNESS:  I don't remember that being in
23 the paper or anything.
24

Page 126

1 BY MR. HERBERT:
2     Q.  Okay.  You had some -- you had a
3 disciplinary issue regarding some of the posts that
4 you made on your personal Facebook account, correct?
5     A.  That is correct.
6     Q.  And on that account you -- there were
7 posts which were on your account about white
8 supremacy, correct?
9     A.  If you say so.
10    Q.  Well, do you remember there being posts
11 about white supremacy?
12    A.  I remember posting -- yeah.  Yeah, I
13 think there might have been one.
14    Q.  And promoting Black Lives Matter?
15    A.  Yes.
16    Q.  And showing a -- one of them, one of the
17 images showing a white police officer holding a baton
18 over an African American's head with the text, "You
19 can't make a time in history when black people
20 weren't targeted by the police."  Do you remember
21 posting that?
22    A.  You can't name a time in history, that is
23 correct.
24    Q.  Okay.  And then another one about the

Page 127



Willie Hunt   -   3/21/2022
2:20-cv-02310-CSB-EIL   # 41-5   Page 35 of 100
Paul Berge, et al. vs. City of Kankakee, et al.

1 black race rising and conquering the world, correct?

2    **A. Yes.**

3    Q. And then another post about comparing

4 Caucasians to monkeys and referring to Caucasians as

5 Neanderthals, correct?

6    **A. That was taken out of context but, yes, I**

7 **did post that or re-post that or shared that, yes.**

8    Q. Okay. And at the time you posted, you

9 would agree with me that those posts are derogatory

10 towards white people, correct?

11    **A. If you're talking about the one that**

12 **compared Caucasians to a monkey, the context of that,**

13 **it was talking about the RH negative factor and how**

14 **it got into the human gene system and that at first**

15 **it started out as a Caucasian trait but over the**

16 **years we all -- you have that HR negative factor in**

17 **all of the races. That was the gist of that.**

18    Q. Do you believe that any of your posts

19 were derogatory towards white people?

20    **A. Besides that one?**

21    Q. Besides which one?

22    **A. The one about the monkey or whatever.**

23    Q. So that was --

24    **A. But like I said, that was taken out of**

1 context. They just took the picture and didn't read

2 anything of the discussion that was being had with

3 that.

4    Q. All right. So that was a picture of a

5 white man with a tail, correct?

6    **A. Yes, but there was more to it than that.**

7    Q. I get it. So is it your testimony that

8 that picture was derogatory towards white people?

9    **A. If they didn't understand the context of**

10 **what was being discussed, yes.**

11    Q. Well, you were disciplined for your posts

12 on your social media account, correct?

13    **A. Yes.**

14    Q. And you were disciplined by the police

15 department, correct?

16    **A. Yes.**

17    Q. And you were disciplined because the

18 posts were inappropriate, correct?

19    **A. The chief felt that being a lieutenant, I**

20 **should have used better judgment, yes.**

21    Q. Better judgment not to make those posts,

22 correct?

23    **A. Yes. However, he stated that he wasn't**

24 **infringing on my...**

1    Q. First Amendment?

2    **A. First Amendment right, but it's just,**

3 **yeah.**

4    MR. MCGRATH: Can we identify which chief

5 because there's been a number of chiefs identified.

6    MR. HERBERT: Yeah.

7 BY MR. HERBERT:

8    Q. Which chief told you that?

9    **A. That was Chief Regnier.**

10    Q. Okay. And you shouldn't have posted

11 those because they could be considered derogatory by

12 some people, correct?

13    **A. Yes.**

14    Q. Okay. And derogatory against white

15 people, correct?

16    **A. Yes.**

17    Q. At the time in which you posted that, did

18 you have any negative feeling toward white people in

19 general?

20    **A. No.**

21    Q. As you sit here today, do you have any

22 derogatory feeling toward white people?

23    **A. No.**

24    Q. Do you know Nickey Yates?

1    **A. Yes.**

2    Q. How long have you known him?

3    **A. Probably six, seven years maybe.**

4    Q. When was the last time you spoke with

5 him?

6    **A. Probably maybe, almost a year ago maybe.**

7    Q. Okay. Do you know whether or not Nickey

8 Yates has any derogatory feeling toward white people?

9    **A. You would have to ask Nickey Yates that.**

10    Q. I know. I did.

11    **A. Okay. So you know, I don't. So you can**

12 **share it with me then.**

13    Q. It was pretty clear he had a lot of

14 derogatory feelings towards white people.

15    **A. Okay.**

16    Q. So my question is: Are you aware of the

17 fact that Nickey Yates doesn't like white people?

18    MR. MCGRATH: I just object to the form of

19 the question, foundation, it calls for speculation,

20 and I would object to the prior testimony.

21 BY MR. HERBERT:

22    Q. You can answer.

23    **A. You'll have to ask Nickey Yates.**

24    Q. Right, I know, but I'm asking you.

Willie Hunt  -  3/21/2022
2:20-cv-02310-CSB-EIL  # 41-5  Page 36 of 100
Paul Berge, et al. vs. City of Kankakee, et al.

Page 132

1    A.  I don't know how he feel about white
2  people.
3    Q.  Did you ever hear any rumors that Nickey
4  Yates is racist towards white people?
5    A.  I know of one situation that he had at
6  the county building.
7    Q.  What happened?
8    A.  He was applying for a position and it was
9  given to someone else that was less qualified, and he
10  was removed from the building by PD.
11    Q.  And he made a complaint against the
12  police officers?
13    A.  I don't know if he made a complaint.
14    Q.  He made race an issue in that situation,
15  correct?
16    A.  Yes.
17    Q.  And he made the complaints to the police
18  department in some way, shape, or form, correct?
19    A.  I believe so.
20    Q.  Okay.  And Nickey Yates, he was -- as a
21  board commissioner, he played a role in the selection
22  of individuals off a promotional list, correct?
23    A.  At the recommendation of the chief of
24  police, yes.

Page 133

1    Q.  Right.  And other than that one incident,
2  did you ever hear any rumors about Nickey Yates being
3  a racist towards white people?
4    A.  No.
5    Q.  Okay.  Did you have any concerns about --
6  based upon the complaints that you heard regarding
7  Nickey Yates that you just talked about, did you have
8  any concerns about his role in the -- at the Board of
9  Police and Fire Commissioners at all?
10    A.  No.
11    Q.  Okay.  In February 2018 there was an
12  individual named Hunter that was promoted to sergeant
13  and he skipped over two Caucasian males.  Do you
14  remember that?
15    A.  As I stated previously, there were four
16  chiefs that skipped while I was employed with the
17  City of Kankakee.  I believe --
18    Q.  I'm asking about this one.
19    A.  We talked about a couple of them, and I'm
20  trying to remember Hunter.  I'm trying to remember
21  which administration.  Was that Price's
22  administration?
23    Q.  February 2018.
24    A.  That would have been Price, yes.

Page 134

1    Q.  Okay.  So Hunter was promoted.  He was
2  ranked No. 3 on the promotional list, correct?
3    A.  Yes.
4    Q.  And he skipped over two white males that
5  were ranked one and two respectively above him,
6  correct?
7    A.  Correct.
8    Q.  Okay.  And that decision was made by
9  whom?
10    A.  Probably the chief of police.
11    Q.  Okay.  That would have been Price Dumas,
12  correct?
13    A.  Price Dumas.
14    Q.  And prior to --
15    MR. MCGRATH:  I'm sorry.  Was that for
16  sergeant or lieutenant?
17    MR. HERBERT:  That was for sergeant.
18    MR. MCGRATH:  Thank you.
19  BY MR. HERBERT:
20    Q.  And then shortly after Hunter was
21  promoted over two higher ranked Caucasian males, then
22  the same scenario happened with Michael Sneed,
23  correct?
24    A.  Well, I think Dumas promoted a white

Page 135

1  officer over -- he skipped and got another white
2  officer too to sergeant, Gary Tyson.
3    Q.  Right, but Hunter was promoted over two
4  white individuals.  You're aware of that?
5    A.  And Gary Tyson was too, yes.
6    Q.  Okay.  So Hunter was a No. 3 ranked
7  individual and he was promoted over the Nos. 1 and 2
8  ranked individuals who happened to be Caucasians,
9  correct?
10    A.  Correct.
11    Q.  And that's the same thing that happened
12  with respect to Michael Sneed, correct?  He was
13  ranked third on the list?
14    A.  Correct.
15    Q.  And he was promoted over two individuals
16  that were ranked one and two that were Caucasian,
17  correct?
18    A.  Correct.
19    Q.  Do you know why Hunter was promoted over
20  the two white individuals ahead of him?
21    A.  You'd probably have to check with chief,
22  Chief Dumas.
23    Q.  You were the deputy chief at the time,
24  correct?



Willie Hunt  -  3/21/2022
2:20-cv-02310-CSB-EIL  # 41-5  Page 37 of 100
Paul Berge, et al. vs. City of Kankakee, et al.

1  A. I was deputy chief, yes, but Dumas --
2  Q. Do you know any reasons why Hunter was
3 promoted over the two white individuals in
4 February 2018?
5  A. Like I said, you would have to check with
6 Chief Dumas because he's the one that presented that
7 to the Police and Fire Commission, but also it's
8 within the State law that you can promote from the
9 top three.
10  Q. And how do you know that?
11  A. Because I read the law.
12  Q. Okay. And did you have conversations
13 with Price Dumas about the promotion of Hunter in any
14 way?
15  A. No. He knew the law.
16  Q. How do you know that?
17  A. Because he was with the Kankakee Police
18 Department before and he was a state trooper, so he
19 knows the rule of three.
20  Q. Okay. And it's your belief that -- what
21 is your understanding of the law?
22  A. That the chief can promote within the top
23 three of the list.
24  Q. Is that it?

Page 136

1  A. Pretty much. I'm sure you have to have
2 some justification or reasoning behind it or some
3 type of documentation behind it. Like I said, I
4 didn't -- I didn't make that recommendation, so.
5  Q. Was Price Dumas, do you know if he wanted
6 to make the command staff, he wanted to change the
7 command staff in any way, the makeup of it?
8  A. You would have to ask Price Dumas.
9  Q. Well, he was on-board with the mayor and
10 certainly he was hired by the mayor because he had
11 the same philosophy as her with respect to the makeup
12 of the command staff of the Kankakee Police
13 Department. You would agree with me on that?
14  A. Well, like I said, he promoted Gary Tyson
15 which was a white male, so.
16  Q. Again, I'm not asking about that though.
17 I'm saying --
18  MR. MCGRATH: You can finish your answer.
19  THE WITNESS: Yeah. He promoted Gary Tyson
20 which was a white male and he skipped to get Gary
21 also, so I think he was just trying to put qualified
22 people in place. That's just my speculation of it.
23 BY MR. HERBERT:
24  Q. But the mayor wanted to have more

Page 137

1 minorities in the command staff of the police
2 department, correct?
3  MR. MCGRATH: Objection. Asked and answered.
4  THE WITNESS: According to this deposition,
5 that's what I read. That's what you read me, yes.
6 BY MR. HERBERT:
7  Q. Well, you agreed with me on that.
8 That was part of her campaign?
9  A. I agreed, yeah, what was written, yes.
10  Q. Okay. And she's the one that chose Price
11 Dumas to be the chief, correct?
12  A. Yes.
13  Q. Okay. And so Dumas agreed with her that
14 the command staff needed to be more based upon
15 minorities, right?
16  MR. MCGRATH: Objection.
17  THE WITNESS: You would have to ask Price
18 Dumas.
19 BY MR. HERBERT:
20  Q. Okay. So you have no idea --
21  A. What conversation those two had, no, I
22 don't.
23  Q. How about any conversations that you had
24 with Price Dumas, did it ever come up in any way,

Page 138

1 shape, or form that Price Dumas wanted to get some
2 more minorities in the command staff?
3  A. I don't recall having that direct
4 conversation.
5  Q. Okay. And again, I'm not talking about
6 direct necessarily if you have one, but do you
7 remember having some indirect conversations that,
8 hey, we need to change the makeup of this department
9 with Dumas?
10  A. Well, yes.
11  Q. Okay. Tell me about that.
12  A. Hiring. In order to first have
13 minorities in command, you have to have minority
14 officers.
15  Q. Okay.
16  A. So recruiting is one element that I was
17 pretty much in charge of and trying to recruit
18 African Americans, females, Hispanics. That was my
19 job. That was one of my jobs, to be over
20 recruitment.
21  Q. When did you have that role?
22  A. As deputy chief.
23  Q. Okay. So the entire time as deputy chief
24 one of your roles was to work on the recruitment of

Page 139



Willie Hunt  -  3/21/2022
2:20-cv-02310-CSB-EIL  # 41-5  Page 38 of 100
Paul Berge, et al. vs. City of Kankakee, et al.

1 minority officers for the Kankakee Police Department?
2     A. Yes.
3     Q. And who gave you that assignment?
4     A. That was just part of my assignment. I
5 can't remember if it came down from the chief or if
6 it was just me being as deputy chief working with the
7 commander because we had a recruitment team because
8 we're CALEA certified. We were supposed to have all
9 these things in place, so I think that's probably
10 where I was in charge of the recruitment and I kind
11 of allocated it down to the patrol commander to set
12 up a team that would reflect the makeup of the
13 department. So we had a white male, Hispanic, black,
14 Asian. We had the whole rainbow coalition on this
15 team to reflect how the city wanted its department to
16 look.
17     Q. How did the city want the department to
18 look?
19     A. To just reflect the community.
20     Q. Okay. And did you believe that the
21 command staff -- prior to you being promoted to
22 deputy chief, did you believe that the command staff
23 represented the community?
24     A. It took 40 years for me to get promoted

Page 140

1 to lieutenant, so I think we as a department had a
2 ways to go. The last lieutenant that was promoted
3 was promoted when I was born, so it took kind of
4 40 years. So I think as a whole the police
5 department was a little behind its recruitment
6 efforts, its advancement of minorities in a
7 leadership role, the hiring of minorities also, so
8 yes.
9     Q. Too white. The police department was too
10 white before you were promoted, correct, to deputy
11 chief?
12     A. I wouldn't say too white. I would say
13 that it didn't give an actual reflection of the
14 community in which it served.
15     Q. Because there wasn't enough minorities,
16 correct?
17     A. It wasn't enough minorities. When I say
18 minorities, I'm talking females, Asian, not just
19 black.
20     Q. Okay. Not enough minorities within the
21 police department in general, correct?
22     A. Correct.
23     Q. And not enough minorities within the
24 command staff, correct?

Page 141

1     A. Correct.
2     Q. Okay. And then -- so your recruitment
3 effort, that was a job -- that was an assignment that
4 was given to you at some point after you became
5 deputy chief, correct?
6     A. I would say according to the CALEA
7 standards, I oversaw that, but I delegated it out to
8 the commander and he delegated it out to a sergeant.
9 I mean, it was delegated. I said, we need a
10 recruitment team. Told the commander, make it
11 happen. He went and got a lieutenant, a sergeant,
12 you know, and made it happen.
13     Q. And the commander was Austin?
14     A. Commander Austin.
15     Q. And your recruitment team was you wanted
16 to recruit in the minority neighborhoods, correct?
17     A. Yes.
18     Q. You wanted to get more minorities to
19 apply for the position, correct?
20     A. Yes.
21     Q. You wanted to get more minorities to
22 become part of the police department, correct?
23     A. In law enforcement in general, yes.
24     Q. And you wanted to get those minorities

Page 142

1 that became part of the police department to become
2 part of the command staff for the police department
3 eventually?
4     A. Eventually.
5     Q. And that was the message that you gave to
6 Commander Austin, correct?
7     A. I would agree with that.
8     Q. Okay. Do you think the fact that Hunter
9 was promoted over two white males, do you think the
10 fact that Hunter was black, do you think that had
11 anything to do with it?
12     A. No. According to the union which
13 supported Steve Hunter in that promotion, the union
14 even said he was qualified, more qualified than those
15 individuals, and they didn't see anything wrong with
16 that and they were going to support him in his new
17 role.
18     Q. And you agreed with the union?
19     A. I usually don't agree with the union.
20     Q. You did on this one?
21     A. You know, I was just surprised that they
22 came out and said that because there was a lot of --
23 like you said, there was a lot of talk about it,
24 about him being black, then the union stepped up and

Page 143



Willie Hunt  -  3/21/2022
2:20-cv-02310-CSB-EIL  # 47-5  Page 39 of 100
Paul Berge, et al. vs. City of Kankakee, et al.

1  said, no, he was the most qualified on that list.

2      Q.  But my question was a little bit more

3  direct.

4      A.  Yeah.  Do I agree with the union?

5      Q.  Hold on.  No, no.  It was, do you believe

6  that the fact that Hunter was black, do you think

7  that had any reason to do with him being promoted

8  over individuals that were ranked higher of him?

9      A.  No.  Like I said, I would like to think

10  it was based on Steve's qualification as an officer

11  and his ability.

12      Q.  But you would agree that the promotion of

13  Hunter, it certainly made the command staff more

14  diverse, right?

15      A.  I would agree that Steve Hunter is black.

16      Q.  Okay.  And it made it more diverse,

17  right?

18      A.  Yes.

19      Q.  Something that you wanted, correct?

20      A.  Not -- like I said before, my goal was to

21  recruit minorities to have the department reflective

22  of the community.  Steve Hunter was promoted.  The

23  union agreed with him being promoted.  The union

24  agreed with the two officers being skipped within

Page 144

1  their union because Steve Hunter was more qualified.

2      No, I agree Steve is black.  He is

3  black, but his qualifications should have came before

4  his color.

5      Q.  Okay.  Did the chief, Chief Dumas, did he

6  listen to the union?  Was that part of his

7  decision-making process when he skipped Hunter over

8  the two individuals?

9      A.  I don't know.  You'll have to ask him.  I

10  think that came, that union endorsement came after

11  the fact.

12      Q.  Do you think the fact that the two

13  individuals ahead of Hunter were white, do you think

14  that had anything to do with Hunter passing those

15  individuals on the list?

16      A.  I don't think both of them was white.  I

17  think one was Asian and one was white, and I think

18  that his qualifications propelled him ahead of those

19  guys.

20      Q.  Okay.  And I get that, but I'm asking

21  more specific.  Aside from the qualifications, that's

22  a factor that's taken, I'm assuming, when somebody is

23  making a promotion, correct?

24      A.  Correct.

Page 145

1      Q.  And you would agree that an individual

2  that skips over two other individuals, there has to

3  be some compelling reason to do that, correct?

4      A.  Correct.

5      Q.  Because the norm is just to go off in

6  rank order.  That's how it's normally done, correct?

7      A.  No.  Like I said, I've worked under five

8  administrators, five chiefs, and four out of five

9  skipped.

10      Q.  Okay.  With the case with Hunter, do you

11  think that him bypassing the other two individuals,

12  do you think race was a factor in any way?

13      A.  Once again I like to say, I would like to

14  believe and I believe that it was based on his

15  qualifications.  Steve was black.  I can't take that

16  away from him, but his qualifications, I'm assuming

17  that the chief pulled files, looked at the files and

18  looked at the qualifications and figured he would be

19  a better candidate for that position of sergeant at

20  the time.

21      Q.  What if the chief looked at the

22  qualifications and said, "Boy, I like Hunter's

23  qualifications, and I like the fact that Hunter is

24  black."  What if the chief had done that.  In your

Page 146

1  opinion, would that be appropriate?

2      MR. MCGRATH:  Objection.  The form of the

3  question, an incomplete hypothetical, foundation,

4  relevance.

5      You can answer.

6      THE WITNESS:  You would have to ask the chief

7  that.

8  BY MR. HERBERT:

9      Q.  I'm asking you though.

10      MR. MCGRATH:  Objection.  Relevance,

11  incomplete hypothetical, foundation.

12  BY MR. HERBERT:

13      Q.  Would you think that was acceptable?

14      A.  No.

15      MR. MCGRATH:  The same objection.

16  BY MR. HERBERT:

17      Q.  Why not?

18      MR. MCGRATH:  The same objection.

19      THE WITNESS:  Like I said, I think it should

20  be based on qualifications.  The color of your skin

21  shouldn't matter.

22  BY MR. HERBERT:

23      Q.  But you talked about that law which

24  allows the chief to select any one of the top three

Page 147



Willie Hunt - 3/21/2022
2:20-cv-02310-CSB-EIL # 41-5 Page 40 of 100
Paul Berge, et al. vs. City of Kankakee, et al.

1 candidates on a list, correct?

2 **A. Correct.**

3 Q. And they can use whatever criteria they

4 want to make that selection, correct?

5 **A. I'm assuming they could, but it would**

6 **have to be probably justified.**

7 Q. Right, but there's nothing in the law

8 that says you have to look at X, Y, and Z in making

9 your decision, right?

10 **A. I believe that is correct.**

11 Q. Okay. And so the chief might have looked

12 at Hunter and said, "He's black. I'm going to give

13 him the nudge over these other two guys because of

14 that fact." Is it possible that happened?

15 MR. MCGRATH: Objection. It calls for

16 speculation, an incomplete hypothetical, foundation,

17 relevance.

18 THE WITNESS: You would have to ask the chief

19 that.

20 BY MR. HERBERT:

21 Q. Okay. And the same thing with Sneed.

22 You don't know if race was involved in his promotion

23 at all?

24 **A. You would have to ask the chief that.**

Page 148

1 Q. Okay. Would it surprise you if the chief

2 wanted -- that part of the reason he wanted Hunt --

3 or I'm sorry, Sneed to be promoted was the fact that

4 Sneed was black?

5 MR. MCGRATH: Objection. Foundation, the

6 form of the question, an incomplete hypothetical and

7 misstates the prior testimony.

8 BY MR. HERBERT:

9 Q. You can answer.

10 **A. You'll have to ask the chief that.**

11 Q. Okay. The chief resigned, Chief Dumas

12 resigned, correct?

13 **A. That is correct.**

14 Q. And he resigned -- do you know the reason

15 why he resigned?

16 **A. I believe it was some personal, it was**

17 **personal issues.**

18 Q. What were the personal issues that you're

19 aware of that were part of the chief's decision to

20 resign?

21 **A. I think he was having some issues with**

22 **his health.**

23 Q. Okay. You're aware of the fact that

24 Chief Dumas was being investigated by the Illinois

Page 149

1 State Police at some point prior to him resigning,

2 correct?

3 **A. Yes.**

4 Q. And that was an investigation into Chief

5 Dumas's misuse of department computers, correct?

6 MR. MCGRATH: Objection. Mistakes the --

7 strike that.

8 Objection. Form of the question,

9 incomplete hypothetical.

10 BY MR. HERBERT:

11 Q. You can answer.

12 **A. Yeah, I believe they closed that**

13 **investigation because they found out that -- that the**

14 **department policy was not appropriate for the use of**

15 **the -- the way the records was using the computers.**

16 Q. Okay. But my question was, you're aware

17 that the Illinois State Police was conducting this

18 investigation into Chief Dumas based upon allegations

19 of him misusing the department computer for personal

20 reasons?

21 **A. Yeah, and that's what I'm saying. It**

22 **came back that they found no wrongdoing, and that the**

23 **department policy, as far as records using the**

24 **chief's name to run everybody's name that had a**

Page 150

1 **warrant or a criminal background was inappropriate.**

2 Q. But you know that the chief was using the

3 department computer to run some information about

4 people that were complaining about the mayor, right?

5 **A. Yeah.**

6 Q. Okay. And you know that the mayor told

7 the chief to look into some of these individuals that

8 were complaining about the mayor, right?

9 **A. I was aware of the chief looking into**

10 **that, yes.**

11 Q. Yeah, because you did the same thing,

12 didn't you?

13 **A. I did the same thing?**

14 Q. Didn't you conduct investigations into

15 people that were critical of the mayor?

16 **A. You have to refresh my memory. I can't**

17 **recall that.**

18 Q. Do you remember the mayor coming to you

19 and saying, "Hey, there's people making complaints

20 about me on Facebook. Find out who these people

21 are"?

22 **A. No, I don't recall that.**

23 Q. Okay. You're aware of there was a group

24 on Facebook that was critical of the mayor, correct?

Page 151



Willie Hunt  -  3/21/2022
2:20-cv-02310-CSB-EIL   # 41-5   Page 41 of 100
Paul Berge, et al. vs. City of Kankakee, et al.

1    MR. MCGRATH: Objection. Foundation. I
2 assume we're talking about Chasity Wells-Armstrong.
3    MR. HERBERT: Yeah, I'm sorry.
4 BY MR. HERBERT:
5    Q.   Mayor Chasity Wells-Armstrong. You're
6 aware of that Facebook group that was titled You're
7 Probably From Kankakee?
8    **A.   Yes. I've heard of the group, yes.**
9    Q.   Yeah. And you are aware that they were
10 critical of the mayor, correct?
11    **A.   Yes.**
12    Q.   And it was Mayor Chasity Wells?
13    **A.   Yes.**
14    Q.   And they were critical of you as well,
15 correct?
16    **A.   Yes.**
17    Q.   And they were critical of Chief Dumas?
18    **A.   Yes.**
19    Q.   And they were critical of Donell Austin?
20    **A.   Yes.**
21    Q.   They were critical of the black leaders
22 in the police department, correct?
23    **A.   You just named all the black leaders,**
24 **yes.**
                                        Page 152

1    Q.   Okay. They were critical about the
2 promotion system within the Kankakee Police
3 Department, correct?
4    **A.   I didn't follow the group, but yes.**
5    Q.   Well, you didn't follow them, but you
6 conducted an investigation to determine who was part
7 of the group, correct?
8    **A.   I don't recall that.**
9    Q.   You don't recall conducting any
10 investigation into that group that was critical of
11 the black command staff of the police department
12 including Mayor Chasity Wells?
13    **A.   I don't recall doing an investigation on**
14 **you ought to be from -- You're Probably From Kankakee**
15 **Facebook group.**
16    Q.   Well, you believed it was police officers
17 that were behind those negative posts, correct?
18    MR. MCGRATH: Objection. Form, foundation.
19 You can answer.
20    THE WITNESS: I don't believe that was in the
21 group. If you're talking about the Shreffler
22 incident, I don't believe he was part of that group.
23 BY MR. HERBERT:
24    Q.   Okay. But you believed that white police
                                        Page 153

1 officers were being critical on Facebook posts about
2 the black command staff in the police department,
3 fair to say?
4    **A.   I believe a lot of information that was**
5 **being leaked out about the police department, yes.**
6    Q.   Was being done by white police officers?
7    **A.   Yes.**
8    Q.   Against the black command staff, correct?
9    **A.   Against the black administration, yes.**
10    Q.   Okay. And you conducted an investigation
11 to determine whether or not any of these white
12 officers were in fact Kankakee Police Department
13 members, correct?
14    **A.   Robin Passwater and I called Shreffler in**
15 **and asked him if he had posted any of that stuff,**
16 **yes.**
17    Q.   Did you ever hear the mayor say anything
18 about the police department being too white?
19    **A.   No.**
20    Q.   Did you ever hear her complain about the
21 way white officers treat people in the community?
22    **A.   I might have heard an incident with --**
23 **that she spoke of probably with Ray Pasal.**
24    Q.   And that was a white police officer, the
                                        Page 154

1 way he treated people in the community?
2    **A.   Yeah, it was another white guy. Yes.**
3    Q.   Okay. Other than that incident, did you
4 ever hear the mayor complain that white officers were
5 mistreating minority members of the community in the
6 police department?
7    **A.   I don't recall a direct conversation, no.**
8    Q.   Do you remember anything indirect along
9 those lines?
10    **A.   No.**
11    Q.   Okay. You're aware of the fact that
12 Robin Passwater complained that the chief accused him
13 of being a racist?
14    **A.   When?**
15    Q.   Are you aware that Passwater --
16    **A.   I was about to say in the past or was it**
17 **the present or...**
18    Q.   At any point. Mayor Chasity Wells
19 accused Passwater of being a racist. You're aware of
20 that, right?
21    **A.   I remember that -- I can't remember if it**
22 **was Price Dumas or the mayor that mentioned something**
23 **like that maybe.**
24    Q.   Mentioned that they accused Passwater of
                                        Page 155



Willie Hunt - 3/21/2022
2:20-cv-02310-CSB-EIL # 47-5 Page 42 of 100
Paul Berge, et al. vs. City of Kankakee, et al.

1 being a racist?

2    **A. Yeah.**

3    Q. Okay. So either Price or the mayor would

4 have accused Passwater of being a racist. Is that

5 your understanding?

6    **A. Yeah, but with Price it probably would**

7 **have been in the past. I'm thinking like in the past**

8 **like with our lawsuit.**

9    Q. Okay. Did you believe that Passwater was

10 a racist?

11    **A. When I first met Robin, Robin was good.**

12 **He was a good guy. He was good to me. As a rookie,**

13 **he gave me the training guide and let me go to any**

14 **training I wanted to go to, so I never had any ill**

15 **feelings towards Robin Passwater.**

16    Q. So were you surprised when you heard that

17 there was allegations about him being a racist?

18    **A. I remember hearing that from other**

19 **community members, yes.**

20    Q. Okay. Did you ever say, "Hey, he's not a

21 racist. I've worked with this guy forever,"

22 something along those lines?

23    MR. MCGRATH: Objection. Foundation,

24 conversations.

Page 156

1    THE WITNESS: No, I don't remember having

2 conversations.

3 BY MR. HERBERT:

4    Q. Did you ever tell the chief, Chief Dumas

5 "He's not a racist," Passwater?

6    **A. No.**

7    Q. How about the mayor? Did you ever tell

8 Mayor Chasity Wells, "Hey, Passwater's not a racist"?

9    **A. No, I don't remember having that**

10 **conversation.**

11    Q. Okay. But you remember one of those two

12 making allegations that Passwater was a racist?

13    **A. Yeah.**

14    Q. Do you know why they believed Passwater

15 was a racist?

16    **A. You would have to ask either one of them.**

17 **I don't... The only thing I know, that Robin quit as**

18 **acting chief on the mayor.**

19    Q. Okay. And is that why the mayor thought

20 he was a racist, because she thought that he quit

21 because she was black and he was white?

22    MR. MCGRATH: Objection. Form of the

23 question, foundation. It calls for speculation.

24      But if you know.

Page 157

1    THE WITNESS: I can speculate.

2 BY MR. HERBERT:

3    Q. Go ahead.

4    MR. MCGRATH: I'd rather you not speculate.

5 Just whatever you know.

6    THE WITNESS: I don't know.

7 BY MR. HERBERT:

8    Q. Was the mayor, was she upset that

9 Passwater quit?

10    MR. MCGRATH: Objection. Form of the

11 question, foundation, it calls for speculation.

12    THE WITNESS: You would have to ask the

13 mayor.

14 BY MR. HERBERT:

15    Q. Well, do you know? Did the mayor say

16 anything to you that indicated that she was upset

17 that Passwater quit?

18    **A. I think she made it known that she was**

19 **upset that he quit.**

20    Q. And did she say anything to you that

21 indicated that she believed Passwater quit because a

22 new black administration had come in under her?

23    **A. I don't remember that conversation.**

24    Q. Do you know if the fact that Passwater

Page 158

1 quitting was the reason why the mayor characterized

2 Passwater as being a racist?

3    **A. I don't know. You'll have to ask her.**

4    Q. Okay. How about Price Dumas, was he

5 upset that Passwater quit?

6    **A. He wasn't there when Passwater quit, no.**

7    Q. Okay. You're aware of the fact that Paul

8 Berge made some accusations against Donell Austin,

9 correct?

10    **A. Yes.**

11    Q. He made allegations that Austin harassed

12 him in the workplace, correct?

13    **A. Yes.**

14    Q. Stuck his -- Donell Austin stuck his

15 crotch in the face of Paul Berge, correct?

16    **A. Correct.**

17    Q. Okay. And there was never any

18 investigation conducted by you into the allegations

19 made by Berge, was there?

20    **A. I didn't know of the allegations until**

21 **you -- we did the depositions and all that stuff.**

22    Q. You're saying at Paul Berge's

23 interrogation --

24    **A. Yes.**

Page 159

Willie Hunt  -  3/21/2022
2:20-cv-02310-CSB-EIL  #145-5  Page 43 of 100
Paul Berge, et al. vs. City of Kankakee, et al.

1  Q.  -- he made the allegation, correct?

2  A.  Yes.

3  Q.  And in fact, you told -- you were present

4  during that interrogation, correct?

5  A.  Yes.

6  Q.  And Chief Kosman was present during the

7  interrogation, correct?

8  MR. MCGRATH:  Objection.

9  BY MR. HERBERT:

10  Q.  Or was he?  I'm not even sure.  I don't

11  remember.

12  A.  I don't think so.

13  Q.  Okay.  And you told Donell Austin that

14  Paul Berge made that complaint against him, correct?

15  A.  No, I told the chief.

16  Q.  You told the chief?

17  A.  I told the chief that, yeah.

18  Q.  And the chief told Donell Austin that

19  Berge made that complaint against him, correct?

20  A.  Correct.

21  Q.  And were you ever tasked with the duty to

22  conduct an investigation into the complaint of Paul

23  Berge?

24  A.  No.

Page 160

1  Q.  At the time Paul Berge made the

2  complaint, he was a member of the Kankakee Police

3  Department, correct?

4  A.  Correct.

5  Q.  And do you know if any investigation was

6  done into the complaint made by Paul Berge?

7  A.  I don't think Berge officially made a

8  complaint until -- that was my first time hearing

9  that at the -- what did you call it?

10  Q.  The interrogation.

11  A.  Interrogation.

12  Q.  Okay.  Do you know of any investigation

13  that was done at the point in which Paul Berge made

14  this complaint?

15  A.  Yes, I believe the chief -- somehow I

16  believe -- something was done because I can vaguely

17  recall that Gary Tyson was called in because he was

18  in the office when that allegedly happened.

19  Q.  But that happened prior to -- prior to

20  Berge making a complaint, right?

21  A.  No, he was in the office when all of that

22  kind of occurred.  You know how the squad room is set

23  up.  There's a big glass where you can see what's

24  happening in there.  So I believe Gary Tyson, if I'm

Page 161

1  not mistaken, disputed that in the interrogation.

2  Q.  But Tyson wasn't in the room the entire

3  time that Berge was in there with Austin, correct?

4  A.  Yeah, whatever he said in interrogation.

5  I would have to look at the interrogation to see what

6  he said.

7  Q.  Right.  So Austin couldn't refute Berge's

8  allegations.  He could only refute them during the

9  part he was in there, correct?

10  A.  That is correct.

11  Q.  And you would agree with me that there

12  was never an investigation done by anyone within the

13  Kankakee Police Department regarding that complaint

14  against Paul Berge?

15  A.  Because I don't think Berge officially

16  made a complaint.

17  Q.  Okay.  What would Berge have needed to do

18  to make an official complaint?

19  A.  Just come to -- if he couldn't go to

20  Donell, he should have came to me or the chief or HR

21  or Internal Affairs.

22  Q.  But you were there when he made the

23  complaint?

24  A.  That was the first time I heard of it.

Page 162

1  Q.  Is it your testimony that what Paul Berge

2  said in his interrogation doesn't qualify as a

3  complaint that deserves an investigation?

4  A.  And I think we looked into it and I think

5  that's when Gary Tyson -- we looked into it as much

6  as we could because there was only two people.  You

7  were there.  You did the interrogation.

8  Q.  Tell me what you did to look into it.

9  A.  The chief looked into it.

10  Q.  So when you say we --

11  A.  When I say we, I'm generically speaking

12  the department.  Sorry.

13  Q.  What is your knowledge about what

14  investigation was conducted into that complaint?

15  A.  I think Gary Tyson was called in and

16  questioned about it, and I think -- you were there

17  when that happened.

18  Q.  I was in the room when the chief

19  conducted an investigation?

20  A.  No, I'm just saying when Gary Tyson said

21  what he said.  I think he said the same thing to the

22  chief.

23  Q.  What else do you know?  What other steps

24  did the chief take?

Page 163

Willie Hunt - 3/21/2022
2:20-cv-02310-CSB-EIL # 4 5 Page 44 of 100
Paul Berge, et al. vs. City of Kankakee, et al.

1    A.   That was it.
2    Q.   And in your understanding of how --
3 certainly as a supervisor in the Kankakee Police
4 Department, you investigated complaints made against
5 supervisors by officers, correct?
6    A.   I believe I have.
7    Q.   And there's a process that needs to be
8 followed that's set forth in the rules and
9 regulations of the Kankakee Police Department,
10 correct?
11    A.   That is correct.
12    Q.   And the process is that there is to be a
13 thorough and timely investigation, correct?
14    A.   That is correct.
15    Q.   And included in that investigation is to
16 interview all persons that may or may not have
17 knowledge of the incident, correct?
18    A.   That is correct.
19    Q.   And none of that was done in this case,
20 was it?
21    A.   I don't know.
22    Q.   If that wasn't done, you would agree that
23 Paul Berge was not given the due process rights that
24 he was entitled to with respect to making a complaint

*Page 164*

1 against a department supervisor?
2    MR. MCGRATH:  Objection.  Objection.  Form of
3 the question, it calls for a legal conclusion,
4 incomplete hypothetical, relevance, and foundation.
5    THE WITNESS:  And you would have to ask the
6 chief of police.
7 BY MR. HERBERT:
8    Q.   But I'm asking you based upon your
9 knowledge of how an investigation -- what type of
10 investigation is required into a complaint of sexual
11 harassment?  You're aware of the steps that are
12 required to be taken, correct?
13    A.   Correct.
14    Q.   And you're not aware of any of those
15 steps being taken?
16    A.   I don't know what the chief did, no.
17    Q.   Okay.  And you know that Paul Berge was
18 eventually terminated, correct?
19    A.   Correct.
20    Q.   And his termination was signed off on by
21 the Board of Police and Fire Commissioners, correct?
22    A.   Correct.
23    Q.   And Nickey Yates was the secretary for
24 the Board of Police and Fire Commissioners, correct?

*Page 165*

1    A.   Correct.
2    Q.   And Nickey Yates signed off on the
3 termination of Paul Berge, correct?
4    A.   I don't think he just signed off by
5 himself.  I think it was put to a vote.
6    Q.   Okay.  And you're aware that Mike
7 Shreffler was terminated, correct?
8    A.   Correct.
9    Q.   And you're aware of the fact that Nickey
10 Yates signed off on the termination of Mike
11 Shreffler, correct?
12    A.   Once again, I don't think he just
13 individually signed off on it.  I think it was put to
14 a vote.
15    Q.   Okay.  And a vote by the Police and Fire
16 Commissioners?
17    A.   That is correct.
18    Q.   And you know as you sit here today that
19 Mike Shreffler was not given a hearing, correct?
20    A.   That is correct.
21    Q.   Okay.  And you agree with me that Mike
22 Shreffler should have been given a hearing prior to
23 him being terminated, correct?
24    MR. MCGRATH:  Objection.  Misstates the

*Page 166*

1 testimony, relevance, foundation, and an incomplete
2 hypothetical.
3    THE WITNESS:  I believe he was given a notice
4 to appear before the board.
5 BY MR. HERBERT:
6    Q.   My question is, you agree with me that
7 Mike Shreffler should have been given a hearing prior
8 to him being terminated, correct?
9    MR. MCGRATH:  The same objection.  A legal
10 conclusion, incomplete hypothetical, foundation, and
11 relevance.
12    THE WITNESS:  I believe he was given notice
13 to appear before the board.
14 BY MR. HERBERT:
15    Q.   Again that's not my question.  The
16 question is a hearing.  You agree that there's a
17 difference between given a notice to appear before
18 the board and having a hearing?  You agree with me
19 that there's a difference between those two, correct?
20    A.   There's a difference.
21    Q.   Okay.  And a hearing is where the chief
22 is required to present evidence, correct?
23    A.   Correct.
24    Q.   And the defendant is required to present

*Page 167*



Willie Hunt - 3/21/2022
2:20-cv-02310-CSB-EIL # 47-5 Page 45 of 100
Paul Berge, et al. vs. City of Kankakee, et al.

1 evidence concerning the allegations against them,
2 correct?
3    **A.  That is correct.**
4    Q.  And there's rules that have to be
5 followed with respect to the introduction of evidence
6 and the conduct of the hearing, correct?
7    **A.  There are rules that are to be followed,**
8 **correct.**
9    Q.  And you would agree with me that
10 Shreffler was never given a hearing, correct?
11    MR. MCGRATH:  Objection.  It calls for a
12 legal conclusion, incomplete hypothetical,
13 foundation, and relevance.
14 BY MR. HERBERT:
15    Q.  You can answer.
16    **A.  I just know that he was given a notice.**
17    Q.  Right.  Do you know if he was given a
18 hearing?
19    **A.  I don't know if he was given a hearing.**
20    Q.  Okay.  As you sit here today, you don't
21 know if Mike Shreffler was given a hearing before the
22 Police and Fire Commission?
23    **A.  He wasn't given a hearing.**
24    Q.  That's what I'm asking you.  I'm confused
Page 168

1 as to why you're answering I don't know.
2       He was not given a hearing before
3 the Police and Fire Commission, correct?
4    MR. MCGRATH:  Objection.  It calls for a
5 legal conclusion, foundation, an incomplete
6 hypothetical and relevance.
7    THE WITNESS:  Again he was given a notice,
8 and a notice and a hearing are two separate things,
9 so.
10 BY MR. HERBERT:
11    Q.  And he was not given a hearing?
12    MR. MCGRATH:  Objection.  Relevance,
13 incomplete hypothetical, foundation, and it calls for
14 a legal conclusion.
15 BY MR. HERBERT:
16    Q.  You can answer.
17    **A.  He was given a notice.  He wasn't given a**
18 **hearing.**
19    Q.  He wasn't allowed to present evidence on
20 his behalf in front of the Police and Fire
21 Commission, was he?
22    MR. MCGRATH:  Objection.  It calls for a
23 legal conclusion, foundation, relevance, and
24 incomplete hypothetical.
Page 169

1    THE WITNESS:  He chose not to come before the
2 Police and Fire Commission.
3 BY MR. HERBERT:
4    Q.  Is it your testimony that the notice he
5 got was for a hearing on the charges against him?
6    MR. MCGRATH:  Objection.  Relevance,
7 incomplete hypothetical, foundation.
8 BY MR. HERBERT:
9    Q.  You can answer.
10    **A.  I know he was given a notice to come**
11 **before the Police and Fire Commission.**
12    Q.  Which is different than getting a hearing
13 and being -- having the ability to present evidence
14 in a case?
15    MR. MCGRATH:  Objection.  An incomplete
16 hypothetical, foundation, and relevance.
17 BY MR. HERBERT:
18    Q.  Right?
19    **A.  I just know he was given a notice to come**
20 **before the board.  If he went before the board, maybe**
21 **he could have asked for a hearing.  I don't know.  I**
22 **don't know.**
23    Q.  Okay.  All right.  And if I can show
24 you -- I'm just going to show you the exhibit.  The
Page 170

1 exhibit to our Response to Defendants' First Request
2 for Production, and what it is is I'll preface it,
3 it's the posts that were on Chief Willie Hunt's
4 Facebook.  So if I can mark this as Defendant hunt --
5 I'll get you a clean copy of this, 2.
6          (Hunt Deposition
7           Exhibit No. 2 was marked
8           for identification.)
9    MR. HERBERT:  Mike, here's what I'm showing
10 him.
11    MR. MCGRATH:  Yeah.
12 BY MR. HERBERT:
13    Q.  If you can take a look at those several
14 pages and tell me if those were the posts that you
15 were referring to when you indicated earlier that you
16 were disciplined for Facebook posts.  And you can
17 look at those.  I'll be back in two seconds.
18          (Short interruption.)
19 BY MR. HERBERT:
20    Q.  And once you've had a chance to review
21 those, just let me know.
22       Okay.  You just looked at those in
23 Defendant Hunt No. 2.  Were those the posts that you
24 were referring to when you testified earlier that
Page 171

1 appeared on your Facebook?

2 **A. Yes.**

3 Q. Okay. And if I can show you what I'm

4 going to mark as Exhibit No. 3.

5         (Whereupon, Hunt Deposition

6         Exhibit No. 3 was marked

7         for identification.)

8 BY MR. HERBERT:

9 Q. First, do you recognize this document?

10 **A. Yes.**

11 Q. Okay. And what is it?

12 **A. It's Kankakee Policy 328.**

13 Q. Okay. And it's entitled --

14 MR. MCGRATH: You gave me the wrong one. I

15 have 1,000.

16 MR. HERBERT: Oh, here. Here, Mike, take a

17 look.

18 MR. MCGRATH: All right.

19 BY MR. HERBERT:

20 Q. Okay. It's entitled Discriminatory

21 Harassment, correct?

22 **A. Yes.**

23 Q. And do you know if that policy was in

24 place during your time as deputy chief?

Page 172

---

1 **A. Yes.**

2 Q. Okay. And you would agree with me that

3 it talks about discriminating against -- or

4 prohibiting discrimination against anyone based upon

5 their race, correct?

6 **A. Yes.**

7 Q. And that discrimination is included in

8 the application process to be a police officer,

9 correct?

10 **A. Correct.**

11 Q. And it's also included in the promotional

12 process within the police department, correct?

13 **A. Correct.**

14 Q. All right. I have nothing else on that.

15 And I'll show you what I'm marking

16 as Hunt Exhibit No. 4.

17         (Whereupon, Hunt Deposition

18         Exhibit No. 4 was marked

19         for identification.)

20 BY MR. HERBERT:

21 Q. And this is -- do you recognize this

22 document?

23 **A. Yes.**

24 Q. Okay. And it's entitled what?

Page 173

---

1 **A. Recruitment and Selection.**

2 Q. Okay. And looking through there, you

3 agree with me that it talks about recruitment into

4 the police department, correct?

5 **A. Yes.**

6 Q. And that's the policy with respect to

7 recruiting individuals into the police department,

8 correct?

9 **A. Correct.**

10 Q. And it's also the policy with respect to

11 promotions within the police department, correct, job

12 assignments?

13 **A. I don't see promotion, but. I don't see**

14 **anything about promotions on this. Recruitment,**

15 **training.**

16 Q. Is it your belief that that document

17 applies to just the recruitment of candidates for the

18 police department?

19 **A. No, because it says right here, the**

20 **Department Minority Makeup. "It is the goal of the**

21 **Kankakee Police Department to have ranks of sworn**

22 **officers comprised of ethnic and gender proportions**

23 **reflective of the community workforce. The Kankakee**

24 **Police Department, Board of Fire and Police**

Page 174

---

1 **Commissioners has a recruitment plan to recruit**

2 **minorities and females in this effort to obtain the**

3 **goal."**

4 Q. Okay. And was -- did you have any role

5 in the creation of that policy?

6 **A. No, this is all CALEA, from us being**

7 **CALEA certified.**

8 Q. Okay. And what's your understanding of

9 what is meant by recruitment based upon the makeup of

10 the community?

11 **A. We should look to employ people from the**

12 **community that is reflective of the community and it**

13 **gives the stipulation regardless of race, sexual**

14 **orientation, pregnancy, religion, creed, color,**

15 **national origin, ancestry, physical or mental**

16 **handicap, marriage status, veteran status, sexual**

17 **status, all that.**

18 Q. Okay.

19 **A. But, yeah, as I stated previously that we**

20 **were looking to hire minorities and females to be**

21 **reflective of the community.**

22 Q. Okay. You would agree with me that when

23 you were deputy chief that Kankakee, the population

24 was majority Caucasian, right?

Page 175

---



Willie Hunt  -  3/21/2022
2:20-cv-02310-CSB-EIL   # 44-5   Page 47 of 100
Paul Berge, et al. vs. City of Kankakee, et al.

1    A.  No.

2    Q.  What's your understanding of what the
3 majority race was in Kankakee?

4    A.  Probably minority.  It was probably more
5 minority.

6    Q.  Okay.  And what percentage, do you know?

7    A.  If you did black and brown, Asian, it
8 probably was maybe 60 percent maybe.

9    Q.  Okay.

10    A.  Maybe higher.

11    Q.  All right.  I have nothing further on
12 that.  And finally I'm going to mark as -- Defendant
13 Exhibit No. 5.

14         (Whereupon, Hunt Deposition
15          Exhibit No. 5 was marked
16          for identification.)

17 BY MR. HERBERT:

18    Q.  I'm giving you -- I'm showing you
19 what we've marked as Defendant Exhibit No. 5, and if
20 you can turn to the last page of that there is a --
21 it looks like your signature.  Is that correct?

22    A.  That would be an electronic signature?

23    Q.  I guess.  I guess my question is, do you
24 remember signing this document?

Page 176

1    A.  I remember going over this document, yes.

2    Q.  Okay.  And when you went over it, you
3 agreed that all the answers were true to the best of
4 your knowledge?

5    A.  Yes.

6    Q.  Okay.  And if we can go to the first
7 question.  "Describe your involvement in the
8 promotional process for lieutenant."  And what was
9 your process in the promotional process for
10 lieutenant when Sneed was promoted?

11    A.  When Sneed was promoted?

12    Q.  Yes.  That process?

13    A.  You mean the testing process?

14    Q.  Yes.

15    A.  I want to say Stanard, they came in and
16 said what were you looking for, what books.  They had
17 a selection of books that you had to pick from.  The
18 chief picked out the books, what he wanted the test
19 questions to come out of, and they would ask what
20 policies are important to the direction of the police
21 department and they would pick out the policies, and
22 Stanard would put together the test from there.  And
23 they would send out a list of study material for the
24 officers to be posted, and for like lieutenant and

Page 177

1 sergeant because it was like an assessment, they
2 would have to sign up for the time slots.

3    Q.  Uh-huh.  And I guess what was your role
4 in it as far as not necessarily the individual steps,
5 but what was your role in this process?

6    A.  I probably pinned up the time slots for
7 the officers to sign up for their assessment.

8    Q.  Okay.

9    A.  That was it for the testing process.  As
10 far as the promotion, I had nothing to do with Sneed
11 getting promoted to lieutenant.  That was handled by
12 Frank Kosman.  He wanted me to keep away from it for
13 any reason that people may think I had a hand in it,
14 so I didn't have anything to do with that.

15    Q.  So Kosman told you that he wanted you to
16 stay away from the promotion process because he was
17 afraid that somebody might say that you had a hand in
18 it?

19    A.  Yeah.

20    Q.  And when did he tell you that?

21    A.  That was before, before he went through
22 the process.

23    Q.  And why was he fearful that somebody
24 would think that you had a hand in it?

Page 178

1    A.  Because I've been with the department and
2 I know Sneed, and he just wanted me to -- he kept me
3 out of that process.  He kept me out of the testing
4 process so it wouldn't seem like I had anything to do
5 with anything.

6    Q.  Did Kosman know that you were working for
7 Stanard & Associates at the point in which he
8 expressed fear that people would accuse you of being
9 involved in it?

10    A.  Yes.

11    Q.  And was that one of the reasons why he
12 thought people might accuse you of being involved in
13 it?

14    A.  No.  I think he thought because of me
15 being at the department knowing Sneed, people would
16 think that.

17    Q.  And the fact that you being involved in
18 picking a black guy over two white guys, Kosman was
19 fearful that people would think you were behind that?

20    A.  You would have to ask him about that.

21    Q.  Well, when he said that, did you think
22 that was one of the reasons?

23    MR. MCGRATH:  Objection.  Foundation for when
24 this conversation took place.

Page 179



Willie Hunt  -  3/21/2022
Paul Berge, et al. vs. City of Kankakee, et al.
2:20-cv-02310-CSB-EIL  # 41-5  Page 48 of 100

BY MR. HERBERT:

Q. You can answer.

A. What was the question again?

Q. When he said he's afraid that people are going to accuse you of being behind it, was one of your thoughts that people are going to accuse me because I'm black and we're promoting a black guy over two other individuals?

MR. MCGRATH: Objection. Form of the question, again foundation.

THE WITNESS: No. All three of those guys worked for me. I knew all three of those guys.

BY MR. HERBERT:

Q. Well, then why would he be concerned about you --

A. Let me finish my answer.

Q. I'm sorry. Go ahead.

A. Let me finish my answer. All three of those guys worked for me, and I believe that he wanted to be non-biased in his decision because what he did, I think he pulled personnel -- he did research because he didn't know none of the guys.

Q. At the time in which Kosman made this statement to you, you had already had people

Page 180

complaining about you on that Facebook post, correct?

A. That happened in 2016.

Q. Okay. So, yes, they had already made allegations against you, correct, the people on the Facebook page?

A. I don't know what allegations, but can I finish?

People, when I got the deputy chief position, it was a lot of people, I don't know why, but I had to call different guys in the office because they said I had a hit list out, I was going to do this, I was going to do that. I remember talking to one officer in general, Zach Johnston, and he was going around saying I had a hit list, and I'm like, "Man, I don't go home thinking about you guys," and the decision to pull him out of the traffic unit had nothing to do with him, it was just budgetary.

Q. Was he white?

A. He was white. And I explained it to him. I'm like, "Man, this has nothing to do with you. It's just a budgetary thing, and once the money is allocated to the task force again, you'll go back in, but right now it didn't make sense to have you working outside the department for $600 a month."

Page 181

You know, so I explained it to him and he was good with that, and a lot of -- more guys came in and I explained the rationale behind some of the decisions. It was mainly financial. It had nothing to do with them personally, you know.

Q. Well, at the time in which you became aware of the fact that people thought you had a hit list, Berge had already been brought up on charges, right?

A. No.

Q. No?

A. This is when I first got in, when I first became deputy chief, so I don't think the Berge situation happened until Frank Kosman was chief.

Q. And Shreffler believed he was on that hit list, correct?

A. Shreffler, I put Shreffler -- no. I don't know why he would think that. I put Shreffler in the gang unit. He was part of the gang unit.

Q. Well, tell me about the hit list then. What was your understanding of --

A. Well, this was just station talk or the grapevine or whatever.

Q. Right. That's what I'm asking about.

Page 182

What was your understanding of the hit list that people thought you had?

A. To this day I don't understand because I would bring guys in that would say things like that, bring them in, explain to them like, "Man, this was done for this reason. We have a budget to stay within." Just like with the overtime. Our overtime was way out of whack because we had nine people on injury reserve. I was moving people from specialty units to come back to field patrol, and they were thinking, "Well, you're pulling us out," I'm like, "I'm not pulling you out. I'm trying to save the city money by doing this. You're going back."

You know, so a lot of that was just bringing guys in and explaining to them, like this is why this was done. It had nothing to do with you personally. It was just we needed bodies because we had nine people out on injured reserve, and out of that nine I think maybe two or three went out on disability. So it was just calling people in and saying this is why this is done. It's not malicious. It's not me after you. It's just me trying to make the budget fit.

Q. I've got it. Who else aside from that

Page 183



Willie Hunt  -  3/21/2022
2:20-cv-02310-CSB-EIL   # 41-5   Page 49 of 100
Paul Berge, et al. vs. City of Kankakee, et al.

1 person that you mentioned, who else did you call in
2 to explain why you had to do that?
3      A.  Gary Tyson, even Lombardi.  He filed a
4 grievance, but Lombardi was called in, I explained to
5 him that it was just budgetary.  I'm trying to think
6 who else.  But, yeah, it was...
7      Q.  Anyone else that you can think of?
8      A.  Not right offhand.
9      Q.  So the three people that you mentioned
10 that you called in to explain, these people thought
11 that you had -- that they were part of a hit list or
12 something?
13      A.  No, like for Kreissler and Tyson, I just
14 explained to them what was going on.  Zach, yeah, I
15 had to bring Zach in because he was in a specialty
16 unit and pulled back in, so I had to explain to him
17 that it's not that you were being taken out of the
18 unit because you did anything, it was just no money
19 there to fund your position.
20      Q.  But these guys thought they were part of
21 that hit list.  Is that why you went to them?
22      A.  Well, they would come in.  Lombardi would
23 come in and I would try to explain to him because he
24 was union president, and trying to alleviate some of
Page 184

1 the problems with the union, so I'd talk to him.
2      Q.  Okay.  But the other guys?
3      A.  It was only one that really thought --
4 that the hit list came up.  That was Zach.
5      Q.  Okay.  But the other guys that you
6 mentioned --
7      A.  Gary Tyson --
8      Q.  Just let me finish the question so it's
9 good.  But the other guys that you mentioned that you
10 explained your rationale for taking action against
11 them, those guys were white, correct?
12      A.  Yes.
13      Q.  Okay.  And the -- your understanding of
14 the hit list, you got that from just rumors around
15 the station I think you said?
16      A.  Yeah.
17      Q.  Okay.  And was it your understanding that
18 you had a hit list against specific officers?
19      A.  Like I said, I just recall Zach Johnston
20 for that reason because his position was outside the
21 department and then I brought him back in.
22      Q.  I know, but I'm talking about the hit
23 list.  You said that there was rumors about you
24 having a hit list.  What was your understanding of
Page 185

1 that hit list, and I'm not saying that there was one,
2 but what was your understanding of --
3      A.  That I was doing things to certain
4 officers because of the hit list.  So like I said,
5 for Zach, I'll use Zach as an example, taking him out
6 of stolen auto and putting him into the traffic unit
7 until that position was funded again and I moved him
8 back to that position.
9      Q.  Okay.  And all the people that you became
10 aware of that thought they might be part of that hit
11 list, those were all white males, correct?
12      A.  When you mentioned Shreffler, I didn't
13 know Shreffler thought he was on a hit list.
14      Q.  But they were all white males, correct?
15      A.  One white male.  That was Zach, the one I
16 talked to.
17      Q.  Okay.  And then Tyson?
18      A.  Tyson I just told him.  He would just
19 stop by the office and I tried to explain what was
20 going on, so.
21      Q.  Right.  So all those names that you
22 mentioned --
23      A.  Were white males.
24      Q.  Okay.  Any black males express any
Page 186

1 concerns that they thought they were on your hit
2 list?
3      A.  Not to my knowledge.  Even when I found
4 out that Donell had filed a complaint with the FBI,
5 he wasn't on my hit list.  I didn't know anything
6 about it, but he wasn't on my hit list.  I treated
7 him the same because I didn't want to create a
8 hostile work environment, didn't want to, you know,
9 intimidate a whistleblower or whatever, so.
10      Q.  And when you talk about that complaint
11 that Donell filed with the FBI, he accused you of
12 criminal conduct, right?
13      A.  Yeah.
14      Q.  And he accused you of -- well, tell us.
15 What was the criminal conduct?
16      A.  I mean, I found out about that through
17 your filing, your lawsuit.
18      Q.  Yeah, and he accused you of criminal
19 conduct concerning the awarding of contracts to
20 Auto-Lab, right?
21      A.  Yeah, and I don't know what he gathered
22 out of that conversation.
23      Q.  But that was his complaint, right?
24      A.  Yeah.  Can I finish?
Page 187



Willie Hunt  -  3/21/2022
2:20-cv-02310-CSB-EIL   # 41-5  Page 50 of 100
Paul Berge, et al. vs. City of Kankakee, et al.

**Page 188**

1  Q.  Yeah.

2  A.  Okay.  I don't know what he gathered out

3  of that conversation that we had with Auto-Lab.  They

4  were trying to get a fleet contract and we explained

5  to him in order to get a fleet contract, it would

6  have to go through a bidding process.  What he took

7  from that, you would have to ask him, or what he

8  heard or what he thought was criminal about that, I

9  don't know.

10  We told him that we couldn't flat

11  out give them a fleet contract without it going to

12  open bid for everybody to bid because we had probably

13  about four mechanic shops that we used and we kind of

14  rotated the vehicles through those shops.

15  Q.  Got it.  I want to go back to what you

16  talked about how in the testing process for

17  lieutenant Stanard & Associates requested certain

18  books and policies.  They requested that the chief

19  identify certain books and policies to use for the

20  test, right?

21  A.  Correct.

22  Q.  And were you part of that conversation?

23  A.  I think I was attached to the e-mail.

24  Q.  Okay.

**Page 189**

1  A.  Yeah.

2  Q.  And who was that e-mail from, do you

3  know?

4  A.  Probably Lory.

5  Q.  Okay.  And that would have been before

6  you were hired by Stanard?

7  A.  Yes.

8  Q.  Do you know what month it would have

9  been?

10  A.  Probably 2017, June, July.

11  Q.  Okay.

12  A.  No, no.  It had to be after I was

13  appointed, so maybe the end of July, August.

14  Q.  After you were appointed to where?

15  A.  Deputy chief.

16  Q.  Okay.  And who else was also included on

17  that e-mail?

18  A.  The chief of police.

19  Q.  And that would have been Chief Dumas?

20  A.  Yes.

21  Q.  And anyone else on that e-mail?

22  A.  No.

23  Q.  And you still have that e-mail?

24  A.  Yes.

**Page 190**

1  Q.  Okay.  I'm going to ask that you produce

2  that.

3  A.  That was all part of -- you already asked

4  for that.

5  Q.  Great.  Okay.  And why were you included

6  on that -- or strike that.

7  Did you work with the chief to

8  identify books and policies that Stanard should use

9  in compiling the test?

10  A.  No.  That was the chief's decision.

11  Q.  Okay.  So what role did you have in

12  choosing the books or policies?

13  A.  None.  I just make sure -- I just made

14  sure we had a facility for the test to be

15  administered.

16  Q.  But during the testing process, you would

17  agree with me that you were -- that you were on the

18  e-mails with Stanard to you and the chief and vice

19  versa, right?

20  A.  Yes.

21  Q.  Okay.  So you and the chief are the only

22  people from the department that were in communication

23  with Stanard regarding the testing process, correct?

24  A.  Yes.

**Page 191**

1  Q.  Why were you included on the e-mails if

2  you had a limited role in the testing process?

3  A.  Just in case something happened to the

4  chief or he wasn't there, I can respond or let him

5  know that, "Hey, you got this e-mail.  You need to

6  respond to it," so.

7  Q.  Did you have any conversations with the

8  chief about the testing process?

9  A.  As far as how it was done in the past,

10  that's just about it.  We used Stanard & Associates.

11  He asked who did we use in the past, I'm like, we

12  used Stanard & Associates, the same ones we've been

13  using since 2005 for the most part.

14  Q.  And did you work on the testing processes

15  in the past?

16  A.  No.  Did I work on the testing processes

17  in the -- no.

18  Q.  Did you have anything to do with the

19  testing processes in the past?

20  A.  No.

21  Q.  Were you cc'd or part of any e-mails

22  between Stanard and you for any test prior to the

23  2017 lieutenants test?

24  A.  No.

Willie Hunt  -  3/21/2022
2:20-cv-02310-CSB-EIL  # 41-5  Page 51 of 100
Paul Berge, et al. vs. City of Kankakee, et al.

1    Q.  Do you know why it is that you were cc'd
2  on this promotional test and not any other
3  promotional tests?
4        A.  Because I wasn't in command.  I mean, I
5  was -- only the chief and the deputy chief deal with
6  the testing process.  So I wasn't -- when you asked
7  why wasn't I cc'd or e-mailed in the past, I wasn't
8  in that role.
9        Q.  Other than your knowledge about the books
10  and policies and how the chief selected them, any
11  other involvement with the testing process or the
12  promotional process in any way?
13        A.  That was it.
14        Q.  Okay.  So do you know why Sneed was
15  promoted over Kreissler and Berge?
16        A.  You would have to ask Chief Kosman.
17        Q.  So do you have any reason to know why he
18  was promoted over Kreissler and Berge?
19        A.  You would have to ask Chief Kosman.
20        Q.  And I'm going to, but I'm just asking
21  you.  Is it fair to say you have no idea why he was
22  promoted over them?
23        A.  No.  Maybe --
24        MR. MCGRATH:  Don't speculate.

Page 192

1        THE WITNESS:  Okay.
2  BY MR. HERBERT:
3        Q.  And the person that made the decision?
4        A.  Chief Kosman.
5        Q.  Okay.  Anyone else that you know of?
6        A.  No.
7        Q.  And Chief Kosman was the only person
8  aside from you that was involved in the process in
9  any way from the Kankakee Police Department?
10        A.  What process are we talking about, the
11  testing process?
12        Q.  Yeah.
13        A.  No, I wasn't involved in the testing
14  process with Chief Kosman.
15        Q.  But anyone else from the Kankakee Police
16  Department involved in the testing process in any
17  way?
18        A.  Under Chief Kosman, no.
19        Q.  How about under Chief Dumas?
20        A.  Just me and Price.
21        Q.  And that's what I'm asking you.  Under
22  Chief Dumas what was your involvement in the testing
23  process?
24        A.  We just talked about that.  I probably

Page 193

1  picked the facility and put up the times for the
2  assessments.
3        Q.  Okay.  And would that have been on
4  multiple promotional lists or just for the lieutenant
5  list in which Sneed was promoted?
6        A.  That would be for the sergeants and the
7  lieutenants.
8        Q.  Okay.  So the sergeants list where Hunter
9  was promoted to sergeant, correct?
10        A.  Correct.
11        Q.  And the lieutenants list where Sneed was
12  promoted to lieutenant?
13        A.  Correct.
14        Q.  And those were the two lists where an
15  African American was promoted over the two higher
16  ranking members on the list, correct?
17        A.  Correct.
18        MR. MCGRATH:  Objection.  Form and
19  foundation, also misstates the prior testimony.
20  BY MR. HERBERT:
21        Q.  Do you think that fact had -- was a
22  reason that Kosman was concerned that people would
23  associate you with the promotion of these black
24  officers?

Page 194

1        MR. MCGRATH:  Objection.  It calls for
2  speculation.
3        You can answer if you know.
4        THE WITNESS:  Because I'm black?
5  BY MR. HERBERT:
6        Q.  Yeah.
7        A.  You'll have to ask Chief Kosman.
8        Q.  Well, you would agree with me at the time
9  when those two were promoted, Hunter and Sneed, they
10  were promoted over two higher ranked white
11  candidates, correct?
12        MR. MCGRATH:  Objection.  It misstates the
13  prior testimony.  I think there was somebody else
14  promoted along with Hunter who is white.
15        MR. HERBERT:  It's irregardless if somebody
16  else was, but.
17        THE WITNESS:  As I stated previously, the
18  union supported Steve Hunter being promoted over the
19  other two officers because of his qualifications with
20  the department.
21  BY MR. HERBERT:
22        Q.  And you had been accused of being
23  discriminatory against white officers at the point in
24  which these two police officers had been promoted

Page 195



Willie Hunt  -  3/21/2022
2:20-cv-02310-CSB-EIL   # 41-5   Page 52 of 100
Paul Berge, et al. vs. City of Kankakee, et al.

1 over white officers, fair to say?
2    **A.  Could you repeat that?**
3    Q.  You had been accused of discriminating
4 against white officers at the point in which these
5 two black officers were promoted over two higher
6 ranked individuals?
7    MR. MCGRATH:  Objection.  Foundation, it
8 misstate prior testimony.
9    THE WITNESS:  Who accused me of
10 discrimination?
11 BY MR. HERBERT:
12    Q.  Do you remember the question?
13    **A.  No.**
14    Q.  Okay.  You had been accused in Facebook
15 posts of being discriminatory against white police
16 officers, correct?
17    **A.  No.**
18    Q.  Okay.
19    **A.  That was -- the Facebook posts had**
20 **nothing to do with white police officers.**
21    Q.  The Facebook posts that you posted that
22 you were disciplined for, there was concern and
23 rumors that you were discriminatory against white
24 people after those Facebook posts, correct?

Page 196

1    MR. MCGRATH:  Objection.  Hearsay,
2 foundation, it calls for speculation.
3    THE WITNESS:  I've never been accused or
4 charged with being discriminatory towards any white
5 person.
6 BY MR. HERBERT:
7    Q.  You certainly became aware of the fact
8 that there were rumors that you were a racist against
9 white people after it was determined that you posted
10 all that information on your Facebook post?
11    MR. MCGRATH:  Objection.  Foundation,
12 incomplete hypothetical, calls for speculation.
13    THE WITNESS:  None of the officers can say I
14 treated them different because of their race.
15 BY MR. HERBERT:
16    Q.  That's not my question though.  That's
17 not my question.  My question is, certainly you were
18 aware of the fact that police officers were
19 complaining that you were a racist after it was
20 disclosed what the content of your Facebook posts
21 were?
22    MR. MCGRATH:  The same objections.
23    THE WITNESS:  Like I said, I was never
24 charged with being a racist or treating anybody any

Page 197

1 different before the posts or after the posts.
2 BY MR. HERBERT:
3    Q.  Your Facebook posts, the fact that you
4 posted those, that was known throughout the
5 department, correct?
6    MR. MCGRATH:  Objection.  That calls for
7 speculation.
8 BY MR. HERBERT:
9    Q.  You can answer.
10    **A.  Yes, because the department leaked those**
11 **posts.  Yes.**
12    Q.  Right.  And those posts were subject
13 of -- they were reposted on various Facebook
14 accounts, right?
15    **A.  Exactly.**
16    Q.  And they were reposted in the -- and the
17 posts were accusing you of being a racist, correct?
18    **A.  Correct.**
19    Q.  And those were posts, some of them from
20 this unknown group, correct?
21    **A.  Yes.**
22    Q.  And it was the group that you believed
23 had white police officers involved in that group?
24    MR. MCGRATH:  Objection.  It calls for

Page 198

1 speculation.  It's an unknown group.
2    If you know, you can answer.
3    THE WITNESS:  I don't know.
4 BY MR. HERBERT:
5    Q.  Okay.  But you believe that police
6 officers were part of that group, correct?
7    **A.  I think you're confusing two separate**
8 **things.  The investigation of Shreffler wasn't part**
9 **of that group.  Robin and I called Shreffler in and**
10 **asked him did he create this account.  Shreffler said**
11 **no.  That was the end of that.  As far as**
12 **investigating You Are Probably From Kankakee, I never**
13 **investigated You Are Probably From Kankakee.**
14    Q.  Okay.  Well, then let's focus on where
15 you said that your Facebook posts were reposted.
16 They were reposted on various social media sites?
17    **A.  Yes.**
18    Q.  Okay.  And on those sites people were
19 accusing you of being a racist based upon those
20 posts, right?
21    **A.  Yes.**
22    MR. MCGRATH:  Objection.  Foundation.
23 BY MR. HERBERT:
24    Q.  And they were accusing you to be a racist

Page 199



Willie Hunt  -  3/21/2022
2:20-cv-02310-CSB-EIL  # 41-5  Page 53 of 100
Paul Berge, et al. vs. City of Kankakee, et al.

1 against white people based upon those posts, correct?

2 MR. MCGRATH: Objection. Foundation,

3 relevance of other people, speculation.

4 THE WITNESS: Some.

5 BY MR. HERBERT:

6 Q. Okay. So fair to say that your police

7 department, there were rumors that you were a racist

8 within your police department?

9 MR. MCGRATH: Objection. Foundation.

10 THE WITNESS: Some may have felt that way.

11 MR. MCGRATH: Don't speculate. If you know,

12 you know.

13 BY MR. HERBERT:

14 Q. And in fact, you know that people were

15 complaining about you being a racist within the

16 police department, correct?

17 MR. MCGRATH: Objection. Foundation.

18 THE WITNESS: No.

19 BY MR. HERBERT:

20 Q. You became aware of the fact that people

21 were complaining about you being a racist within the

22 police department, correct?

23 **A. Nobody came to me and complained, no.**

24 Q. I understand that, but you became aware

Page 200

1 that people were complaining that you were a racist,

2 correct?

3 **A. Through the groups.**

4 Q. Okay. Through the groups and through --

5 **A. But I didn't know who was in the group.**

6 Q. Through the groups and through

7 communications with the command staff, correct? You

8 talked about it with Chief Dumas, correct?

9 **A. No. At the time it was Chief Regnier who**

10 **disciplined me.**

11 Q. Okay. But I'm saying the posts that

12 followed afterwards that was reposting that

13 information.

14 **A. That happened under Chief Regnier.**

15 Q. Okay. And you talked to Chief Regnier

16 about it, correct?

17 **A. Yeah, I went in and talked to Chief**

18 **Regnier about it.**

19 Q. Okay. Do you know if candidates on a

20 promotional list are allowed to have letters of

21 recommendation written on their behalf?

22 **A. I don't know.**

23 Q. Okay. But you know that now Lieutenant

24 Sneed had letters of recommendation submitted on his

Page 201

1 behalf, correct?

2 **A. I know that now, yes.**

3 Q. Okay. And how do you know that now?

4 **A. Because I think it was in one of the**

5 **things I read with Tim Kreissler mentioning it about.**

6 Q. Okay. And you would agree if one

7 candidate was allowed to have character letters

8 considered on their behalf, that opportunity should

9 have been given to all of the candidates, correct?

10 **A. Since it's not a requirement, I mean, I**

11 **don't see where that would play a role since it's not**

12 **a requirement or part of the testing process.**

13 Q. But if individuals in the testing process

14 were allowed to have other considerations that

15 weren't afforded to the same candidates, that

16 certainly wouldn't be a fair testing process, right?

17 **A. Well, I don't think that would be fair or**

18 **I don't think that would be even considered if it**

19 **wasn't allowed to the other -- in this case, I guess**

20 **we're talking about two candidates.**

21 Q. Right.

22 **A. So I don't think the chief would use that**

23 **or I can't say what he would use, but I wouldn't use**

24 **that if it wasn't afforded to the other two as making**

Page 202

1 **my final decision.**

2 Q. And you don't know what the chief

3 considered in this case?

4 **A. I don't know what the chief considered.**

5 **You'll have to ask Chief Kosman.**

6 Q. What about if you were in the testing

7 process and you were -- and a white -- well, during

8 your lawsuit, you alleged that white police officers

9 were given an advantage in the testing process that

10 wasn't afforded to you, correct?

11 **A. Correct.**

12 Q. Okay. And you would agree with me that

13 somebody being allowed to submit letters on their

14 behalf and other individuals not being given that

15 same consideration, that would be the same type of

16 thing that you were complaining about in your

17 lawsuit, correct?

18 MR. MCGRATH: Objection. The form of the

19 question, incomplete hypothetical, foundation.

20 THE WITNESS: I can answer that?

21 MR. MCGRATH: Yeah.

22 THE WITNESS: If that was solely being used

23 as a determining factor, yes, that would be unfair.

24

Page 203



Willie Hunt  -  3/21/2022
2:20-cv-02310-CSB-EIL  # 47-5  Page 54 of 100
Paul Berge, et al. vs. City of Kankakee, et al.

BY MR. HERBERT:

Q.  What if it was one of the factors that was used?

A.  I don't know that.

Q.  Right, but I'm asking you.  You said if it was solely being used.

What if Lieutenant Sneed was allowed to submit a character letter or character letters on his behalf and the other two candidates that were higher ranked than him, what if they didn't have that ability.  Is it your testimony that that would not be a discriminatory practice in the promotional process?

A.  I don't know if Chief Kosman placed weight on that.  You would have to ask Chief Kosman.

Q.  Let's not even look at the weight, just those factors alone.  If one individual was allowed to have further -- was allowed to have considerations made concerning his promotion that other individuals were not allowed to have, you would agree with me that the testing process would be flawed fundamentally, right?

MR. MCGRATH:  Objection.  An incomplete hypothetical, calls for speculation.

THE WITNESS:  I can recall officers coming to

the assessment with their resumés, and the resumés was just put aside, so it had no weight, so I can only speculate.

MR. MCGRATH:  I don't want you to speculate.

THE WITNESS:  And I'm not going to speculate, but that's not part of the testing process.  Having letters, character letters, that's not part of the testing process.

MR. MCGRATH:  Can I just take a quick little...

MR. HERBERT:  Yeah.  And I'm wrapping up.  Absolutely.

(Whereupon, a short break was had.)

MR. HERBERT:  Back on the record.  I don't think I have any further questions.

MR. MCGRATH:  Okay.  I just have some follow-ups.  Sorry.

EXAMINATION

BY MR. MCGRATH:

Q.  Mr. Hunt, it was brought up -- these letters of recommendation that Sneed submitted, have you ever seen any such letters of recommendation?

A.  No.

Q.  Has anyone ever told you who the letters of recommendation came from or what they stated?

A.  No.

Q.  Has anyone from the department told you that these letters of recommendation were submitted, or are you basing your belief that letters of recommendation were submitted upon your review of the complaint that's been filed in this case?

A.  Based on a complaint that Tim made, I just assumed they were submitted.

Q.  Okay.  So no one from the Fire and Police Commission, Chief Kosman, no one within the department ever told you that Sneed was allowed to submit letters of recommendation from whoever and they stated whatever.  You're just going based upon what's in the complaint?

A.  No one ever told me that.  I was just going by what was in the complaint.

Q.  All right.  This former Officer Shreffler was brought up.  You were deposed in that case, correct?  He had filed a lawsuit against the city?

A.  I believe so.

Q.  All right.  And he was represented by Mr. Herbert who's been taking your deposition today?

A.  Yes.

Q.  Because he started out your deposition, he asked you that, you know, I deposed you previously in that case, correct?

A.  Correct.

Q.  Were you deposed here at this office or another location?

A.  This is my first time coming here.  I believe it was at the city.

MR. HERBERT:  It was on Zoom, wasn't it?

THE WITNESS:  It might have been Zoom, yeah.  Yeah, because I think me and Mr. Herbert met in Kankakee first, but it might have been on Zoom.

BY MR. MCGRATH:

Q.  And Shreffler is no longer with the department?

A.  That is correct.

Q.  He was terminated from the department?

A.  That is correct.

Q.  And he filed a federal lawsuit against the City of Kankakee, correct?

A.  That is correct.

Q.  Are you aware that that lawsuit has been dismissed by the federal judge?



Willie Hunt  -  3/21/2022
2:20-cv-02310-CSB-EIL   # 41-5   Page 55 of 100
Paul Berge, et al. vs. City of Kankakee, et al.

**Page 208**

1  A.  Yes.

2  Q.  And what were the allegations of his

3 lawsuit?  What wrongdoings was he claiming?

4  A.  I think maybe discrimination.

5  Q.  Did it involve the First Amendment right

6 of speech?

7  A.  I can't recall without looking at the

8 complaint.

9  Q.  Do you know if he made any complaints

10 about not having a hearing before the Fire and Police

11 Commission or due process rights?

12  A.  I don't believe so.

13  Q.  Okay.  When you were hired as a police

14 officer with the City of Kankakee up until the point

15 that Frank Kosman became the chief, the department

16 always used Stanard as the testing company, correct?

17  A.  That is correct.

18  Q.  Do you know who pays Stanard, the testing

19 company, to do the testing for both the hiring and

20 the promotions with the Fire and Police Commission?

21  A.  It's a line item.

22  Q.  Let me ask you, do you know if the Fire

23 and Police Commission has a budget within the City of

24 Kankakee?

**Page 209**

1  A.  They do.

2  Q.  And do you know if the Fire and Police

3 Commission pay for Stanard's services to help them or

4 assist them in the hiring and promotion testing

5 process?

6  MR. HERBERT:  I'm going to object to

7 speculation, foundation.

8  THE WITNESS:  It's a line item for the Police

9 and Fire Commission.

10 BY MR. MCGRATH:

11  Q.  All right.  So is it your belief that the

12 Fire and Police Commission has a line item and

13 they're responsible for making the payments to

14 Stanard & Associates for the process of hiring and

15 promoting officers?

16  MR. HERBERT:  Objection.  Foundation.

17  THE WITNESS:  That is correct.

18 BY MR. MCGRATH:

19  Q.  You advised former Chief Dumas that you

20 were doing some work for Stanard, correct?

21  A.  Yes.

22  Q.  And that certainly wasn't a full-time

23 position with Stanard, correct?

24  A.  Correct.

**Page 210**

1  Q.  It was a very limited part-time position?

2  A.  Very.

3  Q.  I believe you stated that you've been an

4 assessment evaluator approximately six times?

5  A.  Yes.

6  Q.  All right.  And you advised Chief Kosman

7 that you were an assessment evaluator for Stanard

8 when he became the chief?

9  A.  Yes.

10  Q.  Were you made aware that new Chief Frank

11 Kosman wanted to change from Stanard to Police

12 Consultants?

13  A.  Yes.

14  Q.  And did you try to talk Chief Kosman out

15 of that based upon your doing a handful of

16 assessments with other departments?

17  A.  No.

18  Q.  An assessment evaluator was a position

19 that you were asked to take on by Stanard &

20 Associates.  I believe you stated you got paid $300 a

21 day, correct?

22  A.  Yes.

23  Q.  All right.  And depending on the size of

24 the department, you would perform your function as an

**Page 211**

1 assessment evaluator for one day, two days, three

2 days depending on the size of the department,

3 correct?

4  A.  That is correct.

5  Q.  And how many hours per day would you work

6 as an assessment evaluator?

7  A.  From 8:00 to 4:00.

8  Q.  And were you ever an assessment evaluator

9 for the City of Kankakee?

10  A.  No.

11  Q.  And assessment evaluators, Stanard of

12 course reached out to individuals that had experience

13 within police departments, correct?

14  MR. HERBERT:  Objection.  Foundation,

15 speculation.

16  THE WITNESS:  Experience in police

17 departments and at certain times minority officers in

18 leadership roles, females in leadership roles also.

19 BY MR. MCGRATH:

20  Q.  In your experience did you ever see them

21 use a police officer or a patrol officer as an

22 assessment evaluator?

23  A.  No.

24  Q.  In your experience would they reach out

Willie Hunt  -  3/21/2022
2:20-cv-02310-CSB-EIL  # 47-5  Page 56 of 100
Paul Berge, et al. vs. City of Kankakee, et al.

1 to individuals that had more experience within their
2 individual police departments or law enforcement to
3 be an assessment evaluator?
4     MR. HERBERT:  Objection.  Speculation,
5 foundation.
6     THE WITNESS:  You have to be ranked.
7 BY MR. MCGRATH:
8     Q.  You have to hold a rank within the
9 department?
10     A.  A rank of lieutenant and above.
11     Q.  And again you testified that depending on
12 the department and the assignment, there would be
13 anywhere from three to ten assessment evaluators on a
14 given assignment?
15     A.  The most I saw was about eight, yeah.
16     Q.  All right.  You couldn't remember the
17 first assignment with Stanard, what department, but
18 what departments have you acted in the role as an
19 assessment evaluator?
20     A.  If I can look at my phone, I've got the
21 e-mails.
22     Q.  Sure.  Yeah.
23     MR. HERBERT:  If you can identify like the
24 dates of those e-mails too that you're getting your

Page 212

1 knowledge from.
2     THE WITNESS:  Okay.  Champaign.
3 BY MR. MCGRATH:
4     Q.  What was the date of that?
5     A.  That will be 12/29/17.  Hillcrest PD --
6 I'm sorry, Crest Hill.  I said Hillcrest.  Crest Hill
7 PD, 12/3 of '18.  Cook County Forest Preserve, 12/6
8 of '18.  Evanston Police Department, 1/2 of '19.
9 Bloomington PD, 8/26 of '19.  Urbana, 9/2 of '20.
10 Evanston Police.
11     MR. HERBERT:  You already said that one,
12 unless you did a second time.
13     THE WITNESS:  I did it again.
14     MR. HERBERT:  I'm sorry.
15     THE WITNESS:  3/1/21.  Cook County Preserve,
16 Forest Preserve, Cook County Forest Preserve, I'm
17 sorry, 3/4/21.  Morris, 5/20 of '21.  That's it.
18 BY MR. MCGRATH:
19     Q.  I wasn't keeping track of the count, but
20 there was more than six, but it appeared to me that a
21 number of them were after you retired from the
22 Kankakee Police Department, correct?
23     A.  I retired March 5th of 2021, so
24 everything after that I was retired.

Page 213

1     Q.  As far as training, you indicated that
2 when you would go to whatever location you were going
3 to be an assessment evaluator, the training would be
4 two to three hours prior to the assessment starting,
5 correct?
6     A.  Yes.
7     Q.  And that is the time that you and the
8 other assessors would meet with Lory?
9     A.  Yeah, we all meet together, and usually
10 it would be a team of us that worked together prior,
11 so the training would be -- it may be shorter because
12 we worked together.
13     Q.  Do you know if the idea is for you to get
14 together to kind of go over that particular
15 department's policies and their scenarios, for you to
16 talk and go over those scenarios with the policies in
17 an effort to be consistent with your scoring?
18     A.  If we had a question in reference to the
19 policy or needed more information, Lory would bring
20 that information to us.
21     Q.  Would you go over the particular
22 scenarios for that assessment with the team of
23 assessors prior to the assessments starting?
24     A.  Yes.

Page 214

1     Q.  And you would go through -- if you had
2 five scenarios, you would go through all five
3 scenarios, and then all the assessors would tabulate
4 or how they would grade, and was that done in an
5 effort for all the assessors to come up with a more
6 similar scoring or objective scoring for the
7 scenarios?
8     A.  We would all pick a role because each
9 scenario had a part.  We were all assigned roles in
10 the beginning before we met with any candidate, and
11 according to the training, we would have to be one or
12 two points away, so I couldn't give a person a five
13 and you give them a one.  It would be like we'll
14 discuss why did you give him a one.  What did you
15 see, what did you hear, what did you not hear.  We
16 take notes when we're doing it.
17         So we will say, "Hey, did you hear
18 them say this?"  Mr. Herbert may have heard them
19 saying something, he'll write something down, they're
20 like, hey, I heard that too, and you didn't hear
21 that.  So we'll compare notes, and you'll be like,
22 oh, okay, I missed that part.  From a one I give him
23 a two maybe or whatever.  But we still have to be
24 within one or two points away from each other.

Page 215

Willie Hunt  -  3/21/2022
2:20-cv-02310-CSB-EIL  # 41-5  Page 57 of 100
Paul Berge, et al. vs. City of Kankakee, et al.

1  Q.  And you'd do that for two or
2  three hours before you actually began the assessments
3  with the candidates?
4  **A.  Well, we knew about how to do the point**
5  **system before.  That was part of the training.**
6  Q.  Okay.  Prior to going to a location to be
7  an evaluator, are you given any of the scenarios or
8  policies, or are you given it the day that you
9  report?
10  **A.  Everything is there when you report.**
11  **We're not given anything ahead of time.**
12  Q.  As far as the City of Kankakee and
13  Stanard, you had some e-mails with Lory.  Do those
14  pertain to -- the majority of them, do they pertain
15  to you being an evaluator for Stanard?
16  **A.  The early ones from Lory were to the**
17  **chief and I was cc'd on it about selecting the books**
18  **and all that stuff, but the ones after that, they**
19  **were all pertaining to the assessment.**
20  Q.  And the earlier ones, as far as selecting
21  the book, is that like the study guides for the test?
22  **A.  Yes, sir.**
23  Q.  At any time while you were employed with
24  the City of Kankakee, were you ever given a copy of

Page 216

1  the actual written test --
2  **A.  No.**
3  Q.  -- or the exam that was going to be given
4  to any of the candidates?
5  **A.  No.**
6  Q.  At any time when you were employed with
7  the City of Kankakee, were you ever given any of the
8  scenarios that would be asked of those candidates
9  seeking promotion that they would have to discuss and
10  go through in front of the assessment team that was
11  assigned to the City of Kankakee?
12  **A.  No.**
13  Q.  And you were never assigned to the City
14  of Kankakee assessment team?
15  **A.  No.**
16  Q.  You said during your tenure with the
17  department there were five separate chiefs, four had
18  skipped over or out of order on various promotion
19  lists, correct?
20  **A.  Correct.**
21  Q.  And you took us through Chief William
22  Doster?
23  **A.  Doster.**
24  Q.  Doster?

Page 217

1  **A.  Yes.**
2  Q.  Chief Regnier?
3  **A.  Regnier.**
4  Q.  Regnier?
5  **A.  Yes.**
6  Q.  And you didn't get to the other chiefs.
7  If you could.
8  **A.  Chief Price.**
9  Q.  And he skipped over who?
10  **A.  He skipped over Jose Martinez and**
11  **Scott -- I can't remember Scott's last name.**
12  Q.  Is he Asian?
13  **A.  He was an Asian officer, and promoted**
14  **Gary Tyson.**
15  Q.  So Chief Dumas skipped over Martinez
16  who's a minority?
17  **A.  Yes.  He's Hispanic.**
18  Q.  And he skipped over Scott who's Asian, is
19  a minority?
20  **A.  Yes.**
21  Q.  To get to another minority?
22  **A.  No, to get to Gary Tyson, a white**
23  **officer.**
24  Q.  Gary Tyson is white?

Page 218

1  **A.  Yes.**
2  Q.  And then the fourth chief.  You said
3  there were chiefs that --
4  **A.  I believe Dumas skipped Berge and --**
5  **Berge and maybe Martinez -- I'm trying to think.  It**
6  **was Berge -- no, it was Martinez and Lathan.  Lathan**
7  **and Martinez Price skipped to get Hunter.**
8  MR. HERBERT:  I'm just going to object to
9  foundation on all this.
10  BY MR. MCGRATH:
11  Q.  Was that for the promotion to sergeant?
12  **A.  To sergeant, yes.**
13  MR. HERBERT:  Objection.  Foundation,
14  speculation.
15  BY MR. MCGRATH:
16  Q.  What was your rank or position when Chief
17  Dumas skipped over Martinez and Lathan?
18  **A.  Deputy chief.**
19  Q.  All right.  And Lathan, is he black or
20  white?
21  **A.  He's white.**
22  Q.  And those two individuals were skipped
23  over on the sergeants promotional list to get to what
24  individual?

Page 219



Willie Hunt - 3/21/2022
2:20-cv-02310-CSB-EIL # 41-5 Page 58 of 100
Paul Berge, et al. vs. City of Kankakee, et al.

| | |
|---|---|
| 1  A.  Steve Hunter. | 1  A.  What I'm wearing now. |
| 2  Q.  And his race? | 2  Q.  Okay.  For the record, you're wearing a |
| 3  A.  Black. | 3  nice suit and tie, and you believe that's how you |
| 4  Q.  And was there another chief? | 4  were dressed on that date? |
| 5  A.  Frank Kosman. | 5  A.  Yes. |
| 6  Q.  And Chief Kosman, how many times did he | 6  Q.  And you don't know if that conversation |
| 7  skip over any candidates on a posted promotional | 7  took place either at the high school or the community |
| 8  list? | 8  college or the police department? |
| 9  A.  Once.  He skipped Tim Kreissler and Paul | 9  A.  That is correct. |
| 10  Berge to promote Sneed. | 10  Q.  I believe you testified, and correct me |
| 11  Q.  All right.  And again based upon your | 11  if I'm wrong, that you believe that Chief Dumas was |
| 12  testimony today, you had no involvement with that | 12  with you also? |
| 13  selection? | 13  A.  I believe so. |
| 14  A.  No. | 14  Q.  And you don't remember anyone else being |
| 15  Q.  All right.  Did you have any | 15  there? |
| 16  conversations with Chief Kosman prior to him making | 16  A.  No. |
| 17  that selection? | 17  Q.  And you remember Lory collecting up her |
| 18  A.  Him just stating that he wanted to keep | 18  items, a laptop or a purse, purse, belongings and |
| 19  me out of it. | 19  what you believe to be some of the testing material? |
| 20  Q.  Okay.  Prior to him making the | 20  A.  Yes. |
| 21  announcements or sending the letter to the Fire and | 21  MR. HERBERT:  Objection.  Misstates the |
| 22  Police Commission stating he was going to select | 22  evidence. |
| 23  Sneed over Kreissler and Berge, did he advise you of | 23  BY MR. MCGRATH: |
| 24  that? | 24  Q.  Did I misstate what you testified to |
| Page 220 | Page 222 |

| | |
|---|---|
| 1  A.  No.  He did all of the homework.  I | 1  earlier? |
| 2  recall him pulling files and doing that and -- | 2  A.  That's correct. |
| 3  because he didn't know anybody from the department, | 3  Q.  At any time during that conversation did |
| 4  so he was going through the personnel files and doing | 4  you ask to look at any of the examination materials? |
| 5  that, and I believe I found out the day of the Police | 5  A.  No. |
| 6  and Fire Commission. | 6  Q.  Did you at any time during the |
| 7  Q.  The meeting when the promotional | 7  conversation attempt to change or alter or review any |
| 8  selection was going to be announced or publicly | 8  of the examination questions or the answers submitted |
| 9  made -- | 9  by the different candidates? |
| 10  A.  Yes. | 10  A.  No. |
| 11  Q.  -- before the Fire and Police Commission? | 11  Q.  At any time during that conversation did |
| 12  A.  Yes. | 12  you ever talk to Lory about any individual |
| 13  Q.  You were asked a lot of questions about | 13  candidates? |
| 14  this Lory of Stanard & Associates, and you said you | 14  A.  No. |
| 15  couldn't recall where you were when you had the | 15  Q.  You didn't drop any names to Lory, like, |
| 16  conversation with her, correct? | 16  "Hey, who I hope does really well on this test is |
| 17  A.  Correct. | 17  Sneed," or "I hope Berge bombs on this test," nothing |
| 18  MR. HERBERT:  Objection.  It misstates the | 18  like that? |
| 19  evidence. | 19  A.  No. |
| 20  Go ahead. | 20  Q.  Do you know who the assessment evaluators |
| 21  BY MR. MCGRATH: | 21  were for the 2017 or 2018 lieutenants promotional |
| 22  Q.  You said you were working, but you | 22  examination process were? |
| 23  weren't in uniform.  As deputy chief what would you | 23  A.  There were two female state troopers |
| 24  wear? | 24  present for the sergeant assessment.  For the |
| Page 221 | Page 223 |

Willie Hunt  -  3/21/2022
2:20-cv-02310-CSB-EIL  # 41-5  Page 59 of 100
Paul Berge, et al. vs. City of Kankakee, et al.

1 lieutenant assessment, I do not recall.

2     Q.   When the written examinations are passed

3 out, are the candidates who are seeking promotion to

4 lieutenant and the candidate seeking promotion to

5 sergeant all in the same room?

6     MR. HERBERT:  I'm going to object foundation

7 based upon what he's testified to.

8         You can answer.

9     THE WITNESS:  I believe so, yes.

10 BY MR. MCGRATH:

11    Q.   All right.  Were you there present within

12 the room when the exams were handed out to the

13 candidates who were seeking promotion to sergeant and

14 lieutenant in 2017, 2018?

15    A.   I don't believe so.

16    Q.   Okay.  The assessment evaluations, is

17 that done along with the Fire and Police Commission,

18 or is it done separately by just the assessment

19 evaluators?

20    MR. HERBERT:  I'm going to object.  The

21 general nature of the question, foundation for this

22 test if that's --

23 BY MR. MCGRATH:

24    Q.   For the 2017, 2018 promotional test?

Page 224

1     A.   It was just done by the assessors.  You

2 said 2017?

3     Q.   2017, 2018, the test that's at issue.

4     A.   The test at issue is the one with Price.

5 That would be the assessors.  When Frank did his, I

6 believe the Police and Fire Commission wanted some

7 involvement.

8     Q.   Okay.  They wanted more involvement?

9     A.   Yes.

10    Q.   But prior to Chief Kosman, Stanard &

11 Associates would send out their assessment evaluators

12 to do their assessments?

13    A.   That is correct.

14    Q.   All right.  And while those assessments

15 are being done, is any command staff allowed to be in

16 the room when those assessments are being done?

17    MR. HERBERT:  Objection.  Vague, foundation.

18    THE WITNESS:  I believe so just in case the

19 assessors had a question in regards to policy and

20 procedure.  They would just be set aside as a

21 resource.  They wouldn't have any -- they couldn't

22 question or say anything.

23 BY MR. MCGRATH:

24    Q.   For the list and the exams that we're

Page 225

1 here discussing, the 2017 or 2018 exam for lieutenant

2 and for sergeant, were you present for any of the

3 assessment evaluations?

4     A.   No.

5     Q.   All right.  Do you know who from the

6 department if any was present for the assessment

7 evaluations?

8     A.   I think it would be --

9     Q.   If you know.

10    A.   I don't want to speculate.

11    Q.   Okay.  Is there any record kept of that,

12 do you know?  Is there an attendance sheet?

13    A.   Stanard & Associates would have a record

14 of that.

15    Q.   All right.  Do you believe advising your

16 supervisors, that being Chief Dumas and then Chief

17 Kosman, that you would periodically be requested to

18 be an assessment evaluator, you telling them that in

19 person or verbally, however you did it, that that

20 satisfied the secondary employment requirement within

21 the department?

22    MR. HERBERT:  Objection.  Vague, relevance,

23 foundation.

24    THE WITNESS:  Yes, because they would be the

Page 226

1 one approving the secondary employment.

2 BY MR. MCGRATH:

3     Q.   Is that why you advised them that you

4 were doing some work for Stanard?

5     A.   Yes.

6     Q.   You were part of a group that filed a

7 federal lawsuit, I think it was back in 2005, 2006,

8 that time period, correct?

9     A.   Yes.

10    Q.   You were asked some questions about that.

11 You testified that your chief complaint was that the

12 testing process was outdated, however, the complaint

13 also had some discriminatory allegations, correct?

14    A.   Correct.

15    Q.   What was the outcome of that federal

16 lawsuit?

17    A.   The city had already changed the policy,

18 the testing policy prior to going to court, so we

19 couldn't mention that, and I was No. 1 on the list to

20 get promoted and I couldn't even mention that, so

21 they used the recommendations from the Blue Ribbon

22 Committee and since then nine minorities were

23 promoted.

24    Q.   Okay.  And did that federal lawsuit, did

Page 227



Willie Hunt  -  3/21/2022
2:20-cv-02310-CSB-EIL  # 41-5  Page 60 of 100
Paul Berge, et al. vs. City of Kankakee, et al.

1 it go to trial?

2    **A.  It went to trial.**

3    Q.  Was that a bench trial or a jury trial,

4 if you remember?

5    **A.  I just remember Judge McCuskey.  That's**

6 **all I remember.**

7    Q.  Did you testify at that trial?

8    **A.  I testified at that trial.**

9    Q.  And do you know what the outcome, the

10 results of that trial was?

11    **A.  The attorney got paid, we got our money**

12 **back, and like I said, the city had already changed**

13 **the testing policies prior to us going to court.**

14    Q.  When you say you got your money back,

15 what money did you get back?

16    **A.  What we paid in attorney fees.**

17    Q.  All right.  Were you awarded any damages?

18    **A.  No.**

19    Q.  All right.  Do you recall if your group

20 hired a private attorney to file that lawsuit?

21    **A.  Yes.**

22    Q.  And so the city had to pay that attorney

23 for his legal services?

24    **A.  Yes.**

1    Q.  Did you receive any additional

2 compensation, any money from the city?

3    **A.  Not from the city, no.**

4    Q.  Did any of the other plaintiffs receive

5 any additional money from the city?

6    **A.  No.**

7    Q.  Has anyone filed an EEOC charge or a

8 charge with the Department of Human Rights against

9 you within the Kankakee Police Department?

10    **A.  Not that I'm aware of.**

11    Q.  Have you ever been served with any formal

12 complaint of discrimination by any member of the

13 Kankakee Police Department?

14    **A.  No.**

15    Q.  Just briefly on the Facebook posts which

16 it appears that some you didn't know who they were

17 posted by or who was behind these phantom groups, but

18 you were disciplined for sharing or posting items on

19 Facebook by former Chief -- I always mispronounce his

20 name but it's --

21    **A.  Regnier.**

22    Q.  Regnier?

23    **A.  Uh-huh.**

24    MR. HERBERT:  I'm going to object to the form

1 of the question because you're down there.

2 BY MR. MCGRATH:

3    Q.  And what discipline did you receive from

4 former Chief Regnier based upon those Facebook posts?

5    **A.  A written reprimand.**

6    Q.  Were you reduced in rank or lose any

7 compensation?

8    **A.  No.**

9    Q.  You brought up the rule of three, and I

10 believe you testified that that's a law in the State

11 of Illinois?

12    **A.  Yes.**

13    Q.  Does that law allow the chief to select

14 any of the top three candidates that are posted on a

15 promotional list?

16    **A.  That is correct.**

17    MR. HERBERT:  Objection.

18 BY MR. MCGRATH:

19    Q.  All right.  If there was no rule of

20 three, the chief wouldn't have to select anybody

21 because he would just go down the list.  Do you agree

22 with that?

23    MR. HERBERT:  Objection.  Foundation.

24      Go ahead.

1    THE COURT REPORTER:  What was the answer?

2    THE WITNESS:  That is correct.

3 BY MR. MCGRATH:

4    Q.  You were shown some policies from the

5 Kankakee Police Department, correct?

6    **A.  Correct.**

7    Q.  Specifically Exhibit 4 is policy 1,000

8 which pertains to recruitment and selection, correct?

9    **A.  Yes.**

10    Q.  And you read through what the policy

11 attempts to make up for the lack of minorities within

12 the police department, correct?

13    **A.  That is correct.**

14    MR. HERBERT:  Objection.

15 BY MR. MCGRATH:

16    Q.  The department minority makeup, it's an

17 attempt to change the current makeup to have more

18 minority representation within the police department.

19 Is that a fair reading of this policy?

20    MR. HERBERT:  Objection.  Foundation,

21 speculation.

22    THE WITNESS:  That is a correct reading of

23 the policy.

24

Willie Hunt - 3/21/2022
2:20-cv-02310-CSB-EIL # 41-5 Page 61 of 100
Paul Berge, et al. vs. City of Kankakee, et al.

BY MR. MCGRATH:

Q. And this policy at the bottom left indicates it's a copyright from Lexipol with a date of -- this is from August of 2020, correct?

A. That is correct.

Q. And Lexipol, are you familiar with that company?

A. Yes.

Q. Is that a company that generates policies for police departments throughout the United States?

A. That is correct.

MR. HERBERT: Objection. Foundation.

THE WITNESS: That is correct.

BY MR. MCGRATH:

Q. And Lexipol prepares policies based upon the current law within the United States, correct?

MR. HERBERT: Objection. Foundation.

THE WITNESS: That is correct.

BY MR. MCGRATH:

Q. And it tailors the policies for particular states if particular states have laws that are slightly different from federal law, correct?

MR. HERBERT: Objection. Foundation.

THE WITNESS: That is correct.

Page 232

BY MR. MCGRATH:

Q. Prior to Chasity Wells-Armstrong being elected and sworn in as the mayor, how many females were on the Kankakee Police Department? Let's talk about the year going into when she was sworn in.

A. We have Marci Gearhart, Morgen Golden, Dee Regas, Melvina Calvin, Jen Schoon, and Lacie. And Lacie, I can't remember her married number.

Q. Okay. So you identified six female officers?

A. Yes.

Q. Those were all full-time officers?

A. Yes.

Q. And at the same time how many total officers were within the Kankakee Police Department?

A. I think we had 67.

Q. So six females out of 67 sworn police officers approximately?

A. Yes.

Q. How many Asian officers did the department have at the same time period?

A. Two.

Q. How many Hispanics officers did the department have at that time?

Page 233

A. I believe six.

Q. And how many black officers did the department have at that time?

A. 12.

Q. And currently, at least at the time of your retirement, how many women full-time officers?

A. You have Morgen, Melvina, Jen Schoon, Lacie, Costello, Mendez. You said since I retired, right?

Q. Well, at the time of your retirement unless you know now if it's more?

A. Mendez and they probably have three other females.

MR. HERBERT: I'm going to object again to the answer.

BY MR. MCGRATH:

Q. Do you know currently, as you sit here today, whether or not there's approximately ten female officers with the Kankakee Police Department?

A. Close to ten, yes.

Q. All right. Do you know how many Asians are employed with the Kankakee Police Department?

A. One.

Q. Do you know how many Hispanics are

Page 234

employed with the Kankakee Police Department?

A. You've got Martinez, Martinez, Mendez, Maramontis (phonetic). Four.

Q. Four. And how many black officers currently with the Kankakee Police Department?

A. You have Brooks, CJ, Burse, Austin, Melvina, Williams, Bradley, seven.

Q. When Chasity Wells-Armstrong was elected mayor but prior to her taking office, can you give me a break down of what the command staff was?

A. The top four were white males.

Q. The top four being the chief?

A. The chief, deputy chief, commander, commander. You have two commanders.

Q. They were all white?

A. Uh-huh.

Q. Under the commander is lieutenants?

A. Lieutenants.

Q. Do you recall the break down of the lieutenants just prior to Chasity Wells-Armstrong becoming the mayor?

A. You had two black lieutenants -- yeah, two black lieutenants and four, four white lieutenants.

Page 235



Willie Hunt - 3/21/2022
2:20-cv-02310-CSB-EIL # 4-5 Page 62 of 100
Paul Berge, et al. vs. City of Kankakee, et al.

Q.  The same time period as far as sergeant?

A.  Sergeants you had two black sergeants and the rest was white male.  I think it was -- at the time I believe it was twelve.  So ten white males.

Q.  As far as the organizational chart of the police department, the chief is appointed by the mayor with the advice and consent of the city council?

A.  Yes.

Q.  And the deputy chief, is that position appointed by the chief?

A.  Appointed by the chief and the mayor.

Q.  Is that by city code or by State statute?

A.  City code and with the approval of the council.  You still go before the council.

Q.  But the choice is the chief's?

MR. HERBERT:  Objection.

BY MR. MCGRATH:

Q.  Is the choice for deputy chief the chief but then the mayor?

A.  It's the mayor.  The chief appoints the two commanders.

Q.  The chief appoints or fills both commander positions?

Page 236

A.  Yes.

Q.  Does that need to have the approval of the mayor or the advice and consent of the city council?

A.  Not the council, maybe the mayor and the chief talk about it.

Q.  Okay.  But under the city code or State statute does the choice selection of whoever the chief wants to put in the two commander positions need the mayor's approval?

MR. HERBERT:  Objection.  Foundation for this witness.

THE WITNESS:  I wouldn't know.  I never put anybody.  I was not in that position, so I can't answer that.

BY MR. MCGRATH:

Q.  And once Wells-Armstrong became the mayor, can you tell me the breakdown of the command staff the day after she became mayor?  Who was the chief?

A.  There was no chief.  The chief resigned.

Q.  And which chief resigned?

A.  Regnier.

Q.  Did he resign --

Page 237

A.  A little before she took office.

Q.  Was there an acting chief before she took office?

A.  It would be the deputy chief.

Q.  And who would that have been at the time?

A.  Robin Passwater.

Q.  And he is white, correct?

A.  Yes.

Q.  So when Chasity Wells-Armstrong took over as the mayor, Passwater was in the position of acting chief because he was the prior deputy chief?

A.  Well, she appointed him.  He was just -- I mean, in the absence of the chief, the deputy chief would fill that spot.  She then turned around and appointed him acting chief.

Q.  So she promoted him from deputy chief to acting chief?

A.  Yes.

Q.  Was there also any deputy chiefs under Passwater who was the acting chief?

A.  No.

Q.  Who were the two commanders when Passwater was the acting chief?

A.  I believe Chris Kidwell and maybe Jay

Page 238

Etzel.

Q.  And what was the breakdown of the lieutenants a day or so after Wells-Armstrong became the mayor?

A.  Two black lieutenants and I think four, four white lieutenants.

Q.  What about sergeants?

A.  Two black sergeants and ten, ten white sergeants.

Q.  All right.  Then at some point Passwater stepped down as acting chief?

A.  Yes.

Q.  Did he do that on his own, or was he forced out?

MR. HERBERT:  Objection.  Foundation.

THE WITNESS:  He did it on his own.

BY MR. MCGRATH:

Q.  And how do you know that?

A.  Because he was no longer acting.

Q.  Did he tender a letter to the department or to the mayor, city council?  How do you know that it was his choice not to be the acting chief?

MR. HERBERT:  Objection.  Foundation.

THE WITNESS:  I don't know.

Page 239

Willie Hunt  -  3/21/2022
2:20-cv-02310-CSB-EIL  # 41-5  Page 63 of 100
Paul Berge, et al. vs. City of Kankakee, et al.

BY MR. MCGRATH:

Q.  What position did Passwater go into?

A.  He should have went back to lieutenant, but he went back to deputy chief.

Q.  Okay.  Was there anyone placed in the acting chief position to replace Passwater?

A.  No, not until Price came along.

Q.  How much time elapsed from the time that Passwater went back to deputy chief until Price Dumas was named acting chief?

A.  Probably a month.

Q.  And Price Dumas was never confirmed by the city council, correct?

A.  Correct.

Q.  The mayor appointed him as the chief, but without the advice and consent of the city council, he never became the police chief?

A.  Correct.  He was an intern.

Q.  And did he name you as the deputy chief?

A.  Yes.

Q.  And was that brought before the city council?

A.  Yes.

Q.  And did you receive the advice and

Page 240

consent of the city council?

A.  Yes.

Q.  And who were the two commanders under acting Chief Dumas?

MR. HERBERT:  I'm going to object to foundation.  At what point are we talking about?

BY MR. MCGRATH:

Q.  When Dumas was brought on-board and he wasn't named as the chief, he was the acting chief?

A.  Kidwell and Passwater.

Q.  So Kidwell and Passwater were the commanders?

A.  Yes.

Q.  Both of those individuals are white, correct?

A.  Yes.

Q.  And Jay Etzel, what position was he?

A.  He went back to lieutenant.

Q.  And when Jay Etzel was moved back to lieutenant, what was the makeup of the lieutenant branch of the Kankakee Police Department as far as whites and blacks?

A.  One black lieutenant and nine, nine white lieutenants.

Page 241

Q.  Was there an increase in the number of lieutenants because I thought there was six?

A.  Oh, I'm sorry.  It was one and five.

Q.  One black and five whites?

A.  Yes.

Q.  Who was the one black lieutenant?

A.  Donell Austin.

Q.  Who was the black lieutenant that was no longer a lieutenant?

A.  Me.

Q.  Okay.  And you went up to deputy chief, correct?

A.  Correct.

Q.  And the makeup of the sergeants when Chief Dumas or acting Chief Dumas came on-board?

A.  It was -- I think when he came on-board -- I mean, Regnier retired and that opened up -- no, it didn't open up a spot.  I think when I moved up, it opened up a spot.

Q.  In the sergeants --

A.  Opened up a lieutenant spot and a sergeant spot.

Q.  Okay.  And do you recall who made it to lieutenant and who made it to sergeant?

Page 242

A.  No, I don't.

Q.  Do you know if it was a white or a black that came from sergeant to lieutenant when you were made deputy chief?

MR. HERBERT:  Objection.  Foundation.  He already said he doesn't know.

THE WITNESS:  When I moved up because Dumas didn't hold rank, there was no opening for lieutenant, but I think there was one for sergeant. I'm trying to remember what sergeant left or -- somebody had to leave for Hunter to get promoted.  I just can't recall right now who left or...

BY MR. MCGRATH:

Q.  That information, you'd be able to determine that information by looking at a police roster, correct?

A.  Yeah, the department has got records of that.

MR. MCGRATH:  Okay.  That's all I have.

MR. HERBERT:  Just a couple questions.

FURTHER EXAMINATION

BY MR. HERBERT:

Q.  So when the mayor, when she was elected, the top four highest ranking members of the police

Page 243



Willie Hunt - 3/21/2022
2:20-cv-02310-CSB-EIL # 45-5 Page 64 of 100
Paul Berge, et al. vs. City of Kankakee, et al.

1 department were white males, correct?

2    **A.  That is correct.**

3    Q.  And then the chief resigned, correct?

4    **A.  Yes.**

5    Q.  And then Passwater, Etzel, and Kidwell,

6 they were eventually demoted to a lower rank,

7 correct?

8    **A.  Later on, yes.**

9    Q.  Okay.  And the chief was replaced with

10 Dumas who's black, correct?

11    **A.  Yes.**

12    Q.  And that was made by the mayor, correct?

13    **A.  Correct.**

14    Q.  And the deputy chief replaced Passwater

15 who is white, correct?

16    **A.  Correct.**

17    Q.  And that was you, correct?

18    **A.  Correct.**

19    Q.  And when you were promoted to deputy

20 chief, you were promoted from the rank of lieutenant,

21 correct?

22    **A.  Correct.**

23    Q.  And you bypassed the rank of commander,

24 correct?

Page 244

1    **A.  Correct.**

2    Q.  And you were promoted essentially two

3 spots to deputy chief, correct?

4    **A.  Correct.**

5    Q.  And you said that that decision was made

6 by the mayor and the chief, correct?

7    **A.  Correct.**

8    Q.  And then the commander -- or Etzel and

9 Kidwell were demoted, correct?

10    **A.  Correct.**

11    Q.  And Kid -- or I'm sorry, Austin was

12 promoted to commander, correct?

13    **A.  Correct.**

14    Q.  And was there another person promoted to

15 commander?

16    **A.  Dave Skelly.**

17    Q.  Okay.  And what was Skelly the commander

18 of?

19    **A.  The bureau, detectives.**

20    Q.  Is Skelly white?

21    **A.  Yes.**

22    Q.  And what was Donell Austin the commander

23 of?

24    **A.  Patrol commander.**

Page 245

1    Q.  Okay.  So the entire patrol division?

2    **A.  Correct.**

3    Q.  Okay.  And those decisions were made by

4 the chief and the mayor, correct?

5    **A.  Correct.**

6    Q.  Okay.  You talked about during the trial,

7 that you testified during the trial in the lawsuit

8 where you alleged discrimination, correct?

9    **A.  Correct.**

10    Q.  And do you have a copy of the transcript?

11    **A.  Somewhere.**

12    Q.  I would ask if you would look for that

13 and produce that to your lawyer, that would be great.

14    **A.  Would it be found in federal court or**

15 **something or...**

16    Q.  I don't know.  If you can make an attempt

17 if you have it.

18    MR. MCGRATH:  Do you know if they ordered it?

19    THE WITNESS:  I don't know.

20    MR. HERBERT:  It's a federal trial.  They

21 order.

22    THE WITNESS:  Yeah, somebody ordered it.  The

23 city -- somebody got it.  The city probably got it

24 too.

Page 246

1    MR. MCGRATH:  Did anyone appeal?

2    THE WITNESS:  Yes.

3    MR. MCGRATH:  Oh, okay.  Then it was ordered.

4    MR. HERBERT:  Then I'm going to ask if you

5 could produce it because the city's got a copy of it.

6 BY MR. HERBERT:

7    Q.  If you can look as well.  I don't want

8 you to go through boxes and boxes.  But you've seen

9 the transcript?

10    **A.  You know what, if it was ordered, I never**

11 **looked at it.  I knew that Officer Brooks did appeal,**

12 **so I know the city would have a copy of it.**

13    MR. HERBERT:  Okay.  So I'm going to make a

14 request for that.

15    MR. MCGRATH:  Is Brooks one of the

16 plaintiffs?

17    THE WITNESS:  Yes.

18 BY MR. HERBERT:

19    Q.  You talked about the chief being involved

20 in the assessment.  He would be there in case there

21 was questions?

22    **A.  Not the chief, no.**

23    Q.  I'm sorry.  Who did you say from the

24 department would have been involved in that?

Page 247



Willie Hunt - 3/21/2022
2:20-cv-02310-CSB-EIL # 41-5 Page 65 of 100
Paul Berge, et al. vs. City of Kankakee, et al.

| | |
|---|---|
| 1   A.  Probably a commander or a lieutenant. | 1  don't have any cc e-mails or anything like that, so I |
| 2  Somebody lower ranked.  The chiefs never participate | 2  couldn't tell you.  The department would know.  It |
| 3  in the actual testing process. | 3  would be posted on the list when the evaluators -- |
| 4    Q.  Okay.  And who was involved in the | 4    Q.  And what's your understanding as to why |
| 5  assessment regarding the 2017, 2018 lieutenant | 5  the police and fire wanted more involvement?  Where |
| 6  promotion from the City of Kankakee? | 6  do you base that understanding from? |
| 7    A.  I can't recall. | 7    A.  You have to ask the commissioners. |
| 8    Q.  But it's normally a deputy chief or a | 8    Q.  Well, I'm asking you because you said |
| 9  commander you said? | 9  that the police and fire wanted more involvement, so |
| 10    A.  No, no deputy chief or chief.  It would | 10  how did you find that out? |
| 11  be either a lieutenant or a commander just to sit in | 11    A.  Because Frank said he was going to have |
| 12  in case the assessors had a question about policy and | 12  the company come down and train them on assessments, |
| 13  procedure. | 13  giving them assessments. |
| 14    Q.  Okay.  So that lieutenant or commander | 14    Q.  Okay.  Train the police and fire on |
| 15  that sat in, that person would have been involved in | 15  giving assessments? |
| 16  the selection of material for the assessment? | 16    A.  Yes, how to score assessments. |
| 17    A.  No. | 17    Q.  And in all of the departments that you've |
| 18    Q.  And as you sit here today, you don't know | 18  worked for, did the Police and Fire Commission |
| 19  who from Kankakee was involved in that assessment, | 19  conduct the assessments on any of those departments? |
| 20  but it would have been somebody from Kankakee? | 20    A.  I only worked for one, and my first |
| 21    A.  I want to say Chris Kidwell. | 21  promotion, yes, the Police and Fire Commission did |
| 22    Q.  Okay. | 22  the questioning. |
| 23    A.  But I'm not a hundred percent sure. | 23    Q.  Okay.  But I'm not saying that you worked |
| 24    Q.  And then I think you said that the | 24  for.  I'm talking -- |
| <div align="right">Page 248</div> | <div align="right">Page 250</div> |
| 1  assessment evaluation changed at some point because | 1    A.  Oh, okay. |
| 2  the police and fire wanted involvement in that | 2    Q.  That's okay.  The other -- you listed |
| 3  process? | 3  about seven or eight different departments that you |
| 4    A.  Yes. | 4  conducted assessments for. |
| 5    Q.  When did that happen? | 5    A.  Uh-huh. |
| 6    A.  When Kosman became chief. | 6    Q.  My question is, out of those seven or |
| 7    Q.  And what happened? | 7  eight departments, did the Police and Fire Commission |
| 8    A.  They just wanted to be trained by the | 8  conduct the assessments in any of those? |
| 9  company on how to do evaluations.  I believe the | 9    A.  No. |
| 10  company that Kosman chose came down and trained the | 10    Q.  Are you aware of any departments other |
| 11  Fire and Police commissioners on how to do | 11  than Kankakee where the Police and Fire Commission |
| 12  evaluations. | 12  conducted the assessments for promotional tests? |
| 13    Q.  And when was that done? | 13    A.  I'm not aware. |
| 14    A.  Prior to the evaluation assessments. | 14    Q.  You're not aware of any that do? |
| 15    Q.  Right, but it would have been sometime | 15    A.  That I did assessments for, no. |
| 16  after Chief Kosman became the chief? | 16    Q.  Okay.  But what about any departments |
| 17    A.  Yes. | 17  that you know of?  Do you know of any departments |
| 18    Q.  And then prior to the next promotional | 18  other than Kankakee where the Police and Fire |
| 19  evaluation? | 19  Commission conduct the assessments? |
| 20    A.  Yes. | 20    A.  I can't think of any. |
| 21    Q.  Do you know when that was, when Frank | 21    Q.  Okay.  And take your time. |
| 22  Kosman's first promotional evaluation, when it took | 22    A.  I think Kankakee is the only department |
| 23  place? | 23  that I know that did that. |
| 24    A.  I wasn't involved in that process, so I | 24    Q.  Okay.  Pretty unusual you would agree, |
| <div align="right">Page 249</div> | <div align="right">Page 251</div> |



Willie Hunt  -  3/21/2022
2:20-cv-02310-CSB-EIL   # 41-5   Page 66 of 100
Paul Berge, et al. vs. City of Kankakee, et al.

1 correct, where testing -- where a testing company --
2 I haven't finished the question though. Where a
3 testing company would be hired to conduct the test
4 except for one portion of the test. That's pretty
5 unusual you would agree, correct?
6  **A. Yeah.**
7  Q. And you talked about the assessment
8 evaluators that were involved in the sergeants
9 promotion and the lieutenants promotion, and the
10 sergeant promotion we're talking about the one with
11 Hunter, correct?
12  **A. Correct.**
13  Q. Okay. And the lieutenants promotion is
14 the one with Sneed, correct?
15  **A. Correct.**
16  Q. Okay. And you said, I believe you said
17 that there was -- for the sergeants one there was two
18 female state troopers involved in that assessment,
19 correct?
20  **A. Correct.**
21  Q. And you said with the lieutenants one,
22 you didn't recall who was present for the assessment?
23  **A. That's correct.**
24  Q. Okay.

Page 252

1  **A. The only reason I knew that two female**
2 **lieutenants, I remember two female lieutenants**
3 **because they came back to talk to the female**
4 **officers.**
5  Q. When did that happen?
6  **A. After the testing process.**
7  Q. Who were the two female troopers?
8  **A. One name was Cindy and the other one was**
9 **a black female. Cindy was a white female, the other**
10 **one was a black female.**
11  Q. Do they work for Stanard?
12  **A. Yes.**
13  Q. And the individuals that were involved in
14 the assessment evaluation for the lieutenants test,
15 did they work for Stanard?
16  **A. Yes.**
17  Q. Did you know the two female troopers that
18 came back to speak to the female officers?
19  **A. Not before.**
20  Q. Not before what?
21  **A. That day.**
22  Q. Not before that day?
23  **A. Uh-huh.**
24  Q. And do you know them -- do you know them

Page 253

1 in a different manner now other than them coming in
2 to speak?
3  **A. Yes.**
4  Q. Tell me about that.
5  **A. I worked with Cindy on a couple of those**
6 **assessments.**
7  Q. How about the other trooper?
8  **A. I worked on an assessment with her too.**
9  Q. So prior to the lieutenants testing
10 process where Sneed was promoted in August 2019, you
11 had been employed by Stanard, correct?
12  **A. Correct.**
13  Q. And you had been employed by Stanard for
14 more than a year and a half, correct?
15  **A. If you can tell me the dates.**
16  Q. Sure. Well, prior to Sneed's promotion
17 in August 2019, you had conducted assessments for
18 Stanard, paid by Stanard for Champaign, correct?
19  **A. Champaign. I've done an assessment for**
20 **Champaign, yes.**
21  Q. But you understand the question?
22  **A. Yes.**
23  Q. 12/29/17?
24  **A. Yes.**

Page 254

1  Q. So that is a year and a half before Sneed
2 was promoted to lieutenant, you had already conducted
3 an assessment for Stanard?
4  **A. Yes.**
5  Q. The same company that conducted the
6 testing procedure for Sneed, correct?
7  **A. Yes.**
8  Q. And then you had worked with Hillcrest as
9 well December 3, 2018, correct?
10  **A. Yes.**
11  Q. And then you had worked with the Cook --
12 or with Crest Hill, I believe, in 2018?
13  **A. Yes.**
14  Q. And you had also worked on a project for
15 Stanard for the assessment related to the Cook County
16 Forest Preserve, correct?
17  **A. Correct.**
18  Q. And you had also worked for Stanard on an
19 evaluation for the assessment for the Evanston Police
20 Department, correct?
21  **A. Correct.**
22  Q. And then the Bloomington Police
23 Department, correct?
24  **A. Correct.**

Page 255



Willie Hunt  -  3/21/2022
2:20-cv-02310-CSB-EIL   # 41-5   Page 67 of 100
Paul Berge, et al. vs. City of Kankakee, et al.

1  Q.  And all of those were assignments that
2 you had prior to the promotion of Michael Sneed to
3 lieutenant, correct?
4  **A.  Correct.**
5  Q.  Do you remember who worked with you on
6 the assessment for the portion for the Champaign
7 Police Department?
8  **A.  I can't recall.**
9  Q.  How about the same thing for the other
10 ones?
11  **A.  Some of them were -- I worked with Cindy**
12 **on a couple, Amir on a couple, the commander from**
13 **Joliet on a couple.**
14  Q.  Do you know if any of those individuals
15 that you worked on with the assessment for the other
16 departments that we just named that you did prior to
17 Michael Sneed being promoted, if any of those
18 individuals were involved in the assessment of the
19 Kankakee lieutenants promotion system?
20  **A.  No, I'm not aware.**
21  Q.  No, you're not aware?
22  **A.  No.**
23  Q.  Is it possible that one of the
24 individuals that you worked with in these assessment

1 centers also worked on the assessment for the
2 Kankakee lieutenants promotional process?
3  **A.  It could, but I wouldn't know because I**
4 **didn't see those assessors.  It's possible that it**
5 **could have been.**
6  Q.  Wouldn't you agree that would be a
7 conflict of interest if you worked with assessors
8 that worked on the assessment test for the
9 lieutenants examination for the Kankakee Police
10 Department?
11  **A.  No.**
12  Q.  You had no role in the testing process
13 for the lieutenants test, correct?
14  **A.  No.**
15  Q.  And you -- that was done because the
16 chief wanted to keep you out of the testing process,
17 correct?
18  **A.  What's --**
19  Q.  I'll withdraw the question.
20  **A.  Yeah, which chief are you talking about?**
21  Q.  So if I understand your testimony
22 correctly, you said that Chief Kosman was the
23 individual that made the decision to promote Sneed
24 over Kreissler and Berge, correct?

1  **A.  Correct.**
2  Q.  And you said earlier today that you had
3 worked with all three of those individuals in the
4 past, correct?
5  **A.  That is correct.**
6  Q.  And I think you said Kosman didn't know
7 anyone from the department, correct?
8  **A.  That is correct.**
9  Q.  And it's your testimony that Chief Kosman
10 never asked you your opinion about any of the three
11 officers involved?
12  **A.  I didn't want to taint the process**
13 **because I knew I've been there long enough to know**
14 **everybody's secret or anything like that and I didn't**
15 **want to do anything to taint any of those guys.**
16  Q.  But my question was, did Chief Kosman
17 ever ask you, "Hey, tell me your thoughts on any one
18 of these three individuals"?
19  **A.  I can't recall, and if I did, I would be**
20 **like, "They all worked for me."**
21  Q.  Okay.  Well, what do you remember about
22 Chief Kosman asking you and you telling Chief Kosman
23 about those three individuals?
24  **A.  I don't recall anything.**

1  Q.  But it's possible that Chief Kosman asked
2 you about those three individuals, correct?
3  **A.  I don't recall Chief Kosman asking me**
4 **about those individuals.  The only thing that I**
5 **remember Chief Kosman asking about as far as Berge**
6 **was when Berge was going through his thing, that was**
7 **it.**
8  Q.  And that was prior to Sneed being
9 promoted?
10  **A.  That was after.  That was after.**
11  Q.  Wouldn't you expect a chief to ask one of
12 his -- ask his deputy chief that had worked with
13 individuals for years, wouldn't you expect the chief
14 to ask you your opinion about individuals that he was
15 about to place on a promotional list?
16  MR. MCGRATH:  Objection.  Objection.
17 Foundation, it calls for speculation.
18  THE WITNESS:  Like you said, they all thought
19 I was a racist so why would he even just bring me
20 into that?
21 BY MR. HERBERT:
22  Q.  And when you say they all thought you
23 were a racist.
24  **A.  You said that.  That was part of your**



Willie Hunt - 3/21/2022
2:20-cv-02310-CSB-EIL # 41-5 Page 68 of 100
Paul Berge, et al. vs. City of Kankakee, et al.

1 line of questioning. No.

2 Q. Is that why you believe Chief Kosman
3 didn't bring you into it, because everyone thought
4 you were a racist?

5 A. No. I just thought he just felt that was
6 something he wanted to do on his own.

7 Q. Do you think that Chief Kosman believed
8 that people thought you were a racist and he wanted
9 to keep you from the selection process because of
10 that?

11 MR. MCGRATH: Objection. Form of the
12 question, speculation, compound.

13 You can answer.

14 THE WITNESS: You'll have to ask Chief Kosman
15 that.

16 BY MR. HERBERT:

17 Q. Okay. But you thought when you weren't
18 asked, you thought part of the reason was because
19 other people thought you were a racist?

20 A. No, I just thought he was doing it on his
21 own. Some things the chief didn't involve me with,
22 so I just figured that was one of the things that he
23 didn't involve me with, so.

24 Q. And you would agree with me that the

Page 260

1 chief's selection of Sneed over the other two
2 officers, that was performance based, right?

3 A. I don't know what it was based on. You
4 will have to ask Chief Kosman.

5 Q. Well, what's your understanding of what
6 criteria the chief can use to make that selection?

7 A. Like you said, it's not written in stone
8 what criteria that the chief can use to make his
9 selection, so I'm assuming that Chief Kosman
10 documented or did whatever he had to do to make a
11 selection. You'd have to ask him.

12 Q. You were involved in law enforcement for
13 how many years?

14 A. 25.

15 Q. Okay. And based upon your working in law
16 enforcement for 25 years, what do you think would be
17 the chief's criteria that they would use to promote
18 somebody over two individuals that scored higher than
19 them? What would be your understanding of what
20 criteria would be utilized?

21 A. I don't know what was in those guy's
22 personnel file, but I imagine I would look at the
23 personnel file, talk to people in the department,
24 talk to people in the community, talk to those

Page 261

1 officers, talk to their supervisors, look at
2 discipline and go from there.

3 Q. Do you know if the chief, Chief Kosman
4 did any one of those things?

5 A. You have to ask Chief Kosman.

6 Q. Well, you know he didn't talk to his
7 supervisors, correct?

8 A. I don't know. I was out of that -- I
9 wasn't their supervisor then.

10 Q. Do you know of any supervisors that the
11 chief spoke with about any of those three
12 individuals?

13 A. I don't know.

14 Q. Do you know of any community members that
15 the chief spoke with about any of those three
16 individuals?

17 A. I don't know. Those were my suggestions.
18 I don't know what the chief did.

19 Q. What were your suggestions?

20 A. What I just told you that I would do.

21 Q. Okay.

22 A. So I don't know if the chief did any of
23 those.

24 Q. Did you make those suggestions to the

Page 262

1 chief?

2 A. No.

3 Q. Did you speak to the chief at all about
4 the selection of any one of those three individuals?

5 A. No.

6 Q. Did you speak with anyone within the
7 department about the selection of those three
8 individuals?

9 A. No.

10 Q. Did you speak to anyone within the Police
11 and Fire Commission about the selection of any of
12 those three individuals?

13 A. No.

14 Q. Did you speak with anyone?

15 A. No.

16 MR. HERBERT: All right. I have nothing
17 further.

18 MR. MCGRATH: Nothing further. All right.
19 We'll waive.

20 (Deposition concluded at 3:57 p.m.)

21

22

23

24

Page 263



Willie Hunt - 3/21/2022
2:20-cv-02310-CSB-EIL # 47-5 Page 69 of 100
Paul Berge, et al. vs. City of Kankakee, et al.

```
 1                    REPORTER'S CERTIFICATE

 2

 3          I, Brenda S. Hall, CSR No. 084-003359,

 4   Certified Shorthand Reporter of said state, do hereby

 5   certify:

 6          That previous to the commencement of the

 7   examination of the witness, the witness was duly

 8   sworn to testify the whole truth concerning the

 9   matters herein;

10          That the foregoing deposition transcript was

11   reported stenographically by me, was thereafter

12   reduced to typewriting under my personal direction

13   and constitutes a true record of the testimony given

14   and the proceedings had;

15          That the said deposition was taken before me

16   at the time and place specified;

17          That I am not a relative or employee or

18   attorney or counsel, nor a relative or employee of

19   such attorney or counsel for any of the parties

20   hereto, nor interested directly or indirectly in the

21   outcome of this action.

22

23

24
```



Willie Hunt - 3/21/2022
2:20-cv-02310-CSB-EIL # 17-5 Page 70 of 100
Paul Berge, et al. vs. City of Kankakee, et al.

1        IN WITNESS WHEREOF, I do hereunto set my hand

2   at Chicago, Illinois, this 13th day of April, 2022.

3

4

5        _____

6        Certified Shorthand Reporter

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24



Willie Hunt - 3/21/2022
2:20-cv-02310-CSB-EIL  # 17-5  Page 71 of 100
Paul Berge, et al. vs. City of Kankakee, et al.

## WORD INDEX

**< $ >**
**$300**  71:*10*  210:*20*
**$600**  181:*24*

**< 0 >**
**06**  29:*21*
**084-003359**  1:*17*
 264:*3*

**< 1 >**
**1**  3:*10*  30:22  31:*4,*
 *16*  32:*4, 11, 18*
 34:*11*  40:*20, 22*
 44:*3, 4*  85:*23*
 87:*10*  108:*11, 17*
 135:*7*  227:*19*
**1,000**  172:*15*  231:7
**1/2**  213:*8*
**10**  97:*19*
**100**  1:*19*  2:*3*
**108**  3:*10*
**1099**  68:*17*  70:*13*
 72:*10*  81:*5, 6*
**1099s**  81:*21*
**11:00**  1:*18*
**111**  7:*21, 22*  10:*19*
 20:*20*
**12**  97:*19*  234:*4*
**12/29/17**  213:*5*
 254:*23*
**12/3**  213:*7*
**12/6**  213:*7*
**12-year**  126:*11*
**13**  9:*9*
**13th**  265:2
**14**  85:*14*  87:*9, 23*
**16**  108:*23*
**171**  3:*10*
**172**  3:*15*
**173**  3:*15*
**176**  3:*18*
**18**  213:*7, 8*
**18th**  15:*13*
**19**  213:*8, 9*
**19th**  83:*17, 18*
**1st**  85:*9, 11, 17*
 88:7

**< 2 >**

**2**  3:*10*  31:*4*  32:*4,*
 *11, 18*  40:*23*  44:*4*
 120:*17*  135:7
 171:*5, 7, 23*
**2/20/2022**  87:*10*
**2/22/22**  85:*11*  88:*8*
**20**  15:*14, 15*
 123:*24*  213:*9*
**2003**  116:*8, 12, 23*
 117:*3, 7*
**2005**  24:7, *10*
 26:*19*  27:*14*
 116:*10*  191:*13*
 227:7
**2006**  29:22, *23*
 30:*17*  33:*3*  42:*18,*
 *19*  227:7
**2011**  29:*15, 17, 24*
 31:*10, 18*  32:*1, 24*
 43:*3, 13, 23*
**2016**  29:*12, 17, 21*
 181:*2*
**2017**  20:*17*  29:*11*
 43:*17*  50:9, *20*
 51:*1*  74:*1, 10*  83:*6,*
 *16, 18*  89:*19*
 109:*22*  118:*17*
 189:*10*  191:*23*
 223:*21*  224:*14, 24*
 225:*2, 3*  226:*1*
 248:*5*
**2018**  22:*11, 21*
 23:*2, 5*  27:*11*
 49:*24*  50:*10, 19*
 67:*5*  69:*2, 9*  74:*1*
 89:*19*  92:*1*  133:*11,*
 *23*  136:*4*  223:*21*
 224:*14, 24*  225:*3*
 226:*1*  248:*5*  255:*9,*
 *12*
**2019**  22:*11*  25:*1, 2,*
 *4*  27:*15*  55:*14*
 118:*17*  254:*10, 17*
**2020**  22:*11*  80:*20*
 232:*4*
**2021**  9:*3*  11:*19*
 12:*5*  14:*9, 13, 23*
 15:*3*  16:*3*  20:*23*
 85:*9, 17, 23*  87:*10*
 213:*23*

**2022**  1:*18*  265:2
**205**  3:*5*
**206**  1:*18*  2:*3*
**20-cv-2310**  1:*6*  4:*13*
**21**  1:*18*  213:*17*
**22nd**  83:*1*
**23rd**  16:*16*
**24**  15:*8*
**243**  3:*4*
**25**  261:*14, 16*

**< 3 >**
**3**  3:*15*  20:*17*
 30:*10, 18, 23*  31:*20*
 40:*23*  134:2  135:6
 172:*4, 6*  255:*9*
**3/1/21**  213:*15*
**3/4/21**  213:*17*
**3:57**  263:*20*
**312**  2:*4*
**328**  3:*15*  172:*12*
**3318**  2:*8*
**3500**  71:*19*

**< 4 >**
**4**  3:*1, 15*  108:*22*
 173:*16, 18*  231:7
**4:00**  211:7
**40**  29:*14*  140:*24*
 141:*4*
**405-7011**  10:*8*
**424-5678**  2:*9*
**47**  83:*14*  84:*6, 14,*
 *20*  87:22

**< 5 >**
**5**  3:*18*  14:*23*
 176:*13, 15, 19*
**5/20**  213:*17*
**50**  15:*6, 12*
**5th**  16:*11, 12*
 213:*23*

**< 6 >**
**6**  109:*21*
**60**  176:*8*
**60661**  2:*4*
**60805**  2:*8*
**655-7660**  2:*4*
**67**  233:*16, 17*

**2022**  1:*18*  265:2

**< 7 >**
**708**  2:*9*

**< 8 >**
**8/26**  213:*9*
**8:00**  211:7
**815**  10:*8*

**< 9 >**
**9/2**  213:*9*
**90s**  33:*24*
**95th**  2:*8*
**97**  38:*14*

**< A >**
**a.m**  1:*18*
**ability**  107:*9*
 144:*11*  170:*13*
 204:*11*
**able**  94:7  243:*14*
**above-entitled**  1:*15*
**absence**  238:*13*
**Absolutely**  205:*12*
**acceptable**  147:*13*
**access**  78:*17*  84:*17*
 100:*14, 20, 21*
 101:*19, 24*  102:*3, 6,*
 *8*
**account**  84:*15, 17,*
 *19, 21, 22, 23*  85:*1,*
 *3, 23*  127:*4, 6, 7*
 129:*12*  199:*10*
**accounts**  198:*14*
**accurately**  119:*19*
**accusations**  159:*8*
**accuse**  179:*8, 12*
 180:*5, 6*
**accused**  155:*12, 19,*
 *24*  156:*4*  187:*11,*
 *14, 18*  195:22
 196:*3, 9, 14*  197:*3*
**accusing**  198:*17*
 199:*19, 24*
**acronym**  118:*12*
**acted**  212:*18*
**acting**  122:*1*
 157:*18*  238:2, *10,*
 *15, 17, 20, 23*
 239:*11, 19, 22*

240:*6, 10* 241:*4, 9*
242:*15*
**action** 185:*10*
264:*21*
**actor** 38:*8*
**acts** 109:*11*
**actual** 141:*13*
217:*1* 248:*3*
**additional** 229:*1, 5*
**address** 10:*1* 66:*7,
10* 76:*12* 84:*5*
86:*1, 8* 87:*7* 88:*11*
**adjustments** 33:*5*
44:*9*
**administer** 49:*17*
**administered** 29:*1*
30:*2* 57:*6* 190:*15*
**administering** 28:*5,
12* 56:*15*
**administration**
25:*18* 43:*2* 79:*15*
98:*5* 133:*21, 22*
154:*9* 158:*22*
**administrator**
47:*16, 17* 48:*8, 9*
**administrators**
146:*8*
**admit** 109:*9*
**admits** 109:*11*
**advancement** 141:*6*
**advantage** 203:*9*
**advice** 236:*7* 237:*3*
240:*16, 24*
**advise** 220:*23*
**advised** 209:*19*
210:*6* 227:*3*
**advising** 226:*15*
**Affairs** 162:*21*
**affiliated** 23:*7* 80:*5,
9* 95:*17*
**Affirmative** 108:*12*
**afforded** 202:*15, 24*
203:*10*
**afraid** 178:*17*
180:*4*
**African** 39:*18*
40:*14* 45:*10, 17*
113:*11, 20, 22*
114:*17, 22* 119:*19*
120:*21* 127:*18*

139:*18* 194:*15*
**Afterward** 64:*17*
**age** 15:*4*
**ago** 131:*6*
**agree** 19:*12* 52:*10*
77:*21* 95:*3* 98:*14*
107:*12* 108:*5*
111:*17* 122:*24*
123:*6, 15, 17* 128:*9*
137:*13* 143:*7, 19*
144:*4, 12, 15* 145:*2*
146:*1* 162:*11*
164:*22* 166:*21*
167:*6, 16, 18* 168:*9*
173:*2* 174:*3*
175:*22* 190:*17*
195:*8* 202:*6*
203:*12* 204:*19*
230:*21* 251:*24*
252:*5* 257:*6* 260:*24*
**agreed** 110:*15, 21*
111:*11* 119:*10, 13*
138:*7, 9, 13* 143:*18*
144:*23, 24* 177:*3*
**ahead** 30:*24* 31:*15*
32:*12* 45:*11, 12, 19*
51:*22* 82:*18*
135:*20* 145:*13, 18*
158:*3* 180:*17*
216:*11* 221:*20*
230:*24*
**allegation** 160:*1*
**allegations** 113:*7*
114:*10, 13* 150:*18*
156:*17* 157:*12*
159:*11, 18, 20*
162:*8* 168:*1* 181:*4,
6* 208:*2* 227:*13*
**alleged** 113:*24*
203:*8* 246:*8*
**allegedly** 161:*18*
**alleging** 113:*2*
**alleviate** 184:*24*
**allocated** 140:*11*
181:*22*
**allow** 230:*13*
**allowed** 169:*19*
201:*20* 202:*7, 14,
19* 203:*13* 204:*7,
16, 17, 19* 206:*13*

225:*15*
**allows** 147:*24*
**alter** 223:*7*
**Amendment** 130:*1,
2* 208:*5*
**American** 40:*15*
45:*11, 18, 19*
113:*11, 20* 114:*17,
22* 120:*21* 194:*15*
**Americans** 39:*18*
113:*22* 119:*19*
139:*18*
**American's** 127:*18*
**Amir** 105:*17*
256:*12*
**amount** 20:*9*
**a-n** 13:*18*
**ancestry** 175:*15*
**announced** 221:*8*
**announcements**
220:*21*
**Answer** 3:*18* 4:*23*
5:*1* 7:*4* 23:*12*
45:*24* 64:*5* 75:*1, 2,
13* 91:*2* 99:*16*
107:*5, 15* 108:*12*
109:*8, 12* 112:*12*
117:*11* 122:*22*
131:*22* 137:*18*
147:*5* 149:*9*
150:*11* 153:*19*
168:*15* 169:*16*
170:*9* 180:*2, 16, 18*
195:*3* 198:*9* 199:*2*
203:*20* 224:*8*
231:*1* 234:*15*
237:*15* 260:*13*
**answered** 73:*10*
138:*3*
**answering** 169:*1*
**Answers** 3:*10* 4:*21*
6:*1, 5* 89:*13* 103:*3,
6, 8* 177:*3* 223:*8*
**anybody** 197:*24*
221:*3* 230:*20*
237:*14*
**anymore** 84:*17*
**apart** 106:*20*
**apologize** 21:*3*
**appeal** 247:*1, 11*
**appear** 167:*4, 13, 17*

**Appeared** 2:*6, 9*
172:*1* 213:*20*
**appears** 229:*16*
**application** 173:*8*
**applied** 14:*18*
20:*19*
**applies** 174:*17*
**apply** 14:*19* 21:*3,
14, 18* 47:*12* 142:*19*
**applying** 132:*8*
**appointed** 11:*11*
19:*4, 7* 120:*7, 8, 11,
17* 122:*23* 126:*16*
189:*13, 14* 236:*6,
11, 12* 238:*12, 15*
240:*15*
**appointment**
120:*14, 15*
**appoints** 236:*21, 23*
**approached** 64:*7*
**appropriate** 147:*1*
150:*14*
**approval** 236:*14*
237:*2, 10*
**approved** 97:*1*
**approving** 227:*1*
**Approximately** 9:*7,
9* 42:*7* 210:*4*
233:*18* 234:*18*
**April** 16:*2, 3*
109:*22* 265:*2*
**A-r-c-h-e-i** 14:*6*
**Archie** 14:*4*
**A-r-c-h-y** 14:*5*
**area** 56:*8*
**areas** 102:*12*
**Asian** 44:*22*
140:*14* 141:*18*
145:*17* 176:*7*
218:*12, 13, 18*
233:*20*
**Asians** 111:*14*
234:*21*
**aside** 12:*8* 102:*6*
145:*21* 183:*24*
193:*8* 205:*2* 225:*20*
**asked** 4:*22* 21:*4*
40:*10* 49:*13, 21*
50:*2* 53:*8* 54:*20*
56:*3* 63:*23, 24*
64:*1, 7* 73:*10* 75:*1,

Willie Hunt - 3/21/2022
2:20-cv-02310-CSB-EJ… # 17-5 Page 73 of 100
Paul Berge, et al. vs. City of Kankakee, et al.

6, 10 80:11 107:22
108:1, 3 138:3
154:15 170:21
190:3 191:11
192:6 199:10
207:3 210:19
217:8 221:13
227:10 258:10
259:1 260:18
**asking** 7:9 28:4
35:11, 23, 24 53:6
57:21 60:9 76:20
83:22 84:24 112:1
115:14 123:11
131:24 133:18
137:16 145:20
147:9 165:8
168:24 182:24
192:20 193:21
204:5 250:8
258:22 259:3, 5
**assess** 53:5 56:6
**assessment** 49:7
65:20 68:22 69:1,
4, 10, 13 70:21, 24
71:24 72:6, 7, 15
75:11 76:13, 14
104:9, 16 107:1, 12
108:6 178:1, 7
205:1 210:4, 7, 18
211:1, 6, 8, 11, 22
212:3, 13, 19 214:3,
4, 22 216:19
217:10, 14 223:20,
24 224:1, 16, 18
225:11 226:3, 6, 18
247:20 248:5, 16,
19 249:1 252:7, 18,
22 253:14 254:8,
19 255:3, 15, 19
256:6, 15, 18, 24
257:1, 8
**assessments** 49:14,
22 65:16 67:2
69:24 71:9 76:10
79:10 82:4 93:14
94:5 102:18
103:10 194:2
210:16 214:23
216:2 225:12, 14,
16 249:14 250:12,

13, 15, 16, 19 251:4,
8, 12, 15, 19 254:6,
17
**assessor** 50:3 53:9
54:20 56:3 57:22
64:8, 14 73:7 75:7
76:7 102:19
**assessors** 76:8
105:3, 8, 10, 11
106:18 107:8
214:8, 23 215:3, 5
225:1, 5, 19 248:12
257:4, 7
**assigned** 215:9
217:11, 13
**assignment** 14:17
82:14 91:23 140:3,
4 142:3 212:12, 14,
17
**assignments** 174:12
256:1
**assist** 209:4
**associate** 194:23
**Associates** 22:3, 5,
10, 13 23:5, 8, 15,
16 24:1, 6, 8 25:7,
13, 17, 23 26:3, 12,
16, 24 27:10, 13, 22,
24 28:2, 5, 7, 14, 18
30:2, 5 31:4, 19
33:5 44:12 47:1, 6,
9, 18 51:2, 13, 16
52:22 54:1, 9
57:15 60:12 61:10
62:3 63:5, 9, 11, 17
64:1 67:9, 12, 19,
20 68:2 69:17
70:14 71:13, 18
72:11, 14 73:19
74:5, 9, 13, 16, 18
77:11, 16 78:2, 14
79:1, 11, 16, 22
80:6, 10, 12, 15
81:2, 12, 23 82:2, 6,
10 83:23 84:8, 14
85:2, 22 88:2
89:10, 22 90:3, 17
91:6, 13, 21 92:14,
17, 23 93:3, 7, 8, 15
94:1, 6 95:10, 16,
23 96:3, 7, 10, 11,

21 97:12, 14, 17
99:9 100:1, 11, 14,
15 101:20 102:1, 4,
7, 14 103:7 105:13
106:14 116:17
179:7 188:17
191:10, 12 209:14
210:20 221:14
225:11 226:13
**assume** 152:2
**assumed** 206:10
**assuming** 17:24
80:2 145:22
146:16 148:5 261:9
**attached** 188:23
**attempt** 223:7
231:17 246:16
**attempts** 231:11
**attendance** 226:12
**attorney** 65:24
88:20 228:11, 16,
20, 22 264:18, 19
**August** 189:13
232:4 254:10, 17
**Austin** 121:1
125:10, 17 126:6,
16 142:13, 14
143:6 152:19
159:8, 11, 14
160:13, 18 162:3, 7
235:6 242:7
245:11, 22
**authorized** 74:23
**auto** 186:6
**Auto-Lab** 187:20
188:3
**awarded** 20:22
51:6 228:17
**awarding** 187:19
**aware** 21:10 33:8
34:7 79:9, 14, 18
96:10, 14 110:8, 13
131:16 135:4
149:19, 23 150:16
151:9, 23 152:6, 9
155:11, 15, 19
159:7 165:11, 14
166:6, 9 182:7
186:10 197:7, 18
200:20, 24 207:23
210:10 229:10

251:10, 13, 14
256:20, 21

**< B >**
**back** 31:11 57:4
65:5 83:6 89:7, 9
106:13 150:22
171:17 181:22
183:10, 13 184:16
185:21 186:8
188:15 205:15
227:7 228:12, 14,
15 240:3, 4, 9
241:18, 19 253:3, 18
**background** 151:1
**Barbara** 12:3, 6, 23,
24
**base** 20:5 250:6
**based** 19:18 20:2,
5, 10 41:10 48:21
98:5 101:15
102:21 103:6, 8, 23
107:10, 15 112:9
114:15 133:6
138:14 144:10
146:14 147:20
150:18 165:8
173:4 175:9
199:19 200:1
206:9, 15 210:15
220:11 224:7
230:4 232:15
261:2, 3, 15
**basing** 206:6
**baton** 127:17
**becoming** 235:21
**began** 69:9 216:2
**beginning** 215:10
**behalf** 2:6, 9
169:20 201:21
202:1, 8 203:14
204:9
**belief** 6:19 35:5
117:8 136:20
174:16 206:6
209:11
**believe** 4:17 5:20,
24 6:17, 24 7:12
8:22 11:20 16:1
24:16 26:9, 10, 11
33:24 35:11 39:21,

Willie Hunt  -  3/21/2022
2:20-cv-02310-CSB-EIL  # 17-5  Page 74 of 100
Paul Berge, et al. vs. City of Kankakee, et al.

23  40:22  49:12, 24
50:13  56:24  57:19
58:13  69:2  71:10
73:21  95:12  112:4,
15, 20  114:23
115:15, 18  116:6
119:15, 17, 18
123:22  128:18
132:19  133:17
140:20, 22  144:5
146:14  148:10
149:16  150:12
153:20, 22  154:4
156:9  161:15, 16,
24  164:6  167:3, 12
180:19  199:5
206:22  207:9
208:12  210:3, 20
219:4  221:5  222:3,
10, 11, 13, 19  224:9,
15  225:6, 18
226:15  230:10
234:1  236:4
238:24  249:9
252:16  255:12
260:2
**believed**  6:8, 9
111:1, 4, 7, 18
114:20  116:2
119:6  153:16, 24
157:14  158:21
182:15  198:22
260:7
**belongings**  222:18
**bench**  228:3
**benefit**  20:10
**benefits**  17:20
**BERGE**  1:2  44:3,
20, 22  45:7  46:7, 8,
10  50:15  51:17, 21
52:9  53:12  59:15,
16  60:14  67:22
68:4  90:11  92:15
159:8, 15, 19
160:14, 19, 23
161:1, 6, 7, 13, 20
162:3, 14, 15, 17
163:1  164:23
165:17  166:3
182:8, 13  192:15,
18  219:4, 5, 6

220:10, 23  223:17
257:24  259:5, 6
**Berge's**  159:22
162:7
**best**  6:4, 6  100:6
177:3
**better**  29:23, 24
129:20, 21  146:19
**bid**  188:12
**bidding**  188:6
**big**  57:7  161:23
**bigger**  62:20
**bit**  103:11  144:2
**black**  41:6  44:18
118:20  121:3, 15,
21  122:5, 17  123:3,
8, 16, 18  126:6
127:14, 19  128:1
140:13  141:19
143:10, 24  144:6,
15  145:2, 3  146:15,
24  148:12  149:4
152:21, 23  153:11
154:2, 8, 9  157:21
158:22  176:7
179:18  180:7
186:24  194:23
195:4  196:5
219:19  220:3
234:2  235:4, 22, 23
236:2  239:5, 8
241:23  242:4, 6, 8
243:2  244:10
253:9, 10
**blacks**  111:8  120:5
241:22
**Bloomington**  213:9
255:22
**Blue**  116:12  227:21
**board**  11:6, 7, 8, 9,
11, 16, 22  12:5, 21
14:7, 13, 14  132:21
133:8  165:21, 24
167:4, 13, 18
170:20  174:24
**bodies**  183:17
**Bohlen**  13:15, 18
**B-o-h-l-e-n**  13:19
**B-o-l-e-n**  13:18
**bombs**  223:17
**book**  216:21

**books**  177:16, 17,
18  188:18, 19
190:8, 12  192:9
216:17
**born**  141:3
**bottom**  232:2
**Bourbonnais**  105:20
**boxes**  247:8
**boy**  36:19  146:22
**Bradley**  235:7
**branch**  241:21
**break**  4:24  88:23
89:5  205:13
235:10, 19
**breakdown**  237:18
239:2
**Brenda**  1:16  264:3
**Brian**  34:10, 18
**briefcase**  62:9, 15,
23  76:5
**briefly**  229:15
**bring**  183:4, 5
184:15  214:19
259:19  260:3
**bringing**  183:15
**broadened**  115:3
**broader**  79:19
**Brooks**  235:6
247:11, 15
**brought**  76:5
100:7, 22  116:17
182:8  185:21
205:21  206:20
230:9  240:21  241:8
**brown**  176:7
**budget**  183:6, 23
208:23
**budgetary**  26:10
181:17, 21  184:5
**building**  132:6, 10
**bunch**  8:5  104:18
**bureau**  245:19
**Burse**  235:6
**business**  76:21
77:1  98:21, 24  99:8
**businesses**  98:20
**bypassed**  92:2
244:23
**bypassing**  89:18
146:11

**books**  177:16, 17,
18  188:18, 19
190:8, 12  192:9
216:17

**< C >**
**CALEA**  140:8
142:6  175:6, 7
**call**  55:24  104:2
161:9  181:10  184:1
**called**  4:4  16:20
75:12  154:14
161:17  163:15
184:4, 10  199:9
**calling**  183:20
**calls**  26:6  35:6, 21
68:11  99:13  107:4
123:21  131:19
148:15  157:23
158:11  165:3
168:11  169:4, 13,
22  195:1  197:2, 12
198:6, 24  204:23
259:17
**Calvin**  233:7
**campaign**  110:2, 9
122:8  123:16  138:8
**candidacy**  110:6
**candidate**  29:1
32:11  45:11, 12, 18
111:2  146:19
202:7  215:10  224:4
**candidates**  30:6, 24
31:3, 8  41:14
45:19  46:14, 16
51:12  52:1, 5, 12
89:19  92:3, 7  93:4
148:1  174:17
195:11  201:19
202:9, 15, 20  204:9
216:3  217:4, 8
220:7  223:9, 13
224:3, 13  230:14
**Capacity**  1:11
108:24  109:10
**capita**  34:1
**card**  70:16
**care**  89:1
**career**  19:1, 12, 20
**career-wise**  94:7
**case**  4:13  5:17
89:12  146:10
164:19  170:14
191:3  202:19
203:3  206:8, 20



Willie Hunt   -   3/21/2022
2:20-cv-02319-CSB-EIL   # 47-5   Page 75 of 100
Paul Berge, et al. vs. City of Kankakee, et al.

207:*4*  225:*18*
247:*20*  248:*12*
**category**  101:*14*
**Caucasian**  45:*22*
128:*15*  133:*13*
134:*21*  135:*16*
175:*24*
**Caucasians**  46:*10*
128:*4, 12*  135:*8*
**cause**  1:*15*
**causes**  118:*23*
**cc**  250:*1*
**cc'd**  191:*21*  192:*1,
7*  216:*17*
**centers**  257:*1*
**CENTRAL**  1:*1*
**CEOs**  116:*13*
**certain**  20:*9*  103:*3,
4, 17*  104:*6*  186:*3*
188:*17, 19*  211:*17*
**certainly**  83:*10*
117:*8*  137:*10*
144:*13*  164:*3*
197:*7, 17*  202:*16*
209:*22*
**CERTIFICATE**
264:*1*
**Certified**  1:*16*
140:*8*  175:*7*  264:*4*
265:*6*
**certify**  264:*5*
**chain**  9:*12*
**challenging**  89:*17*
**Champaign**  213:*2*
254:*18, 19, 20*  256:*6*
**chance**  75:2  124:*3*
171:*20*
**change**  85:*15*
116:*15*  137:*6*
139:*8*  210:*11*
223:*7*  231:*17*
**changed**  10:*1*
116:*5, 7, 8, 18*
117:*2, 4*  120:*1, 4*
121:*20*  122:*3*
126:*17*  227:*17*
228:*12*  249:*1*
**changing**  113:*5*
**character**  202:*7*
204:*8*  205:*7*
**characterized**  159:*1*

**charge**  139:*17*
140:*10*  229:*7, 8*
**charged**  197:*4, 24*
**charges**  170:*5*
182:*8*
**Charles**  38:*8*
**chart**  236:*5*
**Chasity**  15:*18*
79:22  95:*21*
109:*21*  119:*18*
120:*18*  121:*14, 21*
122:*7*  152:*2, 5, 12*
153:*12*  155:*18*
157:*8*  233:2  235:*8,
20*  238:*9*
**CHASTITY**  1:*9*
**Check**  70:*19, 20*
135:*21*  136:*5*
**Chicago**  1:*19*  2:*4*
20:*12*  56:*8*  265:2
**CHIEF**  1:*8*  16:*23*
17:*12*  18:*20, 21*
19:*5, 19*  20:*3, 7, 11,
16*  24:22  33:*22, 23*
34:*5, 8*  36:*8, 9, 11*
37:*13*  39:*2, 12, 17*
41:*17*  42:*23*  43:*7,
14*  44:*1*  45:*2, 8*
49:*19*  58:*1*  61:*5, 8,
11, 13, 15, 22*  62:2
63:*20*  86:*6, 9, 11*
87:*5*  91:*7, 8, 12, 18,
20*  94:*3, 10*  99:*20*
105:*19, 21, 22, 23*
108:*24*  109:*11*
119:9  121:*14*
122:*1*  123:*19*
124:*3, 8, 14, 16, 20,
23*  125:*13, 23, 24*
129:*19*  130:*4, 8, 9*
132:*23*  134:*10*
135:*21, 22, 23*
136:*1, 6, 22*  138:*11*
139:*22, 23*  140:*5, 6,
22*  141:*11*  142:*5*
145:5  146:*17, 21,
24*  147:*6, 24*
148:*11, 18, 24*
149:*1, 10, 11, 24*
150:*4, 18*  151:*2, 7,
9*  152:*17*  155:*12*

157:*4, 18*  160:*6, 15,
16, 17, 18*  161:*15*
162:*20*  163:*9, 18,
22, 24*  165:*6, 16*
167:*21*  171:*3*
172:*24*  175:*23*
177:*18*  181:*8*
182:*13, 14*  188:*18*
189:*15, 18, 19*
190:*7, 18, 21*  191:*4,
8*  192:*5, 10, 16, 19*
193:*4, 7, 14, 18, 19,
22*  195:*7*  201:*8, 9,
14, 15, 17*  202:*22*
203:*2, 4, 5*  204:*13,
14*  206:*12*  208:*15*
209:*19*  210:*6, 8, 10,
14*  216:*17*  217:*21*
218:*2, 8, 15*  219:*2,
16, 18*  220:*4, 6, 16*
221:*23*  222:*11*
225:*10*  226:*16*
227:*11*  229:*19*
230:*4, 13, 20*
235:*12, 13*  236:*6,
10, 11, 12, 19, 21, 23*
237:*6, 9, 20, 21, 22*
238:*2, 4, 11, 13, 15,
16, 17, 20, 23*
239:*11, 22*  240:*4, 6,
9, 10, 15, 17, 19*
241:*4, 9*  242:*11, 15*
243:*4*  244:*3, 9, 14,
20*  245:*3, 6*  246:*4*
247:*19, 22*  248:*8,
10*  249:*6, 16*
257:*16, 20, 22*
258:*9, 16, 22*  259:*1,
3, 5, 11, 12, 13*
260:*2, 7, 14, 21*
261:*4, 6, 8, 9*  262:*3,
5, 11, 15, 18, 22*
263:*1, 3*
**chiefs**  33:*12, 15*
39:*15*  98:*24*  99:*15*
130:5  133:*16*
146:*8*  217:*17*
218:*6*  219:*3*
238:*19*  248:*2*
**chief's**  61:*16, 20*
62:*1, 5*  149:*19*

150:*24*  190:*10*
236:*16*  261:*1, 17*
**choice**  236:*16, 19*
237:*8*  239:*22*
**choosing**  190:*12*
**chose**  25:*11*  99:*20*
138:*10*  170:*1*
249:*10*
**Chris**  13:*15*
238:*24*  248:*21*
**C-h-r-i-s**  13:*16*
**Cindy**  253:*8, 9*
254:5  256:*11*
**CITY**  1:7, 8  15:*1*
23:*20, 21*  24:5
27:*14*  28:2  29:5
49:*18*  50:6  51:*20*
52:*13*  80:*1, 5*  84:*5,
8*  88:*11*  95:4  96:*5,
11, 15*  97:*3, 6, 19,
23, 24*  98:*3, 8, 15,
21*  99:*1*  100:2
109:*3, 15*  116:*14*
119:*24*  133:*17*
140:*15, 17*  183:*13*
206:*21*  207:*9, 21*
208:*14, 23*  211:*9*
216:*12, 24*  217:*7,
11, 13*  227:*17*
228:*12, 22*  229:*2, 3,
5*  236:*7, 13, 14*
237:*3, 7*  239:*21*
240:*13, 16, 21*
241:*1*  246:*23*
247:*12*  248:*6*
**city's**  247:*5*
**CJ**  235:*6*
**claiming**  208:*3*
**clarified**  111:*21*
**clarify**  31:*13, 14*
**clean**  171:*5*
**clear**  5:*4*  131:*13*
**click**  82:*23*  83:*3*
**Close**  234:*20*
**closed**  150:*12*
**coalition**  140:*14*
**Coash**  34:*10, 20, 21,
24*  35:*18*  36:*6, 12*
37:*6, 9, 12, 13*
39:*19*  40:*20*  41:*5*
**C-o-a-s-h**  34:*20*



Willie Hunt - 3/21/2022
2:20-cv-02310-CSB-EIL # 17-5 Page 76 of 100
Paul Berge, et al. vs. City of Kankakee, et al.

**code** 109:*16*
236:*13, 14* 237:*7*
**collecting** 58:*24*
222:*17*
**college** 222:*8*
**colleges** 7:*24*
**color** 145:*4* 147:*20*
175:*14*
**Colorado** 48:*22*
**com** 48:*15, 18, 19*
**come** 24:*12, 17*
30:*5* 63:*18, 20*
71:*16* 75:2, *14, 20*
102:*23* 106:22
138:*24* 158:22
162:*19* 170:*1, 10,*
*19* 177:*19* 183:*10*
184:*22, 23* 215:*5*
250:*12*
**coming** 63:*9* 92:*1*
93:*4* 103:*22* 108:*6*
151:*18* 204:*24*
207:*8* 254:*1*
**command** 9:*12*
18:*22* 110:*18, 23*
119:*3, 7, 13, 20, 23*
120:*1, 5, 18, 22*
122:*4, 12* 126:*18*
137:*6, 7, 12* 138:*1,*
*14* 139:*2, 13*
140:*21, 22* 141:*24*
143:*2* 144:*13*
153:*11* 154:*2, 8*
192:*4* 201:*7*
225:*15* 235:*10*
237:*18*
**commander** 105:*17,*
*18* 121:*6, 8* 124:*18*
125:*11, 17, 20*
126:*8* 140:*7, 11*
142:*8, 10, 13, 14*
143:*6* 235:*13, 14,*
*17* 236:*24* 237:*9*
244:*23* 245:*8, 12,*
*15, 17, 22, 24* 248:*1,*
*9, 11, 14* 256:*12*
**commanders**
235:*14* 236:*22*
238:*22* 241:*3, 12*
**commencement**
264:*6*

**COMMISSION** 1:*7*
96:*2* 136:*7* 168:*22*
169:*3, 21* 170:*2, 11*
206:*12* 208:*11, 20,*
*23* 209:*3, 9, 12*
220:*22* 221:*6, 11*
224:*17* 225:*6*
250:*18, 21* 251:*7,*
*11, 19* 263:*11*
**commissioner**
132:*21*
**Commissioners**
133:*9* 165:*21, 24*
166:*16* 175:*1*
249:*11* 250:*7*
**Committee** 116:*13*
227:*22*
**committing** 109:*12*
**communicate** 65:*14,*
*17*
**communicated**
66:*23*
**communication**
66:*22* 82:*11* 93:*23*
190:*22*
**communications**
28:*7* 83:*3* 87:*11*
88:*2* 94:*1* 201:*7*
**community** 11:*13*
116:*14* 119:*16*
126:*18* 140:*19, 23*
141:*14* 144:*22*
154:*21* 155:*1, 5*
156:*19* 174:*23*
175:*10, 12, 21*
222:*7* 261:*24*
262:*14*
**company** 22:*18*
23:*13, 17* 24:*12, 15*
26:*16* 47:*10* 70:*4*
72:*20, 21* 73:*1, 4*
100:*8* 208:*16, 19*
232:*7, 9* 249:*9, 10*
250:*12* 252:*1, 3*
255:*5*
**compare** 215:*21*
**compared** 103:*11*
128:*12*
**comparing** 128:*3*
**compelling** 146:*3*

**compensation**
229:*2* 230:*7*
**compiling** 190:*9*
**complain** 154:*20*
155:*4*
**complained** 155:*12*
200:*23*
**complaining** 115:*7*
151:*4, 8* 181:*1*
197:*19* 200:*15, 21*
201:*1* 203:*16*
**Complaint** 108:*13*
114:*3, 9* 115:*3, 4,*
*11, 12* 132:*11, 13*
160:*14, 19, 22*
161:*2, 6, 8, 14, 20*
162:*13, 16, 18, 23*
163:*3, 14* 164:*24*
165:*10* 187:*4, 10,*
*23* 206:*8, 9, 16, 18*
208:*8* 227:*11, 12*
229:*12*
**complaints** 132:*17*
133:*6* 151:*19*
164:*4* 208:*9*
**complete** 54:*19, 22*
117:*10*
**completed** 76:*2*
**completely** 77:*11*
**completion** 71:*3*
**component** 101:*7,*
*13* 102:*10* 119:*23*
**components** 108:*7*
114:*6, 8*
**compound** 260:*12*
**comprised** 174:*22*
**computer** 102:*4*
150:*19* 151:*3*
**computers** 150:*5, 15*
**concern** 196:*22*
**concerned** 180:*14*
194:*22*
**concerning** 85:*2*
109:*14* 168:*1*
187:*19* 204:*18*
264:*8*
**concerns** 133:*5, 8*
187:*1*
**concluded** 263:*20*
**conclusion** 63:*2*
66:*13* 165:*3*

**conduct** 24:*8, 12*
167:*10* 168:*12*
169:*5, 14, 23*
69:*24* 77:*17* 96:*22*
151:*14* 160:*22*
168:*6* 187:*12, 15,*
*19* 250:*19* 251:*8,*
*19* 252:*3*
**conducted** 6:*14*
27:*13* 51:*17* 53:*22*
54:*10, 16* 69:*13*
74:*9* 89:*23* 102:*18*
104:*16* 153:*6*
154:*10* 159:*18*
163:*14, 19* 251:*4,*
*12* 254:*17* 255:*2, 5*
**conducting** 73:*24*
74:*18* 90:*18* 97:*18*
150:*17* 153:*9*
**confirmed** 240:*12*
**conflict** 257:*7*
**conflicts** 98:*16*
**confused** 54:*4* 88:*1*
168:*24*
**confusing** 92:*10*
199:*7*
**conquering** 128:*1*
**consent** 236:*7*
237:*3* 240:*16* 241:*1*
**consider** 50:*3*
**consideration**
203:*15*
**considerations**
202:*14* 204:*17*
**considered** 130:*11*
202:*8, 18* 203:*3, 4*
**consistent** 95:*2*
214:*17*
**constant** 94:*24*
**constitutes** 264:*13*
**Consultants** 24:*16,*
*17* 25:*6, 10, 17, 24*
26:*4* 210:*12*
**contact** 55:*17*
64:*16, 18, 21* 65:*1*
**contacted** 64:*13*
65:*6, 9* 66:*4, 14, 22*
75:*10* 76:*12*
**content** 197:*20*
**context** 128:*6, 12*
129:*1, 9*



Willie Hunt - 3/21/2022
2:20-cv-02319-CSB-EIL # 17-5 Page 77 of 100
Paul Berge, et al. vs. City of Kankakee, et al.

continued 82:5
116:3 117:23
contract 94:23
96:11, 15 98:8
99:19 188:4, 5, 11
contracts 187:19
conversation 36:14,
20, 24 37:17, 24
38:3 56:1, 10, 12
57:2, 11, 14, 18
58:8, 11 59:23
60:8, 10 61:17
63:12, 13 66:13
67:7, 12 74:12, 16
75:21 76:6, 22
82:10, 11 93:13, 16,
23 94:21, 22 95:13
138:21 139:4
155:7 157:10
158:23 179:24
187:22 188:3, 22
221:16 222:6
223:3, 7, 11
conversations 126:3
136:12 138:23
139:7 156:24
157:2 191:7 220:16
Cook 213:7, 15, 16
255:11, 15
cool 9:19
copies 80:13
100:24
copy 108:15, 19
111:23 171:5
216:24 246:10
247:5, 12
copyright 232:3
correct 4:16 5:19
6:5 15:21, 22, 23
19:5, 6, 7, 10, 11, 13,
14, 21, 22, 24 20:20,
21, 23 23:23 25:14,
15, 20, 21 26:16, 17,
19, 20 27:15, 16
28:20, 21 30:3, 4
31:1, 5, 8 32:12, 13
33:1, 2, 6, 7 35:19
37:9 39:4, 5 41:8,
11, 15, 16 42:6, 18,
21 44:18 45:22, 23
46:11, 12 47:6

50:16 51:14, 18, 19,
22, 23 52:1 53:7,
12 54:13, 18 56:12
58:12 59:6, 7, 9
61:23 62:3 63:2, 6,
7, 11, 18, 21, 22
67:13 68:5 73:20
74:13, 14, 20 77:8,
11, 12, 14, 15, 19, 20,
23, 24 78:2, 7, 8, 14,
15, 18, 19, 21, 22
79:12, 13 85:23
89:14, 15, 20, 21, 24
90:1, 3, 4, 12 92:3,
7, 18, 20, 21 95:7, 8,
13, 14 96:22 97:1,
2, 4, 5, 7, 8, 10, 11,
14, 20, 21 98:4, 9,
17, 18, 21, 22 99:2,
3, 11 101:4, 5, 7, 8,
11, 12, 16, 17 102:9,
10 107:2 109:23,
24 110:4, 6, 11, 12,
13, 14, 15, 19, 20, 23,
24 111:2, 5, 10, 20
113:4, 8, 9, 11, 15,
22, 23 114:2, 11, 14,
18, 22 115:16, 17,
20, 21, 24 116:4
117:16, 20 118:1,
12, 24 119:1, 3, 4, 7,
14, 24 120:2, 3, 6, 9,
13, 19, 20, 23, 24
121:1, 2, 6, 7, 9, 10,
12, 13, 15, 16, 17, 18,
21, 23 122:5, 8, 12,
14, 15, 17 125:8, 9,
12, 14, 15 127:4, 5,
8, 23 128:1, 5, 10
129:5, 12, 15, 18, 22
130:12, 15 132:15,
18, 22 134:2, 6, 7,
12, 23 135:9, 10, 12,
14, 17, 18, 24 138:2,
11 141:10, 16, 21,
22, 24 142:1, 5, 16,
19, 22 143:6
144:19 145:23, 24
146:3, 4, 6 148:1, 2,
4, 10 149:12, 13
150:2, 5 151:24

152:10, 15, 22
153:3, 7, 17 154:8,
13 159:9, 12, 15, 16
160:1, 4, 7, 14, 19,
20 161:3, 4 162:3,
9, 10 164:5, 10, 11,
13, 14, 17, 18
165:12, 13, 18, 19,
21, 22, 24 166:1, 3,
7, 8, 11, 17, 19, 20,
23 167:8, 19, 22, 23
168:2, 3, 6, 8, 10
169:3 172:21
173:5, 9, 10, 12, 13
174:4, 8, 9, 11
176:21 181:1, 4
182:16 185:11
186:11, 14 188:21
190:23 194:9, 10,
13, 16, 17 195:11
196:16, 24 198:5,
17, 18, 20 199:6
200:1, 16, 22 201:2,
7, 8, 16 202:1, 9
203:10, 11, 17
206:21 207:4, 5, 17,
19, 21, 22 208:16,
17 209:17, 20, 23,
24 210:21 211:3, 4,
13 213:22 214:5
217:19, 20 221:16,
17 222:9, 10 223:2
225:13 227:8, 13,
14 230:16 231:2, 5,
6, 8, 12, 13, 22
232:4, 5, 11, 13, 16,
18, 22, 24 238:7
240:13, 14, 18
241:15 242:12, 13
243:16 244:1, 2, 3,
7, 10, 12, 13, 15, 16,
17, 18, 21, 22, 24
245:1, 3, 4, 6, 7, 9,
10, 12, 13 246:2, 4,
5, 8, 9 252:1, 5, 11,
12, 14, 15, 19, 20, 23
254:11, 12, 14, 18
255:6, 9, 16, 17, 20,
21, 23, 24 256:3, 4
257:13, 17, 24

258:1, 4, 5, 7, 8
259:2 262:7
corrected 6:21 7:7
111:22
correction 6:18
correctly 109:6
257:22
Costello 234:8
council 80:2, 5
96:5 97:3, 6 98:9
236:8, 15 237:4, 5
239:21 240:13, 16,
22 241:1
counsel 264:18, 19
count 213:19
county 132:6
213:7, 15, 16 255:15
couple 22:6, 7
103:20 104:13
133:19 243:20
254:5 256:12, 13
course 56:6 211:12
COURT 1:1 13:5
116:10 227:18
228:13 231:1
246:14
create 187:7 199:10
creating 63:5
118:23
creation 175:5
credentials 18:2
123:23 126:13
creed 175:14
Crest 213:6 255:12
criminal 151:1
187:12, 15, 18 188:8
criteria 148:3
261:6, 8, 17, 20
critical 151:15, 24
152:10, 14, 17, 19,
21 153:1, 10 154:1
crotch 159:15
CSR 1:17 264:3
cultures 118:10
current 65:3
105:21 115:1
116:15 231:17
232:16
currently 7:19
11:16 12:2 14:14



Willie Hunt - 3/21/2022
2:20-cv-02310-CSB-EIL # 17-5 Page 78 of 100
Paul Berge, et al. vs. City of Kankakee, et al.

19:*23* 106:*8* 234:*5,*
*17* 235:*5*

**< D >**
**dad** 36:*22* 37:*2, 18*
**damages** 228:*17*
**dan.herbert@danher**
**bertlaw.com** 2:*5*
**DANIEL** 2:*2*
**Darrell** 13:*13*
**date** 55:*7* 73:*17*
82:*21* 83:*15* 213:*4*
222:*4* 232:*3*
**dates** 212:*24*
254:*15*
**Dave** 245:*16*
**day** 20:*13, 14*
68:*21* 71:*10* 183:*3*
210:*21* 211:*1, 5*
216:*8* 221:*5*
237:*19* 239:*3*
253:*21, 22* 265:*2*
**days** 71:*11* 211:*1, 2*
**deal** 192:*5*
**dealing** 28:*14*
99:*18*
**Deb** 13:*21*
**December** 15:*13*
255:*9*
**decision** 109:*18*
125:*22* 126:*7*
134:*8* 148:*9*
149:*19* 180:*20*
181:*16* 190:*10*
193:*3* 203:*1* 245:*5*
257:*23*
**decision-making**
145:*7*
**decisions** 182:*4*
246:*3*
**Dee** 233:*7*
**defendant** 89:*17*
167:*24* 171:*4, 23*
176:*12, 19*
**Defendants** 1:*12*
2:*9* 3:*10* 4:*12*
108:*12* 109:*9* 171:*1*
**Defenses** 108:*13*
**degree** 124:*1, 2*
126:*11*

**delegated** 142:*7, 8, 9*
**delete** 65:*12*
**demoted** 121:*8*
123:*3* 124:*12*
244:*6* 245:*9*
**demoting** 122:*16*
**demotion** 125:*19*
**dep** 6:*7* 7:*16, 17*
**Department** 6:*10*
7:*1, 11* 15:*1* 16:*18*
17:*1* 18:*7, 22*
21:*16* 23:*23, 24*
24:*9* 25:*14, 19, 20*
26:*22* 27:*1, 9* 28:*9,*
*15* 30:*11, 15* 31:*16,*
*22* 32:*24* 33:*4, 9*
36:*19, 23* 37:*21*
42:*11* 43:*14* 44:*9*
45:*13* 49:*6* 52:*4*
56:*6, 16, 21* 57:*5,*
*10* 58:*5* 59:*24*
60:*1, 4, 22* 62:*20,*
*21* 64:*18* 69:*3, 6,*
*13* 70:*10* 73:*20*
74:*23* 77:*14, 18*
78:*11, 17, 21, 24*
79:*8, 20* 82:*7*
84:*15, 17, 21, 23*
86:*5, 23, 24* 87:*2, 7*
91:*5* 94:*2, 13, 16*
95:*17* 96:*21*
100:*18* 101:*22*
102:*11* 103:*22*
104:*1* 105:*7, 9, 16*
106:*5, 9* 109:*3, 15*
110:*11, 19* 111:*9,*
*12, 19* 112:*5, 7, 10,*
*16* 113:*2* 115:*5*
116:*4, 18, 24* 117:*7,*
*13* 118:*1, 4, 7*
119:*15, 20* 120:*6*
121:*20* 122:*10*
124:*1* 129:*15*
132:*18* 136:*18*
137:*13* 138:*2*
139:*8* 140:*1, 13, 15,*
*17* 141:*1, 5, 9, 21*
142:*22* 143:*1, 2*
144:*21* 150:*5, 14,*
*19, 23* 151:*3*
152:*22* 153:*3, 11*

154:*2, 5, 12, 18*
155:*6* 161:*3*
162:*13* 163:*12*
164:*4, 9* 165:*1*
173:*12* 174:*4, 7, 11,*
*18, 20, 21, 24*
177:*21* 179:*1, 15*
181:*24* 185:*21*
190:*22* 193:*9, 16*
195:*20* 198:*5, 10*
200:*7, 8, 16, 22*
206:*4, 13* 207:*16,*
*18* 208:*15* 210:*24*
211:*2* 212:*9, 12, 17*
213:*8, 22* 217:*17*
221:*3* 222:*8* 226:*6,*
*21* 229:*8, 9, 13*
231:*5, 12, 16, 18*
233:*4, 15, 21, 24*
234:*3, 19, 22* 235:*1,*
*5* 236:*6* 239:*20*
241:*21* 243:*17*
244:*1* 247:*24*
250:*2* 251:*22*
255:*20, 23* 256:*7*
257:*10* 258:*7*
261:*23* 263:*7*
**departments** 28:*3*
49:*14, 22* 53:*5*
56:*7* 69:*7* 93:*14*
94:*8* 118:*24* 119:*3,*
*7, 13* 210:*16*
211:*13, 17* 212:*2,*
*18* 232:*10* 250:*17,*
*19* 251:*3, 7, 10, 16,*
*17* 256:*16*
**department's** 30:*20*
103:*23* 118:*7*
214:*15*
**depending** 105:*6*
210:*23* 211:*2*
212:*11*
**deposed** 206:*20*
207:*3, 6*
**deposition** 1:*14*
3:*10* 4:*11, 15, 20*
5:*8, 17, 22* 6:*1, 9,*
*20* 7:*3, 4, 7, 12*
10:*2* 108:*16*
111:*22, 23* 138:*4*
171:*6* 172:*5*

173:*17* 176:*14*
206:*24* 207:*2*
263:*20* 264:*10, 15*
**depositions** 159:*21*
**Deputy** 18:*20, 21*
19:*5, 19* 20:*3, 7, 10,*
*15* 49:*19* 58:*1*
86:*6, 9, 11* 87:*5*
108:*24* 109:*10*
123:*19* 124:*8, 14,*
*16, 20, 22* 125:*13*
135:*23* 136:*1*
139:*22, 23* 140:*6,*
*22* 141:*10* 142:*5*
172:*24* 175:*23*
181:*8* 182:*13*
189:*15* 192:*5*
219:*18* 221:*23*
235:*13* 236:*10, 19*
238:*4, 11, 13, 16, 19*
240:*4, 9, 19* 242:*11*
243:*4* 244:*14, 19*
245:*3* 248:*8, 10*
259:*12*
**deputychief** 88:*11,*
*12*
**deputychiefhunt**
88:*4*
**D-e-p-u-t-y-c-h-i-e-f-**
**h-u-n-t** 86:*14*
**deputychiefhunt@g**
**mail.com** 86:*21*
88:*14*
**derogatory** 128:*9,*
*19* 129:*8* 130:*11,*
*14, 22* 131:*8, 14*
**Describe** 177:*7*
**deserves** 163:*3*
**despite** 51:*24*
**destroy** 80:*18*
**destroyed** 80:*23*
**detectives** 245:*19*
**determine** 103:*5*
153:*6* 154:*11*
243:*15*
**determined** 197:*9*
**determining** 203:*23*
**developed** 116:*12*
**difference** 167:*17,*
*19, 20*



Willie Hunt  -  3/21/2022
2:20-cv-02310-CSB-EIL   # 17-5   Page 79 of 100
Paul Berge, et al. vs. City of Kankakee, et al.

**different** 11:*21*
14:*11* 30:*11* 31:*21*
33:*12* 56:*8* 75:*13*
77:*5* 85:*16* 102:*20*,
*22* 116:*20* 170:*12*
181:*10* 197:*14*
198:*1* 223:*9*
232:*22* 251:*3* 254:*1*
**direct** 139:*3, 6*
144:*3* 155:*7*
**direction** 177:*20*
264:*12*
**directly** 264:*20*
**Director** 8:*24* 20:*19*
**disability** 183:*20*
**disciplinary** 127:*3*
**discipline** 5:*15*
230:*3* 262:*2*
**disciplined** 100:*9*
129:*11, 14, 17*
171:*16* 196:*22*
201:*10* 229:*18*
**disclose** 98:*16, 19*
99:*8*
**disclosed** 99:*5, 14*
197:*20*
**discovery** 1:*14* 4:*11*
**discriminated**
111:*8, 20* 112:*5*
113:*3, 10, 12* 114:*1,
21, 23* 115:*15* 117:*6*
**discriminating**
114:*17* 117:*19*
173:*3* 196:*3*
**discrimination** 6:*9,
13* 7:*2, 13* 116:*22*
117:*23* 118:*6*
173:*4, 7* 196:*10*
208:*4* 229:*12* 246:*8*
**discriminatory**
116:*3* 172:*20*
195:*23* 196:*15, 23*
197:*4* 204:*12*
227:*13*
**discuss** 106:*20*
215:*14* 217:*9*
**discussed** 129:*10*
**discussing** 226:*1*
**discussion** 129:*2*
**dismissed** 207:*24*
**disputed** 162:*1*

**DISTRICT** 1:*1*
7:*21, 22* 10:*19*
12:*13* 20:*20* 21:*24*
**diverse** 144:*14, 16*
**diversify** 122:*10*
**diversifying** 111:*12*
**diversity** 110:*10*
118:*23* 119:*2, 6, 12*
**DIVISION** 1:*2*
246:*1*
**doctoral** 124:*2*
**document** 16:*18, 20*
71:*14* 95:*5* 112:*13,
15* 172:*9* 173:*22*
174:*16* 176:*24*
177:*1*
**documentation**
81:*11* 137:*3*
**documented** 95:*9*
261:*10*
**documenting** 100:*10*
**documents** 5:*7*
78:*17, 21* 80:*23*
81:*1, 14, 22* 89:*12*
96:*18* 106:*11*
**doing** 33:*13* 36:*1*
49:*7, 13, 21* 72:*5*
73:*19* 79:*9* 82:*3*
86:*18* 93:*14* 94:*5,
9, 12* 98:*20* 105:*9*
153:*13* 183:*13*
186:*3* 209:*20*
210:*15* 215:*16*
221:*2, 4* 227:*4*
260:*20*
**domestic** 103:*19*
**donated** 110:*2*
**Donell** 121:*1* 126:*6,
10* 152:*19* 159:*8,
14* 160:*13, 18*
162:*20* 187:*4, 11*
242:*7* 245:*22*
**Doster** 33:*17, 21*
34:*5, 10* 39:*12*
217:*22, 23, 24*
**D-o-s-t-e-r** 33:*21*
**dot** 48:*15, 18, 19*
**downstate** 20:*4*
**Dr** 10:*22, 23* 11:*2*
**dressed** 222:*4*

**drop** 223:*15*
**due** 164:*23* 208:*11*
**duly** 4:*2* 264:*7*
**Dumas** 61:*22, 24*
91:*10, 11, 18, 20*
92:*22* 93:*2, 6, 11,
22* 121:*17* 125:*24*
126:*15, 16* 134:*11,
13, 24* 135:*22*
136:*1, 6, 13* 137:*5,
8* 138:*11, 13, 18, 24*
139:*1, 9* 145:*5*
149:*11, 24* 150:*18*
152:*17* 155:*22*
157:*4* 159:*4*
189:*19* 193:*19, 22*
201:*8* 209:*19*
218:*15* 219:*4, 17*
222:*11* 226:*16*
240:*9, 12* 241:*4, 8*
242:*15* 243:*7*
244:*10*
**Dumas's** 150:*5*
**duties** 26:*22* 27:*18,
21* 47:*3*
**duty** 61:*1, 3* 98:*15,
19* 160:*21*

**< E >**
**earlier** 75:*14* 87:*16*
92:*13, 16* 171:*15,
24* 216:*20* 223:*1*
258:*2*
**early** 22:*23* 33:*24*
70:*11* 216:*16*
**Edison** 8:*17*
**education** 116:*19*
**EEOC** 229:*7*
**effect** 6:*11, 16, 17*
**effort** 142:*3* 175:*2*
214:*17* 215:*5*
**efforts** 141:*6*
**eight** 41:*2* 212:*15*
251:*3, 7*
**either** 32:*17* 57:*7*
88:*13* 96:*19*
106:*21* 156:*3*
157:*16* 222:*7*
248:*11*
**elapsed** 54:*21*
240:*8*

**elected** 11:*10, 12,
13* 109:*22* 110:*1*
111:*5* 119:*18*
120:*2* 121:*21*
122:*3* 233:*3* 235:*8*
243:*23*
**election** 15:*20, 22,
24* 16:*1*
**electronic** 176:*22*
**element** 139:*16*
**elementary** 8:*1, 16*
**Ellexson** 17:*18*
**e-mail** 48:*12* 64:*13,
16, 19, 22, 24* 65:*1,
3, 5, 8, 11, 15, 18*
66:*5, 6, 10* 82:*19,
20* 83:*15, 21, 22*
84:*2, 5, 8* 85:*15, 16,
17* 86:*1, 4, 8, 24*
87:*1, 4, 5, 7, 11, 14*
88:*11* 188:*23*
189:*2, 17, 21, 23*
191:*5*
**e-mailed** 82:*13*
192:*7*
**e-mails** 65:*12, 23*
81:*15, 21* 82:*23*
83:*12* 84:*6, 7, 13,
14, 18, 20* 85:*1, 13,
19, 21* 86:*3* 87:*10,
22* 88:*1, 3, 17, 20*
190:*18* 191:*1, 21*
212:*21, 24* 216:*13*
250:*1*
**employ** 175:*11*
**employed** 6:*24*
7:*20* 23:*15* 25:*13,
19* 26:*15* 42:*10*
52:*21* 63:*23* 64:*1*
67:*8* 68:*19* 69:*19*
71:*18* 78:*24* 79:*8*
91:*5, 13, 21* 92:*23*
93:*2, 7* 95:*4, 10, 16,
23* 96:*3, 6, 9* 97:*17*
98:*15* 100:*11*
106:*8* 112:*7*
133:*16* 216:*23*
217:*6* 234:*22*
235:*1* 254:*11, 13*
**employee** 264:*17, 18*
**employees** 95:*5*



Willie Hunt - 3/21/2022
2:20-cv-02310-CSB-EIL # 17-5 Page 80 of 100
Paul Berge, et al. vs. City of Kankakee, et al.

employment 81:2
82:1 93:24 94:18,
23 95:2, 7 99:1
226:20 227:1
encompass 7:23
encourage 18:14
ended 82:1
endorsement 145:10
enforcement 142:23
212:2 261:12, 16
entire 74:17
139:23 162:2 246:1
entitled 17:20
164:24 172:13, 20
173:24
environment 187:8
equipment 101:24
essentially 245:2
ethnic 174:22
Etzel 239:1 241:17,
19 244:5 245:8
evaluate 94:7
106:16
evaluation 70:6, 12
101:15 249:1, 14,
19, 22 253:14
255:19
evaluations 51:21
79:5 224:16 226:3,
7 249:9, 12
Evaluator 22:14, 15
210:4, 7, 18 211:1,
6, 8, 22 212:3, 19
214:3 216:7, 15
226:18
evaluators 211:11
212:13 223:20
224:19 225:11
250:3 252:8
Evanston 56:8
213:8, 10 255:19
eventually 15:19
56:17 143:3, 4
165:18 244:6
Evergreen 2:8
everybody 76:15
188:12
everybody's 150:24
258:14
evidence 75:17
167:22 168:1, 5

169:19 170:13
221:19 222:22
exact 41:24 53:15
54:24 55:5, 7
71:16 82:21
exactly 44:4 57:8
69:5 94:11 198:15
exam 28:13 217:3
226:1
EXAMINATION
3:1 4:6 54:10
77:17, 18, 22 99:24
103:12 107:16
205:19 223:4, 8, 22
243:21 257:9 264:7
examinations 70:1
74:19 224:2
examined 4:4
example 103:18
105:9 186:5
exams 224:12
225:24
Excuse 11:1 31:11
Executives 118:21
exempt 18:24
Exhibit 3:10
108:17 170:24
171:1, 7 172:4, 6
173:16, 18 176:13,
15, 19 231:7
expect 259:11, 13
expensive 26:13
experience 44:14
70:2 116:19
211:12, 16, 20, 24
212:1
explain 183:5
184:2, 10, 16, 23
186:19
explained 181:19
182:1, 3 184:4, 14
185:10 188:4
explaining 183:15
express 186:24
expressed 179:8


< F >
face 159:15
Facebook 3:10
127:4 151:20, 24
152:6 153:15

154:1 171:4, 16
172:1 181:1, 5
196:14, 19, 21, 24
197:10, 20 198:3,
13 199:15 229:15,
19 230:4
facilitator 73:8
100:23 105:6
facilities 49:2
facility 57:7 58:3
62:20 190:14 194:1
fact 84:4 96:10
110:8 123:3, 8
126:6 131:17
143:8, 10 144:6
145:11, 12 146:23
148:14 149:3, 23
154:12 155:11
158:24 159:7
160:3 166:9
179:17 182:7
194:21 197:7, 18
198:3 200:14, 20
factor 128:13, 16
145:22 146:12
203:23
factored 126:7
factors 204:2, 16
fair 32:23 51:3
55:13 89:11
103:10 104:19
107:10 113:8
119:21, 22 154:3
192:21 196:1
200:6 202:16, 17
231:19
fall 23:1, 2, 5
familiar 232:6
far 28:13 124:14
150:23 178:4, 10
191:9 199:11
214:1 216:12, 20
236:1, 5 241:21
259:5
favor 34:21
FBI 187:4, 11
fear 179:8
fearful 178:23
179:19

February 16:16
83:1 133:11, 23
136:4
federal 207:20, 24
227:7, 15, 24
232:22 246:14, 20
fee 71:6, 7
feel 4:24 31:13
132:1
feeling 130:18, 22
131:8
feelings 131:14
156:15
fees 228:16
felt 106:21 122:23
129:19 200:10
260:5
female 9:21, 22
223:23 233:9
234:19 252:18
253:1, 2, 3, 7, 9, 10,
17, 18
females 111:13
139:18 141:18
175:2, 20 211:18
233:3, 17 234:13
field 183:10
figured 146:18
260:22
file 5:9, 10, 13 17:6
116:9 228:20
261:22, 23
filed 115:8 184:3
187:4, 11 206:8, 21
207:20 227:6 229:7
files 146:17 221:2,
4
filing 187:17
fill 17:2 68:14, 18
70:14 238:14
filled 68:23 72:9
89:12
fills 236:23
final 30:6, 9, 10, 11,
15, 17, 20 31:19
51:21 52:13 92:1,
5 107:9 108:7
109:18 203:1
finally 176:12
financial 98:3



Willie Hunt - 3/21/2022
2:20-cv-02310-CSB-EIL # 17-5 Page 81 of 100
Paul Berge, et al. vs. City of Kankakee, et al.

182:*4*

**Find** 151:*20* 250:*10*

**fine** 4:*9* 7:*18*

**finish** 5:*1* 61:*7*
137:*18* 180:*16, 18*
181:*7* 185:*8* 187:*24*

**finished** 55:*11*
93:*10* 252:2

**FIRE** 1:*7* 23:*24*
96:*1* 133:*9* 136:7
165:*21, 24* 166:*15*
168:*22* 169:*3, 20*
170:2, *11* 174:*24*
206:*11* 208:*10, 20,*
*22* 209:2, *9, 12*
220:*21* 221:6, *11*
224:*17* 225:6
249:2, *11* 250:5, *9,*
*14, 18, 21* 251:7, *11,*
*18* 263:*11*

**FIRM** 2:2

**first** 9:*16* 22:*19*
38:*19* 44:*15* 45:*10*
52:*11* 57:*11, 14*
68:22, *24* 69:*4, 6, 9,*
*13* 72:7 73:*9*
74:*15* 83:*15* 91:22
105:*14, 15* 109:*8*
118:*8* 121:*24*
128:*14* 130:*1, 2*
139:*12* 156:*11*
161:8 162:*24*
171:*1* 172:9 177:6
182:*12* 207:8, *13*
208:5 212:*17*
249:22 250:*20*

**fit** 183:*23*

**Five** 13:*24* 33:*12,*
*13* 88:23 89:*1, 2*
107:*14* 146:7, 8
215:2, *12* 217:*17*
242:*3, 4*

**flat** 71:*5, 7* 188:*10*

**flawed** 204:*20*

**fleet** 188:*4, 5, 11*

**focus** 199:*14*

**follow** 65:*24*
103:*24* 153:*4, 5*

**followed** 32:*24*
33:4 164:8 168:5,

7 201:*12*

**follows** 4:*5*

**follow-ups** 205:*18*

**force** 181:22

**forced** 239:*14*

**foregoing** 264:*10*

**Forest** 213:7, *16*
255:*16*

**forever** 156:*21*

**form** 17:2 27:2
32:5 68:*17* 70:*13*
76:24 90:6, *24*
92:8 99:*12* 103:*13*
107:*3, 17* 117:*9*
122:*18* 123:*20*
131:*18* 132:*18*
139:*1* 147:2 149:6
150:8 153:*18*
157:22 158:*10*
165:2 180:*9*
194:*18* 203:*18*
229:24 260:*11*

**formal** 229:*11*

**former** 206:*19*
209:*19* 229:*19*
230:*4*

**forth** 103:7 164:*8*

**forward** 87:2

**forwarded** 84:*18*
86:*1*

**found** 150:*13, 22*
187:*3, 16* 221:*5*
246:*14*

**Foundation** 32:*5*
35:*14, 21* 52:*14*
68:*10* 99:*13* 112:9
117:*10* 122:*19*
123:*21* 131:*19*
147:*3, 11* 148:*16*
149:*5* 152:*1*
153:*18* 156:*23*
157:*23* 158:*11*
165:*4* 167:*1, 10*
168:*13* 169:*5, 13,*
*23* 170:*7, 16*
179:*23* 180:*10*
194:*19* 196:7
197:*2, 11* 199:22
200:*2, 9, 17* 203:*19*
209:*7, 16* 211:*14*
212:*5* 219:*9, 13*

224:*6, 21* 225:*17*
226:*23* 230:*23*
231:*20* 232:*12, 17,*
*23* 237:*11* 239:*15,*
*23* 241:*6* 243:*5*
259:*17*

**four** 33:*13* 107:*14*
118:*15* 133:*15*
146:*8* 188:*13*
217:*17* 235:*3, 4, 11,*
*12, 23* 239:*5, 6*
243:*24*

**fourth** 219:2

**FRANK** 1:*8* 17:*14*
24:*19, 20* 25:*2, 4, 8*
50:*19* 55:*13* 91:*11*
100:*7* 178:*12*
182:*14* 208:*15*
210:*10* 220:*5*
225:*5* 249:*21*
250:*11*

**FRAZIER** 2:*7*

**free** 4:*24* 31:*13*

**front** 169:*20*
217:*10*

**full-time** 209:22
233:*12* 234:6

**function** 210:*24*

**fund** 184:*19*

**fundamentally**
204:*21*

**funded** 186:7

**fundraisers** 110:*4*

**funny** 9:*17*

**further** 106:*20*
176:*11* 204:*17*
205:*16* 243:*21*
263:*17, 18*

**furthermore** 124:2

**< G >**

**gain** 100:*21*

**gang** 182:*19*

**Gary** 135:2, *5*
137:*14, 19, 20*
161:*17, 24* 163:*5,*
*15, 20* 184:*3* 185:7
218:*14, 22, 24*

**gathered** 187:*21*
188:2

**gathering** 56:2, *11,*
*14, 18* 58:*10* 62:*13,*
*22* 75:4 76:*1, 4*

**Gathing** 13:2, *6*

**G-a-t-h-i-n-g** 13:*6*

**Gearhart** 233:*6*

**gender** 174:22

**gene** 128:*14*

**general** 71:*17*
118:*9* 130:*19*
141:*21* 142:*23*
181:*13* 224:*21*

**generates** 232:9

**generically** 163:*11*

**Genevar** 9:*15*
10:*23, 24* 11:*1*

**G-e-n-e-v-a-r** 9:*23*

**getting** 76:2, *5*
115:*19, 23* 170:*12*
178:*11* 212:*24*

**gist** 128:*17*

**give** 4:*21, 23* 48:*13*
57:*9* 62:*21* 65:*23*
66:*6* 82:*21* 87:*14*
105:*15* 111:*23*
141:*13* 148:*12*
188:*11* 215:*12, 13,*
*14, 22* 235:*9*

**given** 14:*17* 50:*23*
55:*7, 19* 56:*4, 24*
57:*9* 62:*18, 19*
70:*16, 18* 112:*21*
132:*9* 142:*4*
164:*23* 166:*19, 22*
167:*3, 7, 12, 17*
168:*10, 16, 17, 19,*
*21, 23* 169:*2, 7, 11,*
*17* 170:*10, 19*
202:*9* 203:*9, 14*
212:*14* 216:*7, 8, 11,*
*24* 217:*3, 7* 264:*13*

**gives** 30:*14* 175:*13*

**giving** 4:*20* 21:*19*
75:2 100:*19*
176:*18* 250:*13, 15*

**glass** 161:*23*

**Gmail** 86:*6, 20*
87:*1, 2*

**go** 31:*11, 15* 61:*6,*
*9* 70:*11* 82:*18*
86:*3* 141:2 146:*5*



156:*13, 14*  158:*3*
162:*19*  177:*6*
180:*17*  181:*15, 22*
188:*6, 15*  214:*2, 14,*
*16, 21*  215:*1, 2*
217:*10*  221:*20*
228:*1*  230:*21, 24*
236:*15*  240:*2*
247:*8*  262:*2*
**goal**  144:*20*  174:*20*
175:*3*
**goals**  119:*12*
**goes**  83:*6*
**going**  12:*13*  21:*20*
23:*8*  27:*11*  35:*10*
50:*9*  52:*15*  61:*6, 9,*
*14*  65:*22*  81:*9, 11*
88:*19*  89:*9*  107:*19*
112:*8*  143:*16*
148:*12*  170:*24*
172:*4*  176:*12*
177:*1*  180:*5, 6*
181:*11, 12, 14*
183:*13*  184:*14*
186:*20*  188:*11*
190:*1*  192:*20*
205:*5*  206:*15, 18*
209:*6*  214:*2*  216:*6*
217:*3*  219:*8*
220:*22*  221:*4, 8*
224:*6, 20*  227:*18*
228:*13*  229:*24*
233:*5*  234:*14*
241:*5*  247:*4, 13*
250:*11*  259:*6*
**Golden**  233:*6*
**Good**  4:*8, 10*  27:*7*
75:*11*  88:*22*  89:*1,*
*3*  94:*6*  124:*14*
156:*11, 12*  182:*2*
185:*9*
**goodness**  29:*10*
**grade**  108:*7*  215:*4*
**grammar**  7:*23*  8:*11*
**granted**  109:*13*
**grapevine**  182:*23*
**great**  82:*22, 24*
86:*18*  190:*5*  246:*13*
**grievance**  184:*4*
**ground**  4:*19*  5:*4*

**group**  41:*1*  113:*14,*
*16, 17, 19*  118:*11*
151:*23*  152:*6, 8*
153:*4, 7, 10, 15, 21,*
*22*  198:*20, 22, 23*
199:*1, 6, 9*  201:*5*
227:*6*  228:*19*
**groups**  201:*3, 4, 6*
229:*17*
**guess**  7:*9*  21:*10*
28:*4*  176:*23*  178:*3*
202:*19*
**guesses**  26:*2*
**guide**  156:*13*
**guides**  216:*21*
**guy**  155:*2*  156:*12,*
*21*  179:*18*  180:*7*
**guys**  88:*23*  107:*8,*
*13*  145:*19*  148:*13*
179:*18*  180:*11, 12,*
*19, 22*  181:*10, 15*
182:*2*  183:*4, 15*
184:*20*  185:*2, 5, 9,*
*11*  258:*15*
**guy's**  261:*21*

**< H >**
**half**  88:*24*  254:*14*
255:*1*
**Hall**  1:*16*  264:*3*
**hand**  178:*13, 17, 24*
265:*1*
**handed**  224:*12*
**handful**  210:*15*
**handicap**  175:*16*
**handle**  104:*1*
**handled**  28:*14, 19*
178:*11*
**handling**  28:*16, 17*
**happen**  39:*6*  41:*23*
142:*11, 12*  249:*5*
253:*5*
**happened**  64:*12*
80:*17*  85:*19*  132:*7*
134:*22*  135:*8, 11*
148:*14*  161:*18, 19*
163:*17*  181:*2*
182:*14*  191:*3*
201:*14*  249:*7*
**happening**  161:*24*
**harassed**  159:*11*

**harassment**  165:*11*
172:*21*
**hard**  71:*15*
**head**  4:*22*  15:*15*
127:*18*
**health**  149:*22*
**hear**  36:*4*  132:*3*
133:*2*  154:*17, 20*
155:*4*  215:*15, 17, 20*
**heard**  35:*15, 18*
36:*3, 5, 12*  133:*6*
152:*8*  154:*22*
156:*16*  162:*24*
188:*8*  215:*18, 20*
**hearing**  39:*7*
156:*18*  161:*8*
166:*19, 22*  167:*7,*
*16, 18, 21*  168:*6, 10,*
*18, 19, 21, 23*  169:*2,*
*8, 11, 18*  170:*5, 12,*
*21*  208:*10*
**Hearsay**  197:*1*
**held**  9:*1*
**he'll**  215:*19*
**help**  124:*7*  209:*3*
**HERBERT**  2:*2*
3:*1*  4:*7, 14*  13:*7*
26:*7*  27:*4*  32:*7*
35:*8, 22*  36:*10*
52:*15, 17*  64:*9*
68:*12*  73:*13*  75:*18,*
*23*  77:*2*  78:*4*
81:*20*  86:*7*  88:*22*
89:*4, 7, 8*  90:*8*
91:*3*  92:*12*  98:*13*
99:*23*  104:*3*  107:*7,*
*21*  108:*14, 19, 21*
112:*11*  117:*14*
122:*21*  124:*6*
127:*1*  130:*6, 7*
131:*21*  134:*17, 19*
137:*23*  138:*6, 19*
147:*8, 12, 16, 22*
148:*20*  149:*8*
150:*10*  152:*3, 4*
153:*23*  157:*3*
158:*2, 7, 14*  160:*9*
165:*7*  167:*5, 14*
168:*14*  169:*10, 15*
170:*3, 8, 17*  171:*9,*
*12, 19*  172:*8, 16, 19*

173:*20*  176:*17*
180:*1, 13*  193:*2*
194:*20*  195:*5, 15,*
*21*  196:*11*  197:*6,*
*15*  198:*2, 8*  199:*4,*
*23*  200:*5, 13, 19*
204:*1*  205:*11, 15*
206:*24*  207:*10, 12*
209:*6, 16*  211:*14*
212:*4, 23*  213:*11,*
*14*  215:*18*  219:*8,*
*13*  221:*18*  222:*21*
224:*6, 20*  225:*17*
226:*22*  229:*24*
230:*17, 23*  231:*14,*
*20*  232:*12, 17, 23*
234:*14*  236:*17*
237:*11*  239:*15, 23*
241:*5*  243:*5, 20, 22*
246:*20*  247:*4, 6, 13,*
*18*  259:*21*  260:*16*
263:*16*
**hereto**  264:*20*
**hereunto**  265:*1*
**Hey**  65:*20*  139:*8*
151:*19*  156:*20*
157:*8*  191:*5*
215:*17, 20*  223:*16*
258:*17*
**high**  7:*23*  8:*2, 7, 8,*
*9, 10, 13, 14*  57:*8*
58:*3*  222:*7*
**higher**  37:*10*  39:*3*
40:*6, 17*  45:*16*
46:*16*  51:*12, 18*
52:*5, 12*  89:*19*
134:*21*  144:*8*
176:*10*  194:*15*
195:*10*  196:*5*
204:*10*  261:*18*
**highest**  18:*22*
19:*20*  243:*24*
**Hill**  213:*6*  255:*12*
**Hillcrest**  213:*5, 6*
255:*8*
**hire**  175:*20*
**hired**  10:*9*  11:*18*
14:*8*  22:*17*  23:*11,*
*12*  34:*4*  47:*5, 10*
51:*2*  66:*23*  67:*4,*
*12, 23*  68:*2, 14*



Willie Hunt - 3/21/2022
Paul Berge, et al. vs. City of Kankakee, et al.
2:20-cv-02310-CSB-EIL # 17-5 Page 83 of 100

69:*18*, *24* 72:*9*, *19*, *22* 73:*1* 77:*16* 90:*17* 92:*14*, *17* 98:*5* 121:*15* 137:*10* 189:*6* 208:*13* 228:*20* 252:*3*

**hiring** 24:*4* 64:*8* 109:*1* 139:*12* 141:*7* 208:*19* 209:*4*, *14*

**Hispanic** 140:*13* 218:*17*

**Hispanics** 111:*14* 139:*18* 233:*23* 234:*24*

**history** 127:*19*, *22*

**hit** 103:*3*, *6*, *17* 104:*6* 181:*11*, *14* 182:*7*, *15*, *20* 183:*1* 184:*11*, *21* 185:*4*, *14*, *18*, *22*, *24* 186:*1*, *4*, *10*, *13* 187:*1*, *5*, *6*

**hold** 22:*12* 40:*24* 61:*6* 63:*24* 99:*5* 144:*5* 212:*8* 243:*8*

**holding** 127:*17*

**home** 56:*6* 181:*15*

**homework** 221:*1*

**homicides** 34:*1*

**hope** 223:*16*, *17*

**hostile** 187:*8*

**hour** 88:*24*

**hourly** 71:*5*

**hours** 70:*11* 104:*13* 211:*5* 214:*4* 216:*2*

**house** 81:*4*

**HR** 10:*15* 17:*16*, *17* 128:*16* 162:*20*

**human** 10:*16*, *18* 128:*14* 229:*8*

**hundred** 248:*23*

**HUNT** 1:*10*, *14* 3:*1*, *10* 4:*3*, *8*, *13*, *15* 86:*11* 87:*5* 89:*9* 108:*11*, *16*, *23* 109:*9* 149:*2* 171:*4*, *6*, *23* 172:*5* 173:*16*, *17* 176:*14* 205:*21*

**Hunter** 133:*12*, *20* 134:*1*, *20* 135:*3*, *6*, *19* 136:*2*, *13* 143:*8*, *10*, *13* 144:*6*, *13*, *15*, *22* 145:*1*, *7*, *13*, *14* 146:*10*, *23* 148:*12* 194:*8* 195:*9*, *14*, *18* 219:*7* 220:*1* 243:*11* 252:*11*

**Hunter's** 146:*22*

**Hunt's** 171:*3*

**hypothetical** 122:*19* 147:*3*, *11* 148:*16* 149:*6* 150:*9* 165:*4* 167:*2*, *10* 168:*12* 169:*6*, *13*, *24* 170:*7*, *16* 197:*12* 203:*19* 204:*23*

**< I >**

**ID** 3:*10* 18:*4*

**idea** 71:*17* 138:*20* 192:*21* 214:*13*

**identification** 70:*16* 108:*18* 171:*8* 172:*7* 173:*19* 176:*16*

**identified** 130:*5* 233:*9*

**identify** 130:*4* 188:*19* 190:*8* 212:*23*

**ill** 156:*14*

**ILLINOIS** 1:*1*, *17*, *19* 2:*4*, *8* 149:*24* 150:*17* 230:*11* 265:*2*

**images** 127:*17*

**imagine** 261:*22*

**important** 177:*20*

**imposed** 109:*13*

**inappropriate** 129:*18* 151:*1*

**incident** 133:*1* 153:*22* 154:*22* 155:*3* 164:*17*

**include** 17:*23* 116:*19*

**included** 87:*23* 115:*2* 164:*15*

173:*7*, *11* 189:*16* 190:*5* 191:*1*

**including** 60:*13* 153:*12*

**incomplete** 122:*19* 147:*3*, *11* 148:*16* 149:*6* 150:*9* 165:*4* 167:*1*, *10* 168:*12* 169:*5*, *13*, *24* 170:*7*, *15* 197:*12* 203:*19* 204:*22*

**incorrect** 6:*2*

**increase** 110:*22* 119:*12* 122:*11* 242:*1*

**increasing** 110:*17*

**indicated** 158:*16*, *21* 171:*15* 214:*1*

**indicates** 232:*3*

**indicating** 21:*19*

**indirect** 139:*7* 155:*8*

**indirectly** 264:*20*

**individual** 4:*12* 17:*17* 33:*22* 44:*20* 46:*7* 60:*5* 62:*3*, *24* 102:*24* 103:*20* 107:*10* 123:*8* 133:*12* 135:*7* 146:*1* 178:*4* 204:*16* 212:*2* 219:*24* 223:*12* 257:*23*

**Individually** 1:*10* 166:*13*

**individuals** 28:*8* 32:*4*, *17*, *21* 40:*14*, *17* 41:*6* 45:*1*, *16*, *22* 53:*5* 101:*11*, *14* 106:*3*, *4*, *7* 126:*10* 132:*22* 135:*4*, *8*, *15*, *20* 136:*3* 143:*15* 144:*8* 145:*8*, *13*, *15* 146:*2*, *11* 151:*7* 174:*7* 180:*8* 196:*6* 202:*13* 203:*14* 204:*18* 211:*12* 212:*1* 219:*22* 241:*14* 253:*13* 256:*14*, *18*, *24* 258:*3*, *18*, *23* 259:*2*,

4, *13*, *14* 261:*18* 262:*12*, *16* 263:*4*, *8*, *12*

**influence** 77:*13*

**inform** 93:*11* 94:*17*, *21* 96:*6*

**information** 5:*16* 12:*14* 28:*16* 90:*21* 93:*12* 99:*4* 151:*3* 154:*4* 197:*10* 201:*13* 214:*19*, *20* 243:*14*, *15*

**informed** 98:*23*

**informing** 95:*5*

**infringing** 129:*24*

**initial** 115:*3*

**initiated** 57:*17*, *19*

**injured** 183:*18*

**injury** 183:*9*

**insensitivities** 112:*19*

**interest** 98:*16* 257:*7*

**interested** 49:*13*, *21* 53:*8* 264:*20*

**intern** 240:*18*

**Internal** 162:*21*

**interrogation** 159:*23* 160:*4*, *7* 161:*10*, *11* 162:*1*, *4*, *5* 163:*2*, *7*

**Interrogatories** 89:*14*

**interruption** 171:*18*

**interview** 164:*16*

**intimidate** 187:*9*

**introduction** 168:*5*

**investigated** 149:*24* 164:*4* 199:*13*

**investigating** 199:*12*

**investigation** 18:*7*, *10* 150:*4*, *13*, *18* 153:*6*, *10*, *13* 154:*10* 159:*18* 160:*22* 161:*5*, *12* 162:*12* 163:*3*, *14*, *19* 164:*13*, *15* 165:*9*, *10* 199:*8*

**investigations** 151:*14*



Willie Hunt - 3/21/2022
2:20-cv-02310-CSB-EIL #17-5 Page 84 of 100
Paul Berge, et al. vs. City of Kankakee, et al.

**involve** 27:*18*, *21* 208:*5* 260:*21*, *23*

**involved** 26:*18*, *23*, *24* 67:*20* 72:*2* 77:*7* 90:*10* 96:*20* 101:*21* 103:*18* 104:*19* 105:*2* 126:*2* 148:*22* 179:*9*, *12*, *17* 193:*8*, *13*, *16* 198:*23* 247:*19*, *24* 248:*4*, *15*, *19* 249:*24* 252:*8*, *18* 253:*13* 256:*18* 258:*11* 261:*12*

**involvement** 177:*7* 192:*11* 193:*22* 220:*12* 225:*7*, *8* 249:*2* 250:*5*, *9*

**irregardless** 195:*15*

**issue** 127:*3* 132:*14* 225:*3*, *4*

**issues** 110:*9* 112:*16*, *17* 115:*5* 117:*13*, *15*, *16* 118:*2*, *3*, *4*, *7* 149:*17*, *18*, *21*

**item** 208:*21* 209:*8*, *12*

**items** 222:*18* 229:*18*

**its** 140:*15* 141:*5*, *6*


**< J >**

**j.hunt@gmail.com** 87:*21*

**James** 17:*18*

**Jay** 238:*24* 241:*17*, *19*

**Jefferson** 1:*19* 2:*3*

**Jen** 233:*7* 234:*7*

**Jess** 13:*2*, *3*

**Jesse** 13:*4*

**job** 82:*4* 139:*19* 142:*3* 174:*11*

**jobs** 139:*19*

**Joe** 59:*17*

**John** 34:*23*

**Johnston** 13:*21* 181:*13* 185:*19*

**joined** 119:*5*, *8*, *10*

**Joliet** 105:*10*, *19* 106:*10* 256:*13*

**Jose** 59:*17* 218:*10*

**judge** 207:*24* 228:*5*

**judgment** 129:*20*, *21*

**July** 20:*17* 83:*17*, *18* 189:*10*, *13*

**June** 9:*2* 11:*19* 14:*9* 20:*24* 21:*1* 189:*10*

**junior** 8:*13*

**jury** 228:*3*

**justification** 137:*2*

**justified** 148:*6*


**< K >**

**KANKAKEE** 1:*7*, *8* 5:*11* 6:*10* 7:*1*, *10*, *21*, *22* 8:*8*, *13* 15:*1* 20:*19* 21:*15*, *23*, *24* 23:*21* 24:*9* 25:*14*, *18*, *19* 27:*1*, *9*, *14* 28:*8* 29:*6* 32:*24* 33:*3*, *8* 37:*2* 42:*10* 45:*13* 56:*16*, *20* 57:*8* 58:*3* 60:*4*, *21* 73:*20* 78:*11*, *16*, *20*, *24* 79:*8*, *15* 91:*5* 94:*2*, *16* 95:*4*, *17* 96:*12*, *15* 97:*10*, *13*, *19*, *23* 98:*1*, *3*, *15*, *21* 99:*2*, *10* 100:*2* 101:*21* 109:*3*, *15*, *16* 110:*10*, *19* 111:*9*, *19* 112:*4*, *7*, *22* 113:*1* 116:*3*, *23* 117:*24* 119:*20* 121:*20* 133:*17* 136:*17* 137:*12* 140:*1* 152:*7* 153:*2*, *14* 154:*12* 161:*2* 162:*13* 164:*3*, *9* 172:*12* 174:*21*, *23* 175:*23* 176:*3* 193:*9*, *15* 199:*12*, *13* 207:*13*, *21* 208:*14*, *24* 211:*9* 213:*22* 216:*12*, *24* 217:*7*, *11*, *14* 229:*9*, *13* 231:*5* 233:*4*, *15* 234:*19*, *22* 235:*1*, *5*

**241**:*21* 248:*6*, *19*, *20* 251:*11*, *18*, *22* 256:*19* 257:*2*, *9*

**KCC** 57:*1*, *3*, *6*, *7* 58:*4* 60:*1* 62:*18*, *19*

**keep** 178:*12* 220:*18* 257:*16* 260:*9*

**keeping** 213:*19*

**Kennedy** 8:*17*

**kept** 179:*2*, *3* 226:*11*

**key** 103:*3*, *6* 104:*6*

**Kid** 245:*11*

**kid's** 44:*6*

**Kidwell** 121:*11* 124:*2*, *7*, *16* 125:*4*, *20* 238:*24* 241:*10*, *11* 244:*5* 245:*9* 248:*21*

**K-i-d-w-e-l-l** 121:*12*

**Kidwell's** 124:*11*

**kind** 47:*14*, *15* 140:*10* 141:*3* 161:*22* 188:*13* 214:*14*

**Kinkade** 119:*9*

**knew** 28:*12* 89:*16*, *22* 90:*2*, *5*, *9* 91:*7*, *9* 95:*15* 97:*12*, *17*, *22* 98:*2*, *7* 106:*4* 124:*15* 136:*15* 180:*12* 216:*4* 247:*11* 253:*1* 258:*13*

**know** 4:*18* 6:*22* 12:*5*, *17*, *20* 14:*13* 18:*10* 22:*23* 25:*9*, *22* 26:*8* 29:*20* 34:*24* 35:*3* 39:*11*, *13*, *24* 40:*3* 41:*24* 43:*24* 44:*11*, *24* 45:*3*, *5*, *6* 47:*11* 48:*4* 50:*4*, *20* 51:*6* 52:*18*, *21* 53:*15*, *16* 54:*21*, *24* 55:*5*, *9* 57:*4*, *5*, *10* 59:*23* 61:*13*, *16*, *17* 66:*3* 67:*15*, *17*, *18*, *19*, *24* 68:*6*, *9* 69:*5* 71:*12* 72:*19*, *21*, *24* 73:*3*,

**6** 74:*24* 78:*23* 79:*6*, *7*, *21*, *24* 80:*1*, *4*, *8*, *12* 85:*19* 89:*10* 90:*21* 91:*12* 93:*18*, *20* 94:*12*, *14* 95:*15*, *19* 96:*17* 101:*18*, *23* 103:*15* 105:*11* 106:*7* 112:*14* 124:*10* 125:*22* 126:*5*, *10*, *20* 130:*24* 131:*7*, *10*, *11*, *24* 132:*1*, *5*, *13* 135:*19* 136:*2*, *10*, *16* 137:*5* 142:*12* 143:*21* 145:*9* 148:*22* 149:*14* 151:*2*, *6* 157:*14*, *17*, *24* 158:*5*, *6*, *15*, *24* 159:*3*, *20* 161:*5*, *12*, *22* 163:*23* 164:*21* 165:*16*, *17* 166:*18* 168:*16*, *17*, *19*, *21* 169:*1* 170:*10*, *19*, *21*, *22* 171:*21* 172:*23* 176:*6* 179:*2*, *6* 180:*22* 181:*6*, *9* 182:*1*, *5*, *18* 183:*14* 185:*22* 186:*13* 187:*5*, *8*, *21* 188:*2*, *9* 189:*3*, *8* 191:*5* 192:*1*, *14*, *17* 193:*5* 195:*3* 199:*2*, *3* 200:*11*, *12*, *14* 201:*5*, *19*, *22*, *23* 202:*2*, *3* 203:*2*, *4* 204:*4*, *13* 207:*3* 208:*9*, *18*, *22* 209:*2* 214:*13* 221:*3* 222:*6* 223:*20* 226:*5*, *9*, *12* 228:*9* 229:*16* 234:*11*, *17*, *21*, *24* 237:*13* 239:*18*, *21*, *24* 243:*2*, *6* 246:*16*, *18*, *19* 247:*10*, *12* 248:*18* 249:*21* 250:*2* 251:*17*, *23* 253:*17*, *24* 256:*14* 257:*3* 258:*6*, *13* 261:*3*, *21* 262:*3*, *6*,



Willie Hunt - 3/21/2022
2:20-cv-02310-CSB-EIL # 17-5 Page 85 of 100
Paul Berge, et al. vs. City of Kankakee, et al.

*8*, *10*, *13*, *14*, *17*, *18*, *22*

**knowing** 179:*15*

**knowledge** 6:*5*, *6* 100:*6* 124:*13* 163:*13* 164:*17* 165:*9* 177:*4* 187:*3* 192:*9* 213:*1*

**known** 99:*5* 131:*2* 158:*18* 198:*4*

**knows** 136:*19*

**KOSMAN** 1:*8* 17:*14* 24:*19*, *20* 25:*2*, *4*, *8* 55:*14* 91:*11* 94:*3*, *10* 100:*7* 160:*6* 178:*12*, *15* 179:*6*, *18* 180:*23* 182:*14* 192:*16*, *19* 193:*4*, *7*, *14*, *18* 194:*22* 195:*7* 203:*5* 204:*13*, *14* 206:*12* 208:*15* 210:*6*, *11*, *14* 220:*5*, *6*, *16* 225:*10* 226:*17* 249:*6*, *10*, *16* 257:*22* 258:*6*, *9*, *16*, *22* 259:*1*, *3*, *5* 260:*2*, *7*, *14* 261:*4*, *9* 262:*3*, *5*

**Kosman's** 249:*22*

**KREISSLER** 1:*4* 46:*10* 50:*15* 51:*17*, *21* 52:*9* 53:*12* 59:*16* 60:*14* 67:*22* 68:*4* 90:*11* 92:*16* 184:*13* 192:*15*, *18* 202:*5* 220:*9*, *23* 257:*24*

< L >

**Lacie** 233:*7*, *8* 234:*8*

**lack** 231:*11*

**lacked** 118:*9*

**Lamont** 39:*23*

**laptop** 62:*23* 222:*18*

**Latham** 219:*6*, *17*, *19*

**L-a-u-r-i-e** 47:*22*

**LAW** 2:*2* 136:*8*, *11*, *15*, *21* 142:*23* 147:*23* 148:*7* 212:*2* 230:*10*, *13* 232:*16*, *22* 261:*12*, *15*

**laws** 232:*21*

**lawsuit** 89:*16* 90:*20* 114:*7* 115:*9* 116:*9* 156:*8* 187:*17* 203:*8*, *17* 206:*21* 207:*20*, *23* 208:*3* 227:*7*, *16*, *24* 228:*20* 246:*7*

**lawyer** 246:*13*

**lead** 34:*1*

**leaders** 116:*13* 118:*20* 152:*21*, *23*

**leadership** 141:*7* 211:*18*

**leaked** 154:*5* 198:*10*

**leave** 76:*2*, *6* 243:*11*

**leaving** 36:*18*, *23* 37:*20* 39:*8*

**left** 28:*17* 43:*14* 113:*17*, *19* 232:*2* 243:*10*, *12*

**legal** 165:*3* 167:*9* 168:*12* 169:*5*, *14*, *23* 228:*23*

**letter** 204:*8* 220:*21* 239:*20*

**letters** 201:*20*, *24* 202:*7* 203:*13* 204:*8* 205:*7*, *22*, *23* 206:*1*, *5*, *6*, *14*

**Lexipol** 232:*3*, *6*, *15*

**License** 1:*17*

**lieutenant** 19:*21* 20:*3* 29:*8*, *14*, *17*, *18*, *24* 32:*1*, *3*, *16*, *18*, *20*, *21* 37:*3* 38:*4* 42:*20*, *22*, *23* 43:*1*, *9*, *10* 46:*11*, *22*, *24* 50:*12*, *24* 51:*8*, *11* 52:*10* 53:*19*, *23* 54:*12*, *18*, *23* 55:*12* 58:*15*, *18* 63:*6* 67:*21* 68:*4*

74:*2*, *11* 76:*9* 89:*20* 92:*2*, *19*, *24* 100:*3* 106:*10* 109:*18*, *19* 125:*20* 129:*19* 134:*16* 141:*1*, *2* 142:*11* 177:*8*, *10*, *24* 178:*11* 188:*17* 194:*4*, *12* 201:*23* 204:*7* 212:*10* 224:*1*, *4*, *14* 226:*1* 240:*3* 241:*18*, *20*, *23* 242:*6*, *8*, *9*, *21*, *24* 243:*3*, *9* 244:*20* 248:*1*, *5*, *11*, *14* 255:*2* 256:*3*

**lieutenants** 191:*23* 194:*7*, *11* 223:*21* 235:*17*, *18*, *20*, *22*, *23*, *24* 239:*3*, *5*, *6* 241:*24* 242:*2* 252:*9*, *13*, *21* 253:*2*, *14* 254:*9* 256:*19* 257:*2*, *9*, *13*

**limited** 191:*2* 210:*1*

**Lincoln** 8:*17*

**line** 208:*21* 209:*8*, *12* 260:*1*

**lines** 155:*9* 156:*22*

**list** 30:*6*, *9*, *10*, *11*, *14*, *16*, *17*, *20* 31:*4*, *16*, *19* 33:*6* 37:*10* 39:*19* 40:*1*, *11*, *22* 41:*3*, *4*, *5* 44:*8*, *11*, *12*, *16* 45:*12* 46:*5* 55:*8*, *14* 63:*5*, *10*, *18*, *21* 92:*1*, *5* 93:*4*, *8*, *9* 101:*10* 132:*22* 134:*2* 135:*13* 136:*23* 144:*1* 145:*15* 148:*1* 177:*23* 181:*11*, *14* 182:*8*, *16*, *20* 183:*1* 184:*11*, *21* 185:*4*, *14*, *18*, *23*, *24* 186:*1*, *4*, *11*, *13* 187:*2*, *5*, *6* 194:*5*, *8*, *11*, *16* 201:*20* 219:*23* 220:*8* 225:*24* 227:*19* 230:*15*, *21*

250:*3* 259:*15*

**listed** 103:*21* 251:*2*

**listen** 145:*6*

**lists** 30:*12* 194:*4*, *14* 217:*19*

**little** 103:*11* 141:*5* 144:*2* 205:*10* 238:*1*

**Lives** 127:*14*

**located** 48:*20*

**location** 207:*7* 214:*2* 216:*6*

**Lombardi** 184:*3*, *4*, *22*

**long** 9:*1* 20:*15* 22:*4* 24:*5* 33:*22* 53:*14* 66:*3*, *14*, *23* 88:*23* 118:*14* 131:*2* 258:*13*

**longer** 207:*15* 239:*19* 242:*9*

**longevity** 116:*19*

**look** 7:*16*, *17* 9:*17* 12:*11* 17:*6* 48:*1* 82:*17* 108:*13* 126:*18* 140:*16*, *18* 148:*8* 151:*7* 162:*5* 163:*8* 171:*13*, *17* 172:*17* 175:*11* 204:*15* 212:*20* 223:*4* 246:*12* 247:*7* 261:*22* 262:*1*

**looked** 53:*4* 85:*8*, *24* 146:*17*, *18*, *21* 148:*11* 163:*4*, *5*, *9* 171:*22* 247:*11*

**looking** 7:*3* 9:*19* 71:*14* 82:*18*, *20* 83:*7* 85:*5*, *7* 112:*13* 151:*9* 174:*2* 175:*20* 177:*16* 208:*7* 243:*15*

**looks** 176:*21*

**L-o-r-i** 47:*23*

**Lory** 47:*16*, *20* 48:*4* 49:*8* 52:*18*, *22* 53:*1* 54:*8* 55:*17* 57:*12* 58:*23* 59:*18*, *21* 61:*9* 63:*10* 65:*15*, *18*, *23* 72:*11*, *14* 73:*2*, *5*, *6*,



Willie Hunt   -   3/21/2022
2:20-cv-02319-CSB-EIL   # 17-5   Page 86 of 100
Paul Berge, et al. vs. City of Kankakee, et al.

*9*, *18*  74:*6*, *24*
76:*22*  78:*10*  80:*8*,
*12*  81:*19*, *21*  82:*16*
84:*7*, *13*  85:*22*
105:*5*  189:*4*  214:*8*,
*19*  216:*13*, *16*
221:*14*  222:*17*
223:*12*, *15*
**L-o-r-y** 48:*14*
**Lory's** 47:*24*  72:*16*
**lose** 230:*6*
**lot** 131:*13*  143:*22*,
*23*  154:*4*  181:*9*
182:*2*  183:*14*
221:*13*
**lower** 244:*6*  248:*2*

**< M >**
**maintain** 109:*2*
**major** 114:*3*
**majority** 175:*24*
176:*3*  216:*14*
**makeup** 110:*18*
119:*23*  122:*12*
137:*7*, *11*  139:*8*
140:*12*  174:*20*
175:*9*  231:*16*, *17*
241:*20*  242:*14*
**making** 6:*11*, *15*
33:*1*, *9*  34:*8*  60:*19*
62:*10*  79:*19*
114:*14*  145:*23*
148:*8*  151:*19*
157:*12*  161:*20*
164:*24*  202:*24*
209:*13*  220:*16*, *20*
**male** 9:*21*  113:*22*
120:*12*  121:*9*, *11*,
*15*  123:*2*  137:*15*,
*20*  140:*13*  186:*15*
236:*3*
**males** 32:*14*
113:*21*  116:*1*
122:*5*  133:*13*
134:*4*, *21*  143:*9*
186:*11*, *14*, *23*, *24*
235:*11*  236:*4*  244:*1*
**malicious** 183:*21*
**Man** 29:*10*  129:*5*
181:*15*, *20*  183:*5*

**manner** 79:*12*
254:*1*
**Maramontis** 235:*3*
**March** 1:*18*  16:*9*,
*10*, *11*, *12*  85:*9*, *11*,
*17*, *23*  87:*10*  88:*7*
213:*23*
**Marci** 233:*6*
**Mark** 8:*17*  108:*11*
171:*4*  172:*4*  176:*12*
**MARKED** 3:*10*
108:*17*  171:*7*
172:*6*  173:*18*
176:*15*, *19*
**marking** 173:*15*
**marriage** 175:*16*
**married** 233:*8*
**Martinez** 59:*17*
218:*10*, *15*  219:*5*, *6*,
*7*, *17*  235:*2*
**Mary** 14:*4*
**master** 76:*9*
**master's** 124:*1*
126:*11*
**material** 56:*18*
59:*10*, *19*, *21*  60:*13*
61:*10*  62:*7*, *11*, *22*,
*24*  76:*3*  100:*15*
177:*23*  222:*19*
248:*16*
**materials** 58:*11*, *14*,
*24*  59:*5*, *6*, *8*  60:*6*
62:*14*  223:*4*
**matter** 84:*4*
127:*14*  147:*21*
**matters** 264:*1*
**MAYOR** 1:*9*
15:*16*, *18*  16:*23*
17:*9*, *10*  19:*7*
79:*21*  95:*21*
109:*22*  110:*1*
111:*2*, *5*  119:*17*, *18*
120:*2*, *18*  121:*14*,
*21*  122:*7*  123:*10*,
*17*, *23*  125:*23*, *24*
126:*15*, *16*  137:*9*,
*10*, *24*  151:*4*, *6*, *8*,
*15*, *18*, *24*  152:*5*, *10*,
*12*  153:*12*  154:*17*
155:*4*, *18*, *22*  156:*3*
157:*7*, *8*, *18*, *19*

158:*8*, *13*, *15*  159:*1*
233:*3*  235:*9*, *21*
236:*7*, *12*, *20*, *21*
237:*3*, *5*, *18*, *19*
238:*10*  239:*4*, *21*
240:*15*  243:*23*
244:*12*  245:*6*  246:*4*
**mayor's** 237:*10*
**McCuskey** 228:*5*
**MCGRATH** 2:*7*
3:*5*  26:*5*  27:*2*
32:*5*  35:*6*, *20*  36:*7*
52:*14*  64:*3*  68:*10*
73:*10*  75:*16*, *22*
76:*24*  78:*3*  81:*19*
86:*3*  89:*2*  90:*6*, *24*
92:*8*  98:*11*  99:*12*
103:*13*  107:*3*, *17*
108:*20*  112:*8*
117:*9*  122:*18*
123:*20*  126:*20*
130:*4*  131:*18*
134:*15*, *18*  137:*18*
138:*3*, *16*  147:*2*, *10*,
*15*, *18*  148:*15*
149:*5*  150:*6*  152:*1*
153:*18*  156:*23*
157:*22*  158:*4*, *10*
160:*8*  165:*2*
166:*24*  167:*9*
168:*11*  169:*4*, *12*,
*22*  170:*6*, *15*
171:*11*  172:*14*, *18*
179:*23*  180:*9*
192:*24*  194:*18*
195:*1*, *12*  196:*7*
197:*1*, *11*, *22*  198:*6*,
*24*  199:*22*  200:*2*, *9*,
*11*, *17*  203:*18*, *21*
204:*22*  205:*4*, *9*, *17*,
*20*  207:*14*  209:*10*,
*18*  211:*19*  212:*7*
213:*3*, *18*  219:*10*,
*15*  221:*21*  222:*23*
224:*10*, *23*  225:*23*
227:*2*  230:*2*, *18*
231:*3*, *15*  232:*1*, *14*,
*19*  233:*1*  234:*16*
236:*18*  237:*16*
239:*17*  240:*1*
241:*7*  243:*13*, *19*

246:*18*  247:*1*, *3*, *15*
259:*16*  260:*11*
263:*18*
**mean** 8:*4*  24:*21*
49:*16*  62:*10*  142:*9*
177:*13*  187:*16*
192:*4*  202:*10*
238:*13*  242:*17*
**meaning** 22:*7*  40:*6*
**meant** 36:*8*  175:*9*
**mechanic** 188:*13*
**media** 126:*17*
129:*12*  199:*16*
**meet** 70:*11*  73:*9*,
*22*  74:*5*  214:*8*, *9*
**meeting** 63:*10*, *12*
74:*5*  97:*4*  221:*7*
**Melvina** 233:*7*
234:*7*  235:*7*
**member** 113:*1*
161:*2*  229:*12*
**members** 11:*8*, *15*,
*22*  12:*20*  14:*8*
80:*1*, *4*  154:*13*
155:*5*  156:*19*
194:*16*  243:*24*
262:*14*
**memo** 16:*21*, *22*, *23*
21:*19*
**memory** 151:*16*
**Mendez** 234:*8*, *12*
235:*2*
**mental** 175:*15*
**mention** 227:*19*, *20*
**mentioned** 155:*22*,
*24*  184:*1*, *9*  185:*6*,
*9*  186:*12*, *22*
**mentioning** 202:*5*
**mess** 9:*23*
**message** 143:*5*
**met** 72:*13*, *15*  74:*1*
156:*11*  207:*12*
215:*10*
**MICHAEL** 2:*7*
5:*18*  44:*7*  59:*9*, *12*
134:*22*  135:*12*
256:*2*, *17*
**middle** 22:*24*
**Mike** 108:*14*, *19*
166:*6*, *10*, *19*, *21*



Willie Hunt - 3/21/2022
2:20-cv-02310-CSB-EIL # 17-5 Page 87 of 100
Paul Berge, et al. vs. City of Kankakee, et al.

167:*7* 168:*21*
171:*9* 172:*16*
**military** 30:*15*
31:*17* 44:*14*
116:*19* 126:*12*
**Miller** 40:*10*, *12*, *13*
**Mine** 114:*15*
**minorities** 40:*11*
110:22 111:*13*
113:*12* 114:*19*
138:*1*, *15* 139:2, *13*
141:*6*, *7*, *15*, *17*, *18*,
*20*, *23* 142:*18*, *21*,
*24* 144:*21* 175:2,
*20* 227:22 231:*11*
**minority** 6:*14* 7:2,
*13* 110:*18* 111:*20*
112:*6* 116:22
117:5, *19* 122:*11*
139:*13* 140:*1*
142:*16* 155:*5*
174:*20* 176:*4*, *5*
211:*17* 218:*16*, *19*,
*21* 231:*16*, *18*
**minutes** 88:*24*
89:*1*, 2
**mispronounce**
229:*19*
**missed** 215:22
**misstate** 75:*17*
196:*8* 222:*24*
**Misstates** 64:*3*
75:*16*, 22 98:*11*
122:*20* 149:*7*
166:*24* 194:*19*
195:*12* 221:*18*
222:*21*
**mistaken** 162:*1*
**Mistakes** 150:*6*
**mistreating** 155:*5*
**misunderstandings**
112:*18*
**misuse** 150:*5*
**misusing** 150:*19*
**mmcgrath@osmfm.c**
**om** 2:*9*
**Monday** 1:*18*
**money** 110:*2*
181:*21* 183:*13*
184:*18* 228:*11*, *14*,
*15* 229:2, *5*

**Monferdini** 41:*5*
59:*16*
**monkey** 128:*12*, 22
**monkeys** 128:*4*
**month** 14:*21* 16:*5*,
*6* 21:*5* 22:*20*
67:*15* 69:*8* 181:*24*
189:*8* 240:*11*
**monthly** 70:*20*
**months** 66:*20*
67:*10*, *11* 75:*9*
76:*12*
**Morgen** 233:*6*
234:*7*
**morning** 4:*8*
**Morris** 213:*17*
**moved** 186:*7*
241:*19* 242:*19*
243:*7*
**movie** 38:*8*
**moving** 183:*9*
**multiple** 194:*4*
**MURPHEY** 2:*7*

**< N >**
**name** 8:*4* 9:*16*, *23*
13:*5* 44:*5*, *6* 47:*20*,
*24* 72:*18* 81:*17*
127:22 150:*24*
218:*11* 229:*20*
240:*19* 253:*8*
**named** 133:*12*
152:*23* 240:*10*
241:*9* 256:*16*
**names** 105:*11*, *14*,
*15* 186:*21* 223:*15*
**nation** 34:*1*
**National** 118:*20*
175:*15*
**nature** 224:*21*
**Neanderthals** 128:*5*
**necessarily** 139:*6*
178:*4*
**necessary** 109:*2*
**need** 4:*23* 7:*17*
60:*20* 108:*19*
115:*1* 116:*14*
139:*8* 142:*9* 191:*5*
237:2, *10*
**needed** 60:*23* 76:*8*
110:*10*, *21* 114:*4*

119:*6*, *14* 138:*14*
162:*17* 183:*17*
214:*19*
**needs** 164:*7*
**negative** 128:*13*, *16*
130:*18* 153:*17*
**negotiate** 107:*9*
**negotiated** 107:*1*
**neighborhoods**
142:*16*
**never** 36:*5*, *12*
56:*6* 74:*11* 90:*13*
95:*9* 98:*23* 116:22
156:*14* 159:*17*
162:*12* 168:*10*
197:*3*, *23* 199:*12*
217:*13* 237:*13*
240:*12*, *17* 247:*10*
248:2 258:*10*
**new** 7:*9* 10:*5*
143:*16* 158:22
210:*10*
**Newcomb** 48:*3*, *4*
52:*19*, 22 53:*1*
54:*8* 55:*17* 57:*12*
58:*24* 59:*19*, *21*
61:*9* 62:*7* 63:*10*
65:*15*, *18*, *23* 67:*8*
72:*11*, *14* 74:*24*
76:*23* 78:*10* 80:*9*
105:*5*
**N-e-w-c-o-m-b** 48:*3*
**newcomb@stanard**
48:*14*
**nice** 222:*3*
**NICKEY** 1:*10*
130:*24* 131:*7*, *9*, *17*,
*23* 132:*3*, *20* 133:2,
*7* 165:*23* 166:2, *9*
**Nicki** 81:*15*
**nine** 8:*6* 183:*8*, *18*,
*19* 227:22 241:*23*
**NOBLE** 118:*11*, *12*,
*23*
**Nodding** 15:*15*
**Nolte** 38:*4*, *6*, *8*, *9*
**N-o-l-t-e** 38:*9*
**non-African** 45:*18*
**non-biased** 180:*20*
**norm** 146:*5*

**normally** 146:*6*
248:*8*
**Nos** 31:*4* 32:*4*
135:*7*
**note** 108:*11*
**notes** 215:*16*, 21
**notice** 1:*20* 167:*3*,
*12*, *17* 168:*16*
169:*7*, *8*, *17* 170:*4*,
*10*, *19*
**nudge** 148:*13*
**NUMBER** 3:*10*
4:*13* 10:*4*, *7* 31:22
48:*10* 55:*18*, *20*
71:*16* 130:*5*
213:*21* 233:*8* 242:*1*
**numerous** 120:*4*

**< O >**
**Object** 76:*24*
112:*8* 117:*9*
131:*18*, *20* 209:*6*
219:*8* 224:*6*, *20*
229:*24* 234:*14*
241:*5*
**Objection** 26:*5*
27:*2* 32:*5* 35:*6*, *20*,
*21* 36:*7* 52:*14*
64:*3* 68:*10* 73:*10*
75:*16*, 22 90:*6*, *24*
92:*8* 98:*11* 99:*12*
103:*13* 107:*3*, *17*
122:*18* 123:*20*
138:*3*, *16* 147:2, *10*,
*15*, *18* 148:*15*
149:*5* 150:*6*, *8*
152:*1* 153:*18*
156:*23* 157:22
158:*10* 160:*8*
165:2 166:*24*
167:*9* 168:*11*
169:*4*, *12*, 22 170:*6*,
*15* 179:*23* 180:*9*
194:*18* 195:*1*, *12*
196:*7* 197:*1*, *11*
198:*6*, *24* 199:22
200:2, *9*, *17* 203:*18*
204:22 209:*16*
211:*14* 212:*4*
219:*13* 221:*18*
222:*21* 225:*17*



Willie Hunt  -  3/21/2022
2:20-cv-02319-CSB-EIL    # 17-5    Page 88 of 100
Paul Berge, et al. vs. City of Kankakee, et al.

226:22  230:17, 23
231:14, 20  232:12,
17, 23  236:17
237:11  239:15, 23
243:5  259:16
260:11
**objections**  197:22
**objective**  104:6
215:6
**obtain**  175:2
**obviously**  4:23
**occurred**  161:22
**occurring**  6:10
**O'Connor**  10:11, 13,
14, 17
**ODELSEN**  2:7
**offered**  91:22
**offhand**  184:8
**office**  48:23, 24
61:16, 20  62:2, 6
75:5, 15, 20  93:17
121:24  161:18, 21
181:10  186:19
207:6  235:9  238:1,
3
**officer**  27:8  39:3
51:22  99:11
102:21  103:1, 19,
21  112:23  116:23
120:13  127:17
135:1, 2  144:10
154:24  173:8
181:13  206:19
208:14  211:21
218:13, 23  247:11
**officers**  6:15  7:2,
14  72:4, 5  111:20
112:6, 21  115:4
117:6, 19  132:12
139:14  140:1
144:24  153:16
154:1, 6, 12, 21
155:4  164:5
174:22  177:24
178:7  185:18
186:4  194:24
195:19, 23, 24
196:1, 4, 5, 16, 20
197:13, 18  198:23
199:6  203:8
204:24  209:15

211:17  233:10, 12,
15, 18, 20, 23  234:2,
6, 19  235:4  253:4,
18  258:11  261:2
262:1
**Official**  1:11  16:17
108:24  109:10
162:18
**officially**  161:7
162:15
**Oh**  12:15  16:7, 10,
21  29:10  44:5
62:16  70:5  81:17
112:14  172:16
215:22  242:3
247:3  251:1
**Okay**  4:18  5:2, 3, 6,
10, 17, 21, 24  6:7,
19, 22  7:8, 19  8:3,
7, 9, 15, 21, 23  9:10,
14, 18  10:4, 7, 9, 17,
21, 23  11:10, 21
12:2, 4, 7, 15, 16, 23
13:8, 12, 14, 20, 22
14:7, 16, 19  15:2, 7,
12, 16, 19  16:7, 12,
17, 20, 24  17:4, 8,
15, 19, 23  18:2, 4, 6,
18, 21  19:15  20:6,
15, 18  21:8, 14, 22
22:4, 7  23:4, 14, 18,
21  24:1, 20  25:5
26:2, 11, 14  28:18
29:7, 13  30:1, 13,
17, 23  31:7, 10, 21,
24  32:20, 23  33:11,
15  34:6, 17, 21, 24
36:17, 20  37:4, 8,
15  38:1, 10, 18
39:15, 22  40:12, 14
41:6, 13, 17  42:1, 2,
7, 17  43:17, 12, 18,
24  44:8, 15, 24
45:5, 9, 24  46:3, 4
47:15, 24  48:7, 23
49:8, 15, 20  50:8,
14, 21  51:5, 10
52:18  53:10, 14, 21
54:6, 15, 21  55:16
56:20  57:2, 17, 20,
23  58:2, 7, 17  63:4

64:12  66:1, 2, 3, 9,
12, 21  67:6, 11, 15,
18  68:1, 18, 21, 24
69:3, 21  70:13, 23
71:12  72:2, 7  73:3,
6  74:4, 8  75:13
76:19  77:21  78:9,
13, 23  79:3, 14
80:4, 13, 19  81:1, 9,
12, 13  82:5, 9, 15
83:10, 20  84:3, 6,
12, 20, 24  85:5, 12,
15  86:2, 18  87:14,
24  88:19, 20, 21
89:4, 16  91:4, 12,
20, 24  92:13, 19, 22
93:22  94:14  95:9,
13, 21  97:16  98:2,
7  100:9, 24  101:3
102:6, 12  103:5, 10
104:22  105:1, 15,
24  106:11, 24
108:2, 10, 23  109:6,
8  110:8  112:20
113:7  114:6, 16, 20
115:14  116:2, 6, 9,
11  117:5, 23
118:11, 16, 18, 22
119:10  120:1
122:7, 24  123:14
124:19  125:3, 5
127:2, 24  128:8
130:10, 14  131:7,
11, 15  132:20
133:5, 11  134:1, 8,
11  135:6  136:12,
20  138:7, 10, 13, 20
139:5, 11, 15, 23
140:20  141:20
142:2  143:8
144:16  145:5, 20
146:10  148:11, 21
149:1, 11, 23
150:16  151:6, 23
153:1, 24  154:10
155:3, 11  156:3, 9,
20  157:11, 19
159:4, 7, 17  160:13
161:12  162:17
165:17  166:6, 15,
21  167:21  168:20

170:23  171:22
172:3, 11, 13, 20
173:2, 24  174:2
175:4, 8, 18, 22
176:6, 9, 18  177:2,
6  178:8  181:3
185:2, 5, 13, 17
186:9, 17, 24  188:2,
24  189:5, 11, 16
190:1, 5, 11, 21
192:14  193:1, 5
194:3, 8  196:14, 18
199:5, 14, 18  200:6
201:4, 11, 15, 19, 23
202:3, 6  203:12
205:17  206:11
208:13  213:2
215:22  216:6
220:20  222:2
224:16  225:8
226:11  227:24
233:9  237:7  240:5
242:11, 23  243:19
244:9  245:17
246:1, 3, 6  247:3,
13  248:4, 14, 22
250:14, 23  251:1, 2,
16, 21, 24  252:13,
16, 24  258:21
260:17  261:15
262:21
**on-board**  137:9
241:8  242:15, 17
**Once**  146:13
166:12  171:20
181:21  220:9
237:17
**ones**  8:11  115:23
191:12  216:16, 18,
20  256:10
**ongoing**  35:20
**online**  14:18, 20
**open**  62:11  76:4
188:12  242:18
**opened**  21:9
242:17, 19, 21
**opening**  243:8
**operate**  109:2
**operated**  108:23
**operating**  109:10



Willie Hunt - 3/21/2022
Paul Berge, et al. vs. City of Kankakee, et al.
2:20-cv-02310-CSB-EIL # 17-5 Page 89 of 100

opinion 112:*1*
147:*1* 258:*10*
259:*14*
opportunity 202:*8*
opposed 107:*16*
108:*7*
order 33:*1, 4, 9*
34:*8* 35:*11* 39:*16*
41:*11, 20* 43:*5, 8*
44:*2* 52:*13* 93:*8*
139:*12* 146:*6*
188:*5* 217:*18*
246:*21*
ordered 246:*18, 22*
247:*3, 10*
orders 33:*13, 16*
organization
118:*18, 20* 119:*5, 8,*
*11*
organizational
236:*5*
orientation 175:*14*
origin 175:*15*
original 113:*16*
originally 48:*21*
ought 153:*14*
outcome 227:*15*
228:*9* 264:*21*
outdated 114:*4, 24*
227:*12*
outside 94:*12, 18*
95:*6* 181:*24* 185:*20*
oversaw 142:*7*
overtime 183:*7*
owners 47:*6, 8, 11*

**< P >**
p.m 263:*20*
page 76:*15* 108:*22*
109:*21* 176:*20*
181:*5*
pages 171:*14*
paid 70:*18, 24*
71:*5, 8, 13, 17*
210:*20* 228:*11, 16*
254:*18*
paper 95:*10*
100:*24* 126:*23*
papers 16:*13*
paperwork 68:*14,*

23 70:*14*
Park 2:*8*
part 26:*21* 113:*7,*
*14* 115:*10, 11, 12*
118:*11, 14* 122:*7*
123:*1, 18* 138:*8*
140:*4* 142:*22*
143:*1, 2* 145:*6*
149:*2, 19* 153:*6, 22*
162:*9* 182:*19*
184:*11, 20* 186:*10*
188:*22* 190:*3*
191:*13, 21* 199:*6, 8*
202:*12* 205:*6, 7*
215:*9, 22* 216:*5*
227:*6* 259:*24*
260:*18*
participate 248:*2*
particular 102:*24*
214:*14, 21* 232:*21*
particularly 56:*7*
parties 264:*19*
partly 115:*19*
parts 102:*20*
part-time 210:*1*
party 28:*16*
Pasal 154:*23*
passed 224:*2*
passing 145:*14*
Passwater 79:*4*
120:*16* 122:*1, 6*
124:*3* 125:*6*
154:*14* 155:*12, 15,*
*19, 24* 156:*4, 9, 15*
157:*5, 12, 14* 158:*9,*
*17, 21, 24* 159:*2, 5,*
*6* 238:*6, 10, 20, 23*
239:*10* 240:*2, 6, 9*
241:*10, 11* 244:*5, 14*
Passwater's 157:*8*
patrol 140:*11*
183:*10* 211:*21*
245:*24* 246:*1*
patrolman 42:*5, 13*
58:*18*
PAUL 1:*2* 40:*10,*
*13* 44:*3* 59:*15, 16*
159:*7, 15, 22*
160:*14, 22* 161:*1, 6,*
*13* 162:*14* 163:*1*

164:*23* 165:*17*
166:*3* 220:*9*
pay 19:*19* 20:*2, 5*
209:*3* 228:*22*
paycheck 80:*19, 24*
paychecks 80:*14*
payment 96:*24*
97:*10*
payments 209:*13*
pays 96:*21* 208:*18*
PD 132:*10* 213:*5, 7,*
*9*
pending 5:*2*
pension 19:*16, 18,*
*23* 20:*4, 5, 10*
people 9:*7* 39:*8*
43:*8* 76:*9, 10*
104:*19, 22* 105:*1*
115:*18, 24* 122:*16,*
*17* 127:*19* 128:*10,*
*19* 129:*8* 130:*12,*
*15, 18, 22* 131:*8, 14,*
*17* 132:*2, 4* 133:*3*
137:*22* 151:*4, 15,*
*19, 20* 154:*21*
155:*1* 163:*6*
175:*11* 178:*13*
179:*8, 12, 15, 19*
180:*4, 6, 24* 181:*4,*
*8, 9* 182:*7* 183:*2, 8,*
*9, 18, 20* 184:*9, 10*
186:*9* 190:*22*
194:*22* 196:*24*
197:*9* 199:*18*
200:*1, 3, 14, 20*
201:*1* 260:*8, 19*
261:*23, 24*
percent 176:*8*
248:*23*
percentage 176:*6*
perform 210:*24*
performance
101:*15* 124:*11*
261:*2*
performed 102:*17*
performing 95:*6*
period 27:*17* 28:*20*
53:*21* 63:*15, 24*
68:*8* 74:*17* 227:*8*
233:*21* 236:*1*

periodically 226:*17*
periods 73:*23*
person 60:*13*
80:*12* 184:*1* 193:*3,*
*7* 197:*5* 215:*12*
226:*19* 245:*14*
248:*15*
personal 5:*9, 15, 16*
10:*6* 64:*21, 24*
66:*5, 10* 84:*15, 18,*
*21* 85:*1, 3, 16, 17,*
*23* 86:*4* 87:*5* 88:*7*
127:*4* 149:*16, 17,*
*18* 150:*19* 264:*12*
personally 182:*5*
183:*17*
personnel 5:*9, 10,*
*13* 17:*6* 109:*2, 15*
180:*21* 221:*4*
261:*22, 23*
persons 164:*16*
pertain 216:*14*
pertaining 216:*19*
pertains 231:*8*
phantom 229:*17*
phase 24:*18* 107:*13*
philosophy 137:*11*
phone 9:*19* 10:*4, 5,*
*6, 7* 12:*11* 17:*7*
48:*1, 10* 55:*18, 19*
82:*17, 19, 20* 83:*8*
84:*12* 85:*6, 7*
212:*20*
phonetic 235:*3*
physical 62:*17*
90:*14* 175:*15*
physically 60:*5*
pick 177:*17, 21*
215:*8*
picked 177:*18*
194:*1*
picking 179:*18*
picture 129:*1, 4, 8*
pinned 178:*6*
place 15:*24* 38:*3*
59:*22, 23* 62:*1, 5*
72:*16* 93:*16*
104:*12* 137:*22*
140:*9* 172:*24*
179:*24* 222:*7*

Willie Hunt - 3/21/2022
2:20-cv-02310-CSB-EIL # 17-5 Page 90 of 100
Paul Berge, et al. vs. City of Kankakee, et al.

249:*23* 259:*15* 264:*16*

**placed** 204:*13* 240:*5*

**Plaintiffs** 1:*5* 2:*6* 90:22 113:*15* 229:*4* 247:*16*

**plan** 175:*1*

**play** 26:2*1* 125:*16, 19* 202:*11*

**played** 132:2*1*

**please** 8:5 48:*13* 77:6 87:*14* 117:*1*

**point** 4:*24* 23:8 26:22 27:*17* 34:*3, 14* 42:*11, 13, 15* 43:*13* 45:9 53:22, *24* 54:9 78:2, *5, 6* 89:*11* 90:*18* 92:*14* 97:20 99:9, *18* 101:*19* 106:*23* 112:22 117:*6* 122:*3* 124:*23* 142:*4* 150:*1* 155:*18* 161:*13* 179:7 195:*23* 196:4 208:*14* 216:4 239:*10* 241:6 249:*1*

**points** 30:*15* 31:*17* 76:*16* 103:*3, 4* 104:7 106:*19* 107:*14* 215:*12, 24*

**POLICE** 1:7 6:*10* 7:*1, 11* 15:1 16:*17* 17:*1, 12* 18:22 21:*15* 23:23, *24* 24:9, *16, 17* 25:5, *10, 14, 16, 18, 20, 24* 26:4, *22* 27:*1, 8, 9* 28:*3, 8, 15* 32:*24* 33:*3, 8* 42:*10* 45:*13* 49:6 52:4 53:*5* 56:*16, 21* 60:4, *22* 73:*20* 78:*11, 16, 20, 24* 79:8, *20* 82:7 91:5 94:2, *16* 95:*17* 96:*1, 21* 99:*11* 101:*21* 105:*17, 18, 19, 21, 22* 108:*24*

109:*3, 11, 15* 110:*10, 18, 19, 22* 111:9, *19* 112:*4, 7, 22* 113:2 116:*4, 18, 23* 117:*7, 13, 24* 118:*6, 24* 119:*3, 7, 13, 15, 20* 120:6, *12, 18* 121:*14, 20* 122:*4, 10, 12* 123:*24* 127:*17, 20* 129:*14* 132:*12, 17, 24* 133:9 134:*10* 136:*7, 17* 137:*12* 138:*1* 140:*1* 141:*4, 9, 21* 142:22 143:*1, 2* 150:*1, 17* 152:22 153:2, *11, 16, 24* 154:2, *5, 6, 12, 18, 24* 155:6 161:2 162:*13* 164:*3, 9* 165:*6, 21, 24* 166:*15* 168:22 169:*3, 20* 170:2, *11* 173:8, *12* 174:*4, 7, 11, 18, 21, 24* 177:*20* 189:*18* 193:9, *15* 195:*24* 196:*15, 20* 197:*18* 198:*23* 199:*5* 200:6, *8, 16, 22* 203:8 206:*11* 208:*10, 13, 20, 23* 209:2, *8, 12* 210:*11* 211:*13, 16, 21* 212:2 213:*8, 10, 22* 220:22 221:5, *11* 222:8 224:*17* 225:6 229:9, *13* 231:5, *12, 18* 232:*10* 233:*4, 15, 17* 234:*19, 22* 235:*1, 5* 236:6 240:*17* 241:*21* 243:*15, 24* 249:2, *11* 250:5, *9, 14, 18, 21* 251:7, *11, 18* 255:*19, 22* 256:7 257:9 263:*10*

**police-related** 76:2*1* 77:*1*

**policies** 177:*20, 21* 188:*18, 19* 190:*8, 12* 192:*10* 214:*15, 16* 216:*8* 228:*13* 231:*4* 232:9, *15, 20*

**Policy** 3:*15* 94:*17* 150:*14, 23* 172:*12, 23* 174:*6, 10* 175:*5* 214:*19* 225:*19* 227:*17, 18* 231:7, *10, 19, 23* 232:2 248:*12*

**population** 175:*23*

**portion** 102:*13* 107:*16* 109:9 252:*4* 256:6

**position** 8:*23* 9:*1* 10:*10* 11:3 14:*18, 20* 18:*24* 19:*1, 4, 9, 13* 20:*10, 23* 21:*8, 14, 18* 22:*12* 47:*13* 48:7 51:*6, 7* 76:22 120:*11, 12* 121:*8* 124:*17* 125:*8* 126:*14* 132:*8* 142:*19* 146:*19* 181:9 184:*19* 185:*20* 186:7, *8* 209:*23* 210:*1, 18* 219:*16* 236:*10* 237:*14* 238:*10* 240:2, *6* 241:*17*

**positions** 12:*7* 121:*19* 122:*4* 236:*24* 237:*9*

**possession** 81:*3*

**possible** 148:*14* 256:*23* 257:*4* 259:*1*

**post** 128:*3, 7* 181:*1* 197:*10*

**posted** 21:*11, 12* 128:*8* 130:*10, 17* 154:*15* 177:*24* 196:2*1* 197:*9* 198:*4* 220:*7* 229:*17* 230:*14* 250:*3*

**posting** 127:*12, 21* 229:*18*

**posts** 3:*10* 127:*3, 7, 10* 128:*9, 18*

129:*11, 18, 21* 153:*17* 154:*1* 171:*3, 14, 16, 23* 196:*15, 19, 21, 24* 197:*20* 198:*1, 3, 11, 12, 17, 19* 199:*15, 20* 200:*1* 201:*11* 229:*15* 230:*4*

**potential** 98:*16*

**powers** 109:*13*

**practice** 204:*12*

**preface** 171:2

**pregnancy** 175:*14*

**preparation** 5:*7*

**prepare** 5:*6*

**prepares** 232:*15*

**preschool** 8:*1*

**PRESENT** 2:*1* 58:7 59:*3* 93:*18, 21* 155:*17* 160:*3, 6* 167:22, *24* 169:*19* 170:*13* 223:*24* 224:*11* 226:2, *6* 252:*22*

**presented** 136:*6*

**Preserve** 213:7, *15, 16* 255:*16*

**president** 12:*1, 2, 4, 8, 9, 18* 184:*24*

**Pretty** 44:*13* 80:*3* 103:*24* 106:*17* 131:*13* 137:*1* 139:*17* 251:*24* 252:*4*

**previous** 7:7 74:*18* 264:*6*

**previously** 111:*24* 133:*15* 175:*19* 195:*17* 207:*3*

**Price** 61:22, *24* 91:9, *10, 11, 17* 92:22 93:*6, 11, 22* 121:*17* 133:*24* 134:*11, 13* 136:*13* 137:*5, 8* 138:*10, 17, 24* 139:*1* 155:22 156:*3, 6* 159:*4* 193:*20* 218:*8* 219:7 225:*4* 240:7, *9, 12*



Willie Hunt - 3/21/2022
2:20-cv-02310-CSB-EIL # 47-5 Page 91 of 100
Paul Berge, et al. vs. City of Kankakee, et al.

**Price's** 133:*21*
**printed** 6:*23*
**Prior** 21:*6, 15, 18*
23:*5, 8* 27:*10*
52:*19, 22* 54:*17*
63:*4, 8, 9* 64:*3*
73:*24* 74:*5, 10*
83:*2* 85:*16, 23*
88:*9, 10* 92:*1, 15,*
*23* 93:*3, 7* 98:*1*
104:*9* 110:*1*
119:*17* 122:*20*
131:*20* 134:*14*
140:*21* 149:*7*
150:*1* 161:*19*
166:*22* 167:*7*
191:*22* 194:*19*
195:*13* 196:*8*
214:*4, 10, 23* 216:*6*
220:*16, 20* 225:*10*
227:*18* 228:*13*
233:*2* 235:*9, 20*
238:*11* 249:*14, 18*
254:*9, 16* 256:*2, 16*
259:*8*
**priority** 112:*21*
**private** 228:*20*
**Probably** 22:*6*
24:*7* 50:*6* 56:*7, 24*
57:*5* 61:*24* 62:*18,*
*19* 65:*16* 67:*1*
71:*15* 93:*17*
105:*10* 118:*15, 17*
131:*3, 6* 134:*10*
135:*21* 140:*9*
148:*6* 152:*7*
153:*14* 154:*23*
156:*6* 176:*4, 8*
178:*6* 188:*12*
189:*4, 10* 193:*24*
199:*12, 13* 234:*12*
240:*11* 246:*23*
248:*1*
**problem** 94:*9*
**problems** 185:*1*
**procedure** 225:*20*
248:*13* 255:*6*
**procedures** 26:*23*
27:*14* 64:*2*
**proceedings** 264:*14*

**process** 27:*18* 28:*6*
49:*13, 15, 17, 18*
50:*4, 7, 11, 14* 51:*1*
52:*8* 53:*4, 11, 13,*
*17, 22* 54:*11, 12, 14,*
*17, 19, 22* 55:*11, 22,*
*24* 56:*4, 15, 19*
58:*15, 21* 59:*1, 2*
60:*4, 15, 17, 20*
61:*18* 63:*16* 67:*21*
70:*12* 73:*8* 74:*13*
75:*4* 76:*3* 77:*8, 10,*
*22* 89:*23, 24* 90:*3,*
*11, 17, 18* 96:*24*
97:*15* 99:*18, 21*
100:*1, 4* 101:*4, 7*
104:*23* 108:*5, 8*
109:*18* 112:*22*
113:*4, 6, 8, 10*
114:*1, 4, 15, 16, 24*
115:*2, 8, 21* 116:*3,*
*15, 16, 18* 117:*2, 4*
145:*7* 164:*7, 12, 23*
173:*8, 12* 177:*8, 9,*
*12, 13* 178:*5, 9, 16,*
*22* 179:*3, 4* 188:*6,*
*16* 190:*16, 23*
191:*2, 8* 192:*6, 11,*
*12* 193:*8, 10, 11, 14,*
*16, 23* 202:*12, 13,*
*16* 203:*7, 9* 204:*12,*
*20* 205:*6, 8* 208:*11*
209:*5, 14* 223:*22*
227:*12* 248:*3*
249:*3, 24* 253:*6*
254:*10* 257:*2, 12,*
*16* 258:*12* 260:*9*
**processes** 50:*2*
73:*24* 97:*18*
191:*14, 16, 19*
**produce** 65:*22*
66:*1* 81:*10, 11*
88:*20* 89:*13* 95:*5*
190:*1* 246:*13* 247:*5*
**producing** 93:*8*
**Production** 171:*2*
**Proegler** 8:*18*
**P-r-o-e-g-l-e-r** 8:*20*
**prohibiting** 173:*4*
**project** 71:*2, 3*

105:*13* 255:*14*
**projects** 27:*10*
**promise** 122:*8*
123:*17*
**promote** 126:*7*
136:*8, 22* 220:*10*
257:*23* 261:*17*
**promoted** 29:*5, 9,*
*17, 18* 30:*1* 31:*7,*
*24* 32:*3, 16, 18, 20,*
*21* 36:*19, 23* 37:*13,*
*21, 23* 38:*17, 18*
39:*3, 9, 10, 11, 16*
40:*21, 24* 41:*1, 2, 7,*
*10, 15* 43:*1, 8*
44:*15* 45:*1, 6, 11,*
*18, 21* 46:*6, 9, 13,*
*15, 24* 50:*15, 19*
51:*11, 24* 52:*5, 9,*
*12* 53:*11, 18, 23*
54:*18, 23* 55:*8, 11*
56:*17* 67:*22* 74:*11*
92:*6, 15, 18, 19, 24*
100:*3* 109:*19*
115:*23* 120:*5, 22*
121:*1, 5* 123:*1, 2,*
*19* 124:*8, 19, 23*
125:*10* 126:*15*
133:*12* 134:*1, 21,*
*24* 135:*3, 7, 15, 19*
136:*3* 137:*14, 19*
140:*21, 24* 141:*2, 3,*
*10* 143:*9* 144:*7, 22,*
*23* 149:*3* 177:*10,*
*11* 178:*11* 192:*15,*
*18, 22* 194:*5, 9, 12,*
*15* 195:*9, 10, 14, 18,*
*24* 196:*5* 218:*13*
227:*20, 23* 238:*16*
243:*11* 244:*19, 20*
245:*2, 12, 14*
254:*10* 255:*2*
256:*17* 259:*9*
**promoting** 127:*14*
180:*7* 209:*15*
**promotion** 42:*3*
44:*1* 45:*15* 46:*19,*
*22* 54:*17* 56:*4*
74:*2* 89:*18, 20*
90:*19* 92:*2* 109:*18*
125:*17* 136:*13*

143:*13* 144:*12*
145:*23* 148:*22*
153:*2* 174:*13*
178:*10, 16* 194:*23*
204:*18* 209:*4*
217:*9, 18* 219:*11*
224:*3, 4, 13* 248:*6*
250:*21* 252:*9, 10,*
*13* 254:*16* 256:*2, 19*
**promotional** 24:*3*
28:*19* 29:*2* 37:*10*
51:*10* 54:*12* 64:*8*
67:*21* 68:*3* 73:*24*
74:*8, 19* 89:*24*
100:*2* 112:*21*
113:*4* 115:*8*
132:*22* 134:*2*
173:*11* 177:*8, 9*
192:*2, 3, 12* 194:*4*
201:*20* 204:*12*
219:*23* 220:*7*
221:*7* 223:*21*
224:*24* 230:*15*
249:*18, 22* 251:*12*
257:*2* 259:*15*
**promotions** 33:*9,*
*14, 16* 34:*9* 41:*21*
115:*19* 174:*11, 14*
208:*20*
**propelled** 145:*18*
**property** 78:*13*
**proportions** 174:*22*
**public** 21:*9*
**publicly** 221:*8*
**pull** 55:*6* 83:*21*
84:*1, 12* 181:*16*
**pulled** 146:*17*
180:*21* 184:*16*
**pulling** 183:*11, 12*
221:*2*
**purse** 222:*18*
**pursuant** 1:*20*
**put** 16:*12, 18*
120:*5* 137:*21*
166:*5, 13* 177:*22*
182:*17, 18* 194:*1*
205:*2* 237:*9, 13*
**putting** 186:*6*

**< Q >**
**qualification** 144:*10*



Willie Hunt  -  3/21/2022
Paul Berge, et al. vs. City of Kankakee, et al.
2:20-cv-02310-CSB-EIL  # 17-5  Page 92 of 100

**qualifications** 145:*3, 18, 21* 146:*15, 16, 18, 22, 23* 147:*20* 195:*19*
**qualified** 122:*23* 123:*5, 12, 13* 132:*9* 137:*21* 143:*14* 144:*1* 145:*1*
**qualify** 163:2
**question** 4:*22* 5:*1* 7:*9* 19:*2* 21:*10* 23:*11* 26:*5* 27:*3, 5, 12* 32:6, *8* 38:*20* 39:*6* 46:*1, 2* 52:*6, 16* 61:7 67:*3* 73:*16* 77:*1, 3* 90:*7* 91:*1* 92:*9* 93:*5* 99:*13* 103:*14* 107:*4, 6, 10, 11, 18, 20, 24* 108:*2, 4, 23* 111:*17* 112:*3* 117:*1, 10* 122:*19* 123:*21* 131:*16, 19* 144:2 147:*3* 149:*6* 150:*8, 16* 157:*23* 158:*11* 165:*3* 167:*6, 15, 16* 176:*23* 177:*7* 180:*3, 10* 185:*8* 196:*12* 197:*16, 17* 203:*19* 214:*18* 224:*21* 225:*19, 22* 230:*1* 248:*12* 251:*6* 252:*2* 254:*21* 257:*19* 258:*16* 260:*12*
**questioned** 163:*16*
**questioning** 250:*22* 260:*1*
**questions** 73:*12* 177:*19* 205:*16* 221:*13* 223:*8* 227:*10* 243:*20* 247:*21*
**quick** 205:*9*
**quit** 122:*6* 157:*17, 20* 158:*9, 17, 19, 21* 159:*5, 6*
**quite** 106:*1*
**quitting** 159:*1*

**< R >**
**race** 37:*4* 114:*2* 115:*7, 11, 16, 20* 123:*16* 128:*1* 132:*14* 146:*12* 148:*22* 173:*5* 175:*13* 176:*3* 197:*14* 220:*2*
**races** 112:*19* 117:*22* 118:*10* 128:*17*
**racial** 115:*5* 117:*16*
**racist** 132:*4* 133:*3* 155:*13, 19* 156:*1, 4, 10, 17, 21* 157:*5, 8, 12, 15, 20* 159:*2* 197:*8, 19, 24* 198:*17* 199:*19, 24* 200:*7, 15, 21* 201:*1* 259:*19, 23* 260:*4, 8, 19*
**Raimondo** 34:*23* 35:*1, 19* 36:*6, 7, 11* 37:*4, 8, 10, 12, 14* 38:*19, 23, 24* 39:*1, 2, 8, 10, 11, 20* 40:*4, 5, 18, 23* 41:*5*
**Raimondo's** 36:*16* 37:*18*
**rainbow** 140:*14*
**raised** 97:*3*
**ran** 110:*9*
**range** 106:*23*
**rank** 18:*18, 24* 20:*9* 33:*1, 4, 9* 34:*8* 35:*10* 37:*15* 39:*16* 41:*10, 20* 43:*5, 8* 44:*2* 46:*10* 52:*13* 53:*18* 63:*6, 10* 93:*4, 8* 121:*5* 124:*19, 22* 146:*6* 212:*8, 10* 219:*16* 230:*6* 243:*8* 244:*6, 20, 23*
**ranked** 30:*8, 18, 21, 23* 31:*3, 19, 21* 32:*4, 10, 11* 37:*10* 39:*3, 24* 40:*3, 6, 17, 20* 44:*12* 45:*12, 16, 19* 46:*16* 51:*12, 22*

52:*5, 12* 53:*4* 63:*5* 76:*9, 10* 89:*19* 101:*14* 134:*2, 5, 21* 135:*6, 8, 13, 16* 144:*8* 195:*10* 196:*6* 204:*10* 212:*6* 248:*2*
**ranking** 194:*16* 243:*24*
**ranks** 120:*6, 22* 174:*21*
**rationale** 182:*3* 185:*10*
**Ray** 154:*23*
**reach** 211:*24*
**reached** 15:*4* 211:*12*
**read** 102:*19, 20* 109:*6* 129:*1* 136:*11* 138:*5* 202:*5* 231:*10*
**reading** 231:*19, 22*
**ready** 76:*2, 6*
**really** 88:*24* 185:*3* 223:*16*
**reason** 5:*24* 35:*9, 11* 36:*13* 39:*13* 59:*20* 74:*22, 23* 123:*1, 18* 124:*10* 144:*7* 146:*3* 149:*2, 14* 159:*1* 178:*13* 183:*6* 185:*20* 192:*17* 194:*22* 253:*1* 260:*18*
**reasoning** 137:*2*
**reasons** 15:*9* 25:*9, 22* 26:*9* 35:*3* 45:*3, 6* 123:*7* 136:*2* 150:*20* 179:*11, 22*
**recall** 14:*15* 58:*9* 59:*4, 22* 60:*7, 24* 61:*12, 17* 66:*15* 69:*5* 72:*18* 93:*9, 21* 94:*11* 139:*3* 151:*17, 22* 153:*8, 9, 13* 155:*7* 161:*17* 185:*19* 204:*24* 208:*7* 221:*2, 15* 224:*1* 228:*19* 235:*19* 242:*23* 243:*12* 248:*7*

252:*22* 256:*8* 258:*19, 24* 259:*3*
**receive** 17:*20* 20:*9* 104:*9* 106:*11, 15* 229:*1, 4* 230:*3* 240:*24*
**received** 80:*14* 106:*13*
**receiving** 19:*16, 18, 24* 97:*10*
**recognize** 172:*9* 173:*21*
**recommendation** 132:*23* 137:*4* 201:*21, 24* 205:*22, 23* 206:*2, 5, 7, 14*
**recommendations** 227:*21*
**recommended** 119:*9*
**record** 9:*18* 83:*7* 85:*5* 89:*7* 205:*15* 222:*2* 226:*11, 13* 264:*13*
**records** 150:*15, 23* 243:*17*
**recruit** 49:*11* 139:*17* 142:*16* 144:*21* 175:*1*
**recruited** 47:*14, 15* 49:*8* 51:*2, 13* 53:*1, 7, 24* 54:*8, 16*
**recruiting** 52:*19, 22* 139:*16* 174:*7*
**Recruitment** 3:*15* 139:*20, 24* 140:*7, 10* 141:*5* 142:*2, 10, 15* 174:*1, 3, 14, 17* 175:*1, 9* 231:*8*
**recycle** 65:*12*
**reduced** 230:*6* 264:*12*
**reference** 214:*18*
**referring** 40:*8* 43:*22* 50:*21* 128:*4* 171:*15, 24*
**reflect** 114:*5* 115:*1* 116:*15* 119:*16* 140:*12, 15, 19*
**reflected** 119:*23*
**reflection** 141:*13*



Willie Hunt - 3/21/2022
2:20-cv-02310-CSB-EIL # 47-5 Page 93 of 100
Paul Berge, et al. vs. City of Kankakee, et al.

**reflective** 144:*21*
174:*23* 175:*12*, *21*
**refresh** 151:*16*
**refute** 162:*7*, *8*
**regard** 19:*13*
**regarding** 68:*4*
74:*1* 89:*18* 127:*3*
133:*6* 162:*13*
190:*23* 248:*5*
**regardless** 60:*2*, *10*
175:*13*
**regards** 4:*20*
225:*19*
**Regas** 233:*7*
**Regnier** 39:*17*
41:*17* 42:*24* 43:*7*,
*14* 79:*5* 130:*9*
201:*9*, *14*, *15*, *18*
218:*2*, *3*, *4* 229:*21*,
*22* 230:*4* 237:*23*
242:*17*
**R-e-g-n-i-e-r** 41:*18*
**regs** 103:*24* 104:*1*
**regulations** 164:*9*
**related** 28:*8* 56:*14*
66:*11* 81:*22* 255:*15*
**relation** 39:*7* 67:*7*
**relationship** 98:*3*,
*24* 99:*1*, 8
**relationships** 98:*20*
**relative** 264:*17*, *18*
**relevance** 147:*4*, *10*
148:*17* 165:*4*
167:*1*, *11* 168:*13*
169:*6*, *12*, *23* 170:*6*,
*16* 200:*3* 226:*22*
**relevant** 90:*16*, *21*
**relied** 124:*7*
**religion** 175:*14*
**remainders** 41:*4*
**remaining** 40:*22*
**remember** 4:*18*
5:*14* 6:*11*, *15* 8:*12*
17:*4* 22:*20* 42:*7*
43:*18* 44:*4*, *6*
49:*23* 57:*8* 69:*8*,
*12* 92:*16* 104:*10*
105:*14* 126:*21*, *22*
127:*10*, *12*, *20*
133:*14*, *20* 139:*7*
140:*5* 151:*18*

155:*8*, *21* 156:*18*
157:*1*, *9*, *11* 158:*23*
160:*11* 176:*24*
177:*1* 181:*12*
196:*12* 212:*16*
218:*11* 222:*14*, *17*
228:*4*, *5*, *6* 233:*8*
243:*10* 253:*2*
256:*5* 258:*21* 259:*5*
**removed** 132:*10*
**renew** 99:*19*
**renewed** 98:*8*
**Repeat** 27:*6*, *12*
32:*9* 54:*2* 93:*5*
117:*1* 196:*2*
**repeating** 73:*12*, *16*
**replace** 240:*6*
**replaced** 25:*17*, *23*
26:*3* 244:*9*, *14*
**report** 9:*7*, *10* 11:*2*
49:*2* 216:*9*, *10*
**reported** 264:*11*
**Reporter** 1:*16*
13:*5* 231:*1* 264:*4*
265:*6*
**REPORTER'S**
264:*1*
**reports** 9:*4*
**re-post** 128:*7*
**reposted** 198:*13*, *16*
199:*15*, *16*
**reposting** 201:*12*
**representation**
231:*18*
**represented** 119:*19*
140:*23* 206:*23*
**reprimand** 230:*5*
**request** 50:*5* 66:*1*
89:*13* 171:*1* 247:*14*
**requested** 188:*17*,
*18* 226:*17*
**required** 99:*8*
165:*10*, *12* 167:*22*,
*24*
**requirement** 202:*10*,
*12* 226:*20*
**research** 180:*22*
**reserve** 183:*9*, *18*
**resign** 18:*12*, *14*
149:*20* 237:*24*

**resigned** 18:*18*
82:6 149:*11*, *12*, *14*,
*15* 237:*21*, *22* 244:*3*
**resigning** 21:*15*
150:*1*
**resource** 10:*16*
225:*21*
**resources** 10:*18*
**respect** 102:*16*
135:*12* 137:*11*
164:*24* 168:*5*
174:*6*, *10*
**respectively** 134:*5*
**respond** 102:*21*
191:*4*, *6*
**responding** 65:*19*
**Response** 171:*1*
**responses** 102:*24*
**responsibilities**
109:*13*
**responsible** 109:*1*
209:*13*
**rest** 236:*3*
**resulted** 100:*2*
124:*11*
**results** 55:*6* 77:*19*
228:*10*
**resumés** 205:*1*
**retire** 9:*3* 14:*22*
21:*20*
**retired** 14:*21*, *23*,
*24* 15:*2*, *10*, *17*
16:*5*, *7* 17:*19* 18:*6*,
*9* 19:*15* 21:*7*, *23*
24:*10* 87:*13* 88:*6*
105:*17*, *18*, *22*, *23*
106:*5* 213:*21*, *23*,
*24* 234:*8* 242:*17*
**retirement** 15:*4*
16:*13* 17:*23* 18:*2*
234:*6*, *10*
**retiring** 17:*21*
38:*16*
**returned** 106:*13*
**reversed** 29:*16*
**review** 5:*7*, *21*
78:*21* 171:*20*
206:*7* 223:*7*
**RH** 128:*13*
**Ribbon** 116:*12*
227:*21*

**right** 10:*23* 20:*8*,
*18* 29:*19* 38:*15*
46:*5*, *6* 59:*12*, *13*,
*15* 68:*8* 76:*18*
79:*7* 87:*9* 89:*7*, *9*
97:*23* 99:*21*
102:*23* 104:*4*
106:*3* 108:*10*, *22*
111:*15* 112:*2*
116:*21* 121:*3*
122:*2* 123:*7* 124:*8*,
*12* 125:*5*, *11*
126:*18* 129:*4*
130:*2* 131:*24*
133:*1* 135:*3*
138:*15* 144:*14*, *17*
148:*7*, 9 151:*4*, 8
155:*20* 161:*20*
162:*7* 168:*17*
170:*18*, *23* 172:*18*
173:*14* 174:*19*
175:*24* 176:*11*
181:*23* 182:*9*, *24*
184:8 186:*21*
187:*12*, *20*, *23*
188:*20* 190:*19*
198:*12*, *14* 199:*20*
202:*16*, *21* 204:*5*,
*21* 206:*19*, *23*
208:*5* 209:*11*
210:6, *23* 212:*16*
219:*19* 220:*11*, *15*
224:*11* 225:*14*
226:*5*, *15* 228:*17*,
*19* 230:*19* 234:*9*,
*21* 239:*10* 243:*12*
249:*15* 261:*2*
263:*16*, *18*
**rights** 164:*23*
208:*11* 229:*8*
**Rinardo** 38:*22*
**rising** 128:*1*
**Robert** 105:*18*
**Robin** 79:*4* 120:*16*
122:*1*, 6 154:*14*
155:*12* 156:*11*, *15*
157:*17* 199:*9* 238:*6*
**role** 58:*20* 59:*1*
60:*3*, *15*, *16* 77:*22*
102:*7*, *16* 109:*17*
125:*16*, *19* 132:*21*



**Willie Hunt - 3/21/2022**
2:20-cv-02319-CSB-EIL # 47-5 Page 94 of 100
**Paul Berge, et al. vs. City of Kankakee, et al.**

133:8  139:21
141:7  143:17
175:4  178:3, 5
190:11  191:2
192:8  202:11
212:18  215:8
257:12
**roles**  28:22  139:24
211:18  215:9
**rookie**  38:12
156:12
**room**  58:23  59:18,
21  60:2, 5, 11, 15
61:6, 9  62:13
74:22, 24  90:9, 14
161:22  162:2
163:18  224:5, 12
225:16
**roster**  243:16
**rotated**  188:14
**rubric**  103:2, 6, 8
106:16
**rule**  52:2  136:19
230:9, 19
**rules**  4:19  5:4
103:23  104:1
164:8  168:4, 7
**rumor**  36:12
**rumors**  35:15, 18
36:3, 4, 5  39:8
132:3  133:2
185:14, 23  196:23
197:8  200:7
**run**  77:10  150:24
151:3

**< S >**
**Safety**  8:24  20:19
**sat**  248:15
**satisfied**  226:20
**save**  183:12
**saw**  212:15
**saying**  23:19  38:21
68:7  77:4  79:20
86:23  92:16
116:21  117:5
122:2  123:13
126:19  137:17
150:21  151:19
159:22  163:20
181:14  183:21

186:1  201:11
215:19  250:23
**says**  108:23  148:8
174:19
**scenario**  100:19
101:13  102:13, 20
103:18  134:22
215:9
**scenarios**  101:2, 3,
6, 16, 18, 20  102:9,
17  103:23  214:15,
16, 22  215:2, 3, 7
216:7  217:8
**School**  7:21, 22  8:1,
2, 7, 8, 10  10:18
11:8, 9, 10, 15
20:20  21:13, 24
57:8  58:4  62:19
222:7
**schools**  7:23  8:3, 4,
6, 9, 11, 16
**Schoon**  233:7
234:7
**score**  102:23
106:21  107:9
250:16
**scored**  51:18
261:18
**scores**  76:16
101:10  107:1
**scoring**  103:11
214:17  215:6
**Scott**  44:5, 6  46:7
218:11, 18
**Scott's**  218:11
**second**  18:22
44:20, 22  45:22
66:24  213:12
**secondary**  94:23
226:20  227:1
**seconds**  171:17
**secret**  258:14
**secretary**  165:23
**Security**  8:24  20:20
**see**  6:20  16:1
64:14  82:23  83:3,
21  84:11  87:19
94:8  102:21
108:14  109:3
143:15  161:23
162:5  174:13

202:11  211:20
215:15  257:4
**seeking**  217:9
224:3, 4, 13
**seen**  45:10, 17  52:3,
7, 11  96:17, 19
205:23  247:8
**select**  147:24
220:22  230:13, 20
**selected**  192:10
**selecting**  216:17, 20
**selection**  3:17
132:21  148:4
174:1  177:17
220:13, 17  221:8
231:8  237:8
248:16  260:9
261:1, 6, 9, 11
263:4, 7, 11
**selections**  33:1
**send**  177:23  225:11
**sending**  21:19
220:21
**senior**  48:9
**sense**  181:23
**sensitive**  117:22
**sensitivity**  118:10
**sent**  17:8  65:9
84:4, 7, 21, 23
**separate**  101:14
103:19  169:8
199:7  217:17
**separately**  224:18
**Sergeant**  29:8, 9, 17,
18  30:2  37:16, 23
42:4, 5, 15, 16
44:16  46:5, 9, 19
50:12  51:11  52:6
54:12  58:15, 18, 19
74:10  76:9  126:12
133:12  134:16, 17
135:2  142:8, 11
146:19  178:1
194:9  219:11, 12
223:24  224:5, 13
226:2  236:1
242:22, 24  243:3, 9,
10  252:10
**sergeants**  41:1
43:11  44:1  194:6,
8  219:23  236:2

239:7, 8, 9  242:14,
20  252:8, 17
**served**  123:24
126:11  141:14
229:11
**service**  15:8  19:1,
13, 20
**services**  209:3
228:23
**session**  71:23  72:1
**sessions**  72:3
**set**  103:7  115:22
140:11  161:22
164:8  225:20  265:1
**Seven**  11:17, 20
41:2  65:19  131:3
235:7  251:3, 6
**sexual**  165:10
175:13, 16
**shaking**  4:21
**shape**  132:18  139:1
**share**  131:12
**shared**  128:7
**sharing**  229:18
**sheet**  226:12
**shops**  188:13, 14
**short**  66:19  89:5
171:18  205:13
**shorter**  214:11
**Shorthand**  1:16
264:4  265:6
**Shortly**  91:22
134:20
**show**  108:10
170:23, 24  172:3
173:15
**showing**  127:16, 17
171:9  176:18
**shown**  231:4
**Shreffler**  5:18
153:21  154:14
166:7, 11, 19, 22
167:7  168:10, 21
182:15, 17, 18
186:12, 13  199:8, 9,
10  206:19  207:15
**S-h-r-e-f-f-l-e-r**  5:18
**sic**  14:6
**sign**  178:2, 7
**signature**  176:21, 22

Willie Hunt - 3/21/2022
2:20-cv-02310-CSB-EIL # 47-5 Page 95 of 100
Paul Berge, et al. vs. City of Kankakee, et al.

signed 165:*20*
166:*2, 4, 10, 13*
signing 176:*24*
silent 9:*22*
similar 215:*6*
single 36:*12*
sir 16:*14* 216:*22*
Sissy 10:*11, 14, 17*
S-i-s-s-y 10:*12*
sit 7:*11* 12:*17*
25:*22* 51:*5* 55:*9*
59:*19* 69:*12* 74:*21*
76:*23* 106:*20*
126:*5* 130:*21*
166:*18* 168:*20*
234:*17* 248:*11, 18*
site 70:*8, 9*
sites 199:*16, 18*
situation 45:*17*
52:*7* 94:*24* 132:*5,*
*14* 182:*14*
situations 34:*7*
102:*22* 118:*9*
six 13:*24* 65:*16, 19*
67:*1* 131:*3* 210:*4*
213:*20* 233:*9, 17*
234:*1* 242:*2*
size 105:*7* 210:*23*
211:*2*
Skelly 245:*16, 17, 20*
skin 147:*20*
skip 34:*15* 41:*13*
220:*7*
skipped 33:*13, 16*
34:*10, 17, 21, 24*
35:*19* 36:*6, 8, 9, 11*
37:*12, 13* 39:*3*
133:*13, 16* 134:*4*
135:*1* 137:*20*
144:*24* 145:*7*
146:*9* 217:*18*
218:*9, 10, 15, 18*
219:*4, 7, 17, 22*
220:*9*
skips 146:*2*
slightly 232:*22*
slots 178:*2, 6*
small 56:*2*
Sneed 44:*7, 17, 18,*
*24* 45:*6, 15, 21*
46:*6, 9, 13, 15, 24*

50:*15, 20* 51:*9, 11,*
*18, 22, 24* 52:*4, 9*
53:*11, 18, 23* 54:*17,*
*23* 55:*11* 56:*16*
59:*9, 12* 60:*14*
67:*21* 68:*4* 74:*11*
89:*18* 90:*11* 92:*2,*
*6, 15, 18, 24* 100:*3*
109:*19* 134:*22*
135:*12* 148:*21*
149:*3, 4* 177:*10, 11*
178:*10* 179:*2, 15*
192:*14* 194:*5, 11*
195:*9* 201:*24*
204:*7* 205:*22*
206:*13* 220:*10, 23*
223:*17* 252:*14*
254:*10* 255:*1, 6*
256:*2, 17* 257:*23*
259:*8* 261:*1*
Sneed's 45:*5* 46:*18,*
*21* 254:*16*
social 129:*12*
199:*16*
solely 203:*22* 204:*6*
somebody 38:*18*
39:*16* 52:*11* 60:*11*
72:*16* 74:*16* 85:*22*
94:*1* 101:*10*
106:*22* 107:*9, 14*
145:*22* 178:*17, 23*
195:*13, 15* 203:*13*
243:*11* 246:*22, 23*
248:*2, 20* 261:*18*
son 36:*23* 37:*21,*
*23* 38:*17*
sorry 21:*1* 34:*17*
37:*9* 41:*14* 46:*8*
81:*17* 85:*10* 86:*17*
87:*19, 20, 22* 102:*9*
125:*5* 134:*15*
149:*3* 152:*3*
163:*12* 180:*17*
205:*18* 213:*6, 14,*
*17* 242:*3* 245:*11*
247:*23*
sounds 29:*23*
106:*24*
South 1:*18* 2:*3*

speak 68:*16*
253:*18* 254:*2*
263:*3, 6, 10, 14*
speaking 163:*11*
specialty 183:*9*
184:*15*
specific 17:*1* 19:*3*
28:*4* 60:*9* 102:*11*
145:*21* 185:*18*
specifically 53:*6*
119:*2* 231:*7*
specified 264:*16*
speculate 35:*4, 23*
158:*1, 4* 192:*24*
200:*11* 205:*3, 4, 5*
226:*10*
speculating 35:*13,*
*17* 36:*2, 3*
speculation 26:*6*
35:*7, 21* 68:*11*
99:*13* 107:*4*
123:*21* 131:*19*
137:*22* 148:*16*
157:*23* 158:*11*
195:*2* 197:*2, 12*
198:*7* 199:*1* 200:*3*
204:*23* 209:*7*
211:*15* 212:*4*
219:*14* 231:*21*
259:*17* 260:*12*
speech 208:*6*
spell 8:*19* 9:*16*
33:*18* 38:*5*
spelled 13:*19* 86:*12*
spoke 39:*19* 44:*16*
131:*4* 154:*23*
262:*11, 15*
spoken 72:*10*
spot 120:*17* 238:*14*
242:*18, 19, 21, 22*
spots 245:*3*
spread 106:*20*
squad 161:*22*
staff 9:*4* 110:*18,*
*23* 119:*3, 20, 23*
120:*1, 6, 18, 23*
122:*4, 12* 126:*12,*
*18* 137:*6, 7, 12*
138:*1, 14* 139:*2*
140:*21, 22* 141:*24*
143:*2* 144:*13*

153:*11* 154:*2, 8*
201:*7* 225:*15*
235:*10* 237:*19*
staffs 119:*7, 13*
Stanard 22:*3, 5, 9,*
*13* 23:*4, 7, 15, 16*
24:*1, 6, 8* 25:*6, 13,*
*17, 23* 26:*3, 12, 16,*
*24* 27:*10, 13, 22, 23*
28:*2, 5, 7, 14, 18*
30:*2, 5, 10, 14* 31:*4,*
*19* 33:*5* 44:*12*
47:*1, 6, 8, 18* 48:*5*
49:*3* 51:*2, 13, 16*
52:*22* 53:*22, 24*
54:*8, 9, 16* 57:*15*
60:*11* 61:*10* 62:*3*
63:*5, 9, 11, 17* 64:*1*
67:*8, 12, 18, 19*
68:*2* 69:*16* 70:*14*
71:*13, 17* 72:*10, 13*
73:*18, 19, 23* 74:*4,*
*9, 13, 16, 17* 77:*10,*
*16* 78:*1, 14* 79:*1,*
*11, 15, 21* 80:*5, 9,*
*12, 14* 81:*2, 12, 22*
82:*2, 6, 10* 83:*23*
84:*7, 14* 85:*2, 22*
88:*2* 89:*10, 22*
90:*3, 17* 91:*6, 13,*
*21* 92:*14, 17, 23*
93:*3, 7, 15, 24* 94:*6*
95:*10, 16, 23* 96:*3,*
*7, 10, 11, 21* 97:*12,*
*14, 17* 99:*9, 18, 20,*
*21* 100:*1, 11, 13, 14*
101:*19* 102:*1, 3, 7,*
*13* 103:*7* 104:*23*
105:*12* 106:*14*
116:*17* 177:*15, 22*
179:*7* 188:*17*
189:*6* 190:*8, 18, 23*
191:*10, 12, 22*
208:*16, 18* 209:*14,*
*20, 23* 210:*7, 11, 19*
211:*11* 212:*17*
216:*13, 15* 221:*14*
225:*10* 226:*13*
227:*4* 253:*11, 15*
254:*11, 13, 18*



**Willie Hunt  -  3/21/2022**
2:20-cv-02310-CSB-EIL  # 47-5  Page 96 of 100
Paul Berge, et al. vs. City of Kankakee, et al.

255:*3*, *15*, *18*
**S-t-a-n-a-r-d** 48:*16*
**Stanard's** 30:*17*
 209:*3*
**stand** 123:*23*
**s-t-a-n-d-a-r-d**
 48:*15*
**standards** 70:*12*
 114:*5* 115:*1*
 116:*16* 142:*7*
**standing** 113:*18*, *19*
**star** 17:*24*
**start** 71:*2*
**started** 21:*23*
 22:*21* 73:*19*
 113:*17* 128:*15*
 207:*2*
**starting** 214:*4*, *23*
**State** 1:*17* 72:*4*
 92:*4* 105:*17*, *18*
 106:*2* 136:*8*, *18*
 150:*1*, *17* 223:*23*
 230:*10* 236:*13*
 237:*7* 252:*18* 264:*4*
**stated** 21:*5* 90:*13*
 109:*12* 129:*23*
 133:*15* 175:*19*
 195:*17* 206:*2*, *15*
 210:*3*, *20*
**statement** 6:*11*, *15*
 103:*20* 180:*24*
**STATES** 1:*1* 20:*4*
 109:*7* 232:*10*, *16*, *21*
**stating** 220:*18*, *22*
**station** 182:*22*
 185:*15*
**status** 175:*16*, *17*
**statute** 236:*13*
 237:*8*
**stay** 178:*16* 183:*6*
**stenographically**
 264:*11*
**stepdad** 36:*16*
**Stepfather** 37:*19*
 39:*7*
**stepped** 143:*24*
 239:*11*
**steps** 55:*16* 163:*23*
 165:*11*, *15* 178:*4*
**STERK** 2:*7*
**Steuben** 8:*17*

**Steve** 143:*13*
 144:*15*, *22* 145:*1*, *2*
 146:*15* 195:*18*
 220:*1*
**Steve's** 144:*10*
**stipulation** 175:*13*
**stolen** 186:*6*
**stone** 261:*7*
**stop** 186:*19*
**stopped** 75:*5* 82:*3*
**stored** 78:*10*
**Street** 1:*19* 2:*3*, *8*
**strike** 19:*19* 28:*22*
 47:*4* 52:*7* 54:*11*
 66:*5* 72:*8* 85:*20*
 99:*6* 150:*7* 190:*6*
**stubs** 80:*24*
**Stuck** 159:*14*
**study** 177:*23*
 216:*21*
**stuff** 56:*2*, *11*, *14*
 62:*15*, *23* 75:*4*
 76:*1*, *4* 154:*15*
 159:*21* 216:*18*
**subject** 90:*19*
 198:*12*
**subjective** 103:*11*
 107:*15* 108:*6*
**subjectivity** 108:*9*
**submit** 203:*13*
 204:*8* 206:*14*
**submitted** 201:*24*
 205:*22* 206:*5*, *7*, *10*
 223:*8*
**sued** 113:*1*, *5*, *15*
**suggested** 116:*14*
**suggestions** 262:*17*,
 *19*, *24*
**suit** 222:*3*
**Suite** 1:*19* 2:*3*
**superintendent**
 9:*13*, *14* 10:*15*, *18*
**supervision** 109:*1*,
 *14*
**supervisor** 10:*21*
 164:*3* 165:*1* 262:*9*
**supervisors** 6:*14*
 41:*14* 94:*17* 95:*6*
 111:*9*, *19* 112:*5*
 113:*3* 117:*18*

118:*8* 164:*5*
 226:*16* 262:*1*, *7*, *10*
**support** 124:*4*
 143:*16*
**supported** 110:*6*
 143:*13* 195:*18*
**supposed** 94:*20*
 140:*8*
**supremacy** 127:*8*,
 *11*
**sure** 4:*21* 12:*12*
 32:*10* 37:*9* 48:*2*
 54:*3*, *6* 55:*14* 58:*6*
 60:*19*, *22* 76:*15*, *16*
 79:*2*, *3*, *4* 100:*5*
 106:*18* 137:*1*
 160:*10* 190:*13*, *14*
 212:*22* 248:*23*
 254:*16*
**surprise** 149:*1*
**surprised** 143:*21*
 156:*16*
**sworn** 4:*2* 174:*21*
 233:*3*, *5*, *17* 264:*8*
**system** 128:*14*
 153:*2* 216:*5* 256:*19*

**< T >**
**tabulate** 215:*3*
**tail** 129:*5*
**tailors** 232:*20*
**taint** 258:*12*, *15*
**take** 4:*23* 15:*24*
 24:*18* 93:*16*
 104:*12* 108:*13*
 146:*15* 163:*24*
 171:*13* 172:*16*
 205:*9* 210:*19*
 215:*16* 251:*21*
**taken** 1:*15* 4:*12*,
 *15* 89:*6* 128:*6*, *24*
 145:*22* 165:*12*, *15*
 184:*17* 264:*15*
**talk** 56:*2* 107:*13*
 143:*23* 182:*22*
 185:*1* 187:*10*
 210:*14* 214:*16*
 223:*12* 233:*4*
 237:*6* 253:*3*
 261:*23*, *24* 262:*1*, *6*

**talked** 4:*19* 6:*8*
 41:*7* 52:*4* 55:*21*,
 *23* 75:*15* 84:*7*
 88:*4* 102:*7* 104:*8*
 110:*17* 126:*16*
 133:*7*, *19* 147:*23*
 186:*16* 188:*16*
 193:*24* 201:*8*, *15*,
 *17* 246:*6* 247:*19*
 252:*7*
**talking** 46:*4* 62:*22*
 82:*16* 91:*16*
 104:*10* 111:*13*
 117:*15*, *18* 128:*11*,
 *13* 139:*5* 141:*18*
 152:*2* 153:*21*
 181:*13* 185:*22*
 193:*10* 202:*20*
 241:*6* 250:*24*
 252:*10* 257:*20*
**talks** 173:*3* 174:*3*
**tamper** 77:*18*
**targeted** 127:*20*
**task** 181:*22*
**tasked** 160:*21*
**tax** 71:*14*
**team** 140:*7*, *12*, *15*
 142:*10*, *15* 214:*10*,
 *22* 217:*10*, *14*
**tell** 6:*20* 9:*12*
 11:*24* 14:*16* 22:*19*
 23:*14* 25:*9* 26:*14*
 28:*11* 29:*4*, *7*
 33:*11*, *15* 34:*6*
 35:*5* 36:*15*, *22*
 38:*1*, *10* 43:*12*, *24*
 47:*3*, *12* 55:*1*, *16*
 61:*5*, *8* 64:*10*
 66:*22* 68:*13* 69:*6*
 70:*5* 75:*24* 82:*22*
 83:*11*, *16* 91:*4*, *15*,
 *20* 92:*22* 93:*2*, *6*
 94:*4*, *10* 95:*22*
 96:*2* 100:*17*
 121:*23* 139:*11*
 157:*4*, *7* 163:*8*
 171:*14* 178:*20*
 182:*20* 187:*14*
 237:*18* 250:*2*
 254:*4*, *15* 258:*17*

Willie Hunt  -  3/21/2022
Paul Berge, et al. vs. City of Kankakee, et al.
2:20-cv-02310-CSB-EIL   # 17-5  Page 97 of 100

**telling** 96:*16*
226:*18* 258:22
**ten** 29:*11* 88:24
105:*10* 212:*13*
234:*18*, 20 236:4
239:8
**tender** 239:*20*
**tenure** 117:*24*
217:*16*
**terminated** 165:*18*
166:7, 23 167:8
207:*18*
**termination** 165:*20*
166:3, *10*
**test** 19:9 28:*14*, 17
30:*3* 50:*18*, 21, 23,
24 51:8, *10*, 17
55:6, 7 56:24 57:5
59:6, 8, *11*, 12, 15
60:6, *14* 62:*11*, 17,
*18*, 19, 21, 24 63:2,
8 66:*14* 68:*3* 74:6,
*10*, 24 90:*14* 100:2
101:*1*, 2, 9 107:2
177:*18*, 22 188:*20*
190:9, *14* 191:22,
23 192:2 216:*21*
217:*1* 223:*16*, 17
224:22, 24 225:3, *4*
252:3, 4 253:*14*
257:8, *13*
**testified** 4:5 92:*13*
171:*24* 212:*11*
222:*10*, 24 224:7
227:*11* 228:8
230:*10* 246:7
**testify** 228:7 264:8
**testimony** 64:*4*
75:*17* 80:22 87:24
98:*12* 99:*14* 115:6
122:*20* 129:7
131:*20* 149:7
163:*1* 167:*1* 170:4
194:*19* 195:*13*
196:8 204:*11*
220:*12* 257:*21*
258:9 264:*13*
**testing** 23:*17* 24:2,
*3*, 6, 9, *13*, *18* 25:6,
*18* 26:*19* 27:*14*, *18*
28:6 29:6 47:*16*,

*17* 49:*12*, *15*, 17, *18*
50:2, *4*, 7, *11*, 14
51:*1* 52:8 53:*4*, *11*,
*13*, 17, 22 54:*10*, *11*,
*14*, 16 55:*11*, 21, 24
56:*15*, 19 57:9
58:*3*, *14*, 20 59:*1*, 2,
*10*, 19, 21 60:*3*, 6,
*13*, 15, 16, 20 61:*10*,
*18* 62:7, *14* 63:*16*
64:2 70:8, 9 73:8,
24 74:*12* 75:*3*
76:*3* 77:7, *10*, 17
89:23 90:*18* 97:*15*,
*18* 99:*17*, 21, 24
100:*4*, 7 101:*4*, 7
102:*10* 104:*23*
108:5, 8 113:5, 8,
*10* 114:*1*, *3*, 15, 16,
24 115:2, 21
116:*15*, 16, 18
117:*4* 177:*13*
178:9 179:*3*
188:*16* 190:*16*, 23
191:*2*, 8, *14*, 16, 19
192:6, *11* 193:*11*,
*13*, 16, 22 202:*12*,
*13*, 16 203:6, 9
204:*20* 205:6, 8
208:*16*, 18, 19
209:*4* 222:*19*
227:*12*, 18 228:*13*
248:*3* 252:*1*, *3*
253:6 254:9 255:6
257:*12*, 16
**tests** 28:*19*, 24
29:2 58:*19* 64:8
74:9 78:9 90:*10*
96:22 100:*18*
101:*21* 192:*3*
251:*12*
**text** 127:*18*
**Thank** 39:2 134:*18*
**thing** 28:*13* 55:5
75:*3* 94:7 135:*11*
148:*21* 151:*11*, *13*
157:*17* 163:*21*
181:*21* 203:*16*
256:9 259:*4*, 6
**things** 18:*4* 56:9
116:*20* 140:9

169:8 183:*4* 186:*3*
199:8 202:5
260:*21*, 22 262:*4*
**think** 13:*1*, 19 14:2
21:5 25:*4* 33:24
35:9 36:8 40:5
41:2 44:*3* 46:*14*
48:*21* 50:23 55:*1*,
*18* 56:2 59:*20*
64:*11* 65:*10* 66:*19*
68:23 72:*15* 74:22
75:*4*, 7 76:*11*, 21
81:*14* 82:*13* 83:*20*
88:22 90:*16*, 20
106:*1* 111:*21*
117:*12* 118:8, 9
119:22 121:24
122:*1*, 9 123:*4*, *12*
126:*13* 127:*13*
134:24 137:*21*
140:9 141:*1*, 4
143:8, 9, *10* 144:6,
9 145:*10*, 12, 13, 16,
17 146:*11*, 12
147:*13*, 19 149:*21*
158:*18* 160:*12*
161:7 162:*15*
163:*4*, 15, 16, 21
166:*4*, 5, 12, 13
178:*13*, 24 179:*14*,
16, 19, 21 180:*21*
182:*13*, 18 183:*19*
184:5, 7 185:*15*
188:23 194:*21*
195:*13* 199:7
202:*4*, 17, 18, 22
205:*16* 207:*12*
208:*4* 219:5 226:8
227:7 233:*16*
236:*3* 239:5
242:*16*, 18 243:9
248:24 251:20, 22
258:6 260:7 261:*16*
**thinking** 57:6
156:7 181:*15*
183:*11*
**third** 28:*16* 32:*10*
135:*13*
**thorough** 164:*13*
**thought** 16:7 46:*4*
56:*3*, 5 57:*21* 64:7

75:6 76:7 94:6
111:7 124:*3*
157:*19*, 20 179:*12*,
*14* 182:7 183:2
184:*10*, 20 185:*3*
186:*10*, 13 187:*1*
188:8 242:2
259:*18*, 22 260:*3*, 5,
8, *17*, 18, 19, 20
**thoughts** 180:6
258:*17*
**thousand** 29:*20*
116:*10*
**three** 52:2 62:6
70:*11* 71:*11* 88:*3*
105:8 106:2, *3*, 4
118:*15* 121:*19*
122:*3* 136:9, 19, 23
147:24 180:*11*, 12,
*18* 183:*19* 184:9
211:*1* 212:*13*
214:*14* 216:2 230:9,
14, 20 234:*12*
258:*3*, *10*, 18, 23
259:2 262:*11*, 15
263:*4*, 7, 12
**tie** 222:*3*
**till** 85:*11*
**Tim** 59:*16* 202:5
206:9 220:9
**time** 6:8 7:*10*
10:2, *15* 15:16
18:6, 9 20:9 25:*12*,
16 27:8, 17 28:*19*
43:9 45:9, *10*, 22
52:*3*, *11* 53:*15*, 21
54:*21*, 22, 23, 24
55:*1*, 5, *10* 58:*15*
60:*12* 61:24 63:*14*,
24 66:*12*, 24 67:22
68:*1*, 8 69:*18* 73:*1*,
*23* 74:*1*, 15 82:9
88:23 96:9 97:*13*,
16 99:20 106:*17*
111:*18* 112:6, 9
127:*19*, 22 128:8
130:*17* 131:*4*
135:*23* 139:*23*
146:*20* 161:*1*, 8
162:*3*, 24 172:24
178:2, 6 180:*23*



Willie Hunt   -   3/21/2022
2:20-cv-02310-CSB-EIL   # 17-5   Page 98 of 100
Paul Berge, et al. vs. City of Kankakee, et al.

182:*6*  195:*8*  201:*9*
207:*8*  213:*12*
214:*7*  216:*11*, *23*
217:*6*  223:*3*, *6*, *11*
227:*8*  233:*14*, *21*,
*24*  234:*3*, *5*, *10*
236:*1*, *4*  238:*5*
240:*8*  251:*21*
264:*16*
**timely**  164:*13*
**times**  65:*14*, *17*, *19*
194:*1*  210:*4*
211:*17*  220:*6*
**TIMOTHY**  1:*2*
**titled**  152:*6*
**titles**  11:*21*
**to/from**  16:*24*  17:*3*,
*5*
**today**  12:*17*  25:*23*
51:*5*  55:*9*  59:*20*
69:*12*  74:*21*  76:*23*
126:*5*  130:*21*
166:*18*  168:*20*
206:*24*  220:*12*
234:*18*  248:*18*
258:*2*
**today's**  5:*7*  7:*11*
**told**  56:*4*, *5*  61:*13*
73:*11*  75:*7*  76:*11*
83:*10*  91:*14*  93:*13*
94:*5*  130:*8*  142:*10*
151:*6*  160:*3*, *13*, *15*,
*16*, *17*, *18*  178:*15*
186:*18*  188:*10*
206:*1*, *4*, *13*, *17*
262:*20*
**top**  120:*22*  121:*19*
122:*3*  136:*9*, *22*
147:*24*  230:*14*
235:*11*, *12*  243:*24*
**total**  71:*13*, *20*
233:*14*
**track**  213:*19*
**Tracy**  13:*9*
**traffic**  181:*16*
186:*6*
**train**  250:*12*, *14*
**trained**  70:*3*
103:*16*  249:*8*, *10*
**Training**  5:*15*  38:*4*,
*11*  70:*4*, *5*, *6*  71:*22*,

*23*  72:*1*, *3*, *7*  76:*14*
102:*8*  104:*9*, *12*, *15*,
*19*  105:*2*  106:*12*,
*17*  109:*1*, *14*
156:*13*, *14*  174:*15*
214:*1*, *3*, *11*  215:*11*
216:*5*
**trait**  128:*15*
**transcript**  246:*10*
247:*9*  264:*10*
**treat**  154:*21*
**treated**  155:*1*
187:*6*  197:*14*
**treating**  197:*24*
**trial**  228:*1*, *2*, *3*, *7*, *8*,
*10*  246:*6*, *7*, *20*
**trick**  73:*14*
**tried**  64:*14*  186:*19*
**trooper**  136:*18*
254:*7*
**troopers**  72:*4*
106:*2*  223:*23*
252:*18*  253:*7*, *17*
**true**  177:*3*  264:*13*
**truth**  35:*14*, *15*
264:*8*
**try**  76:*8*  184:*23*
210:*14*
**trying**  73:*14*  90:*14*
133:*20*  137:*21*
139:*17*  183:*12*, *22*
184:*5*, *24*  188:*4*
219:*5*  243:*10*
**turn**  15:*12*  108:*22*
109:*21*  176:*20*
**turned**  29:*14*
238:*14*
**Twain**  8:*17*
**twelve**  236:*4*
**twenty**  9:*2*  29:*12*
**twice**  29:*5*
**two**  22:*7*  24:*24*
29:*20*  30:*11*, *24*
31:*3*, *8*  32:*14*, *17*
45:*21*  46:*10*  51:*12*
52:*1*, *5*, *12*  60:*10*,
*11*  70:*11*  76:*16*
89:*18*  92:*3*, *6*
106:*19*  116:*10*
126:*9*  133:*13*
134:*4*, *5*, *21*  135:*3*,

*15*, *16*, *20*  136:*3*
138:*21*  143:*9*
144:*24*  145:*8*, *12*
146:*2*, *11*  148:*13*
157:*11*  163:*6*
167:*19*  169:*8*
171:*17*  179:*18*
180:*8*  183:*19*
194:*14*, *15*  195:*9*,
*10*, *19*, *24*  196:*5*
199:*7*  202:*20*, *24*
204:*9*  211:*1*  214:*4*
215:*12*, *23*, *24*
216:*1*  219:*22*
223:*23*  233:*22*
235:*14*, *22*, *23*
236:*2*, *22*  237:*9*
238:*22*  239:*5*, *8*
241:*3*  245:*2*
252:*17*  253:*1*, *2*, *7*,
*17*  261:*1*, *18*
**type**  26:*14*  69:*17*
112:*17*  137:*3*
165:*9*  203:*15*
**typewriting**  264:*12*
**Tyson**  135:*2*, *5*
137:*14*, *19*  161:*17*,
*24*  162:*2*  163:*5*, *15*,
*20*  184:*3*, *13*  185:*7*
186:*17*, *18*  218:*14*,
*22*, *24*

**< U >**
**Uh-huh**  11:*8*  86:*15*
95:*8*  178:*3*  229:*23*
235:*16*  251:*5*
253:*23*
**understand**  7:*8*
19:*1*  27:*5*  32:*8*
38:*2*, *20*  46:*1*, *2*
54:*7*  77:*3*  107:*22*,
*24*  123:*6*  129:*9*
183:*3*  200:*24*
254:*21*  257:*21*
**understanding**
117:*21*  136:*21*
156:*5*  164:*2*  175:*8*
176:*2*  182:*21*
183:*1*  185:*13*, *17*,
*24*  186:*2*  250:*4*, *6*

261:*5*, *19*
**unfair**  203:*23*
**uniform**  57:*23*, *24*
221:*23*
**union**  143:*12*, *13*,
*18*, *19*, *24*  144:*4*, *23*
145:*1*, *6*, *10*  184:*24*
185:*1*  195:*18*
**unit**  181:*16*  182:*19*
184:*16*, *18*  186:*6*
**UNITED**  1:*1*
232:*10*, *16*
**units**  183:*10*
**unknown**  198:*20*
199:*1*
**unusual**  251:*24*
252:*5*
**update**  116:*16*
**upset**  158:*8*, *16*, *19*
159:*5*
**up-to-date**  114:*5*
**Upton**  39:*23*, *24*
40:*12*
**URBANA**  1:*2*
213:*9*
**use**  57:*7*  148:*3*
150:*14*  186:*5*
188:*19*  190:*8*
191:*11*  202:*22*, *23*
211:*21*  261:*6*, *8*, *17*
**usually**  57:*9*  62:*20*
76:*8*  80:*18*  143:*19*
214:*9*
**utilized**  115:*7*
261:*20*

**< V >**
**Vague**  225:*17*
226:*22*
**vaguely**  161:*16*
**various**  198:*13*
199:*16*  217:*18*
**vehicles**  188:*14*
**vendor**  97:*9*, *13*, *22*,
*24*  99:*1*
**V-e-r-a-t**  13:*10*
**verbal**  4:*21*
**verbally**  226:*19*
**Verrett**  13:*9*
**V-e-r-r-e-t-t**  13:*11*
**versa**  190:*19*

**veteran** 126:*10*, *11* 175:16

**Vice** 12:*9*, *18* 190:*18*

**vote** 97:6 166:*5*, *14*, *15*

**voted** 15:*19*, 22

**vs** 1:6

**< W >**

**W-4** 68:*17*

**wait** 4:22 30:*14*

**waive** 263:*19*

**Walters** 9:*15*, 24 10:22, *23* 11:2

**want** 4:*20* 7:6, *16* 8:*4* 37:9 54:6 55:*3* 65:*20* 88:*23* 90:*21* 95:*1* 140:*17* 148:*4* 177:*15* 187:*7*, *8* 188:*15* 205:*4* 226:*10* 247:7 248:*21* 258:*12*, *15*

**wanted** 64:*14* 75:*10* 122:9, *11* 137:*5*, *6*, *24* 139:*1* 140:*15* 142:*15*, *18*, *21*, *24* 144:*19* 149:2 156:*14* 177:*18* 178:*12*, *15* 179:2 180:*20* 210:*11* 220:*18* 225:*6*, *8* 249:2, *8* 250:*5*, *9* 257:*16* 260:*6*, *8*

**wants** 237:*9*

**warrant** 151:*1*

**way** 27:*19* 28:*15* 77:5 80:6 100:*10*, *15* 103:*16* 115:*21* 124:5 132:*18* 136:*14* 137:7 138:*24* 146:*12* 150:*15* 154:*21* 155:*1* 183:*8* 192:*12* 193:9, *17* 200:*10*

**ways** 141:2

**wear** 57:*24* 221:*24*

**wearing** 222:*1*, 2

**website** 12:*13* 21:*13*

**week** 66:*18* 82:*13*

**weight** 204:*14*, *15* 205:2

**Well** 7:5 22:*19* 25:2 33:*4* 35:9 38:*1*, 21 45:*21* 47:*12* 48:9 62:*12* 65:22 69:*8* 75:*24* 87:*14* 95:*3* 96:*17* 97:*16* 99:5 102:7 120:*8* 123:*11* 124:*10* 127:*10* 129:*11* 134:*24* 137:9, *14* 138:7 139:*10* 152:*14* 153:5, *16* 158:*15* 179:*21* 180:*14* 182:*6*, *20*, *22* 183:*11* 184:22 187:*14* 195:*8* 199:*14* 202:*17* 203:7 216:*4* 223:*16* 234:*10* 238:*12* 247:7 250:*8* 254:*16* 255:9 258:*21* 261:5 262:*6*

**Wells** 12:*3*, 6, *24* 79:22 119:*18* 120:2, *19* 121:*15*, 21 152:*12* 153:*12* 155:*18* 157:*8*

**WELLS-ARMSTRONG** 1:9 15:*18* 95:22 109:22 152:*2*, 5 233:2 235:*8*, *20* 237:*17* 238:9 239:*3*

**Wells's** 122:*8*

**went** 6:7 41:*20* 44:*1* 52:6 70:*4* 76:*6*, *13* 110:*4* 116:*10* 122:*4* 142:*11* 170:*20* 177:2 178:*21* 183:*19* 184:*21* 201:*17* 228:2 240:*3*, *4*, 9 241:*18* 242:*11*

**we're** 6:22 140:*8* 152:2 180:7 202:*20* 215:*16* 216:*11* 225:*24* 252:*10*

**We've** 118:*2*, *3* 176:*19* 191:*12*

**whack** 183:*8*

**whatsoever** 82:*12*

**WHEREOF** 265:*1*

**Whichever** 50:9

**whistleblower** 187:9

**white** 6:*14* 30:*24* 31:*3*, 8 32:*14* 37:*5*, 7 41:*13*, *14* 44:*21*, 23 45:*11* 46:*14*, *15* 51:*12* 52:*1*, 5 89:*18* 111:*8*, *13*, *19* 112:*5*, *20* 113:*3* 115:*24* 116:*1* 117:*18* 120:*12* 121:*9*, *11*, *20* 122:*5*, *16* 123:*2*, 9 127:*7*, *11*, *17* 128:*10*, *19* 129:*5*, *8* 130:*14*, *18*, *22* 131:*8*, *14*, *17* 132:*1*, *4* 133:*3* 134:*4*, *24* 135:*1*, *4*, *20* 136:*3* 137:*15*, *20* 140:*13* 141:*9*, *10*, *12* 143:*9* 145:*13*, *16*, *17* 153:*24* 154:*6*, *11*, *18*, *21*, *24* 155:*2*, *4* 157:*21* 179:*18* 181:*18*, *19* 185:*11* 186:*11*, *14*, *15*, *23* 195:*10*, *14*, *23* 196:*1*, *4*, *15*, *20*, *23* 197:*4*, 9 198:*23* 200:*1* 203:*7*, *8* 218:22, *24* 219:*20*, *21* 235:*11*, *15*, *23* 236:*3*, *4* 238:7 239:*6*, *8* 241:*14*, *23* 243:2 244:*1*, *15* 245:*20* 253:*9*

**whites** 112:*20* 241:22 242:*4*

**whunt** 88:*11*

**wife** 18:*17*

**William** 33:*17*, *19* 217:*21*

**Williams** 13:*13* 235:7

**WILLIE** 1:*9*, *14* 3:*1* 4:*3*, *12* 87:*15*, *19* 171:*3*

**W-i-l-l-i-e** 87:*15*

**Willie.j.hunt** 87:*12*

**Willie.j.hunt@gmail. com** 65:*2*

**willie.jhunt** 88:*5*, 6

**withdraw** 52:*15* 257:*19*

**WITNESS** 3:*1* 4:*1*, *4* 13:6 36:9 64:6 73:*11* 86:6 92:*10* 99:*17* 103:*16* 107:6, *19* 117:*12* 123:22 126:22 137:*19* 138:*4*, *17* 147:*6*, *19* 148:*18* 153:*20* 157:*1* 158:*1*, *6*, *12* 165:*5* 167:*3*, *12* 169:*7* 170:*1* 180:*11* 193:*1* 195:*4*, *17* 196:9 197:*3*, *13*, *23* 199:*3* 200:*4*, *10*, *18* 203:*20*, 22 204:*24* 205:*5* 207:*11* 209:*8*, *17* 211:*16* 212:*6* 213:*2*, *13*, *15* 224:9 225:*18* 226:*24* 231:*2*, 22 232:*13*, *18*, *24* 237:*12*, *13* 239:*16*, *24* 243:7 246:*19*, 22 247:*2*, *17* 259:*18* 260:*14* 264:7 265:*1*

**wjhunt** 88:*4*

**Wjhunt@citykankak ee-il.gov** 87:*8* 88:*15*

**women** 234:*6*

**word** 86:*13*

**words** 103:*17*

**work** 7:*21* 20:*8* 21:22, *23* 22:*2*, *4*, 9 23:*8* 26:*14* 27:*10*, *11*, 23 28:*1* 51:*13*



Willie Hunt - 3/21/2022
2:20-cv-03310 CSB FLU - # 17.5 - Page 100 of 100
Paul Berge, et al. vs. City of Kankakee, et al.

52:*18* 53:*24* 54:*8*
60:*12* 64:*2* 66:*11*
69:*16, 17, 22* 73:*20*
79:*1, 11* 82:*5*
83:22 86:*1, 3*
97:*10* 100:*13*
102:*17* 105:*12*
124:*11* 139:*24*
187:*8* 190:*7*
191:*14, 16* 209:*20*
211:*5* 227:*4*
253:*11, 15*
**worked** 22:*3* 23:*4*
25:*12* 33:*12* 49:*3*
79:*15, 21* 81:*7, 8*
89:*11* 90:*2* 99:*10*
100:*1* 102:*13*
105:*13, 19* 106:*1, 8*
112:9 146:*7*
156:*21* 180:*12, 19*
214:*10, 12* 250:*18,
20, 23* 254:*5, 8*
255:*8, 11, 14, 18*
256:*5, 11, 15, 24*
257:*1, 7, 8* 258:*3,
20* 259:*12*
**workforce** 174:*23*
**working** 27:*21*
34:*2, 4, 6, 12* 47:*1*
48:*5* 61:*2* 68:*3*
69:*9* 73:*23* 78:*1*
86:*4* 97:*14* 104:*23*
105:*12* 124:*1*
140:*6* 179:*6*
181:*24* 221:22
261:*15*
**workplace** 159:*12*
**world** 128:*1*
**wrapping** 205:*11*
**write** 17:*1* 215:*19*
**written** 21:*1* 63:*2*
101:*9* 103:*12*
107:*2, 16* 138:*9*
201:*21* 217:*1*
224:*2* 230:*5* 261:*7*
**wrong** 81:*18*
143:*15* 172:*14*
222:*11*
**wrongdoing** 150:*22*
**wrongdoings** 208:*3*

**wrote** 73:*17* 87:*16*

**< Y >**
**YATES** 1:*10*
130:*24* 131:*8, 9, 17,
23* 132:*4, 20* 133:*2,
7* 165:*23* 166:*2, 10*
**Yeah** 9:*20* 26:*8*
27:*13* 31:*14* 41:*4*
73:*16* 77:*6* 82:*17*
83:*6, 13, 19* 84:*11*
85:*4* 89:*2* 94:*15*
105:*4* 112:*3* 117:*2*
127:*12* 130:*3, 6*
137:*19* 138:*9*
144:*4* 150:*12, 21*
151:*5, 11* 152:*3, 9*
155:2 156:*2, 6*
157:*13* 160:*17*
162:*4* 171:*11*
175:*19* 178:*19*
184:*6, 14* 185:*16*
187:*13, 18, 21, 24*
188:*1* 189:*1*
193:*12* 195:*6*
201:*17* 203:*21*
205:*11* 207:*11, 12*
212:*15, 22* 214:*9*
235:22 243:*17*
246:22 252:*6*
257:*20*
**year** 22:*24* 38:*13*
41:*24* 42:*8* 43:*19*
49:*23* 55:*2, 3, 4, 10*
66:*16, 17* 81:*6, 8*
98:*8* 131:*6* 233:*5*
254:*14* 255:*1*
**years** 15:*8* 22:*6, 7*
24:*24* 29:*11* 43:*19,
21* 97:*19* 118:*15,
16* 123:*24* 128:*16*
131:*3* 140:*24*
141:*4* 259:*13*
261:*13, 16*
**Yep** 84:*9*

**< Z >**
**Zach** 181:*13*
184:*14, 15* 185:*4,
19* 186:*5, 15*

**zero** 70:*2*
**Zoom** 207:*10, 11, 13*

