E-FILED
Friday, 17 June, 2022  10:54:59 AM
Clerk, U.S. District Court, ILCD

BEFORE THE BOARD OF FIRE AND POLICE COMMISSIONERS
CITY OF KANKAKEE, KANKAKEE COUNTY, ILLINOIS

## <u>DISCIPLINARY CHARGES FILED AGAINST SERGEANT PAUL BERGE</u>

Chief Frank Kosman, through his attorney Michael McGrath files the following Charges against Sergeant Paul Berge, seeking the termination of Sergeant Paul Berge's employment with the Kankakee Police Department for cause.

### COUNT I
### (Sergeant Berge's Conduct On July 15, 2020)

1.  At all times relevant hereto, Sergeant Paul Berge was employed by the Kankakee Police Department as a Sergeant.

2.  The Kankakee Police Department, like all police departments is a "paramilitary" organization that has a formalized hierarchy and structure, i.e. chain of command.

3.  On July 15, 2020 Sgt. Berge failed to follow direct orders of his superior, Commander Austin and was insubordinate to Commander Austin

4.  Specifically, Sgt. Berge refused to acknowledge Commander Austin on said date, failed to answer questions posed by Commander Austin to Sgt Berge regarding an assignment/task of the patrol unit.

5.  Sgt Berge physically confronted Commander Austin and was verbally abusive and disrespectful to Commander Austin.

6.  Sgt Berge failed to follow multiple direct orders from Commander Austin.

7.  The conduct described above occurred while Sgt Berge was on duty and wearing the uniform of the Kankakee police department.

.

**EXHIBIT N**          **DEFENDANTS 001639**

8.      Chief Kosman charges that the conduct set forth above violates the following Rules,

General Orders and Policies of the Kankakee Police Department, specifically:

A.      Policy 200.3 .Command Protocol

B.      Policy 200.3.1 Succession of Command

C.      Policy 200.3.3 Orders

D.      Policy 341 Standards of Conduct

E.      Policy 341.3.5 Performance

D.      Said conduct constitutes cause and/or just cause for the termination of Sgt. Berge's

employment under applicable Illinois case law and arbitration decisions.

ACCORDINGLY, Chief Kosman requests that the employment of Sgt. Berge be

terminated, and that Sgt. Berge be discharged as a police officer of the Kankakee Police

Department.

## COUNT II
### (Sergeant Berge's Conduct on July 18, 2020)

9.      At all times relevant hereto, Sgt. Berge was employed by the Kankakee Police

Department as a Sergeant.

10.     The Kankakee Police Department, like all police departments is a "paramilitary"

organization that has a formalized hierarchy and structure, i.e. chain of command.

11.     On July 18, 2020, Sgt. Berge failed to follow direct orders of his superior, Police

Chief Frank Kosman, and was insubordinate to his superior, Police Chief Frank Kosman.

12.     Specifically, Sgt. Berge failed to acknowledge Chief Kosman at a public protest.

Sgt. Berge failed to follow direct orders from Chief Kosman and was insubordinate to Chief

Kosman.

2

DEFENDANTS 001640

13.    The conduct described above occurred while Sgt. Berge was on duty and wearing the uniform of the Kankakee police department.

14.    Chief Kosman charges that the conduct set forth above violates the following Rules, General Orders and Policies of the Kankakee Police Department, specifically:

A.    Policy 200.3   Command Protocol

B.    Policy 200.3.1   Succession of Command

C.    Policy 200.3.3   Orders

D.    Policy 341   Standards of Conduct

E.    Policy 341.3.5   Performance

F.    Said conduct constitutes cause and/or just cause for the termination of Sgt. Berge's employment under applicable Illinois case law and arbitration decisions.

ACCORDINGLY, Chief Kosman requests that the employment of Sgt. Berge be terminated, and that Sgt. Berge be discharged as a police officer of the Kankakee Police Department.

## COUNT III
### (Untruthfulness During Interrogation)

15.    At all times relevant hereto, Sgt. Berge was employed as a police officer in the City of Kankakee, holding the rank of Sergeant.

16.    On July 30, 2010, Sgt. Berge was interrogated with respect to the matters set forth in Counts I and II hereinabove.  The interrogation was conducted in accordance with the Uniform Peace Officers Disciplinary Act.

17.    A copy of the interrogation transcript will be furnished to Sgt. Berge through his attorney in accordance with application provisions of the Uniform Peace Officers Disciplinary Act when said transcript is available.

DEFENDANTS 001641

18.     At the commencement of the interrogation Sgt. Berge was admonished that his failure to honestly answer any questions could result in the filing of Charges seeking his termination.  During the course of the interrogation Sgt. Berge made false statements, including but not limited to:

A.      He denied seeing Chief Kosman when he arrived at the public protest.

B.      He denied hearing Chief Kosman's direct order(s).

C.      He denied brushing off Chief Kosman as he walked away from Chief Kosman

D.      He denied being insubordinate to his superiors, including Chief Kosman, on July 15, 2020 and July 18, 2020.

E.      Sgt. Berge stated he had a lawful reason to disregard the orders given to him.

19.     The denials set forth in paragraph 19 above were intentional falsehoods made by Sgt. Berge in an effort to avoid being disciplined for the matters set forth in Counts I and II.

20.     Sgt. Berge's untruthfulness as set forth above constitutes cause for termination of Sgt. Berge's employment.

ACCORDINGLY, Chief Kosman requests that the employment of Sgt. Berge be terminated, and that Sgt. Berge be discharged as a police officer of the City of Kankakee.


_____
        **Chief Frank Kosman**

_____
        8/13/2020
        **Date**


4

DEFENDANTS 001642

## NOTICE OF INTERROGATION

TO:  Sergeant Paul Berge:

1.  You are hereby notified that you will be interrogated on July 30, 2020 at 10:00 a.m. at the Kankakee Police Department, 2nd floor conference room. This interrogation will take place in accordance with the Uniform Peace Officers Disciplinary Act, 50 ILCS 725/1 *et seq.*

2.  The person in charge of the investigation is Deputy Chief Willie Hunt.

3.  The purpose of the interrogation is to determine whether you violated any rules of this Department or otherwise engaged in wrongful conduct with respect to the following:

> To determine whether you violated any rules, regulations, or department procedures with respect to the performance of your duties, failure to follow commands and orders, and insubordination while on duty July 15, 2020 and July 18, 2020.
>
> To determine whether you fully and accurately reported your activities with respect to your work as a Kankakee Sergeant.

4.  In addition to Deputy Chief Willie Hunt, City Attorney, Michael J. McGrath and City Inspector, Ronald Bartlett will be present at the interrogation and will be participating in the interrogation.

5.  A complete stenographic record of the interrogation will be made and a complete copy thereof will be made available to you without cost and without delay.

6.  Admissions you make in the course of the interrogation may be used as evidence of misconduct or as the basis for charges seeking your suspension, removal, demotion, discharge or other disciplinary action.

7.  You have the right to be represented by counsel of your choosing at the interrogation. You also have the right to have a representative of your collective bargaining unit present at the interrogation.

**DEFENDANTS 001643**

8.      You have no right to remain silent at the interrogation.  You have an obligation to truthfully answer questions put to you.  If you refuse to answer questions put to you, you will be ordered to answer the question.

9.      If you persist in your refusal after the order has been given to you, such refusal constitutes a violation of the rules and regulations of the Kankakee Police Department and will serve as a basis for which your discharge will be sought.

10.      Any admission made by you during the course of this interrogation cannot be used against you in a subsequent criminal proceeding.

Deputy Chief Willie Hunt

2

DEFENDANTS 001644

## UPODA 3.8(b) AFFIDAVIT

I declare and affirm that the facts contained in this Notice are complete, accurate and true to the best of my knowledge and belief.

_____
Deputy Chief Willie Hunt

Subscribed and Sworn to before me
this  23rd  day of July 2020.

_____
Notary Public

"OFFICAL SEAL"
VALERIE JAENICKE
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 04/01/2024

The undersigned hereby acknowledges that he has received this Notice of Interrogation.

Date/Time: 7/24/20  11:30 AM      _____
                                   Employee Signature

Witnessed By:

_____

3

DEFENDANTS 001645

**EXAMINATION UNDER OATH OF SERGEANT PAUL BERGE**
Sergeant Paul  Berge on 07/30/2020

```
 1

 2

 3   IN RE THE INTERROGATION OF:

 4   KANKAKEE POLICE DEPARTMENT INTERROGATION

 5

 6

 7

 8                  Examination under oath of

 9                   SERGEANT PAUL BERGE,

10   pursuant to the provisions of the UNIFORM PEACE

11   OFFICERS DISCIPLINARY ACT 50 ILCS 725/1, before

12   Adrienne M. Lightfoot, Certified Shorthand Reporter and

13   Notary Public, within and for the State of Illinois at

14   the KANKAKEE POLICE DEPARTMENT, 385 East Oak Street,

15   2nd Floor, Kankakee, Illinois, taken on July 30, 2020,

16   at the hour of 10:00 a.m. pursuant to notice.

17

18

19   BY:  Adrienne M. Lightfoot
          License No. 084-004276
20

21

22

23

24
```

DEFENDANTS 001646

**EXAMINATION UNDER OATH OF SERGEANT PAUL BERGE**
Sergeant Paul Berge on 07/30/2020     **Pages 2..5**

---

**Page 2**

```
 1          A P P E A R A N C E S
 2  REPRESENTING THE COMPLAINANT,
    KANKAKEE POLICE DEPARTMENT:
 3
 4          ODELSON STARK MURPHY FRAZIER & McGRATH
            Attorneys At Law
 5          3318 West 95th Street
            Evergreen Park, Illinois 60805
 6          (708)424-5678
 7          By:  Michael McGrath, Esq.
 8
 9
10  REPRESENTING THE RESPONDENT,
    SERGEANT PAUL BERGE:
11
12          HERBERT LAW FIRM
            Attorneys At Law
13          206 South Jefferson
            Suite 100
14          Chicago, Illinois 60661
            (312)655-7660
15
            By:  Daniel Q. Herbert, ESq.
16
17
18  ALSO PRESENT:
19      Timothy Klopp, City of Kankakee, Sergeant
20      Willie Hunt, Deputy Chief
21      Ronald L. Bartlett, Office of City Inspector
22
23
24
```

**Page 3**

```
 1              I N D E X
 2
 3  WITNESS                          PAGE
 4  Sergeant Paul Berge
 5      Examination by
        Mr. McGrath                     5
 6
 7
 8
 9          E X H I B I T S
10  DOCUMENT                         PAGE
11  Berge Deposition Exhibit No.  1     5
12  Berge Deposition Exhibit No.  2     9
13
14
15
16
17
18
19
20
21  (Said exhibits were tendered to the court reporter,
22  therefore, are attached hereto.)
23
24
```

**Page 4**

```
 1              (Witness Sworn)
 2          MR. McGRATH:  Good morning, everyone.  My
 3  name is Mike McGrath.  I'm from the Law Firm of
 4  Odelson, Stark.  I'm one of the City attorneys.
 5          We're here for the City of Kankakee.  We
 6  are here to take the formal interrogation of Sergeant
 7  Paul -- is it, Berg?
 8          THE WITNESS:  Berge.
 9          MR. McGRATH:  Berge?
10          THE WITNESS:  Yes, sir.
11          MR. McGRATH:  -- today, pursuant to notice
12  that was sent out.  There's a number of people here in
13  the conference room here just outside the Police
14  Department.
15          If everyone could just introduce
16  themselves going from --
17          MR. KLOPP:  Sergeant Tim Klopp, representing
18  Sergeant's Bargaining Unit for the FOP Lodge 102.
19          MR. HERBERT:  Good Morning, Dan Herbert.  I'm
20  a private attorney.
21          I'm representing Sergeant Paul Berge.
22          Go ahead, Paul.
23          THE WITNESS:  Sorry.  Paul Berge.
24          MR. McGRATH:  Do you have a spelling?
```

**Page 5**

```
 1          THE WITNESS:  B-e-r-g-e.
 2          MR. McGRATH:  Thank you.
 3          MR. HUNT:  Deputy Chief Willie Hunt,
 4  W-i-l-l-i-e, H-u-n-t.
 5          MR. BARLETT:  Ron Bartlett, B-a-r-t-l-e-t-t.
 6  And I'm the City Inspector for the City of Kankakee.
 7          SERGEANT PAUL BERGE,
 8  called as a witness herein, after having been first
 9  duly sworn, was examined and testified as follows:
10              EXAMINATION
11  BY MR. McGRATH:
12     Q    Okay.  Sergeant, before we mark this,
13  Berge No. 1.  Do you recognize that document?
14     A    Yes, sir.
15              (WHEREUPON, Berge Deposition
16              Exhibit No. 1, was marked for
17              identification.)
18  BY MR. McGRATH:
19     Q    And you recognize that as being the Notice of
20  Interrogation that was served upon you and which you
21  signed on Page 3?
22     A    Yes, sir.
23     Q    And that's your signature approximately in
24  the middle of the page, dated July 24, 2020 at
```

---

DEFENDANTS 001647

**EXAMINATION UNDER OATH OF SERGEANT PAUL BERGE**
**Sergeant Paul  Berge on 07/30/2020**                                          **Pages 6..9**

Page 6

1  11:30 a.m.?
2      A    Yes, sir.
3      Q    Have you ever been formally deposed by the
4  Calumet City Police Department?
5          MR. HERBERT:  Kankakee.
6          MR. McGRATH:  What did I say?  Cam many met
7  city.
8          THE WITNESS:  Formally deposed like this?
9  No, sir.
10  BY MR. McGRATH:
11      Q    Okay.  I just want to go through, just so I
12  know that you understand the rules of the formal
13  interrogation.
14          You're here pursuant to the Uniform
15  Police Officers' Disability Act, which is found at
16  50ILCS725 slash 1.
17          Are you aware you've been called here as
18  part of an investigation of recent events, actions
19  and/or incidents, which you were involved in to
20  determine if you violated any Department rules or
21  engaged in any wrongful conduct?
22      A    Yes.
23      Q    The -- going through the Notice of
24  Interrogation, Paragraph 2, the actual person who was

Page 7

1  in charge of this investigation is going to be Deputy
2  Chief Willie Hunt, who is here in the room; do you
3  understand that?
4      A    Yes, sir.
5          MR. HERBERT:  And I'm sorry, Mike, if I can
6  just correct you on one more thing.  You said it's
7  pursuant to the Police Officers' --
8          MR. McGRATH:  Disciplinary Act.
9          MR. HERBERT:  -- Disability Act.  I thought
10  you said Disability Act.
11          MR. McGRATH:  No, Disciplinary Act.
12          MR. HERBERT:  Perfect.  As long as your
13  record is clear.
14          Can you correct that?  It should be
15  Disciplinary Act.
16  BY MR. McGRATH:
17      Q    And, again, the purpose of the interrogation
18  is to determine whether you violated any rules of the
19  Kankakee Police Department or, otherwise, engaged in
20  any wrongful conduct; do you understand?
21      A    Yes, sir.
22      Q    Specifically, we are here to address whether
23  or not you failed to follow commands or orders, or if
24  you acted -- or were insubordinate on July 15, 2020 and

Page 8

1  July 18, 2020; do you understand that?
2      A    Yes, sir.
3      Q    In addition to Deputy Chief Willie Hunt, I'll
4  be involved in this investigation, along with City
5  Inspector Ron Bartlett; do you understand that?
6      A    Yes, sir.
7      Q    As you can see, sitting in front of you is a
8  Court Reporter.  She's taking everything down.  And a
9  copy of the transcript, once it's complete, will be
10  provided to you at no cost to you; do you understand
11  that?
12      A    Yes, sir.
13          (WHEREUPON, there was a pause.)
14
15
16  BY MR. McGRATH:
17      Q    Sergeant, you're aware that any admissions
18  that you make in the course of this interrogation may
19  be used as evidence of misconduct, or as the basis of
20  charges seeking your suspension, removal, demotion,
21  discharge or any other disciplinary action?
22      A    Yes, sir.
23      Q    Paragraph 8.  Do you understand you have no
24  right to remain silent at this interrogation, and that

Page 9

1  you have an obligation to truthfully answer the
2  questions put before you; and if you refuse to answer
3  any questions put to you, you will be ordered to answer
4  those questions?  Do you understand that?
5      A    Yes, sir.
6      Q    And do you understand that if you persist in
7  your refusal to answer a question that you have been
8  ordered to answer, that refusal can constitute another
9  violation of the rules AND regulations of the Kankakee
10  Police Department?
11      A    Yes, sir.
12      Q    Okay.  You are currently -- you have been
13  placed on Administrative Paid Leave, correct?
14      A    Yes, sir.
15          Can I read something into the record
16  before we formally start, go further, please?
17          MR. McGRATH:  Daniel will give you a chance.
18          MR. HERBERT:  Well, he's going to give us his
19  preface statement.
20          MR. McGRATH:  Okay.  Let me just do the next
21  exhibit first.
22          (WHEREUPON, Berge Deposition
23          Exhibit No.2, was marked for
24          identification.)

DEFENDANTS 001648

**EXAMINATION UNDER OATH OF SERGEANT PAUL BERGE**
Sergeant Paul Berge on 07/30/2020                    Pages 10..13

Page 10

1  BY MR. McGRATH:
2      Q    Sergeant, placed before you is Berge No.2,
3  which is the document dated July 20th 2020 from Chief
4  Frank Kosman.  Did you receive this document from the
5  Police Department on July 20th of 2020?
6      A    Yes, sir.
7      Q    And you understand that this document was
8  prepared by the Chief, giving you notice that you are
9  being put on Paid Administrative Leave pending the
10 investigation of the incidents that are now contained
11 in the Notice of Formal Interrogation?
12     A    Correct.
13     Q    Okay.  With that, if you have any other
14 statements, we want to -- I'll allow you to read that
15 or make that at this time.
16     A    Okay.  Thank you.  *This statement is not
17 being given freely or voluntarily, but under duress.
18 I'm only giving this statement because I know I'll be
19 fired if I refuse.*
20         MR. HERBERT:  You are not going to refer to
21 these two exhibits anymore, are you?
22         MR. McGRATH:  No.
23         MR. HERBERT:  Okay.  Ready to go.
24         MR. McGRATH:  Oh, that was it?  Okay.

Page 11

1  BY MR. McGRATH:
2      Q    Since the time you've been placed on
3  Administrative Leave on July 20th of 2020, have you
4  spoken to any members of the Kankakee Police Department
5  about you being placed on Administrative Leave?
6      A    I spoke with Tim Klopp and Chris
7  Lombary(Phonetic).
8      Q    Chris Lombary, what is his rank with the
9  Police Department?
10     A    He's a Detective, and he's the President of
11 our FOP Unit here at the Kankakee Police Department.
12     Q    Can you tell me when and where you were when
13 you spoke with him?
14     A    I can't exactly tell you when.  It was
15 immediately following my Notice of Administrative
16 Leave, so --
17     Q    Was it that day?  Was it the day after?
18     A    I'm sure I spoke to him that day.  I spoke to
19 him several days, just trying to get together an
20 attorney, how I may be represented, who is going to be
21 here for me.
22     Q    Have you spoken to anyone else within the
23 Kankakee Police Department regarding you having been
24 placed on Paid Administrative Leave?

Page 12

1      A    No, sir.
2      Q    Briefly, I'd like to go through your
3  background with the Police Department.
4          Where did you go for training prior to
5  being hired by the Kankakee Police Department?
6      A    Prior to being hired?
7      Q    Yes.
8      A    Prior to being hired, I was at Olivet
9  Nazarene University.
10     Q    In what capacity?
11     A    As a student.
12     Q    And then you applied to be a Police Officer
13 with the Kankakee City Police Department?
14     A    Yes, sir.
15     Q    And what year was that?
16     A    Oh, I believe it was around 2006.
17     Q    And after your application, obviously, you
18 were hired.  Is that when you were sent to training?
19     A    Yes.
20     Q    All right.  Where did you receive your
21 training?
22     A    At the Police Training Institute in
23 Champaign.
24     Q    And what year was?

Page 13

1      A    It would be that same year, 2006.
2      Q    How long of a training course was that?  Was
3  it four months, or --
4      A    Three months.  I believe 11 or 12 weeks.
5      Q    During that training, were you taught what is
6  referred to as a Chain of Command within a Police
7  Department?
8      A    I'd have to go back and specifically look at
9  any lessons, but I understand there's a Chain of
10 Command within the Police Department.
11     Q    Did you receive any training as far as
12 following orders of superior officers?
13     A    Once again, I'd have to go back and see what
14 specific course curriculums we had.  Nothing
15 specifically that I can remember.
16     Q    After the academy, you became a Police
17 Officer.  Have you received ongoing training with the
18 Kankakee Police Department?
19     A    Yes, sir.
20     Q    Has any of that training dealt with the Chain
21 of Command or following orders of superior officers?
22     A    Once again, I'd have to specifically look.  I
23 don't believe so, though.
24     Q    What about day-to-day training, on-the-job

DEFENDANTS 001649

**EXAMINATION UNDER OATH OF SERGEANT PAUL BERGE**
**Sergeant Paul Berge on 07/30/2020**                 **Pages 14..17**

Page 14

1  training, have you learned about what the Chain of
2  Command of the Kankakee City Police Department is?
3      A    Once again, I'd have to look at all the
4  Lexipol Daily Training bulletins that we go over.
5      Q    Who was the Police Chief when you were hired
6  in 2006?
7      A    That was Chief Michael Kinkade.
8      Q    How many chiefs have you worked under?
9      A    I believe this will be the fourth one.
10     Q    Can you give me the names, spelling and last
11 names, who were subsequent chiefs after Chief Kinkade?
12     A    That was Chief Larry Regnier, I believe
13 spelled R-e-g-n-i-e-r.  That's close.
14          And then after that, it was Price Dumas,
15 Chief Price Dumas, D-u-m-a-s.  And now it's Chief Frank
16 Kosman, K-o-s-m-a-n.
17     Q    When, approximately, did Frank Kosman become
18 the Chief of the Kankakee City Police Department?
19     A    Oh, I'm not really too sure, sir.
20 Approximately two years ago, maybe, year and a half
21 ago, two years ago.
22     Q    When were you promoted to Sergeant?
23     A    2015, I believe or -- 2016.  I think it was
24 the beginning of 2016.

Page 15

1      Q    And were you placed on a promotion list and
2  selected off of that promotional list to become a
3  Sergeant?
4      A    Yes, sir.
5      Q    And who was the Chief that selected you off
6  of that promotion list?
7      A    I believe it was Chief Larry Regnier.
8      Q    Being promoted to a Sergeant means that --
9  Patrol Officers are -- they're staffing officers that
10 work below you, correct?
11     A    I wouldn't say they work below me.  They work
12 with me.
13     Q    But you are a higher ranking official with
14 the Police Department?
15     A    I just do a different kind of job.  But if
16 you want to get specific, I assume.  Sure.
17     Q    I just want to get your understanding.  Do
18 you believe that you were moved up in the Chain of
19 Command of the Kankakee City Police Department when you
20 were promoted to a Sergeant?
21     A    Sure.
22     Q    And as a result, you were above certain
23 members of the Kankakee City Police Department,
24 correct?

Page 16

1      A    I'm not comfortable with that terminology
2  "above."
3      Q    Then how would you characterize it?  What are
4  you comfortable with?
5      A    That I supervise, and I do a different job as
6  far as correcting reports, you know, just kind of being
7  there for the guys.
8      Q    And how many of the guys do you supervise as
9  a Sergeant with the Police Department?
10     A    Would I be on my squad or, in general,
11 overall per shift, or --
12     Q    You explain it.  How many are in the whole
13 squad?
14     A    Traditionally, there's three people per
15 squad, and there is one Sergeant.
16     Q    You say three people per squad; that's three
17 Patrol Officers?
18     A    Yes.
19     Q    And then there's a Sergeant above the three
20 Patrol Officers, correct?
21     A    There's a Sergeant who supervises, yes, sir.
22     Q    Okay.  And is that on every shift?
23     A    Yes, sir.
24     Q    So in your role as a Sergeant, since 2016,

Page 17

1  you have supervised whatever Patrol Officers were
2  assigned to your shift?
3      A    Yes, sir.
4      Q    At the time of your hire, were you given any
5  general orders, rules or regulations of the Police
6  Department?
7      A    I believe so.  I probably went over them at
8  the time with my Field Training Officers.
9      Q    Are you aware that you are responsible for
10 knowing the General Orders, the Rules and Regulations
11 of the Police Department?
12     A    Yes, sir.
13     Q    And are you given updates, amendments to
14 those General Orders, Rules and Regulations when they
15 are amended and approved by the Command Staff?
16     A    Yes, sir.  That's through our Lexipol System.
17     Q    You mentioned that before, Lexipol.  That's a
18 computer-base system, correct?
19     A    Yes, sir.
20     Q    To save on paper, all the General Orders,
21 Rules, Regulations, are contained within Lexipol,
22 correct?
23     A    Correct.
24     Q    And how do you access Lexipol?

**EXAMINATION UNDER OATH OF SERGEANT PAUL BERGE**
Sergeant Paul Berge on 07/30/2020                    Pages 18..21

Page 18

1    A    Via computer.
2    Q    And can you access that from a remote
3    computer at your home, or does it have to be a computer
4    terminal here within the Police Department?
5    A    You can access it from remote computer, but
6    traditionally, you access it here at the Police
7    Department while you're on shift.
8    Q    But as a Sergeant with the Kankakee Police
9    Department, you have no limitations on when you can
10   access that computer system to review the General
11   Orders, the Rules, Regulations of the Police
12   Department, correct?
13   A    The only limitations that I was made aware of
14   was the document I signed from Chief Kosman regarding
15   my Administrative Leave.  It stated in there that I
16   couldn't -- I'd have to specifically read it --
17            MR. HERBERT:  And you are referring to
18   Exhibit 2?
19            THE WITNESS:  Exhibit No. 2, yes, sir.
20            It say, "While on Administrative Leave,
21   you may not come to the workplace, perform any work,
22   exercise any police powers and authority or access work
23   e-mail or systems unless expressly approved by
24   Lieutenant Commander, Deputy Chief of Police or Police

Page 19

1    Chief of the Kankakee Police Department."
2    BY MR. McGRATH:
3    Q    Okay.  But up to July 19th of 2020, you had
4    full and complete access to that system to review any
5    of the General Orders, Rules, Regulations of the Police
6    Department, correct?
7    A    Yes, sir.
8    Q    And if you wanted to see any of the General
9    Orders, Rules, Regulations of the Police Department
10   from July 20th of this year through today's date, you
11   could have requested that, obviously, through your
12   Union representatives and gotten copies of anything
13   that you would have wanted to see, correct?
14   A    I would have had to ask my Lieutenant
15   Commander Deputy Chief, Police Chief, but not my Union
16   reps.
17   Q    Okay.  Have you asked anyone to review any
18   General Rules, Regulations or General Orders in
19   preparation for your formal interrogation?
20   A    I asked my Lieutenant Passwater, on my shift,
21   if I could access Lexipol to look at the policies.
22   Q    And when did you ask Lieutenant -- can you
23   spell the last name?
24   A    P-a-s-s-w-a-t-e-r.

Page 20

1            MR. HERBERT:  And if I can, Mike, I'm going
2    to just object that the notice does not specify a
3    violation of any department orders, so I would ask, at
4    this point, if the Chief alleges that Sergeant Berge
5    violated an order, that we be given notice of that
6    order, be allowed to review it.
7            MR. McGRATH:  Okay.
8    BY MR. McGRATH:
9    Q    Again, going back to Lieutenant Passwater and
10   your conversation with him, when did that take place?
11   A    I'd have to specifically look.  But it was
12   within, probably, two days of my notice of
13   Administrative Leave.
14   Q    And what did you ask of him?
15   A    If I can access the Lexipol System to look at
16   the numbers that are on the Administrative Leave
17   notification, which I'm being accused of violating.
18   Q    And what did he state to you?
19   A    He stated okay.
20   Q    And did he provide those to you, or did you
21   request copies of those be sent to you?
22   A    No, sir.
23   Q    And why not?
24   A    Because I remotely accessed the Lexipol

Page 21

1    System from my residence.
2    Q    Okay.  So you were able to review those
3    numbers?
4    A    Yes, sir.
5    Q    Are you aware that the Kankakee's Police
6    Department is a paramilitary operation?
7    A    It -- we wouldn't call it a paramilitary
8    organization.  I don't really consider it paramilitary,
9    however, people do refer to Police Departments as
10   paramilitary.
11   Q    Why do you not consider it to be
12   paramilitary?
13   A    Well, just in this day and age of -- you
14   know, obviously, now they want to defund police
15   training.  And they are always talking about how Police
16   Departments are becoming more and more militarized.  I
17   don't -- I don't like that term speaking about Police.
18   Q    Well, let me get your definition.  What does
19   it mean that a Police Department is a paramilitary
20   operation?
21   A    Well, mili -- like militarized, or like the
22   military.
23   Q    Meaning what?
24   A    Meaning that we wear uniforms.  We have

**EXAMINATION UNDER OATH OF SERGEANT PAUL BERGE**
Sergeant Paul Berge on 07/30/2020                    Pages 22..25

Page 22

1 weapons. We have powers of arrest. We go through
2 training.
3       Q     Anything else as far as your understanding of
4 what a paramilitary operation is?
5       A     No, sir.
6       Q     You base that upon wearing a uniform, power
7 to arrest and that you have weapons?
8       A     Weapons, training, additional training as far
9 as dealing with the public, high stress situations. I
10 was on the Kankakee City Swat Team. I was in the Drug
11 Unit. I conducted many, many search warrants, so --
12      Q     Do you believe that Police Departments are
13 structured like the military, that's why they are
14 considered paramilitary operations, that you have a
15 Chain of Command from --
16      A     I agree there's a hierarchy of positions,
17 yes.
18      Q     Okay. And you agree -- do you agree that's
19 important for the proper functioning of a Police
20 Department, to have the hierarchy?
21      A     I believe it's probably necessary to have it
22 outlined.
23      Q     Why?
24      A     Well, because at each different position, you

Page 23

1 have a different assignment, a different job to do.
2       Q     Anything else?
3       A     No, sir.
4       Q     What is the hierarchy here with the Kankakee
5 City Police Department from the top to bottom?
6       A     I'd have to specifically look at what it is
7 in the Lexipol System, according to our Rules and Regs.
8       Q     You have been a Police Officer with this
9 Department since 2006?
10      A     Yes, sir.
11      Q     So in 14 years, you'd would have to review
12 the system to tell me what the hierarchy of the Police
13 Department is?
14      A     In order to be specific to your question,
15 yes, sir. I have a general --
16      Q     In general terms, from top to bottom, tell me
17 what --
18            MR. HERBERT: Just let him finish the
19 question. Okay? You are doing great. Just let him
20 finish.
21            THE WITNESS: I apologize.
22 BY MR. McGRATH:
23      Q     In general terms, if you could just give me
24 what you believe the hierarchy of the Calumet

Page 24

1 City Police Department is --
2       A     Kankakee.
3       Q     Kankakee. I apologize -- Kankakee, from top
4 to bottom?
5       A     I believe it would start with the Chief of
6 Police and then the Deputy Chief of Police. And then
7 we have the two Commanders. And then structured-wise,
8 I believe Lieutenants would be next, and then Sergeants
9 and then Patrolmen.
10      Q     In your capacity of a Sergeant with the
11 Police Department, have you ever given commands to
12 Patrol Officers?
13      A     Giving them direction? Yes, sir.
14      Q     No. Have you ever given Patrol Officers, who
15 you supervise, commands while they were working for the
16 Police Department?
17      A     I wouldn't say commands. I would say advice,
18 instructions.
19      Q     Is it your testimony, under oath, in the last
20 four years you have not given any commands to any of
21 the Patrol Officers that you supervise?
22            MR. HERBERT: I'm going to just object to the
23 vague nature of "commands."
24            You can answer.

Page 25

1            THE WITNESS: I have told people to do
2 things, yes.
3 BY MR. McGRATH:
4       Q     Okay. What's the difference between a
5 command and telling somebody to do something?
6       A     I believe giving a command is you are telling
7 someone to do something just because of the position
8 that you hold instead of having a team concept of, we
9 are all together; you know what I mean?
10            This is one team. We are out there
11 doing our thing. We have different positions on the
12 team, and we do specific jobs and we work as one unit.
13      Q     Working as a team, as one unit, you as a
14 Sergeant, are kind of like the team captain; are you
15 not, above the three Patrol Officers?
16      A     That's kind of a -- I don't know if I'm a
17 team captain.
18      Q     In the four years you've been a Sergeant, has
19 any Patrol Officers that you have supervised ever given
20 you a command to do something?
21      A     It depends on the situation.
22      Q     Give me a specific.
23      A     If I'm doing something untactical, out on the
24 street, that's dangerous, yes.

DEFENDANTS 001652

**EXAMINATION UNDER OATH OF SERGEANT PAUL BERGE**
Sergeant Paul Berge on 07/30/2020                    Pages 26..29

Page 26

1    Q    I need a specific incident, if you could.
2  And name the officer.
3    A    I couldn't name him right now, sir.
4    Q    Take your time and think about, in the last
5  four years, if you ever been in command, and given a
6  command, by a Patrol Officer that you are the
7  supervisor of?
8         MR. HERBERT:  Other than the example, you
9  just gave?
10        MR. McGRATH:  Yes.
11        THE WITNESS:  Can you repeat the question?
12  I'm -- I feel like there's been multiple questions.
13        MR. McGRATH:  Can you read that back?
14             (Record Read)
15        THE WITNESS:  I mean, as far as being out on
16  the Swat Team, during a Swat Operation, yes.  As far as
17  specific dates and times, and the specific,
18  quote/unquote "command" no, sir; I couldn't tell you.
19  BY MR. McGRATH:
20    Q    Are you currently on the Swat team?
21    A    No, sir.
22    Q    When was the last time you were on the Swat
23  team?
24    A    Three years ago, I believe, two or three

Page 27

1  years.
2    Q    Are there other sergeants on the Swat team
3  when you were on the Swat team?
4    A    Yes, sir.
5    Q    As a sergeant in charge of three patrol
6  officers, if you gave a command to one of those patrol
7  officers to do something, would you expect that patrol
8  officer to follow your command or directive?
9    A    Not blindly, no, sir.
10    Q    Yes or no?
11    A    No, sir.
12        MR. HERBERT:  Let him ask the question.
13        THE WITNESS:  Oh, sorry.
14  BY MR. McGRATH:
15    Q    So it's your testimony as a sergeant that if
16  you gave a directive or command to a patrol officer to
17  do something in the line or the course of being a
18  patrol officer, you would not expect them to follow
19  that directive or order; is that your answer?
20        MR. HERBERT:  I'm going to object.  That
21  misstates his testimony.  Go ahead.
22        THE WITNESS:  Once again, it needs to be
23  specific situations and what's going on.  I mean, we
24  are in a high stress job.

Page 28

1  BY MR. McGRATH:
2    Q    If you told one of your patrol officers to go
3  over to the west side of the city to check on a house,
4  would you expect that patrol officer to follow your
5  directive or command?
6    A    Yes, sir.
7    Q    And if you directed or demanded that patrol
8  officer to go to that house on the west side of the
9  city and they didn't do it and just sat there, what
10  would you do?
11    A    I'd ask them what they were doing and I'd ask
12  them what their reasons were for not wanting to go to
13  the west side and check on the house.
14    Q    Has that ever happened where you have asked a
15  patrol officer to go somewhere or do something, you
16  being their sergeant, and a patrol officer has not
17  followed your directive or order?
18    A    Not that I could recall, sir.
19    Q    So it's fair to say that you would expect and
20  it's been a common occurrence that if you give a
21  directive or an order to a patrol officer that you are
22  in charge of supervising, they follow your directive or
23  order in the last four years?
24    A    Yes, sir.

Page 29

1    Q    Have you ever had a situation in the last
2  four years as a sergeant that you have given a
3  directive or an order to one of your patrol officers
4  and they have not followed your order or directive?
5    A    Not that I could specifically think of, sir.
6    Q    Would you agree that as a sergeant, if you
7  are given an order or a command from a higher ranking
8  officer with the department such as the lieutenant or a
9  commander, that you are supposed to follow that order
10  or directive?
11    A    Once again it depends on the directive.
12    Q    Prior to July of this year, had you ever been
13  given an order or command by a higher ranking officer
14  with the Kankakee City Police Department that you did
15  not follow?
16    A    As far as -- I'm a little confused here.  I
17  kind of feel like it's a loaded question.
18    Q    Since you became a sergeant in 2016, you told
19  us that the hierarchy of the police department there's
20  a number of positions that are higher than the sergeant
21  position, correct, within the chain of command of the
22  police department?
23    A    The hierarchy of the way the police
24  department is set up.

**EXAMINATION UNDER OATH OF SERGEANT PAUL BERGE**
Sergeant Paul  Berge on 07/30/2020                    Pages 30..33

Page 30

1    Q    Right.
2    A    Like I said previously, though, sir, I don't
3  think anyone is higher than anybody.
4    Q    What do you mean by you don't believe that
5  anyone is higher than anybody?
6    A    I think we are all on the same team.  We are
7  here to do a specific job.  We just all have different
8  jobs within the police department.
9    Q    Do you believe it's your job with the
10  Kankakee City Police Department to follow the orders or
11  commands of the police chief?
12    A    It depends on what those are.
13    Q    Can you elaborate on that?  Which orders and
14  directives would you follow and which orders and
15  directives would you not follow from the chief of
16  police?
17    A    I wouldn't follow immoral or unethical or
18  unlawful orders.
19    Q    And why not?
20    A    Because we as members of the police
21  department, we have a public trust and we are trying to
22  reach out to the community, and actually in today's day
23  and age we are trying to change the way the police and
24  the community we serve interact.

Page 31

1    Q    Going back to my question.  Have you ever
2  been given an order or directive from the three prior
3  chiefs from the Kankakee City Police Department that
4  you mentioned and you disobeyed or disregarded that
5  command or directive from the three prior chiefs?
6    MR. HERBERT:  I'm just going to object, vague
7  nature of the question.  You can answer if you
8  understand the question.
9    THE WITNESS:  I kind of understand question
10  it, I just -- once again, it's a loaded question.
11  BY MR. McGRATH:
12    Q    Let me unload it.  You were currently under
13  Chief Kosman.  You testified that you worked under
14  three prior police chiefs?
15    A    Yes, sir.
16    Q    During all those years, did you ever disobey
17  any order or command given to you by any of those three
18  prior police chiefs?  Yes or no?
19    A    I don't remember ever getting any orders or
20  commands or specifically dealing with those three
21  police chiefs.
22    Q    Since you became sergeant, have you ever been
23  given a directive or command from any lieutenants from
24  the police department?

Page 32

1    MR. HERBERT:  I am just going to object
2  again.  Ongoing objection and vague nature of
3  directive, command, order.  I'm not sure if that's
4  contained within the policy what those definitions are
5  but that's my objection.
6    THE WITNESS:  Can you repeat the question?
7    MR. McGRATH:  Can you read it back, please?
8    (Portion read back.)
9    THE WITNESS:  I'm sure I have been.  I can't
10  give you any specific examples, though in our day do
11  day operations.
12  BY MR. McGRATH:
13    Q    Can you give me any specific instance where
14  you disregard or disobeyed a directive, a command or an
15  order from a lieutenant given to you from 2016 through
16  today's date?
17    A    Once again, sir, I can't give you any
18  specific examples.
19    Q    From 2016 through today's date, have you ever
20  been given a directive, a command or an order from any
21  of the commanders within the police department?
22    A    Once again I can't give you any specific
23  examples.
24    Q    Had you been given a directive, order or

Page 33

1  command from any of the commanders with the police
2  department from 2016 through today's date, would you
3  have followed that directive, command or order?
4    MR. HERBERT:  Objection.  Incomplete.
5  Hypothetical.  You can answer.
6    THE WITNESS:  Once again it depends on the
7  order or command or request.
8  BY MR. McGRATH:
9    Q    In the last four years can -- up until
10  July of 2020, can you specifically tell us any
11  directive, order or command that you received from
12  either the chief, the deputy chief, a commander or a
13  lieutenant that you disregarded or failed to follow?
14    A    I can't give you any specific examples, sir.
15    Q    Are you aware that a superior officer can
16  give a command, order or directive to another superior
17  officer and that is a valid command, directive or order
18  to a lower ranking officer?
19    A    Once again it depends on the specific order
20  or directive.
21    Q    So you are taking issue with the contents of
22  the order, the directive or communication?
23    A    I am taking issue with the moral or ethical
24  or lawful nature of the order, yes, sir.

**EXAMINATION UNDER OATH OF SERGEANT PAUL BERGE**
Sergeant Paul  Berge on 07/30/2020                                    Pages 34..37

Page 34

1    Q    Are you aware of any rules, regulations or
2  procedures that state that you are allowed to disregard
3  any command, directive or order from a higher ranking
4  officer based upon your morals or ethical belief?
5    A    I'd have to specifically look in the manual
6  in the Lexipol system to find that out.  I believe
7  there is something in there that talks about ethical or
8  morality or lawful orders.
9    Q    And have you reviewed that?  Have you seen
10  that?
11    A    I have seen it, yes.  I can't give you the
12  specific language of it.
13    Q    If you believe that you have been given an
14  order, directive or command that is against your morals
15  or your ethical beliefs, what is an officer supposed to
16  do when that occurs?
17    A    If it goes against morality and ethics?
18    Q    Against --
19    A    I don't feel they are bound to obey that
20  order.
21    Q    Are they supposed to express the reason for
22  not obeying that order or do a to from or talk to their
23  supervisor?  What is the protocol for an officer to
24  disregard an order, directive or command from a higher

Page 35

1  ranking officer?
2         MR. HERBERT:  In -- I'm just going to object.
3  Are you asking him what the procedure is with the
4  Kankakee Police Department or --
5         MR. McGRATH:  With the Kankakee Police
6  Department.
7  BY MR. McGRATH:
8    Q    What is the protocol, if there is a protocol,
9  if such a situation occurs?
10    A    I'd be unaware of that.  I can only tell you
11  how I would handle the situation, and I would handle
12  the situation as a discussion with that person to come
13  to some sort of an agreement and figure out where we
14  both stand and how we are going to deal with the
15  situation.
16  BY MR. McGRATH:
17    Q    And is that contained in any general order,
18  rule or regulation that you would handle it by having a
19  conversation with a higher ranking officer if you were
20  given a directive, command or order to do something and
21  you believe that it is immoral or against your ethics
22  to follow through with that order, directive or
23  command?
24    A    I'm unaware of any specific language.  I can

Page 36

1  only say how I would handle a situation as a supervisor
2  and as a 14-year veteran of the police department.
3    Q    Again when I asked you earlier, that's never
4  happened, has it, where you have given an order,
5  directive or command to a lower ranking officer and
6  they failed to follow through on your directive, order
7  or command based upon their morals or their belief that
8  it's not a proper order, directive or command, correct?
9    A    I wouldn't give an unethical or unlawful
10  directive.
11    Q    Okay.  So that's never happened?
12    A    I can't give you any specific instances, no,
13  sir.
14    Q    Tell me what's your definition or your belief
15  of what insubordination is.
16    A    Honestly, I don't have the specific
17  definition offhand or specific wording.  It --
18    Q    In general terms, what do you believe
19  insubordination is?
20         MR. HERBERT:  I'm going to object.
21  BY MR. McGRATH:
22    Q    Or how would you characterize an officer
23  within the police department as being insubordinate?
24         MR. HERBERT:  I am going to object to his

Page 37

1  belief or what he believes insubordinate is.  The chief
2  has brought charges here saying that he was
3  insubordinate.  So his understanding of it is, quite
4  frankly, irrelevant.  You can answer.
5         THE WITNESS:  Someone who is being rude or
6  unethical or immoral.
7  BY MR. McGRATH:
8    Q    Would you believe an officer with the
9  department would be insubordinate by failing to follow
10  the rules or a directive from a commanding officer?
11         MR. HERBERT:  Objection.  Incomplete.
12  Hypothetical.  You can answer.
13         THE WITNESS:  Once again it specifically
14  depends on what that command, order or directive is.
15  BY MR. McGRATH:
16    Q    Have you ever charged any officer that you
17  had been charged with supervising with insubordination?
18    A    No, sir.
19    Q    Have you ever been charged with
20  insubordination prior to July of 2020?
21    A    No, sir.
22    Q    Are you aware of any officers within the
23  Kankakee City Police Department being charged with
24  insubordination within the last ten years?

DEFENDANTS 001655

**EXAMINATION UNDER OATH OF SERGEANT PAUL BERGE**
Sergeant Paul  Berge on 07/30/2020                    Pages 38..41

Page 38

1    A    No, sir.
2    Q    What are officers supposed to do if they are
3  given a valid command or directive from their
4  supervisor?
5    A    What's the definition of valid, sir?
6    Q    Valid -- a proper command?
7    A    A proper command?
8    Q    Yes.
9    A    Proper?
10        MR. HERBERT:  Yes.
11        THE WITNESS:  That it would be followed.
12  BY MR. McGRATH:
13    Q    And it has to be followed.  And if it's not
14  followed they would be insubordinate to that commanding
15  officer, correct?
16    A    Once again it depends on what your definition
17  of insubordinate is and once again it depends on what a
18  persons' character values of moral would --
19    Q    It really doesn't --
20    A    And it depends on --
21        MR. HERBERT:  Hold on.
22  BY MR. McGRATH:
23    Q    It really doesn't.  If a patrol officer is
24  give a proper command from a supervising officer, you

Page 39

1  just testified that they have to follow that order,
2  correct?
3    A    Can I get a specific example?
4    Q    It's a proper order.
5        MR. HERBERT:  I am going to object to its --
6  first of all it's argumentative.  It's been asked
7  answered.
8  BY MR. McGRATH:
9    Q    If a commanding officer directed or commanded
10  a patrol officer to go and perform street detail or to
11  walk in front of the school to make sure there's no
12  incidents in front of the school, is that a proper
13  order?
14        MR. HERBERT:  Objection.  Incomplete.
15  Hypothetical based on those facts.
16        THE WITNESS:  Once again it just depends on
17  the situation.
18  BY MR. McGRATH:
19    Q    Okay.  Let's talk about you specifically.
20  You are a sergeant of three patrol officers.  Would you
21  be able to order one of your patrol officers under your
22  command to go over to the local grade school and make
23  sure there's no incidents going on in the playground?
24    A    Will I be able to ask them?  Yes, sir.

Page 40

1    Q    Can you order them, direct them to do that?
2  Not ask them.  You are their supervisor, you get the
3  difference?  So would you be able to direct or order
4  them and say officer, I'd like you to go over to the
5  school to check out the playground?  First, let's start
6  out, can you give that order or directive to that
7  patrol officer as a sergeant?
8        MR. HERBERT:  I'm going to object.  If the
9  chief is alleging that an order is different than
10  asking, then I think that needs to be defined.  What is
11  an order?  Is there a definition that we need to look
12  at?  My client has already testified as to what his
13  belief of an order is.
14  BY MR. McGRATH:
15    Q    You can answer the question.
16    A    Can I get the question repeated, sir?
17        MR. McGRATH:  Sure.
18        (Record Read)
19  BY MR. McGRATH:
20    Q    Let me just -- I'll rephrase the question.
21        As a Sergeant, you would have the
22  authority and ability to direct one of your Patrol
23  Officers to go over to the local grade school and check
24  on the well-being of the students in the playground,

Page 41

1  correct?
2    A    I could direct them to do that, yes, sir.
3    Q    Yes.  And it would be your expectation that
4  that Patrol Officer would follow your direction, your
5  command, to go over to the local grade school and check
6  on the well-being of the children in the playground,
7  correct?
8    A    I believe that Officer would follow me asking
9  him to do that, yes.
10    Q    Your expectation is that he would follow your
11  direction and command, because you are the Sergeant
12  telling him or her where to go and what to do, correct?
13    A    No, sir; not specifically because I'm a
14  Sergeant.
15    Q    Okay.  And if you gave that directive or
16  command to a Patrol Officer and they failed to follow
17  your directive or command, what would you do?
18    A    Have a discussion with them.
19    Q    All right.  Now, how long of a discussion
20  would you have with this individual who was not
21  following your order or command, to simply go over to
22  the local grade school and check on the well-being of
23  kids in the playground?
24    A    It depends on the specific situation, sir.

**EXAMINATION UNDER OATH OF SERGEANT PAUL BERGE**
Sergeant Paul Berge on 07/30/2020                    Pages 42..45

Page 42

1  Q   Okay.  Has any Officer, under your command,
2  ever failed to follow an order given by you claiming
3  that they believe that the order you gave was an
4  unlawful order?
5  A   Once again, sir, I haven't given any unlawful
6  orders.
7  Q   Let's draw your attention to July 15th of
8  2020.  Do you recall that date?
9  A   Yes, sir.
10  Q   And on that date, were you in the Sergeant's
11  office?
12  A   Yes, sir.
13  Q   And we're talking about approximately 1:30 to
14  2:00 p.m. on that date, correct?
15  A   Yes, sir.
16  Q   And who else was in the Sergeant's room?
17  A   Sergeant Gary Tison.
18  Q   Anyone else?
19  A   Commander Donna Austin walked into the
20  office.
21  Q   Do you recall when Commander Austin entered
22  the room?
23  A   Yes, sir.
24  Q   Was anything stated between you and Commander

Page 43

1  Austin at that time?
2  A   He brought up a specific call from earlier in
3  the day about homeless people sitting at an abandoned
4  church, having open alcohol.
5  Q   Where were you located in the Sergeant's
6  office at that time?
7  A   As soon as you walk in the office, there's a
8  desk directly to your right.  I was sitting behind that
9  desk.  I believe I actually had my feet up, because I
10  was just talking with Sergeant Tison, just about
11  general things.
12  Q   What were -- what was the hours of your shift
13  on that date?
14  A   I started at -- the specific -- I started at
15  5:45 a.m.  However, we get there a little earlier to do
16  our duties before our shift starts, and we're scheduled
17  to 2:15.
18  Q   Where did Commander Austin go when he entered
19  the Sergeant's office?
20  A   He stood at the door and next to that -- the
21  chair, right by the desk, by the door.
22  Q   Was Sergeant Tison still in the room?
23  A   Yes, sir.
24  Q   And, specifically, what did Commander Austin

Page 44

1  state to you?
2  A   I couldn't give you the specific words in
3  general.  He talked about requesting us -- or actually,
4  requiring us to write the homeless people, City
5  Ordinance Tickets, for open alcohol containers at that
6  abandoned church.
7  Q   Did he say anything else?
8  A   Right then and there?
9  Q   Yes.
10  A   I can't think of any specific things off the
11  top of my head, sir.
12  Q   Were you under the influence of any drugs,
13  either legal or illegal at the time?
14  A   No, sir.
15  Q   Were you under the influence of alcohol?
16  A   No, sir.
17  Q   At the time you were meeting with the
18  Commander, were you paying attention to the Commander,
19  making eye contact with the Commander, while you are
20  having a conversation with him?
21  A   It depends on what your definition of
22  conversation is, because -- go ahead, sir.  No, I'm
23  finished.
24  Q   Did put Commander ever have to wave his hand

Page 45

1  in front of you, in a motion, to ask if you were even
2  listening to him; do you recall that happening?
3  A   I don't recall that happening, no, sir.
4  Q   Did the Commander ever have to tap on the
5  desk in an attempt to get your attention while he was
6  trying to have a conversation with you?
7  A   Are you talking about the specific point when
8  the Commander was enraged with me, and was raising his
9  voice with me, and I had my feet on the desk, and I
10  closed my eyes and I said a prayer to myself because I
11  didn't understand why he would be so enraged and upset
12  at that specific point in time?
13  Q   No.  I'm talking about the time when the
14  Commander was tapping on the desk to get your
15  attention, which occurred right around the time that
16  Sergeant Tison made the statement that "something is
17  wrong with him," referring to you; do you recall that
18  occurring?
19  A   I remember closing my eyes, saying "Our
20  Father" in my head.  And then that actually calmed down
21  the Commander.  And he was actually calling me by name.
22  He said, "Paul, Paul" and I opened my eyes, and I
23  looked at him, and said, "Yes.  Yes."
24  Q   So you acknowledge that the Commander had to

**EXAMINATION UNDER OATH OF SERGEANT PAUL BERGE**
**Sergeant Paul Berge on 07/30/2020**                    **Pages 46..49**

Page 46

1  call out your name, repeatedly, as he stood in front of
2  you with your feet up on the desk and your eyes were
3  closed?
4          MR. HERBERT:  I'm going to object to the form
5  of the question.  Assume facts not in evidence.
6  BY MR. McGRATH:
7      Q     Is that what took place, or did not take
8  place?
9      A     That it stopped him from badgering me --
10     Q     I'm not talking about --
11     A     -- without words?
12     Q     I'm not talking about --  I'm talking
13  about --
14          MR. HERBERT:  Hold on.  Let him finish his
15  answer though, please.
16  BY MR. McGRATH:
17     Q     The question, sir, if you don't understand
18  the question, let me know, and I'll rephrase it.
19          But is that at the point when the
20  Commander was standing in front of you, a Commanding
21  Officer, of yours, and you had your feet up on the desk
22  and your eyes were closed, and he repeatedly stated
23  your name to get your attention; do you recall that
24  occurring?  Yes or no?

Page 47

1      A     I recall him badgering me with his words and
2  me closing my eyes to collect my thoughts, saying "an
3  our father," and that actually stopped him from yelling
4  at me, like, belittling me.
5      Q     When you say he was "belittling" you, when,
6  during the conversation, did that take place, and what
7  did the Commander state, specifically, that belittled
8  you?
9      A     It was his attitude, the look on his face.  I
10  almost thought he wanted to fight me.  It was
11  absolutely one of the most ridiculous things that I
12  have been a part of, sitting behind my desk, at the end
13  of shift, just talking with another Sergeant.
14          And for him to come in there and become
15  so enraged -- would you like me to tell you why he
16  became so enraged?
17     Q     No.
18     A     You wouldn't like me to tell you?
19     Q     No.  I want to know --
20          MR. HERBERT:  You can answer your -- answer
21  your question -- answer the question how you want to
22  answer it.
23          THE WITNESS:  Because when he came into the
24  room, specifically, talking about this incident, I

Page 48

1  said -- I said, "We can't write -- they are homeless
2  people.  They are people.  They are homeless.
3          We can't write them Ordinance tickets.
4  They don't pay them anyways.  And it doesn't reflect
5  good on us to keep pound away at these people who were
6  already having troubles in life.  It makes no sense."
7  BY MR. McGRATH:
8      Q     And it's after you made that statement to the
9  commander, is that when you closed your eyes with your
10  feet up on the desk and the Commander stood in front of
11  you?
12     Q     Would you like me to demonstrate how he stood
13  in front of me?
14     Q     No.
15          MR. HERBERT:  Go ahead.  If you want to
16  demonstrate, go ahead.
17          THE WITNESS:  I had my feet up on the desk
18  and he was right here.  He literally stood like this
19  with his foot on the desk -- on the chair, and was
20  doing this to me, with his legs spread open, like he
21  was trying to intimidate me or be a bully or --
22          As far as I'm concerned, that's sexual
23  harassment.  He's doing this, trying to stick his
24  crotch in my face.  Now, is that -- I was really

Page 49

1  confused in why he was so enraged by me just saying I'm
2  not going to write City Ordinance tickets to homeless
3  people.  (Indicating.)
4  BY MR. McGRATH:
5      Q     Was Sergeant Tison in the room when this took
6  place?
7      A     Yes, sir.
8      Q     You understand that the Commander is a higher
9  ranking officer than you in your position, as Sergeant,
10  correct?
11     A     I understand in the hierarchy of things, he
12  has a different job.
13     Q     In the hierarchy, he is a higher ranking
14  Officer with the Police Department than the position
15  you hold as a Sergeant, correct?
16     A     If that's the way you want to phrase it, yes,
17  sir.
18     Q     Did the Commander ask you, while you were
19  sitting in the chair with your eyes closed, on whether
20  or not you were okay?
21     A     I don't recall that.  I only recall him
22  saying "Paul, Paul."  And it stopped him from being so
23  angry.
24     Q     Did you, at that point, get up from the chair

**EXAMINATION UNDER OATH OF SERGEANT PAUL BERGE**
Sergeant Paul  Berge on 07/30/2020                    Pages 50..53

Page 50

1 and go around the desk and get in the face of the
2 Commander?
3      A    At that point?
4      Q    Yes.
5      A    And it depends on -- getting in the face --
6 and it depends on the reasons why.
7           MR. HERBERT:  Explain what happened.
8           MR. McGRATH:  No, let me...
9 BY MR. McGRATH:
10     Q    I'll just ask:  Do you get up out of your
11 chair and go towards where the Commander was standing?
12 Yes or no?
13     A    At one point, yes, I did.  Because I was
14 scared --
15     Q    Then when you got --
16          MR. HERBERT:  Hold on.  Let him finish his
17 question.
18          THE WITNESS:  Because I was scared he was
19 going to attack me.  He was so upset.  It was the
20 craziest thing.  And I am a wrestler, that's how I have
21 always done control tactics, things like that.
22          So I didn't want to be cheap-shotted
23 or -- you know, without being close to him -- in order
24 to be able to defend myself.

Page 51

1           It was -- it was -- it was really
2 uncalled for.
3 BY MR. McGRATH:
4      Q    Did you, around that time, make a statement
5 to the Commander, to the effect, what have you done in
6 the three years since you've been a Patrol Commander?
7 Yes or no?
8      A    Those aren't my specific words.
9      Q    Did you make any statements along those lines
10 that -- what have you done in the three years that you
11 have been a Patrol Commander?
12     A    I said he hasn't done anything for these
13 people that we are dealing with in the community for
14 the past three years.  If all we're doing is --
15          You know, when this Administration came
16 in, we were all forced to sit in this room, to take a
17 Restorative Justice Class, which, what I took from it,
18 is not to hammer on people with fines and arrests and
19 Law Enforcement, but to find alternatives to it.
20          Now, with these homeless people -- over
21 the last however many months I've been on day shift --
22 okay, I've been watching how they get treated by
23 Patrolmen or by other Supervisors on the shift, because
24 they don't like them downtown.  They think they are a

Page 52

1 nuisance.  But they're people.
2           So what I've been doing is -- because
3 I've been driving past them, and they wouldn't do it at
4 first -- but I just wave at them, say "how are you
5 doing guys?"  Most of them wouldn't even look at me.
6 Most of them would completely ignore me.
7           But over time -- because I go out
8 there -- and I keep messing with them, and I'm not
9 hammering them.
10          I mean, these are people who have no
11 jobs.  They don't have a house.  They have alcoholism
12 problems.  They have drug problems.  They have mental
13 health issues.
14          I'm trying to treat them like human
15 beings, and trying to find alternative ways for them to
16 be treated and for them to come in compliance of what
17 we'd like.
18          And I'm going to tell you what, sir, as
19 far as being at that abandoned church or over on
20 that -- I think it's the 400 block of South Dearborn --
21 there used to be a place where there's beer cans and
22 litter and all sorts of stuff thrown all over the
23 place.
24          But I treat these guys with respect and

Page 53

1 they respect that.  I treat them like human beings.  I
2 get out and talk to them.  And, you know what, I buy
3 them lunch every once in a while.  All right.  I'm
4 trying to give them some dignity.
5           I'm trying to show them a different way
6 of doing things.  Okay.  On this specific day, one of
7 the guys who I built a rapport with, they call him
8 "Twin."  I think his name is Antoine Berry.
9           Okay.  I actually washed a squad car
10 with him.  I took him to the Police Department and asked
11 him if he wanted to make a couple bucks.  I took him
12 here, I got out with him.  I washed my squad car with
13 him, and I paid him five bucks.
14          And that specific day, I gave him more
15 money.  I took him down to Wal-Mart, and I gave him
16 $20.  And I said, "Hey, go inside and buy all those
17 guys lunch."
18          And he went inside and bought them
19 lunch.  I didn't go with him.  He did it on his own.
20 And he comes back out, I went and dropped him off.
21          I mean, I've sat at that church and
22 prayed with those guys.  Matthew Obowiner(Phonetic),
23 for instance, he's a guy who people treat like shit.
24 But you know what, this --

**EXAMINATION UNDER OATH OF SERGEANT PAUL BERGE**
Sergeant Paul Berge on 07/30/2020                    Pages 54..57

Page 54

1      MR. HERBERT:  You are doing fine.
2      THE COURT REPORTER:  Can you spell that name?
3      THE WITNESS:  Matthew Obowiner?  Well, I
4  don't know how to spell his last name.
5      But, you know, I'm trying to give these
6  guys dignity, and find out what their story is, treat
7  them like human beings.
8      The day of the -- what day was --
9      MR. HERBERT:  The 18th -- let's get to the
10 18th first.
11     THE WITNESS:  Okay.
12     MR. McGRATH:  Let's get back to your
13 office.
14     THE WITNESS:  As far as to -- as far as --
15     MR. HERBERT:  Let him finish, please.  Go
16 ahead.
17     THE WITNESS:  As far as Antoine Berry, that
18 specific day, they were sitting there.  And Antoine's a
19 good dude.  He's a decent guy.  He's from Milwaukee.
20     He actually likes metallic band, like,
21 metal music, which, that's how we kind of start
22 talking.  Hey, I'm in my squad car as I'm asking him
23 where is he from, what's he do, trying to figure out
24 what his story is.

Page 55

1      Okay.  He's a decent dude.  Honestly,
2  I've never seen him intoxicated under the influence of
3  things.  I really think he goes down there and talks to
4  these guys.  He has a speaker that he plays music for
5  them.  All right.
6      So he was down there.  I think --
7  specifically, I think there was two icehouse cans out
8  there, two.
9      Now, this is a hot summer day, they are
10 underneath the shade.  Where are they supposed to go?
11 There's no one over there to complain.  The place is
12 dirty.  They pick up their trash.
13     I rolled up.  I said, "Hey, why are you
14 guys drinking that?"  Because I can't remember what
15 time it was.
16     I said, "Quit drinking that shit,"
17 because it's got higher alcohol in it, and it gets them
18 messed up a lot faster.
19     And I looked at Antoine, because he was
20 standing out there, and he was perfectly fine, I said,
21 "Hey, man, can you handle this for me?"  And he said,
22 "Yep, man, I'll get it."  I said, "Thanks," and I drove
23 away.
24

Page 56

1  BY MR. McGRATH:
2      Q    Okay.  I'd like to get back to the incident
3  at the office, the Sergeant's office, on the date we
4  are talking about.
5      Did you make a statement to the
6  Commander as you stood in close proximity to him that
7  this is not your department anymore?  Did you make a
8  statement to that effect?
9      A    I don't remember saying that, no, sir.
10     Q    Did you make a statement -- or a follow-up
11 statement, that this is our department.  We are taking
12 it back?
13     A    No, I don't remember saying that, no, sir.
14     Q    Did you tell the Commander to "get out of my
15 office.  This is my office"?
16     A    I told -- yes, "to leave my office," because
17 of his actions.  And his -- him looking like he was
18 going to fight me.
19     And if we want to get back to it, at one
20 point after I said I'm not going to write these guys
21 City Ordinance tickets, because there's different ways
22 to do it, he was so enraged, he said, "You're relieved
23 of your duty."
24     I said, "Huh!"  I'm sitting in the

Page 57

1  office, at the end of the day, correcting paperwork.
2  I'm relieved of my duties for trying to talk to you and
3  ask you --
4      And I asked him a specific question, I
5  said, "Well, who called in the complaint?"  And he
6  wouldn't give me the answer.
7      And I said, "Well, who is the property
8  owner?"  Because, you know what, the property owner can
9  do is come to the Police Department, and we could talk
10 about what's going on there.  And we can work something
11 out, because these guys got no place to go.
12     We can figure something out for them.
13 But he's yelling at me, saying I'm relieved of my duty.
14 And then he's telling me to go into his office.
15     And at that point, I -- I was afraid he
16 was going to hit me, and he was so upset that I said,
17 "I'm not going to your office," because I felt like he
18 was trying to rope me into something.
19     Q    Was Sergeant Tison in your office at this
20 time?
21     A    You know what, I don't know, sir, because I
22 know that Sergeant Klopp walked in the office, and he
23 shut the door.
24     And I know that Sergeant Tison, he got

DEFENDANTS 001660

**EXAMINATION UNDER OATH OF SERGEANT PAUL BERGE**
Sergeant Paul Berge on 07/30/2020                     Pages 58..61

Page 58

1  up, and he shut the door, because he had to go take
2  care of his shit briefing.
3           And once Sergeant Tison got up and left
4  the office, that's when I stood up, because I was by
5  myself in there.
6           And I didn't know what was going to
7  happen. That's why I got close to him, because I
8  didn't want him to freakin' haul off and punch me.
9      Q    Had Commander Austin ever threatened you with
10 physical force prior to that date?
11     A    No, sir.
12     Q    On that date, did Commander Austin raise a
13 fist or raise any of his arms in your direction?
14     A    No, but he raised his crotch across the desk
15 and tried to stick it in my face.
16     Q    What type of desk were you sitting in front
17 of?
18     A    It was a Sergeant desk, in the Sergeant's
19 office.
20     Q    Standard desk?
21     A    Sure. Whatever standard is -- we can go up
22 and look in the Sergeant's office and you'd get a
23 better idea of it, sir.
24     Q    During the time you were standing near

Page 59

1  Commander Austin, did you receive a telephone call from
2  the Records Department?
3      A    I don't recall.
4      Q    Did Commander Austin advise you to tell the
5  caller that you would call back and to hang up the
6  phone?
7      A    I don't recall that, sir.
8      Q    Did Commander Austin advise you that you're
9  relieved of duty and you are to go home?
10     A    He did say that, yes.
11     Q    Where were you when he --
12     A    And then he said go to my office.
13     Q    Where were you when he made that statement?
14     A    I was sitting at my desk.
15     Q    He made that statement prior to you getting
16 up and you going around the desk and him -- and you
17 approaching him?
18     A    Yes, sir.
19     Q    When he told you that you were relieved of
20 your duty, did you immediately get up and leave the
21 Sergeant's office and go home? Yes or no?
22     A    No, sir, because I was completely confused
23 about what was going on. Why me saying, I'm not going
24 to write a City Ordinance ticket to homeless people,

Page 60

1  why it made him so mad.
2      Q    Have you spoken with Sergeant Tison about
3  what he observed or seen in the office on that date?
4      A    No, sir.
5      Q    Do you recall Sergeant Tison asking you
6  whether or not you were okay?
7      A    No, sir.
8      Q    Were you yelling at Commander Austin while in
9  the Sergeant's office?
10     A    No, sir.
11     Q    Did you ever raise your voice, in any way,
12 while you were having a conversation with Commander
13 Austin?
14     A    I don't believe so, sir.
15     Q    And you understand what I mean by raising
16 your voice, correct?
17     A    Well, he was yelling at me, so I'm sure my
18 voice was raised.
19     Q    So your voice was raised?
20     A    If you want to use that term, yes, sir.
21 Fine.
22     Q    Who was speaking louder, Commander Austin, or
23 yourself?
24     A    I don't know, sir. I believe Commander

Page 61

1  Austin was. He was the one who really lost his cool.
2      Q    And who was in the Sergeant's office when you
3  believe Commander Austin lost his cool? Who would have
4  observed that?
5      A    I believe Sergeant Tison would have.
6      Q    Anyone else?
7      A    I'm unaware of anyone else being in the
8  office, sir.
9      Q    Did you contact your union or any
10 representative based upon what took place on that date
11 in the Sergeant's office prior to you --
12          MR. HERBERT: Object.
13 BY MR. McGRATH:
14     Q    -- prior to you being served with -- being
15 placed on Administrative Leave?
16          MR. HERBERT: I'm going to object to any
17 discussions or communications he had with his Union
18 Representatives.
19          You can answer the question if you
20 contacted them. Don't go into the context.
21          THE WITNESS: I don't believe I contacted
22 them. I don't think I did.
23 BY MR. McGRATH:
24     Q    How close did you get to Commander Austin

**EXAMINATION UNDER OATH OF SERGEANT PAUL BERGE**
**Sergeant Paul  Berge on 07/30/2020**                    **Pages 62..65**

Page 62

1  while you were speaking with him in front of the desk?
2      A    When I was by myself in the office with him?
3      Q    Yes.
4      A    Two feet.
5      Q    Did he still have his foot up on the desk?
6      A    No, sir.  We were standing in the middle of
7  the room.
8      Q    All right.  Were you facing chest to chest?
9      A    Chest to chest, face to face with
10  approximately two feet in between us.
11      Q    Was the door to the Sergeant's office open or
12  closed?
13      A    I believe Sergeant Tison closed it when he
14  left.  So I would have to say closed.
15      Q    Who was the next person to enter the
16  Sergeant's office?
17      A    I think it was Sergeant Klopp.
18      Q    Do you recall Commander Austin ordering you
19  or commanding you to hang up the telephone when you
20  received the phone call?
21      A    I don't recall that, no, sir.
22      Q    Did you hang up the telephone after being
23  given a command by Commander Austin to hang up the
24  telephone?

Page 63

1          MR. HERBERT:  I'm going to object to the
2  question.  It assumes he was given a command.
3          THE WITNESS:  Once again, sir, I don't
4  specifically recall answering the phone or being on the
5  phone.
6  BY MR. McGRATH:
7      Q    Sergeant Tim Klopp entered the office,
8  correct?
9      A    Yes, sir.
10      Q    At what point in time did he enter the
11  office?
12      A    I don't know.  I think I was sitting back at
13  the desk when he came back in the office.
14      Q    And then what took place?
15      A    Commander Austin kept telling me to go to his
16  office, and he was so enraged and so emotional.  And,
17  obviously, I was bothered by the situation, also, that
18  I wasn't going to get baited into going into his
19  office.
20          And I said we can deal with it in a
21  couple days when our emotions were a little calm down,
22  because nothing was going to get done at that point in
23  time.
24      Q    Did you prepare any memorandum, any notes,

Page 64

1  documents, to memorialize what took place in the
2  Sergeant's office that day?
3      A    No, sir.
4      Q    Three days later, on July 18, 2020, you were
5  working, correct?
6      A    Yes, sir.
7      Q    On that date --
8          MR. HERBERT:  Do you need a break?
9          THE WITNESS:  Yeah, I could probably use a
10  drink of water.  My mouth is pretty dry.
11          (WHEREUPON, off the record.)
12  BY MR. McGRATH:
13      Q    Let's go back on the record.
14          Sergeant, I just want to go, briefly,
15  back, again, to the June -- sorry, to the July 15th
16  incident in the Sergeant's office.
17          Would you agree, sir, that Commander
18  Austin, he came to your office to speak to you about
19  the homeless situation with people drinking in the area
20  of 400 South Dearborn, actually, the day before,
21  correct?
22      A    No, sir.  The day before -- no, I don't
23  recall that; no, sir.
24      Q    But was it an ongoing issue with either

Page 65

1  homeless people or individual subjects out, drinking,
2  in the area of 400 South Dearborn, that was an area
3  that the Department wanted to address, that specific --
4      A    That's been an area that's, traditionally,
5  been an issue because of trash and people hanging out
6  there and doing unsavory things out there.
7          But, like I said, now it's -- it's
8  pretty cleaned up down there.  And all those guys are
9  pretty respectful and pretty open to just casual
10  contact that I have with them.
11          They actually -- sometimes, I drive by
12  them just to wave at them.  And sometimes they start --
13  they start moving along.  I ask them, "Man, where are
14  you guys going?  I said we've got no complaints on you,
15  go, hang out.  I'm just waving at you."
16          So, you know, I don't see it as an issue
17  today.  I mean, obviously, I haven't been at work for
18  the last ten days, but --
19      Q    Are you aware that the Police Department
20  receives calls and inquiries about incidents such as
21  subjects out drinking alcohol in public during the
22  broad day light, specifically in the area of 400 South
23  Dearborn?
24          It's been an area that's been somewhat

DEFENDANTS 001662

**EXAMINATION UNDER OATH OF SERGEANT PAUL BERGE**
Sergeant Paul Berge on 07/30/2020                    Pages 66..69

**Page 66**

1  of a trouble spot for the city, through the years;
2  would you agree to that?
3      A    Over the past -- it's been an area that we've
4  got complaints on, yes, sir.
5      Q    Okay.  And continued complaints, and one way
6  to address those complaints is, possibly, to issue
7  citations or tickets to those subjects involved,
8  correct?
9      A    That's one possible remedy.
10     Q    To the subjects that are out there drinking,
11 to go out there, issue them citations, tell them to
12 leave the area, that's proper police work, correct?
13     MR. HERBERT:  I'm going object just to the
14 extent that you indicated that there was continued
15 complaints.  I don't think that's in the evidence at
16 this point.
17     THE WITNESS:  In my opinion, that hasn't
18 worked over the years, if the same specific areas are a
19 problem.  And you are kind of, quote/unquote -- you
20 have to be spinning your wheels at that point, because
21 you're writing people without jobs tickets.
22         And then they are getting negative
23 police contacts and negative opinions of the police in
24 the community.  And they feel like they are getting

**Page 67**

1  picked on.
2          So at this -- at this point in time,
3  especially, with the restorative justice model and all
4  the Supervisors, that took a class in this room, in, I
5  don't think that's the way that we should push police
6  work to --
7          To hammer on these guys for what?  It
8  doesn't change the fact that a lot of them have mental
9  problems, a lot of them are alcoholics, some of them
10 are freakin' drug addicts.
11         It just -- it doesn't -- it doesn't make
12 sense.  I think treating them like people gets a better
13 response and more respect.  I mean, I sit down there --
14 and like I said, I prayed with them, and I BS with
15 them, and they joke.  I don't spend prolonged periods
16 of time with them, but I wave, "Hey, guys, how is it
17 going?  Are you guys good today?"  Go about my day.
18 BY MR. McGRATH:
19     Q    Going back to the Police Department
20 specifically, Commander Austin.  Were you aware that it
21 was his directive that citations should be issued to
22 the subjects that were out drinking alcohol at 400
23 South Dearborn on or about July 14th/July 15th of 2020?
24     A    He was specifically asking us to write City

**Page 68**

1  Ordinance tickets.  And as I stated, I was trying to
2  explain to him that it doesn't do any good.  I said,
3  "It's not -- it doesn't give Police a positive feeling
4  for these people."
5          And, like I said, he became enraged when
6  I said that the City Ordinance tickets aren't going to
7  work.  It was more about look at me, I'm a Commander,
8  and you are going to do what I say or-else type
9  situation, not a "Let's discuss about a problem in the
10 community."
11         And, like I said, I said, "Who
12 complained?"  I said, "Who is the property owner?"  I
13 said, "We could all come together and discuss something
14 about it."
15         You know, it's a slow process trying to
16 reach these people or try to get to know them, after
17 years of being treated terribly.  So, you know, it's an
18 ongoing evolving thing.
19     Q    Just for the record, you are aware that
20 Commander Austin directed you to have citations, local
21 Ordinance Citations issued to the subjects that were
22 out consuming alcohol at 400 South Dearborn in mid-July
23 of 2020?
24     MR. HERBERT:  I'm going to object.  That's

**Page 69**

1  not what the evidence stated.  It's misstating his
2  testimony.
3          But you can answer.
4      THE WITNESS:  He asked us to -- from that
5  point on -- go ahead and write them City Ordinance
6  tickets.
7  BY MR. McGRATH:
8      Q    And when you say "he asked us," who are you
9  referring to?
10     A    Well, me, specifically, and the shift that I
11 work on.
12     Q    The shift that you are the Supervisor of,
13 correct?
14     A    Yes, sir, I'm the Sergeant on that shift.
15     Q    And you, as a Sergeant, supervise three
16 Patrol Officers that work that shift, correct?
17     A    Yes, sir, we work as a team.
18     Q    And did you advise any of the Patrol Officers
19 that you supervise on that shift to go out and write
20 the citations?
21     A    No, sir, I didn't.
22     Q    And why not?
23     A    Because I didn't believe it's an ethical or
24 moral thing to go out and do that to people without

**EXAMINATION UNDER OATH OF SERGEANT PAUL BERGE**
Sergeant Paul  Berge on 07/30/2020                     Pages 70..73

Page 70

1  jobs who are homeless.
2          It doesn't -- it's not the right thing
3  to do.  And that's what being a Police Officer,
4  especially nowadays, is what people want --
5      Q   Did you ever --
6      A   -- go on and do the right thing.
7      Q   Did you advise Commander Austin that you
8  weren't going to direct your patrol team to write the
9  tickets because you did not believe it was the right
10  thing to do?
11         Did you advise that to Commander Austin
12  on July 15th of 2020?  Yes or no?
13     A   Did I advise him that?
14     Q   Yes.  Yes or no?
15     A   No, sir.
16     MR. HERBERT:  You can answer however you
17  want.  You don't have to answer yes or no.
18     THE WITNESS:  Okay.  No.  Right.  No, sir.  I
19  was trying to explain to him that we could come up with
20  a different solution, and that -- me even questioning
21  him, enraged him.
22         Like I said, he went into this rant.
23  And he stuck his crotch in my face.  And he was
24  belligerent towards me.  And, like I said, I was afraid

Page 71

1  he was going to punch me.
2          It was -- like I said, it was crazy.  It
3  didn't make any sense for a City Ordinance ticket for
4  homeless people.
5  BY MR. McGRATH:
6      Q   Did you go and talk to any other Commanders,
7  Lieutenants, the Deputy Chief or the Chief in regards
8  to your personal beliefs on why tickets shouldn't be
9  issued, based upon the Command of Commander Austin?
10     A   No, sir, I didn't.  Because I would assume
11  that after years of experience, and it doesn't get you
12  anywhere with anybody, that it would just be a given.
13         Maybe that's just my style of being a
14  Police Officer; I don't know.
15     Q   So just to rehash, you had full knowledge
16  that Commander Austin directed you, for you and your
17  team to issue citations to the subjects that were
18  consuming alcohol at 400 South Dearborn on July 15th,
19  correct?
20     MR. HERBERT:  I'm going to object.  It's
21  argumentative, misstating the evidence.  It's been
22  asked and answered.  He has already answered the
23  questions.
24     THE WITNESS:  Like I said, he asks us to,

Page 72

1  and I was trying to have a discussion with him.  But
2  that discussion ended pretty quickly because of his
3  response.
4  BY MR. McGRATH:
5      Q   And after you left the Sergeant's office on
6  July 15th, 2020, you never raised that issue with any
7  other Commanders, Lieutenants, the Deputy Chief or the
8  Chief of Police, that you didn't believe it was
9  appropriate to write tickets to any of the subjects at
10  4800 South Dearborn?
11         The first time that you've expressed
12  this position is today in your formal interrogation?
13     MR. HERBERT:  I'm going to object.  It's a
14  compound question, first of all.  Second of all, he's
15  not charged with failing to notify his Command Staff
16  about his beliefs with respect to writing the homeless
17  people.
18         With that being said, you can answer the
19  question if you understand it.
20     THE WITNESS:  Well, can you -- like I said,
21  can you specifically repeat the question for me?
22  BY MR. McGRATH:
23     Q   Sure.
24     A   Which part you would like answered, sir,

Page 73

1  because --
2      Q   Well, you agreed that you were fully aware
3  that Commander Austin gave you an order to direct your
4  team to write citations to the subjects at 400 South
5  Dearborn on July 15th of 2020, correct?
6      MR. HERBERT:  Same objection I made the last
7  time.  It's argument.
8      THE WITNESS:  He asked us to do that, and I
9  was trying to come up with a solution about writing
10  people without jobs tickets.
11  BY MR. McGRATH:
12     Q   And you understood his order -- there was
13  nothing confusing about it -- you understood that he
14  wanted you to go out, if you see the subjects there
15  drinking alcohol, write them a Local Ordinance ticket?
16  There was nothing confusing about that, correct?
17     MR. HERBERT:  I am going to object to the
18  extent that you are assuming that's an Order.
19         My client has indicated it was -- they
20  had conversation about it.
21     THE WITNESS:  Well, we do have discretion as
22  Police Officers, and, like I said previously, what I
23  recall, what I took away from the Restorative Justice
24  Class is the find alternatives to specific law, hammer

**EXAMINATION UNDER OATH OF SERGEANT PAUL BERGE**
Sergeant Paul  Berge on 07/30/2020                    Pages 74..77

Page 74

1  people with fines and arrests and things like that.
2            It's about restoring the community's --
3  in my opinion, it was about restoring the community's
4  faith in the Police, and restoring their faith in each
5  other.
6  BY MR. McGRATH:
7      Q    But the answer to the question:  There was
8  nothing confusing about the content of what Commander
9  Austin stated to you, that he wanted you and your team
10 to go out to that area to write tickets to those
11 individuals on July 15th, 2020, correct?
12           You understood what he meant?
13     A    He meant in the future, yes, sir.
14     Q    So he --
15     A    I'm sorry.  Go ahead, sir.
16     Q    He wasn't asking about the day before or the
17 date of July 15th, of why tickets weren't issued to
18 individuals who are out consuming alcohol in public at
19 400 South Dearborn?
20     A    He did ask about it.  And I explained to him
21 that Antoine Berry, the person I built a rapport with,
22 I have a decent working relationship with, was out
23 there.  And I told him to handle it.
24           Because I think that they respond a

Page 75

1  little better, it's a little bit of respect, and it's
2  not just a Police Officer coming down there and saying,
3  "Look at me, I'm the police.  And this is what you
4  get."
5      Q    Again, you understood what Commander Austin
6  was asking, correct, to write citations, whether you
7  disagreed with it or not?
8            But you understood that he wanted
9  citations written to those individuals, correct?
10     A    Yes, sir, that's what he was asking.
11     Q    And you did not have your team go and write
12 citations to those individuals on that date, correct?
13     A    No, sir.  He relieved me of my duty.  It was
14 the end of our shift.  It was actually my Friday.  So I
15 had the next two days off.
16     Q    And you never spoke to any higher ranking
17 officer with the department to express your position
18 that those citations shouldn't be issued, either on
19 July 15th or at any date in the future, based upon what
20 Commander Austin wanted, correct?
21     MR. HERBERT:  Same objection to the same
22 question that was asked earlier.
23     THE WITNESS:  No, sir.  We have been,
24 traditionally, given discretionary powers as to when to

Page 76

1  specifically enforce -- I mean, these are petty
2  offenses, so --
3            MR. McGRATH:  Going on to July 18, 2020, you
4  were working, correct?
5      A    Yes, sir.
6      Q    In full uniform, correct?
7      A    I had my uniform on that day.
8      Q    Did you have an assigned squad car?
9      A    Yes, sir.
10     Q    Lieutenant Robin Passwater was also working
11 that day, correct?
12     A    Yes, sir.
13     Q    As a Lieutenant, he's, obviously, a higher
14 ranking officer than you, correct?
15     A    In the hierarchy of the Police Department,
16 yes, sir.
17     Q    He's a superior officer to you, correct?
18     A    He does a different job, sir.
19     Q    Was there a planned protest march within the
20 city on that date?
21     A    Yes, sir.
22     Q    All right.  That march led to the county
23 courthouse, correct?
24     A    Yes, sir.

Page 77

1      Q    What was your assignment for that date?
2      A    I was on General Patrol.
3      Q    In General Patrol, are you assigned a beat?
4      A    No, sir.
5      Q    You patrol the whole city?
6      A    Yes, sir.
7      Q    All right.  Are you aware that -- that Chief
8  Frank Kosman was working that day?
9      A    I became aware when I drove by the protest
10 march slash parade, and saw that he was following the
11 children who were marching in it or being paraded
12 around.
13     Q    What was Chief Kosman wearing?
14     A    He was wearing his uniform.
15     Q    Do you know if he had his police vehicle with
16 him?
17     A    He had his Chief's vehicle with him, yes,
18 sir.
19     Q    And when you initially saw Chief Kosman, who
20 else did you see with him?
21     A    In his vehicle?  There's no one else in his
22 vehicle, sir.
23     Q    So you saw him following the March.  He was
24 in his squad car?

**EXAMINATION UNDER OATH OF SERGEANT PAUL BERGE**
**Sergeant Paul Berge on 07/30/2020**                    **Pages 78..81**

Page 78

1    A    He was behind the march, in his squad car,
2  and Sergeant Miller was behind Chief Kosman.
3    Q    In another vehicle?
4    A    Yes, sir.
5    Q    And were you called to that area, or did you
6  just happen to come upon that area?
7    A    I just was curious as to what the protest
8  march parade was about, so I just went to go see what
9  it was.
10   Q    How many people did you see in the protest
11 march?
12   A    Oh, I don't know, 10 to 15 children, and
13 maybe -- I know three adults, for sure, who were
14 marching with the little kids.  And then there was two
15 people in a minivan, following, also.
16   Q    Not the -- maybe it wasn't clear.  Not people
17 that you know, but in total, how many people do you see
18 out marching?  Was it more than 20?
19   A    I couldn't tell you that, sir.  I didn't
20 specifically count how many people were there.
21   Q    Ballpark, was it more than 20 or 30 people?
22   A    I couldn't tell you that, sir.  I don't know.
23   Q    Was it less than 20 people?
24   A    I don't know.

Page 79

1    Q    Was it more than 10 people?
2         MR. HERBERT:  Just what you remember.
3         THE WITNESS:  Sure.  More than 10 people,
4  yes, sir.
5  BY MR. McGRATH:
6    Q    And where were you, specifically, when you
7  made these observations?
8    A    We were at the intersection of Station and
9  East Avenue where I parked my car, got out of my squad
10 and started cheering for the kids, clapping my hands.
11   Q    Where were you when you saw --
12   A    Saying, "Support your children.  Good job.
13 Support your kids."  And I actually put a fist up in
14 the air.
15        And I was acknowledged by the two people
16 in the minivan, following, who waved at me also, as I
17 was waving, going, "Hey, little kids, how's it going?"
18 And they were waving at me, too.
19   Q    Specifically, where were you when you were
20 waving at the kids --
21   A    It was at East and Station Street.  I pulled
22 my squad car into a parking lot, and parked it.  I got
23 out of my car, and I started cheering on the
24 children -- the little kids.

Page 80

1    Q    Were you walking along with the crowd of
2  individuals?
3    A    No, sir.
4    Q    Were you standing or sitting?  What were you
5  doing, specifically?
6    A    At that intersection, I was standing and
7  waving at the kids.
8    Q    How long were you at that location for?
9    A    A minute, approximately.
10   Q    From where you were at, were you able to see
11 where Chief Kosman was?
12   A    I really didn't pay attention to where he
13 was.
14   Q    Were you able to see Chief Kosman from where
15 you were?
16   A    I saw him as the march slash parade continued
17 on.  He was following in his car.
18   Q    So did the march slash parade pass you, along
19 with Chief Kosman's vehicle?
20   A    Yes, sir.
21   Q    All right.  And then was Miller's vehicle --
22 did that pass you, also?
23   A    Sergeant Miller's vehicle did, yes, sir.
24   Q    Were there any other police vehicles after

Page 81

1  Sergeant Miller's vehicle?
2    A    No, sir; I don't believe so.
3    Q    And where did the group and the two squad
4  cars go?  In what direction?
5    A    There was actually three squad cars, Marcy
6  Gearhart(Phonetic).  She was actually leading.  They
7  drove -- they marched over -- paraded over to the
8  intersection of Merchant and, I believe, Dearborn,
9  where they stopped and they had water.
10   Q    How far away from you is that location?
11   A    Well, I kind of drove around the Farmer's
12 Market, saw where they marched to, and I stopped my
13 vehicle on Merchant Street just east of Dearborn.
14   Q    And did you park your squad car and get out
15 of your squad car?
16   A    Yes, sir.
17   Q    Why did you do that?
18   A    Because the children were stopped, so -- and
19 I wanted to give the kids a good impression of the
20 police, not to just march around for political reasons.
21        Because they are children.  They are
22 innocent.  They don't know what they are doing.  They
23 are just being told what to do.
24        I mean, it's hard enough for kids to

DEFENDANTS 001666

**EXAMINATION UNDER OATH OF SERGEANT PAUL BERGE**
**Sergeant Paul Berge on 07/30/2020**                    **Pages 82..85**

**Page 82**

1  grow up nowadays as is, let alone, be forced to do
2  something that they have no idea about.
3        So I got out of my squad car -- I
4  actually took my outer vest off, because in this day
5  and age, people don't want -- like I said previously --
6  the militaristic look of police or intimidating look.
7        And I wasn't going to -- I didn't
8  anticipate any Law Enforcement action, besides trying
9  to interact with the children to give them a positive
10  view of a Police Officer.
11        And as they started -- continued to
12  march by, I was waving at them, after -- I was sitting
13  on the ledge, actually.  I jumped up to that Daily
14  Journals area, and there's a concrete ledge, right
15  about this high.
16        After I took my vest off, I jumped onto
17  there, and I sat there.  And I waved at the kids.  I
18  said, "Hey kids, have you ever seen inside of a police
19  car?  Do you want to see how the lights work?"  And
20  they were waving at me smiling.
21        And there was a woman in the march slash
22  parade, and she acknowledged what I was saying.  And
23  she said, "We'll do it afterwards, at Bird Park, where
24  the march splash parade started from" .

**Page 83**

1        Or I assumed that they were going to
2  circle around and go back too, to finish it up.
3    Q   What was that woman's name; do you know?
4    A   I have no idea, sir.
5    Q   Have you ever seen her before?
6    A   No, sir.  She had a mask on, also -- so
7  pretty unidentifiable, in my opinion.
8    Q   When you were making these statements to the
9  children, where was Chief Kosman?
10    A   I'm not sure, sir.  He was probably in his
11  police vehicle.  He wasn't near me.
12    Q   Was this a real large group or gathering that
13  was walking, the protest, that you weren't able to see
14  where Chief Kosman's squad car was?
15        MR. HERBERT:  I'm going to object.  I don't
16  think he said he couldn't see.  He doesn't remember
17  where it was.
18        THE WITNESS:  My specific attention was on
19  the children in the parade, trying to give them a good
20  experience of a police car, and a positive interaction
21  with a Police Officer.
22  BY MR. McGRATH:
23    Q   How long did it take for the 10 to 15
24  children to walk past your location?

**Page 84**

1    A   Past my specific car?
2    Q   You were sitting on a ledge, right?
3    A   Yes, sir.
4    Q   How long did it take for the kids to walk
5  past you?
6    A   Twenty seconds, sir.
7    Q   All right.  And then, was Chief Kosman still
8  following in his squad car after the group, let's say,
9  were walking?
10    A   I wasn't really paying attention, sir.
11    Q   And what did you do after the children passed
12  you?
13    A   I got into my squad car, and I followed along
14  until they got to the courthouse.
15    Q   When you say you "followed along," followed
16  along how?
17        MR. HERBERT:  In your car?
18  BY MR. McGRATH:
19    Q   In your car?
20    A   In my squad car, yes, sir.
21    Q   Did you get behind Sergeant Miller's squad
22  car?
23    A   I can't specifically remember where I was.  I
24  wasn't --

**Page 85**

1    Q   Did you get behind Chief Kosman's squad car?
2    A   I can't specifically remember where I was.  I
3  wasn't -- I wasn't in the parade slash march.
4    Q   I thought you said you followed along.
5    A   Well, I followed along.  I knew where they
6  were going to go.  So they were walking, and I drove
7  around and got to their destination eventually.
8    Q   To the location where you believe that they
9  were going to?
10    A   Yes, sir.
11    Q   Okay.  You parked your squad car where?
12    A   By the courthouse.
13    Q   And did you get out of your squad car?
14    A   Yes, sir.
15    Q   And no one from the department had directed
16  you or advised you to go to any of the locations that
17  you've just testified to, correct?
18    A   No, sir.  No one asked me to go to those
19  areas.
20    Q   Okay.  And then you went by the courthouse,
21  got out of your squad car?
22    A   Yes, sir.
23    Q   Did you see where the group was at that
24  point?

**EXAMINATION UNDER OATH OF SERGEANT PAUL BERGE**
Sergeant Paul Berge on 07/30/2020                    Pages 86..89

Page 86

1    A    Yeah, the children were sitting on the
2 courthouse steps.
3    Q    And where did --
4    A    The Protest Organizer, Travis Miller, he was
5 standing in the lawn someplace.
6    Q    Travis Miller?
7    A    Yes, sir.
8    Q    Common spelling, M-i-l-l-e-r?
9    A    I believe so.  Yes, sir.
10   Q    Is he the father or guardian of any of the
11 children; do you know?
12   A    I don't believe he is, sir.  I know he
13 considers himself a Community Activist or Community
14 Organizer.  I know that he's been involved in at least
15 one other previous Protest, which I consider a Protest,
16 which was, I believe, the first one that came through
17 the city of Kankakee that I worked long with Sergeant
18 John Raimondo, R-a-i-m-o-n-d-o.
19   Q    So at the point that you saw the 10 to 15
20 children sitting on the steps of the courthouse and
21 Mr. Miller out in the grass area, front, you're in your
22 squad car and you exited.  Did you see Chief Kosman or
23 Sergeant Miller at that point?
24   A    Yes, sir.

Page 87

1    Q    And where were they?
2    A    They were parked in the area, also.  I
3 couldn't give you a specific -- exactly where they
4 were.
5    Q    In relation to where you parked your squad
6 car, where were their squad cars?
7    A    They were parked a distance away from me.
8    Q    Well, what's a distance?
9    A    I couldn't tell you, sir.  I wasn't parked by
10 them.
11   Q    Were you parked at a different street?
12   A    I wasn't parked on the street.  I believe I
13 pulled into -- there's a half circle drive that leads
14 to the rear of the courthouse.  I believe I parked
15 there.
16   Q    Where were they parked at?
17   A    I think -- and I thought -- they were parked
18 on -- is it -- that's what?  Harrison -- South Harrison
19 Avenue, the hundred block.
20   Q    All right.  Did you see Chief Kosman or
21 Sergeant Miller outside of their vehicles?
22   A    Eventually, I did, yes, sir.
23   Q    When you parked to get out of your squad car,
24 was Chief Kosman's vehicle and Sergeant Miller's

Page 88

1 vehicle already there and parked?
2    A    I really wasn't paying attention to that,
3 sir.
4    Q    Okay.  When is the first time you saw Chief
5 Kosman?
6    A    It was at East and Station Street.
7    Q    By the courthouse?
8    A    No, sir.
9    Q    No, I'm talking, once you parked by the
10 courthouse, when was the next time that you saw Chief
11 Kosman?
12   A    When he was directing Sergeant Miller to
13 approach me after I approached Travis Miller, who
14 organized the event, and walked up to him.
15        And I actually shook his hand.  And I
16 was going to walk over and sit with the kids, because
17 once again, just to have a positive experience with
18 them.
19        And then I could hear Sergeant Miller
20 saying something to me.  And he was saying that Chief
21 Kosman didn't want me over there.  And that really
22 confused me, because I thought the whole idea of a
23 Protest March was to bring people together; not to
24 drive wedges in between people.

Page 89

1        And you want to have a positive outreach
2 to, especially, children in the community, and
3 especially of a Community Organizer, like Travis, who's
4 been involved in multiple things.
5    Q    Prior to you getting in the vicinity of
6 Mr. Miller, did you hear Chief Kosman order you to stop
7 and to leave the area?
8    A    No, sir.
9    Q    Did you hear Chief Kosman advise you that he
10 wanted you to leave the area where the persons were
11 protesting?
12   A    No, sir; not before I approached the kids.
13   Q    And you acknowledge that you walked towards
14 Mr. Miller, correct?
15   A    Yes, sir.
16   Q    Did you walk towards Mr. Miller with your --
17 both arms extended?
18   A    No, sir.
19   Q    What was your reason for approaching
20 Mr. Miller?
21        MR. HERBERT:  I'm going to object, just based
22 on -- is the Chief alleging --
23        Because it's unclear from the charges
24 that we have been given -- is the Chief alleging that

**EXAMINATION UNDER OATH OF SERGEANT PAUL BERGE**
**Sergeant Paul Berge on 07/30/2020**                                    **Pages 90..93**

Page 90

1  Sergeant Berge approaching a member in the community is
2  somehow insubordinate?
3              MR. McGRATH:  No.
4              MR. HERBERT:  If not, then I don't know why
5  we're asking these questions.
6              MR. McGRATH:  The factual background.
7              MR. HERBERT:  Well, then I guess I'm going to
8  ask:  What are the insubordinate acts that the Chief
9  believes my client committed on July 18th?  Because we
10 don't know what they are.
11             MR. McGRATH:  Failure to follow the commands
12 and orders of the Chief of Police of the Kankakee City
13 Police Department, along with another superior officer.
14             MR. HERBERT:  Okay.  I'd ask what the
15 commands are if we could specify them.
16             MR. McGRATH:  Okay.
17 BY MR. McGRATH:
18     Q     Well, the first two commands is when Chief
19 Kosman told you to stop and to leave the area.
20             You did not stop and leave the area when
21 Chief Kosman told you to stop and leave the area,
22 correct?
23     A     I left the area when I was aware that he was
24 asking me, because Sergeant miller approached me and

Page 91

1  said the Chief was trying to tell me something.
2              So when I talked with the Chief, he
3  actually got face to face with me.  And he was telling
4  me that he gave me commands to leave.
5              And I didn't know he said that. I was
6  going over to interact with little children.  And I
7  shook the Protest Organizer's hand.
8              I was confused.  And the Chief said, "Go
9  home.  You're suspended."  I said, "What!"  I said -- I
10 told him -- I said, "Do you not want me to go interact
11 with children?"  I said, "That's unethical and
12 immoral."  I said, "That's not lawful."
13             I wasn't doing anything wrong.  I was
14 trying to interact with community members and children.
15 And I didn't know -- I was thoroughly confused.
16     Q     You acknowledge that Chief Kosman is the head
17 of the Police Department, correct?
18     A     I acknowledge he has a specific job as chief
19 of Police, yes, sir.
20     Q     In the hierarchy, he's the top -- he is the
21 head honcho of the Police Department, correct?
22     A     He is the Chief of Police.
23     Q     Right?
24     A     Yes, sir.

Page 92

1     Q     And you have to follow his orders and
2  commands, correct?
3     A     It depends if they are moral, ethical or
4  lawful, sir.
5     Q     Okay.  Did you advise Lieutenant Passwater
6  that you didn't believe Chief Kosman's orders or
7  lawful -- or that they were unethical or immoral, on
8  July 20th of 2020?
9     A     I don't specifically remember that, sir.
10            MR. HERBERT:  July 18th, are we talking
11 about?
12            MR. McGRATH:  July 18th.  I'm sorry.
13 BY MR. McGRATH:
14     Q     Did you advise Chief Kosman that his orders
15 were immoral, unethical or improper on that date?
16     A     On the 18th?
17     Q     Yes.
18     A     Yes, sir.  When he said I was suspended, and
19 I told him that I was going to sit with the kids on the
20 courthouse steps.  And I said, "That's unethical and
21 immoral, and it's unlawful."
22            I wasn't doing anything wrong.  I wasn't
23 doing anything illegal.  I was just trying to interact
24 with children from our community.

Page 93

1     Q     When did he tell you that you were suspended
2  when you told the Chief that his order was immoral and
3  improper and illegal?
4     A     I think he might have -- I'm not sure of the
5  specific timeline of conversation when he was telling
6  me to go home; I'm suspended.
7     Q     Did that occur in front of the courthouse or
8  at the Police Station?
9     A     That occurred by the courthouse.
10    Q     You acknowledge that Chief Kosman gave you an
11 order, to leave the area, correct?
12    A     I acknowledge that Sergeant Miller was able
13 to get my attention and said, "The Chief was asking you
14 to leave," which, like I said, really confused me.
15            Because I was trying to interact with
16 the kids.  I walked up to Travis Miller and shook his
17 hand.  I didn't even say anything to him.
18    Q     Did Sergeant Miller advise you that the Chief
19 wanted you to leave the area?
20    A     Yes, sir, he did, when he got my attention.
21    Q     And did you immediately leave the area when
22 he advised you of the Chief's order?
23            MR. HERBERT:  I'm going to object to the
24 phrase of it being an order.

**EXAMINATION UNDER OATH OF SERGEANT PAUL BERGE**
Sergeant Paul  Berge on 07/30/2020                    Pages 94..97

Page 94

1          Go ahead.
2          THE WITNESS:  I left the area after the brief
3   conversation that the Chief and I had about him giving
4   me commands, and I was suspended, and me telling him
5   they are children, and that it's unethical and immoral,
6   to tell me not to go sit next to kids, and give them a
7   positive experience with a Police Officer.
8   BY MR. McGRATH:
9          Q    Did you, in any way, refuse to leave the area
10  when you were given the order to leave the area, either
11  by Chief Kosman or Sergeant Miller?
12         MR. HERBERT:  I am going to object to the
13  vague nature of this question.  The Chief is alleging
14  he violated an order.  I think the Chief has to specify
15  whose order he violated, because what the testimony and
16  the evidence shows right now is that this was allegedly
17  an order passed down to somebody else, given to my
18  client, which wouldn't be a direct order, so --
19         You can answer the question if you can.
20         THE WITNESS:  Can repeat the question,
21  please, sir?
22         MR. McGRATH:  Can you read that back, please?
23         (Record read.)
24         THE WITNESS:  Well, Sergeant Miller is the

Page 95

1   one who got my attention and said the Chief was trying
2   to tell me something.  Then I went and spoke with the
3   Chief.
4          And he told me I was suspended, and I
5   explained to him that I wanted to interact with the
6   kids.
7   BY MR. McGRATH:
8          Q    Is it your testimony that you never learned
9   from Sergeant Miller that Chief Kosman had ordered you
10  to leave the area?
11         A    Sergeant Miller said that the Chief was
12  trying to tell me something.
13         Q    So it's your testimony that Sergeant Miller
14  never advised you that Chief Kosman had placed an order
15  for you to leave the area?
16         A    I can't specifically say the conversation I
17  had with Sergeant Miller.
18         Q    Did you have any conversation with Lieutenant
19  Robin Passwater on that day?
20         A    Yes, sir.
21         Q    And where at?
22         A    Throughout the day, I spoke with him, at
23  various points.
24         Q    Did you see Lieutenant Passwater by the

Page 96

1   courthouse?
2          A    Yes, sir.
3          Q    During the time period that we're talking
4   about?
5          A    Yes, sir.
6          Q    And when did Lieutenant Passwater arrive, and
7   when did you first see Lieutenant Passwater?
8          A    After the Chief was yelling at me to go home
9   and -- I mean, he was pretty upset with me.  I stood
10  there, in front of him, with my hands behind my back.
11         And he was berating me in public.
12         Q    How many times did Chief Kosman -- when you
13  had the conversation with him, face to face -- advise
14  you or direct you to leave the area?
15         A    I couldn't tell you that, sir.
16         Q    Was it more than twice?
17         A    I couldn't tell you that, sir.
18         Q    Was it more than three times?
19         A    I couldn't tell you that, sir.
20         Q    Was it more than five times?
21         A    I couldn't tell you that, sir.
22         Q    Why can't you tell us that?  It only happened
23  a week ago.
24         A    Well, you are right, but that's -- a lot of

Page 97

1   things have happened in the past week, sir.  I have
2   been under a lot of stress.
3          My home life hasn't been very nice,
4   because of me being put in this situation where I'm out
5   there just trying to be a Community Police Officer,
6   community-orientated policing, that's what it's about.
7          It's about trying to change the attitude
8   of people, especially today, in this society, trying to
9   give them a positive outlook on the police, especially
10  when -- they think that all police are bad.
11         It's time that that culture gets turned
12  around, and we start moving forward in a positive
13  direction, not always having police interactions that
14  we're called to, where people are upset, and we are
15  always just, specifically, enforcing the law.
16         It's about the community partnership.
17  It's about positive interactions with the police.
18         Q    With all the community work and the positive
19  interaction with the community, has that, in any way,
20  affected your memory as far as how many commands or how
21  many times Chief Kosman ordered you to leave the area
22  while you met with him?
23         A    I couldn't tell you how many times he told
24  me, sir.  You'd have to ask him.

DEFENDANTS 001670

**EXAMINATION UNDER OATH OF SERGEANT PAUL BERGE**
Sergeant Paul Berge on 07/30/2020                Pages 98..101

Page 98

1    Q    So if Chief Kosman stated -- or state that it
2  was more than five times, you wouldn't question that,
3  correct, because you don't have any memory?
4    A    I know he asked me to leave, yes, sir.
5    Q    But you don't know how many times?
6    A    No, sir.
7    Q    And then, again, this was out in the public?
8    A    Yes, sir.
9    Q    You are in uniform?  The Chief's in uniform,
10 correct?
11   A    He was in uniform.  I still had my outer vest
12 off, because we weren't anticipating any unlawful --
13 law enforcement action.  And I wanted to have a soft
14 look for the kids, not to be intimidating to them.
15   Q    Did you have your utility belt on?
16   A    Oh, yes, sir.
17   Q    All right.  And your dark pants?
18   A    My --
19   Q    Dark pants.
20        Your utility belt, you were wearing
21 that, which contains your side arm, your weapon,
22 correct?
23   A    Yes, sir.
24   Q    Your handcuffs?

Page 99

1    A    Yes, sir.
2    Q    What else is on your utility belt?
3    A    My radio.
4    Q    What else?
5    A    That is all.
6    Q    All right.  And you had dark pants, and
7  your --
8    A    My uniform pants on, yes, sir.
9    Q    And your uniform shoes, correct?
10   A    Yes, sir.
11   Q    You wear a white shirt?
12   A    I wear a black undershirt, sir.
13   Q    And does it have any markings of the Police
14 Department on that shirt?
15   A    My undershirt?  Yes, it has a gold badge on
16 it from when I worked in KAMEG.
17        MR. McGRATH:  We're going to take a quick
18 little break.  Okay.
19        MR. HERBERT:  All right.  Are we wrapping up
20 here?
21            (WHEREUPON, off the record.)
22 BY MR. McGRATH:
23   Q    Briefly, just a couple of more questions in
24 regards to the date by the courthouse, which is

Page 100

1  July 18, 2020.
2        You indicated that Chief Kosman parked
3  his squad car some distance away from where you had
4  parked your squad car, on the half circle drive by the
5  courthouse?
6    A    No, I parked in the half circle drive.  I
7  believe the Chief and Sergeant Miller parked on
8  Harrison, the hundred block of South Harrison.
9    Q    Okay.  When you got out of your vehicle, from
10 the half circle drive, at around that time, did you see
11 Chief Kosman, in any way?
12   A    No, sir.
13   Q    Did you hear Chief Kosman make any statements
14 to you or call out to you at that time?
15   A    No, sir.
16   Q    At that time, did you wave off Chief Kosman
17 in a manner of -- the old brushback, waveoff, you know,
18 waving your hand back to somebody?  It's like, forget
19 you or forget about it?
20   A    No, sir.
21   Q    Did you make any type of a motion like that,
22 at all, in the direction of where Chief Kosman was?
23   A    No, sir.
24        MR. McGRATH:  That's all I have.

Page 101

1        THE WITNESS:  You know, I'm just -- I'm
2  confused of the fact that -- in both these situations,
3  I'm just trying to do what's best for the community.
4        But I think that people in the Kankakee
5  City Police Department should start doing, and which
6  will provide a good future for members of our Police
7  Department and members of the community.
8        So both of these situations are pretty
9  confusing, me wanting to interact with children shaking
10 the hand of a Protest Organizer, and trying to do the
11 right thing for people who are homeless and just,
12 pretty much, down on their luck, just trying to be
13 positive with them.  So that's really all.
14            (WHEREUPON, the deposition was
15                adjourned.)
16
17
18
19
20
21
22
23
24

DEFENDANTS 001671

**EXAMINATION UNDER OATH OF SERGEANT PAUL BERGE**
Sergeant Paul  Berge on 07/30/2020                    Pages 102..103

Page 102

1   STATE OF ILLINOIS )
                      )SS:
2   COUNTY OF C O O K )
3           I, Adrienne M. Lightfoot, Certified
4   Shorthand Reporter and Notary Public, CSR
5   No. 084-00427, in and for the County of Cook, State of
6   Illinois, do hereby certify that previous to the
7   commencement of the examination, the witness, JOSE
8   HERNANDEZ, was duly sworn by me to testify the truth.
9           That the said deposition was taken at
10  the time and place aforesaid; that the testimony given
11  by said witness was reduced to writing by means of my
12  shorthand notes and thereafter transcribed into
13  typewritten form; and that the foregoing is a true,
14  correct and complete transcript of my shorthand notes
15  so taken as aforesaid.
16          The signature of the witness to the
17  foregoing deposition was not applicable.
18          I further certify that there were
19  present at the taking of the said deposition the
20  persons and parties as indicated on the appearance page
21  made a part of this deposition.
22          I further certify that I am not counsel
23  for nor, in any way, related to any of the parties to
24  this suit; nor am I in any way interested in the

Page 103

1   outcome thereof.
2           I further certify that this certificate
3   applies to the original signed and certified
4   transcripts only.  I assume no responsibility for the
5   accuracy of any copies not made under my control or
6   direction.
7           IN WITNESS WHEREOF, I have set my hand
8   this 19th day of August 2020.
9
10
11  _____
12          ADRIENNE M. LIGHTFOOT
            No. 084-004276
13
14
15
16
17
18
19
20
21
22
23
24

DEFENDANTS 001672

**EXAMINATION UNDER OATH OF SERGEANT PAUL BERGE**
Sergeant Paul Berge on 07/30/2020          Index: $20..actions

**$**

$20   53:16

**1**

1   5:13,16
  6:16
10   78:12
  79:1,3
  83:23
  86:19
102   4:18
11   13:4
11:30   6:1
12   13:4
14   23:11
14-year   36:2
14th/july
  67:23
15   7:24
  78:12
  83:23
  86:19
15th   42:7
  64:15
  67:23
  70:12
  71:18 72:6
  73:5
  74:11,17
  75:19
18   8:1 64:4
  76:3 100:1

**2**

18th   54:9,
  10 90:9
  92:10,12,
  16
19th   19:3
1:30   42:13

2   6:24
  18:18,19
20   78:18,
  21,23
2006   12:16
  13:1 14:6
  23:9
2015   14:23
2016   14:23,
  24 16:24
  29:18
  32:15,19
  33:2
2020   5:24
  7:24 8:1
  10:3,5
  11:3 19:3
  33:10
  37:20 42:8
  64:4 67:23
  68:23
  70:12 72:6
  73:5 74:11
  76:3 92:8
  100:1
20th   10:3,5

11:3 19:10
  92:8
24   5:24
2:00   42:14
2:15   43:17

**3**

3   5:21
30   78:21

**4**

400   52:20
  64:20
  65:2,22
  67:22
  68:22
  71:18 73:4
  74:19
4800   72:10

**5**

50ILCS725
  6:16
5:45   43:15

**8**

8   8:23

**A**

a.m.   6:1
  43:15

abandoned
  43:3 44:6
  52:19
ability
  40:22
absolutely
  47:11
academy
  13:16
access   17:24
  18:2,5,6,
  10,22
  19:4,21
  20:15
accessed
  20:24
accused
  20:17
acknowledge
  45:24
  89:13
  91:16,18
  93:10,12
acknowledged
  79:15
  82:22
Act   6:15
  7:8,9,10,
  11,15
acted   7:24
action   8:21
  82:8 98:13
actions   6:18
  56:17

DEFENDANTS 001673

EXAMINATION UNDER OATH OF SERGEANT PAUL BERGE
Sergeant Paul Berge on 07/30/2020       Index: Activist..area

Activist
  86:13

acts  90:8

actual  6:24

addicts
  67:10

addition  8:3

additional
  22:8

address  7:22
  65:3 66:6

adjourned
  101:15

Administration
  51:15

Administrative
  9:13 10:9
  11:3,5,15,
  24 18:15,
  20 20:13,
  16 61:15

admissions
  8:17

adults  78:13

advice  24:17

advise  59:4,
  8 69:18
  70:7,11,13
  89:9 92:5,
  14 93:18
  96:13

advised
  85:16

93:22
95:14

affected
  97:20

afraid  57:15
  70:24

age  21:13
  30:23 82:5

agree  22:16,
  18 29:6
  64:17 66:2

agreed  73:2

agreement
  35:13

ahead  4:22
  27:21
  44:22
  48:15,16
  54:16 69:5
  74:15 94:1

air  79:14

alcohol  43:4
  44:5,15
  55:17
  65:21
  67:22
  68:22
  71:18
  73:15
  74:18

alcoholics
  67:9

alcoholism
  52:11

allegedly
  94:16

alleges  20:4

alleging
  40:9
  89:22,24
  94:13

allowed  20:6
  34:2

alternative
  52:15

alternatives
  51:19
  73:24

amended
  17:15

amendments
  17:13

and/or  6:19

angry  49:23

answering
  63:4

anticipate
  82:8

anticipating
  98:12

Antoine  53:8
  54:17
  55:19
  74:21

Antoine's
  54:18

anymore
  10:21 56:7

apologize
  23:21 24:3

application
  12:17

applied
  12:12

approach
  88:13

approached
  88:13
  89:12
  90:24

approaching
  59:17
  89:19 90:1

approved
  17:15
  18:23

approximately
  5:23
  14:17,20
  42:13
  62:10 80:9

area  64:19
  65:2,4,22,
  24 66:3,12
  74:10
  78:5,6
  82:14
  86:21 87:2
  89:7,10
  90:19,20,
  21,23

DEFENDANTS 001674

EXAMINATION UNDER OATH OF SERGEANT PAUL BERGE
Sergeant Paul  Berge on 07/30/2020          Index: areas..belittled

93:11,19,
21 94:2,9,
10 95:10,
15 96:14
97:21

areas  66:18
85:19

argument
73:7

argumentative
39:6 71:21

arm  98:21

arms  58:13
89:17

arrest  22:1,
7

arrests
51:18 74:1

arrive  96:6

assigned
17:2 76:8
77:3

assignment
23:1 77:1

assume  15:16
46:5 71:10

assumed  83:1

assumes  63:2

assuming
73:18

attack  50:19

attempt  45:5

attention
42:7 44:18
45:5,15
46:23
80:12
83:18
84:10 88:2
93:13,20
95:1

attitude
47:9 97:7

attorney
4:20 11:20

attorneys
4:4

Austin
42:19,21
43:1,18,24
58:9,12
59:1,4,8
60:8,13,22
61:1,3,24
62:18,23
63:15
64:18
67:20
68:20
70:7,11
71:9,16
73:3 74:9
75:5,20

authority
18:22
40:22

Avenue  79:9
87:19

aware  6:17
8:17 17:9
18:13 21:5
33:15 34:1
37:22
65:19
67:20
68:19 73:2
77:7,9
90:23

_____

_____
        B
_____

B-A-R-T-L-E-T-
T  5:5

B-E-R-G-E
5:1

back  13:8,
13 20:9
26:13 31:1
32:7,8
53:20
54:12
56:2,12,19
59:5
63:12,13
64:13,15
67:19 83:2
94:22
96:10
100:18

background
12:3 90:6

bad  97:10

badge  99:15

badgering

46:9 47:1

baited  63:18

Ballpark
78:21

band  54:20

Bargaining
4:18

BARLETT  5:5

Bartlett  5:5
8:5

base  22:6

based  34:4
36:7 39:15
61:10 71:9
75:19
89:21

basis  8:19

beat  77:3

beer  52:21

beginning
14:24

beings  52:15
53:1 54:7

belief  34:4
36:7,14
37:1 40:13

beliefs
34:15 71:8
72:16

believes
37:1 90:9

belittled

DEFENDANTS 001675

47:7

**belittling**
47:4,5

**belligerent**
70:24

**belt** 98:15,
20 99:2

**berating**
96:11

**Berg** 4:7

**Berge** 4:8,9,
21,23 5:7,
13,15 9:22
10:2 20:4
90:1

**Berry** 53:8
54:17
74:21

**Bird** 82:23

**bit** 75:1

**black** 99:12

**blindly** 27:9

**block** 52:20
87:19
100:8

**bothered**
63:17

**bottom** 23:5,
16 24:4

**bought** 53:18

**bound** 34:19

**break** 64:8

99:18

**briefing**
58:2

**briefly** 12:2
64:14
99:23

**bring** 88:23

**broad** 65:22

**brought** 37:2
43:2

**brushback**
100:17

**BS** 67:14

**bucks** 53:11,
13

**built** 53:7
74:21

**bulletins**
14:4

**bully** 48:21

**buy** 53:2,16

_____

C
_____

**call** 21:7
43:2 46:1
53:7 59:1,
5 62:20
100:14

**called** 5:8
6:17 57:5
78:5 97:14

**caller** 59:5

**calling**
45:21

**calls** 65:20

**calm** 63:21

**calmed** 45:20

**Calumet** 6:4
23:24

**Cam** 6:6

**cans** 52:21
55:7

**capacity**
12:10
24:10

**captain**
25:14,17

**car** 53:9,12
54:22 76:8
77:24 78:1
79:9,22,23
80:17
81:14,15
82:3,19
83:14,20
84:1,8,13,
17,19,20,
22 85:1,
11,13,21
86:22
87:6,23
100:3,4

**care** 58:2

**cars** 81:4,5
87:6

**casual** 65:9

**chain** 13:6,
9,20 14:1
15:18
22:15
29:21

**chair** 43:21
48:19
49:19,24
50:11

**Champaign**
12:23

**chance** 9:17

**change** 30:23
67:8 97:7

**character**
38:18

**characterize**
16:3 36:22

**charge** 7:1
27:5 28:22

**charged**
37:16,17,
19,23
72:15

**charges** 8:20
37:2 89:23

**cheap-shotted**
50:22

**check** 28:3,
13 40:5,23
41:5,22

**cheering**

**EXAMINATION UNDER OATH OF SERGEANT PAUL BERGE**
Sergeant Paul Berge on 07/30/2020    Index: chest..commanded

79:10,23

chest  62:8,9

chief  5:3
7:2 8:3
10:3,8
14:5,7,11,
12,15,18
15:5,7
18:14,24
19:1,15
20:4 24:5,
6 30:11,15
31:13
33:12 37:1
40:9 71:7
72:7,8
77:7,13,19
78:2
80:11,14,
19 83:9,14
84:7 85:1
86:22
87:20,24
88:4,10,20
89:6,9,22,
24 90:8,
12,18,21
91:1,2,8,
16,18,22
92:6,14
93:2,10,
13,18
94:3,11,
13,14
95:1,3,9,
11,14
96:8,12

97:21 98:1
100:2,7,
11,13,16,
22

Chief's
77:17
93:22 98:9

chiefs  14:8,
11 31:3,5,
14,18,21

children
41:6 77:11
78:12
79:12,24
81:18,21
82:9 83:9,
19,24
84:11
86:1,11,20
89:2 91:6,
11,14
92:24 94:5
101:9

Chris  11:6,8

church  43:4
44:6 52:19
53:21

circle  83:2
87:13
100:4,6,10

citations
66:7,11
67:21
68:20,21
69:20
71:17 73:4

75:6,9,12,
18

city  4:4,5
5:6 6:4,7
8:4 12:13
14:2,18
15:19,23
22:10 23:5
24:1 28:3,
9 29:14
30:10 31:3
37:23 44:4
49:2 56:21
59:24 66:1
67:24 68:6
69:5 71:3
76:20 77:5
86:17
90:12
101:5

claiming
42:2

clapping
79:10

class  51:17
67:4 73:24

cleaned  65:8

clear  7:13
78:16

client  40:12
73:19 90:9
94:18

close  14:13
50:23 56:6
58:7 61:24

closed  45:10
46:3,22
48:9 49:19
62:12,13,
14

closing
45:19 47:2

collect  47:2

comfortable
16:1,4

command
13:6,10,21
14:2 15:19
17:15
22:15
25:5,6,20
26:5,6,18
27:6,8,16
28:5 29:7,
13,21
31:5,17,23
32:3,14,20
33:1,3,7,
11,16,17
34:3,14,24
35:20,23
36:5,7,8
37:14
38:3,6,7,
24 39:22
41:5,11,
16,17,21
42:1 62:23
63:2 71:9
72:15

commanded

DEFENDANTS 001677

**EXAMINATION UNDER OATH OF SERGEANT PAUL BERGE**
Sergeant Paul Berge on 07/30/2020   Index: commander..contained

39:9

commander
  18:24
  19:15 29:9
  33:12
  42:19,21,
  24 43:18,
  24 44:18,
  19,24
  45:4,8,14,
  21,24
  46:20 47:7
  48:9,10
  49:8,18
  50:2,11
  51:5,6,11
  56:6,14
  58:9,12
  59:1,4,8
  60:8,12,
  22,24
  61:3,24
  62:18,23
  63:15
  64:17
  67:20
  68:7,20
  70:7,11
  71:9,16
  73:3 74:8
  75:5,20

commanders
  24:7 32:21
  33:1 71:6
  72:7

commanding
  37:10

38:14 39:9
46:20
62:19

commands
  7:23
  24:11,15,
  17,20,23
  30:11
  31:20
  90:11,15,
  18 91:4
  92:2 94:4
  97:20

committed
  90:9

common   28:20
  86:8

communication
  33:22

communications
  61:17

community
  30:22,24
  51:13
  66:24
  68:10
  86:13
  89:2,3
  90:1 91:14
  92:24
  97:5,16,
  18,19
  101:3,7

community's
  74:2,3

community-
orientated
  97:6

complain
  55:11

complained
  68:12

complaint
  57:5

complaints
  65:14
  66:4,5,6,
  15

complete  8:9
  19:4

completely
  52:6 59:22

compliance
  52:16

compound
  72:14

computer
  18:1,3,5,
  10

computer-base
  17:18

concept   25:8

concerned
  48:22

concrete
  82:14

conduct   6:21
  7:20

conducted
  22:11

conference
  4:13

confused
  29:16 49:1
  59:22
  88:22
  91:8,15
  93:14
  101:2

confusing
  73:13,16
  74:8 101:9

considered
  22:14

considers
  86:13

constitute
  9:8

consuming
  68:22
  71:18
  74:18

contact
  44:19 61:9
  65:10

contacted
  61:20,21

contacts
  66:23

contained
  10:10
  17:21 32:4

DEFENDANTS 001678

**EXAMINATION UNDER OATH OF SERGEANT PAUL BERGE**
Sergeant Paul  Berge on 07/30/2020      Index: containers..days

35:17

containers
  44:5

content  74:8

contents
  33:21

context
  61:20

continued
  66:5,14
  80:16
  82:11

control
  50:21

conversation
  20:10
  35:19
  44:20,22
  45:6 47:6
  60:12
  73:20 93:5
  94:3
  95:16,18
  96:13

cool  61:1,3

copies  19:12
  20:21

copy  8:9

correct  7:6,
  14 9:13
  10:12
  15:10,24
  16:20
  17:18,22,

23 18:12
19:6,13
29:21 36:8
38:15 39:2
41:1,7,12
42:14
49:10,15
60:16 63:8
64:5,21
66:8,12
69:13,16
71:19
73:5,16
74:11
75:6,9,12,
20 76:4,6,
11,14,17,
23 85:17
89:14
90:22
91:17,21
92:2 93:11
98:3,10,22
99:9

correcting
  16:6 57:1

cost  8:10

count  78:20

county  76:22

couple  53:11
  63:21
  99:23

Court  8:8
  54:2

courthouse
  76:23

84:14
85:12,20
86:2,20
87:14
88:7,10
92:20
93:7,9
96:1 99:24
100:5

craziest
  50:20

crazy  71:2

crotch  48:24
  58:14
  70:23

crowd  80:1

culture
  97:11

curious  78:7

curriculums
  13:14

_____

D

_____

D-U-M-A-S
  14:15

Daily  14:4
  82:13

Dan  4:19

dangerous
  25:24

Daniel  9:17

dark  98:17,
  19 99:6

date  19:10
  32:16,19
  33:2 42:8,
  10,14
  43:13 56:3
  58:10,12
  60:3 61:10
  64:7 74:17
  75:12,19
  76:20 77:1
  92:15
  99:24

dated  5:24
  10:3

dates  26:17

day  11:17,
  18 21:13
  30:22
  32:10,11
  43:3 51:21
  53:6,14
  54:8,18
  55:9 57:1
  64:2,20,22
  65:22
  67:17
  74:16
  76:7,11
  77:8 82:4
  95:19,22

day-to-day
  13:24

days  11:19
  20:12
  63:21 64:4
  65:18

DEFENDANTS 001679

75:15

**deal**  35:14
63:20

**dealing**  22:9
31:20
51:13

**dealt**  13:20

**Dearborn**
52:20
64:20
65:2,23
67:23
68:22
71:18
72:10 73:5
74:19
81:8,13

**decent**  54:19
55:1 74:22

**defend**  50:24

**defined**
40:10

**definition**
21:18
36:14,17
38:5,16
40:11
44:21

**definitions**
32:4

**defund**  21:14

**demanded**
28:7

**demonstrate**
48:12,16

**demotion**
8:20

**department**
4:14 6:4,
20 7:19
9:10 10:5
11:4,9,11,
23 12:3,5,
13 13:7,
10,18
14:2,18
15:14,19,
23 16:9
17:6,11
18:4,7,9,
12 19:1,6,
9 20:3
21:6,19
22:20
23:5,9,13
24:1,11,16
29:8,14,
19,22,24
30:8,10,21
31:3,24
32:21 33:2
35:4,6
36:2,23
37:9,23
49:14
53:10
56:7,11
57:9 59:2
65:3,19
67:19

75:17
76:15
85:15
90:13
91:17,21
99:14
101:5,7

**Departments**
21:9,16
22:12

**depends**
25:21
29:11
30:12
33:6,19
37:14
38:16,17,
20 39:16
41:24
44:21
50:5,6
92:3

**deposed**  6:3,
8

**deposition**
5:15 9:22
101:14

**deputy**  5:3
7:1 8:3
18:24
19:15 24:6
33:12 71:7
72:7

**desk**  43:8,
9,21 45:5,
9,14 46:2,

21 47:12
48:10,17,
19 50:1
58:14,16,
18,20
59:14,16
62:1,5
63:13

**destination**
85:7

**detail**  39:10

**Detective**
11:10

**determine**
6:20 7:18

**difference**
25:4 40:3

**dignity**  53:4
54:6

**direct**  40:1,
3,22 41:2
70:8 73:3
94:18
96:14

**directed**
28:7 39:9
68:20
71:16
85:15

**directing**
88:12

**direction**
24:13
41:4,11

58:13 81:4
97:13
100:22
**directive**
27:8,16,19
28:5,17,
21,22
29:3,4,10,
11 31:2,5,
23 32:3,
14,20,24
33:3,11,
16,17,20,
22 34:3,
14,24
35:20,22
36:5,6,8,
10 37:10,
14 38:3
40:6
41:15,17
67:21
**directives**
30:14,15
**directly**
43:8
**dirty** 55:12
**Disability**
6:15 7:9,
10
**disagreed**
75:7
**discharge**
8:21
**disciplinary**

7:8,11,15
8:21
**discretion**
73:21
**discretionary**
75:24
**discuss**
68:9,13
**discussion**
35:12
41:18,19
72:1,2
**discussions**
61:17
**disobey**
31:16
**disobeyed**
31:4 32:14
**disregard**
32:14
34:2,24
**disregarded**
31:4 33:13
**distance**
87:7,8
100:3
**document**
5:13 10:3,
4,7 18:14
**documents**
64:1
**Donna** 42:19
**door** 43:20,

21 57:23
58:1 62:11
**downtown**
51:24
**draw** 42:7
**drink** 64:10
**drinking**
55:14,16
64:19
65:1,21
66:10
67:22
73:15
**drive** 65:11
87:13
88:24
100:4,6,10
**driving** 52:3
**dropped**
53:20
**drove** 55:22
77:9 81:7,
11 85:6
**drug** 22:10
52:12
67:10
**drugs** 44:12
**dry** 64:10
**dude** 54:19
55:1
**duly** 5:9
**Dumas** 14:14,
15

**duress** 10:17
**duties** 43:16
57:2
**duty** 56:23
57:13
59:9,20
75:13

---
**E**
---

**e-mail** 18:23
**earlier** 36:3
43:2,15
75:22
**east** 79:9,
21 81:13
88:6
**effect** 51:5
56:8
**elaborate**
30:13
**emotional**
63:16
**emotions**
63:21
**end** 47:12
57:1 75:14
**ended** 72:2
**enforce** 76:1
**enforcement**
51:19 82:8
98:13
**enforcing**

DEFENDANTS 001681

**EXAMINATION UNDER OATH OF SERGEANT PAUL BERGE**
Sergeant Paul Berge on 07/30/2020          Index: engaged..finish

97:15

engaged   6:21
  7:19

enraged
  45:8,11
  47:15,16
  49:1 56:22
  63:16 68:5
  70:21

enter   62:15
  63:10

entered
  42:21
  43:18 63:7

ethical
  33:23
  34:4,7,15
  69:23 92:3

ethics   34:17
  35:21

event   88:14

events   6:18

eventually
  85:7 87:22

evidence
  8:19 46:5
  66:15 69:1
  71:21
  94:16

evolving
  68:18

EXAMINATION
  5:10

examined   5:9

examples
  32:10,18,
  23 33:14

exercise
  18:22

exhibit   5:16
  9:21,23
  18:18,19

exhibits
  10:21

exited   86:22

expect   27:7,
  18 28:4,19

expectation
  41:3,10

experience
  71:11
  83:20
  88:17 94:7

explain
  16:12 50:7
  68:2 70:19

explained
  74:20 95:5

express
  34:21
  75:17

expressed
  72:11

expressly
  18:23

extended

89:17

extent   66:14
  73:18

eye   44:19

eyes   45:10,
  19,22
  46:2,22
  47:2 48:9
  49:19

_____

    F

face   47:9
  48:24
  50:1,5
  58:15 62:9
  70:23 91:3
  96:13

facing   62:8

fact   67:8
  101:2

facts   39:15
  46:5

factual   90:6

failed   7:23
  33:13 36:6
  41:16 42:2

failing   37:9
  72:15

Failure
  90:11

fair   28:19

faith   74:4

Farmer's
  81:11

faster   55:18

father   45:20
  47:3 86:10

feel   26:12
  29:17
  34:19
  66:24

feeling   68:3

feet   43:9
  45:9 46:2,
  21 48:10,
  17 62:4,10

felt   57:17

Field   17:8

fight   47:10
  56:18

figure   35:13
  54:23
  57:12

find   34:6
  51:19
  52:15 54:6
  73:24

fine   54:1
  55:20
  60:21

fines   51:18
  74:1

finish
  23:18,20
  46:14

DEFENDANTS 001682

**EXAMINATION UNDER OATH OF SERGEANT PAUL BERGE**
Sergeant Paul Berge on 07/30/2020          Index: finished..guys

```
50:16                6:12 10:11              ─────                  44:2 53:4
54:15 83:2           19:19                     G                    54:5 57:6
                     72:12                    ─────                 68:3 81:19
finished                                                            82:9 83:19
  44:23              formally              Gary  42:17              87:3 94:6
                       6:3,8 9:16                                   97:9
fired  10:19                               gathering
                     forward                 83:12                giving  10:8,
Firm  4:3              97:12                                        18 24:13
                                           gave  26:9              25:6 94:3
fist  58:13          found  6:15             27:6,16
  79:13                                      41:15 42:3           gold  99:15
                     fourth  14:9            53:14,15
follow  7:23                                 73:3 91:4            good  4:2,19
  27:8,18            Frank  10:4             93:10                  48:5 54:19
  28:4,22             14:15,17                                     67:17 68:2
  29:9,15             77:8                  Gearhart(               79:12
  30:10,14,                                 phonetic)              81:19
  15,17             frankly  37:4            81:6                  83:19
  33:13                                                            101:6
  35:22 36:6        freakin'               general
  37:9 39:1          58:8 67:10              16:10                grade  39:22
  41:4,8,10,                                 17:5,10,               40:23
  16 42:2           freely  10:17            14,20                  41:5,22
  90:11 92:1                                 18:10
                    Friday  75:14            19:5,8,18            grass  86:21
follow-up                                    23:15,16,
  56:10             front  8:7               23 35:17            great  23:19
                      39:11,12               36:18
foot  48:19           45:1 46:1,             43:11 44:3          group  81:3
  62:5                20 48:10,              77:2,3                83:12 84:8
                      13 58:16                                     85:23
FOP  4:18             62:1 86:21           give  9:17,
  11:11               93:7 96:10             18 14:10            grow  82:1
                                             23:23
force  58:10        full  19:4               25:22              guardian
                      71:15 76:6             28:20                86:10
forced  51:16                                32:10,13,
  82:1              fully  73:2              17,22              guess  90:7
                                             33:14,16
forget              functioning              34:11             guy  53:23
  100:18,19           22:19                  36:9,12             54:19
                                             38:24 40:6
form  46:4          future  74:13                              guys  16:7,8
                      75:19                                      52:5,24
formal  4:6           101:6                                      53:7,17,22
```

DEFENDANTS 001683

**EXAMINATION UNDER OATH OF SERGEANT PAUL BERGE**
Sergeant Paul Berge on 07/30/2020    Index: H-U-N-T..Honestly

54:6 55:4,
14 56:20
57:11
65:8,14
67:7,16,17

___

**H**

H-U-N-T  5:4

half  14:20
87:13
100:4,6,10

hammer  51:18
67:7 73:24

hammering
52:9

hand  44:24
88:15 91:7
93:17
100:18
101:10

handcuffs
98:24

handle
35:11,18
36:1 55:21
74:23

hands  79:10
96:10

hang  59:5
62:19,22,
23 65:15

hanging  65:5

happen  58:7
78:6

happened
28:14
36:4,11
50:7 96:22
97:1

happening
45:2,3

harassment
48:23

hard  81:24

Harrison
87:18
100:8

haul  58:8

head  44:11
45:20
91:16,21

health  52:13

hear  88:19
89:6,9
100:13

Herbert  4:19
6:5 7:5,9,
12 9:18
10:20,23
18:17 20:1
23:18
24:22 26:8
27:12,20
31:6 32:1
33:4 35:2
36:20,24
37:11
38:10,21
39:5,14

40:8 46:4,
14 47:20
48:15
50:7,16
54:1,9,15
61:12,16
63:1 64:8
66:13
68:24
70:16
71:20
72:13
73:6,17
75:21 79:2
83:15
84:17
89:21
90:4,7,14
92:10
93:23
94:12
99:19

Hey  53:16
54:22
55:13,21
67:16
79:17
82:18

hierarchy
22:16,20
23:4,12,24
29:19,23
49:11,13
76:15
91:20

high  22:9
27:24

82:15

higher  15:13
29:7,13,20
30:3,5
34:3,24
35:19
49:8,13
55:17
75:16
76:13

hire  17:4

hired  12:5,
6,8,18
14:5

hit  57:16

hold  25:8
38:21
46:14
49:15
50:16

home  18:3
59:9,21
91:9 93:6
96:8 97:3

homeless
43:3 44:4
48:1,2
49:2 51:20
59:24
64:19 65:1
70:1 71:4
72:16
101:11

honcho  91:21

Honestly

EXAMINATION UNDER OATH OF SERGEANT PAUL BERGE
Sergeant Paul Berge on 07/30/2020        Index: hot..irrelevant

36:16 55:1

hot   55:9

hours   43:12

house   28:3,
   8,13 52:11

how's   79:17

human   52:14
   53:1 54:7

hundred
   87:19
   100:8

Hunt   5:3
   7:2 8:3

Hypothetical
   33:5 37:12
   39:15

——————————
         I
——————————

icehouse
   55:7

idea   58:23
   82:2 83:4
   88:22

identification
   5:17 9:24

ignore   52:6

illegal
   44:13
   92:23 93:3

immediately
   11:15
   59:20

93:21

immoral
   30:17
   35:21 37:6
   91:12
   92:7,15,21
   93:2 94:5

important
   22:19

impression
   81:19

improper
   92:15 93:3

incident
   26:1 47:24
   56:2 64:16

incidents
   6:19 10:10
   39:12,23
   65:20

Incomplete
   33:4 37:11
   39:14

Indicating
   49:3

individual
   41:20 65:1

individuals
   74:11,18
   75:9,12
   80:2

influence
   44:12,15
   55:2

initially
   77:19

innocent
   81:22

inquiries
   65:20

inside
   53:16,18
   82:18

Inspector
   5:6 8:5

instance
   32:13
   53:23

instances
   36:12

Institute
   12:22

instructions
   24:18

insubordinate
   7:24 36:23
   37:1,3,9
   38:14,17
   90:2,8

insubordinatio
n   36:15,19
   37:17,20,
   24

interact
   30:24 82:9
   91:6,10,14
   92:23
   93:15 95:5

101:9

interaction
   83:20
   97:19

interactions
   97:13,17

interrogation
   4:6 5:20
   6:13,24
   7:17 8:18,
   24 10:11
   19:19
   72:12

intersection
   79:8 80:6
   81:8

intimidate
   48:21

intimidating
   82:6 98:14

intoxicated
   55:2

introduce
   4:15

investigation
   6:18 7:1
   8:4 10:10

involved
   6:19 8:4
   66:7 86:14
   89:4

irrelevant
   37:4

DEFENDANTS 001685

**EXAMINATION UNDER OATH OF SERGEANT PAUL BERGE**
Sergeant Paul Berge on 07/30/2020          Index: issue..law

issue  33:21,
  23 64:24
  65:5,16
  66:6,11
  71:17 72:6

issued  67:21
  68:21 71:9
  74:17
  75:18

issues  52:13

_____

**J**
_____

job  15:15
  16:5 23:1
  27:24
  30:7,9
  49:12
  76:18
  79:12
  91:18

jobs  25:12
  30:8 52:11
  66:21 70:1
  73:10

John  86:18

joke  67:15

Journals
  82:14

July  5:24
  7:24 8:1
  10:3,5
  11:3 19:3,
  10 29:12
  33:10
  37:20 42:7

64:4,15
67:23
70:12
71:18 72:6
73:5
74:11,17
75:19 76:3
90:9 92:8,
10,12
100:1

jumped
  82:13,16

June  64:15

justice
  51:17 67:3
  73:23

_____

**K**
_____

K-O-S-M-A-N
  14:16

KAMEG  99:16

Kankakee  4:5
  5:6 6:5
  7:19 9:9
  11:4,11,23
  12:5,13
  13:18
  14:2,18
  15:19,23
  18:8 19:1
  22:10 23:4
  24:2,3
  29:14
  30:10 31:3
  35:4,5

37:23
86:17
90:12
101:4

Kankakee's
  21:5

kids  41:23
  78:14
  79:10,13,
  17,20,24
  80:7
  81:19,24
  82:17,18
  84:4 88:16
  89:12
  92:19
  93:16 94:6
  95:6 98:14

kind  15:15
  16:6
  25:14,16
  29:17 31:9
  54:21
  66:19
  81:11

Kinkade
  14:7,11

Klopp  4:17
  11:6 57:22
  62:17 63:7

knew  85:5

knowing
  17:10

knowledge
  71:15

Kosman  10:4
  14:16,17
  18:14
  31:13
  77:8,13,19
  78:2
  80:11,14
  83:9 84:7
  86:22
  87:20
  88:5,11,21
  89:6,9
  90:19,21
  91:16
  92:14
  93:10
  94:11
  95:9,14
  96:12
  97:21 98:1
  100:2,11,
  13,16,22

Kosman's
  80:19
  83:14 85:1
  87:24 92:6

_____

**L**
_____

language
  34:12
  35:24

large  83:12

Larry  14:12
  15:7

law  4:3
  51:19

DEFENDANTS 001686

**EXAMINATION UNDER OATH OF SERGEANT PAUL BERGE**
Sergeant Paul Berge on 07/30/2020     Index: lawful..manner

73:24 82:8
97:15
98:13

lawful 33:24
34:8 91:12
92:4,7

lawn 86:5

leading 81:6

leads 87:13

learned 14:1
95:8

leave 9:13
10:9 11:3,
5,16,24
18:15,20
20:13,16
56:16
59:20
61:15
66:12
89:7,10
90:19,20,
21 91:4
93:11,14,
19,21
94:9,10
95:10,15
96:14
97:21 98:4

led 76:22

ledge 82:13,
14 84:2

left 58:3
62:14 72:5
90:23 94:2

legal 44:13

legs 48:20

lessons 13:9

let alone
82:1

Lexipol 14:4
17:16,17,
21,24
19:21
20:15,24
23:7 34:6

lieutenant
18:24
19:14,20,
22 20:9
29:8 32:15
33:13
76:10,13
92:5
95:18,24
96:6,7

lieutenants
24:8 31:23
71:7 72:7

life 48:6
97:3

light 65:22

lights 82:19

likes 54:20

limitations
18:9,13

lines 51:9

list 15:1,

2,6

listening
45:2

literally
48:18

litter 52:22

loaded 29:17
31:10

local 39:22
40:23
41:5,22
68:20
73:15

located 43:5

location
80:8 81:10
83:24 85:8

locations
85:16

Lodge 4:18

Lombary 11:8

Lombary(
phonetic)
11:7

long 7:12
13:2 41:19
80:8 83:23
84:4 86:17

looked 45:23
55:19

lost 61:1,3

lot 55:18
67:8,9

79:22
96:24 97:2

louder 60:22

lower 33:18
36:5

luck 101:12

lunch 53:3,
17,19

---

**M**

---

M-I-L-L-E-R
86:8

mad 60:1

made 18:13
45:16 48:8
59:13,15
60:1 73:6
79:7

make 8:18
10:15
39:11,22
51:4,9
53:11
56:5,7,10
67:11 71:3
100:13,21

makes 48:6

making 44:19
83:8

man 55:21,
22 65:13

manner
100:17

DEFENDANTS 001687

EXAMINATION UNDER OATH OF SERGEANT PAUL BERGE
Sergeant Paul Berge on 07/30/2020    Index: manual..misconduct

manual  34:5

march  76:19,
   22 77:10,
   23 78:1,8,
   11 80:16,
   18 81:20
   82:12,21,
   24 85:3
   88:23

marched
   81:7,12

marching
   77:11
   78:14,18

Marcy  81:5

mark  5:12

marked  5:16
   9:23

Market  81:12

markings
   99:13

mask  83:6

Matthew
   53:22 54:3

Mcgrath  4:2,
   3,9,11,24
   5:2,11,18
   6:6,10
   7:8,11,16
   8:16 9:17,
   20 10:1,
   22,24 11:1
   19:2 20:7,
   8 23:22

25:3
26:10,13,
19 27:14
28:1 31:11
32:7,12
33:8 35:5,
7,16 36:21
37:7,15
38:12,22
39:8,18
40:14,17,
19 46:6,16
48:7 49:4
50:8,9
51:3 54:12
56:1
61:13,23
63:6 64:12
67:18 69:7
71:5 72:4,
22 73:11
74:6 76:3
79:5 83:22
84:18
90:3,6,11,
16,17
92:12,13
94:8,22
95:7
99:17,22
100:24

Meaning
   21:23,24

means  15:8

meant  74:12,
   13

meeting
   44:17

member  90:1

members  11:4
   15:23
   30:20
   91:14
   101:6,7

memorandum
   63:24

memorialize
   64:1

memory  97:20
   98:3

mental  52:12
   67:8

mentioned
   17:17 31:4

Merchant
   81:8,13

messed  55:18

messing  52:8

met  6:6
   97:22

metal  54:21

metallic
   54:20

Michael  14:7

mid-july
   68:22

middle  5:24
   62:6

Mike  4:3
   7:5 20:1

mili  21:21

militaristic
   82:6

militarized
   21:16,21

military
   21:22
   22:13

miller  78:2
   86:4,6,21,
   23 87:21
   88:12,13,
   19 89:6,
   14,16,20
   90:24
   93:12,16,
   18 94:11,
   24 95:9,
   11,13,17
   100:7

Miller's
   80:21,23
   81:1 84:21
   87:24

Milwaukee
   54:19

minivan
   78:15
   79:16

minute  80:9

misconduct
   8:19

DEFENDANTS 001688

**EXAMINATION UNDER OATH OF SERGEANT PAUL BERGE**
Sergeant Paul  Berge on 07/30/2020      Index: misstates..officer

misstates
   27:21

misstating
   69:1 71:21

model   67:3

money   53:15

months   13:3,
   4 51:21

moral   33:23
   38:18
   69:24 92:3

morality
   34:8,17

morals   34:4,
   14 36:7

morning   4:2,
   19

motion   45:1
   100:21

mouth   64:10

moved   15:18

moving   65:13
   97:12

multiple
   26:12 89:4

music   54:21
   55:4

─────── N ───────

names   14:10,
   11

nature   24:23
   31:7 32:2
   33:24
   94:13

Nazarene
   12:9

negative
   66:22,23

nice   97:3

No.2   9:23
   10:2

notes   63:24

notice   4:11
   5:19 6:23
   10:8,11
   11:15
   20:2,5,12

notification
   20:17

notify   72:15

nowadays
   70:4 82:1

nuisance
   52:1

number   4:12
   29:20

numbers
   20:16 21:3

─────── O ───────

oath   24:19

obey   34:19

obeying
   34:22

object   20:2
   24:22
   27:20 31:6
   32:1 35:2
   36:20,24
   39:5 40:8
   46:4
   61:12,16
   63:1 66:13
   68:24
   71:20
   72:13
   73:17
   83:15
   89:21
   93:23
   94:12

objection
   32:2,5
   33:4 37:11
   39:14 73:6
   75:21

obligation
   9:1

Obowiner
   54:3

Obowiner(
phonetic)
   53:22

observations
   79:7

observed
   60:3 61:4

occur   93:7

occurred
   45:15 93:9

occurrence
   28:20

occurring
   45:18
   46:24

occurs   34:16
   35:9

Odelson   4:4

offenses
   76:2

offhand
   36:17

office
   42:11,20
   43:6,7,19
   54:13
   56:3,15,16
   57:1,14,
   17,19,22
   58:4,19,22
   59:12,21
   60:3,9
   61:2,8,11
   62:2,11,16
   63:7,11,
   13,16,19
   64:2,16,18
   72:5

officer
   12:12
   13:17 23:8
   26:2,6

DEFENDANTS 001689

**EXAMINATION UNDER OATH OF SERGEANT PAUL BERGE**

27:8,16,18
28:4,8,15,
16,21
29:8,13
33:15,17,
18 34:4,
15,23
35:1,19
36:5,22
37:8,10,16
38:15,23,
24 39:9,10
40:4,7
41:4,8,16
42:1 46:21
49:9,14
70:3 71:14
75:2,17
76:14,17
82:10
83:21
90:13 94:7
97:5

**officers**
13:12,21
15:9
16:17,20
17:1,8
24:12,14,
21 25:15,
19 27:6,7
28:2 29:3
37:22 38:2
39:20,21
40:23
69:16,18
73:22

**Officers'**
6:15 7:7

**official**
15:13

**Olivet**  12:8

**on-the-job**
13:24

**ongoing**
13:17 32:2
64:24
68:18

**open**  43:4
44:5 48:20
62:11 65:9

**opened**  45:22

**operation**
21:6,20
22:4 26:16

**operations**
22:14
32:11

**opinion**
66:17 74:3
83:7

**opinions**
66:23

**or-else**  68:8

**order**  20:5,6
23:14
27:19
28:17,21,
23 29:3,4,
7,9,13
31:2,17

32:3,15,
20,24
33:3,7,11,
16,17,19,
22,24
34:3,14,
20,22,24
35:17,20,
22 36:4,6,
8 37:14
39:1,4,13,
21 40:1,3,
6,9,11,13
41:21
42:2,3,4
50:23
73:3,12,18
89:6 93:2,
11,22,24
94:10,14,
15,17,18
95:14

**ordered**  9:3,
8 95:9
97:21

**ordering**
62:18

**orders**  7:23
13:12,21
17:5,10,
14,20
18:11
19:5,9,18
20:3
30:10,13,
14,18
31:19 34:8

42:6 90:12
92:1,6,14

**Ordinance**
44:5 48:3
49:2 56:21
59:24
68:1,6,21
69:5 71:3
73:15

**organization**
21:8

**organized**
88:14

**Organizer**
86:4,14
89:3
101:10

**Organizer's**
91:7

**outer**  82:4
98:11

**outlined**
22:22

**outlook**  97:9

**outreach**
89:1

**owner**  57:8
68:12

———————————

**P**

———————————

**P-A-S-S-W-A-T-
E-R**  19:24

**p.m.**  42:14

DEFENDANTS 001690

EXAMINATION UNDER OATH OF SERGEANT PAUL BERGE
Sergeant Paul Berge on 07/30/2020          Index: paid..picked

paid  9:13
  10:9 11:24
  53:13

pants  98:17,
  19 99:6,8

paper  17:20

paperwork
  57:1

parade  77:10
  78:8
  80:16,18
  82:22,24
  83:19 85:3

paraded
  77:11 81:7

Paragraph
  6:24 8:23

paramilitary
  21:6,7,8,
  10,12,19
  22:4,14

park  81:14
  82:23

parked  79:9,
  22 85:11
  87:2,5,7,
  9,11,12,
  14,16,17,
  23 88:1,9
  100:2,4,6,
  7

parking
  79:22

part  6:18

47:12
72:24

partnership
  97:16

pass  80:18,
  22

passed  84:11
  94:17

Passwater
  19:20 20:9
  76:10 92:5
  95:19,24
  96:6,7

past  51:14
  52:3 66:3
  83:24
  84:1,5
  97:1

patrol  15:9
  16:17,20
  17:1
  24:12,14,
  21 25:15,
  19 26:6
  27:5,6,7,
  16,18
  28:2,4,7,
  15,16,21
  29:3 38:23
  39:10,20,
  21 40:7,22
  41:4,16
  51:6,11
  69:16,18
  70:8 77:2,
  3,5

Patrolmen
  24:9 51:23

Paul  4:7,
  21,22,23
  5:7 45:22
  49:22

pause  8:13

pay  48:4
  80:12

paying  44:18
  84:10 88:2

pending  10:9

people  4:12
  16:14,16
  21:9 25:1
  43:3 44:4
  48:2,5
  49:3
  51:13,18,
  20 52:1,10
  53:23
  59:24
  64:19
  65:1,5
  66:21
  67:12
  68:4,16
  69:24 70:4
  71:4 72:17
  73:10 74:1
  78:10,15,
  16,17,20,
  21,23
  79:1,3,15
  82:5
  88:23,24

97:8,14
  101:4,11

Perfect  7:12

perfectly
  55:20

perform
  18:21
  39:10

period  96:3

periods
  67:15

persist  9:6

person  6:24
  35:12
  62:15
  74:21

personal
  71:8

persons
  89:10

persons'
  38:18

petty  76:1

phone  59:6
  62:20
  63:4,5

phrase  49:16
  93:24

physical
  58:10

pick  55:12

picked  67:1

DEFENDANTS 001691

**EXAMINATION UNDER OATH OF SERGEANT PAUL BERGE**
Sergeant Paul  Berge on 07/30/2020          Index: place..prior

place  20:10
  46:7,8
  47:6 49:6
  52:21,23
  55:11
  57:11
  61:10
  63:14 64:1
planned
  76:19
playground
  39:23
  40:5,24
  41:6,23
plays  55:4
point  20:4
  45:7,12
  46:19
  49:24
  50:3,13
  56:20
  57:15
  63:10,22
  66:16,20
  67:2 69:5
  85:24
  86:19,23
points  95:23
police  4:13
  6:4,15
  7:7,19
  9:10 10:5
  11:4,9,11,
  23 12:3,5,
  12,13,22
  13:6,10,

16,18
14:2,5,18
15:14,19,
23 16:9
17:5,11
18:4,6,8,
11,22,24
19:1,5,9,
15 21:5,9,
14,15,17,
19 22:12,
19 23:5,8,
12 24:1,6,
11,16
29:14,19,
22,23
30:8,10,
11,16,20,
23 31:3,
14,18,21,
24 32:21
33:1 35:4,
5 36:2,23
37:23
49:14
53:10 57:9
65:19
66:12,23
67:5,19
68:3 70:3
71:14 72:8
73:22 74:4
75:2,3
76:15
77:15
80:24
81:20
82:6,10,18

83:11,20,
21 90:12,
13 91:17,
19,21,22
93:8 94:7
97:5,9,10,
13,17
99:13
101:5,6
policies
  19:21
policing
  97:6
policy  32:4
political
  81:20
portion  32:8
position
  22:24 25:7
  29:21
  49:9,14
  72:12
  75:17
positions
  22:16
  25:11
  29:20
positive
  68:3 82:9
  83:20
  88:17 89:1
  94:7 97:9,
  12,17,18
  101:13
possibly

66:6
pound  48:5
power  22:6
powers  18:22
  22:1 75:24
prayed  53:22
  67:14
prayer  45:10
preface  9:19
preparation
  19:19
prepare
  63:24
prepared
  10:8
President
  11:10
pretty  64:10
  65:8,9
  72:2 83:7
  96:9
  101:8,12
previous
  86:15
previously
  30:2 73:22
  82:5
Price  14:14,
  15
prior  12:4,
  6,8 29:12
  31:2,5,14,
  18 37:20

EXAMINATION UNDER OATH OF SERGEANT PAUL BERGE
Sergeant Paul Berge on 07/30/2020          Index: private..read

58:10
59:15
61:11,14
89:5

private  4:20

problem
  66:19 68:9

problems
  52:12 67:9

procedure
  35:3

procedures
  34:2

process
  68:15

prolonged
  67:15

promoted
  14:22
  15:8,20

promotion
  15:1,6

promotional
  15:2

proper  22:19
  36:8 38:6,
  7,9,24
  39:4,12
  66:12

property
  57:7,8
  68:12

protest

76:19 77:9
78:7,10
83:13
86:4,15
88:23 91:7
101:10

protesting
  89:11

protocol
  34:23 35:8

provide
  20:20
  101:6

provided
  8:10

proximity
  56:6

public  22:9
  30:21
  65:21
  74:18
  96:11 98:7

pulled  79:21
  87:13

punch  58:8
  71:1

purpose  7:17

pursuant
  4:11 6:14
  7:7

push  67:5

put  9:2,3
  10:9 44:24
  79:13 97:4

Q

question  9:7
  23:14,19
  26:11
  27:12
  29:17
  31:1,7,8,
  9,10 32:6
  40:15,16,
  20 46:5,
  17,18
  47:21
  50:17 57:4
  61:19 63:2
  72:14,19,
  21 74:7
  75:22
  94:13,19,
  20 98:2

questioning
  70:20

questions
  9:2,3,4
  26:12
  71:23 90:5
  99:23

quick  99:17

quickly  72:2

Quit  55:16

quote/unquote
  26:18
  66:19

R

R-A-I-M-O-N-D-
O  86:18

R-E-G-N-I-E-R
  14:13

radio  99:3

Raimondo
  86:18

raise  58:12,
  13 60:11

raised  58:14
  60:18,19
  72:6

raising  45:8
  60:15

rank  11:8

ranking
  15:13
  29:7,13
  33:18 34:3
  35:1,19
  36:5 49:9,
  13 75:16
  76:14

rant  70:22

rapport  53:7
  74:21

reach  30:22
  68:16

read  9:15
  10:14
  18:16

DEFENDANTS 001693

**EXAMINATION UNDER OATH OF SERGEANT PAUL BERGE**
Sergeant Paul Berge on 07/30/2020      Index: Ready..response

```
26:13,14          record   7:13         87:5               Reporter   8:8
32:7,8            9:15 26:14                                54:2
40:18             40:18               relationship
94:22,23          64:11,13              74:22            reports   16:6
                  68:19
Ready  10:23      94:23               relieved           representative
                  99:21                56:22               61:10
real  83:12                            57:2,13
                  Records   59:2       59:9,19          representative
rear  87:14                            75:13            s  19:12
                  refer  10:20                             61:18
reason  34:21     21:9                remain   8:24
89:19                                                   represented
                  referred           remedy  66:9         11:20
reasons           13:6
28:12 50:6                           remember            representing
81:20             referring           13:15              4:17,21
                  18:17               31:19
recall  28:18     45:17 69:9          45:19            reps   19:16
42:8,21                               55:14
45:2,3,17         reflect   48:4      56:9,13          request
46:23 47:1                            79:2 83:16        20:21 33:7
49:21             refusal   9:7,      84:23 85:2
59:3,7            8                   92:9             requested
60:5                                                    19:11
62:18,21          refuse   9:2       remote  18:2,
63:4 64:23        10:19 94:9         5                 requesting
73:23                                                   44:3
                  Regnier           remotely
receive  10:4     14:12 15:7          20:24            requiring
12:20                                                   44:4
13:11 59:1        Regs   23:7        removal  8:20
                                                       residence
received          regulation        repeat   26:11      21:1
13:17             35:18              32:6 72:21
33:11                               94:20             respect
62:20             regulations                          52:24 53:1
                  9:9 17:5,         repeated           67:13
receives          10,14,21           40:16             72:16 75:1
65:20             18:11
                  19:5,9,18         repeatedly         respectful
recent   6:18     34:1               46:1,22           65:9

recognize         rehash  71:15     rephrase          respond
5:13,19                              40:20             74:24
                  relation           46:18
                                                      response
                                                       67:13 72:3
```

EXAMINATION UNDER OATH OF SERGEANT PAUL BERGE
Sergeant Paul Berge on 07/30/2020        Index: responsible..show

responsible
  17:9

restorative
  51:17 67:3
  73:23

restoring
  74:2,3,4

result  15:22

review  18:10
  19:4,17
  20:6 21:2
  23:11

reviewed
  34:9

ridiculous
  47:11

Robin  76:10
  95:19

role  16:24

rolled  55:13

Ron  5:5 8:5

room  4:13
  7:2 42:16,
  22 43:22
  47:24 49:5
  51:16 62:7
  67:4

rope  57:18

rude  37:5

rule  35:18

rules  6:12,
  20 7:18
  9:9 17:5,

10,14,21
18:11
19:5,9,18
23:7 34:1
37:10

─────────
      S
─────────

sat  28:9
  53:21
  82:17

save  17:20

scared
  50:14,18

scheduled
  43:16

school
  39:11,12,
  22 40:5,23
  41:5,22

search  22:11

seconds  84:6

seeking  8:20

selected
  15:2,5

sense  48:6
  67:12 71:3

sergeant
  4:6,17,21
  5:7,12
  8:17 10:2
  14:22
  15:3,8,20
  16:9,15,
  19,21,24

18:8 20:4
24:10
25:14,18
27:5,15
28:16
29:2,6,18,
20 31:22
39:20
40:7,21
41:11,14
42:17
43:10,22
45:16
47:13
49:5,9,15
57:19,22,
24 58:3,18
60:2,5
61:5
62:13,17
63:7 64:14
69:14,15
78:2 80:23
81:1 84:21
86:17,23
87:21,24
88:12,19
90:1,24
93:12,18
94:11,24
95:9,11,
13,17
100:7

Sergeant's
  4:18
  42:10,16
  43:5,19
  56:3

58:18,22
59:21 60:9
61:2,11
62:11,16
64:2,16
72:5

sergeants
  24:8 27:2

serve  30:24

served  5:20
  61:14

set  29:24

sexual  48:22

shade  55:10

shaking
  101:9

shift  16:11,
  22 17:2
  18:7 19:20
  43:12,16
  47:13
  51:21,23
  69:10,12,
  14,16,19
  75:14

shirt  99:11,
  14

shit  53:23
  55:16 58:2

shoes  99:9

shook  88:15
  91:7 93:16

show  53:5

EXAMINATION UNDER OATH OF SERGEANT PAUL BERGE

Sergeant Paul Berge on 07/30/2020          Index: shows..South

shows  94:16

shut  57:23
  58:1

side  28:3,
  8,13 98:21

signature
  5:23

signed  5:21
  18:14

silent  8:24

simply  41:21

sir  4:10
  5:14,22
  6:2,9 7:4,
  21 8:2,6,
  12,22 9:5,
  11,14 10:6
  12:1,14
  13:19
  14:19 15:4
  16:21,23
  17:3,12,
  16,19
  18:19 19:7
  20:22 21:4
  22:5 23:3,
  10,15
  24:13
  26:3,18,21
  27:4,9,11
  28:6,18,24
  29:5 30:2
  31:15
  32:17
  33:14,24

36:13
37:18,21
38:1,5
39:24
40:16
41:2,13,24
42:5,9,12,
  15,23
43:23
44:11,14,
  16,22 45:3
46:17
49:7,17
52:18
56:9,13
57:21
58:11,23
59:7,18,22
60:4,7,10,
  14,20,24
61:8 62:6,
  21 63:3,9
64:3,6,17,
  22,23 66:4
69:14,17,
  21 70:15,
  18 71:10
72:24
74:13,15
75:10,13,
  23 76:5,9,
  12,16,18,
  21,24
77:4,6,18,
  22 78:4,
  19,22 79:4
80:3,20,23
81:2,16

83:4,6,10
84:3,6,10,
  20 85:10,
  14,18,22
86:7,9,12,
  24 87:9,22
88:3,8
89:8,12,
  15,18
91:19,24
92:4,9,18
93:20
94:21
95:20
96:2,5,15,
  17,19,21
97:1,24
98:4,6,8,
  16,23
99:1,8,10,
  12 100:12,
  15,20,23

sit  51:16
  67:13
  88:16
  92:19 94:6

sitting  8:7
  43:3,8
  47:12
  49:19
  54:18
  56:24
  58:16
  59:14
  63:12 80:4
  82:12 84:2
  86:1,20

situation
  25:21 29:1
  35:9,11,
  12,15 36:1
  39:17
  41:24
  63:17
  64:19 68:9
  97:4

situations
  22:9 27:23
  101:2,8

slash  6:16
  77:10
  80:16,18
  82:21 85:3

slow  68:15

smiling
  82:20

society  97:8

soft  98:13

solution
  70:20 73:9

someplace
  86:5

sort  35:13

sorts  52:22

South  52:20
  64:20
  65:2,22
  67:23
  68:22
  71:18
  72:10 73:4

DEFENDANTS 001696

**EXAMINATION UNDER OATH OF SERGEANT PAUL BERGE**
Sergeant Paul Berge on 07/30/2020          Index: speak..steps

74:19
87:18
100:8

speak  64:18

speaker  55:4

speaking
 21:17
 60:22 62:1

specific
 13:14
 15:16
 23:14
 25:12,22
 26:1,17
 27:23 30:7
 32:10,13,
 18,22
 33:14,19
 34:12
 35:24
 36:12,16,
 17 39:3
 41:24
 43:2,14
 44:2,10
 45:7,12
 51:8 53:6,
 14 54:18
 57:4 65:3
 66:18
 73:24
 83:18 84:1
 87:3 91:18
 93:5

specifically
 7:22 13:8,

15,22
18:16
20:11 23:6
29:5 31:20
33:10 34:5
37:13
39:19
41:13
43:24
47:7,24
55:7 63:4
65:22
67:20,24
69:10
72:21 76:1
78:20
79:6,19
80:5 84:23
85:2 92:9
95:16
97:15

spell  19:23
54:2,4

spelled
 14:13

spelling
 4:24 14:10
 86:8

spend  67:15

spinning
 66:20

splash  82:24

spoke  11:6,
 13,18
 75:16
 95:2,22

spoken  11:4,
 22 60:2

spot  66:1

spread  48:20

squad  16:10,
 13,15,16
 53:9,12
 54:22 76:8
 77:24 78:1
 79:9,22
 81:3,5,14,
 15 82:3
 83:14
 84:8,13,
 20,21
 85:1,11,
 13,21
 86:22
 87:5,6,23
 100:3,4

Staff  17:15
 72:15

staffing
 15:9

stand  35:14

standard
 58:20,21

standing
 46:20
 50:11
 55:20
 58:24 62:6
 80:4,6
 86:5

Stark  4:4

start  9:16
 24:5 40:5
 54:21
 65:12,13
 97:12
 101:5

started
 43:14
 79:10,23
 82:11,24

starts  43:16

state  20:18
 34:2 44:1
 47:7 98:1

stated  18:15
 20:19
 42:24
 46:22 68:1
 69:1 74:9
 98:1

statement
 9:19
 10:16,18
 45:16 48:8
 51:4 56:5,
 8,10,11
 59:13,15

statements
 10:14 51:9
 83:8
 100:13

Station
 79:8,21
 88:6 93:8

steps  86:2,

DEFENDANTS 001697

**EXAMINATION UNDER OATH OF SERGEANT PAUL BERGE**
Sergeant Paul Berge on 07/30/2020          Index: stick..telephone

20 92:20

stick  48:23
58:15

stood  43:20
46:1
48:10,12,
18 56:6
58:4 96:9

stop  89:6
90:19,20,
21

stopped  46:9
47:3 49:22
81:9,12,18

story  54:6,
24

street  25:24
39:10
79:21
81:13
87:11,12
88:6

stress  22:9
27:24 97:2

structured
22:13

structured-
wise  24:7

stuck  70:23

student
12:11

students
40:24

stuff  52:22

style  71:13

subjects
65:1,21
66:7,10
67:22
68:21
71:17 72:9
73:4,14

subsequent
14:11

summer  55:9

superior
13:12,21
33:15,16
76:17
90:13

supervise
16:5,8
24:15,21
69:15,19

supervised
17:1 25:19

supervises
16:21

supervising
28:22
37:17
38:24

supervisor
26:7 34:23
36:1 38:4
40:2 69:12

Supervisors

51:23 67:4

Support
79:12,13

supposed
29:9
34:15,21
38:2 55:10

suspended
91:9 92:18
93:1,6
94:4 95:4

suspension
8:20

Swat  22:10
26:16,20,
22 27:2,3

sworn  4:1
5:9

system
17:16,18
18:10 19:4
20:15 21:1
23:7,12
34:6

systems
18:23

———————
T
———————

tactics
50:21

taking  8:8
33:21,23
56:11

talk  34:22
39:19 53:2
57:2,9
71:6

talked  44:3
91:2

talking
21:15
42:13
43:10
45:7,13
46:10,12
47:13,24
54:22 56:4
88:9 92:10
96:3

talks  34:7
55:3

tap  45:4

tapping
45:14

taught  13:5

team  22:10
25:8,10,
12,13,14,
17 26:16,
20,23
27:2,3
30:6 69:17
70:8 71:17
73:4 74:9
75:11

telephone
59:1
62:19,22,

**EXAMINATION UNDER OATH OF SERGEANT PAUL BERGE**
Sergeant Paul Berge on 07/30/2020          Index: telling..treat

24

**telling**
25:5,6
41:12
57:14
63:15 91:3
93:5 94:4

**ten** 37:24
65:18

**term** 21:17
60:20

**terminal**
18:4

**terminology**
16:1

**terms** 23:16,
23 36:18

**terribly**
68:17

**testified**
5:9 31:13
39:1 40:12
85:17

**testimony**
24:19
27:15,21
69:2 94:15
95:8,13

**thing** 7:6
25:11
50:20
68:18
69:24
70:2,6,10

101:11

**things** 25:2
43:11
44:10
47:11
49:11
50:21 53:6
55:3 65:6
74:1 89:4
97:1

**thought** 7:9
47:10 85:4
87:17
88:22

**thoughts**
47:2

**threatened**
58:9

**thrown** 52:22

**ticket** 59:24
71:3 73:15

**tickets** 44:5
48:3 49:2
56:21
66:7,21
68:1,6
69:6 70:9
71:8 72:9
73:10
74:10,17

**Tim** 4:17
11:6 63:7

**time** 10:15
11:2 17:4,
8 26:4,22

43:1,6
44:13,17
45:12,13,
15 51:4
52:7 55:15
57:20
58:24
63:10,23
67:2,16
72:11 73:7
88:4,10
96:3 97:11
100:10,14,
16

**timeline**
93:5

**times** 26:17
96:12,18,
20 97:21,
23 98:2,5

**Tison** 42:17
43:10,22
45:16 49:5
57:19,24
58:3 60:2,
5 61:5
62:13

**today** 4:11
65:17
67:17
72:12 97:8

**today's**
19:10
30:22
32:16,19
33:2

**told** 25:1
28:2 29:18
56:16
59:19
74:23
81:23
90:19,21
91:10
92:19 93:2
95:4 97:23

**top** 23:5,16
24:3 44:11
91:20

**total** 78:17

**traditionally**
16:14 18:6
65:4 75:24

**training**
12:4,18,
21,22
13:2,5,11,
17,20,24
14:1,4
17:8 21:15
22:2,8

**transcript**
8:9

**trash** 55:12
65:5

**Travis** 86:4,
6 88:13
89:3 93:16

**treat** 52:14,
24 53:1,23
54:6

**EXAMINATION UNDER OATH OF SERGEANT PAUL BERGE**
Sergeant Paul Berge on 07/30/2020          Index: treated..Wal-mart

treated
  51:22
  52:16
  68:17

treating
  67:12

trouble   66:1

troubles
  48:6

trust   30:21

truthfully
  9:1

turned   97:11

Twenty   84:6

Twin   53:8

type   58:16
  68:8
  100:21

_____
       U
_____

unaware
  35:24  61:7

uncalled
  51:2

unclear
  89:23

underneath
  55:10

undershirt
  99:12,15

understand
  6:12  7:3,

20  8:1,5,
10,23  9:4,
6  10:7
13:9  31:8,
9  45:11
46:17
49:8,11
60:15
72:19

understanding
  15:17  22:3
  37:3

understood
  73:12,13
  74:12
  75:5,8

unethical
  30:17  36:9
  37:6  91:11
  92:7,15,20
  94:5

unidentifiable
  83:7

uniform   6:14
  22:6  76:6,
  7  77:14
  98:9,11
  99:8,9

uniforms
  21:24

union   19:12,
15  61:9,17

unit   4:18
11:11
22:11

25:12,13

University
  12:9

unlawful
  30:18  36:9
  42:4,5
  92:21
  98:12

unload   31:12

unsavory
  65:6

untactical
  25:23

unware   35:10

updates
  17:13

upset   45:11
  50:19
  57:16  96:9
  97:14

utility
  98:15,20
  99:2

_____
       V
_____

vague   24:23
31:6  32:2
94:13

valid   33:17
38:3,5,6

values   38:18

vehicle
  77:15,17,

21,22  78:3
80:19,21,
23  81:1,13
83:11
87:24  88:1
100:9

vehicles
  80:24
  87:21

vest   82:4,
16  98:11

veteran   36:2

vicinity
  89:5

view   82:10

violated
  6:20  7:18
  20:5
  94:14,15

violating
  20:17

violation
  9:9  20:3

voice   45:9
60:11,16,
18,19

voluntarily
  10:17

_____
       W
_____

W-I-L-L-I-E
  5:4

Wal-mart

EXAMINATION UNDER OATH OF SERGEANT PAUL BERGE
Sergeant Paul Berge on 07/30/2020                Index: walk..years

53:15

walk 39:11
43:7 83:24
84:4 88:16
89:16

walked 42:19
57:22
88:14
89:13
93:16

walking 80:1
83:13 84:9
85:6

wanted 19:8,
13 47:10
53:11 65:3
73:14 74:9
75:8,20
81:19
89:10
93:19 95:5
98:13

wanting
28:12
101:9

warrants
22:11

washed 53:9,
12

watching
51:22

water 64:10
81:9

wave 44:24

52:4 65:12
67:16
100:16

waved 79:16
82:17

waveoff
100:17

waving 65:15
79:17,18,
20 80:7
82:12,20
100:18

ways 52:15
56:21

weapon 98:21

weapons
22:1,7,8

wear 21:24
99:11,12

wearing 22:6
77:13,14
98:20

wedges 88:24

week 96:23
97:1

weeks 13:4

well-being
40:24
41:6,22

west 28:3,
8,13

wheels 66:20

white 99:11

Willie 5:3
7:2 8:3

woman 82:21

woman's 83:3

wording
36:17

words 44:2
46:11 47:1
51:8

work 15:10,
11 18:21,
22 25:12
57:10
65:17
66:12 67:6
68:7
69:11,16,
17 82:19
97:18

worked 14:8
31:13
66:18
86:17
99:16

working
24:15
25:13 64:5
74:22
76:4,10
77:8

workplace
18:21

wrapping

99:19

wrestler
50:20

write 44:4
48:1,3
49:2 56:20
59:24
67:24
69:5,19
70:8 72:9
73:4,15
74:10
75:6,11

writing
66:21
72:16 73:9

written 75:9

wrong 45:17
91:13
92:22

wrongful
6:21 7:20

———————————

Y

year 12:15,
24 13:1
14:20
19:10
29:12

years 14:20,
21 23:11
24:20
25:18
26:5,24
27:1 28:23

DEFENDANTS 001701

```
    29:2 31:16
    33:9 37:24
    51:6,10,14
    66:1,18
    68:17
    71:11

yelling  47:3
    57:13
    60:8,17
    96:8
```

DEFENDANTS 001702

## NOTICE OF INTERROGATION

TO:   Sergeant Paul Berge:

1.   You are hereby notified that you will be interrogated on July 30, 2020 at 10:00 a.m. at the Kankakee Police Department, 2nd floor conference room.  This interrogation will take place in accordance with the Uniform Peace Officers Disciplinary Act, 50 ILCS 725/1 et seq.

2.   The person in charge of the investigation is Deputy Chief Willie Hunt.

3.   The purpose of the interrogation is to determine whether you violated any rules of this Department or otherwise engaged in wrongful conduct with respect to the following:

> To determine whether you violated any rules, regulations, or department procedures with respect to the performance of your duties, failure to follow commands and orders, and insubordination while on duty July 15, 2020 and July 18, 2020.

> To determine whether you fully and accurately reported your activities with respect to your work as a Kankakee Sergeant.

4.   In addition to Deputy Chief Willie Hunt, City Attorney, Michael J. McGrath and City Inspector, Ronald Bartlett will be present at the interrogation and will be participating in the interrogation.

5.   A complete stenographic record of the interrogation will be made and a complete copy thereof will be made available to you without cost and without delay.

6.   Admissions you make in the course of the interrogation may be used as evidence of misconduct or as the basis for charges seeking your suspension, removal, demotion, discharge or other disciplinary action.

7.   You have the right to be represented by counsel of your choosing at the interrogation.  You also have the right to have a representative of your collective bargaining unit present at the interrogation.



EXHIBIT
# 1
berge

DEFENDANTS 001703

8.    You have no right to remain silent at the interrogation.  You have an obligation to truthfully answer questions put to you.  If you refuse to answer questions put to you, you will be ordered to answer the question.

9.    If you persist in your refusal after the order has been given to you, such refusal constitutes a violation of the rules and regulations of the Kankakee Police Department and will serve as a basis for which your discharge will be sought.

10.    Any admission made by you during the course of this interrogation cannot be used against you in a subsequent criminal proceeding.

_____

Deputy Chief Willie Hunt

2

DEFENDANTS 001704

## UPODA 3.8(b) AFFIDAVIT

I declare and affirm that the facts contained in this Notice are complete, accurate and true to the best of my knowledge and belief.

_____
Deputy Chief Willie Hunt

Subscribed and Sworn to before me
this ___ day of July 2020.

_____
Notary Public

"OFFICAL SEAL"
VALERIE JAENICKE
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 04/01/2024

The undersigned hereby acknowledges that he has received this Notice of Interrogation.

Date/Time: 7/24/20  11:30 AM

_____
Employee Signature

Witnessed By:

3

DEFENDANTS 001705



*City of Kankakee*
**Kankakee Police Department**

Administrative Leave Pending Investigation

July 20, 2020

Sgt. Paul Berge
385 E Oak Street
Kankakee, IL 60901

Dear Sergeant Paul Berge:

This letter is official notice that pursuant to 1020.4.2.C of the Kankakee Police Department's Policy Manual you have been placed on Administrative Leave with Pay pending the results of an investigation into incidents that took place on July 15, 2020 and July 18, 2020 where you committed acts of insubordination by refusing to obey lawful orders from persons of superior rank in violation of 200.3.3B and 341.3.5.F of the Kankakee Police Department's Policy Manual.

The purpose of this leave is to give the City an opportunity to investigate this matter with minimal disruption to the workplace and to consider if disciplinary action, up to and including termination, may be appropriate. While on administrative leave, you may not come to the workplace, perform any work, exercise any police powers and authority or access work email or systems unless expressly approved by a lieutenant, commander, deputy chief of police or police chief of the Kankakee Police Department.

Your leave will begin immediately and will continue until further notice. While you are on Administrative Leave, you remain an employee of the City of Kankakee and must continue to observe all rules and regulations regarding the conduct of City employees. You will continue to accrue all rights and benefits as an employee.

During your leave, you are directed to remain at your residence during your regular work hours of 5:45 AM to 2:15 PM as currently scheduled. You must be available to provide information or services during these hours as directed by your supervisor. You must call your supervisor each work day between 6:00 AM and 2:00 PM. You may leave your residence during your regular lunch break from 11:00 AM to 11:30 AM. To leave your residence at any other time during the regular work hours cited above, you must request sick leave or other benefit time. If your supervisor approves your request, you may leave your residence during the period of approved leave.

**EXHIBIT**
Berge #2

DONALD E. GREEN PUBLIC SAFETY CENTER
385 East Oak Street
Kankakee, Illinois

Telephone:
Fax: 815-933-0463
Website: https://citykankakee-IL.gov/police.php

DEFENDANTS 001706



*City of Kankakee*
**Kankakee Police Department**

You may be contacted at your residence during your regular work hours. If you are not at your residence and your supervisor has not approved sick or annual leave for this time, you will be considered to be absent without leave and will be given unauthorized leave without pay.

Failure to comply with all of the directives in this letter will subject you to disciplinary action, up to and including dismissal from City employment.

Sincerely,

Frank J. Kosman

Chief of Police

cc: HR Director James Ellexson

Issued by _____  Date 7/20/2020

Received by _____  Date 7/20/20

Witnessed by _____  Date 7/20/20

DONALD E. GREEN PUBLIC SAFETY CENTER
385 East Oak Street
Kankakee, Illinois

Telephone: 815-933-0401
Fax: 815-933-0463
Website: https://citykankakee-IL.gov/police.php

DEFENDANTS 001707

# In The Matter Of:

*Kankakee Board of Fire and Police Commissioners Meeting*

*Seargeant Paul Berge*
*September 15, 2020*

*Schelli Reporting Service, Ltd.*
*schellireporting@aol.com*
*(312) 558-1113*

Original File 091520kkfpcmeeting.txt
Min-U-Script® with Word Index

DEFENDANTS 001708

**Page 1**

```
 1
 2    BEFORE THE BOARD OF FIRE AND POLICE COMMISSIONERS
 3       CITY OF KANKAKEE, KANKAKEE CITY, ILLINOIS
 4
 5           Report of proceedings had at the Board
 6  of Commissioners' Meeting for the Kankakee Fire and
 7  Police Commission, held at 385 East Oak Street,
 8  Kankakee, Illinois, on the 15th day of September,
 9  A.D., 2020, commencing at the hour of 5:30 p.m.
10
11  APPEARANCES:
12       Chief Frank Kosman
         Dr. Willie Davis, Chairman
13       Mr. Nickey Yates, Secretary
         Mr. Mario Flores, Commissioner
14       Ms. Dawn Landwehr, Commissioner
         Ms. Cortney Bessant, Commissioner
15
16  APPEARANCES:
17       OTTOSEN, DiNOLFO, HASENBALG & CASTALDO, LTD.,
         by MR. JOHN H. KELLY
18          On behalf of Board of Commissioners;
19       ODELSON & STERK, by
         MR. MICHAEL McGRATH
20          On behalf of Chief Kosman;
21       HERBERT LAW FIRM, by
22       MR. DANIEL HERBERT
23          On behalf of Sergeant Paul Berge.
24              * * * * * *
```

**Page 2**

```
 1              I N D E X
 2  WITNESS                              PAGE
 3  DONELL AUSTIN, SR.
 4      Direct Examination by Mr. McGrath...... 35
 5      Cross-Examination by Mr. Herbert...... 76
 6      Redirect Examination by Mr. McGrath.... 123
 7      Recross-Examination by Mr. Herbert..... 137
 8      Redirect Examination by Mr. McGrath.... 141
 9      Recross-Examination by Mr. Herbert..... 142
10
11  TIMOTHY KLOPP
12      Direct Examination by Mr. McGrath...... 147
13      Cross-Examination by Mr. Herbert....... 169
14
15  ROBIN PASSWATER
16      Direct Examination by Mr. McGrath...... 174
17      Cross-Examination by Mr. Herbert....... 188
18      Redirect Examination by Mr. McGrath.... 190
19      Recross-Examination by Mr. Herbert..... 193
20
21           E X H I B I T S
22  CHIEF EXHIBIT                        PAGE
23      No. 1.................................. 44
24      No. 2.................................. 49
```

**Page 3**

```
 1       CHAIRMAN DAVIS: I have a motion for.  I
 2  need a second.  All those in favor of that motion
 3  say aye.
 4          (All say aye.)
 5       CHAIRMAN DAVIS: Opposed?
 6          We have none.
 7          Attorney Kelly?
 8       MR. KELLY: Thank you, Mr. Chairman.
 9  This is, in fact, a meeting of the Board of Fire &
10  Police Commissioners of the City of Kankakee called
11  for the purpose of hearing charges filed against a
12  member of the Kankakee City Police Department.
13          Are both parties present?
14       MR. HERBERT: Yes.
15       MR. McGRATH: Yes.
16       MR. KELLY: Would the Chief and his
17  attorney identify themselves for the record?
18       MR. McGRATH: On behalf of Chief Kosman,
19  Mike McGrath, M-C-G-R-A-T-H.  Chief Kosman
20  obviously sits next to me.
21       MR. KELLY: And for the sergeant?
22       MR. HERBERT: Good evening.  Dan
23  Herbert, H-E-R-B-E-R-T, on behalf of Sergeant Paul
24  Berge, who is here.
```

**Page 4**

```
 1       MR. KELLY: This matter comes before the
 2  Board of Police & Fire Commissioners based on a
 3  statement of disciplinary charges filed against
 4  Sergeant Paul Berge by Chief Kosman on or about
 5  August the 13th of 2020.
 6          Do both parties acknowledge
 7  receipt of those charges?
 8       MR. McGRATH: Yes.
 9       MR. HERBERT: Yes.
10       MR. KELLY: And both parties acknowledge
11  notice of this hearing?
12       MR. McGRATH: Yes.
13       MR. HERBERT: Yes.
14       MR. KELLY: Mr. Herbert, on behalf of
15  your client, have you waived any 30-day requirement
16  relative to the commencement of a hearing on this
17  matter?
18       MR. HERBERT: Yes, we are beyond
19  30 days, yes.
20       MR. KELLY: This matter will proceed
21  with the Commission hearing evidence on the
22  charges, and I believe it has already been agreed
23  that the Commission will hear this in a bifurcated
24  matter, which means they will hear testimony and
```

DEFENDANTS 001709

Page 5

1 the presentation of evidence on whether or not the
2 allegations in the complaint have been proven. And
3 if any of those allegations are proven, then in the
4 second phase of the hearing, when a penalty may be
5 appropriate. Is that correct?
6      MR. HERBERT: Yes.
7      MR. KELLY: Mr. McGrath, correct?
8      MR. McGRATH: Yes.
9      MR. KELLY: Before we get started
10 hearing on the charges, the Commission's record
11 includes several documents filed by counsel.
12 Number one, Mr. Herbert has filed on behalf of
13 Sergeant Berge a motion for a bill of particulars.
14 Mr. McGrath, on behalf of Keith Kosman, has filed a
15 written response to that motion for bill of
16 particulars. Mr. Herbert has also filed a motion
17 to dismiss the charges, and I do not believe the
18 City has responded in writing to that. Am I
19 correct on that?
20      MR. McGRATH: That's correct.
21      MR. KELLY: So those are the pleadings
22 that are currently pending before the Commission as
23 we begin tonight. Comments from either party
24 relative to those pleadings?

Page 6

1      MR. HERBERT: Yes, just briefly.
2 Obviously the Board has the motions in front of
3 them. Really what our complaint here with respect
4 to the bill of particulars and the motion to
5 dismiss is that we are not on proper notice as to
6 what we are defending ourselves against, and that's
7 important certainly for a case in which the Chief
8 is seeking to terminate a very good employee for
9 years and years. But without getting into too many
10 of the details, there are many allegations that
11 simply don't put Sergeant Berge on notice as to
12 what the Chief is alleging that he did wrong. And
13 I can cite to paragraph 4.
14      Chief alleged response, Failed to
15 follow multiple direct orders from Commander
16 Austin. Well, we need to know what direct orders
17 Sergeant Berge is alleged to have violated, not
18 multiple orders, and same thing with respect to
19 Chief Kosman. If we look at paragraph 8 of the
20 motion, Chief identifies five statements that the
21 Chief believes count as false statements. And then
22 he identified in the five paragraphs, which don't
23 put us on notice, it doesn't put us on notice as to
24 what specific orders my client has alleged to have

Page 7

1 violated. The charges talk about multiple orders,
2 but they don't identify with specificity what
3 orders he has alleged to have violated and by whom.
4 Many of the charges talk about other supervisors,
5 allegations about violating direct orders given by
6 other supervisors. We need to know who that is.
7 We need to know what the direct orders are and who
8 those chiefs [sic] were.
9      And if I can just, you know,
10 supplement my motion to dismiss orally -- and I'm
11 wrapping up here, but we had this issue. It was
12 raised at the interrogation, and obviously this
13 Board and the rules for administrative hearings --
14 certainly one of the fundamental basics here is
15 that the respondent, the person who the Chief is
16 seeking to fire, knows exactly why it is they're
17 seeking to fire him. We received a notice of
18 interrogation, and I objected to the lack of
19 specificity during the interrogation. And I don't
20 know if the Board takes judicial notice of the
21 transcript, but it's going to come into play at
22 some point. But page 20, you can see I clearly am
23 saying, Wait a minute. We don't know what we're
24 defending ourselves against. And the notice of the

Page 8

1 interrogation in this case, which led to these
2 charges, talks about two different things. And I
3 ask the Board to determine whether or not you think
4 these allegations are clear: First, to determine
5 whether he violated any rules, regulations, or
6 department procedures with respect to the
7 particular -- or I'm sorry -- the performance of
8 your duties; failure to follow commands and orders
9 and insubordination while on duty July 15th and
10 July 18th. And then the next one, the final one,
11 to determine whether you fully and accurately
12 reported your activities with respect to your work
13 as a Kankakee sergeant.
14      I will note that that second
15 allegation, that doesn't contain anywhere -- or
16 that does not -- it's not a charge in this case.
17 So the interrogation essentially determined
18 apparently that he didn't violate that charge, but
19 we're still left with this vague charge before the
20 Board here. So I would ask that you simply require
21 the Chief to specify what orders, by whom does the
22 Chief believe Sergeant Berge did not follow. Thank
23 you.
24      MR. KELLY: Mr. McGrath?

Page 9

1  MR. McGRATH: Thank you.  Briefly in
2  response, as far as the bill of particulars, I
3  filed a written response and that's primarily based
4  on counsel's argument that the Code of Civil
5  Procedure has not been followed.  Your very own
6  rules state that the Code of Civil Procedure is
7  inapplicable to this hearing.  It's an
8  administrative hearing.  I stand on what I put in
9  my written response, that the bill of particulars
10  have no merit.
11  As far as the second motion
12  you've raised in the due process plane, it's not
13  being fully aware and put on notice of why we're
14  here tonight.  Certainly I can tell you that we
15  have given to counsel approximately 400 pages of
16  documents, we've given him video of the second
17  incident on July 18th of this year over by the
18  county courthouse, he was put on notice with the
19  formal interrogation, he was put on notice prior to
20  the formal interrogation when he was placed on paid
21  leave by the Chief, citations to policies were
22  issued.  During the formal interrogation, he was
23  questioned at length as to what transpired on
24  July 15th and July 18th of this year, the 15th

Page 10

1  pertaining to his conduct and behavior with the
2  Commander in the sergeants' office when he was
3  having a conversation with Commander Austin, and on
4  the 18th when there was a peaceful protest and
5  Sergeant Berge involves himself with that peaceful
6  protest.  On both occasions, he failed to follow
7  direct orders from his superiors, on the 15th from
8  Commander Austin and, on the 18th, Chief Kosman
9  himself.  He was questioned at length during the
10  formal interrogation.  He was represented by
11  counsel.  They were both there obviously.  They've
12  received a copy of that transcript.  They're fully
13  aware of the allegations.  In the discovery in this
14  matter, we've tendered all the incident reports
15  that were prepared by the parties involved,
16  including the Chief, Commander Austin, and a couple
17  sergeants.  Those reports that were tendered to
18  counsel contain all of the facts or allegations and
19  indicate and state what directions and what orders
20  were not followed and the examples of
21  insubordination by Sergeant Berge on those separate
22  cases.  The charge itself adequately states the
23  dates and the specific policy sections that were
24  violated -- or allegedly violated according to

Page 11

1  Chief Kosman on those dates and also further states
2  that, during the formal interrogation, Sergeant
3  Berge failed to truthfully and honestly respond to
4  questions posed to him by the Chief and that is
5  Count 3.
6  As far as due process, due
7  process puts you on notice of what the charges are
8  or what the basic allegations are and you come
9  before a body and you have the ability to
10  cross-exam your accusers and the witnesses who
11  testify against you.  We are prepared to present
12  four witnesses starting tonight with Commander
13  Austin, Sergeant Klopp, Lieutenant Passwater, and
14  finishing with Chief Kosman.  I don't know how long
15  we intend on going tonight, but we have the
16  records.  Their sworn testimony will be subject to,
17  I'm sure, strenuous cross-examination.  That's what
18  due process is.  He knows why he's here, and I
19  believe that his motion should be denied and we
20  should just move forward with the hearing.
21  MR. KELLY: Mr. Herbert, anything to
22  follow?
23  MR. HERBERT: Just briefly.  For the
24  Board to suggest that because the Code of Civil

Page 12

1  Procedure does not have to be followed in no way
2  means that a property interest in a job such as
3  this for Sergeant Berge are somehow waived, and
4  that is the suggestion here, that, well, because
5  the Code of Civil Procedure doesn't apply, they
6  don't -- the Board doesn't have to take notice.
7  That means that he's not entitled to notification
8  of the charges against him?  That's fundamentally
9  wrong, and it's fundamentally unfair and, according
10  to the Board's own rules and regulations, talk
11  about how the complaints -- the complaint in the
12  case has to provide a plain and concise statement
13  of the facts upon which the complaint is based.
14  And we would suggest, as we sit here today, just
15  like at the interrogation, we don't know exactly
16  what we're alleged to have violated.  Thank you.
17  And it's a simple remedy.  The Chief can put on the
18  record, here's what you violated.  There shouldn't
19  be any mystery here.
20  MR. KELLY: At this point in time, the
21  Commission has the right to consider the pleadings
22  filed by Mr. Herbert and the arguments just made by
23  counsel.  I would ask if the Commission wants to go
24  to closed session to deliberate on those issues or

DEFENDANTS 001711

Page 13

1  if you want to do it here in open session.
2        CHAIRMAN DAVIS: What's the --
3        COMMISSIONER FLORES: I'm fine to
4  deliberate here.
5        COMMISSIONER BESSANT: I'm good here.
6        MR. KELLY: Then the commissioners have
7  heard the arguments of counsel.  I have copies of
8  the bill of particulars and the Chief's response
9  here if you want -- if anybody wants to look at it.
10  I'm sorry we didn't have copies for all of you, but
11  if you have to take a minute to look at that.
12        COMMISSIONER BESSANT: I got this.
13        MR. KELLY: Do you all have it?
14        CHAIRMAN DAVIS: Yes.
15        MR. KELLY: So then based on
16  Mr. Herbert's motion to the commission, the
17  question before the commission is whether or not
18  there is enough information in the charges to
19  apprise the sergeant of the rule violations that
20  the Chief has alleged.  And remember, of course,
21  that simply because an allegation is made does not
22  mean it is proved.  It is the Chief's burden to
23  prove beyond a -- or excuse me -- by a
24  preponderance of the evidence that the allegations

Page 14

1  he has made in the three counts of this complaint
2  are true, and that will take place with the
3  presentation of witnesses.  So short of that, the
4  commissioners should look at the complaint and, in
5  your estimation, does it give the sergeant enough
6  notice of the basis for the Chief's charges.  And
7  the Civil Procedure Act does not apply.  However,
8  all elements of basic fairness do apply.  The Fire
9  and Police Commission Act and your rules are very
10  clear that you must afford an officer who is
11  charged and brought before you due process.
12        CHAIRMAN DAVIS: Attorney Kelly, who has
13  this document?
14        MR. KELLY: Which is that document?
15        CHAIRMAN DAVIS: This is the --
16        MR. KELLY: The charges?
17        COMMISSIONER BESSANT: The bill of
18  particulars.
19        CHAIRMAN DAVIS: The bill of
20  particulars, who has got that?
21        MR. KELLY: The request for the bill of
22  particulars was made by Mr. Herbert.
23        CHAIRMAN DAVIS: Did he get that?  Did
24  he get this?

Page 15

1        MR. KELLY: The charges, the
2  disciplinary charges?
3        CHAIRMAN DAVIS: The bill of particulars
4  that I'm looking at right now.
5        COMMISSIONER BESSANT: This came from
6  him, correct?
7        MR. KELLY: Mr. Herbert filed a pleading
8  that is titled "Motion for Bill of Particulars."
9        CHAIRMAN DAVIS: Okay.
10        MR. KELLY: The Chief then filed a
11  written response to the bill of particulars.
12        CHAIRMAN DAVIS: This is it.  This bill
13  of particulars that I'm looking at, this is the
14  response that was received?
15        MR. KELLY: Yes, that's the Chief's
16  response.  Let me just make sure.  Yes, that's the
17  Chief's -- No, that's Mr. Herbert's motion.  That's
18  where he's asking for the bill of particulars.  The
19  Chief then filed a written response to that.  And
20  if you don't have a copy --
21        CHAIRMAN DAVIS: That's what I was
22  looking for.
23        MR. KELLY: I have a copy of that.
24        COMMISSIONER FLORES: Yeah, that's what

Page 16

1  we have in that folder.
2        CHAIRMAN DAVIS: This 101-page
3  transcript, where is that?  Does somebody have
4  that?
5        MR. KELLY: That -- I believe that's the
6  transcript of the interrogation.  That will most
7  likely be introduced as evidence.
8        CHAIRMAN DAVIS: So the people have
9  that?
10        MR. KELLY: Both sides have that.
11        CHAIRMAN DAVIS: That's what I was
12  wondering.  I just wanted to know if they had --
13  They will have the opportunity to cross-examine any
14  one of those witnesses that's put up in front of
15  us?
16        MR. KELLY: Absolutely.
17        CHAIRMAN DAVIS: Do you want to look at
18  that?  Okay.
19        COMMISSIONER FLORES: If I may, I think
20  because the defense has an opportunity to respond,
21  has an opportunity to cross-examine, I would motion
22  that we deny the motion for the bill of particulars
23  if I understood that correctly.
24        MR. KELLY: Motion for the bill of

Page 17

1 particulars, and then there's the motion to
2 dismiss, which was based on the bill of particulars
3 also.
4        COMMISSIONER FLORES: So I would motion
5 that we do not vote for those motions.
6        CHAIRMAN DAVIS: Do we have a second?
7        COMMISSIONER BESSANT: I would second
8 that.
9        CHAIRMAN DAVIS: So the motion for the
10 bill of particulars is denied at this point
11 considering the fact that there's information that
12 we feel comfortable with.  So all those in favor of
13 the denial at this point say aye.
14        (All say aye.)
15        CHAIRMAN DAVIS: Opposed?
16        We go forward.
17        MR. KELLY: So the record should then
18 reflect that the Commission has voted 5 to nothing
19 to deny the motion for bill of particulars and the
20 motion to dismiss.
21        Does either party have any other
22 preliminary matters prior to commencing the
23 hearing?
24        MR. HERBERT: Just the motion to exclude

Page 18

1 witnesses.
2        MR. McGRATH: That's fine.
3        MR. KELLY: So Mr. Herbert has made a
4 motion to exclude witnesses, which would mean any
5 witness who is going to be called to testify would
6 not be allowed to be in the room while the hearing
7 is going on.  A fairly standard motion.  The City
8 has agreed to that motion.  So if there is anybody
9 here outside the Chief and Sergeant Berge who will
10 be called as a witness tonight, we would ask that
11 they excuse themselves from the room and not
12 discuss what they may have heard tonight with
13 anybody else outside of this room.
14        Anything else, Mr. Herbert?
15        MR. HERBERT: I guess just maybe a
16 housekeeping matter.  I don't know about the masks,
17 but, you know, credibility is at issue here with
18 witnesses.  And I don't know if the Board has a
19 preference.  I would prefer, if we can do so
20 safely, that witnesses do not wear masks when
21 they're being examined, but I will defer to the
22 Board obviously.
23        CHAIRMAN DAVIS: Are they going to be
24 standing there?  Where are the witnesses going to

Page 19

1 be located?
2        MR. McGRATH: Well, there's a timing
3 issue again with the planning commission coming in
4 at 7:00.  So we probably have to be out of here at
5 6:45 to allow the court reporter to break down and
6 set back up in the conference room.  So if we're
7 going here, I don't know how you guys want to set
8 up with the witness, if you just want to bring a
9 chair out and they can sit in front of the
10 commission so everybody -- all the commissioners
11 can see the witness.  Downstairs we have the table
12 set up, and we have a spot where our witness can
13 sit also.
14        CHAIRMAN DAVIS: But --
15        MR. McGRATH: There's distance for it.
16        CHAIRMAN DAVIS: Is there enough
17 distance down there?
18        COMMISSIONER FLORES: For the witness.
19        MR. McGRATH: For the witness away from
20 anybody, I believe.
21        COMMISSIONER BESSANT: So --
22        COMMISSIONER YATES: So are you
23 recommending that we go downstairs now to avoid
24 interruption?

Page 20

1        MR. McGRATH: It's at your pleasure.
2 Obviously I have a very brief opening.  I can do it
3 down there and then go right into -- My first
4 witness, as I stated, is Commander Austin.
5        MR. KELLY: Mr. Herbert, do you have an
6 opening also, or will you reserve to your case?
7        MR. HERBERT: I will likely give a short
8 opening.
9        MR. KELLY: Why don't we do opening
10 statements here, and then we can move downstairs
11 and we'll call -- because it would be hard to call
12 a witness, to have to interrupt them and move them
13 down.  So let's do opening statements here.  We'll
14 move downstairs to call a witness.  I agree that it
15 would be most advantageous if the witness could
16 avoid wearing a mask while testifying while the
17 rest of us continue to wear our masks and hopefully
18 not confuse the court reporter too terribly.  So if
19 there's no other preliminary matters, since it's
20 the Chief's burden to go forward, Mr. McGrath, do
21 you have an opening statement?
22        MR. McGRATH: I do.
23        It just dawned on me, were you
24 going to adjourn your meeting and then just

DEFENDANTS 001713

Page 21

1 continue with our hearing because there's people
2 here that really have no input or don't have to be
3 here for the hearing unless you need them.
4          MR. KELLY: If people that were here for
5 the commission meeting, we probably won't adjourn
6 until we close tonight. But if there's people here
7 who do not have to be here, you're free to leave.
8          MR. McGRATH: So that will be HR
9 Director and ...
10         CHAIRMAN DAVIS: So at this point, we
11 are going to get the opening statements from both
12 attorneys?
13         MR. KELLY: Right.
14         CHAIRMAN DAVIS: And then we'll go
15 downstairs?
16         MR. KELLY: I think that's the best
17 plan.
18         CHAIRMAN DAVIS: I think so too. Yeah,
19 that's good. Let's do that.
20         MR. McGRATH: Great. Thank you.
21         MR. KELLY: Mr. McGrath?
22         MR. McGRATH: Members of the Commission,
23 this is a very straightforward and simple matter.
24 Police departments are paramilitary organizations.

Page 22

1 They're patterned after the military. There's a
2 set chain of command. And when an officer is given
3 a command or a directive from a higher-ranking
4 officer of that department, that command or
5 directive has to be followed. It's that simple.
6          As you know, the Kankakee Police
7 Department has written rules. They're called
8 policies, which every officer is provided a copy of
9 when they're hired. They're given supplements and
10 amendments during their career, and every officer
11 must follow and adhere to the department's
12 policies. The Kankakee Police Department has
13 policies that explain the chain of command, orders
14 that have to be followed and behavior that will not
15 be tolerated by the department, specifically
16 insubordination. You will hear what
17 insubordination is. Essentially, it means defiance
18 of authority or refusal to obey orders.
19          We are here tonight because
20 Sergeant Berge failed to follow the orders of his
21 superiors. And in doing so, he was insubordinate
22 in many respects in front of fellow officers and in
23 front of the general public. You will hear
24 testimony from various members of the police

Page 23

1 department, from fellow sergeants all the way up to
2 Chief Kosman, the head of the police department.
3          On July 15th, Sergeant Berge
4 failed to follow through on a given assignment when
5 his commander, Commander Austin, requested an
6 update on the assignment. Sergeant Berge's
7 behavior was very strange. He failed to answer
8 questions. He had his eyes closed. He ignored
9 direct orders. He got up at one point out of his
10 chair and got in the commander's face. He acted in
11 a very disrespectful manner to the commander all in
12 the presence of many officers and near the
13 sergeants' office within the police station. The
14 evidence will show his behavior was unbecoming of
15 an officer. He was defiant and refused to obey
16 multiple orders. Clearly he was insubordinate.
17          A few days later on July 18th,
18 2020, there was a peaceful protest march going on
19 in the city. Chief Kosman worked that Saturday
20 morning to make sure everything went smoothly, that
21 traffic control was conducted, and the march was
22 able to go throughout the city wherever the
23 marchers and protesters wanted to go. Chief Kosman
24 detailed another sergeant with him and a patrol

Page 24

1 officer that morning. No other police personnel
2 were asked or requested to assist Chief Kosman.
3          You will hear from Chief Kosman
4 why he decided to control the march in this matter.
5 You will hear testimony that Sergeant Berge, who
6 was not detailed or assigned in any way to the
7 protest, slash, peaceful march, was seen sitting
8 alongside in a couple of areas as the march
9 proceeded. When the march proceeded to the county
10 courthouse, Sergeant Berge arrived at that
11 location. When Sergeant Berge exited his vehicle,
12 Chief Kosman directed him to back away from the
13 crowd telling him to back off. Sergeant Berge
14 failed to follow multiple direct orders from Chief
15 Kosman and continued towards the crowd. Chief
16 Kosman followed in the direction of Sergeant Berge
17 and again ordered him back to his vehicle.
18 Sergeant Berge waved off Chief Kosman and
19 intentionally disobeyed Chief Kosman's direct
20 orders. Sergeant Miller was sent over to Sergeant
21 Berge to advise him to leave the area. Sergeant
22 Berge eventually went back to where Chief Kosman
23 was, and Chief Kosman once again ordered him to
24 leave the area. Sergeant Berge refused to follow

DEFENDANTS 001714

Page 25

1 that order.  Chief Kosman called Lieutenant
2 Passwater to come to the scene as Lieutenant
3 Passwater was the day shift supervisor on that day.
4 Lieutenant Passwater defined -- I should say
5 Lieutenant Passwater obviously arrived on the scene
6 within a couple of minutes.  He was only a couple
7 blocks way, and he advised Sergeant Berge to leave
8 the area.  Sergeant Berge went back -- I'm sorry.
9 Lieutenant Passwater advised Sergeant Berge to
10 follow the Chief's order, and Sergeant Berge still
11 refused.  It wasn't until Sergeant Berge asked
12 Lieutenant Passwater, What do you want me to do,
13 and Lieutenant Passwater says, I want you to follow
14 Chief Kosman's orders.  And Sergeant Berge finally
15 left the area.  The orders given to Sergeant Berge
16 were given in a public area, and they were heard
17 and observed by the public who were involved with
18 the protest and the march.  Sergeant Berge's
19 failure to follow Chief Kosman's multiple orders
20 was also heard and observed by members of the
21 public out in the area.
22           Not only will you hear testimony
23 from witnesses tonight of what took place on
24 July the 15th specifically and July 18th, you will

Page 26

1 be able to see the whole incident on July 18th as
2 it was recorded by four separate cameras in the
3 area.  The evidence will show that Sergeant Berge
4 failed to follow very simple orders and directives
5 given by his superiors, including Chief Kosman, on
6 two separate dates.  He was insubordinate on both
7 dates in multiple ways and failed to follow
8 multiple, multiple simple orders.
9           You will learn that Chief Kosman
10 placed Sergeant Berge on administrative leave the
11 following Monday, and Chief Kosman will explain why
12 he did so.  A formal interrogation was scheduled on
13 July 30th wherein Sergeant Berge was directed to
14 answer questions truthfully while being under oath.
15 You will hear evidence from the interrogation that
16 Sergeant Berge lied about what took place on
17 July 15th and July 18th.  You will hear some very
18 unusual, bizarre explanations given by Sergeant
19 Berge during that interrogation.  These are further
20 examples of insubordination.
21           The evidence will show that he
22 lied under oath.  He failed to follow simple, basic
23 orders and directives of his superiors.  He was
24 insubordinate to his superiors in front of fellow

Page 27

1 offices and the public.  Those are the allegations
2 contained in the charges before you.  The Chief has
3 filed those charges with the request that Sergeant
4 Berge be terminated from the Kankakee Police
5 Department.  Thank you.
6           MR. KELLY:  Mr. Herbert?
7           MR. HERBERT:  Thank you.  It's my
8 pleasure to be in front of the Commission.  It's
9 also my pleasure to represent Sergeant Paul Berge
10 in this case.  Sergeant Paul Berge you will hear --
11 I don't know if any of you know him, but he is a
12 41-year-old man.  He's married.  He's got
13 three kids, young kids, 16, 15, and four.  He's
14 responsible for those kids.  He's responsible for
15 his wife.  And his only means of income is this
16 job, this job that the Chief is looking to
17 terminate him from.
18           Paul Berge, you'll hear, he
19 graduated from Olivet Nazarene College, received
20 his four-year bachelor's degree.  He was tested to
21 become a Kankakee police officer.  As the Board
22 knows better than anyone, the Kankakee Police
23 Department does a thorough vetting investigation to
24 determine whether or not this person is an

Page 28

1 appropriate fit.  The Chief has a lot of options.
2 They can choose from a lot of people.  They chose
3 Paul, and they chose him because he's got
4 tremendous character and showed that he was going
5 to be a promising police officer.  And he was
6 despite these two incidents on two dates.  You're
7 not going to hear anything else about Paul Berge
8 that shows that he is incapable or should not be a
9 police officer, somehow his ability to be a police
10 officer substantially is impaired.  We have to
11 judge him -- and I'm going to ask you to do this
12 not on an incident that lasted five minutes one day
13 and five minutes the other day, but on the totality
14 of the circumstances.  And what are those?  What do
15 we have to look at here?
16           What we have is a history which
17 is well-documented, his career on the Kankakee
18 Police Department.  And those factors have to be
19 taken in when you consider the discipline from
20 these two five-minute incidents.  When he was
21 assigned as a patrol officer, he thrived with
22 Kankakee so much so that he was appointed to a very
23 distinguished SWAT team.  And the evidence is going
24 to show this.  The SWAT team, obviously you don't

DEFENDANTS 001715

Page 29

1  take everyone that you -- that is a police officer
2  within your department.  You want to make sure that
3  person has the skills, the training, and the
4  integrity.  He did.  And that's why the chief,
5  obviously a different chief, chose him.  And then
6  after he was so successful in that unit, he goes on
7  and he is given another very desirable assignment,
8  select assignment because of his abilities as a
9  police officer, because of his integrity.  He gets
10  transferred to the desirable MEG unit, Kankakee
11  Metropolitan Enforcement Group, KMEG I believe.  I
12  think the Board knows what that group does.  It's a
13  drug unit.  You need not only police officers that
14  are effective at their job; but when you're talking
15  drugs, you're talking money, you're talking
16  temptation, you're talking all of those things.  So
17  who do you choose?  Somebody with integrity.  We
18  chose Paul.  He didn't.  He did it well.  He was a
19  credit to the Kankakee Police Department.  He was
20  so good at his job that he was also promoted to a
21  supervisor position chosen by the Chief.  We need
22  you to supervise these individuals because you're a
23  darn good police officer and you have integrity.
24  We certainly know that that's part of it, that's

Page 30

1  part of the desire here.  And he has served now
2  since 2000 -- I'm sorry.  What year --
3            MR. BERGE: '6.
4            MR. HERBERT: '6.
5                 And you were promoted to sergeant
6  in 2016?
7            MR. BERGE: Yes, sir.
8            MR. HERBERT: So he has served the City
9  of Kankakee selflessly and honorably as a police
10  officer for the last 14 years.  So what brings us
11  here today?  What brings us here before the board
12  to fire a grown man, a supervisor with a 14-year
13  history?  How egregious was that conduct that we
14  come here today to terminate this father, this
15  sergeant, this employee of Kankakee?
16                 You heard the opening.  You've
17  seen the charges.  Sergeant Berge apparently failed
18  to follow some directives by two supervisors, the
19  Chief and Commander Austin.  This is so serious
20  that he should be fired?  Well, what you won't hear
21  is any problems that emanated from his alleged
22  failure to follow these direct orders.  Nobody was
23  hurt.  Nobody made complaints about it, only the
24  complainants in this case.  Big deal.  Oh, I'm

Page 31

1  sorry.  It is a big deal.  Why, as the Chief said,
2  because we're a paramilitary organization,
3  paramilitary.
4                 I think we can all recognize that
5  in 2020, as we sit here today, the role of law
6  enforcement is changing.  The City of Kankakee, the
7  Chief publicly talks about the necessity for
8  change, and one of those things is we need to be a
9  community-based enforcement.  We're not the
10  military.  We have to demilitarize, but all of a
11  sudden now we have to follow military rules.  He'll
12  admit that -- The Chief will admit, every witness
13  will admit that, you know, it's important that we
14  make changes now.  Do you know why?  Because it's
15  important that subordinates have the ability to
16  question their authorities, their supervisors,
17  because if we don't have that authority, it can
18  lead to trouble.  And one very telling example of
19  that, which we all know, which has changed the
20  police departments all over this country, all over
21  this world, George Floyd.  George Floyd died
22  because a supervising officer -- I don't know all
23  the facts of it, but we've all seen the video I'm
24  assuming -- committed horrible acts, and it's come

Page 32

1  out, it's come out in court cases, it's come out
2  publicly that the subordinate officers did not want
3  to challenge their supervisor.  And as a result of
4  that fear, that paramilitary fear, that fear of
5  being brought in front of a commission just like
6  this for being fired, that led to the death of
7  George Floyd.  Now, I am not exploiting the George
8  Floyd case.  I am not saying that the results here
9  would have resulted in a death, but it's an
10  important comparison because we can't have it both
11  ways.  We can't have the Chief going out saying
12  it's so important that we change and we become less
13  militaristic, but then we're going to fire
14  somebody, fire somebody because he disobeyed some
15  orders that led to nothing.  I think what you're
16  going to see that it led to is nothing more than
17  perhaps hurt feelings.  The Chief, I think, is
18  going to show he was ticked that Paul didn't do
19  immediately what he requested.  That's important.
20  The evidence is going to show that these direct
21  orders that my client allegedly failed to follow,
22  he did follow them, not fast enough for the
23  two complainants in this case.  That's not the
24  standard here.  It was hurt feelings, nothing more.

Page 33

 1 And I get it, but we have to be bigger than that
 2 when we're talking about terminating a tenured
 3 employee who has a wife and kids.
 4         The superintendent -- or I'm
 5 sorry. The Chief bears the burden in this case,
 6 bears the burden to prove all the elements of the
 7 charge, and I've already spoken at length about how
 8 we don't believe we're on notice; but they're
 9 alleging that he violated some direct orders. They
10 have to prove that, prove that they were, you know,
11 direct orders, which the evidence will show and
12 we'll explain that to you, what we believe the law
13 is with respect to that. But then there's a second
14 prong. Even if they prove everything that's in
15 their complaint -- and I would suggest to you that
16 they will not be able to. But even if they did
17 prove everything, we don't do anything to mitigate
18 it or to poke holes in their case, they still have
19 to prove that these actions were so egregious, so
20 egregious that he has to be fired, that Paul,
21 because of these actions, that impairs his ability
22 to be a police officer. That's what the law is
23 with respect to that. And I would ask the Board to
24 look at this. And if you conclude that this is

Page 34

 1 nothing but hurt feelings, then there's no
 2 question. It has to be a not guilty. Hold the
 3 Chief to its burden. The Chief brought the charges
 4 here. The Chief is required to prove to you that
 5 Paul Berge committed such horrible policy
 6 violations that he deserves to be fired. Hold the
 7 Chief to that burden. Thank you.
 8         MR. KELLY: Thank you, Mr. Herbert.
 9         At this point in time, the
10 Commission is going to go off the record for the
11 purposes of moving the hearing room to another room
12 in the Kankakee police and fire facility. We will
13 be off the record. I caution anybody who is a
14 witness in this matter and the commissioners not to
15 discuss anything you heard while we're in the
16 process of moving to the new room. The time is
17 6:30 p.m. We'll be off the record.
18         (A short break was had.)
19         MR. KELLY: It's 6:45 p.m. The
20 commission is, again, in session. All members of
21 the commission are present. Both parties, Chief
22 Kosman and Sergent Berge, are present along with
23 their counsel. The commission will now commence
24 the hearing. Chief Berge [sic] is going to call

Page 35

 1 his first witness.
 2         Before we proceed with witnesses,
 3 I want to make sure that the parties understand
 4 that, as a hearing officer, I will rule on legal
 5 objections. On any factual objections or
 6 objections that are more involved, I'm going to ask
 7 the commissioners to rule on those themselves. Are
 8 you ready with the first witness.
 9         MR. McGRATH: I am. Thank you. I would
10 call Commander Austin, please, and ask that he be
11 sworn in.
12         MR. KELLY: Would you please swear in
13 the witness?
14         (Witness sworn.)
15 WHEREUPON:
16         DONELL AUSTIN, SR.,
17 called as a witness herein, having been first duly
18 sworn, was examined and testified as follows:
19         DIRECT EXAMINATION
20 BY MR. McGRATH:
21     Q.   Good evening, Commander Austin. As you
22 can see, we're set up in this conference room.
23 Sitting before you is the commission, and we have a
24 court reporter over in the corner. It's just going

Page 36

 1 to be like in court. When I ask for clarification,
 2 if you can just kind of direct your answers towards
 3 the commission so they can hear you clearly. And
 4 the court reporter, sometimes it can help to read
 5 lips and helps fill out the transcript.
 6     A.   Yes, sir.
 7     Q.   We start off by you stating your full
 8 name for the record and giving your Star number.
 9     A.   My name is Donell Deshawn Austin,
10 Senior, and my serial number is 3046.
11     Q.   Is that your Star number?
12     A.   Yes.
13     Q.   And you are employed here with the
14 Kankakee Police Department?
15     A.   Yes.
16     Q.   How long have you been so employed?
17     A.   20 years.
18     Q.   And your current rank is commander?
19     A.   Correct.
20     Q.   Prior -- How long have you been a
21 commander?
22     A.   A little over two years.
23     Q.   And can you just take us through your
24 employment history prior to becoming a police

Page 37

1 officer with the City of Kankakee? For example,
2 did you have any military experience?
3    A.   Correct.  I had spent 1989 to 2003 in a
4 couple different branches of the U.S. military,
5 Reserves, National Guard, and regular Army.  During
6 that time, I rose to the rank of staff sergent.
7    Q.   And then you applied to become a police
8 officer with this department, and you went through
9 the whole process and you were hired, correct?
10    A.   Correct.
11    Q.   And how long were you a patrol officer?
12    A.   I was a patrolman for approximately
13 nine years.
14    Q.   And when you're hired by the Kankakee
15 Police Department, are you given copies of the
16 police department's policies or procedures?
17    A.   Yes, sir.
18    Q.   And is that in written form, or is that
19 in a data bank or how are you given those policies?
20    A.   At the time I was hired, it was all in
21 written form; but we've since progressed with
22 technology, and now you receive it in either a disk
23 or you can get it online.
24    Q.   And when the policies change, either

Page 38

1 through the changes of laws or amendments by the
2 department, are officers given those changes?
3    A.   That's correct.  Through Lexipol is what
4 we use, the company that we use to facilitate our
5 policy updates and policy training.  Officers are
6 given policy updates regularly, and they have to
7 acknowledge that they received the policy, read the
8 policy, and accept it.
9    Q.   And that's with all officers, patrol
10 officers, sergeants, lieutenants, everyone within
11 the police department?
12    A.   From the chief on down, yes.
13    Q.   And then there's acknowledgement that it
14 was sent to them, they acknowledge that they
15 received it, and they're responsible for reading
16 and knowing those policies, correct?
17    A.   Correct, and the records are maintained
18 of that fact when those officers acknowledge those
19 policies and it can be printed out in a spreadsheet
20 form.
21    Q.   And Lexipol, this is a computer-based
22 system that you can retrieve or review any of the
23 department's policies at any time through a
24 computer here at the department, correct?

Page 39

1    A.   Yes, sir.
2    Q.   And can officers also review those
3 policies and procedures on Lexipol at remote sites
4 such as, first of all, at a personal residence or
5 outside the department?
6    A.   Correct.  Anywhere you have Internet
7 connectivity, you can retrieve or review those
8 policies.  You can even do it from your cell phone.
9 So there's a Lexipol app that you can do that with
10 your cell phone, which is something that many of
11 our officers prefer.
12    Q.   Going back to your training and your
13 experience with the department, you said you were a
14 patrol officer for nine years.  What rank did you
15 hold next?
16    A.   In 2009, I was promoted to sergeant.
17    Q.   Did you have to test for that position,
18 or were you selected off of a list?
19    A.   I had to test for the position and then
20 be placed on the list.
21    Q.   All right.  And how long after you were
22 on the list were you selected?
23    A.   On that list, I was No. 2 on that
24 particular list out of, I believe, ten applicants.

Page 40

1 And I believe I was selected after -- because I
2 took the test in 2008, and I was promoted in 2009.
3    Q.   And how long did you serve as a
4 sergeant?
5    A.   Six years.
6    Q.   Until you were promoted to lieutenant,
7 correct?
8    A.   Yes, sir, 2018.
9    Q.   And when you were promoted to sergeant,
10 who was the chief in the department?
11    A.   When I was promoted to Chief -- excuse
12 me -- to sergeant, Chief Kinkade was the chief of
13 police at the time.
14    Q.   And who was the chief that promoted you
15 to lieutenant?
16    A.   Chief Regnier was the chief at the time.
17    Q.   Can you spell the last name for court
18 reporter, if you can?
19    A.   R-E-G-N-I-E-R.
20    Q.   Thank you.  Commander, would you agree
21 that there is a chain of command or a hierarchy
22 within the Kankakee Police Department?
23    A.   Yes.
24    Q.   And is that based or following a

DEFENDANTS 001718

Page 41

1  paramilitary type of an organization?
2     A.   Correct.  That's why we have ranks such
3  as sergeant, lieutenant, commanders, chief, deputy
4  chief, and chief similar to ranks that we have in
5  the U.S. military, and our insignia mocks or mimics
6  what military insignia are like.
7     Q.   Just for the record, I know the
8  commission knows it, but can you go from top --
9  highest-ranking individual within the police
10  department down?
11     A.   The chief of police is the
12  highest-ranking individual in the police department
13  followed by the deputy chief, and then there are
14  two commanders, the investigations commander and
15  patrol commander, and then there are lieutenants.
16  And after that, there's sergeants.  And after that,
17  patrolman.
18     Q.   In total, how big is the department,
19  including all the officers and patrol officers?
20     A.   Right now we're standing at 68 sworn.
21     Q.   Let me ask you:  If a lawful order is
22  given to a lower-ranking officer, is that officer
23  required to follow that order pursuant to the
24  policies and procedures of the department?

Page 42

1     A.   Yes.
2     Q.   Okay.  And if an officer is given an
3  order and if they perceive that order to be an
4  order due to something illegal or against the law,
5  is there a procedure that those officers should
6  follow if they are given an illegal order of
7  command?
8     A.   If they're given an illegal order, they
9  are not bound by policy to obey the order.
10  However, they are to advise that supervisor of the
11  conflict with the order and then report that to the
12  next supervisor higher.
13     Q.   Within your department's policies, it
14  talks about insubordination?
15     A.   Yes.
16     Q.   Are you familiar with that term?
17     A.   Yes.
18     Q.   Would you agree that insubordination
19  means that an officer --
20         MR. HERBERT: I'm going to object,
21  leading.
22         MR. McGRATH: I'll rephrase it.
23         MR. KELLY: Sustained.
24  BY MR. McGRATH:

Page 43

1     Q.   What's your definition of
2  insubordination?
3         MR. HERBERT: I'm going to object to
4  relevance, what his definition of insubordination
5  is.
6         MR. KELLY: I will overrule that
7  objection.  I think the commander can testify as to
8  what he understands it to be.
9  BY THE WITNESS:
10     A.   It's my understanding that
11  insubordination is when an officer or an employee
12  does not follow a directive from a supervising
13  person or in some way or fashion, whether it be
14  passively or aggressively, just disregards the
15  order.
16     Q.   Would that include being disobedient?
17     A.   Yes.
18     Q.   Would that include being disrespectful?
19     A.   Yes.
20     Q.   I would like to draw your attention to a
21  location here in the city of Kankakee, that being
22  400 South Dearborn.
23     A.   Yes.
24     Q.   Is there an old church or a funeral home

Page 44

1  located in that area?
2     A.   Yes, sir.
3     Q.   And is there a parking lot near that old
4  funeral home or church?
5     A.   Yes, sir, there is.
6     Q.   And has there been ongoing issues at
7  that location with residents or individuals?
8     A.   Yes, sir.
9     Q.   And what type of issues have been
10  ongoing, and for how long have those issues been
11  ongoing at that location?
12     A.   In a 60-day period, we probably had
13  somewhere in the neighborhood of 30 calls to that
14  particular location ranging from criminal damage,
15  public intoxication, suspicious person, and drug
16  activity and such.
17     Q.   All right.  I'm going to show you what
18  I've marked as Chief Exhibit 1.
19         MR. HERBERT: That's fine.  I know what
20  it is.
21         (Chief Exhibit No. 1 marked for
22         identification.)
23  BY MR. McGRATH:
24     Q.   Commander, if you can take a look at

Page 45

1 that exhibit and just tell the commission if you
2 can recognize what that is.
3    A.   Yes.  This is a CAD report.  Basically
4 the time period looks like from June 20th to
5 July 6th.
6    Q.   And during that time period, does that
7 reflect that there was approximately 20 calls or
8 incidents at that location?
9    A.   Yes.  They range from criminal trespass,
10 drug activity, officers doing extra patrols,
11 fireworks, shots fired, suspicious activity,
12 suspicious person, and suspicious person.  So there
13 are various calls.
14    Q.   Is that a record that is generated here
15 at the police department and kept in the regular
16 course of business as something that can be printed
17 out if an officer or staff member wanted to review
18 it?
19    A.   It's generated by our -- actually by
20 Kankakee Communications Center.  They generate the
21 CAD report.  It's entered into our records
22 management system, and we can access it.
23       MR. McGRATH: Okay.  At this time, I ask
24 that Exhibit 1 be admitted into evidence.

Page 46

1       MR. HERBERT: I would just object to the
2 standpoint that I don't believe this witness
3 obtained this document, and he indicated that it
4 just pertains to a certain time period.  We don't
5 know if that's factual.  I would admit that the
6 dates are on there, but this could be a report from
7 a year ago.  So I would say the foundation has not
8 been laid for the introduction of this document and
9 the testimony by this witness to what he believes
10 is on the document.
11       MR. KELLY: Mr. McGrath, is there any
12 additional foundation that the commander could lay
13 relative to his familiarity with that type of
14 report and the -- I know he's testified it's kept
15 in the ordinary course of business.  Is there
16 anything else additional the commander could add?
17       MR. HERBERT: If I can be clear, I'm not
18 saying that this -- that there's no foundation to
19 establish this document; but there's no foundation
20 to establish the testimony related to this
21 document, if that makes sense.  I don't mind the
22 document coming into evidence; but anything
23 regarding this witness' testimony about specifics
24 on here, I don't think he can testify to that.

Page 47

1       MR. KELLY: I don't think that the
2 document is being admitted to testify -- or to
3 provide the commission with facts about any of the
4 incidents that allegedly occurred at that location
5 over that period of time.  I think the commander
6 has testified that that document is kept by the
7 communications agency which serves the City of
8 Kankakee.  It's a CAD report, a computer-aided
9 dispatch report, that contains certain entries made
10 by that dispatch center that's kept in the ordinary
11 course of business.  I think that a sufficient
12 foundation has been laid, and I would recommend
13 that the objection be overruled and that the
14 Chief's Exhibit No. 1 be admitted.
15       MR. McGRATH: Thank you.
16 BY MR. McGRATH:
17    Q.   And just to follow up with that exhibit,
18 in that location, Commander, have you gone by that
19 address, 400 South Dearborn, in your capacity as a
20 commander and have you seen individuals out there?
21    A.   Yes.
22    Q.   Have you seen individuals out there
23 consuming open alcohol?
24    A.   Yes.

Page 48

1    Q.   Have you seen individuals loitering out
2 in that area?
3    A.   Yes.
4    Q.   Have you seen individuals littering out
5 in that area?
6    A.   Yes.
7    Q.   And have you been made aware as a
8 commander that there's been incidents between the
9 individuals at that location such as physical
10 altercations causing --
11       MR. HERBERT: I'm going to object,
12 leading and foundation for all of these.
13       MR. KELLY: I think the questions are
14 foundational.  So I don't have any problem with
15 that.  Again, there is a certain latitude given.
16 I'm going to encourage counsel not to lead
17 witnesses and, where you can, please make the
18 questions nonleading.
19       MR. McGRATH: Okay.  Thank you.
20 BY MR. McGRATH:
21    Q.   Have you seen that kind of activity?
22 It's been a location that's made aware to you and
23 the officers in the department of ongoing issues?
24    A.   Correct.

2:20-cv-02310-CSB-EIL # 17-15 Page 83 of 270
**Kankakee Board of Fire and Police Commissioners**
**Meeting**
**Seargeant Paul Berge**
**September 15, 2020**

Page 49

1    MR. HERBERT: I'm going to object,
2  foundation.
3    MR. KELLY: Overruled.
4        (Chief Exhibit No. 2 marked for
5          identification.)
6  BY MR. McGRATH:
7    Q.  I'm going to show you what's been marked
8  as Chief Exhibit No. 2. It's an e-mail chain. Can
9  you take a look at that and tell me if you
10 recognize it or have you seen that before?
11   A.  Yes.
12   Q.  Can you tell the commission who
13 generated that e-mail and how you received the
14 information contained in that e-mail, if you did
15 receive that information and the date of the
16 e-mail?
17   A.  Yes, I did receive this e-mail on
18 July 14th from the deputy chief, whom I report to.
19 It is a forward about the funeral home at Dearborn
20 and Hickory, which is 400 South Dearborn. In this
21 particular e-mail, the deputy chief received an
22 e-mail from the alderwoman from that area and
23 stated that there had been some complaints about
24 people hanging out in front of the old funeral home

Page 50

1  at Hickory and Dearborn drinking and really getting
2  comfortable in front of the building.
3    Q.  And the name of the alderperson who
4  issued or sent out that e-mail; do you know?
5    A.  Alderwoman Stacy Gall.
6    Q.  And were other individuals within the
7  city carbon-copied on that e-mail?
8    A.  Correct. Tomora Nelson, who is the
9  director of code enforcement.
10   Q.  And were any other aldermen specific --
11 Is that the 2nd Ward within the city?
12   A.  I believe that is the 2nd Ward, and so
13 Alderman O'Brien was copied on it and Alderman
14 Curtis.
15   Q.  And does it indicate the wards on that
16 e-mail?
17   A.  On Alderwoman's ward, it's the 2nd Ward,
18 as part of her e-mail, and 6th Ward for Curtis and
19 2nd Ward for Alderman O'Brien.
20   Q.  And obviously Alderwoman Gall is an
21 elected official here in the city?
22   A.  Yes.
23   Q.  And through that e-mail, was she
24 requesting assistance by the police department

Page 51

1  and/or the code department?
2    MR. HERBERT: Objection, speculation as
3  to what she's requesting. How could he know that?
4  BY THE WITNESS:
5    A.  The e-mail --
6    MR. HERBERT: Hold on.
7    MR. KELLY: Wait a minute, Commander.
8  We'll sustain the objection. Ask the question in a
9  different manner.
10 BY MR. McGRATH:
11   Q.  Specifically what did the alderwoman
12 want done based upon what she wrote in her e-mail?
13   MR. HERBERT: Same objection.
14   MR. KELLY: Overruled.
15 BY THE WITNESS:
16   A.  The e-mail is directed to Deputy Chief
17 Hunt and Ms. Nelson. One of the last sentences
18 says, Can someone go and make sure nobody is in
19 there and make sure it's secure because she said
20 that yesterday she got a complaint that someone --
21 there was possibly someone inside the place?
22   MR. HERBERT: I'm going to object to
23 that and ask that that be stricken because that's
24 not what's in the e-mail. So if he can explain

Page 52

1  that information that's not in the e-mail
2  "yesterday." I don't see that in here. "I've
3  gotten complaints lately."
4  BY MR. McGRATH:
5    Q.  Did you speak with Alderwoman Gall?
6    A.  I did not.
7    Q.  Other than the information that's
8  contained within her e-mail, did you speak with
9  anyone else within the department about the e-mail
10 or the request that's contained within the e-mail
11 about checking out --
12   A.  Deputy Chief Hunt, yes.
13   Q.  And when did that conversation take
14 place?
15   A.  I believe that morning of the 15th.
16   Q.  And then what did you do with that
17 information? Did you talk to any officers or take
18 any steps in regards to following through on that
19 e-mail?
20   A.  Sergeant Berge was the shift commander
21 or acting shift commander that day. I asked him to
22 ensure that he go by there and check on that
23 residence. I called him by phone to ask him and
24 ensure that we go by; and if we found any city

Page 53

1  ordinance violations, that we should issue the
2  appropriate citations.
3     Q.   When you stated that you initially spoke
4  with him and then there's a later phone call, when
5  and where were you when you spoke to him?
6        MR. HERBERT: I'm going to object.  I
7  don't think that was the evidence.  I think he
8  said --
9        MR. KELLY: Overruled.
10  BY MR. McGRATH:
11     Q.   Unless I heard you incorrectly, did you
12  speak with Sergeant Berge first?
13     A.   Yes.
14     Q.   And before the --
15     A.   While inside -- while inside the police
16  department, yes.
17     Q.   And that, you believe, was July 15th of
18  2020?
19     A.   Yes.
20     Q.   And would that have been in the morning?
21     A.   That was in the morning, yes.
22     Q.   At approximately what time?
23     A.   It could have been shortly after I got
24  to work, which I get to work at 8:00 a.m.

Page 54

1     Q.   8:00 a.m.?
2     A.   Yes, sir.
3     Q.   And the conversation that you had with
4  the sergeant, it happened within the police
5  station, but where within the police station?
6     A.   In the squad room.  So that's the area
7  between my office and the sergeant and lieutenants'
8  office.
9     Q.   The squad room, is that where roll call
10  or the change of shifts is conducted?
11     A.   That's correct.
12     Q.   Is there a podium in the squad room?
13     A.   Yes.
14     Q.   And your office is located on one end of
15  the squad room, correct?
16     A.   Correct.
17     Q.   Would you agree that your office is
18  located towards the end of the squad room that has
19  the podium?
20     A.   Yes.
21     Q.   And on the opposite side of the squad
22  room, there's two offices, correct?
23     A.   Yes.
24     Q.   And whose offices are on the other side

Page 55

1  of the squad room?
2     A.   So my office is on the north side of the
3  squad room.  The sergeants' and lieutenants'
4  offices are on the south side of the squad room.
5     Q.   And are they adjacent, the lieutenants'
6  and sergeants' offices, in the squad room?
7     A.   Correct.
8     Q.   And do they each have their own
9  individual door to go into their offices?
10     A.   Yes.
11     Q.   And is there a glass window where you
12  can see into the sergeants' office from the squad
13  room?
14     A.   Yes.
15     Q.   And is there glass window in the
16  lieutenants' office that you can see into the
17  office from the squad room also?
18     A.   Yes.
19     Q.   Going back to this conversation, you
20  said it happened in the squad room.
21     A.   Yes.
22     Q.   Was anyone else present?
23     A.   No.  I believe all the other officers
24  were on the street at that time.

Page 56

1     Q.   You basically went over --
2     A.   Do you think you can go by this address
3  and check on it today?
4     Q.   You indicated that you stated to write
5  city ordinance tickets if there were violations?
6     A.   My later conversation was, could you go
7  by and make sure that we issue city ordinance
8  citations if it's appropriate.
9     Q.   That was by a telephone conversation?
10     A.   Correct.
11     Q.   How long after approximately from the
12  face-to-face meeting or conversation that you had
13  with the sergeant did you have that telephone
14  conversation?
15     A.   It was probably a couple of hours
16  because I think it was about 11:30 or something to
17  that effect.
18     Q.   Did you call the sergeant?
19     A.   Yes.
20     Q.   And the sergeant answered, you
21  recognized his voice, correct?
22     A.   Correct.
23     Q.   And what was stated in that
24  conversation?

DEFENDANTS 001722

Page 57

1    A.   I basically said, could you go by -- go
2  by that address, check and see if somebody is over
3  there or send some of our personnel to that address
4  and ensure that the guys, if we have city ordinance
5  violations, see that we issue the appropriate
6  citation.
7    Q.   The citations that you're referring to,
8  are those arrestable or jailable offenses?
9    A.   No.
10   Q.   Certainly if an officer sees a criminal
11 offense occurring, an officer, within their
12 discretion, can arrest the person?
13   A.   Correct.
14   Q.   But you're referring to just local
15 ordinances that carry a fine?
16   A.   Correct.
17   Q.   Did you receive any feedback or calls
18 back from the sergeant after the telephone
19 conversation?
20   A.   I did not.
21   Q.   I draw your attention to approximately
22 1:35 p.m. on July 15th of '20.
23   A.   Yes.
24   Q.   Do you recall that date and time?

Page 58

1    A.   Yes, sir.
2    Q.   Up until that time, had you had any
3  communication with Sergeant Berge regarding
4  400 South Dearborn, if anyone was found there, any
5  citations issued, anything like that?
6    A.   Prior to that, no, besides what I told
7  you.
8    Q.   And on the 15th at 1:35 p.m., did you
9  have occasion to go to the sergeants' office?
10   A.   Yes.
11   Q.   And what was your reason for going to
12 the sergeants' office at that time?
13   A.   My reason to go to the sergeants' office
14 was to ascertain what action that he took.  I did
15 hear that our officers got out at that location,
16 but I did not hear the summation of that particular
17 call.  So I wanted to find out if we had issued
18 citations, what did we do.
19        MR. HERBERT: You know, I'm sorry.  Can
20 I have that portion read back?  I didn't --
21 something about the officers got out or something.
22        (Record read as requested.)
23 BY MR. McGRATH:
24   Q.   And you're referring that you got that

Page 59

1  information.  Do you remember how you received or
2  obtained that information that officers got out and
3  had gone to the area?
4    A.   Basically I heard the call via radio
5  traffic.  So I heard radio traffic that we were in
6  that vicinity, but I did not hear the totality of
7  the traffic.  So I wanted to know what we did at
8  that time over there.
9    Q.   So correct me if I'm wrong, you just
10 heard over the radio in radio talk, in coding, that
11 they were at a certain location, and then that was
12 the essence of the information you knew based upon
13 what you heard?
14   A.   Correct.  In police jargon, which, you
15 know, guys -- officers will say, I'm out at
16 385 East Oak, which means -- tells dispatch that I
17 am out of service at this location busy on a call.
18 So if an officer says "I'm out," that's what I
19 mean.  I'm out here, I'm out there, and then
20 they'll say 10-8, which means I'm back in service.
21        MR. HERBERT: I'm going to object.
22        MR. KELLY: Overruled.  It's just an
23 explanation.
24 BY MR. McGRATH:

Page 60

1    Q.   Is that the type of radio transmission
2  you heard on that date?
3    A.   Correct.
4    Q.   And on the 15th, do you have other
5  assignments or duties that kept you busy or were
6  you just sitting in your office listening to the
7  radio?
8    A.   I had other assignments.
9    Q.   And then going back to when you went to
10 the sergeants' office, when you went to the
11 sergeants' office to talk to Sergeant Berge to find
12 out what had taken place, what was your demeanor?
13   A.   Calm and just inquisitive.
14   Q.   Were you upset in any way?
15   A.   No.
16   Q.   Were you angry in any way?
17   A.   No.
18   Q.   And as you -- or when you entered the
19 sergeants' office, did you see Sergeant Berge in
20 the office?
21   A.   Yes.
22   Q.   Did you see anyone else in the office?
23   A.   Yes, Sergeant Tyson.
24   Q.   Inside the sergeants' office, there's

Page 61

1   two desks there?
2       A.   Correct.
3       Q.   And what was Sergeant Berge doing when
4   you entered the office?
5       A.   At the time, I believe his feet were
6   kicked up on the desk.  He had his hat kicked back,
7   and he was just kind of leaning back.
8       Q.   And where was Sergeant Tyson?
9       A.   Sergeant Tyson was in the sergeants'
10  office seats on the south side of the building just
11  like you-all are on the south side of the building.
12  Sergeant Berge was on this desk, which would be in
13  my mind the west side of that office, and Sergeant
14  Tyson was on this side, which would be the east
15  side of the office.
16      Q.   And how big is the desk approximately?
17  What's it look like?
18      A.   The desk --
19      Q.   The desk Berge was sitting at?
20      A.   The desk is probably twice the size of
21  this table and maybe six inches longer.
22      Q.   That table to me looks like it's about
23  24 inches.  Would it be fair to say that the
24  regular desk is three, four feet in depth?

Page 62

1       A.   Yes.
2       Q.   And he was sitting at his desk with his
3   feet up on the desk, correct?
4       A.   Yes.
5       Q.   At that time, did you yell or scream --
6       A.   I did not.
7       Q.   -- at Sergeant Berge?
8            Did you come busting into the
9   office?  And by that, pushing the door open
10  abruptly or busting in and saying --
11           MR. HERBERT:  I'm going to object and
12  just --
13  BY MR. McGRATH:
14      Q.   -- anything along those lines?
15           MR. HERBERT:  -- ask that he not lead
16  and just ask what happened.
17           MR. KELLY:  Sustained.  Try not to lead.
18  BY MR. McGRATH:
19      Q.   Did you sense if anything was wrong with
20  Sergeant Berge at that time?
21           MR. HERBERT:  Objection.
22           MR. KELLY:  Overruled.
23           MR. HERBERT:  He can say what he
24  observed.

Page 63

1           MR. KELLY:  Well, he said, did he sense.
2   I think that anticipates an observation.
3   BY THE WITNESS:
4       A.   When I walked into the room, the door
5   was open as it normally is.  I saw Sergeant Berge
6   sitting with his feet kicked up on the desk.  I
7   said, Sergeant Berge?  He didn't respond.  I said,
8   Sergeant Berge?  He didn't respond.  He had his
9   eyes closed.  Then he opened his eyes.  So then I
10  said, Hey, Paul, Paul.
11      Q.   Just for the record, you're moving --
12      A.   I'm waving my hand in front of his
13  eyesight because he's looking diagonally away from
14  me.  So I'm waving my hand in front of him trying
15  to get his attention.  As I did that, I kind of
16  looked at Sergeant Tyson to see if he was seeing
17  what I was seeing.  Sergeant Tyson said, Something
18  is wrong with him.  Sergeant Berge kind of blinked
19  his eyes several times, shook his head, and it
20  looked as though either he was sleepy or groggy or
21  something to that effect.  I could not tell.  So
22  then he kind of --
23           MR. HERBERT:  I'm going to object to the
24  narrative.

Page 64

1           MR. KELLY:  Ask a question.
2   BY MR. McGRATH:
3       Q.   Did you at any time have to tap on the
4   desk?
5       A.   So after I waved and Sergeant Tyson made
6   his comment, I tapped on the desk like this, Paul,
7   Paul, Paul, can you hear me?  Are you okay?  Is
8   everything okay?  Are you okay?
9       Q.   As you were doing this, just so it's
10  clear, where were you standing at or where were you
11  physically at?
12      A.   At that point in time, I was standing in
13  front of the desk.
14      Q.   So the opposite side of the desk of the
15  sergeant?
16      A.   Correct.
17      Q.   And go ahead.  You can pick up where you
18  tapped on the desk to get his attention.
19      A.   So I tapped on the desk to get his
20  attention.  He said something that was kind of
21  incoherent.  I could not really understand what he
22  was talking about.  I said, Paul, did we go by that
23  address and did we do anything?
24           What address?  What are you

Page 65

1  talking about?
2           400 Dearborn.  I asked you to
3  make sure somebody went over there.  Did you do
4  anything?
5           Why?  What's the problem?
6           I said, We've got aldermen and
7  people calling us saying go check this address.
8           What alderman?  Who?
9           It doesn't matter which alderman
10  it is.  The citizens are contacting the alderman,
11  and the aldermen are calling us to go and check on
12  this address.
13           What citizens?  Who called?
14  Q.   Did you consider him to be dismissive or
15  rude during this portion of your conversation?
16  A.   Absolutely.
17  Q.   Would you consider him to be elusive to
18  the questions you posed to him?
19  A.   Yes.
20  Q.   And as you're testifying here today,
21  what was the tone of your voice in speaking with
22  the sergeant?  Did you raise it?
23  A.   The tone of my voice is just as exactly
24  as I'm talking right now.  I'm asking him questions

Page 66

1  directly.  I deal with -- Over the course of my
2  career, I've dealt with belligerent people who
3  don't want to cooperate with me all the time.  So I
4  know how to keep my composure.  So at that
5  particular time, I kept my tone at an even keel to
6  ensure that things didn't change.  So the entire
7  time, at that point in time, my tone was
8  even-keeled just as if we're talking right now.
9  Q.   Up until this point, is Sergeant Tyson
10  still in the sergeants' room?
11  A.   Yes.
12  Q.   And is the door to the sergeants' room
13  open or closed, if you remember?
14  A.   The door is open.
15  Q.   And then what happened next?
16  A.   By this time, Sergeant Berge was
17  standing.  And as he stood up, I backed away from
18  the desk and that's when he was asking me questions
19  about who called, what aldermen, what citizen, and
20  so on and so forth.
21  Q.   When -- In order to stand, I take it he
22  took his feet off the desk?
23  A.   Yes.
24  Q.   And was he standing on the opposite side

Page 67

1  of the desk from you?
2  A.   Yes.
3  Q.   Did he ever come around the desk?
4  A.   Yes.  So shortly after that, he came
5  around the desk and that's when he started berating
6  me and telling me about what have I done for the
7  department in the three years that I've been patrol
8  commander, that this isn't my department anymore,
9  that -- this is not your department, this is our
10  department, we're going to take our department
11  back, we're going to make it great again, things of
12  that nature.  And I said, What are you talking
13  about?  He said, You can ask anybody.  You can ask
14  those guys out there.  You can ask the citizens in
15  the street.  You don't know how to do your job.
16  Q.   I don't mean to interrupt you there.
17  Again, going back to he came around the desk and he
18  made these statements to you, how close in
19  proximity were you and him together?
20  A.   By that time, he was -- I can smell his
21  breath.  That's how close he was.
22  Q.   Were you --
23  A.   So he was about a foot away from me just
24  give or take a few inches.

Page 68

1  Q.   Did you go towards Sergeant Berge, or
2  did he come around the desk and approach you?
3  A.   He came around the desk and approached
4  me.
5  Q.   Did he get chest to chest, face to face
6  to you?
7  A.   Yes.
8  Q.   At that time is when he made those
9  statements to you?
10  A.   Yes.
11  Q.   Based upon your earlier definition of
12  insubordination, do you believe or is it your
13  opinion that those comments and statements he made
14  to you were insubordinate?
15  A.   Absolutely.
16  Q.   You asked him -- Did you ask him what he
17  was talking about?
18  A.   Yes, several times I asked him, What
19  exact- -- What are you talking about, Paul?  What
20  is it that you're talking about?
21  Q.   Did it seem to you that he was
22  questioning your authority?
23       MR. HERBERT:  Objection.  Strike that.
24  I'll withdraw it.

Page 69

1  BY THE WITNESS:
2  A.   Yes, I believe he was questioning my
3  authority.
4  Q.   Based on your definition of
5  insubordination, do you believe he was being
6  insubordinate by questioning your authority?
7  A.   Yes.
8  Q.   At any time did the phone ring on
9  Sergeant Berge's desk?
10  A.   Yes.
11  Q.   And what happened?
12  A.   By this time, I believe Sergeant Klopp
13  came in the room and stated that --
14       MR. HERBERT: I'm going to object to
15  hearsay, what other people said. It's not
16  responsive to his question.
17       MR. KELLY: Overruled.
18  BY MR. McGRATH:
19  Q.   Let me just back up.  The phone rang.
20  Did Sergeant Berge answer the phone?
21  A.   Yes.
22  Q.   Did he engage or start a conversation
23  with the caller?
24  A.   Yes.

Page 70

1  Q.   Did you direct him or state anything to
2  him as he was on the phone?
3  A.   Yes.  I told him to hang up the phone
4  because we were still in mid conversation when he
5  decided to answer the phone.
6  Q.   And did he hang up the phone?
7  A.   He did not.
8  Q.   Did he continue the conversation?
9  A.   Correct.
10  Q.   Did you repeat your order for him to
11  hang up the phone?
12  A.   Yes.
13  Q.   Approximately how many times?
14  A.   Four.
15  Q.   Four times?
16  A.   Yes.
17  Q.   He failed to follow those orders of
18  hanging up the phone?
19  A.   Yes.
20  Q.   What did you do then?
21  A.   I told him to hang up the phone, and he
22  can call the other person on the line back.  After
23  the fourth time, I reached over and pushed down the
24  receiver.

Page 71

1  Q.   And why did you do that?
2  A.   Because I wanted Sergeant Berge's full
3  attention.
4  Q.   After you pressed the phone to
5  disconnect the phone call --
6  A.   Disconnect the phone call.
7  Q.   -- then what happened?
8  A.   Then Sergeant Berge hung up the phone,
9  and then I told him that -- Excuse me.  I hung up
10  the phone, and then I told him that he was relieved
11  of duty, that he needed to gather his things and
12  leave the police department.
13  Q.   And did he immediately follow your order
14  and gather his belongings and leave the sergeants'
15  office in the police department?
16  A.   He did not.
17  Q.   And Sergeant Klopp, was he in the
18  office?
19  A.   Yes.
20  Q.   The sergeants' office?
21  A.   Yes.
22  Q.   At some point, Sergeant Tyson left the
23  office?
24  A.   Correct.

Page 72

1  Q.   Was that before Sergeant Klopp came into
2  the office?
3  A.   At some point, Sergeant Tyson left the
4  office to conduct the shift meeting I believe and
5  Sergeant Klopp came in to speak with the two of us.
6  Q.   And as the meeting between you and the
7  sergeant progressed, were voices raised?
8  A.   Yes.
9  Q.   Both you and the sergeant?
10  A.   Yes.
11  Q.   Was there yelling and screaming?
12  A.   I believe voices were raised.  I don't
13  know if there was any screaming.
14  Q.   Do you believe your voices could be
15  heard out in the squad room?
16  A.   Absolutely.
17  Q.   While you were having this conversation
18  with Sergeant Berge, were you in the vicinity of a
19  window, a glass window that could be seen in the
20  squad room?
21  A.   Yes.
22  Q.   Do you believe that the actions that
23  took place between you and Sergeant Berge were
24  visible to individual officers in the squad room?

DEFENDANTS 001726

Page 73

1    A.    Visible and audible, yes.
2    Q.    And at that time, is that just before a
3  shift change?
4    A.    Correct, it was at shift change.  1:45
5  is when the shifts change.  So second shift would
6  have been coming in for their shift briefing while
7  first shift would have been coming in to go off
8  shift.
9    Q.    Approximately how many officers and
10  supervisors would be in and around the squad room
11  at that time?
12    A.    Somewhere from 12 to 15 officers.
13    Q.    Do you have an opinion of whether or not
14  Sergeant Berge's statements to you were
15  insubordinate?
16          MR. HERBERT: Objection.  He's not an
17  expert witness.  He's not making the decision.  His
18  opinion is irrelevant.
19          MR. KELLY: Overruled.  It's his opinion
20  as to whether or not they were insubordinate.  The
21  ultimate question will be for the commission, but
22  the commander can state whether he thought it was.
23  BY THE WITNESS:
24    A.    Yes, I believe his statements to me were

Page 74

1  insubordinate.
2    Q.    During your conversation with Sergeant
3  Berge, did he disobey multiple direct orders you
4  gave him?
5    A.    Yes.
6    Q.    And do you find that to be insubordinate
7  in itself?
8    A.    Yes.
9    Q.    Was he discourteous to you?
10    A.    Yes.
11    Q.    Was he disrespectful to you?
12    A.    Yes.
13    Q.    Were you ever aggressive physically
14  towards Sergeant Berge?
15    A.    No, sir.
16    Q.    Did you then file a written report and
17  forward that on to Chief Kosman?
18    A.    Yes.
19    Q.    And that report, is it dated July 16th,
20  2020?
21    A.    Yes.
22    Q.    And in the report, did you indicate --
23          MR. HERBERT: I'm going to object to
24  leading.

Page 75

1          MR. KELLY: Sustained.
2  BY MR. McGRATH:
3    Q.    In your report, did you indicate any
4  policy violations?
5    A.    Yes.  341.5, I believe, F, Frank, for
6  subordination.
7    Q.    I'm going to ask you a couple strange
8  questions.  Did you ever put your foot on the desk
9  when you were on the opposite side of the desk with
10  Sergeant Berge?
11    A.    No.
12    Q.    Did you ever put your foot on a chair by
13  the desk while you were speaking with Sergeant
14  Berge?
15    A.    No.
16    Q.    I'm going to apologize to the commission
17  and yourself, but I need to ask this question.  It
18  will be clear later on in the hearing.  Did you
19  ever thrust your waist or crotch area towards
20  Sergeant Berge?
21    A.    No.
22    Q.    Did you ever thrust your waist or crotch
23  towards Sergeant Berge's face?
24    A.    No.

Page 76

1          MR. McGRATH: Thank you, Commander.
2  That's all I have.
3          MR. KELLY: Chief's Exhibit No. 2?
4          MR. McGRATH: I'm sorry.  Thank you.  I
5  ask that that be admitted also.
6          MR. HERBERT: No objection.
7          MR. KELLY: Chief's Exhibit No. 2 is
8  admitted without objection.
9          Mr. Herbert, it's your witness.
10          MR. HERBERT: Thank you.
11          CROSS-EXAMINATION
12  BY MR. HERBERT:
13    Q.    Good evening, Commander.  How are you?
14    A.    Fine, sir.
15    Q.    Sir, you were in the military; is that
16  correct?
17    A.    Yes, sir.
18    Q.    And you would agree that there's
19  differences between the military and the police
20  department, correct?
21    A.    Yes.
22    Q.    And certainly the police department does
23  not follow all the rules and regulations of the
24  military, correct?

DEFENDANTS 001727

Page 77

1    A.   No, sir.
2    Q.   Police department is much less
3   structured than the military, correct?
4        MR. McGRATH: Objection, form of the
5   question.
6        MR. KELLY: Overruled.
7        You can answer.
8   BY THE WITNESS:
9    A.   Repeat the question, please.
10   Q.   You would agree that the Kankakee Police
11   Department is certainly much less structured than
12   the United States military?
13   A.   Yes, sir.
14   Q.   You were appointed commander?
15   A.   Yes, sir.
16   Q.   And that was approximately two years
17   ago?
18   A.   Yes, sir.
19   Q.   And who appointed you?
20   A.   At the time, Chief Preston [sic].
21   Q.   And you gave a definition of
22   insubordination, and I wrote it down.  And tell me
23   if this is what you remember saying.  "When an
24   officer or employee does not follow a directive of

Page 78

1   a supervisor, and that includes being
2   disrespectful."  Does that sound about right what
3   you said?
4    A.   Yes.
5    Q.   And that's your definition of
6   insubordination, correct?
7    A.   Right.
8    Q.   You would agree with me that the police
9   department, Kankakee Police Department, has rules
10   and regulations, correct?
11   A.   Yes, sir.
12   Q.   They have a collective bargaining
13   agreement, correct?
14   A.   Yes.
15   Q.   And fair to say that the policies are
16   approximately 750 pages alone?
17   A.   Yes, sir.
18   Q.   And in there includes all of the
19   discipline -- or I'm sorry -- all the department
20   rules, correct?
21   A.   Yes.
22   Q.   And it also provides definitions for
23   various types of infractions, correct?
24   A.   Correct.

Page 79

1    Q.   And you would agree with me that nowhere
2   in any of those documents does it contain the
3   definition of insubordination such as the one you
4   just gave?
5    A.   That is why I utilized the department's
6   definition when writing my report.
7    Q.   I don't think that was the question,
8   though.  You would agree with me that your
9   definition that you just testified to the ladies
10   and gentlemen of the board, that doesn't contain --
11   that's not contained anywhere in the department
12   policies or collective bargaining agreement or
13   anything issued by the department, correct?
14   A.   When I was asked the question, it was
15   what is my definition of insubordination.
16   Q.   Not my question.
17   A.   So that's --
18   Q.   Not my question.  Well, let's go there.
19   So this definition is your definition, correct?
20   A.   That answer, yes, sir.
21   Q.   And you don't know if it's the same as
22   the Chief's definition, correct?
23   A.   No.
24   Q.   And you don't know if it's the same as

Page 80

1   Sergeant Berge's definition, correct?
2    A.   No.
3    Q.   And if somebody violates a policy of the
4   Kankakee Police Department and the policy is based
5   upon your interpretation and not the department's,
6   that wouldn't be fair, would it?
7        MR. McGRATH: Objection, form of the
8   question.
9        MR. KELLY: Sustained.
10   BY MR. HERBERT:
11   Q.   You would agree with me that somebody
12   cannot be disciplined simply because they didn't
13   agree with your definition of a policy violation,
14   correct?
15       MR. McGRATH: Objection, form of the
16   question and he's not bringing the discipline.
17       MR. KELLY: I think he can answer that
18   question.
19   BY THE WITNESS:
20   A.   One more time for the question, please.
21   Q.   Sure.  Sergeant Berge is here alleged to
22   have been insubordinate to you, correct?
23   A.   Yes.
24   Q.   And you believe he was insubordinate to

DEFENDANTS 001728

Page 81

1  you?
2     A.   Yes.
3     Q.   And your belief is based upon your
4  definition of what you believe insubordination is,
5  correct?
6     A.   Yes.
7     Q.   And that's why you filed the complaint
8  because you believe, based upon your definition of
9  insubordination that you filed, that he was
10 insubordinate, correct?
11    A.   I filed my complaint based on the
12 departmental's definition of insubordination.  The
13 question asked here was what was my opinion or what
14 was my definition.  The complaint was based on the
15 departmental definition of insubordination.
16    Q.   Okay.  What is the departmental
17 definition of insubordination?
18    A.   As you stated --
19    Q.   I'm asking you what you --
20    A.   As you stated, there's 750 pages of
21 departmental policy.  At this point in time,
22 without a chance to recall or look at it, I can't
23 tell you.  If I can look at my particular
24 statement, I can tell you.  Do I have an

Page 82

1  opportunity to look at my statement?
2     Q.   Did you check what the department's
3  policy was when you made this subjective complaint
4  that Sergeant Berge was insubordinate to you?
5     A.   Yes.
6     Q.   Okay.  And when did you do that?
7     A.   When I wrote my statement.
8     Q.   And what did you check?
9     A.   I checked the departmental policy.
10    Q.   And is it your testimony that that
11 policy -- you checked that and you were provided a
12 definition of insubordination?
13    A.   The policy has a statement as to what
14 insubordination is.
15    Q.   And what is that statement as you sit
16 here today?
17    A.   As I said, if I can review my statement,
18 I can tell you that.
19    Q.   As you sit here today as a commander in
20 a police department, you don't know what the
21 department's policy is with respect to
22 insubordination?
23    A.   I cannot recite each policy to you.
24    Q.   Tell me what you know of it.

Page 83

1     A.   I can't recite each policy to you, and
2  I'm not going to try to.
3     Q.   Well, you would agree that to violate a
4  direct order of the police department, that it
5  would be -- it's contingent upon the fact that the
6  officer knew what the policy was?  Do you
7  understand that question?
8     A.   Yes, sir.
9     Q.   A willful violation of the policy,
10 correct?
11         MR. McGRATH: Object to the form of the
12 question.
13         MR. KELLY: Overruled.
14 BY MR. HERBERT:
15    Q.   A willful violation of the policy,
16 correct?
17    A.   Yes.
18    Q.   And so as you sit here today, without
19 knowing -- You're on duty, correct?
20    A.   No, I'm not.
21    Q.   As you sit here today in full uniform
22 with the radio on, but not on duty, you don't know
23 what the definition of insubordination is per the
24 department, correct?

Page 84

1         MR. McGRATH: Objection, asked and
2  answered.
3         MR. KELLY: Sustained.
4  BY MR. HERBERT:
5     Q.   So you don't know what -- you don't know
6  if you said something to the Chief in the hallway,
7  you don't know if it can be considered by the
8  department to be insubordination, correct?
9     A.   No, that's not correct.
10    Q.   Okay.  And you said that it includes
11 being disrespectful?  That is -- That was part of
12 your definition of insubordination, correct?
13    A.   Yes.
14    Q.   Okay.  And you talked about not just an
15 officer, but any employee that doesn't follow a
16 directive of a supervisor.  Do you remember saying
17 that?
18    A.   Yes.
19    Q.   So any employee of the police department
20 that doesn't follow an order is guilty of
21 insubordination per your definition, correct?
22    A.   Yes.
23    Q.   So the paramilitary aspect of being a
24 civilian versus being a police officer, that's

DEFENDANTS 001729

Page 85

1  irrelevant with respect to insubordination,
2  correct?
3        MR. McGRATH: Objection, form of the
4  question.  Is he talking about the police
5  department or a civilian?
6  BY MR. HERBERT:
7     Q.   Well, you know what I'm talking about,
8  right?
9        MR. KELLY: Overruled.
10 BY MR. HERBERT:
11    Q.   You know what I'm talking about, right?
12    A.   Rephrase the question.
13    Q.   Sure.  You're talking about civilians
14 being subjected to insubordination just like
15 officers, right?
16    A.   We have civilian employees that work for
17 the police department that report to sworn
18 officers; i.e., the Chief's secretary reports to
19 the Chief, the investigations' administrative
20 assistant reports to the investigations' commander,
21 the records' clerk and the IT personnel report to
22 Deputy Chief.
23    Q.   But when you said an officer or any
24 employee, that's any employee that is employed by

Page 86

1  the City of Kankakee?
2     A.   No, any -- when I mentioned that, I was
3  talking about any employee that works for the
4  police department and is under our instruction.
5     Q.   But you didn't say that.  You said
6  employee, whether it's an officer or an employee?
7     A.   Well, that's what I was inferring.
8     Q.   So you're including civilians in there,
9  correct?
10    A.   Uh-huh.
11    Q.   So it's your definition that a civilian
12 can be liable of being insubordinate to a
13 commanding officer; is that correct?
14    A.   To their supervisor, yes.
15    Q.   And you said includes being
16 disrespectful.  What is the definition of being
17 disrespectful?
18    A.   What's your definition of being
19 disrespectful?
20    Q.   I'm not a witness in the case right now.
21 So you have to answer my questions.
22    A.   Being curt or discourteous.
23    Q.   Being curt or discourteous, that is your
24 definition of disrespectful?

Page 87

1     A.   Yes.
2     Q.   What does it mean to be curt?
3     A.   To say things that are contradictory, to
4  say things that are adversarial when a supervisor
5  is trying to give you direction and you disagree in
6  a way that is objectionable.
7     Q.   Okay.  Any other definition that you
8  have of being curt?
9     A.   No.
10    Q.   And what was the other, curt or --
11    A.   Discourteous.
12    Q.   Discourteous.  What is your definition
13 of discourteous?
14    A.   To be not courteous, to say things that
15 are disrespectful and not courteous.
16    Q.   And what -- Is your definition of
17 disrespectful the same as the department's
18 definition of disrespectful?
19    A.   Well, the thing is is that's the reason
20 why -- My complaint goes to --
21    Q.   Not my question.
22    A.   My complaint goes to --
23    Q.   Hold on.  You've got to answer my
24 question, though.

Page 88

1     A.   -- the Chief, who ascertains whether the
2  complaint has merit.
3     Q.   I get it, but that wasn't my question
4  I'm going to ask it again.  If you don't understand
5  it, tell me.  Is your definition of disrespectful,
6  curt, discourteous, is that the same as the
7  department's definition of disrespectful?
8     A.   There is no part of our department
9  policy that fits every scenario or explains or
10 defines each scenario where someone can be
11 discourteous, disrespectful, or insubordinate.
12    Q.   What is the department's policy of
13 disrespectful?
14    A.   It just says that.  It doesn't say if
15 you do this, this is disrespectful; if you do that,
16 it is disrespectful.  That's left up to the
17 interpretation of the chief of police and the
18 police and fire commission.
19    Q.   Interpretation is important, right?
20 Right?
21    A.   Yes.
22    Q.   Because what's disrespectful to one
23 person might not be disrespectful to the other
24 person, correct?

Page 89

1  A. Yes.
2  Q. What's seen as disagreeing or being
3  adversarial with one person might not seem that way
4  to another person, correct?
5  A. Yes.
6  Q. And that includes supervisors, right?
7  What you find contradictory or adversarial, another
8  supervisor might see it totally different, correct?
9  A. Yes.
10  Q. And you said disagree. So if an
11  employee disagrees with you, that employee is being
12  curt, therefore, insubordinate?
13      MR. McGRATH: Objection, form of the
14  question.
15      MR. KELLY: Sustained.
16  BY MR. HERBERT:
17  Q. You said that one of the definitions of
18  curt was disagreement, adversarial. Do you
19  remember saying that?
20  A. Yes.
21  Q. Is it your testimony for the board here
22  that, if a subordinate disagrees with you, that
23  they are being curt?
24  A. If a subordinate disagrees with me when

Page 90

1  I've given them a lawful order and they object in a
2  way that is disrespectful and/or curt, yes. An
3  employee can disagree --
4  Q. There's no question pending.
5  A. I was answering the rest of your
6  question.
7  Q. You talked about how there was an
8  ongoing complaint at this funeral home?
9  A. Yes.
10  Q. And the document that you were shown, I
11  believe it was Chief Exhibit --
12      MR. HERBERT: Was it 2, Mike, or 1 and
13  2?
14      MR. McGRATH: That was 1. 1 was the CAD
15  sheet, and 2 is the e-mail.
16  BY MR. HERBERT:
17  Q. And the Exhibit 1 and 2, do you have
18  them there?
19  A. Yes, sir.
20  Q. You did not -- You did not prepare those
21  documents, correct?
22  A. Did not.
23  Q. And as far as Exhibit No. 2 where it
24  talks -- you talk about in your testimony, I

Page 91

1  believe you said, that it goes from, you said,
2  June 20th to July 6th. Do you remember saying
3  that?
4  A. Yes.
5  Q. Well, if you look at it, there's also
6  dates in here from June 4th, June 14th. So you
7  misspoke?
8  A. Yes, I did.
9  Q. That's okay. And you were aware of all
10  of these complaints that are referenced in Exhibit
11  -- Chief Exhibit 2?
12      MR. McGRATH: Objection, misstates the
13  evidence.
14      MR. KELLY: Sustained.
15  BY MR. HERBERT:
16  Q. Were you --
17      MR. KELLY: I think you're referring to
18  No. 1, the CAD?
19      MR. HERBERT: No. I'm talking about 2.
20  Isn't that the P CAD or the CAD?
21      MR. KELLY: No. That's No. 1. The
22  e-mail chain from the alderwoman to the deputy
23  chief is the --
24      MR. HERBERT: 2?

Page 92

1      MR. KELLY: Is 2.
2      MR. HERBERT: Thank you.
3  BY MR. HERBERT:
4  Q. E-mail -- I'm sorry. Exhibit No. 1, do
5  you see that there? That's the printout that you
6  were shown?
7  A. Yes.
8  Q. And is it your -- When did you become
9  aware that this document -- Or strike that.
10      Were you aware of the contents
11  within this document at any point?
12  A. When are you asking me when I was aware?
13  Q. Bad question. When did you first see
14  this document, Exhibit 1?
15  A. Just in recent weeks.
16  Q. Okay. So after this case had been filed
17  by the Chief?
18  A. Correct.
19  Q. And so when you said that you had seen
20  people, you saw criminal activity going on at that
21  location?
22  A. The complaint was loitering, and we
23  seen -- I have seen individuals loitering in that
24  area.

Page 93

1  Q.   Okay.  When had you seen individuals
2  loitering in that area?
3  A.   I can't give you a date.
4  Q.   Was it before June 14th, 2020?
5  A.   You mean July 14th?
6  Q.   Yes.  I'm sorry.  Thank you.
7  A.   I can't recall.
8  Q.   You can't recall as you sit here today
9  whether or not you had ever seen anyone out there
10 loitering prior to this alleged incident with
11 Sergeant Berge where you allege it was based upon
12 your command at 400 South on Jefferson?
13 A.   Dearborn.
14 Q.   Dearborn.
15 A.   What I'm saying to you is that there are
16 multiple incidents of people loitering in the
17 community.  Do I recall --
18 Q.   I'm asking what you saw.
19 A.   Do I recall someone being in that
20 address loitering?  Yes.  Do I recall what date?
21 No.
22 Q.   Multiple times?
23 A.   More than once, yes.
24 Q.   You saw it?

Page 94

1  A.   More than once, yes.
2  Q.   You never made an arrest there, did you?
3  A.   No.
4  Q.   So you saw people committing municipal
5  ordinance violations, and you didn't take any
6  police action to arrest them?
7  A.   What I did is call my subordinates and
8  say, hey, we need to do an extra watch in that
9  area.
10 Q.   When did you call your subordinates to
11 tell them we need to do an extra watch --
12 A.   I've talked to --
13 Q.   Hold on.  Let me finish the question.
14 A.   Again --
15 Q.   You've got to let me finish the
16 question.
17 A.   Sure.
18 Q.   When did you call your subordinates to
19 tell them to do a -- what did you call it? -- a
20 watch on that area?
21 A.   I put out a myriad of different
22 directives to the patrol division.  Do I know
23 exactly what date and time?  No.
24 Q.   Okay.  What -- So you put out

Page 95

1  directives.  Is that a written directive?
2  A.   At times there are written directives,
3  at times I send text messages, at times I just say
4  something verbally to the shift commander at the
5  time or whoever the supervisor is at the time.
6  Q.   How many written directives did you send
7  prior to July 15th, 2020, at that location,
8  400 South Dearborn?
9  A.   I would have to review my records to be
10 able to tell you.  I don't know.
11 Q.   But a written directive, there certainly
12 would be record of that, correct?
13 A.   There should be.
14 Q.   You can obtain that, correct?
15 A.   There should be.
16 Q.   So if you send out a written directive
17 prior to July 15th, 2020, about that address, we
18 can get that record?
19 A.   It's possible.  In our intranet, which
20 is the Zimbra, we send multiple messages out
21 through that to our officers and I send it to the
22 supervisors or I send it to the entire patrol
23 division or I'll send it to the entire department.
24 That system, after a period of 30 days, those

Page 96

1  messages disappear.
2  Q.   Did you check in this case to see
3  whether or not these written directives that you
4  sent out about 400 South Dearborn, the address
5  subject to the charges against Paul Berge, did you
6  check to see whether or not that evidence existed?
7       MR. McGRATH:  Objection, form and
8  foundation.
9       MR. KELLY:  Sustained.  He can ask if he
10 checked.  Whether it's evidence or not, I think
11 that's probably open for the commission, but ...
12 BY THE WITNESS:
13 A.   No.
14 Q.   So you testified that you received an
15 e-mail from the alderman, correct?
16 A.   I received the e-mail from the deputy
17 chief.
18 Q.   Okay.  And that you told Paul Berge
19 to -- What did you tell him to do?
20 A.   I told him to ensure that our personnel
21 go over there and check; and if there were city
22 ordinance violations, if we could issue the
23 appropriate citations.
24 Q.   Did you issue a written directive in

Page 97

1  this case?
2     A.   No.  That was a phone call, the phone
3  call.
4     Q.   Hold on.
5     A.   Phone call and a face-to-face
6  conversation.
7     Q.   You did not issue a written directive to
8  Sergeant Berge to go over and do anything at
9  400 South Dearborn?
10     A.   No.
11     Q.   But prior to getting this e-mail and
12  telling Mr. Paul Berge, you are aware of numerous
13  instances of criminal activity going on at
14  400 South Dearborn?
15     A.   There were multiple locations in that
16  vicinity that we've had criminal activity and/or
17  loitering or complaints of the such.
18     Q.   And one of those was 400 South Dearborn?
19     A.   Correct.  We had problems at the gazebo.
20  We had problems at the depot.  We've had problems
21  at the old Tyson Engineering, and we've had
22  problems with people hanging out in front of Key
23  City Liquors.  So those are all locations in the
24  downtown area where we've had issues.  So most of

Page 98

1  the day shift officers, if not all the day shift
2  officers, understand what those problem areas are.
3     Q.   And you testified that with Sergeant
4  Berge you asked to make sure that they go by there
5  and check on that place.  Do you remember
6  testifying to that?
7     A.   Yes.
8     Q.   Was that a direct order that you gave to
9  Paul Berge?
10     A.   Yes.
11     Q.   Okay.  And if you see any violators,
12  violations, issue them a citation?  Is that what
13  you testified to earlier today?
14     A.   What I said is that if the officers --
15     Q.   Well, hold on.  I'm talking about this
16  specific point.
17         MR. KELLY: Let him answer the question.
18  He was answering the question.  Don't cut him off.
19  Just let him answer.
20         MR. HERBERT: Then I'm going to object
21  to nonresponsive, but go ahead.
22         MR. KELLY: You don't know.  He hasn't
23  answered.
24  BY MR. HERBERT:

Page 99

1     Q.   Go ahead.
2     A.   Could you repeat the question?
3     Q.   Nah.  I'll ask a different question.
4  But you told Paul Berge that if there was any
5  violations, that a citation should be issued,
6  something along those lines, correct?
7     A.   That we should probably issue citations.
8  Officer discretion is officer discretion.
9     Q.   Was that a direct order to Sergeant
10  Berge?
11     A.   It was a direct order that we have
12  someone go by there and check on that address, yes.
13     Q.   And somebody did, in fact, go by there,
14  police, correct?
15     A.   Yes.
16     Q.   So Paul Berge did not violate the direct
17  order to have somebody go by there, correct?
18     A.   No.
19     Q.   So with respect to -- with that order,
20  that certainly is not what you believe Berge was
21  insubordinate for?
22     A.   No.
23     Q.   And I think you said, Do you think you
24  can go by and check on this?  You said that to Paul

Page 100

1  Berge, correct?
2     A.   In the morning, that's what I said.  In
3  the phone call, I said we need to make sure that
4  our guys go by and issue -- if it's possible, to
5  issue the necessary or the appropriate city
6  ordinance violations.
7     Q.   And you said that you went into the
8  sergeants' office, correct?
9     A.   Yes.
10     Q.   And you went in there because you wanted
11  to know what happened with that 400 South Dearborn?
12     A.   Yes, sir.
13     Q.   You were not at 400 South Dearborn that
14  day, correct?
15     A.   No.
16     Q.   You don't know what was going on there,
17  correct?
18     A.   No, I didn't have time to go by there.
19     Q.   And you talked about how you were calm
20  and not upset at any point, correct?
21     A.   Yes, sir.
22     Q.   And then you talked about how Sergeant
23  Berge had his feet kicked up on the desk and he was
24  leaning back in his chair?

Page 101

1   A.   Yes, sir.
2   Q.   Was that a violation of a policy,
3   Sergeant Berge doing that?
4   A.   No.
5   Q.   Was Sergeant Berge being insubordinate
6   to you based upon those actions?
7   A.   No.
8   Q.   And then you sensed that something was
9   wrong with Sergeant Berge.  You testified to that,
10  correct?
11  A.   Yes.
12  Q.   And did you think he was intoxicated?
13  A.   I could not tell what his state of mind
14  was.  I just knew that he appeared to be
15  incoherent.
16  Q.   Well, you did allege that you believed
17  he was intoxicated at some point, correct?
18  A.   I said that he may be intoxicated or
19  something to that nature or just tired because he
20  did say that he was tired.
21  Q.   You said that you asked him twice, and
22  he didn't respond to you to both requests, correct?
23  A.   Asked him what twice?
24  Q.   You called his name out, and he didn't

Page 102

1   respond twice?
2   A.   Correct.
3   Q.   Those are not violations?  Those were
4   not -- He wasn't being insubordinate with those
5   actions, correct?
6   A.   At the time, it seemed as though he was
7   trying to just ignore my presence.
8   Q.   So at the time, you believed he was
9   being insubordinate?
10  A.   At the time, I was trying to ascertain
11  what was going on with Sergeant -- At the time, I
12  was trying to ascertain what was going on with
13  Sergeant Berge because I didn't know if he was
14  tired, under some kind of intoxicating compounds.
15  I didn't know what his situation was.
16  Q.   Okay.  And then when he didn't respond
17  to you, you tapped on the desk, right?
18  A.   After several more attempts to get his
19  attention.
20  Q.   How many times total to get his
21  attention?
22  A.   Somewhere between three and five.  I
23  don't know.
24  Q.   And then you approached his desk; is

Page 103

1   that correct?
2   A.   Yes.
3   Q.   Did you ever tell him take his feet off
4   the desk?
5   A.   No.
6   Q.   And you hit his desk.  You did it
7   four times when you demonstrated it.  Does that
8   sound like the number you hit it?
9   A.   Sounds like, right, yes.
10  Q.   And you talked about how you got as
11  close to smell his breath; do you remember making
12  that statement?
13  A.   I did not say I got as close to smell
14  his breath.  I said that he got into my space close
15  enough I could almost smell his breath.
16  Q.   Did you smell alcohol?
17  A.   I did not.
18  Q.   Drinking while on duty certainly is a
19  serious allegation; you would agree?
20  A.   Yes.
21  Q.   And it's not an allegation that should
22  be made unless it's based upon fact, correct?
23  A.   That's correct, but I never said
24  anything about alcohol.

Page 104

1   Q.   Okay.  Well, we'll get to that because
2   you did claim that Sergeant Berge may have been
3   intoxicated.  Do you remember that?
4   A.   I said he appeared to be intoxicated.
5   Q.   And what other reasons other than what
6   you testified to did it appear that Sergeant Berge
7   was intoxicated?
8   A.   Because he was making incoherent
9   statements, some that weren't even discernible.
10  Q.   And you said that the phone rang, and
11  then you told him to hang up the phone, correct?
12  A.   Yes, sir.
13  Q.   And you don't know -- You didn't know
14  who was on the phone at that time, correct?
15  A.   No, sir.
16  Q.   And you would agree that that's part of
17  a sergeant's duties is to answer the telephone when
18  it rings in their office, correct?
19  A.   Yes.
20  Q.   And you pushed down the receiver.  And
21  at that point, you didn't know who was on the
22  phone, correct?
23  A.   Yes, I did because Sergeant Berge told
24  me that Mrs. Jennings was on the line.

Page 105

1  Q.  Who's Ms. Jennings?
2  A.  Mrs. Jennings is a records clerk.
3  Q.  So it's police-related business,
4  correct?
5  A.  Correct.
6  Q.  And you told him to leave the police
7  department, gather your things and leave the police
8  department?  Do you remember saying that?
9  A.  I told him that he was relieved of duty,
10  and he should gather his things and leave.
11  Q.  And he did leave, correct?
12  A.  He did not leave as I told him to leave.
13  He left because Sergeant Klopp told him that he
14  probably should leave.  If the commander is giving
15  you an order, then you should probably leave and
16  that's when he left.
17  Q.  You told him to leave, and he left
18  sometime after that, correct?
19  A.  Yes.
20  Q.  And you made a complaint about -- You
21  have a duty to make a complaint about inappropriate
22  behavior in the workplace, correct?
23  A.  Yes.
24  Q.  You have a duty to report misconduct

Page 106

1  that you witness from anyone in the workplace,
2  correct?
3  A.  Yes.
4  Q.  And you heard -- You were asked a lot of
5  questions about did you ever put your -- I don't
6  know how you refer to your middle section -- did
7  you stick that in the face of Sergeant Berge at any
8  point.  Do you remember being asked questions about
9  that?
10  A.  I was asked questions about that.
11  Q.  And, in fact, you know as you sit here
12  today, that Sergeant Berge claimed that he was
13  intimidated by your actions, correct?
14  A.  He claimed that, yes.
15  Q.  And you know that he claimed that you
16  stuck his [sic] crotch right in your face, correct?
17  A.  I don't know how he would stick his
18  crotch -- I would stick his crotch in his face
19  because that's what you said.
20  Q.  You're probably right.
21          Well, let's try it a different
22  way.  You're aware of the fact that he alleged you
23  stuck your crotch in his face, correct?
24  A.  I'm aware of that allegation, yes.

Page 107

1  Q.  And that would certainly be improper
2  behavior by a commanding officer in a police
3  department?
4  A.  It would be improper behavior by anyone
5  in the police department.
6  Q.  I agree.
7          And your duty to make -- to
8  report the infractions that you see in the
9  workplace, that is pursuant to the department
10  policy, correct?
11  A.  Correct.
12  Q.  And you're required to make the report
13  to the appropriate supervisor, correct?
14  A.  Yes.
15  Q.  And you did that in this case, correct?
16  A.  I was not aware of that allegation until
17  I heard about Sergeant Berge's interrogation.
18  Q.  You're talking about the allegation
19  where you're the accused for the sexual harassment.
20  I'm not talking about that one.  I'm talking about
21  the case that brings us here today for Sergeant
22  Berge.  You made a complaint against him for being
23  insubordinate, correct?
24  A.  Yes.

Page 108

1  Q.  And that's -- you were required to do
2  that, correct?
3  A.  Yes.
4  Q.  And you're required to document any and
5  all the reasons -- or any and all of the
6  infractions that you saw that substantiate your
7  complaint, correct?
8  A.  Yes.
9  Q.  And you provide this in a report,
10  correct?
11  A.  Yes.
12  Q.  And that report is an official
13  department report, correct?
14  A.  Yes.
15  Q.  And any intentional falsifications in
16  that report would subject you to discipline,
17  correct?
18  A.  Yes.
19  Q.  It would be a violation of department
20  policy, correct?
21  A.  Yes.
22  Q.  And you are required to -- As soon as
23  you witness an infraction, you have a duty to take
24  immediate action, correct?

DEFENDANTS 001735

Page 109

1    A.   Yes.
2    Q.   To make a notification immediately,
3  correct?
4    A.   Yes.
5    Q.   In this case, you didn't do that?  You
6  did not make the notification until the following
7  day, July 16th, 2020?
8    A.   That's not accurate.
9    Q.   Okay.  Well, you prepared a To/From,
10  correct?
11    A.   Yes.
12    Q.   And that's the complaint that you made
13  against Sergeant Berge concerning what you have
14  just testified to today?
15    A.   May I answer your question?
16    Q.   I hope you will.  Please.
17    A.   Okay.  Immediately after the incident
18  happened, I immediately went to my direct
19  supervisor and notified them of what happened,
20  prepared my written report, and submitted it the
21  next day.
22    Q.   Who did you go to?  Who was your direct
23  supervisor?
24    A.   Deputy Chief Hunt.

Page 110

1    Q.   And you went to him on July 15th?
2    A.   I believe so, yes.
3    Q.   Well, believe so.  Was it the same day
4  that you had this alleged blowup with Paul Berge?
5    A.   Absolutely.  I went to my direct
6  supervisor and told him what happened directly
7  afterwards.
8    Q.   How long after you had this argument
9  with Paul Berge did you go to your direct
10  supervisor, Chief Hunt?
11    A.   Minutes.  Minutes after this happened, I
12  went to my supervisors and advised them what had
13  occurred.
14    Q.   You said supervisors.  Who else did you
15  advise --
16    A.   Chief and Deputy Chief.
17    Q.   Excuse me.  Let me finish the question
18  just so the court reporter is --
19    A.   Okay.  Deputy Chief and Chief, I told
20  them what happened.
21    Q.   Deputy Chief and Chief.  You went and
22  told them --
23    A.   That I had --
24    Q.   Hold on.  Did you tell them -- Were they

Page 111

1  together when you told them about this?
2    A.   No, I don't believe so.
3    Q.   Who did you speak to first?
4    A.   Deputy Chief Hunt.
5    Q.   Where did this meeting take place?
6    A.   In his office.
7    Q.   Okay.  And what did you tell him?
8    A.   I had to relieve Sergeant Berge of duty.
9    Q.   Anything else?
10    A.   I don't recall what else happened.  I
11  just remember telling him that I had to relieve him
12  of duty.
13    Q.   And were you told to document any
14  complaints you had against him?
15    A.   Yes.
16    Q.   And then you went and talked to the
17  Chief?
18    A.   I believe so.
19    Q.   So what time do you think this was when
20  you went and spoke to the Chief?
21    A.   I don't recall.
22    Q.   And you told the Chief -- What did you
23  tell the Chief?
24    A.   Just basically -- excuse me -- that I

Page 112

1  had to relieve Sergeant Berge of duty.
2    Q.   Did you tell them about the
3  insubordinate acts?
4    A.   I don't recall.  I know that I was still
5  trying to decompress and trying to recollect
6  everything that had occurred.
7    Q.   So you had a duty to report misconduct
8  that you believed occurred with Sergeant Berge.
9  And as you testified today, your testimony is that
10  you went and spoke to your deputy chief and the
11  chief and you may not have reported the misconduct
12  of Sergeant Berge; is that your testimony?
13        MR. McGRATH:  Objection, misstates the
14  testimony.
15        MR. KELLY:  Overruled.  I don't think it
16  misstates the testimony.
17  BY THE WITNESS:
18    A.   So I told them that I had to relieve him
19  of duty.
20    Q.   Not my question, though.
21    A.   What was your question?
22    Q.   My question is --
23    A.   Did I tell them about the misconduct?
24    Q.   Hold on.  Did you tell them about the

DEFENDANTS 001736

Page 113

1  insubordinate acts that you believe occurred with
2  Sergeant Berge when you went and spoke to them on
3  July 15th moments after this incident allegedly
4  occurred?
5      A.  I believe I told him -- told them that
6  he was being insubordinate, and that's why I
7  relieved him of duty.
8      Q.  What else did you tell them?
9      A.  I can't recall.
10     Q.  Did you tell them the specifics?
11     A.  I can't recall.
12     Q.  Well, do you think that you would have
13  if it just happened minutes ago?
14         MR. McGRATH: Objection, asked and
15  answered.
16         MR. KELLY: Sustained.
17  BY MR. HERBERT:
18     Q.  You agree -- You've conducted internal
19  investigations involving complaints made by
20  officers, correct?
21     A.  Yes.
22     Q.  And you would agree with me that if you
23  did go and make these complaints with Deputy Chief
24  Hunt and with the Chief, that they would be

Page 114

1  required to document that interview, correct?
2      A.  Yes.
3      Q.  You're looking at the file here.
4  There's no document indicating --
5      A.  I have not looked at the file.
6      Q.  Okay.  Well, would it surprise you to
7  know that there is no document that I have seen
8  that indicates that you went and reported the
9  misconduct that you believe you just witnessed with
10  a lower-ranking officer?
11     A.  I have no control over that.
12     Q.  And then you prepared a To/From you
13  said, correct?
14     A.  Yes.
15     Q.  And you prepared it the same day; is
16  that what you said?
17     A.  I started writing it, and I completed it
18  the next day.
19     Q.  What time did you complete it the next
20  day?
21     A.  I'm uncertain what exact time.
22     Q.  And do you know if it was in the
23  morning, afternoon, evening?
24     A.  I know I worked on it for quite some

Page 115

1  time.
2      Q.  Okay.  And you put in there all the
3  facts that you had -- all the infractions that you
4  had seen, correct?
5      A.  To my recollection, yes.
6      Q.  And you sent this to the Chief, correct?
7         MR. McGRATH: Objection, form of the
8  question, asked and answered.
9         MR. KELLY: Overruled.  I don't think
10  he's asked -- he's been asked that question yet.
11  BY MR. HERBERT:
12     Q.  Do you remember the question?
13     A.  Yes.  Did I send it to the Chief was the
14  question.
15     Q.  Yeah.  You read your To/From before you
16  testified here today, correct?
17     A.  Yes.
18     Q.  The one you sent to the Chief?
19     A.  Wasn't it sent to the Deputy Chief and
20  then CC'd the Chief?
21     Q.  No.  It says "To Chief Kosman."  So you
22  know what I'm talking about right, that To/From?
23     A.  Yes.
24     Q.  And in there you indicated that Sergeant

Page 116

1  Berge was either very tired or intoxicated.  Do you
2  remember saying that?
3      A.  Yes.
4      Q.  And did you gain any other information
5  to make the determination that he may have been
6  intoxicated other than what you've testified to
7  today because you wrote this obviously after that?
8  Were there any other facts that occurred that led
9  you to believe that Sergeant Berge was maybe
10  intoxicated?
11     A.  Well, due to the fact that -- of the
12  heightened agitation of Sergeant Berge at the
13  time --
14     Q.  Not my question.
15     A.  Well, I'm answering the question.
16     Q.  Okay.  Go ahead.
17     A.  So due to the fact that he was highly
18  agitated, hollering, yelling, screaming, getting
19  into close proximity of myself, there was no way
20  for me to conduct any further test.  There was no
21  way for me to conduct field sobriety or do anything
22  to that nature or even ask -- I couldn't ask
23  Sergeant Berge to leave the office much less go to
24  the hospital for a blood draw.  So no, I wasn't

Page 117

1  able to ascertain any other evidence that he might
2  have been intoxicated because he was uncooperative
3  with just my simple question -- my simple directive
4  of to hang up the phone.  So there was no way I
5  could ask him to go to the hospital or do any
6  further tests.
7      Q.   But that's what you wanted to do, but
8  you didn't do it?
9      A.   I'm just saying that it wasn't feasible
10  at the time.
11     Q.   You would agree with me that if you had
12  a belief, a reasonable belief that one of your
13  employees under your command was intoxicated on
14  duty, you had a duty to conduct an investigation to
15  determine whether or not that fact was accurate,
16  correct?
17     A.   Yes.
18     Q.   And you didn't do it here, correct?
19     A.   Did not investigate it any further based
20  on what happened, no.
21     Q.   And you're required to follow the orders
22  of the police department, correct?
23     A.   I am required to follow the directives,
24  yes.

Page 118

1      Q.   And there is a directive that says, if
2  you see misconduct, you better --
3      A.   If we have just cause, if we have just
4  cause -- Based on the FOP contract, if we have just
5  cause, then we can require an officer to take tests
6  to determine whether his sobriety is good or not.
7      Q.   Have you been disciplined for failing to
8  conduct a proper investigation into what you
9  believed was an intoxicated employee in the
10  workplace?
11     A.   No.
12     Q.   And then you put in here with the -- to
13  the Chief that -- something about that the subjects
14  in question poured the alcohol out and were advised
15  to leave the area.  Who is that referring to?
16     A.   If you look at the statement, I said I
17  spoke with Patrolman Wynn shortly after that.  And
18  I said -- I asked him what happened.  He told me
19  that the individuals that they found at that
20  location were, in fact, drinking at that location
21  and were told to pour out their alcohol.
22     Q.   When you made the complaint to the Chief
23  and you put in there that you were aware that a
24  minority supervisor has given Sergeant Berge an

Page 119

1  order and he was noncompliant, do you remember
2  making that allegation to the Chief in your
3  To/From?
4      A.   Yes.
5      Q.   And who was that minority supervisor
6  that Sergeant Berge was not compliant with?
7      A.   Lieutenant Sneed.
8      Q.   And did you witness that incident?
9      A.   Did not.
10     Q.   What is your basis of knowledge for that
11  incident?
12     A.   It was October 3rd, 2019.  There was an
13  incident where Sergeant Berge --
14     Q.   I'm just asking, what is your knowledge?
15  How do you know?
16     A.   I'm telling you what my knowledge is
17  because --
18     Q.   I'm sorry.  Then I asked a poor
19  question.
20     A.   Okay.
21     Q.   What's the basis of your knowledge?  You
22  didn't witness the incident, correct?
23     A.   Correct.
24     Q.   Have you seen any reports?

Page 120

1      A.   Yes.
2      Q.   And Sergeant Berge wasn't found to be
3  insubordinate in that case, correct?
4      A.   To my knowledge, no.
5      Q.   Despite the fact that he was, under your
6  definition, noncompliant, correct?
7      A.   Yes.
8      Q.   And then wrapping up here, you said a
9  minority supervisor.  Did that offend you that
10  Sergeant Berge had been noncompliant with a
11  minority supervisor?
12     A.   No.  I just thought that it was a trend,
13  that he has an issue with minority supervisors.
14     Q.   Because of the incident with you,
15  correct?
16     A.   Correct, because I have never heard of
17  him having a similar incident with any White male,
18  Caucasian officer.
19     Q.   So you believe at the time you wrote
20  this letter -- Or strike that.
21          What other reasons did you have
22  other than the incident with you and the incident
23  with this lieutenant to conclude that he had a
24  problem with minority supervisors?

Page 121

1    A.   Because I received unsubstantiated
2  reports that Sergeant Berge was very upset about
3  multiple minorities being promoted, and he made the
4  statement at the podium to his subordinates, like I
5  said, unsubstantiated.
6    Q.   What does that mean, unsubstantiated?
7    A.   That means that people would talk, but
8  no one would go on record to make it record.
9    Q.   So you believe that Sergeant Berge
10  was --
11    A.   Can I finish?
12    Q.   I'll ask another question.
13    A.   Okay.
14    Q.   You believe that Sergeant Berge was --
15  had a problem with minority supervisors?
16    A.   Yes.
17    Q.   And you wanted to let the Chief know
18  that you believe that he had a problem with
19  minority supervisors, correct?
20    A.   I had no other reason to understand why
21  Sergeant Berge would be insubordinate on
22  two different occasions with just so happened to be
23  coincidentally minority supervisors.
24    Q.   You would agree that's a horrible,

Page 122

1  horrible allegation to make against somebody if, in
2  fact, it wasn't true?  You would agree with me on
3  that, wouldn't you?
4    A.   But it's an allegation that should be
5  investigated.
6    Q.   Not my question.  You would agree with
7  me that's a horrible allegation to make against a
8  White police officer that he is racist and doesn't
9  like minority supervisors?  It's a horrible
10  allegation to make against somebody; would you
11  agree if it wasn't true?
12    A.   It would be a horrible allegation
13  against any officer if it wasn't true.
14    Q.   It could destroy their career, correct?
15    A.   Against any officer.
16    Q.   Because being a racist would destroy
17  anyone's career on the police department, correct?
18    A.   If confirmed, yes.
19    Q.   You didn't confirm it.  You just alleged
20  it to the Chief to disparage his character to get
21  him fired because you believe he was racist against
22  Blacks, correct?
23    A.   No.
24        MR. HERBERT: Nothing further.

Page 123

1        REDIRECT EXAMINATION
2  BY MR. McGRATH:
3    Q.   Commander, counsel ended with stating
4  just horrible, horrible allegations against an
5  officer.  Following the formal interrogation, that
6  was the first time you had ever heard that Sergeant
7  Berge --
8        MR. HERBERT: Objection to leading.
9        MR. KELLY: Overruled.
10  BY MR. McGRATH:
11    Q.   -- that Sergeant Berge had alleged
12  against you that you thrust your crotch in his
13  face, correct?
14    A.   Yes.
15    Q.   That you got up in his face and
16  gyrated --
17        MR. HERBERT: Objection.
18  BY MR. McGRATH:
19    Q.   Thrusted towards his face, is that the
20  first time you heard that?
21        MR. KELLY: Overruled.
22  BY THE WITNESS:
23    A.   Yes, that's the first time I ever heard
24  that.

Page 124

1    Q.   The formal interrogation was at the end
2  of July as you just went through.  If there's
3  misconduct from one officer to another officer, the
4  officer that believes he was abused or there's been
5  misconduct has a duty and obligation under the
6  policies to generate a report or make a
7  complaint --
8        MR. HERBERT: Objection, misleading.
9  BY MR. McGRATH:
10    Q.   -- immediately, correct?
11        MR. KELLY: Overruled.
12  BY THE WITNESS:
13    A.   Yes.
14    Q.   You were asked that multiple times about
15  the immediacy --
16        MR. HERBERT: I'm going to have an
17  ongoing objection here to leading.
18  BY MR. McGRATH:
19    Q.   -- the immediacy of you going to the
20  Deputy Chief and Chief Kosman after the incident
21  between you and Sergeant Berge in the sergeants'
22  office, correct?
23    A.   Yes.
24    Q.   We are now two months out from that

**Kankakee Board of Fire and Police Commissioners Meeting**

**Seargeant Paul Berge
September 15, 2020**

Page 125

1  July 15th date in the sergeants' office.  Are you
2  aware of any complaint, a memo, To/From, an e-mail,
3  text, anything from Sergeant Berge to substantiate
4  or even a claim that you gyrated or thrust your
5  crotch into his face --
6      MR. KELLY: Objection --
7      THE REPORTER: You guys, I cannot take
8  you all talking at the same time.  So if we can
9  wait ...
10  BY MR. McGRATH:
11     Q.  -- until it came out at the
12  interrogation?
13      MR. HERBERT: Objection.  It's improper
14  burden shifting to allege that Sergeant Berge has
15  to do something here.
16      MR. KELLY: Mr. Herbert, you're
17  overruled.  You asked the question you asked the
18  Commander.  I'm sure that counsel gets to ask that
19  question back.
20  BY THE WITNESS:
21     A.  No, I was not aware of any allegation or
22  any complaint of that nature.  The only time I
23  heard about it was from Sergeant Berge's
24  interrogation.

Page 126

1      Q.  And certainly in the policies, are there
2  rules and regulations that pertain to alleged
3  sexual harassment or sexual misconduct in the
4  workplace?
5      MR. HERBERT: I'm going to object to how
6  this witness, based upon his prior testimony -- if
7  we're purporting him to be an expert on policy
8  knowledge, I think he's already waived that issue.
9      MR. KELLY: There's been no purporting
10  to be an expert.  He's asking him if he was aware
11  of rules that prohibit that kind of conduct.  I
12  think the commander is eminently qualified to
13  testify to that.
14  BY THE WITNESS:
15     A.  I am aware that there are rules that
16  govern any sexual misconduct and reporting of such
17  conduct.
18     Q.  And, again, you testified that the
19  policies, they're over 700 pages, correct?
20     A.  Yes.
21     Q.  And they're amended and changed
22  throughout the course of your career?
23     A.  Correct.
24     Q.  And you can't cite to exact provisions

Page 127

1  and definitions as you sit here without reviewing
2  or seeing those policies, correct?
3      A.  Correct.
4      Q.  But you're aware if someone makes an
5  allegation --
6      MR. HERBERT: Objection.
7  BY MR. McGRATH:
8      Q.  -- of sexual harassment in the
9  workplace, that that should be reported
10  immediately?
11      MR. HERBERT: Objection.  Who's
12  testifying here?
13      MR. KELLY: He can answer -- Overruled.
14  He can answer the question.
15  BY THE WITNESS:
16     A.  Yes.
17     Q.  You were asked a lot of questions about
18  policies and procedures.  You did testify that in
19  your report you cited to 341.3.5, performance,
20  correct?
21     A.  Correct.
22     Q.  And you were able to testify to that
23  without reviewing your report as I recall, correct?
24     A.  Yes, sir.

Page 128

1      Q.  I'm going to just show you.  Commander,
2  341.3.5 is a number of subparagraphs, correct?
3      A.  Correct.
4      MR. KELLY: Mr. McGrath, is this an
5  exhibit?
6      MR. McGRATH: It's not.
7      MR. KELLY: Is it refreshing his
8  recollection?
9      MR. McGRATH: Yes.
10      MR. HERBERT: Well, actually, no.  I
11  object.  He claims he didn't need to have anything
12  refreshed, that he actually cited 34.1.  So I don't
13  know why we're showing him this document.
14  BY MR. McGRATH:
15     Q.  Can you recite to subparagraphs A
16  through Z of that section?
17     A.  No.
18     Q.  Can you recite to subparagraphs AA, AB,
19  AC, AD, AE, AF of that section?
20     A.  No, sir.
21     Q.  If I showed it to you, would it refresh
22  your memory or would you be able to tell the
23  commission what those sections --
24      MR. HERBERT: If I can, I am not going

DEFENDANTS 001740

Page 129

1 to object to the introduction of this document if
2 that makes it easier for you. If you want -- The
3 board can take judicial notice of this. So I don't
4 know if we need to have the witness read it. I'm
5 not telling you how to try your case. I'm just
6 saying I don't object to this coming in.
7 BY MR. McGRATH:
8    Q.   Okay. So there would be no objection
9 that subsection -- subparagraph C, unsatisfactory
10 work performance, including, but not included to,
11 failure, incompetence, inefficiency, or delay in
12 performing and/or carrying out proper orders, work
13 assignments, or instructions of supervisors without
14 a reasonable and modified excuse. Is that
15 contained in that policy?
16    A.   Yes, sir.
17        MR. HERBERT: What letter is that, Mike?
18        MR. McGRATH: That was C under
19 paragraph --
20        MR. HERBERT: I don't object to any of
21 this coming in.
22        MR. McGRATH: Okay. Thank you.
23 BY MR. McGRATH:
24    Q.   Disobedience or insubordination to

Page 130

1 constitute in authorities including refusal or
2 deliberate failure to carry out or follow lawful
3 directives and orders from any supervisor or
4 person, any person of authority; is that contained
5 in there?
6    A.   Yes.
7    Q.   Under paragraph H, disparaging remarks
8 or conduct concerning duly constituted authority to
9 the extent that such conduct disrupts the
10 efficiency of the department or subverts the good
11 order, efficiency, and discipline of the department
12 or which would tend to discredit any member
13 thereof?
14    A.   Yes.
15    Q.   Knowingly making false, misleading, or
16 malicious statements that are reasonably calculated
17 to harm, destroy, or discredit the morale,
18 reputation, authority, or official standing of the
19 department or members thereof?
20    A.   Yes.
21    Q.   Giving false or misleading statements or
22 misrepresenting or omitting material information to
23 a supervisor or to other person or a person of
24 authority in connection with any investigation or

Page 131

1 in the reporting of any department-related
2 businesses in subparagraph AF?
3    A.   Yes.
4    Q.   You were asked about your report and
5 your impression of Sergeant Berge when you went
6 into the office. You were asked about the sentence
7 in your report, that it appeared that Sergeant
8 Berge was either very tired or intoxicated, period.
9 Do you recall that question?
10    A.   Yes.
11    Q.   And that statement -- or that sentence,
12 rather, in your report is in the very introductory
13 paragraph of your report, correct?
14    A.   Yes.
15    Q.   Was that one of your first impressions
16 of Sergeant Berge, that he's either very tired or
17 possibly intoxicated?
18    A.   Yes.
19    Q.   And as a commander, do you have
20 experience in DUI arrests or seeing individuals
21 under the influence of alcohol and/or drugs?
22    A.   Yes.
23    Q.   With drugs, you don't always have a
24 scent or a smell of a drug, correct?

Page 132

1    A.   Correct.
2    Q.   Even in alcohol cases, depending on what
3 is consumed, you may smell alcohol?
4        MR. HERBERT: Objection. I'm going to
5 have an ongoing objection to the witness not
6 testifying to leading questions.
7        MR. KELLY: Both counsel have had some
8 latitude relative to leading questions.
9        MR. HERBERT: I'm on cross-examination.
10        MR. KELLY: I understand that. I'm
11 asking counsel not to be leading in the questions.
12 BY MR. McGRATH:
13    Q.   There's various indicators, are there
14 not, of individuals that may be under the influence
15 of alcohol?
16    A.   Yes.
17    Q.   And what are some of those indicators?
18        MR. HERBERT: Objection, relevance.
19        MR. KELLY: Overruled. The question is
20 insubordination -- excuse me -- intoxication. It
21 was brought up by both counsel. I think he can
22 ask.
23 BY THE WITNESS:
24    A.   Glassy eyes, slurred speech, slow

Page 133

1  response times, inability to walk, just there's
2  several different indicators of intoxication.  It
3  just depends on what kind of compound we're talking
4  about.
5     Q.   If a person appears to be tired, is that
6  an indicator?
7     A.   A person can be tired and also show
8  indications that could be construed as being
9  intoxicated as well.
10    Q.   And if a person is incoherent as he's
11  testified, is that an indicator of an individual
12  possibly being under the influence of alcohol?
13    A.   It's possible, yes, sir.
14    Q.   And you never requested Sergeant Berge
15  to do any field sobriety test or take any type of
16  alcohol-related test, correct?
17    A.   No, sir.
18    Q.   Your testimony was because he failed to
19  follow a number of lawful orders, correct?
20        MR. HERBERT: Objection, misstating the
21  evidence.  His testimony is his testimony.
22        MR. KELLY: Overruled.
23  BY THE WITNESS:
24    A.   Yes.

Page 134

1     Q.   Just to repeat, did, Commander, Berge,
2  did he violate a number of lawful orders that you
3  gave?
4     A.   Yes.
5     Q.   And during the time that you gave a
6  number of lawful orders, did he get up and
7  physically approach you and get into your face?
8        MR. HERBERT: I'm just going to object
9  and renew my motions that I made pretrial.  Now
10  counsel is talking about numerous commands.  Again,
11  we have no idea what we're defending ourselves
12  against here.
13        MR. KELLY: Mr. Herbert, I believe this
14  commander testified in ample detail exactly what he
15  told Sergeant Berge on direct examination.
16  BY MR. McGRATH:
17    Q.   Did Sergeant Berge get up and come
18  around the desk and confront you, get into your
19  face within a foot of your person?
20    A.   Yes.
21    Q.   And do you believe that to be curt,
22  disrespectful?
23    A.   Yes.
24    Q.   Do you believe that to be insubordinate?

Page 135

1     A.   Yes.
2     Q.   Based upon the paragraphs and
3  subparagraphs that we just went through, do you
4  believe that that conduct and the other conduct
5  that you testified to is a violation of that
6  section by Sergeant Berge?
7        MR. HERBERT: Objection, relevance, what
8  he thinks.  He didn't even know what they were.
9  So ...
10        MR. KELLY: Well, he can testify on his
11  belief.  Again, the ultimate question is for the
12  commission to determine.
13  BY THE WITNESS:
14    A.   Yes.
15    Q.   Isn't it true you wrote a summary report
16  after you spoke with the Deputy Chief and the Chief
17  about what took place?
18    A.   Yes.
19    Q.   And a summary report just highlights
20  what took place, correct?
21        MR. HERBERT: Objection.
22        MR. KELLY: Overruled.
23  BY THE WITNESS:
24    A.   Yes.

Page 136

1     Q.   In your report after the To/From, it
2  states "policy violation" and again it cites to the
3  section that you cited to tonight?
4     A.   Yes.
5     Q.   And, lastly, there's a handful of
6  problem areas here in the city as far as loiters or
7  individuals hanging out and committing ordinance
8  violations, correct?
9        MR. HERBERT: Objection.
10        MR. KELLY: Try not to ask a leading
11  question.
12  BY MR. McGRATH:
13    Q.   Are there more than one locations that
14  the city and your department are aware of where
15  individuals loiter and commit ordinance violations?
16    A.   Yes.
17    Q.   And as a commander of the patrol
18  division, do you give that information and
19  directives out to your subordinates to patrol and
20  police those areas?
21    A.   Yes.
22    Q.   You were asked about, did you check
23  about past written directives for 400 South
24  Dearborn.  Do you remember that question?

Page 137

1    A.   Yes.
2    Q.   Did I or anyone ask you to look into
3  that and bring that here tonight?
4    A.   No, sir.
5         MR. McGRATH: Thank you, Commander.
6         MR. KELLY: Recross?
7         MR. HERBERT: Briefly.  I'll try to be
8  brief.
9              RECROSS-EXAMINATION
10  BY MR. HERBERT:
11    Q.   You said that you didn't know about
12  Sergeant Berge making a complaint about you
13  committing a harassing act such as sticking your
14  crotch in his face.  You said that you weren't
15  aware of that, correct?
16    A.   I was not.
17    Q.   And you became -- you heard about that
18  he made that complaint during his interrogation,
19  correct?
20    A.   Yes, sir.
21    Q.   Who did you hear that from?
22    A.   Deputy Chief.
23    Q.   Deputy Chief who?
24    A.   Deputy Chief Hunt.

Page 138

1    Q.   What did he tell you?
2    A.   That there are allegations that I was
3  gyrating or doing something of a sexual nature
4  during the incident.
5    Q.   Did he tell you who the complainant was?
6    A.   Yes, that Sergeant Berge made that
7  complaint.
8    Q.   Anyone else?
9    A.   Or made that statement during his
10  interrogation.  He did not file a formal complaint.
11    Q.   Anyone else other than Deputy Chief Hunt
12  tell you that Paul Berge made a sexual harassment
13  complaint against you?
14    A.   Again, there was no sexual harassment
15  complaint ever made.  There was a statement made
16  during Sergeant Berge's interrogation.
17    Q.   Got it.
18         Sticking a crotch in somebody's
19  face in the workplace, you would agree with me that
20  that would constitute sexual harassment, correct?
21    A.   Yes.
22    Q.   And you're aware of the fact that that's
23  exactly what Sergeant Berge alleged of you,
24  correct?

Page 139

1    A.   Yes.
2    Q.   And he alleged that you committed sexual
3  harassment by sticking your crotch in his face,
4  correct?
5    A.   That was what he -- a statement he made
6  during his interrogation.
7    Q.   And you were told this by your Deputy
8  Chief, correct?
9    A.   Yes, sir.
10    Q.   Who else told you about it?
11    A.   Chief of police was there as well.
12    Q.   Okay.  So the chief of police told you
13  about the complaint made against you for sexual
14  harassment?
15         MR. McGRATH: Objection, misstates the
16  evidence.
17         MR. KELLY: Overruled.
18  BY MR. HERBERT:
19    Q.   You can answer.
20    A.   Yes.
21    Q.   Anyone else?
22    A.   No.
23    Q.   Did you talk to the mayor about the
24  sexual harassment complaint made against you?

Page 140

1    A.   No.
2    Q.   Just the Chief and the Deputy Chief?
3    A.   Yes, sir.
4    Q.   Have you been disciplined for any of the
5  allegations made against you of the sexual
6  harassment?
7    A.   No.
8    Q.   Have your job duties changed in any way?
9    A.   No.
10    Q.   You're still allowed to go out and
11  conduct -- You're still allowed to supervise police
12  officers, correct?
13    A.   Yes.
14    Q.   Everyone on your command?
15    A.   Yes.
16    Q.   Your job is exactly the same, correct?
17    A.   Yes.
18    Q.   You were never asked to prepare a report
19  about -- Strike that.
20         MR. HERBERT: I'm done.  Thank you.
21         MR. McGRATH: Just a quick follow-up as
22  far as the sexual harassment complaint because I'm
23  a little confused.
24

DEFENDANTS 001743

Page 141

REDIRECT EXAMINATION

BY MR. McGRATH:

Q. Did Sergeant Berge ever submit a written complaint that you've ever seen about any type of sexual harassment complaint against you?

MR. HERBERT: Objection, foundation, compound question.

MR. KELLY: Overruled.

BY THE WITNESS:

A. To my knowledge, no.

Q. You were told that Sergeant Berge, while he was under oath at his formal interrogation, made the allegation --

MR. HERBERT: Objection, leading.

BY MR. McGRATH:

Q. -- or complaint that you gyrated or thrust your genitals towards his face, correct?

A. Yes, sir.

Q. As you sit here today under oath and you're in the room with Sergeant Berge, did that happen?

A. No, it absolutely did not happen.

Q. Is it fair to say, based on your testimony, that Sergeant Berge lied under oath

Page 142

during his formal interrogation and that's the basis for Count 3 of the charge?

MR. HERBERT: Objection.

MR. KELLY: Sustain the objection.

MR. McGRATH: Nothing further. Thank you.

RECROSS-EXAMINATION

BY MR. HERBERT:

Q. You were made aware that Sergeant Berge didn't submit a formal complaint by the Deputy Chief and the Chief, correct?

A. I was made aware that the statement was made during the formal interrogation and never received any information about a formal complaint.

Q. But you testified that you became aware that there was no formal complaint made; isn't that what you just testified to a minute ago?

A. At this point in time, I have no knowledge of a formal complaint.

Q. Okay. And you, in fact, talked about Paul Berge not filing a formal complaint with the Chief and the Deputy Chief when they told you about what happened at the interrogation, correct?

A. Could you repeat that question, please?

Page 143

Q. Yeah. Well, they told you that Paul Berge made a sexual harassment complaint against you during his required interrogation and they also told you that he didn't file a complaint, correct?

A. What I was told was that was the inference that was made during that interrogation. I did not hear about a formal complaint -- I was not told that he didn't file a complaint. I was not told that there was any complaint at all. All I know is that a statement was made during the interrogation. I don't know if he was offered the opportunity to make a complaint. I don't know if there was a complaint that was going to be made.

Q. Okay. But you testified today that you know that there was no formal complaint made or you're unaware of any formal complaint?

A. I'm unaware of any formal complaint.

Q. So you checked to see if there was a formal complaint made by Paul Berge with respect to the sexual harassment allegation?

A. I've never had an allegation to that effect made against me.

Q. That wasn't my question.

A. So I can't know how to go about looking

Page 144

for a complaint. Anytime we receive a complaint against any of your conduct, we are told by our supervisors to write a statement to the allegations. I never was given that directive.

Q. You were never told to write a statement to the allegations of sexual harassment that were made against you that you're aware of and the Chief and Deputy Chief told you about?

A. It wasn't -- Excuse me. As I stated before, I never heard that there was a complaint. I heard that --

Q. No, no, no. You testified that you did hear there was a complaint. The Chief --

A. I heard there was a statement made during his formal interrogation.

Q. And the statement was that you stuck your crotch in his face and sexually harassed him?

A. As has been repeated multiple times. I understand what was said.

Q. I think I do too now. Thank you.

MR. McGRATH: Nothing, Commander. I apologize that you had to go through that.

MR. KELLY: Do any of the commissioners have any questions for Commander Austin?

Page 145

1    COMMISSIONER BESSANT: I do.
2    THE WITNESS: Yes.
3    COMMISSIONER BESSANT: When you file
4  your complaint and you send it to the Chief, does
5  he then have the -- is he, like, the entity who
6  gets to say, hey, this is something to be
7  investigated; or whenever you file your complaint,
8  is that just a complaint on his record?
9    THE WITNESS: Like, a sexual harassment
10 complaint?
11   COMMISSIONER BESSANT: No, like your
12 report.  What do they call it, a To/ ...
13   MR. HERBERT: A To/From.
14   THE WITNESS: When I write my statement,
15 I observe whatever infractions or any supervisor
16 will view the policy and say, this is what was
17 violated and it's the chief's interpretation on
18 whether there should be discipline brought or not.
19   COMMISSIONER BESSANT: So your statement
20 is, hey, this is what happened and this is what I
21 did?  You don't have any say in, like, the actual
22 discipline area?
23   THE WITNESS: No.
24   MR. KELLY: Anything else from the

Page 146

1  commission?
2    Commander Austin, thank you for
3  being here tonight.  Please do not discuss your
4  testimony outside of this room.
5    THE WITNESS: Yes, sir.
6    MR. KELLY: Does the commission want to
7  take a break, court reporter?
8    CHAIRMAN DAVIS: Let's take a short
9  break.
10   MR. KELLY: It's 8:35.  We'll go off the
11 record for ten minutes.  Let's be back at 8:45.
12   (A short break was had.)
13   MR. KELLY: It's 8:45.  So just for the
14 commissioners' understanding, the Chief has
15 three more witnesses to call, the sergeant,
16 Lieutenant Passwater, and the Chief.  I think we
17 all agreed that the sergeant and lieutenant will be
18 relatively quick witnesses and that the
19 lieutenant -- or excuse me -- and the Chief will
20 take longer so that after these sergeant and the
21 lieutenant witnesses, my recommendation would be
22 that we adjourn the hearing for tonight and
23 continue on to the September 23rd date with the
24 Chief finishing his case and then Mr. Herbert

Page 147

1  putting on his case if he believes that's
2  necessary.
3    CHAIRMAN DAVIS: Sounds good.
4    MR. KELLY: So the commission
5  understands.  Okay.
6    Can we have the witness sworn,
7  please?
8    (Witness sworn.)
9  WHEREUPON:
10   TIMOTHY KLOPP,
11 called as a witness herein, having been first duly
12 sworn, was examined and testified as follows:
13   DIRECT EXAMINATION
14 BY MR. McGRATH:
15   Q.  Can you please -- The commission is in
16 front of you.  So can you talk to them directly so
17 they can hear you.  Good.
18   First, start off by stating your
19 full name and giving us your Star number?
20   A.  Sergeant Timothy Klopp, Star No. 3647.
21   Q.  And that is with the Kankakee Police?
22   A.  Kankakee city police for over 24 years.
23   Q.  And current rank, sir?
24   A.  Sergeant.

Page 148

1    Q.  How long have you been a sergeant?
2    A.  For nine years, I believe.
3    Q.  As far as your current shift, you work
4  the day shift, the evening shift?
5    A.  Afternoon shift.
6    Q.  Which starts when and ends when?
7    A.  It would be 1:00 -- well,
8  approximately -- the time being paid is 1:45 p.m.
9  to 10:15 p.m.  As a sergeant or shift commander, we
10 get there a little bit earlier to get paperwork
11 ready for the shift.
12   Q.  And when there's a shift change, is that
13 conducted in the squad room?
14   A.  Yes.
15   Q.  I draw your attention to July 15th of
16 this year.  At approximately 1:44 or just before
17 you're about to get paid, where were you?
18   A.  I was walking in from the hallway to
19 the -- you have to walk through the squad room to
20 get to the sergeants' office.
21   Q.  And were you in uniform?
22   A.  Yes.
23   Q.  And the other officers and sergeants or
24 personnel that are employed by the police

DEFENDANTS 001745

Page 149

1  department on that date, were they all in uniform?
2      A.   I believe everybody that was either in
3  the squad room or the sergeants' office, I think
4  they were in uniform.
5      Q.   Okay.  And you went back to this
6  sergeants' room?
7      A.   Yes.
8      Q.   And for what reason?
9      A.   Well, normally when we're getting ready
10  for our shift briefing, there might be a few things
11  that we have to write down.  We have to pick up the
12  taser, an arbitrator mic, which is our recording
13  mic for our audio system -- audio/video system.
14  There could be other memos or critical information
15  that we may pick up from other sergeants from the
16  previous shift that we would pass on to our shift
17  for our shift briefing.
18      Q.   Okay.  The sergeants' room itself, is it
19  next to the lieutenants' office?
20      A.   It is next to it, yes.
21      Q.   And can you describe the sergeants'
22  office?
23      A.   Well, I mean, if we use this as an
24  example for the shift -- for the squad room, there

Page 150

1  would be -- at one end of the squad room there's
2  two offices that share a common wall down the
3  center.  There's a door on -- would be on the left.
4  That would be the lieutenants' office; and the door
5  on the right, that would be the sergeants' office.
6  There's only one desk in the lieutenants' office.
7  There's two desks in the sergeants' office.
8      Q.   Is there a door into the sergeants'
9  office?
10      A.   Yes.
11      Q.   Is there a glass pane, or is it a solid
12  door?
13      A.   It is a fairly solid door with a small
14  window in it, and then there's a larger standalone
15  window on the adjacent wall.
16      Q.   And does that larger glass window look
17  out into the squad room?
18      A.   Yes.
19      Q.   And approximately what are the
20  dimensions of the window, ballpark?
21      A.   Probably 4 by 4, 4 feet by 4 feet.
22      Q.   And is that window more aligned -- more
23  in line with the desk as you enter the sergeants'
24  office as compared to the desk opposite the door of

Page 151

1  the sergeants' office, if that makes sense?
2      A.   Yes.  If you were standing in the squad
3  room looking through that window, you would see one
4  of the sergeants -- the area directly in line with
5  one of the sergeants' desk.
6      Q.   And did you enter the sergeants' office
7  on that day?
8      A.   Yes.  As soon as I walked through the
9  squad room, I entered the sergeants' office.  The
10  door was open.  There was no reason for me not to
11  enter.
12      Q.   And was there anyone in the sergeants'
13  office when you entered?
14      A.   Yes, there were several people.  There
15  were Sergeant Gary Tyson was sitting at the
16  furthest desk from the door, Sergeant Paul Berge
17  was sitting at the other desk, and Commander Donell
18  Austin was standing up on the other side of the
19  desk that Sergeant Berge was at.
20      Q.   Just so I'm clear, the desk that
21  Sergeant Berge was sitting at, is that the desk
22  that's more visible in that area of the office --
23      A.   From the doorway?
24      Q.   The doorway and the window.

Page 152

1      A.   Yes.
2      Q.   And what, if anything, did you notice as
3  you walked into the sergeants' office at that time?
4      A.   There was a discussion going on.
5  Immediately I didn't know exactly what it was about
6  because I was only hearing very little bit parts of
7  it, but I went in the office, grabbed my taser that
8  I was going to use for the day, my arbitrator mic.
9  I might have been in there -- I don't even know if
10  it was 30 seconds total before I walked back out.
11      Q.   During that time, did you ever hear
12  Commander Austin give a directive or a command or
13  order to Sergeant Berge?
14      A.   I heard him -- I couldn't say if I
15  classified that at that time as an order,
16  directive, or anything else.  I heard him say
17  something to the effect of -- and I can't even say
18  that I heard all of it, but I heard him say
19  something to the effect of -- that Sergeant Berge
20  was relieved and he can go home.
21      Q.   And do you recall the tone of voice that
22  was given, or can you characterize the tone of
23  voice that was given by Commander Austin?
24      A.   It was louder than the normal

Page 153

1 conversation voice.
2    Q.   Would you characterize it as yelling or
3 screaming, or was it an elevated tone?
4    A.   It was just a louder-than-normal
5 conversation voice.
6    Q.   Did the tone from Commander Austin when
7 he made that statement to Sergeant Berge, did it
8 appear to be threatening in any way?
9    A.   No.
10    Q.   Did you hear Sergeant Berge make any
11 response or take any action or leave the office
12 after Commander Austin made that statement to him?
13    A.   I'm trying to make sure the order of
14 events. If it's possible, I could review a
15 statement and just make sure the order of events of
16 what I heard, when I heard it.
17    Q.   And the statement you're referring to, a
18 report that you prepared after the events of
19 July 15th of 2020?
20    A.   Yes.
21    Q.   Was that a To/From from you to Commander
22 Austin following?
23    A.   I believe so.
24    Q.   If I showed it to you, would that

Page 154

1 refresh your memory as far as the chronological
2 order of the incident?
3    A.   Absolutely, absolutely.
4    Q.   I'll show you the report.
5       MR. HERBERT: I got it.
6 BY MR. McGRATH:
7    Q.   Take your time to read it, Sergeant, and
8 let me know when your memory is refreshed.
9       (Witness viewing document.)
10 BY THE WITNESS:
11    A.   So I didn't hear anything specific right
12 then at that time. I exited the door. Because
13 there was -- they were talking loud at that time,
14 because the shift briefing was getting ready to
15 start right then, as I exited, I closed the door.
16 So I pulled it from its latching point so it would
17 close automatically. It's got an automatic closer
18 on it.
19    Q.   And did you do that so the shift change
20 or the next --
21    A.   I did it for multiple reasons.
22 Actually, I did it so that way there could -- the
23 squad room did not -- necessarily couldn't hear
24 what was going on as easily because it was a

Page 155

1 louder-than-normal conversation. I did it so that
2 way they could have some privacy in there without
3 disrupting anything going on with the shift
4 briefing.
5    Q.   At the time you're in the office and you
6 heard Commander Austin make that statement, did you
7 ever see him have his foot up on top of the desk?
8    A.   I don't think so when I was in there.
9    Q.   Where was he standing at?
10    A.   If this was -- If you want to say this
11 was the desk where Sergeant Berge was sitting, the
12 desk would probably be about this wide and he was
13 standing right on the other side of the desk.
14    Q.   So Commander Austin was on the opposite
15 side of the desk as Sergeant Berge?
16    A.   Yes.
17    Q.   Standing there?
18    A.   Yes, I believe so at that time. Again,
19 I was probably only in there 30, 45 seconds at that
20 time.
21    Q.   And at any time, did you reenter the
22 office?
23    A.   Yes.
24    Q.   And why did you reenter, and when did

Page 156

1 you reenter?
2    A.   Well -- So when I exited the office and
3 I closed the door behind me, that left Sergeant
4 Gary Tyson, Sergeant Berge, and Commander Austin in
5 the office. I went up to the podium, which is at
6 the opposite end if this was the -- where the
7 offices are, this is our podium would be up here
8 like this podium. So I went up there, quickly
9 looked through your briefing book because I was
10 getting ready to start the briefing even though
11 Sergeant Gary Tyson and me are both working the
12 same shift. So I was expecting him to be coming
13 out shortly from that office. And before I even
14 got ready to start the meeting, I was just looking
15 through the paperwork. Sergeant Tyson did come out
16 of the office. He walked up to me at the podium.
17 He suggested that I may want to go back in the
18 sergeants' office because it was getting a little
19 heated.
20    Q.   Approximately how much time elapsed from
21 the time that you entered the office at around
22 1:44 p.m. until the time you were standing at the
23 podium and Sergeant Tyson came to you and said you
24 should possibly go back --

DEFENDANTS 001747

Page 157

1    A.   The total time from the time when I
2  entered the office until when I spoke with Sergeant
3  Tyson?
4    Q.   Yes.
5    A.   Probably no more than two minutes.
6    Q.   Did Sergeant Tyson exit the sergeants'
7  office and then go directly to where you were
8  standing by the podium?
9    A.   Yes.
10   Q.   He told you that you should go back to
11 the sergeants' office?
12   A.   He suggested that -- He said, I believe
13 almost the exact terms were, You may want to go
14 back in there.  It's getting heated, and Berge
15 might need a rep.
16   Q.   And then you proceed to the sergeants'
17 office?
18   A.   Yes.  I walked back across the squad
19 room to outside the sergeant's door.
20   Q.   When Sergeant Tyson said he may need a
21 rep, what was he referring to?
22   A.   I believe -- Well, the way I took it was
23 that he was meaning a bargaining unit
24 representative, a union steward.  I'm also, besides

Page 158

1  being the vice president of the FOP lodge, I'm also
2  one of the bargaining unit members or union
3  stewards for the sergeants' negotiating committee.
4    Q.   And did you take it that that's what he
5  meant, that Sergeant Berge might need a rep based
6  on what was going on?
7    A.   For something that dealt with -- I mean,
8  the first thing that popped in my head was maybe
9  this was a discipline issue or something like that.
10   Q.   And then you went to the office?
11   A.   I went to the office.  Before I even got
12 to the office, the window that's adjacent to the
13 door, I could see both of them now basically
14 standing very close proximity right in front of
15 each other right inside that window.
16   Q.   So when you left, was Sergeant Berge
17 still sitting at his desk?
18   A.   Yes.
19   Q.   And the commander was standing opposite
20 of him?
21   A.   Yes.
22   Q.   And you said it was about two minutes
23 from the time you exited -- actually, you said it
24 was two minutes from the time you went into the

Page 159

1  office, grabbed your taser and your mic -- -
2    A.   From the time I exited the office until
3  the time I was speaking with Sergeant Tyson at the
4  podium, about two minutes.
5    Q.   Okay.  And then how long did it take you
6  to walk to the sergeants' office from the podium?
7    A.   Probably 30 seconds maximum, probably
8  less, but maximum.
9    Q.   And then you opened the door and
10 entered?
11   A.   I looked outside for just a second to
12 see if anybody was going to basically motion for me
13 not to enter, but then I entered.  And then I
14 basically went to the area right between the
15 two sergeants' desks and basically just was silent
16 for a little bit trying to sort of figure out what
17 was going on.
18   Q.   Could you hear either Sergeant Berge's
19 or Commander Austin's voice prior to entering the
20 office?
21   A.   I could hear very loud talking at that
22 point because it was -- the sound was coming
23 through from the closed door of the office.  So it
24 was definitely heated, but it wasn't that I could

Page 160

1  understand what was being said.
2    Q.   Did you recognize one voice or both
3  voices being part of that?
4    A.   It was both.
5    Q.   And then take us to when you stood in
6  the office.  Were Sergeant Berge and Commander
7  Austin in close proximity?
8    A.   Very close proximity.
9    Q.   What do you mean?
10   A.   I would say, you know, from one nose to
11 the other nose was probably a foot.
12   Q.   And what about chest to chest?
13   A.   Well, it would be about the same or
14 less.  I mean ...
15   Q.   And they were standing on what side of
16 the desk at this time?
17   A.   Well, they were standing basically in
18 front of the window, which is again opposite the
19 desk, and so just a little further to the wall from
20 where the desk is right in front of the window.
21   Q.   Would you agree that that's the general
22 area where Commander Austin was standing when you
23 exited the office?
24   A.   Probably about three -- Where Commander

DEFENDANTS 001748

Page 161

1  Austin would have been standing was probably about
2  three feet away from where he was standing when I
3  was in the office.
4  Q.  And what, if anything, did you hear or
5  observe at that time?
6  A.  It was just a lot of exchange back and
7  forth, but, again, I wasn't there for the whole
8  conversation.  So I had a very difficult time
9  understanding the whole train of thought of what
10 was going on.  So the longer I stood there, the
11 more I was picking up little bits and pieces, but
12 not necessarily what started it.  It was just what
13 was being said while I was there.
14 Q.  And can you tell us specifically what
15 you heard either Commander Austin or Sergeant Berge
16 state at that time?
17 A.  At least one of the statements I believe
18 I heard was something to the effect of that
19 Sergeant Berge saying to Commander Austin, what
20 have you done for your guys for the last
21 three years?  Again, I'm paraphrasing because it
22 was something similar to that.
23 Q.  Anything else that you recall?
24 A.  Austin said -- responded to that back,

Page 162

1  What are you talking about, and basically asking
2  for a description of what he was saying, what he
3  was meaning.
4  Q.  And did you ever hear any description?
5  A.  No, I did not.
6  Q.  And while they were going back and
7  forth, can you describe the tone of their voices
8  and the intensity of the situation?
9  A.  It was getting more and more intense.
10 It was -- I mean, just saying the verbal exchange
11 was getting louder, it was almost turning into a
12 shouting match.  It seemed there was -- it seemed
13 to be -- I'm trying to think of how to phrase it.
14 I really thought that it had the potential to turn
15 physical.
16 Q.  Was the door open or closed at this
17 time?
18 A.  It was closed because I reclosed it when
19 I entered.
20 Q.  And at that time, Commander Austin was a
21 higher-ranking officer than Sergeant Berge,
22 correct?
23 A.  Yes.
24 Q.  Did you ever hear Commander Austin give

Page 163

1  an order or directive to Sergeant Berge to leave or
2  he was relieved of his duties and to go home?
3  A.  Yes.
4        MR. HERBERT: I'm just going to object
5  to order or directive.  I think that's for the
6  board to determine the ultimate conclusion here.
7        MR. KELLY: Sustain that objection.  If
8  you'll rephrase that question.
9  BY MR. McGRATH:
10 Q.  Did you hear Commander Austin tell
11 Sergeant Berge that he was relieved of duty?
12 A.  I'm trying to think of the exact words
13 that I used in the statement; but at some point, I
14 had asked both of them to take a few steps back and
15 take it down a couple steps intensity-wise.  And
16 then -- because I just -- I thought it was -- it
17 had the potential of getting out of hand.  So I
18 basically interjected into their conversation.  I
19 asked them, hey, let's attempt to talk about this
20 as adults.  If they -- either one of them wanted my
21 help to try and sort of tell me what was going on
22 and I would do my best to, you know, help the
23 situation if I could, but I basically asked them,
24 hey, let's take it down a couple steps

Page 164

1  intensity-wise and take a few steps back with each
2  other and that did happen.  I'm sorry.  That did
3  happen, and Sergeant Berge did go back and sit at
4  the sergeant's desk.  I believe it was after he did
5  that that Commander Austin said that he was giving
6  him a direct order and that he needed to go home.
7  Q.  Did Sergeant Berge get up and respond to
8  or acknowledge Commander Austin's direct order that
9  he was relieved of duty and to go home?
10 A.  Not immediately.
11 Q.  How much time elapsed, or what was
12 stated next?
13 A.  After -- I believe after Commander
14 Austin said that, there was maybe between a 30- to
15 60-second pause.  There was nothing else said.
16 Sergeant Berge was basically just sitting in the
17 chair at the sergeant's desk.  Really nothing else
18 was said back and forth.  And at that point, I
19 said, Paul, he's giving you a direct order.  You
20 know, maybe you should go home for now and take up
21 the discussion again on another day.
22 Q.  And after you advised Sergeant Berge
23 that it was a direct order, it would be best for
24 him to leave, did he leave then?

Page 165

1   A.   Not immediately, but, again, he -- I
2   think he sort of thought about it for a few
3   seconds.  And then he said to me basically, he was
4   responding to me that, yeah, you know, you're
5   right, we can take this up on another day.
6        Q.   And Sergeant Berge left the office then?
7        A.   He did gather up a couple items that he
8   had in front of him and at the desk and then
9   ultimately he left.
10       Q.   Was Commander Austin still in the office
11  at that time?
12       A.   Yes.
13       Q.   And you were still in the office at that
14  time?
15       A.   Yes.
16       Q.   Did you remain in the office after
17  Sergeant Berge left?
18       A.   For a little while, I think.
19       Q.   What about Commander Austin?
20       A.   I don't remember if he walked out right
21  away or not.  I'm not sure.
22       Q.   Did you -- You prepared a To/From
23  regarding this incident, correct?
24       A.   Yes.

Page 166

1        Q.   Were you requested to prepare a To/From?
2        A.   Yes.
3        Q.   And who requested you to prepare the
4   To/From?
5        A.   You know what?  I'm not sure if it was
6   Commander Austin or if it was Chief Kosman.  I'm
7   not quite sure because it wasn't immediately.  It
8   was -- I think it was either much later that day or
9   the next day I think I was asked to do it.
10       Q.   If your To/From is dated July 15th of
11  2020 --
12       A.   Yeah.
13       Q.   -- is that the date you would have
14  prepared it?
15       A.   That would have been the same day, yes.
16       Q.   And you signed your report, correct?
17       A.   Yes.
18       Q.   And if your report is to Commander
19  Austin --
20       A.   It probably was him that asked me.
21       Q.   Because your report does not CC any
22  other personnel?
23       A.   No.  Yeah.  Normally when we're doing a
24  statement, it's -- this is not exactly considered a

Page 167

1   report for our purposes.  It's considered a
2   statement.  So that's what it was.  It goes to one
3   person.  They disseminate it how they feel
4   necessary.
5        Q.   And how did this report get to Commander
6   Austin?  By that, did you hand it to him, e-mail
7   it, drop it in his mailbox?
8        A.   I believe I would have put it in his
9   in/out tray in the sergeants' office, and he would
10  have gotten it.
11       Q.   If it's dated July 15th, 2020, would you
12  have done it that day or do you know if --
13       A.   Yes, it would have been done that same
14  day.
15       Q.   Again, you indicated that you're the
16  union rep, correct?
17       A.   Yes.
18       Q.   You're familiar with the CBAs that have
19  been negotiated through the years?
20       A.   Yes.
21       Q.   You're familiar with policies and
22  procedures of the police department?
23       A.   I believe so.
24       Q.   In general terms, if someone has an

Page 168

1   allegation of sexual harassment in the workplace,
2   is that supposed to be reported immediately to
3   their supervisors or somebody within the police
4   department?
5        MR. HERBERT:  Objection.  My client is
6   not charged with failure to report sexual
7   harassment.  It's irrelevant to this hearing, and I
8   don't think there's been foundation for this
9   witness to offer his opinions on this.
10       MR. KELLY:  I think we'll overrule the
11  objection.  However, the purpose of the questioning
12  cannot be to present a sexual harassment.  If he's
13  asking him if he knows that the policies and the
14  rules and regulations contain such a prohibition or
15  requirement, then I think the sergeant can answer.
16  BY MR. McGRATH:
17       Q.   Sexual harassment in the workplace is
18  prohibited, correct?
19       A.   Yes.
20       Q.   And if someone believes they've been
21  sexually harassed in the workplace, is there a
22  policy and procedure that that should be reported
23  to someone within the department within due course
24  or a short time after any alleged incident?

Page 169

1  MR. HERBERT: I'm going to object,
2  foundation.
3  MR. KELLY: Overruled.
4  BY THE WITNESS:
5  A.  I mean, normally they would report it
6  to -- they can be reporting it to any supervisor,
7  but they would probably normally report it to their
8  direct supervisor first unless that supervisor was
9  involved in any of the allegation.  And then they
10  would go to somebody above that or, if possible, of
11  equal rank.
12  MR. McGRATH: Thank you.
13  CROSS-EXAMINATION
14  BY MR. HERBERT:
15  Q.  Hi, Sergeant.  How are you?
16  A.  Hello.
17  Q.  It sounds like these two guys were
18  pretty ticked off at each other?
19  A.  I would say that's safe to say.
20  Q.  Two alpha males not backing down, right?
21  MR. McGRATH: Objection, form of the
22  question.
23  MR. KELLY: Sustained.
24  BY MR. HERBERT:

Page 170

1  Q.  It appeared that it was pretty mutual,
2  both were upset, correct?
3  A.  I believe so.
4  Q.  Certainly Commander Austin, you didn't
5  hear him using strictly soft-toned language, did
6  you?
7  A.  No.
8  Q.  As a matter of fact, it was the opposite
9  of that?  It was loud and disruptive, correct?
10  MR. McGRATH: Objection, disruptive.
11  MR. KELLY: Overruled.
12  You can answer.
13  BY THE WITNESS:
14  A.  I think it was just -- in my mind, it
15  was disruptive for the other people that were in
16  the squad room.  So that's what I was concerned
17  with initially, and that is why I chose to close
18  the door when I was exiting because I was pretty
19  sure it was going to be disruptive for holding a
20  shift briefing in an adjacent room.
21  Q.  Got it.  And you've been a police
22  officer how long?  I'm sorry.
23  A.  Over 24 years.
24  Q.  You would agree with me that in those

Page 171

1  24 years you've certainly seen officers have a
2  difference of opinion in the past?
3  A.  Yes.
4  Q.  You've certainly seen officers get into
5  arguments with each other, correct?
6  A.  Yes.
7  Q.  I bet that you've also seen officers get
8  into physical fights with each other?
9  A.  I would have to really rack my memory,
10  but it's certainly possible.  But nothing jumps out
11  at me in the moment.
12  Q.  Okay.  And you said that Commander
13  Austin told you to write a To/From, correct?
14  A.  I believe that's just based on looking
15  at who it was to.  I probably addressed it to
16  whoever told me to do it.
17  Q.  And we already established that it's to
18  Commander Austin, this To/From?  So likely that
19  would have been Commander Austin asked you to
20  prepare a To/From?
21  A.  Yes, I believe so.
22  Q.  Did you ever suspect that Paul Berge was
23  drunk that day, intoxicated?
24  A.  No.

Page 172

1  Q.  Did Commander Austin ever express any
2  concern to you about Paul Berge being intoxicated
3  that day?
4  A.  No.
5  Q.  Do you know where you were when
6  Commander Austin told you to write a report?  Was
7  it in the police station somewhere?
8  A.  I mean, it may have been.  I was
9  obviously still working because I would have been
10  working 2:00 p.m. to 10:00 p.m., but I don't
11  remember if it was in person or it was over the
12  phone.
13  Q.  Did he give you any direction on how --
14  what to write in the To/From in any way?
15  A.  Nothing except that, do a statement
16  covering the incident that happened.
17  Q.  Okay.  And that's what you did, correct?
18  A.  Yes.
19  Q.  And I think you said that Commander
20  Austin told Paul Berge that he was relieved of
21  duty, correct?
22  A.  Are we --
23  Q.  I'll ask another question.  At -- You
24  testified at one point that Commander Austin

DEFENDANTS 001751

Page 173

1  specifically said that he's giving Paul a direct
2  order?  Do you remember testifying about that?
3      A.   Yeah, that would have been the second
4  time that I was in the office.
5      Q.   Okay.  So the previous command, they
6  were not based upon -- they weren't prefaced by
7  saying this is a direct order, correct?
8      A.   Not that I heard, no.
9      Q.   And then after the commander gave Paul
10  that direct order, you said there was about a 30-
11  to 60-second pause.  Do you remember saying that?
12      A.   Yes.
13      Q.   And then after a few seconds, Paul
14  gathered up his stuff and he left, correct?
15      A.   Yeah, there was -- there would have been
16  a 30- to 60-second pause before I said something to
17  Paul.  And then after that, that's when he gathered
18  up his stuff.
19      Q.   And left?
20      A.   Yep.
21      Q.   Did you ever hear any rumors about Paul
22  Berge being a racist?
23      A.   Nope.
24      Q.   Did you ever hear rumors about Paul

Page 174

1  Berge having a problem with minority supervisors?
2      A.   Nope.
3          MR. HERBERT: Nothing further.
4          MR. McGRATH: Nothing based on that.
5  Thank you.
6          MR. KELLY: Commissioners have any
7  questions for Sergeant Klopp?
8              None.
9          Sergeant, thank you for your
10  testimony.  Please do not discuss your testimony
11  with anybody outside of this hearing room.
12          THE WITNESS: Okay.
13          (A short break was had.)
14          MR. KELLY: If the court reporter will
15  swear in the witness, please.
16          (Witness sworn.)
17  WHEREUPON:
18              ROBIN PASSWATER,
19  called as a witness herein, having been first duly
20  sworn, was examined and testified as follows:
21              DIRECT EXAMINATION
22  BY MR. McGRATH:
23      Q.   Lieutenant, sorry to keep you so late;
24  but if you can start by stating your full name and

Page 175

1  giving your Star or badge number?
2      A.   It's Robin Passwater, 9930.
3      Q.   And you're currently employed as a
4  lieutenant with the Kankakee Police Department?
5      A.   Yes.
6      Q.   How long have you been employed with
7  this department?
8      A.   31 years.
9      Q.   And how long have you been a lieutenant?
10      A.   20 years, maybe 22.
11      Q.   Have you held any --
12      A.   20 years.
13      Q.   Have you held any other positions within
14  the department?
15      A.   I've held every position at the
16  department.
17      Q.   Including ...
18      A.   Deputy Chief.  I was acting Chief.  I
19  was Commander of Investigations.  The only thing I
20  haven't done is patrol commander.
21      Q.   I would like to draw your attention to
22  Saturday morning, July 18th of 2020.  Were you
23  working that day?
24      A.   Yes.

Page 176

1      Q.   In uniform?
2      A.   Yes.
3      Q.   Did you have an assigned or marked squad
4  car that day?
5      A.   It's an unmarked squad, but yes.
6      Q.   Were you aware on that date that there
7  was a scheduled protest or march that was going to
8  take place within the city?
9      A.   Yes.
10      Q.   Were you involved in any of the planning
11  of providing police protection or police
12  involvement with that march or protest?
13      A.   Yes, I went over there in the beginning
14  just to see how big the crowd was.  It was a small
15  crowd.  I thought about maybe ten people.  And so
16  Sergeant Miller said that he would be able to
17  handle it, and there was a car on that side of town
18  over there and the Chief was also in.  So that was
19  pretty much it.  It wasn't a very large crowd.
20      Q.   When you say you went over and you saw
21  the crowd and it was approximately ten people and
22  you saw Sergeant Miller, where was this at?
23      A.   In Bird Park.
24      Q.   Bird Park, is that where this march or

Page 177

1  protest started?
2      A.   Yes.
3      Q.   And what were the ages of the
4  individuals that were in this protest or march?
5      A.   They were young.  I would say maybe
6  8th graders.  It was organized by young kids and
7  their parents.  It looked like their parents were
8  there.  So I'm guessing they were just younger.  It
9  was a younger group, it looked like to me.
10     Q.   But the combination of children and
11 adults?
12     A.   Yes.
13     Q.   Did they have any banners or signage?
14     A.   They did have some, yes.
15     Q.   Do you know why or why not there was not
16 a large police presence from your department at
17 Bird Park or where the protest was or the march was
18 beginning?
19     A.   Because it wasn't needed.  It was a
20 small group.  So we had enough people to deal with
21 it.  It was Saturday morning, not a lot of traffic;
22 and, you know, as long as we had a car to lead it
23 and a car behind it, we thought it was good enough.
24     Q.   Are you aware that Chief Kosman was

Page 178

1  working that day and he was going to be involved
2  with the parade or the escorting of the --
3      A.   Yes, he was in the rear of it, I
4  believe.
5      Q.   And at approximately 12:00 p.m. on that
6  date, did you receive a call either by telephone or
7  radio from Chief Kosman?
8      A.   Yes, I got a cell phone call.
9      Q.   Do you recall receiving that call?
10     A.   Yes.
11     Q.   And do you recall what Chief Kosman
12 stated to you or what you stated to him during that
13 call?
14     A.   He asked me to meet him at the
15 courthouse, the back of the courthouse.
16     Q.   And did he indicate why he wanted you to
17 go to the courthouse?
18     A.   No.
19     Q.   Were you the shift commander on that
20 day?
21     A.   Yes.
22     Q.   So as the shift commander, you would
23 have been in charge or supervised over which --
24     A.   All the officers working that day until

Page 179

1  patrol officers.
2      Q.   And everyone is aware of who the shift
3  supervisor is?
4      A.   Yes.
5      Q.   And when you received that call from
6  Chief Kosman, do you recall where you were at
7  approximately?
8      A.   Yeah.  I was down maybe by the depot,
9  down in the depot downtown.  I think I was a little
10 further south there, maybe by Jewel.  Pretty -- I
11 mean, I was near downtown.
12     Q.   Maybe about four or five blocks away?
13     A.   Yes.
14     Q.   And did you then drive over to the
15 county courthouse?
16     A.   Yes.
17     Q.   Did it take you less than two minutes to
18 get there?
19     A.   Yes.
20     Q.   When you arrived, did you see Chief
21 Kosman?
22     A.   Yes.
23     Q.   And where was he at?
24     A.   On the circle drive on the south end of

Page 180

1  the courthouse, on the east side of that circle
2  drive.  So close to Harrison Avenue.
3      Q.   For your benefit and for the commission,
4  if you turn around, there's a frozen video that we
5  have from some cameras.  But is the area where the
6  Chief was, can you see that on that still shot?
7      A.   Yeah, by that second car, behind that
8  second car or right at that second car.
9      Q.   And he was standing out there in the
10 grass area?
11     A.   Yeah, him and -- he was on -- he was
12 actually on the pavement, him and Sergeant Berge
13 were together.
14     Q.   Okay.  And did you -- where did you park
15 at?  Do you remember?
16     A.   Yeah, just, like, behind that second
17 car.  So behind that -- Let me get up here and do
18 this because my arm is hurting.  So back -- I just
19 parked right here, and they were right here.
20     Q.   And did you get out of your car and then
21 approach where they were at?
22     A.   Yes, I did.
23     Q.   And did you hear any conversation
24 between Chief Kosman and Sergeant Berge as you

DEFENDANTS 001753

Page 181

1 approached where they were at?
2 A. No, I didn't hear anything. I got out,
3 and they were done really kind of talking and they
4 were just standing there together, I guess.
5 Q. Who, if anyone, did you speak with?
6 A. I walked up to both of them, and
7 Sergeant Berge backed off probably, like, 10 feet
8 and I spoke to the Chief a little bit.
9 Q. What did the Chief tell you?
10 A. Chief told me that he thought that
11 Sergeant Berge was acting inappropriate at the --
12 during the march and talking to protesters
13 inappropriate at the courthouse and that he had
14 asked him to leave or return to his shift and that
15 Sergeant Berge did not do that. Then he told him
16 to go home. He sent him home for the day, and
17 Sergeant Berge refused.
18 Q. So the Chief advised you that he had
19 ordered or directed Sergeant Berge to leave the
20 area and go home?
21 MR. HERBERT: I'm going to object. It
22 misstates the testimony.
23 MR. KELLY: Sustained.
24 BY MR. McGRATH:

Page 182

1 Q. Again, can you just --
2 MR. HERBERT: Objection. It's been
3 asked and answered.
4 BY MR. McGRATH:
5 Q. What did the Chief tell you as far as
6 what he told Sergeant Berge?
7 MR. HERBERT: I'm going to object. It's
8 been asked and answered.
9 MR. KELLY: Overruled.
10 BY THE WITNESS:
11 A. He said to him, Sergeant Berge -- What
12 he told me was, he told Sergeant Berge to go back,
13 you know, leave the courthouse, get away from
14 everybody else. And then when he refused to do
15 that, he told him he was going to relieve him of
16 duty or he was sending him home for the day.
17 Q. Was it your understanding that those
18 directives were made prior to your arrival at the
19 courthouse?
20 MR. HERBERT: I'm going to object to
21 that characterization, the word directive.
22 BY THE WITNESS:
23 A. Yes, they were. I mean --
24 MR. KELLY: Hold on. The objection is

Page 183

1 sustained, again, whether or not a directive, you
2 can elicit that testimony from the lieutenant.
3 BY MR. McGRATH:
4 Q. Did the Chief tell you that he gave
5 directives to Sergeant Berge prior to you arriving
6 on the scene?
7 A. Yes.
8 Q. And then when you arrived on the scene,
9 Chief Kosman told you what had taken place between
10 Sergeant Berge and himself?
11 A. Yes.
12 Q. And obviously Sergeant Berge was still
13 there, correct?
14 A. Yes.
15 Q. Did it appear to you that he was
16 leaving, getting into his squad car, leaving the
17 area at that time?
18 A. No, he was still right there.
19 Q. Did you talk to Sergeant Berge about why
20 he didn't leave?
21 A. He actually came over and rejoined us
22 because I had spoken with the Chief, like,
23 separately a little bit, and Sergeant Berge told me
24 he didn't think he was doing anything wrong. And

Page 184

1 he goes, Well, I'll do anything you say, sir. And
2 I said, Well, you have to do exactly what the Chief
3 told you to do. And if he gave you an order to do
4 something, then you need to do it.
5 Q. So Sergeant Berge stated to you that,
6 I'll do whatever you tell me to do, sir?
7 MR. HERBERT: Objection.
8 BY MR. McGRATH:
9 Q. Meaning you or Chief Kosman?
10 MR. HERBERT: Objection.
11 MR. KELLY: Sustained. I think that the
12 lieutenant has made his statement relative to what
13 the Chief said.
14 BY MR. McGRATH:
15 Q. And did you tell Sergeant Berge what to
16 do?
17 A. I told him to follow the Chief's order
18 is what I told him to do.
19 Q. And did you repeat or have to repeat
20 what the Chief's order was?
21 A. No.
22 MR. HERBERT: Objection to -- Withdrawn.
23 I'm sorry. Go ahead. No, no, no. You can go
24 ahead. I withdrew my objection.

Page 185

1  BY THE WITNESS:
2    A.  I don't know what the Chief exactly told
3  him.  I just told him to follow the Chief's order
4  according to what the Chief told me.  Whatever the
5  Chief told you to do, you need to do it and he just
6  stated, Okay.  I'll go home then.
7    Q.  So at that point then, he agreed to
8  follow the order and he went to his car?
9        MR. HERBERT: Objection.
10        MR. KELLY: Basis?
11        MR. HERBERT: Well, we're characterizing
12  it as an order.  He's testifying.  It's
13  argumentative.  He can ask what happened.  He left,
14  not he agreed to obey the order.
15        MR. KELLY: Sustained.  Ask another
16  question.
17  BY MR. McGRATH:
18    Q.  After you told Sergeant Berge to follow
19  what Chief Kosman had stated, he then went to his
20  vehicle and left the area, correct?
21    A.  Yes.
22    Q.  Would you agree that there is a chain of
23  command within the Kankakee Police Department?
24    A.  Yes.

Page 186

1    Q.  Would you agree that the Chief position
2  is the highest position within the police
3  department?
4    A.  Yes.
5    Q.  Would you agree that subordinate
6  officers have to follow lawful orders of
7  higher-ranking officers, including the Chief?
8        MR. HERBERT: I'm going to object.
9        MR. KELLY: Overruled.
10  BY THE WITNESS:
11    A.  Yes.
12    Q.  And if a subordinate officer failed to
13  follow a direct, lawful order of a superior
14  officer, do you believe that to be insubordinate?
15        MR. HERBERT: I'm going to object to
16  incomplete hypothetical.
17        MR. KELLY: Overruled.
18        You can answer, Lieutenant.
19  BY THE WITNESS:
20    A.  Yeah, I think they can be, yes.
21    Q.  You prepared a To/From or a report
22  regarding the incident on July 18th of 2020?
23    A.  Yeah, I was directed to write a
24  statement.

Page 187

1    Q.  And who directed you to write that
2  statement?
3    A.  I believe it was the Chief, but I'm not
4  for sure.  But I think it was.  I think he
5  mentioned to me for me to write it down.  It's
6  typical protocol.  So ...
7    Q.  Did he have to direct you to write the
8  report?
9    A.  Not generally, no, because I know I need
10  to have it documented.
11    Q.  And so the date on your report is
12  July 19th, 2020.  Did you prepare this report the
13  next day, or did you prepare it --
14    A.  I probably wrote it the next day, yes.
15    Q.  Did you submit it to Chief Kosman?
16    A.  I don't know if I gave it to him
17  directly or through the chain of command.  I may
18  have given it to Donell Austin, but I'm not
19  certain.
20    Q.  July 19th, 2020, would have been a
21  Sunday if July 18th was a Saturday?
22    A.  Yeah.  So obviously it went through -- I
23  mean, I could have held it or -- I don't remember
24  how it got to the Chief.

Page 188

1        MR. McGRATH: Thank you.  That's all I
2  have.
3        CROSS-EXAMINATION
4  BY MR. HERBERT:
5    Q.  Hi, Lieutenant.  How are you?
6    A.  Good.
7    Q.  So Paul was under -- Sergeant Berge was
8  under your command that day on July 20th, 2020?
9    A.  Yep.
10    Q.  Did Paul violate any policies that you
11  provided?
12    A.  No, he did not.
13    Q.  Did you see Paul -- Did you witness
14  Paul -- Strike that.
15        You were Paul's direct supervisor
16  as a lieutenant, correct?
17    A.  Yes.
18    Q.  And you were responsible for Paul and
19  what he was doing that day, his duties, correct?
20    A.  Yes.
21    Q.  And did you find that Paul did anything
22  improper with respect to being at a certain
23  location at any point during the day?
24    A.  Not that I saw.

Page 189

1  Q.   And how long has Paul worked under your
2  command? He's been a policeman since 2006?
3  A.   Yeah.  So at different stages, depending
4  on the position I had, but most recently it
5  probably was six months maybe because he got
6  transferred from midnights to the day shift.
7  Q.   How would you characterize the work that
8  Paul does as a police officer?
9  A.   I think he's a very good officer.
10  Q.   Any reason to believe that Paul is a
11  racist in any way?
12  A.   I have never seen that, no.
13  Q.   Would it surprise you if somebody were
14  to accuse him of being a racist?
15  A.   Listen, they accuse me of being a
16  racist.  So it doesn't surprise me about anything.
17  So it's easy to do.
18  Q.   Fair enough.  Thank you.
19       When you saw Paul that day, you
20  didn't see him yelling at any -- yelling in any
21  way, did you?
22  A.   No.
23  Q.   And has Paul ever been insubordinate to
24  you at any point during the times in which you have

Page 190

1  supervised him?
2  A.   No.
3  Q.   No.  And just so the record is clear,
4  no, he has never been?
5  A.   Never been insubordinate to me, no.
6       MR. HERBERT: I have nothing further.
7  Thank you very much.
8       REDIRECT EXAMINATION
9  BY MR. McGRATH:
10  Q.   Just a quick follow-up since you were
11  asked about past actions.  Have you ever been in a
12  situation where you were called out to a location
13  by the Chief because a lower-ranking officer failed
14  to follow the lawful order of the Chief?
15       MR. HERBERT: I'm going to object to the
16  form of the question.
17       MR. KELLY: Overruled.
18  BY THE WITNESS:
19  A.   Not that I can ever recall, no.
20  Q.   So this was the first time in the
21  30-plus years that you've worked for this police
22  department that you were called out to an area
23  because a lower-ranking officer failed to follow a
24  lawful order of a superior officer; and in this

Page 191

1  case, it was the chief of the department?
2       MR. HERBERT: I'm going to object.  It
3  misstates the evidence in this case.  He says he
4  does not recall ever doing that.  It's different
5  than this was the first time ever.
6       MR. KELLY: Overruled.
7       You can answer, Lieutenant.
8  BY THE WITNESS:
9  A.   This is the first time that I ever
10  recall it happening.
11       MR. McGRATH: Thank you.
12       MR. HERBERT: Nothing.
13       MR. KELLY: Do the commissioners have
14  any questions for the lieutenant?
15       COMMISSIONER FLORES: So it sounds like
16  what I heard, Lieutenant, was before you arrived at
17  the courthouse, you were told -- Sorry -- were you
18  told by Chief Kosman that he was not following
19  directions, orders, directives?
20       THE WITNESS: No.  He just asked me to
21  come up to meet with him at the courthouse.
22       COMMISSIONER FLORES: Okay.  Thank you.
23       MR. KELLY: Anything else from the
24  commission?

Page 192

1       COMMISSIONER BESSANT: So just to
2  clarify, he only left after you said, Hey, you need
3  to follow the chief's directive?  He didn't seem to
4  be leaving before that?
5       THE WITNESS: I don't know what he was
6  doing, you know, before that, if he was going to
7  leave or not.  I just know that when I said, You
8  just need to follow what the Chief told you to do,
9  he just said, Okay, I'll go home then.
10       MR. KELLY: Anybody else?  Any follow-up
11  from either counsel?
12       COMMISSIONER YATES: I do.
13       You said they call you a racist.
14  Who is they?
15       THE WITNESS: You know, the mayor did,
16  Day 1, when I came in.  So -- and here's the deal,
17  she had never met me before in my life.  We never,
18  ever met each other.  So she did.
19       MR. HERBERT: If I can ask a follow-up
20  question.
21       COMMISSIONER FLORES: Can I?
22       MR. HERBERT: Sure.
23       MR. KELLY: Let's let the commissioner
24  ask.  Go ahead.

DEFENDANTS 001756

Page 193

1    COMMISSIONER FLORES: So when you said
2 "they," did you just mean the mayor?
3    THE WITNESS: Well, no.  I think it was
4 more just in a group.  I mean, I've been to court
5 for the same thing.  I've been to federal court.
6    COMMISSIONER FLORES: For some kind of
7 racial thing?
8    THE WITNESS: Yeah.  So -- and we won
9 because it never happened.  It was a lie.
10    MR. KELLY: Anything else from the
11 commissioners?
12    Mr. Herbert, follow up?
13    RECROSS-EXAMINATION
14 BY MR. HERBERT:
15    Q.   Who was the mayor that called you a
16 racist?
17    A.   The mayor in term right now.
18    Q.   And she called you a racist, and you
19 said it was within a group?
20    A.   No.  Well, she was part of a group, but
21 no.  I was in her office twice on two occasions,
22 and one was the second day she got in the office.
23 So ...
24    Q.   Fair to say that the mayor wants to have

Page 194

1 Black supervisors as opposed to White supervisors,
2 correct?
3    MR. McGRATH: Objection, form of the
4 question, foundation, relevance.
5    CHAIRMAN DAVIS: I don't understand what
6 this has got to do with this issue.
7    MR. KELLY: Exactly.
8    CHAIRMAN DAVIS: So can we get back to
9 the case at hand?
10    MR. HERBERT: Well, the question was
11 asked, and that's just for -- the question was
12 asked --
13    CHAIRMAN DAVIS: I'm just thinking about
14 the relevance of that verse what we're dealing
15 with.
16    COMMISSIONER BESSANT: There's no
17 relevance.
18    MR. KELLY: Any additional questions for
19 the lieutenant?
20    Lieutenant, you're excused.
21 Please do not discuss your testimony tonight
22 outside of this courtroom, and thank you for coming
23 in.
24    So at this point in time, I

Page 195

1 believe the sole, remaining witness for the City is
2 the Chief and I think everybody is in agreement
3 that that's going to take longer than possibly the
4 commission wants to spend tonight.  So at this
5 point in --
6    MR. McGRATH: I also have another
7 witness, Sergeant Tyson, who was in the sergeants'
8 office.  And I believe I stated in my opening or
9 when we were upstairs, he just retired on Friday
10 and he was unavailable tonight.  So I will be
11 bringing him in prior to the Chief.  He won't be
12 that long of a witness, but he'll be coming in
13 before the Chief.
14    MR. KELLY: Okay.
15    CHAIRMAN DAVIS: Can we do a continuance
16 of this to the 23rd?
17    MR. KELLY: Yes.  I ask for a member of
18 the commission to make a motion to adjourn this
19 hearing to September 23rd at 5:30 p.m.
20    CHAIRMAN DAVIS: Let's have it as a
21 motion then.
22    COMMISSIONER BESSANT: I make the motion
23 to adjourn this hearing.
24    CHAIRMAN DAVIS: All right.

Page 196

1    COMMISSIONER FLORES: I second.
2    CHAIRMAN DAVIS: The motion is that we
3 will adjourn this meeting until the 23rd.  That's
4 acceptable, I believe.  I have a motion and a
5 second on the floor.  All those in favor of that?
6    COMMISSIONER YATES: Can I raise one
7 question before?  Is 5:00 or 5:30 more reasonable?
8    COMMISSIONER BESSANT: 5:30.
9    CHAIRMAN DAVIS: 5:30?
10    COMMISSIONER BESSANT: Yeah.
11    CHAIRMAN DAVIS: We'll post it as 5:30
12 then.
13    MR. McGRATH: I believe the upstairs
14 room will be available.
15    CHAIRMAN DAVIS: Yeah, it's available on
16 the 23rd.
17    MR. McGRATH: Yes.
18    MR. HERBERT: If I can just put one
19 thing on the record real quick based upon some of
20 the comments made by the board members as far as
21 relevance.  I know that you're going to instruct
22 the board that they can look at potential bias and
23 motivation for witnesses when determining
24 credibility.  So I trust that you will do your job

DEFENDANTS 001757

Page 197

1  on that, and I have no reason to believe you won't.
2       MR. KELLY: That's correct.  The board
3  knows and will be reminded that it is their job to
4  make -- to determine credibility of any witness
5  that they hear.
6       CHAIRMAN DAVIS: Let me clear this
7  motion.  I didn't finish the motion, though.  So it
8  hasn't been carried yet.
9            All those in favor to adjourn
10  this meeting -- Chief?
11       CHIEF KOSMAN: Is this closing the
12  hearing, and is there a part of another meeting?
13  Or is this the closing of the meeting?
14       CHAIRMAN DAVIS: We adjourn this.  So
15  it's still the same meeting.
16       CHIEF KOSMAN: So I can still bring
17  something up that doesn't have anything to do with
18  this?
19       CHAIRMAN DAVIS: It's going to be the
20  same meeting.  It's kind of, like, a continuance.
21       CHIEF KOSMAN: I want to bring up that
22  we have an opening for a sergeant.  We had Sergeant
23  Tyson retiring, and we need to know -- I don't know
24  if you want to bring it up at that meeting, the

Page 198

1  beginning of that meeting, or set up an another
2  special meeting because we have 30 days to appoint
3  the next sergeant and there's two people left on
4  the eligibility list.  So, you know, I just want
5  to --
6       CHAIRMAN DAVIS: I think we can bring it
7  up at that meeting.  So we'll bring it up at that
8  meeting.
9            All those in favor of continuing
10  the meeting until the 23rd at 5:30, all those in
11  favor, let it be known by saying aye?
12            (All say aye.)
13            Opposed?
14            So we will continue this meeting
15  then.
16            (WHEREUPON, the meeting was
17             adjourned to September 23rd,
18             2020, at 5:30 p.m.)
19
20
21
22
23
24

Page 199

1  STATE OF ILLINOIS   )
2  COUNTY OF COOK      )  SS.
3
4       Tommasina M. Mantia, being first duly
5  sworn, on oath says that she is a Certified
6  Shorthand Reporter, Registered Merit Reporter,
7  doing business in the City of Chicago, County of
8  Cook and the State of Illinois;
9       That she reported in shorthand the
10  proceedings had at the foregoing Board of Fire and
11  Police Commissioners' Meeting;
12       And that the foregoing is a true and
13  correct transcript of her shorthand notes so taken
14  as aforesaid and contains all the proceedings had
15  at the said Board of Fire and Police Commissioners'
16  Meeting.
17                 *Tommasina M. Mantia*
18
19
20            TOMMASINA M. MANTIA, CSR, RMR
              CSR No. 084-004469
21
22
23
24

**[**

**[sic] (4)**
  7:8;34:24;77:20;
  106:16

**A**

**AA (1)**
  128:18
**AB (1)**
  128:18
**abilities (1)**
  29:8
**ability (4)**
  11:9;28:9;31:15;
  33:21
**able (8)**
  23:22;26:1;33:16;
  95:10;117:1;127:22;
  128:22;176:16
**above (1)**
  169:10
**abruptly (1)**
  62:10
**Absolutely (8)**
  16:16;65:16;68:15;
  72:16;110:5;141:22;
  154:3,3
**abused (1)**
  124:4
**AC (1)**
  128:19
**accept (1)**
  38:8
**acceptable (1)**
  196:4
**access (1)**
  45:22
**according (3)**
  10:24;12:9;185:4
**accurate (2)**
  109:8;117:15
**accurately (1)**
  8:11
**accuse (2)**
  189:14,15
**accused (1)**
  107:19
**accusers (1)**
  11:10
**acknowledge (6)**
  4:6,10;38:7,14,18;
  164:8
**acknowledgement (1)**
  38:13
**across (1)**
  157:18
**Act (3)**
  14:7,9;137:13
**acted (1)**
  23:10

**acting (3)**
  52:21;175:18;
  181:11
**action (4)**
  58:14;94:6;108:24;
  153:11
**actions (7)**
  33:19,21;72:22;
  101:6;102:5;106:13;
  190:11
**activities (1)**
  8:12
**activity (7)**
  44:16;45:10,11;
  48:21;92:20;97:13,16
**acts (3)**
  31:24;112:3;113:1
**actual (1)**
  145:21
**actually (7)**
  45:19;128:10,12;
  154:22;158:23;
  180:12;183:21
**AD (1)**
  128:19
**add (1)**
  46:16
**additional (3)**
  46:12,16;194:18
**address (12)**
  47:19;56:2;57:2,3;
  64:23,24;65:7,12;
  93:20;95:17;96:4;
  99:12
**addressed (1)**
  171:15
**adequately (1)**
  10:22
**adhere (1)**
  22:11
**adjacent (4)**
  55:5;150:15;
  158:12;170:20
**adjourn (8)**
  20:24;21:5;146:22;
  195:18,23;196:3;
  197:9,14
**adjourned (1)**
  198:17
**administrative (4)**
  7:13;9:8;26:10;
  85:19
**admit (4)**
  31:12,12,13;46:5
**admitted (5)**
  45:24;47:2,14;76:5,
  8
**adults (2)**
  163:20;177:11
**advantageous (1)**
  20:15
**adversarial (4)**
  87:4;89:3,7,18

**advise (3)**
  24:21;42:10;110:15
**advised (6)**
  25:7,9;110:12;
  118:14;164:22;181:18
**AE (1)**
  128:19
**AF (2)**
  128:19;131:2
**afford (1)**
  14:10
**afternoon (2)**
  114:23;148:5
**afterwards (1)**
  110:7
**again (23)**
  19:3;24:17,23;
  34:20;48:15;67:11,17;
  88:4;94:14;126:18;
  134:10;135:11;136:2;
  138:14;155:18;
  160:18;161:7,21;
  164:21;165:1;167:15;
  182:1;183:1
**against (29)**
  3:11;4:3;6:6;7:24;
  11:11;12:8;42:4;96:5;
  107:22;109:13;
  111:14;122:1,7,10,13,
  15,21;123:4,12;
  134:12;138:13;
  139:13,24;140:5;
  141:5;143:2,22;144:2,
  7
**agency (1)**
  47:7
**ages (1)**
  177:3
**aggressive (1)**
  74:13
**aggressively (1)**
  43:14
**agitated (1)**
  116:18
**agitation (1)**
  116:12
**ago (4)**
  46:7;77:17;113:13;
  142:17
**agree (28)**
  20:14;40:20;42:18;
  54:17;76:18;77:10;
  78:8;79:1,8;80:11,13;
  83:3;103:19;104:16;
  107:6;113:18,22;
  117:11;121:24;122:2,
  6,11;138:19;160:21;
  170:24;185:22;186:1,
  5
**agreed (5)**
  4:22;18:8;146:17;
  185:7,14
**agreement (3)**

  78:13;79:12;195:2
**ahead (7)**
  64:17;98:21;99:1;
  116:16;184:23,24;
  192:24
**alcohol (10)**
  47:23;103:16,24;
  118:14,21;131:21;
  132:2,3,15;133:12
**alcohol-related (1)**
  133:16
**Alderman (7)**
  50:13,13,19;65:8,9,
  10;96:15
**aldermen (4)**
  50:10;65:6,11;
  66:19
**alderperson (1)**
  50:3
**alderwoman (6)**
  49:22;50:5,20;
  51:11;52:5;91:22
**Alderwoman's (1)**
  50:17
**aligned (1)**
  150:22
**allegation (20)**
  8:15;13:21;103:19,
  21;106:24;107:16,18;
  119:2;122:1,4,7,10,
  12;125:21;127:5;
  141:13;143:20,21;
  168:1;169:9
**allegations (15)**
  5:2,3;6:10;7:5;8:4;
  10:13,18;11:8;13:24;
  27:1;123:4;138:2;
  140:5;144:4,6
**allege (3)**
  93:11;101:16;
  125:14
**alleged (17)**
  6:14,17,24;7:3;
  12:16;13:20;30:21;
  80:21;93:10;106:22;
  110:4;122:19;123:11;
  126:2;138:23;139:2;
  168:24
**allegedly (4)**
  10:24;32:21;47:4;
  113:3
**alleging (2)**
  6:12;33:9
**allow (1)**
  19:5
**allowed (3)**
  18:6;140:10,11
**almost (3)**
  103:15;157:13;
  162:11
**alone (1)**
  78:16
**along (3)**

  34:22;62:14;99:6
**alongside (1)**
  24:8
**alpha (1)**
  169:20
**altercations (1)**
  48:10
**always (1)**
  131:23
**amended (1)**
  126:21
**amendments (2)**
  22:10;38:1
**ample (1)**
  134:14
**and/or (5)**
  51:1;90:2;97:16;
  129:12;131:21
**angry (1)**
  60:16
**answered (7)**
  56:20;84:2;98:23;
  113:15;115:8;182:3,8
**anticipates (1)**
  63:2
**anymore (1)**
  67:8
**apologize (2)**
  75:16;144:22
**app (1)**
  39:9
**apparently (2)**
  8:18;30:17
**appear (3)**
  104:6;153:8;183:15
**appeared (4)**
  101:14;104:4;
  131:7;170:1
**appears (1)**
  133:5
**applicants (1)**
  39:24
**applied (1)**
  37:7
**apply (3)**
  12:5;14:7,8
**appoint (1)**
  198:2
**appointed (3)**
  28:22;77:14,19
**apprise (1)**
  13:19
**approach (3)**
  68:2;134:7;180:21
**approached (3)**
  68:3;102:24;181:1
**appropriate (8)**
  5:5;28:1;53:2;56:8;
  57:5;96:23;100:5;
  107:13
**approximately (18)**
  9:15;37:12;45:7;
  53:22;56:11;57:21;

61:16;70:13;73:9;
77:16;78:16;148:8,16;
150:19;156:20;
176:21;178:5;179:7
**arbitrator (2)**
149:12;152:8
**area (31)**
24:21,24;25:8,15,
16,21;26:3;44:1;48:2,
5;49:22;54:6;59:3;
75:19;92:24;93:2;
94:9,20;97:24;118:15;
145:22;151:4,22;
159:14;160:22;180:5,
10;181:20;183:17;
185:20;190:22
**areas (4)**
24:8;98:2;136:6,20
**argument (2)**
9:4;110:8
**argumentative (1)**
185:13
**arguments (3)**
12:22;13:7;171:5
**arm (1)**
180:18
**Army (1)**
37:5
**around (9)**
67:3,5,17;68:2,3;
73:10;134:18;156:21;
180:4
**arrest (3)**
57:12;94:2,6
**arrestable (1)**
57:8
**arrests (1)**
131:20
**arrival (1)**
182:18
**arrived (5)**
24:10;25:5;179:20;
183:8;191:16
**arriving (1)**
183:5
**ascertain (4)**
58:14;102:10,12;
117:1
**ascertains (1)**
88:1
**aspect (1)**
84:23
**assigned (3)**
24:6;28:21;176:3
**assignment (4)**
23:4,6;29:7,8
**assignments (3)**
60:5,8;129:13
**assist (1)**
24:2
**assistance (1)**
50:24
**assistant (1)**

85:20
**assuming (1)**
31:24
**attempt (1)**
163:19
**attempts (1)**
102:18
**attention (10)**
43:20;57:21;63:15;
64:18,20;71:3;102:19,
21;148:15;175:21
**Attorney (3)**
3:7,17;14:12
**attorneys (1)**
21:12
**audible (1)**
73:1
**audio (1)**
149:13
**audio/video (1)**
149:13
**August (1)**
4:5
**Austin (48)**
6:16;10:3,8,16;
11:13;20:4;23:5;
30:19;35:10,16,21;
36:9;144:24;146:2;
151:18;152:12,23;
153:6,12,22;155:6,14;
156:4;160:7,22;161:1,
15,19,24;162:20,24;
163:10;164:5,14;
165:10,19;166:6,19;
167:6;170:4;171:13,
18,19;172:1,6,20,24;
187:18
**Austin's (2)**
159:19;164:8
**authorities (2)**
31:16;130:1
**authority (9)**
22:18;31:17;68:22;
69:3,6;130:4,8,18,24
**automatic (1)**
154:17
**automatically (1)**
154:17
**available (2)**
196:14,15
**Avenue (1)**
180:2
**avoid (2)**
19:23;20:16
**aware (28)**
9:13;10:13;48:7,22;
91:9;92:9,10,12;
97:12;106:22,24;
107:16;118:23;125:2,
21;126:10,15;127:4;
136:14;137:15;
138:22;142:9,12,15;
144:7;176:6;177:24;

179:2
**away (9)**
19:19;24:12;63:13;
66:17;67:23;161:2;
165:21;179:12;182:13
**aye (6)**
3:3,4;17:13,14;
198:11,12

## B

**bachelor's (1)**
27:20
**back (39)**
19:6;24:12,13,17,
22;25:8;39:12;55:19;
57:18;58:20;59:20;
60:9;61:6,7;67:11,17;
69:19;70:22;100:24;
125:19;146:11;149:5;
152:10;156:17,24;
157:10,14,18;161:6,
24;162:6;163:14;
164:1,3,18;178:15;
180:18;182:12;194:8
**backed (2)**
66:17;181:7
**backing (1)**
169:20
**Bad (1)**
92:13
**badge (1)**
175:1
**ballpark (1)**
150:20
**bank (1)**
37:19
**banners (1)**
177:13
**bargaining (4)**
78:12;79:12;
157:23;158:2
**based (28)**
4:2;9:3;12:13;
13:15;17:2;40:24;
51:12;59:12;68:11;
69:4;80:4;81:3,8,11,
14;93:11;101:6;
103:22;117:19;118:4;
126:6;135:2;141:23;
158:5;171:14;173:6;
174:4;196:19
**basic (3)**
11:8;14:8;26:22
**Basically (15)**
45:3;56:1;57:1;
59:4;111:24;158:13;
159:12,14,15;160:17;
162:1;163:18,23;
164:16;165:3
**basics (1)**
7:14
**basis (5)**

14:6;119:10,21;
142:2;185:10
**bears (2)**
33:5,6
**became (2)**
137:17;142:15
**become (4)**
27:21;32:12;37:7;
92:8
**becoming (1)**
36:24
**begin (1)**
5:23
**beginning (3)**
176:13;177:18;
198:1
**behalf (5)**
3:18,23;4:14;5:12,
14
**behavior (7)**
10:1;22:14;23:7,14;
105:22;107:2,4
**behind (5)**
156:3;177:23;
180:7,16,17
**belief (4)**
81:3;117:12,12;
135:11
**believes (5)**
6:21;46:9;124:4;
147:1;168:20
**belligerent (1)**
66:2
**belongings (1)**
71:14
**benefit (1)**
180:3
**berating (1)**
67:5
**Berge (190)**
3:24;4:4;5:13;6:11,
17;8:22;10:5,21;11:3;
12:3;18:9;22:20;23:3;
24:5,10,11,13,16,18,
21,22,24;25:7,8,9,10,
11,14,15;26:3,10,13,
16,19;27:4,9,10,18;
28:7;30:3,7,17;34:5,
22,24;52:20;53:12;
58:3;60:11,19;61:3,
12,19;62:7,20;63:5,7,
8,18;66:16;68:1;
69:20;71:8;72:18,23;
74:3,14;75:10,14,20;
80:21;82:4;93:11;
96:5,18;97:8,12;98:4,
9;99:4,10,16,20;
100:1,23;101:3,5,9;
102:13;104:2,6,23;
106:7,12;107:22;
109:13;110:4,9;111:8;
112:1,8,12;113:2;
116:1,9,12,23;118:24;

119:6,13;120:2,10;
121:2,9,14,21;123:7,
11;124:21;125:3,14;
131:5,8,16;133:14;
134:1,15,17;135:6;
137:12;138:6,12,23;
141:3,11,20,24;142:9,
21;143:2,19;151:16,
19,21;152:13,19;
153:7,10;155:11,15;
156:4;157:14;158:5,
16;160:6;161:15,19;
162:21;163:1,11;
164:3,7,16,22;165:6,
17;171:22;172:2,20;
173:22;174:1;180:12,
24;181:7,11,15,17,19;
182:6,11,12;183:5,10,
12,19,23;184:5,15;
185:18;188:7
**Berge's (11)**
23:6;25:18;69:9;
71:2;73:14;75:23;
80:1;107:17;125:23;
138:16;159:18
**besides (2)**
58:6;157:24
**BESSANT (15)**
13:5,12;14:17;15:5;
17:7;19:21;145:1,3,
11,19;192:1;194:16;
195:22;196:8,10
**best (3)**
21:16;163:22;
164:23
**bet (1)**
171:7
**better (2)**
27:22;118:2
**beyond (2)**
4:18;13:23
**bias (1)**
196:22
**bifurcated (1)**
4:23
**Big (5)**
30:24;31:1;41:18;
61:16;176:14
**bigger (1)**
33:1
**bill (19)**
5:13,15;6:4;9:2,9;
13:8;14:17,19,21;
15:3,8,11,12;18:16:22,
24;17:2,10,19
**Bird (3)**
176:23,24;177:17
**bit (5)**
148:10;152:6;
159:16;181:8;183:23
**bits (1)**
161:11
**bizarre (1)**

26:18
**Black (1)**
194:1
**Blacks (1)**
122:22
**blinked (1)**
63:18
**blocks (2)**
25:7;179:12
**blood (1)**
116:24
**blowup (1)**
110:4
**Board (22)**
3:9;4:2;6:2;7:13,20;
8:3,20;11:24;12:6;
18:18,22;27:21;29:12;
30:11;33:23;79:10;
89:21;129:3;163:6;
196:20,22;197:2
**Board's (1)**
12:10
**body (1)**
11:9
**book (1)**
156:9
**both (21)**
3:13;4:6,10;10:6,
11;16:10;21:11;26:6;
32:10;34:21;72:9;
101:22;132:7,21;
156:11;158:13;160:2,
4;163:14;170:2;181:6
**bound (1)**
42:9
**branches (1)**
37:4
**break (6)**
19:5;34:18;146:7,9,
12;174:13
**breath (4)**
67:21;103:11,14,15
**brief (2)**
20:2;137:8
**briefing (8)**
73:6;149:10,17;
154:14;155:4;156:9,
10;170:20
**briefly (4)**
6:1;9:1;11:23;137:7
**bring (7)**
19:8;137:3;197:16,
21,24;198:6,7
**bringing (2)**
80:16;195:11
**brings (3)**
30:10,11;107:21
**brought (5)**
14:11;32:5;34:3;
132:21;145:18
**building (3)**
50:2;61:10,11
**burden (7)**

13:22;20:20;33:5,6;
34:3,7;125:14
**business (1)**
45:16;46:15;47:11;
105:3
**businesses (1)**
131:2
**busting (2)**
62:8,10
**busy (2)**
59:17;60:5

**C**

**CAD (7)**
45:3,21;47:8;90:14;
91:18,20,20
**calculated (1)**
130:16
**call (30)**
20:11,11,14;34:24;
35:10;53:4;54:9;
56:18;58:17;59:4,17;
70:22;71:5,6;94:7,10,
18,19;97:2,3,5;100:3;
145:12;146:15;178:6,
8,9,13;179:5;192:13
**called (16)**
3:10;18:5,10;22:7;
25:1;35:17;52:23;
65:13;66:19;101:24;
147:11;174:19;
190:12,22;193:15,18
**caller (1)**
69:23
**calling (2)**
65:7,11
**calls (4)**
44:13;45:7,13;
57:17
**Calm (2)**
60:13;100:19
**came (11)**
15:5;67:4,17;68:3;
69:13;72:1,5;125:11;
156:23;183:21;192:16
**cameras (2)**
26:2;180:5
**can (114)**
6:13;7:9,22;9:14;
12:17;18:19;19:9,11,
12;20:2,10;28:2;31:4,
17;35:22;36:2,3,4,23;
37:23;38:19,22;39:2,
7,8,9;40:17,18;41:8;
43:7;44:24;45:2,16,
22;46:17,24;48:17;
49:8,12;51:18,24;
55:12,16;56:2;57:12;
58:19;62:23;64:7,17;
67:13,13,14,20;70:22;
73:22;77:7;80:17;
81:23,24;82:17,18;

84:7;86:12;88:10;
90:3;95:14,18;96:9;
99:24;118:5;121:11;
125:8;127:13,14;
128:15,18,24;129:3;
132:21;133:7;135:10;
139:19;147:6,15,16,
17;149:21;152:20,22;
161:14;162:7;165:5;
168:15;169:6;170:12;
174:24;180:6;182:1;
183:2;184:23;185:13;
186:18,20;190:19;
191:7;192:19,21;
194:8;195:15;196:6,
18,22;197:16;198:6
**capacity (1)**
47:19
**car (11)**
176:4,17;177:22,23;
180:7,8,8,17,20;
183:16;185:8
**carbon-copied (1)**
50:7
**career (6)**
22:10;28:17;66:2;
122:14,17;126:22
**carried (1)**
197:8
**carry (2)**
57:15;130:2
**carrying (1)**
129:12
**case (25)**
6:7;8:1,16;12:12;
20:6;27:10;30:24;
32:8,23;33:5,18;
86:20;92:16;96:2;
97:1;107:15,21;109:5;
120:3;129:5;146:24;
147:1;191:1,3;194:9
**cases (3)**
10:22;32:1;132:2
**Caucasian (1)**
120:18
**cause (3)**
118:3,4,5
**causing (1)**
48:10
**caution (1)**
34:13
**CBAs (1)**
167:18
**CC (1)**
166:21
**CC'd (1)**
115:20
**cell (3)**
39:8,10;178:8
**Center (3)**
45:20;47:10;150:3
**certain (6)**
46:4;47:9;48:15;

59:11;187:19;188:22
**certainly (16)**
6:7;7:14;9:14;
29:24;57:10;76:22;
77:11;95:11;99:20;
103:18;107:1;126:1;
170:4;171:1,4,10
**chain (7)**
22:2,13;40:21;49:8;
91:22;185:22;187:17
**chair (5)**
19:9;23:10;75:12;
100:24;164:17
**CHAIRMAN (42)**
3:1,5,8;13:2,14;
14:12,15,19,23;15:3,9,
12,21;16:2,8,11,17;
17:6,9,15;18:23;
19:14,16;21:10,14,18;
146:8;147:3;194:5,8,
13;195:15,20,24;
196:2,9,11,15;197:6,
14,19;198:6
**challenge (1)**
32:3
**chance (1)**
81:22
**change (10)**
31:8;32:12;37:24;
54:10;66:6;73:3,4,5;
148:12;154:19
**changed (3)**
31:19;126:21;140:8
**changes (3)**
31:14;38:1,2
**changing (1)**
31:6
**character (2)**
28:4;122:20
**characterization (1)**
182:21
**characterize (3)**
152:22;153:2;189:7
**characterizing (1)**
185:11
**charge (7)**
8:16,18,19;10:22;
33:7;142:2;178:23
**charged (2)**
14:11;168:6
**charges (21)**
3:11;4:3,7,22;5:10,
17;7:1,4;8:2;11:7;
12:8;13:18;14:6,16;
15:1,2;27:2,3;30:17;
34:3;96:5
**check (14)**
52:22;56:3;57:2;
65:7,11;82:2,8;96:2,6,
21;98:5;99:12,24;
136:22
**checked (4)**
82:9,11;96:10;

143:18
**checking (1)**
52:11
**chest (4)**
68:5,5;160:12,12
**Chief (190)**
3:16,18,19;4:4;6:7,
12,14,19,20,21;7:15;
8:21,22;9:21;10:8,16;
11:1,4,14;12:17;
13:20;15:10,19;18:9;
23:2,19,23;24:2,3,12,
14,15,18,19,22,23;
25:1,14,19;26:5,9,11;
27:2,16;28:1;29:4,5,
21;30:19;31:1,7,12;
32:11,17;33:5;34:3,3,
4,7,21,24;38:12;
40:10,11,12,12,14,16,
16;41:3,4,4,11,13;
44:18,21;49:4,8,18,
21;51:16;52:12;
74:17;77:20;84:6;
85:19,22;88:1,17;
90:11;91:11,23;92:17;
96:17;109:24;110:10,
16,16,19,19,21,21;
111:4,17,20,22,23;
112:10,11;113:23,24;
115:6,13,18,19,20,21;
118:13,22;119:2;
121:17;122:20;
124:20,20;135:16,16;
137:22,23,24;138:11;
139:8,11,12;140:2,2;
142:11,11,22,22;
144:7,8,13;145:4;
146:14,16,19,24;
166:6;175:18,18;
176:18;177:24;178:7,
11;179:6,20;180:6,24;
181:8,9,10,18;182:5;
183:4,9,22;184:2,9,
13;185:2,4,5,19;
186:1,7;187:3,15,24;
190:13,14;191:1,18;
192:8;195:2,11,13;
197:10,11,16,21
**chiefs (1)**
7:8
**Chief's (17)**
13:8,22;14:6;15:15,
17;20:20;25:10;
47:14;76:3,7;79:22;
85:18;145:17;184:17,
20;185:3;192:3
**children (1)**
177:10
**choose (2)**
28:2;29:17
**chose (3)**
28:2,3;29:5,18;
170:17

**chosen (1)**
29:21
**chronological (1)**
154:1
**church (2)**
43:24;44:4
**circle (2)**
179:24;180:1
**circumstances (1)**
28:14
**citation (1)**
57:6;98:12;99:5
**citations (8)**
9:21;53:2;56:8;
57:7;58:5,18;96:23;
99:7
**cite (2)**
6:13;126:24
**cited (3)**
127:19;128:12;
136:3
**cites (1)**
136:2
**citizen (1)**
66:19
**citizens (3)**
65:10,13;67:14
**City (27)**
3:10,12;5:18;18:7;
23:19,22;30:8;31:6;
37:1;43:21;47:7;50:7,
11,21;52:24;56:5,7;
57:4;86:1;96:21;
97:23;100:5;136:6,14;
147:22;176:8;195:1
**Civil (6)**
9:4,6;11:24;12:5;
14:7
**civilian (4)**
84:24;85:5,16;
86:11
**civilians (2)**
85:13;86:8
**claim (2)**
104:2;125:4
**claimed (3)**
106:12,14,15
**claims (1)**
128:11
**clarification (1)**
36:1
**clarify (1)**
192:2
**classified (1)**
152:15
**clear (8)**
8:4;14:10;46:17;
64:10;75:18;151:20;
190:3;197:6
**clearly (3)**
7:22;23:16;36:3
**clerk (2)**
85:21;105:2

**client (4)**
4:15;6:24;32:21;
168:5
**close (13)**
21:6;67:18,21;
103:11,13,14;116:19;
154:17;158:14;160:7,
8;170:17;180:2
**closed (9)**
12:24;23:8;63:9;
66:13;154:15;156:3;
159:23;162:16,18
**closer (1)**
154:17
**closing (2)**
197:11,13
**Code (6)**
9:4,6;11:24;12:5;
50:9;51:1
**coding (1)**
59:10
**coincidentally (1)**
121:23
**collective (2)**
78:12;79:12
**College (1)**
27:19
**combination (1)**
177:10
**comfortable (2)**
17:12;50:2
**coming (10)**
19:3;46:22;73:6,7;
129:6,21;156:12;
159:22;194:22;195:12
**command (15)**
22:2,3,4,13;40:21;
42:7;93:12;117:13;
140:14;152:12;173:5;
185:23;187:17;188:8;
189:2
**Commander (91)**
6:15;10:2,3,8,16;
11:12;20:4;23:5,5,11;
30:19;35:10,21;36:18,
21;40:20;41:14,15;
43:7;44:24;46:12,16;
47:5,18,20;48:8;51:7;
52:20,21;67:8;73:22;
76:1,13;77:14;82:19;
85:20;95:4;105:14;
123:3;125:18;126:12;
128:1;131:19;134:1,
14;136:17;137:5;
144:21,24;146:2;
148:9;151:17;152:12,
23;153:6,12,21;155:6,
14;156:4;158:19;
159:19;160:6,22,24;
161:15,19;162:20,24;
163:10;164:5,8,13;
165:10,19;166:6,18;
167:5;170:4;171:12,

18,19;172:1,6,19,24;
173:9;175:19,20;
178:19,22
**commanders (2)**
41:3,14
**commander's (1)**
23:10
**commanding (2)**
86:13;107:2
**commands (2)**
8:8;134:10
**commence (1)**
34:23
**commencement (1)**
4:16
**commencing (1)**
17:22
**comment (1)**
64:6
**Comments (3)**
5:23;68:13;196:20
**Commission (39)**
4:21,23;5:22;12:21,
23;13:16,17;14:9;
17:18;19:3,10;21:5,
22;27:8;32:5;34:10,
20,21,23;35:23;36:3;
41:8;45:1;47:3;49:12;
73:21;75:16;88:18;
96:11;128:23;135:12;
146:1,6;147:4,15;
180:3;191:24;195:4,
18
**COMMISSIONER (30)**
13:3,5,12;14:17;
15:5,24;16:19;17:4,7;
19:18,21,22;145:1,3,
11,19;191:15,22;
192:1,12,21,23;193:1,
6;194:16;195:22;
196:1,6,8,10
**Commissioners (11)**
3:10;4:2;13:6;14:4;
19:10;34:14;35:7;
144:23;174:6;191:13;
193:11
**commissioners' (1)**
146:14
**Commission's (1)**
5:10
**commit (1)**
136:15
**committed (3)**
31:24;34:5;139:2
**committee (1)**
158:3
**committing (3)**
94:4;136:7;137:13
**common (1)**
150:2
**communication (1)**
58:3
**Communications (2)**

45:20;47:7
**community (1)**
93:17
**community-based (1)**
31:9
**company (1)**
38:4
**compared (1)**
150:24
**comparison (1)**
32:10
**complainant (1)**
138:5
**complainants (2)**
30:24;32:23
**complaint (62)**
5:2;6:3;12:11,13;
14:1,4;33:15;51:20;
81:7,11,14;82:3;
87:20,22;88:2;90:8;
92:22;105:20,21;
107:22;108:7;109:12;
118:22;124:7;125:2,
22;137:12,18;138:7,
10,13,15;139:13,24;
140:22;141:4,5,16;
142:10,14,16,19,21;
143:2,4,7,8,9,12,13,
15,16,17,19;144:1,1,
10,13;145:4,7,8,10
**complaints (9)**
12:11;30:23;49:23;
52:3;91:10;97:17;
111:14;113:19,23
**complete (1)**
114:19
**completed (1)**
114:17
**compliant (1)**
119:6
**composure (1)**
66:4
**compound (2)**
133:3;141:7
**compounds (1)**
102:14
**computer (1)**
38:24
**computer-aided (1)**
47:8
**computer-based (1)**
38:21
**concern (1)**
172:2
**concerned (1)**
170:16
**concerning (2)**
109:13;130:8
**concise (1)**
12:12
**conclude (2)**
33:24;120:23
**conclusion (1)**

163:6
**conduct (15)**
10:1;30:13;72:4;
116:20,21;117:14;
118:8;126:11,17;
130:8,9;153:4,4;
140:11;144:2
**conducted (4)**
23:21;54:10;
113:18;148:13
**conference (2)**
19:6;35:22
**confirm (1)**
122:19
**confirmed (1)**
122:18
**conflict (1)**
42:11
**confront (1)**
134:18
**confuse (1)**
20:18
**confused (1)**
140:23
**connection (1)**
130:24
**connectivity (1)**
39:7
**consider (4)**
12:21;28:19;65:14,
17
**considered (3)**
84:7;166:24;167:1
**considering (1)**
17:11
**constitute (2)**
130:1;138:20
**constituted (1)**
130:8
**construed (1)**
133:8
**consumed (1)**
132:3
**consuming (1)**
47:23
**contacting (1)**
65:10
**contain (5)**
8:15;10:18;79:2,10;
168:14
**contained (7)**
27:2;49:14;52:8,10;
79:11;129:15;130:4
**contains (1)**
47:9
**contents (1)**
92:10
**contingent (1)**
83:5
**continuance (2)**
195:15;197:20
**continue (5)**
20:17;21:1;70:8;

2:20-cv-02310-CSB-EIL  # 17-15  Page 125 of 270
Kankakee Board of Fire and Police Commissioners
Meeting

Seargeant Paul Berge
September 15, 2020

146:23;198:14
**continued (1)**
   24:15
**continuing (1)**
   198:9
**contract (1)**
   118:4
**contradictory (2)**
   87:3;89:7
**control (3)**
   23:21;24:4;114:11
**conversation (23)**
   10:3;52:13;54:3;
   55:19;56:6,9,12,14,
   24;57:19;65:15;
   69:22;70:4,8;72:17;
   74:2;97:6;153:1,5;
   155:1;161:8;163:18;
   180:23
**cooperate (1)**
   66:3
**copied (1)**
   50:13
**copies (3)**
   13:7,10;37:15
**copy (4)**
   10:12;15:20,23;
   22:8
**corner (1)**
   35:24
**correctly (1)**
   16:23
**counsel (15)**
   5:11;9:15;10:11,18;
   12:23;13:7;34:23;
   48:16;123:3;125:18;
   132:7,11,21;134:10;
   192:11
**counsel's (1)**
   9:4
**count (3)**
   6:21;11:5;142:2
**country (1)**
   31:20
**counts (1)**
   14:1
**county (3)**
   9:18;24:9;179:15
**couple (5)**
   10:16;24:8;25:6,6,
   37:4;56:15;75:7;
   163:15,24;165:7
**course (7)**
   13:20;45:16;46:15;
   47:11;66:1;126:22;
   168:23
**court (12)**
   19:5;20:18;32:1;
   35:24;36:1,4;40:17;
   110:18;146:7;174:14;
   193:4,5
**courteous (2)**
   87:14,15

**courthouse (12)**
   9:18;24:10;178:15,
   15,17;179:15;180:1;
   181:13;182:13,19;
   191:17,21
**courtroom (1)**
   194:22
**covering (1)**
   172:16
**credibility (3)**
   18:17;196:24;197:4
**credit (1)**
   29:19
**criminal (6)**
   44:14;45:9;57:10;
   92:20;97:13,16
**critical (1)**
   149:14
**cross-exam (1)**
   11:10
**cross-examination (5)**
   11:17;76:11;132:9;
   169:13;188:3
**cross-examine (2)**
   16:13,21
**crotch (12)**
   75:19,22;106:16,18,
   18,23;123:12;125:5;
   137:14;138:18;139:3;
   144:17
**crowd (6)**
   24:13,15;176:14,15,
   19,21
**current (3)**
   36:18;147:23;148:3
**currently (2)**
   5:22;175:3
**curt (11)**
   86:22,23;87:2,8,10;
   88:6;89:12,18,23;
   90:2;134:21
**Curtis (2)**
   50:14,18
**cut (1)**
   98:18

**D**

**damage (1)**
   44:14
**Dan (1)**
   3:22
**darn (1)**
   29:23
**data (1)**
   37:19
**date (13)**
   49:15;57:24;60:2;
   93:3,20;94:23;125:1;
   146:23;149:1;166:13;
   176:6;178:6;187:11
**dated (3)**
   74:19;166:10;

167:11
**dates (7)**
   10:23;11:1;26:6,7;
   28:6;46:6;91:6
**DAVIS (41)**
   3:1,5;13:2,14;14:12,
   15,19,23;15:3,9,12,21;
   16:2,8,11,17;17:6,9,
   15;18:23;19:14,16;
   21:10,14,18;146:8;
   147:3;194:5,8,13;
   195:15,20,24;196:2,9,
   11,15;197:6,14,19;
   198:6
**dawned (1)**
   20:23
**day (42)**
   25:3,3;28:12,13;
   52:21;98:1,1;100:14;
   109:7,21;110:3;
   114:15,18,20;148:4;
   151:7;152:8;164:21;
   165:5;166:8,9,15;
   167:12,14;171:23;
   172:3;175:23;176:4;
   178:1,20,24;181:16;
   182:16;187:13,14;
   188:8,19,23;189:6,19;
   192:16;193:22
**days (4)**
   4:19;23:17;95:24;
   198:2
**deal (5)**
   30:24;31:1;66:1;
   177:20;192:16
**dealing (1)**
   194:14
**dealt (2)**
   66:2;158:7
**Dearborn (17)**
   43:22;47:19;49:19,
   20;50:1;58:4;65:2;
   93:13,14;95:8;96:4;
   97:9,14,18;100:11,13;
   136:24
**death (2)**
   32:6,9
**decided (2)**
   24:4;70:5
**decision (1)**
   73:17
**decompress (1)**
   112:5
**defending (3)**
   6:6;7:24;134:11
**defense (1)**
   16:20
**defer (1)**
   18:21
**defiance (1)**
   22:17
**defiant (1)**
   23:15

**defined (1)**
   25:4
**defines (1)**
   88:10
**definitely (1)**
   159:24
**definition (36)**
   43:1,4;68:1;69:4;
   77:21;78:5;79:3,6,9,
   15,19,19,22;80:1,13;
   81:4,8,12,14,15,17;
   82:12;83:23;84:12,21;
   86:11,16,18,24;87:7,
   12,16,18;88:5,7;120:6
**definitions (3)**
   78:22;89:17;127:1
**degree (1)**
   27:20
**delay (1)**
   129:11
**deliberate (3)**
   12:24;13:4;130:2
**demeanor (1)**
   60:12
**demilitarize (1)**
   31:10
**demonstrated (1)**
   103:7
**denial (1)**
   17:13
**denied (2)**
   11:19;17:10
**deny (2)**
   16:22;17:19
**Department (86)**
   3:12;8:6;22:4,7,12,
   15;23:1,2;27:5,23;
   28:18;29:2,19;36:14;
   37:8,15;38:2,11,24;
   39:5,13;40:10,22;
   41:10,12,18,24;45:15;
   48:23;50:24;51:1;
   52:9;53:16;67:7,8,9,
   10,10;71:12,15;76:20,
   22;77:2,11;78:9,9,19;
   79:11,13;80:4;82:20;
   83:4,24;84:8,19;85:5,
   17;86:4;88:8;95:23;
   105:7,8;107:3,5,9;
   108:13,19;117:22;
   122:17;130:10,11,19;
   136:14;149:1;167:22;
   168:4,23;175:4,7,14,
   16;177:16;185:23;
   186:3;190:22;191:1
**departmental (4)**
   81:15,16,21;82:9
**departmental's (1)**
   81:12
**department-related (1)**
   131:1
**departments (2)**
   21:24;31:20

**department's (11)**
   22:11;37:16;38:23;
   42:13;79:5;80:5;82:2,
   21;87:17;88:7,12
**depending (2)**
   132:2;189:3
**depends (1)**
   133:3
**depot (3)**
   97:20;179:8,9
**depth (1)**
   61:24
**deputy (29)**
   41:3,13;49:18,21;
   51:16;52:12;85:22;
   91:22;96:16;109:24;
   110:16,19,21;111:4;
   112:10;113:23;
   115:19;124:20;
   135:16;137:22,23,24;
   138:11;139:7;140:2;
   142:10,22;144:8;
   175:18
**describe (2)**
   149:21;162:7
**description (2)**
   162:2,4
**deserves (1)**
   34:6
**Deshawn (1)**
   36:9
**desirable (2)**
   29:7,10
**desire (1)**
   30:1
**desk (55)**
   61:6,12,16,18,19,20,
   24;62:2,3;63:6;64:4,6,
   13,14,18,19;66:18,22;
   67:1,3,5,17;68:2,3;
   69:9;75:8,9,13;
   100:23;102:17,24;
   103:4,6;134:18;150:6,
   23,24;151:5,16,17,19,
   20,21;155:7,11,12,13,
   15;158:17;160:16,19,
   20;164:4,17;165:8
**desks (3)**
   61:1;150:7;159:15
**despite (2)**
   28:6;120:5
**destroy (3)**
   122:14,16;130:17
**detail (1)**
   134:14
**detailed (2)**
   23:24;24:6
**details (1)**
   6:10
**determination (1)**
   116:5
**determine (9)**
   8:3,4,11;27:24;

117:15;118:6;135:12;
163:6;197:4
**determined (1)**
8:17
**determining (1)**
196:23
**diagonally (1)**
63:13
**died (1)**
31:21
**difference (1)**
171:2
**differences (1)**
76:19
**different (12)**
8:2;29:5;37:4;51:9;
89:8;94:21;99:3;
106:21;121:22;133:2;
189:3;191:4
**difficult (1)**
161:8
**dimensions (1)**
150:20
**direct (39)**
6:15,16;7:5,7;10:7;
23:9;24:14,19;30:22;
32:20;33:9,11;35:19;
36:2;70:1;74:3;83:4;
98:8;99:9,11,16;
109:18,22;110:5,9;
134:15;147:13;164:6,
8,19,23;169:8;173:1,
7,10;174:21;186:13;
187:7;188:15
**directed (6)**
24:12;26:13;51:16;
181:19;186:23;187:1
**direction (3)**
24:16;87:5;172:13
**directions (2)**
10:19;191:19
**directive (20)**
22:3,5;43:12;77:24;
84:16;95:1,11,16;
96:24;97:7;117:3;
118:1;144:4;152:12,
16;163:1,5;182:21;
183:1;192:3
**directives (15)**
26:4,23;30:18;
94:22;95:1,2,6;96:3;
117:23;130:3;136:19,
23;182:18;183:5;
191:19
**directly (6)**
66:1;110:6;147:16;
151:4;157:7;187:17
**Director (2)**
21:9;50:9
**disagree (3)**
87:5;89:10;90:3
**disagreeing (1)**
89:2

**disagreement (1)**
89:18
**disagrees (3)**
89:11,22,24
**disappear (1)**
96:1
**discernible (1)**
104:9
**disciplinary (2)**
4:3;15:2
**discipline (8)**
28:19;78:19;80:16;
108:16;130:11;
145:18,22;158:9
**disciplined (3)**
80:12;118:7;140:4
**disconnect (2)**
71:5,6
**discourteous (8)**
74:9;86:22,23;
87:11,12,13;88:6,11
**discovery (1)**
10:13
**discredit (2)**
130:12,17
**discretion (3)**
57:12;99:8,8
**discuss (5)**
18:12;34:15;146:3;
174:10;194:21
**discussion (2)**
152:4;164:21
**disk (1)**
37:22
**dismiss (5)**
5:17;6:5;7:10;17:2,
20
**dismissive (1)**
65:14
**Disobedience (1)**
129:24
**disobedient (1)**
43:16
**disobey (1)**
74:3
**disobeyed (2)**
24:19;32:14
**disparage (1)**
122:20
**disparaging (1)**
130:7
**dispatch (3)**
47:9,10;59:16
**disregards (1)**
43:14
**disrespectful (22)**
23:11;43:18;74:11;
78:2;84:11;86:16,17,
19,24;87:15,17,18;
88:5,7,11,13,15,16,22,
23;90:2;134:22
**disrupting (1)**
155:3

**disruptive (4)**
170:9,10,15,19
**disrupts (1)**
130:9
**disseminate (1)**
167:3
**distance (2)**
19:15,17
**distinguished (1)**
28:23
**division (3)**
94:22;95:23;136:18
**document (22)**
14:13,14;46:3,8,10,
19,21,22;47:2,6;
90:10;92:9,11,14;
108:4;111:13;114:1,4,
7;128:13;129:1;154:9
**documented (1)**
187:10
**documents (4)**
5:11;9:16;79:2;
90:21
**done (8)**
51:12;67:6;140:20;
161:20;167:12,13;
175:20;181:3
**DONELL (4)**
35:16;36:9;151:17;
187:18
**door (22)**
55:9;62:9;63:4;
66:12,14;150:3,4,8,12,
13,24;151:10,16;
154:12,15;156:3;
157:19;158:13;159:9,
23;162:16;170:18
**doorway (2)**
151:23,24
**down (17)**
19:5,17;20:3,13;
38:12;41:10;70:23;
77:22;104:20;149:11;
150:2;163:15,24;
169:20;179:8,9;187:5
**Downstairs (5)**
19:11,23;20:10,14;
21:15
**downtown (3)**
97:24;179:9,11
**draw (5)**
43:20;57:21;
116:24;148:15;175:21
**drinking (4)**
44:16;50:1;103:18;
118:20
**drive (3)**
179:14,24;180:2
**drop (1)**
167:7
**drug (4)**
29:13;44:15;45:10;
131:24

**drugs (3)**
29:15;131:21,23
**drunk (1)**
171:23
**due (9)**
9:12;11:6,6,18;
14:11;42:4;116:11,17;
168:23
**DUI (1)**
131:20
**duly (4)**
35:17;130:8;
147:11;174:19
**during (27)**
7:19;9:22;10:9;
11:2;22:10;26:19;
37:5;45:6;65:15;74:2;
134:5;137:18;138:4,9,
16;139:6;142:1,13;
143:3,6,10;144:15;
152:11;178:12;
181:12;188:23;189:24
**duties (6)**
8:8;60:5;104:17;
140:8;163:2;188:19
**duty (23)**
8:9;71:11;83:19,22;
103:18;105:9,21,24;
107:7;108:23;111:8,
12;112:1,7,19;113:7;
117:14,14;124:5;
163:11;164:9;172:21;
182:16

**E**

**earlier (3)**
68:11;98:13;148:10
**easier (1)**
129:2
**easily (1)**
154:24
**East (3)**
59:16;61:14;180:1
**easy (1)**
189:17
**effect (6)**
56:17;63:21;
143:22;152:17,19;
161:18
**effective (1)**
29:14
**efficiency (2)**
130:10,11
**egregious (3)**
30:13;33:19,20
**either (15)**
5:23;17:21;37:22,
24;63:20;116:1;131:8,
16;149:2;159:18;
161:15;163:20;166:8;
178:6;192:11
**elapsed (2)**

156:20;164:11
**elected (1)**
50:21
**elements (2)**
14:8;33:6
**elevated (1)**
153:3
**elicit (1)**
183:2
**eligibility (1)**
198:4
**else (24)**
18:13,14;28:7;
46:16;52:9;55:22;
60:22;110:14;111:9,
10;113:8;138:8,11;
139:10,21;145:24;
152:16;161:23;
164:15,17;182:14;
191:23;192:10;193:10
**elusive (1)**
65:17
**e-mail (29)**
49:8,13,14,16,17,21,
22;50:4,7,16,18,23;
51:5,12,16,24;52:1,8,
9,10,19;90:15;91:22;
92:4;96:15,16;97:11;
125:2;167:6
**emanated (1)**
30:21
**eminently (1)**
126:12
**employed (6)**
36:13,16;85:24;
148:24;175:3,6
**employee (16)**
6:8;30:15;33:3;
43:11;77:24;84:15,19;
85:24;24;86:3,6,6;
89:11,11;90:3;118:9
**employees (2)**
85:16;117:13
**employment (1)**
36:24
**encourage (1)**
48:16
**end (6)**
54:14,18;124:1;
150:1;156:6;179:24
**ended (1)**
123:3
**ends (1)**
148:6
**Enforcement (4)**
29:11;31:6,9;50:9
**engage (1)**
69:22
**Engineering (1)**
97:21
**enough (8)**
13:18;14:5;19:16;
32:22;103:15;177:20,

23;189:18

**ensure (5)**
52:22,24;57:4;66:6;
96:20

**enter (4)**
150:23;151:6,11;
159:13

**entered (10)**
45:21;60:18;61:4;
151:9,13;156:21;
157:2;159:10,13;
162:19

**entering (1)**
159:19

**entire (3)**
66:6;95:22,23

**entitled (1)**
12:7

**entity (1)**
145:5

**entries (1)**
47:9

**equal (1)**
169:11

**escorting (1)**
178:2

**essence (1)**
59:12

**essentially (2)**
8:17;22:17

**establish (2)**
46:19,20

**established (1)**
171:17

**estimation (1)**
14:5

**Even (14)**
33:14,16;39:8;66:5;
104:9;116:22;125:4;
132:2;135:8;152:9,17;
156:10,13;158:11

**evening (5)**
3:22;35:21;76:13;
114:23;148:4

**even-keeled (1)**
66:8

**events (3)**
153:14,15,18

**eventually (1)**
24:22

**everybody (4)**
19:10;149:2;
182:14;195:2

**everyone (4)**
29:1;38:10;140:14;
179:2

**evidence (21)**
4:21;5:1;13:24;
16:7;23:14;26:3,15,
21;28:23;32:20;
33:11;45:24;46:22;
53:7;91:13;96:6,10;
117:1;133:21;139:16;

191:3

**exact (4)**
114:21;126:24;
157:13;163:12

**exact- (1)**
68:19

**exactly (12)**
7:16;12:15;65:23;
94:23;134:14;138:23;
140:16;152:5;166:24;
184:2;185:2;194:7

**EXAMINATION (7)**
35:19;123:1;
134:15;141:1;147:13;
174:21;190:8

**examined (4)**
18:21;35:18;
147:12;174:20

**example (3)**
31:18;37:1;149:24

**examples (2)**
10:20;26:20

**except (1)**
172:15

**exchange (2)**
161:6;162:10

**exclude (2)**
17:24;18:4

**excuse (10)**
13:23;18:11;40:11;
71:9;110:17;111:24;
129:14;132:20;144:9;
146:19

**excused (1)**
194:20

**Exhibit (18)**
44:18,21;45:1,24;
47:14,17;49:4,8;76:3,
7;90:11,17,23;91:10,
11;92:4,14;128:5

**existed (1)**
96:6

**exit (1)**
157:6

**exited (7)**
24:11;154:12,15;
156:2;158:23;159:2;
160:23

**exiting (1)**
170:18

**expecting (1)**
156:12

**experience (3)**
37:2;39:13;131:20

**expert (3)**
73:17;126:7,10

**explain (4)**
22:13;26:11;33:12;
51:24

**explains (1)**
88:9

**explanation (1)**
59:23

**explanations (1)**
26:18

**exploiting (1)**
32:7

**express (1)**
172:1

**extent (1)**
130:9

**extra (3)**
45:10;94:8,11

**eyes (5)**
23:8;63:9,9,19;
132:24

**eyesight (1)**
63:13

**F**

**face (19)**
23:10;68:5,5;75:23;
106:7,16,18,23;
123:13,15,19;125:5;
134:7,19;137:14;
138:19;139:3;141:17;
144:17

**face-to-face (2)**
56:12;97:5

**facilitate (1)**
38:4

**facility (1)**
34:12

**fact (17)**
3:9;17:11;38:18;
83:5;99:13;103:22;
106:11,22;116:11,17;
117:15;118:20;120:5;
122:2;138:22;142:20;
170:8

**factors (1)**
28:18

**facts (6)**
10:18;12:13;31:23;
47:3;115:3;116:8

**factual (2)**
35:5;46:5

**Failed (17)**
6:14;10:6;11:3;
22:20;23:4,7;24:14;
26:4,7,22;30:17;
32:21;70:17;133:18;
186:12;190:13,23

**failing (1)**
118:7

**failure (6)**
8:8;25:19;30:22;
129:11;130:2;168:6

**fair (6)**
61:23;78:15;80:6;
141:23;189:18;193:24

**fairly (2)**
18:7;150:13

**fairness (1)**
14:8

**false (3)**
6:21;130:15,21

**falsifications (1)**
108:15

**familiar (3)**
42:16;167:18,21

**familiarity (1)**
46:13

**far (10)**
9:2,11;11:6;90:23;
136:6;140:22;148:3;
154:1;182:5;196:20

**fashion (1)**
43:13

**fast (1)**
32:22

**father (1)**
30:14

**favor (6)**
3:2;17:12;196:5;
197:9;198:9,11

**fear (3)**
32:4,4,4

**feasible (1)**
117:9

**federal (1)**
193:5

**feedback (1)**
57:17

**feel (2)**
17:12;167:3

**feelings (3)**
32:17,24;34:1

**feet (11)**
61:5,24;62:3;63:6;
66:22;100:23;103:3;
150:21,21;161:2;
181:7

**fellow (3)**
22:22;23:1;26:24

**few (7)**
23:17;67:24;
149:10;163:14;164:1;
165:2;173:13

**field (2)**
116:21;133:15

**fights (1)**
171:8

**figure (1)**
159:16

**file (8)**
74:16;114:3,5;
138:10;143:4,8;145:3,
7

**filed (16)**
3:11;4:3;5:11,12,14,
16;9:3;12:22;15:7,10,
19;27:3;81:7,9,11;
92:16

**filing (1)**
142:21

**fill (1)**
36:5

**final (1)**
8:10

**finally (1)**
25:14

**find (5)**
58:17;60:11;74:6;
89:7;188:21

**fine (5)**
13:3;18:2;44:19;
57:15;76:14

**finish (5)**
94:13,15;110:17;
121:11;197:7

**finishing (2)**
11:14;146:24

**Fire (10)**
3:9;4:2;7:16,17;
14:8;30:12;32:13,14;
34:12;88:18

**fired (6)**
30:20;32:6;33:20;
34:6;45:11;122:21

**fireworks (1)**
45:11

**First (22)**
8:4;20:3;35:1,8,17;
39:4;53:12;73:7;
92:13;111:3;123:6,20,
23;131:15;147:11,18;
158:8;169:8;174:19;
190:20;191:5,9

**fit (1)**
28:1

**fits (1)**
88:9

**five (6)**
6:20,22;28:12,13;
102:22;179:12

**five-minute (1)**
28:20

**floor (1)**
196:5

**FLORES (6)**
13:3;15:24;16:19;
17:4;19:18;191:15,22;
192:21;193:1,6;196:1

**Floyd (4)**
31:21,21;32:7,8

**folder (1)**
16:1

**follow (46)**
6:15;8:8;22:10;6;
11:22;22:11,20;23:4;
24:14,24;25:10,13,19;
26:4,7,22;30:18,22;
31:11;32:21,22;41:23;
42:6;43:12;47:17;
70:17;71:13;76:23;
77:24;84:15,20;
117:21,23;130:2;
133:19;184:17;185:3,
8,18;186:6,13;190:14,
23;192:3,8;193:12

**followed (7)**
9:5;10:20;12:1;
22:5,14;24:16;41:13
**following (7)**
26:11;40:24;52:18;
109:6;123:5;153:22;
191:18
**follows (3)**
35:18;147:12;
174:20
**follow-up (4)**
140:21;190:10;
192:10,19
**foot (3)**
67:23;75:8,12;
134:19;155:7;160:11
**FOP (2)**
118:4;158:1
**form (14)**
37:18,21;38:20;
77:4;80:7,15;83:11;
85:3;89:13;96:7;
115:7;169:21;190:16;
194:3
**formal (23)**
9:19,20,22;10:10;
11:2;26:12;123:5;
124:1;138:10;141:12;
142:1,10,13,14,16,19,
21;143:7,15,16,17,19;
144:15
**forth (4)**
66:20;161:7;162:7;
164:18
**forward (5)**
11:20;17:16;20:20;
49:19;74:17
**found (4)**
52:24;58:4;118:19;
120:2
**foundation (12)**
46:7,12,18,19;
47:12;48:12;49:2;
96:8;141:6;168:8;
169:2;194:4
**foundational (1)**
48:14
**four (8)**
11:12;26:2;27:13;
61:24;70:14,15;103:7;
179:12
**fourth (1)**
70:23
**four-year (1)**
27:20
**Frank (1)**
75:5
**free (1)**
21:7
**Friday (1)**
195:9
**front (19)**
6:2;16:14;19:9;

22:22,23;26:24;27:8;
32:5;49:24;50:2;
63:12,14;64:13;97:22;
147:16;158:14;
160:18,20;165:8
**frozen (1)**
180:4
**full (5)**
36:7;71:2;83:21;
147:19;174:24
**fully (3)**
8:11;9:13;10:12
**fundamental (1)**
7:14
**fundamentally (2)**
12:8,9
**funeral (5)**
43:24;44:4;49:19,
24;90:8
**further (11)**
11:1;26:19;116:20;
117:6,19;122:24;
142:5;160:19;174:3;
179:10;190:6
**furthest (1)**
151:16

**G**

**gain (1)**
116:4
**Gall (3)**
50:5,20;52:5
**Gary (3)**
151:15;156:4,11
**gather (5)**
71:11,14;105:7,10;
165:7
**gathered (2)**
173:14,17
**gave (10)**
74:4;77:21;79:4;
98:8;134:3,5;173:9;
183:4;184:3;187:16
**gazebo (1)**
97:19
**general (3)**
22:23;160:21;
167:24
**generally (1)**
187:9
**generate (2)**
45:20;124:6
**generated (3)**
45:14,19;49:13
**genitals (1)**
141:17
**gentlemen (1)**
79:10
**George (4)**
31:21,21;32:7,7
**gets (3)**
29:9;125:18;145:6

**given (26)**
7:5;9:15,16;22:2,9;
23:4;25:15,16;26:5,
18;29:7;37:15,19;
38:2,6;41:22;42:2,6,8;
48:15;90:1;118:24;
144:4;152:22,23;
187:18
**giving (8)**
36:8;105:14;
130:21;147:19;164:5,
19;173:1;175:1
**glass (5)**
55:11,15;72:19;
150:11,16
**Glassy (1)**
132:24
**goes (6)**
29:6;87:20,22;91:1;
167:2;184:1
**Good (15)**
3:22;6:8;13:5;
21:19;29:20,23;35:21;
76:13;118:6;130:10;
147:3,17;177:23;
188:6;189:9
**govern (1)**
126:16
**grabbed (2)**
152:7;159:1
**graders (1)**
177:6
**graduated (1)**
27:19
**grass (1)**
180:10
**Great (2)**
21:20;67:11
**groggy (1)**
63:20
**Group (10)**
29:11,12;177:9,20;
193:4,19,20
**grown (1)**
30:12
**Guard (1)**
37:5
**guess (2)**
18:15;181:4
**guessing (1)**
177:8
**guilty (2)**
34:2;84:20
**guys (8)**
19:7;57:4;59:15;
67:14;100:4;125:7;
161:20;169:17
**gyrated (3)**
123:16;125:4;
141:16
**gyrating (1)**
138:3

**H**

**hallway (2)**
84:6;148:18
**hand (5)**
63:12,14;163:17;
167:6;194:9
**handful (1)**
136:5
**handle (1)**
176:17
**hang (6)**
70:3,6,11,21;
104:11;117:4
**hanging (4)**
49:24;70:18;97:22;
136:7
**happen (4)**
141:21,22;164:2,3
**happened (22)**
54:4;55:20;62:16;
66:15;69:11;71:7;
100:11;109:18,19;
110:6,11,20;111:10;
113:13;117:20;
118:18;121:22;
142:23;145:20;
172:16;185:13;193:9
**happening (1)**
191:10
**harassed (2)**
144:17;168:21
**harassing (1)**
137:13
**harassment (20)**
107:19;126:3;
127:8;138:12,14,20;
139:3,14,24;140:6,22;
141:5;143:2,20;144:6;
145:9;168:1,7,12,17
**hard (1)**
20:11
**harm (1)**
130:17
**Harrison (1)**
180:2
**hat (1)**
61:6
**head (3)**
23:2;63:19;158:8
**hear (38)**
4:23,24;22:16,23;
24:3,5;25:22;26:15,
17;27:10,18;28:7;
30:20;36:3;58:15,16;
59:6;64:7;137:21;
143:7;144:13;147:17;
152:11;153:10;
154:11,23;159:18,21;
161:4;162:4,24;
163:10;170:5;173:21,
24;180:23;181:2;

197:5
**heard (35)**
13:7;18:12;25:16,
20;30:16;34:15;
53:11;59:4,5,10,13;
60:2;72:15;106:4;
107:17;120:16;123:6,
20,23;125:23;137:17;
144:10,11,14;152:14,
16,18,18;153:16,16;
155:6;161:15,18;
173:8;191:16
**hearing (24)**
3:11;4:11,16,21;5:4,
10;9:7,8;11:20;17:23;
18:6;21:1,3;34:11,24;
35:4;75:18;146:22;
152:6;168:7;174:11;
195:19,23;197:12
**hearings (1)**
7:13
**hearsay (1)**
69:15
**heated (3)**
156:19;157:14;
159:24
**heightened (1)**
116:12
**held (4)**
175:11,13,15;
187:23
**Hello (1)**
169:16
**help (3)**
36:4;163:21,22
**helps (1)**
36:5
**HERBERT (133)**
3:14,22,23;4:9,13,
14,18;5:6,12,16;6:1;
11:21,23;12:22;14:22;
15:7;17:24;18:3,14,
15;20:5,7;27:6,7;30:4,
8;34:8;42:20;43:3;
44:19;46:1,17;48:11;
49:1;51:2,6,13,22;
53:6;58:19;59:21;
62:11,15,21,23;63:23;
68:23;69:14;73:16;
74:23;76:6,9,10,12;
80:10;83:14;84:4;
85:6,10;89:16;90:12,
16;91:15,19,24;92:2,
3;98:20,24;113:17;
115:11;122:24;123:8,
17;124:8,16;125:3,18,
16;126:5;127:6,11;
128:10,24;129:17,20;
132:4,9,18;133:20;
134:8,13;135:7,21;
136:9;137:7,10;
139:18;140:20;141:6,
14;142:3,8;145:13;

146:24;154:5;163:4;
168:5;169:1,14,24;
174:3;181:21;182:2,7,
20;184:7,10,22;185:9,
11;186:8,15;188:4;
190:6,15;191:2,12;
192:19,22;193:12,14;
194:10;196:18
H-E-R-B-E-R-T (1)
3:23
Herbert's (2)
13:16;15:17
herein (1)
35:17;147:11;
174:19
here's (2)
12:18;192:16
Hey (7)
63:10;94:8;145:6,
20;163:19,24;192:2
Hi (2)
169:15;188:5
Hickory (2)
49:20;50:1
hierarchy (1)
40:21
higher (1)
42:12
higher-ranking (3)
22:3;162:21;186:7
highest (1)
186:2
highest-ranking (2)
41:9,12
highlights (1)
135:19
highly (1)
116:17
himself (3)
10:5,9;183:10
hired (4)
22:9;37:9,14,20
history (3)
28:16;30:13;36:24
hit (2)
103:6,8
Hold (11)
34:2,6;39:15;51:6;
87:23;94:13;97:4;
98:15;110:24;112:24;
182:24
holding (1)
170:19
holes (1)
33:18
hollering (1)
116:18
home (16)
43:24;44:4;49:19,
24;90:8;152:20;
163:2;164:6,9,20;
181:16,16,20;182:16;
185:6;192:9

honestly (1)
11:3
honorably (1)
30:9
hope (1)
109:16
hopefully (1)
20:17
horrible (9)
31:24;34:5;121:24;
122:1,7,9,12;123:4,4
hospital (2)
116:24;117:5
hours (1)
56:15
housekeeping (1)
18:16
HR (1)
21:8
hung (2)
71:8,9
Hunt (8)
51:17;52:12;
109:24;110:10;111:4;
113:24;137:24;138:11
hurt (4)
30:23;32:17,24;
34:1
hurting (1)
180:18
hypothetical (1)
186:16

I

idea (1)
134:11
identification (2)
44:22;49:5
identified (1)
6:22
identifies (1)
6:20
identify (2)
3:17;7:2
ie (1)
85:18
ignore (1)
102:7
ignored (1)
23:8
illegal (3)
42:4,6,8
immediacy (2)
124:15,19
immediate (1)
108:24
immediately (12)
32:19;71:13;109:2,
17,18;124:10;127:10;
152:5;164:10;165:1;
166:7;168:2
impaired (1)

28:10
impairs (1)
33:21
important (7)
6:7;31:13,15;32:10,
12,19;88:19
impression (1)
131:5
impressions (1)
131:15
improper (4)
107:1,4;125:13;
188:22
in/out (1)
167:9
inability (1)
133:1
inapplicable (1)
9:7
inappropriate (3)
105:21;181:11,13
incapable (1)
28:8
inches (3)
61:21,23;67:24
incident (22)
9:17;10:14;26:1;
28:12;93:10;109:17;
113:3;119:8,11,13,22;
120:14,17,22,22;
124:20;138:4;154:2;
165:23;168:24;
172:16;186:22
incidents (6)
28:6,20;45:8;47:4;
48:8;93:16
include (2)
43:16,18
included (1)
129:10
includes (6)
5:11;78:1,18;84:10;
86:15;89:6
including (8)
10:16;26:5;41:19;
86:8;129:10;130:1;
175:17;186:7
incoherent (4)
64:21;101:15;
104:8;133:10
income (1)
27:15
incompetence (1)
129:11
incomplete (1)
186:16
incorrectly (1)
53:11
indicate (5)
10:19;50:15;74:22;
75:3;178:16
indicated (4)
46:3;56:4;115:24;

167:15
indicates (1)
114:8
indicating (1)
114:4
indications (1)
133:8
indicator (2)
133:6,11
indicators (3)
132:13,17;133:2
individual (5)
41:9,12;55:9;72:24;
133:11
individuals (16)
29:22;44:7;47:20,
22;48:1,4,9;50:6;
92:23;93:1;118:19;
131:20;132:14;136:7,
15;177:4
inefficiency (1)
129:11
inference (1)
143:6
inferring (1)
86:7
influence (3)
131:21;132:14;
133:12
information (15)
13:18;17:11;49:14,
15;52:1,7,17;59:1,2,
12;116:4;130:22;
136:18;142:14;149:14
infraction (1)
108:23
infractions (5)
78:23;107:8;108:6;
115:3;145:15
initially (2)
53:3;170:17
input (1)
21:2
inquisitive (1)
60:13
inside (5)
51:21;53:15,15;
60:24;158:15
insignia (2)
41:5,6
instances (1)
97:13
instruct (1)
196:21
instruction (1)
86:4
instructions (1)
129:13
insubordinate (31)
22:21;23:16;26:6,
24;68:14;69:6;73:15,
20;74:1,6;80:22,24;
81:10;82:4;86:12;

88:11;89:12;99:21;
101:5;102:4,9;107:23;
112:3;113:1,6;120:3;
121:21;134:24;
186:14;189:23;190:5
insubordination (32)
8:9;10:21;22:16,17;
26:20;42:14,18;43:2,
4,11;68:12;69:5;
77:22;78:6;79:3,15;
81:4,9,12,15,17;82:12,
14,22;83:23;84:8,12,
21;85:1,14;129:24;
132:20
integrity (4)
29:4,9,17,23
intend (1)
11:15
intense (1)
162:9
intensity (1)
162:8
intensity-wise (2)
163:15;164:1
intentional (1)
108:15
intentionally (1)
24:19
interest (1)
12:2
interjected (1)
163:18
internal (1)
113:18
Internet (1)
39:6
interpretation (4)
80:5;88:17,19;
145:17
interrogation (32)
7:12,18,19;8:1,17;
9:19,20,22;10:10;
11:2;12:15;16:6;
26:12,15,19;107:17;
123:5;124:1;125:12,
24;137:18;138:10,16;
139:6;141:12;142:1,
13,23;143:3,6,11;
144:15
interrupt (2)
20:12;67:16
interruption (1)
19:24
interview (1)
114:1
intimidated (1)
106:13
into (30)
6:9;7:21;20:3;
45:21,24;46:22;55:9,
12,16;62:8;63:4;72:1;
100:7;103:14;116:19;
118:8;125:5;131:6;

134:7,18;137:2;150:8,
17;152:3;158:24;
162:11;163:18;171:4,
8;183:16
**intoxicated (17)**
101:12,17,18;104:3,
4,7;116:1,6,10;117:2,
13;118:9;131:8,17;
133:9;171:23;172:2
**intoxicating (1)**
102:14
**intoxication (3)**
44:15;132:20;133:2
**intranet (1)**
95:19
**introduced (1)**
16:7
**introduction (2)**
46:8;129:1
**introductory (1)**
131:12
**investigate (1)**
117:19
**investigated (2)**
122:5;145:7
**investigation (4)**
27:23;117:14;
118:8;130:24
**investigations (3)**
41:14;113:19;
175:19
**investigations' (2)**
85:19,20
**involved (6)**
10:15;25:17;35:6;
169:9;176:10;178:1
**involvement (1)**
176:12
**involves (1)**
10:5
**involving (1)**
113:19
**irrelevant (3)**
73:18;85:1;168:7
**issue (17)**
7:11;18:17;19:3;
53:1;56:7;57:5;96:22,
24;97:7;98:12;99:7;
100:4,5;120:13;126:8;
158:9;194:6
**issued (6)**
9:22;50:4;58:5,17;
79:13;99:5
**issues (6)**
12:24;44:6,9,10;
48:23;97:24
**items (1)**
165:7

**J**

**jailable (1)**
57:8

**jargon (1)**
59:14
**Jefferson (1)**
93:12
**Jennings (3)**
104:24;105:1,2
**Jewel (1)**
179:10
**job (10)**
12:2;27:16,16;
29:14,20;67:15;140:8,
16;196:24;197:3
**judge (1)**
28:11
**judicial (2)**
7:20;129:3
**July (37)**
8:9,10;9:17,24,24;
23:3,17;25:24,24;
26:1,13,17,17;45:5;
49:18;53:17;57:22;
74:19;91:2;93:5;95:7,
17;109:7;110:1;
113:3;124:2;125:1;
148:15;153:19;
166:10;167:11;
175:22;186:22;
187:12,20,21;188:8
**jumps (1)**
171:10
**June (5)**
45:4;91:2,6,6;93:4

**K**

**Kankakee (31)**
3:10,12;8:13;22:6,
12;27:4,21,22;28:17,
22;29:10,19;30:9,15;
31:6;34:12;36:14;
37:1,14;40:22;43:21;
45:20;47:8;77:10;
78:9;80:4;86:1;
147:21,22;175:4;
185:23
**keel (1)**
66:5
**keep (2)**
66:4;174:23
**Keith (1)**
5:14
**Kelly (132)**
3:7,8,16,21;4:1,10,
14,20;5:7,9,21;8:24;
11:21;12:20;13:6,13,
15;14:12,14,16,21;
15:1,7,10,15,23;16:5,
10,16,24;17:17;18:3;
20:5,9;21:4,13,16,21;
27:6;34:8,19;35:12;
42:23;43:6;46:11;
47:1;48:13;49:3;51:7,
14;53:9;59:22;62:17,

22;63:1;64:1;69:17;
73:19;75:1;76:3,7;
77:6;80:9,17;83:13;
84:3;85:9;89:15;
91:14,17,21;92:1;
96:9;98:17,22;112:15;
113:16;115:9;123:9,
21;124:11;125:6,16;
126:9;127:13;128:4,7;
132:7,10,19;133:22;
134:13;135:10,22;
136:10;137:6;139:17;
141:8;142:4;144:23;
145:24;146:6,10,13;
147:4;163:7;168:10;
169:3,23;170:11;
174:6,14;181:23;
182:9,24;184:11;
185:10,15;186:9,17;
190:17;191:6,13,23;
192:10,23;193:10;
194:7,18;195:14,17;
197:8
**kept (6)**
45:15;46:14;47:6,
10;60:5;66:5
**Key (1)**
97:22
**kicked (4)**
61:6,6;63:6;100:23
**kids (5)**
27:13,13,14;33:3;
177:6
**kind (13)**
36:2;48:21;61:7;
63:15,18,22;64:20;
102:14;126:11;133:3;
181:3;193:6;197:20
**Kinkade (1)**
40:12
**Klopp (9)**
11:13;69:12;71:17;
72:1,5;105:13;147:10,
20;174:7
**KMEG (1)**
29:11
**knew (3)**
59:12;83:6;101:14
**knowing (2)**
38:16;83:19
**Knowingly (1)**
130:15
**knowledge (8)**
119:10,14,16,21;
120:4;126:8;141:10;
142:19
**known (1)**
198:11
**knows (7)**
7:16;11:18;27:22;
29:12;41:8;168:13;
197:3
**Kosman (42)**

3:18,19;4:4;5:14;
6:19;10:8;11:1,14;
23:2,19,23;24:2,3,12,
15,16,18,22,23;25:1;
26:5,9,11;34:22;
74:17;115:21;124:20;
166:6;177:24;178:7,
11;179:6,21;180:24;
183:9;184:9;185:19;
187:15;191:18;
197:11,16,21
**Kosman's (3)**
24:19;25:14,19

**L**

**lack (1)**
7:18
**ladies (1)**
79:9
**laid (2)**
46:8;47:12
**language (1)**
170:5
**large (2)**
176:19;177:16
**larger (2)**
150:14,16
**last (4)**
30:10;40:17;51:17;
161:20
**lasted (1)**
28:12
**lastly (1)**
136:5
**latching (1)**
154:16
**late (1)**
174:23
**lately (1)**
52:3
**later (5)**
23:17;53:4;56:6;
75:18;166:8
**latitude (2)**
48:15;132:8
**law (4)**
31:5;33:12,22;42:4
**lawful (10)**
41:21;90:1;130:2;
133:19;134:2,6;186:6,
13;190:14,24
**laws (1)**
38:1
**lay (1)**
46:12
**lead (5)**
31:18;48:16;62:15,
17;177:22
**leading (10)**
42:21;48:12;74:24;
123:8;124:17;132:6,8,
11;136:10;141:14

**leaning (1)**
61:7;100:24
**learn (1)**
26:9
**least (1)**
161:17
**leave (28)**
9:21;21:7;24:21,24;
25:7;26:10;71:12,14;
105:6,7,10,11,12,12,
14,15,17;116:23;
118:15;153:11;163:1;
164:24,24;181:14,19;
182:13;183:20;192:7
**leaving (3)**
183:16,16;192:4
**led (5)**
8:1;32:6,15,16;
116:8
**left (20)**
8:19;25:15;71:22;
72:3;88:16;105:13,16,
17;150:3;156:3;
158:16;165:6,9,17;
173:14,19;185:13,20;
192:2;198:3
**legal (1)**
35:4
**length (3)**
9:23;10:9;33:7
**less (7)**
32:12;77:2,11;
116:23;159:8;160:14;
179:17
**letter (2)**
120:20;129:17
**Lexipol (4)**
38:3,21;39:3,9
**liable (1)**
86:12
**lie (1)**
193:9
**lied (3)**
26:16,22;141:24
**Lieutenant (30)**
11:13;25:1,2,4,5,9,
12,13;40:6,15;41:3;
119:7;120:23;146:16,
17,19,21;174:23;
175:4,9;183:2;184:12;
186:18;188:5,16;
191:7,14,16;194:19,
20
**lieutenants (2)**
38:10;41:15
**lieutenants' (7)**
54:7;55:3,5,16;
149:19;150:4,6
**life (1)**
192:17
**likely (3)**
16:7;20:7;171:18
**line (4)**

70:22;104:24;
150:23;151:4
**lines (2)**
62:14;99:6
**lips (1)**
36:5
**Liquors (1)**
97:23
**list (6)**
39:18,20,22,23,24;
198:4
**Listen (1)**
189:15
**listening (1)**
60:6
**littering (1)**
48:4
**little (12)**
36:22;140:23;
148:10;152:6;156:18;
159:16;160:19;
161:11;165:18;179:9;
181:8;183:23
**local (1)**
57:14
**located (4)**
19:1;44:1;54:14,18
**location (19)**
24:11;43:21;44:7,
11,14;45:8;47:4,18;
48:9;22;58:15;59:11,
17;92:21;95:7;118:20,
20;188:23;190:12
**locations (3)**
97:15,23;136:13
**lodge (1)**
158:1
**loiter (1)**
136:15
**loitering (8)**
48:1;92:22,23;93:2,
10,16,20;97:17
**loiters (1)**
136:6
**long (17)**
11:14;36:16,20;
37:11;39:21;40:3;
44:10;56:11;110:8;
148:1;159:5;170:22;
175:6,9;177:22;189:1;
195:12
**longer (4)**
61:21;146:20;
161:10;195:3
**look (18)**
6:19;13:9,11;14:4;
16:17;28:15;33:24;
44:24;49:9;61:17;
81:22,23;82:1;91:5;
118:16;137:2;150:16;
196:22
**looked (7)**
63:16,20;114:5;

156:9;159:11;177:7,9
**looking (10)**
15:4,13,22;27:16;
63:13;114:3;143:24;
151:3;156:14;171:14
**looks (2)**
45:4;61:22
**lot (7)**
28:1,2;44:3;106:4;
127:17;161:6;177:21
**loud (3)**
154:13;159:21;
170:9
**louder (2)**
152:24;162:11
**louder-than-normal (2)**
153:4;155:1
**lower-ranking (4)**
41:22;114:10;
190:13,23

## M

**mailbox (1)**
167:7
**maintained (1)**
38:17
**makes (4)**
46:21;127:4;129:2;
151:1
**making (6)**
73:17;103:11;
104:8;119:2;130:15;
137:12
**male (1)**
120:17
**males (1)**
169:20
**malicious (1)**
130:16
**man (2)**
27:12;30:12
**management (1)**
45:22
**manner (2)**
23:11;51:9
**many (10)**
6:9,10;7:4;22:22;
23:12;39:10;70:13;
73:9;95:6;102:20
**march (13)**
23:18,21;24:4,7,8,9;
25:18;176:7,12,24;
177:4,17;181:12
**marchers (1)**
23:23
**marked (5)**
44:18,21;49:4,7;
176:3
**married (1)**
27:12
**mask (1)**
20:16

**masks (3)**
18:16,20;20:17
**match (1)**
162:12
**material (1)**
130:22
**matter (11)**
4:1,17,20,24;10:14;
18:16;21:23;24:4;
34:14;65:9;170:8
**matters (2)**
17:22;20:19
**maximum (2)**
159:7,8
**may (16)**
5:4;16:19;18:12;
101:18;104:2;109:15;
112:11;116:5;132:3,
14;149:15;156:17;
157:13,20;172:8;
187:17
**maybe (13)**
18:15;61:21;116:9;
158:8;164:14,20;
175:10;176:15;177:5;
179:8,10,12;189:5
**mayor (6)**
139:23;192:15;
193:2,15,17,24
**McGRATH (106)**
3:15,18,19;4:8,12;
5:7,8,14,20;8:24;9:1;
18:2;19:2,15,19;20:1,
20,22;21:8,20,21,22;
35:9,20;42:22,24;
44:23;45:23;46:11;
47:15,16;48:19,20;
49:6;51:10;52:4;
53:10;58:23;59:24;
62:13,18;64:2;69:18;
75:2;76:1,4;77:4;80:7,
15;83:11;84:1;85:3;
89:13;90:14;91:12;
96:7;112:13;113:14;
115:7;123:2,10,18;
124:9,18;125:10;
127:7;128:4,6,9,14;
129:7,18,22,23;
132:12;134:16;
136:12;137:5;139:15;
140:21;141:2,15;
142:5;144:21;147:14;
154:6;163:9;168:16;
169:12,21;170:10;
174:4,22;181:24;
182:4;183:3;184:8,14;
185:17;188:1;190:9;
191:11;194:3;195:6;
196:13,17
**M-C-G-R-A-T-H (1)**
3:19
**mean (19)**
13:22;18:4;59:19;

67:16;87:2;93:5;
121:6;149:23;158:7;
160:9,14;162:10;
169:5;172:8;179:11;
182:23;187:23;193:2,
4
**meaning (3)**
157:23;162:3;184:9
**means (9)**
4:24;12:2,7;22:17;
27:15;42:19;59:16,20;
121:7
**meant (2)**
158:5
**meet (2)**
178:14;191:21
**meeting (22)**
3:9;20:24;21:5;
56:12;72:4,6;111:5;
156:14;196:3;197:10,
12,13,15,20,24;198:1,
2,7,8,10,14,16
**MEG (1)**
29:10
**member (4)**
3:12;45:17;130:12;
195:17
**Members (7)**
21:22;22:24;25:20;
34:20;130:19;158:2;
196:20
**memo (1)**
125:2
**memory (4)**
128:22;154:1,8;
171:9
**memos (1)**
149:14
**mentioned (2)**
86:2;187:5
**merit (2)**
9:10;88:2
**messages (3)**
95:3,20;96:1
**met (2)**
192:17,18
**Metropolitan (1)**
29:11
**mic (4)**
149:12,13;152:8;
159:1
**mid (1)**
70:4
**middle (1)**
106:6
**midnights (1)**
189:6
**might (8)**
88:23;89:3,8;117:1;
149:10;152:9;157:15;
158:5
**Mike (3)**
3:19;90:12;129:17

**militaristic (1)**
32:13
**military (12)**
22:1;31:10,11;37:2,
4;41:5,6;76:15,19,24;
77:3,12
**Miller (3)**
24:20;176:16,22
**mimics (1)**
41:5
**mind (4)**
46:21;61:13;
101:13;170:14
**minorities (1)**
121:3
**minority (11)**
118:24;119:5;
120:9,11,13,24;
121:15,19,23;122:9;
174:1
**minute (4)**
7:23;13:11;51:7;
142:17
**minutes (12)**
25:6;28:12,13;
110:11,11;113:13;
146:11;157:5;158:22,
24;159:4;179:17
**misconduct (10)**
105:24;112:7,11,23;
114:9;118:2;124:3,5;
126:3,16
**misleading (3)**
124:8;130:15,21
**misrepresenting (1)**
130:22
**misspoke (1)**
91:7
**misstates (6)**
91:12;112:13,16;
139:15;181:22;191:3
**misstating (1)**
133:20
**mitigate (1)**
33:17
**mocks (1)**
41:5
**modified (1)**
129:14
**moment (1)**
171:11
**moments (1)**
113:3
**Monday (1)**
26:11
**money (1)**
29:15
**months (2)**
124:24;189:5
**morale (1)**
130:17
**more (18)**
32:16,24;35:6;

DEFENDANTS 001769

2:20-cv-02310-CSB-EIL # 17-15 Page 132 of 270
Kankakee Board of Fire and Police Commissioners
Meeting
Seargeant Paul Berge
September 15, 2020

80:20;93:23;94:1;
102:18;136:13;
146:15;150:22,22;
151:22;157:5;161:11;
162:9,9;193:4;196:7
**morning (9)**
23:20;24:1;52:15;
53:20,21;100:2;
114:23;175:22;177:21
**most (4)**
16:6;20:15;97:24;
189:4
**motion (33)**
3:1,2;5:13,15,16;
6:4,20;7:10;9:11;
11:19;13:16;15:8,17;
16:21,22,24;17:1,4,9,
19,20,24;18:4,7,8;
159:12;195:18,21,22;
196:2,4;197:7,7
**motions (3)**
6:2;17:5;134:9
**motivation (1)**
196:23
**move (4)**
11:20;20:10,12,14
**moving (3)**
34:11,16;63:11
**Mrs (2)**
104:24;105:2
**much (9)**
28:22;77:2,11;
116:23;156:20;
164:11;166:8;176:19;
190:7
**multiple (18)**
6:15,18;7:1;23:16;
24:14;25:19;26:7,8,8;
74:3;93:16,22;95:20;
97:15;121:3;124:14;
144:18;154:21
**municipal (1)**
94:4
**must (2)**
14:10;22:11
**mutual (1)**
170:1
**myriad (1)**
94:21
**myself (1)**
116:19
**mystery (1)**
12:19

**N**

**Nah (1)**
99:3
**name (7)**
36:8,9;40:17;50:3;
101:24;147:19;174:24
**narrative (1)**
63:24

**National (1)**
37:5
**nature (5)**
67:12;101:19;
116:22;125:22;138:3
**Nazarene (1)**
27:19
**near (3)**
23:12;44:3;179:11
**necessarily (2)**
154:23;161:12
**necessary (3)**
100:5;147:2;167:4
**necessity (1)**
31:7
**need (24)**
3:2;6:16;7:6,7;
13:11;21:3;29:13,21;
31:8;75:17;94:8,11;
100:3;128:11;129:4;
157:15,20;158:5;
184:4;185:5;187:9;
192:2,8;197:23
**needed (3)**
71:11;164:6;177:19
**negotiated (1)**
167:19
**negotiating (1)**
158:3
**neighborhood (1)**
44:13
**Nelson (2)**
50:8;51:17
**new (1)**
34:16
**next (16)**
3:20;8:10;39:15;
42:12;66:15;109:21;
114:18,19;149:19,20;
154:20;164:12;166:9;
187:13,14;198:3
**nine (3)**
37:13;39:14;148:2
**Nobody (3)**
30:22,23;51:18
**noncompliant (2)**
119:1;120:6,10
**none (2)**
3:6;174:8
**nonleading (1)**
48:18
**nonresponsive (1)**
98:21
**Nope (2)**
173:23;174:2
**normal (1)**
152:24
**normally (5)**
63:5;149:9;166:23;
169:5,7
**north (1)**
55:2
**nose (2)**

160:10,11
**note (1)**
8:14
**notice (17)**
4:11;6:5,11,23,23;
7:17,20,24;9:13,18,
19;11:7;12:6;14:6;
33:8;129:3;152:2
**notification (3)**
12:7;109:2,6
**notified (1)**
109:19
**nowhere (1)**
79:1
**Number (11)**
5:12;36:8,10,11;
103:8;128:2;133:19;
134:2,6;147:19;175:1
**numerous (2)**
97:12;134:10

**O**

**Oak (1)**
59:16
**oath (5)**
26:14,22;141:12,19,
24
**obey (4)**
22:18;23:15;42:9;
185:14
**object (30)**
42:20;43:3;46:1;
48:11;49:1;51:22;
53:6;59:21;62:11;
63:23;69:14;74:23;
83:11;90:1;98:20;
126:5;128:11;129:1,6,
20;134:8;163:4;
169:1;181:21;182:7,
20;186:8,15;190:15;
191:2
**objected (1)**
7:18
**objection (55)**
43:7;47:13;51:2,8,
13;62:21;68:23;
73:16;76:6,8;77:4;
80:7,15;84:1;85:3;
89:13;91:12;96:7;
112:13;113:14;115:7;
123:8,17;124:8,17;
125:6,13;127:6,11;
129:8;132:4,5,18;
133:20;135:7,21;
136:9;139:15;141:6,
14;142:3,4;163:7;
168:5,11;169:21;
170:10;182:2,24;
184:7,10,22,24;185:9;
194:3
**objectionable (1)**
87:6

**objections (3)**
35:5,5,6
**obligation (1)**
124:5
**O'Brien (2)**
50:13,19
**observation (1)**
63:2
**observe (2)**
145:15;161:5
**observed (3)**
25:17,20;62:24
**obtain (1)**
95:14
**obtained (2)**
46:3;59:2
**obviously (14)**
3:20;6:2;7:12;
10:11;18:22;20:2;
25:5;28:24;29:5;
50:20;116:7;172:9;
183:12;187:22
**occasion (1)**
58:9
**occasions (3)**
10:6;121:22;193:21
**occurred (7)**
47:4;110:13;112:6,
8;113:1,4;116:8
**occurring (1)**
57:11
**October (1)**
119:12
**off (15)**
24:13,18;34:10,13,
17;36:7;39:18;66:22;
73:7;98:18;103:3;
146:10;147:18;
169:18;181:7
**offend (1)**
120:9
**offense (1)**
57:11
**offenses (1)**
57:8
**offer (1)**
168:9
**offered (1)**
143:11
**office (88)**
10:2;23:13;54:7,8,
14,17;55:2,12,16,17;
58:9,12,13;60:6,10,11,
19,20,22,24;61:4,10,
13,15;62:9;71:15,18,
20,23;72:2,4;100:8;
104:18;111:6;116:23;
124:22;125:1;131:6;
148:20;149:3,19,22;
150:4,5,6,7,9,24;
151:1,6,9,13,22;152:3,
7;153:11;155:5,22;
156:2,5,13,16,18,21;

157:2,7,11,17;158:10,
11,12;159:1,2,6,20,23;
160:6,23;161:3;165:6,
10,13,16;167:9;173:4;
193:21,22;195:8
**officer (61)**
14:10;22:2,4,8,10;
23:15;24:1;27:21;
28:5,9,10,21;29:1,9,
23;30:10;31:22;
33:22;35:4;37:1,8,11;
39:14;41:22,22;42:2,
19;43:11;45:17;57:10,
11;59:18;77:24;83:6;
84:15,24;85:23;86:6,
13;99:8,8;107:2;
114:10;118:5;120:18;
122:8,13,15;123:5;
124:3,3,4;162:21;
170:22;186:12,14;
189:8,9;190:13,23,24
**officers (41)**
22:22;23:12;29:13;
32:2;38:2,5,9,10,18;
39:2,11;41:19,19;
42:5;45:10;48:23;
52:17;55:23;58:15,21;
59:2,15;72:24;73:9,
12;85:15,18;95:21;
98:1,2,14;113:20;
140:12;148:23;171:1,
4,7;178:24;179:1;
186:6,7
**offices (8)**
27:1;54:22,24;55:4,
6,9;150:2;156:7
**official (3)**
50:21;108:12;
130:18
**old (4)**
43:24;44:3;49:24;
97:21
**Olivet (1)**
27:19
**omitting (1)**
130:22
**once (3)**
24:23;93:23;94:1
**one (38)**
5:12;7:14;8:10,10,
16:14;23:9;28:12;
31:8,18;51:17;54:14;
79:3;80:20;88:22;
89:3,17;97:18;107:20;
115:18;117:12;121:8;
124:3;131:15;136:13;
150:1,6;151:3,5;
158:2;160:2,10;
161:17;163:20;167:2;
172:24;193:22;196:6,
18
**ongoing (7)**
44:6,10,11;48:23;

2:20-cv-02310-CSB-EIL # 17-15 Page 133 of 270
Kankakee Board of Fire and Police Commissioners
Meeting

Seargeant Paul Berge
September 15, 2020

90:8;124:17;132:5

**online (1)**
37:23

**only (11)**
25:6,22;27:15;
29:13;30:23;125:22;
150:6;152:6;155:19;
175:19;192:2

**open (9)**
13:1;47:23;62:9;
63:5;66:13,14;96:11;
151:10;162:16

**opened (2)**
63:9;159:9

**opening (10)**
20:2,6,8,9,13,21;
21:11;30:16;195:8;
197:22

**opinion (6)**
68:13;73:13,18,19;
81:13;171:2

**opinions (1)**
168:9

**opportunity (5)**
16:13,20,21;82:1;
143:12

**Opposed (4)**
3:5;17:15;194:1;
198:13

**opposite (10)**
54:21;64:14;66:24;
75:9;150:24;155:14;
156:6;158:19;160:18;
170:8

**options (1)**
28:1

**orally (1)**
7:10

**order (50)**
25:1,10;41:21,23;
42:3,3,4,6,8,9,11;
43:15;66:21;70:10;
71:13;83:4;84:20;
90:1;98:8;99:9,11,17,
19;105:15;119:1;
130:11;152:13,15;
153:13,15;154:2;
163:1,5;164:6,8,19,
23;173:2,7,10;184:3,
17,20;185:3,8,12,14;
186:13;190:14,24

**ordered (3)**
24:17,23;181:19

**orders (40)**
6:15,16,18,24;7:1,3,
5,7;8:8,21;10:7,19;
22:13,18,20;23:9,16;
24:14,20;25:14,15,19;
26:4,8,23;30:22;
32:15,21;33:9,11;
70:17;74:3;117:21;
129:12;130:3;133:19;
134:2,6;186:6;191:19

**ordinance (9)**
53:1;56:5,7;57:4;
94:5;96:22;100:6;
136:7,15

**ordinances (1)**
57:15

**ordinary (2)**
46:15;47:10

**organization (2)**
31:2;41:1

**organizations (1)**
21:24

**organized (1)**
177:6

**ourselves (3)**
6:6;7:24;134:11

**out (61)**
19:4,9;23:9;25:21;
32:1,1,1,11;36:5;
38:19;39:24;45:17;
47:20,22;48:1,4;
49:24;50:4;52:11;
58:15,17,21;59:2,15,
17,18,19,19;60:12;
67:14;72:15;93:9;
94:21,24;95:16,20;
96:4;97:22;101:24;
118:14,21;124:24;
125:11;129:12;130:2;
136:7,19;140:10;
150:17;152:10;
156:13,15;159:16;
163:17;165:20;
171:10;180:9,20;
181:2;190:12,22

**outside (8)**
18:9,13;39:5;146:4;
157:19;159:11;
174:11;194:22

**over (27)**
9:17;24:20;31:20,
20;35:24;36:22;47:5;
56:1;57:2;59:8,10;
65:3;66:1;70:23;
96:21;97:8;114:11;
126:19;147:22;
170:23;172:11;
176:13,18,20;178:23;
179:14;183:21

**overrule (1)**
43:6;168:10

**overruled (30)**
47:13;49:3;51:14;
53:9;59:22;62:22;
69:17;73:19;77:6;
83:13;85:9;112:15;
115:9;123:9,21;
124:11;125:17;
127:13;132:19;
133:22;135:22;
139:17;141:8;169:3;
170:11;182:9;186:9,
17;190:17;191:6

**own (3)**
9:5;12:10;55:8

**P**

**page (1)**
7:22

**pages (4)**
9:15;78:16;81:20;
126:19

**paid (3)**
9:20;148:8,17

**pane (1)**
150:11

**paperwork (2)**
148:10;156:15

**parade (1)**
178:2

**paragraph (5)**
6:13,19;129:19;
130:7;131:13

**paragraphs (2)**
6:22;135:2

**paramiliary (6)**
21:24;31:2,3;32:4;
41:1;84:23

**paraphrasing (1)**
161:21

**parents (2)**
177:7,7

**Park (4)**
176:23,24;177:17;
180:14

**parked (1)**
180:19

**parking (1)**
44:3

**part (9)**
29:24;30:1;50:18;
84:11;88:8;104:16;
160:3;193:20;197:12

**particular (7)**
8:7;39:24;44:14;
49:21;58:16;66:5;
81:23

**particulars (19)**
5:13,16;6:4;9:2,9;
13:8;14:18,20,22;
15:3,8,11,13,18;
16:22;17:1,2,10,19

**parties (6)**
3:13;4:6,10;10:15;
34:21;35:3

**parts (1)**
152:6

**party (2)**
5:23;17:21

**pass (1)**
149:16

**passively (1)**
43:14

**Passwater (11)**
11:13;25:2,3,4,5,9,

12,13;146:16;174:18;
175:2

**past (2)**
136:23;171:2;
190:11

**patrol (14)**
23:24;28:21;37:11;
38:9;39:14;41:15,19;
67:7;94:22;95:22;
136:17,19;175:20;
179:1

**patrolman (3)**
37:12;41:17;118:17

**patrols (1)**
45:10

**patterned (1)**
22:1

**Paul (53)**
3:23;4:4;27:9,10,
18;28:3,7;29:18;
32:18;33:20;34:5;
63:10,10;64:6,7,7,22;
68:19;96:5,18;97:12;
98:9;99:4,16,24;
110:4,9;138:12;
142:21;143:1,19;
151:16;164:19;
171:22;172:2,20;
173:1,9,13,17,21,24;
188:7,10,13,14,18,21;
189:1,8,10,19,23

**Paul's (1)**
188:15

**pause (3)**
164:15;173:11,16

**pavement (1)**
180:12

**peaceful (2)**
10:4,5;23:18;24:7

**penalty (1)**
5:4

**pending (2)**
5:22;90:4

**people (20)**
16:8;21:1,4,6;28:2;
49:24;65:7;66:2;
69:15;92:20;93:16;
94:4;97:22;121:7;
151:14;170:15;
176:15,21;177:20;
198:3

**per (2)**
83:23;84:21

**perceive (1)**
42:3

**performance (3)**
8:7;127:19;129:10

**performing (1)**
129:12

**perhaps (1)**
32:17

**period (7)**
44:12;45:4,6;46:4;

47:5;95:24;131:8

**person (23)**
7:15;27:24;29:3;
43:13;44:15;45:12,12;
57:12;70:22;88:23,24;
89:3,4;130:4,4,23,23;
133:5,7,10;134:19;
167:3;172:11

**personal (1)**
39:4

**personnel (6)**
24:1;57:3;85:21;
96:20;148:24;166:22

**pertain (1)**
126:2

**pertaining (1)**
10:1

**pertains (1)**
46:4

**phase (1)**
5:4

**phone (30)**
39:8,10;52:23;53:4;
69:8,19,20;70:2,3,5,6,
11,18,21;71:4,5,6,8,
10;97:2,2,5;100:3;
104:10,11,14,22;
117:4;172:12;178:8

**phrase (1)**
162:13

**physical (3)**
48:9;162:15;171:8

**physically (3)**
64:11;74:13;134:7

**pick (3)**
64:17;149:11,15

**picking (1)**
161:11

**pieces (1)**
161:11

**place (13)**
14:2;25:23;26:16;
51:21;52:14;60:12;
72:23;98:5;111:5;
135:17,20;176:8;
183:9

**placed (3)**
9:20;26:10;39:20

**plain (1)**
12:12

**plan (1)**
21:17

**plane (1)**
9:12

**planning (2)**
19:3;176:10

**play (1)**
7:21

**pleading (1)**
15:7

**pleadings (2)**
5:21,24;12:21

**please (13)**

35:10,12;48:17;
77:9;80:20;109:16;
142:24;146:3;147:7,
15;174:10,15;194:21
**pleasure (3)**
20:1;27:8,9
**pm (12)**
34:17,19;57:22;
58:8;148:8,9;156:22;
172:10,10;178:5;
195:19;198:18
**podium (11)**
54:12,19;121:4;
156:5,7,8,16,23;
157:8;159:4,6
**point (30)**
7:22;12:20;17:10,
13;21:10;23:9;34:9;
64:12;66:7,9;71:22;
72:3;81:21;92:11;
98:16;100:20;101:17;
104:21;106:8;142:18;
154:16;159:22;
163:13;164:18;
172:24;185:7;188:23;
189:24;194:24;195:5
**poke (1)**
33:18
**Police (90)**
3:10,12;4:2;14:9;
21:24;22:6,12,24;
23:2,13;24:1;27:4,21,
22;28:5,9,9,18;29:1,9,
13,19,23;30:9;31:20;
33:22;34:12;36:14,24;
37:7,15,16;38:11;
40:13,22;41:9,11,12;
45:15;50:24;53:15;
54:4,5;59:14;71:12,
15;76:19,22;77:2,10;
78:8,9;80:4;82:20;
83:4;84:19,24;85:4,
17;86:4;88:17,18;
94:6;99:14;105:6,7;
107:2,5;117:22;122:8,
17;136:20;139:11,12;
140:11;147:21,22;
148:24;167:22;168:3;
170:21;172:7;175:4;
176:11,11;177:16;
185:23;186:2;189:8;
190:21
**policeman (1)**
189:2
**police-related (1)**
105:3
**policies (24)**
9:21;22:8,12,13;
37:16,19,24;38:16,19,
23;39:3,8;41:24;
42:13;78:15;79:12;
124:6;126:1,19;127:2,
18;167:21;168:13;

188:10
**policy (33)**
10:23;34:5;38:5,5,6,
7,8;42:9;75:4;80:3,4,
13;81:21;82:3,9,11,
13,21,23;83:1,6,9,15;
88:9,12;101:2;107:10;
108:20;126:7;129:15;
136:2;145:16;168:22
**poor (1)**
119:18
**popped (1)**
158:8
**portion (2)**
58:20;65:15
**posed (2)**
11:4;65:18
**position (7)**
29:21;39:17,19;
175:15;186:1,2;189:4
**positions (1)**
175:13
**possible (6)**
95:19;100:4;
133:13;153:14;
169:10;171:10
**possibly (5)**
51:21;131:17;
133:12;156:24;195:3
**post (1)**
196:11
**potential (3)**
162:14;163:17;
196:22
**pour (1)**
118:21
**poured (1)**
118:14
**prefaced (1)**
173:6
**prefer (2)**
18:19;39:11
**preference (1)**
18:19
**preliminary (2)**
17:22;20:19
**prepare (7)**
90:20;140:18;
166:1,3;171:20;
187:12,13
**prepared (10)**
10:15;11:11;109:9,
20;114:12,15;153:18;
165:22;166:14;186:21
**preponderance (1)**
13:24
**presence (3)**
23:12;102:7;177:16
**present (6)**
3:13;11:11;34:21,
22;55:22;168:12
**presentation (2)**
5:1;14:3

**president (1)**
158:1
**pressed (1)**
71:4
**Preston (1)**
77:20
**pretrial (1)**
134:9
**pretty (5)**
169:18;170:1,18;
176:19;179:10
**previous (2)**
149:16;173:5
**primarily (1)**
9:3
**printed (2)**
38:19;45:16
**printout (1)**
92:5
**prior (14)**
9:19;17:22;36:20,
24;58:6;93:10;95:7,
17;97:11;126:6;
159:19;182:18;183:5;
195:11
**privacy (1)**
155:2
**probably (25)**
19:4;21:5;44:12;
56:15;61:20;96:11;
99:7;105:14,15;
106:20;150:21;
155:12,19;157:5;
159:7,7;160:11,24;
161:1;166:20;169:7;
171:15;181:7;187:14;
189:5
**problem (8)**
48:14;65:5;98:2;
120:24;121:15,18;
136:6;174:1
**problems (5)**
30:21;97:19,20,20,
22
**Procedure (7)**
9:5,6;12:1,5;14:7;
42:5;168:22
**procedures (6)**
8:6;37:16;39:3;
41:24;127:18;167:22
**proceed (3)**
4:20;35:2;157:16
**proceeded (2)**
24:9,9
**process (7)**
9:12;11:6,7,18;
14:11;34:16;37:9
**progressed (2)**
37:21;72:7
**prohibit (1)**
126:11
**prohibited (1)**
168:18

**prohibition (1)**
168:14
**promising (1)**
28:5
**promoted (9)**
29:20;30:5;39:16;
40:2,6,9,11,14;121:3
**prong (1)**
33:14
**proper (3)**
6:5;118:8;129:12
**property (1)**
12:2
**protection (1)**
176:11
**protest (10)**
10:4,6;23:18;24:7;
25:18;176:7,12;177:1,
4,17
**protesters (2)**
23:23;181:12
**protocol (1)**
187:6
**prove (8)**
13:23;33:6,10,10,
14,17,19;34:4
**proved (1)**
13:22
**proven (2)**
5:2,3
**provide (3)**
12:12;47:3;108:9
**provided (2)**
22:8;82:11;188:11
**provides (1)**
78:22
**providing (1)**
176:11
**provisions (1)**
126:24
**proximity (5)**
67:19;116:19;
158:14;160:7,8
**public (6)**
22:23;25:16,17,21;
27:1;44:15
**publicly (2)**
31:7;32:2
**pulled (1)**
154:16
**purporting (2)**
126:7,9
**purpose (2)**
3:11;168:11
**purposes (2)**
34:11;167:1
**pursuant (2)**
41:23;107:9
**pushed (2)**
70:23;104:20
**pushing (1)**
62:9
**put (19)**

6:11,23,23;9:8,13,
18,19;12:17;16:14;
75:8,12;94:21,24;
106:5;115:2;118:12,
23;167:8;196:18
**puts (1)**
11:7
**putting (1)**
147:1

## Q

**qualified (1)**
126:12
**quick (4)**
140:21;146:18;
190:10;196:19
**quickly (1)**
156:8
**quite (2)**
114:24;166:7

## R

**racial (1)**
193:7
**racist (10)**
122:8,16,21;173:22;
189:11,14,16;192:13;
193:16,18
**rack (1)**
171:9
**radio (8)**
59:4,5,10,10;60:1,7;
83:22;178:7
**raise (2)**
65:22;196:6
**raised (4)**
7:12;9:12;72:7,12
**rang (2)**
69:19;104:10
**range (1)**
45:9
**ranging (1)**
44:14
**rank (5)**
36:18;37:6;39:14;
147:23;169:11
**ranks (2)**
41:2,4
**rather (1)**
131:12
**reached (1)**
70:23
**read (7)**
36:4;38:7;58:20,22;
115:15;129:4;154:7
**reading (1)**
38:15
**ready (6)**
35:8;148:11;149:9;
154:14;156:10,14
**real (1)**

DEFENDANTS 001772

2:20-cv-02310-CSB-EIL # 17-15 Page 135 of 270
Kankakee Board of Fire and Police Commissioners
Meeting
Seargeant Paul Berge
September 15, 2020

196:19
**Really (8)**
    6:3;21:2;50:1;
    64:21;162:14;164:17;
    171:9;181:3
**rear (1)**
    178:3
**reason (8)**
    58:11,13;87:19;
    121:20;149:8;151:10;
    189:10;197:1
**reasonable (3)**
    117:12;129:14;
    196:7
**reasonably (1)**
    130:16
**reasons (4)**
    104:5;108:5;
    120:21;154:21
**recall (22)**
    57:24;81:22;93:7,8,
    17,19,20;111:10,21;
    112:4;113:9,11;
    127:23;131:9;152:21;
    161:23;178:9,11;
    179:6;190:19;191:4,
    10
**receipt (1)**
    4:7
**receive (8)**
    37:22;49:15,17;
    57:17;144:1;178:6
**received (14)**
    7:17;10:12;15:14;
    27:19;38:7,15;49:13,
    21;59:1;96:14,16;
    121:1;142:14;179:5
**receiver (2)**
    70:24;104:20
**receiving (1)**
    178:9
**recent (1)**
    92:15
**recently (1)**
    189:4
**recite (4)**
    82:23;83:1;128:15,
    18
**reclosed (1)**
    162:18
**recognize (4)**
    31:4;45:2;49:10;
    160:2
**recognized (1)**
    56:21
**recollect (1)**
    112:5
**recollection (2)**
    115:5;128:8
**recommend (1)**
    47:12
**recommendation (1)**
    146:21

**recommending (1)**
    19:23
**record (20)**
    3:17;5:10;12:18;
    17:17;34:10,13,17;
    36:8;41:7;45:14;
    58:22;63:11;95:12,18;
    121:8,8;145:8;146:11;
    190:3;196:19
**recorded (1)**
    26:2
**recording (1)**
    149:12
**records (5)**
    11:16;38:17;45:21;
    95:9;105:2
**records' (1)**
    85:21
**Recross (1)**
    137:6
**RECROSS-EXAMINATION (3)**
    137:9;142:7;193:13
**REDIRECT (3)**
    123:1;141:1;190:8
**reenter (3)**
    155:21,24;156:1
**refer (1)**
    106:6
**referenced (1)**
    91:10
**referring (7)**
    57:7,14;58:24;
    91:17;118:15;153:17;
    157:21
**reflect (2)**
    17:18;45:7
**refresh (2)**
    128:21;154:1
**refreshed (2)**
    128:12;154:8
**refreshing (1)**
    128:7
**refusal (2)**
    22:18;130:1
**refused (5)**
    23:15;24:24;25:11;
    181:17;182:14
**regarding (4)**
    46:23;58:3;165:23;
    186:22
**regards (1)**
    52:18
**Regnier (1)**
    40:16
**R-E-G-N-I-E-R (1)**
    40:19
**regular (3)**
    37:5;45:15;61:24
**regularly (1)**
    38:6
**regulations (6)**
    8:5;12:10;76:23;
    78:10;126:2;168:14

**rejoined (1)**
    183:21
**related (1)**
    46:20
**relative (5)**
    4:16;5:24;46:13;
    132:8;184:12
**relatively (1)**
    146:18
**relevance (7)**
    43:4;132:18;135:7;
    194:4,14,17;196:21
**relieve (5)**
    111:8,11;112:1,18;
    182:15
**relieved (8)**
    71:10;105:9;113:7;
    152:20;163:2,11;
    164:9;172:20
**remain (1)**
    165:16
**remaining (1)**
    195:1
**remarks (1)**
    130:7
**remedy (1)**
    12:17
**remember (23)**
    13:20;59:1;66:13;
    77:23;84:16;89:19;
    91:2;98:5;103:11;
    104:3;105:8;106:8;
    111:11;115:12;116:2;
    119:1;136:24;165:20;
    172:11;173:2,11;
    180:15;187:23
**reminded (1)**
    197:3
**remote (1)**
    39:3
**renew (1)**
    134:9
**rep (4)**
    157:15,21;158:5;
    167:16
**repeat (7)**
    70:10;77:9;99:2;
    134:1;142:24;184:19,
    19
**repeated (1)**
    144:18
**rephrase (3)**
    42:22;85:12;163:8
**report (51)**
    42:11;45:3,21;46:6,
    14;47:8,9;49:18;
    74:16,19,22;75:3;
    79:6;85:17,21;105:24;
    107:8,12;108:9,12,13,
    16;109:20;112:7;
    124:6;127:19,23;
    131:4,7,12,13;135:15,
    19;136:1;140:18;

145:12;153:18;154:4;
    166:16,18,21;167:1,5;
    168:6;169:5,7;172:6;
    186:21;187:8,11,12
**reported (6)**
    8:12;112:11;114:8;
    127:9;168:2,22
**reporter (9)**
    19:5;20:18;35:24;
    36:4;40:18;110:18;
    125:7;146:7;174:14
**reporting (3)**
    126:16;131:1;169:6
**reports (6)**
    10:14,17;85:18,20;
    119:24;121:2
**represent (1)**
    27:9
**representative (1)**
    157:24
**represented (1)**
    10:10
**reputation (1)**
    130:18
**request (3)**
    14:21;27:3;52:10
**requested (7)**
    23:5;24:2;32:19;
    58:22;133:14;166:1,3
**requesting (2)**
    50:24;51:3
**requests (1)**
    101:22
**require (2)**
    8:20;118:5
**required (10)**
    34:4;41:23;107:12;
    108:1,4,22;114:1;
    117:21,23;143:3
**requirement (2)**
    4:15;168:15
**reserve (1)**
    20:6
**Reserves (1)**
    37:5
**residence (2)**
    39:4;52:23
**residents (1)**
    44:7
**respect (11)**
    6:3,18;8:6,12;33:13,
    23;82:21;85:1;99:19;
    143:19;188:22
**respects (1)**
    22:22
**respond (8)**
    11:3;16:20;63:7,8;
    101:22;102:1,16;
    164:7
**responded (2)**
    5:18;161:24
**respondent (1)**
    7:15

**responding (1)**
    165:4
**response (2)**
    5:15;6:14;9:2,3,9;
    13:8;15:11,14,16,19;
    133:1;153:11
**responsible (4)**
    27:14,14;38:15;
    188:18
**responsive (1)**
    69:16
**rest (2)**
    20:17;90:5
**result (1)**
    32:3
**resulted (1)**
    32:9
**results (1)**
    32:8
**retired (1)**
    195:9
**retiring (1)**
    197:23
**retrieve (1)**
    38:22;39:7
**return (1)**
    181:14
**review (7)**
    38:22;39:2,7;45:17;
    82:17;95:9;153:14
**reviewing (1)**
    127:1,23
**right (40)**
    12:21;15:4;20:3;
    21:13;39:21;41:20;
    44:17;65:24;66:8;
    78:2,7;85:8,11,15;
    86:20;88:19,20;89:6;
    102:17;103:9;106:16,
    20;115:22;150:5;
    154:11,15;155:13;
    158:14,15;159:14;
    160:20;165:5,20;
    169:20;180:8,19,19;
    183:18;193:17;195:24
**ring (1)**
    69:8
**rings (1)**
    104:18
**ROBIN (2)**
    174:18;175:2
**role (1)**
    31:5
**roll (1)**
    54:9
**room (47)**
    18:6,11,13;19:6;
    34:11,11,16;35:22;
    54:6,9,12,15,18,22;
    55:1,3,4,6,13,17,20;
    63:4;66:10,12;69:13;
    72:15,20,24;73:10;
    141:20;146:4;148:13,

DEFENDANTS 001773

**Kankakee Board of Fire and Police Commissioners Meeting**

Seargeant Paul Berge
September 15, 2020

19;149:3,6,18,24;
150:1,17;151:3,9;
154:23;157:19;
170:16,20;174:11;
196:14
**rose (1)**
37:6
**rude (1)**
65:15
**rule (3)**
13:19;35:4,7
**rules (14)**
7:13;8:5;9:6;12:10;
14:9;22:7;31:11;
76:23;78:9,20;126:2,
11,15;168:14
**rumors (2)**
173:21,24

## S

**safe (1)**
169:19
**safely (1)**
18:20
**same (17)**
6:18;51:13;79:21,
24;87:17;88:6;110:3;
114:15;125:8;140:16;
156:12;160:13;
166:15;167:13;193:5;
197:15,20
**Saturday (4)**
23:19;175:22;
177:21;187:21
**saw (10)**
63:5;92:20;93:18,
24;94:4;108:6;176:20,
22;188:24;189:19
**saying (21)**
7:23;32:8,11;46:18;
62:10;65:7;77:23;
84:16;89:19;91:2;
93:15;105:8;116:2;
117:9;129:6;161:19;
162:2,10;173:7,11;
198:11
**scenario (2)**
88:9,10
**scene (4)**
25:2,5;183:6,8
**scent (1)**
131:24
**scheduled (2)**
26:12;176:7
**scream (1)**
62:5
**screaming (4)**
72:11,13;116:18;
153:3
**seats (1)**
61:10
**second (18)**

3:2;5:4;8:14;9:11,
16;17:6,7;33:13;73:5;
159:11;173:3;180:7,8,
8,16;193:22;196:1,5
**seconds (5)**
152:10;155:19;
159:7;165:3;173:13
**secretary (1)**
85:18
**section (5)**
106:6;128:16,19;
135:6;136:3
**sections (2)**
10:23;128:23
**secure (1)**
51:19
**seeing (4)**
63:16,17;127:2;
131:20
**seeking (3)**
6:8;7:16,17
**seem (3)**
68:21;89:3;192:3
**seemed (3)**
102:6;162:12,12
**sees (1)**
57:10
**select (1)**
29:8
**selected (3)**
39:18,22;40:1
**selflessly (1)**
30:9
**send (10)**
57:3;95:3,6,16,20,
21,22,23;115:13;
145:4
**sending (1)**
182:16
**Senior (1)**
36:10
**sense (4)**
46:21;62:19;63:1;
151:1
**sensed (1)**
101:8
**sent (8)**
24:20;38:14;50:4;
96:4;115:6,18,19;
181:16
**sentence (2)**
131:6,11
**sentences (1)**
51:17
**separate (3)**
10:21;26:2,6
**separately (1)**
183:23
**September (3)**
146:23;195:19;
198:17
**sergeant (240)**
3:21,23;4:4;5:13;

6:11,17;8:13,22;10:5,
21;11:2,13;12:3;
13:19;14:5;18:9;
22:20;23:3,6,24;24:5,
10,11,13,16,18,20,20,
21,24;25:7,8;26:3,10,13,
16,18;27:3,9,10;30:5,
15,17;37:6;39:16;
40:4,9,12;41:3;52:20;
53:12;54:4,7;56:13,
18,20;57:18;58:3;
60:11,19,23;61:3,8,9,
12,13;62:7,20;63:5,7,
8,16,17,18;64:5,15;
65:22;66:9,16;68:1;
69:9,12,20;71:2,8,17,
22;72:1,3,5,7,9,18,23;
73:14;74:2,14;75:10,
13,20,23;80:1,21;
82:4;93:11;97:8;98:3;
99:9;100:22;101:3,5,
9;102:11,13;104:2,6,
23;105:13;106:7,12;
107:17,21;109:13;
111:8;112:1,8,12;
113:2;115:24;116:9,
12,23;118:24;119:6,
13;120:2,10;121:2,9,
14,21;123:6,11;
124:21;125:3,14,23;
131:5,7,16;133:14;
134:15,17;135:6;
137:12;138:6,16,23;
141:3,11,20,24;142:9;
146:15,17,20;147:20,
24;148:1,9;151:15,16,
19,21;152:13,19;
153:7,10;154:7;
155:11,15;156:3,4,11,
15,23;157:2,6,20;
158:5,16;159:3,18;
160:6;161:15,19;
162:21;163:1,11;
164:3,7,16,22;165:6,
17;168:15;169:15;
174:7,9;176:16,22;
180:12,24;181:7,11,
15,17,19;182:6,11,12;
183:5,10,12,19,23;
184:5,15;185:18;
188:7;195:7;197:22,
22;198:3
**sergeants (7)**
10:17;23:1;38:10;
41:16;148:23;149:15;
151:4
**sergeants' (44)**
10:2;23:13;55:3,6,
12;58:9,12,13;60:10,
11,19,24;61:9;68:16,
12;71:14,20;100:8;
124:21;125:1;148:20;

149:3,6,18,21;150:5,7,
8,23;151:1,5,6,9,12;
152:3;156:18;157:6,
11,16;158:3;159:6,15;
167:9;195:7
**sergeant's (4)**
104:17;157:19;
164:4,17
**Sergent (1)**
34:22
**serial (1)**
36:10
**serious (2)**
30:19;103:19
**serve (1)**
40:3
**served (2)**
30:1,8
**serves (1)**
47:7
**service (2)**
59:17,20
**session (3)**
12:24;13:1;34:20
**set (6)**
19:6,7,12;22:2;
35:22;198:1
**several (6)**
5:11;63:19;68:18;
102:18;133:2;151:14
**sexual (23)**
107:19;126:3,3,16;
127:8;138:3,12,14,20;
139:2,13,24;140:5,22;
141:5;143:2,20;144:6;
145:9;168:1,6,12,17
**sexually (2)**
144:17;168:21
**share (1)**
150:2
**sheet (1)**
90:15
**shift (35)**
25:3;52:20,21;72:4;
73:3,4,5,6,7,8;95:4;
98:1,1;148:3,4,4,5,9,
11,12;149:10,16,16,
17,24;154:14,19;
155:3;156:12;170:20;
178:19,22;179:2;
181:14;189:6
**shifting (1)**
125:14
**shifts (2)**
54:10;73:5
**shook (1)**
63:19
**short (7)**
14:3;20:7;34:18;
146:8,12;168:24;
174:13
**shortly (4)**
53:23;67:4;118:17;

156:13
**shot (1)**
180:6
**shots (1)**
45:11
**shouting (1)**
162:12
**show (5)**
23:14;26:3,21;
28:24;32:18,20;33:11;
44:17;49:7;128:1;
133:7;154:4
**showed (3)**
28:4;128:21;153:24
**showing (1)**
128:13
**shown (2)**
90:10;92:6
**shows (1)**
28:8
**side (18)**
54:21,24;55:2,4;
61:10,11,13,14,15;
64:14;66:24;75:9;
151:18;155:13,15;
160:15;176:17;180:1
**sides (1)**
16:10
**signage (1)**
177:13
**signed (1)**
166:16
**silent (1)**
159:15
**similar (3)**
41:4;120:17;161:22
**simple (8)**
12:17;21:23;22:5;
26:4,8,22;117:3,3
**simply (4)**
6:11;8:20;13:21;
80:12
**sit (13)**
12:14;19:9,13;31:5;
82:15,19;83:18,21;
93:8;106:11;127:1;
141:19;164:3
**sites (1)**
39:3
**sits (1)**
3:20
**sitting (12)**
24:7;35:23;60:6;
61:19;62:2;63:6;
151:15,17,21;155:11;
158:17;164:16
**situation (4)**
102:15;162:8;
163:23;190:12
**Six (3)**
40:5;61:21;189:5
**size (1)**
61:20

**skills (1)**
29:3
**slash (1)**
24:7
**sleepy (1)**
63:20
**slow (1)**
132:24
**slurred (1)**
132:24
**small (3)**
150:13;176:14;
177:20
**smell (7)**
67:20;103:11,13,15,
16;131:24;132:3
**smoothly (1)**
23:20
**Sneed (1)**
119:7
**sobriety (3)**
116:21;118:6;
133:15
**soft-toned (1)**
170:5
**sole (1)**
195:1
**solid (2)**
150:11,13
**somebody (15)**
16:3;29:17;32:14,
14;57:2;65:3;80:3,11;
99:13,17;122:1,10;
168:3;169:10;189:13
**somebody's (1)**
138:18
**somehow (2)**
12:3;28:9
**someone (10)**
51:18,20,21;88:10;
93:19;99:12;127:4;
167:24;168:20,23
**sometime (1)**
105:18
**sometimes (1)**
36:4
**somewhere (4)**
44:13;73:12;
102:22;172:7
**soon (2)**
108:22;151:8
**sorry (17)**
8:7;13:10;25:8;
30:2;31:1;33:5;58:19;
76:4;78:19;92:4;93:6;
119:18;164:2;170:22;
174:23;184:23;191:17
**sort (3)**
159:16;163:21;
165:2
**sound (3)**
78:2;103:8;159:22
**Sounds (4)**

103:9;147:3;
169:17;191:15
**South (18)**
43:22;47:19;49:20;
55:4;58:4;61:10,11;
93:12;95:8;96:4;97:9,
14,18;100:11,13;
136:23;179:10,24
**space (1)**
103:14
**speak (6)**
52:5,8;53:12;72:5;
111:3;181:5
**speaking (3)**
65:21;75:13;159:3
**special (1)**
198:2
**specific (5)**
6:24;10:23;50:10;
98:16;154:11
**specifically (5)**
22:15;25:24;51:11;
161:14;173:1
**specificity (2)**
7:2,19
**specifics (2)**
46:23;113:10
**specify (1)**
8:21
**speculation (1)**
51:2
**speech (1)**
132:24
**spell (1)**
40:17
**spend (1)**
195:4
**spent (1)**
37:3
**spoke (9)**
53:3,5;111:20;
112:10;113:2;118:17;
135:16;157:2;181:8
**spoken (2)**
33:7;183:22
**spot (1)**
19:12
**spreadsheet (1)**
38:19
**squad (31)**
54:6,9,12,15,18,21;
55:1,3,4,6,12,17,20;
72:15,20,24;73:10;
148:13,19;149:3,24;
150:1,17;151:2,9;
154:23;157:18;
170:16;176:3,5;
183:16
**SR (1)**
35:16
**Stacy (1)**
50:5
**staff (2)**

37:6;45:17
**stages (1)**
189:3
**stand (2)**
9:8;66:21
**standalone (1)**
150:14
**standard (2)**
18:7;32:24
**standing (23)**
18:24;41:20;64:10,
12;66:17,24;130:18;
151:2,18;155:9,13,17;
156:22;157:8;158:14,
19;160:15,17,22;
161:1,2;180:9;181:4
**standpoint (1)**
46:2
**Star (5)**
36:8,11;147:19,20;
175:1
**start (7)**
36:7;69:22;147:18;
154:15;156:10,14;
174:24
**started (5)**
5:9;67:5;114:17;
161:12;177:1
**starting (1)**
11:12
**starts (1)**
148:6
**state (6)**
9:6;10:19;70:1;
73:22;101:13;161:16
**stated (16)**
20:4;49:23;53:3;
56:4,23;69:13;81:18,
20;144:9;164:12;
178:12,12;184:5;
185:6,19;195:8
**statement (36)**
4:3;12:12;20:21;
81:24;82:1,7,13,15,
17;103:12;118:16;
121:4;131:11;138:9,
15;139:5;142:12;
143:10;144:3,5,14,16;
145:14,19;153:7,12,
15,17;155:6;163:13;
166:24;167:2;172:15;
184:12;186:24;187:2
**statements (14)**
6:20,21;20:10,13;
21:11;67:18;68:9,13;
73:14,24;104:9;
130:16,21;161:17
**states (4)**
10:22;11:1;77:12;
136:2
**stating (4)**
36:7;123:3;147:18;
174:24

**station (4)**
23:13;54:5,5;172:7
**steps (5)**
52:18;163:14,15,24;
164:1
**steward (1)**
157:24
**stewards (1)**
158:3
**stick (3)**
106:7,17,18
**sticking (3)**
137:13;138:18;
139:3
**still (17)**
8:19;25:10;33:18;
66:10;70:4;112:4;
140:10,11;158:17;
165:10,13;172:9;
180:6;183:12,18;
197:15,16
**stood (3)**
66:17;160:5;161:10
**straightforward (1)**
21:23
**strange (2)**
23:7;75:7
**street (2)**
55:24;67:15
**strenuous (1)**
11:17
**stricken (1)**
51:23
**strictly (1)**
170:5
**Strike (5)**
68:23;92:9;120:20;
140:19;188:14
**structured (2)**
77:3,11
**stuck (3)**
106:16,23;144:16
**stuff (2)**
173:14,18
**subject (3)**
11:16;96:5;108:16
**subjected (1)**
85:14
**subjective (1)**
82:3
**subjects (1)**
118:13
**submit (3)**
141:3;142:10;
187:15
**submitted (1)**
109:20
**subordinate (5)**
32:2;89:22,24;
186:5,12
**subordinates (6)**
31:15;94:7,10,18;
121:4;136:19

**subordination (1)**
75:6
**subparagraph (2)**
129:9;131:2
**subparagraphs (4)**
128:2,15,18;135:3
**subsection (1)**
129:9
**substantially (1)**
28:10
**substantiate (2)**
108:6;125:3
**subverts (1)**
130:10
**successful (1)**
29:6
**sudden (1)**
31:11
**sufficient (1)**
47:11
**suggest (3)**
11:24;12:14;33:15
**suggested (2)**
156:17;157:12
**suggestion (1)**
12:4
**summary (2)**
135:15,19
**summation (1)**
58:16
**Sunday (1)**
187:21
**superintendent (1)**
33:4
**superior (2)**
186:13;190:24
**superiors (5)**
10:7;22:21;26:5,23,
24
**supervise (2)**
29:22;140:11
**supervised (2)**
178:23;190:1
**supervising (2)**
31:22;43:12
**supervisor (29)**
25:3;29:21;30:12;
32:3;42:10,12;78:1;
84:16;86:14;87:4;
89:8;95:5;107:13;
109:19,23;110:6,10;
118:24;119:5;120:9,
11;130:3,23;145:15;
169:6,8,8;179:3;
188:15
**supervisors (21)**
7:4,6;30:18;31:16;
73:10;89:6;95:22;
110:12,14;120:13,24;
121:15,19,23;122:9;
129:13;144:3;168:3;
174:1;194:1,1
**supplement (1)**

**Kankakee Board of Fire and Police Commissioners**
**Meeting**

7:10
**supplements (1)**
22:9
**supposed (1)**
168:2
**sure (23)**
11:17;15:16;23:20;
29:2;35:3;51:18,19;
56:7;65:3;80:21;
85:13;94:17;98:4;
100:3;125:18;153:13,
15;165:21;166:5,7;
170:19;187:4;192:22
**surprise (3)**
114:6;189:13,16
**suspect (1)**
171:22
**suspicious (4)**
44:15;45:11,12,12
**sustain (3)**
51:8;142:4;163:7
**Sustained (14)**
42:23;62:17;75:1;
80:9;84:3;89:15;
91:14;96:9;113:16;
169:23;181:23;183:1;
184:11;185:15
**SWAT (2)**
28:23,24
**swear (2)**
35:12;174:15
**sworn (11)**
11:16;35:11,14,18;
41:20;85:17;147:6,8,
12;174:16,20
**system (5)**
38:22;45:22;95:24;
149:13,13

**T**

**table (3)**
19:11;61:21,22
**talk (12)**
7:1,4;12:10;52:17;
59:10;60:11;90:24;
121:7;139:23;147:16;
163:19;183:19
**talked (8)**
84:14;90:7;94:12;
100:19,22;103:10;
111:16;142:20
**talking (32)**
29:14,15,15,16;
33:2;64:22;65:1,24;
66:8;67:12;68:17,19,
20;85:4,7,11,13;86:3;
91:19;98:15;107:18,
20,20;115:22;125:8;
133:3;134:10;154:13;
159:21;162:1;181:3,
12
**talks (4)**

8:2;31:7;42:14;
90:24
**tap (1)**
64:3
**tapped (4)**
64:6,18,19;102:17
**taser (3)**
149:12;152:7;159:1
**team (2)**
28:23,24
**technology (1)**
37:22
**telephone (5)**
56:9,13;57:18;
104:17;178:6
**telling (7)**
24:13;31:18;67:6;
97:12;111:11;119:16;
129:5
**tells (1)**
59:16
**temptation (1)**
29:16
**ten (4)**
39:24;146:11;
176:15,21
**tend (1)**
130:12
**tendered (2)**
10:14,17
**tenured (1)**
33:2
**term (2)**
42:16;193:17
**terminate (3)**
6:8;27:17;30:14
**terminated (1)**
27:4
**terminating (1)**
33:2
**terms (2)**
157:13;167:24
**terribly (1)**
20:18
**test (6)**
39:17,19;40:2;
116:20;133:15,16
**tested (1)**
27:20
**testified (24)**
35:18;46:14;47:6;
79:9;96:14;98:3,13;
101:9;104:6;109:14;
112:9;115:16;116:6;
126:18;133:11;
134:14;135:5;142:15,
17;143:14;144:12;
147:12;172:24;174:20
**testify (9)**
11:11;18:5;43:7;
46:24;47:2;126:13;
127:18,22;135:10
**testifying (7)**

20:16;65:20;98:6;
127:12;132:6;173:2;
185:12
**testimony (26)**
4:24;11:16;22:24;
24:5;25:22;46:9,20,
23;82:10;89:21;
90:24;112:9,12,14,16;
126:6;133:18,21,21;
141:24;146:4;174:10,
10;181:22;183:2;
194:21
**tests (2)**
117:6;118:5
**therefore (1)**
89:12
**thereof (2)**
130:13,19
**thinking (1)**
194:13
**thorough (1)**
27:23
**though (7)**
63:20;79:8;87:24;
102:6;112:20;156:10;
197:7
**thought (9)**
73:22;120:12;
161:9;162:14;163:16;
165:2;176:15;177:23;
181:10
**threatening (1)**
153:8
**three (9)**
14:1;27:13;61:24;
67:7;102:22;146:15;
160:24;161:2,21
**thrived (1)**
28:21
**throughout (2)**
23:22;126:22
**thrust (5)**
75:19,22;123:12;
125:4;141:17
**Thrusted (1)**
123:19
**ticked (2)**
32:18;169:18
**tickets (1)**
56:5
**times (14)**
63:19;68:18;70:13,
15;93:22;95:2,3,3;
102:20;103:7;124:14;
133:1;144:18;189:24
**timing (1)**
19:2
**TIMOTHY (2)**
147:10,20
**tired (8)**
101:19,20;102:14;
116:1;131:8,16;133:5,
7

**titled (1)**
15:8
**To/ (1)**
145:12
**To/From (18)**
109:9;114:12;
115:15,22;119:3;
125:2;136:1;145:13;
153:21;165:22;166:1,
4,10;171:13,18,20;
172:14;186:21
**today (20)**
12:14;30:11,14;
31:5;56:3;65:20;
82:16,19;83:18,21;
93:8;98:13;106:12;
107:21;109:14;112:9;
115:16;116:7;141:19;
143:14
**together (4)**
67:19;111:1;
180:13;181:4
**told (64)**
58:6;70:3,21;71:9,
10;96:18,20;99:4;
104:11,23;105:6,9,12,
13,17;110:6,19,22;
111:1,13,22;112:18;
113:5,5;118:18,21;
134:15;139:7,10,12;
141:11;142:22;143:1,
4,5,8,9;144:2,5,8;
157:10;171:13,16;
172:6,20;181:10,15;
182:6,12,12,15;183:9,
23;184:3,17,18;185:2,
3,4,5,18;191:17,18;
192:8
**tolerated (1)**
22:15
**Tomora (1)**
50:8
**tone (9)**
65:21,23;66:5,7;
152:21,22;153:3,6;
162:7
**tonight (16)**
5:23;9:14;11:12,15;
18:10,12;21:6;22:19;
25:23;136:3;137:3;
146:3,22;194:21;
195:4,10
**took (9)**
25:23;26:16;40:2;
58:14;66:22;72:23;
135:17,20;157:22
**top (2)**
41:8;155:7
**total (4)**
41:18;102:20;
152:10;157:1
**totality (2)**
28:13;59:6

**totally (1)**
89:8
**towards (9)**
24:15;36:2;54:18;
68:1;74:14;75:19,23;
123:19;141:17
**town (1)**
176:17
**traffic (5)**
23:21;59:5,5,7;
177:21
**train (1)**
161:9
**training (5)**
29:3;38:5;39:12
**transcript (5)**
7:21;10:12;16:3,6;
36:5
**transferred (2)**
29:10;189:6
**transmission (1)**
60:1
**transpired (1)**
9:23
**tray (1)**
167:9
**tremendous (1)**
28:4
**trend (1)**
120:12
**trespass (1)**
45:9
**trouble (1)**
31:18
**true (5)**
14:2;122:2,11,13;
135:15
**trust (1)**
196:24
**truthfully (2)**
11:3;26:14
**Try (7)**
62:17;83:2;106:21;
129:5;136:10;137:7;
163:21
**trying (11)**
63:14;87:5;102:7,
10,12;112:5,5;153:13;
159:16;162:13;163:12
**turn (2)**
162:14;180:4
**turning (1)**
162:11
**twice (5)**
61:20;101:21,23;
102:1;193:21
**two (27)**
8:2;26:6;28:6,6,20;
30:18;32:23;36:22;
41:14;54:22;61:1;
72:5;77:16;121:22;
124:24;150:2,7;157:5;
158:22,24;159:4,15;

Kankakee Board of Fire and Police Commissioners
Meeting

Seargeant Paul Berge
September 15, 2020

169:17,20;179:17;
193:21;198:3
**type (6)**
  41:1;44:9;46:13;
  60:1;133:15;141:4
**types (1)**
  78:23
**typical (1)**
  187:6
**Tyson (22)**
  60:23;61:8,9,14;
  63:16,17;64:5;66:9;
  71:22;72:3;97:21;
  151:15;156:4,11,15,
  23;157:3,6,20;159:3;
  195:7;197:23

**U**

**ultimate (3)**
  73:21;135:11;163:6
**ultimately (1)**
  165:9
**unavailable (1)**
  195:10
**unaware (2)**
  143:16,17
**unbecoming (1)**
  23:14
**uncertain (1)**
  114:21
**uncooperative (1)**
  117:2
**under (18)**
  26:14,22;86:4;
  102:14;117:13;120:5;
  124:5;129:18;130:7;
  131:21;132:14;
  133:12;141:12,19,24;
  188:7,8;189:1
**understands (2)**
  43:8;147:5
**understood (1)**
  16:23
**unfair (1)**
  12:9
**uniform (5)**
  83:21;148:21;
  149:1,4;176:1
**union (3)**
  157:24;158:2;
  167:16
**unit (5)**
  29:6,10,13;157:23;
  158:2
**United (1)**
  77:12
**unless (4)**
  21:3;53:11;103:22;
  169:8
**unmarked (1)**
  176:5
**unsatisfactory (1)**

129:9
**unsubstantiated (3)**
  121:1,5,6
**unusual (1)**
  26:18
**up (58)**
  7:11;16:14;19:6,8,
  12;23:1,9;35:22;
  47:17;58:2;61:6;62:3;
  63:6;64:17;66:9,17;
  69:19;70:3,6,11,18,
  21;71:8,9;88:16;
  100:23;104:11;117:4;
  120:8;123:15;132:21;
  134:6,17;149:11,15;
  151:18;155:7;156:5,7,
  8,16;161:11;164:7,20;
  165:5,7;173:14,18;
  180:17;181:6;191:21;
  193:12;197:17,21,24;
  198:1,7,7
**update (1)**
  23:6
**updates (2)**
  38:5,6
**upon (15)**
  12:13;51:12;59:12;
  68:11;80:5;81:3,8;
  83:5;93:11;101:6;
  103:22;126:6;135:2;
  173:6;196:19
**upset (4)**
  60:14;100:20;
  121:2;170:2
**upstairs (2)**
  195:9;196:13
**use (4)**
  38:4,4;149:23;
  152:8
**used (1)**
  163:13
**using (1)**
  170:5
**utilized (1)**
  79:5

**V**

**vague (1)**
  8:19
**various (4)**
  22:24;45:13;78:23;
  132:13
**vehicle (3)**
  24:11,17;185:20
**verbal (1)**
  162:10
**verbally (1)**
  95:4
**verse (1)**
  194:14
**versus (1)**
  84:24

**vetting (1)**
  27:23
**via (1)**
  59:4
**vice (1)**
  158:1
**vicinity (3)**
  59:6;72:18;97:16
**video (3)**
  9:16;31:23;180:4
**view (1)**
  145:16
**viewing (1)**
  154:9
**violate (5)**
  8:18;83:3;99:16;
  134:2;188:10
**violated (10)**
  6:17;7:1,3;8:5;
  10:24,24;12:16,18;
  33:9;145:17
**violates (1)**
  80:3
**violating (1)**
  7:5
**violation (7)**
  80:13;83:9,15;
  101:2;108:19;135:5;
  136:2
**violations (14)**
  13:19;34:6;53:1;
  56:5;57:5;75:4;94:5;
  96:22;98:12;99:5;
  100:6;102:3;136:8,15
**violators (1)**
  98:11
**visible (3)**
  72:24;73:1;151:22
**voice (9)**
  56:21;65:21,23;
  152:21,23;153:1,5;
  159:19;160:2
**voices (5)**
  72:7,12,14;160:3;
  162:7
**vote (1)**
  17:5
**voted (1)**
  17:18

**W**

**waist (2)**
  75:19,22
**Wait (3)**
  7:23;51:7;125:9
**waived (3)**
  4:15;12:3;126:8
**walk (3)**
  133:1;148:19;159:6
**walked (8)**
  63:4;151:8;152:3,
  10;156:16;157:18;

165:20;181:6
**walking (1)**
  148:18
**wall (3)**
  150:2,15;160:19
**wants (4)**
  12:23;13:9;193:24;
  195:4
**Ward (6)**
  50:11,12,17,17,18,
  19
**wards (1)**
  50:15
**watch (3)**
  94:8,11,20
**waved (2)**
  24:18;64:5
**waving (2)**
  63:12,14
**way (22)**
  12:1;23:1;24:6;
  25:7;43:13;60:14,16;
  87:6;89:3;90:2;
  106:22;116:19,21;
  117:4;140:8;153:8;
  154:22;155:2;157:22;
  172:14;189:11,21
**ways (2)**
  26:7;32:11
**wear (2)**
  18:20;20:17
**wearing (1)**
  20:16
**weeks (1)**
  92:15
**well-documented (1)**
  28:17
**weren't (3)**
  104:9;137:14;173:6
**west (1)**
  61:13
**What's (10)**
  13:2;43:1;49:7;
  51:24;61:17;65:5;
  86:18;88:22;89:2;
  119:21
**whenever (1)**
  145:7
**wherein (1)**
  26:13
**WHEREUPON (4)**
  35:15;147:9;
  174:17;198:16
**wherever (1)**
  23:22
**White (3)**
  120:17;122:8;194:1
**whole (4)**
  26:1;37:9;161:7,9
**Who's (2)**
  105:1;127:11
**whose (1)**
  54:24

**wide (1)**
  155:12
**wife (2)**
  27:15;33:3
**willful (2)**
  83:9,15
**window (15)**
  55:11,15;72:19,19;
  150:14,15,16,20,22;
  151:3,24;158:12,15;
  160:18,20
**withdraw (1)**
  68:24
**Withdrawn (1)**
  184:22
**withdrew (1)**
  184:24
**within (25)**
  23:13;25:6;29:2;
  38:10;40:22;41:9;
  42:13;50:6,11;52:8,9,
  10;54:4,5;57:11;
  92:11;134:19;168:3,
  23,23;175:13;176:8;
  185:23;186:2;193:19
**without (8)**
  6:9;76:8;81:22;
  83:18;127:1,23;
  129:13;155:2
**witness (84)**
  18:5,10;19:8,11,12,
  18,19;20:4,12,14,15;
  31:12;34:14;35:1,8,
  13,14,17;43:9;46:2,9;
  51:4,15;63:3;69:1;
  73:17,23;76:9;77:8;
  80:19;86:20;96:12;
  106:1;108:23;112:17;
  119:8,22;123:22;
  124:12;125:20;126:6,
  14;127:15;129:4;
  132:5,23;133:23;
  135:13,23;141:9;
  145:2,9,14,23;146:5;
  147:6,8,11;154:9,10;
  168:9;169:4;170:13;
  174:12,15,16,19;
  182:10,22;185:1;
  186:10,19;188:13;
  190:18;191:8,20;
  192:5,15;193:3,8;
  195:1,7,12;197:4
**witness' (1)**
  46:23
**witnessed (1)**
  114:9
**witnesses (16)**
  11:10,12;14:3;
  16:14;18:1,4,18,20,
  24;25:23;35:2;48:17;
  146:15,18,21;196:23
**won (1)**
  193:8

**Kankakee Board of Fire and Police Commissioners Meeting**

Seargeant Paul Berge
September 15, 2020

**wondering (1)**
16:12
**word (1)**
182:21
**words (1)**
163:12
**work (8)**
8:12;53:24,24;
85:16;129:10,12;
148:3;189:7
**worked (4)**
23:19;114:24;
189:1;190:21
**working (6)**
156:11;172:9,10;
175:23;178:1,24
**workplace (10)**
105:22;106:1;
107:9;118:10;126:4;
127:9;138:19;168:1,
17,21
**works (1)**
86:3
**world (1)**
31:21
**wrapping (2)**
7:11;120:8
**write (12)**
56:4;144:3,5;
145:14;149:11;
171:13;172:6,14;
186:23;187:1,5,7
**writing (3)**
5:18;79:6;114:17
**written (20)**
5:15;9:3,9;15:11,
19;22:7;37:18,21;
74:16;95:1,2,6,11,16;
96:3,24;97:7;109:20;
136:23;141:3
**wrong (7)**
6:12;12:9;59:9;
62:19;63:18;101:9;
183:24
**wrote (7)**
51:12;77:22;82:7;
116:7;120:19;135:15;
187:14
**Wynn (1)**
118:17

**Y**

**YATES (3)**
19:22;192:12;196:6
**year (5)**
9:17,24;30:2;46:7;
148:16
**years (20)**
6:9,9;30:10;36:17,
22;37:13;39:14;40:5;
67:7;77:16;147:22;
148:2;161:21;167:19;

170:23;171:1;175:8,
10,12;190:21
**yell (1)**
62:5
**yelling (5)**
72:11;116:18;
153:2;189:20,20
**Yep (2)**
173:20;188:9
**yesterday (2)**
51:20;52:2
**you-all (1)**
61:11
**young (3)**
27:13;177:5,6
**younger (2)**
177:8,9

**Z**

**Zimbra (1)**
95:20

**1**

**1 (13)**
44:18,21;45:24;
47:14;90:12,14,14,17;
91:18,21;92:4,14;
192:16
**1:00 (1)**
148:7
**1:35 (2)**
57:22;58:8
**1:44 (2)**
148:16;156:22
**1:45 (2)**
73:4;148:8
**10 (1)**
181:7
**10:00 (1)**
172:10
**10:15 (1)**
148:9
**101-page (1)**
16:2
**10-8 (1)**
59:20
**11:30 (1)**
56:16
**12 (1)**
73:12
**12:00 (1)**
178:5
**13th (1)**
4:5
**14 (1)**
30:10
**14th (4)**
49:18;91:6;93:4,5
**14-year (1)**
30:12
**15 (2)**

27:13;73:12
**15th (21)**
8:9;9:24,24;10:7;
23:3;25:24;26:17;
52:15;53:17;57:22;
58:8;60:4;95:7,17;
110:1;113:3;125:1;
148:15;153:19;
166:10;167:11
**16 (1)**
27:13
**16th (2)**
74:19;109:7
**18th (12)**
8:10;9:17,24;10:4,
8;23:17;25:24;26:1,
17;175:22;186:22;
187:21
**1989 (1)**
37:3
**19th (2)**
187:12,20

**2**

**2 (14)**
39:23;49:4,8;76:3,
7;90:12,13,15,17,23;
91:11,19,24;92:1
**2:00 (1)**
172:10
**20 (6)**
7:22;36:17;45:7;
57:22;175:10,12
**2000 (1)**
30:2
**2003 (1)**
37:3
**2006 (1)**
189:2
**2008 (1)**
40:2
**2009 (2)**
39:16;40:2
**2016 (1)**
30:6
**2018 (1)**
40:8
**2019 (1)**
119:12
**2020 (18)**
4:5;23:18;31:5;
53:18;74:20;93:4;
95:7,17;109:7;153:19;
166:11;167:11;
175:22;186:22;
187:12,20;188:8;
198:18
**20th (3)**
45:4;91:2;188:8
**22 (1)**
175:10
**23rd (7)**

146:23;195:16,19;
196:3,16;198:10,17
**24 (4)**
61:23;147:22;
170:23;171:1
**2nd (4)**
50:11,12,17,19

**3**

**3 (2)**
11:5;142:2
**30 (7)**
4:19;44:13;95:24;
152:10;155:19;159:7;
198:2
**30- (3)**
164:14;173:10,16
**3046 (1)**
36:10
**30-day (1)**
4:15
**30-plus (1)**
190:21
**30th (1)**
26:13
**31 (1)**
175:8
**34.1 (1)**
128:12
**341.3.5 (2)**
127:19;128:2
**341.5 (1)**
75:5
**3647 (1)**
147:20
**385 (1)**
59:16
**3rd (1)**
119:12

**4**

**4 (5)**
6:13;150:21,21,21,
21
**400 (15)**
9:15;43:22;47:19;
49:20;58:4;65:2;
93:12;95:8;96:4;97:9,
14,18;100:11,13;
136:23
**41-year-old (1)**
27:12
**45 (1)**
155:19
**4th (1)**
91:6

**5**

**5 (1)**
17:18

**5:00 (1)**
196:7
**5:30 (7)**
195:19;196:7,8,9,
11;198:10,18

**6**

**6 (2)**
30:3,4
**6:30 (1)**
34:17
**6:45 (2)**
19:5;34:19
**60-day (1)**
44:12
**60-second (3)**
164:15;173:11,16
**68 (1)**
41:20
**6th (3)**
45:5;50:18;91:2

**7**

**7:00 (1)**
19:4
**700 (1)**
126:19
**750 (2)**
78:16;81:20

**8**

**8 (1)**
6:19
**8:00 (2)**
53:24;54:1
**8:35 (1)**
146:10
**8:45 (2)**
146:11,13
**8th (1)**
177:6

**9**

**9930 (1)**
175:2

DEFENDANTS 001778

# In The Matter Of:

*Board of Fire and Police Commissioners*
*City of Kankakee*

*September 30, 2020*

*Schelli Reporting Service, Ltd.*
*schellireporting@aol.com*
*(312) 558-1113*

Original File 093020kkfpcmeeting.txt
**Min-U-Script® with Word Index**

DEFENDANTS 001779

**Page 1**

1
2    BEFORE THE BOARD OF FIRE AND POLICE COMMISSIONERS

3      CITY OF KANKAKEE, KANKAKEE CITY, ILLINOIS

4

5           Report of proceedings had at the Board

6    of Commissioners' Meeting for the Kankakee Fire and

7    Police Commission, held at 385 East Oak Street,

8    Kankakee, Illinois, on the 30th day of September,

9    A.D., 2020, commencing at the hour of 5:30 p.m.

10

11   APPEARANCES:

12        Chief Frank Kosman
          Dr. Willie Davis, Chairman
13        Mr. Nickey Yates, Secretary
          Mr. Mario Flores, Commissioner
14        Ms. Dawn Landwehr, Commissioner
          Ms. Cortney Bessant, Commissioner

15

16   APPEARANCES:

17        OTTOSEN, DiNOLFO, HASENBALG & CASTALDO, LTD.,
          by MR. JOHN H. KELLY
18            On behalf of Board of Commissioners;

19        ODELSON & STERK, by
          MR. MICHAEL McGRATH
20            On behalf of Chief Kosman;

21        HERBERT LAW FIRM, by
22        MR. DANIEL HERBERT

23            On behalf of Sergeant Paul Berge.

24            *  *  *  *  *  *

**Page 2**

1                 I N D E X

2    WITNESS                                    PAGE

3    GARY TYSON
          Direct Examination by Mr. McGrath...... 8
4         Cross-Examination by Mr. Herbert....... 21
          Redirect Examination by Mr. McGrath.... 31
5         Recross-Examination by Mr. Herbert..... 37

6    CHIEF FRANK KOSMAN
          Direct Examination by Mr. McGrath...... 39
7         Cross-Examination by Mr. Herbert....... 98
          Redirect Examination by Mr. McGrath.... 161
8         Recross-Examination by Mr. Herbert..... 172
          Redirect Examination by Mr. McGrath.... 188

9    PAUL BERGE
10        Direct Examination by Mr. Herbert...... 195
          Cross-Examination by Mr. McGrath...... 233

11
                E X H I B I T S
12
     CHIEF EXHIBIT                              PAGE
13        No. 3................................... 41
          No. 4................................... 74
14        No. 5................................... 77
          No. 6................................... 78
15
     BOARD EXHIBIT                              PAGE
16        No. 1................................... 119

17   RESPONDENT'S EXHIBIT                       PAGE

18        No. 1................................... 149
          No. 2................................... 204
19

20

21

22

23

24

**Page 3**

1        CHAIRMAN DAVIS: We'll call the meeting.
2    We're going to start out with the public comments
3    section of our agenda.
4        MR. KELLY: So, Chairman, would you take
5    roll to make sure we note that all commissioners
6    are here?
7        CHAIRMAN DAVIS: Yeah, we can do that.
8    Let's have roll call.
9        COMMISSIONER YATES: Dr. Davis?
10       CHAIRMAN DAVIS: Here.
11       COMMISSIONER YATES: Cortney Bessant?
12       COMMISSIONER BESSANT: Here.
13       COMMISSIONER YATES: Mario Flores?
14       COMMISSIONER FLORES: Present.
15       COMMISSIONER YATES: Dawn Landwehr?
16       COMMISSIONER LANDWEHR: Here.
17       COMMISSIONER YATES: Nickey Yates.  All
18   present in the form of five.
19       CHAIRMAN DAVIS: All commissioners are
20   here.  It looks like we have at least one comment
21   from the public.
22            (WHEREUPON, there was a
23             statement made by a member of
24             the public.)

**Page 4**

1        CHAIRMAN DAVIS: Thank you.
2            Any other comment from the
3    public?  Just for your information, ma'am, as a
4    group, the commissioners, we obviously -- when we
5    look at case, we have to look at the evidence that
6    is presented to us.  So I'm saying that to you
7    because, in lieu of your comments, while they are
8    not a part of the information being presented to
9    us, we technically can't consider that.  But you
10   have a right to make your statement.
11           All right.  Any comments from any
12   other commissioner?
13           We have moved through our agenda
14   at the last meeting, and we have moved all the way
15   down to -- on the police, it's the hearing charges,
16   which we will take up today.  Due to the fact that
17   we have this room scheduled -- it's a tightly
18   scheduled facility, we are going to continue our
19   meeting in the training room downstairs.  So just
20   for the information for the public as well, while
21   you're here right now, we have a room downstairs.
22   That does not prohibit you from listening in as you
23   would if you were listening here.  It just simply
24   means we are moving the meeting because there's

**Board of Fire and Police Commissioners**
**City of Kankakee**

September 30, 2020

Page 5

1 another meeting scheduled in this room, and we feel
2 like the time might conflict.
3          Okay.  So having said that, I
4 would entertain a motion from the commissioners to
5 move us to the training room, which is down on the
6 that first level.
7          COMMISSIONER YATES: Yes.
8          COMMISSIONER FLORES: So moved.
9          CHAIRMAN DAVIS: Okay.  I have a motion
10 on the floor to move us to that.
11          COMMISSIONER BESSANT: I second.
12          CHAIRMAN DAVIS: I have a second.  So
13 we're going to move -- we're going to continue our
14 meeting downstairs just so we won't be interrupted
15 later on.
16          (A short break was had.)
17          CHAIRMAN DAVIS: I show the record that
18 we have with us three attorneys.  Let's see.
19 Attorney McGrath, that's for the City.
20          MR. McGRATH: Good evening.
21          CHAIRMAN DAVIS: Attorney Kelly is our
22 attorney for the commissioners.  And I should point
23 out another thing about Attorney Kelly -- I'm
24 saying this for the sake of the public.  He's

Page 6

1 functioning as a hearing officer.  So as things
2 will go, he'll make certain rulings on information
3 that's being presented.  That's Attorney Kelly.
4 And he and Attorney Herbert --
5          MR. HERBERT: Herbert.
6          CHAIRMAN DAVIS: Yeah, Herbert is
7 representing Sergeant Berge.
8          And, Sergeant Berge, we're not
9 holding it against you for being late getting in
10 because he's already clarified it for you.
11          MR. BERGE: Yes, sir.  Thank you.
12          CHAIRMAN DAVIS: So we will take over
13 here, and I'm going to turn it over to Attorney
14 Kelly to do what he does.
15          MR. KELLY: One thing I would caution
16 members of the public that are here for the
17 hearing, please do not express any comments or
18 speak out loud during the hearing.  Again, as
19 Dr. Davis indicated at our commencement of the
20 hearing, this is an evidentiary proceeding.  There
21 are certain rules of due process provided by both
22 state law and Kankakee City ordinances that protect
23 the rights of both Sergeant Berge and the Chief to
24 have a fair hearing in this process.  As Dr. Davis

Page 7

1 indicated, the commission can only hear the
2 evidence that is presented by either party.  And
3 with that, I believe the Chief has a witness to
4 call.
5          MR. HERBERT: I'm sorry.  John, can I
6 make a brief statement, put something on the
7 record?
8          MR. KELLY: Sure.
9          MR. HERBERT: As everyone here knows,
10 there was a public comment section earlier wherein
11 a member of the community came in and made
12 statements that go to the heart of the charges
13 here.  I know that the chairman of the board
14 indicated that the board technically could not
15 consider the charges.  I would just indicate that
16 that individual is in the courtroom today for the
17 hearing, and I would just indicate that the
18 statements made by this fine woman -- I'm sorry if
19 I forget your name, but -- although they were
20 certainly allowed under the Public Meetings Act,
21 they were based with opinion, speculation,
22 irrelevant subject matter not subject to
23 cross-examination.  So I certainly ask and I trust
24 that the Board will disregard anything that this

Page 8

1 fine woman may have said for these proceedings.
2          MR. KELLY: The Commission absolutely
3 understands that.  They have been appropriately
4 cautioned.  Additionally, the comments were not
5 transcribed as part of the court record, only an
6 indication that a member of the citizen -- a member
7 of the community spoke during the public hearing.
8          Mr. McGrath?
9          MR. McGRATH: Good evening.  The Chief
10 next calls Gary Tyson.
11          (Witness sworn.)
12 WHEREUPON:
13          GARY TYSON,
14 called as a witness herein, having been first duly
15 sworn, was examined and testified as follows:
16          DIRECT EXAMINATION
17 BY MR. McGRATH:
18   Q.   Good evening, Mr. Tyson.  Just so you
19 know, this is the second night of this hearing.
20 And because of COVID, we're all wearing masks and
21 we're spread out here; but we agreed that witnesses
22 can take the mask down to help you breathe and make
23 it a little clearer to testify.  Okay?
24   A.   Yes, sir.

Page 9

1    Q.   Sir, can you start out by just stating
2  your name?
3    A.   My name is Gary Tyson.
4    Q.   And you are recently retired from the
5  Kankakee Police Department, correct?
6    A.   That is correct.
7    Q.   Congratulations.  What was the date of
8  your --
9    A.   9/11 of this year.
10   Q.   Okay.  And what was the rank when you
11  retired, sir?
12   A.   I was a sergeant.
13   Q.   And how long were you a sergeant with
14  the Kankakee Police Department approximately?
15   A.   Approximately four years.
16   Q.   And prior to that, you were a patrol
17  officer with the same department?
18   A.   That's correct.
19   Q.   And in total, how long did you work for
20  the Kankakee Police Department?
21   A.   20 years.
22   Q.   I would like to draw your attention to
23  July 15th of this year.  Were you working that day?
24   A.   Yes, I was.

Page 10

1    Q.   And were you working as a sergeant for
2  the police department?
3    A.   Yes, I was.
4    Q.   Were you working in full uniform?
5    A.   Yes.
6    Q.   Prior to taking the witness stand, did
7  you have a chance or opportunity to review a memo
8  you prepared regarding an incident that occurred in
9  the sergeants' office on that date?
10   A.   Yes, I did.
11   Q.   And when I say an incident in the
12  sergeants' office on that date, it involved
13  Sergeant Berge.  Do you recall that incident?
14   A.   Yes, I do.
15   Q.   And you had a chance to briefly review
16  your memo just prior to sitting down?
17   A.   Yes, I did.
18   Q.   And prior to you walking in the room,
19  you and I have never spoken; am I correct?
20   A.   No.
21   Q.   Initially, in looking at your memo, the
22  very top of it states June 29th of 2020?
23   A.   That's correct.  I used that top section
24  on every memo and just forgot to fill in the date,

Page 11

1  but it was actually 7- --
2    Q.   July 15th?
3    A.   Yes, that's correct.
4    Q.   So that's an --
5    A.   It's an error.
6    Q.   -- error?
7             Going to that date, do you recall
8  the shift that you were working?
9    A.   I was coming in to prepare for the
10  second shift.
11   Q.   So approximately what time did you get
12  to the police department?
13   A.   Probably around 1:45 -- or 1:15 is when
14  I usually get there.
15   Q.   I would like to draw your attention
16  around 1:45 p.m.  Were you in the sergeants'
17  office?
18   A.   I was.
19   Q.   And was Sergeant Berge also in the
20  sergeants' office?
21   A.   Yes, he was.
22   Q.   And do you recall if you were sitting at
23  one desk and if Sergeant Berge was sitting at a
24  desk?

Page 12

1    A.   That's correct.
2    Q.   And if somebody were to walk into that
3  office, what desk were you sitting at and what desk
4  was Sergeant Berge sitting at?
5    A.   He was sitting in the desk closest to
6  the door, and I was sitting in the far east desk.
7    Q.   And there's a single door that goes into
8  that office?
9    A.   That's correct.
10   Q.   And was the door open to that office
11  when you were in the office around that time you
12  were sitting at the desk?
13   A.   Yes, it was.
14   Q.   And I've been told there's a window in
15  the sergeants' office that you can see into the
16  squad room?
17   A.   That's correct.
18   Q.   All right.  And the squad room, can you
19  see into the sergeants' office?
20   A.   Yes.
21   Q.   At around that time, were you present
22  when Commander Austin came to the sergeants'
23  office?
24   A.   Yes, I was.

**Board of Fire and Police Commissioners**
**City of Kankakee**                                                    September 30, 2020

---

Page 13

1 Q. And when Commander Austin came to the
2 sergeants' office, where was he standing or where
3 did he go?
4 A. He was standing right inside the
5 doorway.
6 Q. When -- Strike that.
7 When Commander Austin came into
8 the sergeants' office, do you recall what his
9 overall demeanor was?
10 MR. HERBERT: Objection.
11 MR. KELLY: Nature?
12 MR. HERBERT: I'm sorry?
13 MR. KELLY: What was the nature of the
14 objection?
15 MR. HERBERT: The nature? Speculation,
16 relevance, foundation.
17 MR. KELLY: I'll sustain the objection.
18 If you can lay a better
19 foundation as to how the sergeant may have made an
20 observation here.
21 BY MR. McGRATH:
22 Q. Did you observe Commander Austin enter
23 the sergeants' office?
24 A. Yes.

---

Page 14

1 Q. And did he come in yelling and screaming
2 at anyone within the sergeants' office?
3 A. No, he did not.
4 Q. Did he appear to be in an excited state
5 to you?
6 A. No.
7 MR. HERBERT: Same objection.
8 MR. KELLY: Overruled.
9 BY MR. McGRATH:
10 Q. Did he appear to be angry to you?
11 A. No.
12 Q. Did Commander Austin come into the
13 sergeants' office to speak with you or to Sergeant
14 Berge?
15 MR. HERBERT: I'm going to object,
16 speculation and leading, which that was not
17 leading, but we're getting there.
18 MR. KELLY: The objection will be
19 sustained.
20 BY MR. McGRATH:
21 Q. Did Commander Austin speak to anyone
22 when he went into the sergeants' office?
23 A. He spoke to Sergeant Berge.
24 Q. And what did he state; do you recall?

---

Page 15

1 A. He was asking him about a call earlier
2 and what happened.
3 Q. And did Sergeant Berge respond to him?
4 A. No, not at first.
5 Q. What did Sergeant Berge do or what were
6 your observations of Sergeant Berge as Commander
7 Austin was speaking with him?
8 A. I looked over at him, and I didn't know
9 if he was asleep. He was sitting with his feet up
10 on the desk, and his eyes were closed.
11 Q. Did you hear Sergeant Berge respond to
12 Commander Austin?
13 A. No.
14 Q. You stated Sergeant Berge's eyes were
15 closed. How long were his eyes closed for?
16 A. I couldn't tell you. I didn't stare at
17 him. I was doing my own paperwork.
18 Q. Did you ever call out Sergeant Berge's
19 name to try to get his attention?
20 A. I did.
21 Q. At what point or when did this happen?
22 A. After I saw Commander Austin asking him
23 a couple times or call his name a couple times, I
24 looked over and I said, Hey, Paul, are you okay, or

---

Page 16

1 something to that effect. And he looked up at me
2 and he said, I'm fine. Just a little tired.
3 Q. Did you hear what Commander Austin was
4 asking or stating to Sergeant Berge?
5 A. The commander reiterated his question
6 about an earlier incident.
7 Q. And did Sergeant Berge give any response
8 or explanation about this earlier incident?
9 A. No.
10 Q. While you were in the room with
11 Commander Austin and Sergeant Berge, did the
12 telephone ring?
13 A. Yes, it did.
14 Q. And is there more than one telephone in
15 the office?
16 A. Yes, there is.
17 Q. And which telephone in the office rang?
18 A. The one on Sergeant Berge's desk.
19 Q. And where was Sergeant Berge at when the
20 phone rang?
21 A. Still sitting at the desk.
22 Q. And did he answer the phone?
23 A. Yes, he did.
24 Q. And after he answered the phone, did

---

DEFENDANTS 001783

**Board of Fire and Police Commissioners**
**City of Kankakee**

September 30, 2020

Page 17

1  Commander Austin make any statements to him?
2    A.  He told him that this conversation
3  wasn't over and to hang up the phone so they could
4  talk.
5    Q.  And did Sergeant Berge hang up the phone
6  when he was advised to hang up the phone by
7  Commander Austin?
8    A.  No, he did not.
9    Q.  And then what happened?
10    A.  I believe he said something to the
11  effect of, You need to get out of the office.
12  Sergeant Berge said that to Commander Austin.
13    Q.  All right.  Did you ever see Sergeant
14  Berge get up and approach Commander Austin?
15    A.  Not until I left the room and I went to
16  do my shift briefing.  And when I was standing at
17  the podium, you can see in that window you
18  mentioned earlier and I can see them talking, both
19  standing in front of the window talking.
20    Q.  Up until the time that you left the
21  sergeants' office, was Sergeant Berge sitting at
22  his desk?
23    A.  Yes, he was.
24    Q.  And up until the time that you left the

Page 18

1  sergeants' office, was Commander Austin standing
2  across the desk from Sergeant Berge?
3    A.  Yes, he was.
4    Q.  Where was he standing?
5    A.  He was still standing by the doorway.
6    Q.  Did you ever see Commander Austin put
7  his feet or leg up on top of Sergeant Berge's desk?
8    A.  No.
9    Q.  Did you ever see Commander Austin thrust
10  his crotch in the direction of Sergeant Berge --
11    A.  No.
12    Q.  -- from across the desk?
13    A.  No.
14    Q.  Did you ever hear Commander Austin tell
15  Sergeant Berge that he was relieved of his duties?
16    A.  Yes, I did.
17    Q.  And did you hear that prior to you
18  leaving the sergeants' office?
19    A.  Yes, I did.
20    Q.  Did Sergeant Berge, after being told
21  that he was relieved of his duties, get up, gather
22  his things, and leave the police department?
23    A.  No, not at that time.
24    Q.  And is that the approximate time that

Page 19

1  you left the sergeants' office?
2    A.  That's correct.
3    Q.  And what was the reason that you had to
4  leave the sergeants' office?
5    A.  To conduct my shift briefing, to tell
6  the patrolmen who were waiting outside sitting in
7  the squad room their assignments and that day's
8  briefing.
9    Q.  And as you left the sergeants' office,
10  just to be clear, where was Sergeant Berge at?
11       MR. HERBERT: I'm going to object, asked
12  and answered.
13       MR. KELLY: Overruled.
14  BY THE WITNESS:
15    A.  Still sitting at his desk.
16    Q.  And when you left the sergeants' office,
17  where was Commander Austin at?
18    A.  Still standing inside the doorway.
19    Q.  Did you close the sergeants' door when
20  you left the office?
21    A.  I don't recall.
22    Q.  Did you then go to the podium in the
23  squad room?
24    A.  I was walking that way.  I stopped to

Page 20

1  talk to Sergeant Klopp, who is the vice president
2  of the union; and I told him, You might want to go
3  in there and just mediate, make sure everything is
4  okay in there.
5    Q.  Did you have that conversation with
6  Sergeant Klopp within the squad room?
7    A.  Yes, I guess on my way to the podium,
8  approximately right there.  And then I stood at the
9  podium, and Sergeant Klopp walked in.
10    Q.  And approximately how long would it take
11  you to walk from the sergeants' office to where the
12  podium was located in the squad room?
13    A.  Five seconds, ten seconds.
14    Q.  Now, when you got to the podium, I
15  believe you stated earlier that you can see what
16  was going on inside of the sergeants' office?
17    A.  That's correct.
18    Q.  And at that point, what did you see
19  through the window?  Where was Sergeant Berge, and
20  where was Commander Austin?
21       MR. HERBERT: Objection.  This has
22  already been testified to.
23       MR. KELLY: Overruled.  This is when the
24  sergeant was back out in roll call.

DEFENDANTS 001784

Page 21

BY THE WITNESS:

1   A.   I looked up, and I saw Commander Austin
2   still pretty close to where he was when I left.
3   And then I saw Sergeant Berge standing up in front
4   of the window also.
5   Q.   And how close were they?
6   A.   Maybe a foot apart.
7         MR. McGRATH:  Thank you.  That's all I
8   have.
9            CROSS-EXAMINATION
10  BY MR. HERBERT:
11  Q.   Good evening, Sergeant.  How are you?
12  A.   Good.
13  Q.   You put the wrong date on the memo?
14  A.   That's correct.
15  Q.   Is that the memo that you submitted to
16  Commander Austin?
17  A.   That's correct.
18  Q.   Did he indicate to you that you put the
19  wrong date down?
20  A.   I don't think he ever mentioned it to
21  me, no.
22  Q.   Were you ever disciplined for putting
23  the wrong date?

Page 22

1   A.   No.
2   Q.   It was a mistake, correct?
3   A.   It was a mistake.
4   Q.   So you indicated that you were sitting
5   in the office with my client, Paul Berge?
6   A.   That's correct.
7   Q.   How long were you sitting in the office
8   with Paul?
9   A.   Before the Commander came in or ...
10  Q.   Yeah, before the Commander came in.
11  A.   I don't know an approximate.  Maybe
12  ten minutes.
13  Q.   Did Paul seem angry to you at any point?
14  A.   No.
15  Q.   Did you have any conversation with Paul
16  before the commander came in?
17  A.   I usually would ask him what -- you
18  know, what, if anything, went on today, but there
19  was nothing.  I don't remember any other
20  conversation.
21  Q.   Very normal for sergeants to sit in that
22  office, correct?
23  A.   Yes.
24  Q.   It's a sergeants' office, correct?

Page 23

1   A.   Yes.
2   Q.   You've sat in the office with Paul
3   dozens of times prior to this date?
4   A.   Yes.
5   Q.   Did Commander Austin ever come into the
6   sergeants' office at any other time other than this
7   date in July when it was you and Paul in the
8   office?
9   A.   He does it quite frequently.
10  Q.   And Paul was at the end of his tour?
11  A.   That's correct.
12  Q.   And Paul, you said he looked tired?
13  A.   I don't know if when I first came in
14  there he looked tired; but I noticed once the
15  commander started talking to him, I looked over at
16  him.  I was doing my paperwork at my computer with
17  my back to him most of the time.
18  Q.   And then the commander called his name a
19  couple of times?
20  A.   That's correct.
21  Q.   And then you called his name?
22  A.   That's correct.
23  Q.   And Paul didn't answer at first?
24  A.   He answered me.  I said, Are you okay?

Page 24

1   He said, No, I'm just tired.
2   Q.   And when Commander Austin was calling to
3   Paul, did it appear that Paul was asleep still?
4   A.   Yes.
5   Q.   When he awoke, did he seem like he was
6   groggy?
7   A.   A little bit.
8   Q.   And did you ever smell any alcohol on
9   Paul?
10  A.   No.
11  Q.   Did you ever have reason to believe that
12  Paul was intoxicated at any point?
13  A.   No.
14  Q.   Did Commander Austin ever say anything
15  about Paul smelling like alcohol when he came in
16  the room?
17  A.   No.
18  Q.   Did the subject of Paul being under the
19  influence of alcohol come up at any point during
20  that day?
21  A.   I think when I talked to Commander
22  Austin later, we mentioned -- or I don't remember.
23  I think he said, What was that all about, or
24  something and, you know, it seemed like he was off

2:20-cv-02310-CSB-EIL # 17-15 Page 148 of 270
Board of Fire and Police Commissioners
City of Kankakee                                                    September 30, 2020

Page 25

1 or something.
2 Q. But the question was anything said about
3 alcohol.
4 A. I don't recall.
5 Q. But you would agree, as a sergeant, you
6 certainly have a duty to report misconduct in the
7 workplace if you see it, correct?
8 A. Absolutely.
9 Q. And if you had occasion to believe that
10 Paul was drinking, you certainly would have
11 reported that, correct?
12 A. Yes.
13 Q. And also same thing, if you believe that
14 somebody was being insubordinate, you would have a
15 duty to report that, correct?
16 A. Correct.
17 Q. And you never reported Paul being
18 insubordinate in this case, correct?
19 A. I put it on a memo that -- of what
20 happened.
21 Q. Right. But you filled this memo out
22 that day or later?
23 A. That day.
24 Q. And you were commanded to do that by

Page 26

1 Commander Austin, correct?
2 A. Correct.
3 Q. So you never independently went and
4 reported anything that you saw? Your only response
5 to this was after a request -- or I should say a
6 command by Commander Austin to write a To/From,
7 correct?
8 A. Correct.
9 Q. Did you find it odd that you were
10 writing a To/From to Commander Austin when he was
11 the one making the complaint in this case?
12 A. He's in our chain of command. So I
13 usually just put my lieutenant, which he wasn't
14 there that day. So I didn't think to put him and
15 then just right up the chain.
16 Q. But did you find it unusual that
17 Commander Austin was asking you to give him a
18 To/From for an incident in which he was the
19 complainant in?
20 A. I didn't know he was the complainant at
21 the time, no.
22 Q. But now that you do, kind of unusual;
23 you would agree with me on that?
24 MR. McGRATH: Objection, form of the

Page 27

1 question.
2 MR. KELLY: Overruled.
3 BY MR. HERBERT:
4 Q. You may answer.
5 A. He's the next up on the chain of command
6 besides the lieutenant. So no, that's who I would
7 write just about anything to.
8 Q. And the phones, there's two phones in
9 the office?
10 A. That's correct.
11 Q. Phone rings routinely, I would imagine?
12 A. Yes.
13 Q. One of your duties as a sergeant is to
14 answer the phone?
15 A. Yes.
16 Q. Paul may have answered the phone,
17 correct?
18 A. Yes, he did.
19 Q. Did you know at the time who was on the
20 telephone that Paul was speaking with?
21 A. I don't recall who it was.
22 Q. And what did Commander Austin do after
23 Paul answered the telephone?
24 A. He advised Paul that the conversation

Page 28

1 wasn't over and to hang up the phone.
2 Q. Okay. He advised him, correct?
3 A. That's correct.
4 Q. He didn't say, I'm giving you a direct
5 order to hang up the phone, correct?
6 A. He gave him a direct order to -- I
7 believe he did give him a direct order to hang up
8 the phone.
9 Q. How many times did he tell him to hang
10 up the phone?
11 A. I don't recall.
12 Q. Would it have been more than once?
13 A. It may have been. I don't recall.
14 Q. And at the time in which he told him to
15 hang up the phone, obviously Paul was on the
16 telephone, correct?
17 A. Correct.
18 Q. Do you know if he was speaking or if he
19 was listening to the person on the telephone?
20 A. I believe he was doing both.
21 Q. Okay. When you walked out of the office
22 to conduct roll call, how long had the Commander
23 been in your office?
24 A. Anywhere from -- It wasn't a long time.

2:20-cv-02310-CSB-EIL # 17-15 Page 149 of 270
Board of Fire and Police Commissioners
City of Kankakee                                       September 30, 2020

Page 29

1 Five minutes.
2   Q.   And during those five minutes, you never
3 saw Paul threaten the commander in any way?
4   A.   No.
5   Q.   You never saw him disrespectful in any
6 way to the commander?
7   A.   Telling him to get out of the office
8 several times, but ...
9   Q.   Did the commander leave when he was told
10 to get out?
11   A.   No.  He said, It's not your office.
12 It's the police department's office.
13   Q.   It's labeled the sergeants' office?
14   A.   It's labeled the sergeants' office.
15   Q.   So after you left and went to the
16 podium, you couldn't see what was going on at the
17 point in which you left and walked to the podium,
18 correct?
19   A.   Correct.
20   Q.   And when you came back into the
21 office -- Or strike that.
22        You said that you talked to
23 Sergeant Kropp, correct?
24   A.   Correct.

Page 30

1   Q.   Klopp.  Excuse me.
2   A.   Klopp.
3   Q.   And you told him basically to go in
4 there --
5   A.   Correct.
6   Q.   -- and mediate, right?
7   A.   Right.
8   Q.   Didn't say that Paul was threatening the
9 commander in any way?
10   A.   No, I did not.
11        MR. HERBERT: I have nothing further.
12 Thank you -- Strike that.
13        Just maybe one more question or
14 maybe two.
15 BY MR. HERBERT:
16   Q.   You have communicated with the Chief
17 regarding your testimony tonight, correct?
18   A.   Correct.
19        MR. HERBERT: Nothing further.
20        MR. KELLY: Mr. McGrath, any follow-up
21 based on Mr. Herbert?
22        MR. McGRATH: Just a couple.
23
24

Page 31

1        REDIRECT EXAMINATION
2 BY MR. McGRATH:
3   Q.   Now, Retired Sergeant Tyson, I believe
4 you just testified that during the interaction with
5 Sergeant Berge in the office that day, I believe
6 you stated he just seemed to be off or seemed a
7 little off.  Did you just state -- testify to that?
8   A.   Yes, I did.
9   Q.   At any point during the time when
10 Commander Austin was trying to get his attention,
11 did Sergeant Berge make incoherent statements or
12 comments that you couldn't make out?
13   A.   Yes, he did.
14   Q.   Did he make or state words that didn't
15 make any sense to you?
16        MR. HERBERT: Never mind.  No objection.
17 BY THE WITNESS:
18   A.   The second time Commander Austin tried
19 to talk to him, he just mumbled something.  His
20 eyes were open, but I couldn't -- I couldn't
21 understand what it was and I was a little
22 concerned.  And I said, Are you okay?  And he said,
23 Yeah.
24   Q.   As far as the police department, there's

Page 32

1 obviously a chain of command, correct?
2   A.   Correct.
3   Q.   And you were asked about being requested
4 by Commander Austin to prepare a memo.  And, in
5 fact, you were asked if he gave you an order to
6 prepare a memo, correct?
7   A.   Yes.
8   Q.   And you prepared that memo?  You
9 followed his order, correct?
10   A.   Correct.
11   Q.   You took no issue with taking that order
12 from a superior officer and then following through
13 with the order that was directed to you, which was
14 to prepare a memo, and you prepared the memo,
15 correct?
16        MR. HERBERT: Objection, compound
17 question objection, relevance what this witness
18 thought about it.
19        MR. KELLY: Overruled.
20 BY THE WITNESS:
21   A.   That's correct.
22   Q.   You prepared that To/From not a week
23 later, not two weeks later, you prepared it the day
24 of --

DEFENDANTS 001787

**Board of Fire and Police Commissioners**
**City of Kankakee**

**September 30, 2020**

Page 33

1  A.  As soon as I walked back in the office
2  after my shift.
3  Q.  Very shortly after you were given that
4  order, you followed that order and you prepared the
5  To/From, correct?
6  A.  That's correct.
7  Q.  And I believe you testified that
8  Sergeant Berge was given at least one, possibly
9  more direct orders to hang up the phone by
10  Commander Austin?
11  A.  That's correct.
12  Q.  And Sergeant Berge did not follow those
13  direct commands, did he, in your presence?
14  A.  No.
15  Q.  And as far as him being disrespectful,
16  you testified that Sergeant Berge told his
17  commanding officer to get out of the office,
18  correct?
19        MR. HERBERT: Objection.  It's argument.
20        MR. KELLY: Sustained.
21  BY MR. McGRATH:
22  Q.  Did Sergeant Berge tell his commanding
23  officer to get out of his office?
24  A.  He did.

Page 34

1  Q.  And, again, that's an office that
2  belongs to the taxpayers of the City of Kankakee,
3  correct?
4        MR. HERBERT: Objection, relevance.
5        MR. KELLY: Overruled.
6  BY THE WITNESS:
7  A.  That's correct.
8  Q.  It's not -- It wasn't your office?  It
9  wasn't Sergeant Berge's office?  It's an office
10  that's owned and operated by the police department
11  that you're allowed to use, correct?
12  A.  That's correct.
13        MR. McGRATH: Okay.  Thank you.  That's
14  all I have.
15        MR. KELLY: Mr. Herbert, any recross?
16        MR. HERBERT: Nothing else.
17        MR. KELLY: Any commissioners have any
18  questions for Mr. Tyson?
19        COMMISSIONER FLORES: Sorry.  I would
20  like to thank you for your 20 years.  In your
21  20 years, have you ever experienced something like
22  this before where a superior officer is trying to
23  get the attention of another officer, anything like
24  this ever happen in the 20 years that you can

Page 35

1  recall?
2        THE WITNESS: Not that I can recall.
3        COMMISSIONER FLORES: Okay.
4        MR. KELLY: Anything else?
5        COMMISSIONER BESSANT: In a situation
6  like this, is it normal for the superior officer to
7  say, hey, send a To/From to kind of tell what
8  happens if there's any kind of altercation or
9  disagreement?
10        MR. HERBERT: I'm going to object to
11  that.
12        MR. KELLY: Overruled.
13  BY THE WITNESS:
14  A.  Commander Austin told me I'm going to
15  have to write a memo.  It was up to me who I put on
16  the memo, and maybe it shouldn't have been to
17  Commander Austin.  I should have put it to --
18        COMMISSIONER BESSANT: No.  I just
19  meant --
20        MR. HERBERT: Let him finish his answer,
21  please.
22        COMMISSIONER BESSANT: Sorry.  Go ahead.
23  BY THE WITNESS:
24  A.  So for me just to put his name on it, he

Page 36

1  never directed me to say, this just goes to me.  It
2  was just write a memo or write a statement of what
3  happened in the office, and that's what I did.
4        COMMISSIONER BESSANT: Is it just, like,
5  not necessarily who it was from, but is it just,
6  hey, can you write up what you saw?  Is that
7  something that's typically --
8        THE WITNESS: Daily, yes.
9        COMMISSIONER BESSANT: Thank you.
10        MR. KELLY: Any further questions from
11  the commission?
12        Any follow-up from either
13  attorney based on --
14        MR. HERBERT: Yes.
15        MR. McGRATH: I do, too.
16        MR. KELLY: All right.
17        MR. HERBERT: Do you want to go first?
18        MR. McGRATH: Yeah.  Thanks.
19  BY MR. McGRATH:
20  Q.  Just to follow up on that type of a
21  question, is it the regular course of duty of
22  police officers to write memos, To/From memos,
23  reports just to document what took place?
24  A.  Absolutely.

Schelli Reporting Service, Ltd.
(312) 558-1113

DEFENDANTS 001788

**Board of Fire and Police Commissioners**
**City of Kankakee**

September 30, 2020

Page 37

1 Q. And they're just summaries, correct?
2 They either go in a file or they're directed to
3 somebody within the department?
4     MR. HERBERT: I'm going to object to
5 foundation here.
6     MR. KELLY: Overruled.
7 BY THE WITNESS:
8 A. That's correct.
9 Q. And in your 20 years of being a police
10 officer, a sergeant, has that always been the case?
11 A. Yes.
12     MR. McGRATH: Thank you.
13     MR. KELLY: Mr. Herbert?
14     RECROSS-EXAMINATION
15 BY MR. HERBERT:
16 Q. You said that you've never seen a
17 situation where a supervisor has said something to
18 a subordinate and the subordinate -- or the
19 supervisor asked a question to the subordinate and
20 the subordinate never answered? You've never seen
21 that in your history in the police department?
22 A. Not that I can recall.
23 Q. Did you ever fall asleep on your couch
24 and your wife is calling to you and you don't

Page 38

1 answer the first question?
2 A. Of course.
3 Q. Don't answer the second, third, fourth
4 question sometimes?
5     MR. McGRATH: Objection.
6     MR. KELLY: Sustained.
7     MR. HERBERT: Nothing further.
8     MR. KELLY: Any other follow-up from the
9 commission?
10     Any other from Mr. McGrath?
11     MR. McGRATH: No. Thanks for coming in.
12     MR. KELLY: Thank you for coming in.
13 You are free to go. Please do not discuss your
14 testimony here tonight with anybody outside of this
15 room.
16     MR. McGRATH: Yes, I would call Chief
17 Kosman, please.
18
19
20
21
22
23
24

Page 39

1     (Witness sworn.)
2 WHEREUPON:
3     CHIEF FRANK KOSMAN,
4 called as a witness herein, having been first duly
5 sworn, was examined and testified as follows:
6     DIRECT EXAMINATION
7 BY MR. McGRATH:
8 Q. Good evening, Chief. Can you start off
9 by stating your full name for the record?
10 A. My name is Frank Kosman, K-O-S-M-A-N.
11 Q. And your current employment?
12 A. I am -- Since May of 2019, I've been
13 employed as the chief of police for the City of
14 Kankakee.
15 Q. I'll just have you go through a little
16 bit of your background, specifically as it pertains
17 to law enforcement. How long have you been in law
18 enforcement? How did you get into law enforcement,
19 training, that kind stuff?
20 A. I've been in law enforcement since 1984.
21 I was hired by the Village of Bensenville as a
22 police officer, and I rose through the ranks. And
23 in the year 2000- -- or 2002, I was promoted to
24 chief of police -- or appointed chief of police,

Page 40

1 and then I was chief of police for the next
2 16 years until October of 2018. After that, I
3 served six months as special deputy for the
4 U.S. Marshal Service at the federal court building,
5 the Dirksen building downtown.
6 Q. And then applied, and you were hired
7 here as the chief of police?
8 A. Yes.
9 Q. And under what administration or what
10 mayor appointed you as the chief?
11 A. Under Mayor Wells-Armstrong.
12 Q. Briefly on your education, do you have
13 any college degrees?
14 A. I do. I have a degree in administration
15 criminal justice from Bradley University and a
16 master's of law enforcement and justice
17 administration from Western Illinois University.
18 Q. Did you obtain those degrees prior to
19 being hired in Bensenville as a patrol officer?
20 A. I had my Bradley degree. I graduated
21 that in 1981, and I got my Western Illinois
22 University degree while I was working for the
23 Village of Bensenville. And that was in 1999.
24 Q. Within the Kankakee Police Department,

DEFENDANTS 001789

Page 41

1  are there set policies and procedures?
2   A.   Yes, there are.
3   Q.   And are those contained -- or are they
4  in written form, or are they given to all officers
5  within the department?
6   A.   They are in electronic form.
7   Q.   And are they amended or supplemented
8  from time to time, and are those amendments and
9  supplements given to the officers within the
10  department?
11   A.   Yes.
12   Q.   And are all the officers of the
13  department supposed to know what the rules and
14  policies are and to follow those rules and
15  policies?
16   A.   Yes.
17   Q.   I'm going to show you what is marked as
18  Chief Exhibit No. 3.
19       MR. HERBERT: What numbers?
20       MR. KELLY: 2, Policy 200, 341, and
21  1020.
22       MR. HERBERT: Thank you.
23       (Chief Exhibit No. 3 marked for
24           identification.)

Page 42

1  BY MR. McGRATH:
2   Q.   Chief, Exhibit 3 is three of the
3  policies with the police department, Policy 200,
4  341, and Policy 1020?
5   A.   Yes.
6   Q.   Do you recognize those policies?
7   A.   Yes, they're policies at the Kankakee
8  Police Department.
9   Q.   And those are just three of the policies
10  within the Kankakee Police Department, correct?
11   A.   Correct.
12   Q.   In total, I believe we heard last time,
13  if you printed out all the policies, it's over 700,
14  800 pages, correct?
15   A.   I think it's around 700.
16   Q.   Can you tell us about the Kankakee
17  Police Department?  Is there a chain of command,
18  and what is the chain of command?
19   A.   Yes.  A chain of command starts with the
20  chief of police, and then there's a deputy chief,
21  there's two commanders, one for patrol and one for
22  investigations.  There's lieutenants assigned to
23  the patrol division, and underneath lieutenants are
24  sergeants, and then under sergeants are patrolmen

Page 43

1  and women.
2   Q.   And is that the hierarchy of the
3  Kankakee Police Department?
4   A.   Yes.
5   Q.   And does the Kankakee Police Department
6  follow paramilitary type of an organization, or is
7  it a paramilitary type of organization?
8   A.   Yes.
9   Q.   And within that paramilitary
10  organization, do you expect orders given by
11  superiors to their subordinates to be followed?
12   A.   Yes.
13   Q.   And not just orders, but orders,
14  commands, or directives?  If you're told to do
15  something by a superior, are officers supposed to
16  follow those orders, commands, or directives?
17       MR. HERBERT: Objection.  It's compound,
18  it's leading, and it is an incomplete hypothetical
19  without getting into it more.
20       MR. KELLY: Overruled.
21  BY THE WITNESS:
22   A.   Yes.
23   Q.   We've heard the term insubordination?
24   A.   Yes.

Page 44

1   Q.   What does insubordination mean to you as
2  the chief of the Kankakee Police Department?
3   A.   Disobedience or failure to follow a
4  lawful order.
5   Q.   I would like to draw your attention to
6  July 18th of this year.  Do you recall that being a
7  Saturday and you working on that day?
8   A.   Yes.
9   Q.   Was there a preplanned peaceful protest
10  to take place within the city of Kankakee on that
11  day?
12   A.   Yes.
13   Q.   And what was the protest about?
14   A.   It was following the incident in
15  Minneapolis, and I believe it was social justice.
16   Q.   Was it along the lines of a Black Lives
17  Matter peaceful protest?
18   A.   Yeah, it was a march.
19   Q.   Was this -- Were you made aware of this
20  march prior to July 18th of 2020?
21   A.   Yes.
22   Q.   And so you knew that this march was
23  going to take place on that date?
24   A.   Yes.

**Board of Fire and Police Commissioners**
**City of Kankakee**                                                    **September 30, 2020**

Page 45

1  Q.   Were you involved as chief of your
2  police department with that march on July 18th of
3  2020?
4  A.   Yes.
5  Q.   And how was it that you were involved,
6  and what was your role?
7  A.   After learning about the march, we
8  decided that -- what would have to be done would be
9  I would come in and Sergeant Miller from the
10  traffic unit would be there and we would have an
11  officer from patrol that would also be with
12  assisting with the -- to maintain the peace during
13  the march.
14  Q.   I know as chief you're always available
15  24/7, but do you typically work on Saturdays,
16  Chief?
17  A.   No.
18  Q.   So you came in on this Saturday to work
19  because -- specifically because of this march?
20  A.   Yes.
21  Q.   And where did the march begin?
22  A.   At Bird Park.
23  Q.   Were you in uniform on that date?
24  A.   Yes, I was.

Page 46

1  Q.   Similar to what you're wearing today?
2  A.   Yes.
3  Q.   And were you driving your chief's car?
4  A.   Yes, my assigned squad.
5  Q.   Is that a marked or unmarked --
6  A.   It's an unmarked, gray Dodge.
7  Q.   You had mentioned two other officers,
8  Sergeant Miller.  Did Sergeant Miller begin or was
9  he assigned to Bird Park from the beginning of this
10  march?
11  A.   Yeah, he was there when I showed up.
12  Q.   Was Sergeant Miller in uniform?
13  A.   Yes.
14  Q.   Was Sergeant Miller driving a marked
15  squad car?
16  A.   Yes.
17  Q.   And then there's another officer that
18  you mentioned.  What was that officer's name?
19  A.   Gearhart.
20  Q.   Can you spell that?
21  A.   G-E-A-R-H-A-R-T, I think.
22  Q.   And was that officer in uniform and in a
23  marked squad car on that day?
24  A.   Yes.

Page 47

1  Q.   Can I ask you for the -- on that day why
2  you did not include other patrol units or officers
3  from your department to assist with this march?
4        MR. HERBERT: I'm going to object,
5  assuming facts not in evidence.
6        MR. KELLY: Overruled.
7  BY THE WITNESS:
8  A.   We thought it was sufficient for the
9  march.  And if we needed more, we could always call
10  more from the patrol division.
11  Q.   The beginning of the march, unless you
12  needed more support, it was just going to be you,
13  Sergeant Miller, and Officer Gearhart?
14  A.   Yes.
15  Q.   Can you take the commission through the
16  route of this march from Bird Park?  Approximately
17  where did they go, what direction?
18  A.   They went east on Station Street and
19  then went to Dearborn, turned left on Dearborn, and
20  then came to Merchant Street, and then Merchant
21  east again to Indiana, and then Indiana north to
22  the courthouse.
23  Q.   And tell us the size of the crowd of
24  these marchers.  How many people were in the --

Page 48

1  A.   I think probably it started -- it was
2  about 15, but people were joining during the march.
3  So there was probably, by the time we got to the
4  courthouse, around 20 people, and then there was a
5  couple cars that were following.  I don't know how
6  many people in the cars.
7  Q.   Out of that 15 to 20 people, can you
8  give me a breakdown of how many children or
9  teenagers or adults were in that crowd?
10  A.   Approximately half.  I don't know.
11  Maybe a third, if you talk five preteens, five
12  teens, and then maybe there was a little bit more
13  adults, I would think.
14  Q.   Did you see any children under the age
15  of 12?
16  A.   Yes.
17  Q.   Approximately how many?
18  A.   I'm guessing five.
19  Q.   Did you ever see Sergeant Berge during
20  the route of the march from Bird Park until he got
21  to the courthouse?
22  A.   Yes.
23  Q.   And when was the first time you saw
24  Sergeant Berge?

DEFENDANTS 001791

Page 49

1    A.   I saw him first when I was in the back
2  of the march and when I got up to about Washington
3  Street.
4    Q.   And where did you see Sergeant Berge,
5  and what was he doing?
6    A.   I forgot.  He was on foot on the north
7  or south side of the street just east of, there's
8  like, an alley.  So in between that area of, like,
9  Washington Street and the alley, in that general
10  area.
11    Q.   As the march went through the city, were
12  you in your squad car?
13    A.   The march would periodically stop, and
14  then the protesters would just stop and do some
15  protesting.  And then I might have gotten out of my
16  car during that period of time.  I'm not really
17  sure.  I think that's what happened around
18  Washington Street, just past Washington Street.
19    Q.   But coming from Bird Park, was it a
20  small parade --
21    A.   Yes.
22    Q.   -- of marchers?
23    A.   Right.  They would stop at Washington or
24  just east of Washington the first time.

Page 50

1    Q.   You were driving your chief's car?
2    A.   Yes.
3    Q.   And where were you in line of the
4  procession?
5    A.   I was at the end -- either myself or
6  Sergeant Miller would end up switching at the end.
7    Q.   At the end.  Was there a squad car at
8  the front of the procession?
9    A.   That would be Officer Gearhart.
10    Q.   Did she have her MARS lights activated?
11    A.   I believe so.  I think so, yes.
12    Q.   Was part of the reason to have marked
13  squad cars is to provide traffic control and safety
14  for the protesters or marchers?
15    A.   And the motoring public.
16    Q.   Was Sergeant Berge ever assigned any
17  detail in relation to this march?
18        MR. HERBERT: I'm going to object to
19  foundation.  You can ask him if he assigned
20  anything.
21  BY MR. McGRATH:
22    Q.   Did you assign Sergeant Berge to any
23  detail as it relates to this march?
24    A.   I didn't personally assign him to

Page 51

1  anything.
2    Q.   Do you know if any shift commander
3  assigned Sergeant Berge to do anything with the
4  protest?
5        MR. HERBERT: Same objection.
6        MR. KELLY: Overruled.
7  BY THE WITNESS:
8    A.   Could you ask that question again?
9    Q.   Yeah.  Have you ever been told by any of
10  your supervisors that they detailed Sergeant Berge
11  to be involved with the protest on that date?
12    A.   No.  I don't know that, but there could
13  have been some radio traffic as we were marching as
14  the procession went along, that maybe we needed
15  help -- you know, extra help at an intersection
16  like Washington, a major intersection, that could
17  have happened.
18    Q.   Did you ever see Sergeant Berge assist
19  or help in any major intersection as the marchers
20  went from Bird Park to the county courthouse?
21    A.   I didn't see it.
22    Q.   Was there a second time that you saw
23  Sergeant Berge along the march?
24    A.   Yes.

Page 52

1    Q.   And where did you see him?  What was he
2  doing?
3    A.   He was -- That second time I'd seen him,
4  that was when the marchers had stopped again at
5  Dearborn and Merchant Street and were protesting.
6  And I got in my car to help direct traffic for
7  westbound Dearborn because cars were stopped there,
8  and there was some drivers that were getting upset.
9  And so I wanted to be there and tell them to stop
10  and turn around.  And at that point when I was
11  standing there talking with them, looking back I
12  saw Sergeant Berge sitting on a half wall on a
13  building on the northeast corner of the
14  intersection.
15    Q.   And what was he doing?
16    A.   He was sitting on the wall, had his
17  hands down on the wall.  He was swaying back and
18  forth and kicking his feet.
19    Q.   Did you see him or hear him make any
20  statements to any of the marchers?
21    A.   No.
22    Q.   Do you know -- Strike that.
23        Did you assign Sergeant Berge to
24  go to that location and sit there?

Page 53

1    A.   No.
2    Q.   Did you then continue on with the
3  marchers to the county courthouse?
4    A.   The marchers continued that way, yes.  I
5  followed them there.
6    Q.   You were behind the marchers.  Officer
7  Gearhart was leading the procession?
8    A.   Correct.
9    Q.   And as the marchers got to the county
10  courthouse, did you park your vehicle?
11    A.   Yes, I did.
12    Q.   Where did you park your vehicle?
13    A.   On the east side of the courthouse on
14  Indiana.
15    Q.   And did Sergeant Miller park his
16  vehicle?
17    A.   He parked behind my squad.
18    Q.   Did you stay in your squad car at that
19  time?
20    A.   Initially, yes.
21    Q.   And where were the protesters going or
22  what were they doing?
23    A.   They were starting to go to the front of
24  the courthouse.

Page 54

1    Q.   Okay.  Did you observe Sergeant Berge
2  near the courthouse?
3    A.   Yes.  I looked to my left, and I saw
4  Sergeant Berge walking in the grassy area towards
5  the front of the courthouse.
6    Q.   Where were you when you first made this
7  observation?
8    A.   I was -- I think I was still seated in
9  the front seat of my squad car.
10    Q.   And what did you do?
11    A.   I exited the car and started yelling for
12  Sergeant Berge.
13    Q.   Approximately how far away was Sergeant
14  Berge from you when you got out of your car?
15    A.   I would say a couple car lengths.  So
16  probably around 40 feet initially.
17    Q.   You indicated you made some sort of
18  statement or comments towards him.  What did you
19  state to Sergeant Berge at that time?
20    A.   I yelled, Sergeant Berge or Paul.  I
21  want you to, you know, stop and go back by your
22  car.
23    Q.   And why did you tell him that?
24    A.   I didn't want him to be intermingled

Page 55

1  with the crowd of protesters.
2    Q.   When you made that statement to him, was
3  that a command, directive, or an order from you for
4  him to go back to his squad car?
5    A.   The first time it was an order.  I told
6  him to leave and to go back to his car, and I had
7  to repeat myself several times.  The last time I
8  said it, I told him that it was a direct order --
9  I'm giving him a direct order to go back to his car
10  and leave.
11    Q.   Did Sergeant Berge face you or look in
12  your direction or make any movements as you were
13  making these statements to him?
14    A.   Yes, he stopped and looked in my
15  direction as I was walking towards him.
16    Q.   And did he go back to his squad car as
17  you ordered him to at that time?
18    A.   No, he did not.
19    Q.   What did he do?
20    A.   He turned away, made a motion with his
21  hand waving me off.
22         MR. HERBERT:  Objection,
23  characterization.
24         MR. KELLY:  Sustained.

Page 56

1  BY MR. McGRATH:
2    Q.   If you can physically show the
3  commission what you observed Sergeant Berge do, you
4  can do so?
5    A.   I told him as a direct order, he went
6  like this, and he continued to walk.
7    Q.   Just for the record, you waved with your
8  right arm?
9    A.   Waved down.
10    Q.   Did he wave his right arm as you just
11  did in the direction of where you were located?
12    A.   Yes.
13    Q.   And were you saying anything to him
14  immediately before, during, or after he made that
15  movement?
16    A.   That was when I told him it's a direct
17  order for him to go back to his car and leave.
18    Q.   You gave him a direct order to go back
19  to his car, and that's when he made the motion or
20  around the same time?
21    A.   Around the -- I said, Sergeant Berge,
22  I'm giving you a direct order to go back to your
23  car and leave this area.  And that's when he turned
24  or he was looking at me already and just went like

Page 57

1  this (gestured) and just turned away.
2     Q.   And then what happened?
3     A.   Then I was astounded that that had
4  happened, and I looked and I saw Sergeant Miller
5  was in his squad car.  And I yelled to Sergeant
6  Miller, Did you just see what happened?  And he got
7  out of his car and started approaching me and said,
8  No, I wasn't watching or something to that effect.
9  And then I told him that I gave him an order to
10  leave, and he just disobeyed me and walked up to
11  the front.
12     Q.   Did you advise Sergeant Miller that
13  Sergeant Berge had been insubordinate to you?
14     A.   Yes.
15     Q.   When did you advise him that he had been
16  insubordinate to you?
17     A.   What I just told him is the manner of
18  insubordination.
19     Q.   What did Sergeant Miller do then?
20     A.   He said, Let me go talk to him.
21     Q.   Did Sergeant Miller go anywhere?
22     A.   He walked to the front of the courthouse
23  to go talk to Sergeant Berge.
24     Q.   Sergeant Berge had continued walking to

Page 58

1  the front of the courthouse?
2     A.   Yes.
3     Q.   And did you see Sergeant Miller approach
4  Sergeant Berge?
5     A.   I saw him approach.
6     Q.   And approximately in what location in
7  the front of the courthouse did they approach each
8  other or meet?
9     A.   They were on the north side of the
10  courthouse, probably more on the right-hand side or
11  the east side of the front door of the courthouse.
12     Q.   As you, going back a little bit, ordered
13  Sergeant Berge to go back to his car, did that take
14  place in the presence of any of the protesters that
15  were still --
16     A.   My attention was directed to Sergeant
17  Berge, but I know that there was people around.
18     Q.   Okay.  When Sergeant Miller went and
19  spoke or approached Sergeant Berge, did that
20  interaction take place near or around where the
21  protesters were?
22     A.   Yes.
23     Q.   And then what happened?
24     A.   Shortly thereafter Sergeant Berge came

Page 59

1  walking back towards the east side heading in a
2  south -- in a southern -- walking south.
3     Q.   Was he walking in the general direction
4  back towards where you were at?
5     A.   I was east of him, but he was walking
6  south and I walked towards him.
7     Q.   Did you have a conversation with him?
8     A.   Yes, I did.
9     Q.   Can you take us through that
10  conversation, what you stated to him and what he
11  stated to you?
12     A.   I told him that he was going to have
13  to -- he was being -- he had to go back to his car
14  and then leave the area, he was done for the day,
15  and that I would -- he would report to my office at
16  10:00 o'clock in the morning the first time he
17  comes back to work, when he comes back to work at
18  10:00 o'clock in the morning on Monday and then
19  talk to me in my office.
20     Q.   Did you order him to go back to the
21  station and relieve him of his duties during the
22  conversation?
23     A.   Yes.
24     Q.   And you had ordered him to go to your

Page 60

1  office on Monday morning at 10:00 a.m.?
2     A.   Yes.
3     Q.   Did Sergeant Berge immediately leave the
4  area when you gave him the order to leave the area?
5     A.   No, he did not.
6     Q.   Did he make any statement to you on why
7  he was not following your direct order?
8     A.   He told me that he didn't have to follow
9  an unlawful order, and my order was unlawful
10  because he only wanted to talk to the children.
11     Q.   And what did you state to him when he
12  made that statement?
13     A.   I told him that my order was not
14  unlawful and that he should now leave and go back
15  to the station.
16     Q.   And after you made that second order for
17  him to leave and go back to the station, did
18  Sergeant Berge leave?
19     A.   No, he did not.
20     Q.   Was there further conversation between
21  you and Sergeant Berge?
22     A.   Yes.
23     Q.   What other comments were made between
24  you two?

Page 61

1    A.   He told me I was a poor leader.  And at
2  that point I told him that in my 34 years of law
3  enforcement experience, I never witnessed such
4  insubordination.  He then replied to me that maybe
5  it was time for me to retire, and then I replied
6  back to him that maybe it's time for him to find
7  another job.
8    Q.   And after that interaction, did Sergeant
9  Berge go back to his squad and to the police
10  station and be relieved of duty?
11    A.   No.
12    Q.   Then what took place?
13    A.   I had called Lieutenant Passwater to
14  come to the scene over the radio, and he arrived
15  while we were still talking in the driveway area of
16  the courthouse.
17    Q.   And was Lieutenant Passwater the day
18  shift supervisor on July 18th of 2020?
19    A.   Yes, he was.
20    Q.   And did he arrive at the location where
21  you were within a couple minutes of your call?
22    A.   Yes.
23    Q.   When you called him, what did you tell
24  him?

Page 62

1    A.   I told him that I had ordered Sergeant
2  Berge to leave the area and report back, that he
3  was relieved of duty for the rest of the day, he
4  was to report back to me on Monday at
5  10:00 o'clock, and Sergeant Berge was refusing to
6  leave.
7    Q.   Did you make this phone call in front of
8  Sergeant Berge?
9    A.   It was a radio call that I called him,
10  and I don't think so.  I think it was in the time
11  when Sergeant Miller was talking to him.
12    Q.   Lieutenant Passwater arrived on the
13  scene?
14    A.   Yes.  When I first -- That's after -- My
15  conversation with Sergeant Passwater was at the
16  scene, not on the phone.  On the radio traffic, the
17  only thing I talked to him was on the -- on the
18  radio for him to come to the scene.
19    Q.   Okay.  And when he got to the scene, did
20  you have a conversation with Lieutenant Passwater,
21  did you advise him of what was taking place?
22    A.   Correct.
23    Q.   And was that in the presence of Sergeant
24  Berge?

Page 63

1    A.   Yes.
2    Q.   And then what took place?
3    A.   Then I told Sergeant Berge again that he
4  was to go to the station, put away his gear, go
5  home, and then come back to see me in my office at
6  10:00 o'clock in the morning --
7    Q.   You made this --
8    A.   -- on Monday.
9    Q.   This would be the third time you gave
10  him an order for him to leave the area and go to
11  the station advising him he was relieved of duty.
12  Did he go to the squad car and go to the station at
13  that time?
14    A.   No, he did not.
15    Q.   And then what took place?
16    A.   He looked to Lieutenant Passwater and
17  asked Lieutenant Passwater what he should do.
18    Q.   And did you hear what Lieutenant
19  Passwater stated to Sergeant Berge?
20    A.   Lieutenant Passwater said that he should
21  listen to the chief of police.
22    Q.   And then what took place?
23    A.   He said, Okay, and he walked to his car
24  and then drove, I assume, back to the station and

Page 64

1  left.
2    Q.   Do you know an individual by the name of
3  Travis Miller?
4    A.   Yes.
5    Q.   Was he at the protest?
6    A.   Yes.
7    Q.   Was he involved with organizing the
8  protest?
9         MR. HERBERT: Objection -- Disregard.
10  Withdraw my objection.
11  BY THE WITNESS:
12    A.   I do not know that he was involved in
13  it.
14    Q.   Did you have a conversation with him
15  near the courthouse on the date of the protest?
16    A.   Yes.
17    Q.   And who else was present for that
18  conversation?
19    A.   I believe Sergeant Miller was there.
20    Q.   All right.  And what did Travis Miller
21  state to you, and what did you state to him?
22         MR. HERBERT: I'm going to object.  It's
23  hearsay.  It's irrelevant.  Paul Berge is not
24  charged with any misconduct towards Travis Miller

**Board of Fire and Police Commissioners**
**City of Kankakee**
September 30, 2020

Page 65

1  in this case.  Sergeant Berge is already gone at
2  this point per the Chief's testimony.
3       MR. KELLY: I'm not sure exactly when
4  that conversation took place.  So we'll look to
5  Mr. McGrath to make that foundation.  As you know,
6  hearsay -- rules in the Civil Practice Act that
7  illuminate hearsay are not necessarily applicable
8  to this hearing.  I will allow the testimony to
9  continue.  The commission then will give it
10  whatever weight they believe is relevant according
11  to the testimony.
12  BY MR. McGRATH:
13    Q.  Did you speak to this Travis Miller
14  after Sergeant Berge finally left the area?
15    A.  Yes.
16    Q.  And what did Travis Miller state to you,
17  and what did you state to him?
18       MR. HERBERT: Objection.  Sergeant Berge
19  is charged with insubordination in this case
20  towards the Chief.  At this point in time of the
21  testimony, Sergeant Berge has already left.  So
22  there's no relevance to any conversation he had
23  with Travis Miller because Travis Miller is not
24  involved in these charges.

Page 66

1       MR. KELLY: It's certainly possible that
2  Mr. Miller was a witness to the events that
3  occurred before Sergeant Berge left.
4       MR. HERBERT: He should have commanded
5  him to testify then.  This is inappropriate to get
6  it out through the chief.
7       MR. KELLY: Well, I move that it's not
8  inappropriate.  The commission will determine
9  whether it's inappropriate.
10       MR. HERBERT: If I can -- and I respect
11  your decision, but perhaps we can have an offer of
12  proof as to what the relevance of the testimony is
13  concerning the Chief's conversation with Travis
14  Miller.  I think that would short -- could curtail
15  this issue one way or the other.
16       MR. KELLY: I think if Mr. Miller was a
17  witness and he had relevant information to give,
18  albeit through the Chief, the commission can hear
19  that and determine as to whether or not it's
20  credible information.
21       MR. HERBERT: I agree, but we've all --
22  all the lawyers here looked through the reports and
23  we know that Travis Miller doesn't have anything to
24  do with the insubordination.  Unless there's

Page 67

1  something out there that we haven't seen yet, that
2  I haven't been given, none of his testimony is
3  relevant.  But with that being said, I respect the
4  decision.
5       MR. KELLY: Well, then I think we'll let
6  Mr. McGrath inquire as to the nature of
7  Mr. Miller's testimony.  And if based on those
8  questions I determine as a hearing officer that
9  it's not relevant, I will stop that line of
10  questioning.
11       MR. HERBERT: Thank you.
12       MR. McGRATH: Thank you.
13  BY MR. McGRATH:
14    Q.  Chief, you've already testified that you
15  directed Sergeant Berge on three separate occasions
16  to leave the area, correct, or was --
17       MR. HERBERT: I'm going to object.  It's
18  asked and answered.  It's leading.
19       MR. KELLY: Overruled.
20  BY THE WITNESS:
21    A.  At least.
22    Q.  Okay.  Did you have a reason -- or what
23  was your reason or basis to order Sergeant Berge to
24  leave the area where this protest was taking place?

Page 68

1    A.  I wanted to avoid any possible
2  confrontation between the protesters and the
3  officers that might occur.
4    Q.  Going to the conversation that you had
5  with this Travis Miller, did he advise you that
6  there was any confrontations that took place
7  between --
8    A.  Yes.
9    Q.  -- him and Sergeant Berge?
10    A.  Yes.
11    Q.  And what did Travis Miller advise you?
12       MR. HERBERT: Objection, same objection.
13  Sergeant Berge is gone.  He's charged with
14  insubordination.  All of this is irrelevant.
15       MR. KELLY: Right now I do not believe
16  it is irrelevant.  The objection is overruled.  We
17  will allow Mr. McGrath to explore this line of
18  questioning.
19  BY MR. McGRATH:
20    Q.  You can answer.
21    A.  Travis Miller told me that, while he was
22  in front of the courthouse, Sergeant Berge walked
23  up to him and said, What's up, Travis?  What's up,
24  Travis?  And Travis Miller said that he felt

2:20-cv-02310-CSB-EIL # 17-15 Page 159 of 270
Board of Fire and Police Commissioners
City of Kankakee
September 30, 2020

Page 69

1 intimidated by Sergeant Berge.
2 MR. HERBERT: Objection.
3 MR. KELLY: We'll sustain that
4 objection.
5 MR. HERBERT: Ask that it be stricken.
6 MR. KELLY: Sustained as to what
7 Mr. Miller may have felt.
8 BY MR. McGRATH:
9 Q. Given all the civil unrest that we've
10 seen in the media with peaceful protests and then
11 some clashes with police, is that part of the
12 reason why you wanted a limited amount of police
13 officers involved with this small group of
14 marchers?
15 MR. HERBERT: Objection, argument,
16 leading.
17 MR. KELLY: Overruled.
18 BY THE WITNESS:
19 A. The protest march was -- had a potential
20 of having argument between law enforcement and the
21 protesters. So I thought we had a job to do to be
22 there, and that's all we should do and not be
23 intermingling and have any further contact,
24 especially. And if that was to happen, that would

Page 70

1 be me making the contact.
2 Q. At the time of July 18th of 2020, did
3 you have knowledge or information in regards to the
4 incident between Sergeant Berge and Austin -- the
5 Commander on July 15th?
6 A. Yes.
7 Q. And when did you first obtain or gain
8 information regarding what took place on July 15th?
9 A. I think it was around 5:00 o'clock that
10 evening that I think it was Wednesday evening of
11 the 15th. I was in my office, and Commander Austin
12 came in alone and told me about it.
13 Q. And what did Commander Austin tell you?
14 A. Commander Austin told me that he had had
15 a discussion with -- or attempted to have a
16 discussion with Sergeant Berge about a call earlier
17 in the day, and he was just checking up on what
18 happened at the call and he became confrontational.
19 He told Sergeant Berge to come to Commander
20 Austin's officer so they can talk in private, and
21 Sergeant Berge told Commander Austin to get out of
22 the sergeants' office.
23 Q. And were you made aware that there was
24 any To/From or memos being generated regarding the

Page 71

1 July 15th, 2020, incident?
2 A. I think that followed that then. I
3 don't know if he had -- I don't think he had one
4 already written up, but it probably was, like, you
5 know, the next day or, you know, probably a
6 combination. You have to, you know, write a memo
7 documenting what happened and who else was there.
8 Q. So he gave you a brief overview of what
9 took place, and then did you get copies?
10 MR. HERBERT: I'm going to object to the
11 characterization of what Commander Austin gave, a
12 brief overview.
13 MR. KELLY: Overruled.
14 BY MR. McGRATH:
15 Q. A brief conversation with Commander
16 Austin --
17 MR. HERBERT: Objection, argument of
18 facts that's not in evidence. There's no testimony
19 about the length of his conversation, whether or
20 not it was a summary that Commander Austin was
21 giving. It's an inappropriate question.
22 MR. KELLY: The objection will be
23 sustained.
24 Please lay a foundation.

Page 72

1 BY MR. McGRATH:
2 Q. How long did you have a conversation
3 with Commander Austin on July 15th?
4 A. Probably 10 to 15 minutes.
5 Q. Was anyone else present?
6 A. No.
7 Q. Did he summarize what took place?
8 A. Basically he did where he told me that
9 he had a confrontation -- verbal confrontation with
10 Sergeant Berge. And when Sergeant Berge told
11 him -- or what stuck in my mind was the part where
12 he told him to come to my office to discuss it and
13 that Sergeant Berge told him to get out of the
14 sergeants' office, and then Commander Austin's
15 opinion was that it was -- he was being
16 insubordinate.
17 Q. Were you advised that he was relieved of
18 his duties on that date by Commander Austin?
19 A. Yes, he was.
20 Q. Do you recall -- Do you remember if you
21 were given any To/Froms or any memos when you met
22 with Austin -- Commander Austin on the 15th?
23 A. I don't think he had any report done
24 then, but I'm not sure.

**Board of Fire and Police Commissioners**
**City of Kankakee**

September 30, 2020

Page 73

1   Q.   The following day would be a Thursday,
2  the day after a Friday.  Were those the two regular
3  days that Sergeant Berge was off?
4   A.   Yes.
5   Q.   And then you told us about the incident
6  on the 18th.  Did you go to the police department
7  on the following Monday?
8   A.   Yes.
9   Q.   And did Sergeant Berge appear at your
10  office as directed?
11   A.   Yes.
12   Q.   Did he appear with anyone?
13   A.   I believe so.
14   Q.   And who was with him?
15       MR. HERBERT: Objection, relevance.
16       MR. KELLY: Overruled.
17  BY THE WITNESS:
18   A.   I don't recall right now.
19   Q.   Did you meet with Sergeant Berge?
20   A.   Yes.
21   Q.   At that time, did you advise him that he
22  was being placed on administrative leave?
23   A.   Yes.
24   Q.   Did you prepare correspondence placing

Page 74

1  him on administrative leave, and did you ask him to
2  sign --
3   A.   Yes.
4   Q.   -- that form?
5       (Chief Exhibit No. 4 marked for
6           identification.)
7  BY MR. McGRATH:
8   Q.   And is that Chief Exhibit 4, the notice
9  that you were placing Sergeant Berge on
10  administrative leave based upon his conduct on
11  July 15th and July 18th, and do you indicate what
12  policy sections you believed at that time he may
13  have violated?
14   A.   Yes.
15   Q.   Did you then contact anyone from the
16  county in regards to the July 18th incident?
17   A.   Yes.
18   Q.   And who did you contact?
19   A.   Lieutenant Trent Butkowski.
20       MR. HERBERT: I'm sorry.  I didn't hear
21  that name.  Trent ...
22       THE WITNESS: I believe it's Trent
23  Butkowski.  I think it's B-U-T-K-O-W-S-K-I.
24  BY MR. McGRATH:

Page 75

1   Q.   And the lieutenant works for the
2  Kankakee Sheriff's Department?
3   A.   Yes.
4   Q.   And what was your reason for contacting
5  that individual?
6   A.   Because I know there's cameras around
7  the courthouse.  So I thought that there's a good
8  chance that the cameras would have caught what
9  happened.
10   Q.   And did you ever receive video footage
11  from what took place on July 18th, 2020, around the
12  courthouse?
13   A.   Yes.
14   Q.   How did you receive that video footage?
15   A.   I went to the Sheriff's Office, and I
16  met with Lieutenant Butkowski -- I could be saying
17  his name wrong -- and he burned it on a memory
18  stick.
19   Q.   A flash drive?
20   A.   A flash drive, the camera.
21   Q.   And after --
22   A.   The video I mean.
23   Q.   And at the time that you obtained the
24  flash drive with the video, did you then review the

Page 76

1  video?
2   A.   Yes.
3   Q.   Did you review any To/Froms or the memos
4  that were prepared in regards to the July 15th
5  incident and/or the July 18th incident?
6   A.   Yes.
7   Q.   And at that time, did you set up a
8  formal interrogation?
9   A.   Yes.
10   Q.   And, Chief, as chief of the police
11  department, under Illinois law, you're allowed to
12  set up what is --
13       MR. HERBERT: Objection.
14  BY MR. McGRATH:
15   Q.   -- is a formal interrogation, correct?
16       MR. HERBERT: Objection.
17       MR. KELLY: Basis?
18       MR. HERBERT: Basis?
19       MR. KELLY: Yes.
20       MR. HERBERT: He's leading pretty much
21  the entire direct, but go ahead.
22       MR. KELLY: I'll overrule the objection
23  and tell Mr. McGrath not to lead the witness.
24

DEFENDANTS 001798

**Board of Fire and Police Commissioners**
**City of Kankakee**

**September 30, 2020**

Page 77

1      (Chief Exhibit No. 5 marked for
2         identification.)
3   BY MR. McGRATH:
4      Q.   Chief, if I can ask you to look at
5   Chief's Exhibit 5 --
6          MR. HERBERT: Can I ask what this
7   exhibit is being shown to him for?  Is he
8   impeaching the witness with this?  He didn't
9   indicate that he prepared this.  So what's the
10  basis for showing this witness this sheet of paper?
11         MR. KELLY: He's going to have a chance
12  to ask him what the document is.  I don't know.
13  BY MR. McGRATH:
14     Q.   Again, put before you, Chief is -- do
15  you recognize that document?
16     A.   Yes.
17     Q.   What do you recognize that document to
18  be?
19     A.   A notice of interrogation.
20     Q.   And a notice to take whose
21  interrogation?
22     A.   To take the interrogation of Sergeant
23  Berge.
24     Q.   Was that prepared at your direction

Page 78

1   following your review of the videos and the To/From
2   memos and what you personally experienced on
3   July 18th, 2020, with Sergeant Berge?
4      A.   Yes.
5      Q.   And did that formal interrogation take
6   place?
7      A.   Yes.
8      Q.   Did that formal interrogation take place
9   on July 30, 2020, here at the police department?
10     A.   Yes.
11     Q.   Up until the time of the formal
12  interrogation, from July 15th up until July 30th,
13  2020, did Sergeant Berge ever reach out to you
14  either by text, phone call, try to get ahold of you
15  and apologize for any of his actions?
16         MR. HERBERT: I'm going to object.
17         MR. KELLY: Overruled.
18  BY THE WITNESS:
19     A.   No.
20         MR. HERBERT: Transcript?
21         MR. McGRATH: Yeah.
22         (Chief Exhibit No. 6 marked for
23            identification.)
24

Page 79

1   BY MR. McGRATH:
2      Q.   Chief, I'm going to mark this as Chief's
3   Exhibit No. 6 and ask you if you recognize this.
4      A.   Yes.  This is the interrogation, the
5   printout of the interrogation of Sergeant Paul
6   Berge.
7      Q.   Is that a court reported --
8      A.   Yes.
9      Q.   -- interrogation from when Sergeant
10  Berge was interrogated on that date?
11     A.   Yes.
12     Q.   And was Sergeant Berge under oath when
13  he was asked questions at the formal interrogation?
14     A.   Yes.
15     Q.   And would you, as chief of the police
16  department, expect him to answer all of those
17  questions truthfully and honestly?
18     A.   Yes.
19     Q.   And did you have a chance to go through
20  the transcript from Sergeant Berge's formal
21  interrogation?
22     A.   Yes.
23     Q.   And do you recall Sergeant Berge
24  claiming at the formal interrogation that Commander

Page 80

1   Austin was the aggressor on July 15th, 2020?
2      A.   Yes.
3      Q.   Do you recall reading in the formal
4   interrogation --
5          MR. HERBERT: I'm going to object to
6   leading.
7          MR. KELLY: Sustained.
8   BY MR. McGRATH:
9      Q.   Did Sergeant Berge ever file any type of
10  a sexual harassment complaint with anyone in the
11  department based upon what took place in the
12  sergeants' office on July 15th, 2020?
13     A.   No.
14     Q.   After reviewing the formal interrogation
15  transcript, the To/Froms, the memos, speaking with
16  individuals involved in the July 15th and July 18th
17  incident, and your own knowledge of what took
18  place, did you direct that charges be drawn up
19  against Sergeant Berge?
20     A.   Yes.
21         MR. McGRATH: I would like to show the
22  video.
23         MR. KELLY: Is there sound?
24         MR. McGRATH: There's no sound.

Page 81

1       MR. KELLY: So the court reporter can
2   indicate there's a video being played.
3   BY MR. McGRATH:
4       Q.   Again, Chief, you testified that you got
5   video footage from the Sheriff's Department,
6   correct?
7       A.   Correct.
8       Q.   And was that from four cameras in the
9   location of the county courthouse?
10      A.   Correct.
11      Q.   The first still shot we're looking at is
12  the beginning of one of the videos, which -- does
13  it not depict in the northeast south section of the
14  courthouse -- or what direction are we looking at?
15      A.   We're looking south from a camera
16  installed on a post on the northeast corner of the
17  facility.
18      Q.   Sometimes it gets tricky.  But as we go
19  through, if you can just describe and I'll stop it
20  and pause it as to see if you can identify someone
21  or squad cars or what's going on?
22      A.   So the march is just turning now onto
23  north Indiana from Merchant Street, and leading in
24  the squad car is Officer Gearhart.  And there's the

Page 82

1   marchers.
2       Q.   I'm going to speed this up a little bit.
3       A.   Just making the turn now is my squad and
4   followed by Sergeant Miller.  Sergeant Miller is in
5   the intersection.  I am pulling over to the curb
6   now.
7       Q.   That dark car, is that your vehicle?
8       A.   That's my car, yeah.  I think that's
9   Travis Miller with the flag right there.
10      Q.   With the black and red flag?
11      A.   Yeah, in the back by my squad car.
12      Q.   I see.
13      A.   And then Sergeant Miller is pulling up
14  behind me.
15      Q.   In the white SUV?
16      A.   In the white SUV.
17      Q.   Do you know whose --
18      A.   And that's Sergeant Berge pulling into
19  the parking lot.  I was watching the crowd.  So I
20  didn't see him pull up.  And sometime around this
21  point I see him and I start yelling to him to go
22  back, and we have a discussion telling him to go
23  back here.
24      Q.   I just stopped it here, and the time

Page 83

1   stamp is 11:43:01.  Is that you out of your squad
2   car?
3       A.   Yeah, I just stepped outside of my
4   squad.
5       Q.   And is Sergeant Berge facing you at this
6   time?
7       A.   Yes, he is.
8       Q.   And do you recall if you made any
9   statements at this time?
10      A.   If I made any statements or he made any
11  statements?
12      Q.   Yes, if you made any statements or he
13  made any statements.
14      A.   I told him to go back, don't go up in
15  front, go back to your squad car.
16      Q.   And did he make any statements to you at
17  that time?
18      A.   I don't recall him saying anything.
19      Q.   Is that your hand extended?
20      A.   And that's when he waved.  You just saw
21  where he waved me off.
22      MR. HERBERT: I'm just -- I'm going to
23  object.  The video speaks for itself.  I don't know
24  why we need a narrative of it.  It's improper

Page 84

1   testimony.
2       MR. KELLY: Overruled.  The Chief is a
3   witness.  He can testify to what happened.
4       MR. McGRATH: I'm just trying to play it
5   back.
6       THE WITNESS: I think if you stop and
7   start playing it again, it will work.
8       MR. McGRATH: Okay.
9   BY MR. McGRATH:
10      Q.   You testified earlier at one point
11  Sergeant Berge brushed you off or waved you off?
12      A.   Yes.
13      Q.   Can you tell the commission when you see
14  that occurring on the video?
15      A.   Yep.  If you hit where the block is, I
16  think -- so stop it, and I think -- Does it go --
17  Hit it again, and that should play smoother.
18  There, and twice actually.
19      Q.   Do you see two people speaking over by
20  the SUV?
21      MR. HERBERT: Objection.
22  BY MR. McGRATH:
23      Q.   Do you see two people by the SUV?
24      MR. HERBERT: Objection.

DEFENDANTS 001800

Page 85

1      MR. KELLY: Overruled.
2  BY THE WITNESS:
3    A.   Yes.
4    Q.   And do you see an officer that's closer
5  to the viewer?
6      MR. HERBERT: Objection.
7      MR. KELLY: Overruled.
8  BY THE WITNESS:
9    A.   Yes.
10    Q.   Who is that individual?
11    A.   That is Sergeant Miller.
12    Q.   And who are the two people off in the
13  distance?
14    A.   That is myself and Sergeant Berge.
15    Q.   And was this during the time when you
16  gave him commands to leave the area?
17    A.   This is the time where I gave him
18  commands to leave the area and return his gear to
19  the station and he was done until he reported to me
20  on Monday morning at 10:00.
21    Q.   As the video is rolling, are you
22  continuing to have a conversation with Sergeant
23  Berge?
24    A.   Yes.

Page 86

1    Q.   And what are you stating during this
2  time?
3    A.   This is during the time period where
4  Sergeant Berge was telling me that I was a poor
5  leader and where we had the discussion about
6  whether it was time for me to retire or for him to
7  find another job. And, also, I kept on ordering
8  him to leave the area. He also would have been at
9  this time telling me that it was an unlawful order
10  for me.
11      MR. HERBERT: I'm going to object.
12  There's no question pending.
13      MR. KELLY: He asked the Chief to
14  narrate the Chief's recollection of what happened.
15  I think we'll allow that.
16  BY MR. McGRATH:
17    Q.   During this time, what was he saying,
18  Chief?
19    A.   Another part of the discussion was that
20  Sergeant Berge told me that it was an unlawful
21  order for me to tell him that he couldn't walk up
22  to the front of the courthouse because all he
23  wanted to do was talk to the children. At the
24  bottom, that's Sergeant Miller talking to Travis

Page 87

1  Miller.
2    Q.   Is Travis Miller the person with the hat
3  on?
4    A.   Yes.
5    Q.   At this time, did you call Lieutenant
6  Passwater to come to the area?
7    A.   Yes. Sergeant Passwater missed this.
8  We missed the part where Sergeant Passwater showed
9  up.
10    Q.   And is that Sergeant --
11    A.   That's Lieutenant Passwater leaving. So
12  you must have jumped.
13    Q.   Chief, can you come over and help? I
14  want to speed this up so we're just not sitting
15  here watching. This is your laptop, correct?
16    A.   Yes.
17    Q.   Right here again is Sergeant Berge.
18  This is Sergeant Berge from another angle, correct?
19    A.   Correct. This is looking north from a
20  camera on a post south of the courthouse on the
21  east side. This is where we had the discussion.
22  I'm stepping out of the car telling Sergeant Berge
23  to leave. I point towards the car, and he waves me
24  off.

Page 88

1    Q.   It skipped a little bit. Did you see
2  him wave off? Is that you walking towards --
3    A.   Yes, I'm following him.
4      MR. HERBERT: I guess the record will
5  reflect there was no wave off.
6      THE WITNESS: Just there.
7  BY MR. McGRATH:
8    Q.   Was that the wave-off you were talking
9  about?
10    A.   Yes.
11    Q.   Chief, why are you walking in the
12  direction of Sergeant Berge at this point?
13    A.   Because I'm still commanding him to come
14  back and not to go to the front of the -- and
15  Sergeant Miller called me, and I told him what
16  happened. He told me, Let me talk to him, because
17  he obviously heard at that point me yelling at him.
18      MR. HERBERT: I'm going to object.
19      MR. KELLY: Sustained. Strike the
20  Chief's supposition regarding whether or not
21  Sergeant Miller heard the conversation.
22  BY MR. McGRATH:
23    Q.   Who is this walking towards you now,
24  Chief?

**Board of Fire and Police Commissioners**
**City of Kankakee**                                    September 30, 2020

Page 89

1    A.   That's Sergeant Berge.  This is the
2  point where I would have been telling him that he
3  was relieved for the day, relieved of duty and not
4  until he comes back to see me on Monday morning.
5    Q.   From this angle, are you blocked?  Are
6  you behind the squad car?
7    A.   Yes, he's talking to me behind the
8  squad.
9    Q.   Who is that walking up now?
10   A.   It's Lieutenant Passwater.  That's
11 Lieutenant -- After I ordered him, he looked at
12 Lieutenant Passwater and asked him what to do.
13 Lieutenant Passwater told him listen to the Chief,
14 and so then he leaves.  This is the front of the
15 courthouse.
16   Q.   Okay.  Is this the area where the
17 marchers met up?
18   A.   Yes.
19   Q.   This is the group that met up in the
20 front of the courthouse?
21   A.   Yes.
22   Q.   Who is that officer?
23   A.   Sergeant Berge talking to Sergeant
24 Miller.

Page 90

1    Q.   Chief, you testified that you reviewed
2  the transcript from the formal interrogation with
3  sworn testimony by Sergeant Berge, correct?
4    A.   Correct.
5    Q.   Do you recall him being asked this
6  question and him giving this answer --
7         MR. HERBERT:  Objection.
8  BY MR. McGRATH:
9    Q.   -- during the formal interrogation?
10        MR. HERBERT:  Objection.
11        MR. KELLY:  What's the basis?
12        MR. HERBERT:  Is he impeaching his
13 witness?  He has to lay a foundation as to why he's
14 asking him this question.  If he wants to get out
15 something about what the Chief believes to be the
16 basis for the inconsistent statements, then he has
17 to ask the Chief that.  He can't read the Chief
18 that information.
19        MR. KELLY:  First of all, I think the
20 foundation has been laid relative to the transcript
21 and the interrogation that took place.  I think it
22 is absolutely appropriate for him to ask the Chief
23 if a conversation or an exchange took place in that
24 transcript.  If he's going to ask the Chief about

Page 91

1  the import of that conversation, then he's got to
2  ask that questions.  He can ask the Chief if he
3  recalled that conversation.
4         MR. HERBERT:  Well, then if Mr. McGrath
5  is going to ask -- if he's going to direct the
6  chief to what he believes the inconsistent
7  statements are, then it's inappropriate.  The Chief
8  should have to testify to what in that document he
9  believes is inconsistent, not what is suggested to
10 him by his attorney.  It's improper, and it goes to
11 my motion that I filed before this case started
12 because we still don't know what the Chief believes
13 was inconsistent.  And for Mr. McGrath -- no
14 offense to him, he's doing his job.  But for him to
15 tell the Chief what the Chief should consider
16 inconsistent, it's inappropriate.
17        MR. KELLY:  I don't know that he's asked
18 that question.  So he's entitled to continue to
19 inquire.  Your objection is noted.
20        MR. HERBERT:  Okay.
21 BY MR. McGRATH:
22   Q.   Chief, do you recall Sergeant Berge
23 being asked at his interrogation, "When you got out
24 of your vehicle from the half circle drive, at

Page 92

1  around that time, do you see Chief Kosman in any
2  way?"
3         And Sergeant Berge responded,
4  "No, sir"?
5         MR. HERBERT:  Objection.
6  BY MR. McGRATH:
7    Q.   Did you review that in the formal
8  interrogation transcript?
9         MR. HERBERT:  Objection.
10        MR. KELLY:  Overruled.
11 BY THE WITNESS:
12   A.   Yes.
13   Q.   And do you believe that to be a
14 truthful, honest statement of Sergeant Berge?
15        MR. HERBERT:  Objection.
16        MR. KELLY:  Overruled.
17        MR. HERBERT:  This is improper for the
18 record.
19        MR. KELLY:  I understand the objection,
20 but it is absolutely proper for him to ask his
21 client about Chief Kosman's reaction to statements
22 made in that transcript and in that interrogation.
23 BY MR. McGRATH:
24   Q.   You can answer.  Was that a truthful,

**Board of Fire and Police Commissioners**
**City of Kankakee**
September 30, 2020

Page 93

1  honest response?
2    A.  No, it was not.
3    Q.  Do you recall seeing the question to
4  Sergeant Berge, "Did you hear Chief Kosman make any
5  statements to you or call out to you at that time?"
6          Response from Sergeant Berge,
7  "No, sir."
8          Is that a truthful statement or
9  response --
10          MR. HERBERT: Objection.
11  BY MR. McGRATH:
12    Q.  -- to Sergeant Berge at his --
13          MR. HERBERT: Objection.
14  BY MR. McGRATH:
15    Q.  -- formal interrogation based upon --
16          MR. HERBERT: Objection.
17  BY MR. McGRATH:
18    Q.  -- what took place on July 18th, 2018?
19          MR. KELLY: We understood your
20  objection. It's noted for the record. It is
21  overruled. The Chief can answer.
22          MR. HERBERT: Well, I'm going to add one
23  more to that, the previous basis, but the objection
24  is how can this Chief testify to what Sergeant

Page 94

1  Berge heard and how can he say it's a false
2  statement? There's no foundation for it unless
3  he's an expert.
4          MR. KELLY: I think whether it's a false
5  statement or not, it's the Chief's belief based on
6  him being a part of that conversation. And, more
7  importantly, it's going to be up to this commission
8  to decide whether or not they believe it's a false
9  statement. So I'm sure you're going to have
10  Sergeant Berge testify as to his view of these
11  issues, and the commission will listen to it all.
12          MR. HERBERT: It's the Chief's burden of
13  proof, but they're proving it in an improper way is
14  my position. We don't have to put on any evidence.
15  They have to prove their case.
16          MR. KELLY: Okay.
17          MR. HERBERT: And they're being spoon
18  fed the charges here.
19          MR. KELLY: The Chief is entitled to his
20  testimony as to what he believes. If you choose
21  not to put on your client, that's absolutely your
22  right; but the commission can then also infer his
23  silence in taking into account the evidence.
24          MR. HERBERT: Then I'm going to object

Page 95

1  to the relevance of these questions because, again,
2  we don't know what the allegations pertain to with
3  respect to false charges -- false statements.
4          MR. KELLY: For the record, the motion
5  for bill of particulars has been denied. The
6  commission has found that there is sufficient
7  information in the charges for you to prepare a
8  defense. We have overruled the objections. We
9  noted it for the record. The Chief is going to be
10  allowed to continue answering in this line of
11  questioning.
12  BY MR. McGRATH:
13    Q.  To go back, Chief, to the question, "Did
14  you hear Chief Kosman make any statements to you or
15  call out to you at that time?"
16          Sergeant Berge responded under
17  oath, "No, sir."
18          Do you believe that to be a
19  truthful and honest response?
20    A.  No.
21    Q.  Next question, "At that time, did you
22  wave off Chief Kosman in the manner of the old
23  brush back, wave off, you know, waving your hand
24  back to somebody, it's like forget you or forget

Page 96

1  about it?"
2          And Sergeant Berge's response
3  was, "No, sir."
4          Do you believe that to be a
5  truthful and honest response by Sergeant Berge
6  under oath?
7    A.  No.
8    Q.  After reviewing everything, you
9  obviously had charges prepared and brought against
10  Sergeant Berge, correct?
11    A.  Correct.
12    Q.  And you are seeking his termination
13  based upon those charges, correct?
14    A.  Correct.
15    Q.  And why are you seeking his termination?
16    A.  Because of the insubordination. It
17  would be difficult to manage a police department if
18  officers -- or subordinates do not follow the
19  lawful commands -- lawful orders of superior
20  officers.
21    Q.  And you're referring to July 15th with
22  Commander Austin?
23    A.  Yes.
24    Q.  And that is Count 1 of the charges,

**Board of Fire and Police Commissioners**
**City of Kankakee**
September 30, 2020

---

Page 97

1  correct?
2      A.   Correct.
3      Q.   And you're referring to July 18th when
4  he disobeyed direct orders from you?
5      A.   Correct.
6      Q.   And that's contained in Count 2 of the
7  charges.  And Count 3 of the charges making
8  unlawful -- or untruthful statements, rather, under
9  oath at his formal interrogation, correct?
10     A.   Correct.
11     Q.   As chief of the police department, are
12 you concerned about officers not being truthful
13 while testifying under oath?
14     A.   Yes.
15     Q.   Why?
16     A.   Because it can impeach other testimony
17 if during the criminal cases.
18         MR. McGRATH: Thank you, Chief.  That's
19 all I have.
20         MR. KELLY: The time is 7:45.  The
21 commission has indicated it's going to take a break
22 at this time.  We'll go off the record then.
23         (A short break was had.)
24         MR. KELLY: We're back on the record.

---

Page 98

1           And I believe, Mr. Herbert, the
2  Chief is your witness.
3         MR. HERBERT: Thank you.
4           CROSS-EXAMINATION
5  BY MR. HERBERT:
6      Q.   Good evening, Chief.  How are you?
7      A.   Good.
8      Q.   So you sent charges to Paul Berge,
9  correct?
10     A.   Correct.
11     Q.   Drafted charges, correct?
12     A.   I'm sorry?
13     Q.   You drafted the charges?
14     A.   Not personally.
15     Q.   Okay.  Somebody that you directed to
16 draft the charges?
17     A.   Our attorney.
18     Q.   And you indicated what charges you
19 believed were -- Sergeant Berge was guilty of
20 violating, correct?
21     A.   Yes.
22     Q.   And you were also -- you sent him a
23 notice of interrogation, correct?
24     A.   Correct.

---

Page 99

1      Q.   And that was prior to the charges being
2  decided, correct?
3      A.   Correct.
4      Q.   And it looks like you sent the notice of
5  interrogation to Paul Berge.  It looks like on
6  July 24th is when he signed them.  Does that sound
7  about right?
8      A.   I'm not sure.
9      Q.   I can show you Chief Exhibit No. 5, if I
10 can.  And directing you to the last page, 7/24/20,
11 11:30 a.m., employee signature, correct?
12     A.   Yes.
13     Q.   Fair to say that the answer to that
14 question is yes, he was given that on
15 September 24th -- or I'm sorry -- July 24th?
16     A.   That's what the document indicates, yes.
17     Q.   And the charges were sworn.  Do you know
18 what day that is, that it says there?
19     A.   It looks like the 23rd.  It's notarized
20 on the 23rd.
21     Q.   And the charges in this case -- Well,
22 strike that.
23           When you sent the notice of
24 interrogation to Paul Berge, you had not yet

---

Page 100

1  interrogated Paul Berge, correct?
2      A.   Can I look at the --
3      Q.   But we just established he signed it on
4  the 24th, you issued it on the 23rd.  You agree
5  with me that --
6      A.   It was -- Our conversation was that
7  Deputy Chief Hunt would sign it since I was the one
8  that was involved in one of the charges.
9      Q.   But Paul Berge signed the notice of
10 interrogation on July 24th, and he had not yet
11 given his interrogation, correct?
12     A.   I'm not sure which day that would have
13 been, the charges -- if -- The charges, yeah, it
14 would have been after -- I think after the
15 interrogation.
16     Q.   And the first time that Paul Berge could
17 have addressed the allegations against him would
18 have been that day of the interrogation, correct?
19         MR. McGRATH: Objection, form of the
20 question.
21         MR. KELLY: Overruled.
22 BY THE WITNESS:
23     A.   Can you repeat that question?
24     Q.   Sure.  The first time that Paul Berge

---

**Board of Fire and Police Commissioners**
**City of Kankakee**

September 30, 2020

Page 101

1 could address the charges against him would have
2 been at the interrogation, correct?
3     A.   Formally, I think, yes.
4     Q.   What does -- Was he allowed to address
5 them informally at some point prior to the
6 interrogation?
7     A.   There was nothing prohibiting him from
8 talking to me.
9     Q.   That's not what I asked.  Was he
10 provided an opportunity to give his defense in any
11 way prior to the interrogation?
12    A.   No.  I think by law it would have to be
13 a formal interrogation.  And so then it would be
14 with the lawyers and the representatives there.  So
15 for us to interrogate him, it would have to be a
16 formal process.
17    Q.   And the point of the interrogation is
18 for the employee to be able to address the charges,
19 correct?
20    A.   For an employee?  For an employer to
21 address the charges or employee?  To both really,
22 right?
23    Q.   I'm talking about the employee.  I'm
24 talking about Paul Berge here.

Page 102

1     A.   Yes.
2     Q.   The first time -- or the purpose of the
3 interrogation was for him to address the charges
4 that were placed against him for the first time,
5 correct?
6     A.   The purpose of the interrogation is for
7 the -- for us to interrogate him and ask him what
8 happened.
9     Q.   And is he allowed to explain what
10 happened?
11    A.   The questions would probably make that
12 very relevant.
13    Q.   I don't understand what that means?
14    A.   If you're asked a question, he just
15 explains it, then the answer would be yes.
16    Q.   The purpose of the interrogation would
17 be to allow Paul Berge in this case an opportunity
18 to explain his side of the story regarding the
19 allegations that were made against him, correct?
20    A.   The purpose as I see it, the
21 interrogation is for the employer, the police
22 department, the chief to ask him questions about
23 what happened so that he gets -- the chief gets a
24 better idea of what happened, not so much for

Page 103

1 the -- it's -- I guess it's -- it happens at the
2 same degrees for the both sides, but the purpose of
3 the interrogation isn't the person that's being
4 interrogated to be asking questions; but they would
5 answer the questions that are being put to them.
6     Q.   To give you more information, correct?
7     A.   Correct.
8     Q.   To determine whether or not charges are
9 appropriate, correct?
10    A.   Correct.
11    Q.   To determine whether or not the
12 recommendation for termination is appropriate,
13 correct?
14    A.   Correct.
15    Q.   When did you make the decision that Paul
16 Berge was to be charged with the charges that he
17 sits here facing today?
18    A.   When we drew up the charges.
19    Q.   Okay.  And that would be July 23rd,
20 correct?
21        MR. McGRATH:  Objection.  That's not the
22 date of the charges.
23        MR. HERBERT:  It's what he just
24 testified.  Notice of interrogation.  I'm sorry.

Page 104

1        MR. McGRATH:  The charges --
2        MR. HERBERT:  I'll withdraw my question.
3        MR. McGRATH:  It's August.
4 BY MR. HERBERT:
5     Q.   The charges were drawn up in August,
6 correct?
7     A.   Yes.
8     Q.   So it would have been shortly before you
9 drew up the charges in this case that you concluded
10 that Paul Berge was guilty of committing the
11 violations that you allege in the charges, correct?
12    A.   Correct.
13    Q.   And certainly you couldn't make the
14 determination that Paul Berge was guilty of the
15 charges prior to his interrogation, correct?
16    A.   Not formally, no.
17    Q.   Can you do it informally?
18    A.   Well, the charges are -- and what you're
19 seeking is termination.  There's a process that has
20 to be followed through.  So it's to follow through
21 the process.
22    Q.   So then my question is:  When did you
23 make the determination that Paul Berge violated the
24 policies that you charged him with and that he was

Page 105

1  to be terminated?
2      A.   Well, after the interrogation.
3      Q.   And it's after the interrogation because
4  that was the first opportunity you had to hear Paul
5  Berge's side of the -- or his response to the
6  allegations against him, correct?
7      A.   Well, in response, it was the first
8  answer that -- in response to the incident with
9  Commander Austin and -- but it wasn't the first
10  response with me because we had had a conversation
11  at the time of the -- what I consider to be
12  insubordination.
13      Q.   And that was what you testified to
14  today?
15      A.   Correct.
16      Q.   Did you give him an opportunity to
17  present -- Did you present him with allegations on
18  that day, the day of the protest?
19      A.   I was telling him that he was disobeying
20  a lawful order.
21      Q.   Did you tell him which orders you
22  believed to be lawful orders that you believed he
23  was disobeying?
24      A.   Yes.

Page 106

1      Q.   What did you tell him?
2      A.   I told him that -- There was two parts.
3  The first part was for him to return to his car and
4  leave the area.  The second order was for him to
5  leave the area and go back to the station and he
6  was relieved for duty -- or relieved of duty until
7  he came and saw me at 10:00 o'clock in the morning
8  that following Monday morning.
9      Q.   And did you allow Paul Berge to address
10  those charges, those allegations on the day of the
11  protest?
12      A.   Yeah, we had a conversation.
13      Q.   Did you inform him of what allegations
14  you believed he was guilty of violating?
15      A.   Yes.
16      Q.   What did you tell him?
17      A.   I told him that he disobeyed me when I
18  told him to leave the area and that he disobeyed me
19  again when he was refusing to leave and go back and
20  put his gear away and go home, that he was being
21  relieved of duty until Monday morning.
22      Q.   At what point did you tell Paul Berge
23  this?
24      A.   When we were standing outside the squad

Page 107

1  car.
2      Q.   Who else was present when you told Paul
3  Berge this?
4      A.   Just himself and me until Lieutenant
5  Passwater showed up.
6      Q.   Okay.  So what commands is Paul Berge
7  sitting here facing today as being insubordinate
8  against you with respect to the July 18th incident?
9  You said returning to the car, correct?
10      A.   No.  I told him to go back to his car
11  before he got up to the front of the courthouse,
12  and he continued and went to the courthouse.  So
13  that was, one, disobeying the order.  The second
14  disobeying the order is when I told him to leave
15  the area, going back to the station, going -- and
16  he's relieved of duty until Monday, he refused to
17  leave.
18      Q.   And that's what he's charged with, being
19  insubordinate?
20      A.   On my incident, yes.
21      Q.   And you said that you had a conversation
22  with Paul Berge, and you told him those
23  two specific points as to why you believed he was
24  being insubordinate, correct?

Page 108

1      A.   Yes.
2      Q.   Can you tell me then why did you not put
3  in the notice of interrogation -- why did you not
4  put the two bases for the allegations in the notice
5  of interrogation?
6      A.   I don't know that it's not in there.  I
7  would have to review that.
8      Q.   Tell me because it's important that an
9  employee such as Paul Berge, a sergeant, know what
10  he's being accused of violating?  You would agree
11  with me, right?  You would agree with me on that?
12      A.   Yes, it's always important.
13      Q.   Tell me where in that notice of
14  interrogation you identified what actions were
15  insubordinate.
16      A.   I think in point 3.  It says in there
17  that purpose of the interrogation is to determine
18  whether you violated any rules of this department
19  or otherwise engaged in wrongful conduct with
20  respect to the following:  To determine whether you
21  violated any rules, regulations, department
22  procedures with respect to performance of your
23  duties, failure to follow commands and orders, and
24  insubordination while on duty July 15th and

Page 109

1  July 18th, 2020.
2  Q.   Okay.  You saw at the interrogation I
3  made an issue that we didn't know what we were
4  being charged with violating?  You saw that in the
5  interrogation, correct?
6  A.   I don't recall that.
7  Q.   Why didn't you put in here that these
8  are the two incidents that I believe were
9  insubordinate?  Why didn't you put that in there?
10  A.   I believe they are in there.
11  Q.   You just looked at it.  Is it what you
12  just read?  Is that what you believe -- You think
13  that puts him on proper notice as to what he was
14  specifically being charged with?
15        MR. McGRATH: Objection, form of the
16  question.
17        MR. KELLY: Overruled.
18        You can answer.
19  BY THE WITNESS:
20  A.   Yes.
21  Q.   There's 748 pages of policies, right?
22  A.   Around 700.
23  Q.   Okay.  And that sentence puts Paul Berge
24  on notice as to what of those 700 pages he is -- he

Page 110

1  was alleged to have violated?
2  A.   Yes.
3  Q.   And so the questions at the
4  interrogation with respect to the insubordination,
5  the only questions that were relevant to your
6  notice of charges would have been questions
7  directed at your command to tell Paul Berge to
8  leave the area, correct?
9        MR. McGRATH: Objection, form of the
10  question, misstates the --
11        MR. HERBERT: I'm sorry.  I'll withdraw.
12  BY MR. HERBERT:
13  Q.   The purpose of the interrogation would
14  have been to ask questions relevant to the
15  allegations in this case; fair to say?
16  A.   Yes.
17  Q.   And the allegations as we just
18  identified are that Paul Berge was insubordinate
19  when he was told by you to return to the car and he
20  did not and he was told to leave the area and go
21  back to the station and he did not, correct?
22  A.   On the incident on the 18th.
23  Q.   Right.
24        Why is it that the interrogation

Page 111

1  is filled with so many other things that have
2  nothing to do with either of those two points?
3        MR. McGRATH: Objection, form of the
4  question.  I don't know what "so many other things"
5  means.
6        MR. KELLY: Yeah, I think we will
7  sustain the objection.
8  BY MR. HERBERT:
9  Q.   So you would agree with me that any --
10  Well, let me ask you this:  You charged Paul Berge
11  with giving untruthful testimony at the
12  interrogation, correct?
13  A.   Correct.
14  Q.   What statements did Paul Berge give that
15  were untruthful?
16  A.   That he didn't see me at the incident
17  and that he didn't --
18  Q.   Hold on.  Let me just go one at a time.
19  "Did not see me at the incident," that's what
20  you're -- that's one lie that you believe was
21  contained within that transcript?
22  A.   Yes.
23  Q.   At what point do you believe that Paul
24  Berge saw you and said he didn't see you?

Page 112

1  A.   When he was walking up to the front of
2  the courthouse and on the east side of the
3  courthouse.
4  Q.   Okay.  And where were you at that point?
5  A.   That's when I was getting out of my car.
6  Q.   Where were you in relation to Paul Berge
7  at that point?
8  A.   I was to the east of him.
9  Q.   How far?
10  A.   Maybe two car lengths.
11  Q.   You were behind him, correct?
12  A.   Well, as he was walking, he was -- I was
13  in front of him, then he was behind me because I
14  was in my car.
15  Q.   And is that the only instance that you
16  believe constituted his untruthful testimony
17  concerning him not seeing you?
18  A.   That he didn't think we had a
19  conversation or he didn't hear me?
20  Q.   That's not my question. I'm sticking
21  with what you just said about one of the bases for
22  the untruthful statements was that he stated that
23  he did not see you at the incident.  Do you
24  remember saying that?

Page 113

1    A.  Yes.
2    Q.  So other than that incident where you
3  described he was walking to the courthouse as you
4  were getting out of the car, any other instances
5  where he said he didn't see you when, in fact, you
6  think he did?
7    A.  No.
8    Q.  Paul Berge was not looking at you
9  directly, correct?
10      MR. McGRATH: Objection, foundation. At
11  what time?
12      MR. KELLY: Sustained.
13  BY MR. HERBERT:
14    Q.  Did you ever ask Paul Berge, Hey, did
15  you see me?
16    A.  No.
17    Q.  Did Paul Berge ever say, I see you?
18    A.  No.
19    Q.  So how in the world do you know if Paul
20  Berge saw you during this brief interaction?
21    A.  Because afterwards when I talked to him,
22  I asked why he didn't follow my direct order and he
23  said because he thought it was an unlawful order.
24    Q.  That's not my question, no. Focus on --

Page 114

1  I'm talking about when you said he gave a false
2  statement that he said he didn't see me during that
3  brief instance that you just talked about, what was
4  your basis -- how do you know that Paul Berge did
5  not see you at that moment?
6    A.  At the moment when he was looking at me?
7    Q.  Chief, you brought these charges.
8    A.  I did.
9    Q.  So I'm not sure why you're -- you're the
10  one that alleged that he didn't see you at the
11  instance. So I'm not sure why you're not -- you're
12  confused by my question.
13    A.  I'm not confused. When we were at the
14  scene, I asked him why he didn't follow my
15  directions.
16    Q.  That's not what I'm asking you.
17    A.  Well, that's a part of why I think that
18  he saw me and heard me.
19    Q.  Well, you just testified that it was
20  when Paul was walking towards the courthouse and
21  you were walking up to him. That was the incident.
22    A.  Yes.
23    Q.  The conversation was not that you had
24  with Paul Berge. That was after that incident,

Page 115

1  correct?
2    A.  But it was about that conversation
3  earlier.
4    Q.  Okay. And did Paul Berge say, I saw
5  you?
6    A.  No. I asked why he didn't listen to me,
7  and he said because he thought my order was
8  unlawful and he just wanted to talk to the
9  children.
10    Q.  And you believed that that statement
11  alone proves that Paul Berge saw you; is that your
12  testimony today?
13    A.  Yes.
14    Q.  What other false statement did Paul
15  Berge give other than apparently not seeing you?
16    A.  He didn't hear me make that statement.
17    Q.  He did not hear you make what statement?
18    A.  Order him to leave.
19    Q.  So this would have been the order to
20  leave and go to back to the station?
21    A.  No. This would have been the order to
22  leave the area.
23    Q.  Okay. Well, then it's irrelevant to the
24  charges here because you said the insubordinate

Page 116

1  acts are that he return to his car, one, and leave
2  and go back to the station? Those were the
3  insubordinate acts that you just testified that
4  Paul Berge is charged with violating, correct?
5    A.  I think I don't understand the question.
6    Q.  Okay. You just said that his untruthful
7  statement was to not -- that he did not hear your
8  order for him to leave. And correct me if I'm
9  wrong, but this order that you're talking about for
10  him to leave, this was not one of the two bases in
11  which Paul Berge is charged with violating here
12  today, correct?
13      MR. McGRATH: Objection, form of the
14  question.
15      MR. KELLY: Foundation on it. We'll
16  sustain the objection. I'm not sure where you're
17  going with this.
18      MR. HERBERT: I'm not sure where the
19  charges are going with it either.
20      MR. KELLY: Well, the charges are the
21  charges. They're in evidence. The commission has
22  accepted them.
23  BY MR. HERBERT:
24    Q.  What evidence do you have to charge Paul

**Board of Fire and Police Commissioners**
**City of Kankakee**

September 30, 2020

---

Page 117

1 Berge as we sit here today with his testimony that
2 he didn't hear you? What evidence do you have as
3 we sit here today to the contrary?
4     A.     The evidence I guess is the video that
5 shows him looking at me and then waving me off.
6     Q.     But you're saying he lied when he said
7 he didn't hear you. The video doesn't have any
8 audio, right?
9     A.     Correct.
10     Q.     So that's the only basis that you made
11 to conclusively determine that Paul Berge didn't
12 hear you, was watching that video?
13     A.     And my subsequent conversation with him.
14     Q.     Well, did you ask Paul Berge, Hey, did
15 you hear me?
16     A.     It's implied in when I asked him why
17 didn't he listen to me.
18     Q.     Did he ever tell you, Yeah, I heard you.
19 I just didn't want to listen to you?
20     A.     Not in those words, but he did say that
21 he thought my order was unlawful. So he wasn't
22 going to listen to it, and he just wanted to talk
23 to the children.
24     Q.     Okay. Other than those two statements

Page 118

1 that you believe he didn't see you and you believe
2 he -- that he did see you and that he did hear you,
3 what other false statements did Paul Berge make
4 during that interrogation -- Strike that.
5         What other false statements is
6 Paul Berge charged with as making at that
7 interrogation?
8     A.     Can I refer to the charges to see -- to
9 refresh my memory?
10     Q.     Sure.
11         MR. HERBERT: Mike, do you have a copy?
12 Is that one of your exhibits?
13         MR. McGRATH: I did not make it an
14 exhibit because the commission has it.
15         MR. KELLY: It's part of the
16 commission's record.
17         MR. HERBERT: Do you mind if I -- Well,
18 I'll mark it then for me.
19 BY MR. HERBERT:
20     Q.     So as you sit here today --
21         MR. KELLY: You can just consider it
22 Board Exhibit No. 1.
23         MR. HERBERT: Perfect.
24

Page 119

1         (Board Exhibit No. 1 marked for
2         identification.)
3 BY MR. HERBERT:
4     Q.     As you sit here today, you can't
5 remember the false statements that you allege Paul
6 Berge of committing other than you believe when he
7 said he didn't see you, you think that's false, and
8 that he didn't hear you, you think that's false,
9 correct?
10     A.     I think also included is when he waved
11 me away -- waved his hands towards me when he said
12 he didn't do that either.
13     Q.     Let me ask you this: When did you
14 determine -- When did you discover that he waved
15 his hand at you and -- When did you discover that
16 point?
17         MR. McGRATH: Objection, form of the
18 question.
19         MR. KELLY: Sustained.
20 BY MR. HERBERT:
21     Q.     When did you notice that he waved his
22 hand at you? At what point? Was it that day?
23     A.     Yes.
24     Q.     Why didn't you charge Paul Berge with

Page 120

1 waving his hand in a disrespectful manner to you?
2     A.     I think it was just part of the not
3 listening to the order, and then it was in the
4 interrogation when he denied doing it.
5     Q.     It was in the interrogation when he was
6 addressing charges -- or allegations that were made
7 against him and he didn't know that one of the
8 allegations is that he brushed his hand and you
9 found that to be inappropriate? He didn't know
10 that during the interrogation, right?
11     A.     He didn't know it or he didn't know it
12 was a charge?
13     Q.     Was it a charge at the point of
14 interrogation, or was it an allegation?
15     A.     Well, the allegation is that he lied
16 about it. So it wasn't before then.
17     Q.     Okay. What other statements?
18     A.     If I can review it.
19     Q.     Other than those three, you don't
20 remember, correct? You don't remember as you sit
21 here today, right?
22     A.     I don't want to misspeak. So I want to
23 verify it, yes.
24     Q.     You've sat through the entire hearing,

---

Page 121

1 correct?
2    A.   Correct.
3    Q.   You filed the charges against Paul
4 Berge, correct?
5    A.   Correct.
6    Q.   And you can't even remember what the
7 charges were other than those three?
8    A.   In reference to the interrogation.
9    Q.   Yeah.  Okay.  Well, I'll let you refresh
10 your recollection as you look at Board Exhibit
11 No. 1.  Tell me what other statements he's charged
12 with being untruthful about.
13    A.   I think the one would be that Sergeant
14 Berge stated he had a lawful reason to disregard
15 the orders given to him.
16    Q.   So Paul Berge saying that he thought he
17 had a lawful reason to disregard the order, that is
18 one of the bases for him giving false testimony
19 during an interrogation?
20    A.   Yes.
21    Q.   I don't mean to be cute with this, but
22 you don't read minds, do you?
23    A.   No.
24    Q.   You have no idea what Paul Berge thought

Page 122

1 was a lawful order or not a lawful order, correct?
2    A.   I would expect him to know.
3    Q.   Okay.  Any other false statements other
4 than those three that are the bases of this charge
5 as you refresh your recollection by looking at the
6 charging document?
7    A.   I don't remember the specifics on the
8 15th other than -- I don't remember the specifics
9 on the 15th.
10    Q.   Right, but I'm asking about the
11 interrogation, the interrogation.
12    A.   I would have to look at the
13 interrogation to remember the exact thing what he
14 said that would have been ...
15    Q.   So you mean to tell me and the ladies
16 and gentlemen of the board that, as you look at the
17 charges, you don't know what you alleged were false
18 statements?
19         MR. McGRATH: Objection, form of the
20 question, argumentative.
21         MR. KELLY: Overruled.
22              You can answer.
23 BY THE WITNESS:
24    A.   It says the 15th and the 18th, and I

Page 123

1 know the 18th for sure were charged under --
2    Q.   That's not my question.
3    A.   Well, the 15th and the 18th.
4    Q.   Listen again.  It's your testimony --
5 Hold on.  You've got to let me finish the question.
6    A.   Okay.
7    Q.   As you look at these charges that you
8 filed against a decorated sergeant, you can't tell
9 what the other false statements are without looking
10 at the transcript?
11    A.   Correct.
12    Q.   How in the heck in the world is he
13 supposed to know what he is charged with if you
14 drafted the charges and you don't even know?  Don't
15 you see a problem there?
16         MR. McGRATH: Objection, form of the
17 question, argumentative.
18         MR. KELLY: Sustained.
19 BY MR. HERBERT:
20    Q.   You've gone through the bill of rights
21 for the police officers, the Illinois statute that
22 talks about peace officers' bill of rights?
23    A.   Yes.
24    Q.   You have a collective bargaining

Page 124

1 agreement that contains clauses regarding
2 discipline, correct?
3    A.   Yes.
4    Q.   And you're given training in policy on
5 how it is to properly discipline an officer under
6 your command, correct?
7    A.   Correct.
8    Q.   And one of those things is that you put
9 that officer on notice as to what he is being
10 charged with so that he can come in front of the
11 board and address the allegations, correct?
12    A.   Correct.
13    Q.   And also when he comes to an
14 interrogation, he knows what he's being accused of
15 violating?  That's another policy, correct?
16    A.   Correct.
17    Q.   So the basis for the false statements
18 are Paul Berge said he thought something and you
19 believe that did not occur in his head, and the
20 second one -- correct me if I'm wrong -- is that
21 you believe Paul Berge did not see with his own
22 eyes you on the scene, correct?  And then the third
23 one is he did not hear you, and you believe he did
24 hear you?

DEFENDANTS 001810

**Board of Fire and Police Commissioners**
**City of Kankakee**

September 30, 2020

Page 125

1    A.   Yes.
2    Q.   Okay.  So the basis of your allegations,
3  your charges against a decorated officer,
4  supervisor, are that you don't think what he said
5  was going on in his head was true, you don't think
6  what he said was going on in his eyes were true,
7  and you don't think what you said -- or what he
8  said about what was going on in his ears was true?
9    A.   Yes.
10   Q.   Let's move on to the other charges.
11 Well, we've got the two insubordinate acts.  We've
12 got the false statements finally through
13 cross-examination of the -- of you.  We know
14 exactly what we're being charged with here.  Tell
15 me what acts of insubordination concerning the
16 incident with -- Or strike that.
17         Those are two of the counts.
18 It's the false statements at the interrogation that
19 you just spoke of, and it's the insubordinate acts
20 with respect to you on July 18th, correct?
21   A.   Correct.
22   Q.   And then the first count -- Those are
23 Counts 2 and 3.  And the first count is the
24 insubordinate acts by Paul Berge towards Commander

Page 126

1  Austin, correct?
2    A.   Correct.
3    Q.   Let's do this again.  What are the
4  insubordinate acts that Paul Berge committed -- Or
5  strike that.
6         What charges as we sit here today
7  constitute the insubordination that Paul Berge
8  committed with respect to the incident with
9  Commander Austin?
10         MR. McGRATH: Objection to the form of
11 the question.
12         MR. KELLY: The charges, are you talking
13 about Count 1 or -- We'll overrule the objection
14 based on his prior questioning.  I think we're
15 looking at Count 1.
16 BY MR. HERBERT:
17   Q.   You can answer.
18         MR. KELLY: You can answer.
19 BY MR. HERBERT:
20   Q.   Do you want me to ask another question?
21   A.   No.
22   Q.   I'm not rushing you.
23   A.   It was the insubordination to Commander
24 Austin and not answering his questions at the time

Page 127

1  of the -- of that incident and then in the
2  confrontation.
3    Q.   Let's break them down like we did last
4  time.
5    A.   Specifically I got to get the charges to
6  see.
7    Q.   Well, let me ask you:  As you sit here
8  today, do you know what -- you said one of the
9  bases was that Sergeant Berge didn't answer
10 Commander Austin's questions.  Is that what your
11 testimony is?
12   A.   I guess the major -- the one that sticks
13 in my mind --
14   Q.   Let's stick with the question though.
15 As long as you're not moving away, I want to stick
16 with what we're talking about here.  I don't want
17 to move onto the next point until this one.
18         What questions of Commander
19 Austin represent the charge against Paul Berge for
20 insubordination for his failure to answer, what
21 questions?
22   A.   I guess it was more commands than
23 questions.
24   Q.   Well, what is it?  I don't know either.

Page 128

1    A.   I told him to leave, and Sergeant -- or
2  to come to his office, and Sergeant Berge told him
3  no, to leave the sergeants' office.
4    Q.   Okay.  So that's one basis for
5  insubordination.  So when you testified earlier not
6  answering questions, that's not a basis of the
7  insubordination charges against Paul Berge with
8  respect to Commander Austin?
9    A.   I'm sorry?
10   Q.   It wasn't a great question.
11         We talked about -- I said, give
12 me the reasons why -- that support the charges of
13 insubordination with respect to the incident with
14 Commander Austin, and you said it wasn't -- it was
15 Berge not answering Commander Austin's questions.
16 And then correct me if I'm wrong, you seem to be
17 backtracking from that statement?
18   A.   Well, I guess the original thing with
19 Commander Austin was to ask questions about an
20 incident that happened, and I don't think it ever
21 got to that point.  So that question probably
22 wasn't answering the question because it never got
23 to that point.  The point --
24   Q.   I have no idea what that means.

DEFENDANTS 001811

**Board of Fire and Police Commissioners**
**City of Kankakee**

September 30, 2020

Page 129

1    A.   That means he went there to talk to him
2  in reference to an incident that happened earlier
3  on in the shift.  And because of their -- of the
4  situation with not answering right away and then
5  the phone call and then being told to leave the
6  office and -- so the questions never got answered.
7    Q.   What question or questions that Paul
8  Berge failed to answer from Commander Austin is he
9  charged with being insubordinate with?
10    A.   I don't know if there was a question
11  like I said.  I don't think that it got to that
12  point where there was a question.  So I misspoke,
13  but that was what was the beginning of the whole
14  conversation but didn't -- I don't think it got to
15  that point.
16    Q.   Well, let's go back to my original
17  question then.  What acts had Paul Berge committed
18  is he charged with being insubordinate of towards
19  Commander Austin?
20    A.   He was -- for refusing to leave the
21  sergeants' office and go to the commander's office,
22  and he told sergeant -- or Commander Austin to
23  leave the sergeants' office.
24    Q.   Okay.  Other than that statement or that

Page 130

1  issue, is there anything else that -- in the
2  charges that Paul Berge was charged being
3  insubordinate of?
4    A.   And when he made statements to
5  Sergeant -- to Lieutenant -- When Sergeant Berge
6  told Commander Austin that he hadn't done anything
7  in three years or however long he's been the
8  Commander.
9    Q.   Okay.  Any other actions that Paul Berge
10  is charged with being insubordinate of with respect
11  to that incident?
12    A.   No.
13    Q.   Do you think that the charge -- You've
14  seen the charges.  You're the one that filed them.
15  Do the charges in there -- they don't say anything
16  about Paul Berge is charged with being
17  insubordinate for refusing to leave the sergeants'
18  office, do they?
19    A.   I have to look at the charges.
20    Q.   You don't know as you sit here today?
21    A.   I'm sorry?
22    Q.   You don't know as you sit here today?
23    A.   I don't know the exact verbiage, no.
24    Q.   And you don't know -- I'm assuming you

Page 131

1  don't know that there's nothing in the charges that
2  Paul Berge, that he was charged with being
3  insubordinate because he told Austin that he did
4  not do anything in three years, correct?
5    A.   I would have to look at it.
6    Q.   You don't know as you sit here today?
7    A.   Correct.
8    Q.   Despite the fact that you've been here
9  for the hearing and you brought the charges, you
10  don't know as you sit here today, correct?
11    A.   Correct.
12    Q.   And you would agree with me that in the
13  notice of interrogation, the first opportunity Paul
14  Berge was given to address the specific allegations
15  against him, there is no specific allegation such
16  as what you just testified to, correct?
17    A.   On what form is that again?
18    Q.   Notice of interrogation, when you put
19  him on notice as to what you believe he was guilty
20  of, right?
21    A.   It was covered by insubordination.
22    Q.   And fair to say you didn't really care
23  what Paul Berge's answers were at the interrogation
24  because you had already made up your mind, he's

Page 132

1  guilty, correct?
2    A.   Well, I wanted to hear what happened in
3  the interrogation.
4    Q.   That wasn't my question, though.
5        You had already made up your mind
6  that Paul Berge was guilty of all of these acts
7  that you just testified to before he even gave his
8  interrogation?
9        MR. McGRATH: Objection, misstates the
10  record.
11        MR. KELLY: Overruled.
12  BY THE WITNESS:
13    A.   Did I make up my mind?  I think that I
14  had a strong indication that unless I heard
15  something new in the interrogation that would
16  change my mind, then I had a strong inclination
17  that -- especially since in my experience during
18  the July 18th, that it was insubordination.
19    Q.   Okay.  But as far as what happened with
20  Commander Austin, you didn't know what happened
21  other than what you heard from anyone?  You had no
22  direct knowledge of it, correct?
23    A.   Correct.
24    Q.   So wouldn't you have wanted to hear Paul

Page 133

1  Berge's side of it before you determined that Paul
2  Berge was being insubordinate before you concluded
3  that he was being insubordinate to Commander
4  Austin?
5          MR. McGRATH: Objection, foundation,
6  misstates the evidence.  He didn't testify he made
7  up his mind.
8          MR. KELLY: Overruled.
9  BY THE WITNESS:
10     A.   Would I want to hear what he had to say
11  in reference to that incident?
12     Q.   Yes.
13     A.   Yes.
14     Q.   And that's the policy, right?  You can't
15  charge somebody guilty until they've been given all
16  of their due process rights, correct?
17     A.   Correct.
18     Q.   You have to conduct a fair and impartial
19  investigation and afford the respondent -- the
20  supervisor every opportunity that he's entitled to
21  with respect to due process concerning the
22  collective bargaining agreement, the Kankakee City
23  Police Department policy?  He's entitled to every
24  one of those before you make a determination about

Page 134

1  the guilt or innocence in this case?
2     A.   You would have a good -- you would have
3  to follow policy before you would be -- decide to
4  bring charges, but it's the Board of Police and
5  Fire Commissioners that would decide guilt or
6  innocence.
7     Q.   I don't understand.  That's not
8  responsive to my question.
9          Before you bring charges --
10     A.   Before I bring charges.
11     Q.   -- you have to conduct a fair and
12  impartial investigation, correct?
13     A.   Yes.
14     Q.   And you cannot make any conclusions
15  until you have conducted that fair and impartial
16  investigation, correct?
17     A.   Correct.
18     Q.   And you can't -- And part of that fair
19  and impartial investigation is providing specific
20  notices of charges to the respondent that he can
21  answer and respond to, correct?
22     A.   Correct.
23     Q.   And being -- given an opportunity to
24  address the allegations against him, correct?

Page 135

1     A.   Correct.
2          MR. McGRATH: Objection, asked and
3  answered.
4          MR. KELLY: Overruled.
5  BY MR. HERBERT:
6     Q.   You didn't do that in this case for
7  Sergeant Paul Berge because you had already made up
8  your mind that you were going to terminate him
9  before you even send him a notice of interrogation?
10          MR. McGRATH: Objection, that misstates
11  the evidence.  It's argumentative.
12          MR. KELLY: Sustained.
13  BY MR. HERBERT:
14     Q.   You determined -- Or strike that.
15          Do you remember sending a text
16  message to Commander Austin right around July 18th,
17  2020?
18     A.   Yes.
19     Q.   It would have been the same day as the
20  incident against you, correct?
21     A.   Correct.
22     Q.   And tell me if this sounds correct of
23  what you told Commander Austin:  "FYI, just sent
24  Sergeant Berge home for insubordination and

Page 136

1  refusing to obey my direct order," not plural,
2  order.  Do you remember saying that in the text?
3     A.   Sounds right.
4     Q.   Okay.  And, in fact, you said he was not
5  ordered to come -- he was ordered not to come back
6  to work until Monday at 1000 hours and report to me
7  at that time?  Do you remember saying that in your
8  text to Commander Austin?
9     A.   Yes.
10     Q.   And then you said, "I plan on putting
11  him on administrative leave and seeking his
12  termination."  Do you remember saying that?
13     A.   Yes.
14     Q.   You heard Commander Austin testify in
15  this case, right?
16     A.   Yes.
17     Q.   And what Commander Austin believed were
18  insubordinate acts by Paul Berge weren't the same
19  as what you believed were insubordinate acts by
20  Paul Berge with respect to Commander Austin?
21     A.   I would say they're probably included in
22  what I think was done and what Commander Austin
23  would have thought.
24     Q.   Okay.  So the ladies and gentlemen of

**Board of Fire and Police Commissioners**
**City of Kankakee**

September 30, 2020

Page 137

1 the board can read Commander Austin's testimony in
2 the transcript, and it's your testimony that you
3 agree with Commander Austin as to what all the
4 insubordinate acts were committed on that day?
5   A.  Yes.
6   Q.  Well, let's talk about some of the
7 things that you said Paul Berge was not charged
8 with being insubordinate with respect to Commander
9 Austin.  You never mentioned anything about him not
10 hanging up the telephone, did you?  When I asked
11 you to tell me what the charges were, you didn't
12 mention anything about the telephone, did you?
13   A.  No.
14   Q.  Well, Commander Austin made a big deal
15 about that.  You apparently didn't think that was a
16 violation of a direct order, right?
17   A.  No.  I forgot to mention it.
18   Q.  You forgot to mention it?
19   A.  Yes.
20   Q.  So he is charged with insubordination
21 concerning his acts with the telephone call?
22   A.  Yes.
23   Q.  Anything else that you forgot to
24 mention?

Page 138

1   A.  Possible.
2   Q.  Well, what would refresh your
3 recollection?  How about the charges?  Would that
4 refresh your recollection?
5   A.  Yes.
6   Q.  Okay.  Well, we did this already, but
7 let's do it again if you want.  Showing you Board
8 Exhibit No. 1 for the second time asking the same
9 question --
10   A.  Okay.
11   Q.  -- is your memory refreshed?
12   A.  Slightly.
13   Q.  Can you enlighten us, please?
14   A.  I'm sorry?
15   Q.  Well, tell us.
16   A.  Well, the part about standing up next to
17 each other very close and raising their voice to
18 him and he was telling him that he was not a -- I
19 already said that about the three -- not doing
20 anything in your three years and that the alleged
21 statement in reference to taking back the police
22 department.
23   Q.  Is it your testimony that -- It's not
24 your testimony that Paul Berge should not have been

Page 139

1 at that protest, is it?
2   A.  There was no order out to not come to
3 the protest.
4   Q.  Okay.  And certainly you didn't charge
5 him with being at the protest is against the
6 department policy in any way, correct?
7   A.  Correct.
8   Q.  So you saw him sitting on a wall swaying
9 back and forth, kicking his feet you said, right?
10   A.  Correct.
11   Q.  He is not charged with inappropriate
12 conduct sitting on a wall and swaying his feet back
13 and forth, is he?
14   A.  No.
15   Q.  When you exited your car and you yelled
16 for Berge, I believe you said you were about
17 40 feet away from him?
18   A.  Approximately.
19   Q.  And this was in the presence of other
20 protesters is what you said, correct?
21   A.  There was protesters around, yes.
22   Q.  I'm just asking.  That's what you
23 testified to earlier, correct?
24   A.  Yes.

Page 140

1   Q.  And protesters were chanting?
2   A.  I don't recall hearing any chanting at
3 that time.
4   Q.  It wasn't just a peaceful Saturday
5 morning on that street at that time, correct?  Do
6 you know when I say "peaceful," not a serene
7 morning?
8   A.  On the street or on the -- in the
9 courthouse are we talking about?
10   Q.  How about in the street?
11   A.  In the street, no, there was protesting.
12   Q.  And you were in close proximity to those
13 protests, correct?
14   A.  Sure.
15   Q.  And those protests were loud, correct?
16   A.  Relatively.
17   Q.  And Paul Berge was in close proximity to
18 those loud protests as well, correct?
19   A.  I think he was in the area where they
20 stopped, yeah, twice.
21   Q.  Isn't it possible that Paul didn't hear
22 your command because there was chants of the
23 protesters going on?  Isn't that possible?
24   A.  No.

Page 141

1  Q.  What about the radio?  It was going,
2  correct?
3  A.  We had radios on, yes.
4  Q.  Do you know if there was a call?  Do you
5  know if there was anyone talking on the radio at
6  the point in which you allegedly made this command
7  to Paul?
8  A.  I don't recall.  I don't know.
9  Q.  Well, did you investigate to see because
10  that certainly would be an exonerating factor if
11  there was a radio call coming over, correct?
12      MR. McGRATH:  Objection, form of the
13  question.
14      MR. KELLY:  Sustained.
15  BY MR. HERBERT:
16  Q.  Do you know how loud Paul Berge had his
17  radio on that day?
18  A.  No.
19  Q.  You didn't investigate any of those
20  facts, right?
21  A.  No.
22  Q.  You didn't care to, correct?
23  A.  No, we had a conversation.
24  Q.  That's because you already made your

Page 142

1  decision that day, right after you already made
2  your decision to terminate?
3  A.  I was there.
4  Q.  Okay.  Paul said he wanted to interact
5  with the children.  Is that what you testified to
6  today?
7  A.  Yes.
8  Q.  And was that inappropriate for him to
9  want to go interact with the children?
10  A.  Well, he would have to be interspersed
11  with the protesters and -- Yes.  So it would have
12  been inappropriate.
13  Q.  So it is inappropriate for your officers
14  to interact with children at any point in which
15  there is a protest going on; is that your
16  testimony?
17  A.  No.
18  Q.  Why then in this case?
19  A.  Because the protests had stopped.  They
20  were in there, and I didn't want to have any
21  confrontations.
22  Q.  Did you see any signs of there being a
23  confrontation by Paul Berge at that point?
24      MR. McGRATH:  Objection, foundation.  At

Page 143

1  what point?
2      MR. KELLY:  Overruled.
3  BY THE WITNESS:
4  A.  I thought he was acting erratic when I
5  saw him sitting on that half wall, and I didn't
6  want him interacting with the people involved in
7  there because I did not know how it would go.
8  Q.  Okay.  Why didn't you order that he
9  leave the scene at the point you saw him sitting on
10  the wall if you thought he was somehow a danger to
11  the protest?
12      MR. McGRATH:  Objection.  He didn't say
13  anything about a danger.
14      MR. KELLY:  Sustained.
15  BY MR. HERBERT:
16  Q.  Why didn't you direct Paul Berge to
17  leave when you believe that he may have incited
18  something with respect to this protest?
19      MR. McGRATH:  Objection, misstates the
20  evidence.
21      MR. KELLY:  Overruled.
22  BY THE WITNESS:
23  A.  I didn't have the opportunity.  I was in
24  the -- following the protesters.  And when we went

Page 144

1  past him, I didn't know he was going to follow us
2  there.
3  Q.  Why didn't you just get on the radio
4  when you saw him sitting there and say, Sergeant
5  Berge, leave the scene?
6  A.  It didn't cross my mind.
7  Q.  Because it wasn't a big deal, correct?
8  A.  At that point, I don't think it was.
9  Q.  And Paul Berge is not charged with any
10  inappropriate conduct towards -- was it Travis
11  Miller?  Did I get his name correct?  Paul Berge is
12  not charged with inappropriate contact with Travis
13  Miller in this case, correct?
14  A.  Correct.
15  Q.  And Travis Miller -- Let's strike that.
16  Give me one second, please.
17      Who conducted the investigation
18  into the insubordinate acts that you allege against
19  Paul Berge with respect to Commander Austin?
20  A.  I think Chief Inspector -- I would say
21  the City inspector -- the City inspector with our
22  attorney did the interrogation that was part of the
23  investigation.
24  Q.  I'm saying the investigation prior to

DEFENDANTS 001815

**Board of Fire and Police Commissioners**
**City of Kankakee**

September 30, 2020

Page 145

1    the interrogation, though.
2        A.   I think it was -- there was -- It mostly
3    was the interrogation.  I mean, Inspector Bartlett
4    was brought into it to review all the materials
5    that we had and also going in with the
6    interrogation.
7        Q.   So the only investigative steps taken
8    with respect to the Commander Austin incident was
9    the interrogation --
10       A.   Correct.
11       Q.   -- of Sergeant Berge?
12       A.   And collecting the documents from the
13   other officers that were present.
14       Q.   And speaking to that, Commander Austin
15   was collecting the documents of the other officers
16   that were present, correct?
17       A.   I believe so.
18       Q.   And you commanded him to do that,
19   correct?
20       A.   I don't know if I commanded him actually
21   to do it.  I meant for him to get the documents,
22   and he might have already told me that he had told
23   the officers that were there to write up what had
24   happened.

Page 146

1        Q.   You would agree with me that it's
2    inappropriate pursuant to Kankakee Police
3    Department policy that the person that is making
4    the complaint against a particular officer should
5    not conduct the investigation into that officer?
6    You would agree with me on that, correct?
7        A.   I would agree it's not optimum, yes.
8        Q.   Because it has to be a fair and
9    impartial investigation against an -- against any
10   officer, let alone a decorated sergeant, correct?
11       A.   Correct.
12       Q.   And despite that, you and Commander
13   Austin conducted this investigation, correct?
14       A.   We collected the documents from the
15   other officers and turned them over to the City
16   inspector.
17       Q.   Well, we didn't collect it.  We already
18   established that Commander Austin directed these
19   officers and then gave those investigative facts to
20   you, correct?
21       A.   Right.
22       Q.   And part of -- Commander Austin told you
23   about what happened on that day with respect to his
24   interaction with Paul Berge, correct?

Page 147

1        A.   Correct.
2        Q.   And did you think that the allegations
3    made by Commander Austin at the point in which he
4    told you, do you think those were serious
5    allegations against Paul Berge?
6        A.   Yes.
7        Q.   And why is it that you did not strip
8    Paul Berge after hearing those allegations?
9        A.   Because I wanted to have an opportunity
10   to find out from Sergeant Berge, but we had to have
11   all the information from all the other officers
12   too.
13       Q.   What opportunity did you give to Paul
14   Berge to explain -- to address allegations of
15   misconduct against him with respect to the
16   Commander Austin incident?
17       A.   At his interrogation.
18       Q.   A month later?
19       A.   Yes.
20       Q.   And Commander Austin, he made
21   allegations that Paul Berge may have been
22   intoxicated, correct?
23       A.   Yes.
24       Q.   Did you do an investigation to determine

Page 148

1    whether or not he was intoxicated?
2        A.   No.
3        Q.   You would agree with me that's a very
4    serious allegation to make against a police
5    officer, that they're intoxicated on duty, correct?
6        A.   Correct.
7        Q.   And you found nothing to substantiate
8    this belief that he may have been intoxicated by
9    Commander Austin, correct?
10       A.   I'm sorry.  Say that again.
11       Q.   I'll withdraw the question.
12             He also told you that Paul
13   Berge's incident with him, that was the second such
14   incident that I am aware that when a minority
15   supervisor has given Sergeant Berge an order and he
16   was not compliant or verbally resisted with that
17   order?  Do you remember him telling you that?
18       A.   I remember hearing it in the hearing.
19       Q.   Okay.  Well, if I showed you the To/From
20   that was written to you on July 16th, 2020,
21   addressed to you, would that refresh your
22   recollection?
23       A.   Yes.
24       Q.   Okay.  If I can show, I'll mark this as

**Board of Fire and Police Commissioners**
**City of Kankakee**

September 30, 2020

Page 149

1  Plaintiff Exhibit -- I'm sorry, not plaintiff --
2  Respondent Exhibit No. 2.
3        MR. HERBERT: And, Mike, it's the
4  July 16th memo.  Here it is.  Page 2.  You can take
5  a look.
6        MR. KELLY: Is there already a
7  Respondent's 1?
8        MR. HERBERT: No, there isn't.  I
9  apologize because that was the board exhibit.
10            (Respondent's Exhibit No. 1
11            marked for identification.)
12 BY MR. HERBERT:
13    Q.   Go ahead and look at that.  And when
14 you're done, you can hand it back to me and tell me
15 if that document refreshes your recollection?
16            (Witness viewing document.)
17 BY MR. HERBERT:
18    Q.   I just asked you about page 2 here.
19    A.   I'm trying to get the context.  Okay.
20    Q.   Do you remember the question?
21    A.   No.
22    Q.   Commander Austin made an allegation to
23 you that Paul Berge was insubordinate to another
24 minority supervisor other than him, correct?

Page 150

1    A.   In the memo.  I don't remember that in
2  our conversation that we had.
3    Q.   Against another minority supervisor,
4  second incident against another minority
5  supervisor, what did you take that to mean?
6    A.   I don't remember the complete details,
7  but I think there was an incident --
8    Q.   I'm just asking what you took that to
9  mean by, the allegation that it was a second
10 minority supervisor that he had been insubordinate
11 against?  I'll withdraw the question.
12            You would agree with me that
13 insubordination doesn't matter what color the
14 supervisor is, correct?
15    A.   Correct.
16    Q.   So the fact that it was a second
17 incident against a supervisor, whether or not that
18 supervisor was a minority or not was wholly
19 irrelevant, correct?
20    A.   It could be relevant, but I don't know
21 that it is.
22    Q.   So insubordinate to a Black supervisor
23 could be less tolerable than insubordinate to a
24 White supervisor?

Page 151

1    A.   No.
2    Q.   Well, then how can it be -- Give me an
3  instance of how it can be relevant.  What does
4  race -- How can race make something relevant to an
5  allegation of insubordination?
6    A.   I guess it can go towards motivation or
7  the state of mind of the person.
8    Q.   And that's clearly what Commander Austin
9  was saying, was that Paul Berge, this is another
10 minority supervisor, another Black supervisor that
11 the White sergeant is being insubordinate against,
12 right?  That's what you took that to mean, correct?
13    A.   It's one interpretation, yes.
14    Q.   It's a pretty serious allegation to make
15 against anyone, that they are somehow motivated by
16 race and somehow have some animus towards a
17 particular race?  It's a horrible allegation to
18 make against somebody, isn't it?
19            MR. McGRATH: Objection, foundation,
20 relevance, not in the charges.
21            MR. KELLY: Overruled.
22 BY THE WITNESS:
23    A.   Yes.
24    Q.   Did you investigate to see whether or

Page 152

1  not Paul Berge was a racist and had a history of
2  being insubordinate towards minority supervisors?
3            MR. McGRATH: Objection, form of the
4  question, foundation, relevancy.
5            MR. KELLY: We'll overrule the question,
6  but I'm not -- this is clearly not part of these
7  charges.  It's clearly not anything that Commander
8  Austin testified to.  So I'll allow him to answer
9  that question, but I'm not sure where that line of
10 questioning -- how it's going to help the board
11 decide this case.
12            So, Chief, you can answer that
13 question.
14 BY THE WITNESS:
15    A.   I don't know if it was part of the
16 interrogation or not, but that's where -- if it was
17 going to be, it would be.  If it isn't, I haven't
18 done anything else.
19    Q.   So this horribly offensive allegation is
20 made against Paul Berge, and the only thing that
21 possibly could have been done would have been your
22 interrogation against him, correct?
23    A.   I don't know if it is an allegation or
24 just an observation to an interpretation by a

Min-U-Script®

Schelli Reporting Service, Ltd.
(312) 558-1113

(38) Pages 149 - 152

DEFENDANTS 001817

Page 153

1  person, but it doesn't -- I don't think in there
2  it's saying that he was definitely motivated by
3  race.
4     Q.   You're right.  It doesn't say that.
5  They just threw that out -- he just threw that out
6  there to dirty up Paul Berge, right, because you
7  didn't see any basis for it to be in there,
8  correct?
9        MR. McGRATH: Objection, compound.
10        MR. HERBERT: I'll withdraw it.
11        MR. KELLY: Sustained.
12 BY MR. HERBERT:
13    Q.   Well, you knew that Paul Berge had filed
14 a discrimination charge with the Illinois
15 Department of Human Rights concerning allegations
16 that he was being racially targeted at the time in
17 which you received this horrible allegation from
18 Commander Austin, correct?
19        MR. McGRATH: Objection, foundation,
20 relevance.
21        MR. KELLY: We'll sustain the objection
22 as to foundation.  So I think Mr. Herbert can
23 inquire about the charges of discrimination.
24 That's the first time we've heard of that, and I

Page 154

1  think the commission needs to know more about it.
2  BY MR. HERBERT:
3     Q.   You're aware of the fact that Paul Berge
4  filed a charge of discrimination with the Illinois
5  Department of Human Rights on or about
6  November 2019 concerning allegations that he was
7  being racially discriminated against while working
8  for the Kankakee Police Department, correct?
9     A.   I don't remember being notified of that.
10    Q.   Well, did you ever -- were you ever --
11 So is it your testimony today that you have never
12 been notified regarding any charges concerning race
13 made by Paul Berge with respect to his employment
14 at the Kankakee Police Department?
15    A.   Yes, I don't recall that.
16    Q.   Well, did you ever talk to the mayor
17 about officers under your command that were
18 complaining about racial discrimination?
19        MR. McGRATH: Objection.  What is the
20 relevance with this?
21        MR. KELLY: Yeah.
22        MR. McGRATH: It's not in the charges.
23        MR. KELLY: Yeah, I don't think this is,
24 again, going to prove anything for the commission.

Page 155

1  So we'll sustain the objection.
2        MR. HERBERT: Well, there's a lot of
3  allegations made in the interrogation that aren't
4  in the charges either.  I think we should just
5  point that point out.
6        MR. KELLY: Well, the commission is only
7  going to decide the three counts that are in front
8  of them.  So ...
9        MR. HERBERT: I agree.  But as I said
10 last time, the commission is free to judge the
11 credibility of a witness by any motivation to lie,
12 bias -- and I'm not indicating that this chief is.
13 But if there is a motivation to be biased towards
14 somebody -- and I guess this is my offer of proof.
15        There are racial discrimination
16 charges filed with the IDHR against the Village --
17 or I'm sorry -- the City of Kankakee concerning
18 disparate treatment by White officers as opposed to
19 various Black officers.  And if this termination,
20 which comes on the heels of this charge, is related
21 in any way, shape, or form to the protected rights
22 of an individual to file that, then this board can
23 look at it and say this is all pretext.  They made
24 up this case against Sergeant Berge to fire him.

Page 156

1  Or if they didn't make up all the facts, even if
2  the facts occurred, they're firing him because he
3  made this charge.  That's my offer of proof.
4        MR. McGRATH: Again, I object as to
5  relevance.  The Chief just testified he's not even
6  aware of it.  Secondly, that's a completely
7  different forum if it is even filed, and this
8  commission can't make any rulings as far as any
9  EEOC claims or allegations.  Certainly you can try
10 to impeach or affect somebody's credibility, but
11 the Chief has testified that he doesn't even know
12 about it.  I think that should end the questioning.
13 If we're going to go in and start questioning all
14 the elected officials and go into -- it's going
15 beyond the three counts that are in the charges
16 that weren't trumped up.
17        MR. KELLY: For the record, Mr. Herbert
18 has made his offer of proof.  The City has
19 responded.  I will tell the commissioners that you
20 do not have any jurisdiction regarding complaints
21 of discrimination from either -- any minority or
22 majority offered in this department.  That is not
23 the question before you.  And as we sit here
24 tonight, neither Commander Austin nor the Chief nor

Page 157

1  any other witness has testified to any
2  discriminatory or racial motive in anything that is
3  before you tonight.
4       MR. HERBERT: Got it.
5  BY MR. HERBERT:
6    Q.   Chief, did you talk to the mayor
7  concerning your decision to file charges against
8  Paul Berge in this case?
9    A.   Yes.
10   Q.   Did you discuss -- Did you ask for her
11  approval to file charges against Paul Berge in this
12  case?
13   A.   No.
14   Q.   Did she in any way indicate whether or
15  not she believed Paul Berge should have been
16  charged and termination sought in this case?
17   A.   No.
18   Q.   Well, did she -- was she part of the
19  investigation into Paul Berge's alleged misconduct
20  in any way in this case?
21   A.   No.
22   Q.   Would it surprise you that there's
23  various e-mails between you and the Chief
24  concerning the incident that happened at the

Page 158

1  protests, specifically with regard to Paul Berge's
2  actions in that case?
3    A.   To me and the mayor?
4    Q.   Yes.
5    A.   I'm sure I would have informed her of
6  it, yes.
7    Q.   That's what I'm asking you.
8    A.   Yeah.
9       MR. HERBERT: I think I'm just coming to
10  the end just to give everyone a preview here.
11  BY MR. HERBERT:
12   Q.   You're aware of the class, the
13  supervision of police personnel that was given to
14  the supervisors within the Kankakee Police
15  Department, correct?
16   A.   Which class?  The Northwestern class?
17   Q.   No.  This was one that was done at the
18  Frankfort Police Department January 30th to
19  February 3rd, 2017?
20   A.   I think that's the Northwestern one.
21   Q.   You took that class, right?
22   A.   If I did, it was a long time ago.
23   Q.   And in that class, it talks about the
24  importance of supervisors -- or strike that -- it

Page 159

1  talks about the importance of enhancing the
2  community police relationship, correct?
3    A.   I'm sure.
4    Q.   In fact, there's a lot of pictures where
5  there's -- and that might be a different one, but
6  there's another training course?
7    A.   I'm sure there's a lot of training
8  courses in the community.
9    Q.   But I found it.  It's odd.  There was a
10  number of pictures in there with police officers
11  with little children.  I can find that and submit
12  it to the record, but that's a policy of the
13  Frankfort -- I'm sorry -- the Kankakee Police
14  Department is to have a warm relationship as best
15  you can with the community, correct?
16   A.   Community partnership, yeah.
17   Q.   And not come off as a military
18  organization against the citizens, correct?
19   A.   Correct.  It's a benefit for us to be
20  part of the community.
21   Q.   And you've heard the term
22  demilitarization, correct?
23   A.   Right.
24   Q.   And, in fact, you've spoken to the press

Page 160

1  about this, you've spoken to various community
2  groups, and, you know, you've indicated that it is
3  the policy of Kankakee Police Department to become
4  less militarized, correct?
5    A.   I don't know if I would use those terms.
6  I think when they talk about demilitarize, when
7  they're talking about not having the armored
8  vehicles and having the equipment.  I think that's
9  more in line with demilitarization.
10   Q.   Well, it's also instead of just locking
11  people up and being the bad guy, making arrests,
12  it's also at a protest to try and be friendly with
13  people that are not violating the law, right?
14   A.   Correct.
15   Q.   That's the policy, correct?
16   A.   I don't know if it's demilitarization.
17  It's more community policing.
18   Q.   Let's just see what else I've got here,
19  and I think I'm close to --
20       MR. HERBERT: I think that's it.  Thank
21  you, Chief.
22       MR. KELLY: Any redirect?
23       MR. McGRATH: Yeah, briefly.
24

Page 161

1    REDIRECT EXAMINATION
2  BY MR. McGRATH:
3    Q.   Just some follow-up, Chief.  Again, as
4  far as the chronological events that took place,
5  there was an incident that you were made aware of
6  between Commander Austin and the sergeant on
7  July 15th, correct?
8    A.   Correct.
9    Q.   You had a brief conversation with
10 Commander Austin who told you that he
11 relieved Sergeant Berge of his duties that day,
12 correct?
13       MR. HERBERT: Objection.  Is he
14 testifying, or is the witness testifying?  This is
15 not cross-examination.
16       MR. KELLY: So, Mr. McGrath, form your
17 questions in the form of a question.
18 BY MR. McGRATH:
19   Q.   Did you get a brief synopsis from Austin
20 about what took place on July 15th?
21   A.   Yes.
22   Q.   And then you went through the incident
23 that you witnessed personally on July 18th,
24 correct?

Page 162

1    A.   Correct.
2    Q.   Then you called in --
3        MR. HERBERT: Objection.  He's got to
4  ask a question.
5  BY MR. McGRATH:
6    Q.   Did you set an appointment with Sergeant
7  Berge on --
8        MR. HERBERT: Objection.
9  BY MR. McGRATH:
10   Q.   -- the following Monday?
11       MR. HERBERT: Continuing line of
12 objection to leading.
13       MR. KELLY: Well, that question was, did
14 you set up an appointment.
15       MR. HERBERT: I didn't hear the "did,"
16 but...
17 BY THE WITNESS:
18   A.   Yes.
19   Q.   Because there was a number of questions
20 about Sergeant Berge not being aware of what the
21 charges or the allegations -- Again, Chief
22 Exhibit 4 --
23       MR. HERBERT: Can I see what that is,
24 please?  What is the purpose of showing him this

Page 163

1  document?  Are you impeaching him, or are you
2  refreshing his recollection?
3        MR. McGRATH: I haven't shown it to him
4  yet.
5  BY MR. McGRATH:
6    Q.   On July 20th when you met with Sergeant
7  Berge, did you apprise him -- or advise him of why
8  he was being placed on administrative leave?
9    A.   Yes.
10   Q.   And did that include --
11       MR. HERBERT: Objection -- Ask the
12 question.  Ask the leading question before I
13 object.
14 BY MR. McGRATH:
15   Q.   Did that include identifying specific
16 policies to Sergeant Berge of what you believe he
17 violated?
18       MR. HERBERT: Objection.
19       MR. KELLY: Overruled.
20 BY THE WITNESS:
21   A.   Yes.
22   Q.   And those policies have numbers assigned
23 to them, correct?
24   A.   Correct.

Page 164

1    Q.   And were those numbers included in the
2  notice that you gave him placing him on
3  administrative leave?
4    A.   Yes.
5    Q.   You were asked some questions about the
6  charges and the untruthful statements.  Do you
7  remember those questions from counsel?
8    A.   Yes.
9    Q.   Do you remember being asked about the
10 untruthful statement that Sergeant Berge didn't see
11 you by the courthouse?  Do you remember that line
12 of questioning?
13   A.   Yes.
14   Q.   When you were out by the courthouse and
15 Sergeant Berge was within two car lengths of you,
16 were you guys face to face?  Did you look at each
17 other?
18   A.   Yes.
19   Q.   Did you look at him, and did he look at
20 you?
21   A.   Yes.
22   Q.   Is that what we saw on the video?
23       MR. HERBERT: Objection -- Strike that.
24          Withdrawn.

DEFENDANTS 001820

**Board of Fire and Police Commissioners**
**City of Kankakee**

September 30, 2020

Page 165

BY MR. McGRATH:
1   Q.   Did the two of you look at each other?
2       MR. HERBERT: Objection.  The video
3   speaks for itself.
4       MR. KELLY: Sustained.
5
6   BY MR. McGRATH:
7   Q.   Do you have any question in your mind
8   that Sergeant Berge saw you when you faced him and
9   he faced you?
10  A.   No.
11  Q.   You were asked questions about, did he
12  hear you make statements at that time.  Do you
13  remember that --
14      MR. HERBERT: I'm sorry, Mike.  I'm
15  just --
16  BY MR. McGRATH:
17  Q.   Do you remember that line of
18  questioning?
19      MR. HERBERT: I'm just going to object
20  to vagueness because I don't know what he's
21  referring to.
22  BY MR. McGRATH:
23  Q.   When you were asked about the untruthful
24  statements, the Count 3, and you were asked to list

Page 166

1   them out without looking at the charges and the
2   second one you said --
3       MR. HERBERT: No, no.  He did look at
4   the charges.  He still couldn't do it.
5   BY MR. McGRATH:
6   Q.   You listed out the second one.  Is
7   that when you were asked about Sergeant Berge
8   didn't hear you make statements or comments, you
9   know, outside your vehicle by the courthouse,
10  correct?
11  A.   Yes.
12  Q.   And do you remember that line of
13  questioning?
14  A.   Yes.
15  Q.   Did you make statements, give directives
16  or orders to Sergeant Berge when you were outside
17  in that area when he was approximately 30 to
18  40 feet away from you?
19      MR. HERBERT: I'm going to object.  This
20  is improper.  It's beyond the scope of my questions
21  concerning that matter.  None of that is relevant
22  to whether or not he heard them.
23      MR. KELLY: Overruled.  You raised the
24  topic.  He's certainly entitled to inquire about

Page 167

1   the Chief's perspective.
2   BY THE WITNESS:
3   A.   Yes.
4   Q.   You made statements or comments to
5   Sergeant Berge about --
6       MR. HERBERT: Objection, asked and
7   answered.  He's testifying.
8       MR. KELLY: Overruled.
9   BY THE WITNESS:
10  A.   Yes.
11  Q.   And did Sergeant Berge respond to your
12  direct orders or your comments to him at that time?
13  A.   He responded by turning away and waving
14  his hand out.
15  Q.   Did he ever vocalize or verbally say
16  anything in response to what you ordered him to do?
17  A.   Not that I recall.
18  Q.   When you made those statements to him,
19  were you facing him and was he facing you?
20  A.   Yes.
21  Q.   And after you made those statements,
22  that's when he turned and waved his hand away from
23  you?
24      MR. HERBERT: I'm going to object to

Page 168

1   just vagueness because what statements are we
2   talking about?
3       MR. KELLY: Overruled.  It's clear what
4   we're talking about based on your cross-examination
5   of the Chief.
6   BY MR. McGRATH:
7   Q.   Specifically because there was a
8   question what statements did you make as you were
9   facing Sergeant Berge and he was facing you prior
10  to him brushing you off.
11      MR. HERBERT: I'm going to object.  This
12  is all argument of facts not in evidence, and he's
13  testifying for the witness.
14      MR. KELLY: Overruled.
15  BY MR. McGRATH:
16  Q.   Go ahead, Chief.
17      MR. HERBERT: That question can't be
18  answered legally, though, because it's assuming
19  these facts.  So I'm going to reiterate my
20  objection.
21      MR. KELLY: I believe those facts are in
22  evidence based on the Chief's testimony during
23  cross-examination.
24          Chief, you can answer the

DEFENDANTS 001821

Page 169

1 question.
2 BY THE WITNESS:
3    A.  I ordered him not to go in the front and
4 to go back to his car and leave the area.
5    Q.   And when you made that statement to him,
6 were you facing him and was he facing you?  Were
7 you looking at him?
8    A.  Yes.  But during that time, he, like,
9 turned -- waved and turned and walked away.
10    Q.  At the time that you made that
11 statement, were the marchers and the protesters, a
12 majority of them, in the front of the courthouse?
13    A.  Yes.
14    Q.  I didn't hear counsel ask you -- I heard
15 him ask you a lot of questions about
16 insubordination, but I didn't hear him ask you too
17 many questions about the direct orders that
18 Sergeant Berge didn't follow.  Did you give
19 Sergeant Berge direct orders on July 18th, 2020,
20 that were not followed by the sergeant?
21    A.  Yes.
22    Q.  And what were those orders?
23    A.  The first one was not to go up in front,
24 to go back to his car, and to leave the area.  The

Page 170

1 second one was to go back to the station, put his
2 gear away, and go home and he was relieved of duty
3 until 10:00 o'clock Monday morning.
4    Q.   And by the sergeant's failure to follow
5 those direct orders, would he be considered to be
6 based upon your definition of insubordination of
7 being failure to follow lawful orders?
8    A.  Yes.
9    Q.   As far as you saw in Commander Austin's
10 report, he suspected that Sergeant Berge might have
11 been intoxicated on July 15th, correct?
12    A.  Correct.
13    Q.   He was never requested to go for any
14 type of analysis on that date, correct?
15    A.  Correct.
16    Q.   He's not been charged with being
17 intoxicated on July 15th, correct?
18    A.  Correct.
19    Q.   But you heard Retired Sergeant Tyson
20 indicate how he behaved in the office, correct?
21    A.  Correct.
22    Q.   And just to be clear, the charges that
23 were brought up, those were prepared after you
24 received the To/Froms, you spoke with staff with

Page 171

1 your department, and after the formal interrogation
2 took place, correct?
3          MR. HERBERT: I'm going to object.
4          MR. KELLY: Overruled.
5 BY THE WITNESS:
6    A.  Correct.
7    Q.   The charges, Chief, in front of you,
8 what's the date that you signed off on the charges?
9          MR. HERBERT: I'm going to object.
10 That's improper.
11 BY MR. McGRATH:
12    Q.  Do you recall the date that the charges
13 were signed?
14          MR. HERBERT: After you just showed it
15 to him.
16 BY MR. McGRATH:
17    Q.  Do you recall?  Have you seen it?
18    A.  I seen it just now.
19    Q.  What was it?
20    A.  August 13th.
21    Q.  Of 2020, correct?
22    A.  Correct.
23          MR. McGRATH: Thank you, Chief.  That's
24 all I have.

Page 172

1          MR. KELLY: Any recross?
2          MR. HERBERT: Promise to be real brief.
3          RECROSS-EXAMINATION
4 BY MR. HERBERT:
5    Q.   You were asked a question about, did
6 that meet your definition of insubordination.  Do
7 you remember being asked that question?
8    A.  Yes.
9    Q.   You heard Commander Austin testify
10 two weeks ago today, I believe?
11    A.  Yes.
12    Q.   And he talked about his definition of
13 insubordination, correct?
14    A.  Yes.
15    Q.   Do you agree with his definition of
16 insubordination?
17    A.  I don't recall exactly, but I think I
18 have a simpler one and it's --
19    Q.   Let me give you some of the salient
20 points.  He testified that even in a nonmilitary --
21 I'm sorry -- even a nonsworn employee of the
22 Kankakee Police Department, they can be guilty of
23 insubordination as well, correct?  That's what he
24 testified to; does that sound right?

**Board of Fire and Police Commissioners**
**City of Kankakee**                                                    **September 30, 2020**

Page 173

1    A.    Yes.
2    Q.    You don't believe that, do you?
3    A.    Well, I think a civilian could if you're
4    a member of the department and you've disobeyed an
5    order.
6    Q.    How about when Commander Austin said
7    that if somebody is discourteous to somebody?  Does
8    that meet your definition of insubordination?
9    A.    No, I think there's other -- No, I
10   don't.
11   Q.    How about if somebody is curt with
12   somebody?  Does that meet your definition of
13   insubordination?
14   A.    No.
15   Q.    So your commander has a completely
16   different understanding of insubordination than you
17   do as a chief, correct?
18          MR. McGRATH: Objection, form of the
19   question, that misstates the evidence.
20          MR. KELLY: Sustained.
21   BY MR. HERBERT:
22   Q.    Your commander's understanding of
23   insubordination is not the same as your
24   understanding of insubordination, correct?

Page 174

1          MR. McGRATH: Objection, form of the
2    question.
3          MR. KELLY: Overruled.
4    BY THE WITNESS:
5    A.    Yes.
6          MR. HERBERT: Nothing else.
7          MR. McGRATH: Nothing based on that.
8          MR. KELLY: Commissioners, any questions
9    for the Chief?
10         CHAIRMAN DAVIS: I have one, at least
11   one.
12         MR. KELLY: Dr. Davis?
13         CHAIRMAN DAVIS: This whole thing about
14   insubordination has been beat around a lot.  What I
15   would like to know is:  According to the department
16   policy, is there a process, is it a one-step
17   process, or are there progressive processes if a
18   person is insubordinate?  Do you understand what
19   I'm asking?  Is it something that if I do it one
20   time, I get by with a suspension and the next time
21   it happens I can be terminated?  Is it progressive
22   discipline I guess is what I'm trying to understand
23   here?
24         THE WITNESS: There is progressive

Page 175

1    discipline until you hit a certain level, and
2    then -- Like, if I tell you to finish your report
3    tonight and you don't finish it tonight but you
4    finish it the first thing in the morning when you
5    come back to work, whatever, you probably can get
6    in trouble, but it might not be as serious as when
7    you're out in a situation, a tactical situation,
8    and you're ordered to guard a side of a building
9    and you walk away from doing that.  That would be
10   when safety is involved.  Any tactical operations,
11   it's a more serious situation for discipline.
12         CHAIRMAN DAVIS: So the determination
13   for serious --
14         THE WITNESS: It's all based on the
15   context.
16         CHAIRMAN DAVIS: The other question I
17   had was -- has to do with this time line that was
18   talked about a lot.  We did -- I guess I'm feeling
19   a little bit confused as to the time line, when the
20   interrogation took place and not -- I think the
21   attorney was making an issue that I didn't quite
22   get it.  I was sitting listening to it.  Was the
23   charges filed after the interrogation, before the
24   interrogation?  When were they filed?

Page 176

1          THE WITNESS: The charges with the board
2    are filed after the interrogation.
3          CHAIRMAN DAVIS: But dealing with the
4    sergeant, though, I guess, was that before?
5          THE WITNESS: I'm sorry?
6          CHAIRMAN DAVIS: When did the sergeant
7    know what he had been charged with?  After the
8    interrogation?
9          THE WITNESS: He knew he was being put
10   on administrative leave, and then there was the
11   interrogation.  And then there was the charges to
12   the board.
13         MR. KELLY: Dr. Davis, I think there's
14   three separate documents in the question here.  One
15   was Chief Exhibit No. 4, which is the
16   administrative leave order, and there was some
17   reference to the charges in that.  And there's
18   violations in that.  Then there was a notice of
19   interrogation on July 24th.  That also contains
20   some references to violations.  And then after the
21   interrogation is when the charges that you're
22   hearing tonight were filed.
23         CHAIRMAN DAVIS: Were actually filed?
24         MR. KELLY: Yeah.  So there's three

Page 177

1 separate documents that arguably apprised Sergeant
2 Berge of his violations.
3         CHAIRMAN DAVIS: Okay. That's what -- I
4 just want to be clear on that. Okay.
5         COMMISSIONER YATES: I have a question.
6 Are you done?
7         CHAIRMAN DAVIS: I'm done.
8         COMMISSIONER YATES: Back to this theme
9 about insubordination. In a paramilitary
10 organization, is that good or bad, insubordination?
11        THE WITNESS: Insubordination is bad.
12        COMMISSIONER YATES: Does it affect good
13 order and discipline?
14        THE WITNESS: Definitely does.
15        COMMISSIONER YATES: In what way?
16        THE WITNESS: It makes you ineffective
17 and inefficient if you can't give an order and have
18 someone follow that order to achieve THE purpose
19 that you, as a leader of the department, has as the
20 goal for the department.
21        COMMISSIONER YATES: If good order and
22 discipline has been affected, does that affect your
23 ability to do your job?
24        THE WITNESS: It would make it -- Since

Page 178

1 I'm being held accountable for what the police
2 department does, then if I can't have discipline or
3 be able to have that chain of command where you can
4 give an order and expect it to be followed, then
5 the whole system wouldn't work.
6         COMMISSIONER YATES: Thank you.
7         MR. KELLY: Any other commissioners,
8 questions? Any follow-up, Mr. McGrath or
9 Mr. Herbert?
10        MR. McGRATH: None for me.
11        MR. HERBERT: I have some. I'm going to
12 respectfully put an objection on the record that I
13 think it's inappropriate for a board member to try
14 and buttress the testimony of the Chief's witness
15 in this case if that didn't come out in testimony.
16 That was not clarifying questions. That was
17 questions designed to elicit information out of the
18 Chief that would be beneficial to terminating him.
19 So that's my objection.
20        MR. KELLY: You can put that on the
21 record. I disagree, and I will tell the
22 commissioners I think the commissioners have the
23 absolute right to ask those questions.
24        MR. HERBERT: And then I have a couple

Page 179

1 more questions.
2 BY MR. HERBERT:
3    Q.   You were asked questions about the
4 disciplinary system within the Kankakee Police
5 Department for officers, correct?
6    A.   Correct.
7    Q.   And it was talking about the progressive
8 discipline, correct?
9    A.   Correct.
10   Q.   And Kankakee follows the progressive
11 discipline policy, correct?
12   A.   Correct.
13   Q.   And it lists -- The department policy
14 lists various offenses and it gives it a
15 categorization such as a Level 1, 2, 3, 4, 5?
16   A.   No.
17   Q.   You're not familiar with that?
18   A.   No, it doesn't.
19   Q.   Okay. Are you familiar with the policy
20 that identifies certain misconduct as a Level 1,
21 Level 2, Level 3, Level 4, Level 5?
22        MR. McGRATH: I'm just going to object.
23 Since we bifurcated this hearing, I believe that
24 would be more in line for the second portion of the

Page 180

1 hearing.
2         MR. HERBERT: I disagree.
3         MR. KELLY: I'll overrule the objection.
4 I think given the questions about progressive
5 discipline by the commissioners, I think he's
6 entitled to follow up on that.
7 BY MR. HERBERT:
8    Q.   Do you remember the question?
9    A.   I removed those categories from the --
10 when I became chief. So they are not categorized
11 like that.
12   Q.   What did you remove? Did you remove the
13 entire policy?
14   A.   No. I just removed the categories.
15   Q.   Okay. Would it surprise you if those
16 categories are still listed in one of the policies?
17   A.   Yes.
18   Q.   I'm going to ask the board to take
19 judicial notice of several department policies.
20 And would it also surprise you that insubordination
21 is listed as a Level 2 offense in one of the
22 department policies?
23   A.   Yes.
24   Q.   That would surprise you?

**Board of Fire and Police Commissioners**
**City of Kankakee**

September 30, 2020

Page 181

1   A.   Because I thought I took those levels
2   off.
3   Q.   Okay.  When did you take those levels
4   off?
5   A.   The years are flying by.  I think maybe
6   at the beginning of the year.
7   Q.   The beginning of 2020?
8   A.   Somewhere in there or the end of 2019.
9   Q.   Do you know what policy -- the name of
10  the policy was that you got rid of?
11  A.   I didn't get rid of it.  It's standard
12  of conduct.  I took out the categories of the
13  discipline, those classifications.
14       MR. HERBERT: Thank you.  Nothing else.
15       COMMISSIONER BESSANT: I have a
16  question.
17       MR. McGRATH: I have nothing.  Thank
18  you.
19       MR. KELLY: Okay.
20       COMMISSIONER BESSANT: So we talked
21  about the discipline at the different levels that
22  you guys have and the categories and all of that.
23  Is it your discretion if something is more heinous
24  or more -- bigger or anything like that to say,

Page 182

1   hey, I feel like this is something that needs to
2   jump these steps?
3       THE WITNESS: Yes.
4       COMMISSIONER BESSANT: So you have the
5   right to say, hey, I understand that this isn't our
6   policy, but I feel like this is not safe or this is
7   not whatever, so we're going to go to one step
8   instead of the other, correct?
9       THE WITNESS: I missed the beginning
10  part of that second set.
11       COMMISSIONER BESSANT: Masks are hard.
12       In your position, you can say,
13  hey, you did X, Y, and Z, and the policy is
14  progressive.  You know, he keeps saying Level 1,
15  Level 2, Level 3, but you can say this is
16  especially heinous or this is more -- it's late,
17  sorry -- this is worse than typical; so I don't
18  necessarily have to take these steps, I can go
19  straight to whatever?
20       THE WITNESS: Correct.  And even when
21  there is the categories that were in there, there
22  was still a statement at the beginning of the
23  policy that it's the discretion of the chief of
24  police to whatever the punishment might be, if it

Page 183

1   fits whatever the policy violation might be.
2       COMMISSIONER BESSANT: And perhaps I
3   missed that.  How long have you been in law
4   enforcement?
5       THE WITNESS: It will be almost 36 years
6   now.
7       COMMISSIONER BESSANT: So it was -- You
8   took everything that you had into, hey, I think
9   this is the proper step to do?  There wasn't
10  anything -- I guess I can't figure -- You took all
11  of your knowledge and all of your experience and
12  everything and said, hey, this is what I think is
13  appropriate?  That's what you used in making your
14  decisions, right?
15       THE WITNESS: Correct.
16       COMMISSIONER BESSANT: Thank you.
17       MR. KELLY: Any additional?
18  BY MR. HERBERT:
19  Q.   You're governed by the Kankakee Police
20  Department policy with respect to the conduct of an
21  investigation, correct?
22  A.   Correct.
23  Q.   And you are required to follow a
24  progressive discipline system, correct?

Page 184

1   A.   Correct, but there is also some
2   discretion involved too.
3   Q.   Okay.  Is it your testimony that every
4   insubordination case warrants termination
5   regardless of the incident?
6   A.   No.
7   Q.   You take into account the individual
8   that is alleged to have committed insubordination,
9   correct?
10  A.   I don't know what you mean by "the
11  individual."
12  Q.   Well, you look to see if there's any
13  prior disciplinary history?
14  A.   Right.
15  Q.   And you look to see whether or not
16  they've committed the same offense and they've been
17  found guilty of committing the same offense in the
18  past, correct?
19  A.   It would be a review of, I guess, the
20  whole entire disciplinary actions that have been
21  taken in the past.
22  Q.   Did you do that in this case with Paul
23  Berge?
24  A.   I'm aware of previous, yes.

**Board of Fire and Police Commissioners**
**City of Kankakee**

September 30, 2020

Page 185

1    Q.    What about Paul Berge's insubordination
2    warrants termination as opposed to some other
3    insubordinate act?
4    A.    I'm trying to think of what I legally or
5    whatever that would be able to be brought up at
6    this because this is a bifurcated.  Are we supposed
7    to be talking about previous discipline?
8    Q.    No, no.  What about Paul Berge's act
9    that night warranted that -- the recommendation for
10   termination?
11   A.    That would be the day at the incident --
12   to me, it was a tactical situation -- and also
13   based on the previous just three -- couple days
14   before, in my opinion, was over insubordination
15   too.  So to me, it's very hazardous for me and
16   other supervisors on the department to have a
17   subordinate that is not going to be following
18   orders.
19   Q.    Right.  But you said that some
20   insubordination, it absolutely doesn't recommend
21   terminating?
22   A.    Correct.
23   Q.    You said that, correct?
24   A.    Correct.

Page 186

1    Q.    So when you were asked questions by the
2    board member about how insubordination, no matter
3    what, destroys the police department's ability to
4    conduct a proper paramilitary organization, it's
5    not all insubordination cases, right?
6    A.    It's not only insubordination, no.
7    Q.    It's not every -- Not every
8    insubordination case would destroy the police
9    department's ability to operate in a paramilitary
10   organization such as the questions you were asked?
11   A.    Every -- I guess I'll clarify.  Every
12   insubordination or act of insubordination is
13   unacceptable, but what the discipline in reference
14   to it would be determined by the seriousness of the
15   insubordination.
16   Q.    The seriousness of the act of
17   insubordination?
18   A.    Correct.
19   Q.    And what are the factors that make one
20   insubordination to a supervisor more serious than
21   another?
22   A.    Well, there's various acts, but one of
23   the major ones would be one in a tactical situation
24   or one in an administrative process.

Page 187

1    Q.    Okay.  Where it would affect the outcome
2    somehow, potentially dangerously, right, for the
3    officers?
4    A.    Yes.
5    Q.    And that would be a serious one,
6    correct?
7    A.    Yes.
8    Q.    Was anyone in the public hurt as a
9    result of Paul Berge disobeying your orders?
10   A.    No.
11   Q.    Was any officer's life placed in
12   jeopardy by Paul Berge disobeying your order?
13   A.    Could have.
14   Q.    I didn't ask you if it could have.  Was
15   it?
16   A.    No.
17   Q.    What about with him disobeying the
18   orders of Commander Austin?  Did any of those
19   alleged disobedient acts place an officer in
20   danger?
21   A.    No.
22   Q.    Did any of them place a citizen in
23   danger?
24   A.    No.

Page 188

1         MR. HERBERT: Nothing else.
2         MR. KELLY: Any additional questions of
3    the chief?
4         MR. McGRATH: Quick follow-up.
5              REDIRECT EXAMINATION
6    BY MR. McGRATH:
7    Q.    Obviously there's different levels of
8    insubordination.  You testified if somebody didn't
9    fill out a report within six hours and not until
10   the next day, it's insubordinate, but it's at a
11   lower level?  Is that what you're saying?
12   A.    Correct.
13   Q.    Is it a higher level if an officer
14   doesn't follow a direct order, a lawful direct
15   order from a superior officer?
16        MR. HERBERT: I'm going to object.  He's
17   rehabilitating his witness improperly here.  His
18   witness was just asked questions.  He can't try to
19   rehabilitate him through leading questions.
20        MR. KELLY: We'll sustain the objection.
21   I think the commission has heard the testimony on
22   insubordination and understands that there are
23   different levels of it and understands why the
24   Chief may or may not have at this point in time

**Board of Fire and Police Commissioners**
**City of Kankakee**
September 30, 2020

Page 189

1 taken it more serious.
2 MR. McGRATH: I agree. Nothing further.
3 MR. KELLY: Anything else?
4 So in terms of exhibits,
5 Chief's 3, 4, 5, and 6 have not yet been admitted.
6 MR. McGRATH: I don't have 5, I think.
7 Dan, you might have 5.
8 I would ask that they all be
9 admitted.
10 MR. KELLY: Any objection?
11 MR. HERBERT: Do you have them there?
12 If I can just look at them.
13 No objection.
14 What is 5, Mike?
15 MR. KELLY: 5 is the notice of
16 interrogation.
17 MR. HERBERT: That's right. I do have
18 that, I think. Here it is. Chief's 5, no objection.
19 MR. KELLY: So then on behalf of the
20 Chief, the commission has before it Exhibits 1, 2,
21 3, 4, 5, and 6, all admitted without objection.
22 MR. HERBERT: Correct.
23 MR. KELLY: Except No. 1, which was
24 admitted over objection, and that was the CAD

Page 190

1 report.
2 And what about Respondent's
3 No. 1, which is a memo regarding Commander Austin?
4 MR. HERBERT: Yes, I would like to get a
5 clean copy. If I can admit that, though.
6 MR. KELLY: Any objection, Mr. McGrath?
7 MR. McGRATH: I do object. What's the
8 relevance or purpose of putting in a report?
9 MR. HERBERT: The same as the relevance
10 and purpose of you putting in the reports.
11 MR. KELLY: I think the commission will
12 allow the admittance of Respondent's No. 1;
13 however, the commission will only give it the
14 weight that it deserves relative to the charges
15 before the commission. So that's all of the
16 objections.
17 Mr. McGrath, any additional
18 witnesses or evidence?
19 MR. McGRATH: No other exhibits or
20 witnesses. So at this time, the Chief would rest.
21 MR. KELLY: Mr. Herbert, what is your
22 case? Are you going to call witnesses or --
23 MR. HERBERT: I am going to call Paul
24 Berge for sure.

Page 191

1 MR. KELLY: And I expect his -- the
2 examination will be lengthy.
3 MR. HERBERT: His direct will be very
4 short. I don't know about the cross.
5 MR. KELLY: So conservatively another
6 hour of testimony. Does the commission want to
7 continue?
8 COMMISSION FLORES: Can we take a
9 five-minute break?
10 MR. HERBERT: Can I ask -- I'm sorry.
11 Assuming that we finish with Mr. Berge and I rest,
12 are we going to -- will we put it up for a vote or
13 do they vote?
14 MR. KELLY: Well, I was going to get to
15 that. After the conclusion of the evidence, we'll
16 ask each party if they want to make any closing
17 arguments, closing statements. And then the
18 commission is authorized by law to go to closed
19 session to deliberate on the evidence, and that
20 deliberation would involve the testimony that
21 you've heard and the exhibits that you've seen.
22 You get to consider those. And, again, you can
23 take as much time or as little time to do that as
24 you wish. You do have to give a full and fair

Page 192

1 hearing to the evidence. So if the -- and you're
2 also entitled to have the transcript of the hearing
3 if you want to review that, but that's going to
4 take some time. But we're going to have to get it
5 prepared. So at the conclusion of the testimony,
6 let's say that Sergeant Berge testifies and that's
7 done, both parties rest, both parties make their
8 closing arguments, the commission then can
9 deliberate and that again could take some time. So
10 are we talking another two or three hours tonight?
11 That's possible, but, again, the commission could
12 say, all right, we've heard the evidence, we want
13 to get the transcript, and then have another
14 meeting at which time we will deliberate on the
15 evidence.
16 CHAIRMAN DAVIS: That was the question.
17 I wanted to ask you: Could we hear all the
18 information, get all the evidence, and deliberate
19 it on a separate meeting from tonight?
20 MR. KELLY: You absolutely can, and I
21 would encourage you -- and I don't mean
22 encourage -- you are prohibited by law from
23 discussing it amongst yourselves between this
24 hearing, if it's concluded, and the next hearing at

**Board of Fire and Police Commissioners**
**City of Kankakee**                                            September 30, 2020

Page 193

1    which you deliberate.
2          CHAIRMAN DAVIS: I'm thinking that it
3    might take us a while to go through all of this and
4    past 12:00 o'clock. It's getting kind of late. We
5    can get quite drunk. You can only absorb so much
6    information. I don't know how the commissioners
7    feel, but would you be okay to go to another
8    meeting?
9          COMMISSIONER BESSANT: Can we first hear
10   all the testimony, and then at that time evaluate
11   depending on what time because he's saying it's not
12   supposed to be very late?
13         CHAIRMAN DAVIS: I'm okay with it.
14         COMMISSION BESSANT: Just kind of see
15   what that time looks like.
16         MR. KELLY: The only thing I will tell
17   the commission, I would encourage you to take as
18   much time as necessary. Certainly the career of a
19   police sergeant is on the line here, and you want
20   to give it the appropriate consideration. So take
21   as much time as you believe you need to deliberate
22   on this case.
23         CHAIRMAN DAVIS: What do you think?
24         COMMISSION LANDWEHR: I think

Page 194

1    deliberation should be a different day. It's
2    getting late, but we should finish with the
3    evidence. We've only got one witness.
4          CHAIRMAN DAVIS: Okay. Mario?
5          COMMISSIONER FLORES: Yeah.
6          CHAIRMAN DAVIS: You feel the same way.
7    So that will be the consensus. We'll get all the
8    information and the evidence that we have.
9          MR. KELLY: You want to take a short
10   break before Sergeant Berge is called?
11         MR. McGRATH: I apologize. I forgot the
12   flash drive with the video I would also ask to be
13   introduced as a Chief's exhibit, please.
14         MR. KELLY: We're going to make that
15   Chief's Exhibit 7.
16         MR. HERBERT: No objection.
17         CHAIRMAN DAVIS: Okay.
18         MR. KELLY: The other thing,
19   Mr. Herbert, the copy of the charges you gave me
20   was missing the last page. I don't know if it's
21   over there in your pages somewhere.
22         MR. HERBERT: I will get it during the
23   break.
24         MR. KELLY: Yeah. That's fine. Okay.

Page 195

1    So let's -- it's five minutes to 10:00, 9:55.
2    We'll go off the record.
3          (A short break was had.)
4          MR. KELLY: Let's go back on the record.
5    It's 10:05.
6          Mr. Herbert, it's your case.
7          MR. HERBERT: I'm going to at this time
8    call sergeant Paul Berge.
9          (Witness sworn.)
10   WHEREUPON:
11               PAUL BERGE,
12   called as a witness herein, having been first duly
13   sworn, was examined and testified as follows:
14         DIRECT EXAMINATION
15   BY MR. HERBERT:
16   Q.   Good evening, Paul. How are you?
17   A.   Good, sir. How are you?
18   Q.   Would you please introduce yourself to
19   the ladies and gentlemen of the commission?
20   A.   Paul Berge. Obviously I'm a sergeant
21   here at the police department. I've been on the
22   SWAT team. I'm on Mutual Aid. I'm on the field
23   force team.
24   Q.   Let me just break those up, if you don't

Page 196

1    mind.
2    A.   Yes, sir.
3    Q.   How do you spell your last name?
4    A.   B-E-R-G-E.
5    Q.   And how old are you, Paul?
6    A.   41.
7    Q.   And are you married?
8    A.   Yes, sir.
9    Q.   And do you have any children?
10   A.   Two stepkids and a daughter.
11   Q.   And what are their ages?
12   A.   My stepson is 17, just turned 17 over
13   the weekend, my stepdaughter is 15, and my daughter
14   is four.
15   Q.   And how long have you been married?
16   A.   I've been with my wife for almost
17   13 years, but we got married about a little over a
18   year ago finally.
19   Q.   And, Paul, did you go to college?
20   A.   Yes, sir.
21   Q.   Where did you go to college?
22   A.   I went to William Rainey Harper College,
23   which is in Palatine. I got my associate's degree
24   there, then I graduated from Olivet Nazarene

DEFENDANTS 001828

Page 197

1 University with a bachelor's.
2    Q.    With a bachelor's?
3    A.    Bachelor's degree, yes.
4    Q.    What year?  Do you remember what year
5 you graduated from --
6    A.    I believe 2006.
7    Q.    And just take a breath, and just let me
8 finish the question.  It's very common.
9             And after college -- or during
10 college, did you work at all?
11    A.    Yes, sir.
12    Q.    And tell me about that, please.
13    A.    I worked at Menards, the outdoor lot
14 driving forklifts, fulfilling people's orders.
15    Q.    And then how about after college?  What
16 did you do?
17    A.    I was hired my last semester of college
18 to go to the police academy.  So I went to my last
19 semester of college and the police academy at the
20 same time.
21    Q.    So you applied to be a Kankakee police
22 officer?
23    A.    Yes, sir.
24    Q.    And during that employment process, it's

Page 198

1 a fairly rigorous process; fair to say?
2    A.    Yes, sir.
3    Q.    And there's a lot more candidates than
4 there is positions normally?
5    A.    Yes, sir.
6    Q.    And there's a pretty significant vetting
7 process of all the candidates, correct?
8    A.    Yes, sir.
9    Q.    And it includes running your background,
10 correct?
11    A.    Yes, sir.
12    Q.    Interviewing your neighbors and prior
13 employers?
14    A.    Yes, sir.
15    Q.    And it includes looking at your prior
16 work history, correct?
17    A.    Yes, sir.
18    Q.    It includes psychological testing as
19 well?
20    A.    Yes, sir.
21    Q.    Physical testing?
22    A.    Yes, sir.
23    Q.    And you were chosen for [sic] the city
24 of Kankakee to be a police officer?

Page 199

1    A.    Yes, sir.
2    Q.    What year did you begin the academy?
3    A.    2000- -- early 2006, I believe.
4    Q.    Okay.  And you went through the academy.
5 And did you successfully complete the academy?
6    A.    Yes, sir.
7    Q.    And then where were you assigned after
8 that?
9    A.    I'm second shift, afternoon shift
10 patrol.
11    Q.    You were assigned to second watch right
12 out of the academy?
13    A.    Well, you go through an FTO phase with,
14 like, four weeks with each field training officer,
15 three phases of that, and then you're released to
16 be on your own.
17    Q.    You were released to be on your own; is
18 that correct?
19    A.    Yes, sir.
20    Q.    And that's because you successfully
21 completed all of your field training?
22    A.    Yes, sir.
23    Q.    And the evaluation process at the field
24 training program is how you act as a police

Page 200

1 officer, correct?
2    A.    Yes, sir.
3    Q.    How you deal with the public?
4    A.    Yes, sir.
5    Q.    How you handle orders, correct?
6    A.    Yes, sir.
7    Q.    And after passing that, tell us about
8 where you were assigned and how your job kind of
9 progressed through that?
10    A.    I started off with patrol.  I was there
11 for about five years.  After five years --
12    Q.    And patrol, I have a feeling everyone
13 knows; but just for the record, it's essentially
14 riding in the marked car with a uniform?
15    A.    Essentially it's proactive police work
16 and reactionary police work, going out there trying
17 to make contacts with the public, and also
18 answering various calls.
19    Q.    And tell me, how long did you do that
20 for?
21    A.    I did that for approximately five years.
22    Q.    Okay.  And did you have numerous
23 supervisors during that five-year time period?
24    A.    Yes, sir.

Board of Fire and Police Commissioners
City of Kankakee                                         September 30, 2020

Page 201

1    Q.    Okay.  And how did your job change after
2  that five-year period?
3    A.    I was assigned to the Kankakee Area
4  Metropolitan Enforcement Group, KAMEG, and I also
5  at that same exact time I tried out and I was
6  appointed to the SWAT team.
7    Q.    Okay.  And that was a very desirable
8  assignment?
9    A.    Yes, sir.
10   Q.    And it's an assignment that had to be
11  approved by the City of Kankakee, correct?
12   A.    Yes, sir.
13   Q.    And tell us about your duties when you
14  were there.
15   A.    Conducting drug investigations and also
16  being proactive on the street when it comes to
17  making contacts, trying to stop lower-level street
18  gun and drug crimes, and then taking those people
19  at the lower level and trying to progress through
20  case works and buys and search warrants to
21  higher-level targets.
22   Q.    Okay.  So dealing with a lot of drugs
23  and money and informants and things like that?
24   A.    Yes, sir.

Page 202

1    Q.    Fair to say that it would require an
2  officer with integrity in a position such as that?
3    A.    Yes, sir.
4    Q.    Was your integrity ever questioned in
5  any way during that assignment?
6    A.    No, sir.
7    Q.    And tell me about how your job changed,
8  if at all, after that assignment.
9    A.    After that assignment, I came back to
10  midnight shift as a patrolman.
11   Q.    And what year would that have been
12  approximately?
13   A.    Maybe seven years ago approximately.
14   Q.    And how did your job change or how long
15  did you do that before there was some change in
16  your job?
17   A.    Approximately two years I believe, and
18  then ultimately I was promoted to sergeant.
19   Q.    How did it change after two years?
20   A.    Just my promotion.  I stayed on the same
21  shift being promoted.  So just changing jobs.
22  Instead of going out there and answering the calls,
23  I was responsible for backup for my officers,
24  giving them advice, and checking their reports.

Page 203

1    Q.    And during your time period -- and is it
2  KAMEG?  Is that the acronym?
3    A.    Yes, sir.
4    Q.    Did you work with various supervisors in
5  that unit?
6    A.    Only two.
7    Q.    Okay.  And how about when you went to
8  midnights before you were promoted as sergeant?
9    A.    Yes.
10   Q.    Did you have different supervisors?
11   A.    Yes, sir.
12   Q.    And then the process of becoming a
13  sergeant, how is it that you became a sergeant?
14  What was the process?
15   A.    It's a testing process there's a written
16  examination and then also an oral portion of that.
17   Q.    Okay.  And was there a list that was
18  made as a result of those tests?
19   A.    Yes, sir.
20   Q.    And do you remember where you ranked on
21  the list?
22   A.    The list that I was promoted, I was
23  ranked No. 1.
24   Q.    Do you know how many people -- do they

Page 204

1  apply for a sergeant's position?  Is that how it
2  works?
3    A.    Yeah.  I mean, whoever volunteers as a
4  patrolman to take the sergeants' exam.  Any officer
5  can take it.
6    Q.    Do you know you were No. 1 out of how
7  many people that applied?  Do you have any idea?
8    A.    I can't recall, no.
9    Q.    And then you were then promoted to
10  sergeant?
11   A.    Yes, sir.
12   Q.    And did you receive any additional
13  training prior to your promotion to sergeant?
14   A.    I was promoted to sergeant, but then I
15  went to the supervisors school in Frankfort, the
16  Northwestern one.
17   Q.    And I'm going to show you a document
18  here that I'll mark as Respondent's No. 2?
19        MR. KELLY: 2?
20        MR. HERBERT: 2.  Thank you.
21        (Respondent's Exhibit No. 2
22         marked for identification.)
23  BY MR. HERBERT:
24   Q.    Take a look at that.  And is that the

Page 205

1 supervisory training program that you were
2 referring to when you testified?
3    A.   I believe so.  I mean, it was six years
4 ago or however long, but it looks appropriate.
5    Q.   And did you apply to go to that school?
6    A.   No, sir.
7    Q.   And did -- Were you sent there?
8    A.   I was assigned there, yes.
9    Q.   That's fine, if I can take that back
10 from you.
11          And you looked through the course
12 outline, and it looks to be the --
13    A.   Just the two cover sheets --
14    Q.   Just take a look --
15    A.   -- and the location.
16    Q.   Take a look at it, and tell me if that
17 is a true and accurate copy of the packet that you
18 were trained on.
19    A.   I mean, it appears to be accurate.
20          MR. HERBERT: I'm going to ask that this
21 be admitted into evidence.
22          MR. McGRATH: No objection.
23          MR. KELLY: Okay.  Exhibit No. 2 is
24 admitted without objection.

Page 206

1 BY MR. HERBERT:
2    Q.   How long was that training program?
3    A.   That was a week-long course.
4    Q.   And you were in there with other
5 supervisors from other departments?
6    A.   Yes, sir.
7    Q.   And tell me about your career as a
8 sergeant.  Tell me about the job assignments that
9 you had from initial assignment to --
10    A.   I was just on the midnight shift
11 initially, and then eventually there was a day
12 shift opening.  So I applied for it.  One of my --
13 Actually, a couple of my supervisors said I could
14 probably need a break from midnights because I went
15 through some personal things in my life and said it
16 would probably be good to see the light of day
17 instead of working all night.
18    Q.   And during that time period, did you
19 work in that capacity up until the result of the
20 charges filed in this case?
21    A.   Yes, sir.
22    Q.   And during that time period, did you
23 also have various supervisors within the city of
24 Kankakee?

Page 207

1    A.   Yes, sir.
2    Q.   Let's direct your attention to
3 July 18th.  On that date -- or I'm sorry.
4 July 15th.  On that date, you were involved in an
5 incident with Commander Austin, correct?
6    A.   Yes, sir.
7    Q.   Tell us -- Tell the ladies and gentlemen
8 of the commission -- Tell us what happened with
9 that incident and if you want to explain the
10 beginning of it, however you want to describe the
11 incident.
12    A.   To start off, it was at the end of our
13 shift.
14    Q.   I'm sorry, Paul.  I didn't ask a very
15 good question.  The end of your shift -- So we're
16 talking July 15th, correct?
17    A.   July 15th, yes, sir.
18    Q.   And during that -- on July 15th, what
19 time did you start work that day?  Do you know?
20    A.   5:45.  We get there a little earlier.
21 We have pre-shift stuff we have to do, but we start
22 our shift at 5:45.
23    Q.   5:45 a.m.?
24    A.   Yes, sir.

Page 208

1    Q.   What were your job duties on that day?
2    A.   Just to back up the patrolmen if they
3 needed extra help doing whatever, if they had
4 questions, and also correcting paperwork, checking
5 reports.
6    Q.   Did you have any specific job duties
7 assigned to you by Commander Austin on that day?
8    A.   No, sir.
9    Q.   Tell us what happened in the sergeants'
10 office.  Or strike that.
11          Before I get to that, during the
12 day, was there anything unusual about the day or
13 was it a rather routine day as a sergeant?
14    A.   It was -- I mean, as far as work-wise,
15 it was pretty routine.  I mean --
16    Q.   Right.  We're going to get to that
17 episode.
18    A.   Yeah.  I'm just saying that that day I
19 actually took two gentlemen back to the police
20 station on separate occasions.  One of them I
21 washed the squad car with, and the other gentleman
22 we actually washed my truck with just to get to
23 know them.  They were some homeless guys.
24    Q.   And did you know these homeless guys

Page 209

1  prior to that?
2      A.   I've been trying to build a relationship
3  with them.  When I first came to day shift, they
4  were considered a problem being in the downtown
5  area and I didn't consider the way some officers
6  treated them very appropriately.  They would get
7  negative responses from them.  So I basically
8  started just waving at them.  At first they
9  wouldn't start waving at me; but after a period of
10 time, I'd actually stop and roll my window down and
11 make them wave at me.
12     Q.   Why did you take such an interest in
13 that?
14     A.    Just trying to build a relationship with
15 them just so they understand that, listen, we're
16 not -- police officers, we're -- I'm not out here
17 to, you know, try to get you in trouble.  I'm out
18 here to try to help you.  You know, it was --
19     Q.   And those two individuals that you did
20 this special act with as far as you didn't arrest
21 them, it was, like, an alternative action with
22 them?
23     A.   Yes.  I mean, I spent, you know,
24 multiple months trying to deal with them.  You

Page 210

1  know, like a couple times the guys were getting
2  loud or things like that, you know, they were
3  removed by officers and I would come up to them and
4  I would try to talk to them.  I started off by
5  giving them protein bars, you know, and just
6  letting them be, you know, and then progressively I
7  started buying them lunch, things like that.
8      Q.    And were these homeless people in one
9  particular area normally, or were they kind of all
10 over the city?
11     A.    For my shift, they were considered the
12 problem right downtown, like, Station Street and
13 Schuyler, a few blocks north and a few blocks south
14 of that is where it was considered an issue.
15     Q.    And when you established this rapport
16 with them and provided them some alternative
17 opportunities, did you feel pretty good about that
18 as a police officer?
19     A.    I did.  I felt like it was making the
20 actual progress with them.  I mean, these guys,
21 they moved over a block away from the downtown
22 area.  You know, I was able to sit down and talk
23 with them.  I actually prayed with them a few times
24 just trying to build a rapport with them, just

Page 211

1  treat them decently like humans when most people
2  consider they're homeless and, you know, they want
3  them to go hide and things like that.  They're
4  still citizens.  They just have issues in life.
5  They have mental problems, drug problems,
6  alcoholism.  I'm just trying to give them some
7  self-worth.
8      Q.    Okay.  And did that experience play any
9  role into your encounter with Commander Austin on
10 July 15th?
11     A.   I believe it probably did, yes, sir.
12     Q.   Tell us about what happened.
13     A.   It was the end of our shift.  Commander
14 Austin came into our office.  He was asking me
15 about the homeless people at the intersection.  I
16 believe it's Hickory and Dearborn.  I thought it
17 was an abandoned church.  People say it's an
18 abandoned funeral home.  It's a spot for them to
19 sit and just hang out.  There's shade.  It's hot
20 out during the summertime.  You know, there was
21 times when they would be hanging out there, I would
22 just drive by and they would get up and walk away.
23 I'd try coming back.  Where did you guys go?
24     Q.    So let's go back to -- or focus more on

Page 212

1  the interaction with Commander Austin.
2      A.   Yes, sir.  He came in, and he basically
3  said that we received complaints about them hanging
4  out at that certain location and that I was to give
5  them City ordinance tickets for open alcohol.
6      Q.    And, Paul, if I can stop you there.  Is
7  this at the end of the tour in the sergeants'
8  office?
9      A.   Yes, sir, when Commander Austin first
10 came in the door.
11     Q.    And you heard that testimony about how
12 he -- you were -- Well, you were sleeping and/or
13 drunk or intoxicated.  Were you intoxicated?
14     A.   No, sir.
15     Q.   Have you ever been intoxicated on duty?
16     A.   No, sir.
17     Q.   Were you sleeping?
18     A.   No, sir.
19     Q.   What happened?
20     A.    Well, when Commander Austin told me that
21 I'm to write them City ordinance tickets for open
22 alcohol, I said, Well, they're homeless.  They
23 don't have jobs.  I'm not going to write them City
24 ordinance tickets for alcohol.  They don't pay them

Page 213

1 anyway, plus that doesn't continue to build a
2 relationship with them. It just makes them feel
3 like we're out there trying to hammer them.
4 Q. What was Commander Austin's reaction to
5 that?
6 A. He became pretty enraged with me.
7 Actually, he was kind of like how dare I even
8 question what he was telling me.
9 Q. Well, why didn't you just say, Okay,
10 Commander. I'm going to go write these homeless
11 people ordinance tickets?
12 A. Because I'm trying to change the way
13 that we deal with people in the streets,
14 alternatives to just going out there and enforcing
15 people with fines and arrests and things like that.
16 Q. And the ordinance tickets, the people
17 that he was asking you to write ordinance
18 violations to, do you have any reason to believe
19 that they would pay those tickets?
20 A. No, sir. They don't have jobs. So I
21 believe just basically ruining a relationship with
22 them, and there's not going to be any outcome of,
23 you know, having them paying the ticket. It's just
24 going to be a negative reaction that they're going

Page 214

1 to have with us.
2 Q. And as far as in the Kankakee Police
3 Department when you were a police officer and then
4 as a sergeant, were you allowed to give your input
5 on different areas of concern in the community and
6 different alternatives to policing?
7 A. Yes, sir.
8 Q. And is that what you were doing when you
9 spoke to Commander Austin?
10 A. Yes, sir.
11 Q. Had you done that with any other
12 supervisors?
13 A. I've done that with all of my
14 supervisors having had discussions about issues
15 that we're dealing with and trying to find the best
16 solution for things.
17 Q. How about, like, the patrol officers
18 that worked for you? Did you ever tell somebody to
19 do something and they said, you know, that's not
20 the best alternative?
21 A. Yes, sir.
22 Q. And what did you do in those situations?
23 A. Have a discussion about it and come to
24 some sort of positive direction we can take the

Page 215

1 situation.
2 Q. Is that your understanding what the
3 Kankakee Police Department is supposed to be
4 operating under?
5 A. Yes, sir.
6 Q. It's in their policies, correct?
7 A. Yes, sir.
8 Q. And it certainly was in the training
9 that you had with supervisor training program,
10 correct?
11 MR. McGRATH: Objection, foundation.
12 It's not in evidence.
13 MR. HERBERT: It is in evidence. We
14 just put it in.
15 MR. McGRATH: Do you have an outline of
16 the training?
17 MR. HERBERT: That's what we're
18 referring to.
19 MR. KELLY: I'll overrule the objection.
20 You can ask.
21 BY MR. HERBERT:
22 Q. So Commander Austin, you said that he
23 became -- I don't know the word you used.
24 A. He immediately became enraged, and I

Page 216

1 know there's been reference to the sexual
2 harassment part of it.
3 Q. Well, let's -- Yeah, let's just focus on
4 what you saw with respect to Commander Austin.
5 A. He just became enraged and started
6 getting loud with me, and it was kind of like how
7 dare I question him and what he's telling us to do
8 and -- you know.
9 Q. And what happened next?
10 A. Well, he was standing there. He put
11 his -- He had his foot up on the chair.
12 Q. Where was his foot up on the chair in
13 relation to where you were sitting?
14 A. Across the desk. So I mean, I was
15 sitting here like this. I had my feet up, I mean,
16 just relaxing. That's how we usually do --
17 Q. Can you demonstrate for the ladies and
18 gentlemen of the board kind of -- maybe if I'm
19 sitting -- if I'm you in that chair, can you
20 demonstrate what Commander Austin did?
21 A. Well, there's a chair right here, and he
22 had his foot up on the chair. I forget which one.
23 I think it was like this. As soon as I said that I
24 wasn't going to write them City ordinance tickets,

DEFENDANTS 001833

Page 217

1  he had his foot on the chair and he kind of tried
2  sticking his crotch.  He was, like, posturing on
3  me.
4     Q.  If you can turn around and show that to
5  the board.  How far away was his crotch from your
6  face?
7     A.  I mean, it was approximately from here
8  to there, but he was like -- he's staring at me.
9  And I was just like, I didn't really know what was
10 going on.
11    Q.  So would you say from here to here --
12    A.  Here there's a wall.  So he was like
13 this.
14    Q.  Just let me finish.
15        MR. McGRATH:  Would you agree that --
16 BY MR. HERBERT:
17    Q.  Were you saying this table or both
18 tables?
19    A.  Both tables approximately.
20    Q.  Both tables?
21    A.  Approximately.
22        MR. HERBERT:  Four, three, two and a
23 half feet for the record.
24        MR. McGRATH:  Three.

Page 218

1  BY MR. HERBERT:
2     Q.  You can have a seat.
3         So when the commander did that,
4  what was your reaction?
5     A.  I didn't know.  I didn't know what was
6  going on.  I was pretty confused.
7     Q.  Did you take it as a sign of aggression?
8     A.  Yes, sir, I did.
9     Q.  And that was based on what, his body
10 language?
11    A.  His body language, his eyes, his loud --
12 voice got loud with me, I mean, almost immediately.
13    Q.  Had the supervisor ever done that to you
14 in the past?
15    A.  No, sir.
16    Q.  So what happened next?
17    A.  Then before I could do anything else or
18 say anything, he says I'm relieved of my duty.
19 Now, all I said was I'm not writing these homeless
20 people City ordinance tickets, and all of a sudden
21 he's becoming loud with me and aggressive and
22 saying I'm relieved of my duty.  I was like,
23 relieved of my duty.  I'm sitting here talking
24 and --

Page 219

1     Q.  So what happened next then?
2     A.  I actually -- because I was confused, I
3  closed my eyes and I said an Our Father prayer in
4  my head just to kind of, okay, is this really going
5  on?
6     Q.  And what do you mean by, Is this really
7  going on?
8     A.  Is his reaction actually really
9  happening over I'm not going to write City
10 ordinance tickets to homeless people?  Like, it
11 didn't make any sense at all.  It was --
12    Q.  Were you put in fear in any way?
13    A.  I was nervous.  I actually felt like he
14 wanted to fight me.  I mean, it was -- it felt like
15 he was trying to get a reaction from me.
16    Q.  Okay.  So you closed your eyes and said
17 an Our Father?
18    A.  An Our Father, yes, sir.
19    Q.  What happened next?
20    A.  He said, Paul, Paul, Paul.  And he
21 knocked on the desk, and I opened my eyes.  And I
22 said, Yeah?  He said, You fell asleep.  I'm like,
23 I'm just tired.  I wasn't tired.  I was just -- You
24 fell asleep.  Well, no, I didn't fall asleep, but

Page 220

1  okay.  I'm just tired, you know, but that -- me
2  closing my eyes, it stopped him from getting loud
3  with me.
4     Q.  What happened next?
5     A.  At some point, Officer Klopp came in to
6  start his shift and then he left.  And as he left,
7  he ended up closing the door to the sergeants'
8  office.  Sergeant Tyson was still in there.  And
9  then when Sergeant Tyson got up to go do his shift
10 briefing, that's when I got out of my seat and had
11 got closer to Commander Austin.
12    Q.  Why did you get out of your seat?
13    A.  Because I was actually afraid that he
14 was going to punch me.  It was absolutely a
15 ridiculous, ridiculous moment.
16    Q.  What about being sitting down in a chair
17 gave you trepidation in any way about being
18 punched?
19    A.  I have a background in wrestling.  So I
20 don't want to have any distance because I don't box
21 anybody; but if I'm close to you, you can't wind up
22 and hit me and I can hold onto you.
23    Q.  And when you got out of your chair, did
24 you do it in a way to intimidate the commander?

Page 221

1    A.  No, sir.  He was the one trying to
2  intimidate me.  So --
3    Q.  Did you do it in a way to be
4  discourteous?
5    A.  No, sir.  I was just doing it in a way
6  to protect myself.
7    Q.  And what happened next?
8    A.  Eventually Sergeant Klopp came back in.
9  I sat back down, and, you know, he said I'm
10  relieved of my duty again.  And I'm like, This is
11  the most ridiculous thing I've been a part of.
12    Q.  Did he give you an explanation as to why
13  you were being relieved of your duty?
14    A.  No, sir.
15    Q.  Do you remember hearing stuff about a
16  phone ringing?
17    A.  I remember hearing stuff.  I testified
18  that I don't recall doing that.
19    Q.  Answering the phone?
20    A.  Yes, sir.
21    Q.  What else do you remember happening
22  during that incident other than what you've
23  testified to?
24    A.  I remember Commander Austin telling me

Page 222

1  I'm relieved of my duty and to go to his office.  I
2  said, I'm not going to your office because I --
3    Q.  Why didn't you go to his office when he
4  told you to go to his office?
5    A.  Because he was being so loud with me
6  that I didn't want him to bait me into something,
7  and I kind of thought that he was, like, trying to
8  set me up for something.  I don't know.  It was
9  absolutely ridiculous.
10    Q.  Were you afraid for your -- Were you
11  afraid physically to go into an office with the
12  commander at that point?
13    A.  Yes, sir.  I wasn't going to go into an
14  office with him.
15    Q.  And then what happens next?
16    A.  Eventually Sergeant Klopp came in.  Once
17  again, he said, You're relieved of your duty.  And
18  I sat there, I thought about it, and eventually I
19  got up and I left.
20    Q.  How long do you think it was that you
21  left after he told you to leave?
22    A.  After the initial time?  I mean, I don't
23  know.  A few minutes.
24    Q.  Okay.

Page 223

1    A.  Two minutes, three minutes, not long.
2    Q.  After the first time that he told you to
3  leave, why didn't you just jump up, grab your
4  stuff, and run out of the office?
5    A.  Because I didn't understand why I was
6  being relieved of my duty for saying I was not
7  going to write homeless people City ordinance
8  tickets.
9    Q.  Let's fast-forward then.  Let's go three
10  days further.  As a result of that incident, you
11  were not relieved of your duty in any way, correct?
12    A.  No, sir.  No one even talked to me about
13  it.
14    Q.  You were allowed to go to work without
15  any restrictions, correct?
16    A.  Yes, sir.
17    Q.  You were allowed to continue supervising
18  your -- the police officers below you, correct?
19    A.  Yes, sir.
20    Q.  And tell us about July 18th.  What shift
21  were you working?
22    A.  Day shift.
23    Q.  And what time did you start that day?
24    A.  5:45 again, sir.

Page 224

1    Q.  Do you remember if you had any specific
2  duties that day?
3    A.  Just the normal supervisor day.
4    Q.  And when you're a supervisor, do you
5  have any specific areas that you're assigned to or
6  is it the entire city?
7    A.  Just the entire city.
8    Q.  How about the police officers that work
9  for you?  Are they assigned to --
10    A.  Yes, sir, they have geographical beats.
11    Q.  And did you have any specific duties
12  that day?  And I apologize if I asked that
13  question.
14    A.  Just as being a supervisor, backing my
15  guys up, and answering questions they had, checking
16  reports, paperwork.
17    Q.  Did you have any restrictions as to your
18  duty that day?
19    A.  No, sir.
20    Q.  Did you have any direction as to places
21  that you were supposed to go and places that you
22  were not supposed to go?
23    A.  No, sir.
24    Q.  And tell us what happened during that

**Board of Fire and Police Commissioners**
**City of Kankakee**

September 30, 2020

Page 225

1 day, and we can just -- I don't know if anything
2 relevant happened prior to the interaction with
3 Chief Kosman, but --
4 A. There was obviously that protest. I
5 didn't even go by it because I've been involved in
6 larger, previous protests with big groups of
7 people, you know, starting in Bourbonnais, coming
8 all the way to Kankakee, and back into Bourbonnais.
9 Q. Were you aware of the protests -- I
10 mean, was it talked about, like, at roll call?
11 A. Yeah, I was aware there was one
12 scheduled for the day.
13 Q. So tell us about your involvement.
14 A. It started -- I can't remember what time
15 it started. I just drove by to be curious, and I
16 saw that it was all just a bunch of children. And
17 I was like, you know, they're kids.
18 Q. When you say children and kids, what do
19 you mean? How old?
20 A. Children. I don't know. Young kids,
21 young kids. I mean, not high school kids. You
22 know, maybe not even junior high kids. Little
23 kids, like -- you know. So --
24 Q. And they were involved in this protest?

Page 226

1 A. Yes, sir.
2 Q. And were there any adults involved?
3 A. Yes, sir.
4 Q. And approximately how many people were
5 involved? How many were children? How many were
6 adults?
7 A. Probably 15 or 20 people. It wasn't a
8 very big group.
9 Q. And tell us about what happened at the
10 protest.
11 A. The first time, the group stopped at
12 East and Station. I actually pulled into a parking
13 lot on the southeast corner. I got out of my car,
14 and actually I clapped for the kids and said, Good
15 job, kids. Support your kids. Support the
16 children. And the kids were waving at me and
17 smiling. And, actually, one of the cars that was a
18 minivan that was following, the two people in that
19 car actually acknowledged me and waved at me also.
20 Q. And then what happened?
21 A. Then the protests continued. They
22 stopped at the intersection of Merchant and
23 Dearborn. They were standing around. And, you
24 know, I obviously want kids who are going to be

Page 227

1 growing up in this community to have a positive
2 outlook on police officers, you know. And whatever
3 your political thoughts are and things like that,
4 these are children. It's hard enough to be
5 children today. So when they were stopped, I
6 parked my car. I actually took off my outer vest
7 because the whole narrative of being not so scary
8 looking, not so militarized, or, you know, kind of
9 gave a softer look to them. So I took that off.
10 There is a half wall right by the Daily Journal on
11 the northeast corner. I jumped up there. And as
12 the kids were passing, I was waving at them. And I
13 said, Hey, kids, you want to see the inside of a
14 police car? Do you want to see how the lights
15 work? And there was actually --
16 Q. When you said that, were you threatening
17 to put them in the squad car in any way?
18 A. No. I was like, Do you want to see how
19 the lights work? All kids like to watch police
20 lights.
21 Q. Did any kids appear to be concerned
22 about anything you were saying to them?
23 A. No, sir.
24 Q. Any adult appear to be concerned about

Page 228

1 any of your --
2 A. No, sir. There was a woman who was
3 marching in it who acknowledged me. Again, she
4 said, We'll do it after, which I'm assuming
5 referring to showing the kids the police lights at
6 Bird Park.
7 Q. And then what happens? Do you go to
8 Bird Park?
9 A. No, sir. The protestors continued to
10 the courthouse.
11 Q. And then what happened?
12 A. I followed up, and I was going to go sit
13 with the children.
14 Q. What do you mean you followed up? Did
15 you get back in your car?
16 A. I got back in my car, and I followed
17 along. And I parked, as you can see, on that
18 circle drive.
19 Q. And then what happened?
20 A. I got out of my car to approach the
21 kids. I walked up to Travis Miller. I didn't say
22 anything to him. He said, What's up? I stuck my
23 hand out, I shook his hand, and then I continued to
24 go walk towards the kids to go just interact with

**Schelli Reporting Service, Ltd.**
**(312) 558-1113**

DEFENDANTS 001836

Page 229

1  them.  At that point, Sergeant Miller got my
2  attention and said that Chief Kosman didn't want me
3  going over there.  I was like, Why does he not want
4  me going over there?  It didn't make sense, but --
5      Q.   Why were you -- Your intention to go
6  over there was what, to just interact with the
7  peaceful protesters?
8      A.   If they wanted to talk -- Yeah, if they
9  wanted to talk with me, they could.  Just sit next
10  to them and just show them that we're not scary.
11  We're not out -- you know, we're with you guys.
12  This is all -- We're all in this together.
13      Q.   Prior to you having this interaction
14  with Sergeant Miller --
15      A.   Yes, sir.
16      Q.   -- did you ever -- did you ever -- were
17  you ever confronted by the Chief?
18      A.   No, sir.
19      Q.   Did you ever hear the Chief say anything
20  to you?
21      A.   No, sir.
22      Q.   Did you see the Chief?
23      A.   No, sir.
24      Q.   What -- So Sergeant Miller tells you,

Page 230

1  Chief wants you not to go over there?
2      A.   The Chief doesn't want you over there.
3  So I was like, Okay.  I said, Good job, kids.  And
4  I was walking back to my car.
5      Q.   Then what happened?
6      A.   That's when the Chief confronted me and
7  he was being loud with me, telling me he was giving
8  me orders and this and that.  I was like, What
9  orders?  I didn't hear any orders.  So I continued
10  back to my car, and that's when he was telling me,
11  I told you I didn't want you going by the kids and,
12  you know, you're acting weird and this and that.
13  I'm like, You can't tell me that.  I'm like, That's
14  unethical and immoral.  I'm like, They're children.
15  Why don't you want me going by the children?
16  And --
17      Q.   Did you notice any signs of violence
18  that was about to erupt with this protest?
19      A.   No, sir.  They were kids.  I mean, no.
20      Q.   When the Chief told you that, did you
21  think that the Chief had mis- -- either
22  misunderstood what was going on or didn't have an
23  accurate view of what was happening?
24      A.   Yes, sir.

Page 231

1      Q.   And what happened then?
2      A.   He said, Go home.  You're suspended.
3  Suspended?  Why?  What?  I was like, What are you
4  talking about?  This is --
5      Q.   Now, this is three days after you had
6  just been told to go home by Commander Austin,
7  correct?
8      A.   Yes, sir.
9      Q.   Had you ever been told to go home by a
10  supervisor in the -- during your shift prior to
11  this incident?
12      A.   No, sir.
13      Q.   Were you a little surprised at being
14  told now for a second time to go home?
15      A.   Yes, sir.
16      Q.   And were you clear as to what the
17  Chief's rationale was for why he wanted you to go
18  home?
19      A.   No, sir.
20      Q.   You can tell he was kind of upset?
21      A.   He was just -- Yeah, he was upset with
22  me.
23      Q.   And did you have any reason to know at
24  that point what it was that he was upset about?

Page 232

1      A.   No, sir.
2      Q.   So is that part of the reason why you
3  didn't -- Or strike that.
4           Why didn't you just -- When the
5  Chief said go home, why didn't you just run to your
6  car and drive home?
7      A.   I was trying to get clarification,
8  figure out what was going on, and also Lieutenant
9  Passwater, he was my direct supervisor that day.
10  So he kind of needed to know what's going on and
11  what the situation was.
12      Q.   What were your thoughts after now being
13  told to go home a second time by a supervisor?
14  Were -- What were your feelings?
15      A.   Honestly I was pretty confused.  I
16  didn't know what to think.  I didn't know what the
17  issue was.  I don't know.  It was -- I'd never
18  dealt with any of this in my entire career.
19      Q.   You were interrogated in this matter?
20      A.   Yes, sir.
21      Q.   Did you give truthful answers to the
22  best of your ability in that case?
23      A.   Yes, sir.
24      Q.   Did you give any willful false testimony

DEFENDANTS 001837

Page 233

1  in that case?
2     A.   No, sir.
3          MR. HERBERT: Nothing further.
4          MR. KELLY: Cross?
5              CROSS-EXAMINATION
6  BY MR. McGRATH:
7     Q.   Good evening, Sergeant.
8              When you were hired with this
9  department, you were given copies of the policies
10 and procedures, correct?
11    A.   Yes, sir.
12    Q.   And you acknowledge that you have to
13 know the policy and procedures and follow the
14 policies and procedures?
15    A.   Yes, sir.
16    Q.   And you're given updates, supplements to
17 any changes to the policies and procedures,
18 correct?
19    A.   Yes, sir.
20    Q.   You're aware that under Policy 34- --
21 341.3.5, performance, so paragraph F reads that
22 disobedience or insubordination to constitute
23 authorities, including refusal or deliberate
24 failure to carry out or follow lawful directives

Page 234

1  and orders from any supervisor or person in a
2  position of authority?  You're familiar with that
3  language, correct?
4     A.   If that's what the policy says, it's
5  what it says.
6     Q.   Are you questioning I read it wrong?
7     A.   No, sir.
8     Q.   But you're aware that there's a
9  hierarchy within the police department here at
10 Kankakee?
11    A.   Yes, sir.
12    Q.   The Chief is the top dog?  He's the head
13 of the department?
14    A.   He does a different job than everybody
15 else does.
16    Q.   He's the head of the department?
17    A.   If you want to look at the hierarchy,
18 yes, sir.
19    Q.   I want to ask you:  Is that the
20 hierarchy of the department --
21         MR. HERBERT: Objection.
22 BY MR. McGRATH:
23    Q.   -- that the Chief is the top of the
24 department?

Page 235

1          MR. HERBERT: Objection.  It's been
2  asked and answered, vagueness as to head, top.
3          MR. KELLY: Sustained.
4  BY MR. McGRATH:
5     Q.   Is the Chief the ultimate, top authority
6  within the Kankakee Police Department?
7          MR. HERBERT: Again, I'm going to
8  object.
9          MR. KELLY: Overruled.
10 BY THE WITNESS:
11    A.   As far as -- I'm confused by the
12 question.
13    Q.   You give me the rank of the hierarchy of
14 the Kankakee Police Department from the top who has
15 the most authority and down.  Tell us your
16 understanding based upon all your years with this
17 department.
18    A.   The most authority, sir, we always just
19 do different jobs for the police department.  It's
20 a team effort.  But if you want to go through the
21 hierarchy, it goes the chief, deputy chief, there's
22 two commanders, and then there's lieutenants and
23 sergeants and patrolmen.
24    Q.   Who sets the policies of the department?

Page 236

1  Who signs off on them?
2     A.   We have a Lexipol system that is kind of
3  gone over by attorneys, and there is a person who's
4  in charge of the KOLEA system and also Lexipol.  So
5  I don't know who signs off on the policies because
6  we have attorneys that go through our policies.  So
7  it's kind of like they're the ones who sign off on
8  it.
9     Q.   Where are the attorneys for the City?
10         MR. HERBERT: Objection.
11 BY THE WITNESS:
12    A.   From Lexipol.
13         MR. HERBERT: Objection.
14 BY MR. McGRATH:
15    Q.   So the attorneys for Lexipol set the
16 policies --
17         MR. HERBERT: Hold on, Paul.  You just
18 got to let me -- Objection.  What does this have to
19 do with anything, the attorneys for the policy?
20         MR. KELLY: I think he's trying to
21 ascertain --
22         MR. HERBERT: We will stipulate --
23         MR. McGRATH: The hierarchy.  No, I
24 don't want to stipulate.

**Board of Fire and Police Commissioners**
**City of Kankakee**

**September 30, 2020**

Page 237

1     MR. HERBERT: Let me finish, please.
2     MR. McGRATH: I'm not willing to
3  stipulate. I want the testimony.
4     MR. HERBERT: You're asking him vague
5  questions. We will stipulate to the hierarchy, but
6  as far as we don't know -- nobody knows as we sit
7  here today if somebody makes decisions other than
8  the chief.
9     MR. McGRATH: Counsel, I appreciate your
10  testimony. I have a right to ask your --
11     MR. HERBERT: I got two days of it from
12  you, Mike.
13     MR. KELLY: Objection is overruled. He
14  is entitled to inquire as to the witness'
15  understanding of authority in the police
16  department. It seems to be that is the central
17  issue in these charges.
18  BY MR. McGRATH:
19     Q.   Do you understand the question?
20     A.   Can you repeat the question, sir?
21     Q.   Bring us through who has the highest
22  level of authority within the Kankakee Police
23  Department.
24     A.   For me to go through the hierarchy --

Page 238

1     MR. HERBERT: We just did this.
2  Objection. He's gone through this.
3     MR. KELLY: He did not answer that
4  question.
5  BY THE WITNESS:
6     A.   Once again, sir, chief, deputy chief,
7  two patrol commanders -- I mean, two commanders,
8  lieutenants, sergeants, patrolmen.
9     Q.   And would you agree based upon the
10  policies that a subordinate has to follow a lawful
11  order given to them by a higher-ranking officer?
12     MR. HERBERT: I'm going to object. What
13  policies are you referring to? And he's not giving
14  enough variables. Just because it's a lawful order
15  doesn't mean --
16     MR. KELLY: Overruled.
17     You can answer the question.
18  BY THE WITNESS:
19     A.   Depends on the morals and ethics of the
20  order.
21     Q.   Where with this Lexipol and -- You knew
22  you were going to testify tonight. Where in the
23  policies and procedures does it contain any
24  language as far as morals or what your personal

Page 239

1  beliefs are in order not to follow a lawful order
2  by a supervising officer?
3     MR. HERBERT: Objection, objection.
4  BY MR. McGRATH:
5     Q.   Is that contained anywhere in your
6  policies?
7     MR. HERBERT: Objection. It's burden
8  shifting. The Chief brought these charges. He is
9  here to answer questions. As far as his belief on
10  what is moral, it means nothing to these charges.
11  There is no dispute that the Chief and the
12  commander are his supervisors. He's not alleging
13  that. So what is the point of this testimony?
14     MR. KELLY: Number one, he hasn't
15  answered that question.
16     MR. HERBERT: He just gave the rank.
17     MR. KELLY: He gave the rank, but he has
18  not answered the question as to who has the lawful
19  authority in the department. Additionally, he's
20  entitled to inquire as to the sergeant's
21  understanding of insubordination. That's what the
22  sergeant is charged with. That's what these
23  commissioners need to figure out.
24     MR. HERBERT: Why would it be relevant

Page 240

1  what the sergeant thought? The Chief is alleging
2  he was insubordinate. What difference does it make
3  what anyone else in here thinks about what
4  insubordination is other than the Chief?
5     MR. KELLY: Well, I think it's really
6  important for the commission to understand what his
7  belief is as far as insubordination because if he
8  doesn't believe that insubordination is defined by
9  the policies for instance, that may make a
10  difference. He's entitled to inquire.
11     MR. HERBERT: Okay.
12  BY MR. McGRATH:
13     Q.   Do you believe, sir, that if you're
14  given a lawful order by a supervising officer
15  within the police department, that you have to
16  follow that order; yes or no?
17     A.   It depends on what the order is.
18     Q.   Yes or no, do you have to follow an
19  order from your supervising officer?
20     MR. HERBERT: Asked and answered.
21  BY THE WITNESS:
22     A.   It depends on what the order is, sir.
23     Q.   Where --
24     A.   Lawful --

DEFENDANTS 001839

**Board of Fire and Police Commissioners**
**City of Kankakee**

September 30, 2020

Page 241

1      MR. HERBERT: Just relax.
2      THE WITNESS: I'm relaxed.
3   BY MR. McGRATH:
4    Q.   Where in the policies and procedures
5   does it give you as a subordinate officer
6   discretion not to follow a lawful order given to
7   you by a superior officer?
8    A.   I'm unaware where it would say that
9   specific thing.
10    Q.   You've never seen it in the policies,
11   correct, because it's not in the policies?
12    A.   I haven't gone through all 700 pages.
13   So no, sir.  So you're correct.
14    Q.   You never read that?  No one has ever
15   told you that it's within the policies that, you
16   know what, it's up to you to decide whether or not
17   you want to follow a lawful order of a superior,
18   correct?
19    A.   No.  We only go through specific
20   questions on a daily basis through our Lexipol
21   system.  Many times it's the same questions asked
22   from month to month, same dated scenarios.
23    Q.   There is a provision within the policies
24   if you believe it's an unlawful order, that you are

Page 242

1   to take steps so you don't have to follow an
2   unlawful order, correct?
3    A.   Yes, sir.
4    Q.   But there's nothing in the provisions --
5   or no provision within the policies that pertains
6   to any issues of immoral or what you perceive to be
7   an unethical order and that being a reason not to
8   follow an order, correct?
9      MR. HERBERT: I'm going to object to
10   vagueness of the question.  What is he talking
11   about, general orders?
12      MR. McGRATH: Within the policies.
13      MR. HERBERT: Well, hold on.
14   BY MR. McGRATH:
15    Q.   748 pages that you have access --
16      MR. HERBERT: That's not --
17   BY MR. McGRATH:
18    Q.   -- from Lexipol, is there anything
19   within those pages and the policies that you've
20   testified that you're supposed to know and follow,
21   is there anything within those policies that you've
22   ever seen that say if you believe some order -- a
23   lawful order from a commander or a supervising
24   officer is immoral or unethical, you don't have to

Page 243

1   follow that order?
2      MR. HERBERT: Objection, form of the
3   question.
4   BY MR. McGRATH:
5    Q.   Have you ever seen that?
6      MR. HERBERT: Compound.
7      MR. KELLY: Overruled.
8   BY THE WITNESS:
9    A.   I would have to go back and look at the
10   policies.
11    Q.   As you sit here today, sir --
12      (Simultaneous crosstalk.)
13      MR. HERBERT: Objection.
14      MR. KELLY: He's answered the question.
15      MR. HERBERT: The attorney can't cut him
16   off just because he doesn't like the answer.
17      MR. KELLY: Move on.
18   BY MR. McGRATH:
19    Q.   Quickly, as far as your background, you
20   were assigned to the SWAT team?
21    A.   Yes, sir.
22    Q.   You were assigned to -- it's called the
23   KAMEG?
24    A.   Yes, sir.

Page 244

1    Q.   I think you testified that that's a
2   desirable assignment?
3    A.   Yes, sir.  Depends on your definition of
4   desirable.  Some people don't want to do it.
5    Q.   Was it desirable to you?
6    A.   I thought it was desirable, yes, sir.
7    Q.   And is it the basis of that that you --
8   it's made up of officers from surrounding
9   communities, correct?
10    A.   Yes, sir.
11    Q.   And the main purpose of that unit is to
12   investigate illegal drug activity?
13    A.   Yes, sir.  It's one of the portions of
14   it, drug activity, gun violence.
15    Q.   You said to stop illegal drug crimes,
16   correct?
17    A.   Yes.
18    Q.   That would include using illegal drugs
19   or people that are using illegal drugs on the
20   streets?  You want to catch those people, correct?
21      MR. HERBERT: Objection, form.
22      MR. KELLY: Overruled.
23   BY THE WITNESS:
24    A.   Catch?

DEFENDANTS 001840

**Board of Fire and Police Commissioners**
**City of Kankakee**                                    **September 30, 2020**

Page 245

1    Q.   You want to arrest them?
2    A.   No.
3    Q.   You want to stop --
4         MR. HERBERT: Hold on.
5    BY MR. McGRATH:
6    Q.   Is one of the purposes of KAMEG the
7    intent to stop illegal drug activity?
8    A.   Yes, sir.
9    Q.   And you indicated or testified that to
10   be part of that unit requires an officer to have
11   integrity, correct?
12   A.   Yes, sir.
13   Q.   And you testified that your integrity
14   with that unit was never questioned, correct?
15   A.   Correct.
16   Q.   Do you recall being removed from that
17   department based upon your usage of illegal drugs?
18        MR. HERBERT: Objection, objection.
19        MR. KELLY: Basis?
20        MR. HERBERT: Basis?  Relevant.  He has
21   not -- I have not provided any evidence of this.
22   So it's too late in the game to get out whatever
23   you're alleging to get out.
24        MR. KELLY: Well, I think he's entitled

Page 246

1    to inquire about it because you asked a question,
2    and he testified that the integrity had not been
3    questioned.  I think he's entitled to impeach on
4    that issue.  I'm not sure what he's using to -- for
5    the basis of his impeachment.  But if there is a
6    document that he's referring to, then some
7    explanation as to why it hasn't been shared prior
8    to tonight may be in order or we'll take a time-out
9    and you can look at the document.
10        MR. HERBERT: My objection is it
11   shouldn't be used.  It should be sanctioned.  He
12   shouldn't be allowed to get into it.  He violated
13   the rules.  Can I see what he's looking at then for
14   the first time when he's going to ask him things on
15   this?
16        MR. McGRATH: A newspaper article that I
17   printed from my office that I didn't get from
18   anyone.
19        MR. HERBERT: You're going to impeach
20   his integrity with a newspaper article?
21   BY MR. McGRATH:
22   Q.   Sir, were you removed --
23        MR. HERBERT: Hold on.  Where is the
24   finding that the accusation was true?  You can't

Page 247

1    impeach somebody with accusations.
2         MR. McGRATH: He's under oath.  I'm
3    asking him questions.  Hold up.  And depending on
4    how he answers, I have the right to call a witness
5    in rebuttal.
6         MR. HERBERT: No, no.  You have to be
7    able to prove up what you're trying to impeach.
8    And right now as we sit here today, you don't have
9    any proof.  You're fishing.  So that's
10   inappropriate.
11        MR. McGRATH: It's not fishing.
12        MR. HERBERT: No, you have to be able to
13   prove up your impeachment, not by asking questions
14   of it.  So if you can prove --
15        MR. McGRATH: I can.
16        MR. HERBERT: If you can prove that he
17   somehow tested positive and his integrity is
18   questioned as you sit here today, then those
19   questions can be asked.
20        MR. McGRATH: Okay.
21   BY MR. McGRATH:
22   Q.   Were you removed from KAMEG by the
23   supervisors of KAMEG for illegal drug usage?
24   A.   I was removed by the chief of police,

Page 248

1    yes, sir.
2    Q.   From which chief of police?
3    A.   Larry Regnier.
4    Q.   So -- But Larry Regnier, as chief of
5    police for Kankakee at the time, he wasn't a
6    supervisor, didn't run KAMEG?  That's a separate
7    unit, correct?
8    A.   Correct.
9    Q.   All right.
10   A.   I will be happy to explain it to you.
11   Q.   You actually were supervised by Master
12   Sergeant Aaron Harsey, H-A-R-S-E-Y, correct?
13   A.   Yes, sir, I believe so.
14   Q.   And Lieutenant Chris Kidwell, correct?
15   A.   Yes.
16   Q.   Neither one of those two individuals
17   were associated with the Kankakee Police
18   Department, correct?
19   A.   Chris Kidwell was, yes, sir.
20   Q.   Master Sergeant Aaron Harsey, who is not
21   associated with the Kankakee City Police
22   Department, he removed you from KAMEG based upon
23   your illegal use of steroids, correct?
24        MR. HERBERT: Objection, same objection.

**Board of Fire and Police Commissioners**
**City of Kankakee**                    September 30, 2020

Page 249

1    MR. KELLY: I understand the objection.
2  Noted.  He can answer the question.
3  BY MR. McGRATH:
4    Q.   Yes or no, sir?  You were removed from
5  KAMEG --
6        MR. HERBERT: Hold on.  Let him ask the
7  question.
8  BY MR. McGRATH:
9    Q.   Yes or no, were you removed from KAMEG
10  based upon your use of illegal drugs, that being
11  illegal performance-enhancing steroids by Master
12  Sergeant Aaron Harsey?
13        MR. HERBERT: Objection to the term
14  "use" meaning proven.
15  BY MR. McGRATH:
16    Q.   Yes or no?
17        MR. KELLY: It's overruled.  He can
18  answer the question.  The sergeant should answer.
19  BY THE WITNESS:
20    A.   I believe it was Chris Kidwell who
21  initially got the phone call from my then
22  girlfriend and now wife because we were having
23  relationship issues, and Chris Kidwell relayed that
24  information to Chief Larry Regnier.  I was brought

Page 250

1  into the chief's office, confronted with the
2  accusations.  And I said, yes, sir.  I got sent for
3  a drug test, and I was put on administrative leave.
4  Yes, sir.
5    Q.   And you were removed from KAMEG based
6  upon that, correct?
7    A.   For nonprescribed steroids, yes, sir.
8    Q.   On July 15th, were you on any type of
9  medications?
10    A.   No, sir.
11    Q.   Illegal drugs?
12    A.   No, sir.
13    Q.   You heard Sergeant Tyson, who's now
14  retired, and Sergeant Klopp, who is a union rep,
15  testify at this hearing before this commission,
16  correct?
17    A.   Yes, sir.
18    Q.   Did you hear them being questioned about
19  whether they ever saw Commander Austin with his
20  foot on a chair or on a desk and thrusting his
21  crotch towards you in any way?  Did you hear them
22  testify and deny that they saw that?
23        MR. HERBERT: Objection, misstates the
24  question and testimony and it's compound.

Page 251

1  BY THE WITNESS:
2    A.   I don't recall their testimony.
3        MR. KELLY: Overruled.
4  BY MR. McGRATH:
5    Q.   Do you know them to be truthful
6  individuals?
7    A.   I know that Sergeant Tyson in a previous
8  incident, he vented this to me, was upset because
9  his job was threatened if he did not give a proper
10  statement to, at the time, Chief Dumas and Deputy
11  Chief Hunt.  So Sergeant Tyson was very close to
12  retirement.  So Sergeant Tyson wants to retire.  I
13  don't matter to him.
14    Q.   You acknowledge at least -- because you
15  just testified you don't remember what they
16  testified to, but sergeant Tyson was in the room --
17    A.   Yes, sir, he was.
18    Q.   -- when Commander Austin came in?
19    A.   Yes, sir.
20    Q.   Do you recall Sergeant Tyson testifying
21  just earlier tonight that Commander Austin was not
22  upset when he came to the room, that he wasn't
23  angry in any way?  Do you remember him testifying
24  to that?

Page 252

1    A.   Yes, sir, he was.
2    Q.   Sergeant Tyson --
3        MR. HERBERT: Hold on.  Let him finish
4  the question.
5  BY MR. McGRATH:
6    Q.   Sergeant Tyson is no longer with the
7  department, right?
8    A.   No, sir.
9    Q.   He just retired?
10    A.   Yes, sir.
11    Q.   So there's no reason for him to come in
12  here and make up or lie about what he observed or
13  what happened in the sergeants' room, correct?
14    A.   I assume he was subpoenaed and wrote a
15  statement.
16        MR. HERBERT: You got to let him finish.
17  BY MR. McGRATH:
18    Q.   I can represent to you that there was no
19  need for a subpoena, that he appeared on his --
20        MR. HERBERT: Objection.  Call yourself
21  as a witness if you want to do that.
22  BY MR. McGRATH:
23    Q.   Sergeant Klopp, he testified that he
24  never saw Commander Austin with his foot on a chair

2:20-cv-02310-CSB-EIL   # 17-15   Page 205 of 270
Board of Fire and Police Commissioners
City of Kankakee                                         September 30, 2020

Page 253

1 or up on the desk or any thrusting towards you as
2 you're testifying now, correct?
3    A.   Sergeant Klopp came in after that
4 occurred.
5    Q.   Is it your testimony that --
6    A.   The commander took his foot off the
7 chair he was doing this going, Paul, Paul, Paul as
8 I was saying the Our Father prayer in my head.
9    Q.   And it's your testimony that Commander
10 Austin would put his foot up on the desk and thrust
11 his crotch towards your face in an intimidating
12 manner all in front of the glass window that any
13 officer in the squad room walking around or anyone
14 in the lieutenants' office would be able to look in
15 and see what was going on?  Is that your testimony
16 you want everyone to believe?
17    A.   He put his foot on the chair, and it
18 depends.  The window is only about this wide, sir.
19 So it depends on your angle.  So no, not everyone
20 in the squad room gets --
21        MR. HERBERT: For the record, I would
22 say 4 feet by -- or 3 feet by 3 feet.
23 BY MR. McGRATH:
24    Q.   And you took it as being a form of

Page 254

1 sexual harassment?  You testified to that at the
2 interrogation, correct?
3    A.   Yes, sir, when you spread your legs and
4 stick your hips out towards another individual,
5 yes, sir.
6    Q.   You didn't file any type of sexual
7 harassment claim on July 15th, July 16th, July
8 17th, 18th, 19th --
9        MR. HERBERT: Objection.
10 BY MR. McGRATH:
11    Q.   -- of 2020, correct?
12        MR. HERBERT: Objection, relevance.  He
13 was locked out of the police station, and he
14 couldn't do any of that.  So it's irrelevant.
15        MR. KELLY: It's overruled.
16 BY THE WITNESS:
17    A.   No, sir, I didn't.  I testified I didn't
18 know whether I was being sexually harassed or not.
19 It appeared to be as it was.  However, no, I
20 thought we were going to discuss the situation as
21 two men at the police department who worked on the
22 SWAT team together previously.
23    Q.   You didn't prepare any To/Froms or any
24 memos regarding the incident on July 15th or

Page 255

1 July 18th, correct?
2        MR. HERBERT: Objection.  He wasn't
3 allowed to prepare anything.  The testimony is the
4 first time he could explain this was at his
5 interrogation.
6        MR. KELLY: The objection is overruled.
7 He can ask that question.  It's up to the sergeant
8 to answer.
9 BY MR. McGRATH:
10    Q.   Did you ever prepare a memo, a note,
11 write a card to the Chief, send a letter to the
12 mayor, write to the legal attorneys for the City,
13 and put down what your versions of the events that
14 took place on July 15th and July 18th of 2020, sir?
15        MR. HERBERT: Objection, relevance.  He
16 provided proper notice in an interrogation.  So the
17 question is irrelevant.
18        MR. KELLY: Overruled.
19        You can answer the question.
20 BY MR. McGRATH:
21    Q.   Did you ever do that?
22    A.   I was never asked to, sir.
23    Q.   The question, sir, is did you ever do
24 that?

Page 256

1        MR. HERBERT: Asked and answered.
2 BY MR. McGRATH:
3    Q.   Not that you were asked.  Did you ever
4 do that?
5        MR. HERBERT: Mike, you got to wait for
6 the ruling on the objection.  Just because he
7 doesn't like the answer doesn't mean he gets to ask
8 it a second time.
9        MR. KELLY: But it's truly not an answer
10 to his question.  So the objection is overruled.
11 BY THE WITNESS:
12    A.   No, sir, I never prepared a written
13 document.
14    Q.   And when you were having a conversation
15 with Commander Austin, did you make the statement
16 to him that this is not your department anymore?
17    A.   No, sir.
18    Q.   Well, at your interrogation on page 56,
19 you testified under oath that you couldn't remember
20 whether or not you said that.
21        MR. HERBERT: Objection.
22 BY MR. McGRATH:
23    Q.   But tonight --
24        MR. HERBERT: It's not impeaching, it's

Page 257

1 not impeaching, and it's contained elsewhere.  It's
2 not impeaching.  So ...
3       MR. KELLY: I'll overrule the objection.
4 He can ask that question.
5 BY MR. McGRATH:
6    Q.   And the commission can look at page 56
7 of the transcript.  Did you state --
8       MR. HERBERT: Hold on.
9 BY MR. KELLY:
10    Q.   -- at the interrogation that you
11 couldn't remember if you made that statement?
12       MR. HERBERT: Objection.  If he wants to
13 impeach my witness, he has to do it the proper way,
14 which I'm assuming we know how to do it.  You have
15 to give him a copy of the transcript, you have to
16 ask him this, were you asked this question, did you
17 give this answer, and there better not be another
18 place in this transcript; otherwise, it's in bad
19 faith if he talks about that.  But that's the
20 proper way to impeach if he's trying to do that.
21       MR. KELLY: Well, I think he gets to
22 inquire as to the witness' recollection of the
23 interrogation.  And if there is a question of his
24 recollection, then he may need to read the

Page 258

1 transcript.  But the objection is overruled.
2       MR. HERBERT: You can't ask the
3 specifics.  Were you asked this on page 56,
4 commission look at it, that's improper; but
5 whatever your ruling is is fine.
6       MR. KELLY: Objection is overruled.
7            Answer the question.
8 BY MR. McGRATH:
9    Q.   Today your answer under oath is that you
10 did not make that statement; is that what you just
11 testified to?
12       MR. HERBERT: Objection, vague.  I have
13 no idea what he's talking about.
14       MR. KELLY: Overruled.
15 BY THE WITNESS:
16    A.   Apparently I made a mistake to my
17 original testimony.  As far as I'm concerned me
18 saying, I don't remember or I didn't, it's the same
19 thing.  I never made that statement.  I don't
20 remember making that statement.  I never did.
21    Q.   Did you state during your
22 interrogation --
23       MR. HERBERT: Where are we at?
24       MR. McGRATH: Strike that.

Page 259

1 BY MR. McGRATH:
2    Q.   Did you state to Commander Austin when
3 you were at the sergeants' office that this is our
4 department, we're taking it back?
5    A.   I didn't say that or I don't recall.
6 I'm not sure of what my original testimony is.
7    Q.   When Commander Austin advised you that
8 you were relieved of duty, you understood that you
9 were to leave the department at that time, correct?
10    A.   I was pretty confused as to why.  I
11 didn't understand.
12    Q.   I'm not asking you if you agreed or if
13 you didn't know why.  But if a commanding officer
14 tells you you're relieved of duty, does that mean
15 that you are relieved of duty, that you are to
16 leave the department; yes or no?
17       MR. HERBERT: Objection, relevance.
18 It's some other scenario, and it's vague and an
19 incomplete hypothetical.
20       MR. KELLY: It's overruled.
21 BY THE WITNESS:
22    A.   That's never happened to me before, sir.
23 I'm unaware of a policy because I was thoroughly
24 confused as to City ordinance tickets equal I'm

Page 260

1 relieved of my duty sitting at my desk doing
2 paperwork at the end of the day.
3    Q.   At this time when you were relieved of
4 duty is when you went around the desk and got into
5 Commander Austin's face.  You were within a foot of
6 him, correct?
7       MR. HERBERT: Objection, vague.
8       MR. KELLY: Overruled.
9 BY THE WITNESS:
10    A.   The time line there, sir, it's been a
11 while since the incident happened.  It's been a
12 while since my interrogation.  I've been under a
13 lot of stress.  My home life is terrible.  Probably
14 going to get a divorce because of this.  So you
15 know what?  They're trying to take a 15-year career
16 away from me.  I served this city honorably.  I've
17 done thousands of calls.  I've done hundreds of
18 search warrants.
19    Q.   As far as my --
20    A.   I served citizens here honorably.
21    Q.   But he's not answering the question.
22    A.   Now this --
23    Q.   For a failure to follow a simple order,
24 sir.

Board of Fire and Police Commissioners
City of Kankakee                                          September 30, 2020

Page 261

1    A.    No, because I'm Paul Berge, and they
2    don't like me because of my EEOC complaint, because
3    of who I'm friends with.
4    Q.    You failed to follow a simple order --
5          MR. HERBERT: Objection.
6    BY MR. McGRATH:
7    Q.    -- on July 15th in the sergeants'
8    office; agreed?
9          MR. HERBERT: Objection. It's an
10   improper question.
11   BY MR. McGRATH:
12   Q.    Agreed?
13         MR. HERBERT: Objection.
14         MR. KELLY: Overruled.
15         MR. HERBERT: You've got to listen. You
16   can't keep asking.
17            Now you can answer.
18   BY THE WITNESS:
19   A.    I left eventually, sir.
20   Q.    If you would have just followed his
21   commands, we wouldn't be here today?
22         MR. HERBERT: Objection.
23         MR. McGRATH: I'll withdraw that.
24   BY MR. McGRATH:

Page 262

1    Q.    You don't recall or remember Commander
2    Austin telling you to hang up the telephone?
3    A.    I testified that I don't recall
4    answering the phone.
5    Q.    And is it your testimony that when you
6    arrived at the courthouse on July 18th, 2020, that
7    you did not see Chief Kosman outside of his
8    vehicle?
9    A.    Yes, sir.
10   Q.    When you say "yes, sir," you did not see
11   him?
12   A.    I wasn't paying attention to him.
13   Q.    Not paying attention. Did you see him
14   or did you not see him when he was outside of his
15   squad car making statements or giving you orders or
16   commands? Did you see him?
17   A.    No, sir.
18   Q.    Why on the video did you turn and face
19   towards him?
20         MR. HERBERT: Objection. Don't answer
21   that.
22         MR. KELLY: Overruled.
23   BY THE WITNESS:
24   A.    I was attempting to listen to my radio.

Page 263

1    I had radio traffic going on. I was looking down
2    trying to hear my radio because these radios that
3    we bought, they're very hard to hear. I had it
4    turned up. If you watch the video, I actually turn
5    my radio up as I'm walking and then the radio
6    traffic is going on. I stopped to try to listen to
7    it. I determined that it's not something that I
8    had to go to. So I continued on.
9    Q.    And you just happened to turn in the
10   direction of where the Chief was, and it's your
11   testimony under oath today that you didn't see the
12   Chief as he was outside of his car? You were
13   fiddling with your radio? Is that what your
14   testimony is?
15         MR. HERBERT: Objection.
16         MR. KELLY: Objection is sustained.
17   BY MR. McGRATH:
18   Q.    Sergeant Miller went over to where you
19   were at and told you the Chief wants you out of the
20   area, correct?
21   A.    Yes, sir.
22   Q.    Did you understand that information
23   coming from Sergeant Miller being information that
24   he got from Chief Kosman?

Page 264

1    A.    He told me to the effect that the Chief
2    didn't want me over there.
3    Q.    And then did you immediately leave the
4    area?
5    A.    Yes, sir, I did.
6    Q.    Well, you had a conversation with the
7    Chief before you left the area, correct?
8    A.    Well, as I was leaving the area, yes,
9    sir. The Chief approached me.
10   Q.    And what did the Chief specifically say
11   to you, and what did you say to him?
12   A.    I have a hard time remembering the
13   specific conversation. He was extremely upset with
14   me. He was telling me I wasn't listening to him, I
15   was acting weird, I didn't want you going by the
16   kids. I didn't know what was going on. They're
17   kids, man.
18   Q.    Did he direct you to leave the area when
19   you were having this conversation; yes or no?
20   A.    When we were walking? I don't remember
21   exactly when he told me to leave the area.
22   Q.    I'm talking about Chief Kosman.
23   A.    Yes, sir.
24   Q.    You had a conversation with him, and at

**Board of Fire and Police Commissioners**
**City of Kankakee**                                                    **September 30, 2020**

Page 265

1  least one time he told you to leave the area face
2  to face, correct?  Yes or no?
3      A.   At my squad car, yes, sir, he was
4  telling -- he told me to leave.
5      Q.   Did you get in your squad car and leave;
6  yes or no?
7          MR. HERBERT:  No, no, no.  You don't get
8  to tell him how to answer the question.
9          MR. McGRATH:  It's cross-examination.
10         MR. HERBERT:  You can't him tell him to
11 limit his answer to yes or no.
12         MR. KELLY:  Overruled.  He can ask.
13         MR. HERBERT:  You can answer however you
14 want.  You don't have to answer yes or no.
15 BY MR. McGRATH:
16     Q.   Yes or no, did you immediately leave
17 after given a lawful order by Chief Kosman to leave
18 the area?
19         MR. HERBERT:  Objection.  Hold on.
20 Objection, foundation.  What order are you talking
21 about?  What was the order?  Where did this
22 conversation take place?
23         MR. KELLY:  The objection is overruled.
24 He made it clear as to what order the Chief gave

Page 266

1  him, and that was to leave area.  And it was at the
2  time they were talking behind the squad car.
3  That's all been made clear.
4  BY THE WITNESS:
5      A.   I was trying to get an explanation as to
6  why.  Once again, I didn't understand why he was so
7  mad.  They were kids.  I wanted to go sit next to
8  kids, give them a positive interaction with the
9  police.  It's that simple.
10     Q.   Actually, what's simple is you had a
11 simple order from Chief Kosman to leave the area
12 and you didn't want to leave the area.  So you
13 disregarded his order; isn't that true?
14         MR. HERBERT:  Objection.
15         MR. KELLY:  Sustained.
16 BY MR. McGRATH:
17     Q.   Chief Kosman gave you a follow-up order
18 to leave the area, and you failed to follow that
19 direct order; isn't that true?
20     A.   I'm unsure how many times the Chief was
21 telling me this.  Once again, he was yelling at me,
22 and I immediately -- when he immediately confronted
23 me.  So I was like -- my head was ...
24     Q.   You don't remember, but -- the exact

Page 267

1  number of times, but Chief Kosman ordered you on
2  multiple times as you stood talking with him by
3  your squad car for you to leave the area, correct?
4          MR. HERBERT:  I'm going to object.  It
5  misstates the evidence here.
6          MR. KELLY:  Objection sustained.  I
7  think you've made the point, Counsel.  Move on.
8  BY MR. McGRATH:
9      Q.   It wasn't until Lieutenant Passwater
10 came and told you that you should follow the
11 Chief's order that you left the area, correct?
12     A.   Yes, sir.  He was my immediate
13 supervisor that day.
14     Q.   And is Chief Kosman higher ranking than
15 Lieutenant Passwater based upon the hierarchy that
16 you gave us earlier; yes or no?
17     A.   Yes, sir.
18         MR. McGRATH:  That's all I have.  Thank
19 you.
20         MR. HERBERT:  Nothing based on that.
21 Nothing.
22         MR. KELLY:  Any questions from the
23 commissioners?
24         COMMISSIONER BESSANT:  I have a

Page 268

1  question.  You made the statement that the order
2  that you were given was unethical and immoral.
3  What made it unethical and immoral to you?
4          THE WITNESS:  At the car when he was
5  telling me that?
6          COMMISSIONER BESSANT:  No, when we were
7  talking about -- Hold on.
8          MR. HERBERT:  That was the order about
9  the -- why didn't you write the homeless people.
10         COMMISSIONER BESSANT:  Yes.  When he
11 gave you that order saying, hey, this is what I
12 need you to do, go write tickets or go check this
13 out and you said it was unethical and immoral, what
14 made it that way to you?
15         THE WITNESS:  We've actually been
16 trained when this mayor was elected, supervisors,
17 we had a class.  It was a restorative justice
18 class, and the general idea of that class was to,
19 instead of going out there and specifically
20 enforcing law, law, law, law, and getting people in
21 the criminal justice system and weighing them down
22 with fines and things like that is to find
23 alternatives to create relationships with people in
24 the community instead of -- I mean, they're

Page 269

1 homeless people. It is immoral and unethical.
2 They can't pay for it. We have to treat them like
3 they're people. It's terrible the way they're
4 treated. It's -- I'm trying to change that, or I
5 was at least.
6        COMMISSIONER BESSANT: And then my
7 second one is: Is there a process in place that
8 you know of if you're given an order or something
9 that you believe is unethical or something that you
10 shouldn't follow, is there a process to reporting
11 that as opposed to just kind of walking out and
12 ignoring it? Is there a process that you guys
13 have?
14        THE WITNESS: I've never had this
15 situation because anytime I've ever dealt with
16 patrolmen, other sergeants, lieutenants, we've had
17 discussions because we all worked together at the
18 police department. We're all on the same team.
19 We're all working towards one goal. So never in my
20 experience has it been do this or else or do that
21 or else. It's always been a collaborative effort
22 with the Kankakee City Police Department. We're
23 here to serve the public, and we're trying to do
24 the best we can, you know. And it's not just one

Page 270

1 person telling people to do stuff. It's everyone
2 coming together and figuring it out. So I've never
3 dealt with any of this in my career.
4        COMMISSIONER BESSANT: Gotcha. Thank
5 you.
6        MR. KELLY: Any other commissioners?
7        COMMISSIONER LANDWEHR: I have a couple
8 questions. Sir, you said that on the 15th of
9 July -- I guess I don't understand whether you said
10 you were ever asked to check on the area where you
11 were expected to give tickets earlier in the day.
12        THE WITNESS: Okay.
13        COMMISSIONER LANDWEHR: Did Commander
14 Austin ask you earlier in the day to check on that
15 area?
16        THE WITNESS: I don't remember that. I
17 do remember trying to explain to him that I did go
18 down there, and they were sitting at that location.
19 They did have a couple open alcohol, cans of beer.
20 There was one of the guys out there. His name was
21 Antwon Berry. He walks around with a speaker.
22 I've taken him to the police department, and we've
23 washed cars together and I've taken him to Walmart.
24 I've bought all the guys out there lunch. And he

Page 271

1 was out there, and I told him, You guys shouldn't
2 be drinking that. I looked at Antwon. I said,
3 Hey, man, can you handle this for me? So I drove
4 away.
5        COMMISSIONER LANDWEHR: So were you
6 doing that activity in response to what you were
7 told by Commander Austin earlier in the day?
8        THE WITNESS: I don't remember him ever
9 telling me to go down there. He was asking about
10 the homeless people there, and I was --
11        COMMISSIONER LANDWEHR: So you don't
12 recall him calling you and asking you to check on
13 homeless people and then checking up with you a
14 second time?
15        THE WITNESS: No, ma'am.
16        COMMISSIONER LANDWEHR: So you don't
17 remember any of that?
18        THE WITNESS: I don't recall any of
19 that.
20        COMMISSIONER LANDWEHR: The first you
21 remember him talking to you about writing the
22 tickets was in the office at the end of shift?
23        THE WITNESS: Yes, ma'am.
24        COMMISSIONER LANDWEHR: So you believe

Page 272

1 he brought it up for the very first time at the end
2 of the day at the close of the shift?
3        THE WITNESS: He was saying that when we
4 go down there and deal with them, we need to
5 enforce the City ordinance tickets and issue
6 citations for open alcohol. That's what he was
7 telling me.
8        COMMISSIONER LANDWEHR: Had you as a
9 department ever discussed or you with Commander
10 Austin ever discussed how you should be handling
11 this?
12        THE WITNESS: No, ma'am. It's never
13 come up.
14        COMMISSIONER LANDWEHR: So it's
15 something you took on yourself to do?
16        THE WITNESS: It was taking on trying to
17 build a relationship with them, yes, ma'am. As
18 police officers, we do have discretionary powers
19 to -- if I pull you over for a traffic citation, do
20 I give you a written warning or a verbal warning or
21 a citation. So you have discretion when it comes
22 to issuing citations when it comes to the law.
23        COMMISSIONER LANDWEHR: Do you have
24 discretion -- If your supervisor tells you to issue

**Board of Fire and Police Commissioners**
**City of Kankakee**

**September 30, 2020**

Page 273

1  tickets, do you still then have discretion to
2  decide what you want to do?
3      THE WITNESS: Yes, ma'am, I believe so.
4      COMMISSIONER LANDWEHR: So then why were
5  you so angry with Commander Austin when he brought
6  the subject up?
7      THE WITNESS: I wasn't angry with him.
8  When I questioned him and I said, we're not going
9  to -- I'm not going to do that, I asked him who
10  called it in, he wouldn't tell me. I said, Who
11  owns the property? He wouldn't tell me. And he
12  got enraged with me almost immediately. He got mad
13  at me for even being -- for I guess questioning him
14  or trying to come to a better solution. He
15  immediately got mad with me, and I was like -- I've
16  never -- It was unprofessional. I've never dealt
17  with that before. I didn't -- I was like, Why are
18  you so mad about City ordinance tickets?
19      COMMISSIONER LANDWEHR: Different --
20  Slightly different subject here. You testified
21  that you are being targeted because of your EEOC
22  complaint?
23      THE WITNESS: Yeah.
24      COMMISSIONER LANDWEHR: When was that

Page 274

1  EEOC complaint filed?
2      THE WITNESS: We filed it last year in
3  November, I believe.
4      COMMISSIONER LANDWEHR: November of '19?
5      THE WITNESS: Yes.
6      COMMISSIONER LANDWEHR: This complaint
7  that we're here for today was brought in October
8  of '19, correct?
9      THE WITNESS: I'm sorry, ma'am.
10      COMMISSIONER LANDWEHR: That complaint
11  that you're here for today was brought in October
12  of '19, correct?
13      MR. HERBERT: July.
14      MR. McGRATH: No. The charges were in
15  August, and then we had the hearing.
16      MR. HERBERT: 2019.
17      THE WITNESS: There are four instances.
18  This July is when the two separate incidents
19  happened, 2020.
20      COMMISSIONER LANDWEHR: In 2020. So
21  your EEOC is 2020 or 2019?
22      THE WITNESS: 2019.
23      COMMISSIONER LANDWEHR: And that's the
24  one that your attorney brought up?

Page 275

1      THE WITNESS: Yes, ma'am.
2      MR. HERBERT: Yes.
3      COMMISSIONER LANDWEHR: That you went to
4  the Illinois Department of --
5      MR. HERBERT: Human Rights.
6      COMMISSIONER LANDWEHR: And that
7  involved -- I'm a little confused. That was your
8  sexual harassment complaint?
9      THE WITNESS: I've never had a sexual
10  harassment complaint, ma'am.
11      COMMISSIONER LANDWEHR: So you didn't
12  bring a sexual harassment complaint?
13      THE WITNESS: No, ma'am.
14      COMMISSIONER LANDWEHR: That was just
15  brought up in your sworn testimony?
16      THE WITNESS: I was confused as to why
17  he put his foot on the chair and said I didn't know
18  if I was getting sexually harassed because it
19  was ...
20      COMMISSIONER LANDWEHR: So you have an
21  EEOC complaint from 2019?
22      THE WITNESS: Yes, ma'am.
23      COMMISSIONER LANDWEHR: And that's
24  involving the belief that you are being targeted

Page 276

1  based on your race?
2      THE WITNESS: Yes, ma'am.
3      MR. HERBERT: I can put it into the
4  record if we want.
5      MR. KELLY: No, that's okay.
6      MR. HERBERT: It alleges much more than
7  that. So I would ask to make that an exhibit.
8      MR. KELLY: I don't think it's -- As I
9  said earlier, I don't think it's relevant to this
10  commission hearing. There's --
11      MR. HERBERT: I think it just became
12  relevant.
13      MR. KELLY: I don't think so.
14      MR. HERBERT: I'm going to ask to put it
15  in as an exhibit. You can do -- The board can do
16  what it wants.
17      MR. KELLY: I'm going to deny that.
18      MR. HERBERT: I'm going to make an offer
19  of proof then. There was extensive testimony by a
20  board member regarding this document that I was
21  prevented from getting into, and the board member
22  does not know the substance of the charge and it's
23  apparently an important factor. And right now as
24  we leave it, the board member has an inaccurate

DEFENDANTS 001848

2:20-cv-02310-CSB-EIL  # 17-15  Page 211 of 270
Board of Fire and Police Commissioners
City of Kankakee                                      September 30, 2020

Page 277

1 depiction of what the IDHR charge is based upon my
2 inability to get into evidence with it and put it
3 into the record. It's a public document.
4         MR. KELLY: First of all, the board
5 member did not testify. The board member asked a
6 question. Second of all, the question was simply
7 when was the charge brought. There was some
8 confusion over whether or not the charge had
9 anything to do with what we're here for on these
10 charges. That was clarified. That's the end of
11 it.
12        MR. HERBERT: Okay. I'm making a
13 record. Okay?
14        MR. KELLY: I understand you're making a
15 record, Counsel. But at some point, the commission
16 has got to make a decision not based on your
17 objections and your idea of where this hearing
18 should go.
19        MR. HERBERT: The commission
20 respectfully has to make a decision based on a fair
21 hearing of my client.
22        MR. KELLY: And they will give -- have
23 given him a fair hearing and will give him a fair
24 hearing.

Page 278

1         MR. HERBERT: That's what I'm doing for
2 my client. I'm not going to stop doing that for my
3 client, and I respect this board.
4         MR. KELLY: Any additional questions for
5 Sergeant Berge?
6         COMMISSIONER FLORES: Sergeant Berge, do
7 you give lawful orders as a sergeant to your
8 subordinates?
9         THE WITNESS: I don't consider anything
10 I ask my patrolmen who I supervise to do lawful
11 order, things like that. Like I've said, we're a
12 team. We all work together.
13        COMMISSIONER FLORES: Okay.
14        THE WITNESS: There's this who's
15 superior, who is this and that. Listen, I just do
16 a different job. Lieutenants do a different job.
17 Commanders do a different job. We're all -- In my
18 eyes, we're all on the same level, which is two
19 different things. We just do different things.
20 We're all supposed to work together.
21        COMMISSIONER FLORES: So the lawful
22 orders that you give are not orders? They're,
23 like, suggestions or you ask them to do things, but
24 it's okay with you if they don't?

Page 279

1         THE WITNESS: If they have a good-faith
2 question to me about it, we talk about reasons why
3 and we come to a collaboration or a consensus that,
4 okay, this is probably best to do it this way, this
5 is probably to do it best that way because there's
6 nothing that serious out there, unless it's a
7 tactical situation or a violent situation where,
8 you know -- and in those situations, we all just
9 kind of know how to react. And my guys, I know my
10 guys. I work with my guys. We work together. We
11 know each other, you know, because we discuss
12 things. We figure things out together. We train
13 together. So ...
14        COMMISSIONER FLORES: Do you believe
15 that every supervisor has your philosophy of that
16 collaboration style?
17        THE WITNESS: No, sir.
18        COMMISSIONER FLORES: Did you believe
19 that before you were charged with this?
20        THE WITNESS: Anytime I've ever had any
21 situation -- not even situations. That's just
22 been -- We've always discussed things. I don't
23 know. Like, on the SWAT team, there was patrolmen,
24 sergeants, lieutenants, commanders. We all just

Page 280

1 discussed things. Do you know what I mean? So
2 I've never dealt with this. It's -- I don't get
3 it.
4         COMMISSIONER FLORES: I'll ask it
5 differently. Have you ever experienced supervisors
6 like Commander Austin or Chief Kosman that when
7 they give an order, they expect it to be followed
8 immediately? Have you ever experienced that before
9 then?
10        THE WITNESS: No, sir, not, like, to
11 this level, no, sir.
12        COMMISSIONER FLORES: Okay. So your
13 testimony today is that the orders that you
14 received from Chief Kosman, the immediacy that they
15 expected, that's the first time in your 15-year
16 career as a police officer that you encountered
17 supervisors that want orders to be followed
18 immediately?
19        THE WITNESS: Yes, sir. I kind of
20 wanted to find out why, and I didn't understand.
21        COMMISSIONER FLORES: Okay.
22        COMMISSIONER YATES: One question.
23 There was a vote of no confidence conducted against
24 the chief, the deputy chief, the commander, the

Page 281

1  patrol commander, and the newly appointed
2  lieutenant.  Did you take a position on that?
3       THE WITNESS: Pardon me?
4       COMMISSIONER YATES: Did you take a
5  position on that vote of no confidence?
6       MR. KELLY: Commissioner Yates, I'm
7  going to ask that you not get an answer to that
8  question because I think that's outside the hearing
9  today.  So I just think that question probably is
10  improper.
11       COMMISSIONER YATES: Roger that.
12       MR. KELLY: Anybody else?  Any follow-up
13  from either attorney?
14       MR. HERBERT: Nope.
15       MR. KELLY: Anything additional,
16  Mr. Herbert, in the respondent's case?
17       MR. HERBERT: No, other than I'm going
18  to introduce -- I'm going to ask the court to take
19  notice of the various documents, but I can rest
20  first, right?
21       MR. KELLY: If you're going to introduce
22  exhibits, you should introduce them before you
23  rest.
24       MR. HERBERT: Okay.  Well, then I am

Page 282

1  going to -- I'm going to have to e-mail you the
2  policies.  I asked the Chief to print them.  He was
3  kind enough to print some of them, but not all of
4  them.  So I have exactly what I'm going to put in.
5  Policy 104, 106, 328, 341, 465, 471, 1000, 1020,
6  and 1026, and Respondent 2, which I will give to
7  you now.
8       MR. KELLY: So those policies are in
9  Respondent No. 3, and I need 104, 106 -- and I did
10  not get the --
11       MR. HERBERT: I'm sorry, John.  I
12  didn't --
13       MR. McGRATH: 104, 106, 328, 341, 465.
14       MR. KELLY: I got after that.
15       MR. HERBERT: I'm sorry.  Where did you
16  leave off, John, because I can tell you?  What
17  number?
18       MR. KELLY: I've got it now.  Any
19  objection to those policies?
20       MR. McGRATH: No.
21       MR. KELLY: So those specific
22  policies -- 104, 106, 328, 346, 465, 471, 1000,
23  1020, and 1076 are admitted.
24       MR. HERBERT: I'm sorry.  1026.

Page 283

1       MR. KELLY: I can't read my writing.
2  They're admitted without objection.  Anything else?
3       MR. HERBERT: Based on that, the
4  respondent will rest.
5       MR. KELLY: Mr. McGrath, any rebuttal?
6       MR. McGRATH: No rebuttal.
7       MR. KELLY: Okay.  Members of the
8  commission, at this point in time, the hearing is
9  closed.  Typically each counsel will be allowed to
10  make an oral closing statement.  I recognize it's
11  late.  Do you want to allow those kinds of closing
12  statements?
13       COMMISSIONER BESSANT: My brain is
14  broken; but if it's 10 to 12 minutes, we can.
15       CHAIRMAN DAVIS: The question is:  Are
16  we talking 10 to 12 minutes, or are we talking
17  about something longer?
18       MR. HERBERT: 10 to 12 minutes for me.
19       MR. KELLY: I mean, you can set a limit.
20       CHAIRMAN DAVIS: 10 to 12 minutes.  I
21  think that will --
22       COMMISSIONER FLORES: If we can set it,
23  I propose we make it five-minute closing arguments.
24       MR. HERBERT: Five is good.

Page 284

1       MR. KELLY: The commissioner is
2  entertaining closing arguments, five minutes for
3  each side, no rebuttal.
4       So, Mr. McGrath, since it's your
5  burden, you can go forward.
6       MR. McGRATH: Thank you.  And on behalf
7  of the Chief and the Deputy Chief, I want to thank
8  everyone for their patience and understanding and
9  being here so late two nights in a row and also for
10  the continuance from last week.  So I appreciate
11  everyone's thoughtfulness and work together.
12       As I stated in my opening, I
13  consider this to be a very simple case.  It is a
14  matter of just following simple, direct, lawful
15  orders from superiors.  You have a copy of the
16  policies.  You have a copy of the formal
17  interrogation transcript.  You have the testimony
18  of all of the witnesses.  And at this point, it's
19  for you to decide who is more credible than not,
20  who do you believe and who don't you believe as to
21  what took place. It's not a matter of did Sergeant
22  Berge not follow the order within ten seconds or
23  30 seconds or five minutes.  It's a matter of just
24  not following the orders.  As far as the charges

**Board of Fire and Police Commissioners**
**City of Kankakee**

September 30, 2020

Page 285

1 and not knowing what he's being charged with, all
2 of that nonsense, well, he was told on July 15th
3 that he disobeyed orders and he was relieved of his
4 duty.  If he didn't know what was going in that
5 office, shame on him.  And you heard him testify he
6 doesn't remember what happened.  He doesn't
7 remember what was said, what went on.  Then
8 three days later you have the Chief, who comes in
9 on a Saturday during protests, when protests are
10 going on, you don't know what's going to happen and
11 you made the decision, which is completely lawful
12 and proper for him to decide who is detailed to
13 that protest.  And there weren't any issues and
14 thank God there weren't any issues, and people
15 have the right -- the First Amendment right to go
16 out and protest and march and the police department
17 offered, you know, assistance, traffic control.
18 It's what police departments are already supposed
19 to do.  For whatever reason, Sergeant Berge had to
20 involve himself.  And you saw the video.  You have
21 a copy of it.  You can take a better look at it
22 than I portrayed it for you because I wasn't so
23 good with the laptop, but you can tell from that if
24 he saw Chief Kosman outside his car.  You can tell

Page 286

1 if there was dialogue going back and forth.  You
2 can tell if he waved off the Chief.  And why was he
3 waving him off?  Because the Chief said, hey, get
4 back here, we don't want you going over there.  And
5 how do you know the Chief said that because
6 Sergeant Berge kept walking and you see the Chief
7 walking towards him, and then the Chief turned
8 around and Sergeant Miller got out of his car and
9 he told him, Go get him out of there.  We don't
10 need him over there.  Let the people just do their
11 protests.  So I don't want you to get all hung up
12 on all of the side issues and racial stuff and
13 who's the mayor and all of this nonsense.  It comes
14 down very simple.  You guys, as a commission, have
15 a very serious responsibility of interviewing and
16 hiring proper people that you want to patrol your
17 streets, and you want qualified individuals who
18 follow orders.  And I don't care what the order is.
19 We'll get into that as far as progressive
20 discipline, but an order is an order is an order.
21 Now, if it's an unlawful order and they say, you go
22 over there and slash those guy's tires because I
23 don't want them protesting, that's something
24 different, right?  And there's rules and policies

Page 287

1 for that, but this is hogwash and this is insane to
2 say that I think this is immoral, this is
3 unethical, and I'm not going to follow lawful
4 orders.  That's just not how the department is run,
5 and I don't think that's how you want your
6 department to run and patrol your streets because
7 if that's the case, then everyone is going to be
8 like, I'm not following today, it's immoral.  I'm
9 going to sit at my desk with my eyes closed and not
10 pay attention to my commanding officer when he's
11 following through on an issue that the elected
12 officials were getting calls on and asking them to
13 look into.  Is it that much to ask just to go over
14 and, you know, clean up the area and say, hey,
15 guys, you got to scatter out of here?  If you have
16 to write tickets, sometimes you've got to write
17 tickets.  Tickets get thrown out.  People -- If you
18 get a ticket, maybe you don't do that conduct
19 again; but it's a lawful order.
20         And then to go against the Chief
21 when you're out in the open and there's a protest
22 and there's civilians and they overhear undoubtedly
23 what's going on or see what's going on, this
24 interaction, and he disregards his orders multiple

Page 288

1 times.  So you keep talking about insubordination,
2 definitions.  It's like an umbrella.  I think
3 everyone here knows what insubordination is in your
4 daily lives.  And if you look at the policies, it's
5 failure to follow a lawful order.  That's
6 insubordination.
7         How many times did you hear from
8 the witnesses that we presented how many lawful
9 orders were disregarded by Sergeant Berge on the
10 15th?  Hang up the telephone.  You know, I'm here.
11 I'm talking to you.  Do you want to pay attention
12 to what's going on?  No one testified that
13 Commander Austin came in all angry and berated
14 like, What the hell is going on?  Certainly no one
15 testified because this goes to credibility -- I
16 couldn't believe it when I heard it at the formal
17 interrogation --
18         COMMISSIONER FLORES: That's about
19 five minutes.
20         MR. McGRATH: -- about the foot and the
21 thrusting.  That goes to credibility.  All
22 three charges were proven, hands down.  I'm out.
23 Thank you.
24         MR. HERBERT: Thank you.  I thank you

Page 289

1  guys for your attention. It's been a long day,
2  especially -- and, you know, my job is to represent
3  Paul Berge. And I'm going to do that. I'm going
4  to hold the Chief, who I'm sure is a very nice man.
5  I don't know him, but we've had friendly
6  conversations. I'm sure he's a fine man, but I'm
7  going to hold the Chief to its burden to prove his
8  case that Paul Berge violated these orders and that
9  these violations were so serious that they would
10  have to result in termination. And I think I told
11  you at the beginning of this case that essentially
12  what you're going to hear is I asked you to hold
13  the Chief responsible for his burden, and that is
14  to show that it has to be more than just people
15  being upset that they're not following your orders.
16          The evidence is undisputed. The
17  failure to follow his orders resulted in no harm
18  whatsoever, no harm. That's undisputed from the
19  Chief that wrote those orders. We have a highly
20  decorated, which you will get his complimentary
21  history, individual that's worked for 16 years, and
22  all of a sudden two days within a three-day time
23  period that lasted about ten minutes each, we're
24  going to fire him for a ten-minute conduct on both

Page 290

1  of these two days? That better be a pretty
2  egregious crime, and we already know it wasn't. It
3  wasn't. It resulted in nothing. And you, as a
4  board, have a job to do, and that is to evaluate
5  the evidence.
6          But if police officers or
7  sergeants or law enforcement in any respect, if
8  they believe that they will get fired for having
9  the audacity to question a supervisor, then the
10  policy is going to be I'm not saying a word. And
11  that's a bad policy. That's bad public policy
12  because we all know just in our experiences there
13  are some bad supervisors out there. And if we're
14  going to create a system where officers are afraid,
15  that officers are just going to be told something
16  and absolutely do it, you're going to create a
17  police department that is going to cost the village
18  millions of dollars in the future. But in this
19  case, the Chief had the burden. The Chief couldn't
20  even go back to my motion, which was denied, but,
21  you know, we had no notice of what exactly the
22  allegations were against him. And the ironic thing
23  is when the Chief was given -- when he couldn't
24  name what the acts were and what the statements

Page 291

1  were, he said something to refresh my recollection,
2  the charges. He got it. It didn't do anything for
3  him. What do you think we were like? He drafted
4  the charges. This was not a fair process. It
5  wasn't. There's no reason that this should result
6  in a recommendation for termination. There's no
7  reason here. It was quite clear. It's not ironic
8  that these two days happened -- that these
9  two incidents happened days apart. This was a
10  calculated attempt to get Paul Berge on a second
11  attempt because they knew the first attempt was
12  nothing. Insubordination they talk about in
13  opening, it's such a horrible thing, it destroys
14  police departments, nah. Depends what level of
15  insubordination it is. You're going to see the
16  documents, and I'm going to ask you to go through
17  them. They talk about progressive discipline.
18  They talk about insubordinate acts being Level 2
19  discipline. They talk about these training
20  documents all about an ulterior method of policing.
21  Do not be the enforcement police. Try and
22  establish relationships with the community. And
23  there's one document that ironically was not given
24  to me, but that's one of the ones we'll produce.

Page 292

1  It's all about homeless people and the Kankakee
2  policy about how to treat homeless people. Don't
3  give them tickets. Use your discretion. Those
4  things were buried from you for a certain reason.
5          Bottom line, this guy deserves
6  the benefit of the doubt. He deserves the benefit
7  of the doubt. He had a bad 20 minutes, even if we
8  believe everything that the Chief said. Is that
9  enough to fire somebody? Is that enough to create
10  a policy where police officers will never say a
11  word against their supervisors? I don't think so.
12  Thank you for your time.
13          MR. KELLY: Okay. That concludes the
14  hearing. Let's go off the record for a minute.
15          (Discussion off the record.)
16          COMMISSIONER FLORES: I make a motion
17  that we adjourn this meeting.
18          COMMISSIONER BESSANT: I second.
19          CHAIRMAN DAVIS: I have a motion. All
20  those in favor of adjourning this meeting, say aye.
21          (All say aye.)
22          (WHEREUPON, the meeting was
23              adjourned to October 14th,
24              2020, at 5:30 p.m.)

DEFENDANTS 001852

**Board of Fire and Police Commissioners**
**City of Kankakee**                                          **September 30, 2020**

Page 293

```
 1  STATE OF ILLINOIS   )
                        )  SS.
 2  COUNTY OF COOK      )

 3

 4          Tommasina M. Mantia, being first duly

 5  sworn, on oath says that she is a Certified

 6  Shorthand Reporter, Registered Merit Reporter,

 7  doing business in the City of Chicago, County of

 8  Cook and the State of Illinois;

 9          That she reported in shorthand the

10  proceedings had at the foregoing Board of Fire and

11  Police Commissioners' Meeting;

12          And that the foregoing is a true and

13  correct transcript of her shorthand notes so taken

14  as aforesaid and contains all the proceedings had

15  at the said Board of Fire and Police Commissioners'

16  Meeting.

17          Tommasina M. Mantia

18

19

20          TOMMASINA M. MANTIA, CSR, RMR
            CSR No. 084-004469
21

22

23

24
```

DEFENDANTS 001853

Board of Fire and Police Commissioners
City of Kankakee

September 30, 2020

## I

**[sic] (1)**
198:23

## A

**Aaron (3)**
248:12,20;249:12
**abandoned (2)**
211:17,18
**ability (4)**
177:23;186:3,9;
232:22
**able (7)**
101:18;178:3;
185:5;210:22;247:7,
12;253:14
**absolute (1)**
178:23
**absolutely (11)**
8:2;25:8;36:24;
90:22;92:20;94:21;
185:20;192:20;
220:14;222:9;290:16
**absorb (1)**
193:5
**academy (6)**
197:18,19;199:2,4,
5,12
**accepted (1)**
116:22
**access (1)**
242:15
**according (2)**
65:10;174:15
**account (2)**
94:23;184:7
**accountable (1)**
178:1
**accurate (3)**
205:17,19;230:23
**accusation (1)**
246:24
**accusations (2)**
247:1;250:2
**accused (2)**
108:10;124:14
**achieve (1)**
177:18
**acknowledge (2)**
233:12;251:14
**acknowledged (2)**
226:19;228:3
**acronym (1)**
203:2
**across (3)**
18:2,12;216:14
**Act (8)**
7:20;65:6;185:3,8;
186:12,16;199:24;
209:20

**acting (3)**
143:4;230:12;
264:15
**action (1)**
209:21
**actions (5)**
78:15;108:14;
130:9;158:2;184:20
**activated (1)**
50:10
**activity (4)**
244:12,14;245:7;
271:6
**acts (18)**
116:1,3;125:11,15,
19,24;126:4;129:17;
132:6;136:18,19;
137:4,21;144:18;
186:22;187:19;
290:24;291:18
**actual (1)**
210:20
**actually (24)**
11:1;84:18;145:20;
176:23;206:13;
208:19,22;209:10;
210:23;213:7;219:2,8,
13;220:13;226:12,14,
17,19;227:6,15;
248:11;263:4;266:10;
268:15
**add (1)**
93:22
**additional (6)**
183:17;188:2;
190:17;204:12;278:4;
281:15
**Additionally (2)**
8:4;239:19
**address (10)**
101:1,4,18,21;
102:3;106:9;124:11;
131:14;134:24;147:14
**addressed (2)**
100:17;148:21
**addressing (1)**
120:6
**adjourn (1)**
292:17
**adjourned (1)**
292:23
**adjourning (1)**
292:20
**administration (3)**
40:9,14,17
**administrative (10)**
73:22;74:1,10;
136:11;163:8;164:3;
176:10,16;186:24;
250:3
**admit (1)**
190:5
**admittance (1)**

190:12
**admitted (8)**
189:5,9,21,24;
205:21,24;282:23;
283:2
**adult (1)**
227:24
**adults (4)**
48:9,13;226:2,6
**advice (1)**
202:24
**advise (7)**
57:12,15;62:21;
68:5,11;73:21;163:7
**advised (5)**
17:6;27:24;28:2;
72:17;259:7
**advising (1)**
63:11
**affect (4)**
156:10;177:12,22;
187:1
**affected (1)**
177:22
**afford (1)**
133:19
**afraid (4)**
220:13;222:10,11;
290:14
**afternoon (1)**
199:9
**afterwards (1)**
113:21
**Again (34)**
6:18;34:1;47:21;
51:8;52:4;63:3;77:14;
81:4;84:7,17;87:17;
95:1;106:19;123:4;
126:3;131:17;138:7;
148:10;154:24;156:4;
161:3;162:21;191:22;
192:9,11;221:10;
222:17;223:24;228:3;
235:7;238:6;266:6,21;
287:19
**against (45)**
6:9;80:19;96:9;
100:17;101:1;102:4,
19;105:6;107:8;
120:7;121:3;123:8;
125:3;127:19;128:7;
131:15;134:24;
135:20;139:5;144:18;
146:4,9,9;147:5,15;
148:4;150:3,4,11,17;
151:11,15,18;152:20,
22;154:7;155:16,24;
157:7,11;159:18;
280:23;287:20;
290:22;292:11
**age (1)**
48:14
**agenda (2)**

3:3;4:13
**ages (1)**
196:11
**aggression (1)**
218:7
**aggressive (1)**
218:21
**aggressor (1)**
80:1
**ago (5)**
158:22;172:10;
196:18;202:13;205:4
**agree (19)**
25:5;26:23;66:21;
100:4;108:10,11;
111:9;131:12;137:3;
146:1,6,7;148:3;
150:12;155:9;172:15;
189:2;217:15;238:9
**agreed (4)**
8:21;259:12;261:8,
12
**agreement (2)**
124:1;133:22
**ahead (4)**
35:22;76:21;
149:13;168:16
**ahold (1)**
78:14
**Aid (1)**
195:22
**albeit (1)**
66:18
**alcohol (9)**
24:8,15,19;25:3;
212:5,22,24;270:19;
272:6
**alcoholism (1)**
211:6
**allegation (12)**
120:14,15;131:15;
148:4;149:22;150:9;
151:5,14,17;152:19,
23;153:17
**allegations (27)**
95:2;100:17;
102:19;105:6,17;
106:10,13;108:4;
110:15,17;120:6,8;
124:11;125:2;131:14;
134:24;147:2,5,8,14,
21;153:15;154:6;
155:3;156:9;162:21;
290:22
**allege (3)**
104:11;119:5;
144:18
**alleged (7)**
110:1;114:10;
122:17;138:20;
157:19;184:8;187:19
**allegedly (1)**
141:6

**alleges (1)**
276:6
**alleging (3)**
239:12;240:1;
245:23
**alley (2)**
49:8,9
**allow (8)**
65:8;68:17;86:15;
102:17;106:9;152:8;
190:12;283:11
**allowed (12)**
7:20;34:11;76:11;
95:10;101:4;102:9;
214:4;223:14,17;
246:12;255:3;283:9
**almost (4)**
183:5;196:16;
218:12;273:12
**alone (3)**
70:12;115:11;
146:10
**along (4)**
44:16;51:14,23;
228:17
**altercation (1)**
35:8
**alternative (3)**
209:21;210:16;
214:20
**alternatives (3)**
213:14;214:6;
268:23
**although (1)**
7:19
**always (7)**
37:10;45:14;47:9;
108:12;235:18;
269:21;279:22
**amended (1)**
41:7
**Amendment (1)**
285:15
**amendments (1)**
41:8
**amongst (1)**
192:23
**amount (1)**
69:12
**analysis (1)**
170:14
**and/or (2)**
76:5;212:12
**angle (2)**
87:18;89:5;253:19
**angry (6)**
14:10;22:13;
251:23;273:5,7;
288:13
**animus (1)**
151:16
**answered (17)**
16:24;19:12;23:24;

Schelli Reporting Service, Ltd.
(312) 558-1113

DEFENDANTS 001854

(1) [sic] - answered

**Board of Fire and Police Commissioners**
**City of Kankakee**                                                                            September 30, 2020

27:16,23;37:20;67:18;
129:6;135:3;167:7;
168:18;235:2;239:15,
18;240:20;243:14;
256:1
**Antwon (2)**
270:21;271:2
**anymore (1)**
256:16
**apart (2)**
21:7;291:9
**apologize (4)**
78:15;149:9;
194:11;224:12
**apparently (4)**
115:15;137:15;
258:16;276:23
**appear (4)**
14:4;10;24:3;73:9,
12;227:21,24
**appeared (2)**
252:19;254:19
**appears (1)**
205:19
**applicable (1)**
65:7
**applied (4)**
40:6;197:21;204:7;
206:12
**apply (2)**
204:1;205:5
**appointed (4)**
39:24;40:10;201:6;
281:1
**appointment (2)**
162:6,14
**appreciate (2)**
237:9;284:10
**apprise (1)**
163:7
**apprised (1)**
177:1
**approach (5)**
17:14;58:3,5,7;
228:20
**approached (2)**
58:19;264:9
**approaching (1)**
57:7
**appropriate (6)**
90:22;103:9,12;
183:13;193:20;205:4
**appropriately (2)**
8:3;209:6
**approval (1)**
157:11
**approved (1)**
201:11
**approximate (2)**
18:24;22:11
**approximately (20)**
9:14,15;11:11;20:8,
10;47:16;48:10,17;

54:13;58:6;139:18;
166:17;200:21;
202:12,13,17;217:7,
19,21;226:4
**area (50)**
49:8,10;54:4;56:23;
59:14;60:4,4;61:15;
62:2;63:10;65:14;
67:16,24;85:16,18;
86:8;87:6;89:16;
106:4,5,18;107:15;
110:8,20;115:22;
140:19;166:17;169:4,
24;201:3;209:5;210:9,
22;263:20;264:4,7,8,
18,21;265:1,18;266:1,
11,12,18;267:3,11;
270:10,15;287:14
**areas (2)**
214:5;224:5
**arguably (1)**
177:1
**argument (3)**
33:19;69:15,20;
71:17;168:12
**argumentative (3)**
122:20;123:17;
135:11
**arguments (4)**
191:17;192:8;
283:23;284:2
**arm (2)**
56:8,10
**armored (1)**
160:7
**around (28)**
11:13,16;12:11,21;
42:15;48:4;49:17;
52:10;54:16;56:20,21;
58:17,20;70:9;75:6,
11;82:20;92:1;
109:22;135:16;
139:21;174:14;217:4;
226:23;253:13;260:4;
270:21;286:8
**arrest (2)**
209:20;245:1
**arrests (2)**
160:11;213:15
**arrive (1)**
61:20
**arrived (3)**
61:14;62:12;262:6
**article (2)**
246:16,20
**ascertain (1)**
236:21
**asleep (6)**
15:9;24:3;37:23;
219:22,24,24
**assign (3)**
50:22,24;52:23
**assigned (17)**

42:22;46:4,9;50:16,
19;51:3;163:22;199:7,
11;200:8;201:3;
205:8;208:7;224:5,9;
243:20,22
**assignment (7)**
201:8,10;202:5,8,9;
206:9;244:2
**assignments (2)**
19:7;206:8
**assist (2)**
47:3;51:18
**assistance (1)**
285:17
**assisting (1)**
45:12
**associated (2)**
248:17,21
**associate's (1)**
196:23
**assume (2)**
63:24;252:14
**assuming (6)**
47:5;130:24;
168:18;191:11;228:4;
257:14
**astounded (1)**
57:3
**attempt (3)**
291:10,11,11
**attempted (1)**
70:15
**attempting (1)**
262:24
**attention (14)**
9:22;11:15;15:19;
31:10;34:23;44:5;
58:16;207:2;229:2;
262:12,13;287:10;
288:11;289:1
**Attorney (15)**
5:19,21,22,23;6:3,4,
13;36:13;91:10;
98:17;144:22;175:21;
243:15;274:24;281:13
**attorneys (7)**
5:18;236:3,6,9,15,
19;255:12
**audacity (1)**
290:9
**audio (1)**
117:8
**August (4)**
104:3,5;171:20;
274:15
**Austin (128)**
12:22;13:1,7,22;
14:12,21;15:7,12,22;
16:3,11;17:1,7,12,14;
18:1,6,9,14;19:17;
20:20;21:2,17;23:5;
24:2,14,22;26:1,6,10,
17;27:22;31:10,18;

32:4;33:10;35:14,17;
70:4,11,13,14,21;
71:11,16,20;72:3,18,
22,22;80:1;96:22;
105:9;126:1,9,24;
127:19;128:8,14,19;
129:8,19,22;130:6;
131:3;132:20;133:4;
135:16,23;136:8,14,
17,20,22;137:3,9,14;
144:19;145:8,14;
146:13,18,22;147:3,
16,20;148:9;149:22;
151:8;152:8;153:18;
156:24;161:6,10,19;
172:9;173:6;187:18;
190:3;207:5;208:7;
211:9,14;212:1,9,20;
214:9;215:22;216:4,
20;220:11;221:24;
231:6;250:19;251:18,
21;252:24;253:10;
256:15;259:2,7;262:2;
270:14;271:7;272:10;
273:5;280:6;288:13
**Austin's (8)**
70:20;72:14;
127:10;128:15;137:1;
170:9;213:4;260:5
**authorities (1)**
233:23
**authority (7)**
234:2;235:5,15,18;
237:15,22;239:19
**authorized (1)**
191:18
**available (1)**
45:14
**avoid (1)**
68:1
**aware (13)**
44:19;70:23;
148:14;154:3;156:6;
158:12;161:5;162:20;
184:24;225:9,11;
233:20;234:8
**away (20)**
54:13;55:20;57:1;
63:4;106:20;119:11;
127:15;129:4;139:17;
166:18;167:13,22;
169:9;170:2;175:9;
210:21;211:22;217:5;
260:16;271:4
**awoke (1)**
24:5
**aye (2)**
292:20,21

**B**

**bachelor's (3)**
197:1,2,3

**back (80)**
20:24;23:17;29:20;
33:1;49:1;52:11,17;
54:21;55:4,6,9,16;
56:17,18,22;58:12,13;
59:1,4,13,17,17,20;
60:14,17;61:6,9;62:2,
4;63:5,24;82:11,22,
23;83:14,15;84:5;
88:14;89:4;95:13,23,
24;97:24;106:5,19;
107:10,15;110:21;
115:20;116:2;129:16;
136:5;138:21;139:9,
12;149:14;169:4,24;
170:1;175:5;177:8;
195:4;202:9;205:9;
208:2,19;211:23,24;
221:8,9;225:8;228:15,
16;230:4,10;243:9;
259:4;286:1,4;290:20
**background (4)**
39:16;198:9;
220:19;243:19
**backing (1)**
224:14
**backtracking (1)**
128:17
**backup (1)**
202:23
**bad (8)**
160:11;177:10,11;
257:18;290:11,11,13;
292:7
**bait (1)**
222:6
**bargaining (2)**
123:24;133:22
**bars (1)**
210:5
**Bartlett (1)**
145:3
**based (30)**
7:21;30:21;36:13;
67:7;74:10;80:11;
93:15;94:5;96:13;
126:14;168:4,22;
170:6;174:7;175:14;
185:13;218:9;235:16;
238:9;245:17;248:22;
249:10;250:5;267:15,
20;276:1;277:1,16,20;
283:3
**bases (6)**
108:4;112:21;
116:10;121:18;122:4;
127:9
**basically (5)**
30:3;72:8;209:7;
212:2;213:21
**basis (19)**
67:23;76:17,18;
77:10;90:1,11,16;93:23;

**Board of Fire and Police Commissioners**
**City of Kankakee**                                                                    September 30, 2020

114:4;117:10;124:17;
125:2;128:4,6;153:7;
241:20;244:7;245:19,
20;246:5
**beat (1)**
174:14
**beats (1)**
224:10
**became (8)**
70:18;180:10;
203:13;213:6;215:23,
24;216:5;276:11
**become (1)**
160:3
**becoming (2)**
203:12;218:21
**beer (1)**
270:19
**begin (3)**
45:21;46:8;199:2
**beginning (10)**
46:9;47:11;81:12;
129:13;181:6,7;182:9,
22;207:10;289:11
**behalf (2)**
189:19;284:6
**behaved (1)**
170:20
**behind (8)**
53:6,17;82:14;89:6,
7;112:11;13;266:2
**belief (5)**
94:5;148:8;239:9;
240:7;275:24
**beliefs (1)**
239:1
**believes (5)**
90:15;91:6,9,12;
94:20
**belongs (1)**
34:2
**below (1)**
223:18
**beneficial (1)**
178:18
**benefit (3)**
159:19;292:6,6
**Bensenville (3)**
39:21;40:19,23
**berated (1)**
288:13
**Berge (272)**
6:7,8,11,23;10:13;
11:19,23;12:4;14:14,
23;15:3,5,6,11;16:4,7,
11,19;17:5,12,14,21;
18:2,10,15,20;19:10;
20:19;21:4;22:5;31:5,
11;33:8,12,16,22;
48:19,24;49:4;50:16,
22;51:3,10,18,23;
52:12,23;54:1,4,12,14,
19,20;55:11;56:3,21;

57:13,23,24;58:4,13,
17,19,24;60:3,18,21;
61:9;62:2,5,8,24;63:3,
19;64:23;65:1,14,18,
21;66:3;67:15,23;
68:9,13,22;69:1;70:4,
16,19,21;72:10,10,13;
73:3,9,19;74:9;77:23;
78:3,13;79:6,10,12,
23;80:9,19;82:18;
83:5;84:11;85:14,23;
86:4,20;87:17,18,22;
88:12;89:1,23;90:3;
91:22;92:3,14;93:4,6,
12;94:1,10;95:16;
96:5,10;98:8,19;99:5,
24;100:1,9,16,24;
101:24;102:17;
103:16;104:10,14,23;
106:9,22;107:3,6,22;
108:9;109:23;110:7,
18;111:10,14,24;
112:6;113:8,14,17,20;
114:4,24;115:4,11,15;
116:4,11;117:1,11,14;
118:3,6;119:6,24;
121:4,14,16,24;
124:18,21;125:24;
126:4,7;127:9,19;
128:2,7,15;129:8,17;
130:2,5,9,16;131:2,
14;132:6;133:2;135:7,
24;136:18,20;137:7;
138:24;139:16;
140:17;141:16;
142:23;143:16;144:5,
9,11,19;145:11;
146:24;147:5,8,10,14,
21;148:15;149:23;
151:9;152:1,20;153:6,
13;154:3,13;155:24;
157:8,11,15;161:11;
162:7,20;163:7,16;
164:10,15;165:8;
166:7,16;167:5,11;
168:9;169:18,19;
170:10;177:2;184:23;
187:9,12;190:24;
191:11;192:6;194:10;
195:8,11,20;261:1;
278:5,6;284:22;
285:19;286:6;288:9;
289:3,8;291:10
**B-E-R-G-E (1)**
196:4
**Berge's (15)**
15:14,18;16:18;
18:7;34:9;79:20;96:2;
105:5;131:23;133:1;
148:13;157:19;158:1;
185:1,8
**Berry (1)**
270:21

**besides (1)**
27:6
**Bessant (24)**
3:11,12;5:11;35:5,
18,22;36:4,9;181:15,
20;182:4,11;183:2,7,
16;193:9,14;267:24;
268:6,10;269:6;270:4;
283:13;292:18
**best (7)**
159:14;214:15,20;
232:22;269:24;279:4,
5
**better (6)**
13:18;102:24;
257:17;273:14;
285:21;290:1
**beyond (2)**
156:15;166:20
**bias (1)**
155:12
**biased (1)**
155:13
**bifurcated (2)**
179:23;185:6
**big (4)**
137:14;144:7;
225:6;226:8
**bigger (1)**
181:24
**bill (3)**
95:5;123:20,22
**Bird (8)**
45:22;46:9;47:16;
48:20;49:19;51:20;
228:6,8
**bit (7)**
24:7;39:16;48:12;
58:12;82:2;88:1;
175:19
**Black (5)**
44:16;82:10;
150:22;151:10;155:19
**block (2)**
84:15;210:21
**blocked (1)**
89:5
**blocks (2)**
210:13,13
**board (29)**
7:13,14,24;118:22;
119:1;121:10;122:16;
124:11;134:4;137:1;
138:7;149:9;152:10;
155:22;176:1,12;
178:13;180:18;186:2;
216:18;217:5;276:15,
20,21,24;277:4,5;
278:3;290:4
**body (2)**
218:9,11
**both (12)**
6:21,23;17:18;

28:20;101:21;103:2;
192:7,7;217:17,19,20;
289:24
**bottom (2)**
86:24;292:5
**bought (2)**
263:3;270:24
**Bourbonnais (2)**
225:7,8
**box (1)**
220:20
**Bradley (2)**
40:15,20
**brain (1)**
283:13
**break (10)**
5:16;97:21,23;
127:3;191:9;194:10,
23;195:3,24;206:14
**breakdown (1)**
48:8
**breath (1)**
197:7
**breathe (1)**
8:22
**brief (9)**
7:6;71:8,12,15;
113:20;114:3;161:9,
19;172:2
**briefing (4)**
17:16;19:5,8;
220:10
**briefly (3)**
10:15;40:12;160:23
**bring (5)**
134:4,9,10;237:21;
275:12
**broken (1)**
283:14
**brought (15)**
96:9;114:7;131:9;
145:4;170:23;185:5;
239:8;249:24;272:1;
273:5;274:7,11,24;
275:15;277:7
**brush (1)**
95:23
**brushed (2)**
84:11;120:8
**brushing (1)**
168:10
**build (5)**
209:2,14;210:24;
213:1;272:17
**building (4)**
40:4,5;52:13;175:8
**bunch (1)**
225:16
**burden (6)**
94:12;239:7;284:5;
289:7,13;290:19
**buried (1)**
292:4

**burned (1)**
75:17
**Butkowski (3)**
74:19,23;75:16
**B-U-T-K-O-W-S-K-I (1)**
74:23
**buttress (1)**
178:14
**buying (1)**
210:7
**buys (1)**
201:20

C

**CAD (1)**
189:24
**calculated (1)**
291:10
**call (30)**
3:1,8;7:4;15:1,18,
23;20:24;28:22;
38:16;47:9;61:21;
62:7,9;70:16,18;
78:14;87:5;93:5;
95:15;129:5;137:21;
141:4,11;190:22,23;
195:8;225:10;247:4;
249:21;252:20
**called (13)**
8:14;23:18,21;39:4;
61:13,23;62:9;88:15;
162:2;194:10;195:12;
243:22;273:10
**calling (3)**
24:2;37:24;271:12
**calls (5)**
8:10;200:18;
202:22;260:17;287:12
**came (28)**
7:11;12:22;13:1,7;
22:9,10,16,23;13;
24:15;29:20;45:18;
47:20;58:24;70:12;
106:7;202:9;209:3;
211:14;212:2,10;
220:5;221:8;222:16;
251:18,22;253:3;
267:10;288:13
**camera (3)**
75:20;81:15;87:20
**cameras (3)**
75:6,8;81:8
**can (141)**
3:7;7:1,5;8:22;9:1;
12:15,18;13:18;17:17,
18;20:15;34:24;35:2;
36:6;37:22;39:8;
42:16;46:20;47:1,15;
48:7;50:19;56:2,4;
59:9;66:10,11,18;
68:20;70:20;77:4,6;
81:1,19,20;84:3,13;

Board of Fire and Police Commissioners
City of Kankakee

September 30, 2020

87:13;91:2;92:24;
93:21,24;94:1,22;
97:16;99:9,10;100:2,
23;104:17;108:2;
109:18;118:8,21;
120:18;122:22;
124:10;126:17,18;
134:20;137:1;138:13;
148:24;149:4,14;
151:2,3,4,6;152:12;
153:22;155:22;156:9;
159:11,15;162:23;
168:24;172:22;
174:21;175:5;178:3,
20;182:12,15,18;
189:12;190:5;191:8,
10,22;192:8,20;193:5,
5,9;204:5;205:9;
212:6;214:24;215:20;
216:17,19;217:4;
218:2;220:22;225:1;
228:17;231:20;
237:20;238:17;246:9,
13;247:14,15,16,19;
249:2,17;252:18;
255:7,19;257:4,6;
261:17;265:12,13;
269:24;271:3;276:3,
15,15;281:19;282:16;
283:14,19,22;284:5;
285:21,23,24;286:2
**candidates (2)**
198:3,7
**cans (1)**
270:19
**capacity (1)**
206:19
**car (72)**
46:3,15,23;49:12,
16;50:1,7;52:6;53:18;
54:9,11,14,15,22;55:4,
6,9,16;56:17,19,23;
57:5,7;58:13;59:13;
63:12,23;81:24;82:7,
8,11;83:2,15;87:22,
23;89:6;106:3;107:1,
9,10;110:19;112:5,10,
14;113:4;116:1;
139:15;164:15;169:4,
24;200:14;208:21;
226:13,19;227:6,14,
17;228:15,16,20;
230:4,10;232:6;
262:15;263:12;265:3,
5;266:2;267:3;268:4;
285:24;286:8
**card (1)**
255:11
**care (3)**
131:22;141:22;
286:18
**career (6)**
193:18;206:7;

232:18;260:15;270:3;
280:16
**carry (1)**
233:24
**cars (7)**
48:5,6;50:13;52:7;
81:21;226:17;270:23
**case (41)**
4:5;25:18;26:11;
37:10;65:1,19;91:11;
94:15;99:21;102:17;
104:9;110:15;134:1;
135:6;136:15;142:18;
144:13;152:11;
155:24;157:8,12,16,
20;158:2;178:15;
184:4,22;186:8;
190:22;193:22;195:6;
201:20;206:20;
232:22;233:1;281:16;
284:13;287:7;289:8,
11;290:19
**cases (2)**
97:17;186:5
**catch (2)**
244:20,24
**categories (6)**
180:9,14,16;181:12,
22;182:21
**categorization (1)**
179:15
**categorized (1)**
180:10
**caught (1)**
75:8
**caution (1)**
6:15
**cautioned (1)**
8:4
**central (1)**
237:16
**certain (6)**
6:2,21;175:1;
179:20;212:4;292:4
**certainly (13)**
7:20,23;25:6,10;
66:1;104:13;139:4;
141:10;156:9;166:24;
193:18;215:8;288:14
**chain (8)**
26:12,15;27:5;32:1;
42:17,18,19;178:3
**chair (13)**
216:11,12,19,21,22;
217:1;220:16,23;
250:20;252:24;253:7,
17;275:17
**CHAIRMAN (32)**
3:1,4,7,10,19;4:1;
5:9,12,17,21;6:6,12;
7:13;174:10,13;
175:12,16;176:3,6,23;
177:3,7;192:16;193:2,

13,23;194:4,6,17;
283:15,20;292:19
**chance (5)**
10:7,15;75:8;77:11;
79:19
**change (7)**
132:16;201:1;
202:14,15,19;213:12;
269:4
**changed (1)**
202:7
**changes (1)**
233:17
**changing (1)**
202:21
**chanting (2)**
140:1,2
**chants (1)**
140:22
**characterization (2)**
55:23;71:11
**charge (18)**
116:24;119:24;
120:12,13;122:4;
127:19;130:13;
133:15;139:4;153:14;
154:4;155:20;156:3;
236:4;276:22;277:1,7,
8
**charged (34)**
64:24;65:19;68:13;
103:16;104:24;
107:18;109:4,14;
111:10;116:4,11;
118:6;121:11;123:1,
13;124:10;125:14;
129:9,18;130:2,10,16;
131:2;137:7,20;
139:11;144:9,12;
157:16;170:16;176:7;
239:22;279:19;285:1
**charges (106)**
4:15;7:12,15;65:24;
80:18;94:18;95:3,7;
96:9,13,24;97:7,7;
98:8,11,13,16,18;99:1,
17,21;100:8,13,13;
101:1,18,21;102:3;
103:8,16,18,22;104:1,
5,9,11,15,18;106:10;
110:6;114:7;115:24;
116:19,20,21;118:8;
120:6;121:3,7;122:17;
123:7,14;125:3,10;
126:6,12;127:5;128:7,
12;130:2,14,15,19;
131:1,9;134:4,9,10,
20;137:11;138:3;
151:20;152:7;153:23;
154:12,22;155:4,16;
156:15;157:7,11;
162:21;164:6;166:1,4;
170:22;171:7,8,12;

175:23;176:1,11,17,
21;190:14;194:19;
206:20;237:17;239:8,
10;274:14;277:10;
284:24;288:22;291:2,
4
**charging (1)**
122:6
**check (4)**
268:12;270:10,14;
271:12
**checking (5)**
70:17;202:24;
208:4;224:15;271:13
**Chief (174)**
6:23;7:3;8:9;30:16;
38:16;39:3,8,13,24,
24;40:1,7,10;41:18,
23;42:2,20,20;44:2;
45:1,14,16;63:21;
65:20;66:6,18;67:14;
74:5,8;76:10,10;77:1,
4,14;78:22;79:2,15;
81:4;84:2;86:13,18;
87:13;88:11,24;89:13;
90:1,15,17,17,22,24;
91:2,6,7,12,15,15,22;
92:1,21;93:4,21,24;
94:19;95:9,13,14,22;
97:11,18;98:2,6;99:9;
100:7;102:22,23;
114:7;144:20;152:12;
155:12;156:5,11,24;
157:6,23;160:21;
161:3;162:21;168:5,
16,24;171:7,23;
173:17;174:9;176:15;
178:18;180:10;
182:23;188:3,24;
189:18,20;190:20;
225:3;229:2,17,19,22;
230:1,2,6,20,21;
232:5;234:12,23;
235:5,21,21;237:8;
238:6,6;239:8,11;
240:1,4;247:24;248:2,
4;249:24;251:10,11;
255:11;262:7;263:10,
12,19,24;264:1,7,9,10,
22;265:17,24;266:11,
17,20;267:1,14;280:6,
14,24,24;282:2;284:7,
7;285:8,24;286:2,3,5,
6,7;287:20;289:4,7,
13,19;290:19,19,23;
292:8
**chief's (19)**
46:3;50:1;65:2;
66:13;77:5;79:2;
86:14;88:20;94:5,12;
167:1;168:22;178:14;
189:5;194:13,15;
231:17;250:1;267:11

**children (21)**
48:8,14;60:10;
86:23;115:9;117:23;
142:5,9,14;159:11;
196:9;225:16,18,20;
226:5,16;227:4,5;
228:13;230:14,15
**choose (1)**
94:20
**chosen (1)**
198:23
**Chris (4)**
248:14,19;249:20,
23
**chronological (1)**
161:4
**church (1)**
211:17
**circle (2)**
91:24;228:18
**citation (2)**
272:19,21
**citations (2)**
272:6,22
**citizen (2)**
8:6;187:22
**citizens (3)**
159:18;211:4;
260:20
**City (33)**
5:19;6:22;34:2;
39:13;44:10;49:11;
133:22;144:21,21;
146:15;155:17;
156:18;198:23;
201:11;206:23;
210:10;212:5,21,23;
216:24;218:20;219:9;
223:7;224:6,7;236:9;
248:21;255:12;
259:24;260:16;
269:22;272:5;273:18
**Civil (2)**
65:6;69:9
**civilian (1)**
173:3
**civilians (1)**
287:22
**claim (1)**
254:7
**claiming (1)**
79:24
**claims (1)**
156:9
**clapped (1)**
226:14
**clarification (1)**
232:7
**clarified (2)**
6:10;277:10
**clarify (1)**
186:11
**clarifying (1)**

178:16
**clashes (1)**
  69:11
**class (8)**
  158:12,16,16,21,23;
  268:17,18,18
**classifications (1)**
  181:13
**clauses (1)**
  124:1
**clean (2)**
  190:5;287:14
**clear (8)**
  19:10;168:3;
  170:22;177:4;231:16;
  265:24;266:3;291:7
**clearer (1)**
  8:23
**clearly (3)**
  151:8;152:6,7
**client (6)**
  22:5;92:21;94:21;
  277:21;278:2,3
**close (10)**
  19:19;21:3,6;
  138:17;140:12,17;
  160:19;220:21;
  251:11;272:2
**closed (8)**
  15:10,15,15;191:18;
  219:3,16;283:9;287:9
**closer (2)**
  85:4;220:11
**closest (1)**
  12:5
**closing (9)**
  191:16,17;192:8;
  220:2,7;283:10,11,23;
  284:2
**collaboration (2)**
  279:3,16
**collaborative (1)**
  269:21
**collect (1)**
  146:17
**collected (1)**
  146:14
**collecting (2)**
  145:12,15
**collective (2)**
  123:24;133:22
**college (9)**
  40:13;196:19,21,22;
  197:9,10,15,17,19
**color (1)**
  150:13
**combination (1)**
  71:6
**coming (10)**
  11:9;38:11,12;
  49:19;141:11;158:9;
  211:23;225:7;263:23;
  270:2

**command (14)**
  26:6,12;27:5;32:1;
  42:17,18,19;55:3;
  110:7;124:6;140:22;
  141:6;154:17;178:3
**commanded (4)**
  25:24;66:4;145:18,
  20
**Commander (156)**
  12:22;13:1,7,22;
  14:12,21;15:6,12,22;
  16:3,5,11;17:1,7,12,
  14;18:1,6,9,14;19:17;
  20:20;21:2,17;22:9,
  10,16;23:5,15,18;
  24:2,14,21;26:1,6,10,
  17;27:22;28:22;29:3,
  6,9;30:9;31:10,18;
  32:4;33:10;35:14,17;
  51:2;70:5,11,13,14,19,
  21;71:11,15,20;72:3,
  14,18,22;79:24;96:22;
  105:9;125:24;126:9,
  23;127:10,18;128:8,
  14,15,19;129:8,19,22;
  130:6,8;132:20;133:3;
  135:16,23;136:8,14,
  17,20,22;137:1,3,8,14;
  144:19;145:8,14;
  146:12,18,22;147:3,
  16,20;148:9;149:22;
  151:8;152:7;153:18;
  156:24;161:6,10;
  170:9;172:9;173:6,15;
  187:18;190:3;207:5;
  208:7;211:9,13;212:1,
  9,20;213:4,10;214:9;
  215:22;216:4,20;
  218:3;220:11,24;
  221:24;222:12;231:6;
  239:12;242:23;
  250:19;251:18,21;
  252:24;253:6,9;
  256:15;259:2,7;260:5;
  262:1;270:13;271:7;
  272:9;273:5;280:6,24;
  281:1;288:13
**commanders (6)**
  42:21;235:22;
  238:7,7;278:17;
  279:24
**commander's (2)**
  129:21;173:22
**commanding (5)**
  33:17,22;88:13;
  259:13;287:10
**commands (11)**
  33:13;43:14,16;
  85:16,18;96:19;107:6;
  108:23;127:22;
  261:21;262:16
**commencement (1)**
  6:19

**comment (3)**
  3:20;4:2;7:10
**comments (11)**
  3:2;4:7,11;6:17;8:4;
  31:12;54:18;60:23;
  166:8;167:4,12
**commission (46)**
  7:1;8:2;36:11;38:9;
  47:15;56:3;65:9;66:8,
  18;84:13;94:7,11,22;
  95:6;97:21;116:21;
  118:14;154:1,24;
  155:6,10;156:8;
  188:21;189:20;
  190:11,13,15;191:6,8,
  18;192:8,11;193:14,
  17,24;195:19;207:8;
  240:6;250:15;257:6;
  258:4;276:10;277:15,
  19;283:8;286:14
**COMMISSIONER (81)**
  3:9,11,12,13,14,15,
  16,17;4:12;5:7,8,11;
  34:19;35:3,5,18,22;
  36:4,9;177:5,8,12,15,
  21;178:6;181:15,20;
  182:4,11;183:2,7,16;
  193:9;194:5;267:24;
  268:6,10;269:6;270:4,
  7,13;271:5,11,16,20,
  24;272:8,14,23;273:4,
  19,24;274:4,6,10,20,
  23;275:3,6,11,14,20,
  23;278:6,13,21;
  279:14,18;280:4,12,
  21,22;281:4,6,11;
  283:13,22;284:1;
  288:18;292:16,18
**commissioners (17)**
  3:5,19;4:4;5:4,22;
  34:17;134:5;156:19;
  174:8;178:7,22,22;
  180:5;193:6;239:23;
  267:23;270:6
**commission's (1)**
  118:16
**committed (6)**
  126:4,8;129:17;
  137:4;184:8,16
**committing (3)**
  104:10;119:6;
  184:17
**common (1)**
  197:8
**communicated (1)**
  30:16
**communities (1)**
  244:9
**community (13)**
  7:11;8:7;159:2,8,15,
  16,20;160:1,17;214:5;
  227:1;268:24;291:22
**complainant (2)**

26:19,20
**complaining (1)**
  154:18
**complaint (12)**
  26:11;80:10;146:4;
  261:2;273:22;274:1,6,
  10;275:8,10,12,21
**complaints (2)**
  156:20;212:3
**complete (2)**
  150:6;199:5
**completed (1)**
  199:21
**completely (3)**
  156:6;173:15;
  285:11
**compliant (1)**
  148:16
**complimentary (1)**
  289:20
**compound (5)**
  32:16;43:17;153:9;
  243:6;250:24
**computer (1)**
  23:16
**concern (1)**
  214:5
**concerned (5)**
  31:22;97:12;
  227:21,24;258:17
**concerning (12)**
  66:13;112:17;
  125:15;133:21;
  137:21;153:15;154:6,
  12;155:17;157:7,24;
  166:21
**concluded (3)**
  104:9;133:2;192:24
**concludes (1)**
  292:13
**conclusion (2)**
  191:15;192:5
**conclusions (1)**
  134:14
**conclusively (1)**
  117:11
**conduct (14)**
  19:5;28:22;74:10;
  108:19;133:18;
  134:11;139:12;
  144:10;146:5;181:12;
  183:20;186:4;287:18;
  289:24
**conducted (4)**
  134:15;144:17;
  146:13;280:23
**Conducting (1)**
  201:15
**confidence (2)**
  280:23;281:5
**conflict (1)**
  5:2
**confrontation (5)**

68:2;72:9,9;127:2;
  142:23
**confrontational (1)**
  70:18
**confrontations (2)**
  68:6;142:21
**confronted (4)**
  229:17;230:6;
  250:1;266:22
**confused (11)**
  114:12,13;175:19;
  218:6;219:2;232:15;
  235:11;259:10,24;
  275:7,16
**confusion (1)**
  277:8
**Congratulations (1)**
  9:7
**consensus (2)**
  194:7;279:3
**conservatively (1)**
  191:5
**consider (10)**
  4:9;7:15;91:15;
  105:11;118:21;
  191:22;209:5;211:2;
  278:9;284:13
**consideration (1)**
  193:20
**considered (3)**
  209:4;210:11,14
**constitute (2)**
  126:7;233:22
**constituted (1)**
  112:16
**contact (5)**
  69:23;70:1;74:15,
  18;144:12
**contacting (1)**
  75:4
**contacts (2)**
  200:17;201:17
**contain (1)**
  238:23
**contained (5)**
  41:3;97:6;111:21;
  239:5;257:1
**contains (2)**
  124:1;176:19
**context (2)**
  149:19;175:15
**continuance (1)**
  284:10
**continue (9)**
  4:18;5:13;53:2;
  65:9;91:18;95:10;
  191:7;213:1;223:17
**continued (9)**
  53:4;56:6;57:24;
  107:12;226:21;228:9,
  23;230:9;263:8
**continuing (2)**
  85:22;162:11

Board of Fire and Police Commissioners
City of Kankakee                                                                September 30, 2020

**contrary (1)**
117:3
**control (2)**
50:13;285:17
**conversation (44)**
17:2;20:5;22:15,20;
27:24;59:7,10,22;
60:20;62:15,20;64:14,
18;65:4,22;66:13;
68:4;71:15,19;72:2;
85:22;88:21;90:23;
91:1,3;94:6;100:6;
105:10;106:12;
107:21;112:19;
114:23;115:2;117:13;
129:14;141:23;150:2;
161:9;256:14;264:6,
13,19,24;265:22
**conversations (1)**
289:6
**copies (2)**
71:9;233:9
**copy (8)**
118:11;190:5;
194:19;205:17;
257:15;284:15,16;
285:21
**corner (4)**
52:13;81:16;
226:13;227:11
**correcting (1)**
208:4
**correspondence (1)**
73:24
**Cortney (1)**
3:11
**cost (1)**
290:17
**couch (1)**
37:23
**counsel (6)**
164:7;169:14;
237:9;267:7;277:15;
283:9
**Count (8)**
96:24;97:6,7;
125:22,23;126:13,15;
165:24
**counts (4)**
125:17,23;155:7;
156:15
**county (5)**
51:20;53:3,9;74:16;
81:9
**couple (13)**
15:23,23;23:19;
30:22;48:5;54:15;
61:21;178:24;185:13;
206:13;210:1;270:7,
19
**course (5)**
36:21;38:2;159:6;
205:11;206:3

**courses (1)**
159:8
**court (5)**
8:5;40:4;79:7;81:1;
281:18
**courthouse (39)**
47:22;48:4,21;
51:20;53:3,10,13,24;
54:2,5;57:22;58:1,7,
10,11;61:16;64:15;
68:22;75:7,12;81:9,
14;86:22;87:20;89:15,
20;107:11,12;112:2,3;
113:3;114:20;140:9;
164:11,14;166:9;
169:12;228:10;262:6
**courtroom (1)**
7:16
**cover (1)**
205:13
**covered (1)**
131:21
**COVID (1)**
8:20
**create (4)**
268:23;290:14,16;
292:9
**credibility (4)**
155:11;156:10;
288:15,21
**credible (2)**
66:20;284:19
**crime (1)**
290:2
**crimes (2)**
201:18;244:15
**criminal (3)**
40:15;97:17;268:21
**cross (3)**
144:6;191:4;233:4
**cross-examination (9)**
7:23;21:10;98:4;
125:13;161:15;168:4,
23;233:5;265:9
**crosstalk (1)**
243:12
**crotch (5)**
18:10;217:2,5;
250:21;253:11
**crowd (4)**
47:23;48:9;55:1;
82:19
**curb (1)**
82:5
**curious (1)**
225:15
**current (1)**
39:11
**curt (1)**
173:11
**curtail (1)**
66:14
**cut (1)**

243:15
**cute (1)**
121:21

**D**

**Daily (4)**
36:8;227:10;
241:20;288:4
**Dan (1)**
189:7
**danger (4)**
143:10,13;187:20,
23
**dangerously (1)**
187:2
**dare (2)**
213:7;216:7
**dark (1)**
82:7
**date (22)**
9:7;10:9,12,24;
11:7;21:14,20,24;
23:3,7;44:23;45:23;
51:11;64:15;72:18;
79:10;103:22;170:14;
171:8,12;207:3,4
**dated (1)**
241:22
**daughter (2)**
196:10,13
**DAVIS (35)**
3:1,7,9,10,19;4:1;
5:9,12,17,21;6:6,12,
19,24;174:10,12,13;
175:12,16;176:3,6,13,
23;177:3,7;192:16;
193:2,13,23;194:4,6,
17;283:15,20;292:19
**Dawn (1)**
3:15
**day (61)**
9:23;24:20;25:22,
44:7,11;46:23;47:1;
59:14;61:17;62:3;
70:17;71:5;73:1,2;
89:3;99:18;100:12,18;
105:18,18;106:10;
119:22;135:19;137:4;
141:17;142:1;146:23;
161:11;185:11;
188:10;194:1;206:11,
16;207:19;208:1,7,12,
12,13,18;209:3;
223:22,23;224:2,3,12,
18;225:1,12;232:9;
260:2;267:13;270:11,
14;271:7;272:2;289:1
**days (10)**
73:3;185:13;
223:10;231:5;237:11;
285:8;289:22;290:1;

291:8,9
**day's (1)**
19:7
**deal (6)**
137:14;144:7;
200:3;209:24;213:13;
272:4
**dealing (3)**
176:3;201:22;
214:15
**dealt (5)**
232:18;269:15;
270:3;273:16;280:2
**Dearborn (6)**
47:19,19;52:5,7;
211:16;226:23
**decently (1)**
211:1
**decide (9)**
94:8;134:3,5;
152:11;155:7;241:16;
273:2;284:19;285:12
**decided (2)**
45:8;99:2
**decision (9)**
66:11;67:4;103:15;
142:1,2;157:7;277:16,
20;285:11
**decisions (2)**
183:14;237:7
**decorated (4)**
123:8;125:3;
146:10;289:20
**defense (2)**
95:8;101:10
**defined (1)**
240:8
**definitely (2)**
153:2;177:14
**definition (7)**
170:6;172:6,12,15;
173:8,12;244:3
**definitions (1)**
288:2
**degree (5)**
40:14,20,22;196:23;
197:3
**degrees (3)**
40:13,18;103:2
**deliberate (7)**
191:19;192:9,14,18;
193:1,21;233:23
**deliberation (2)**
191:20;194:1
**demeanor (1)**
13:9
**demilitarization (3)**
159:22;160:9,16
**demilitarize (1)**
160:6
**demonstrate (2)**
216:17,20
**denied (3)**

291:8,9
**deny (2)**
250:22;276:17
**Department (98)**
9:5,14,17,20;10:2;
11:12;18:22;31:24;
34:10;37:3,21;40:24;
41:5,10,13;42:3,8,10,
17;43:3,5;44:2;45:2;
47:3;73:6;75:2;76:11;
78:9;79:16;80:11;
81:5;96:17;97:11;
102:22;108:18,21;
133:23;138:22;139:6;
146:3;153:15;154:5,8,
14;156:22;158:15,18;
159:14;160:3;171:1;
172:22;173:4;174:15;
177:19,20;178:2;
179:5,13;180:19,22;
183:20;185:16;
195:21;214:3;215:3;
233:9;234:9,13,16,20,
24;235:6,14,17,19,24;
237:16,23;239:19;
240:15;245:17;
248:18,22;252:7;
254:21;256:16;259:4,
9,16;269:18,22;
270:22;272:9;275:4;
285:16;287:4,6;
290:17
**departments (3)**
206:5;285:18;
291:14
**department's (3)**
29:12;186:3,9
**depending (2)**
193:11;247:3
**Depends (7)**
238:19;240:17,22;
244:3;253:18,19;
291:14
**depict (1)**
81:13
**depiction (1)**
277:1
**deputy (8)**
40:3;42:20;100:7;
235:21;238:6;251:10;
280:24;284:7
**describe (2)**
81:19;207:10
**described (1)**
113:3
**deserves (3)**
190:14;292:5,6
**designed (1)**
178:17
**desirable (5)**
201:7;244:2,4,5,6
**desk (23)**
11:23,24;12:3,3,5,6,

DEFENDANTS 001859

**Board of Fire and Police Commissioners**
**City of Kankakee**

September 30, 2020

12;15:10;16:18,21;
17:22;18:2,7,12;
19:15;216:14;219:21;
250:20;253:1,10;
260:1,4;287:9
**Despite (2)**
131:8;146:12
**destroy (1)**
186:8
**destroys (2)**
186:3;291:13
**detail (2)**
50:17,23
**detailed (2)**
51:10;285:12
**details (1)**
150:6
**determination (4)**
104:14,23;133:24;
175:12
**determine (10)**
66:8,19;67:8;103:8,
11;108:17,20;117:11;
119:14;147:24
**determined (4)**
133:1;135:14;
186:14;263:7
**dialogue (1)**
286:1
**difference (2)**
240:2,10
**different (20)**
156:7;159:5;
173:16;181:21;188:7,
23;194:1;203:10;
214:5,6;234:14;
235:19;273:19,20;
278:16,16,17,19,19;
286:24
**differently (1)**
280:5
**difficult (1)**
96:17
**DIRECT (37)**
8:16;28:4,6,7;33:9,
13;39:6;52:6;55:8,9;
56:5,16,18,22;60:7;
76:21;80:18;91:5;
97:4;113:22;132:22;
136:1;137:16;143:16;
167:12;169:17,19;
170:5;188:14,14;
191:3;195:14;207:2;
232:9;264:18;266:19;
284:14
**directed (9)**
32:13;36:1;37:2;
58:16;67:15;73:10;
98:15;110:7;146:18
**directing (1)**
99:10
**direction (12)**
18:10;47:17;55:12,

15;56:11;59:3;77:24;
81:14;88:12;214:24;
224:20;263:10
**directions (1)**
114:15
**directive (1)**
55:3
**directives (4)**
43:14,16;166:15;
233:24
**directly (1)**
113:9
**Dirksen (1)**
40:5
**dirty (1)**
153:6
**disagree (2)**
178:21;180:2
**disagreement (1)**
35:9
**disciplinary (3)**
179:4;184:13,20
**discipline (19)**
124:2,5;174:22;
175:1,11;177:13,22;
178:2;179:8,11;180:5;
181:13,21;183:24;
185:7;186:13;286:20;
291:17,19
**disciplined (1)**
21:23
**discourteous (2)**
173:7;221:4
**discover (2)**
119:14,15
**discretion (8)**
181:23;182:23;
184:2;241:6;272:21,
24;273:1;292:3
**discretionary (1)**
272:18
**discriminated (1)**
154:7
**discrimination (6)**
153:14,23;154:4,18;
155:15;156:21
**discriminatory (1)**
157:2
**discuss (5)**
38:13;72:12;
157:10;254:20;279:11
**discussed (4)**
272:9,10;279:22;
280:1
**discussing (1)**
192:23
**discussion (8)**
70:15,16;82:22;
86:5,19;87:21;214:23;
292:15
**discussions (2)**
214:14;269:17
**Disobedience (2)**

44:3;233:22
**disobedient (1)**
187:19
**disobeyed (6)**
57:10;97:4;106:17,
18;173:4;285:3
**disobeying (7)**
105:19,23;107:13,
14;187:9,12,17
**disparate (1)**
155:18
**dispute (1)**
239:11
**disregard (4)**
7:24;64:9;121:14,
17
**disregarded (2)**
266:13;288:9
**disregards (1)**
287:24
**disrespectful (1)**
29:5;33:15;120:1
**distance (2)**
85:13;220:20
**division (2)**
42:23;47:10
**divorce (1)**
260:14
**document (17)**
36:23;77:12,15,17;
91:8;99:16;122:6;
149:15,16;163:1;
204:17;246:6,9;
256:13;276:20;277:3;
291:23
**documenting (1)**
71:7
**documents (9)**
145:12,15,21;
146:14;176:14;177:1;
281:19;291:16,20
**Dodge (1)**
46:6
**dog (1)**
234:12
**dollars (1)**
290:18
**done (18)**
45:8;59:14;72:23;
85:19;130:6;136:22;
149:14;152:18,21;
158:17;177:6,7;192:7;
214:11,13;218:13;
260:17,17
**door (7)**
12:6,7,10;19:19;
58:11;212:10;220:7
**doorway (3)**
13:5;18:5;19:18
**doubt (2)**
292:6,7
**down (21)**
4:15;5:5;8:22;

10:16;21:20;52:17;
56:9;127:3;209:10;
210:22;220:16;221:9;
235:15;255:13;263:1;
268:21;270:18;271:9;
272:4;286:14;288:22
**downstairs (3)**
4:19,21;5:14
**downtown (4)**
40:5;209:4;210:12,
21
**dozens (1)**
23:3
**Dr (5)**
3:9;6:19,24;174:12;
176:13
**draft (1)**
98:16
**Drafted (4)**
98:11,13;123:14;
291:3
**draw (3)**
9:22;11:15;44:5
**drawn (2)**
80:18;104:5
**drew (2)**
103:18;104:9
**drinking (2)**
25:10;271:2
**drive (8)**
75:19,20,24;91:24;
194:12;211:22;
228:18;232:6
**drivers (1)**
52:8
**driveway (1)**
61:15
**driving (4)**
46:3,14;50:1;
197:14
**drove (3)**
63:24;225:15;271:3
**drug (9)**
201:15,18;211:5;
244:12,14,15;245:7;
247:23;250:3
**drugs (6)**
201:22;244:18,19;
245:17;249:10;250:11
**drunk (2)**
193:5;212:13
**Due (4)**
4:16;6:21;133:16,
21
**duly (3)**
8:14;39:4;195:12
**Dumas (1)**
251:10
**during (42)**
6:18;8:7;24:19;
29:2;31:4,9;45:12;
48:2,19;49:16;56:14;
59:21;85:15;86:1,3,

17;90:9;97:17;
113:20;114:2;118:4;
120:10;121:19;
132:17;168:22;169:8;
194:22;197:9,24;
200:23;202:5;203:1;
206:18,22;207:18;
208:11;211:20;
221:22;224:24;
231:10;258:21;285:9
**duties (12)**
18:15,21;27:13;
59:21;72:18;108:23;
161:11;201:13;208:1,
6;224:2,11
**duty (31)**
25:6,15;36:21;
61:10;62:3;63:11;
89:3;106:6,6,21;
107:16;108:24;148:5;
170:2;212:15;218:18,
22,23;221:10,13;
222:1,17;223:6,11;
224:18;259:8,14,15;
260:1,4;285:4

**E**

**earlier (19)**
7:10;15:1;16:6,8;
17:18;20:15;70:16;
84:10;115:3;128:5;
129:2;139:23;207:20;
251:21;267:16;
270:11,14;271:7;
276:9
**early (1)**
199:3
**ears (1)**
125:8
**east (13)**
12:6;47:18,21;49:7,
24;53:13;58:11;59:1,
5;87:21;112:2,8;
226:12
**education (1)**
40:12
**EEOC (6)**
156:9;261:2;
273:21;274:1,21;
275:21
**effect (4)**
16:1;17:11;57:8;
264:1
**effort (2)**
235:20;269:21
**egregious (1)**
290:2
**either (13)**
7:2;36:12;37:2;
50:5;78:14;111:2;
116:19;119:12;
127:24;155:4;156:21;

**Board of Fire and Police Commissioners**
**City of Kankakee**

September 30, 2020

230:21;281:13
**elected (3)**
156:14;268:16;
287:11
**electronic (1)**
41:6
**elicit (1)**
178:17
**else (22)**
34:16;35:4;64:17;
71:7;72:5;107:2;
130:1;137:23;152:18;
160:18;174:6;181:14;
188:1;189:3;218:17;
221:21;234:15;240:3;
269:20,21;281:12;
283:2
**elsewhere (1)**
257:1
**e-mail (1)**
282:1
**e-mails (1)**
157:23
**employed (1)**
39:13
**employee (7)**
99:11;101:18,20,21,
23;108:9;172:21
**employer (2)**
101:20;102:21
**employers (1)**
198:13
**employment (3)**
39:11;154:13;
197:24
**encounter (1)**
211:9
**encountered (1)**
280:16
**encourage (3)**
192:21,22;193:17
**end (16)**
23:10;50:5,6,6,7;
156:12;158:10;181:8;
207:12,15;211:13;
212:7;260:2;271:22;
272:1;277:10
**ended (1)**
220:7
**enforce (1)**
272:5
**enforcement (11)**
39:17,18,18,20;
40:16;61:3;69:20;
183:4;201:4;290:7;
291:21
**enforcing (2)**
213:14;268:20
**engaged (1)**
108:19
**enhancing (1)**
159:1
**enlighten (1)**

138:13
**enough (5)**
227:4;238:14;
282:3;292:9,9
**enraged (4)**
213:6;215:24;
216:5;273:12
**enter (1)**
13:22
**entertain (1)**
5:4
**entertaining (1)**
284:2
**entire (7)**
76:21;120:24;
180:13;184:20;224:6,
7;232:18
**entitled (6)**
91:18;94:19;
133:20,23;166:24;
180:6;192:2;237:14;
239:20;240:10;
245:24;246:3
**episode (1)**
208:17
**equal (1)**
259:24
**equipment (1)**
160:8
**erratic (1)**
143:4
**error (2)**
11:5,6
**erupt (1)**
230:18
**especially (4)**
69:24;132:17;
182:16;289:2
**essentially (3)**
200:13,15;289:11
**establish (1)**
291:22
**established (3)**
100:3;146:18;
210:15
**ethics (1)**
238:19
**evaluate (2)**
193:10;290:4
**evaluation (1)**
199:23
**even (19)**
121:6;123:14;
132:7;135:9;156:1,5,
7,11;172:20,21;
182:20;213:7;223:12;
225:5,22;273:13;
279:21;290:20;292:7
**evening (10)**
5:20;8:9,18;21:12;
39:8;70:10,10;98:6;
195:16;233:7
**events (3)**

66:2;161:4;255:13
**eventually (5)**
206:11;221:8;
222:16,18;261:19
**everybody (1)**
234:14
**everyone (9)**
7:9;158:10;200:12;
253:16,19;270:1;
284:8;287:7;288:3
**everyone's (1)**
284:11
**evidence (33)**
4:5;7:2;47:5;71:18;
94:14,23;116:21,24;
117:2,4;133:6;135:11;
143:20;168:12,22;
173:19;190:18;
191:15,19;192:1,12,
15,18;194:3,8;205:21;
215:12,13;245:21;
267:5;277:2;289:16;
290:5
**evidentiary (1)**
6:20
**exact (4)**
122:13;130:23;
201:5;266:24
**exactly (6)**
65:3;125:14;
172:17;264:21;282:4;
290:21
**exam (1)**
204:4
**EXAMINATION (8)**
8:16;31:1;39:6;
161:1;188:5;191:2;
195:14;203:16
**examined (3)**
8:15;39:5;195:13
**Except (1)**
189:23
**exchange (1)**
90:23
**excited (1)**
14:4
**Excuse (1)**
30:1
**Exhibit (28)**
41:18,23;42:2;74:5,
8;77:1,5,7;78:22;79:3;
99:9;118:14,22;119:1;
121:10;138:8;149:1,2,
9,10;162:22;176:15;
194:13,15;204:21;
205:23;276:7,15
**exhibits (6)**
118:12;189:4,20;
190:19;191:21;281:22
**exited (2)**
54:11;139:15
**exonerating (1)**
141:10

**expect (6)**
43:10;79:16;122:2;
178:4;191:1;280:7
**expected (2)**
270:11;280:15
**experience (5)**
61:3;132:17;
183:11;211:8;269:20
**experienced (4)**
34:21;78:2;280:5,8
**experiences (1)**
290:12
**expert (1)**
94:3
**explain (7)**
102:9,18;147:14;
207:9;248:10;255:4;
270:17
**explains (1)**
102:15
**explanation (4)**
16:8;221:12;246:7;
266:5
**explore (1)**
68:17
**express (1)**
6:17
**extended (1)**
83:19
**extensive (1)**
276:19
**extra (2)**
51:15;208:3
**extremely (1)**
264:13
**eyes (13)**
15:10,14,15;31:20;
124:22;125:6;218:11;
219:3,16,21;220:2;
278:18;287:9

**F**

**face (9)**
55:11;164:16,16;
217:6;253:11;260:5;
262:18;265:1,2
**faced (2)**
165:8,9
**facility (2)**
4:18;81:17
**facing (9)**
83:5;103:17;107:7;
167:19,19;168:9,9;
169:6,6
**fact (9)**
4:16;32:5;113:5;
131:8;136:4;150:16;
154:3;159:4,24
**factor (2)**
141:10;276:23
**factors (1)**
186:19

**facts (9)**
47:5;71:18;141:20;
146:19;156:1,2;
168:12,19,21
**failed (3)**
129:8;261:4;266:18
**failure (9)**
44:3;108:23;
127:20;170:4,7;
233:24;240:23;288:5;
289:17
**fair (16)**
6:24;99:13;110:15;
131:22;133:18;
134:11,15,18;146:8;
191:24;198:1;202:1;
277:20,23,23;291:4
**fairly (1)**
198:1
**faith (1)**
257:19
**fall (2)**
37:23;219:24
**false (20)**
94:1,4,8;95:3,3;
114:1;115:14;118:3,5;
119:5,7,8;121:18;
122:3,17;123:9;
124:17;125:12,18;
232:24
**familiar (3)**
179:17,19;234:2
**far (23)**
12:6;31:24;33:15;
54:13;112:9;132:19;
156:8;161:4;170:9;
208:14;209:20;214:2;
217:5;235:11;237:6;
238:24;239:9;240:7;
243:19;258:17;
260:19;284:24;286:19
**fast-forward (1)**
223:9
**Father (4)**
219:3,17,18;253:8
**favor (1)**
292:20
**fear (1)**
219:12
**February (1)**
158:19
**fed (1)**
94:18
**federal (1)**
40:4
**feel (7)**
5:1;182:1,6;193:7;
194:6;210:17;213:2
**feeling (2)**
175:18;200:12
**feelings (1)**
232:14
**feet (13)**

**Board of Fire and Police Commissioners**
**City of Kankakee**

September 30, 2020

15:9;18:7;52:18;
54:16;139:9,12,17;
166:18;216:15;
217:23;253:22,22,22
**fell (2)**
219:22,24
**felt (5)**
68:24;69:7;210:19;
219:13,14
**few (4)**
210:13,13,23;
222:23
**fiddling (1)**
263:13
**field (4)**
195:22;199:14,21,
23
**fight (1)**
219:14
**figure (4)**
183:10;232:8;
239:23;279:12
**figuring (1)**
270:2
**file (6)**
37:2;80:9;155:22;
157:7,11;254:6
**filed (16)**
91:11;121:3;123:8;
130:14;153:13;154:4;
155:16;156:7;175:23,
24;176:22,22,23;
206:20;274:1,2
**fill (2)**
10:24;188:9
**filled (2)**
25:21;111:1
**finally (3)**
65:14;125:12;
196:18
**find (9)**
26:9,16;61:6;86:7;
147:10;159:11;
214:15;268:22;280:20
**finding (1)**
246:24
**fine (7)**
7:18;8:1;16:2;
194:24;205:9;258:5;
289:6
**fines (2)**
213:15;268:22
**finish (12)**
35:20;123:5;175:2,
3,4;191:11;194:2;
197:8;217:14;237:1;
252:3,16
**Fire (4)**
134:5;155:24;
289:24;292:9
**fired (1)**
290:8
**firing (1)**

156:2
**first (48)**
5:6;8:14;15:4;
23:13,23;36:17;38:1;
39:4;48:23;49:1,24;
54:6;55:5;59:16;
62:14;70:7;81:11;
90:19;100:16,24;
102:2,4;105:4,7,9;
106:3;125:22,23;
131:13;153:24;
169:23;175:4;193:9;
195:12;209:3,8;212:9;
223:2;226:11;246:14;
255:4;271:20;272:1;
277:4;280:15;281:20;
285:15;291:11
**fishing (2)**
247:9,11
**fits (1)**
183:1
**five (15)**
3:18;20:13;29:1,2;
48:11,11,18;195:1;
200:11,11,21;283:24;
288:2,23;288:19
**five-minute (2)**
191:9;283:23
**five-year (2)**
200:23;201:2
**flag (2)**
82:9,10
**flash (4)**
75:19,20,24;194:12
**floor (1)**
5:10
**Flores (18)**
3:13,14;5:8;34:19;
35:3;191:8;194:5;
278:6,13,21;279:14,
18;280:4,12,21;
283:22;288:18;292:16
**flying (1)**
181:5
**Focus (3)**
113:24;211:24;
216:3
**follow (43)**
33:12;36:20;41:14;
43:6,16;44:3;60:8;
96:18;104:20;108:23;
113:22;114:14;134:3;
144:1;169:18;170:4,7;
177:18;180:6;183:23;
188:14;233:13,24;
238:10;239:1;240:16,
18;241:6,17;242:1,8,
20;243:1;260:23;
261:4;266:18;267:10;
269:10;284:22;
286:18;287:3;288:5;
289:17
**followed (15)**

32:9;33:4;43:11;
53:5;71:2;82:4;
104:20;169:20;178:4;
228:12,14,16;261:20;
280:7,17
**following (19)**
32:12;44:14;48:5;
60:7;73:1,7;78:1;
88:3;106:8;108:20;
143:24;162:10;
185:17;226:18;
284:14,24;287:8,11;
289:15
**follows (4)**
8:15;39:5;179:10;
195:13
**follow-up (8)**
30:20;36:12;38:8;
161:3;178:8;188:4;
266:17;281:12
**foot (14)**
21:7;49:6;216:11,
12,22;217:1;250:20;
252:24;253:6,10,17;
260:5;275:17;288:20
**footage (3)**
75:10,14;81:5
**force (1)**
195:23
**forget (4)**
7:19;95:24,24;
216:22
**forgot (6)**
10:24;49:6;137:17,
18,23;194:11
**forklifts (1)**
197:14
**form (25)**
3:18;26:24;41:4,6;
74:4;100:19;109:15;
110:9;111:3;116:13;
119:17;122:19;
123:16;126:10;
131:17;141:12;152:3;
155:21;161:16,17;
173:18;174:1;243:2;
244:21;253:24
**formal (20)**
76:8,15;78:5,8,11;
79:13,20,24;80:3,14;
90:2,9;92:7;93:15;
97:9;101:13,16;171:1;
284:16;288:16
**Formally (2)**
101:3;104:16
**forth (4)**
52:18;139:9,13;
286:1
**forum (1)**
156:7
**forward (1)**
284:5
**found (5)**

95:6;120:9;148:7;
159:9;184:17
**foundation (19)**
13:16,19;37:5;
50:19;65:5;71:24;
90:13,20;94:2;113:10;
116:15;133:5;142:24;
151:19;152:4;153:19,
22;215:11;265:20
**four (6)**
9:15;81:8;196:14;
199:14;217:22;274:17
**fourth (1)**
38:3
**FRANK (2)**
39:3,10
**Frankfort (3)**
158:18;159:13;
204:15
**free (2)**
38:13;155:10
**frequently (1)**
23:9
**Friday (1)**
73:2
**friendly (2)**
160:12;289:5
**friends (1)**
261:3
**front (28)**
17:19;21:4;50:8;
53:23;54:5,9;57:11,
22;58:1,7,11;62:7;
68:22;83:15;86:22;
88:14;89:14,20;
107:11;112:1,13;
124:10;155:7;169:3,
12,23;171:7;253:12
**FTO (1)**
199:13
**fulfilling (1)**
197:14
**full (3)**
10:4;39:9;191:24
**functioning (1)**
6:1
**funeral (1)**
211:18
**further (9)**
30:11,19;36:10;
38:7;60:20;69:23;
189:2;223:10;233:3
**future (1)**
290:18
**FYI (1)**
135:23

**G**

**gain (1)**
70:7
**game (1)**
245:22

**Gary (3)**
8:10,13;9:3
**gather (1)**
18:21
**gave (23)**
28:6;32:5;56:18;
57:9;60:4;63:9;71:8,
11;85:16,17;114:1;
132:7;146:19;164:2;
194:19;220:17;227:9;
239:16,17;265:24;
266:17;267:16;268:11
**gear (4)**
63:4;85:18;106:20;
170:2
**Gearhart (5)**
46:19;47:13;50:9;
53:7;81:24
**G-E-A-R-H-A-R-T (1)**
46:21
**general (4)**
49:9;59:3;242:11;
268:18
**generated (1)**
70:24
**gentleman (1)**
208:21
**gentlemen (6)**
122:16;136:24;
195:19;207:7;208:19;
216:18
**geographical (1)**
224:10
**gestured (1)**
57:1
**gets (4)**
81:18;102:23,23;
253:20;256:7;257:21
**girlfriend (1)**
249:22
**given (29)**
33:3,8;41:4,9;
43:10;67:2;69:9;
72:21;99:14;100:11;
121:15;124:4;131:14;
133:15;134:23;
148:15;158:13;180:4;
233:9,16;238:11;
240:14;241:6;265:17;
268:2;269:8;277:23;
290:23;291:23
**gives (1)**
179:14
**giving (12)**
28:4;55:9;56:22;
71:21;90:6;111:11;
121:18;202:24;210:5;
230:7;238:13;262:15
**glass (1)**
253:12
**goal (2)**
177:20;269:19
**God (1)**

Board of Fire and Police Commissioners
City of Kankakee

September 30, 2020

285:14
**goes (6)**
  12:7;36:1;91:10;
  235:21;288:15,21
**Good (23)**
  5:20;8:9,18;21:12,
  13;39:8;75:7;98:6,7;
  134:2;177:10,12,21;
  195:16,17;206:16;
  207:15;210:17;
  226:14;230:3;233:7;
  283:24;285:23
**good-faith (1)**
  279:1
**Gotcha (1)**
  270:4
**governed (1)**
  183:19
**grab (1)**
  223:3
**graduated (3)**
  40:20;196:24;197:5
**grassy (1)**
  54:4
**gray (1)**
  46:6
**great (1)**
  128:10
**groggy (1)**
  24:6
**group (6)**
  4:4;69:13;89:19;
  201:4;226:8,11
**groups (2)**
  160:2;225:6
**growing (1)**
  227:1
**guard (1)**
  175:8
**guess (17)**
  20:7;88:4;103:1;
  117:4;127:12,22;
  128:18;151:6;155:14;
  174:22;175:18;176:4;
  183:10;184:19;
  186:11;270:9;273:13
**guessing (1)**
  48:18
**guilt (2)**
  134:1,5
**guilty (10)**
  98:19;104:10,14;
  106:14;131:19;132:1,
  6;133:15;172:22;
  184:17
**gun (2)**
  201:18;244:14
**guy (2)**
  160:11;292:5
**guys (19)**
  164:16;181:22;
  208:23,24;210:1,20;
  211:23;224:15;

229:11;269:12;
270:20,24;271:1;
279:9,10,10;286:14;
287:15;289:1
**guy's (1)**
  286:22

**H**

**half (6)**
  48:10;52:12;91:24;
  143:5;217:23;227:10
**hammer (1)**
  213:3
**hand (12)**
  55:21;83:19;95:23;
  119:15,22;120:1,8;
  149:14;167:14,22;
  228:23,23
**handle (2)**
  200:5;271:3
**handling (1)**
  272:10
**hands (3)**
  52:17;119:11;
  288:22
**hang (12)**
  17:3,5,6;28:1,5,7,9,
  15;33:9;211:19;
  262:3;288:10
**hanging (3)**
  137:10;211:21;
  212:3
**happen (4)**
  15:21;34:24;69:24;
  285:10
**happened (54)**
  15:2;17:9;25:20;
  36:3;49:17;51:17;
  57:2,4,6;58:23;70:18;
  71:7;75:9;84:3;86:14;
  88:16;102:8,10,23,24;
  128:20;129:2;132:2,
  19,20;145:24;146:23;
  157:24;207:8;208:9;
  211:12;212:19;216:9;
  218:16;219:1,19;
  220:4;221:7;224:24;
  225:2;226:9,20;
  228:11,19;230:5;
  231:1;252:13;259:22;
  260:11;263:9;274:19;
  285:6;291:8,9
**happening (3)**
  219:9;221:21;
  230:23
**happens (5)**
  35:8;103:1;174:21;
  222:15;228:7
**happy (1)**
  248:10
**harassed (2)**
  254:18;275:18

**harassment (7)**
  80:10;216:2;254:1,
  7;275:8,10,12
**hard (4)**
  182:11;227:4;
  263:3;264:12
**harm (2)**
  289:17,18
**Harper (1)**
  196:22
**Harsey (3)**
  248:12,20;249:12
**H-A-R-S-E-Y (1)**
  248:12
**hat (1)**
  87:2
**hazardous (1)**
  185:15
**head (8)**
  124:19;125:5;
  219:4;234:12,16;
  235:2;253:8;266:23
**heading (1)**
  59:1
**hear (43)**
  7:1;15:11;16:3;
  18:14,17;52:19;63:18;
  66:18;74:20;93:4;
  95:14;105:4;112:19;
  115:16,17;116:7;
  117:2,7,12,15;118:2;
  119:8;124:23,24;
  132:2,24;133:10;
  140:21;162:15;
  165:12;166:8;169:14,
  16;192:17;193:9;
  229:19;230:9;250:18,
  21;263:2,3;288:7;
  289:12
**heard (23)**
  42:12;43:23;88:17,
  21;94:1;114:18;
  117:18;132:14,21;
  136:14;153:24;
  159:21;166:22;
  169:14;170:19;172:9;
  188:21;191:21;
  192:12;212:11;
  250:13;285:5;288:16
**hearing (36)**
  4:15;6:1,17,18,20,
  24;7:17;8:7,19;65:8;
  67:8;120:24;131:9;
  140:2;147:8;148:18,
  18;176:22;179:23;
  180:1;192:1,2,24,24;
  221:15,17;250:15;
  274:15;276:10;
  277:17,21,23,24;
  281:8;283:8;292:14
**hearsay (3)**
  64:23;65:6,7
**heart (1)**

7:12
**heck (1)**
  123:12
**heels (1)**
  155:20
**heinous (2)**
  181:23;182:16
**held (1)**
  178:1
**hell (1)**
  288:14
**help (9)**
  8:22;51:15,15,19;
  52:6;87:13;152:10;
  208:3;209:18
**Herbert (286)**
  6:4,5,5,6;7:5,9;
  13:10,12,15;14:7,15;
  19:11;20:21;21:11;
  27:3;30:11,15,19,21;
  31:16;32:16;33:19;
  34:4,15,16;35:10,20;
  36:14,17;37:4,13,15;
  38:7;41:19,22;43:17;
  47:4;50:18;51:5;
  55:22;64:9,22;65:18;
  66:4,10,21;67:11,17;
  68:12;69:2,5,15;
  71:10,17;73:15;74:20;
  76:13,16,18,20;77:6;
  78:16,20;80:5;83:22;
  84:21,24;85:6;86:11;
  88:4,18;90:7,10,12;
  91:4,20;92:5,9,15,17;
  93:10,13,16,22;94:12,
  17,24;98:1,3,5;
  103:23;104:2,4;
  110:11,12;111:8;
  113:13;116:18,23;
  118:11,17,19,23;
  119:3,20;123:19;
  126:16,19;135:5,13;
  141:15;143:15;149:3,
  8,12,17;153:10,12,22;
  154:2;155:2,9;156:17;
  157:4,5;158:9,11;
  160:20;161:13;162:3,
  8,11,15,23;163:11,18;
  164:23;165:3,14,19;
  166:3,19;167:6,24;
  168:11,17;171:3,9,14;
  172:2,4;173:21;174:6;
  178:9,11,24;179:2;
  180:2,7;181:14;
  183:18;188:1,16;
  189:11,17,22;190:4,9,
  21,23;191:3,10;
  194:16,19,22;195:6,7,
  15;204:20,23;205:20;
  206:1;215:13,17,21;
  217:16,22;218:1;
  233:3;234:21;235:1,7;
  236:10,13,17,22;

237:1,4,11;238:1,12;
239:3,7,16,24;240:11,
20;241:1;242:9,13,16;
243:2,6,13,15;244:21;
245:4,18,20;246:10,
19,23;247:6,12,16;
248:24;249:6,13;
250:23;252:3,16,20;
253:21;254:9,12;
255:2,15;256:1,5,21,
24;257:8,12;258:2,12,
23;259:17;260:7;
261:5,9,13,15,22;
262:20;263:15;265:7,
10,13,19;266:14;
267:4,20;268:8;
274:13,16;275:2,5;
276:3,6,11,14,18;
277:12,19;278:1;
281:14,16,17,24;
282:11,15,24;283:3,
18,24;288:24
**herein (3)**
  8:14;39:4;195:12
**Hey (15)**
  15:24;35:7;36:6;
  113:14;117:14;182:1,
  5,13;183:8,12;227:13;
  268:11;271:3;286:3;
  287:14
**Hickory (1)**
  211:16
**hide (1)**
  211:3
**hierarchy (10)**
  43:2;234:9,17,20;
  235:13,21;236:23;
  237:5,24;267:15
**high (2)**
  225:21,22
**higher (2)**
  188:13;267:14
**higher-level (1)**
  201:21
**higher-ranking (1)**
  238:11
**highest (1)**
  237:21
**highly (1)**
  289:19
**himself (2)**
  107:4;285:20
**hips (1)**
  254:4
**hired (5)**
  39:21;40:6,19;
  197:17;233:8
**hiring (1)**
  286:16
**history (5)**
  37:21;152:1;
  184:13;198:16;289:21
**hit (4)**

DEFENDANTS 001863

84:15,17;175:1;
220:22
hogwash (1)
287:1
Hold (16)
111:18;123:5;
220:22;236:17;
242:13;245:4;246:23;
247:3;249:6;252:3;
257:8;265:19;268:7;
289:4,7,12
holding (1)
6:9
home (14)
63:5;106:20;
135:24;170:2;211:18;
231:2,6,9,14,18;232:5,
6,13;260:13
homeless (16)
208:23,24;210:8;
211:2,15;212:22;
213:10;218:19;
219:10;223:7;268:9;
269:1;271:10,13;
292:1,2
honest (4)
92:14;93:1;95:19;
96:5
honestly (2)
79:17;232:15
honorably (2)
260:16,20
horrible (3)
151:17;153:17;
291:13
horribly (1)
152:19
hot (1)
211:19
hour (1)
191:6
hours (3)
136:6;188:9;192:10
Human (3)
153:15;154:5;275:5
humans (1)
211:1
hundreds (1)
260:17
hung (1)
286:11
Hunt (2)
100:7;251:11
hurt (1)
187:8
hypothetical (2)
43:18;259:19

I

idea (7)
102:24;121:24;
128:24;204:7;258:13;

268:18;277:17
identification (7)
41:24;74:6;77:2;
78:23;119:2;149:11;
204:22
identified (2)
108:14;110:18
identifies (1)
179:20
identify (1)
81:20
identifying (1)
163:15
IDHR (2)
155:16;277:1
ignoring (1)
269:12
illegal (11)
244:12,15,18,19;
245:7,17;247:23;
248:23;249:10,11;
250:11
Illinois (7)
40:17,21;76:11;
123:21;153:14;154:4;
275:4
illuminate (1)
65:7
imagine (1)
27:11
immediacy (1)
280:14
immediate (1)
267:12
immediately (12)
56:14;60:3;215:24;
218:12;264:3;265:16;
266:22,22;273:12,15;
280:8,18
immoral (9)
230:14;242:6,24;
268:2,3,13;269:1;
287:2,8
impartial (5)
133:18;134:12,15,
19;146:9
impeach (8)
97:16;156:10;
246:3,19;247:1,7;
257:13,20
impeaching (6)
77:8;90:12;163:1;
256:24;257:1,2
impeachment (2)
246:5;247:13
implied (1)
117:16
import (1)
91:1
importance (2)
158:24;159:1
important (4)
108:8,12;240:6;

276:23
importantly (1)
94:7
improper (9)
83:24;91:10;92:17;
94:13;166:20;171:10;
258:4;261:10;281:10
improperly (1)
188:17
inability (1)
277:2
inaccurate (1)
276:24
inappropriate (16)
66:5,8,9;71:21;91:7,
16;120:9;139:11;
142:8,12,13;144:10,
12;146:2;178:13;
247:10
incident (54)
10:8,11,13;16:6,8;
26:18;44:14;70:4;
71:1;73:5;74:16;76:5,
5;80:17;105:8;107:8,
20;110:22;111:16,19;
112:23;113:2;114:21,
24;125:16;126:8;
127:1;128:13,20;
129:2;130:11;133:11;
135:20;145:8;147:16;
148:13,14;150:4,7,17;
157:24;161:5,22;
184:5;185:11;207:5,9,
11;221:22;223:10;
231:11;251:8;254:24;
260:11
incidents (3)
109:8;274:18;291:9
incited (1)
143:17
inclination (1)
132:16
include (4)
47:2;163:10,15;
244:18
included (3)
119:10;136:21;
164:1
includes (3)
198:9,15,18
including (1)
233:23
incoherent (1)
31:11
incomplete (2)
43:18;259:19
inconsistent (5)
90:16;91:6,9,13,16
independently (1)
26:3
Indiana (4)
47:21,21;53:14;
81:23

indicate (8)
7:15,17;21:19;
74:11;77:9;81:2;
157:14;170:20
indicated (9)
6:19;7:1,14;22:4;
54:17;97:21;98:18;
160:2;245:9
indicates (1)
99:16
indicating (1)
155:12
indication (2)
8:6;132:14
individual (9)
7:16;64:2;75:5;
85:10;155:22;184:7,
11;254:4;289:21
individuals (5)
80:16;209:19;
248:16;251:6;286:17
ineffective (1)
177:16
inefficient (1)
177:17
infer (1)
94:22
influence (1)
24:19
inform (1)
106:13
informally (2)
101:5;104:17
informants (1)
201:23
information (19)
4:3,8,20;6:2;66:17,
20;70:3,8;90:18;95:7;
103:6;147:11;178:17;
192:18;193:6;194:8;
249:24;263:22,23
informed (1)
158:5
initial (2)
206:9;222:22
Initially (5)
10:21;53:20;54:16;
206:11;249:21
innocence (2)
134:1,6
input (1)
214:4
inquire (9)
67:6;91:19;153:23;
166:24;237:14;
239:20;240:10;246:1;
257:22
insane (1)
287:1
inside (4)
13:4;19:18;20:16;
227:13
Inspector (5)

144:20,21,21;145:3;
146:16
installed (1)
81:16
instance (5)
112:15;114:3,11;
151:3;240:9
instances (2)
113:4;274:17
instead (6)
160:10;182:8;
202:22;206:17;
268:19,24
insubordinate (42)
25:14,18;57:13,16;
72:16;107:7,19,24;
108:15;109:9;110:18;
115:24;116:3;125:11,
19,24;126:4;129:9,18;
130:3,10,17;131:3;
133:2,3;136:18,19;
137:4,8;144:18;
149:23;150:10,22,23;
151:11;152:2;170:5;
174:18;185:3;188:10;
240:2;291:18
insubordination (66)
43:23;44:1;57:18;
61:4;65:19;66:24;
68:14;96:16;105:12;
108:24;110:4;125:15;
126:7,23;127:20;
128:5,7,13;131:21;
132:18;135:24;
137:20;150:13;151:5;
169:16;170:6;172:6,
13,16,23;173:8,13,16,
23,24;174:14;177:9,
10,11;180:20;184:4,8;
185:1,14,20;186:2,5,6,
8,12,12,15,17,20;
188:8,22;233:22;
239:21;240:4,7,8;
288:1,3,6;291:12,15
integrity (7)
202:2,4;245:11,13;
246:2,20;247:17
intent (1)
245:7
intention (1)
229:5
interact (5)
142:4,9,14;228:24;
229:6
interacting (1)
143:6
interaction (10)
31:4;58:20;61:8;
113:20;146:24;212:1;
225:2;229:13;266:8;
287:24
interest (1)
209:12

**intermingled (1)**
54:24
**intermingling (1)**
69:23
**interpretation (2)**
151:13;152:24
**interrogate (2)**
101:15;102:7
**interrogated (4)**
79:10;100:1;103:4;
232:19
**interrogation (104)**
76:8,15;77:19,21,
22;78:5,8,12;79:4,5,9,
13,21,24;80:4,14;
90:2,9,21;91:23;92:8,
22;93:15;97:9;98:23;
99:5,24;100:10,11,15,
18;101:2,6,11,13,17;
102:3,6,16,21;103:3,
24;104:15;105:2,3;
108:3,5,14,17;109:2,
5;110:4,13,24;111:12;
118:4,7;120:4,5,10,
14;121:8,19;122:11,
11,13;124:14;125:18;
131:13,18,23;132:3,8,
15;135:9;144:22;
145:1,3,6,9;147:17;
152:16,22;155:3;
171:1;175:20,23,24;
176:2,8,11,19,21;
189:16;254:2;255:5,
16;256:18;257:10,23;
258:22;260:12;
284:17;288:17
**interrupted (1)**
5:14
**intersection (7)**
51:15,16,19;52:14;
82:5;211:15;226:22
**interspersed (1)**
142:10
**Interviewing (2)**
198:12;286:15
**intimidate (2)**
220:24;221:2
**intimidated (1)**
69:1
**intimidating (1)**
253:11
**into (37)**
12:2,7,15,19;13:7;
14:12,22;23:5;29:20;
39:18;43:19;82:18;
94:23;144:18;145:4;
146:5;156:14;157:19;
183:8;184:7;205:21;
211:9,14;222:6,11,13;
225:8;226:12;246:12;
250:1;260:4;276:3,21;
277:2,3;286:19;
287:13

**intoxicated (10)**
24:12;147:22;
148:1,5,8;170:11,17;
212:13,13,15
**introduce (4)**
195:18;281:18,21,
22
**introduced (1)**
194:13
**investigate (4)**
141:9,19;151:24;
244:12
**investigation (13)**
133:19;134:12,16,
19;144:17,23,24;
146:5,9,13;147:24;
157:19;183:21
**investigations (2)**
42:22;201:15
**investigative (2)**
145:7;146:19
**involve (2)**
191:20;285:20
**involved (19)**
10:12;45:1,5;51:11;
64:7,12;65:24;69:13;
80:16;100:8;143:6;
175:10;184:2;207:4;
225:5,24;226:2,5;
275:7
**involvement (1)**
225:13
**involving (1)**
275:24
**ironic (2)**
290:22;291:7
**ironically (1)**
291:23
**irrelevant (8)**
7:22;64:23;68:14,
16;115:23;150:19;
254:14;255:17
**issue (12)**
32:11;66:15;109:3;
130:1;175:21;210:14;
232:17;237:17;246:4;
272:5,24;287:11
**issued (1)**
100:4
**issues (8)**
94:11;211:4;
214:14;242:6;249:23;
285:13,14;286:12
**issuing (1)**
272:22

**J**

**January (1)**
158:18
**jeopardy (1)**
187:12
**job (22)**

61:7;69:21;86:7;
91:14;177:23;200:8;
201:1;202:7,14,16;
206:8;208:1,6;226:15;
230:3;234:14;251:9;
278:16,16,17;289:2;
290:4
**jobs (4)**
202:21;212:23;
213:20;235:19
**John (3)**
7:5;282:11,16
**joining (1)**
48:2
**Journal (1)**
227:10
**judge (1)**
155:10
**judicial (1)**
180:19
**July (70)**
9:23;11:2;23:7;
44:6,20;45:2;61:18;
70:2,5,8;71:1;72:3;
74:11,11,16;75:11;
76:4,5;78:3,9,12,12;
80:1,12,16,16;93:18;
96:21;97:3;99:6,15;
100:10;103:19;107:8;
108:24;109:1;125:20;
132:18;135:16;
148:20;149:4;161:7,
20,23;163:6;169:19;
170:11,17;176:19;
207:3,4,16,17,18;
211:10;223:20;250:8;
254:7,7,7,24;255:1,14,
14;261:7;262:6;
270:9;274:13,18;
285:2
**jump (2)**
182:2;223:3
**jumped (2)**
87:12;227:11
**June (1)**
10:22
**junior (1)**
225:22
**jurisdiction (1)**
156:20
**justice (5)**
40:15,16;44:15;
268:17,21

**K**

**KAMEG (11)**
201:4;203:2;
243:23;245:6;247:22,
23;248:6,22;249:5,9;
250:5
**Kankakee (44)**
6:22;9:5,14,20;

34:2;39:14;40:24;
42:7,10,16;43:3,5;
44:2,10;75:2;133:22;
146:2;154:8,14;
155:17;158:14;
159:13;160:3;172:22;
179:4,10;183:19;
197:21;198:24;201:3,
11;206:24;214:2;
215:3;225:8;234:10;
235:6,14;237:22;
248:5,17,21;269:22;
292:1
**keep (2)**
261:16;288:1
**keeps (1)**
182:14
**KELLY (212)**
3:4;5:21,23;6:3,14,
15;7:8;8:2;13:11,13,
17;14:8,18;19:13;
20:23;27:2;30:20;
32:19;33:20;34:5,15,
17;35:4,12;36:10,16;
37:6,13;38:6,8,12;
41:20;43:20;47:6;
51:6;55:24;65:3;66:1,
7,16;67:5,19;68:15;
69:3,6,17;71:13,22;
73:16;76:17,19,22;
77:11;78:17;80:7,23;
81:1;84:2;85:1,7;
86:13;88:19;90:11,19;
91:17;92:10,16,19;
93:19;94:4,16,19;
95:4;97:20,24;100:21;
109:17;111:6;113:12;
116:15,20;118:15,21;
119:19;122:21;
123:18;126:12,18;
132:11;133:8;135:4,
12;141:14;143:2,14,
21;149:6;151:21;
152:5;153:11,21;
154:21,23;155:6;
156:17;160:22;
161:16;162:13;
163:19;165:5;166:23;
167:8;168:3,14,21;
171:4;172:1;173:20;
174:3,8,12;176:13,24;
178:7,20;180:3;
181:19;183:17;188:2,
20;189:3,10,15,19,23;
190:6,11,21;191:1,5,
14;192:20;193:16;
194:9,14,18,24;195:4;
204:19;205:23;
215:19;233:4;235:3,9;
236:20;237:13;238:3,
16;239:14,17;240:5;
243:7,14,17;244:22;
245:19,24;249:1,17;

251:3;254:15;255:6,
18;256:9;257:3,9,21;
258:6,14;259:20;
260:8;261:14;262:22;
263:16;265:12,23;
266:15;267:6,22;
270:6;276:5,8,13,17;
277:4,14,22;278:4;
281:6,12,15,21;282:8,
14,18,21;283:1,5,7,19;
284:1;292:13
**kept (2)**
86:7;286:6
**kicking (2)**
52:18;139:9
**kids (26)**
225:17,18,20,21,21,
22,23;226:14,15,15,
16,24;227:12,13,19,
21;228:5,21,24;230:3,
11,19;264:16,17;
266:7,8
**Kidwell (4)**
248:14,19;249:20,
23
**kind (23)**
26:22;35:7,8;39:19;
193:4,14;200:8;210:9;
213:7;216:6,18;217:1;
219:4;222:7;227:8;
231:20;232:10;236:2,
7;269:11;279:9;
280:19;282:3
**kinds (1)**
283:11
**Klopp (11)**
20:1,6,9;30:1,2;
220:5;221:8;222:16;
250:14;252:23;253:3
**knew (5)**
44:22;153:13;
176:9;238:21;291:11
**knocked (1)**
219:21
**knowing (1)**
285:1
**knowledge (4)**
70:3;80:17;132:22;
183:11
**knows (5)**
7:9;124:14;200:13;
237:6;288:3
**KOLEA (1)**
236:4
**Kosman (20)**
38:17;39:3,10;92:1;
93:4;95:14,22;225:3;
229:2;262:7;263:24;
264:22;265:17;
266:11,17;267:1,14;
280:6,14;285:24
**K-O-S-M-A-N (1)**
39:10

**Kosman's (1)**
92:21
**Kropp (1)**
29:23

## L

**labeled (2)**
29:13,14
**ladies (5)**
122:15;136:24;
195:19;207:7;216:17
**laid (1)**
90:20
**Landwehr (27)**
3:15,16;193:24;
270:7,13;271:5,11,16,
20,24;272:8,14,23;
273:4,19,24;274:4,6,
10,20,23;275:3,6,11,
14,20,23
**language (4)**
218:10,11;234:3;
238:24
**laptop (2)**
87:15;285:23
**larger (1)**
225:6
**Larry (3)**
248:3,4;249:24
**last (12)**
4:14;42:12;55:7;
99:10;127:3;155:10;
194:20;196:3;197:17,
18;274:2;284:10
**lasted (1)**
289:23
**late (8)**
6:9;182:16;193:4,
12;194:2;245:22;
283:11;284:9
**later (7)**
5:15;24:22;25:22;
32:23,23;147:18;
285:8
**law (20)**
6:22;39:17,17,18,
20;40:16;61:2;69:20;
76:11;101:12;160:13;
183:3;191:18;192:22;
268:20,20,20,20;
272:22;290:7
**lawful (31)**
44:4;96:19,19;
105:20,22;121:14,17;
122:1,1;170:7;188:14;
233:24;238:10,14;
239:1,18;240:14,24;
241:6,17;242:23;
265:17;278:7,10,21;
284:14;285:11;287:3,
19;288:5,8
**lawyers (2)**

66:22;101:14
**lay (3)**
13:18;71:24;90:13
**lead (1)**
76:23
**leader (3)**
61:1;86:5;177:19
**leading (12)**
14:16,17;43:18;
53:7;67:18;69:16;
76:20;80:6;81:23;
162:12;163:12;188:19
**learning (1)**
45:7
**least (7)**
3:20;33:8;67:21;
174:10;251:14;265:1;
269:5
**leave (76)**
18:22;19:4;29:9;
55:6,10;56:17,23;
57:10;59:14;60:3,4,
14,17,18;62:2,6;
63:10;67:16,24;73:22;
74:1,10;85:16,18;
86:8;87:23;106:4,5,
18,19;107:14,17;
110:8,20;115:18,20,
22;116:1,8,10;128:1,
3;129:5,20,23;130:17;
136:11;143:9,17;
144:5;163:8;164:3;
169:4,24;176:10,16;
222:21;223:3;250:3;
259:9,16;264:3,18,21;
265:1,4,5,16,17;266:1,
11,12,18;267:3;
276:24;282:16
**leaves (1)**
89:14
**leaving (3)**
18:18;87:11;264:8
**left (23)**
17:15,20,24;19:1,9,
16,20;21:3;29:15,17;
47:19;54:3;64:1;
65:14,21;66:3;220:6,
6;222:19,21;261:19;
264:7;267:11
**leg (1)**
18:7
**legal (1)**
255:12
**legally (2)**
168:18;185:4
**legs (1)**
254:3
**length (1)**
71:19
**lengths (3)**
54:15;112:10;
164:15
**lengthy (1)**

191:2
**less (2)**
150:23;160:4
**letter (1)**
255:11
**letting (1)**
210:6
**level (20)**
5:6;175:1;179:15,
20,21,21,21,21;
180:21;182:14,15,15;
188:11,13;201:19;
237:22;278:18;
280:11;291:14,18
**levels (5)**
181:1,3,21;188:7,23
**Lexipol (7)**
236:2,4,12,15;
238:21;241:20;242:18
**lie (3)**
111:20;155:11;
252:12
**lied (2)**
117:6;120:15
**lieu (1)**
4:7
**lieutenant (26)**
26:13;27:6;61:13,
17;62:12,20;63:16,17,
18,20;74:19;75:1,16;
87:5,11;89:10,11,12,
13;107:4;130:5;
232:8;248:14;267:9,
15;281:2
**lieutenants (7)**
42:22,23;235:22;
238:8;269:16;278:16;
279:24
**lieutenants' (1)**
253:14
**life (4)**
187:11;206:15;
211:4;260:13
**light (1)**
206:16
**lights (5)**
50:10;227:14,19,20;
228:5
**limit (2)**
265:11;283:19
**limited (1)**
69:12
**line (16)**
50:3;67:9;68:17;
95:10;152:9;160:9;
162:11;164:11;
165:17;166:12;
175:17,19;179:24;
193:19;260:10;292:5
**lines (1)**
44:16
**list (4)**
165:24;203:17,21,

22
**listed (3)**
166:6;180:16,21
**listen (13)**
63:21;89:13;94:11;
115:6;117:17,19,22;
123:4;209:15;261:15;
262:24;263:6;278:15
**listening (6)**
4:22,23;28:19;
120:3;175:22;264:14
**lists (2)**
179:13,14
**little (18)**
8:23;16:2;24:7;
31:7,21;39:15;48:12;
58:12;82:2;88:1;
159:11;175:19;
191:23;196:17;
207:20;225:22;
231:13;275:7
**Lives (2)**
44:16;288:4
**located (2)**
20:12;56:11
**location (7)**
52:24;58:6;61:20;
81:9;205:15;212:4;
270:18
**locked (1)**
254:13
**locking (1)**
160:10
**long (21)**
9:13,19;15:15;
20:10;22:7;28:22,24;
39:17;72:2;127:15;
130:7;158:22;183:3;
196:15;200:19;
202:14;205:4;206:2;
222:20;223:1;289:1
**longer (2)**
252:6;283:17
**look (36)**
4:5,5;55:11;65:4;
77:4;100:2;121:10;
122:12,16;123:7;
130:19;131:5;149:5,
13;155:23;164:16,19,
19;165:2;166:3;
184:12,15;189:12;
204:24;205:14,16;
227:9;234:17;243:9;
246:9;253:14;257:6;
258:4;285:21;287:13;
288:4
**looked (16)**
15:8,24;16:1;21:2;
23:12,14,15;54:3;
55:14;57:4;63:16;
66:22;89:11;109:11;
205:11;271:2
**looking (19)**

10:21;52:11;56:24;
81:11,14,15;87:19;
113:8;114:6;117:5;
122:5;123:9;126:15;
166:1;169:7;198:15;
227:8;246:13;263:1
**looks (7)**
3:20;99:4,5,19;
193:15;205:4,12
**lot (12)**
82:19;155:2;159:4,
7;169:15;174:14;
175:18;197:13;198:3;
201:22;226:13;260:13
**loud (12)**
6:18;140:15,18;
141:16;210:2;216:6;
218:11,12,21;220:2;
222:5;230:7
**lower (2)**
188:11;201:19
**lower-level (1)**
201:17
**lunch (2)**
210:7;270:24

## M

**ma'am (12)**
4:3;271:15,23;
272:12,17;273:3;
274:9;275:1,10,13,22;
276:2
**mad (4)**
266:7;273:12,15,18
**main (1)**
244:11
**maintain (1)**
45:12
**major (4)**
51:16,19;127:12;
186:23
**majority (2)**
156:22;169:12
**makes (3)**
177:16;213:2;237:7
**making (16)**
26:11;55:13;70:1;
82:3;97:7;118:6;
146:3;160:11;175:21;
183:13;201:11;
210:19;258:20;
262:15;277:12,14
**man (4)**
264:17;271:3;
289:4,6
**manage (1)**
96:17
**manner (4)**
57:17;95:22;120:1;
253:12
**many (17)**
28:9;47:24;48:6,8,

DEFENDANTS 001866

**Board of Fire and Police Commissioners**
**City of Kankakee**

September 30, 2020

17;111:1,4;169:17;
203:24;204:7;226:4,5,
5;241:21;266:20;
288:7,8
**march (24)**
44:18,20,22;45:2,7,
13,19,21;46:10;47:3,
9,11,16;48:2,20;49:2,
11,13;50:17,23;51:23;
69:19;81:22;285:16
**marchers (14)**
47:24;49:22;50:14;
51:19;52:4,20;53:3,4,
6,9;69:14;82:1;89:17;
169:11
**marching (2)**
51:13;228:3
**Mario (2)**
3:13;194:4
**mark (4)**
79:2;118:18;
148:24;204:18
**marked (13)**
41:17,23;46:5,14,
23;50:12;74:5;77:1;
78:22;119:1;149:11;
200:14;204:22
**married (3)**
196:7,15,17
**MARS (1)**
50:10
**Marshal (1)**
40:4
**mask (1)**
8:22
**masks (2)**
8:20;182:11
**Master (3)**
248:11,20;249:11
**master's (1)**
40:16
**materials (1)**
145:4
**matter (10)**
7:22;44:17;150:13;
166:21;186:2;232:19;
251:13;284:14,21,23
**may (16)**
8:1;13:19;27:4,16;
28:13;39:12;69:7;
74:12;143:17;147:21;
148:8;188:24,24;
240:9;246:8;257:24
**Maybe (16)**
21:7;22:11;30:13,
14;35:16;48:11,12;
51:14;61:4,6;112:10;
181:5;202:13;216:18;
225:22;287:18
**mayor (8)**
40:10,11;154:16;
157:6;158:3;255:12;
268:16;286:13

**McGrath (195)**
5:19,20;8:8,9,17;
13:21;14:9,20;21:8;
26:24;30:20,22;31:2;
33:21;34:13;36:15,18,
19;37:12;38:5,10,11,
16;39:7;42:1;50:21;
56:1;65:5,12;67:6,12,
13;68:17,19;69:8;
71:14;72:1;74:7,24;
76:14,23;77:3,13;
78:21;79:1;80:8,21,
24;81:3;84:4,8,9,22;
86:16;88:7,22;90:8;
91:4,13,21;92:6,23;
93:11,14,17;95:12;
97:18;100:19;103:21;
104:1,3;109:15;110:9;
111:3;113:10;116:13;
118:13;119:17;
122:19;123:16;
126:10;132:9;133:5;
135:2,10;141:12;
142:24;143:12,19;
151:19;152:3;153:9,
19;154:19,22;156:4;
160:23;161:2,16,18;
162:5,9;163:3,5,14;
165:1,6,16,22;166:5;
168:6,15;171:11,16,
23;173:18;174:1,7;
178:8,10;179:22;
181:17;188:4,6;189:2,
6;190:6,7,17,19;
194:11;205:22;
215:11,15;217:15,24;
233:6;234:22;235:4;
236:14,23;237:2,9,18;
239:4;240:12;241:3;
242:12,14,17;243:4,
18;245:5;246:16,21;
247:2,11,15,20,21;
249:3,8,15;251:4;
252:5,17,22;253:23;
254:10;255:9,20;
256:2,22;257:5;258:8,
24;259:1;261:6,11,23,
24;263:17;265:9,15;
266:16;267:8,18;
274:14;282:13,20;
283:5,6;284:4,6;
288:20
**mean (36)**
44:1;75:22;121:21;
122:15;145:3;150:5,9;
151:12;184:10;
192:21;204:3;205:3,
19;208:14,15;209:23;
210:20;216:14,15;
217:7;218:12;219:6,
14;222:22;225:10,19,
21;228:14;230:19;
238:7,15;256:7;

259:14;268:24;280:1;
283:19
**meaning (1)**
249:14
**means (6)**
4:24;102:13;111:5;
128:24;129:1;239:10
**meant (2)**
35:19;145:21
**media (1)**
69:10
**mediate (2)**
20:3;30:6
**medications (1)**
250:9
**meet (5)**
58:8;73:19;172:6;
173:8,12
**meeting (12)**
3:1;4:14,19,24;5:1,
14;192:14,19;193:8;
292:17,20,22
**Meetings (1)**
7:20
**member (12)**
3:23;7:11;8:6,6;
173:4;178:13;186:2;
276:20,21,24;277:5,5
**members (2)**
6:16;283:7
**memo (21)**
10:7,16,21,24;
21:14,16;25:19,21;
32:4,6,8,14,14;35:15,
16;36:2;71:6;149:4;
150:1;190:3;255:10
**memory (3)**
75:17;118:9;138:11
**memos (8)**
36:22,22;70:24;
72:21;76:3;78:2;
80:15;254:24
**men (1)**
254:21
**Menards (1)**
197:13
**mental (1)**
211:5
**mention (4)**
137:12,17,18,24
**mentioned (6)**
17:18;21:21;24:22;
46:7,18;137:9
**Merchant (5)**
47:20,20;52:5;
81:23;226:22
**message (1)**
135:16
**met (5)**
72:21;75:16;89:17,
19;163:6
**method (1)**
291:20

**Metropolitan (1)**
201:4
**midnight (2)**
202:10;206:10
**midnights (2)**
203:8;206:14
**might (12)**
5:2;20:2;49:15;
68:3;145:22;159:5;
170:10;175:6;182:24;
183:1;189:7;193:3
**Mike (6)**
118:11;149:3;
165:14;189:14;
237:12;256:5
**militarized (2)**
160:4;227:8
**military (1)**
159:17
**Miller (54)**
45:9;46:8,8,12,14;
47:13;50:6;53:15;
57:4,6,12,19,21;58:3,
18;62:11;64:3,19,20,
24;65:13,16,23,23;
66:2,14,16,23;68:5,11,
21,24;69:7;82:4,4,9,
13;85:11;86:24;87:1,
2;88:15,21;89:24;
144:11,13,15;228:21;
229:1,14,24;263:18,
23;286:8
**Miller's (1)**
67:7
**millions (1)**
290:18
**mind (14)**
31:16;72:11;
118:17;127:13;
131:24;132:5,13,16;
133:7;135:8;144:6;
151:7;165:7;196:1
**minds (1)**
121:22
**minivan (1)**
226:18
**Minneapolis (1)**
44:15
**minority (9)**
148:14;149:24;
150:3,4,10,18;151:10;
152:2;156:21
**minute (1)**
292:14
**minutes (18)**
22:12;29:1,2;61:21;
72:4;195:1;222:23;
223:1,1;283:14,16,18,
20;284:2,23;288:19;
289:23;292:7
**mis- (1)**
230:21
**misconduct (5)**

25:6;64:24;147:15;
157:19;179:20
**missed (4)**
87:7,8;182:9;183:3
**missing (1)**
194:20
**misspeak (1)**
120:22
**misspoke (1)**
129:12
**misstates (8)**
110:10;132:9;
133:6;135:10;143:19;
173:19;250:23;267:5
**mistake (3)**
22:2,3;258:16
**misunderstood (1)**
230:22
**moment (3)**
114:5,6;220:15
**Monday (13)**
59:18;60:1;62:4;
63:8;73:7;85:20;89:4;
106:8,21;107:16;
136:6;162:10;170:3
**money (1)**
201:23
**month (3)**
147:18;241:22,22
**months (2)**
40:3;209:24
**moral (1)**
239:10
**morals (2)**
238:19,24
**more (30)**
16:14;28:12;30:13;
33:9;43:19;47:9,10,
12;48:12;58:10;
93:23;94:6;103:6;
127:22;154:1;160:9,
17;175:11;179:1,24;
181:23,24;182:16;
186:20;189:1;198:3;
211:24;276:6;284:19;
289:14
**morning (13)**
59:16,18;60:1;63:6;
85:20;89:4;106:7,8,
21;140:5,7;170:3;
175:4
**most (5)**
23:17;211:1;
221:11;235:15,18
**mostly (1)**
145:2
**motion (9)**
5:4,9;55:20;56:19;
91:11;95:4;290:20;
292:16,19
**motivated (2)**
151:15;153:2
**motivation (3)**

151:6;155:11,13
**motive (1)**
  157:2
**motoring (1)**
  50:15
**move (8)**
  5:5,10,13;66:7;
  125:10;127:17;
  243:17;267:7
**moved (4)**
  4:13,14;5:8;210:21
**movement (1)**
  56:15
**movements (1)**
  55:12
**moving (2)**
  4:24;127:15
**much (8)**
  76:20;102:24;
  191:23;193:5,18,21;
  276:6;287:13
**multiple (3)**
  209:24;267:2;
  287:24
**mumbled (1)**
  31:19
**must (1)**
  87:12
**Mutual (1)**
  195:22
**myself (4)**
  50:5;55:7;85:14;
  221:6

## N

**nah (1)**
  291:14
**name (19)**
  7:19;9:2,3;15:19,
  23;23:18,21;35:24;
  39:9,10;46:18;64:2;
  74:21;75:17;144:11;
  181:9;196:3;270:20;
  290:24
**narrate (1)**
  86:14
**narrative (2)**
  83:24;227:7
**Nature (4)**
  13:11,13,15;67:6
**Nazarene (1)**
  196:24
**near (3)**
  54:2;58:20;64:15
**necessarily (3)**
  36:5;65:7;182:18
**necessary (1)**
  193:18
**need (11)**
  17:11;83:24;
  193:21;206:14;
  239:23;252:19;

257:24;268:12;272:4;
282:9;286:10
**needed (5)**
  47:9,12;51:14;
  208:3;232:10
**needs (2)**
  154:1;182:1
**negative (2)**
  209:7;213:24
**neighbors (1)**
  198:12
**neither (2)**
  156:24;248:16
**nervous (1)**
  219:13
**new (1)**
  132:15
**newly (1)**
  281:1
**newspaper (2)**
  246:16,20
**next (19)**
  8:10;27:5;40:1;
  71:5;95:21;127:17;
  138:16;174:20;
  188:10;192:24;216:9;
  218:16;219:1,19;
  220:4;221:7;222:15;
  229:9;266:7
**nice (1)**
  289:4
**Nickey (1)**
  3:17
**night (3)**
  8:19;185:9;206:17
**nights (1)**
  284:9
**nobody (1)**
  237:6
**none (3)**
  67:2;166:21;178:10
**nonmilitary (1)**
  172:20
**nonprescribed (1)**
  250:7
**nonsense (2)**
  285:2;286:13
**nonsworn (1)**
  172:21
**Nope (1)**
  281:14
**nor (2)**
  156:24,24
**normal (3)**
  22:21;35:6;224:3
**normally (2)**
  198:4;210:9
**north (6)**
  47:21;49:6;58:9;
  81:23;87:19;210:13
**northeast (4)**
  52:13;81:13,16;
  227:11

**Northwestern (3)**
  158:16,20;204:16
**notarized (1)**
  99:19
**note (2)**
  3:5;255:10
**noted (4)**
  91:19;93:20;95:9;
  249:2
**notice (28)**
  74:8;77:19,20;
  98:23;99:4,23;100:9;
  103:24;108:3,4,13;
  109:13,24;110:6;
  119:21;124:9;131:13,
  18,19;135:9;164:2;
  176:18;180:19;
  189:15;230:17;
  255:16;281:19;290:21
**noticed (1)**
  23:14
**notices (1)**
  134:20
**notified (2)**
  154:9,12
**November (3)**
  154:6;274:3,4
**number (5)**
  159:10;162:19;
  239:14;267:1;282:17
**numbers (3)**
  41:19;163:22;164:1
**numerous (1)**
  200:22

## O

**oath (9)**
  79:12;95:17;96:6;
  97:9,13;247:2;256:19;
  258:9;263:11
**obey (1)**
  136:1
**object (30)**
  14:15;19:11;35:10;
  37:4;47:4;50:18;
  64:22;67:17;71:10;
  78:16;80:5;83:23;
  86:11;88:18;94:24;
  156:4;163:13;165:19;
  166:19;167:24;
  168:11;171:3,9;
  179:22;188:16;190:7;
  235:8;238:12;242:9;
  267:4
**Objection (153)**
  13:10,14,17;14:7,
  18;20:21;26:24;
  31:16;32:16,17;33:19;
  34:4;38:5;43:17;51:5;
  55:22;64:9,10;65:18;
  68:12,12,16;69:2,4,
  15;71:17,22;73:15;

76:13,16,22;84:21,24;
85:6;90:7,10;91:19;
92:5,9,15,19;93:10,13,
16,20,23;100:19;
103:21;109:15;110:9;
111:3,7;113:10;
116:13,16;119:17;
122:19;123:16;
126:10,13;132:9;
133:5;135:2,10;
141:12;142:24;
143:12,19;151:19;
152:3;153:9,19,21;
154:19;155:1;161:13;
162:3,8,12;163:11,18;
164:23;165:3;167:6;
168:20;173:18;174:1;
178:12,19;180:3;
188:20;189:10,13,18,
21,24;190:6;194:16;
205:22,24;215:11,19;
234:21;235:1;236:10,
13,18;237:13;238:2;
239:3,3,7;243:2,13;
244:21;245:18,18;
246:10;248:24,24;
249:1,13;250:23;
252:20;254:9,12;
255:2,6,15;256:6,10,
21;257:3,12;258:1,6,
12;259:17;260:7;
261:5,9,13,22;262:20;
263:15,16;265:19,20,
23;266:14;267:6;
282:19;283:2
**objections (3)**
  95:8;190:16;277:17
**observation (3)**
  13:20;54:7;152:24
**observations (1)**
  15:6
**observe (2)**
  13:22;54:1
**observed (2)**
  56:3;252:12
**obtain (2)**
  40:18;70:7
**obtained (1)**
  75:23
**obviously (9)**
  4:4;28:15;32:1;
  88:17;96:9;188:7;
  195:20;225:4;226:24
**occasion (1)**
  25:9
**occasions (2)**
  67:15;208:20
**occur (2)**
  68:3;124:19
**occurred (4)**
  10:8;66:3;156:2;
  253:4
**occurring (1)**

84:14
**o'clock (8)**
  59:16,18;62:5;63:6;
  70:9;106:7;170:3;
  193:4
**October (4)**
  40:2;274:7,11;
  292:23
**odd (2)**
  26:9;159:9
**off (38)**
  24:24;31:6,7;39:8;
  55:21;73:3;83:21;
  84:11,11;85:12;87:24;
  88:2,5;95:22,23;
  97:22;117:5;159:17;
  168:10;171:8;181:2,4;
  195:2;200:10;207:12;
  210:4;227:6,9;236:1,
  5,7;243:16;253:6;
  282:16;286:2,3;
  292:14,15
**offense (4)**
  91:14;180:21;
  184:16,17
**offenses (1)**
  179:14
**offensive (1)**
  152:19
**offer (5)**
  66:11;155:14;
  156:3,18;276:18
**offered (2)**
  156:22;285:17
**office (92)**
  10:9,12;11:17,20;
  12:3,8,10,11,15,19,23;
  13:2,8,23;14:2,13,22;
  16:15,17;17:11,21;
  18:1,18;19:1,4,9,16,
  20;20:11,16;22:5,7,
  22,24;23:2,6,8;27:9;
  28:21,23;29:7,11,12,
  13,14,21;31:5;33:1;
  17,23;34:1,8,9,9;36:3;
  59:15,19;60:1;63:5;
  70:11,22;72:12,14;
  73:10;75:15;80:12;
  128:2,3;129:6,21,21,
  23;130:18;170:20;
  208:10;211:14;212:8;
  220:8;222:1,2,3,4,11,
  14;223:4;246:17;
  250:1;253:14;259:3;
  261:8;271:22;285:5
**officer (53)**
  6:1;9:17;32:12;
  33:17,23;34:22,23;
  35:6;37:10;39:22;
  40:19;45:11;46:17,22;
  47:13;50:9;53:6;67:8;
  70:20;81:24;85:4;
  89:22;124:5,9;125:3;

**Board of Fire and Police Commissioners**
**City of Kankakee**

146:4,5,10;148:5;
187:19;188:13,15;
197:22;198:24;
199:14;200:1;202:2;
204:4;210:18;214:3;
220:5;238:11;239:2;
240:14,19;241:5,7;
242:24;245:10;
253:13;259:13;
280:16;287:10

**officers (40)**
36:22;41:4,9,12;
43:15;46:7;47:2;68:3;
69:13;96:18,20;97:12;
123:21;142:13;
145:13,15,23;146:15,
19;147:11;154:17;
155:18,19;159:10;
179:5;187:3;202:23;
209:5,16;210:3;
214:17;223:18;224:8;
227:2;244:8;272:18;
290:6,14,15;292:10

**officers' (1)**
123:22

**officer's (2)**
46:18;187:11

**officials (2)**
156:14;287:12

**old (3)**
95:22;196:5;225:19

**Olivet (1)**
196:24

**once (6)**
23:14;28:12;
222:16;238:6;266:6,
21

**one (86)**
3:20;6:15;11:23;
16:14,18;26:11;27:13;
30:13;33:8;42:21,21;
66:15;71:3;81:12;
84:10;93:22;100:7,8;
107:13;111:18,20;
112:21;114:10;116:1,
10;118:12;120:7;
121:13,18;124:8,20,
23;127:8,12,17;128:4;
130:14;133:24;
144:16;151:13;
158:17,20;159:5;
166:2,6;169:23;170:1;
172:18;174:10,11,19;
176:14;180:16,21;
182:7;186:19,22,23,
24;187:5;194:3;
204:16;206:12;
208:20;210:8;216:22;
221:1;223:12;225:11;
226:17;239:14;
241:14;244:13;245:6;
248:16;265:1;269:7,
19,24;270:20;274:24;

280:22;288:12,14;
291:23,24

**ones (3)**
186:23;236:7;
291:24

**one-step (1)**
174:16

**only (19)**
7:1;8:5;26:4;60:10;
62:17;110:5;112:15;
117:10;145:7;152:20;
155:6;186:6;190:13;
193:5,16;194:3;203:6;
241:19;253:18

**onto (3)**
81:22;127:17;
220:22

**open (7)**
12:10;31:20;212:5,
21;270:19;272:6;
287:21

**opened (1)**
219:21

**opening (3)**
206:12;284:12;
291:13

**operate (1)**
186:9

**operated (1)**
34:10

**operating (1)**
215:4

**operations (1)**
175:10

**opinion (3)**
7:21;72:15;185:14

**opportunities (1)**
210:17

**opportunity (11)**
10:7;101:10;
102:17;105:4,16;
131:13;133:20;
134:23;143:23;147:9,
13

**opposed (3)**
155:18;185:2;
269:11

**optimum (1)**
146:7

**oral (2)**
203:16;283:10

**order (109)**
28:5,6,7;32:5,9,11,
13;33:4,4;44:4;55:3,5,
8,9;56:5,17,18,22;
57:9;59:20;60:4,7,9,9,
13,16;63:10;67:23;
86:9,21;105:20;106:4;
107:13,14;113:22,23;
115:7,18,19,21;116:8,
9;117:21;120:3;
121:17;122:1,1;136:1,
2;137:16;139:2;

143:8;148:15,17;
173:5;176:16;177:13,
17,18,21;178:4;
187:12;188:14,15;
238:11,14,20;239:1,1;
240:14,16,17,19,22;
241:6,17,24;242:2,7,8,
22,23;243:1;246:8;
260:23;261:4;265:17,
20,21,24;266:11,13,
17,19;267:11;268:1,8,
11;269:8;278:11;
280:7;284:22;286:18,
20,20,20,21;287:19;
288:5

**ordered (11)**
55:17;58:12;59:24;
62:1;89:11;136:5,5;
167:16;169:3;175:8;
267:1

**ordering (1)**
86:7

**orders (45)**
33:9;43:10,13,13,
16;96:19;97:4;105:21,
22;108:23;121:15;
166:16;167:12;
169:17,19,22;170:5,7;
185:18;187:9,18;
197:14;200:5;230:8,9,
9;234:1;242:11;
262:15;278:7,22,22;
280:13,17;284:15,24;
285:3;286:18;287:4,
24;288:9;289:8,15,17,
19

**ordinance (13)**
212:5,21,24;213:11,
16,17;216:24;218:20;
219:10;223:7;259:24;
272:5;273:18

**ordinances (1)**
6:22

**organization (7)**
43:6,7,10;159:18;
177:10;186:4,10

**organizing (1)**
64:7

**original (4)**
128:18;129:16;
258:17;259:6

**otherwise (2)**
108:19;257:18

**out (94)**
3:2;5:23;6:18;8:21;
9:1;15:18;17:11;
20:24;25:21;28:21;
29:7,10;31:12;33:17,
23;42:13;48:7;49:15;
54:14;57:7;66:6;67:1;
70:21;72:13;78:13;
83:1;87:22;90:14;
91:23;93:5;95:15;

112:5;113:4;139:2;
147:10;153:5,5;155:5;
164:14;166:1,6;
167:14;175:7;178:15,
17;181:12;188:9;
199:12;200:16;201:5;
202:22;204:6;209:16,
17;211:19,20,21;
212:4;213:3,14;
220:10,12,23;223:4;
226:13;228:20,23;
229:11;232:8;233:24;
239:23;245:22,23;
254:4,13;263:19;
268:13,19;269:11;
270:2,20,24;271:1;
279:6,12;280:20;
285:16;286:8,9;
287:15,17,21;288:22;
290:13

**outcome (2)**
187:1;213:22

**outdoor (1)**
197:13

**outer (1)**
227:6

**outline (2)**
205:12;215:15

**outlook (1)**
227:2

**outside (11)**
19:6;38:14;83:3;
106:24;166:9,16;
262:7,14;263:12;
281:8;285:24

**over (36)**
6:12,13;15:8,24;
17:3;23:15;28:1;
42:13;61:14;82:5;
84:19;87:13;141:11;
146:15;185:14;
189:24;194:21;
196:12,17;210:10,21;
219:9;229:3,4,6;
230:1,2;236:3;263:18;
264:2;272:19;277:8;
286:4,10,22;287:13

**overall (1)**
13:9

**overhear (1)**
287:22

**overrule (6)**
76:22;126:13;
152:5;180:3;215:19;
257:3

**Overruled (60)**
14:8;19:13;20:23;
27:2;32:19;34:5;
35:12;37:6;43:20;
47:6;51:6;67:19;
68:16;69:17;71:13;
73:16;78:17;84:2;
85:1;7;92:10,16;

93:21;95:8;100:21;
109:17;122:21;
132:11;133:8;135:4;
143:2,21;151:21;
163:19;166:23;167:8;
168:3,14;171:4;174:3;
235:9;237:13;238:16;
243:7;244:22;249:17;
251:3;254:15;255:6,
18;256:10;258:1,6,14;
259:20;260:8;261:14;
262:22;265:12,23

**overview (2)**
71:8,12

**own (5)**
15:17;80:17;
124:21;199:16,17

**owned (1)**
34:10

**owns (1)**
273:11

---

**P**

**packet (1)**
205:17

**page (7)**
99:10;149:4,18;
194:20;256:18;257:6;
258:3

**pages (7)**
42:14;109:21,24;
194:21;241:12;
242:15,19

**Palatine (1)**
196:23

**paper (1)**
77:10

**paperwork (5)**
15:17;23:16;208:4;
224:16;260:2

**parade (1)**
49:20

**paragraph (1)**
233:21

**paramilitary (6)**
43:6,7,9;177:9;
186:4,9

**Pardon (1)**
281:3

**Park (11)**
45:22;46:9;47:16;
48:20;49:19;51:20;
53:10,12,15;228:6,8

**parked (3)**
53:17;227:6;228:17

**parking (2)**
82:19;226:12

**part (25)**
4:8;8:5;50:12;
69:11;72:11;86:19;
87:8;94:6;106:3;
114:17;118:15;120:2;

Board of Fire and Police Commissioners
City of Kankakee

September 30, 2020

134:18;138:16;
144:22;146:22;152:6,
15;157:18;159:20;
182:10;216:2;221:11;
232:2;245:10
**particular (3)**
146:4;151:17;210:9
**particulars (1)**
95:5
**parties (2)**
192:7,7
**partnership (1)**
159:16
**parts (1)**
106:2
**party (2)**
7:2;191:16
**passing (2)**
200:7;227:12
**Passwater (20)**
61:13,17;62:12,15,
20;63:16,17,19,20;
87:6,7,8,11;89:10,12,
13;107:5;232:9;267:9,
15
**past (6)**
49:18;144:1;
184:18,21;193:4;
218:14
**patience (1)**
284:8
**patrol (15)**
9:16;40:19;42:21,
23;45:11;47:2,10;
199:10;200:10,12;
214:17;238:7;281:1;
286:16;287:6
**patrolman (2)**
202:10;204:4
**patrolmen (8)**
19:6;42:24;208:2;
235:23;238:8;269:16;
278:10;279:23
**Paul (154)**
15:24;22:5,8,13,15;
23:2,7,10,12,23;24:3,
3,9,12,15,18;25:10,17;
27:16,20,23,24;28:15;
29:3;30:8;54:20;
64:23;79:5;98:8;99:5,
24;100:1,9,16,24;
101:24;102:17;
103:15;104:10,14,23;
105:4;106:9,22;107:2,
6,22;108:9;109:23;
110:7,18;111:10,14,
23;112:6;113:8,14,17,
19;114:4,20,24;115:4,
11,14;116:4,11,24;
117:11,14;118:3,6;
119:5,24;121:3,16,24;
124:18,21;125:24;
126:4,7;127:19;128:7;

129:7,17;130:2,9,16;
131:2,13,23;132:6,24;
133:1;135:7;136:18,
20;137:7;138:24;
140:17,21;141:7,16;
142:4,23;143:16;
144:9,11,19;146:24;
147:5,8,13,21;148:12;
149:23;151:9;152:1,
20;153:6,13;154:3,13;
157:8,11,15,19;158:1;
184:22;185:1,8;187:9,
12;190:23;195:8,11,
16,20;196:5,19;
207:14;212:6;219:20,
20,20;236:17;253:7,7,
7;261:1;289:3,8;
291:10
**pause (1)**
81:20
**pay (5)**
212:24;213:19;
269:2;287:10;288:11
**paying (3)**
213:23;262:12,13
**peace (2)**
45:12;123:22
**peaceful (6)**
44:9,17;69:10;
140:4,6;229:7
**pending (1)**
86:12
**people (48)**
47:24;48:2,4,6,7;
58:17;84:19,23;85:12;
143:6;160:11,13;
201:18;203:24;204:7;
210:8;211:1,15,17;
213:11,13,15,16;
218:20;219:10;223:7;
225:7;226:4,7,18;
244:4,19,20;268:9,20,
23;269:1,3;270:1;
271:10,13;285:14;
286:10,16;287:17;
289:14;292:1,2
**people's (1)**
197:14
**per (1)**
65:2
**perceive (1)**
242:6
**Perfect (1)**
118:23
**performance (2)**
108:22;233:21
**performance-enhancing (1)**
249:11
**perhaps (2)**
66:11;183:2
**period (9)**
49:16;86:3;200:23;
201:2;203:1;206:18,

22;209:9;289:23
**periodically (1)**
49:13
**person (10)**
28:19;87:2;103:3;
146:3;151:7;153:1;
174:18;234:1;236:3;
270:1
**personal (2)**
206:15;238:24
**personally (4)**
50:24;78:2;98:14;
161:23
**personnel (1)**
158:13
**perspective (1)**
167:1
**pertain (1)**
95:2
**pertains (2)**
39:16;242:5
**phase (1)**
199:13
**phases (1)**
199:15
**philosophy (1)**
279:15
**phone (23)**
16:20,22,24;17:3,5,
6;27:11,14,16;28:1,5,
8,10,15;33:9;62:7,16;
78:14;129:5;221:16,
19;249:21;262:4
**phones (2)**
27:8,8
**Physical (1)**
198:21
**physically (2)**
56:2;222:11
**pictures (2)**
159:4,10
**place (35)**
36:23;44:10,23;
58:14,20;61:12;62:21;
63:2,15,22;65:4;
67:24;68:6;70:8;71:9;
72:7;75:11;78:6,8;
80:11,18;90:21,23;
93:18;161:4,20;171:2;
175:20;187:19,22;
255:14;257:18;
265:22;269:7;284:21
**placed (4)**
73:22;102:4;163:8;
187:11
**places (2)**
224:20,21
**placing (3)**
73:24;74:9;164:2
**plaintiff (2)**
149:1,1
**plan (1)**
136:10

**play (3)**
84:4,17;211:8
**played (1)**
81:2
**playing (1)**
84:7
**please (12)**
6:17;35:21;38:13,
17;71:24;138:13;
144:16;162:24;
194:13;195:18;
197:12;237:1
**plural (1)**
136:1
**plus (1)**
213:1
**pm (2)**
11:16;292:24
**podium (8)**
17:17;19:22;20:7,9,
12,14;29:16,17
**point (53)**
5:22;15:21;20:18;
22:13;24:12,19;29:17;
31:9;52:10;61:2;65:2,
20;82:21;84:10;
87:23;88:12,17;89:2;
101:5,17;106:22;
108:16;111:23;112:4,
7;119:16,22;120:13;
127:17;128:21,23,23;
129:12,15;141:6;
142:14,23;143:1,9;
144:8;147:3;155:5,5;
188:24;220:5;222:12;
229:1;231:24;239:13;
267:7;277:15;283:8;
284:18
**points (3)**
107:23;111:2;
172:20
**police (110)**
4:15;9:5,14,20;
10:2;11:12;18:22;
29:12;31:24;34:10;
36:22;37:9,21;39:13,
22,24,24;40:1,7,24;
42:3,8,10,17,20;43:3,
5;44:2;45:2;61:9;
63:21;69:11,12;73:6;
76:10;78:9;79:15;
96:17;97:11;102:21;
123:21;133:23;134:4;
138:21;146:2;148:4;
154:8,14;158:13,14,
18;159:2,10,13;160:3;
172:22;178:1;179:4;
182:24;183:19;186:3,
8;193:19;195:21;
197:18,19,21;198:24;
199:24;200:15,16;
208:19;209:16;
210:18;214:2,3;215:3;

223:18;224:8;227:2,
14,19;228:5;234:9;
235:6,14,19;237:15,
22;240:15;247:24;
248:2,5,17,21;254:13,
21;266:9;269:18,22;
270:22;272:18;
280:16;285:16,18;
290:6,17;291:14,21;
292:10
**policies (45)**
41:1,14,15;42:3,6,7,
9,13;104:24;109:21;
163:16,22;180:16,19,
22;215:6;233:9,14,17;
235:24;236:5,6,16;
238:10,13,23;239:6;
240:9;241:4,10,11,15,
23;242:5,12,19,21;
243:10;282:2,8,19,22;
284:16;286:24;288:4
**policing (3)**
160:17;214:6;
291:20
**Policy (37)**
41:20;42:3,4;74:12;
124:4,15;133:14,23;
134:3;139:6;146:3;
159:12;160:3,15;
174:16;179:11,13,19;
180:13;181:9,10;
182:6,13,23;183:1,20;
233:13,20;234:4;
236:19;259:23;282:5;
290:10,11,11;292:2,
10
**political (1)**
227:3
**poor (2)**
61:1;86:4
**portion (2)**
179:24;203:16
**portions (1)**
244:13
**portrayed (1)**
285:22
**position (7)**
94:14;182:12;
202:2;204:1;234:2;
281:2,5
**positions (1)**
198:4
**positive (4)**
214:24;227:1;
247:17;266:8
**possible (6)**
66:1;68:1;138:1;
140:21,23;192:11
**possibly (2)**
33:8;152:21
**post (2)**
81:16;87:20
**posturing (1)**

Board of Fire and Police Commissioners
City of Kankakee

September 30, 2020

217:2
**potential (1)**
69:19
**potentially (1)**
187:2
**powers (1)**
272:18
**Practice (1)**
65:6
**prayed (1)**
210:23
**prayer (2)**
219:3;253:8
**prepare (9)**
11:9;32:4,6,14;
73:24;95:7;254:23;
255:3,10
**prepared (13)**
10:8;32:8,14,22,23;
33:4;76:4;77:9,24;
96:9;170:23;192:5;
256:12
**preplanned (1)**
44:9
**presence (4)**
33:13;58:14;62:23;
139:19
**Present (10)**
3:14,18;12:21;
64:17;72:5;105:17,17;
107:2;145:13,16
**presented (5)**
4:6,8;6:3;7:2;288:8
**pre-shift (1)**
207:21
**president (1)**
20:1
**press (1)**
159:24
**preteens (1)**
48:11
**pretext (1)**
155:23
**pretty (11)**
21:3;76:20;151:14;
198:6;208:15;210:17;
213:6;218:6;232:15;
259:10;290:1
**prevented (1)**
276:21
**preview (1)**
158:10
**previous (6)**
93:23;184:24;
185:7,13;225:6;251:7
**previously (1)**
254:22
**print (2)**
282:2,3
**printed (2)**
42:13;246:17
**printout (1)**
79:5

**prior (24)**
9:16;10:6,16,18;
18:17;23:3;40:18;
44:20;99:1;101:5,11;
104:15;126:14;
144:24;168:9;184:13;
198:12,15;204:13;
209:1;225:2;229:13;
231:10;246:7
**private (1)**
70:20
**proactive (2)**
200:15;201:16
**Probably (20)**
11:13;48:1,3;54:16;
58:10;71:4,5;72:4;
102:11;128:21;
136:21;175:5;206:14,
16;211:11;226:7;
260:13;279:4,5;281:9
**problem (3)**
123:15;209:4;
210:12
**problems (2)**
211:5,5
**procedures (8)**
41:1;108:22;
233:10,13,14,17;
238:23;241:4
**proceeding (1)**
6:20
**proceedings (1)**
8:1
**process (21)**
6:21,24;101:16;
104:19,21;133:16,21;
174:16,17;186:24;
197:24;198:1,7;
199:23;203:12,14,15;
269:7,10,12;291:4
**processes (1)**
174:17
**procession (2)**
50:4,8;51:14;53:7
**produce (1)**
291:24
**program (4)**
199:24;205:1;
206:2;215:9
**progress (2)**
201:19;210:20
**progressed (1)**
200:9
**progressive (10)**
174:17,21,24;179:7,
10;180:4;182:14;
183:24;286:19;291:17
**progressively (1)**
210:6
**prohibit (1)**
4:22
**prohibited (1)**
192:22

**prohibiting (1)**
101:7
**Promise (1)**
172:2
**promoted (7)**
39:23;202:18,21;
203:8,22;204:9,14
**promotion (2)**
202:20;204:13
**proof (7)**
66:12;94:13;
155:14;156:3,18;
247:9;276:19
**proper (10)**
92:20;109:13;
183:9;186:4;251:9;
255:16;257:13,20;
285:12;286:16
**properly (1)**
124:5
**property (2)**
273:11
**propose (1)**
283:23
**protect (2)**
6:22;221:6
**protected (1)**
155:21
**protein (1)**
210:5
**protest (26)**
44:9,13,17;51:4,11;
64:5,8,15;67:24;
69:19;105:18;106:11;
139:1,3,5;142:15;
143:11,18;160:12;
225:4,24;226:10;
230:18;285:13,16;
287:21
**protesters (16)**
49:14;50:14;53:21;
55:1;58:14,21;68:2;
69:21;139:20,21;
140:1,23;142:11;
143:24;169:11;229:7
**protesting (4)**
49:15;52:5;140:11;
286:23
**protestors (1)**
228:9
**protests (12)**
69:10;140:13,15,18;
142:19;158:1;225:6,9;
226:21;285:9,9;
286:11
**prove (7)**
94:15;154:24;
247:7,13,14,16;289:7
**proven (2)**
249:14;288:22
**proves (1)**
115:11
**provide (1)**

**provided (5)**
6:21;101:10;
210:16;245:21;255:16
**providing (1)**
134:19
**proving (1)**
94:13
**provision (2)**
241:23;242:5
**provisions (1)**
242:4
**proximity (2)**
140:12,17
**psychological (1)**
198:18
**public (17)**
3:2,21,24;4:3,20;
5:24;6:16;7:10,20;
8:7;50:15;187:8;
200:3,17;269:23;
277:3;290:11
**pull (2)**
82:20;272:19
**pulled (1)**
226:12
**pulling (3)**
82:5,13,18
**punch (1)**
220:14
**punched (1)**
220:18
**punishment (1)**
182:24
**purpose (12)**
102:2,6,16,20;
103:2;108:17;110:13;
162:24;177:18;190:8,
10;244:11
**purposes (1)**
245:6
**pursuant (1)**
146:2
**put (40)**
7:6;18:6;21:14,19;
25:19;26:13,14;35:15,
17,24;63:4;77:14;
94:14,21;103:5;
106:20;108:2,4;109:7,
9;124:8;131:18;
170:1;176:9;178:12,
20;191:12;215:14;
216:10;219:12;
227:17;250:3;253:10,
17;255:13;275:17;
276:3,14;277:2;282:4
**puts (2)**
109:13,23
**putting (4)**
21:23;136:10;
190:8,10

50:13
**provided (5)**

**Q**

**qualified (1)**
286:17
**Quick (1)**
188:4
**Quickly (1)**
243:19
**quite (4)**
23:9;175:21;193:5;
291:7

**R**

**race (7)**
151:4,4,16,17;
153:3;154:12;276:1
**racial (4)**
154:18;155:15;
157:2;286:12
**racially (2)**
153:16;154:7
**racist (1)**
152:1
**radio (16)**
51:13;61:14;62:9,
16,18;141:1,5,11,17;
144:3;262:24;263:1,2,
5,5,13
**radios (2)**
141:3;263:2
**Rainey (1)**
196:22
**raised (1)**
166:23
**raising (1)**
138:17
**rang (2)**
16:17,20
**rank (4)**
9:10;235:13;
239:16,17
**ranked (2)**
203:20,23
**ranking (1)**
267:14
**ranks (1)**
39:22
**rapport (2)**
210:15,24
**rather (2)**
97:8;208:13
**rationale (1)**
231:17
**reach (1)**
78:13
**react (1)**
279:9
**reaction (6)**
92:21;213:4,24;
218:4;219:8,15
**reactionary (1)**

2:20-cv-02310-CSB-EIL  # 17-15  Page 234 of 270
Board of Fire and Police Commissioners
City of Kankakee                                                    September 30, 2020

200:16
**read (8)**
90:17;109:12;
121:22;137:1;234:6;
241:14;257:24;283:1
**reading (1)**
80:3
**reads (1)**
233:21
**real (1)**
172:2
**really (8)**
49:16;101:21;
131:22;217:9;219:4,6,
8;240:5
**reason (18)**
19:3;24:11;50:12;
67:22,23;69:12;75:4;
121:14,17;213:18;
231:23;232:2;242:7;
252:11;285:19;291:5,
7;292:4
**reasons (2)**
128:12;279:2
**rebuttal (4)**
247:5;283:5,6;
284:3
**recall (41)**
10:13;11:7,22;13:8;
14:24;19:21;25:4;
27:21;28:11,13;35:1,
2;37:22;44:6;72:20;
73:18;79:23;80:3;
83:8,18;90:5;91:22;
93:3;109:6;140:2;
141:8;154:15;167:17;
171:12,17;172:17;
204:8;221:18;245:16;
251:2,20;259:5;262:1,
3;271:12,18
**recalled (1)**
91:3
**receive (3)**
75:10,14;204:12
**received (4)**
153:17;170:24;
212:3;280:14
**recently (1)**
9:4
**recognize (5)**
42:6;77:15,17;79:3;
283:10
**recollection (11)**
86:14;121:10;
122:5;138:3,4;148:22;
149:15;163:2;257:22,
24;291:1
**recommend (1)**
185:20
**recommendation (3)**
103:12;185:9;291:6
**record (29)**
5:17;7:7;8:5;39:9;

56:7;88:4;92:18;
93:20;95:4,9;97:22,
24;118:16;132:10;
156:17;159:12;
178:12,21;195:2,4;
200:13;217:23;
253:21;276:4;277:3,
13,15;292:14,15
**recross (2)**
34:15;172:1
**RECROSS-EXAMINATION (2)**
37:14;172:3
**red (1)**
82:10
**REDIRECT (4)**
31:1;160:22;161:1;
188:5
**refer (1)**
118:8
**reference (7)**
121:8;129:2;
133:11;138:21;
176:17;186:13;216:1
**references (1)**
176:20
**referring (8)**
96:21;97:3;165:21;
205:2;215:18;228:5;
238:13;246:6
**reflect (1)**
88:5
**refresh (7)**
118:9;121:9;122:5;
138:2,4;148:21;291:1
**refreshed (1)**
138:11
**refreshes (1)**
149:15
**refreshing (1)**
163:2
**refusal (1)**
233:23
**refused (1)**
107:16
**refusing (5)**
62:5;106:19;
129:20;130:17;136:1
**regard (1)**
158:1
**regarding (12)**
10:8;30:17;70:8,24;
88:20;102:18;124:1;
154:12;156:20;190:3;
254:24;276:20
**regardless (1)**
184:5
**regards (3)**
70:3;74:16;76:4
**Regnier (3)**
248:3,4;249:24
**regular (2)**
36:21;73:2
**regulations (1)**

108:21
**rehabilitate (1)**
188:19
**rehabilitating (1)**
188:17
**reiterate (1)**
168:19
**reiterated (1)**
16:5
**related (1)**
155:20
**relates (1)**
50:23
**relation (3)**
50:17;112:6;216:13
**relationship (8)**
159:2,14;209:2,14;
213:2,21;249:23;
272:17
**relationships (2)**
268:23;291:22
**relative (2)**
90:20;190:14
**Relatively (1)**
140:16
**relax (1)**
241:1
**relaxed (1)**
241:2
**relaxing (1)**
216:16
**relayed (1)**
249:23
**released (2)**
199:15,17
**relevance (16)**
13:16;32:17;34:4;
65:22;66:12;73:15;
95:1;151:20;153:20;
154:20;156:5;190:8,9;
254:12;255:15;259:17
**relevancy (1)**
152:4
**relevant (16)**
65:10;66:17;67:3,9;
102:12;110:5,14;
150:20;151:3,4;
166:21;225:2;239:24;
245:20;276:9,12
**relieve (1)**
59:21
**relieved (29)**
18:15,21;61:10;
62:3;63:11;72:17;
89:3,3;106:6,6,21;
107:16;161:11;170:2;
218:18,22,23;221:10,
13;222:1,17;223:6,11;
259:8,14,15;260:1,3;
285:3
**remember (53)**
22:19;24:22;72:20;
112:24;119:5;120:20,

20;121:6;122:7,8,13;
135:15;136:2,7,12;
148:17,18;149:20;
150:1,6;154:9;164:7,
9,11;165:13;17;
166:12;172:7;180:8;
197:4;203:20;221:15,
17,21,24;224:1;
225:14;251:15,23;
256:19;257:11;
258:18,20;262:1;
264:20;266:24;
270:16,17;271:8,17,
21;285:6,7
**remembering (1)**
264:12
**remove (2)**
180:12,12
**removed (11)**
180:9,14;210:3;
245:16;246:22;
247:22,24;248:22;
249:4,9;250:5
**rep (1)**
250:14
**repeat (3)**
55:7;100:23;237:20
**replied (2)**
61:4,5
**report (12)**
25:6,15;59:15;62:2,
4;72:23;136:6;
170:10;175:2;188:9;
190:1,8
**reported (5)**
25:11,17;26:4;79:7;
85:19
**reporter (1)**
81:1
**reporting (1)**
269:10
**reports (6)**
36:23;66:22;
190:10;202:24;208:5;
224:16
**represent (3)**
127:19;252:18;
289:2
**representatives (1)**
101:14
**representing (1)**
6:7
**request (1)**
26:5
**requested (2)**
32:3;170:13
**require (1)**
202:1
**required (1)**
183:23
**requires (1)**
245:10
**resisted (1)**

20;121:6;122:7,8,13;
135:15;136:2,7,12;
148:17,18;149:20;
150:1,6;154:9;164:7,
9,11;165:13;17;
166:12;172:7;180:8;
197:4;203:20;221:15,
17,21,24;224:1;
225:14;251:15,23;
256:19;257:11;
258:18,20;262:1;
264:20;266:24;
270:16,17;271:8,17,
21;285:6,7
**respect (25)**
66:10;67:3;95:3;
107:8;108:20,22;
110:4;125:20;126:8;
128:8,13;130:10;
133:21;136:20;137:8;
143:18;144:19;145:8;
146:23;147:15;
154:13;183:20;216:4;
278:3;290:7
**respectfully (2)**
178:12;277:20
**respond (4)**
15:3,11;134:21;
167:11
**responded (4)**
92:3;95:16;156:19;
167:13
**respondent (6)**
133:19;134:20;
149:2;282:6,9;283:4
**Respondent's (7)**
149:7,10;190:2,12;
204:18,21;281:16
**response (14)**
16:7;26:4;93:1,6,9;
95:19;96:2,5;105:5,7,
8,10;167:16;271:6
**responses (1)**
209:7
**responsibility (1)**
286:15
**responsible (2)**
202:23;289:13
**responsive (1)**
134:8
**rest (7)**
62:3;190:20;
191:11;192:7;281:19,
23;283:4
**restorative (1)**
268:17
**restrictions (2)**
223:15;224:17
**result (6)**
187:9;203:18;
206:19;223:10;
289:10;291:5
**resulted (2)**
289:17;290:3
**retire (3)**
61:5;86:6;251:12
**retired (6)**
9:4,11;31:3;170:19;
250:14;252:9
**retirement (1)**
251:12
**return (4)**
85:18;106:3;
110:19;116:1
**returning (1)**
107:9

**Board of Fire and Police Commissioners**
**City of Kankakee**

September 30, 2020

review (11)
10:7;15;75:24;76:3;
78:1;92:7;108:7;
120:18;145:4;184:19;
192:3
reviewed (1)
90:1
reviewing (2)
80:14;96:8
rid (2)
181:10,11
ridiculous (4)
220:15,15;221:11;
222:9
riding (1)
200:14
right (72)
4:10,11,21;12:18;
13:4;17:13;20:8;
25:21;26:15;30:6,7;
36:16;49:23;56:8,10;
64:20;68:15;73:18;
82:9;87:17;94:22;
99:7;101:22;108:11;
109:21;110:23;117:8;
120:10,21;122:10;
129:4;131:20;133:14;
135:16;136:3,15;
137:16;139:9;141:20;
142:1;146:21;151:12;
153:4,6;158:21;
159:23;160:13;
172:24;178:23;182:5;
183:14;184:14;
185:19;186:5;187:2;
189:17;192:12;
199:11;208:16;
210:12;216:21;
227:10;237:10;247:4,
8;248:9;252:7;
276:23;281:20;
285:15,15;286:24
right-hand (1)
58:10
rights (8)
6:23;123:20,22;
133:16;153:15;154:5;
155:21;275:5
rigorous (1)
198:1
ring (1)
16:12
ringing (1)
221:16
rings (1)
27:11
Roger (1)
281:11
role (2)
45:6;211:9
roll (6)
3:5,8;20:24;28:22;
209:10;225:10

rolling (1)
85:21
room (21)
4:17,19,21;5:1,5;
10:18;12:16,18;16:10;
17:15;19:7,23;20:6,
12;24:16;38:15;
251:16,22;252:13;
253:13,20
rose (1)
39:22
route (2)
47:16;48:20
routine (2)
208:13,15
routinely (1)
27:11
row (1)
284:9
ruining (1)
213:21
rules (8)
6:21;41:13,14;65:6;
108:18,21;246:13;
286:24
ruling (2)
256:6;258:5
rulings (2)
6:2;156:8
run (5)
223:4;232:5;248:6;
287:4,6
running (1)
198:9
rushing (1)
126:22

## S

safe (1)
182:6
safety (2)
50:13;175:10
sake (1)
5:24
salient (1)
172:19
same (24)
9:17;14:7;25:13;
51:5;56:20;68:12;
103:2;135:19;136:18;
138:8;173:23;184:16,
17;190:9;194:6;
197:20;201:5;202:20;
241:21,22;248:24;
258:18;269:18;278:18
sanctioned (1)
246:11
sat (4)
23:2;120:24;221:9;
222:18
Saturday (4)
44:7;45:18;140:4;

285:9
Saturdays (1)
45:15
saw (37)
15:22;21:2,4;26:4;
29:3,5;36:6;48:23;
49:1;51:22;52:12;
54:3;57:4;58:5;83:20;
106:7;109:2,4;111:24;
113:20;114:18;115:4,
11;139:8;143:5,9;
144:4;164:22;165:8;
170:9;216:4;225:16;
250:19,22;252:24;
285:20,24
saying (28)
4:6;5:24;56:13;
75:16;83:18;86:17;
112:24;117:6;121:16;
136:2,7,12;144:24;
151:9;153:2;182:14;
188:11;193:11;
208:18;217:17;
218:22;223:6;227:22;
253:8;258:18;268:11;
272:3;290:10
scary (2)
227:7;229:10
scatter (1)
287:15
scenario (1)
259:18
scenarios (1)
241:22
scene (9)
61:14;62:13,16,18,
19;114:14;124:22;
143:9;144:5
scheduled (4)
4:17,18;5:1;225:12
school (3)
204:15;205:5;
225:21
Schuyler (1)
210:13
scope (1)
166:20
screaming (1)
14:1
search (2)
201:20;260:18
seat (4)
54:9;218:2;220:10,
12
seated (1)
54:8
second (33)
5:11,12;8:19;11:10;
31:18;38:3;51:22;
52:3;60:16;106:4;
107:13;124:20;138:8;
144:16;148:13;150:4,
9,16;166:2,6;170:1;

179:24;182:10;199:9,
11;231:14;232:13;
256:8;269:7;271:14;
277:6;291:10;292:18
Secondly (1)
156:6
seconds (4)
20:13,13;284:22,23
section (4)
3:3;7:10;10:23;
81:13
sections (1)
74:12
seeing (3)
93:3;112:17;115:15
seeking (4)
96:12,15;104:19;
136:11
seem (3)
22:13;24:5;128:16
seemed (3)
24:24;31:6,6
seems (1)
237:16
self-worth (1)
211:7
semester (2)
197:17,19
send (3)
35:7;135:9;255:11
sending (1)
135:15
sense (3)
31:15;219:11;229:4
sent (7)
98:8,22;99:4,23;
135:23;205:7;250:2
sentence (1)
109:23
separate (7)
67:15;176:14;
177:1;192:19;208:20;
248:6;274:18
September (1)
99:15
serene (1)
140:6
Sergeant (270)
6:7,8,23;9:12,13;
10:1,13;11:19,23;
12:4;13:19;14:13,23;
15:3,5,6,11,14,18;
16:4,7,11,18,19;17:5,
12,13,21;18:2,7,10,15,
20;19:10;20:1,6,9,19,
24;21:4,12;25:5;
27:13;29:23;31:3,5,
11;33:8,12,16,22;
34:9;37:10;45:9;46:8,
8,12,14;47:13;48:19,
24;49:4;50:6,16,22;
51:3,10,18,23;52:12,
23;53:15;54:1,4,12,

13,19,20;55:11;56:3,
21;57:4,5,12,13,19,21,
23,24;58:3,4,13,16,18,
19,24;60:3,18,21;
61:8;62:1,5,8,11,15,
23;63:3,19;64:19;
65:1,14,18,21;66:3;
67:15,23;68:9,13,22;
69:1;70:4,16,19,21;
72:10,10,13;73:3,9,
19;74:9;77:22;78:3,
13;79:5,9,12,20,23;
80:9,19;82:4,4,13,18;
83:5;84:11;85:11,14,
22;86:4,20,24;87:7,8,
10,17,18,22;88:12,15,
21;89:1,23,23;90:3;
91:22;92:3,14;93:4,6,
12,24;94:10;95:16;
96:2,5,10;98:19;
108:9;121:13;123:8;
127:9;128:1,2;129:22;
130:5,5;135:7,24;
144:4;145:11;146:10;
147:10;148:15;
151:11;155:24;161:6,
11;162:6,20;163:6,16;
164:10,15;165:8;
166:7,16;167:5,11;
168:9;169:18,19,20;
170:10,19;176:4,6;
177:1;192:6;193:19;
194:10;195:8,20;
202:18;203:8,13,13;
204:10,13,14;206:8;
208:13;214:4;220:8,9;
221:8;222:16;229:1,
14,24;233:7;239:22;
240:1;248:12,20;
249:12,18;250:13,14;
251:7,11,12,16,20;
252:2,6,23;253:3;
255:7;263:18,23;
278:5,6,7;284:21;
285:19;286:6,8;288:9
sergeants (8)
22:21;42:24,24;
235:23;238:8;269:16;
279:24;290:7
sergeants' (41)
10:9,12;11:16,20;
12:15,19,22;13:2,8,
23;14:2,13,22;17:21;
18:1,18;19:1,4,9,16,
19;20:11,16;22:24;
23:6;29:13,14;70:22;
72:14;80:12;128:3;
129:21,23;130:17;
204:4;208:9;212:7;
220:7;252:13;259:3;
261:7
sergeant's (3)
170:4;204:1;239:20

DEFENDANTS 001873

**Board of Fire and Police Commissioners**
**City of Kankakee**

September 30, 2020

serious (12)
147:4;148:4;
151:14;175:6,11,13;
186:20;187:5;189:1;
279:6;286:15;289:9
seriousness (2)
186:14,16
serve (1)
269:23
served (3)
40:3;260:16,20
Service (1)
40:4
session (1)
191:19
set (10)
41:1;76:7,12;162:6,
14;182:10;222:8;
236:15;283:19,22
sets (1)
235:24
seven (1)
202:13
several (3)
29:8;55:7;180:19
sexual (7)
80:10;216:1;254:1,
6;275:8,9,12
sexually (2)
254:18;275:18
shade (1)
211:19
shame (1)
285:5
shape (1)
155:21
shared (1)
246:7
sheet (1)
77:10
sheets (1)
205:13
Sheriff's (3)
75:2,15;81:5
shift (27)
11:8,10;17:16;19:5;
33:2;51:2;61:18;
129:3;199:9,9;202:10,
21;206:10,12;207:13,
15,22;209:3;210:11;
211:13;220:6,9;
223:20,22;231:10;
271:22;272:2
shifting (1)
239:8
shook (1)
228:23
short (6)
5:16;66:14;97:23;
191:4;194:9;195:3
shortly (3)
33:3;58:24;104:8
shot (1)

81:11
show (10)
5:17;41:17;56:2;
80:21;99:9;148:24;
204:17;217:4;229:10;
289:14
showed (5)
46:11;87:8;107:5;
148:19;171:14
showing (4)
77:10;138:7;
162:24;228:5
shown (2)
77:7;163:3
shows (1)
117:5
side (14)
49:7;53:13;58:9,10,
11;59:1;87:21;
102:18;105:5;112:2;
133:1;175:8;284:3;
286:12
sides (1)
103:2
sign (4)
74:2;100:7;218:7;
236:7
signature (1)
99:11
signed (5)
99:6;100:3,9;171:8,
13
significant (1)
198:6
signs (4)
142:22;230:17;
236:1,5
silence (1)
94:23
Similar (1)
46:1
simple (8)
260:23;261:4;
266:9,10,11;284:13,
14;286:14
simpler (1)
172:18
simply (2)
4:23;277:6
Simultaneous (1)
243:12
single (1)
12:7
sit (24)
22:21;52:24;117:1,
3;118:20;119:4;
120:20;126:6;127:7;
130:20,22;131:6,10;
156:23;210:22;
211:19;228:12;229:9;
237:6;243:11;247:8,
18;266:7;287:9
sits (1)

103:17
sitting (32)
10:16;11:22,23;
12:3,4,5,6,12;15:9;
16:21;17:21;19:6,15;
22:4,7;52:12,16;
87:14;107:7;139:8,12;
143:5;144:4;175:22;
216:13,15,19;218:23;
220:16;260:1;270:18
situation (15)
35:5;37:17;129:4;
175:7,7,11;185:12;
186:23;215:1;232:11;
254:20;269:15;279:7,
7,21
situations (3)
214:22;279:8,21
six (3)
40:3;188:9;205:3
size (1)
47:23
skipped (1)
88:1
slash (1)
286:22
sleeping (2)
212:12,17
Slightly (2)
138:12;273:20
small (2)
49:20;69:13
smell (1)
24:8
smelling (1)
24:15
smiling (1)
226:17
smoother (1)
84:17
social (1)
44:15
softer (1)
227:9
solution (2)
214:16;273:14
somebody (17)
12:2;25:14;37:3;
95:24;98:15;133:15;
151:18;155:14;173:7,
7,11,12;188:8;214:18;
237:7;247:1;292:9
somebody's (1)
156:10
somehow (5)
143:10;151:15,16;
187:2;247:17
someone (2)
81:20;177:18
sometime (1)
82:20
sometimes (3)
38:4;81:18;287:16

Somewhere (2)
181:8;194:21
soon (2)
33:1;216:23
sorry (28)
7:5,18;13:12;34:19;
35:22;74:20;98:12;
99:15;103:24;110:11;
128:9;130:21;138:14;
148:10;149:1;155:17;
159:13;165:14;
172:21;176:5;182:17;
191:10;207:3,14;
274:9;282:11,15,24
sort (2)
54:17;214:24
sought (1)
157:16
sound (4)
80:23,24;99:6;
172:24
sounds (2)
135:22;136:3
south (8)
49:7;59:2,2,6;81:13,
15;87:20;210:13
southeast (1)
226:13
southern (1)
59:2
speak (4)
6:18;14:13,21;
65:13
speaker (1)
270:21
speaking (6)
15:7;27:20;28:18;
80:15;84:19;145:14
speaks (2)
83:23;165:4
special (2)
40:3;209:20
specific (13)
107:23;131:14,15;
134:19;163:15;208:6;
224:1,5,11;241:9,19;
264:13;282:21
specifically (8)
39:16;45:19;
109:14;127:5;158:1;
168:7;264:10;268:19
specifics (3)
122:7,8;258:3
speculation (3)
7:21;13:15;14:16
speed (2)
82:2;87:14
spell (2)
46:20;196:3
spent (1)
209:23
spoke (6)
8:7;14:23;58:19;

125:19;170:24;214:9
spoken (3)
10:19;159:24;160:1
spoon (1)
94:17
spot (1)
211:18
spread (2)
8:21;254:3
squad (39)
12:16,18;19:7,23;
20:6,12;46:4,15,23;
49:12;50:7,13;53:17,
18;54:9;55:4,16;57:5;
61:9;63:12;81:21,24;
82:3,11;83:1,4,15;
89:6,8;106:24;208:21;
227:17;253:13,20;
262:15;265:3,5;266:2;
267:3
staff (1)
170:24
stamp (1)
83:1
stand (1)
10:6
standard (1)
181:11
standing (14)
13:2,4;17:16,19;
18:1,4,5;19:18;21:4;
52:11;106:24;138:16;
216:10;226:23
stare (1)
15:16
staring (1)
217:8
start (12)
3:2;9:1;39:8;82:21;
84:7;156:13;207:12,
19,21;209:9;220:6;
223:23
started (12)
23:15;48:1;54:11;
57:7;91:11;200:10;
209:8;210:4,7;216:5;
225:14,15
starting (2)
53:23;225:7
starts (1)
42:19
state (15)
6:22;14:4,24;31:7,
14;54:19;60:11;64:21,
21;65:16,17;151:7;
257:7;258:21;259:2
stated (9)
15:14;20:15;31:6;
59:10,11;63:19;
112:22;121:14;284:12
statement (35)
3:23;4:10;7:6;36:2;
54:18;55:2;60:6,12;

Board of Fire and Police Commissioners
City of Kankakee

92:14;93:8;94:2,5,9;
114:2;115:10,14,16,
17;116:7;128:17;
129:24;138:21;
164:10;169:5,11;
182:22;251:10;
252:15;256:15;
257:11;258:10,19,20;
268:1;283:10
statements (48)
7:12,18;17:1;31:11;
52:20;55:13;83:9,10,
11,12,13,16;90:16;
91:7;92:21;93:5;95:3,
14;97:8;111:14;
112:22;117:24;118:3,
5;119:5;120:17;
121:11;122:3,18;
123:9;124:17;125:12,
18;130:4;164:6;
165:12,24;166:8,15;
167:4,18,21;168:1,8;
191:17;262:15;
283:12;290:24
states (1)
10:22
stating (4)
9:1;16:4;39:9;86:1
Station (20)
47:18;59:21;60:15,
17;61:10;63:4,11,12,
24;85:19;106:5;
107:15;110:21;
115:20;116:2;170:1;
208:20;210:12;
226:12;254:13
statute (1)
123:21
stay (1)
53:18
stayed (1)
202:20
step (2)
182:7;183:9
stepdaughter (1)
196:13
stepkids (1)
196:10
stepped (1)
83:3
stepping (1)
87:22
steps (4)
145:7;182:2,18;
242:1
stepson (1)
196:12
steroids (3)
248:23;249:11;
250:7
stick (4)
75:18;127:14,15;
254:4

sticking (2)
112:20;217:2
sticks (1)
127:12
Still (18)
16:21;18:5;19:15,
18;21:3;24:3;54:8;
58:15;61:15;81:11;
88:13;91:12;166:4;
180:16;182:22;211:4;
220:8;273:1
stipulate (4)
236:22,24;237:3,5
stood (2)
20:8;267:2
stop (16)
49:13,14,23;52:9;
54:21;67:9;81:19;
84:6,16;201:17;
209:10;212:6;244:15;
245:3,7;278:2
stopped (12)
19:24;52:4,7;55:14;
82:24;140:20;142:19;
220:2;226:11,22;
227:5;263:6
story (1)
102:18
straight (1)
182:19
Street (16)
47:18,20;49:3,7,9,
18,18;52:5;81:23;
140:5,8,10,11;201:16,
17;210:12
streets (4)
213:13;244:20;
286:17;287:6
stress (1)
260:13
stricken (1)
69:5
Strike (16)
13:6;29:21;30:12;
52:22;88:19;99:22;
118:4;125:16;126:5;
135:14;144:15;
158:24;164:23;
208:10;232:3;258:24
strip (1)
147:7
strong (2)
132:14,16
stuck (2)
72:11;228:22
stuff (7)
39:19;207:21;
221:15,17;223:4;
270:1;286:12
style (1)
279:16
subject (5)
7:22,22;24:18;

273:6,20
submit (1)
159:11
submitted (1)
21:16
subordinate (7)
37:18,18,19,20;
185:17;238:10;241:5
subordinates (3)
43:11;96:18;278:8
subpoena (1)
252:19
subpoenaed (1)
252:14
subsequent (1)
117:13
substance (1)
276:22
substantiate (1)
148:7
successfully (2)
199:5,20
sudden (2)
218:20;289:22
sufficient (2)
47:8;95:6
suggested (1)
91:9
suggestions (1)
278:23
summaries (1)
37:1
summarize (1)
72:7
summary (1)
71:20
summertime (1)
211:20
superior (9)
32:12;34:22;35:6;
43:15;96:19;188:15;
241:7,17;278:15
superiors (2)
43:11;284:15
supervise (1)
278:10
supervised (1)
248:11
supervising (5)
223:17;239:2;
240:14,19;242:23
supervision (1)
158:13
supervisor (32)
37:17,19;61:18;
125:4;133:20;148:15;
149:24;150:3,5,10,14,
17,18,22,24;151:10,
10;186:20;215:9;
218:13;224:3,4,14;
231:10;232:9,13;
234:1;248:6;267:13;
272:24;279:15;290:9

supervisors (21)
51:10;152:2;
158:14,24;185:16;
200:23;203:4,10;
204:15;206:5,13,23;
214:12,14;239:12;
247:23;268:16;280:5,
17;290:13;292:11
supervisory (1)
205:1
supplemented (1)
41:7
supplements (2)
41:9;233:16
support (4)
47:12;128:12;
226:15,15
supposed (11)
41:13;43:15;
123:13;185:6;193:12;
215:3;224:21,22;
242:20;278:20;285:18
supposition (1)
88:20
sure (26)
3:5;7:8;20:3;49:17;
65:3;72:24;94:9;99:8;
100:12,24;114:9,11;
116:16,18;118:10;
123:1;140:14;152:9;
158:5;159:3,7;190:24;
246:4;259:6;289:4,6
surprise (4)
157:22;180:15,20,
24
surprised (1)
231:13
surrounding (1)
244:8
suspected (1)
170:10
suspended (2)
231:2,3
suspension (1)
174:20
sustain (4)
13:17;69:3;111:7;
116:16;153:21;155:1;
188:20
sustained (21)
14:19;33:20;38:6;
55:24;69:6;71:23;
80:7;88:19;113:12;
119:19;123:18;
135:12;141:14;
143:14;153:11;165:5;
173:20;235:3;263:16;
266:15;267:6
SUV (4)
82:15,16;84:20,23
SWAT (5)
195:22;201:6;
243:20;254:22;279:23

swaying (3)
52:17;139:8,12
switching (1)
50:6
sworn (9)
8:11,15;39:1,5;
90:3;99:17;195:9,13;
275:15
synopsis (1)
161:19
system (8)
178:5;179:4;
183:24;236:2,4;
241:21;268:21;290:14

T

table (1)
217:17
tables (3)
217:18,19,20
tactical (5)
175:7,10;185:12;
186:23;279:7
talk (27)
17:4;20:1;31:19;
48:11;57:20,23;59:19;
60:10;70:20;86:23;
88:16;115:8;117:22;
129:1;137:6;154:16;
157:6;160:6;210:4,22;
229:8,9;279:2;291:12,
17,18,19
talked (11)
24:21;29:22;62:17;
113:21;114:3;128:11;
172:12;175:18;
181:20;223:12;225:10
talking (40)
17:18,19;23:15;
52:11;61:15;62:11;
86:24;88:8;89:7,23;
101:8,23,24;114:1;
116:9;126:12;127:16;
140:9;141:5;160:7;
168:2,4;179:7;185:7;
192:10;207:16;
218:23;231:4;242:10;
258:13;264:22;
265:20;266:2;267:2;
268:7;271:21;283:16,
16;288:1,11
talks (4)
123:22;158:23;
159:1;257:19
targeted (3)
153:16;273:21;
275:24
targets (1)
201:21
taxpayers (1)
34:2
team (9)

Schelli Reporting Service, Ltd.
(312) 558-1113

DEFENDANTS 001875

**Board of Fire and Police Commissioners**
**City of Kankakee**

September 30, 2020

195:22,23;201:6;
235:20;243:20;
254:22;269:18;
278:12;279:23
**technically (2)**
4:9;7:14
**teenagers (1)**
48:9
**teens (1)**
48:12
**telephone (12)**
16:12,14,17;27:20,
23;28:16,19;137:10,
12,21;262:2;288:10
**Telling (22)**
29:7;82:22;86:4,9;
87:22;89:2;105:19;
138:18;148:17;213:8;
216:7;221:24;230:7,
10;262:2;264:14;
265:4;266:21;268:5;
270:1;271:9;272:7
**tells (3)**
229:24;259:14;
272:24
**ten (4)**
20:13;22:12;
284:22;289:23
**ten-minute (1)**
289:24
**term (3)**
43:23;159:21;
249:13
**terminate (2)**
135:8;142:2
**terminated (2)**
105:1;174:21
**terminating (2)**
178:18;185:21
**termination (12)**
96:12,15;103:12;
104:19;136:12;
155:19;157:16;184:4;
185:2,10;289:10;
291:6
**terms (2)**
160:5;189:4
**terrible (2)**
260:13;269:3
**test (1)**
250:3
**tested (1)**
247:17
**testified (46)**
8:15;20:22;31:4;
33:7,16;39:5;67:14;
81:4;84:10;90:1;
103:24;105:13;
114:19;116:3;128:5;
131:16;132:7;139:23;
142:5;152:8;156:5,11;
157:1;172:20,24;
188:8;195:13;205:2;

221:17,23;242:20;
244:1;245:9,13;246:2;
251:15,16;252:23;
254:1,17;256:19;
258:11;262:3;273:20;
288:12,15
**testifies (1)**
192:6
**testify (15)**
8:23;31:7;66:5;
84:3;91:8;93:24;
94:10;133:6;136:14;
172:9;238:22;250:15,
22;277:5;285:5
**testifying (8)**
97:13;161:14,14;
167:7;168:13;251:20,
23;253:2
**testimony (56)**
30:17;38:14;65:2,8,
11,21;66:12;67:2,7;
71:18;84:1;90:3;
94:20;97:16;111:11;
112:16;115:12;117:1;
121:18;123:4;127:11;
137:1,2;138:23,24;
142:16;154:11;
168:22;178:14,15;
184:3;188:21;191:6,
20;192:5;193:10;
212:11;232:24;237:3,
10;239:13;250:24;
251:2;253:5,9,15;
255:3;258:17;259:6;
262:5;263:11,14;
275:15;276:19;
280:13;284:17
**testing (3)**
198:18,21;203:15
**tests (1)**
203:18
**Thanks (2)**
36:18;38:11
**theme (1)**
177:8
**thereafter (1)**
58:24
**thinking (1)**
193:2
**third (4)**
38:3;48:11;63:9;
124:22
**thoroughly (1)**
259:23
**though (6)**
127:14;132:4;
145:1;168:18;176:4;
190:5
**thought (20)**
32:18;47:8;69:21;
75:7;113:23;115:7;
117:21;121:16,24;
124:18;136:23;143:4,

10;181:1;211:16;
222:7,18;240:1;244:6;
254:20
**thoughtfulness (1)**
284:11
**thoughts (2)**
227:3;232:12
**thousands (1)**
260:17
**threaten (1)**
29:3
**threatened (1)**
251:9
**threatening (2)**
30:8;227:16
**three (25)**
5:18;42:2,9;67:15;
120:19;121:7;122:4;
130:7;131:4;138:19,
20;155:7;156:15;
176:14,24;185:13;
192:10;199:15;
217:22,24;223:1,9;
231:5;285:8;288:22
**three-day (1)**
289:22
**threw (2)**
153:5,5
**thrown (1)**
287:17
**thrust (2)**
18:9;253:10
**thrusting (3)**
250:20;253:1;
288:21
**Thursday (1)**
73:1
**ticket (2)**
213:23;287:18
**tickets (21)**
212:5,21,24;213:11,
16,19;216:24;218:20;
219:10;223:8;259:24;
268:12;270:11;
271:22;272:5;273:1,
18;287:16,17,17;
292:3
**tightly (1)**
4:17
**time-out (1)**
246:8
**times (16)**
15:23,23;23:3,19;
28:9;29:8;55:7;210:1,
23;211:21;241:21;
266:20;267:1,2;288:1,
7
**tired (7)**
16:2;23:12,14;24:1;
219:23,23;220:1
**tires (1)**
286:22
**To/From (10)**

26:6,10,18;32:22;
33:5;35:7;36:22;
70:24;78:1;148:19
**To/Froms (5)**
72:21;76:3;80:15;
170:24;254:23
**today (36)**
4:16;7:16;22:18;
46:1;103:17;105:14;
107:7;115:12;116:12;
117:1,3;118:20;119:4;
120:21;126:6;127:8;
130:20,22;131:6,10;
142:6;154:11;172:10;
227:5;237:7;243:11;
247:8,18;258:9;
261:21;263:11;274:7,
11;280:13;281:9;
287:8
**together (11)**
229:12;254:22;
269:17;270:2,23;
278:12,20;279:10,12,
13;284:11
**told (84)**
12:14;17:2;18:20;
20:2;28:14;29:9;30:3;
33:16;35:14;43:14;
51:9;55:5,8;56:5,16;
57:9,17;59:12;60:8,
13;61:1,2;62:1;63:3;
68:21;70:12,14,19,21;
72:8,10,12,13;73:5;
83:14;86:20;88:15,16;
89:13;106:2,17,18;
107:2,10,14,22;
110:19,20;128:1,2;
129:5,22;130:6;131:3;
135:23;145:22,22;
146:22;147:4;148:12;
161:10;212:20;222:4,
21;223:2;230:11,20;
231:6,9,14;232:13;
241:15;263:19;264:1,
21;265:1,4;267:10;
271:1,7;285:2;286:9;
289:10;290:15
**tolerable (1)**
150:23
**tonight (13)**
30:17;38:14;
156:24;157:3;175:3,3;
176:22;192:10,19;
238:22;246:8;251:21;
256:23
**took (36)**
32:11;36:23;61:12;
63:2,15,22;65:4;68:6;
70:8;71:9;72:7;75:11;
80:11,17;90:21,23;
93:18;150:8;151:12;
158:21;161:4,20;
171:2;175:20;181:1,

12;183:8,10;208:19;
227:6,9;253:6,24;
255:14;272:15;284:21
**top (8)**
10:22,23;18:7;
234:12,23;235:2,5,14
**topic (1)**
166:24
**total (2)**
9:19;42:12
**tour (2)**
23:10;212:7
**towards (28)**
54:4,18;55:15;59:1,
4,6;64:24;65:20;
87:23;88:2,23;114:20;
119:11;125:24;
129:18;144:10;151:6,
16;152:2;155:13;
228:24;250:21;253:1,
11;254:4;262:19;
269:19;286:7
**traffic (9)**
45:10;50:13;51:13;
52:6;62:16;263:1,6;
272:19;285:17
**train (1)**
279:12
**trained (2)**
205:18;268:16
**training (16)**
4:19;5:5;39:19;
124:4;159:6,7;199:14,
21,24;204:13;205:1;
206:2;215:8,9,16;
291:19
**transcribed (1)**
8:5
**Transcript (18)**
78:20;79:20;80:15;
90:2,20,24;92:8,22;
111:21;123:10;137:2;
192:2,13;257:7,15,18;
258:1;284:17
**Travis (22)**
64:3,20,24;65:13,
16,23,23;66:13,23;
68:5,11,21,23,24,24;
82:9;86:24;87:2;
144:10,12,15;228:21
**treat (3)**
211:1;269:2;292:2
**treated (2)**
209:6;269:4
**treatment (1)**
155:18
**Trent (3)**
74:19,21,22
**trepidation (1)**
220:17
**tricky (1)**
81:18
**tried (3)**

DEFENDANTS 001876

**Board of Fire and Police Commissioners**
**City of Kankakee**

31:18;201:5;217:1
**trouble (2)**
175:6;209:17
**truck (1)**
208:22
**true (7)**
125:5,6,8;205:17;
246:24;266:13,19
**truly (1)**
256:9
**trumped (1)**
156:16
**trust (1)**
7:23
**truthful (8)**
92:14,24;93:8;
95:19;96:5;97:12;
232:21;251:5
**truthfully (1)**
79:17
**try (12)**
15:19;78:14;156:9;
160:12;178:13;
188:18;209:17,18;
210:4;211:23;263:6;
291:21
**trying (32)**
31:10;34:22;84:4;
149:19;174:22;185:4;
200:16;201:17,19;
209:2,14,24;210:24;
211:6;213:3,12;
214:15;219:15;221:1;
222:7;232:7;236:20;
247:7;257:20;260:15;
263:2;266:5;269:4,23;
270:17;272:16;273:14
**turn (7)**
6:13;52:10;82:3;
217:4;262:18;263:4,9
**turned (11)**
47:19;55:20;56:23;
57:1;146:15;167:22;
169:9,9;196:12;263:4;
286:7
**turning (2)**
81:22;167:13
**twice (2)**
84:18;140:20
**two (47)**
27:8;30:14;32:23;
42:21;46:7;60:24;
73:2;84:19,23;85:12;
106:2;107:23;108:4;
109:8;111:2;112:10;
116:10;117:24;
125:11,17;164:15;
165:2;172:10;192:10;
196:10;202:17,19;
203:6;205:13;208:19;
209:19;217:22;223:1;
226:18;235:22;
237:11;238:7,7;

248:16;254:21;
274:18;278:18;284:9;
289:22;290:1;291:8,9
**type (7)**
36:20;43:6,7;80:9;
170:14;250:8;254:6
**typical (1)**
182:17
**typically (3)**
36:7;45:15;283:9
**Tyson (17)**
8:10,13,18;9:3;
31:3;34:18;170:19;
220:8,9;250:13;251:7,
11,12,16,20;252:2,6

## U

**ulterior (1)**
291:20
**ultimate (1)**
235:5
**ultimately (1)**
202:18
**umbrella (1)**
288:2
**unacceptable (1)**
186:13
**unaware (2)**
241:8;259:23
**under (22)**
7:20;24:18;40:9,11;
42:24;48:14;76:11;
79:12;95:16;96:6;
97:8,13;123:1;124:5;
154:17;215:4;233:20;
247:2;256:19;258:9;
260:12;263:11
**underneath (1)**
42:23
**understands (2)**
8:3;188:22,23
**understood (2)**
93:19;259:8
**undisputed (2)**
289:16,18
**undoubtedly (1)**
287:22
**unethical (9)**
230:14;242:7,24;
268:2,3,13;269:1,9;
287:3
**uniform (5)**
10:4;45:23;46:12,
22;200:14
**union (2)**
20:2;250:14
**unit (6)**
45:10;203:5;
244:11;245:10,14;
248:7
**units (1)**
47:2

**University (4)**
40:15,17,22;197:1
**unlawful (12)**
60:9,9,14;86:9,20;
97:8;113:23;115:8;
117:21;241:24;242:2;
286:21
**unless (5)**
47:11;66:24;94:2;
132:14;279:6
**unmarked (2)**
46:5,6
**unprofessional (1)**
273:16
**unrest (1)**
69:9
**unsure (1)**
266:20
**untruthful (10)**
97:8;111:11,15;
112:16,22;116:6;
121:12;164:6,10;
165:23
**unusual (3)**
26:16,22;208:12
**up (119)**
4:16;15:9;16:1;
17:3,5,6,14,20,24;
18:7,21;21:2,4,24:19;
26:15;27:5;28:1,5,7,
10,15;33:9;35:15;
36:6,20;46:11;49:2;
50:6;57:10;68:23,23,
23;70:17;71:4;76:7,
12;78:11,12;80:18;
82:2,13,20;83:14;
86:21;87:9,14;89:9,
17,19;94:7;103:18;
104:5,9;107:5,11;
112:1;114:21;131:24;
132:5,13;133:7;135:7;
137:10;138:16;
145:23;153:6;155:24;
156:1,16;160:11;
162:14;169:23;
170:23;180:6;185:5;
191:12;195:24;
206:19;208:2;210:3;
211:22;216:11,12,15,
22;220:7,9,21;222:8,
19;223:3;224:15;
227:1,11;228:12,14,
21,22;241:16;244:8;
247:3,7,13;252:12;
253:1,10;255:7;262:2;
263:4,5;271:13;272:1,
13;273:6;274:24;
275:15;286:11;
287:14;288:10
**updates (1)**
233:16
**upon (13)**
74:10;80:11;93:15;

96:13;170:6;235:16;
238:9;245:17;248:22;
249:10;250:6;267:15;
277:1
**upset (8)**
52:8;231:20,21,24;
251:8,22;264:13;
289:15
**usage (2)**
245:17;247:23
**use (6)**
34:11;160:5;
248:23;249:10,14;
292:3
**used (4)**
10:23;183:13;
215:23;246:11
**using (3)**
244:18,19;246:4
**usually (4)**
11:14;22:17;26:13;
216:16

## V

**vague (4)**
237:4;258:12;
259:18;260:7
**vagueness (4)**
165:20;168:1;
235:2;242:10
**variables (1)**
238:14
**various (9)**
155:19;157:23;
160:1;179:14;186:22;
200:18;203:4;206:23;
281:19
**vehicle (7)**
53:10,12,16;82:7;
91:24;166:9;262:8
**vehicles (1)**
160:8
**vented (1)**
251:8
**verbal (2)**
72:9;272:20
**verbally (2)**
148:16;167:15
**verbiage (1)**
130:23
**verify (1)**
120:23
**versions (1)**
255:13
**vest (1)**
227:6
**vetting (1)**
198:6
**vice (1)**
20:1
**video (20)**
75:10,14,22,24;

76:1;80:22;81:2,5;
83:23;84:14;85:21;
117:4,7,12;164:22;
165:3;194:12;262:18;
263:4;285:20
**videos (2)**
78:1;81:12
**view (2)**
94:10;230:23
**viewer (1)**
85:5
**viewing (1)**
149:16
**Village (4)**
39:21;40:23;
155:16;290:17
**violated (8)**
74:13;104:23;
108:18,21;110:1;
163:17;246:12;289:8
**violating (8)**
98:20;106:14;
108:10;109:4;116:4,
11;124:15;160:13
**violation (2)**
137:16;183:1
**violations (6)**
104:11;176:18,20;
177:2;213:18;289:9
**violence (2)**
230:17;244:14
**violent (1)**
279:7
**vocalize (1)**
167:15
**voice (2)**
138:17;218:12
**volunteers (1)**
204:3
**vote (4)**
191:12,13;280:23;
281:5

## W

**wait (1)**
256:5
**waiting (1)**
19:6
**walk (1)**
12:2;20:11;56:6;
86:21;175:9;211:22;
228:24
**walked (11)**
20:9;28:21;29:17;
33:1;57:10,22;59:6;
63:23;68:22;169:9;
228:21
**walking (25)**
10:18;19:24;54:4;
55:15;57:24;59:1,2,3,
5;88:2,11,23;89:9;
112:1,12;113:3;

114:20,21;230:4;
253:13;263:5;264:20;
269:11;286:6,7
**walks (1)**
270:21
**wall (9)**
52:12,16,17;139:8,
12;143:5,10;217:12;
227:10
**Walmart (1)**
270:23
**wants (6)**
90:14;230:1;
251:12;257:12;
263:19;276:16
**warm (1)**
159:14
**warning (2)**
272:20,20
**warranted (1)**
185:9
**warrants (4)**
184:4;185:2;
201:20;260:18
**washed (3)**
208:21,22;270:23
**Washington (7)**
49:2,9,18,18,23,24;
51:16
**watch (3)**
199:11;227:19;
263:4
**watching (4)**
57:8;82:19;87:15;
117:12
**wave (6)**
56:10;88:2,5;95:22,
23;209:11
**waved (13)**
56:7,9;83:20,21;
84:11;119:10,11,14,
21;167:22;169:9;
226:19;286:2
**wave-off (1)**
88:8
**waves (1)**
87:23
**waving (10)**
55:21;95:23;117:5;
120:1;167:13;209:8,9;
226:16;227:12;286:3
**way (36)**
4:14;19:24;20:7;
29:3,6;30:9;53:4;
66:15;92:2;94:13;
101:11;139:6;155:21;
157:14,20;177:15;
194:6;202:5;209:5;
213:12;219:12;
220:17,24;221:3,5;
223:11;225:8;227:17;
250:21;251:23;
257:13,20;268:14;

269:3;279:4,5
**wearing (2)**
8:20;46:1
**Wednesday (1)**
70:10
**week (2)**
32:22;284:10
**weekend (1)**
196:13
**week-long (1)**
206:3
**weeks (3)**
32:23;172:10;
199:14
**weighing (1)**
268:21
**weight (2)**
65:10;190:14
**weird (2)**
230:12;264:15
**Wells-Armstrong (1)**
40:11
**weren't (4)**
136:18;156:16;
285:13,14
**westbound (1)**
52:7
**Western (2)**
40:17,21
**What's (14)**
68:23,23;77:9;
81:21;90:11;171:8;
190:7;228:22;232:10;
266:10;285:10;
287:23,23;288:12
**whatsoever (1)**
289:18
**wherein (1)**
7:10
**WHEREUPON (5)**
3:22;8:12;39:2;
195:10;292:22
**white (5)**
82:15,16;150:24;
151:11;155:18
**whole (5)**
129:13;174:13;
178:5;184:20;227:7
**wholly (1)**
150:18
**who's (4)**
236:3;250:13;
278:14;286:13
**whose (2)**
77:20;82:17
**wide (1)**
253:18
**wife (3)**
37:24;196:16;
249:22
**willful (1)**
232:24
**William (1)**

196:22
**willing (1)**
237:2
**wind (1)**
220:21
**window (8)**
12:14;17:17,19;
20:19;21:5;209:10;
253:12,18
**wish (1)**
191:24
**Withdraw (7)**
64:10;104:2;
110:11;148:11;
150:11;153:10;261:23
**Withdrawn (1)**
164:24
**within (29)**
14:2;20:6;37:3;
40:24;41:5,9;42:10;
43:9;44:10;61:21;
111:21;158:14;
164:15;179:4;188:9;
206:23;234:9;235:6;
237:22;240:15;
241:15,23;242:5,12,
19,21;260:5;284:22;
289:22
**without (7)**
43:19;123:9;166:1;
189:21;205:24;
223:14;283:2
**witness (135)**
7:3;8:11,14;10:6;
19:14;21:1;31:17;
32:17,20;34:6;35:2,
13,23;36:8;37:7;39:1,
4;43:21;47:7;51:7;
64:11;66:2,17;67:20;
69:18;73:17;74:22;
76:23;77:8,10;78:18;
84:3,6;85:2,8;88:6;
90:13;92:11;98:2;
100:22;109:19;
122:23;132:12;133:9;
143:3,22;149:16;
151:22;152:14;
155:11;157:1;161:14;
162:17;163:20;167:2,
9;168:13;169:2;
171:5;174:4,24;
175:14;176:1,5,9;
177:11,14,16,24;
178:14;182:3,9,20;
183:5,15;188:17,18;
194:3;195:9,12;
235:10;236:11;238:5,
18;240:21;241:2;
243:8;244:23;247:4;
249:19;251:1;252:21;
254:16;256:11;
257:13;258:15;
259:21;260:9;261:18;

262:23;266:4;268:4,
15;269:14;270:12,16;
271:8,15,18,23;272:3,
12,16;273:3,7,23;
274:2,5,9,17,22;275:1,
9,13,16,22;276:2;
278:9,14;279:1,17,20;
280:10,19;281:3
**witness' (2)**
237:14;257:22
**witnessed (2)**
61:3;161:23
**witnesses (6)**
8:21;190:18,20,22;
284:18;288:8
**woman (3)**
7:18;8:1;228:2
**women (1)**
43:1
**word (3)**
215:23;290:10;
292:11
**words (2)**
31:14;117:20
**work (25)**
9:19;45:15,18;
59:17,17;84:7;136:6;
175:5;178:5;197:10;
198:16;200:15,16;
203:4;206:19;207:19;
223:14;224:8;227:15,
19;278:12,20;279:10,
10;284:11
**worked (5)**
197:13;214:18;
254:21;269:17;289:21
**working (10)**
9:23;10:1,4;11:8;
40:22;44:7;154:7;
206:17;223:21;269:19
**workplace (1)**
25:7
**works (3)**
75:1;201:20;204:2
**work-wise (1)**
208:14
**world (2)**
113:19;123:12
**worse (1)**
182:17
**wrestling (1)**
220:19
**write (22)**
26:6;27:7;35:15;
36:2,2,6,22;71:6;
145:23;212:21,23;
213:10,17;216:24;
219:9;223:7;255:11,
12;268:9,12;287:16,
16
**writing (4)**
26:10;218:19;
271:21;283:1

**written (6)**
41:4;71:4;148:20;
203:15;256:12;272:20
**wrong (8)**
21:14,20,24;75:17;
116:9;124:20;128:16;
234:6
**wrongful (1)**
108:19
**wrote (2)**
252:14;289:19

## Y

**YATES (17)**
3:9,11,13,15,17,17;
5:7;177:5,8,12,15,21;
178:6;280:22;281:4,6,
11
**year (11)**
9:9,23;39:23;44:6;
181:6;196:18;197:4,4;
199:2;202:11;274:2
**years (23)**
9:15,21;34:20,21,
24;37:9;40:2;61:2;
130:7;131:4;138:20;
181:5;183:5;196:17;
200:11,11,21;202:13,
17,19;205:3;235:16;
289:21
**yelled (3)**
54:20;57:5;139:15
**yelling (5)**
14:1;54:11;82:21;
88:17;266:21
**Yep (1)**
84:15
**Young (2)**
225:20,21

## 1

**1 (18)**
96:24;118:22;
119:1;121:11;126:13,
15;138:8;149:7,10;
179:15,20;182:14;
189:20,23;190:3,12;
203:23;204:6
**1:15 (1)**
11:13
**1:45 (2)**
11:13,16
**10 (5)**
72:4;283:14,16,18,
20
**10:00 (9)**
59:16,18;60:1;62:5;
63:6;85:20;106:7;
170:3;195:1
**10:05 (1)**
195:5

**Board of Fire and Police Commissioners**
**City of Kankakee**

September 30, 2020

**1000 (3)**
136:6;282:5,22
**1020 (4)**
41:21;42:4;282:5,
23
**1026 (2)**
282:6,24
**104 (4)**
282:5,9,13,22
**106 (4)**
282:5,9,13,22
**1076 (1)**
282:23
**11:30 (1)**
99:11
**11:43:01 (1)**
83:1
**12 (5)**
48:15;283:14,16,18,
20
**12:00 (1)**
193:4
**13 (1)**
196:17
**13th (1)**
171:20
**14th (1)**
292:23
**15 (5)**
48:2,7;72:4;196:13;
226:7
**15th (37)**
9:23;11:2;70:5,8,
11;71:1;72:3,22;
74:11;76:4;78:12;
80:1,12,16;96:21;
108:24;122:8,9,24;
123:3;161:7,20;
170:11,17;207:4,16,
17,18;211:10;250:8;
254:7,24;255:14;
261:7;270:8;285:2;
288:10
**15-year (2)**
260:15;280:15
**16 (2)**
40:2;289:21
**16th (3)**
148:20;149:4;254:7
**17 (2)**
196:12,12
**17th (1)**
254:8
**18th (31)**
44:6,20;45:2;61:18;
70:2;73:6;74:11,16;
75:11;76:5;78:3;
80:16;93:18;97:3;
107:8;109:1;110:22;
122:24;123:1,3;
125:20;132:18;
135:16;161:23;
169:19;207:3;223:20;

254:8;255:1,14;262:6
**19 (3)**
274:4,8,12
**1981 (1)**
40:21
**1984 (1)**
39:20
**1999 (1)**
40:23
**19th (1)**
254:8

**2**

**2 (18)**
41:20;97:6;125:23;
149:2,4,18;179:15,21;
180:21;182:15;
189:20;204:18,19,20,
21;205:23;282:6;
291:18
**20 (9)**
9:21;34:20,21,24;
37:9;48:4,7;226:7;
292:7
**200 (2)**
41:20;42:3
**2000- (2)**
39:23;199:3
**2002 (1)**
39:23
**2006 (2)**
197:6;199:3
**2017 (1)**
158:19
**2018 (2)**
40:2;93:18
**2019 (7)**
39:12;154:6;181:8;
274:16,21,22;275:21
**2020 (25)**
10:22;44:20;45:3;
61:18;70:2;71:1;
75:11;78:3,9,13;80:1,
12;109:1;135:17;
148:20;169:19;
171:21;181:7;254:11;
255:14;262:6;274:19,
20,21;292:24
**20th (1)**
163:6
**23rd (4)**
99:19,20;100:4;
103:19
**24/7 (1)**
45:15
**24th (6)**
99:6,15,15;100:4,
10;176:19
**29th (1)**
10:22

**3**

**3 (15)**
41:18,23;42:2;97:7;
108:16;125:23;
165:24;179:15,21;
182:15;189:5,21;
253:22,22;282:9
**30 (3)**
78:9;166:17;284:23
**30th (2)**
78:12;158:18
**328 (3)**
282:5,13,22
**34 (1)**
61:2
**34- (1)**
233:20
**341 (4)**
41:20;42:4;282:5,
13
**341.3.5 (1)**
233:21
**346 (1)**
282:22
**36 (1)**
183:5
**3rd (1)**
158:19

**4**

**4 (9)**
74:5,8;162:22;
176:15;179:15,21;
189:5,21;253:22
**40 (3)**
54:16;139:17;
166:18
**41 (1)**
196:6
**465 (3)**
282:5,13,22
**471 (2)**
282:5,22

**5**

**5 (12)**
77:1,5;99:9;179:15,
21;189:5,6,7,14,15,18,
21
**5:00 (1)**
70:9
**5:30 (1)**
292:24
**5:45 (4)**
207:20,22,23;
223:24
**56 (3)**
256:18;257:6;258:3

**6**

**6 (4)**
78:22;79:3;189:5,
21

**7**

**7 (1)**
194:15
**7- (1)**
11:1
**7/24/20 (1)**
99:10
**7:45 (1)**
97:20
**700 (5)**
42:13,15;109:22,24;
241:12
**748 (2)**
109:21;242:15

**8**

**800 (1)**
42:14

**9**

**9/11 (1)**
9:9
**9:55 (1)**
195:1

DEFENDANTS 001879

# In The Matter Of:

*City of Kankakee Board of Fire and Police Commissions*

---

*Report of Proceedings*
*December 1, 2020*

---

*Schelli Reporting Service, Ltd.*
*schellireporting@aol.com*
*(312) 558-1113*

Original File 120120HEARING.txt
**Min-U-Script® with Word Index**

DEFENDANTS 001880

2:20-cv-02310-CSB-EIL  # 17-15  Page 243 of 270
City of Kankakee Board of Fire and Police Commissions
Report of Proceedings
December 1, 2020

Page 1

1  BEFORE THE BOARD OF FIRE AND POLICE COMMISSIONERS
2    CITY OF KANKAKEE, KANKAKEE CITY, ILLINOIS
3
4                OPEN SESSION
5
6        REPORT OF PROCEEDINGS had at the Board of
7  Commissioners' Meeting for the Kankakee Fire and
8  Police Commission, held at 385 East Oak Street,
9  Kankakee, Illinois, on the 1st day of December 2020,
10  commencing at the hour of at 5:30 p.m.
11
12  APPEARANCES:
13      Chief Frank Kosman (via Zoom)
        Dr. Willie Davis, Chairman
14      Mr. Nickey Yates, Secretary
        Ms. Dawn Landwehr, Commissioner
15      Ms. Cortney Bessant, Commissioner
16  APPEARANCES:
      OTTOSEN, DiNOLFO, HASENBALG & CASTALDO, LTD.,
17    BY:  MR. JOHN H. KELLY
18        Appeared on behalf of the Board of
          Commissioners;
19
      ODELSON & STERK,
20    BY:  MR. MICHAEL MCGRATH
21        Appeared via Zoom on behalf of Chief
          Kosman;
22
      HERBERT LAW FIRM,
23    BY:  MR. DANIEL HERBERT
24        Appeared via Zoom on behalf of Sergeant

Page 2

1    MR. KELLY: I don't know if the people on Zoom
2  can hear me, and that's the first thing.
3    CHAIRMAN DAVIS: Well, let's make sure of that.
4        Can the Zoom people hear attorney
5  Kelly?
6        (No response.)
7    MR. KELLY: I'll step up there.
8    CHAIRMAN DAVIS: Okay. He's going to step up
9  here.
10    MR. KELLY: Good evening. This is the
11  penalty phase of the hearing of charges against
12  Sergeant Paul Berge of the Kankakee City Police
13  Department.
14        Can I have appearances, please, for
15  the record?
16    MR. MCGRATH: On behalf of Chief Kosman,
17  Michael McGrath and Chief Kosman.
18    MR. KELLY: Again, because we've got the Zoom
19  tonight, we'll have to make sure everybody speaks up
20  and also identify yourself as you're speaking.
21        That's attorney Michael McGrath and
22  Chief Kosman.
23        You're muted, Dan.
24    MR. HERBERT: Sorry about that.

Page 3

1        For the record, Dan Herbert,
2  H-e-r-b-e-r-t, on behalf of Paul Berge, who is also
3  on the Zoom.
4    MR. KELLY: Thank you.
5        Four of the commissioners are
6  present, which constitutes a quorum.
7        The purpose of tonight is to
8  entertain presentations by both sides relative to
9  the penalty in this matter. Since the board's
10  determination that Sergeant Berge had, in fact,
11  committed the violations alleged in the complaint,
12  Mr. Herbert has filed a motion to strike and nullify
13  the decision, strike the charges, and order
14  immediate reinstatement.
15        Mr. Herbert, do you want to argue
16  that motion tonight?
17    MR. HERBERT: No. I'll rest on the motion.
18    MR. KELLY: You'll rest on the motion.
19        Mr. McGrath, any response or argument
20  from the city?
21    MR. MCGRATH: Nothing other than we object to
22  the finding that they disagree with the factual and
23  legal basis --
24    MR. KELLY: The commissioners all have a copy

Page 4

1  of the motion, and they do have copies of the
2  supporting documents, attorney Herbert; but I did
3  not give them the whole transcript. I only gave
4  them the portions of the transcript you specifically
5  cited in your motion, if that's all right?
6    MR. HERBERT: That's up to you.
7    MR. KELLY: That's attorney Dan Herbert
8  speaking.
9        Again, remember, please identify
10  yourself as you speak tonight. The court reporter
11  can't see anybody.
12        Commissioners, my recommendation
13  would be to take attorney Herbert's motion as part
14  of the case; and when you deliberate later tonight,
15  to first deliberate on whether or not attorney
16  Herbert's motion to strike and nullify the decision
17  should be granted.
18        So we'll postpone that and do that in
19  deliberation if that's all right with the
20  commissioners?
21    CHAIRMAN DAVIS: That's fine.
22    COMMISSIONER YATES: That's fine.
23    MR. KELLY: That being the case then, we would
24  move to the chief's case in aggravation. I know the

DEFENDANTS 001881

City of Kankakee Board of Fire and Police Commissions

Page 5

1 chief has filed a proposed four exhibits, and
2 Mr. Herbert, by e-mail, has responded with objection
3 to those exhibits.
4        So, I guess, I would allow
5 Mr. McGrath to speak on behalf of the chief's
6 exhibits, and then Mr. Herbert to respond.
7    MR. McGRATH: Thank you, Mr. Kelly, and
8 Commission.
9        Back in the beginning of November, I
10 believe it was November 9th and the 10th, I sent
11 over what I proposed to present tonight as far as
12 aggravation on behalf of the chief and have received
13 the termination of Sergeant Paul Berge from the
14 police department.  Matters of the aggravation --
15 three of the matters were contained within
16 Mr. Berge's personnel file and were tendered over to
17 counsel early on prior to the hearing as part of his
18 discovery request.  I believe that the three and the
19 fourth, I'll talk about briefly, all should be
20 admitted into evidence under the evidence property
21 exception, the hearsay rule.  They are all prepared
22 and generated in the regular course of the police
23 department, kept and safely maintained within the
24 personnel file within the police department and

Page 6

1 the human resource department with the City of
2 Kankakee.
3        Marked as Chief Aggravation No. 1 is
4 a three-day suspension dating back into November of
5 2007 where Sergeant Berge was involved in a physical
6 altercation with another superior officer off duty,
7 which constituted conduct unbecoming of an officer,
8 and also included in the charge was that -- he
9 should refrain from consuming intoxicating beverages
10 to the extent that it results in intoxication,
11 obnoxious or offensive behavior which discredits
12 that person or the department.
13        This was signed off by Sergeant Berge
14 in January of 2008 and served that three-day
15 suspension.  That, again, was contained within his
16 personnel file.
17        Chief Aggravation No. 2 is a 30-day
18 suspension from 2014 based on Sergeant Berge
19 violating the police department policy procedure
20 1012.3.1 relating to possession of a controlled
21 substance wherein he was using steroids without a
22 prescription.  He received a 30-day suspension and
23 ordered to random drug testing over a 12-month
24 period.

Page 7

1        A little bit of this was brought out
2 in the case-in-chief.  As you recall, this matter
3 resulted in Sergeant Berge being removed from KAMEG
4 based upon his use of a controlled substance without
5 having a prescription.  This was signed off by
6 Sergeant Berge in March of 2014.
7        Chief Aggravation No. 3 is an
8 Illinois Traffic Crash Report, dated 4/14 of 2012.
9 This Traffic Crash Report purports to be a hit and
10 run of Sergeant Berge's personal vehicle on that
11 date in the early morning hours.  The accident
12 report indicates that his vehicle was parked on the
13 900 block of South Evergreen Avenue.  There was
14 front-end damage.  The driver of Unit One fled the
15 area.  There's information in the report that the
16 other vehicle was a Ford Mustang registered to
17 Sergeant Berge's personal or home address, I should
18 say, in Manteno at the time.
19        Chief Aggravation No. 4 is a last
20 chance discipline agreement, dated April 6th of
21 2015, three years after the hit and run Illinois
22 Traffic Crash Report on the date that was filled
23 out.  This is signed by the then police chief, by
24 the union representative, Sergeant Berge -- and

Page 8

1 Sergeant Berge on April 6th of 2015.
2        It indicates that Sergeant Berge
3 acknowledged that on 4/14 of 2012 in the early
4 morning hours, he wrecked his personal vehicle into
5 the side of a commercial building in the 100 block
6 of West Hickory Street causing over $500 in damage
7 to his vehicle while under the influence of alcohol
8 and un-prescribed steroids, and he left the scene
9 without filing a police report, and that a police
10 report was made later that same day as an unknown
11 hit-and-run accident at a different address of 900
12 block -- of the 900 block of South Evergreen Avenue.
13 For this, he served a 30-day suspension.  He
14 agreed not to commit or participate in any other
15 major violations of the Kankakee Police
16 Department.
17        I would note that this last chance
18 agreement, it was agreed to last until April 1st of
19 2020, so he worked under this last chance discipline
20 agreement over a five-year period, at which time
21 the city agreed to remove it from his personnel
22 file.
23        As I noted to you, Mr. Kelly, and,
24 Mr. Herbert, I did not have the last chance

DEFENDANTS 001882

Page 9

1  discipline agreement at the time I tendered all of
2  the discovery, including the discipline to
3  Mr. Herbert prior to the hearing.
4          Upon learning of this last chance
5  discipline agreement, along with the recent Illinois
6  Supreme Court case in the matter of the City of
7  Chicago v. Fraternal Order of Police, which I
8  provided a copy to both of you, found at 2020
9  IL 124831, for the proposition that this discipline,
10 as a matter of public policy, can be used in this
11 proceeding.
12         I believe all of the discipline that
13 I just went over, those four exhibits, should
14 be admitted into evidence in aggravation based
15 as business records of the Kankakee Police
16 Department.
17         Thank you.
18 MR. KELLY: Just so both counsel know, none of
19 the commissioners have copies of these exhibits yet.
20 I did not give them specifically because I knew
21 Mr. Herbert had some objections to them, so they
22 have not seen them.
23         Now, Mr. Herbert, if you want to make
24 your objection to those exhibits?

Page 10

1  MR. HERBERT: Sure. Thank you.
2          The chief is trying to fire a
3  decorated police officer for alleged misconduct on
4  two separate days in a 16-year history. The chief
5  wants to fire Paul Berge based upon a strict
6  interpretation of its rules and regulations.
7          What we have here with the
8  discipline case is the chief is clearly saying that
9  the rules and regulations of the police department
10 and the Collective Bargaining Agreement do not
11 matter. They do not matter when they come to Paul
12 Berge.
13         The case is clear regarding the
14 evidence or the admissibility of this evidence that
15 this chief is trying to get into evidence, which,
16 quite honestly, is mind boggling considering the
17 chief is the one that is in charge of creating the
18 rules.
19         As Mr. Kelly knows, and I presume
20 that the board has seen, this is just one more
21 example of Mr. Berge being treated differently than
22 anyone else that comes before this board or that
23 gets disciplined.
24         The fact of the matter is any

Page 11

1  discipline after April 6, 2017, cannot be considered
2  in any way by the chief, by the board, or any other
3  administrative agency that wants to consider in some
4  way, shape, or fashion. The governing authority
5  behind this rule is that of the chief, Kankakee
6  Police Department Policy 34 -- 341.3.10, also the
7  Collective Bargaining Agreement, and I could cite
8  the Illinois Personnel Records Act.
9          So there is no justification for the
10 use of any of this evidence. If it is allowed in,
11 it's a violation of policy.
12         With respect to the case that
13 Mr. McGrath cited, and somehow apparent authority
14 for entering or for admitting evidence, well, I
15 think the chief knows that Kankakee has not followed
16 that court case that dealt with different parties,
17 different subject matters, in a court, not
18 administrative proceeding.
19         There's certainly no basis. It would
20 be in violation of all department policies and
21 Collective Bargaining Agreements with the Kankakee
22 Police Department, which would certainly render
23 any -- Sergeant Berge violating policies of being
24 moot and, perhaps, discriminatory.

Page 12

1  MR. KELLY: Mr. McGrath, any response?
2  MR. MCGRATH: Briefly.
3          As far as the Illinois Supreme Court
4  case, it came out this summer, and it dealt with the
5  administrative hearing just as we're in right now.
6  It wasn't a legal dispute in a court of law, and it
7  pertained to provisions in a Collective Bargaining
8  Agreement, which counsel is arguing the chief
9  discipline. And it also dealt with provisions of
10 the local record act.
11         And if you look at the very front
12 cover page of the opinion, the single issue in this
13 case was whether information in a Collective
14 Bargaining Agreement, contrary to provisions of the
15 local records act, requires destruction of
16 disciplinary files after a fixed period of time,
17 whether that violates public policy.
18         The Illinois Supreme Court ruled that
19 it would violate public policy, that a better public
20 policy is that these disciplinary files and the
21 records and information should be kept and
22 maintained and could be used in disciplinary
23 hearings.
24         Based upon that, clearly the -- any

DEFENDANTS 001883

Page 13

1 discipline that respondent is trying to keep out
2 based upon those arguments should be brought
3 forward and admitted into evidence and considered by
4 the commission as far as disciplining Sergeant
5 Berge.
6     CHAIRMAN DAVIS: I understand that the --
7     MR. KELLY: You're going to have to speak up.
8     CHAIRMAN DAVIS: I'm sorry. I was asking for
9 clarification on the Supreme Court ruling that you
10 just mentioned. I wanted to hear that again. I
11 didn't quite understand what he said -- what the
12 attorney was saying.
13     MR. KELLY: Mr. McGrath?
14     CHAIRMAN DAVIS: Yes, Mr. McGrath.
15     MR. KELLY: Mr. McGrath, could you repeat your
16 argument on that Supreme Court case?
17     MR. MCGRATH: The issue there was whether a
18 provision in a Collective Bargaining Agreement, such
19 as what counsel is raising here, discipline should
20 be removed from a personnel file within a certain
21 time period, say, five years.
22     MR. HERBERT: That's not my argument, but, go
23 ahead.
24     MR. MCGRATH: That was the issue in the

Page 14

1 Chicago --
2     MR. HERBERT: Different issue.
3     MR. MCGRATH: The Illinois Supreme Court ruled,
4 as a matter of public policy, that those matters of
5 discipline should not be purged or removed from the
6 personnel file, and that it be used in any
7 disciplinary proceedings, including administrative
8 proceedings, such as we're involved with tonight.
9     MR. KELLY: Mr. Herbert, I had a question.
10     In your e-mails responding to the
11 chief's proffer of Exhibits 1 to 4, you mentioned
12 Kankakee Police Department Policy 341.3.10, which
13 you referenced tonight. You also mentioned Kankakee
14 Police Department Policy 1026.
15     You've mentioned the Collective
16 Bargaining Agreement, and I did not see anything in
17 the Collective Bargaining Agreement that speaks to
18 the length of time that discipline should remain in
19 an officer's file.
20     Now, if there is, maybe I missed it.
21 If you had a citation and could give it to me, I'd
22 appreciate that.
23     MR. HERBERT: You know, what? I could do that,
24 John, if I had a couple minutes to do it. But I

Page 15

1 don't know if you want to go off and give me three
2 or four minutes, and I could find it if there is
3 something. But I would assume I cited to it if it's
4 relevant.
5     MR. KELLY: You cited the CBA but not a
6 specific section; and like I said, I did not see the
7 typical language that would regulate how long
8 discipline remains in an officer's file, or,
9 more importantly, its ability to -- the
10 department's ability to use it as aggravation in
11 other cases.
12     MR. HERBERT: Let me see, John. I might have
13 it here.
14     MR. KELLY: Okay. Off the record.
15     (WHEREUPON, a discussion was had off
16     the record.)
17     MR. KELLY: What I think we're going to do, my
18 suggestion would be for the commission to entertain
19 a motion to go to closed session to deliberate
20 solely on this issue of the admissibility of Chief's
21 Exhibit Nos. 1-4 based on the arguments that counsel
22 has made.
23     So we can go into closed session.
24 I'm not exactly sure how we do that with this Zoom.

Page 16

1 It probably will be easiest if we all get up and
2 leave, go into another room, and then come back in
3 and just leave the Zoom feed up for you guys to wait
4 until we come back.
5     Then once we're finished with that
6 issue, then move into each side's presentation on
7 aggravation and mitigation.
8     Dan, if you want to take some time to
9 look, we'll start moving into the other room because
10 the court reporter is going to have to move, so that
11 will take us a few minutes, and then we'll just get
12 that accomplished while you look.
13     MR. HERBERT: Great. Thank you.
14     MR. KELLY: Somebody should make a motion to go
15 into closed --
16     CHAIRMAN DAVIS: Make a motion to go into
17 closed session --
18     COMMISSIONER BESSANT: I second.
19     CHAIRMAN DAVIS: -- to discuss --
20     MR. KELLY: The ruling on the chief's
21 admissibility of the chief's exhibits.
22     CHAIRMAN DAVIS: -- the admissibility of the
23 chief's exhibits.
24     All those in favor?

Page 17

1     MR. KELLY: Roll call.
2     CHAIRMAN DAVIS: That's right.  I need a roll
3 call.
4          Roll call.
5     COMMISSIONER YATES: Did we get a second?
6     CHAIRMAN DAVIS: Pardon?
7     COMMISSIONER YATES: Did we get a proper
8 second?  I second it.
9          Motion, second.
10    CHAIRMAN DAVIS: Second it, okay.
11         Roll call.
12    COMMISSIONER YATES: Dr. Davis?
13    CHAIRMAN DAVIS: Yes.
14    COMMISSIONER YATES: Courtney Bessant?
15    COMMISSIONER BESSANT: Yes.
16    COMMISSIONER YATES: Mario Flores?
17         (No response.)
18    COMMISSIONER YATES: Dawn Landwehr?
19    COMMISSIONER LANDWEHR: Yes.
20    COMMISSIONER YATES: Nickey Yates, yes.
21    MR. KELLY: The commission has moved to go to
22 closed session.  We'll go out of open session at
23 6:15 p.m.  We will move into closed session.  We'll
24 be off the record while we transfer to the

Page 18

1 conference room to do that.
2         (WHEREUPON, proceedings were had in
3         closed session outside the hearing of
4         the public which were transcribed
5         under separate seal.)
6         (WHEREUPON, all parties have
7         re-entered the hearing proceedings
8         and the following proceedings were
9         held in open session with all parties
10        present:)
11    CHAIRMAN DAVIS: Okay.  Let's have a motion to
12 come out of closed session and back into open
13 session.
14    COMMISSIONER YATES: So moved.
15    CHAIRMAN DAVIS: Yates.  Second it?
16    COMMISSIONER LANDWEHR: I'll second it.
17    CHAIRMAN DAVIS: All those in favor?
18    COMMISSIONER YATES: Aye.
19    COMMISSIONER LANDWEHR: Aye.
20    COMMISSIONER BESSANT: Aye.
21    CHAIRMAN DAVIS: Opposed?
22         (No response.)
23    CHAIRMAN DAVIS: Okay.  Now 6:52 p.m.
24         Okay, Attorney.

Page 19

1     MR. KELLY: The commission is now back in open
2 session, and I would ask a commissioner to adopt the
3 following motion:  To move to deny Sergeant Berge's
4 request for the nonadmission of Chief's Exhibits
5 Nos. 1-3, and to grant the motion to not admit
6 Chief's Exhibit No. 4.
7          So if somebody would make that
8 motion, a second, and then we'll take a vote, and
9 then I'll explain to both attorneys the commission's
10 reason.
11    CHAIRMAN DAVIS: So moved.
12    COMMISSIONER YATES: Second by Yates.
13    CHAIRMAN DAVIS: Got a second.
14          The motion on the floor as stated by
15 our attorney, I won't try to repeat that entire
16 motion.  We'll just take what you said.
17          All those in favor of that motion,
18 let it be known by saying "aye."
19    COMMISSIONER YATES: Aye.
20    COMMISSIONER LANDWEHR: Aye.
21    COMMISSIONER BESSANT: Aye.
22    CHAIRMAN DAVIS: Opposed?
23         (No response.)
24    CHAIRMAN DAVIS: The motion stands.

Page 20

1     MR. KELLY: The commission found that the
2 provisions of Section 341.3.10 of the rules and
3 regulations or the policies of the Kankakee City
4 Police Department do not allow for the removal of
5 suspension.  They only speak to oral and written
6 reprimand; and that, therefore, even though Sergeant
7 Berge made the request back in 2017, the request was
8 not applicable to anything other than oral and
9 written reprimands.
10          Since the exhibits tendered by the
11 chief as Nos. 1-3 were suspensions, the commission
12 believes that they are -- it is appropriate for that
13 to be admitted.
14          As far as Exhibit No. 4, the last
15 chance agreement, the last chance agreement by its
16 plain language -- in paragraph 8 of the last chance
17 agreement, Chief's Exhibit No. 4, it says, "The
18 provisions of this agreement will be in effect until
19 April 1, 2020, at which time, upon success
20 compliance with the agreement, the city will remove
21 it from his personnel file."
22          That being the case, then the
23 provisions of the Policy 341.3.10 do apply since the
24 city has agreed to remove it from the personnel

**City of Kankakee Board of Fire and Police Commissions**

Page 21

1  file.
2      The commission finds that the Supreme
3  Court case cited by the chief really does not apply
4  because that case was very specific to talk about
5  the destruction of disciplinary files, not the use
6  of disciplinary files in other disciplinary
7  hearings.
8      So for those reasons, the commission,
9  by motion, grants the admission of Chief's exhibits
10  in aggravation of Nos. 1, 2, and 3, but denies the
11  admission of the last chance agreement.
12    MR. HERBERT: Mr. Kelly, if I could just be
13  briefly heard on that?
14    MR. KELLY: Sure.
15    MR. HERBERT: The board's decision was based
16  upon Policy 341.3.10, I believe is what you said;
17  but I just want to point out that if it was not
18  considered, for whatever reason, Policy 1026,
19  specifically 1026.4, where it talks about any
20  employee seeking the removal of any item from his
21  personnel file shall file a written request
22  explaining the employee's position through the chief
23  of police, through the chain of command. And that
24  is pursuant to the Illinois Statute 820

Page 22

1  ILCS 40/2.
2      And then it goes on to read, that the
3  department shall thereafter remove any such item, if
4  appropriate, or within 30 days provide the employee
5  with an explanation of why the contested items will
6  not be removed. If the contested item is not
7  removed from the file, the employee's request and
8  the department's written response shall be retained
9  within the contested item in the employee's
10  personnel file, which, again, is subject to
11  Illinois Statute 802 ILCS 40/6. And I would
12  just argue that there is nothing in his file
13  concerning -- there is in his file the request to
14  remove this, and there is nothing in his file that
15  his request was denied.
16      And that also I would point to Policy
17  1026.6 where it cites the Illinois Administrative
18  Code 56, 320.140, which talks about the items shall
19  be contained for a minimum of five years, and then
20  the following Section 1026.6.1 talking about the
21  purging of files.
22      We would submit that these files
23  should have been purged. In fact, we have every
24  reason to believe that they were purged but brought

Page 23

1  back for this hearing; and if we could look
2  specifically at subparagraphs B and C of that
3  section, Policy B, if the supervisor determines that
4  records from prior discipline should be retained
5  beyond the applicable statutory period, which is the
6  case here, approval for such retention shall be
7  obtained through the chain of command from the chief
8  of police. That hasn't been done in this case.
9      The next section. During the
10  preparation of each employee's performance
11  evaluation, all complaints and discipline should be
12  reviewed to determine the relevancy, if any, to
13  progressive discipline, training, and career
14  development.
15      Final paragraph, if, in the opinion
16  of the chief of police, a complaint or disciplinary
17  action beyond the statutory retention period is no
18  longer relevant, all records of such matters may be
19  destroyed pursuant to resolution.
20      We would submit that based upon the
21  documents that we have submitted, which are the
22  training records, and the evaluations of Mr. Berge
23  that there is nothing contained in there is prior
24  discipline.

Page 24

1      And just, finally, Policy 106, which
2  is entitled, "Policy Manual," and that would be
3  106.1.3, subparagraph D and G are relevant here in
4  that all the officers for Kankakee are required to
5  follow the law in this case. And I think that what
6  we are showing is that by using this discipline,
7  it's not only a violation of Kankakee Police
8  Department policy, which is bad enough, but it's in
9  violation of Illinois statute.
10      So with that I'll rest.
11    MR. KELLY: In response, the commission did
12  look at Policy 1026, and the commission read the
13  Policy 1026 as being subordinate to Policy 341.3.10.
14      The reason for that is Policy 1026 is
15  more general in terms of talking about discipline;
16  and, in fact, in the 1026.3, the section you
17  referred to, the department may remove or correct
18  any such item if appropriate, if appropriate. And
19  by Policy 341, only oral and written reprimands are
20  appropriate.
21      Second, Sergeant Berge's April of
22  2017 request was not specific. He did not talk
23  about any specific document. As I read it, and I
24  think as the commission reads it, the intent of

DEFENDANTS 001886

Page 25

1 this 1026 personnel record speaks to specific
2 documents.
3        For those reasons, the commission
4 found that the language of Section 341 would take
5 precedence, and that Sergeant Berge's request was to
6 remove discipline and under Policy 341 only oral and
7 written reprimands could or should be removed.
8        MR. HERBERT: We obviously disagree
9 respectfully with the interpretation.
10       MR. KELLY: The commission understands that.
11       That being the ruling on the motion
12 then, I think the commission would now entertain --
13 and I'm going to distribute copies of Chief's
14 Exhibits 1, 2, and 3 to each member of the
15 commission, but Exhibit No. 4, as I said, is not
16 being considered by the commission.
17       (WHEREUPON, the documents were
18        tendered to the board members.)
19       MR. KELLY: Mr. McGrath, do you have anything
20 additional in your case for aggravation?
21       MR. MCGRATH: For clarification, are these
22 documents being admitted over the -- business
23 record --
24       MR. KELLY: I would say these documents

Page 26

1 are -- yes, business record or the -- yeah.
2 Documents kept in the usual course of the police
3 department business, yes.
4        MR. MCGRATH: With those being admitted, the
5 chief would rest in aggravation.
6        MR. KELLY: Mr. Herbert, the commission does
7 have your Respondent's Group Exhibit No. 1, the
8 pages from Sergeant Berge's personnel file, and I
9 know you did send today several court cases that I
10 received.  I was unable to give copies to the
11 commission.
12       I don't know what else you might have
13 for your case.
14       MR. HERBERT: Just, first, we object to the
15 admission of those documents.  We don't believe
16 there's been any foundation laid for those
17 documents; and, moreover, this chief was not present
18 for any disciplinary matters, so that is an
19 additional foundational matter.
20       Finally, I sent you -- and it may be
21 a duplicate, but I wanted to make sure it was in
22 there.  I sent -- Mike and John, I sent you an
23 e-mail probably within the last half hour, and I
24 asked that it be added to Exhibit No. 1, and it's

Page 27

1 an -- it is an e-mail, a two-page e-mail from
2 Commander Kidwell to -- or I'm sorry from Sergeant
3 Tyson, T-y-s-o-n, to Commander Kidwell, dated
4 September 6, 2017.
5        I just ask that all that be admitted,
6 judicial notice be taken of all the exhibits.
7        MR. MCGRATH: I responded -- the chief has
8 no objection to that being supplemented to
9 Exhibit 1.
10       MR. KELLY: Mr. Herbert, I'm looking at the
11 e-mail now, and there is a handwritten, looks like,
12 letter of accommodation or congratulations or
13 something?
14       MR. HERBERT: Yes.  And I believe that was an
15 attachment to the e-mail, and I will represent
16 that this was presented to us in discovery by the
17 chief.
18       MR. KELLY: I will -- obviously, we don't have
19 it printed out tonight, but I will make sure that it
20 becomes part of the record, and I will make sure
21 that the commission either reads it, or I'll read
22 that to them as part of their deliberations.
23       MR. HERBERT: Just, finally, I'm going to -- I
24 will raise all the prior motions that I made prior

Page 28

1 to this mitigation stage, and I'm not waiving those
2 is what I should say.
3        MR. KELLY: Okay.  And you --
4        MR. HERBERT: John -- I'm sorry.  I don't know
5 if there's going to be argument.  I don't want to --
6 I'm hesitant to rest before we argue, but -- yes.
7 That's all the physical evidence that we're going to
8 submit.
9        MR. KELLY: And I don't know, whatever your
10 pleasure is, if you each want to make an argument,
11 that's fine.  If you don't want to make an
12 argument, that's fine, too.  I'll leave that up to
13 you guys.
14       MR. MCGRATH: I would make a brief argument, if
15 that's all right?
16       MR. KELLY: So then Mr. McGrath will argue
17 relative to the chief's case in aggravation, and
18 then Mr. Herbert will have like time to argue on
19 behalf of Sergeant Berge in mitigation.
20       Mr. McGrath.
21       MR. MCGRATH: Thank you, Mr. Kelly.  Thank you,
22 Mr. Herbert, Chief Kosman, and members of the
23 commission.
24       We are here tonight to decide what

DEFENDANTS 001887

**City of Kankakee Board of Fire and Police Commissions**

Page 29

1  the appropriate discipline would be in this matter.
2  Certainly you, as the commission, you will not
3  forget what you have already determined in this
4  matter.  You have found Sergeant Berge guilty of the
5  three charges from the counts that were brought
6  against him.
7        Specifically you have already found
8  that on July 15th of 2020, Sergeant Berge failed to
9  follow multiple direct orders that were given to him
10  by superiors.  That he was insubordinate on multiple
11  occasions on that dates.  Similarly, on July 18,
12  2020, he failed to follow direct orders of
13  superiors.  This time he failed to follow direct
14  orders of the chief of the police department.  He
15  was insubordinate on multiple occasions, and he
16  performed to fail -- perform the duties of his
17  job.
18        The third count was providing
19  untruthful, false statements while testifying under
20  oath at his formal interrogation.  Importantly
21  during the formal interrogation, Sergeant Berge
22  denied seeing Chief Kosman at the scene of the
23  rally, denied seeing Chief Kosman get in the vehicle
24  and get out of the vehicle.  He denied hearing Chief

Page 30

1  Kosman give him direct orders.
2        He testified that during the formal
3  interrogation -- you have a copy of the transcript,
4  which you can review, and Steve, the statements that
5  he gave which are false.  And then at the hearing
6  you had the opportunity to see him testify under
7  oath once more and review the video itself from the
8  July 18, 2020, rally.
9        And I would specifically direct your
10  attention to the time periods on the video
11  surveillance, if you would choose to review it once
12  more because it clearly shows Sergeant Berge going
13  around a rock monument, facing Chief Kosman, putting
14  his hands out, and engaging or exchanging comments
15  with Chief Kosman.
16        It is absolutely clear that Sergeant
17  Berge saw Chief Kosman at that point and engaged in
18  conversation, and he waived off the chief on more
19  than one occasion in that area and then proceeded to
20  do what he wanted to do on that day.  What he did
21  was disregard the chief, the head of the
22  department's direct orders.
23        If you look at your different camera
24  angles, but the northeast south, it's labeled.  If

Page 31

1  you look at one hour and 32 minutes, 1-32 through
2  3:27 seconds, that specifically shows when he goes
3  around the rock, and he looks right at the chief.
4  He puts his hands out, and the chief is talking to
5  him.
6        It's absolutely ridiculous for him to
7  have testified at the formal interrogation and then
8  after having the opportunity to review the video, he
9  testified before the commission, the people that are
10  deciding his fate, and, again, testified
11  untruthfully and not accurately, and he just
12  straight out lied about what took place near the
13  chief's car on July 18th.
14        The same clip can be seen from the
15  southeast north clip at two minutes, 33 seconds
16  through three minutes and 21 seconds.
17        By reviewing that tape, it's a slam
18  dunk that Sergeant Berge lied at the formal
19  interrogation and that he lied before this
20  commission when he testified when his job was at
21  stake.
22        He also lied about the sexual
23  harassment with Commander Austin.  He claimed, if
24  you recall, during his formal interrogation, again,

Page 32

1  if you review the transcript, and then again during
2  the testimony before the commission that Commander
3  Austin put a foot up on the desk and thrust his
4  crotch towards his face.  And he went through and
5  explained it, and counsel had him basically
6  demonstrate what took place.
7        What is strange is that Commander
8  Austin, he denied that ever happening, was shocked
9  that he was accused of that happening.  And Sergeant
10  Tyson and Sergeant Klopp both testified before you,
11  you judged their credibility under oath that they
12  never saw such behavior or never saw such acts, and
13  they were right there.  And, again, this is in the
14  sergeant's -- or the training room while roll call
15  was going on.  There's other officers walking
16  around.
17        MR. HERBERT:  For the record, I'm going to --
18  it misstates the evidence as far as them being right
19  there.  They testified that they weren't right there
20  for that.
21        Go ahead.
22        MR. MCGRATH:  You heard the testimony who was
23  in the office, who was there when the Commander
24  Officer came in, who walked out, and then who walked

DEFENDANTS 001888

City of Kankakee Board of Fire and Police Commissions

Page 33

1 right in.  You heard all of that testified.  It just
2 didn't happen.  He lied to the commission; and,
3 again, he was under oath.
4         Just those allegations and the
5 charges, which you've already found him being guilty
6 of, that's enough to justify terminating Sergeant
7 Berge of the Kankakee Police Department.
8         If you look at your -- if you look at
9 your rule, Section 1, hearing of charges, it defines
10 what is cause, what is necessary to have proper
11 cause to terminate an employee from the police
12 department.
13         Cause as defined by this commission
14 is substantial shortcoming which rendered
15 continuance in employment in some way detrimental to
16 the discipline and efficiency of the public service,
17 and something which the law and sound public opinion
18 recognizes as cause of the officer to no longer
19 occupy his position.
20         I'm sure your counsel goes over case
21 law and what cause is, and I would direct your
22 attention to Three Illinois Appellate and Illinois
23 Supreme Court cases which have found just cause to
24 terminate an officer for failing to follow a direct

Page 34

1 order from supervisor.
2         The first case I would cite to is
3 Martin v. Matthys, M-a-t-t-h-y-s, found at
4 149 Ill.App.3d, 800.  It's a First District case
5 from 1986 where the plaintiff officer in that case
6 requested to work at a secondary job.  The police
7 chief in that department advised the officer that he
8 was not allowed to work a secondary job.
9         That officer believed that that order
10 was an unlawful order.  The Illinois Appellate Court
11 disagreed and found that that officer deliberately
12 disobeying that direct order from the police chief
13 about secondary employment was grounds to
14 terminate.
15         I would cite the language used by the
16 court in that case wherein the court stated, the
17 police department is a paramilitary organization
18 with a chain of command leading to the chief of
19 police.  In order to establish and maintain a
20 leadership role, the chief of police must command
21 the respect and obedience of all officers.
22 Flagrant, deliberate, and continuing disobedience,
23 especially by an officer of high rank and ten years'
24 of experience, undermines that authority and weakens

Page 35

1 the entire structure of the organization.
2         A similar case in the State of
3 Illinois is the Launius v. Board of Fire and Police
4 Commissioner case.  Launius is spelled
5 L-a-u-n-i-u-s.  It's found at 151 Ill.2d, 419.  It's
6 an Illinois Supreme Court case that is widely
7 recognized and cited from 1992.  It's from the
8 Des Plaines Police Department where there was a
9 flood situation going on at the Des Plaines River.
10 The officer was ordered to maintain his post; and
11 rather than maintaining his post, the officer left
12 his post to check on his wife and children because
13 of the flood situation.
14         Counsel's familiar with this case.
15 The officer was terminated, and the termination was
16 upheld by the Illinois Supreme Court because that
17 officer failed to follow direct order from
18 commanding officer.
19         I would also cite to Krecek,
20 K-r-e-c-e-k, v. Board of Police Commissioners.
21 Again, an officer, who failed to follow a direct
22 order because that officer subjectively believed the
23 order was unreasonable, was terminated, and the
24 appellate court upheld that termination based

Page 36

1 upon that officer's failure to follow a direct
2 order.
3         Given the evidence that you've heard
4 and the charges that you've already found Sergeant
5 Berge violating, that, in and of itself, justifies
6 his termination from the Kankakee Police
7 Department.
8         Based upon that case law that's been
9 cited, along with other case law that I'm sure
10 Mr. Kelly will inform you of, disobeying a direct
11 order from superior officer on a single occasion --
12 you've heard testimony that he violated direct
13 orders and insubordinate based upon his failure to
14 follow those direct orders on multiple times, on two
15 separate dates, and on top of that lied under oath
16 on multiple times, in a formal interrogation where
17 he was given the opportunity to explain himself.
18 And rather than explain himself, he lied under oath,
19 and that lie was proven during a hearing when he
20 again lied to this very commission.
21         Those instances and that evidence and
22 those facts are enough to justify his termination
23 from the police department.  Put on top of that the
24 discipline that's contained within the sergeant's

Page 37

1 personnel file.
2      You now have before you that back in
3 2007 Sergeant Berge was involved in a physical
4 altercation with who? But yet a superior officer.
5 Where? Off duty, however, it involved consumption
6 of alcohol. It was in a local bar within the City
7 of Kankakee. And he received a suspension based
8 upon the physical altercation with that superior
9 officer, and that suspension was signed off by
10 Sergeant Berge himself.
11      More recently, in 2014, Sergeant
12 Berge received a 30-day suspension for violating
13 department rules for testing positive for
14 non-prescribed steroids and possessing a controlled
15 substance, which steroids are if you don't have a
16 prescription for that.
17   MR. HERBERT: Sorry to interrupt, Mike.
18     Just for the record, I object that
19 any argument or introduction of evidence concerning
20 anything outside of the five-year time period, which
21 is all the aggravating facts in this case.
22   MR. KELLY: For the record, we acknowledge your
23 objection, and it's continuing.
24   MR. MCGRATH: That suspension was a 30-day

Page 38

1 suspension with ongoing drug testing on a random
2 basis for a 12-month period. Again, that suspension
3 was signed off by Sergeant Berge.
4      In 2014, you heard during the hearing
5 how Sergeant Berge was removed from KAMEG, which is
6 the Drug Enforcement Special Unit in that area,
7 which is comprised of officers from Kankakee and
8 surrounding police departments. It is run by
9 command staff outside of the Kankakee Police
10 Department.
11      You have heard comments about
12 Sergeant Berge's integrity and all the good things
13 he's done for the department. You heard evidence
14 that Sergeant Berge be removed from KAMEG based upon
15 his illegal possession of controlled substance was
16 made public. Certainly that brought disrepute to
17 the Kankakee Police Department.
18      In total, you heard from Chief Kosman
19 about a paramilitary operation, and you heard
20 testimony why he brought the charges and is seeking
21 Sergeant Berge's termination. You just can't have
22 an officer on your department who fails to follow
23 the paramilitary operation of a police department
24 and chooses what commands or orders he wants to

Page 39

1 follow and which ones he doesn't want to
2 follow. And then is insubordinate in front of other
3 officers, in front of the general public based upon
4 his failure to follow those general rules and
5 orders. And then to testify under oath on two
6 separate occasions and make outlandish remarks and
7 allegations by a commanding officer where it was
8 never reported, it was never stated to anyone within
9 the department, there is no cry out, there's
10 policies and procedures that we went through such
11 action took place, and he was aware of those
12 policies and procedures he should have reported it.
13 He didn't. It just didn't happen.
14      Based upon the totality of all of
15 Sergeant Berge's action on July 15th, July 18th, and
16 then his formal interrogation, coupled with his
17 testimony before the commission, which was
18 untruthful, an outright lie, along with his prior
19 discipline, Chief Kosman is rightful in asking that
20 he be terminated from the Kankakee Police
21 Department.
22      Thank you.
23   MR. KELLY: Mr. Herbert.
24   MR. HERBERT: Thank you, Mr. Kelly,

Page 40

1 Mr. McGrath, ladies and gentlemen of the board.
2      I will start out by addressing one of
3 the statements made by counsel during his closing,
4 and that is where he cited some case law which he
5 believed supported the decision to terminate, and he
6 indicated that Mr. Kelly will inform you of other
7 cases aside from the ones that counsel for the chief
8 cited, and I would just state that Mr. Kelly is an
9 honorable lawyer, as is Mr. McGrath, and his role is
10 not to be an advocate for the chief or for the
11 respondent, and it's the chief's responsibility to
12 present this case and prove that the allegations
13 were valid, and that Mr. Berge violated those, which
14 the board has ruled on. But at this stage, the
15 board has a very important job, and that is the
16 job to determine what the appropriate penalty is
17 here for the infractions that the board found him
18 guilty of.
19      We certainly don't believe that
20 Mr. Berge was guilty of the allegations brought
21 against him for a number of reasons that we're not
22 going to bring up here because we understand the
23 stage that we're at.
24      The board has an important job, and I

DEFENDANTS 001890

**City of Kankakee Board of Fire and Police Commissions**

**Report of Proceedings**
**December 1, 2020**

Page 41

1 have every reason to believe that the board will
2 take its job seriously.  We are dealing with the
3 possible termination of an honored employee for the
4 City of Kankakee for over 16 years; and what brings
5 us here today is essentially 10, 15 minutes of
6 conduct within that 16-year period.
7        You'll see as you go through the
8 exhibits that Paul Berge's record and his community
9 support and his accommodations and accolades by the
10 Kankakee Police Department and the village are quite
11 commendable.  So what we're looking at is we're
12 going to compare those 10, 15, minutes versus the
13 hundreds of thousands of minutes over that 16-year
14 period, and do those 10, 15 minutes, do they warrant
15 termination of a man who has served the village,
16 served the city, served the department, and served
17 the community with honor and dignity.  And it's your
18 responsibility to make that decision, but your
19 decision has to be consistent.  It has to be lawful.
20 It has to be reasonable.  I trust that the board
21 recognizes its duty and its responsibility.
22        There's a duty to Paul Berge, which
23 is first and foremost.  This is an individual, a
24 married man with children who is looking at being

Page 42

1 terminated in one of the worst economies that we've
2 ever seen, and here's an individual whose job has
3 been to be a police officer.
4        I think we can all recognize that
5 being a police officer, especially in this era
6 doesn't translate into too many other jobs,
7 especially when somebody has been terminated.  So
8 the ramifications are huge, and they are serious,
9 and they must be reasonable.  The decision must be
10 reasonable, nonarbitrary, and consistent with prior
11 discipline.
12        We asked for in this case other
13 examples in which individuals within the City of
14 Kankakee have been disciplined for insubordination.
15 We never received any records other than we received
16 some type of training record for an individual named
17 Todd Koerner, K-o-e-r-n-e-r, and apparently that was
18 responsive to my request for any records of any
19 individuals that had been disciplined in the past
20 for insubordination within the City of Kankakee
21 Police Department.
22        I don't know what his penalty was.  I
23 don't know the circumstances of his alleged
24 insubordination.  But what I do know is that he was

Page 43

1 never brought to the board for termination because
2 termination is for a serious penalty.  And as
3 Mr. McGrath said, it has to be some type of penalty
4 that will result in a substantial shortcoming that
5 is detrimental to the efficiency of a service for
6 the Kankakee Police Department.
7        Sound public opinion must recognize
8 this as good cause.  That's the standard.  And the
9 board has to look at -- they can't look at this case
10 in a vacuum.  They can't look at it in a 10-minute,
11 15-minute time period that the chief wants you to
12 look at it.  Has to look at it consistent with how
13 this police department has disciplined in the past,
14 and it has to look at it in the totality of the
15 circumstances when considering the whole picture,
16 and that is, all the good that Paul Berge has done.
17 The bad that was presented by the chief in
18 aggravation, it shouldn't be in here, but I've made
19 that argument.
20        But I think it goes to a greater
21 point here.  There's policies and procedures in
22 place; and if the chief is going to take the
23 position that these policies and procedures are so
24 clear and concise and required that they can't be

Page 44

1 violated, I think if we look at the chief's actions
2 here with respect to the use of the old files, the
3 policies don't mean that much; or in the
4 alternative, they don't mean that much when it comes
5 to a guy like Paul Berge.  That's where the board
6 has to step in.
7        A substantial shortcoming detrimental
8 to the efficiency of service within the Kankakee
9 Police Department.  What was that substantial
10 shortcoming that the chief proved that effects the
11 efficiency of the Kankakee Police Department?  You
12 heard the evidence here.  It meant nothing other
13 than it ruffled a couple of feathers with the
14 commander and the chief when Paul Berge didn't act
15 fast enough.
16        And that's an important point here.
17 And, again, we're not arguing the facts here because
18 you've already ruled on that, but the facts of the
19 matter here is that Paul Berge, this
20 insubordination, amounts to -- even if we look at
21 all the chief's evidence -- it amounts to that he
22 did not follow the rules fast enough.  He didn't
23 follow them fast enough.
24        The evidence was undisputed that

Page 45

1 there was two direct orders that Paul Berge
2 supposedly violated, and that was leave the office
3 on the first occasion, and leave your tour of duty
4 on the second occasion.  First with the commander,
5 second with the chief.
6        The evidence is undisputed that Paul
7 Berge left the office with the first infraction with
8 Commander Austin.  The evidence is undisputed that
9 Paul Berge left the scene during his interaction
10 with the chief on the second occasion.  But the
11 insubordination is essentially that he didn't do it
12 fast enough.
13        Well, I would ask the ladies and
14 gentlemen of the board to consider the situation
15 that Paul Berge was in.  He was being told to leave
16 for reasons which he did not think, and we still
17 don't think, were reasonable.
18        All of you are employed, I'm
19 assuming, or had jobs.  If somebody came up to you
20 and told you, get out of here.  Go home.  You're not
21 working here anymore, and you firmly believed that
22 you had done nothing wrong, what is the rational
23 response?  What is the response that the chief
24 wants?  And is that response that the chief wants

Page 46

1 rational?  Is the appropriate response to say, yes,
2 sir, leave without defending yourself even for a
3 couple of minutes?
4        It doesn't make any sense.  It
5 doesn't make any sense, and no reasonable person
6 would do that.  And if you heard the evidence, and
7 even if you believe the chief's version, clearly
8 Paul Berge did not know the reasons why he was being
9 sent home.  Whether he was right or wrong about what
10 he thought he was doing was appropriate, that's not
11 relevant to this point.
12        The fact is he didn't think he was
13 doing anything wrong.  He's a supervisor in the
14 police department and is being told to go home for
15 allegedly doing something wrong.  Isn't it
16 reasonable for a supervisor to stand there and say,
17 what am I doing wrong?  Wait a minute.  Wait a
18 minute.  No, no, no.  There must be a
19 misunderstanding.
20        If you're in a grocery store, and a
21 security guard comes up to you before you ring up
22 your groceries and says, you got to get out of here.
23 What are you going to do?  Just walk away and not --
24 you just spent a half an hour shopping for your

Page 47

1 groceries.  You're just going to leave?
2        Clearly, you're going to think, wait
3 a minute.  Wait a minute.  This supervisor or this
4 security guard thinks that I did something wrong.
5 Hold on.  There's a misunderstanding here.  Let me
6 explain that.
7        Is that the type of police department
8 that we want?  That we don't want anyone to stand up
9 for themselves?  To fight for themselves for what
10 they believe is unlawful accusations or unlawful
11 orders?  Is that what you want?
12        Well, if you get that, guess what
13 you're going to get?  You're going to get a police
14 department where the commander of the police
15 department recognizes misconduct of his supervisors,
16 criminal misconduct of his supervisors, and he is so
17 scared to confront his supervisors that he
18 backdoors it.  He goes to the FBI.  That's Commander
19 Austin.  That's a complainant in this case.  That's
20 a star witness in this case.  And the people that he
21 was afraid to confront, they're all players in this
22 case.
23        They're all part of this disciplinary
24 process against Paul Berge, and you have to take

Page 48

1 that into consideration when you're rendering your
2 decision because you owe it not only to Paul Berge,
3 you owe it to the police department, and you know
4 your duties, you owe it to the citizens and
5 residents of the City of Kankakee.  And you can send
6 a horrible message, or you can send a reasonable and
7 rational message here.
8        But if you send the wrong message
9 with Paul Berge, you are going to promote situations
10 that occur when the star witness and the complainant
11 in this case, where he was afraid to confront what
12 he believed to be criminal conduct of his
13 supervisors for probably the same reasons that
14 anyone else that is sitting in Paul Berge's shoes or
15 a patrolman -- god forbid a patrolman that has no
16 rank whatsoever.  You will promote a police
17 department that is -- we've all heard the term code
18 of silence.  This department will become Exhibit A
19 for the code of silence if we are going to terminate
20 excellent employees because they questioned a
21 supervisor who's accusing them of some type of
22 misconduct that wasn't proven.
23        What was proven about the misconduct?
24 Wouldn't it be reasonable for somebody to say, hold

Page 49

1 on a second. You must have something confused. Let
2 me explain myself. Do we want to promote a
3 department where people can't explain themselves?
4         Well, promoting the efficiency of
5 the department, I would submit that the efficiency
6 of the department is promoted by exactly what Paul
7 Berge did. Wait a minute. No. You have
8 something wrong. I didn't do anything wrong here.
9 Whatever you think happened, please let me explain
10 myself.
11         That is an efficient department. But
12 moreover, moreover, the chief was required to
13 prove -- we're not required to prove anything. The
14 chief was required to prove that Paul Berge's action
15 were so detrimental to the Kankakee Police
16 Department that he has to be fired. For what
17 reason? To send a message? Not a good message. It
18 has to be substantial misconduct. Not misconduct.
19 Substantial.
20         You heard the evidence. What was the
21 effect? How did this harm the department? Paul
22 Berge taking longer than Commander Austin and longer
23 than Chief Kosman wanted for him to leave the
24 situation, how did that affect the department? It

Page 51

1 Again, you have to be consistent.
2         Finally, wrapping up here, the chief
3 knows, and they won't admit this, but they know that
4 terminating a 16-year supervisor for this 10,
5 15 minutes of what they allege to be misconduct,
6 they know that's not enough, and they know that
7 because they went at great lengths to bring in all
8 this prior discipline, which three of the four have
9 been let in. They're a big piece of ammunition when
10 it's the last chance agreement.
11         Well, their own rules said it's out
12 of the record, but they still try to get it in. And
13 is that important? Yes. Do you know why? Because
14 it goes towards the absurdity of trying to terminate
15 somebody for this insubordination act based upon the
16 facts in this matter.
17         I submitted a number of cases, and
18 you're going to see that the whole -- the
19 chief's entire argument about well, insubordination
20 is insubordination. That's not true. It's not
21 true.
22         This insubordination, which I'll
23 repeat, was nothing -- was -- first of all, the
24 insubordination was, didn't act fast enough. The

Page 50

1 didn't. The chief told you that.
2         Of course they tried to say, well,
3 it's the code of the police department. We're a
4 paramilitary organization. What does that mean?
5 What does that mean?
6         In 2020, are we a military
7 organization? A paramilitary organization? Or do
8 we want people to think for themselves? People that
9 question things that they don't think are right.
10 Isn't that what we're looking for? It is in most
11 cities. I hope it is in Kankakee.
12         You have to consider the
13 substantial, the significant complimentary history
14 of Paul Berge, including, which you will see, are
15 letters of accommodation from the very citizens and
16 residents that you represent on this board, just
17 months before this incident.
18         These aggravating factors that the
19 chief illegally admitted on argument, take a look at
20 what other police officers said have 16 years on.
21 Tell me if that is any different than any other
22 working police officer of 16 years; or in the
23 alternative, tell me if it's quite a bit better, if
24 it's not quite as egregious as some other officers.

Page 52

1 insubordination is not that they did not do what was
2 requested of them. That's not the case here. Did
3 not act fast enough.
4         Look at the situations in which these
5 alleged insubordination actions took place. One was
6 with a confrontation between a commander and Paul
7 Berge where it's clear, and you look at the charging
8 document, and you look at the interrogation where,
9 basically, the entire course of the interrogation
10 was about how Paul Berge failed to follow the order
11 to arrest these homeless people.
12         Well, they realized after they did
13 this interrogation where he was not properly
14 informed of his charges, which I've raised in two
15 motions to dismiss and a Bill of Particulars; but
16 they realize that we can't get him on that, so let's
17 get him on the fact that he didn't leave the office
18 quick enough.
19         Well, if the entire confrontation
20 started, based upon what the commander wanted him to
21 do, which was arrest homeless people, which we know
22 from the policies that we've submitted and from the
23 testimony that, guess what, that wasn't proper.
24 That doesn't serve the means of the community, and

**City of Kankakee Board of Fire and Police Commissions**

**Report of Proceedings**
**December 1, 2020**

Page 53

1 Paul Berge, as a competent supervisor, stood up and
2 said, no, no, why would I arrest homeless people?
3 What is that going to do for us? They're not going
4 to pay the tickets. Why? Because an alderman
5 complained about them. Is that what the City of
6 Kankakee is going to be? The police department is
7 going to be rubber stamp for some politician who
8 wants to complain about a particular spot, or is it
9 going to be a police department that exercises
10 compassion, uses discretion appropriately, and acts
11 as a compassionate police officer? Just like the
12 policies called for, just like the training that was
13 provided to Paul Berge from the City of Kankakee
14 which is part of your evidence. Another part of it
15 we couldn't get it, but we're not going to argue
16 that point.
17         The City of Kankakee can't on one
18 hand say, wow, we want you to -- you're a
19 supervisor, exercise discretion, recognize the
20 rights and responsibilities of your office and
21 recognize the rights of these citizens, and don't
22 hammer citizens that can't defend themselves. And
23 then when somebody stands up against that, from a
24 supervisor, we're going to discipline that man for

Page 54

1 that?
2         The cases I've submitted, and there's
3 probably eight of them, I believe, but NLRB v. M&B,
4 angry employee threatens -- threatens supervisor.
5 Employer fires her for subordination. Court rules
6 employer cannot revoke an employee from the point
7 she commits an indiscretion and then rely on this to
8 terminate her employment.
9         Each of these situations with the
10 commander and with the chief were provoked by the
11 commander and chief respectively. You can decide
12 whatever you want why that was done, but you cannot
13 look at the timing of this and not recognize the
14 irony behind it. This is a period of two days where
15 this individual has been a model employee, and all
16 of a sudden in two days we have a whistle-blowing
17 commander who's reporting criminal activities about
18 his deputy chief and the mayor and --
19 MR. MCGRATH: I'm going to object. I'm going
20 to object to that. There's nothing to that in the
21 record at all. It just misstates the evidence. It
22 misstates the evidence.
23 MR. HERBERT: It's in the records in the
24 motion.

Page 55

1 MR. KELLY: Proceed.
2 MR. HERBERT: Provoked by that individual who
3 didn't have the courage to do what Paul Berge did.
4 If he did, perhaps he would have saved the City of
5 Kankakee quite a bit of embarrassment.
6         And then the other one was two days
7 later by the chief after this incident with the
8 commander. Nobody raises their eyes to that. Very
9 similar thing. Provocation by the commander.
10 Provocation by the chief. Very similar.
11 Provocation being, you're doing something wrong, go
12 home, to you're doing something wrong, go home.
13         What was clear about the misconduct
14 and Paul Berge -- even if you believe every piece of
15 evidence that the chief submitted, what was so
16 apparently wrong about that -- about what Paul Berge
17 did that would require Paul Berge to say, you're
18 right. I'm wrong. I'm leaving. Within the seconds
19 in which the commander-in-chief wanted him to?
20 Nothing. They didn't prove anything.
21         You have to look, follow the law, and
22 this is what the courts have recognized, is you have
23 to look at the situation in which the alleged
24 insubordination occurred. And if that

Page 56

1 insubordination was in some way provoked or came
2 about as a result of the actions of the employer,
3 well, then you can't -- you can't look at it as a
4 typical insubordination case.
5         J-a-l-i-l v. Abdel, A-b-d-e-l, the
6 defendant fired the plaintiff for insubordination
7 after the complainant complained about harassment.
8 Defendant could have ceased upon the insubordination
9 to fire the plaintiff.
10         And that's an important point here.
11 Paul Berge could not believe why Commander Austin
12 reacted the way he did in that -- in Sergeant
13 Berge's office. Paul Berge could not understand why
14 the chief was telling him two days later essentially
15 the same thing as the commander did. Go home.
16         And as far as what the commander did,
17 the chief talked about it in his closing argument
18 that my client lied about the chief committing
19 sexual harassment. What evidence is there that he
20 lied about it other than the commander said, no.
21 That didn't happen? Well, why would he say it
22 happened? He is liable. He knows that. Because it
23 was legally told to him during -- after a
24 confidential interrogation by the same supervisors

Page 57

1 who are bringing this case against Sergeant
2 Berge.
3         The courts have said, you can't --
4 you can't discipline somebody for insubordination if
5 somebody is objecting to what they believe to be
6 discrimination. You can't do it.
7         That's what we have in this case. We
8 all know that Paul Berge has filed a case of
9 discrimination against the Kankakee Police
10 Department --
11     MR. MCGRATH: Objection. That's not in the
12 record. It's not in the record.
13     MR. HERBERT: I believe it's in my motion.
14     MR. KELLY: Move on.
15     MR. HERBERT: We all know from the testimony in
16 this case, it certainly is in the record, that
17 Paul Berge made a complaint of discrimination,
18 sexual discrimination, against Commander Austin that
19 took place on the day of the incident. We know
20 that.
21     MR. MCGRATH: Objection. That misstates the
22 evidence, also. It's not in the evidence.
23     MR. HERBERT: You remember the evidence. It
24 came out. There was questions by the board members

Page 58

1 about the charge of discrimination. We have the
2 discrimination papers. The chief --
3     MR. MCGRATH: Objection. There's no --
4     MR. HERBERT: -- they know about it.
5     MR. MCGRATH: Objection. There is nothing
6 in the record about a sexual discrimination
7 complaint.
8     MR. KELLY: We understand that this is
9 argument, but we ask both counsel to respect the
10 record that the commission has heard.
11     MR. HERBERT: Paul Berge, at the very least,
12 felt like he was being told to go home for improper
13 reasons. His rationale for that was reasonable. He
14 didn't see any other sergeants being told to go
15 home during that time period or any other time
16 periods.
17         So isn't it reasonable for him to
18 think, why am I being discriminated against? Why is
19 there not -- why is there a brick held over my head
20 for some reason these last few days?
21         If that's any part -- if you consider
22 that as any part of Paul Berge's hesitation to these
23 commands, you can't fire him, and you should undo
24 the discipline because it can't be insubordination.

Page 59

1 It's legally insufficient.
2         You've heard the evidence. I ask
3 that you please do your duty and think about your
4 duty to conduct a fair hearing, to provide due
5 process, and to treat individuals fairly, and to
6 hold the chief to its burden which we would submit
7 they have failed to meet not only at the evidence
8 stage but since we're beyond that, certainly at the
9 disciplinary stage.
10         Thank you.
11     MR. KELLY: Thank you, gentlemen.
12         Mr. Herbert, I'm going to ask that
13 that letter requesting removal of discipline be
14 marked as Berge Exhibit No. 9 in aggravation, so
15 that we get that in the record.
16     MR. HERBERT: Thank you very much.
17     MR. KELLY: With that, I believe -- do the
18 commissioners have any questions?
19     CHAIRMAN DAVIS: I don't think so.
20     MR. KELLY: Then at this point in the process,
21 the commission should make a motion to go to closed
22 session to deliberate on the question of the
23 appropriate penalty to be administered to
24 Sergeant Berge based on the findings in the

Page 60

1 case-in-chief relative to the complaint filed by
2 Chief Kosman.
3         Would a commissioner please make a
4 motion to go to closed session?
5     COMMISSIONER BESSANT: I make a motion to go to
6 closed session.
7     COMMISSIONER YATES: Second.
8     CHAIRMAN DAVIS: Motion and a second.
9         In all favor -- roll call.
10     COMMISSIONER YATES: Dr. Davis?
11     CHAIRMAN DAVIS: Yes.
12     COMMISSIONER YATES: Courtney Bessant?
13     COMMISSIONER BESSANT: Yes.
14     COMMISSIONER YATES: Mario Flores?
15         (No response.)
16     COMMISSIONER YATES: Dawn Landwehr?
17     COMMISSIONER LANDWEHR: Yes.
18     COMMISSIONER YATES: Nick Yates, yes.
19     MR. KELLY: The commission has moved to go into
20 closed session for the purposes of deliberation.
21 The time is 7:58.
22         I believe the commission's intention
23 it to deliberate, to come up with a finding on the
24 appropriate penalty. When the commission does that,

2:20-cv-02310-CSB-EIL # 17-15 Page 258 of 270
City of Kankakee Board of Fire and Police Commissions
Report of Proceedings
December 1, 2020

Page 61

1 they will return to open session to announce their
2 decision.
3     MR. HERBERT: Mr. Kelly, do you want us to stay
4 on the Zoom, or do you want us to get it via
5 e-mail?
6     MR. KELLY: That's entirely up to you. I have
7 no idea how long the commission will take.
8 Obviously, you've both made good arguments. We've
9 got a lot of evidence to consider.
10         If you want to stay, that's certainly
11 fine. As you know, the commission has to announce
12 its decision in open session. It will then
13 follow it up with a written findings and decision,
14 and I can inform counsel, if you're not going to
15 stay, certainly tomorrow by e-mail, but it's up to
16 you.
17     MR. HERBERT: That's fine with me.
18         Paul, I just want to make sure, if
19 you can unmute, and tell me if that's okay with
20 you?
21     SERGEANT BERGE: Yes, sir. That's fine with
22 me.
23     MR. HERBERT: Okay. Thanks, Mr. Kelly.
24     MR. KELLY: Okay. Chief --

Page 62

1     MR. MCGRATH: Are you okay with that, also?
2     CHIEF FRANK KOSMAN: Sure. I'll be on Zoom or
3 here waiting to hear.
4     MR. MCGRATH: Okay.
5     MR. KELLY: Okay. We'll have the Zoom link
6 open; so if anybody stays, they're welcome to
7 stay. If not, like I said, we'll let everybody
8 know.
9     MR. HERBERT: Thanks, Mr. Kelly.
10     MR. KELLY: Thank you.
11         (WHEREUPON, proceedings were had in
12         closed session outside the hearing of
13         the public which were transcribed
14         under separate seal.)
15         (WHEREUPON, all parties have
16         re-entered the hearing proceedings
17         and the following proceedings were
18         held in open session with parties
19         present.)
20     CHAIRMAN DAVIS: Let's get a motion to come out
21 of closed session and back into regular session
22 here.
23     COMMISSIONER YATES: Motion to return to
24 regular session.

Page 63

1     COMMISSIONER LANDWEHR: I'll second it.
2     CHAIRMAN DAVIS: Motion to return.
3         All those in favor let it be known by
4 saying "aye."
5     COMMISSIONER BESSANT: Aye.
6     COMMISSIONER LANDWEHR: Aye.
7     COMMISSIONER YATES: Aye.
8     CHAIRMAN DAVIS: Opposed?
9         (No response.)
10     CHAIRMAN DAVIS: Motion carries.
11         Before we give our disposition on the
12 disciplinary hearing, I want to take care of a
13 couple bills --
14     MR. KELLY: Off the record.
15         (WHEREUPON, a discussion was had off
16         the record.)
17     CHAIRMAN DAVIS: Okay. That takes us up to
18 this point.
19         Attorney, would you take over from
20 here?
21     MR. KELLY: I will.
22         The commission has reached a
23 determination. There were two issues pending before
24 the commission. The first was a motion filed by

Page 64

1 Sergeant Berge to strike and nullify the
2 commission's prior decision.
3         I would ask a commissioner to adopt
4 the following as their motion:
5         A motion to deny the motion to strike
6 and nullify based on the commission's finding that
7 Sergeant Berge has been provided a fair hearing, and
8 that neither the commission, nor any individual
9 commissioner, deprived Sergeant Berge of his due
10 process rights.
11     COMMISSIONER BESSANT: I make a motion to adopt
12 that.
13     CHAIRMAN DAVIS: I second it.
14         Motion is to adopt that --
15     COMMISSIONER BESSANT: Motion that was --
16     CHAIRMAN DAVIS: -- motion that was just read.
17         All those in favor -- no. Let's get
18 a roll call. I'm sorry.
19         Roll call.
20     COMMISSIONER YATES: Dr. Davis?
21     CHAIRMAN DAVIS: Yes.
22     COMMISSIONER YATES: Courtney Bessant?
23     COMMISSIONER BESSANT: Yes.
24     COMMISSIONER YATES: Mario Flores?

2:20-cv-02310-CSB-EIL # 17-15 Page 259 of 270
City of Kankakee Board of Fire and Police Commissions
Report of Proceedings
December 1, 2020

Page 65

1    (No response.)
2    COMMISSIONER YATES: Dawn Landwehr?
3    COMMISSIONER LANDWEHR: Yes.
4    COMMISSIONER YATES: Nickey Yates, yes.
5    CHAIRMAN DAVIS: The motion is approved.
6    COMMISSIONER YATES: With zero nays. Four
7  ayes, zero nays.
8    CHAIRMAN DAVIS: Zero nays.
9    Motion approved. We got one more.
10   MR. KELLY: Then in terms of the penalty,
11 I would ask a commissioner to adopt the
12 following:
13   A motion to terminate the employment
14 of Sergeant Paul Berge based on a finding that his
15 insubordination and untruthfulness, when combined
16 with his prior incidents of discipline, constitute
17 cause that he no longer serve as a police sergeant
18 for the City of Kankakee.
19   COMMISSIONER BESSANT: I make a motion -- you
20 want to do it?
21   COMMISSIONER YATES: I make a motion that we
22 move forward with the termination of Officer
23 Berge -- Sergeant Berge.
24   CHAIRMAN DAVIS: Do we have a second?

Page 66

1    COMMISSIONER BESSANT: I second.
2    CHAIRMAN DAVIS: We have a motion on the floor
3  to adopt this motion that's presented by our
4  counselor here.
5    Roll call.
6    COMMISSIONER YATES: Dr. Davis?
7    CHAIRMAN DAVIS: Yes.
8    COMMISSIONER YATES: Courtney Bessant?
9    COMMISSIONER BESSANT: Yes.
10   COMMISSIONER YATES: Mario Flores?
11   (No response.)
12   COMMISSIONER YATES: Dawn Landwehr?
13   COMMISSIONER LANDWEHR: Yes.
14   COMMISSIONER YATES: Nick Yates, yes.
15   Four ayes, zero nays.
16   CHAIRMAN DAVIS: That motion is approved.
17   MR. KELLY: Just for the record, the commission
18 will follow up this action tonight with a written
19 findings and decision. I will prepare that findings
20 and decision as soon as we get a transcript from
21 tonight. I'll get a copy of that to the commission
22 for their approval and signature. Once that's done,
23 we will serve copies of that on the chief and on
24 Sergeant Berge.

Page 67

1    CHAIRMAN DAVIS: Anything for the good of the
2 order?
3    (No response.)
4    CHAIRMAN DAVIS: Entertain a motion at this
5 point to adjourn this meeting.
6    COMMISSIONER BESSANT: I make a motion to
7 adjourn the meeting.
8    CHAIRMAN DAVIS: Motion made.
9    Second?
10   COMMISSIONER YATES: Second.
11   CHAIRMAN DAVIS: Second.
12   All those in favor say "aye."
13   COMMISSIONER BESSANT: Aye.
14   COMMISSIONER YATES: Aye.
15   COMMISSIONER LANDWEHR: Aye.
16   CHAIRMAN DAVIS: Opposed?
17   (No response.)
18   CHAIRMAN DAVIS: No one is opposed.
19   COMMISSIONER YATES: Next meeting December 15th
20 at 5:30.
21   (Meeting was adjourned.)
22
23
24

Page 68

1  STATE OF ILLINOIS )
2                    ) SS:
3  COUNTY OF COOK   )
4    I, LINDA A. WALICZEK, a Certified
5  Shorthand Reporter of the State of Illinois, do
6  hereby certify that I transcribed the audiocassette
7  of the proceedings had at the hearing aforesaid, and
8  that the foregoing is as true and complete a
9  transcription as possible of the audiocassette of
10 the proceedings transcribed under my personal
11 direction.
12   IN WITNESS WHEREOF, I do hereunto set my
13 hand at Chicago, Illinois, this 12th day of
14 December, 2020.
15
16
17   Certified Shorthand Reporter
18
19 C.S.R. Certificate No. 84-3865.
20
21
22
23
24

**$**

**$500 (1)**
8:6

**A**

**Abdel (1)**
56:5
**A-b-d-e-l (1)**
56:5
**ability (2)**
15:9,10
**absolutely (2)**
30:16;31:6
**absurdity (1)**
51:14
**accident (2)**
7:11;8:11
**accolades (1)**
41:9
**accommodation (2)**
27:12;50:15
**accommodations (1)**
41:9
**accomplished (1)**
16:12
**accurately (1)**
31:11
**accusations (1)**
47:10
**accused (1)**
32:9
**accusing (1)**
48:21
**acknowledge (1)**
37:22
**acknowledged (1)**
8:3
**Act (7)**
11:8;12:10,15;
44:14;51:15,24;52:3
**action (5)**
23:17;39:11,15;
49:14;66:18
**actions (3)**
44:1;52:5;56:2
**activities (1)**
54:17
**acts (2)**
32:12;53:10
**added (1)**
26:24
**additional (2)**
25:20;26:19
**address (2)**
7:17;8:11
**addressing (1)**
40:2
**adjourn (2)**
67:5,7
**adjourned (1)**

**administered (1)**
59:23
**administrative (5)**
11:3,18;12:5;14:7;
22:17
**admissibility (4)**
10:14;15:20;16:21,
22
**admission (3)**
21:9,11;26:15
**admit (2)**
19:5;51:3
**admitted (8)**
5:20;9:14;13:3;
20:13;25:22;26:4;
27:5;50:19
**admitting (1)**
11:14
**adopt (6)**
19:2;64:3,11,14;
65:11;66:3
**advised (1)**
34:7
**advocate (1)**
40:10
**affect (1)**
49:24
**afraid (2)**
47:21;48:11
**Again (15)**
2:18;4:9;6:15;
13:10;22:10;31:10,24;
32:1,13;33:3;35:21;
36:20;38:2;44:17;
51:1
**against (9)**
2:11;29:6;40:21;
47:24;53:23;57:1,9,
18;58:18
**agency (1)**
11:3
**aggravating (2)**
37:21;50:18
**aggravation (16)**
4:24;5:12,14;6:3,
17;7:7,19;9:14;15:10;
16:7;21:10;25:20;
26:5;28:17;43:18;
59:14
**agreed (4)**
8:14,18,21;20:24
**agreement (19)**
7:20;8:18,20;9:1,5;
10:10;11:7;12:8,14;
13:18;14:16,17;20:15,
15,17,18,20;21:11;
51:10
**Agreements (1)**
11:21
**ahead (2)**
13:23;32:21
**alcohol (2)**

**alderman (1)**
53:4
**allegations (4)**
33:4;39:7;40:12,20
**allege (1)**
51:5
**alleged (5)**
3:11;10:3;42:23;
52:5;55:23
**allegedly (1)**
46:15
**allow (2)**
5:4;20:4
**allowed (2)**
11:10;34:8
**along (3)**
9:5;36:9;39:18
**altercation (3)**
6:6;37:4,8
**alternative (1)**
44:4;50:23
**ammunition (1)**
51:9
**amounts (2)**
44:20,21
**angles (1)**
30:24
**angry (1)**
54:4
**announce (2)**
61:1,11
**anymore (1)**
45:21
**apparent (1)**
11:13
**apparently (2)**
42:17;55:16
**appearances (1)**
2:14
**Appellate (3)**
33:22;34:10;35:24
**applicable (2)**
20:8;23:5
**apply (2)**
20:23;21:3
**appreciate (1)**
14:22
**appropriate (11)**
20:12;22:4;24:18,
18,20;29:1;40:16;
46:1,10;59:23;60:24
**appropriately (1)**
53:10
**approval (2)**
23:6;66:22
**approved (3)**
65:5,9;66:16
**April (6)**
7:20;8:1,18;11:1;
20:19;24:21
**area (3)**
7:15;30:19;38:6

**argue (6)**
3:15;22:12;28:6,16,
18;53:15
**arguing (2)**
12:8;44:17
**argument (13)**
3:19;13:16,22;28:5,
10,12,14;37:19;43:19;
50:19;51:19;56:17;
58:9
**arguments (2)**
13:2;15:21;61:8
**around (3)**
30:13;31:3;32:16
**arrest (3)**
52:11,21;53:2
**aside (1)**
40:7
**assume (1)**
15:3
**assuming (1)**
45:19
**attachment (1)**
27:15
**attention (2)**
30:10;33:22
**attorney (10)**
2:4,21;4:2,7,13,15;
13:12;18:24;19:15;
63:19
**attorneys (1)**
19:9
**Austin (8)**
31:23;32:3,8;45:8;
47:19;49:22;56:11;
57:18
**authority (3)**
11:4,13;34:24
**Avenue (2)**
7:13;8:12
**aware (1)**
39:11
**away (1)**
46:23
**Aye (15)**
18:18,19,20;19:18,
19,20,21;63:4,5,6,7;
67:12,13,14,15
**ayes (2)**
65:7;66:15

**B**

**Back (10)**
5:9;6:4;16:2,4;
18:12;19:1;20:7;23:1;
37:2;62:21
**backdoors (1)**
47:18
**bad (2)**
24:8;43:17
**bar (1)**
37:6

**Bargaining (8)**
10:10;11:7,21;12:7,
14;13:18;14:16,17
**based (21)**
6:18;7:4;9:14;10:5;
12:24;13:2;15:21;
21:15;23:20;35:24;
36:8,13;37:7;38:14;
39:3,14;51:15;52:20;
59:24;64:6;65:14
**basically (2)**
32:5;52:9
**basis (23)**
3:23;11:19;38:2
**become (1)**
48:18
**becomes (1)**
27:20
**beginning (1)**
5:9
**behalf (5)**
2:16;3:2;5:5,12;
28:19
**behavior (2)**
6:11;32:12
**behind (2)**
11:5;54:14
**believes (1)**
20:12
**Berge (76)**
2:12;3:2,10;5:13;
6:5,13,18;7:3,6,24;
8:1,2;10:5,12,21;
11:23;13:5;20:7;
23:22;28:19;29:4,8,
21;30:12,17;31:18;
33:7;36:5;37:3,10,12;
38:3,5,14;40:13,20;
41:22;43:16;44:5,14,
19;45:1,7,9,15;46:8;
47:24;48:2,9;49:7,22;
50:14;52:7,10;53:1,
13;55:3,14,16,17;
56:11,13;57:2,8,17;
58:11;59:14,24;61:21;
64:1,7,9;65:14,23,23;
66:24
**Berge's (15)**
5:16;7:10,17;19:3;
24:21;25:5;26:8;
38:12,21;39:15;41:8;
48:14;49:14;56:13;
58:22
**BESSANT (19)**
16:18;17:14,15;
18:20;19:21;60:5,12,
13;63:5;64:11,15,22,
23;65:19;66:1,8,9;
67:6,13
**better (2)**
12:19;50:23
**beverages (1)**
6:9

City of Kankakee Board of Fire and Police Commissions

Report of Proceedings
December 1, 2020

**beyond (3)**
23:5,17;59:8
**big (1)**
51:9
**Bill (1)**
52:15
**bills (1)**
63:13
**bit (3)**
7:1;50:23;55:5
**block (4)**
7:13;8:5,12,12
**board (19)**
10:20,22;11:2;
25:18;35:3,20;40:1,
14,15,17,24;41:1,20;
43:1,9;44:5;45:14;
50:16;57:24
**board's (2)**
3:9;21:15
**boggling (1)**
10:16
**both (7)**
3:8;9:8,18;19:9;
32:10;58:9;61:8
**brick (1)**
58:19
**brief (1)**
28:14
**briefly (3)**
5:19;12:2;21:13
**bring (2)**
40:22;51:7
**bringing (1)**
57:1
**brings (1)**
41:4
**brought (8)**
7:1;13:2;22:24;
29:5;38:16,20;40:20;
43:1
**building (1)**
8:5
**burden (1)**
59:6
**business (4)**
9:15;25:22;26:1,3

**C**

**call (9)**
17:1,3,4,11;32:14;
60:9;64:18,19;66:5
**called (1)**
53:12
**came (5)**
12:4;32:24;45:19;
56:1;57:24
**camera (1)**
30:23
**can (13)**
2:2,4,14;9:10;
15:23;30:4;31:14;

42:4;48:5,6;54:11;
61:14,19
**car (1)**
31:13
**care (1)**
63:12
**career (1)**
23:13
**carries (1)**
63:10
**case (46)**
4:14,23,24;9:6;10:8,
13;11:12,16;12:4,13;
13:16;20:22;21:3,4;
23:6,8;24:5;25:20;
26:13;28:17;33:20;
34:2,4,5,16;35:2,4,6,
14;36:8,9;37:21;40:4,
12;42:12;43:9;47:19,
20,22;48:11;52:2;
56:4;57:1,7,8,16
**case-in-chief (2)**
7:2;60:1
**cases (6)**
15:11;26:9;33:23;
40:7;51:17;54:2
**cause (8)**
33:10,11,13,18,21,
23;43:8;65:17
**causing (1)**
8:6
**CBA (1)**
15:5
**ceased (1)**
56:8
**certain (1)**
13:20
**certainly (9)**
11:19,22;29:2;
38:16;40:19;57:16;
59:8;61:10,15
**chain (3)**
21:23;23:7;34:18
**CHAIRMAN (45)**
2:3,8;4:21;13:6,8,
14;16:16,19,22;17:2,
6,10,13;18:11,15,17,
21,23;19:11,13,22,24;
59:19;60:8,11;62:20;
63:2,8,10,17;64:13,16,
21;65:5,8,24;66:2,7,
16;67:1,4,8,11,16,18
**chance (10)**
7:20;8:17,19,24;
9:4;20:15,15,16;
21:11;51:10
**charge (3)**
6:8;10:17;58:1
**charges (8)**
2:11;3:13;29:5;
33:5,9;36:4;38:20;
52:14
**charging (1)**

52:7
**check (1)**
35:12
**Chicago (2)**
9:7;14:1
**Chief (78)**
2:16,17,22;5:1,12;
6:3,17;7:7,19,23;10:2,
4,8,15,17;11:2,5,15;
12:8;20:11;21:3,22;
23:7,16;26:5,17;27:7,
17;28:22;29:14,22,23,
24;30:13,15,17,18,21;
31:3,4;34:7,12,18,20;
38:18;39:19;40:7,10,
43:11,17,22;44:10,14;
45:5,10,23,24;49:12,
14,23;50:1,19;51:2;
54:10,11,18;55:7,10,
15;56:14,17,18;58:2;
59:6;60:2;61:24;62:2;
66:23
**chief's (19)**
4:24;5:5,14;11;
15:20;16:20,21,23;
19:4,6;20:17;21:9;
25:13;28:17;31:13;
40:11;44:1,21;46:7;
51:19
**children (2)**
35:12;41:24
**choose (1)**
30:11
**chooses (1)**
38:24
**circumstances (2)**
42:23;43:15
**citation (1)**
14:21
**cite (4)**
11:7;34:2,15;35:19
**cited (9)**
4:5;11:13;15:3,5;
21:3;35:7;36:9;40:4,8
**cites (1)**
22:17
**cities (1)**
50:11
**citizens (4)**
48:4;50:15;53:21,
22
**City (19)**
2:12;3:20;6:1;8:21;
9:6;20:3,20,24;37:6;
41:4,16;42:13,20;
48:5;53:5,13,17;55:4;
65:18
**claimed (1)**
31:23
**clarification (2)**
13:9;25:21
**clear (5)**
10:13;30:16;43:24;

52:7;55:13
**clearly (5)**
10:8;12:24;30:12;
46:7;47:2
**client (1)**
56:18
**clip (2)**
31:14,15
**closed (14)**
15:19,23;16:15,17;
17:22,23;18:3,12;
59:21;60:4,6,20;
62:12,21
**closing (2)**
40:3;56:17
**Code (4)**
22:18;48:17,19;
50:3
**Collective (8)**
10:10;11:7,21;12:7,
13;13:18;14:15,17
**combined (1)**
65:15
**command (5)**
21:23;23:7;34:18,
20;38:9
**Commander (24)**
27:2,3;31:23;32:2,7,
23;44:14;45:4,8;
47:14,18;49:22;52:6,
20;54:10,11,17;55:8,
9;56:11,15,16,20;
57:18
**commander-in-chief (1)**
55:19
**commanding (2)**
35:18;39:7
**commands (2)**
38:24;58:23
**commendable (1)**
41:11
**comments (2)**
30:14;38:11
**commercial (1)**
8:5
**Commission (40)**
5:8;13:4;15:18;
17:21;19:1;20:1,11;
21:2,8;24:11,12,24;
25:3,10,12,15,16;26:6,
11;27:21;28:23;29:2;
31:9,20;32:2;33:2,13;
36:20;39:17;58:10;
59:21;60:19,24;61:7,
11;63:22,24;64:8;
66:17,21
**COMMISSIONER (66)**
4:22;16:18;17:5,7,
12,14,15,16,18,19,20;
18:14,16,18,19,20;
19:2,12,19,20,21;
35:4;60:3,5,7,10,12,
13,14,16,17,18;62:23;

63:1,5,6,7;64:3,9,11,
15,20,22,23,24;65:2,3,
4,6,11,19,21;66:1,6,8,
9,10,12,13,14;67:6,10,
13,14,15,19
**commissioners (7)**
3:5,24;4:12,20;
9:19;35:20;59:18
**commission's (4)**
19:9;60:22;64:2,6
**commit (1)**
8:14
**commits (1)**
54:7
**committed (1)**
3:11
**committing (1)**
56:18
**community (3)**
41:8,17;52:24
**compare (1)**
41:12
**compassion (1)**
53:10
**compassionate (1)**
53:11
**competent (1)**
53:1
**complain (1)**
53:8
**complainant (3)**
47:19;48:10;56:7
**complained (2)**
53:5;56:7
**complaint (5)**
3:11;23:16;57:17;
58:7;60:1
**complaints (1)**
23:11
**compliance (1)**
20:20
**complimentary (1)**
50:13
**comprised (1)**
38:7
**concerning (2)**
22:13;37:19
**concise (1)**
43:24
**conduct (4)**
6:7;41:6;48:12;59:4
**conference (1)**
18:1
**confidential (1)**
56:24
**confront (3)**
47:17,21;48:11
**confrontation (2)**
52:6,19
**confused (1)**
49:1
**congratulations (1)**
27:12

DEFENDANTS 001899

**consider (5)**
11:3;45:14;50:12;
58:21;61:9
**consideration (1)**
48:1
**considered (4)**
11:1;13:3;21:18;
25:16
**considering (2)**
10:16;43:15
**consistent (4)**
41:19;42:10;43:12;
51:1
**constitute (1)**
65:16
**constituted (1)**
6:7
**constitutes (1)**
3:6
**consuming (1)**
6:9
**consumption (1)**
37:5
**contained (5)**
5:15;6:15;22:19;
23:23;36:24
**contested (3)**
22:5,6,9
**continuance (1)**
33:15
**continuing (2)**
34:22;37:23
**contrary (1)**
12:14
**controlled (4)**
6:20;7:4;37:14;
38:15
**conversation (1)**
30:18
**copies (5)**
4:1;9:19;25:13;
26:10;66:23
**copy (4)**
3:24;9:8;30:3;66:21
**counsel (11)**
5:17;9:18;12:8;
13:19;15:21;32:5;
33:20;40:3,7;58:9;
61:14
**counselor (1)**
66:4
**Counsel's (1)**
35:14
**count (1)**
29:18
**counts (1)**
29:5
**couple (4)**
14:24;44:13;46:3;
63:13
**coupled (1)**
39:16
**courage (1)**

55:3
**course (4)**
5:22;26:2;50:2;52:9
**court (21)**
4:10;9:6;11:16,17;
12:3,6,18;13:9,16;
14:3;16:10;21:3;26:9;
33:23;34:10,16,16;
35:6,16,24;54:5
**Courtney (4)**
17:14;60:12;64:22;
66:8
**courts (2)**
55:22;57:3
**cover (1)**
12:12
**Crash (3)**
7:8,9,22
**creating (1)**
10:17
**credibility (1)**
32:11
**criminal (3)**
47:16;48:12;54:17
**crotch (1)**
32:4
**cry (1)**
39:9

**D**

**damage (2)**
7:14;8:6
**Dan (4)**
2:23;3:1;4:7;16:8
**date (2)**
7:11,22
**dated (3)**
7:8,20;27:3
**dates (2)**
29:11;36:15
**dating (1)**
6:4
**DAVIS (49)**
2:3,8;4:21;13:6,8,
14;16:16,19,22;17:2,
6,10,12,13;18:11,15,
17,21,23;19:11,13,22,
24;59:19;60:8,10,11;
62:20;63:2,8,10,17;
64:13,16,20,21;65:5,8,
24;66:2,6,7,16;67:1,4,
8,11,16,18
**Dawn (4)**
17:18;60:16;65:2;
66:12
**day (3)**
8:10;30:20;57:19
**days (7)**
10:4;22:4;54:14,16;
55:6;56:14;58:20
**dealing (1)**
41:2

**dealt (3)**
11:16;12:4,9
**December (1)**
67:19
**decide (2)**
28:24;54:11
**deciding (1)**
31:10
**decision (14)**
3:13;4:16;21:15;
40:5;41:18,19;42:9;
48:2;61:2,12,13;64:2;
66:19,20
**decorated (1)**
10:3
**defend (1)**
53:22
**defendant (2)**
56:6,8
**defending (1)**
46:2
**defined (1)**
33:13
**defines (1)**
33:9
**deliberate (6)**
4:14,15;15:19;
34:22;59:22;60:23
**deliberately (1)**
34:11
**deliberation (2)**
4:19;60:20
**deliberations (1)**
27:22
**demonstrate (1)**
32:6
**denied (5)**
22:15;29:22,23,24;
32:8
**denies (1)**
21:10
**deny (2)**
19:3;64:5
**Department (61)**
2:13;5:14,23,24;6:1,
12,19;8:16;9:16;10:9;
11:6,20,22;14:12,14;
20:4;22:3;24:8,17;
26:3;29:14;33:7,12;
34:7,17;35:8;36:7,23;
37:13;38:10,13,17,22,
23;39:9,21;41:10,16;
42:21;43:6,13;44:9,
11;46:14;47:7,14,15;
48:3,17,18;49:3,5,6,
11,16,21,24;50:3;
53:6,9;57:10
**departments (1)**
38:8
**department's (3)**
15:10;22:8;30:22
**deprived (1)**
64:9

**deputy (1)**
54:18
**Des (2)**
35:8,9
**desk (1)**
32:3
**destroyed (1)**
23:19
**destruction (2)**
12:15;21:5
**determination (2)**
3:10;63:23
**determine (2)**
23:12;40:16
**determined (1)**
29:3
**determines (1)**
23:3
**detrimental (4)**
33:15;43:5;44:7;
49:15
**development (1)**
23:14
**different (6)**
8:11;11:16,17;14:2;
30:23;50:21
**differently (1)**
10:21
**dignity (1)**
41:17
**direct (16)**
29:9,12,13;30:1,9,
22;33:21,24;34:12;
35:17,21;36:1,10,12,
14;45:1
**disagree (2)**
3:22;25:8
**disagreed (1)**
34:11
**disciplinary (12)**
12:16,20,22;14:7;
21:5,6,6;23:16;26:18;
47:23;59:9;63:12
**discipline (33)**
7:20;8:19;9:1,2,5,9,
12;10:8;11:1;12:9;
13:1,19;14:5,18;15:8;
23:4,11,13,24;24:6,
15;25:6;29:1;33:16;
36:24;39:19;42:11;
51:8;53:24;57:4;
58:24;59:13;65:16
**disciplined (4)**
10:23;42:14,19;
43:13
**disciplining (1)**
13:4
**discovery (3)**
5:18;9:2;27:16
**discredits (1)**
6:11
**discretion (2)**
53:10,19

**discrimination (1)**
58:18
**discrimination (7)**
57:6,9,17,18;58:1,2,
6
**discriminatory (1)**
11:24
**discuss (1)**
16:19
**discussion (2)**
15:15;63:15
**dismiss (1)**
52:15
**disobedience (1)**
34:22
**disobeying (2)**
34:12;36:10
**disposition (1)**
63:11
**dispute (1)**
12:6
**disregard (1)**
30:21
**disrepute (1)**
38:16
**distribute (1)**
25:13
**District (1)**
34:4
**document (2)**
24:23;52:8
**documents (9)**
4:2;23:21;25:2,17,
22,24;26:2,15,17
**done (6)**
23:8;38:13;43:16;
45:22;54:12;66:22
**Dr (4)**
17:12;60:10;64:20;
66:6
**driver (1)**
7:14
**drug (3)**
6:23;38:1,6
**due (2)**
59:4;64:9
**dunk (1)**
31:18
**duplicate (1)**
26:21
**During (11)**
23:9;29:21;30:2;
31:24;32:1;36:19;
38:4;40:3;45:9;56:23;
58:15
**duties (2)**
29:16;48:4
**duty (7)**
6:6;37:5;41:21,22;
45:3;59:3,4

**E**

**early (3)**
  5:17;7:11;8:3
**easiest (1)**
  16:1
**economies (1)**
  42:1
**effect (2)**
  20:18;49:21
**effects (1)**
  44:10
**efficiency (6)**
  33:16;43:5;44:8,11;
  49:4,5
**efficient (1)**
  49:11
**egregious (1)**
  50:24
**eight (1)**
  54:3
**either (1)**
  27:21
**else (3)**
  10:22;26:12;48:14
**e-mail (8)**
  5:2;26:23;27:1,1,11,
  15;61:5,15
**e-mails (1)**
  14:10
**embarrassment (1)**
  55:5
**employed (1)**
  45:18
**employee (7)**
  21:20;22:4;33:11;
  41:3;54:4,6,15
**employees (1)**
  48:20
**employee's (4)**
  21:22;22:7,9;23:10
**Employer (3)**
  54:5,6;56:2
**employment (4)**
  33:15;34:13;54:8;
  65:13
**Enforcement (1)**
  38:6
**engaged (1)**
  30:17
**engaging (1)**
  30:14
**enough (11)**
  24:8;33:6;36:22;
  44:15,22,23;45:12;
  51:6,24;52:3,18
**entering (1)**
  11:14
**entertain (4)**
  3:8;15:18;25:12;
  67:4
**entire (5)**
  19:15;35:1;51:19;
  52:9,19
**entirely (1)**

  61:6
**entitled (1)**
  24:2
**era (1)**
  42:5
**especially (3)**
  34:23;42:5,7
**essentially (3)**
  41:5;45:11;56:14
**establish (1)**
  34:19
**evaluation (1)**
  23:11
**evaluations (1)**
  23:22
**even (5)**
  20:6;44:20;46:2,7;
  55:14
**evening (1)**
  2:10
**Evergreen (2)**
  7:13;8:12
**everybody (2)**
  2:19;62:7
**evidence (33)**
  5:20,20;9:14;10:14,
  14,15;11:10,14;13:3;
  28:7;32:18;36:3,21;
  37:19;38:13;44:12,21,
  24;45:6,8;46:6;49:20;
  53:14;54:21,22;55:15;
  56:19;57:22,22,23;
  59:2,7;61:9
**exactly (2)**
  15:24;49:6
**example (1)**
  10:21
**examples (1)**
  42:13
**excellent (1)**
  48:20
**exception (1)**
  5:21
**exchanging (1)**
  30:14
**exercise (1)**
  53:19
**exercises (1)**
  53:9
**Exhibit (10)**
  15:21;19:6;20:14,
  17;25:15;26:7,24;
  27:9;48:18;59:14
**exhibits (15)**
  5:1,3,6;9:13,19,24;
  14:11;16:21,23;19:4;
  20:10;21:9;25:14;
  27:6;41:8
**experience (1)**
  34:24
**explain (7)**
  19:9;36:17,18;47:6;
  49:2,3,9

**explained (1)**
  32:5
**explaining (1)**
  21:22
**explanation (1)**
  22:5
**extent (1)**
  6:10
**eyes (1)**
  55:8

**F**

**face (1)**
  32:4
**facing (1)**
  30:13
**fact (6)**
  3:10;10:24;22:23;
  24:16;46:12;52:17
**factors (1)**
  50:18
**facts (5)**
  36:22;37:21;44:17,
  18;51:16
**factual (1)**
  3:22
**fail (1)**
  29:16
**failed (7)**
  29:8,12,13;35:17,
  21;52:10;59:7
**failing (1)**
  33:24
**fails (1)**
  38:22
**failure (3)**
  36:1,13;39:4
**fair (2)**
  59:4;64:7
**fairly (1)**
  59:5
**false (2)**
  29:19;30:5
**familiar (1)**
  35:14
**far (6)**
  5:11;12:3;13:4;
  20:14;32:18;56:16
**fashion (1)**
  11:4
**fast (6)**
  44:15,22,23;45:12;
  51:24;52:3
**fate (1)**
  31:10
**favor (7)**
  16:24;18:17;19:17;
  60:9;63:3;64:17;
  67:12
**FBI (1)**
  47:18
**feathers (1)**

  44:13
**feed (1)**
  16:3
**felt (1)**
  58:12
**few (2)**
  16:11;58:20
**fight (1)**
  47:9
**file (19)**
  5:16,24;6:16;8:22;
  13:20;14:6,19;15:8;
  20:21;21:1,21,21;
  22:7,10,12,13,14;
  26:8;37:1
**filed (5)**
  3:12;5:1;57:8;60:1;
  63:24
**files (7)**
  12:16,20;21:5,6;
  22:21,22;44:2
**filing (1)**
  8:9
**filled (1)**
  7:22
**Final (1)**
  23:15
**finally (4)**
  24:1;26:20;27:23;
  51:2
**find (1)**
  15:2
**finding (4)**
  3:22;60:23;64:6;
  65:14
**findings (4)**
  59:24;61:13;66:19,
  19
**finds (1)**
  21:2
**fine (7)**
  4:21,22;28:11,12;
  61:11,17,21
**finished (1)**
  16:5
**fire (5)**
  10:2,5;35:3;56:9;
  58:23
**fired (2)**
  49:16;56:6
**fires (1)**
  54:5
**firmly (1)**
  45:21
**first (11)**
  2:2;4:15;26:14;
  34:2,4;41:23;45:3,4,7;
  51:23;63:24
**five (2)**
  13:21;22:19
**five-year (2)**
  8:20;37:20
**fixed (1)**

  12:16
**Flagrant (1)**
  34:22
**fled (1)**
  7:14
**flood (2)**
  35:9,13
**floor (2)**
  19:14;66:2
**Flores (4)**
  17:16;60:14;64:24;
  66:10
**follow (19)**
  24:5;29:9,12,13;
  33:24;35:17,21;36:1,
  14;38:22;39:1,2,4;
  44:22,23;52:10;55:21;
  61:13;66:18
**followed (1)**
  11:15
**following (6)**
  18:8;19:3;22:20;
  62:17;64:4;65:12
**foot (1)**
  32:3
**forbid (1)**
  48:15
**Ford (1)**
  7:16
**foremost (1)**
  41:23
**forget (1)**
  29:3
**formal (8)**
  29:20,21;30:2;31:7,
  18,24;36:16;39:16
**forward (2)**
  13:3;65:22
**found (12)**
  9:8;20:1;25:4;29:4,
  7;33:5,23;34:3,11;
  35:5;36:4;40:17
**foundation (1)**
  26:16
**foundational (1)**
  26:19
**Four (7)**
  3:5;5:1;9:13;15:2;
  51:8;65:6;66:15
**fourth (1)**
  5:19
**FRANK (1)**
  62:2
**Fraternal (1)**
  9:7
**front (3)**
  12:11;39:2,3
**front-end (1)**
  7:14

**G**

**gave (2)**

4:3;30:5
**general (3)**
24:15;39:3,4
**generated (1)**
5:22
**gentlemen (3)**
40:1;45:14;59:11
**gets (1)**
10:23
**given (3)**
29:9;36:3,17
**god (1)**
48:15
**goes (6)**
22:2;31:2;33:20;
43:20;47:18;51:14
**Good (7)**
2:10;38:12;43:8,16;
49:17;61:8;67:1
**governing (1)**
11:4
**grant (1)**
19:5
**granted (1)**
4:17
**grants (1)**
21:9
**Great (2)**
16:13;51:7
**greater (1)**
43:20
**groceries (2)**
46:22;47:1
**grocery (1)**
46:20
**grounds (1)**
34:13
**Group (1)**
26:7
**guard (2)**
46:21;47:4
**guess (3)**
5:4;47:12;52:23
**guilty (4)**
29:4;33:5;40:18,20
**guy (1)**
44:5
**guys (2)**
16:3;28:13

**H**

**half (2)**
26:23;46:24
**hammer (1)**
53:22
**hand (1)**
53:18
**hands (2)**
30:14;31:4
**handwritten (1)**
27:11
**happen (3)**

33:2;39:13;56:21
**happened (2)**
49:9;56:22
**happening (2)**
32:8,9
**harassment (1)**
31:23;56:7,19
**harm (1)**
49:21
**head (2)**
30:21;58:19
**hear (4)**
2:2,4;13:10;62:3
**heard (16)**
21:13;32:22;33:1;
36:3,12;38:4,11,13,18,
19;44:12;46:6;48:17;
49:20;58:10;59:2
**hearing (17)**
2:11;5:17;9:3;12:5;
18:3,7;23:1;29:24;
30:5;33:9;36:19;38:4;
59:4;62:12,16;63:12;
64:7
**hearings (2)**
12:23;21:7
**hearsay (1)**
5:21
**held (3)**
18:9;58:19;62:13
**HERBERT (49)**
2:24;3:1,12,15,17;
4:2,6,7;5:2,6;8:24;9:3,
21,23;10:1;13:22;
14:2,9,23;15:12;
16:13;21:12,15;25:8;
26:6,14;27:10,14,23;
28:4,18,22;32:17;
37:17;39:23,24;54:23;
55:2;57:13,15,23;
58:4,11;59:12,16;
61:3,17,23;62:9
**H-e-r-b-e-r-t (1)**
3:2
**Herbert's (2)**
4:13,16
**here's (1)**
42:2
**hesitant (1)**
28:6
**hesitation (1)**
58:22
**Hickory (1)**
8:6
**high (1)**
34:23
**himself (3)**
36:17,18;37:10
**history (2)**
10:4;50:13
**hit (2)**
7:9,21
**hit-and-run (1)**

8:11
**Hold (3)**
47:5;48:24;59:6
**home (9)**
7:17;45:20;46:9,14;
55:12,12;56:15;58:12,
15
**homeless (3)**
52:11,21;53:2
**honestly (1)**
10:16
**honor (1)**
41:17
**honorable (1)**
40:9
**honored (1)**
41:3
**hope (1)**
50:11
**horrible (1)**
48:6
**hour (3)**
26:23;31:1;46:24
**hours (2)**
7:11;8:4
**huge (1)**
42:8
**human (1)**
6:1
**hundreds (1)**
41:13

**I**

**idea (1)**
61:7
**identify (2)**
2:20;4:9
**IL (1)**
9:9
**ILCS (2)**
22:1,11
**Ill2d (1)**
35:5
**IllApp3d (1)**
34:4
**illegal (1)**
38:15
**illegally (1)**
50:19
**Illinois (17)**
7:8,21;9:5;11:8;
12:3,18;14:3;21:24;
22:11,17;24:9;33:22,
22;34:10;35:3,6,16
**immediate (1)**
3:14
**important (5)**
40:15,24;44:16;
51:13;56:10
**importantly (2)**
15:9;29:20
**improper (1)**

58:12
**incident (3)**
50:17;55:7;57:19
**incidents (1)**
65:16
**included (1)**
6:8
**including (3)**
9:2;14:7;50:14
**indicated (1)**
40:6
**indicates (2)**
7:12;8:2
**indiscretion (1)**
54:7
**individual (6)**
41:23;42:2,16;
54:15;55:2;64:8
**individuals (3)**
42:13,19;59:5
**influence (1)**
8:7
**inform (3)**
36:10;40:6;61:14
**information (3)**
7:15;12:13,21
**informed (1)**
52:14
**infraction (1)**
45:7
**infractions (1)**
40:17
**instances (1)**
36:21
**insubordinate (4)**
29:10,15;36:13;
39:2
**insubordination (20)**
42:14,20,24;44:20;
45:11;51:15,19,20,22,
24;52:1,5;55:24;56:1,
4,6,8;57:4;58:24;
65:15
**insufficient (1)**
59:1
**integrity (1)**
38:12
**intent (1)**
24:24
**intention (1)**
60:22
**interaction (1)**
45:9
**interpretation (2)**
10:6;25:9
**interrogation (12)**
29:20,21;30:3;31:7,
19,24;36:16;39:16;
52:8,9,13;56:24
**interrupt (1)**
37:17
**into (18)**
5:20;6:4;8:4;9:14;

10:15;13:3;15:23;
16:2,6,9,15,16;17:23;
18:12;42:6;48:1;
60:19;62:21
**intoxicating (1)**
6:9
**intoxication (1)**
6:10
**introduction (1)**
37:19
**involved (4)**
6:5;14:8;37:3,5
**irony (1)**
54:14
**issue (6)**
12:12;13:17,24;
14:2;15:20;16:6
**issues (1)**
63:23
**item (5)**
21:20;22:3,6,9;
24:18
**items (2)**
22:5,18

**J**

**J-a-l-i-l (1)**
56:5
**January (1)**
6:14
**job (9)**
29:17;31:20;34:6,8;
40:15,16,24;41:2;42:2
**jobs (2)**
42:6;45:19
**John (4)**
14:24;15:12;26:22;
28:4
**judged (1)**
32:11
**judicial (1)**
27:6
**July (6)**
29:8,11;30:8;31:13;
39:15,15
**justification (1)**
11:9
**justifies (1)**
36:5
**justify (2)**
33:6;36:22

**K**

**KAMEG (3)**
7:3;38:5,14
**Kankakee (35)**
2:12;6:2;8:15;9:15;
11:5,15,21;14:12,13;
20:3;24:4,7;33:7;
36:6;37:7;38:7,9,17;
39:20;41:4,10;42:14,

DEFENDANTS 001902

20;43:6;44:8,11;48:5;
49:15;50:11;53:6,13,
17;55:5;57:9;65:18
**keep (1)**
13:1
**KELLY (65)**
2:1,5,7,10,18;3:4,
18,24;4:7,23;5:7;8:23;
9:18;10:19;12:1;13:7,
13,15;14:9;15:5,14,
17;16:14,20;17:1,21;
19:1;20:1;21:12,14;
24:11;25:10,19,24;
26:6;27:10,18;28:3,9,
16,21;36:10;37:22;
39:23,24;40:6,8;55:1;
57:14;58:8;59:11,17,
20;60:19;61:3,6,23,
24;62:5,9,10;63:14,
21;65:10;66:17
**kept (3)**
5:23;12:21;26:2
**Kidwell (2)**
27:2,3
**Klopp (1)**
32:10
**knew (1)**
9:20
**known (2)**
19:18;63:3
**knows (4)**
10:19;11:15;51:3;
56:22
**Koerner (1)**
42:17
**K-o-e-r-n-e-r (1)**
42:17
**Kosman (15)**
2:16,17,22;28:22;
29:22,23;30:1,13,15,
17;38:18;39:19;
49:23;60:2;62:2
**Krecek (1)**
35:19
**K-r-e-c-e-k (1)**
35:20

## L

**labeled (1)**
30:24
**ladies (2)**
40:1;45:13
**laid (1)**
26:16
**Landwehr (14)**
17:18,19;18:16,19;
19:20;60:16,17;63:1,
6;65:2,3;66:12,13;
67:15
**language (4)**
15:7;20:16;25:4;
34:15

**last (13)**
7:19;8:17,18,19,24;
9:4;20:14,15,16;
21:11;26:23;51:10;
58:20
**later (4)**
4:14;8:10;55:7;
56:14
**Launius (2)**
35:3,4
**L-a-u-n-i-u-s (1)**
35:5
**law (8)**
12:6;24:5;33:17,21;
36:8,9;40:4;55:21
**lawful (1)**
41:19
**lawyer (1)**
40:9
**leadership (1)**
34:20
**leading (1)**
34:18
**learning (1)**
9:4
**least (1)**
58:11
**leave (10)**
16:2,3;28:12;45:2,3,
15;46:2;47:1;49:23;
52:17
**leaving (1)**
55:18
**left (4)**
8:8;35:11;45:7,9
**legal (2)**
3:23;12:6
**legally (2)**
56:23;59:1
**length (1)**
14:18
**lengths (1)**
51:7
**letter (2)**
27:12;59:13
**letters (1)**
50:15
**liable (1)**
56:22
**lie (2)**
36:19;39:18
**lied (10)**
31:12,18,19,22;
33:2;36:15,18,20;
56:18,20
**link (1)**
62:5
**little (1)**
7:1
**local (3)**
12:10,15;37:6
**long (2)**
15:7;61:7

**longer (5)**
23:18;33:18;49:22,
22;65:17
**look (25)**
12:11;16:9,12;23:1;
24:12;30:23;31:1;
33:8,8;43:9,9,10,12,
12,14;44:1,20;50:19;
52:4,7,8;54:13;55:21,
23;56:3
**looking (2)**
27:10;41:11,24;
50:10
**looks (2)**
27:11;31:3
**lot (1)**
61:9

## M

**M&B (1)**
54:3
**maintain (2)**
34:19;35:10
**maintained (2)**
5:23;12:22
**maintaining (1)**
35:11
**major (1)**
8:15
**man (3)**
41:15,24;53:24
**Manteno (1)**
7:18
**Manual (1)**
24:2
**many (1)**
42:6
**March (1)**
7:6
**Mario (4)**
17:16;60:14;64:24;
66:10
**Marked (2)**
6:3;59:14
**married (1)**
41:24
**Martin (1)**
34:3
**matter (13)**
3:9;7:2;9:6,10;
10:11,11,24;14:4;
26:19;29:1,4;44:19;
51:16
**Matters (6)**
5:14,15;11:17;14:4;
23:18;26:18
**Matthys (1)**
34:3
**M-a-t-t-h-y-s (1)**
34:3
**may (3)**
23:18;24:17;26:20

**maybe (1)**
14:20
**mayor (1)**
54:18
**MCGRATH (36)**
2:16,17,21;3:19,21;
5:5,7;11:13;12:1,2;
13:13,14,15,17,24;
14:3;25:19,21;26:4;
27:7;28:14,16,20,21;
32:22;37:24;40:1,9;
43:3;54:19;57:11,21;
58:3,5;62:1,4
**mean (4)**
44:3,4;50:4,5
**means (1)**
52:24
**meant (1)**
44:12
**meet (1)**
59:7
**meeting (4)**
67:5,7,19,21
**member (1)**
25:14
**members (4)**
25:18;28:22;57:24
**mentioned (4)**
13:10;14:11,13,15
**message (5)**
48:6,7,8;49:17,17
**Michael (2)**
2:17,21
**might (2)**
15:12;26:12
**Mike (2)**
26:22;37:17
**military (1)**
50:6
**mind (1)**
10:16
**minimum (1)**
22:19
**minute (5)**
46:17,18;47:3,3;
49:7
**minutes (12)**
14:24;15:2;16:11;
31:1,15,16;41:5,12,13,
14;46:3;51:5
**misconduct (9)**
10:3;47:15,16;
48:22,23;49:18,18;
51:5;55:13
**missed (1)**
14:20
**misstates (4)**
32:18;54:21,22;
57:21
**misunderstanding (2)**
46:19;47:5
**mitigation (3)**
16:7;28:1,19

**model (1)**
54:15
**months (1)**
50:17
**monument (1)**
30:13
**moot (1)**
11:24
**more (8)**
10:20;15:9;24:15;
30:7,12,18;37:11;65:9
**moreover (3)**
26:17;49:12,12
**morning (2)**
7:11;8:4
**most (1)**
50:10
**motion (51)**
3:12,16,17,18;4:1,5,
13,16;15:19;16:14,16;
17:9;18:11;19:3,5,8,
14,16,17,24;21:9;
25:11;54:24;57:13;
59:21;60:4,5,8;62:20,
23;63:2,10,24;64:4,5,
5,11,14,15,16;65:5,9,
13,19,21;66:2,3,16;
67:4,6,8
**motions (2)**
27:24;52:15
**move (7)**
4:24;16:6,10;17:23;
19:3;57:14;65:22
**moved (4)**
17:21;18:14;19:11;
60:19
**moving (1)**
16:9
**much (3)**
44:3,4;59:16
**multiple (5)**
29:9,10,15;36:14,16
**must (6)**
34:20;42:9,9;43:7;
46:18;49:1
**Mustang (1)**
7:16
**muted (1)**
2:23
**myself (2)**
49:2,10

## N

**named (1)**
42:16
**nays (4)**
65:6,7,8;66:15
**near (1)**
31:12
**necessary (1)**
33:10
**need (1)**

17:2
**neither (1)**
64:8
**next (2)**
23:9;67:19
**Nick (2)**
60:18;66:14
**Nickey (2)**
17:20;65:4
**NLRB (1)**
54:3
**Nobody (1)**
55:8
**nonadmission (1)**
19:4
**nonarbitrary (1)**
42:10
**none (1)**
9:18
**non-prescribed (1)**
37:14
**nor (1)**
64:8
**north (1)**
31:15
**northeast (1)**
30:24
**Nos (4)**
15:21;19:5;20:11;
21:10
**note (1)**
8:17
**noted (1)**
8:23
**notice (1)**
27:6
**November (3)**
5:9,10;6:4
**nullify (4)**
3:12;4:16;64:1,6
**number (2)**
40:21;51:17

**O**

**oath (7)**
29:20;30:7;32:11;
33:3;36:15,18;39:5
**obedience (1)**
34:21
**object (5)**
3:21;26:14;37:18;
54:19,20
**objecting (1)**
57:5
**objection (8)**
5:2;9:24;27:8;
37:23;57:11,21;58:3,5
**objections (1)**
9:21
**obnoxious (1)**
6:11
**obtained (1)**

23:7
**obviously (3)**
25:8;27:18;61:8
**occasion (5)**
30:19;36:11;45:3,4,
10
**occasions (3)**
29:11,15;39:6
**occupy (1)**
33:19
**occur (1)**
48:10
**occurred (1)**
55:24
**off (13)**
6:6,13;7:5;15:1,14,
15;17:24;30:18;37:5,
9;38:3;63:14,15
**offensive (1)**
6:11
**office (6)**
32:23;45:2,7;52:17;
53:20;56:13
**officer (28)**
6:6,7;10:3;32:24;
33:18,24;34:5,7,9,11,
23;35:10,11,15,17,18,
21,22;36:11;37:4,9;
38:22;39:7;42:3,5;
50:22;53:11;65:22
**officers (7)**
24:4;32:15;34:21;
38:7;39:3;50:20,24
**officer's (3)**
14:19;15:8;36:1
**old (1)**
44:2
**once (4)**
16:5;30:7,11;66:22
**One (12)**
7:14;10:17,20;
30:19;31:1;40:2;42:1;
52:5;53:17;55:6;65:9;
67:18
**ones (2)**
39:1;40:7
**ongoing (1)**
38:1
**only (7)**
4:3;20:5;24:7,19;
25:6;48:2;59:7
**open (8)**
17:22;18:9,12;19:1;
61:1,12;62:6,18
**operation (2)**
38:19,23
**opinion (4)**
12:12;23:15;33:17;
43:7
**opportunity (3)**
30:6;31:8;36:17
**Opposed (5)**
18:21;19:22;63:8;

67:16,18
**oral (4)**
20:5,8;24:19;25:6
**order (14)**
3:13;9:7;34:1,9,10,
12,19;35:17,22,23;
36:2,11;52:10;67:2
**ordered (2)**
6:23;35:10
**orders (11)**
29:9,12,14;30:1,22;
36:13,14;38:24;39:5;
45:1;47:11
**organization (5)**
34:17;35:1;50:4,7,7
**out (20)**
7:1,23;12:4;13:1;
17:22;18:12;21:17;
27:19;29:24;30:14;
31:4,12;32:24;39:9;
40:2;45:20;46:22;
51:11;57:24;62:20
**outlandish (1)**
39:6
**outright (1)**
39:18
**outside (4)**
18:3;37:20;38:9;
62:12
**over (12)**
5:11,16;6:23;8:6,
20;9:13;25:22;33:20;
41:4,13;58:19;63:19
**owe (3)**
48:2,3,4
**own (1)**
51:11

**P**

**page (1)**
12:12
**pages (1)**
26:8
**papers (1)**
58:2
**paragraph (2)**
20:16;23:15
**paramilitary (5)**
34:17;38:19,23;
50:4,7
**Pardon (1)**
17:6
**parked (1)**
7:12
**part (9)**
4:13;5:17;27:20,22;
47:23;53:14,14;58:21,
22
**participate (1)**
8:14
**particular (1)**
53:8

**Particulars (1)**
52:15
**parties (5)**
11:16;18:6,9;62:15,
18
**past (2)**
42:19;43:13
**patrolman (2)**
48:15,15
**Paul (40)**
2:12;3:2;5:13;10:5,
11;41:8,22;43:16;
44:5,14,19;45:1,6,9,
15;46:8;47:24;48:2,9,
14;49:6,14,21;50:14;
52:6,10;53:1,13;55:3,
14,16,17;56:11,13;
57:8,17;58:11,22;
61:18;65:14
**pay (1)**
53:4
**penalty (9)**
2:11;3:9;40:16;
42:22;43:2,3;59:23;
60:24;65:10
**pending (1)**
63:23
**people (10)**
2:1,4;31:9;47:20;
49:3;50:8,8;52:11,21;
53:2
**perform (1)**
29:16
**performance (1)**
23:10
**performed (1)**
29:16
**perhaps (2)**
11:24;55:4
**period (13)**
6:24;8:20;12:16;
13:21;23:5,17;37:20;
38:2;41:6,14;43:11;
54:14;58:15
**periods (2)**
30:10;58:16
**person (2)**
6:12;46:5
**personal (3)**
7:10,17;8:4
**personnel (14)**
5:16;24:6:16;8:21;
11:8;13:20;14:6;
20:21,24;21:21;22:10;
25:1;26:8;37:1
**pertained (1)**
12:7
**phase (1)**
2:11
**physical (4)**
6:5;28:7;37:3,8
**picture (1)**
43:15

**piece (2)**
51:9;55:14
**place (6)**
31:12;32:6;39:11;
43:22;52:5;57:19
**plain (1)**
20:16
**Plaines (2)**
35:8,9
**plaintiff (3)**
34:5;56:6,9
**players (1)**
47:21
**please (5)**
2:14;4:9;49:9;59:3;
60:3
**pleasure (1)**
28:10
**pm (2)**
17:23;18:23
**point (12)**
21:17;22:16;30:17;
43:21;44:16;46:11;
53:16;54:6;56:10;
59:20;63:18;67:5
**Police (64)**
2:12;5:14,22,24;
6:19;7:23;8:9,9,15;
9:7,15;10:3,9;11:6,22;
14:12,14;20:4;21:23;
23:8,16;24:7;26:2;
29:14;33:7,11;34:6,
12,17,19,20;35:3,8,20;
36:6,23;38:8,9,17,23;
39:20;41:10;42:3,5,
21;43:6,13;44:9,11;
46:14;47:7,13,14;
48:3,16;49:15;50:3,
20,22;53:6,9,11;57:9;
65:17
**policies (10)**
11:20,23;20:3;
39:10,12;43:21,23;
44:3;52:22;53:12
**policy (24)**
6:19;9:10;11:6,11;
12:17,19,20;14:4,12,
14;20:23;21:16,18;
22:16;23:3;24:1,2,8,
12,13,13,14,19;25:6
**politician (1)**
53:7
**portions (1)**
4:4
**position (3)**
21:22;33:19;43:23
**positive (1)**
37:13
**possessing (1)**
37:14
**possession (2)**
6:20;38:15
**possible (1)**

41:3
post (3)
35:10,11,12
postpone (1)
4:18
precedence (1)
25:5
preparation (1)
23:10
prepare (1)
66:19
prepared (1)
5:21
prescription (3)
6:22;7:5;37:16
present (6)
3:6;5:11;18:10;
26:17;40:12;62:19
presentation (1)
16:6
presentations (1)
3:8
presented (3)
27:16;43:17;66:3
presume (1)
10:19
printed (1)
27:19
prior (11)
5:17;9:3;23:4,23;
27:24,24;39:18;42:10;
51:8;64:2;65:16
probably (4)
16:1;26:23;48:13;
54:3
procedure (1)
6:19
procedures (4)
39:10,12;43:21,23
Proceed (1)
55:1
proceeded (1)
30:19
proceeding (2)
9:11;11:18
proceedings (8)
14:7,8;18:2,7,8;
62:11,16,17
process (4)
47:24;59:5,20;
64:10
proffer (1)
14:11
progressive (1)
23:13
promote (3)
48:9,16;49:2
promoted (1)
49:6
promoting (1)
49:4
proper (3)
17:7;33:10;52:23

properly (1)
52:13
property (1)
5:20
proposed (2)
5:1,11
proposition (1)
9:9
prove (5)
40:12;49:13,13,14;
55:20
proved (1)
44:10
proven (3)
36:19;48:22,23
provide (2)
22:4;59:4
provided (3)
9:8;53:13;64:7
providing (1)
29:18
provision (1)
13:18
provisions (6)
12:7,9,14;20:2,18,
23
Provocation (3)
55:9,10,11
provoked (3)
54:10;55:2;56:1
public (12)
9:10;12:17,19,19;
14:4;18:4;33:16,17;
38:16;39:3;43:7;
62:13
purged (3)
14:5;22:23,24
purging (1)
22:21
purports (1)
7:9
purpose (1)
3:7
purposes (1)
60:20
pursuant (2)
21:24;23:19
put (2)
32:3;36:23
puts (1)
31:4
putting (1)
30:13

Q

quick (1)
52:18
quite (6)
10:16;13:11;41:10;
50:23,24;55:5
quorum (1)
3:6

R

raise (1)
27:24
raised (1)
52:14
raises (1)
55:8
raising (1)
13:19
rally (2)
29:23;30:8
ramifications (1)
42:8
random (2)
6:23;38:1
rank (2)
34:23;48:16
rather (2)
35:11;36:18
rational (3)
45:22;46:1;48:7
rationale (1)
58:13
reached (1)
63:22
reacted (1)
56:12
read (5)
22:2;24:12,23;
27:21;64:16
reads (2)
24:24;27:21
realize (1)
52:16
realized (1)
52:12
really (1)
21:3
reason (7)
19:10;21:18;22:24;
24:14;41:1;49:17;
58:20
reasonable (10)
41:20;42:9,10;
45:17;46:5,16;48:6,
24;58:13,17
reasons (7)
21:8;25:3;40:21;
45:16;46:8;48:13;
58:13
recall (2)
7:2;31:24
received (7)
5:12;6:22;26:10;
37:7,12;42:15,15
recent (1)
9:5
recently (1)
37:11
recognize (5)
42:4;43:7;53:19,21;

54:13
recognized (2)
35:7;55:22
recognizes (3)
33:18;41:21;47:15
recommendation (1)
4:12
record (26)
2:15;3:1;12:10;
15:14,16;17:24;25:1,
23;26:1;27:20;32:17;
37:18,22;41:8;42:16;
51:12;54:21;57:12,12,
16;58:6,10;59:15;
63:14,16;66:17
records (10)
9:15;11:8;12:15,21;
23:4,18,22;42:15,18;
54:23
re-entered (2)
18:7;62:16
referenced (1)
14:13
referred (1)
24:17
refrain (1)
6:9
regarding (1)
10:13
registered (1)
7:16
regular (3)
5:22;62:21,24
regulate (1)
15:7
regulations (3)
10:6,9;20:3
reinstatement (1)
3:14
relating (1)
6:20
relative (3)
3:8;28:17;60:1
relevancy (1)
23:12
relevant (5)
15:4;23:18;24:3;
46:11
rely (1)
54:7
remain (1)
14:18
remains (1)
15:8
remarks (1)
39:6
remember (2)
4:9;57:23
removal (3)
20:4;21:20;59:13
remove (7)
8:21;20:20,24;22:3,
14;24:17;25:6

removed (8)
7:3;13:20;14:5;
22:6,7;25:7;38:5,14
render (1)
11:22
rendered (1)
33:14
rendering (1)
48:1
repeat (3)
13:15;19:15;51:23
Report (7)
7:8,9,12,15,22;8:9,
10
reported (2)
39:8,12
reporter (2)
4:10;16:10
reporting (1)
54:17
represent (2)
27:15;50:16
representative (1)
7:24
reprimand (1)
20:6
reprimands (3)
20:9;24:19;25:7
request (11)
5:18;19:4;20:7,7;
21:21;22:7,13,15;
24:22;25:5;42:18
requested (2)
34:6;52:2
requesting (1)
59:13
require (1)
55:17
required (5)
24:4;43:24;49:12,
13,14
requires (1)
12:15
residents (2)
48:5;50:16
resolution (1)
23:19
resource (1)
6:1
respect (4)
11:12;34:21;44:2;
58:9
respectfully (1)
25:9
respectively (1)
54:11
respond (1)
5:6
responded (2)
5:2;27:7
respondent (2)
13:1;40:11
Respondent's (1)

26:7
**responding (1)**
14:10
**response (18)**
2:6;3:19;12:1;
17:17;18:22;19:23;
22:8;24:11;45:23,23,
24;46:1;60:15;63:9;
65:1;66:11;67:3,17
**responsibilities (1)**
53:20
**responsibility (3)**
40:11;41:18,21
**responsive (1)**
42:18
**rest (5)**
3:17,18;24:10;26:5;
28:6
**result (2)**
43:4;56:2
**resulted (1)**
7:3
**results (1)**
6:10
**retained (2)**
22:8;23:4
**retention (2)**
23:6,17
**return (3)**
61:1;62:23;63:2
**review (5)**
30:4,7,11;31:8;32:1
**reviewed (1)**
23:12
**reviewing (1)**
31:17
**revoke (1)**
54:6
**ridiculous (1)**
31:6
**right (13)**
4:5,19;12:5;17:2;
28:15;31:3;32:13,18,
19;33:1;46:9;50:9;
55:18
**rightful (1)**
39:19
**rights (3)**
53:20,21;64:10
**ring (1)**
46:21
**River (1)**
35:9
**rock (2)**
30:13;31:3
**role (2)**
34:20;40:9
**Roll (9)**
17:1,2,4,11;32:14;
60:9;64:18,19;66:5
**room (4)**
16:2,9;18:1;32:14
**rubber (1)**

53:7
**ruffled (1)**
44:13
**rule (3)**
5:21;11:5;33:9
**ruled (4)**
12:18;14:3;40:14;
44:18
**rules (9)**
10:6,9,18;20:2;
37:13;39:4;44:22;
51:11;54:5
**ruling (3)**
13:9;16:20;25:11
**run (3)**
7:10,21;38:8

**S**

**safely (1)**
5:23
**same (5)**
8:10;31:14;48:13;
56:15,24
**saved (1)**
55:4
**saw (3)**
30:17;32:12,12
**saying (4)**
10:8;13:12;19:18;
63:4
**scared (1)**
47:17
**scene (3)**
8:8;29:22;45:9
**seal (2)**
18:5;62:14
**second (25)**
16:18;17:5,8,8,9,10;
18:15,16;19:8,12,13;
24:21;45:4,5,10;49:1;
60:7,8;63:1;64:13;
65:24;66:1;67:9,10,11
**secondary (3)**
34:6,8,13
**seconds (4)**
31:2,15,16;55:18
**section (8)**
15:6;20:2;22:20;
23:3,9;24:16;25:4;
33:9
**security (2)**
46:21;47:4
**seeing (2)**
29:22,23
**seeking (2)**
21:20;38:20
**send (5)**
26:9;48:5,6,8;49:17
**sense (2)**
46:4,5
**sent (5)**
5:10;26:20,22,22;

46:9
**separate (5)**
10:4;18:5;36:15;
39:6;62:14
**September (1)**
27:4
**Sergeant (52)**
2:12;3:10;5:13;6:5,
13,18;7:3,6,10,17,24;
8:1,2;11:23;13:4;
19:3;20:6;24:21;25:5;
26:8;27:2;28:19;29:4,
8,21;30:12,16;31:18;
32:9,10;33:6;36:4;
37:3,10,11;38:3,5,12,
14,21;39:15;56:12;
57:1;59:24;61:21;
64:1,7,9;65:14,17,23;
66:24
**sergeants (1)**
58:14
**sergeant's (2)**
32:14;36:24
**serious (2)**
42:8;43:2
**seriously (1)**
41:2
**serve (3)**
52:24;65:17;66:23
**served (6)**
6:14;8:13;41:15,16,
16,16
**service (3)**
33:16;43:5;44:8
**session (22)**
15:19,23;16:17;
17:22,22,23;18:3,9,12,
13;19:2;59:22;60:4,6,
20;61:1,12;62:12,18,
21,21,24
**several (1)**
26:9
**sexual (4)**
31:22;56:19;57:18;
58:6
**shall (5)**
21:21;22:3,8,18;
23:6
**shape (1)**
11:4
**shocked (1)**
32:8
**shoes (1)**
48:14
**shopping (1)**
46:24
**shortcoming (4)**
33:14;43:4;44:7,10
**showing (1)**
24:6
**shows (2)**
30:12;31:2
**side (1)**

8:5
**sides (1)**
3:8
**side's (1)**
16:6
**signature (1)**
66:22
**signed (5)**
6:13;7:5,23;37:9;
38:3
**significant (1)**
50:13
**silence (2)**
48:18,19
**similar (3)**
35:2;55:9,10
**Similarly (1)**
29:11
**single (2)**
12:12;36:11
**sitting (1)**
48:14
**situation (5)**
35:9,13;45:14;
49:24;55:23
**situations (3)**
48:9;52:4;54:9
**slam (1)**
31:17
**solely (1)**
15:20
**Somebody (9)**
16:14;19:7;42:7;
45:19;48:24;51:15;
53:23;57:4,5
**somehow (1)**
11:13
**soon (1)**
66:20
**Sorry (6)**
2:24;13:8;27:2;
28:4;37:17;64:18
**sound (2)**
33:17;43:7
**South (3)**
7:13;8:12;30:24
**southeast (1)**
31:15
**speak (4)**
4:10;5:5;13:7;20:5
**speaking (2)**
2:20;4:8
**speaks (3)**
2:19;14:17;25:1
**Special (1)**
38:6
**specific (5)**
15:6;21:4;24:22,23;
25:1
**specifically (7)**
4:4;9:20;21:19;
23:2;29:7;30:9;31:2
**spelled (1)**

35:4
**spent (1)**
46:24
**spot (1)**
53:8
**staff (1)**
38:9
**stage (5)**
28:1;40:14,23;59:8,
9
**stake (1)**
31:21
**stamp (1)**
53:7
**stand (2)**
46:16;47:8
**standard (1)**
43:8
**stands (2)**
19:24;53:23
**star (2)**
47:20;48:10
**start (2)**
16:9;40:2
**started (1)**
52:20
**State (2)**
35:2;40:8
**stated (3)**
19:14;34:16;39:8
**statements (3)**
29:19;30:4;40:3
**Statute (1)**
21:24;22:11;24:9
**statutory (2)**
23:5,17
**stay (4)**
61:3,10,15;62:7
**stays (1)**
62:6
**step (3)**
2:7,8;44:6
**steroids (4)**
6:21;8:8;37:14,15
**Steve (1)**
30:4
**still (2)**
45:16;51:12
**stood (1)**
53:1
**store (1)**
46:20
**straight (1)**
31:12
**strange (1)**
32:7
**Street (1)**
8:6
**strict (1)**
10:5
**strike (5)**
3:12,13;4:16;64:1,5
**structure (1)**

DEFENDANTS 001906

35:1
**subject (2)**
11:17;22:10
**subjectively (1)**
35:22
**submit (5)**
22:22;23:20;28:8;
49:5;59:6
**submitted (5)**
23:21;51:17;52:22;
54:2;55:15
**subordinate (1)**
24:13
**subordination (1)**
54:5
**subparagraph (1)**
24:3
**subparagraphs (1)**
23:2
**substance (4)**
6:21;7:4;37:15;
38:15
**substantial (7)**
33:14;43:4;44:7,9;
49:18,19;50:13
**success (1)**
20:19
**sudden (1)**
54:16
**suggestion (1)**
15:18
**summer (1)**
12:4
**superior (4)**
6:6;36:11;37:4,8
**superiors (2)**
29:10,13
**supervisor (11)**
23:3;34:1;46:13,16;
47:3;48:21;51:4;53:1,
19,24;54:4
**supervisors (5)**
47:15,16,17;48:13;
56:24
**supplemented (1)**
27:8
**support (1)**
41:9
**supported (1)**
40:5
**supporting (1)**
4:2
**supposedly (1)**
45:2
**Supreme (10)**
9:6;12:3,18;13:9,
16;14:3;21:2;33:23;
35:6,16
**sure (12)**
2:3,19;10:1;15:24;
21:14;26:21;27:19,20;
33:20;36:9;61:18;
62:2

**surrounding (1)**
38:8
**surveillance (1)**
30:11
**suspension (12)**
6:4,15,18,22;8:13;
20:5;37:7,9,12,24;
38:1,2
**suspensions (1)**
20:11

**T**

**talk (3)**
5:19;21:4;24:22
**talked (1)**
56:17
**talking (3)**
22:20;24:15;31:4
**talks (2)**
21:19;22:18
**tape (1)**
31:17
**telling (1)**
56:14
**ten (1)**
34:23
**tendered (4)**
5:16;9:1;20:10;
25:18
**term (1)**
48:17
**terminate (8)**
33:11,24;34:14;
40:5;48:19;51:14;
54:8;65:13
**terminated (5)**
35:15,23;39:20;
42:1,7
**terminating (2)**
33:6;51:4
**termination (11)**
5:13;35:15,24;36:6,
22;38:21;41:3,15;
43:1,2;65:22
**terms (2)**
24:15;65:10
**testified (8)**
30:2;31:7,9,10,20;
32:10,19;33:1
**testify (2)**
30:6;39:5
**testifying (1)**
29:19
**testimony (7)**
32:2,22;36:12;
38:20;39:17;52:23;
57:15
**testing (2)**
6:23;37:13;38:1
**Thanks (1)**
61:23;62:9
**thereafter (1)**

22:3
**therefore (1)**
20:6
**third (1)**
29:18
**though (1)**
20:6
**thought (1)**
46:10
**thousands (1)**
41:13
**threatens (2)**
54:4,4
**three (8)**
5:15,18;7:21;15:1;
29:5;31:16;33:22;
51:8
**three-day (2)**
6:4,14
**thrust (1)**
32:3
**tickets (1)**
53:4
**times (2)**
36:14,16
**timing (1)**
54:13
**today (2)**
26:9;41:5
**Todd (1)**
42:17
**told (7)**
45:15,20;46:14;
50:1;56:23;58:12,14
**tomorrow (1)**
61:15
**tonight (12)**
2:19;3:7,16;4:10,
14;5:11;14:8,13;
27:19;28:24;66:18,21
**took (5)**
31:12;32:6;39:11;
52:5;57:19
**top (2)**
36:15,23
**total (1)**
38:18
**totality (2)**
39:14;43:14
**tour (1)**
45:3
**towards (2)**
32:4;51:14
**Traffic (3)**
7:8,9,22
**training (5)**
23:13,22;32:14;
42:16;53:12
**transcribed (2)**
18:4;62:13
**transcript (5)**
4:3,4;30:3;32:1;
66:20

**transfer (1)**
17:24
**translate (1)**
42:6
**treat (1)**
59:5
**treated (1)**
10:21
**tried (1)**
50:2
**true (2)**
51:20,21
**trust (1)**
41:20
**try (2)**
19:15;51:12
**trying (4)**
10:2,15;13:1;51:14
**two (11)**
10:4;31:15;36:14;
39:5;45:1;52:14;
54:14,16;55:6;56:14;
63:23
**two-page (1)**
27:1
**type (4)**
42:16;43:3;47:7;
48:21
**typical (2)**
15:7;56:4
**Tyson (2)**
27:3;32:10
**T-y-s-o-n (1)**
27:3

**U**

**unable (1)**
26:10
**unbecoming (1)**
6:7
**under (13)**
5:20;8:7,19;18:5;
25:6;29:19;30:6;
32:11;33:3;36:15,18;
39:5;62:14
**undermines (1)**
34:24
**understands (1)**
25:10
**undisputed (3)**
44:24;45:6,8
**undo (1)**
58:23
**union (1)**
7:24
**Unit (2)**
7:14;38:6
**unknown (1)**
8:10
**unlawful (3)**
34:10;47:10,10
**unmute (1)**

61:19
**un-prescribed (1)**
8:8
**unreasonable (1)**
35:23
**untruthful (2)**
29:19;39:18
**untruthfully (1)**
31:11
**untruthfulness (1)**
65:15
**up (23)**
2:7,8,19;4:6;13:7;
16:1,3;28:12;32:3;
40:22;45:19;46:21,21;
47:8;51:2;53:1,23;
60:23;61:6,13,15;
63:17;66:18
**upheld (2)**
35:16,24
**upon (18)**
7:4;9:4;10:5;12:24;
13:2;20:19;21:16;
23:20;36:1,8,13;37:8;
38:14;39:3,14;51:15;
52:20;56:8
**use (5)**
7:4;11:10;15:10;
21:5;44:2
**used (4)**
9:10;12:22;14:6;
34:15
**uses (1)**
53:10
**using (2)**
6:21;24:6
**usual (1)**
26:2

**V**

**vacuum (1)**
43:10
**valid (1)**
40:13
**vehicle (7)**
7:10,12,16;8:4,7;
29:23,24
**version (1)**
46:7
**versus (1)**
41:12
**via (1)**
61:4
**video (3)**
30:7,10;31:8
**village (2)**
41:10,15
**violate (1)**
12:19
**violated (4)**
36:12;40:13;44:1;
45:2

DEFENDANTS 001907

**City of Kankakee Board of Fire and Police Commissions**

violates (1)
  12:17
violating (4)
  6:19;11:23;36:5;
  37:12
violation (4)
  11:11,20;24:7,9
violations (2)
  3:11;8:15
vote (1)
  19:8

**W**

wait (6)
  16:3;46:17,17;47:2,
  3;49:7
waiting (1)
  62:3
waived (1)
  30:18
waiving (1)
  28:1
walk (1)
  46:23
walked (2)
  32:24,24
walking (1)
  32:15
wants (7)
  10:5;11:3;38:24;
  43:11;45:24,24;53:8
warrant (1)
  41:14
way (5)
  11:2,4;33:15;56:1,
  12
weakens (1)
  34:24
welcome (1)
  62:6
weren't (1)
  32:19
West (1)
  8:6
whatsoever (1)
  48:16
wherein (2)
  6:21;34:16
WHEREUPON (7)
  15:15;18:2,6;25:17;
  62:11,15;63:15
whistle-blowing (1)
  54:16
whole (3)
  4:3;43:15;51:18
who's (2)
  48:21;54:17
whose (1)
  42:2
widely (1)
  35:6
wife (1)

35:12
within (16)
  5:15,23,24;6:15;
  13:20;22:4,9;26:23;
  36:24;37:6;39:8;41:6;
  42:13,20;44:8;55:18
without (4)
  6:21;7:4;8:9;46:2
witness (2)
  47:20;48:10
work (2)
  34:6,8
worked (1)
  8:19
working (2)
  45:21;50:22
worst (1)
  42:1
wow (1)
  53:18
wrapping (1)
  51:2
wrecked (1)
  8:4
written (8)
  20:5,9;21:21;22:8;
  24:19;25:7;61:13;
  66:18
wrong (13)
  45:22;46:9,13,15,
  17;47:4;48:8;49:8,8;
  55:11,12,16,18

**Y**

YATES (41)
  4:22;17:5,7,12,14,
  16,18,20,20;18:14,15,
  18;19:12,12,19;60:7,
  10,12,14,16,18,18;
  62:23;63:7;64:20,22,
  24;65:2,4,4,6,21;66:6,
  8,10,12,14,14;67:10,
  14,19
years (6)
  7:21;13:21;22:19;
  41:4;50:20,22
years' (1)
  34:23

**Z**

zero (4)
  65:6,7,8;66:15
Zoom (9)
  2:1,4,18;3:3;15:24;
  16:3;61:4;62:2,5

**1**

1 (9)
  6:3;14:11;20:19;
  21:10;25:14;26:7,24;

27:9;33:9
10 (4)
  41:5,12,14;51:4
100 (1)
  8:5
1012.3.1 (1)
  6:20
1026 (6)
  14:14;21:18;24:12,
  13,14;25:1
1026.3 (1)
  24:16
1026.4 (1)
  21:19
1026.6 (1)
  22:17
1026.6.1 (1)
  22:20
106 (1)
  24:1
106.1.3 (1)
  24:3
10-minute (1)
  43:10
10th (1)
  5:10
124831 (1)
  9:9
12-month (2)
  6:23;38:2
1-3 (2)
  19:5;20:11
1-32 (1)
  31:1
1-4 (1)
  15:21
149 (1)
  34:4
15 (4)
  41:5,12,14;51:5
151 (1)
  35:5
15-minute (1)
  43:11
15th (3)
  29:8;39:15;67:19
16 (3)
  41:4;50:20,22
16-year (4)
  10:4;41:6,13;51:4
18 (2)
  29:11;30:8
18th (2)
  31:13;39:15
1986 (1)
  34:5
1992 (1)
  35:7
1st (1)
  8:18

**2**

2 (3)
  6:17;21:10;25:14
2007 (2)
  6:5;37:3
2008 (1)
  6:14
2012 (2)
  7:8;8:3
2014 (4)
  6:18;7:6;37:11;38:4
2015 (2)
  7:21;8:1
2017 (4)
  11:1;20:7;24:22;
  27:4
2020 (7)
  8:19;9:8;20:19;
  29:8,12;30:8;50:6
21 (1)
  31:16

**3**

3 (3)
  7:7;21:10;25:14
3:27 (1)
  31:2
30 (1)
  22:4
30-day (5)
  6:17,22;8:13;37:12,
  24
32 (1)
  31:1
320.140 (1)
  22:18
33 (1)
  31:15
34 (1)
  11:6
341 (3)
  24:19;25:4,6
341.3.10 (6)
  11:6;14:12;20:2,23;
  21:16;24:13

**4**

4 (6)
  7:19;14:11;19:6;
  20:14,17;25:15
4/14 (2)
  7:8;8:3
40/2 (1)
  22:1
40/6 (1)
  22:11
419 (1)
  35:5

**5**

5:30 (1)

67:20
56 (1)
  22:18

**6**

6 (2)
  11:1;27:4
6:15 (1)
  17:23
6:52 (1)
  18:23
6th (2)
  7:20;8:1

**7**

7:58 (1)
  60:21

**8**

8 (1)
  20:16
800 (1)
  34:4
802 (1)
  22:11
820 (1)
  21:24

**9**

9 (1)
  59:14
900 (3)
  7:13;8:11,12
9th (1)
  5:10

DEFENDANTS 001908