E-FILED
Monday, 05 December, 2022  10:40:00 AM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

| | |
|---|---|
| **PAUL BERGE and TIMOTHY KREISSLER,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| **v.** ) | **Case No. 20-CV-2310** |
| ) | |
| **CITY OF KANKAKEE, POLICE AND** ) | |
| **FIRE COMMISSION OF THE CITY OF** ) | |
| **KANKAKEE, FRANK KOSMAN,** ) | |
| **CHASTITY WELLS-ARMSTRONG, WILLIE** ) | |
| **HUNT, and NICKEY F. YATES, in their** ) | |
| **individual and official capacities,** ) | |
| ) | |
| **Defendants.** ) | |

## ORDER

Plaintiffs, Paul Berge and Timothy Kreissler, brought this suit against Defendants City of Kankakee, the Police and Fire Commission of the City of Kankakee, former Kankakee Chief of Police Frank Kosman, former Kankakee Mayor Chastity Wells-Armstrong, former Kankakee Deputy Police Chief Willie Hunt, and Nickey F. Yates, in their individual and official capacities, alleging violations of Plaintiffs' rights under Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.) and the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution, pursuant to 42 U.S.C. § 1983. Defendants filed a Motion for Summary Judgment (#17) on June 17, 2022. Plaintiffs filed a Response (#20) on August 15, 2022, to which Defendants filed a Reply (#22) on September 6, 2022.

BACKGROUND

The following background facts are taken from Defendants' Statement of Undisputed Material Facts, Plaintiffs' Additional Facts section in their Response, and the exhibits attached by the parties to their filings. The court will list only facts supported by the record and that comply with the Local Rules of the Central District of Illinois. In addition, the court will list only those facts that the court may legally consider on a motion for summary judgment.

The court would note that several of Plaintiffs' Additional Facts were not supported by the accompanying citation to the record, or that the portion of the record cited by Plaintiffs had nothing whatsoever to do with the stated Additional Fact. The Seventh Circuit has long held that "[j]udges are not like pigs, hunting for truffles buried" in the record, and will not root through the hundreds of documents and thousands of pages that make up the record to make a party's case for them. *Gross v. Town of Cicero, Ill.*, 619 F.3d 697, 702-03 (7th Cir. 2010). The Additional Facts the court will not consider, on these bases, are: 1, 5, 34, 35, 55, and 58. Further, concerning both Defendants' Statement of Undisputed Material Facts and Plaintiffs' Additional Facts, to the extent the record differs from the way the fact is presented in the parties' briefs, the court will present the fact as found in the record. Finally, where a party has objected to a fact with a blanket objection or denial that the fact occurred, and nothing more, such objection will be overruled and the fact, if supported by a citation to the record, will be deemed admitted.

*Factual Background*

This suit concerns two distinct instances of alleged discrimination: (1) the promotion of a Black candidate, Michael Sneed, over two white candidates (Plaintiffs), to the rank of lieutenant in the Kankakee Police Department in August 2019; and (2) the termination of Plaintiff Berge's employment in December 2020.

<u>The Parties</u>

Plaintiff Paul Berge is a white male, a resident of Kankakee County, and was formerly employed by the City of Kankakee as a police officer. Plaintiff Timothy Kreissler is a white male, a resident of Kankakee County, and is currently a lieutenant with the Kankakee Police Department ("KPD").

Defendant City of Kankakee ("the City") is a municipal corporation incorporated under the laws of the State of Illinois. Defendant Frank Kosman is a white male and was the Chief of the KPD from May 2019 to May 2021. Defendant Chastity Wells-Armstrong (hereinafter "Wells") is a Black woman, who served as Mayor of Kankakee from April 2017 to April 2021, and before that served on the City Council for two years. Defendant Willie Hunt, a Black male, was employed by the KPD for 24 years, serving as Deputy Chief for the last several years, and retired from the KPD in May 2021. Defendant Nickey Yates, a Black male, has served as a member of the Police and Fire Commission ("the Commission") since 2017.

3

Plaintiffs' Employment with the KPD

Kreissler was hired by the KPD on March 6, 2002, and promoted to sergeant on July 1, 2009. In 2010, he received a 10-day suspension concerning alleged inappropriate sexual conversations during a ride-along with a 19- or 20-year-old woman. Kreissler was promoted to lieutenant in March 2021.

Berge was hired as a KPD officer on February 11, 2006. He was promoted to sergeant in January 2016. Berge was arrested three times before his employment with the KPD. The first arrest was for criminal trespass at a concert when he was young. Next, he was arrested in Elk Grove, Illinois, for possession of cannabis and paraphernalia in 1998, to which he pled guilty. Berge also had a driving under the influence ("DUI") charge in 1998.

While employed as a KPD officer on November 4, 2007, Berge consumed alcohol for a number of hours with a KPD sergeant. At the end of the night of drinking, Berge got in a fight with the sergeant and seriously injured him. The sergeant was hospitalized and suffered a punctured lung, broken ribs, a ruptured eardrum, and a broken orbital socket. Berge did not receive any substantial injury. This incident caused former KPD Chief Kinkade[1] to question Berge's readiness for duty as a police officer.

---

[1]The parties often refer to various individuals by their last name only, and do not provide first names. The court will endeavor to provide complete names where able.

Berge was placed on administrative leave, ordered to contact the employee assistance program to seek evaluation and assistance for possible alcohol abuse, and to participate in anger management counseling. He ultimately received a two-day suspension.

In 2014, Berge was investigated in response to a report that he was abusing steroids, and then tested positive for steroids. This resulted in Berge being removed from the Kankakee Area Metropolitan Enforcement Group ("KAMEG"), a specialized drug enforcement task force. Berge entered a last-chance agreement with the City and received a 30-day suspension.

In 2014, Berge backed a squad car into a street pole, damaging the vehicle. This was determined to be a chargeable offense and he received a written reprimand.

On April 14, 2012, the KPD responded to a call concerning a one-vehicle accident involving Berge's personal vehicle. Berge reported to the responding officer that an unknown vehicle hit his vehicle while it was parked and then fled the area. In fact, it was later determined that there was no hit and run; instead, Berge was driving when he damaged his own vehicle. In April 2015, Berge was ultimately given an unpaid 30-day suspension and another last-chance agreement for making a false police report. Berge signed the agreement that stated that he admitted that he was under the influence of alcohol and unprescribed steroids at the time of the accident. Under the last-chance agreement, which was in effect for a five-year period until April 1, 2020, Berge agreed that if he committed another infraction, he would be terminated from the KPD.

5

<u>Berge's Incidents of Misconduct in July 2020 and Resulting Termination</u>

Berge was placed on administrative leave on July 20, 2020, for allegedly committing acts of insubordination by refusing to obey lawful orders from his superiors.

**July 15, 2020 Incident**

There was a parking lot in Kankakee that had frequent and ongoing issues involving criminal damage, public intoxication, suspicious individuals, drug activity, drinking, and shots fired in the summer of 2020. In response to concerns raised by City aldermen, on July 15, 2020, KPD Commander Donnell Austin told Berge to go to that location and issue citations for any ordinance violations.

That afternoon, Austin went to Berge's office to find out if any citations had been issued at that location. Berge had his feet on the desk and his eyes closed. Austin had to call Berge's name several times, waive his hand in front of Berge's face, and tap on the desk to get Berge's attention. In response to Austin's question about whether anything was done at the subject location, Berge did not answer and instead stood up and asked questions about what citizens were complaining and which aldermen were asking for something to be done, and was rude and dismissive of Austin.

Berge came around the desk, got chest to chest and face to face with Austin, and berated Austin, asking him what he had done for the three years that he had been patrol commander. Berge stated that it was not Austin's department anymore, that it was "their" department, and "they" were going to take it back, and that Austin did not

know how to do his job. Austin considered this to be insubordination. When Berge

answered the phone during his conversation with Austin, Austin ordered him to hang

up four times, which Berge ignored. Austin pushed down the receiver and told Berge

he was relieved of duty and to leave the department, but Berge did not immediately

comply.

Austin informed Chief Kosman of the incident that day and wrote a report about

the incident. He considered Berge to be insubordinate, discourteous, disrespectful,

dismissive, rude, and elusive during the incident.

**July 18, 2020 Incident**

On July 18, 2020, there was a planned peaceful protest march taking place in

Kankakee in response to the death of George Floyd in Minneapolis. Chief Kosman

determined it was sufficient to have himself and two other officers present, and Berge

was not assigned a detail for the march. When the marchers proceeded to the

courthouse, Berge started walking towards the front of the courthouse. Chief Kosman

did not want Berge intermingling with the protestors and gave him a clear order to

leave and go back to his car. Kosman testified in front of the Police and Fire

Commission that he had to repeat the order several times, the last time stating it was a

direct order to go back to his car and leave. Kosman testified that Berge turned away

from him, waived him off, and proceeded to head towards the courthouse.

Kosman told Sergeant Miller what happened, and Miller went to talk to Berge.

As Berge walked away from the courthouse, Kosman approached Berge and told him to

go back to his car, leave the area, that Berge was done for the day, and to report to

Kosman's office on his next workday. Berge told Kosman he did not have to follow unlawful orders and that Kosman's order was unlawful. Kosman ordered Berge to leave, but Berge did not. Berge told Kosman he was a poor leader and maybe it was time for Kosman to retire.

Lieutenant Robin Passwater arrived, and Kosman again told Berge to go to the station, put away his gear, and come to his office on his next workday. Berge again did not comply with the order. Instead, he asked Passwater what he should do, Passwater told Berge to listen to the Chief, and Berge finally complied. Passwater has been a member of the KPD for 31 years and a lieutenant for 20 years, and was not aware of any other occasion in which a subordinate officer refused to follow an order from the Chief of Police.

On July 20, 2020, Kosman advised Berge orally and in writing that he was being placed on administrative leave based upon his conduct on July 15 and 18, 2020, and indicated the policies Berge violated. Kosman reviewed video footage from the July 18 incident and received memos concerning both incidents, and then set up a formal interrogation of Berge. Kosman advised Berge that any admissions made during the course of the interrogation could be used in charges seeking his dismissal. Notice of the interrogation was served upon Berge on July 24, 2020. Kosman testified that he then reviewed the interrogation transcript, determined that Berge made false statements, and filed charges seeking Berge's termination from the KPD on August 13, 2020.

Incidents of Berge's alleged past misconduct were introduced in aggravation at the termination hearing before the Commission. Kosman introduced evidence of the November 2007 incident in which Berge was involved in a physical altercation with a superior officer and received a two-day suspension for conduct unbecoming of an officer, and was directed to refrain from consuming intoxicating beverages to the extent that it resulted in intoxication or offensive behavior that discredited him or the KPD.

The Commission was also made aware that in 2014 Berge received a 30-day suspension for using steroids without a prescription, and that Berge was removed from KAMEG as a result of this incident.

Also introduced was the 2012 incident wherein Berge wrecked his personal vehicle by crashing into a building while under the influence of alcohol and unprescribed steroids and then subsequently filed a false police report claiming it was the result of a hit-and-run accident.

When the Commission was given the opportunity to ask questions of Berge, Commissioners Dawn Landwehr, Cortney Bessant, and Mario Flores asked him whether he had discretion to ignore the order of his supervisors, whether he gives orders to his subordinates, and whether his supervisors expected orders to be followed immediately. Berge testified that in his 15 years of experience he never encountered supervisors that wanted orders followed immediately. Commissioner Yates then asked if Berge participated in the vote of no confidence against his police supervisors, which was related to Berge's testimony concerning receiving and following direct orders given

9

by supervisors. Ultimately, the question was determined to be outside the scope of the hearing and was not answered.

The Commission then voted to terminate Berge on December 1, 2020, and issued its written findings of fact and decision. The Commission that made the decision to terminate Berge was comprised of five members: Dr. Willie Davis, Nickey Yates, Landwehr, Bessant, and Flores. All five members signed the order terminating Berge, and four out of five of the members voted in favor of Berge's termination, with Commissioner Flores absent from the proceedings that evening. Of the five, only Commissioner Yates was named as a defendant in this case.

<u>Promotion of Michael Sneed to Lieutenant Instead of Plaintiffs</u>

In August 2019, Plaintiffs and Michael Sneed were in competition for promotion to an open lieutenant's position in the KPD.

Chief Kosman reviewed the personnel files of the three candidates: Kreissler, Berge, and Sneed, which contained their discipline histories. Kosman also observed the three candidates for three months, reviewed their reports, observed how they interacted with other personnel, and spoke with them.

On August 8, 2019, Kosman sent a memorandum to the Commission listing Kreissler, Berge, and Sneed as the three candidates eligible for promotion to lieutenant. The memorandum provided a summary of the experience of the three candidates, with

Kreissler having 17 years of experience and being acting detective commander, Berge having 13 years of experience and being a sergeant on the midnight shift, and Sneed having 22 years of experience and being the supervisor of the Gang Enforcement Unit.

The memorandum further explained why Kosman was recommending Sneed for promotion to lieutenant, stating "All three candidates are capable sergeants who can be expected to perform the duties of lieutenant successfully. However, Sergeant Sneed has distinguished himself by serving meritoriously for 12 years in KAMEG including the last 6 months of his tenure there as the deputy director of the task force. Since leaving KAMEG, he has successfully commanded the newly formed tactical unit which so far in 2019 is responsible for 30 drug arrests, 8 guns seized, 20 new gang contacts and 38 warrant arrests. Based on his exhibited skills, knowledge and experience, I recommend him for promotion to lieutenant."

Kosman thought Sneed was more proactive in that he was in charge of the gang unit, and he thought that that was what the KPD needed. He thought Kreissler was satisfactory in his position as acting detective commander, but he did not see Kreissler as being proactive with arrests and investigations or going above and beyond satisfactory performance. Kosman did consider that Kreissler had served as acting commander.

Deputy Chief Hunt stated that he was aware Sneed was allowed to have letters of recommendation in his file for promotion, while Plaintiffs did not have letters of recommendation. Hunt then clarified that he had no firsthand knowledge of this, only

11

assuming it was true because it was included in Plaintiffs' Complaint in this case. Kosman testified that he did put a letter of recommendation from a college professor into Sneed's personnel file. Kosman did not put letters of recommendations in Plaintiffs' files, but he would have done so if he had received any.

Kosman then went to the Commission meeting to discuss his recommendation for Sneed's promotion. Kosman informed the Commission that he was recommending promoting Sneed out of rank order. The Commission voted to approve Kosman's recommendation. The Commission looked at more than test scores, and wanted to look at the entire person, including time in uniform. Of the three, Sneed had the most time in uniform. The Commission additionally looked at leadership capacity, and Sneed had served in a leadership capacity in the drug unit. The Commission considered that Kreissler had military experience, but it was not a determining factor. The Commission further considered Kosman's recommendation. Commissioner Yates testified that the fact that Sneed was Black and the other two candidates were white was not a factor in the Commission's determination. The Commission did not see letters of recommendation for any candidate.

Sneed was promoted to lieutenant ahead of two white candidates, Plaintiffs, who were ranked higher than him. Kosman testified that, other than Sneed's promotion to lieutenant over Plaintiffs, Kosman had never in his career promoted an officer out of rank order.

Kosman testified that he made the decision to promote Sneed. Kosman told Mayor Wells that he was going to promote Sneed. Wells testified that she was "fine with" and supported Kosman's decision to promote Sneed. Wells testified that, prior to Kosman telling her he was going to promote Sneed, he had never talked to her about the promotion. Wells did not know if Sneed being Black was a factor in Kosman promoting him over Plaintiffs.

Kosman testified that Wells was not involved in his decision to promote Sneed, and that he never discussed with Wells whether she wanted Sneed to be promoted.

Kosman did communicate with Hunt and Wells prior to promoting Sneed. However, Kosman testified that the decision to promote Sneed was his and his alone. Further, the conversations with Wells and Hunt were to inform them that he had decided to recommend Sneed for promotion. Kosman talked to Wells about the "rule of three," which, in Kosman's understanding, meant that he could recommend for promotion any of the top three candidates on the list (here, between Plaintiffs and Sneed).

Kosman was concerned that the decision to promote Sneed be seen as his and his alone. He could understand why Hunt being involved could be perceived poorly, because Hunt and Sneed were friends.

Berge had no knowledge that Hunt was involved with hiring in the KPD. Hunt had no involvement with Sneed's promotion either time Sneed was promoted.

13

Kreissler testified that Kosman told him it was his (Kosman's) decision to promote Sneed to lieutenant, and was not the decision of Hunt or Wells. Kreissler had no firsthand knowledge that Wells, Hunt, Yates, or the City Council were involved with the selection of Sneed for the promotion. Further, Kreissler never had any conversations concerning promotions with Wells, Hunt, or Yates.

During his time with KAMEG, Sneed was disciplined for discharging his weapon during a training incident. While he was a sergeant, Sneed was determined to have committed a civil rights violation by violating a court order concerning electronic overhears during surveillance operations. The order allowed video surveillance, but not audio surveillance. The State's Attorney's Office dismissed multiple pending cases because of the violation. Kosman did not learn of the violation until after Sneed had been promoted to lieutenant.

<u>Other Promotions Referenced by Plaintiffs</u>

When he was up for a promotion to sergeant in 2015, Sneed was third on the promotional list behind white officers Berge and Halper, yet was promoted over them. This occurred, however, right after Berge was suspended for steroid use. Hunt testified that four out of the five chiefs he has worked under have skipped orders for promotions. Former Chief Price Dumas promoted Gary Tyson, who was white, over others on the promotional list.

Following Wells taking office as mayor in 2017, non-Black individuals were promoted, including Tyson, Jose Martinez (Latino), Lacy (white), Jay Etzel (white), Coash (white), and eventually Kreissler to lieutenant in 2021.

KPD commanders are selected by the Chief of Police. Former Chief Dumas removed Kidwell, who is white, from commander and replaced him with Donnell Austin, who is Black, and made Kidwell director of KAMEG. This was done to give someone else in the KPD a chance to be commander.

In February 2018, Steve Hunter, who is Black, was promoted to sergeant as the third-ranked candidate on the sergeant's promotional list, skipping over two white male candidates. When asked why then-Chief Dumas selected Hunter, Wells said it was because Hunter was very good at his job. The union supported the promotion of Hunter and said he was the most qualified on the list.

<u>Berge's Sexual Harassment Claim</u>

KPD Policy 328 requires any incident of sexual harassment to be timely documented and reported to the appropriate supervisor. A copy of this policy was signed by Berge on June 5, 2017. Berge did not make any complaint of sexual harassment until he was in the middle of his interrogation on July 30, 2020, concerning his incidents of misconduct that had occurred two weeks before.

15

Kosman, in violation of KPD policy, disclosed Berge's sexual harassment claim to Donnell Austin, the alleged harrasser. Kosman did not open a separate file for a separate investigation, but rather investigated the complaint as part of Berge's insubordination interrogation.

Berge claimed that on July 15, 2020, when Austin was attempting to speak with him about Berge's failure to follow the order to issue citations and Berge had his eyes closed and feet up on the desk, Austin put his foot on a chair near him and allegedly was trying to put his crotch in Berge's face. Contrary to the City's policy requirements, Berge never made any complaint of sexual harassment in writing to his supervisor, and did not make any kind of report in a timely manner.

Kosman interviewed Austin concerning Berge's sexual harassment complaint about a week after hearing about it. Berge's complaint was made part of the file related to Berge's alleged insubordination and no separate report number was assigned to it because it had already gone through the interrogation process as part of the investigation into Berge's insubordination. Kosman did not interview Berge personally because Berge made his statement during his interrogation.

<u>Plaintiffs' Equal Employment Opportunity Commission ("EEOC") Charges</u>

Plaintiffs filed charges of discrimination with the EEOC on February 3, 2020. Kosman was not aware of Berge's EEOC charge concerning discrimination at the time he testified at Berge's termination hearing on September 30, 2020, but was aware of it at the time his deposition was taken in this case. Berge had no knowledge of anyone at the

16

City knowing of his EEOC filing. Berge did not have any communications with

Kosman, Wells, Hunt, Yates, or anyone at City Hall concerning his EEOC charges, and

did not advise anyone in administration of the charges.

<u>Mayor Wells' Perspectives on Race and Racial Issues in the KPD</u>

Wells wanted to improve diversity in the KPD, which included improving

gender, ethnicity, and sexual orientation diversity. During her first mayoral campaign,

Wells expressed concerns about the Black community being mistreated by members of

the KPD. She was open to having a Black Chief of Police, but the chief "didn't have to

be" Black. After she was elected, she expressed her concerns about the lack of minorities

within the KPD.

Wells was a member of the African-American Mayors Association. Wells

testified that she believes only white people can be racist. She also wanted to develop

better relationships with the community and to address gun violence.

In Kankakee, the mayor appoints the City Attorney, City Engineer, and the

department heads, including the Chief of Police, subject to confirmation by the City

Council. The first police chief Wells appointed was Robin Passwater, who is white.

Wells expressed concern to Passwater about racial discrimination within the KPD, and

that there were concerns Passwater himself was a racist. Hunt believed Passwater was a

racist. Passwater resigned after this conversation. After he quit, Wells appointed Price

Dumas, who is Black, as acting chief and requested the City Council approve him as

Chief of Police, but the Council declined to do so. She did not reach out to Dumas to be

17

Chief of Police because he was Black. She was frustrated that the City Council did not approve her appointment of Chief Dumas. She believed that race was one of the reasons Dumas was not approved by the City Council. Dumas later resigned, and it became known that Dumas was being investigated by the Illinois State Police in a criminal investigation about misusing police computers prior to his resignation.

Following the City Council's rejection of Dumas, the position was posted, and internal and external applications were submitted. Kosman, a white male, was then appointed as Chief.

Wells' appointments to municipal positions were diverse. Wells appointed Yates and Tomora Nelson, who are Black, to the Commission. Wells also appointed Landwehr, who is white, and Flores, who is Latino, to the Commission. She also appointed Bessant, who is biracial, to the Commission. Wells appointed Pat Power, who is white, as City Attorney; Damon Schuldt, who is white, as Fire Chief; Elizabeth Kubal, who is white, as Comptroller; Mike Hoffman, who is white, as Village Planner; Neil Piggush, who is white, as City Engineer; and Peter Schiel, who is white, as Utility Supervisor.

Wells did desire an increase in minority police within the KPD command staff, and, after she was elected, the top three KPD command staff positions went from white males to Black males. Kosman testified that white KPD officers believes they were

discriminated against by this new command staff, and that they had voiced these complaints to Hunt. Wells became concerned that some white KPD officers were criticizing her and the Black command staff, and she became concerned for her safety.

The KPD Chief of Police had full autonomy to run the department. Wells was not involved in any decisions affecting the KPD, including having no involvement in KPD promotions, other than appointing the Chief of Police. Berge had no knowledge or information that Wells was participating in the day to day operations of the KPD, and never saw any memorandums from her directing personnel on what to investigate, time off, scheduling, instituting or changing policies, hiring, or the day to day operations of the KPD. Berge only saw Wells one time at the KPD, when she said hello and brought donuts.

After Wells was elected and Chief Dumas was appointed, Dumas demoted Commander Kidwell, and Austin was promoted to commander to replace him. Hunt was promoted to Deputy Chief. Wells supported Dumas' decisions in this regard.

<u>Deputy Chief Hunt's Work for Stanard & Associates</u>

From 2018 to 2020, Hunt worked for Stanard & Associates, a company that administered the exams taken by candidates for promotions in police departments, including the 2019 lieutenant promotion at issue in this case. Hunt worked as an "evaluator" for Stanard. Hunt came to know Stanard because it administered the tests for the KPD and Kankakee Fire Department. Hunt was recruited to Stanard by Stanard representative Lory Newcomb.

19

Once Kosman became Chief of Police in May 2019, Hunt had no role in the KPD promotional testing process. All Hunt did was choose the testing facility and post the times and location for the assessments.

Hunt testified that he had never communicated with anyone from Stanard during any KPD promotional process other than once, in 2019 during the Sneed promotional process at issue in this case. That "communication," however, was limited to an interaction at the end of the testing process where Newcomb was "gathering her stuff" and stopped by Hunt's office on her way out of the building. Newcomb likely had the testing materials with her, but Hunt did not see them. She asked Hunt if he ever thought about becoming an assessor because Stanard needed assessors. Hunt told her he would think about it and gave her his address. Hunt later contacted her and did training on conducting assessments. Hunt testified that the assessment portion of the promotional process contained "some subjectivity" for assessors. Hunt did not discuss the Sneed promotion with her, and was not involved in the testing process at KPD. Plaintiffs scored the highest on the lieutenant's exam.

Hunt did violate KPD policy by failing to document that he worked for Stanard. However, he did orally inform Kosman, who had no problem with it. He also violated KPD policy by failing to inform the City Council. However, Hunt noted that he only consulted and conducted assessments for Stanard for other police departments, not KPD. He was not involved in the assessing of any KPD officers for promotions.

Hunt believed that, prior to the testing process being changed in 2003, the KPD discriminated against Black employees on promotions. Hunt and Chief Dumas, the Chief of Police prior to Kosman, discussed their desire to change the racial make up of the KPD, but this was before Plaintiffs were passed over for the lieutenant promotion. Hunt had expressed opinions that, in the past, white KPD officers were given preference over Black KPD officers. He had also made certain social media posts which were discriminatory towards white people, for which he was disciplined.

Nickey Yates' Opinions on Racial Issues and the KPD

Yates voted to terminate Berge, but it was not based upon Berge casting a no confidence vote in the leadership of the KPD or making comments about taking back the department. Yates testified that he never made any attempt to get more Black people in the KPD. Yates does believe that Blacks have been treated unfairly in Kankakee and Kankakee County. Yates had, in the past, made complaints against white KPD officers.

Frank Kosman Miscellany

Kosman promoted and recommended for promotion white individuals, including promoting Jay Etzel to commander, Coash to sergeant, a female officer to sergeant, and Kreissler to lieutenant. He also recommended that Martinez be promoted to sergeant. Kosman made Kreissler acting commander, over anyone of his rank, because he was competent in his job and "was there." However, Kreissler was bypassed in favor of Sneed for the lieutenant's position. Kosman testified that, in his time as Chief

21

of the KPD, the only complaints made to him by white officers about discrimination were in connection with Sneed's promotion.

Commander Austin accused Hunt, Wells, and former Chief Dumas of criminal or corrupt conduct in awarding Kankakee government contracts. Kosman failed to conduct any investigation into the allegations, because he saw no evidence of illegal activity in Austin's complaint.

*Procedural History*

Plaintiffs filed their Complaint (#1) in this matter on November 5, 2020. Count I, against Defendant City, alleges racial discrimination in violation of Title VII for failure to promote Plaintiffs in connection with Sneed's promotion to lieutenant in 2019. Count II alleges retaliation under Title VII by the City against Plaintiffs for engaging in activities protected by Title VII. Count III alleges a § 1983 claim pursuant to *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978), in that the City maintained a policy, custom, and/or widespread practice of discriminating against white male officers in testing, promotions, assignments, transfers, and classifications. Count IV alleges a Fourteenth Amendment equal protection claim pursuant to § 1983 against all individual Defendants in their individual capacities, in that Defendants discriminated against Plaintiffs by treating Plaintiffs different than similarly situated individuals without any legitimate government purpose for doing so.

ANALYSIS

Defendants have moved for summary judgment on all of Plaintiffs' claims, arguing: (1) they should be granted summary judgment on Count I (Title VII discrimination) and Count III (*Monell*) because Plaintiffs have failed to produce evidence that they were discriminated against in the promotional process because of their race or that the City had a policy, custom, or widespread practice of discriminating against white people; (2) they should be granted summary judgment on Count II (Title VII retaliation) because Plaintiffs cannot establish that they were retaliated against for engaging in protected activities; and (3) they should be granted summary judgment on Count IV (equal protection) because Plaintiffs cannot establish that any individual Defendant violated Plaintiffs' rights to equal protection based upon their race.

*Summary Judgment Standard*

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In ruling on a motion for summary judgment, a district court "has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). In making this determination, the court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Singer v. Raemisch*, 593 F.3d 529, 533 (7th Cir. 2010). However, a court's favor toward the nonmoving party

23

does not extend to drawing inferences which are only supported by speculation or conjecture. See *Singer*, 593 F.3d at 533. In addition, this court "need not accept as true a plaintiff's *characterization* of the facts or a plaintiff's legal conclusion." *Nuzzi v. St. George Cmty. Consol. Sch. Dist. No. 258*, 688 F.Supp.2d 815, 835 (C.D. Ill. 2010) (emphasis in original).

The party opposing summary judgment may not rely on the allegations contained in the pleadings. *Waldridge*, 24 F.3d at 920. "[I]nstead, the nonmovant must present definite, competent evidence in rebuttal." *Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 924 (7th Cir. 2004). Summary judgment "is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Koszola v. Bd. of Educ. of City of Chicago*, 385 F.3d 1104, 1111 (7th Cir. 2004), quoting *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003). Specifically, to survive summary judgment, the nonmoving party "must make a sufficient showing of evidence for each essential element of its case on which it bears the burden at trial." *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 936 (7th Cir. 2007), citing *Celotex Corp.*, 477 U.S. at 322-23.

    I.    *Official Capacity Claims Against Individual Defendants*

Defendants first argue that any official capacity claims brought against individual Defendants should be dismissed as redundant and/or duplicative of claims against Defendant City. Plaintiffs respond that the official capacity claims should not be dismissed because the "claims are separate and integral to allege under the controlling statutes."

"[A]n official capacity suit is another way of pleading an action against an entity of which the officer is an agent." *Sow v. Fortville Police Department*, 636 F.3d 293, 300 (7th Cir. 2011). Thus, Plaintiffs' official capacity claims against the individual Defendants can be treated as claims against the City, which Plaintiffs have also named as a defendant based on the same allegations, and therefore the suit against the individual Defendants in their official capacities is redundant. See *Sow*, 636 F.3d at 300; *Lugg v. Sutton*, 368 F.Supp.3d 1257, 1264 (C.D. Ill. 2019).

II.     *Plaintiffs' Title VII Discrimination Claims Against the City (Count I)*

Defendants first argue that Plaintiffs cannot make a showing that the City discriminated against them under Title VII because: (1) they cannot show any background circumstances existed that would support an inference that the City had reason to discriminate against Plaintiffs based on their race; (2) they have failed to show they were treated less favorably than similarly situated individuals outside of their protected class; and (3) the City had legitimate, non-discriminatory reasons for terminating Berge and for promoting Sneed ahead of both Berge and Kreissler.

Plaintiffs respond that: (1) Mayor Wells' campaign promises to diversify thKPD and the subsequent replacement of white higher-rank officers (Chief Passwater, commanders) by Black officers is relevant evidence of discrimination; and (2) the evidence at discovery demonstrated that Defendants appointed and promoted Blacks, and only minimally promoted whites, and because this followed the election of a Black mayor who campaigned on this issue, "there was indeed an invidious policy, custom, and widespread practice of discriminating against [white] people."

25

In racial discrimination suits, the question the court seeks to answer is whether a reasonable juror could conclude that the plaintiff would have kept his job, or been promoted, if he had a different ethnicity, and everything else had remained the same. *LaRiviere v. Board of Trustees of Southern Illinois University*, 926 F.3d 356, 359 (7th Cir. 2019). Put differently, the plaintiff must present evidence which, taken as a whole, would permit a reasonable factfinder to conclude that the plaintiff's race caused the discharge or caused the plaintiff to lose out on the promotion. *Bless v. Cook County Sheriff's Office*, 9 F.4th 565, 574 (7th Cir. 2021). "Unmistakable evidence of racial animus—racial epithets or explicitly race-motivated treatment—makes for simple analysis. The more complicated cases arise when there is no smoking gun showing intentional discrimination." *LaRiviere*, 926 F.3d at 359.

In such cases, the district court may then draw upon the familiar burden-shifting framework established by the U.S. Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to determine if triable issues exist. Although the Seventh Circuit, in *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016), "rejected unhelpful distinctions between evidence, and emphasized that 'all evidence belongs in a single pile and must be evaluated as a whole[,]'" the court did leave the *McDonnell Douglas* burden-shifting test "as a viable option for pursuing employment discrimination claims." *Barbera v. Pearson Education, Inc.*, 906 F.3d 621, 628-29 (7th Cir. 2018), quoting *Ortiz*, 834 F.3d at 766.

Indeed, where the parties organize their arguments in terms of the burden-shifting test, a district court may follow that framework in its analysis, keeping in mind *Ortiz*'s admonition to consider all the evidence as a whole. *Barbera*, 906 F.3d at 629-31; *de Lima Silva v. Department of Corrections*, 917 F.3d 546, 559-61 (7th Cir. 2019). In the instant case, based on the argument put forward on page 28 of Plaintiffs' Response (#20 at p. 28), Plaintiffs appear to rely primarily on the *McDonnell Douglas* burden-shifting test to organize their arguments, pointing to the City's appointment or promotion of Black candidates for other positions and only "minimal" promotion of white candidates. Based on this argument, and the absence of unmistakable evidence of racial animus in the form racial epithets or explicitly race-motivated treatment directed at Plaintiffs, the court finds that the burden-shifting framework is useful in analyzing Plaintiffs' claims. See *LaRiviere*, 926 F.3d at 359-60.

Plaintiffs are pursuing a reverse-discrimination claim, *i.e.*, a claim brought by white plaintiffs. See *Hosick v. Chicago State University Board of Trustees*, 924 F.Supp.2d 956, 966 (N.D. Ill. 2013), citing *Mills v. Health Care Service Corp.*, 171 F.3d 450, 455-57 (7th Cir. 1999).

The Seventh Circuit has modified the *McDonnell Douglas* framework in such a context to require evidence of "background circumstances" supporting a race-discrimination claim brought by a white plaintiff. *Bless*, 9 F.4th at 574. To survive summary judgment under the burden-shifting approach in a reverse discrimination case, a plaintiff must show: (1) background circumstances exist to show an inference

that the employer has reason or inclination to discriminate invidiously against whites or evidence that there is something "fishy" about the facts at hand; (2) he was meeting his employer's legitimate performance expectations; (3) he suffered an adverse employment action; and (4) he was treated less favorably than similarly situated individuals who are not members of his protected class. *Formella v. Brennan*, 817 F.3d 503, 511 (7th Cir. 2016); *Bless*, 9 F.4th at 574.

If the plaintiff makes this prima facie showing, then the burden would shift to the defendant to present a legitimate, non-discriminatory reason for the challenged employment action. *Formella*, 817 F.3d at 511. If the defendant carries this burden, then the burden would shift back to the plaintiff to show pretext, or at least to produce evidence establishing a genuine factual dispute about pretext to defeat summary judgment. *Formella*, 817 F.3d at 511.

<u>Background Circumstances Indicating Intention to Discriminate Against Whites</u>

Plaintiffs cites to Mayor Wells' campaign statements from 2016-17 about the lack of diversity in the KPD and the demotion of several white officers and promotion of Black officers in their place as evidence of "background circumstances" necessary to show an inference that the City had reason or inclination to discriminate against them as white officers. However Wells' statements on diversity are of little value in assessing Plaintiffs' discrimination claims, because the comments were not made around the time of Berge's 2020 termination or Sneed's 2019 promotion and were not made in reference to same. See *Teruggi v. CIT Group/Capital Finance, Inc.*, 709 F.3d 654, 661 (7th Cir. 2013).

Still, even if Plaintiffs could show sufficient background circumstances, the analysis then moves to whether they can make a prima facie case of discrimination under the burden-shifting approach. The court finds that Plaintiffs have demonstrated at least one of the prima facie elements, an adverse employment action, as Berge's termination and the failure to promote both qualify. *Coleman v. Donahue*, 667 F.3d 835, 860 (7th Cir. 2012); *Tyburski v. City of Chicago*, 964 F.3d 590, 598 (7th Cir. 2020). In addition, Defendants make no argument that Plaintiffs were not meeting their employer's legitimate expectations. Thus, the court will focus on whether Plaintiffs were treated less favorably than similarly situated individuals who were not members of Plaintiffs' protected class. If Plaintiffs can satisfy that element, the burden will then shift to Defendants to demonstrate that the adverse actions were based on a legitimate, non-discriminatory reason. For the sake of clarity, the court will address Plaintiffs' claims separately in this context, starting with Plaintiffs' failure to promote claim.

Failure to Promote

**Similarly Situated Comparators**

Defendants argue that Sneed was not similarly situated to Plaintiffs because he had different experiences and qualifications that distinguished him as the most qualified candidate to be promoted to lieutenant. Defendants further argue that, to the extent Plaintiffs cite the promotion of Hunter to sergeant in 2018, that is not a directly comparable situation because the three individuals eligible for promotion were different individuals with different qualifications, experience, and other factors that may not have been considered during the promotional decision, and because the

sergeant position may require different qualifications from the lieutenant position. Defendants also argue that Plaintiffs have produced no evidence concerning the experience, disciplinary history, or other information relating to Hunter in order to demonstrate that he was similarly situated to Plaintiffs. Defendants argue the same goes for other promotional claims, such as the commander positions.

Plaintiffs respond that "[t]he evidence produced during discovery showed that the Defendants appointed and promoted African Americans, and only minimally promoted Caucasian people. Plaintiff[s] did produce evidence that when African American people were promoted, those promotions were based upon discrimination against Caucasian people."

The court finds it incumbent, at this point in its analysis, to comment on Plaintiffs' substantive response to Defendants' argument on this issue, or the lack thereof. The above quoted sentences in the preceding paragraph represent the entirety of Plaintiffs' substantive response to Defendants arguments on the similarly situated comparators.[2] At summary judgment, Plaintiffs cannot rely on mere legal conclusions unsupported by citation to the record, see *Nuzzi*, 688 F.Supp.2d at 835, but rather must present definite, competent evidence in rebuttal to Defendants' arguments. See *Butts*, 387 F.3d at 924. Blanket arguments that Plaintiffs are similarly situated to the other

_____

[2]Indeed, as will be discussed below, Plaintiffs' substantive response to Defendants' summary judgment arguments constitutes just one typewritten page of their Response, *in its entirety*. Plaintiffs make no response whatsoever to Defendants' arguments concerning legitimate non-discriminatory reasons behind the failure to promote and pretext, Berge's termination (in its entirety), retaliation (in its entirety), and equal protection (in its entirety).

officers who were promoted will not suffice. See *Jones v. National Council of Young Men's Christian Assoc. of the United States of America*, 48 F.Supp.3d 1054, 1104-05 (N.D. Ill. 2014). Rather, "[i]t is well established that a plaintiff must provide specific evidence and specific examples of employees who have been treated more favorably in order to establish this element." *Dority v. City of Chicago*, 2001 WL 1155286, at *14 (N.D. Ill. Sept. 28, 2001).

Plaintiffs have not done that here. Instead, Plaintiffs made general, conclusory arguments, impliedly referring the court to their Additional Facts section as evidentiary support for their argument. Plaintiffs provide no further argument, and no further support for their assertion with citation to evidence in the record. Because this argument is perfunctory and undeveloped, the court will not consider it. See *Marcatante v. City of Chicago*, 657 F.3d 433, 444 (7th Cir. 2011) (a passing reference to a due process claim is undeveloped, and therefore waived); *White Eagle Co-Op Association v. Conner*, 553 F.3d 467, 476 (7th Cir. 2009) ("... it is not the province of the courts to complete litigants' thoughts for them, and we will not address this undeveloped argument."); *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991) ("We repeatedly have made clear that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived (even where those arguments raise constitutional issues).").

To determine whether employees are similarly situated, courts ask "whether the other employees' situations were similar enough to the plaintiff's that it is reasonable to infer, in the absence of some other explanation, that the different treatment was a result of race or some other unlawful basis." *de Lima Silva*, 917 F.3d at 559, quoting *Luster v. Illinois Department of Corrections*, 652 F.3d 726, 730 (7th Cir. 2011). To be "similarly situated," co-workers must be directly comparable to the plaintiff in all material aspects, but they need not be identical in every conceivable way. *Langenbach v. Wal-Mart Stores, Inc.*, 761 F.3d 792, 802 (7th Cir. 2014).

There must be enough common factors to allow for a meaningful comparison in order to divine whether intentional discrimination was at play, which, in the usual case, means a plaintiff must at least show that the comparators (1) dealt with the same supervisor; (2) were subject to the same standards; and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them. *Coleman v. Donahoe*, 667 F.3d 835, 847 (7th Cir. 2012). Still, this is not a "magic formula," and the similarly situated inquiry should not devolve into a mechanical, one-to-one mapping between employees. *Coleman*, 667 F.3d at 847.

Defendants argue that Sneed was not similarly situated to Plaintiffs because he had different experiences and qualifications that distinguished him as the most qualified: five more years of experience than Kreissler and nine more than Berge; being a member of KAMEG for 12 years, including the last six months of his tenure serving as

the deputy director of the task force; and commanding the newly formed tactical unit, which at the time of Chief Kosman's recommendation, was responsible for 30 drug arrests, 8 guns seized, 20 new gang contacts, and 38 warrant arrests. Defendants further argue that Plaintiffs have provided no details on the other comparator, Hunter, or the commander promotions, and in any event the commander promotions would not count as Plaintiffs did not apply and were not considered for promotion to commander or any other higher position. Plaintiffs do not respond in any detail to these arguments.

At summary judgment, for a factual question to be in dispute, a party must point the court to the specific evidence in the record that supports that party's position on each of these questions. See *Waldridge*, 24 F.3d at 923. Plaintiffs, if they have competent evidence establishing such a material factual dispute, must directly cite to the portion of the record containing said evidence; otherwise the court will not consider their argument to be sufficiently supported by the facts at summary judgment. See *Gross*, 619 F.3d at 703 ("Beyond striking Gross's statement of facts, we strike any of the parties' factual assertions, in any section of their briefs, that lack direct citation to easily identifiable support in the record."). Plaintiffs must cite to the factual evidence they believe supports their arguments; it is not the job of the court to search through the record to find facts that support Plaintiffs' claims and arguments. See *Gross*, 619 F.3d at 702, quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("As we have repeated time and again, 'Judges are not like pigs, hunting for truffles buried in [the record].'").

When making a prima facie case, the burden is on *Plaintiffs* to demonstrate similarly situated comparators outside of their class who were treated more favorably. For the above reasons, Plaintiffs have failed to do so. However, even if Plaintiffs could do so, and thus make a prima facie case, they could not show that Defendants' proffered legitimate non-discriminatory reasons for promoting Sneed were pretextual.

**Legitimate Non-Discriminatory Reasons for Promoting Sneed**

Defendants argue that the City had legitimate, non-discriminatory reasons for promoting Sneed over Plaintiffs, including more years' experience in the KPD. Sneed had 12 years of service on KAMEG, including as deputy director. In recommending Sneed, Kosman believed Sneed was more proactive than Kreissler, and had reviewed the personnel files of all three candidates, observed their interactions with other personnel, and spoken with each when determining who he would recommend for promotion. Finally, the Commission, in approving Kosman's recommendation, wanted to look at the candidate as a whole instead of just the promotional test scores, and considered Sneed's time in uniform, leadership, and Kosman's recommendation. As testified to by Yates, the Commission did not consider the candidates' race at all. Plaintiffs failed to respond to Defendants' argument on this point.

The court finds that Defendants have proffered legitimate, non-discriminatory reasons for promoting Sneed over Plaintiffs. The burden now shifts back to Plaintiffs to show pretext, or at least to produce evidence establishing a genuine factual dispute about pretext to defeat summary judgment. See *Formella*, 817 F.3d at 511. Pretext involves more than just faulty reasoning or mistaken judgment on the part of the

34

employer; it is a lie, specifically a phony reason for some action. *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 564 (7th Cir. 2016). When assessing a plaintiff's claim that an employer's explanation is pretextual, the court cannot second-guess the employer's facially legitimate business decisions. *Lord*, 839 F.3d at 564.

Again, Plaintiffs have failed to respond to Defendants' legitimate non-discriminatory reasons for promoting Sneed, and failed to argue with specific citation to evidence in the record that Defendants' proffered reasons are pretext. Plaintiffs offer no argument at all about pretext. "When a party raises arguments for summary judgment on various claims, the nonmoving party must respond to the movant's arguments as to each claim." *Inojosa v. Board of Trustees of City Colleges of Chicago, Community College District 508,* 2022 WL 4604578, at *4 (N.D. Ill. Sept. 30, 2022), citing *Nichols v. Michigan City Plant Planning Department*, 755 F.3d 594, 600 (7th Cir. 2014). "'Failure to set forth any evidence or to develop any arguments in opposition to the moving party's summary judgment motion results in waiver of the nonmoving party's arguments and an abandonment of his claims.'" *Inojosa*, 2022 WL 4604578, at *4, quoting *De v. City of Chicago*, 912 F. Supp. 2d 709, 734 (N.D. Ill. 2012); see also *Betco Corp., Ltd. v. Peacock*, 876 F.3d 306, 309 (7th Cir. 2017) (a non-movant's failure to respond to arguments addressed in a summary judgment motion results in a waiver).

The court finds that Plaintiffs have failed to demonstrate the existence of a genuine issue of material fact with respect to their failure to promote claim under the burden-shifting method.

Berge Termination

Next, Defendants argue that Plaintiffs have not provided any evidence that another similarly situated employee engaged in the type of misconduct Berge engaged in, or had the disciplinary history in his personnel file that Berge did, and was treated better, i.e., was not terminated. Plaintiffs did not respond to this argument. The only mention of Berge, at all, in the argument section of Plaintiffs' Response is *one sentence* stating "The Plaintiffs' complaint, as well as many of the questions posed to the Defendants at their depositions, concerned topics which were indeed related to the Plaintiffs' claimed injuries of both failing to be promoted and Berge being terminated."

This one, vague, conclusory sentence is insufficient carry Plaintiffs' burden of identifying similarly situated comparators who were treated more favorably than Berge. Indeed, it is so lacking in substance that it begs the question whether Plaintiffs' have abandoned their claim that Berge's termination was discriminatory under Title VII.

Plaintiffs must present a comparator with enough common factors to allow for a meaningful comparison in order to divine whether intentional discrimination was at play. See *Coleman*, 667 F.3d at 847. Blanket arguments that Berge is similarly situated to every other officer in the KPD who may have committed similar infractions will not suffice. See *Jones,* 48 F.Supp.3d at 1104-05. Plaintiffs have not even done that. They have presented no evidence at all, and therefore have not made a prima facie case for discrimination in Berge's termination.

### Legitimate Non-Discriminatory Reason

Even if they could present a comparator, Plaintiffs have provided no argument that Defendants' legitimate, non-discriminatory basis for Berge's termination was pretext. The incidents from July 2020 represented rank insubordination on the part of Berge, in which he ignored multiple direct orders from superior officers. The Commission also weighed Berge's prior serious incidents of past misconduct, such as the 2007 incident in which he drank to excess with a superior officer and became involved in a physical altercation, earning Berge a two-day suspension; the 2014 30-day suspension for using steroids without a prescription; and the 2012 incident wherein Berge wrecked his personal vehicle by crashing it into a building while under influence of alcohol and unprescribed steroids, and then subsequently filed a false police report claiming it was the result of a hit and run accident.

Plaintiffs did not respond to this argument, and thus have presented no argument or evidence that Kosman's recommendation and the Commission's decision to terminate Berge's employment was a pretext for racial discrimination. Federal courts do not sit as a super-personnel department with authority to review an employer's business decision as to whether someone should be fired or disciplined because of a work-rule violation. *Ballance v. City of Springfield*, 424 F.3d 614, 621 (7th Cir. 2005). An employer's reasons for firing an employee can be foolish or trivial or even baseless, but as long as they are honestly believed, they are not pretextual. *Lord*, 839 F.3d at 564.

Based on the record as a whole, including Berge's lengthy disciplinary record and the incidents of July 2020, the court finds no reason to believe that the City's reasons for terminating him are false.

The court finds that Plaintiffs have failed to demonstrate the existence of a genuine issue of material fact with respect to Berge's termination claim under the burden-shifting method.

<u>Looking at the Evidence as a Whole</u>

Plaintiffs have not demonstrated a genuine issue of material fact as to Title VII discrimination with regard to the failure to promote and the Berge termination claim under the burden-shifting method. Having utilized the burden-shifting method as an analytical tool, the court must still consider all admissible evidence to decide whether a reasonable jury could find that Plaintiffs suffered an adverse action because of their race. See *Tyburski*, 964 F.3d at 598. In other words, the court must assess the evidence "as a whole, rather than asking whether any particular piece of evidence proves the case by itself," regardless of whether the court also analyzes the evidence pursuant to the burden-shifting method of *McDonnell Douglas*. See *Tyburski*, 964 F.3d at 598.

Pulling the lens back, as the Seventh Circuit has instructed in *Ortiz*, when looking at the evidence as a whole to determine whether it would permit a reasonable factfinder to conclude that Plaintiffs' race caused the failure to promote, the court finds that it does not. See *Outley v. City of Chicago*, 354 F.Supp.3d 847, 868 (N.D. Ill. 2019). There is simply no evidence in the record that the actual decisionmakers in this case

38

with respect to Sneed's promotion and Berge's termination had a discriminatory motive in making their decisions. Chief Kosman, who made the recommendations to promote Sneed and fire Berge, testified that Berge's race played no role in his decisions, and that the reasons for promoting Sneed had to do with Sneed's experience and qualifications. Similarly, the reason for terminating Berge had to with his well-documented discipline and insubordination problems. Commissioner Yates testified that the Commission's decisions to affirm or adopt Kosman's recommendations were not motivated by race, but rather by the reasons cited by Kosman in making his recommendations.

Plaintiffs have provided no evidence (or argument) otherwise. Pointing to Wells' campaign statements is unavailing. There is no evidence in the record that Wells was involved in any way with police personnel decisions except in her appointment of the Chief of Police. There is certainly no evidence that Wells was involved in any way with Sneed's promotion or Berge's termination. Likewise for Willie Hunt, who as Deputy Chief of Police did not decide terminations or promotions. Indeed, Kosman, conscious that Hunt was friends with Sneed, went out of his way to avoid having Hunt involved in the promotion process. There is similarly no evidence that Hunt was involved, at all, in Berge's termination or the events leading up to it.

Looking at all the evidence as a whole, no reasonable jury could find that Plaintiffs were discriminated against because of their race when they lost out on the promotion to Sneed and when Berge was terminated.

39

Therefore, summary judgment is GRANTED in favor of Defendants on Plaintiffs'
Title VII discrimination claim in Count I of the Complaint.

III.     *Retaliation Under Title VII (Count II)*

Defendants argue that Plaintiffs cannot establish that they were retaliated against
for engaging in protected activities. They argue any protected activity Kreissler engaged
in took place after the adverse action against him, and there is no causal link between
Berge's protected activities and the adverse actions against him.

Plaintiffs did not respond to Defendants' arguments.

"Title VII prohibits an employer from retaliating against an employee for
opposing or participating in an investigation of an unlawful employment practice."
*Lewis v. Wilkie*, 909 F.3d 858, 866 (7th Cir. 2018), citing 42 U.S.C. § 2000e-3(a). "To prevail
on a Title VII retaliation claim, the plaintiff must prove that (1) he engaged in an activity
protected by the statute; (2) he suffered an adverse employment action; and (3) there is
a causal link between the protected activity and the adverse action." *Lewis*, 909 F.3d at
866. The district court must consider the evidence as a whole and conduct a
straightforward inquiry: does the record contain sufficient evidence to permit a
reasonable fact finder to conclude that retaliatory motive caused the materially adverse
action? *Abrego v. Wilkie*, 907 F.3d 1004, 1014 (7th Cir. 2018).

<u>Kreissler</u>

Defendants argue that the only activity Kreissler claims to have engaged in that
is protected by Title VII is that he filed a Charge of Discrimination with the EEOC on
February 3, 2020. Per the Complaint, the only adverse action taken against Kreissler was

the failure to promote in August 2019, which predates the protected activity. Kreissler was actually promoted to lieutenant in 2021, after the protected activity. Instances of alleged retaliation can only be retaliatory if they occurred after Kreissler engaged in the protected activity of complaining about discrimination based upon race. See *Hayman v. Potter*, 598 F.Supp.2d 904, 910 (N.D. Ind. 2009), citing *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 664 (7th Cir. 2008). Thus, summary judgment is granted in favor of Defendants on Kreissler's Title VII retaliation claim.

Berge

In Plaintiffs' Complaint, they point to three instances of Berge engaging in protected activity: (1) his claim of discrimination filed with the EEOC on February 3, 2020; (2) his oral report of a claim of sexual harassment in the workplace on July 30, 2020, during an interrogation over the July 15 and 18, 2020, insubordination incidents; and (3) a worker's compensation claim he filed in July 2018.

In order to satisfy the first prong, Plaintiff must demonstrate that Berge engaged in activity protected by Title VII, such as reporting an action by his employer that violated Title VII. However, § 2000e-3(a) "does not protect employees for opposing *all* adverse actions by their employers but rather only for opposing *certain* practices that have been 'made an unlawful employment practice' by federal law." *Gomez v. Federal Express, Inc.*, 72 F.Supp.3d 902, 908 (N.D. Ill. 2014) (emphasis in original). "These practices encompass discrimination on the basis of race, color, religion, sex, and national origin." *Gomez*, 72 F.Supp.3d at 908, citing § 2000e–2.

41

To establish a retaliation claim, employees must show that they actually communicated to their employer a belief that the employer has engaged in status-based discrimination, *i.e.* they must actually take a stand against the employer's discriminatory practices. *Gomez*, 72 F.Supp.3d at 908, citing *Crawford v. Metro. Government of Nashville & Davidson County, Tenn.*, 555 U.S. 271, 276-77 (2009).

First, concerning the worker's compensation claim, the filing of such a claim does not constitute protected activity under Title VII. Title VII retaliation only protects employees who communicated to their employer a belief that the employer has engaged in *status-based discrimination*. See *Gomez*, 72 F.Supp.3d at 908. It does not protect employees from retaliation who have filed worker's compensation claims. *Fonseca v. Spraying Systems Co.*, 466 F.Supp.3d 834, 850 (N.D. Ill. 2020).

Berge's February 3, 2020, EEOC Charge similarly cannot support a Title VII retaliation claim. For Plaintiffs to meet their burden on the causal link element of the retaliation claim, they must offer evidence that Berge's EEOC Charge "was 'a but-for cause of the alleged adverse action by the employer[,]'" which means that "the adverse action would not have happened without the activity." *Lesiv v. Illinois Central Railroad Co.*, 39 F.4th 903, 918 (7th Cir. 2022), quoting *Carlson v. CSX Transportation, Inc.*, 758 F.3d 819, 828 n.1 (7th Cir. 2014).

Thus, Berge must offer evidence of a retaliatory motive on the part of Kosman, who recommended his termination, and/or the Commission, who finally approved the termination. See *Lesiv*, 39 F.4th at 918.  Knowledge of the protected activity is necessary

to show causation for a retaliation claim, and thus Plaintiffs must show that Kosman and/or the Commission had knowledge of his EEOC Charge before taking the adverse actions against him. See *Lesiv*, 39 F.4th at 915.

Plaintiffs cannot make that showing. Berge filed a charge of discrimination with the EEOC on February 3, 2020. Kosman was not aware of Berge's EEOC Charge concerning discrimination at the time he testified at Berge's termination hearing on September 30, 2020, but was aware of it at the time his deposition was taken in this case. Berge had no knowledge of anyone at the City knowing of his EEOC filing.

Berge did not have any communications with Kosman, Wells, Hunt, Yates, or anyone at City Hall concerning his EEOC Charge, and did not advise anyone in administration of the charges.

Plaintiffs have not responded to Defendants' arguments on this point, and thus have impliedly and effectively abandoned their retaliation claim against Defendants and forfeited any substantive argument they might have had against summary judgment on this point. See *Diggs v. Lowe's Home Centers, LLC*, 2022 WL 3543496, at *2 (N.D. Ill. Aug. 18, 2022), citing *Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011); *Bolden v. Amtrak*, 2021 WL 6104827, at *1 (C.D. Ill. May 24, 2021). Because Plaintiffs cannot show that Kosman or the Commission had any knowledge of his EEOC Charge, that cannot serve as the basis for a retaliation claim.

Finally, there is evidence that Berge orally informed Kosman of the sexual harassment claim during Kosman's July 30, 2020, interrogation of Berge related to the July 15 and 18 insubordination incidents. However, it is undisputed that Kosman had already notified Berge six days prior, on July 24, 2020, that he was going to be subject to an investigation over the insubordination incidents that could lead to his termination. Thus, Berge's informing Kosman six days later of the sexual harassment claim was not the cause of Kosman investigating Berge and recommending his termination. Further, Plaintiffs have produced no evidence of when the Commission was informed of Berge's sexual harassment complaint, or even if the Commission was aware at all.

Aside from evidence that Berge informed Kosman of the harassment on July 30, 2020, Plaintiffs have produced no other evidence that Kosman or the Commission were influenced by a retaliatory motive when they took the adverse employment actions. Kosman recommended Berge's termination on August 13, 2020. The Commission voted to terminate Berge on December 1, 2020, four months after he would have informed Kosman. The Seventh Circuit has held that suspicious timing is rarely enough to create a triable issue, and thus for an "inference of causation to be drawn solely on the basis of a suspicious-timing argument, [the Seventh Circuit] typically allow[s] no more than a few days to elapse between the protected activity and the adverse action." *Igasaki v. Illinois Department of Professional and Financial Regulation*, 988 F.3d 948, 959 (7th Cir.

2021). Therefore, the two-week gap between Berge's protected activity and Kosman's

recommendation, and the four month gap between Berge's protected activity and his

termination, cannot show retaliation on their own. See *Igasaki*, 988 F.3d at 959.

Again, Plaintiffs did not bother to respond to Defendants' arguments on this

point, and therefore have impliedly and effectively abandoned their retaliation claim

against Defendants and forfeited any substantive argument they might have had

against summary judgment on this issue. See *Diggs, LLC*, 2022 WL 3543496, at *2; *Bolden*,

2021 WL 6104827, at *1.

When stepping back and examining the evidence of record in this case as a

whole, the court finds that the record does not contain sufficient evidence to permit a

reasonable fact finder to conclude that retaliatory motive caused Berge's termination.

See *Abrego*, 907 F.3d at 1014. Summary judgment is GRANTED in favor of Defendants

on Plaintiffs' Title VII retaliation claims in Count II of the Complaint.

IV.    *Equal Protection Claims (Count IV)*

Defendants argue that Plaintiffs cannot demonstrate that their rights under the

Equal Protection Clause were violated because they cannot show that any of the

individual Defendants discriminated against them concerning the failure to promote or

Berge's termination. Once again, Plaintiffs did not respond to this argument in their

Response, and therefore have effectively abandoned their equal protection claim against

Defendants and forfeited any substantive argument they might have had against

summary judgment on this point. See *Diggs, LLC*, 2022 WL 3543496, at *2; *Bolden*, 2021

WL 6104827, at *1.

In an equal protection claim against a state actor brought pursuant to § 1983, a plaintiff may file suit against an individual, so long as that individual caused or participated in the alleged deprivation of the plaintiff's constitutional rights. *Levin v. Madigan*, 692 F.3d 607, 621 (7th Cir. 2012). Liability on a § 1983 equal protection claim is decided one person at a time, and a defendant is liable only if they were personally involved in the constitutional violation. *Taylor v. Ways*, 999 F.3d 478, 493 (7th Cir. 2021). In terms of supervisor liability, "[p]ersonal involvement in a subordinate's constitutional violation requires supervisors to 'know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see.'" *Taylor*, 999 F.3d at 494, quoting *Matthews v. City of East St. Louis*, 675 F.3d 703, 708 (7th Cir. 2012). "Put another way, personal involvement in the equal protection context requires specific intent to discriminate." *Taylor*, 999 F.3d at 494.

<u>Nickey Yates</u>

Yates testified that race did not play a factor in his voting with the rest of the Commission to confirm Sneed's promotion or affirm Berge's termination. Yates testified that the Commission approved Kosman's promotion recommendation because of the entirety of the record and Sneed's leadership capacity and experience. Further, the Commission terminated Berge due to his insubordination and past misconduct. Yates had testified that he did believe Black people had been treated unfairly in Kankakee,

and that he had made complaints against white KPD officers in the past, but there is no evidence that Plaintiffs' race played any factor in Yates' votes on the Commission. There is no evidence Yates violated Plaintiffs' equal protection rights.

Willie Hunt

There is no evidence in the record that Hunt played any role in Sneed's promotion or Berge's termination. In fact, Kreissler himself testified that Kosman told him the decision to promote Sneed was Kosman's decision. Both Plaintiffs admit that had no knowledge of Hunt being involved in the Sneed promotion. There is no evidence Hunt violated Plaintiffs' equal protection rights.

Chastity Wells

Just as with Hunt, there is no evidence in this case that Wells was involved in Sneed's promotion or Berge's termination. The decisions to recommend Sneed for promotion and terminate Berge were made by Kosman and approved by the Commission. Wells played no role in either, and Plaintiffs testified that they had no knowledge of Wells being involved. There is no evidence Wells violated Plaintiffs' equal protection rights.

Frank Kosman

As extensively detailed above, Chief Kosman recommended Sneed for promotion based on his experience, qualifications, and other race-neutral reasons. There is no evidence of any specific intent to discriminate against Plaintiffs on the part of Kosman. Furthermore, as detailed above, Kosman had a more than sufficient basis to

47

investigate Berge and recommend his termination based on the insubordination of July 2020. Plaintiffs have produced no evidence that Kosman had any specific intent to discriminate against Berge in this regard. There is no evidence Kosman violated Plaintiffs' equal protection rights.

For those reasons, summary judgment is GRANTED on Plaintiffs' equal protection claims in Count IV of the Complaint.

*V.      Monell Claims (Count III)*

To establish municipal liability and prevail on their *Monell* claims, it is not enough for Plaintiffs to allege that the City's policy injured them. Rather, they must establish: (1) that they suffered a constitutional injury, and (2) that the City authorized or maintained a custom of approving the unconstitutional conduct. *Petty v. City of Chicago*, 754 F.3d 416, 424 (7th Cir. 2014). But if no constitutional violation occurred in the first place, a *Monell* claim cannot be supported. *Petty*, 754 F.3d at 424.

The court has found the City did not violate Plaintiffs' rights under Title VII and that the individual Defendants did not violate Plaintiffs' rights under the Equal Protection Clause pursuant to § 1983. No constitutional violations have occurred in this case. Thus, Plaintiffs' *Monell* claims fail because they did not suffer a constitutional injury and so have no basis to support a *Monell* claim. See *Petty*, 754 F.3d at 424-25, quoting *Houskins v. Sheahan*, 549 F.3d 480, 493 (7th Cir. 2008) ("In the past, we have said that '[i]t is well established that there can be no municipal liability based on an official policy under Monell if the policy did not result in a violation of [a plaintiff's] constitutional rights.'"). Summary judgment is GRANTED in favor of Defendants' on

48

Count III.

*Conclusion*

For the foregoing reasons, Defendants' Motion for Summary Judgment (#17) is

GRANTED in full.

IT IS THEREFORE ORDERED:

(1)     Defendants' Motion for Summary Judgment (#17) is GRANTED.

        Judgment is entered in favor of Defendants and against Plaintiffs.

(2)     This case is terminated.

        ENTERED this 5th day of December, 2022.

                    s/Colin S.  Bruce
        _____
                    COLIN S. BRUCE
                    U.S. DISTRICT JUDGE